LENNON, MURPHY & LENNON, LLC
Kevin J. Lennon
Attorneys for Defendant
420 Lexington Avenue, Suite 300
New York, NY 10170
(212) 490-6050 - phone
(212) 490-6070 - facsimile

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X
SIXTEEN THIRTEEN MARINE S.A.,          :          08 CV 1318 (HB)

                    Plaintiff,          :          **VERIFIED  ANSWER**

    - against -                         :

CONGENTRA A.G.,                         :

                    Defendant.          :
-----------------------------------------------------X

Defendant, CONGENTRA A.G. ("Congentra" or "Defendant"), by its attorneys,

LENNON, MURPHY & LENNON, LLC, answering the Amended Verified Complaint

propounded by Plaintiff, SIXTEEN THIRTEEN MARINE S.A. ("STM" or "Plaintiff") dated

February 20, 2008, respectfully shows to the Court and alleges upon information and belief as

follows:

    1.    Denies that this is an admiralty and maritime claim within the meaning of Rule

9(h) of the Federal Rules of Civil Procedure or within the admiralty and maritime jurisdiction of

the United States and of this Honorable Court, pursuant to 28 U.S.C. § 1333, or federal question

jurisdiction, pursuant to 28 U.S.C. § 1331.

    2.    Admits that STM is a foreign corporation organized under the laws of a foreign

country but denies that STM has an office, place of business or any other *bona fide* connection to

Monrovia, Liberia beyond a mere legal corporate existence.

3.    Admitted.

4.    Admits that Congentra entered into a contract of charter party with STM for the carriage of soyabean meal ("cargo') from Argentina to Russia but, except as specifically admitted, denies the remainder of the allegations contained in paragraph 4 of the Amended Verified Complaint and refers to the contract of charter party a copy of which is attached hereto as Exhibit 1.

5.    Admits that during discharge of the cargo at St. Petersburg, Russia, which by virtue of the duties it undertook in the contract of charter party, the Plaintiff had obligated itself to safely carry, the cargo was determined to be damaged, although such damage was not solely to cargo beneath the surface layer, in both cargo hold nos. 2 and 4 but, except as specifically admitted, denies the remainder of the allegations contained in paragraph 5 of the Amended Verified Complaint.

6.    Admits that the Russian authorities declared cargo carried by the Plaintiff aboard the Vessel as unfit, thereby condemning the same, but, except as specifically admitted, denies the remainder of the allegations contained in paragraph 6 of the Amended Verified Complaint.

7.    Admits that after discovery of the damaged cargo, and hence determination of Plaintiff's breach of the contract of charter party to safely carry the cargo, that non-party cargo receivers, Euroweg, requested security for the cargo damage claim from the Plaintiff and/or its insurers. Defendant denies that non-party agent Anteks had any interest or role in the security request, and further denies the allegation contained in paragraph 7 of the Amended Verified Complaint that the Defendant and non-party Euroweg were acting "in concert" to the extent the same impliedly suggest illegal acts, a breach of contract by Defendant and/or negligent conduct by the Defendant.

8.    Admitted that the American P&I Club posted a club letter of undertaking in the sum stated as security for the cargo claim.

9.    Denied.

10.    Denied. Cargo was discharged from the vessel on an ongoing basis following her arrival at St. Petersburg save for instances where weather, unavailability of labor and/or unavailability of railway wagons into which the discharged cargo could be loaded. Notwithstanding the foregoing, Congentra reserves the right to claim against STM for vessel off-hire at the discharge port.

11.    Admitted that non-party Bureau Veritas, the vessel's classification society[1], removed the vessel's class certificate and also the vessel's cargo ship safety construction certificate. Upon information and belief removal of the certificates occurred on or about December 28, 2007. Except as specifically admitted herein, Congentra denies the remainder of the allegations contained in paragraph 11 of the Amended Verified Complaint. Attached as Exhibit 2 is a copy of the Russian Port State Control report dated December 29, 2007.

12.    Denied that Congentra requested, interacted or otherwise "persuaded" the Russian Port State Control to board, inspect and detain the Plaintiff's poorly maintained, unsafe, and unseaworthy Vessel. Denied that the Russian Port State Control released the vessel without any "serious deficiencies" being found warranting the vessel's detention from December 29, 2007 until January 11, 2008. See Exhibit 2 attached hereto. Denied that Congentra ever involved

---

[1] In the shipping, classification societies are non-governmental organizations or groups of professionals, ship surveyors and representatives of offices that promote the safety and protection of the environment of ships and offshore structures. Classification societies set technical rules, confirm that designs and calculations meet these rules, survey ships and structures during the process of construction and commissioning, and periodically survey vessel to ensure that they continue to meet the rules. Classification societies are also responsible for classing oil platforms, other offshore structures, and submarines. Included in the survey process is the survey and certification of diesel engines, large or critical pumps such as fire or main bilge pumps, and other machinery vital to the function of the ship. This is frequently done at the manufacturer's plant, which may be hundreds of miles from the shipyard or drydock. See http://en.wikipedia.org/wiki/Classification_society.

Russian Port State Control. Further, and wholly contrary to Plaintiff's misrepresentations and misleading allegations, Russian Port State Control, as a signatory to the Paris Memorandum of Understanding, had a duty to board, inspect and detain the vessel. Attached as Exhibit 3 is a copy of the relevant sections (1 through 3) of the Paris Memorandum of Understanding.

13.    Admitted that the Vessel missed her laycan for her next fixture[2] but denies that the next fixture cancellation date was originally December 23, 2007, or that the cancelling date was extended to December 31, 2007.

14.    Denies information or belief sufficient to admit or deny that non-party Britannia Bulk cancelled the STM – Britannia Bulk fixture due to a declining market.

15.    Denies as false that any authority, including Russian Port State Control, determined that Plaintiff's poorly maintained, unsafe, and unseaworthy Vessel had "no problems" on or about January 2, 2008 or at any other material time. Denied that Bureua Veritas returned the vessel's certificate of class or her cargo ship safety construction certificate prior to January 2, 2008, since such certificates were not returned, at the earliest, to the vessel until January 6, 2008, and also because the vessel's no. 6 cargo hold hydraulic hatch covers were not repaired at least until January 8, 2008.

16.    Denies information or belief sufficient to admit or deny the objective for which STM unlawfully, and in material misrepresentation, *inter alia*, regarding the vessel's prior cargo claim(s) and detention history, entered into a fixture with Britannia Bulk. Admits that the vessel,

---

[2] Although not explained in the Amended Verified Complaint, Plaintiff "fixed" the Vessel for her next employment with non-party Britannia Bulkers on December 20, 2007. Attached hereto as Exhibit 3 is a copy of the STM – Britannia Bulk charter party. Contrary to Plaintiff's allegation, the charter party laycan (i.e., the range of days between which a vessel Owner may lawfully tender a Vessel's Notice of Readiness to commence performance under a charter party, was December 24, 2007 – December 31, 2007. *See* Item 4 (page 9 of 12) – Exhibit 4. Further, and quite contrary to the fantastical version of events presented in Plaintiff's Amended Verified Complaint, cargo discharging ongoing at the time Plaintiff fixed its Vessel with Britannia Bulk was, according to Plaintiff, not even expected to finish until December 27, 2007. *See* Item 15 (page 7 of 12), Exhibit 4. Thus, Plaintiff has materially misrepresented to this Court its *own knowledge* of the Vessel's readiness to be tendered to charterers Britannia Bulk.

as a 27 year old bulk carrier, was in need of significant structural repairs and renewals and was required to enter drydock for an intermediate class survey but, except as specifically admitted, denies the remainder of the allegations of paragraph 16 of the Amended Verified Complaint including the implied ability of STM to obtain repair costs at favorable rate at any repair facility in any part of the world.

17.    Denied that STM could have lawfully performed the charter with Britannia Bulk and further denies that STM would have earned $1,800,000 under its fixture especially as this figure fails to reasonably approximate the net earnings, if any[3], that STM may have earned had Britannia Bulk not cancelled the charter due to STM's failure to timely deliver the vessel.

18.    Denied.

19.    Denied. STM lost its employment with Britannia Bulk due to it entering into a charter party with an unduly restrictive laycan date range, especially given STM's knowledge of the status of cargo discharging, the outstanding class repair recommendation, and the overall poor state of repairs of its Vessel, which made its detention extremely likely, which it could not meet due to the withdrawal of class certificates by Bureau Veritas and detention by Russian Port State Control neither of which was caused directly, or indirectly, by Congentra.

20.    Denies information of knowledge sufficient to form a belief as to the truth, or likely lack thereof, of the allegations set forth in paragraph 20 of the Amended Verified Complaint.

---

[3] Even under the STM - Congentra charter party the vessel was put off hire for nearly one week at the loadport because cargo loading was delayed due to a burned out windlass motor. The Vessel was beset with numerous deficiencies warranting Russian Port State Control to detain the vessel after Bureau Veritas had withdrawn vessel certificates. Such deficiencies required immediate repairs to numerous aspects of the vessel and even during these repairs the Master in an email to Owner's commercial managers informed that the Vessel had experienced burst water pipes in several locations on the Vessel. Further, as reflected by the Vessel's two 2007 detentions and other port state control inspections (see Vessel's 2007 port state control information attached as Exhibit 5), this was a Vessel that was undoubtedly in a poor state of repairs and maintenance and thus it cannot reasonably be assumed that she could have even performed under the fixture with Britannia Bulk.

21.    Admits that the vessel is over 20 years of age[4] but, except as so specifically admitted, denies the remainder of the allegations set forth in paragraph 21 of the Amended Verified Complaint.

22.    Denies information of knowledge sufficient to form a belief as to the truth, or likely lack thereof, of the allegations set forth in paragraph 22 of the Amended Verified Complaint.

23.    Denies information of knowledge sufficient to form a belief as to the truth of the allegations set forth in paragraph 23 of the Amended Verified Complaint.

24.    Denied.

25.    Denies that it is required to affirmatively plead any response to the allegations set forth in paragraph 25 of the Amended Verified Complaint as the same constitutes an improper and unlawful effort to seek by way of a responsive pleading information regarding Congentra's commercial activities and financial affairs.

26.    Denies that it is required to affirmatively plead any response to the allegations set forth in paragraph 26 of the Amended Verified Complaint as the same constitutes an improper and unlawful effort to seek by way of a responsive pleading information regarding Congentra's commercial activities and financial affairs.  Plaintiff has no right to obtain discovery, nor any information, regarding Congentra's financial affairs.

27.    Denies that it is required to affirmatively plead any response to the allegations set forth in paragraph 27 of the Amended Verified Complaint as the same constitutes an improper and unlawful effort to seek by way of a responsive pleading information regarding Congentra's commercial activities and financial affairs.  Plaintiff has no right to obtain discovery, nor any information, regarding Congentra's commercial activities and financial affairs.

---

[4] According to information available at www.equasis.org the Vessel was built in 1980.

28.    Admits that the STM – Congentra charter calls for resolution of all disputes arising from the charter at London arbitration with English law to apply.  Denies that Congentra has not appointed an arbitrator and denies that it has obtained any security from the American P & I Club since such security was provided to non-party Euroweg.

29.    Denied that STM possesses any valid maritime claims for which security may lawfully be obtained in this proceeding but rather has commenced this proceeding with sole intention to unlawfully subject Congentra to vexatious litigation designed to obtain leverage, rather than bona fide security for claims, within the London arbitration.

30.    Admitted that fees and costs are regularly awarded to a prevailing party at London arbitration conducted pursuant to English law but, except as specifically admitted, denies the remainder of the allegations set forth in paragraph 30 of the Amended Verified Complaint.

31.    Denied.

32.    Denied.

33.    Admits that Defendant cannot be "found" within the District as per Supplemental Rule B.  Except as specifically admitted it denies that it is required to affirmatively plead any response to the allegations set forth in paragraph 33 of the Amended Verified Complaint as the same constitutes an improper and unlawful effort to seek by way of a responsive pleading information regarding Congentra's financial affairs.  Plaintiff has no right to obtain discovery, nor any information, regarding Congentra's financial affairs.  Without waiving the aforesaid denial and/or objection, denies the balance of the allegations set forth in paragraph 33 of the Amended Verified Complaint.

Plaintiff's allegation that funds in the name of entities (Uniapro, OOO Euroweg Zerno, OOO Anteks and/or QDV Complex Ltd.) that have not been named as Defendants, nor has any

proof been submitted to the Court confirming that these entities cannot be "found" in the District, may be attached is contrary to Rule B case law in this district. See DS Bulk Pte Ltd. v. Calder Seacarrier Corp., 2006 U.S. Dist. LEXIS 39242, *4-5 (S.D.N.Y. 2006). *Cf.* Essar Int'l Ltd. v. Martrade Gulf Logistics, FZCO, 2006 U.S. Dist. LEXIS 61713, *5 (S.D.N.Y. 2007).

34.    Denied.

## FIRST AFFIRMATIVE DEFENSE

35.    Plaintiff's Complaint fails to state a maritime cause of action for which relief can be granted pursuant to Supplemental Rule B and thus the Complaint should be dismissed.

## SECOND AFFIRMATIVE DEFENSE

36.    This Court lacks personal jurisdiction over Congentra.

## THIRD AFFIRMATIVE DEFENSE

37.    This action should be dismissed on the grounds of improper venue.

## FOURTH AFFIRMATIVE DEFENSE

38.    This action should be dismissed on the grounds of *forum non conveniens*.

## FIFTH AFFIRMATIVE DEFENSE

39.    Improper and insufficient service of process on this answering Defendant.

## SIXTH AFFIRMATIVE DEFENSE

40.    Failure to properly comply with Local Admiralty Rule B.2 as pertains to notice that should have been promptly provided to Congentra once its property had been attached pursuant to STM's service of the Process of Maritime Attachment and Garnishment.

## SEVENTH AFFIRMATIVE DEFENSE

41.    Plaintiff has failed to properly mitigate its damages.

## EIGHTH AFFIRMATIVE DEFENSE

42.    The action must be stayed pending the outcome of London arbitration as per the Law and Arbitration Clause within the parties' contract.

**WHEREFORE**, the Defendant, CONGENTRA A.G., prays that this Honorable Court enter judgment in favor of the answering Defendant against the Plaintiff, dismissing Plaintiff's Complaint and vacating the Order authorizing issuance of Process of Maritime Attachment and Garnishment, including reasonable counsel fees, or, alternatively, reducing the Ex Parte Order, and that Defendant be granted such other and further relief as this Court may deem to be just and proper.

Dated: March 4, 2008
       New York, NY

                          LENNON, MURPHY & LENNON, LLC
                          Attorneys for Defendant
                          CONGENTRA A.G.

              By:         _____
                          KEVIN J. LENNON

                          420 Lexington Avenue, Suite 300
                          New York, NY 10170
                          (212) 490-6050 - phone
                          (212) 490-6070 - facsimile
                          kjl@lenmur.com

TO:    FREEHILL, HOGAN & MAHAR, LLP
       Attorneys for Plaintiff
       80 Pine Street
       New York, NY 10005
       Attn: Michael E. Unger, Esq.
       (212) 425-1900 - phone
       (212) 425-1901 - facsimile

## AFFIRMATION OF SERVICE

I hereby certify that on March 4, 2008, a copy of the foregoing VERIFIED ANSWER was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing. Parties may access this filing through the Court's CM/ECF system.

Kevin J. Lennon

# EXHIBIT 1

**Freight**

| | |
|---|---|
| От: | Operations Congentra [operations@congentra.com] |
| Отправлено: | 10 октября 2007 г. 15:11 |
| Кому: | Billmar Chartering Ltd |
| Тема: | RE: LgINT Message (REF:077332700) |

OK Confirm

-----Original Message-----
From: Billmar Chartering Ltd [mailto:chartering@billmar.gr]
Sent: Wednesday, October 10, 2007 3:15 PM
To: Operations Congentra
Subject: LgINT Message (REF:077332700)
Importance: High

TELIX MSG: 73327-00 10/10/07 14:14

BILLMAR CHARTERING LTD
TEL:+30210 4282290
FAX:+30210 4282294
E-MAIL: chartering@billmar.gr

PAVEL/ZACHOS

RE : MV NICHOLAS M - CONGENTRA

Further to our phone conversation herebelow recap of fixture as per our correspondence notes

Pls go through and confirm same and pls lift subs in time

==== recap   ====

--- vsl's full t/c description ---

01) NAME: M.V "NICHOLAS M."

02) EX NAMES INCLUDING DATE LAST NAME CHANGE: "MED UNITY" (2003)
"LAURA G" (1998) - "FORUM PRODUCT" (1997) - "RAFAELA" (1991).

03) TYPE OF VESSEL: BULK CARRIER

04) ENGINE AND BRIDGE SITUATED: AFT

05) DWAT AND DRAFT SUMMER/WINTER/FRESH/TROPICAL/TROPICAL FRESH:
SUMMER DEADWEIGHT    39,498 METRIC TONS ON 11.169 METRES
WINTER DEADWEIGHT    38,402 METRIC TONS ON 10.937 METRES
TROPICAL DEADWEIGHT  40,608 METRIC TONS ON 11.401 METRES

06) DWAT ON 17/18/19/20/32/32.5/33/33.5 FEET FRESH WATER

| FEET | METRES | FRESHWATER DEADWEIGHT |
|---|---|---|
| 17.0 | 5.18 | 11,462 |
| 18.0 | 5.48 | 12,766 |
| 19.0 | 5.79 | 14,115 |
| 20.0 | 6.10 | 15,468 |
| 32.0 | 9.75 | 31,731 |
| 32.5 | 9.90 | 32,427 |
| 33.0 | 10.06 | 33,151 |
| 33.5 | 10.21 | 33,840 |

1

07) TPC 49 AT SUMMER DRAFT

08) LOA/LBP/EXTREME BEAM/DEPTH MOULDED: 200.90/191.00/27.20/15.20  METRES.

09) CONSTANTS EXCLUDING FRESHWATER:  250 METRIC TONS

10) FRESHWATER CAPACITY: 305 METRIC TONS

11) IF FITTED WITH EVAPORATOR/DAILY PRODUCTION: 10 METRIC TONS / 24  HOURS

12) NUMBER HOLDS/HATCHES: 7/7

13) HATCH TYPE AND SIZES: STEEL HATCH COVER FOLDING TYPE (MACGREGOR)

```
NO.1     9.8 X 12.64 METRES
NO.2    17.6 X 12.64 METRES
NO.3     9.6 X 12.64 METRES
NO.4    17.6 X 12.64 METRES
NO.5     9.6 X 12.64 METRES
NO.6    17.6 X 12.64 METRES
NO.7     9.6 X 12.64 METRES
```

14) HOLDS LENGTHS: NO.1 16.80/ NO.2 26.50/ NO.3 16.80/ NO.4 26.40/ NO.5  16.80/
                    NO.6 26.40/ NO.7 16.00

15) TANK TOP DIMENSIONS:

```
NO.1   HOLD    16.60 X 17.00
NO.2   HOLD    26.50 X 19.20
NO.3+5 HOLDS   16.80 X 19.20
NO.4+6 HOLDS   26.40 X 19.20
NO.7   HOLD    16.00 X 18.50
(LENGTH AT CENTRE LINE - BREADTH AT HALF OF LENGTH)
```

16) MAXIMUM UNIFORM LOADS TANK TOPS/WEATHER DECK/WEATHER DECK  HATCHES;

```
NO.1        HOLD            18.50 METRIC TONS/SQUARE METRE
NO.2-4-6  HOLDS             15    METRIC TONS/SQUARE METRE
NO.3-5-7  HOLDS             23.5  METRIC TONS/SQUARE METRE
MAIN DECK                   3.4   METRIC TONS/SQUARE METRE
HATCH COVER                 1.75  METRIC TONS/SQUARE METRE
```

17) CUBIC CAPACITY IN MAIN HOLDS - GRAIN/BALE:
    GRAIN  47,199 CUBIC METRES
    BALE   43,423 CUBIC METRES

18) CUBIC BREAKDOWN PER HOLD - GRAIN/BALE IN CUBIC METRES:

| | GRAIN | BALE |
|---|---|---|
| NO.1 | 4,946 | 4,550 |
| NO.2 | 8,638 | 7,947 |
| NO.3 | 5,488 | 5,049 |
| NO.4 | 8,689 | 7,994 |
| NO.5 | 5,488 | 5,049 |
| NO.6 | 8,694 | 7,998 |
| NO.7 | 5,256 | 4,836 |

19) ANY PILLARS/CENTRE LINE BULK HARDS/OBSTRUCTIONS IN HOLDS: NO

20) TYPE OF VENTILATION CARGO HOLDS   : NATURAL VENTILATION

21) IF BUILT WITH TOP SIDE TANKS      : YES

22) IF BUILT WITH HOPPER TANKS        : YES

2

23) TANK TOP SURFACE                     : FLAT

24) IF SUITABLE FOR GRAB DISCHARGE       : YES

25) DISTANCE FROM SHIP'S RAIL TO HATCH COAMING: CLEAR DISTANCE 5.50
    METRES

26) DISTANCE WATER LINE/HATCH COAMING FULL BALLAST/LIGHT/FULLY LADEN:

       FULL  BALLAST  = 8.65 METRES
       LIGHT BALLAST  = 11.45 METRES
       FULLY LOADED   = 5.70 METRES

27) AIR DRAFT LIGHT/BALLAST/FULLY LADEN: 41.50/ 39.10/ 36.14 METRES

28) DISTANCE KEEL TO TOP OF RADAR MAST: 47.30 METRES

29) CARGO GEAR                           : GEARLESS

30) CARGO GEAR OUTREACH                  : N/A

31) CARGO GEAR DISTRIBUTION AND HOLDS SERVING  : N/A

32) IF FULLY GRAIN FITTED                : YES

33) IF SELFTRIMMER                       : YES

34) CO2 FITTED                           : NO

35) GRAB FITTED/TYPE AND CAPACITY/HOW OPERATED : N/A

36) AUSTRALIAN HOLD LADDERS FITTED       : YES

37) IF PANAMA CANAL FITTED               : YES

38) SPEED AND CONSUMPTION                :

ABOUT 12.5 KNOTS ON ABOUT 26 MTS (BALLAST)/ABOUT 12.0 KNOTS ON ABOUT 28  MTS
(LADDEN) INTERMEDIATE FUEL OIL 180 CENTISTOKES RME 25 ISO DIS 8217

PLUS

ABOUT 2.5 MTS (AT SEA)/2.0 MTS (AT PORT/WHEN IDLE) MARINE DIESEL OIL  DMB ISO 8217.

Speed and consumption warrantees are given in good weather conditions  only and no
adverse currents.

Within the context of this charterparty, good weather conditions are  understood to mean
winds up to and including Beaufort force 4 and/or Douglas Sea  state 3.

About is understood to mean 0.5knot downwards in the speed and 5pct  upwards in the
consumption.

For performance evaluation purposes, the overall performance of the  vessel is to be
reviewed on all laden and ballast passages during the currency of  the charterparty.
Weather periods in excess to Beaufort 4 and or Douglas  Sea state 3, are to be expressly
excluded from calculations.

Owners liberty vessel to burn diesel oil when manoeuvring/approaching  and leaving
ports/navigating in canals/rivers or congested/confined/shallow  waters or in cold
weather for boiler/heating.

39) NO SUITABLE FOR ALTERNATIVE LOADING IN ACCORDANCE WITH SOLAS  CHAPTER XII, REGULATION
14 WITH EFFECT FROM 01st JULY 2006

3

40) ENGINE TYPE AND BHP/RPM: B&W 13100 BHP/128 RPM

41) NUMBER OF GENERATORS, TYPE AND BHP/RPM:
    - MAN MEP-MAN G6V 23.5/33TL (2 SETS) S/N 6017-6022
    - BAUD W - HOLEBY DIESEL MODEL 5T23LH-2 (1SET) SN 164801
    - 780 BHP EACH / 600 RPM EACH

42) BUNKER CAPACITIES: INTERMEDIATE FUEL OIL: 2,617 METRIC TONS   (100%)/MARINE DIESEL
OIL: 316 METRIC TONS (100%)

43) YEAR AND MONTH BUILT AND WHERE BUILT: MARCH 12, 1980/ BRASIL

44) FLAG : ST. VINCENT & THE GRENADINES

45) PORT OF REGISTRY                          : KINGSTOWN

46) REGISTERED NUMBER                         : 9152

47) LLOYDS NUMBER                             : N/A

48) IMO NUMBER                                : 7433452

49) INTERNATIONAL/ SUEZ/ PANAMA GRT/NRT OR GT/NT:

INTERNATIONAL : 22,912 / 12,300
SUEZ          : 21,341 / 19,040
PANAMA        :        / 19,090

50) CLASS SOCIETY: BUREAU VERITAS

51) CLASS RATING: I 3/3 E BULK CARRIER ESP DEEP SEA

52) LAST DRYDOCK: MAY, 2005

53) LAST SPECIAL SURVEY: MAY, 2005

54) CALL SIGN: J 8 B 2 6 8 0 (J8B2680)

55) TELEX SYSTEM/NUMBER: INMARSAT-C / 437738810-1

56) FASCIMILE NUMBER: 763662742

57) P & I CLUB ENTERED WITH: THE AMERICAN P+I CLUB

58) H & M VALUE: U.S. $ 6,250,000 (SIX MILLION TWO HUNDRED AND FIFTY  THOUSAND
DOLLARS) PLUS $ 1,250,000 IV (ONE MILLION TWO HUNDRED AND FIFTY  THOUSAND
DOLLARS). INSURERS: LLOYD'S UNDERWRITERS "BRIT SYNDICATE" (AS  LEADERS).

59) REGISTERED OWNERS FULL STYLE AND FULL ADDRESS: SIXTEEN THIRTEEN  MARINE
                                        S.A., MONROVIA,  LIBERIA.

60) MANAGER'S NAME, ADRESS / COMMUNICATION DETAILS/ M.I.C.

    CHIAN SPIRIT MARITIME ENTERPRISES INC.

    10 ANT. AMPATIELOU,
    GR-18536 PIRAEUS,
    GREECE.
    TELEPHONE: +30 210 429 4777
    FASCIMILE: +30 210 459 9099
    E-MAIL : operations@chianspirit.gr

All details are given in good faith as "about" wog

--- end of vsl's t/c description ---

4

---

– CHARTS GNTEE THAT THE FIXTURE WILL BE KEPT STRICTLY P+C AND SHALL NOT  REPORT
  SAME IN ANY FIXTURE REPORT INCL BUT NOT LIMITED BALTIC INDICES AND/OR  TO ANY
  OTHER THIRD PARTY.

– ON ARRIVAL AT 1ST LOADPORT AFTER THE VESSEL'S DELIVERY HOLDS TO BE  READY FOR
  PERMITTED CARGO ORDINARY SERVICE, CLEAN, SWEPT, WASHED DOWN AND  DRIED UP SO
  AS TO RECEIVE CHARTERERS INTENDED CARGO TO THE SATISFACTION OF THE  SHIPPERS'
  SURVEYORS IN THE UNLIKELY EVENT THE VSL NOT BE APPROVED BY THE  SURVEYOR THEN
  THE VESSEL TO BE PLACED OFF HIRE AND ALL RELATED EXPENSES THEREOF  TO BE FOR
  OWNERS ACCOUNT.

  MORE SPECIFICALLY IN CASE OF VESSEL'S FAILURE TO FULLY PASS ABOVE  PRELOADING
  CARGO HOLDS INSPECTION VSL TO BE PLACED OFF HIRE, or pro rata of  hire
  according to the number of holds which failed PROVIDED LOCAL  REGULATION
  PERMIT LOADING OF VESSEL WITH PARTIALLY UNCLEAN HOLDS AND SHIPPERS  HAVE
  DECIDED TO COMMENCE LOADING OF THE ALREADY PASSED HOLDS OTHERWISE  VESSEL TO
  BE FULLY OFF- HIRE FROM REJECTION UNTIL THE VSL PASSES THE SAME
  INSPECTION/TEST AND ANY ACTUALLY TIME LOST/DIRECT EXPENSES INCURRED  HEREBY TO
  BE FOR OWS ACCOUNT.

OWNERS WARRANT FOLL:

 – VSL IS SELFTRIMMING SINGLE DECK BULKCARRIER (AND WAS ORIGINALLY
  CONSTRUCTED AS A BULKCARRIER) WITH ENGINE/BRIDGE AND ACCOMMODATION  AFT.

– VSL IS SD SELF-TRIMING BC/BRIDGE N ENG ROOM IS AFT

– VSLS T/T IS FLAT AND SUITABLE FOR GRAB DISCHARGING

– VSL DOES NOT HAVE A CENTERLINE BULKHEAD/BEAM OR ANY OTHER  OBSTRUCTIONS

ALSO DURING THE ENTIRE CURRENCY OF C/P

– VSL SHALL NOT CHANGE OWNERSHIP OR CLASS OR FLAG THROUGHOUT THE
  WHOLE T/C PERIOD;

– VSL IS FULLY ISPS CERTIFIED. (ISPS CERTIFICATE TO BE SENT BY OWNERS
  UPON REQUEST)

– OWS GTE TT VSLS H.COVERS ARE TB WATERTIGHT ALL THROUGHOUT THIS  C/PERIOD N IF
  ANY H.COVER FOUND DEFECTIVE, SAME TB RECTIFIED AT OWS TIME N EXPNS  TO CLASS
  SURVEYOR SATISFACTION IN WHICH CASE VSL TO BE PLACED PRO RATA  OFF-HIRE
  ACCORDING TO THE NUMBER OF HATCHES WHICH FOUND DEFECTIVE AND THE  LOADING
  OPERATIONS WERE ACTUALLY PREVENTED.

 OWS GTEE VSL IS P&I COVERED WITH THE "AMERICAN P&I CLUB" AND CLASSED  WITH
  "B.V, OR IN OWNERS OPTION WITH ANY OTHER MEMBER OF THE INTERNATIONAL  P&I
  GROUP OR IACS MEMBER CLASS RESPECTIVELY, AND SHALL REMAIN SO  THROUGHOUT THE
  WHOLE T/C PERIOD;

– OWS GTEE VSL IS SD SELF-TRIMING BC/BRIDGE N ENG ROOM IS AFT

– OWS GTEE VSLS T/T IS FLAT AND SUITABLE FOR GRAB DISCHARGING

FOR

1. VESSEL: MV "Nicholas M." (ex- "Med Unity") AS DESCRIBED ABOVE

2. ACCOUNT : "CONGENTRA AG of Zug, Switzerland"

   add...6301 Bahnhofstrasse 12, Zugm Switzerland

5

ph.nr...+41793079407
email...operations@congentra.com
mic...Lance Ranger

Charterers very brief background as given and guaranteed by them as true and
accurate:

Congentra for your reference now has under tc m/v Athena and m/v
Rotterdam trader (ex- FOREST PIONEER), Also you can contact Richard  Burger
from Azure for references or BNP Paribas (Suisse) Daniel Ruiz
+41229062253

3. DELIVERY: ON DOP PORTO ALEGRE, BRAZIL ATDNSHINC

4. LAY/CAN : 12:00 HRS LT 10TH OCT 2007 - 24:00HRS LT 13TH OCT 2007

5. ALLOWED TRADING : ONLY 1 STRAIGHT TCT VIA RIVER PLATE, ARGENTINA TO
   ST.PETERSBURG (RUSSIA) AND/OR POLAND, WHICH IS ALLOWED ONLY IN THE  EVENT
   ST.PETERSBURG IS FROZEN, ALWAYS VIA SAFE PORT (S), SAFE BERTH (S),SAFE
   ANCHORAGE (S) ALWAYS AFLOAT (EXCEPT FOR RIVER PLATE ONLY WHEREVER NAABSA
   APPLICABLE AS PER NYPE) ALWAYS WITHIN INSTITUTE WARRANTY LIMITS (CHOPT TO BREACH IWL
FOR WHICH PLS SEE RELEVANT PROVISION HERE BELOW) AND ALWAYS EXCLUDING WAR OR WARLIKE
ZONES (CONWARTIME 2004 TO APPLY), IN/OUT GEO ROTATION.

   DURATION ABT 50 DAYS WOG

   If during the currency of this c/p discharging area is considered out
   of INL/IWL Charterers shall have the privilege of breaking INL/IWL ,
   Charterers paying any extra Insurance
premium thereby
   incurred, provided not exeeding london Lloyds scale and bimco ice clause for
   tc parties to apply. This extra insurance to be covered by owners with their
   h&m underwriters and to be reimbursed by the Charterers against presentation
   of relevant supportive invoice prior redelivery with emailed copies always
   acceptable.

6. ALLOWED CARGO: ONLY HARMLESS GRAINS/GRNPRODS/AGRIPRODS IN BULK AND  MORE
   SPECIFICALLY "CORN/SOYABEANMEAL" IN BULK.

   IT IS UNDERSTOOD THAT CHARTERERS MAY LOAD ANY GRAIN/AGRICULTURAL  PRODUCTS,
   PROVIDED THAT CARGO WILL BE LOADED IN STRICT ACCORDANCE WITH  INTERNATIONAL
   IMO REGULATIONS AND TO BE HARMLESS/NON- IMO DANGEROUS CARGO FOR THE
   LOADING,STORAGE AND CARRIAGE OF WHICH THE VESSEL IS NOT REQUIRED TO  BE CO2
   FITTED OR NO APPENDIX B REQUIREMENTS APPLY OR REQUIRED BY CHARTERERS  AND/OR
   SHIPPERS AND/OR CARGO AND/OR VESSELS OR CARGO UNDERWRITERS AND/OR ANY  OTHER
   COMPETENT AUTHORITY. PALM KERNEL EXPELLERS,SUNFLOWER SEED  EXPELLERS,PELLETS
   ALWAYS TO BE EXCLUDED.

   IF MORE THAN ONE GRADES, CGO TO BE NATURALLY SEPARATED BY VSL'S  HOLDS

7. REDELY : ON DLOSP ST.PETERSBURG, RUSSIA ATDNSHINC.

8. HIRE USD 38,000 DAILY HIRE PLUS USD 575,000 GBB - DAILY HIRE TO  INCLUDE
   OT/FW/LUBES AND TO BE PAYABLE EVERY 15 DAYS IN ADVANCE

   UPON DELY CHARTS TO PAY 15 DAYS HIRE PLUS GBB PLUS FULL VALUE OF  BUNKERS AS
   ON BOARD AT THE DATE OF DELIVERY WITH NO DEDUCTIONS OF ESTIMATED  BUNKERS
   VALUE ON REDELIVERY. ANY SUCH DEDUCTION TO BE MADE FROM THE LAST  SUBSEQUENT
   SUFFICIENT HIRE PAYMENT.

   CHARTERERS NO TO MAKE ANY DEDUCTION IN RESPECT OF OWNERS EXPENSES AT  ANY
   PORT OF CALL DURING THIS CHARTER PARTY OWNERS SETTLING ALL OWNERS'
   EXPENSES
   DIRECTLY WITH AGENTS HOWEVER CHARTERERS' AGENTS TO ATTEND VESSEL'S  MINOR
   MATTERS SUCH AS CASH TO MASTER, CHANGES OF PART OF CREW ETC WITHOUT  CHARGING
   AGENCY FEE. FOR MAJOR SHIP'S HUSBANDRY MATTERS SUCH AS EMERGENCY  DRYDOCKING

6

OWNERS TO MAKE THEIR OWN ARRANGEMENT WITH AGENTS. OWNERS TO ALWAYS HAVE THE
RIGHT TO APPOINT THEIR OWN PROTECTING AGENTS AT BOTH ENDS.

9. BUNKERS ON DELY ABT 110 IFO AND ABT 50 MDO AT USD 450PMT AND USD 750
RESPECTIVELY.

BUNKERS ON REDELIVERY ABT SAME QUANTITIES AT SAME PRICES AS ON DELIVERY.

CHARTERERS TO PAY FULL VALUE OF BUNKERS ON DELY AS ON BOARD.

BOTH CHARTERERS AND OWNERS TO HAVE THE PRIVILEGE TO BUNKER THE VESSEL PRIOR
TO DELIVERY/REDELIVERY PROVIDED SAME DOES NOT INTERFERE WITH VESSEL'S
OPERATIONS OR ITINERARY IN WHICH CASE SAME TO BE SUBJECT TO BOTH PARTIES
MUTUAL AGREEMENT

CHARTS TO HAVE THE RIGHT TO DEDUCT FROM THE LAST SUFFICIENT HIRE
PAYMENT(S)
BUT GIVEN THE ANTICIPATED C/P DURATION IN NO CASE FROM THE FIRST 50 DAYS,
THE ESTIMATED VALUE OF BUNKERS ON REDELIVERY

CHARTERERS TO PAY FULL VALUE OF BUNKERS ON DELY AS ON BOARD.

10. ON HIRE/OFF HIRE SURVEYS TO BE CARRIED OUT AT CHARTS TIME AND EXPENSES
OWNERS APPOINTING MASTER TO ATTEND ON THEIR BEHALF.

11. ANY ADD WAR PREMIUM DURING THIS C/P (IF ANY) TO BE FOR CHRS' ACCT AGAINST
FAXED VOUCHERS; MORE SPECIFICALLY CONWARTIME 2004 TO APPLY.

12. ILOCH

CHARTERERS HAVE THE OPTION OF REDELIVERING THE VESSEL WITHOUT CLEANING HOLDS
CHARTERERS PAYING USD 5000 LUMPSUM

13. C/V/E USD 1,250 PER MONTH PRO RATA

14. OWNERS TO ALLOW CHARTERERS TO DISCHARGE CARGO WITHOUT
PRESENTATION OF ORIGINAL BILL(S)/LADING BY PROVIDING WITH LETTER OF
INDEMNITY IN ACCORDANCE WITH OWNERS P N I CLUB FORM AND WORDING
BEFORE DISCHARGING. LETTER OF INDEMNITY TB SIGNED BY CHARTERERS ONLY.

Neither the Charterers nor their agents shall permit the issue of any
B(s)/L (whether or not signed on behalf of the Owners or on the
charterers behalf of any sub-charterers) incorporating the Hamburg Rules or
any legislation giving effect to the Hamburg Rules or any other legislation
imposing liabilities in excess of Hague-Visby rules. The Charterers shall
indeminify the Owners against any liability, loss or damage which may result
from any breach of the forgoing provision of the clause. No liner Bills or
Way Bills of Lading and no through transhipment or combined transport Bills
of Lading to be issued

15. BIMCO ISM/ISPS/NON-PAYMENT OF HIRE/ ICE-CLAUSE/EVIDENCE OF PERFORMANCE/FUEL
SULPHUR CONTENT/ U.S. SECURITY/U.S.CUSTOMS ADVANCE NOTIFICATION/AMS BIMCO
CLAUSES FOR TIME CHARTER PARTIES CLAUSES TO APPLY

16. FOR THE PURPOSE OF COMPUTING HIRE PAYMENTS, THE TIME FOR
DELIVERY/REDELIVERY SHALL BE ADJUSTED TO G.M.T

17. ANY OFF HIRE DEDUCTION UNDER THIS CHARTER PARTY DUE TO VSLS INEFFICIENCY
ARREST,DETENTION,SEIZURE, MACHINERY BREAKDOWN ETC...BY ANY AUTHORITY AND FOR
ANY REASON TO BE MADE ON THE BASIS OF THE ACTUAL TIME LOST DUE TO THE
VESSSLS INEFFICIENCY ARREST, DETENTION, SEIZURE,MACHINERY BREAKDOWN ETC...
AND NOT FOR THE WHOLE PERIOD OF THE SAME.

IT IS HEREBY UNCONDITIONALLY AGREED THAT THIS CLAUSE IS A "NET/ACTUAL

7

TIME LOST CLAUSE"

18. GENERAL AVERAGE IN LONDON ACCORDING TO YORK-ANTWERP RULES 1994 / ENGLISH LAW TO APPLY

19. NO WAY BILLS, NO LINER OUT BS/L, HAGUE-VISBY RULES TO BE INCORPORATED IN ANY B/L ISSUED UNDER THIS C/P.

20. ALL TAXES AND DUES AND CHARGES ON THE VSL AND/OR CARGO AND/OR FRT AND/OR HIRE ARISING OUT OF CARGOES CARRIED OR PORTS VISITED OR COUNTRIES TRADED THROUGH UNDER THIS CHARTER TO BE FOR CHTRS ACCT.

21. COMM 3.75% TTL COMM INCL 1,25% TO BILLMAR CHARTERING

22. SUB ONLY CHARTS RECONFIRMATION TO BE LIFTED LATEST 13:30 GENEVA TIME TODAY TUE 10TH OCT 2007.

23. OTHERWISE AS PER PROFORMA C/P OF M/V "FURIA R." ACC OLDENDORFF DD 18TH MAY 2006 STRICTLY AND LOGICALLY AMENDED AS PER MAIN TERMS AGREED AS WELL AS BELOW C/P DETAILS/ALTERATIONS;

IT IS WELL UNDERSTOOD AND AGREED THAT ALL TERMS/CONDITIONS IN ABOVE MAIN TERMS AGREEMENT WILL SUPERSEDE ALL TERMS/CONDITIONS/CLAUSES OF SAME MEANING/WORDING OF PROFORMA C/P AND FORM PART OF IT;

MAIN BODY
---------

DELETE LINES AS FROM 1 TILL 19 :  SAME TO BE AMMENDED AS PER MAIN
                                   TERMS AGREED BUT LINES 16/17 TO REMAIN AS
                                   PRINTED

LINES: 45/46/47 :                  DELETE AS NON APPLICABLE

LINE 95 :                          DELETE 'GIVEN WRITTEN NOR' INSERT
'DELIVERED'

LINES 145-150:                     DELETE ALL LINES AS N/A (VSL IS GRLSS)
EXCEPT

                                   IN LINE 150 WHERE THE SENTENCE 'VESSEL TO
                                   WORK...REQUIRED BY CHARTERERS' TO REMAIN

RIDER CLAUSES
--------------

CLAUSE 29 :  TO BE TITLED "ALLOWED CARGO" AND TO BE AMENDED AS PER
             PARA "6" OF MAIN TERMS.

CLAUSE 30 :  TO BE TITLED "ALLOWED TRADING" AND TO BE AMENDED AS PER
             PARA "5" OF MAIN TERMS.

CLAUSE 33 :  AMEND PER MAIN TERMS PARA 12, OWISE AS PER C/P EXCEPT 2ND LINE
             DELETE AS FROM 'INCLUDING, IF PERMITTED"... TILL THE END OF THE
             CLAUSE

CLAUSE 38 :  3RD LINE DELETE "REMAINS UNDER ARREST OR" OTHERWISE AS
             PER ABOVE PARA 17 OF MAIN TERMS.

CLAUSE 39 :  DELETE FOR 9TH PARAGRAPH I.E. AS FROM " CHARTERERS HAVE
             THE OPTION .... TILL ....OF LINER BILLS OF LADING' INSERT ."
NO
             LINER OUT BILLS OF LADING UNDER THIS CHARTER PARTY"

8

CLAUSE 41 : PARA 1 THRU 7 AMENDED AS PER MAIN TERMS (IE QTTIES/PRICES/SPECS
ETC) OWISE TO REMAIN AS PER C/P EXCEPT REPLACE "DRAWN BY THE
SUPPLIER" WITH "TAKEN FROM THE VESSEL'S MANIFOLD DURING THE SUPPLY"

CLAUSE 44 : DELETE AND TO BE AMENDED AS PER ABOVE PARA 8 OF MAIN TERMS.

CLAUSE 49 : 1ST LINE AFTER "SUPERCARGO(ES)" INSERT " UPON REASONABLE REQUEST
AND JUSTIFIED REQUEST"

CLAUSE 51 : DELETE AS NON APPLICABLE

CLAUSE 54 : ADD AT THE END "THIS IS A 'NET ACTUAL TIME LOST CLAUSE'
FOR THE TIME THEREBY ACTUAL LOST AND NOT A PERIOD CLAUSE"

CLAUSE 56 : TO BE DELETED AND TO READ AS PER ABOVE PARA 10 OF MAIN TERMS.

CLAUSE 58 : DELETE "COURIER" INSERT "E-MAIL IF REQUIRED"

CLAUSE 59 : DELETE WHOLE AS N/A

CLAUSE 60 : ADD "AND SAME TO BE INCORPORATED TO ANY BILLS OF
LADING ISSUED HEREUNDER"

CLAUSE 62 : REPLACE "WITHIN 3 BANKING DAYS AFTER VESSEL'S" WITH "ON"
DELETE PARA "CHARTERERS ARE ENTITLED...DISBURSEMENT DIRECTLY)"

CLAUSE 71 : AS PER C/P EXCEPT
LINE 1 DELETE 'JAPAN,' INSERT 'RUSSIA OR ARGENTINA'
DELETE 'DENMARK' INSERT 'FINLAND'
ADD AT END 'PROVIDED NO CARGO ONBOARD'

CLAUSE 72 : DELETE WHOLE AS N/A

CLAUSE 76 : DELETE WHOLE AS N/A

END

rdgs

9

31 Jan 07 11:46     J G R                    00302109881691          P.1

Tramp Maritime Inc.
...
...
E-Mail: chartering@trampmaritime.gr

**Working Copy**

# Time Charter

GOVERNMENT FORM

*Approved by the New York Produce Exchange*
November 6th, 1913 • Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946



1  **This Charter Party**, made and concluded in *Hamburg,* ................................................. *18th day of May 2006* ..... 19..
2  Between *Patinos Maritime Ltd., Malta,*
3  Owners of the good *Malta flag* ................................. Steamship/Motorship *" FURIA R "* ......................................... of
4  of ...................................................... *Indicated horse power*
5  and with hull, machinery and equipment in a thoroughly efficient state and classed *for vessel's description see Clause 82*
6  of .................. of about, ........................... cubic feet bale capacity, and about ...................... tons of 2240 lbs.
7  deadweight capacity (cargo and bunkers, including fresh water and stores not exceeding one and one-half percent of ship's deadweight capacity,
8  allowing a minimum of fifty tons) on a draft of ............... feet ......... inches on ............... Summer freeboard, inclusive of permanent bunkers,
9  which are of the capacity of about ......................................... tons of fuel, and capable of steaming, fully laden, under good weather
10  conditions about ............... knots on a consumption of about ............... tons of Best Welsh coal -best grade fuel oil -best grade Diesel oil;
11  now trading ..............................................
12  ........................................ and *Oldendorff Carriers GmbH & Co. KG* ....... Charterers of the City of *Lübeck, Germany.*

13  **Witnesseth,** That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for
   about 1 (one) timecharter trip via *India* with harmless/lawful cargoes, intention steel products (slabs, coils, pipes etc.), trading
   always via safe and icefree port(s)/berth(s)/anchorage(s), always safely afloat, always within International Navigating
   Conditions (01/11/03) and.................................................... within below mentioned trading limits.
16  Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remaining responsible for
17  the fulfilment of this Charter Party. *Acceptance of delivery of the vessel by the Charterers shall not prejudice their rights against*
   *Owners under this Charter Party.*
18  Vessel to be placed at the disposal of the Charterers, at *on dropping last outward sea pilot KARACHI/BIN QASIM at any time, day/night,*
19  *Sundays and holidays included.*
20  in such dock or at such wharf or place (where she may safely lie, always afloat, at all times of tide, except as otherwise provided in clause No. 61, as
21  the Charterers may direct. If such dock, wharf or place be not available time to cover as provided for in clause No. 6. Vessel on her arrival first loadport
   delivery to be
22  ready to receive *any permissible cargo (see Clause 49). On delivery and throughout the charter vessel to be* with class except holds and
   tight, staunch, strong and in every way fitted for the service, having water ballast, winches *cranes* and
23  donkey boiler with sufficient steam power, or if not equipped with donkey boiler, then other power sufficient to run all the winches/*cranes* at one and the same
24  time (and with full complement of officers, seamen, engineers and firemen for a vessel of her tonnage), to be employed, in carrying lawful merchan-
25  dise, including petroleum or its products, in proper containers excluding - *see Clause 29* -
26  (vessel is not to be employed in the carriage of live-stock, but Charterers are to have the privilege of shipping a small number on deck at their risk,
27  all necessary fitting and other requirements to be for account of Charterers), in lawful trades, between safe port and/or safe places in
   British North
28  America and/or United States of America, and/or West Indies, and/or Central America, and/or Caribbean Sea, and/or Gulf of Mexico, and/or
29  Mexico, and/or South America
30  and/or Africa, and/or Asia, and/or Australia, and/or Tasmania, and/or New Zealand, but excluding Magdalena River, River St. Lawrence between
31  October 31st and May 15th (Hudson Bay and all such ports also excluding, when out of season, White Sea, Black Sea and the Baltic.
   *Trading Exclusions: See Clause 30.*
33
34
   as the Charterers or their Agents shall direct, on the following conditions:

1.  That the Owners shall provide and pay for all provisions, wages and consular shipping and discharging fees of the Crew *and gangway watchmen;*
   *gangway watchmen for cargo and all compulsory shore gangway watchmen to be for Charterers' account; compulsory garbage*
   *removal to be for Charterers' account;* shall pay for the
17  insurance of the vessel, also for all the cabin, deck, engine-room and other necessary stores, including boiler water and maintain her alert and keep
18  the vessel in a thoroughly efficient state in hull, *cargo spaces,* machinery and equipment *with all certificates necessary to comply with current*
   *requirements at ports of call* for and during the service.
9  2.  That whilst on hire the Charterers shall provide and pay for all the fuel except as otherwise agreed, Port Charges, Pilotages, Agencies *(except*
   *agency fee directly related to Owners' matters),* Commissions, Stevedoring/tugs/river dues/canal dues, taxes/dues/fees/vat *on*
   *cargoes/vessel/freight/hire/flag*
6  Consular Charges (except those pertaining to the Crew), and all other usual expenses except those before stated, but unless the vessel put into
   a port for causes for which vessel *and/or her Owners is are* responsible, than all such charges incurred shall be paid by the Owners. Fumigations ordered
   because of
   illness of the crew to be for Owners account. Fumigations ordered because of cargoes carried or ports visited while vessel is employed under this
   charter to be for Charterers' account. All other fumigations to be for Charterers' account; after vessel has been on charter for a continuous period
   of six months or more. *Pilotage Grena/Spodsbjerg, Bosporous Strait, Torres Strait and Great Belt to be for Charterers' account.*

31 Jan 07 11:46      J G R

00302109881691        P.2



45    Charterers are to provide necessary dunnage and shifting boards, also any extra fittings requisite for a special trade or unusual cargo, but
46    Owners to allow them the use of any dunnage and shifting boards *and any other fittings* already aboard vessel. Charterers to have the privilege of using
      shifting boards
47    for dunnage, they making good any damage thereto.
48    3.    ~~That the Charterers, at the port of delivery, and the Owners, at the port of re-delivery, shall take over and pay for all fuel remaining on~~
49    ~~board thereof at the current price, in the respective ports, the vessel to be delivered with not less than~~                                        *tons and not more than*
50    *See Clause 47* ~~tons and to be re-delivered with not less than~~                                                  *tons and not more than*
51    4.    That the Charterers shall pay for the use and hire of the said Vessel at the rate of    *USS 15,000.- (fifteenthousand) per day/pro rata*
52    including overtime, *payable every 15 days in advance* ~~United States Currency per ton on vessel's total deadweight carrying capacity, including~~
      ~~bunkers and~~
53    ~~stores on~~                                                       *tonnes freeboard, per Calendar Month,* commencing on and from the day *and time* of her delivery, as aforesaid, and at
54    and after this same rate for any part of a month daily; hire to continue until the hour of the day of her re-delivery in like good order and condition, ordinary
55    wear and tear excepted, to the Owners (unless lost) *on dropping last outward seapilot one safe port BOSTON/TAMPICO range, port to*
56    *Charterers' option (intention US Gulf, New Orleans or Houston), at any time, day/night, Sundays and holidays included* unless
57    otherwise mutually agreed. Charterers are to give Owners not less than *15/10 days approximate and 8/5/3/1 day(s) definite*
58    notice of vessels expected date of re-delivery, and probable port.
      5.    Payment of said hire to be made to *Owners' bank* in New York in cash in United States Currency, *semi-monthly every 15 days in advance* and
59    for the last half-month *15 days or*
60    part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day, as it becomes
61    due, if so required by Owners, unless bank guarantee or deposit is made by the Charterers, otherwise failing the punctual and regular payment of the
      hire, *or any other amount due to Owners by Charterers* or bank guarantee or deposit, or on any *fundamental* breach of this Charter Party, the
62    Owners shall be at liberty to withdraw the vessel from the service of the Char-
63    terers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers. ~~Time to count from 3 a.m. on the working day~~
      ~~to have the privilege of using vessel at once, such time used is at under hire.~~ *See also Clause 62*
      ~~Cash for vessel's ordinary disbursements at any port may be advanced as required by the Captain, by the Charterers or their Agents, subject~~
64    to 2 1/2% commission and such advances shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the application
      of such advances.
65    6.    That the cargo or cargoes be laden and/or discharged in any *safe dock or at any safe wharf or safe place or safe anchorage in port* that
      Charterers or their Agents may
69    direct, provided the vessel can safely lie always afloat *at any time* of tide, except at such places where it is customary for similar size vessels to safely
70    lie aground.
71    7.    That the whole reach of the Vessel's Hold, Decks, and usual places of loading (not more than she can reasonably stow and carry), also
72    accommodations for Supercargo *at Charterers' risk and expense*, and usual places of loading (not more than she can reasonably stow and carry), also
      for Ship's officers, crew,
73    tackle, apparel, furniture, provisions, stores and fuel. ~~Charterers have the privilege of passengers as far as accommodations allow. Charterers~~
74    paying Owners                                           *per day per passenger for accommodation and meals.* However, it is agreed that in case any fines or extra expenses are
75    incurred in the consequence of the carriage of passengers, Charterers are to bear such risk and expense. *No passengers allowed.*
76    8.    That the Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew and
77    boats *equipment*. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and
78    agency; and Charterers are to load, stow, and trim, *secure, lash, unlash, tally, unless tally is required by Owners in which case will be for*
      *Owners' account and discharge* the cargo at their expense under the supervision of the Captain, who is to sign or, *when required by Charterers,*
      *authorize the Charterers or their agents to sign* Bills of Lading *on his behalf* for
79    cargo as presented, strictly in conformity with Mate's or Tally Clerk's receipts.
80    9.    That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on
81    receiving particulars of the complaint, investigate the same, and if necessary, make a change in the appointments.
82    10.    That the Charterers shall have permission to appoint a Supercargo, who shall accompany the vessel and see that voyages are prosecuted
83    with the utmost despatch. He is to be furnished with free accommodation, and same fare as provided for Captain's table, Charterers paying at the
84    rate of *USS 16.00 $2.00* per day. Owners to victual Pilots and Customs Officers, and also, when authorized by Charterers or their Agents, to victual Tally
85    Clerks, Stevedore's Foreman, etc. Charterers *to compensate Owners humpsum USS 1,250.- per month/pro rata* in respect of Charterers'
      ~~paying at the current rate per meal for all such victualling,~~ *communication and representation.*
      11.    That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, *in writing,* and the
88    terers, their Agents or Supercargo, when required, with a true copy of daily *deck and engine* Logs, showing the course of the vessel and distance run and the
      con-
89    sumption of fuel *as well as revolutions of main engine and velocity of and direction of wind and sea, all in English language.*
90    12.    That the Captain shall use diligence in caring for the ventilation of the cargo. *Vessel has natural ventilation.*
91    13.    ~~That the Charterers shall have the option of continuing this charter for a further period of~~
92    ~~on giving written notice thereof to the Owners or their Agents~~                                                   
93    
94    14.    That if required by Charterers, time not to commence before *19th May, 2006 - noon*    ~~days previous to the opinion of the first named term, or any declared option,~~
95    not have given written notice of readiness on or before *23rd May, 2006 - 24.00 hours*                                      and should vessel
96    their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's readiness.    ~~but at later than 4 p.m.,~~ Charterers or
97    15.    That in the event of the loss of time from deficiency *and/or default and/or strike* of men or *deficiency* of stores, fire, breakdown or damages
      in hull, machinery or equipment, *unless such event has been caused due to stevedores' mishandling,*
98    grounding, detention by average accidents to ship or cargo, dry-docking for the purpose of examination or painting bottom, or by any other cause
9     preventing the full working of the vessel, the payment of hire shall cease for the time thereby lost *unless such deficiency caused by Charterers or by*

31 Jan 07 11:46    J G R    00302109881691    p.2

45    Charterers are to provide necessary dunnage and shifting boards, also any extra fittings requisite for a special trade or unusual cargo, but
46    Owners to allow them the use of any dunnage and shifting boards *and any other fittings* already aboard vessel. Charterers to have the privilege of using
47    ~~shifting boards~~
    for dunnage, they making good any damage therein.
48    3.    ~~That the Charterers, at the port of delivery, and the Owners, at the port of re-delivery, shall take over and pay for all fuel remaining on~~
49    ~~board the vessel at the current prices in the respective ports, the vessel to be delivered with not less than~~ ............................ tons and not more than
50    *See Clause 41* ............... ~~supposed to be re-delivered with not less than~~ ............................ tons and not more than ............................ tons.
51    4.    That the Charterers shall pay for the use and hire of the said Vessel at the rate of US$ 15,000,-- (fifteen thousand) per day/pro rata
52    **including overtime, payable every 15 days in advance** ~~United States Currency per ton or on-cald total deadweight carrying capacity, including~~
    ~~bunkers on~~ ............................
53    ............................ ~~summer freeboard, per Calendar Month,~~ commencing on and from the day *and time* of her delivery, as aforesaid, and as
54    and after the same rate for any part of a month *day*, hire to continue until the hour of the day of her re-delivery in like good order and condition, ordinary
55    wear and tear excepted, to the Owners (unless lost) as **on dropping last outward seapilot one safe port BOSTON/TAMPICO range, port in**
56    **Charterers' option (intention US Gulf, New Orleans or Houston), at any time, day/night, Sundays and holidays included unless**
57    **otherwise mutually agreed.** Charterers are to give Owners not less than **15/10 days approximate and 8/5/3/1 day(s)** definite
58    notice of vessels expected date of re-delivery, and probable port. *See Clause 62*
59    5.    Payment of said hire to be made to *Owners' bank* in ~~New York~~ in cash in United States Currency, ~~semi-monthly~~ **every 15 days** in advance, and
    for the last half-month *15 days* or
60    part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day, as it becomes
61    due, if so required by Owners, unless bank guarantee or deposit is made by the Charterers, otherwise failing the punctual and regular payment of the
    hire, *or any other amount due to Owners by Charterers* or bank guarantee or deposit, or on any *fundamental* breach of this Charter Party, the
    Owners shall be at liberty to withdraw the vessel from the service of the Char-
62    terers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers. ~~Time to count from 7 a.m. on the working day~~
63    ~~following that on which written notice of readiness has been given to Charterers or their Agents before 4 p.m., but if required by Charterers, they~~
    ~~to have the privilege of using vessel at once, such time to count as under hire.~~ *See Clause 62*
    Cash for vessel's ordinary disbursements at any port may be advanced as required by the Captain, by the Charterers or their Agents, subject
6    to 2 1/2% commission and such advances shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the application
68    of such advances.
    6.    That the cargo or cargoes be laden and/or discharged in any *safe* dock or at any *safe* wharf or *safe place or safe anchorage in port that*
69    Charterers or their Agents may ~~direct, provided the vessel can safely lie always afloat at any time of tide, except at such places where it is customary for similar size vessels to safely~~
70    ~~lie aground.~~ **the agreed.**
71    7.    That the whole reach of the Vessels Hold, Decks, and usual places of loading (not more than she can reasonably stow and carry), also
72    accommodations for Supercargo *at Charterers' risk and expense,* if carried, shall be at the Charterers' disposal, reserving only proper and sufficient space
73    for Ship's officers, crew,
74    tackle, apparel, furniture, provisions, stores and fuel. ~~Charterers have the privilege of passengers as far as accommodations allow. Charterers~~
75    ............................ ~~per day per passenger for accommodations and meals. However, it is agreed that in case any fines or extra expenses are~~
76    ~~incurred in the consequence of the carriage of passengers, Charterers are to bear such risk and expense.~~ No passengers allowed.
77    8.    That the Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew and
78    boats **equipment.** The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and
    agency; and Charterers are to load, stow, and trim, **secure,** lash, unlash, tally, unless tally is required by Owners in which case will be for
    Owners' account and discharge the cargo at their expense under the supervision of the Captain, who is to sign or, when required by Charterers,
    authorize the Charterers or their agents to sign Bills of Lading on her behalf for
79    cargo as presented, *strictly* in conformity with Mate's or ~~Tally Clerk's~~ receipts.
80    9.    That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on
81    receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments.
82    10.    That the Charterers shall have permission to appoint a Supercargo, who shall accompany the vessel and see that voyages are prosecuted
83    with the utmost despatch. He is to be furnished with free accommodation, and same fare as provided for Captain's table. Charterers paying at the
84    rate of US$ 16.00 $7.00 per day. Owners to victual Pilots and Customs Officers, and also, when authorized by Charterers or their Agents, to victual Tally
85    Clerks, Stevedore's Foreman, etc., Charterers to compensate Owners lumpsum US$ 1,250.- per month/pro rata in respect of Charterers'
    paying at the current rate per meal, for all such victualling, *communication and representation.*
11.    That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, and the
88    Captain shall keep a full and correct Log of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish the Char-
    terers, their Agents or Supercargo, when required, with a true copy of daily *deck and engine* Logs, showing the course of the vessel and distance run and the
89    sumption of fuel *as well as revolutions of main engine and velocity of and direction of wind and sea, all in English language.*
90    12.    That the Captain shall use diligence in caring for the ventilation of the cargo. *Vessel has natural ventilation.*
91.    13.    ~~That the Owners shall have the option of cancelling this charter for a further period of~~ ............................
92    ............................
93    ~~on giving written notice thereof in the Owners on their Agents~~ ............................
94    14.    That if required by Charterers, time not to commence before **19th May, 2006 – noon** ............................ ~~days previous to the expiration of the first named term, or any declared option~~
95    nor have given written notice of readiness on or before **23rd May, 2006 – 24.00 hours** ............................ and should vessel
96    their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's readiness ............................ but not later than 4 p.m. Charterers or
97    15.    That in the event of the loss of time from deficiency and/or default and/or strike of men or **deficiency** of stores, fire, breakdown or damages
    preventing the full working of the vessel, the payment of hire shall cease for the time thereby lost *unless such deficiency caused by Charterers or by*
9    grounding, detention by average accidents to ship or cargo, drydocking for the purpose of examination or painting bottom, or by any other cause

31 Jan 07 11:47     J G R                00302109881891          p.3

their agents or by their servants and all extra directly related, proven and substantiated expenses may be deducted from the hire; and if upon the voyage the speed be reduced by

100  defect is or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence
101  thereof, and all extra directly related, proven and substantiated expenses shall be deducted from the hire.
102    16. That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be
103  returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas,
104  Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.
105    The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the
106  purpose of saving life and property.
107    17. See Arbitration Clause 38 That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to three persons at New York,
108  one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them, shall be final; and for
109  the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be commercial men.
110    18. That the Owners shall have a lien upon all cargoes, and all sub-freights/sub-hires for any amounts due under this Charter, including General Aver-
111  age contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess
112  deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which
113  might have priority over the title and interest of the owners in the vessel.
114    19. That all derelicts and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and
115  Crew's proportion. General Average shall be adjusted, stated and settled, according to Rules 1 to 15, inclusive, 17 to 22, inclusive, and Rule F of
116  York-Antwerp Rules 1994 and subsequent revisions at London. 1924, at such port or place as may be selected by the carrier, and as to matters not provided for by these
117  Rules, according to the laws and usages at the port of New York. In such adjustment disbursements in foreign currencies shall be exchanged into
118  United States money at the rate prevailing on the dates made and allowances for damage to cargo claimed in foreign currency shall be converted at
119  the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement or
120  bond and such additional security, as may be required by the carrier, must be furnished before delivery of the goods. Such cash deposit as the carrier
121  or his agents may deem sufficient as additional security for the contribution of the goods and for any salvage and special charges thereon, shall, if
     required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery. Such deposit shall, at the option of the
     carrier, be payable in United States money and be remitted to the adjuster. When so remitted the deposit shall be held in a special account at the
     place of adjustment in the name of the adjuster pending settlement of the General Average and refunds or credit balances, if any, shall be paid in
     United States money. Charter hire not to contribute to General Average.
126    In the event of accident, danger, damage or disaster, before or after commencement of the voyage resulting from any cause whatsoever,
127  whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible by statute, contract, or otherwise, the
128  goods, the shippers and the consignees, jointly and severally, shall contribute with the carrier in general average to the payment of any sacrifices,
129  losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the
130  goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully and in the same manner as if such salving ship or
131  ships belonged to strangers.
132    Provisions as to General Average in accordance with the above are to be included in all bills of lading issued hereunder.
133    20. Fuel used by the vessel while off hire, also for cooking, condensing water, or for grates and stoves to be agreed to as to quantity, and the
134  cost of replacing same, to be allowed by Owners.
135    21. That as the vessel may be from time to time employed in tropical waters during the term of this Charter, Vessel is to be docked at con-
136  venient place, bottom cleaned and painted whenever Charterers and Captain think necessary, at least once in every six months, reckoning from
137  time of last painting, and payment of the hire to be suspended until she is again in proper state for the service.
140    22. Owners shall maintain the gear of the ship as fitted, providing gear (for all derricks/cranes) capable of handling lifts up to their maximum
     capacity in accordance with the description clause. three tons, also
141  providing ropes, falls, slings and blocks. If vessel is fitted with derricks, capable of handling heavier lifts, Owners are to provide necessary gear for
     same, otherwise equipment and gear for heavier lifts shall be for Charterers' account. Owners also to provide on the vessel power and electric light on deck
142  and in cargo holds sufficient for night work in all holds simultaneously. lanterns and oil for
143  night work, and vessel to give use of electric light when so fitted, but any additional lights over these on board is to be at Charterers' expense. The
144  Charterers to have the use of any gear on board the vessel.
145    23. Vessel to work night and day, if required by Charterers, and all winches cranes to be at Charterers' disposal during loading and discharging.
146  Steamer to provide one winchman per hatch to work winches day and night, as required. Charterers agreeing to pay officers, engineers, winchmen,
     deck-hands and dock-men for overtime work done in accordance with the working hours and rates stated in the ship's articles. If the rules of the
     port, or labor unions, prevent crew from driving winches, then cranemen Winchmen to be employed and paid by Charterers. In the event of a disabled
     crane or cranes which or winches, or
149  insufficient power to operate winches crane or cranes, Owners to pay for those engine, or engines, in lieu thereof to which case the vessel to remain
150  on-hire, if required, and pay any loss of time and directly related extra expenses including standby expenses, occasioned
     thereby. Any time lost due to crane breakdown and/or insufficient power has been proved to be deducted pro-rata to the number of gangs effected,
     unless shore gear has been employed by the Owners.
151    24. It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions from liability contained
152  in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessels;
153  etc." In respect of all cargo shipped under this charter to or from the United States of America. It is further subject to General Clause Paramount the
54   following clause both
55   of which are to be included in all bills of lading issued hereunder. See Clause 52
56   This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April
57   16, 1926, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of
58   any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of the bill of lading
59   be repugnant to said Act to any extent, such term shall to void to that extent, but no further.

31 Jan 07 11:48     J G R

00302108881891          p.4

160      ~~Both-to-Blame Collision Clause~~
161      ~~If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the~~
162      ~~Master, mariner, pilot or the servant of the Carrier in the navigation or in the management of the ship, the owners of the goods carried~~
163      ~~hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss~~
164      ~~or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-~~
165      ~~carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the other or non-carrying ship or her~~
166      ~~owners as part of their claim against the carrying ship or carrier.~~
167      25.  The vessel shall not be required to enter any ice-bound port, or any port where lights or light-ships have been or are about to be with-
168      drawn by reason of ice, or where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter the
169      port or to get out after having completed loading or discharging. *Vessel not to force ice or to follow ice breakers.*
170      26.  Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The owners to remain responsible for the
171      navigation of the vessel, insurance, crew, *acts of pilots and tugboats* and all other matters, same as when trading for their own account.
172      27.  A commission of 2-1/2 *1.25 per cent* is payable by the Vessel and Owners to *TGM Trans-Globe Monitor Shipping GmbH, Hamburg*
173      ~~plus 3 .75% to Tramp Maritime Inc.~~
174      on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.
175      28.  An address commission of 2-1/2 *3.75* per cent payable to *Charterers.*......................................................... on the hire earned and paid under this Charter.

Clauses 29 through 84 are fully incorporated in this Charter Party. The rider clauses headings are for easy reference only and not part of this Charter Party.

*THE OWNERS:*

                                                    *THE CHARTERERS:*



This Charter Party is a computer generated copy of the NYPE (Revised 3rd October, 1946) form printed under licence from the Association of Ship Brokers & Agents (U.S.A.), Inc. using software which is the copyright of Strategic Software Limited.

It is a precise copy of the original document which can be modified, amended or added to only by the striking out of original characters, or the insertion of new characters, such characters being clearly highlighted by underlining or use of colour or use of a larger font and marked as having been made by the licensee or end user as appropriate and not by the author.

Case 1:08-cv-01318-HB    Document 8-2    Filed 03/04/2008    Page 10 of 39



Trans-Globe Monitor Shipping GmbH

Tramp Maritime Inc.
8.0 Venezuela Street 155 26 Gamrus
ΐα τ·ΙΣΣΙ041ΣΣΣ/Fax=1.Σ1/96=ΣΙΣΣ
E-mail: maritime@trampmaritime.gr

---

### ADDITIONAL CLAUSES TO CHARTER PARTY MV "FURIA R"
### DATED HAMBURG, 18ᵗʰ MAY 2006

#### Clause 29 – Cargo Exclusions

None of the cargoes, goods, or substances listed below are to be loaded during the currency of this charter:

All corrosive, dangerous, explosive, hazardous, inflammable, injurious and toxic substances or goods/all goods or substances as defined by IMO-IMDG code as amended, including but not limited, as follows:

Acids/antiques/art objects and curios/arms and ammunitions/asbestos/ashes/asphalt /automobiles or cars or trucks or lorries or any other vehicles/banknotes or other forms of currency/bonds or other negotiable instruments/bones or bone meats/borax/bullion/calcium carbide/calcium nitrate/calcium oxychloride/cement in bulk, cement clinker/cocoa/containers/copra /corrosives/creosote and creosoted goods/deveo coal/steam coal / pond coal / dross / drugs or narcotics / dynamite / esparto grass / fire briquettes / fishmeal/fishscrap /gypsum/hides/jewellery, metals, stones or other objects of a rare or precious nature/jute/lime/logs /locomotives /livestock/nautice and manioc pellets/nepheline syenite/organic peroxides/petroleum derivatives and all petroleum products/pitch/potash/radioactive substances, products or wastes/rags/ refrigerated cargo/skimmings/salt/rock salt /soda/soda ash/scrap metal in any form including motorblocks, metal borings, shavings and turnings/skins and furs/solvents/stone blocks/war and war like materials/boycott cargoes and any other goods affecting immediately or on long term the safety of the vessel and/or the crew and all cargoes listed in the Appendix B of IMO Code of Safe Practice For Solid Bulk Cargoes.

Any IMO cargo for which Owners' permission has been given to be loaded same is to be loaded/stowed/trimmed and discharged in accordance with IMO regulations/recommendations at Charterers' time/responsibility and expense.

Scrap metal, non oily, excluding metal borings, shavings and turnings is allowed to be loaded with Soft Loading Clause.

#### Clause 30. – Trading Exclusions

The vessel is not permitted to load, discharge, bunker, to force ice or to follow icebreakers, to trade or call for any purpose in countries, places, zones or areas where:

(a) war has been declared, is about to be declared or has broken out without any such declaration or where hostilities are imminent or in progress, including civil war, insurrection, revolution etc.

(b) in Australia / Alaska / Azov Sea / Burma / Cabinda / Cambodia (Kampuchea) / Cuba / all C.I.S Pacific ports / Eritrea / Ethiopia /Faroe Islands / Greenland / Great Lakes / Haiti / Iceland / Iran / Iraq / Israel / Laos / Liberia / Mozambique but Maputo is allowed / Myanmar / New Guinea / New Zealand and its territories / North Korea / Orinoco River not West of Matanzas / Papua / Scandinavia (Norway / Sweden / Finland / Denmark) / Somalia / Sri Lanka / Sierra Leone / Sudan / Syria / Tasmania / Turkish occupied Cyprus / Vanino / South and North Yemen / Zaire

(c) in UN or USA or EU sanctioned or embargoed countries/areas

(d) in high-risk, for gipsy moth or other insect infested port(s) or area(s) as defined by USDA, APHIS, PPQ including the Japanese ports: Chiba, Hachinoe, Hakodate, Hirosima, Oita, Sakata, Shimizu, Tomakomai

(e) no direct trading between P.R. of China and Taiwan or vice versa, is allowed

Trading subject always to CONWARTIME 2004 Clause as attached.

#### Clause 31. – Crew Service

With reference to Clause 8 of this Charter Party "customary assistance" shall include, but not be limited to:                                                    *(to be continued...)*

1



Trans-Globe Monitor Shipping GmbH

Tramp Maritime Inc.
8.) Verstraße Drei - 5533 Framos
3st (=30/4041/1301-Fax=20/404413532
E-Mail: charte+ang@trampmar berit.gr

---

### ADDITIONAL CLAUSES TO CHARTER PARTY MV "FURIA R"
### DATED HAMBURG, 18th MAY 2006

*Clause 31 (continued):*

a) All opening and closing of hatches, when and where required, if permitted by local regulations.

b) Raising and lowering of derricks and rigging cranes, if fitted, and/or gangways in preparation for loading and discharging.

c) Shaping up vessel's holds/hatches and cranes prior arrival at loading and/or discharging places so as to immediately commence loading and/or discharging operations subject to weather conditions and the safety of the crew.

The above services shall be considered as a minimum and shall in no way be construed as an alternative to or reduction in the standard of services from Officers and Crew required under this Charter Party.

A, B, C to be carried out provided shore and labour unions regulations permit, otherwise shore labour to be used at Charterers' account.

#### Clause 32. - Grab Fitting/Operation
*Deleted*

#### Clause 33. - In Lieu Of Hold Cleaning
Charterers shall have the option of redelivering the vessel without cleaning of holds against paying the Owners a lumpsum of US$ 4,000.- including, if permitted by local regulations/stevedores, crew to collect from vessel's holds the lashing materials/dunnage/debris which to be disposed on deck for removal by the Charterers at Charterers' time and expense. If not permitted by local regulations/stevedores the Charterers to arrange for the removal and disposal of the above.

Charterers to use dunnage material permitted for vessel's intended trade according to loading/discharging ports.

#### Clause 34. - Intermediate Hold Cleaning
*Deleted*

#### Clause 35 - Houseflag/Markings
The Charterers shall have the liberty to fly their own houseflag and paint the funnel only with their own colours. Expenses and time in this connection including changing back to Owners' colours prior redelivery to be for Charterers' account.

#### Clause 36 – Additional Fittings
Charterers shall be at liberty to fit/weld at their time/expense any additional equipment/fittings for loading/discharging and or securing cargo. Such work shall be done at the Charterers' expense and time and Charterers shall remove such equipment and fitting at their expense prior to redelivery, if Owners so request. The meaning of this Clause shall include but not limited to welding of padeyes for lashing/securing of cargo in holds on deck.

#### Clause 37 – Dispute Resolution Clause - English Law, London Arbitration
(a) This Contract shall be governed by and construed in accordance with English law and any dispute arising out of or in connection with this Contract shall be referred to arbitration in London in accordance with the Arbitration Act 1996 or any statutory modification or re-enactment thereof save to the extent necessary to give effect to the provisions of this Clause.

The arbitration shall be conducted in accordance with the London Maritime Arbitrators Association (LMAA) Terms current at the time when the arbitration proceedings are commenced.

*(to be continued...)*

2



Tramp Maritime Inc.
9 Il Veronali Street. 18535 Piraeus
"tel: 2824010153251Fax:-3247-8415/352
E-Mail: crew@tramomar.t.ms.gr

Trans-Globe Monitor Shipping GmbN

---

## ADDITIONAL CLAUSES TO CHARTER PARTY MV "FURIA R"
## DATED HAMBURG, 18ᵗʰ MAY 2006

*Clause 37 (continued):*

The reference shall be to three arbitrators. A party wishing to refer a dispute to arbitration shall appoint its arbitrator and send notice of such appointment in writing to the other party requiring the other party to appoint its own arbitrator within 14 calendar days of that notice and stating that it will appoint its arbitrator as sole arbitrator unless the other party appoints its own arbitrator and gives notice that it has done so within the 14 days specified. If the other party does not appoint its own arbitrator and give notice that it has done so within the 14 days specified, the party referring a dispute to arbitration may, without the requirement of any further prior notice to the other party, appoint its arbitrator as sole arbitrator and shall advise the other party accordingly. The award of a sole arbitrator shall be binding on both parties as if he had been appointed by agreement.

Nothing herein shall prevent the parties agreeing in writing to vary these provisions to provide for the appointment of a sole arbitrator.

In cases where neither the claim nor any counterclaim exceeds the sum of USD 50,000 (or such other sum as the parties may agree) the arbitration shall be conducted in accordance with the LMAA Small Claims Procedure current at the time when the arbitration proceedings are commenced.

(b) Notwithstanding the above, the parties may agree at any time to refer to mediation any difference and/or dispute arising out of or in connection with this Contract.

In the case of a dispute in respect of which arbitration has been commenced under the above, the following shall apply:-

(i) Either party may at any time and from time to time elect to refer the dispute or part of the dispute to mediation by service on the other party of a written notice (the "Mediation Notice") calling on the other party to agree to mediation.

(ii) The other party shall thereupon within 14 calendar days of receipt of the Mediation Notice confirm that they agree to mediation, in which case the parties shall thereafter agree a mediator within a further 14 calendar days, failing which on the application of either party a mediator will be appointed promptly by the Arbitration Tribunal ("the Tribunal") or such person as the Tribunal may designate for that purpose. The mediation shall be conducted in such place and in accordance with such procedure and on such terms as the parties may agree or, in the event of disagreement, as may be set by the mediator.

(iii) If the other party does not agree to mediate, that fact may be brought to the attention of the Tribunal and may be taken into account by the Tribunal when allocating the costs of the arbitration as between the parties.

(iv) The mediation shall not affect the right of either party to seek such relief or take such steps as it considers necessary to protect its interest.

(v) Either party may advise the Tribunal that they have agreed to mediation. The arbitration procedure shall continue during the conduct of the mediation but the Tribunal may take the mediation timetable into account when setting the timetable for steps in the arbitration.

(vi) Unless otherwise agreed or specified in the mediation terms, each party shall bear its own costs incurred in the mediation and the parties shall share equally the mediator's costs and expenses.

(vii) The mediation process shall be without prejudice and confidential and no information or documents disclosed during it shall be revealed to the Tribunal except to the extent that they are disclosable under the law and procedure governing the arbitration.

3

Case 1:08-cv-01318-HB    Document 8-2    Filed 03/04/2008    Page 19 of 39



Trans-Globe Monitor Shipping GmbH

Tramp Maritime Inc.
8.0 Vespronal Street. 'C5 35 Piraeus
Tel: +30218411008/Fax: +30218413589
E-Mail: chartering@trampmaritime.gr

---

### ADDITIONAL CLAUSES TO CHARTER PARTY MV "FURIA R"
### DATED HAMBURG, 18ᵗʰ MAY 2006

#### Clause 38 – Arrest
Should the vessel be arrested during the currency of this Charter at the suit of any person including Charterers having or purporting to have a claim against or any interest in the vessel, hire under this Charter Party shall not be payable in respect of any period whilst the vessel remains under arrest or remains unemployed as a result of such arrest, only direct related expenses incurred by and/or during seizure or detention or arrest or delay to be for Owners' account.

This clause shall not apply should the arrest be caused through any fault on the part of Charterers their agents and/or servants.

#### Clause 39 – Bills Of Lading
Charterers' Bills of Lading to be used if required by Charterers, All original Bills of Lading to be couriered to the Owners'/Managers' office, when available to Charterers.

In case the original Bill(s) of Lading are not available upon vessel's arrival at discharging port, Owners/Master to release the entire cargo against Charterers' Letter of Indemnity which to be inline with Owners' standard P & I Club format and which to be signed by Charterers only.

Discharge to commence on receipt by Owners of faxed copy of the LOI.

Should Charterers require vessel to change discharging port after Bills of Lading have been issued Owners to comply with such instructions upon receipt of a faxed copy of a single LOI signed by Charterers only and issued in conformity with Owners' standard P & I Club form.

Attached please find the standard forms of Letters of Indemnity to be given in return for:

a) Delivery cargo without production of the original Bill of Lading.

b) Delivering cargo at a port other than that stated in the Bill of Lading.

c) Delivering cargo at a port other than that stated in the Bill of Lading and without production of the original Bill of Lading.

Charterers may place one original Bill of Lading on board the vessel against marking all original Bills of Lading with the following Clause: "One original Bill of Lading carried on board on which the cargo may be properly released against instructions received from the Charterers".

Owners are herewith instructed to discharge against such Bill of Lading carried on board and will do so unless instructed otherwise by Charterers.

No through-, nor way- Bills of Lading are to be issued under this Charter Party.

Charterers have the option to use in house Bills of Lading and liner Bills of Lading. Charterers to undertake directly to cover for their account all relevant expenses arising from issuance of liner Bills of Lading.

Bills of Lading to be in conformity with Mate's receipt.

All Letter of Indemnity text subject to running changes from the association of P & I Clubs.

#### Clause 40. - Bulldozers
Charterers to have the option to use bulldozers in vessel's holds, provided not exceeding the tank top strength.

If required, vessel to lift onboard, shift from hold to hold and discharge the bulldozers by use of vessel's gear, provided not exceeding vessels gear capacity.

4

 Trans-Globe Monitor Shipping GmbH


Tramp Maritime Inc.
9. H Voratiwe Street, 135.15 Piraeus
Tel: (13)(210411205; Fax: - X1-510-1835
E-Mail: charteng@transpruisline.gr

---

### ADDITIONAL CLAUSES TO CHARTER PARTY MV "FURIA R"
### DATED HAMBURG, 18th MAY 2006

#### Clause 41. - Bunkers
Vessel to be delivered with about 700 metric tons IFO and about 125 metric tons MDO and vessel to be redelivered with about same quantities as on delivery.

Bunker prices at both ends:    US$ 340.- per metric ton IFO and
                               US$ 640.- per metric ton MDO

Charterers to take over and pay for bunkers on delivery together with the first hire payment.

Owners have the right to bunker the vessel, prior redelivery for their own account, provided this operation does not interfere with Charterers' operations.

The Charterers have the option to deduct value of bunkers on redelivery from the last sufficient hire payment(s).

Charterers are allowed to bunker vessel for own account prior delivery provided same does not interfere with vessel's operations.

Charterers to provide the vessel with bunkers in accordance with the ISO Standard 8217:1996 as follows:

IFO 380 CST Class RMG 35 / MDO Class DMB

In order to comply with the terms and conditions of the various bunker suppliers, the sample to govern quality shall be the sample drawn by the supplier and witnessed by the ship's Chief Engineer or Surveyor appointed by Owners. Analysis of said sample in accordance with the recognised ISO test methods at a mutual agreed reputable and dedicated laboratory shall be binding and conclusive for both parties.

Quantity supplied shall be finally determined by sounding of the tanks of the delivering barge or by reading of meters at shore installation or by independent surveyor, if any independent surveyor is appointed, and there is a contradiction the surveyors finding to be the accepted ones.

In case for full vessel's bunkering the availability of empty/available tanks to be taken into consideration after Charterers have consulted with the Master, in order avoid mixing/contamination of not compatible bunkers.

#### Clause 42. - Cargo Claims/P & I Club
Owners guarantee that the vessel is entered and shall remain entered in a Protection and Indemnity Association which is a member of the Group of International P & I Clubs, for the duration of this Charter Party. Entry shall include, but not be limited to, ordinary cover for cargo claims. Charterers confirm that they will remain covered with a first class P and I Club for the duration of this Charter Party.

It shall be considered a fundamental breach by Owners if the vessel's P & I cover or class is cancelled or suspended during the currency of this charter.

In the case of damage to and/or loss of cargo carried on the vessel in which Owners' and/or Charterers' liability could be involved under the terms of this Charter Party, as the case may be, the Owners and/or the Charterers shall on request grant reasonable time extension for commencement of suit in each and every occurrence. Such extensions shall not prejudice the ultimate responsibility of both parties. Liability for cargo claims as between Owners and Charterers shall be apportioned as specified by the Interclub New York Produce Exchange Agreement effective from 1996, and its subsequent amendments.

If required by Charterers, Owners to provide valid Certificate of Entry confirming that the vessel is fully covered for P and I and that collection of premiums are up-to-date.    (to be continued...)

5

31 Jan 07 11:52    J G R    00302108881891    p.10

Tramp Maritime Inc.
9 if Veranoat Street - 166 25 Piraeus
Τμ. (+30)2104102325 - Fax (+30)2104 15285
E-Mail: chartering@trampmarine.gr


Trans-Globe Monitor Shipping GmbH

---

### ADDITIONAL CLAUSES TO CHARTER PARTY MV "FURIA R" DATED HAMBURG, 18th MAY 2006

*Clause 42 (continued):*

No claim is to be settled by one party without prior consent and agreement of the other party. Same to apply for time limits extension.

Owners' P and I Club     : West Of England
Charterers' P and I Club  : U.K. Club

#### Clause 43. - Certificates/Vaccinations

Owners are obliged to deliver and maintain throughout the currency of this Charter Party the vessel, her Crew and anything pertaining hereto supplied with up-to-date and complete certificates (including Oil Pollution Certificates), approvals, equipment and fittings, enabling the vessel and her Crew to trade within the trading limits and to load, carry and discharge all cargoes permitted under this Charter Party.

Officers and Crew to comply with vaccination and sanitary regulations in all ports of call and corresponding certificates to be available onboard, enabling the vessel to obtain free pratique by radio.

If requested, Owners to provide Charterers with copies of any and all such certificates/approvals.

Any time lost and all extra directly related expenses resulting from Owners' non compliance with the above to be for Owners' account and same may be deducted from hire.

#### Clause 44. - Deductions

The Charterers may deduct from the charter hire any amount disbursed for Owners' account. In addition Charterers may deduct from the last hire payments the reasonable estimated expenses incurred by Charterers for Owners' account, but maximum US$ 500,- per port, notwithstanding that vouchers may not then have reached Charterers for submission to Owners.

#### Clause 45. - Delivery/Redelivery Time

Hire to be settled basis Greenwich Mean Time but lay/can to be based on local time.

#### Clause 46. - Double Banking

Charterers have the right to load and/or discharge on double banking basis or by any other means available at loading and/or discharging port or place always subject to Master's reasonable satisfaction and any additional equipment/facilities such as fenders whenever considered necessary by the Master, are to be supplied by the Charterers in their time and at their expense.

Charterers to notify Owners well in advance about such procedure in order Owners arrange timely insurance cover.

If at any time during the operation, the Master reasonably considers it unsafe to continue due to adverse weather conditions etc. he may order the other vessel(s) and/or barge(s) away from his vessel or remove his own vessel in order to avoid prejudicing the safety of the vessel(s). Any additional insurance premium net of all rebates, if required by vessel's Underwriters to be for Charterers' account. Amount not to exceed the premium obtainable on the London market.

#### Clause 47. - Hold Condition

Vessel's holds on arrival at first loading port to be clean swept/washed down by fresh water and dried up so as to receive Charterers' intended cargoes in all respects free of salt, loose rust scale and previous cargo residues to the satisfaction of Charterers'/Shippers' surveyor.

Should the vessel not be approved by the surveyor the vessel to be placed off-hire. Owners warrant vessel's holds will be free of rust scale, clean, dry and suitable in every way for carriage of Charterers' intended cargo and hatchcovers are absolutely watertight.

6

31 Jan 07 11:53      J & R                    00302109861291        p.11



Trans-Globe Monitor Shipping GmbH

Tramp Maritime Inc.
9.7 Memoriae 25, Sydei - 68 22, Greece
( b. : ) 302104 31285/6 - 1-3(-(3)24-)3395
E-mail: chartering@tranpmaritime.gr

---

## ADDITIONAL CLAUSES TO CHARTER PARTY MV "FURIA R"
## DATED HAMBURG, 15ª MAY 2006

### Clause 48. - ITF/Boycott

Owners warrant that the vessel's Crew is and will be during the period of this Charter Party employed under a Bona Fide Union Agreement, the standard of which is fully acceptable to the I.T.F. and Union in all countries not excluded in this Charter Party.

In the event of the vessel being denied or restricted in the use of port and/or loading and/or discharging facilities or shore labour and/or tug or pilotage assistance or of any other restriction, detention or any loss of time whatsoever due to boycott or arrest of the vessel or due to government restrictions all caused by the vessel and/or by reason of the terms and conditions on which members of the Crew are employed or by reason of any trading of this or any other vessel under same ownership or operation or control, the payment of hire shall cease for the time thereby lost and all extra directly related expenses incurred due to above are to be for Owners' account and may be deducted from hire. Owners are also responsible for any claim that may be presented by third party unless same is caused by Charterers and/or their servants/agents.

### Clause 49. - Inspection

The Charterers and/or their Supercargo(es) shall have free and unlimited access to the whole vessel including but not limited to bridge, holds, engine room, all vessel's tanks including bunker, lubricating oil, sludge, ballast water, freshwater tanks during the charter period. Whenever required, the Master, if possible, must bring the vessel to an even trim to ensure correct bunker soundings. The Charterers and/or their Supercargo(es) and/or Surveyor(s) to have free and unlimited access to the vessel's deck and engine log books, tank plans, calibration scales, and CAP/GA/Midship Section Plans.

### Clause 50. Insurance/Basic War Risk

Basic annual war risk insurance premium to be for Owners' account. Any additional war risk insurance premium including blocking and trapping and crew war bonus to be for Charterers' account and to be paid against presentation of original invoices. Additional premium not to exceed London Lloyd's Underwriters' scale. "Conwartime 2004 and subsequent amendments" Clause to be incorporated in this Charter Party and in all Bills of Lading.

### Clause 51. - Laying Up/Return Insurance

Charterers shall have the right to order the laying up of the vessel at any time and for any period of time at a mutually agreed safe berth or safe place, sheltered anchorage, and in the event of such lay-up, the Owners shall promptly take steps to effect all the economy savings in operating costs including insurance, which may be possible and give prompt credit to the Charterers in respect of all such economy savings.

At the request of the Charterers the Owners shall at any time provide an estimate of the economy savings which would be possible in the event of laying up of the vessel.

The Charterers to have the benefit of any return insurance premium received by the Owners from their Underwriters as and when received by reason of the vessel being in port for minimum 30 (thirty) days, provided the vessel is on hire. In case of vessel's lay-up all cost involved in and for reactivation including dry dock if needed to be for Charterers' account and time.

### Clause 52. - Loading Of Steel

If the vessel is nominated to load a full or part cargo of steel products the Owners to appoint a vessel's P & I Surveyor to perform a "pre loading cargo condition survey" provided that such survey is required or recommended by the Owners' P and I Club. Such survey is to take place in Charterers' time and cost to be equally shared between Owners and Charterers. Copy of such survey to be given to Charterers without delay.

Charterers to give sufficient notice to Owners for their intention to load steel cargoes.

7

00302109881891    p.12

    Trans-Globe Monitor Shipping GmbH

Tramp Maritime Inc.
S.P. Varemik Street - 19535 Piraeus
Tel: +30200453835 Fax +3021643 35835
E-Mail: chartering@trampmaritime.gr

---

## ADDITIONAL CLAUSES TO CHARTER PARTY MV "FURIA R"
## DATED HAMBURG, 18th MAY 2006

### Clause 53. - Notices
Owners/Master to give notices for vessel's expected delivery on fixing and daily.

### Clause 54. - Off-Hire
Should the vessel put back whilst on voyage by reason of any accident or breakdown or in the event of loss of time either in port or at sea or deviation upon the course of the voyage caused by sickness of or accident to the Crew or any person travelling onboard the vessel (other than supercargo travelling by request of the Charterers) or by reason of the refusal of the Master or Crew to perform their duties, or oil pollution or capture/seizure, or detention or threatened detention by any authority including arrest, the hire shall be suspended from the time of the inefficiency until the vessel is again efficient in the same or equidistant position, and voyage resumed therefrom. All extra directly related expenses incurred including bunkers consumed during period of suspended hire shall be for Owners' account.

During any off-hire period estimated to exceed 8 days, the Owners to give the Charterers not less than 5 days definite notice of resumption of the service.

### Clause 55. - Oil Pollution
Owners guarantee to provide and maintain during the entire time charter period, at their expense and carry onboard the vessel a valid U.S. Certificate of Financial Responsibility. Owners also guarantee to have secured current certificates for other countries/federal states or municipal or other division or authority thereof, where guarantees are required. All such certificates to be valid throughout the entire timecharter period.

The Charterers shall in no case be liable for any damage as a result of the Owners' failure to obtain the aforementioned certificates. Time lost by non compliance to be considered as off hire and may be deducted from hire.

### Clause 56. - On/Off Hire Survey
On hire/off hire survey to be held at Charterers' time and expense. Owners appointing Master/Chief Engineer to carry out on their behalf joint survey (practically, on/off hire survey is taking place during vessel's operation and there is no separate time for it).

### Clause 57. - Panama-/Suez Canal
Owners warrant that the vessel is fitted for the transit of the Suez and Panama Canal in loaded and/or ballast condition and complies with all and any regulations of the relevant canal authority and shall not be subject to any conditions of transit not customarily required by the relevant canal authority whether pursuant to their regulations or otherwise. Should the vessel not comply with the warranties contained in this clause and/or any regulations or conditions of transit laid down by the relevant canal authority, Charterers may suspend hire for all time lost and Owners to pay all expenses resulting as a consequence of Owners' failure to comply with this warranty.

### Clause 58. - Plans
Owners to courier to the Charterers the Capacity Plan, Deadweight Scale, and General Arrangement Plan as soon as possible.

### Clause 59. - Power Clause
The vessel to supply free of expense to Charterers 440 volt 3 phase 60 cycles and 40 kva per crane from the power supply panel in each crane house. Charterers have the right to fit/connect magnets, grabs or other loading/discharging equipment customary to the trade onto vessel's cranes and/or power supply.

8

31 Jan 07 11:55    J G R                    00302109881891        P.13

 Trans-Globe Monitor Shipping GmbH

Tramp Maritime Inc.
9, 7 Merneri en Street - 165.35 Piraeus
Te 14 (12)140 41 39039/Fax 1-50(2)140 41 39582
E-Mail. chartering@trampmaritime.gr

---

## ADDITIONAL CLAUSES TO CHARTER PARTY MV "FURIA R"
### DATED HAMBURG, 15th MAY 2006

### Clause 60. - Protective Clauses
Conwartime 2004, New Both-to-Blame Collision Clause, New Jason Clause, General Clause Paramount, U.S.- and Canadian Clause Paramount and Club Nuclear Clause to apply.

### Clause 61. - Punctual Payment
With reference to Clause 5, Owners to give Charterers 3 (three) New York banking days written notice excluding Sundays and holidays to rectify a failure to make punctual and regular payment before exercising their right of withdrawal.

### Clause 62. - Bankers

The Royal Bank of Scotland Plc,
45, Akti Miaouli
Piraeus - Greece
Bank's Swift Code  : RBOSGRAA
IBAN             : GR98 0640 0010 0055 5546 6128 100
Favour of Polinos Maritime Ltd.
Account No       : 466128 USD 100
Correspondent Bank in New York: J.P. Morgan-Chase

First hire and value of bunkers on delivery to paid within 3 banking days after vessel's delivery. Charterers entitled to deduct from last sufficient hire payments value of bunkers on redelivery plus estimated Owners' expense US$ 500.- per calling port unless a higher amount has been authorized by the Owners (or Owners to arrange with agents and settle Owners' disbursement directly).

### Clause 63. - Sea Carrier Initiative Agreement
Owners and Charterers confirm they are both signatories to the Sea Carrier Initiative Agreement in order to co-operate with the U.S. Customs Service in the fight against the drug menace.

### Clause 64. - Stevedore Damage
Should any damage be caused to the vessel or her fittings by the Charterers or their stevedores the Master is to:

A) Give written notice to the Charterers immediately after the occurrence of full particulars of the damage caused of the party allegedly responsible for the damage.

B) Promptly but within 24 hours after occurrence give written notice to the party allegedly responsible giving full particulars of the damage and its alleged cause, and obtain the written acknowledgement of liability from such party or failing that, the acknowledgement of receipt of such notice.

C) Immediately arrange, in conjunction with Charterers' agents for the damage to be surveyed and an estimate of the repair costs given.

Failing the aforementioned the Charterers are not to be responsible for such damage and/or loss of time, except for hidden damage, which must be attended to as per the above procedure immediately it is discovered but latest upon completion of the voyage in question.

In case responsible party refuse to sign then the Master will immediately inform Charterers or their agents accordingly.

Any unrepaired damage not affecting seaworthiness and/or her working capacity/class, may be repaired in Owners' time during next regular drydocking and Charterers to pay repair expenses against voucher.

*(to be continued...)*

9



Trans-Globe Monitor Shipping GmbH

Tramp Maritime Inc.
9.11 Veronica: direct - 185 22 Piraeus
Tel:+30(10)41)Zia;Fax:-30(10 41)5535
E-Mail: chartering@trampmaritime.gr

---

## ADDITIONAL CLAUSES TO CHARTER PARTY MV "FURIA R"
## DATED HAMBURG, 18ᵗʰ MAY 2006

### Clause 64 (continued):

If during the performance of the Charter Party stevedores employed by the Charterers should cause such damage to the vessel which affects her seaworthiness and/or her working capacity/class and if such damage should then not be repaired by such stevedore, Charterers will be responsible for cost of such necessary repairs and the vessel shall remain on hire during such repairs, provided Master has fully complied with a/b/c above.

### Clause 65. - Taxes

Taxes and/or dues and/or charges whatsoever, imposed on cargo by any local or national authorities, arising out of trade under this Charter Party to be borne by Charterers. Taxes levied by governments other than that of Owners' domicile or vessel's flag on earnings under this Charter Party other than the hire payable to Owners shall be for Charterers' account.

### Clause 66. - Warranties
Owners warrant that the vessel:

- is not blacklisted by Arab countries nor anywhere else within the agreed trading limits,
- has not traded Cuba and Israel, and,
- is eligible for bunkers in the United States of America, its territories and possessions in accordance with directives from the United States Department of Commerce, Office of International Trade.

### Clause 67. - Watertight Hatches
The Owners guarantee that on vessel's delivery and throughout the currency of this Charter the vessel's hatch covers are watertight. All hatches are to be carefully attended by the Crew to prevent leakage.

### Hatch Test
The Charterers have the option to hose test or ultrasonic test the vessel's hatch covers at loading port(s) at their time/expense and should same not be watertight, Owners have the obligation to arrange necessary measures in order to make the hatch covers fully watertight. Owners shall be given by Charterers three working days to rectify the situation after which if the hatch covers are not watertight, Charterers have the right to cancel this Charter Party and redeliver the vessel, provided no cargo on board.

### Clause 68. - Ocean Route Clause
Charterers may supply "ocean routes" or "fleetweather" or similar advise to the Master throughout the voyage specified by the Charterers. The Master to comply with the reporting procedure of routing service, but it is understood that final routing is always at Master's discretion for safe navigation and choice of route. For the purpose of the charter party 'good weather condition' are to be defined as weather conditions in wind speeds not exceeding Beaufort force 4, evidence of weather condition to be taken from the vessel's deck logs and independent weather bureau's reports. In the event of a consistent discrepancy between deck logs and independent weather bureau's reports the independent weather bureau's reports shall be final and binding by both parties.

### Clause 69. - Drydocking
No drydocking under this Charter Party except in case of emergency.

### Clause 70. - Towage, Pilotage, Etc.
The Owners authorize the Charterers, as agents of and on behalf of the Owners and/or the vessel to arrange and contract for loading/discharging operations in the ports for any towage, pilotage or the like service on usual or customary terms and/or those terms offered or required by towing/pilotage companies employed where such services are furnished.

10



Trans-Globe Monitor Shipping GmbH

Tramp Maritime Inc.
P. O. Merytchia Street. 251 to Suraye
3h 12 2024 61533.2641—2 2745.5595
Fullstic charterling@oramorismore.gr

## ADDITIONAL CLAUSES TO CHARTER PARTY MV "FURIA R"
### DATED HAMBURG, 18ᵗʰ MAY 2006

### Clause 71. - War Cancellation
In the event of war, whether declared or undeclared involving Japan, Greece or Denmark, or between any two or more countries of U.S.A., C.I.S., United Kingdom, People's Republic of China, directly affecting the performance of this Charter either party has the right to cancel this Charter or any remaining portion thereof.

### Clause 72. - Cement Holes
If the vessel is not already fitted with suitable cargo inlets/loading holes Charterers have the option to fit the vessel with same as per requirements of the port/shippers for Charterers' account and expense. Cutting/closing (re-welding/screw fastening) of such openings on completion of loading to be under Master's supervision/satisfaction and responsibility. The cost of classification society's approval of this work to be for Charterers' account.

### Clause 73. - ISM Code
From the date coming into force of the International Safety Management (I.S.M.) code in relation to the vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the vessel and "The Company" (as defined by the I.S.M. Code) shall comply with the requirements of the I.S.M. code. Upon request the Owners shall provide a copy of the relevant Document of Compliance (D.O.C.) and Safety Management Certificate (S.M.C.) to the Charterers. Any loss, damage, expenses or delay caused by failure on the part of the Owners or "The Company" to comply with the I.S.M. Code shall be for the Owners account.

### Clause 74. - Lien
In the event that Charterers have a contractual or statutory right of lien over cargo carried on board for hire, freight, deadfreight or demurrage Owners shall co-operate as much as Owners' P + I Rules permit with Charterers.

### Clause 75. - Comingling
Whilst Charterers have the option to load two or more cargoes in the same holds, Charterers are to supply, erect, dismantle and dispose of any and all separations at their time, risk and expense.
Any claims arising from contamination or admixture to cargo carried in the same hold to be the responsibility of Charterers/Shippers and Receivers and to be for their account.

### Clause 76. - Deck Cargo
Charterer's option to load intended cargo on deck/hatchcover at Charterers' risk/expense in accordance with vessel's deck/hatchcover strength and vessel's stability at Master's discretion. Bills of Lading for deck cargo to be marked "Shipped on deck at Charterers'/Shippers'/Receivers' risk and expense without liability of the carrier for loss or damage howsoever caused".

### Clause 77. - Ballast/Deballast Clause
Any detergent/disinfectant required by authorities to be added to ballast water in order to enable vessel to ballast/deballast holds/spaces within national waters of respective countries to be supplied by Charterers and this to be done at Charterers' time, risk and expense.

### Clause 78. - Sale Option
*Deleted*

### Clause 79. - Hamburg Rules
Neither the Charterers nor their agents shall permit the issue of any Bills of Lading, waybill, or other documents evidencing a contract of carriage (whether or not signed on behalf of the Owners or on the Charterers' behalf or on behalf of any sub-Charterers) incorporating where not compulsorily applicable, the Hamburg Rules or any other legislation giving effect to the Hamburg Rules or any other legislation imposing liabilities in excess of Hague or Hague/Visby Rules.     *(to be continued...)*

11

Case 1:08-cv-01318-HB    Document 8-2    Filed 03/04/2008    Page 27 of 39



Trans-Globe Monitor Shipping GmbH

Tramp Maritime Inc.
9.1. Veratchias Street - 155 35 Piraeus
Tel - 3869455228/Fax (+30-2 97 1938
E-Mail: charter 1g@trampmas.time.gr

---

## ADDITIONAL CLAUSES TO CHARTER PARTY MV "FURIA R"
### DATED HAMBURG, 18th MAY 2006

*Clause 79 (continued):*

The Charterers shall indemnify the Owners against any liability, loss or damage which may result from any breach of the foregoing provisions of this clause.

Clause 80. - Declaration Of Optional Period
*Deleted*

Clause 81.
If the vessel is encountering prolonged stay, minimum 30 days in a port and there is strong reason to believe that the vessel's hull has acquired excessive marine growth affecting vessel's speed/consumption due to the stay at this specific port, Owners are to arrange for diver inspection.

Should the result of this diver inspection indicate there is excessive marine growth on the hull, Owners/Charterers to arrange underwater scrubbing of the hull in Charterers time and expense, prior to vessel's departure from the port, if same can be done without reasonable delay. If the underwater scrubbing is not available or can not be carried out at the port in question same to be carried out in Charterer's time in the next convenient port.

Charterers agree no claim for underperformance of the vessel for the passage from the port in question until underwater scrubbing is carried out.

Dry dock can be carried out in case of emergency.

Clause 82. - Description Of Vessel
M/V "Furia R" ex "Fairy Queen"
BC, Malta Flag, Built 1996, Class NK
46,664 MTDW (summer) on 11.62M SSW
LOA/B/D          : 189.2/31.0/16.5 M
GRT/NRT          : 27,011/16,011
5 Ho/Ha Grain/Bale  : 59,820/57,237 M3
Folding Type Hydraulic Driven Hatch Covers
Hatch Sizes      : No.1: 17.60 x 17.16, No.2-5: 20.8 x 17.16M
Cranes           : 4 x 30 MT

Speed/consumption, based on b/scale under 4 and no adverse current:
-    abt 13,5 knots on abt 25,0 mt MARINE IFO 380CST + abt 1,8 mt MDO in ballast
- .  abt 13,5 knots on abt 27.5 mt MARINE IFO 380CST + abt 1,8 mt MDO in laden .

-    At port:
     abt 0,8 mt MARINE IFO 380CST + abt 1,5 mt MDO - W/W: abt 3,8 mt MDO

Vessel to be supplied with bunkers:
-IFO max 380 CST-grade RMG 35 in accordance with ISO 8217
-MDO grade DMB in accordance with ISO 8217

When manoeuvring and steaming in rivers, canals, dense traffic areas and operating under a load of abt 35 pct or less the vessel is burning MDO.

All details are 'about' excluding bunker grade

As per vessel's classification note (as per SOLAS): "the ship is not allowed to sail with any cargo hold loaded to less than 10 pct of the holds maximum allowable cargo weight when in the full load condition".

Previous cargoes: grains from USA, steels from Black Sea to USA, and before vessel's holds had been sandblasted + painted.
                                                    *(to be continued...)*

                                                                    12

31 Jan 07 11:58     J G R                    00302108881881        p.17

   Trans-Globe Monitor Shipping GmbH


Tramp Maritime Inc.
9.1° Venardas Street, 186 22 Athens
Tel: +30/2104/11/26; fax +30/2104/11/22
E-Mail: chartering@tramp.oard.ine.gr

---

## ADDITIONAL CLAUSES TO CHARTER PARTY MV "FURIA R"
## DATED HAMBURG, 18th MAY 2006

*Clause 82 (continued):*

* Owners to confirm vessel has not been detained by any countries during the last 24 months and has no outstanding deficiencies from port state controls. - Yes but as from February '05 since the vessel has been under present Owners.

* Owners guarantee that the terms and conditions of employment of the crew of the vessel for the period of the Charter Party are covered by a bonafide trade union agreement acceptable to the itf. Owners warrant vessel and Owners are fully ISM (BIMCO ISM Clause to apply) and P and I covered with IACS member throughout the duration of this Charter Party.

* Owners confirm vessel has no centreline beams/bulkheads or any other obstruction on decks or holds which would interfere with loading/discharging operations and use/or use of bulldozers/payloaders.

## MV FURIA R – "BIMCO" BALTIC EXCHANGE DRY CARGO QUESTIONNAIRE

1.    **General**
1.1   Vessel's name                 : "FURIA R"
1.2   Vessel's previous name(s)     : "FAIRY QUEEN"
1.3   Flag                          : MALTA
1.4   Month/year and where built    : JAN 1996 - JAPAN
1.5   Yard name and number          : MITSUI ENGINEERING AND SHIPBUILDING TOMANO
                                       WORKS, JAPAN
1.6   Official class register
      number/Lloyds number          :
1.7   Class of vessel               : NKK NS BULK CARRIER, (ESP) MNS
1.8   Port of registry              : VALETTA, MALTA
1.9   Owners (full style and
      contact numbers)              : POLINOS MARITIME LTD, VALETTA - CONTACT C/O
                                       MANAGERS
1.10  Managers                      : J.G.ROUSSOS SHIPPING S.A, GREECE
1.11  Disponent Owners for the
      purpose of this C/P (if applicable)

2     **Particulars of vessel**
2.1   Type of vessel                : BULK CARRIER

2.2   State following:
      Deadweight all told:        Draft      TPI/TPC   (m/tons)
      Summer      : 46.664        11,62m     51,5
      Winter      : 45.420        11,38m     51,4
      Tropical    : 47.912        11,862m    -51,6
      Fresh Water : 46.664        11,884m    51,6
      Tropical FW : 47.885        12,126m    51,6

2.3   is vessel fitted for transit of:
      A) Panama Canal      : YES
      B) Suez canal        : YES
      C) St. Lawrence Seaway : NO

2.7   GT/NT:
      International  : 27,011   / 16,011
      Suez          : 27,757.29 / 24,983.30

*(to be continued...)*

13

31 Jan 07 11:58 . J G R 0030210988l891 p.18



Trans-Globe Monitor Shipping GmbH

Tramp Maritime Inc.
B.H Shipping, Screen 125 35 Prospect
Tel: (1+389)10-11229, fax:-11-2 11-3288
E-Mail: chartering@trampmaritime.gr

---

## ADDITIONAL CLAUSES TO CHARTER PARTY MV "FURIA R"
### DATED HAMBURG, 18ᵗʰ MAY 2006

*Clause 82 (continued):*

Panama       : 27,011   / 22,454

2.8  Length overall (meters)                    : 189,80

2.9  Length between Perpendiculars (meters)     : 181,00

2.10 Extreme breadth (meters) and depth moulded : 31,90 / 16,50

2.11 Distance from waterline to top of hatch coaming:
    A. Fully loaded condition                                          : HATCH NR 1/3/5: 7.11/7.11/7.11m
    B. Full Ballast condition (ballast holds not flooded) : HATCH NR 1/3/5: 14.83/13.77/12.67
    C. Full ballast condition (ballast holds flooded)     : HATCH NR 1/3/5: 10.93/10.67/10.40

2.12 State vessel's deballasting time in metric tons per hour        : about 1.000 m3 per hour

2.15 State capacity of
    A. Ballast tanks
    B. Hold ballast capacity (state which hold):
       HOLD NR 3 FLOODABLE WITH SEA WATER - CAPACITY 12,589 M3

2.16 Constant excluding fresh water             : about 350 mt
    Daily freshwater consumption                : abt 9mt
    Fresh water capacity                        : 343.0 M3
    State capacity and daily production of evaporators : abt 10mt
    Normal fresh water reserve                  : abt 200mt

2.17 Vessel is fitted with shaft generator      : NO

2.18 State vessel's onboard electrical supply   : ( 440v / 60 Hz)

3.  Cargo arrangements
3.1 Holds:
    A. Number of holds: FIVE (5)
    B. Are vessels holds clear and free of any obstructions: YES
    D. Grain/bale capacities by hold including hatch ways (CUBM/CBFT)
       GRAIN/BALE: 59,820.4/57,236.7 M3 (2.112.557/2.021.315 CBFT)
       GR/BL INCL. HATCHES
       (1): 10,355.5(365.704) / 9,385.6
       (2): 12,547.2(443.104) / 11,974.7
       (3): 12,583.4(444.383) / 11,930.9
       (4): 12,679.7(447.784) / 12,137.1
       (5): 11,654.8(411.582) / 11,308.4
    E. Is vessel strengthened for the carriage of heavy cargoes: YES
    F. Is tanktops steel and suitable for grab discharge: YES
    G. corrugations: vertical
    H. Tank top strength (metric tons per SQM)
       STRENGTHS: TANK TOP  HO 1/3/5: 24MT/M2
                            HO 2/4 : 17MT/M2
    I. Are holds CO2 fitted: NO

*(to be continued...)*

14

 Trans-Globe Monitor Shipping GmbH

Tramp Maritime Inc.
9.8 verg. bää Serfeti-159 35 Street, 3
In 1 (72)(643)(268)/58c~30.1-25 3735
E-Mail: charteling@trampmaritime.gr

## ADDITIONAL CLAUSES TO CHARTER PARTY MV "FURIA R"
### DATED HAMBURG, 18ᵗʰ MAY 2006

*Clause 32 (continued):*

J.  Are holds fitted with smoke detection system: NO
K.  Is vessel fitted with Australian type approved hold ladders: YES
L.  Has vessel a loadmaster computer/loadicator or other type of mechanical stowage calculator: YES
M.  Are holds hoppered at:
Hold side: YES
Forward bulkhead: NO
Aft bulkhead: NO
Can vessel's holds be described as box shaped: NO
N.  Measurement of any tank slopes/hoppering (height and distance from vessel's side at tank (top): HEIGHT: 3.62m / DISTANCE: 3,80 m
O.  Flat floor measurement of cargo holds at tank top:
TANK TOP DIM:  (1): 27,50  X  8,00m FWD
X 23,54m AFT
(2): 27,60  X 23,54m
(3): 27,60  X 23,54m
(4): 28,00  X 23,54m
(5): 28,00  X 23,54m
P.  Is vessel electrical ventilated: NO

3.2  Hatches
A.  Number of hatches: FIVE (5)
B.  Type of hatch covers: FOLDING TYPE HYDRAULIC DRIVEN
C.  Hatch sizes:  (1): 17,60 X 17,16
(2): 20,80 X 17,16
(3): 20,80 X 17,16
(4): 20,80 X 17,16
(5): 20,80 X 17,16
D.  Strength of hatch covers in metric tons per SQM:
HA COVERS: 1/2/3/4/5: 2,45MT/M2
E.  Distance from ship's rail to edge of hatch covers/coaming each side:
ABOUT 6M EACH SIDE, EXCEPT NR 1 FWD WHICH IS LESS
F.  Distance from bow to for of 1st hold opening: ABT 19,60M
G.  Distance from stern to aft of last hold opening: ABT 25,16M
H.  Is vessel fitted with cement holes: YES

4    Speed/consumption/fuel engine (up to beaufort scale force 4/douglas sea scale 3):
-abt 13,50 kn on abt 25,0 mt MARINE IFO 380CST plus abt 1,8 mt MDO in ballast
-abt 13,50 kn on abt 27,5 mt MARINE IFO 380CST plus abt 1,8 mt MDO in laden
-At port abt 1,2 mt MARINE IFO 380CST plus abt 1,8 mt MDO
- W/W: abt 5,8 mt MDO

Vessel to be supplied with bunkers:
-IFO MAX 380 CST-GRADE RMG 35 IN ACCORDANCE WITH ISO 8217
-MDO GRADE DMB IN ACCORDANCE WITH ISO 8217

When manonvering and steaming in rivers, canals, dence traffic areas and operating under a load of abt 35 pct or less the vessel is burning MDO

All details are 'about' excl bunker grade                    (to be continued...)

15



Trans-Globe Monitor Shipping GmbH

Tramp Maritime Inc
8. N. Dergrandji Street. 122 15 Progr...
Td. (+302)1451239 /5911-52 X & +=1517
Email: chartering@trampmade.m.e.gr

---

## ADDITIONAL CLAUSES TO CHARTER PARTY MV "FURIA R"
## DATED HAMBURG, 18ᵗʰ MAY 2006

*Clause 82 (continued):*

4.1
4.2    Bunker grades IFO/MDO: AS STATED ABOVE
4.3    Permanent usable bunker capacities IFO/MDO (excluding unpumpables which are: abt 10 mts
4.4    Port consumption per 24 hours idle/working &/24 hours: AS STATED ABOVE
4.5    Engine Make and type: MITSUI-MAN B+W 6S50MC(MK5)
4.6    Max output BHP/RPM: 11100

5.     Banking information: AS PER THE CHARTER PARTY
5.1    Full style and address of Owners bank for freight/hire remittance: AS PER THE CHARTER PARTY

6.     Classification society, surveys and certificates
6.1    Name of Classification society: NKK
6.2    Date of last special survey: 23/12/2005
6.3    Date of last annual survey
6.4    A. Is vessel entered in a classification approved enhanced survey program: NO
       B. Date of last inspection
       C. Date of next inspection
6.5    Date and last place of last drydock: 23/12/05
6.6    Has vessel been involved in any pollution incidents in the last 12 months:
       NO (AS FROM THE TIME OF PRESENT OWNERSHIP)
6.7    Has vessel been involved in any groundings or collision in the last 12 months:
       NO, AS FROM THE TIME OF PRESENT OWNERSHIP.
6.8    Is vessel ISM certified: YES
6.11   Is vessel's crew covered by full ITF or bona fide trade union agreement acceptable to ITF: YES

7      Communication
7.1    Call sign              : 9 H B X 8
7.6    Inmarsat C Telex number : 4215822010

8      Insurance
8.1    Hull and machinery value:
       USD 24 MILLIONS, INCREASED VALUE USD 6 MILLIONS, TOTAL USD 30 MILLIONS
8.2    Name of Owners' P and I insurers: WEST OF ENGLAND

9      Crew
9.1    Number of crew          : PRESENTLY 23
9.2    Name and nationality of master : PRESENTLY CPT IGOR BUSHUYEV (UKRAINIAN)
9.3    Nationality of officers  : PRESENTLY UKRAINIANS
9.4    Nationality of crew      : PRESENTLY UKRAINIANS

10     Miscellaneous
10.1   Has vessel called at C.I.S. (Russian) Far East Pacific ports in the last 18 months: NO
10.2   State last 5 (five) cargoes carried with load and discharge port(s)
10.3   Is vessel fitted for carriage of grain in accordance with chapter IV of Solas 1974 and
       amendments without requiring bagging strapping and securing when loading a full cargo
       (deadweight) of heavy grain in bulk (stowage factor 42 CBFT) with ends untrimmed? YES
10.4   State number of holds which may be left slack without requiring bagging, strapping and
       securing: ACCORDING TO THE STABILITY CALCULATION

*(to be continued...)*

16

Case 1:08-cv-01318-HB     Document 8-2     Filed 03/04/2008     Page 32 of 39



Trans-Globe Monitor Shipping GmbH

Tramp Maritime Inc
8 & Monginae, Str. 1838 Europe
Tel: +3820-01929/fax i+2021-01923
E-mail: trams@trampmaritime.gr

## ADDITIONAL CLAUSES TO CHARTER PARTY MV "FURIA R"
## DATED HAMBURG, 18th MAY 2006

*Clause 82 (continued):*

| | | |
|---|---|---|
| 11 | Cargo gear (only to be completed if applicable) | |
| 11.1 | If geared state make and type | : IHI |
| 11.2 | Number and capacity of cranes/derricks and where situated | : 4x30 mts between hatches |
| | 1-2, 2-3, 3-4, 4-5 | |
| 11.3 | Outreach of gear beyond ship's rail | : 10,50 meters |
| 11.4 | If gantry cranes/horizontal slewing cranes state minimum clearance distance crane hook to top of hatch coaming | : NO |
| 11.5 | Time needed for full cycle with maximum cargo lift on hook | : |
| 11.6 | Slewing/luffing/hoisting speeds | : |
| 11.7 | Is gear combinable for heavy lift | : NO |
| 11.8 | Are winches electro-hydraulic | : YES |
| 11.9 | Consumption of MDO working cranes per 24 hours | : ABT 3,3mt |
| 11.10 | Has vessel grabs onboard | : NO |
| 11.11 | Is vessel fitted with sufficient lights at each hatch for night work | : YES |

### Clause 83. – BIMCO ISPS/MTSA Clause For Time Charter Parties 2005

(a)  (i)  The Owners shall comply with the requirements of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) relating to the Vessel and "the Company" (as defined by the ISPS Code). If trading to or from the United States or passing through United States waters, the Owners shall also comply with the requirements of the US Maritime Transportation Security Act 2002 (MTSA) relating to the Vessel and the "Owner" (as defined by the MTSA).

(ii)  Upon request the Owners shall provide the Charterers with a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) and the full style contact details of the Company Security Officer (CSO).

(iii)  Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Owners or "the Company"/"Owner" to comply with the requirements of the ISPS Code/MTSA or this Clause shall be for the Owners' account, except as otherwise provided in this Charter Party.

(b)  i)  The Charterers shall provide the Owners and the Master with their full style contact details and, upon request, any other information the Owners require to comply with the ISPS Code/MTSA. Where sub-letting is permitted under the terms of this Charter Party, the Charterers shall ensure that the contact details of all sub-charterers are likewise provided to the Owners and the Master. Furthermore, the Charterers shall ensure that all sub-charter parties they enter into during the period of this Charter Party contain the following provision:

"The Charterers shall provide the Owners with their full style contact details and, where sub-letting is permitted under the terms of the charter party, shall ensure that the contact details of all sub-charterers are likewise provided to the Owners".

(ii)  Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account, except as otherwise provided in this Charter Party.

(c)  Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code/MTSA including, but not limited to, security guards, launch services, vessel escorts, security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the negligence of the Owners, Master or crew.                                     *(to be continued...)*

17



Trans-Globe Monitor Shipping GmbH

Tramp Maritime in.
9.II Verapras Street no. 5, Turs
MLie Inriari3021,Vac~5 ; of' u5
E-Mail: chausring@tampral.lime :

---

## ADDITIONAL CLAUSES TO CHARTER PARTY MV "FURIA R"
## DATED HAMBURG, 18th MAY 2006

*Clause 83 (continued):*

All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

(d) If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

*Footnote: This Clause replaces previously published ISPS Clause for Time Charter Parties AND the US Security Clause for Time Charter Parties, both of which are now officially withdrawn.*

Clause 84. - BIMCO U.S. Customs Advance Notification/AMS Clause For Time Charter Parties

(a) If the Vessel loads or carries cargo destined for the U.S. or passing through U.S. ports in transit, the Charterers shall comply with the current U.S. Customs Regulations (19 CFR 4.7) or any subsequent amendments thereto and shall undertake the role of carrier for the purposes of such regulations and shall, in their own name, time and expense :

   i) Have in place a SCAC (Standard Carrier Alpha Code);

   ii) Have in place an ICB (International Carrier Bond);

   iii) Provide the Owners with a timely confirmation of i) and ii) above; and

   iv) Submit a cargo declaration by AMS (Automated Manifest System) to the U.S. Customs and provide the Owners at the same time with a copy thereof.

(b) The Charterers assume liability for and shall indemnify, defend and hold harmless the Owners against any loss and/or damage whatsoever (including consequential loss and/or damage) and/or any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Charterers' failure to comply with any of the provisions of sub-clause (a). Should such failure result in any delay then, notwithstanding any provision in this Charter Party to the contrary, the Vessel shall remain on hire.

(c) If the Charterers' ICB is used to meet any penalties, duties, taxes or other charges which are solely the responsibility of the Owners, the Owners shall promptly reimburse the Charterers for these amounts.

(d) The assumption of the role of carrier by the Charterers pursuant to this Clause and for the purpose of the U.S. Customs Regulations (19 CFR 4.7) shall be without prejudice to the identity of carrier under any Bill of Lading, other contract, law or regulation.

*************

18

31 Jan 07 12:02    J S R                          00302109881881          P.23

 Trans-Globe Monitor Shipping GmbH

Tramp Maritime Inc.
5. It Maratchau Street, 122 18 Athens
[fax] +302924333787/307/--3--741/3593
E-Mail: chartering@trampmar?tos-s.gr

---

### ADDITIONAL CLAUSES TO CHARTER PARTY MV "FURIA B"
### DATED HAMBURG, 18th MAY 2006

#### NEW JASON CLAUSE

"In the event of accident, danger, damage or disaster before or after commencement of the voyage resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract, or otherwise, the cargo, shippers, consignees, or Owners of the goods shall contribute with the carrier in general average to the payment of any sacrifices, losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the cargo.

If a salvage ship is owned or operated by the carrier, salvage shall be paid for as fully as if such salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, shippers, consignees or Owners of the cargo to the carrier before delivery."

#### NEW BOTH TO BLAME COLLISION CLAUSE

"If the vessel comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, Mariner, Pilot or the Servants of the carrier in the navigation or in the management of the vessel, the Owners of the cargo carried hereunder will indemnify the carrier against all loss or liability to the other or non-carrying ship or her Owners in so far as such loss or liability represents loss of or damage to or any claim whatsoever of the Owners of said cargo, paid or payable by the other or non-carrying ship or her Owners to the Owners of the said cargo and set off, recouped or recovered by the other or non-carrying ship or her Owners as part of their claim against the carrying vessel or carrier.

The foregoing provisions shall also apply where the Owners, operators or those in charge of any ship or ships or objects other than, or in addition to the colliding ships or objects are at fault in respect to a collision or contact."

#### BIMCO BUNKER FUEL SULPHUR CONTENT CLAUSE FOR TIME CHARTER PARTIES 2005

(a) Without prejudice to anything else contained in this Charter Party, the Charterers shall supply fuels of such specifications and grades to permit the Vessel, at all times, to comply with the maximum sulphur content requirements of any emission control zone when the Vessel is ordered to trade within that zone.

The Charterers also warrant that any bunker suppliers, bunker craft operators and bunker surveyors used by the Charterers to supply such fuels shall comply with Regulations 14 and 18 of MARPOL Annex VI, including the Guidelines in respect of sampling and the provision of bunker delivery notes.

The Charterers shall indemnify, defend and hold harmless the Owners in respect of any loss, liability, delay, fines, costs or expenses arising or resulting from the Charterers' failure to comply with this Sub-clause (a).

(b) Provided always that the Charterers have fulfilled their obligations in respect of the supply of fuels in accordance with Sub-clause (a), the Owners warrant that:

   (i)   the Vessel shall comply with Regulations 14 and 18 of MARPOL Annex VI and with the requirements of any emission control zone; and

   (ii)  the Vessel shall be able to consume fuels of the required sulphur content

when ordered by the Charterers to trade within any such zone.

Subject to having supplied the Vessel with fuels in accordance with Sub-clause (a), the Charterers shall not otherwise be liable for any loss, delay, fines, costs or expenses arising or resulting from the Vessel's failure to comply with Regulations 14 and 18 of MARPOL Annex VI.

(c) For the purpose of this Clause, "emission control zone" shall mean zones as stipulated in MARPOL Annex VI and/or zones regulated by regional and/or national authorities such as, but not limited to, the EU and the US Environmental Protection Agency.

#### BIMCO ICE CLAUSE FOR TIME CHARTER PARTIES

(a) The vessel shall not be obliged to force ice but, subject to the Owners' prior approval having due regard to its size, construction and class, may follow ice-breakers.

(b) The Vessel shall not be required to enter or remain in any icebound port or area, nor any port or area where lights, lightships, markers or buoys have been or are about to be withdrawn by reason of ice, nor where on account of ice there is, in the Master's sole discretion, a risk that, in the ordinary course of events, the Vessel will not be able safely to enter and remain at the port or area or to depart after completion of loading or discharging. If, on account of ice, the Master in his sole discretion considers it unsafe to proceed to, enter or remain at the place of loading or discharging for fear of the Vessel being frozen in and/or damaged, he shall be at liberty to sail to the nearest ice-free and safe place and there await the Charterers' instructions.

19

00302109881891                    p.24



Trans-Globe Monitor Shipping GmbH

Tramp Maritime Inc.
9.A Vecerisias Street - 153.21 Piraeus
Tel: (+30)210413(22) Fax:(+30)21413(33)
E-Mart: cramsship@tramomare.net.gr

---

## ADDITIONAL CLAUSES TO CHARTER PARTY MV "FURIA R"
## DATED HAMBURG, 18th MAY 2006

(c) Any delay or deviation caused by or resulting from ice shall be for the Charterers' account and the Vessel shall remain on-hire.

(d) Any additional premiums and/or calls required by the Vessel's underwriters due to the Vessel entering or remaining in any icebound port or area, shall be for the Charterers' account

### WAR RISKS CLAUSE FOR TIME CHARTERS, 2004
Code Name: CONWARTIME 2004

(a) For the purpose of this Clause, the words:
  (i) "Owners" shall include the shipowners, bareboat charterers, disponent owners, managers or other operators who are charged with the management of the Vessel, and the Master; and
  (ii) "War Risks" shall include any actual, threatened or reported:
  war; act of war; civil war; hostilities; revolution; rebellion; civil commotion; warlike operations; laying of mines; acts of piracy; acts of terrorists; acts of hostility or malicious damage; blockades (whether imposed against all vessels or imposed selectively against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever), by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the Vessel, her cargo, crew or other persons on board the Vessel.

(b) The Vessel, unless the written consent of the Owners be first obtained, shall not be ordered to or required to continue to or through, any port, place, area or zone (whether of land or sea), or any waterway or canal, where it appears that the Vessel, her cargo, crew or other persons on board the Vessel, in the reasonable judgement of the Master and/or the Owners, may be, or are likely to be, exposed to War Risks. Should the Vessel be within any such place as aforesaid, which only becomes dangerous, or is likely to be or to become dangerous, after her entry into it, she shall be at liberty to leave it.

(c) The Vessel shall not be required to load contraband cargo, or to pass through any blockade, whether such blockade be imposed on all vessels, or is imposed selectively in any way whatsoever against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever, or to proceed to an area where she shall be subject, or is likely to be subject to a belligerents' right of search and/or confiscation.

(d) (i)  The Owners may effect war risks insurance in respect of the Hull and Machinery of the Vessel and their other interests (including, but not limited to, loss of earnings and detention, the crew and their protection and indemnity Risks), and the premiums and/or calls therefor shall be for their account.
  (ii)  If the Underwriters of such insurance should require payment of premiums and/or calls because, pursuant to the Charterers' orders, the Vessel is within, or is due to enter and remain within, or pass through any area or areas which are specified by such Underwriters as being subject to additional premiums because of War Risks, then the actual premiums and/or calls paid shall be reimbursed by the Charterers to the Owners at the same time as the next payment of hire is due, or upon redelivery, whichever occurs first.

(e) If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then the actual bonus or additional wages paid shall be reimbursed to the Owners by the Charterers at the same time as the next payment of hire is due, or upon redelivery, whichever occurs first.

(f) The Vessel shall have liberty:-
  (i)  to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery, or in any other way whatsoever, which are given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government, body or group whatsoever acting with the power to compel compliance with their orders or directions;
  (ii)  to comply with the order, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance;
  (iii)  to comply with the terms of any resolution of the Security Council of the United Nations, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;
  (iv)  to discharge at any other port any cargo or part thereof which may render the Vessel liable to confiscation as a contraband carrier;
  (v)  to call at any other port to change the crew or any part thereof or other persons on board the Vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions.

20



Trans-Globe Monitor Shipping GmbH

Tramp Maritime Inc.
8, Il Vessa site Serie , GESE Piraeus
tel: +30[0]2144413255; fax t=39210-413255
E-Mail: chartering@trampmaritine.gr

## ADDITIONAL CLAUSES TO CHARTER PARTY MV "FURIA R"
## DATED HAMBURG, 18ᵗʰ MAY 2006

(g). If in accordance with their rights under the foregoing provisions of this Clause, the Owners shall refuse to proceed to the loading or discharging ports, or any one or more of them, they shall immediately inform the Charterers. No cargo shall be discharged at any alternative port without first giving the Charterers notice of the Owners' intention to do so and requesting them to nominate a safe port for such discharge. Failing such nomination by the Charterers within 48 hours of the receipt of such notice and request, the Owners may discharge the cargo at any safe port of their own choice.

(h). If in compliance with any of the provisions of sub-clauses (b) to (g) of this Clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfilment of this Charter Party.

### CARRIAGE OF NUCLEAR MATERIALS

"Notwithstanding any provision whether written or printed contained in this Charter, it is agreed that nuclear fuels or radioactive waste or products are specifically excluded from the cargo permitted to be loaded or carried under this Charter Party. This exclusion does not apply to radio isotopes used or intended to be used for any industrial, commercial, agricultural, medical or scientific purpose, provided Owners' prior approval has been obtained to the loading thereof."

### CANADIAN CLAUSE PARAMOUNT

All the terms, provisions and conditions of the Canadian Water Carriage of Goods Act, 1936, and of the Rules comprising the schedule thereto are, so far as applicable, to govern the contract contained in this Bill of Lading and the Shipowners are to be entitled to the benefit of all privileges, rights and immunities contained in such Act and in the schedule thereto as if the same were herein specifically set out.
If anything herein contain be inconsistent with the said provisions, it shall to the extent of such inconsistency and no further be null and void.

The Carrier shall be under no responsibility whatsoever for loss of or damage to goods howsoever and wheresoever occurring when such loss or damage arises prior to the loading on and/ or subsequent to the discharge from the Carrier's ship.

### U.S.A. CLAUSE PARAMOUNT

If the vessel load in the U.S.A., the U.S.A. Clause Paramount shall be incorporated in all Bills of Lading and shall read as follows:

"The Bill of Lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April 16ᵗʰ, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the Carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any terms of this Bill of Lading be repugnant to said Act to any extent, such term shall be void to that extent but no further".

21



Trans-Globe Monitor Shipping GmbH

Tramp Maritime Inc
5,II Маргаше Strvst· ·ts0 Po 3ags,
Rt.(·2089459887/fact-c; 1·9·1931
E-Mail. chartering@yanonea.truesgr

---

## ADDITIONAL CLAUSES TO CHARTER PARTY MV "FURIA R"
### DATED HAMBURG, 18ᵗʰ MAY 2006

STANDARD FORM LETTER OF INDEMNITY TO BE GIVEN IN RETURN FOR DELIVERING CARGO
AT A PORT OTHER THAN THAT STATED IN THE BILL OF LADING

To:         (insert name of Owners)                          (insert date)
            The Owners of the (insert name of ship)

Dear Sirs,

Ship:       (insert name of ship)

Voyage: (insert load and discharge ports as stated in the bill of lading)

Cargo:      (insert description of cargo)

Bill of Lading:    (insert identification numbers, date and place of issue)

The above cargo was shipped on the above ship by (insert name of shipper) and consigned to (insert name of consignee or party to whose order the bill of lading is made out, as appropriate) for delivery at the port of (insert name of discharge port stated in the bill of lading) but we, (insert name of party requesting substituted delivery), hereby request you to order the ship to proceed to and deliver the said cargo at (insert name of substitute port or place of delivery) against production of at least one original bill of lading.

In consideration of your complying with our above request, we hereby agree as follows:-

1.  To indemnify you, your servants and agents and to hold all of you harmless in respect of any liability, loss, damage or expense of whatsoever nature which you may sustain by reason of the ship proceeding and giving delivery of the cargo against production of at least one original bill of lading in accordance with our request.

2.  In the event of any proceedings being commenced against you or any of your servants or agents in connection with the ship proceeding and giving delivery of the cargo as aforesaid, to provide you, your servants or agents in connection with sufficient funds to defend the same.

3.  If, in connection with the delivery of the cargo as aforesaid, the ship, or any other ship or property in the same or associated ownership, management or control, should be arrested or detained or should the arrest or detention thereof be threatened, or should there be any interference in the use or trading of the vessel (whether by virtue of a caveat being entered on the ship's registry or otherwise howsoever), to provide on demand such bail or other security as may be required to prevent such arrest or detention or to secure the release of such ship or property or to remove such interference and to indemnify you in respect of any liability, loss, damage or expense caused by such arrest or detention or threatened arrest or detention or such interference, whether or not such arrest or detention or threatened arrest or detention or such interference may be justified.

4.  The liability of each and every person under this indemnity shall be joint and several and shall not be conditional upon your procuring first against any person, whether or not such person is party to or liable under this indemnity.

5.  This indemnity shall be governed by and construed in accordance with English law and each and every person liable under this indemnity shall at your request submit to the jurisdiction of the High Court of Justice of England.

Yours faithfully

For and on behalf of
(insert name of Requestor)

The Requestor

...........................................................
Signature

22



Trans-Globe Monitor Shipping GmbH

Tramp Maritime Inc
В.А. Мелентьев, Str. и.  Ул. Б. Харков
Tel. +2020413200, Fax:+2, 2 147 2559
E-Mail: chartering@tramp-mar.gr

## ADDITIONAL CLAUSES TO CHARTER PARTY MV "FURIA R"
## DATED HAMBURG, 18ᵗʰ MAY 2006

STANDARD FORM LETTER OF INDEMNITY TO BE GIVEN IN RETURN FOR DELIVERING CARGO
AT A PORT OTHER THAN THAT STATED IN THE BILL OF LADING AND WITHOUT PRODUCTION
OF THE ORIGINAL BILL OF LADING

To:         *(insert name of Owners)*                          *(insert date)*
            The Owners of the *(Insert name of ship)*

Dear Sirs,

Ship:       *(Insert name of ship)*

Voyage: *(Insert load and discharge ports as stated in the bill of lading)*

Cargo:      *(insert description of cargo)*

Bill of Lading:     *(Insert identification numbers, date and place of issue)*

The above cargo was shipped on the above vessel by *(insert name of shipper)* and consigned to *(insert name of consignee or party to whose order the bill of lading are made out, as appropriate)* for delivery at the port of *(insert name of discharge port stated in the bill of lading)* but we, *(insert name of party requesting substituted delivery)*, hereby request you to order the vessel to proceed to and deliver the said cargo at *(insert name of substitute port or place of delivery)* to *(insert name of party to whom delivery is to be made)* without production of the original bill of lading.

In consideration of your complying with our above request, we hereby agree as follows:-

1.  To indemnify you, your servants and agents and to hold all of you harmless in respect of any liability, loss, damage or expense of whatsoever nature which you may sustain by reason of the ship proceeding and giving delivery of the cargo in accordance with our request.

2.  In the event of any proceedings being commenced against you or any of your servants or agents in connection with the ship proceeding and giving delivery of the cargo as aforesaid, to provide you or them on demand with sufficient funds to defend the same.

3.  If, in connection with the delivery of the cargo as aforesaid, the ship, or any other ship or property in the same or associated ownership, management or control, should be arrested or detained or should the arrest or detention thereof be threatened, or should there be any interference in the use or trading of the vessel (whether by virtue of a caveat being entered on the ship's registry or otherwise howsoever), to provide on demand such bail or other security as may be required to prevent such arrest or detention or to secure the release of such ship or property or to remove such interference and to indemnify you in respect of any liability, loss, damage or expense caused by such arrest or detention or threatened arrest or detention or such interference, whether or not such arrest or detention or threatened arrest or detention or such interference may be justified.

4.  If the place at which we have asked you to make delivery is a bulk liquid or gas terminal or facility, or another ship, lighter or barge, then delivery to such terminal, facility, ship, lighter or barge shall be deemed to be delivered to the party to whom we have requested you to make such delivery.

5.  As soon as all original bills of lading for the above cargo shall have come into our possession, to deliver the same to you, or otherwise to cause all original bills of lading to be delivered to you.

6.  The liability of each and every person under this indemnity shall be joint and several and shall not be conditional upon your proceeding first against any person, whether or not such person is party to or liable under this indemnity.

7.  This indemnity shall be governed by and construed in accordance with English law and each and every person liable under this indemnity shall at your request submit to the jurisdiction of the High Court of Justice of England.

Yours faithfully

For and on behalf of
*(insert name of Requestor)*

The Requestor

..............................................................
Signature

23

31 Jan 07 12:05      J G R                      00302109881891        P.28

 Trans-Globe Monitor Shipping GmbH

Tramp Maritime Inc.
9.ll Memoris Great-Norths Avenue
To: (132)(2641)(23)(Fax: +3,4/4e+),3392
E-Mail: chartering@tramomaritime.gr

---

### ADDITIONAL CLAUSES TO CHARTER PARTY MV "FURIA R"
### DATED HAMBURG, 18th MAY 2006

---

STANDARD FORM LETTER OF INDEMNITY TO BE GIVEN IN RETURN FOR DELIVERING CARGO
WITHOUT PRODUCTION OF THE ORIGINAL BILL OF LADING

To:          (insert name of Owners)                          (Insert date)
             The Owners of the (insert name of ship)
             (insert address)

Dear Sir,

Ship:          (insert name of ship)

Voyage: (insert load and discharge ports as stated in the bill of lading)

Cargo:          (insert description of cargo)

Bill of Lading:     (insert identification numbers, date and place of issue)

The above cargo was shipped on the above ship by (insert name of shipper) and consigned to (insert name of
consignee or party to whose order the bill of lading is made out, as appropriate) for delivery at the port of (insert
name of discharge port stated in the bill of lading) but the Bills of Lading have not arrived and we, (insert name of
party requesting delivery), hereby request you to deliver the said cargo to (insert name of party to whom delivery is to
be made) at (insert place where delivery is to be made) without production of the original Bill(s) of Lading.

In consideration of your complying with our above request, we hereby agree as follows:-

1.  To indemnify you, your servants and agents and to hold all of you harmless in respect of any liability, loss,
    damage or expense of whatsoever nature which you may sustain by reason of the vessel proceeding and giving
    delivery of the cargo in accordance with our request.

2.  In the event of any proceedings being commenced against you or any of your servants or agents in connection
    with the delivery of the cargo as aforesaid, to provide you or them on demand with sufficient funds to defend the
    same.

3.  If, in connection with the delivery of the cargo as aforesaid, the ship, or any other ship or property in the same or
    associated ownership, management or control, should be arrested or detained or should the arrest or detention
    thereof be threatened, or should there be any interference in the use or trading of the vessel (whether by virtue of a
    caveat being entered on the ship's registry or otherwise howsoever), to provide on demand such bail or other
    security as may be required to prevent such arrest or detention or to secure the release of such ship or property or
    to remove such interference and to indemnify you in respect of any liability, loss, damage or expense caused by
    such arrest or detention or threatened arrest or detention or such interference, whether or not such arrest or
    detention or threatened arrest or detention or such interference may be justified.

4.  If the place at which we have asked you to make delivery is a bulk liquid or gas terminal or facility, or another
    ship, lighter or barge, then delivery to such terminal, facility, ship, lighter or barge shall be deemed to be delivered
    to the party to whom we have requested you to make such delivery.

5.  As soon as all original bills of lading for the above cargo shall have come into our possession, to deliver the same
    to you, or otherwise to cause all original bills of lading to be delivered to you, whereupon our liability hereunder
    shall cease.

6.  The liability of each and every person under this indemnity shall be joint and several and shall not be conditional
    upon your proceeding first against any person, whether or not such person is party to or liable under this
    indemnity.

7.  This indemnity shall be governed by and construed in accordance with English law and each and every person
    liable under this indemnity shall at your request submit to the jurisdiction of the High Court of Justice of England.

Yours faithfully

For and on behalf of
(insert name of Requestor)

The Requestor

.......................................................
Signature

                                                                              24

# EXHIBIT 2

*FORM A/1*



**REPORT OF INSPECTION IN ACCORDANCE WITH THE PARIS MEMORANDUM OF UNDERSTANDING ON PORT STATE CONTROL \*)**

Federal Maritime Administration
Rozhdestvenka St., 1/1
109012 Moscow, Russian Federation
+7 095 926 1000, +7 095 926 1311
memorand@pmo.ru

copy to:
- master
- head office
- PSCO

if ship is detained, copy to:
- flag State
- recognised organisation, if applicable

### SHIP PARTICULARS

1. Name of ship: *NICHOLAS   M*  2. Flag of ship: *ST. VINCENT & GRENADINES*

3. Type of ship: *BULKER*  4. Call sign: *J8B2680*

5. IMO number: *7433452*  6. Gross tonnage: *22.012*

7. Date keel laid / major conversion commenced  *1977*

8. Deadweight (where applicable):

9a. Classification society(ies) responsible for issuance of class certificates:
*BV  WITHDRAWN  28.12.07*

9b. Classification society(ies) responsible for issuance of certificates on behalf of the flag State:
*RV;  INSB*

10. Full particulars of company (identical to particulars as in the ISM DoC) \*\*):
*CHIAN  SPIRIT  MARITIME  ENTERPRISES  INC.
126  KOLOKOTRONI  STR.,  185 35  PIRAEUS , GREECE*

11. Name & address of charterer: (Only ships carrying liquid or solid cargoes in bulk, pref. 1st charterer record.)
☐ Demise Charter ☒ Time Charter ☐ Voyage Charter ☐ Not applicable
☐ First Charterer ☐ Last Charterer ☐ Not available
*CONGENTRA  AG
ZUGM  SWITZERLAND*

12. Name and signature of master to certify that the information under 11 is correct:
Name: *AMADO C. APILADO*  Signature: [signature]

### INSPECTION PARTICULARS \*\*)

13. Date of first boarding: *29.12.07*  13b. Date of final report: *11.01.2008*

14. Place of inspection: *St. Petersburg*

15. If vessel is detained: date of issue of detention notice  *29.12.07*

16. Type of inspection: ☐ Initial inspection ☒ More detailed inspection ☐ Expanded inspection
☐ Follow-up inspection ☐ Follow-up detention ☐ (C.)I.C.
☐ Operational control

17. Operational controls (if any): ☐ Abandon Ship ☐ Fire drill ☒ Oily Water Sep. tested
☒ Emerg. Fire Pump ☒ Emergency Generator ☒ Emergency Steering
☒ Communication eq. ☒ Damage control ☒ Other ... *S/G, C.B, ENGINE BLACKOUT*

18. Areas inspected: ☒ Navigation Bridge ☒ Cargo hold(s) / tank(s) ☐ Ballast tanks
☒ Accommodation / Galley ☒ Steering-gear room / Engine room
☒ Decks / Fo'c'sle ☐ Passenger spaces ☐ Car deck

\*) This inspection report has been issued solely for the purposes of informing the master and other port States that an inspection by the port State, mentioned in the heading, has taken place.
This inspection report cannot be construed as a seaworthiness certificate in excess of the certificates the ship is required to carry.
\*\*) Non-ISM ships: Master to supply and sign under 12, for correct full particulars of company
\*\*\*) Masters, Shipowners and/ or Operators are advised that detailed information on the inspection may be subject to publication
(www.parismou.org)

FORM A/2

Name of ship ...... *NICHOLAS M*          IMO number ...... *7433452*

19. Relevant certificate(s):

|  | a) title | b) issuing authority | c) dates of issue and expiry |
|---|---|---|---|
| 1. | Cargo Ship Safety Equipment | *BV* | *13-08-03*   *12-06-08* |
| 2. | Cargo Ship Safety Construction | | |
| 3. | Passenger Ship Safety | | |
| 4. | Cargo Ship Safety Radio | *BV* | *13-08-03*   *13-01-08* |
| 5. | Document of Compliance | *MB* | *08-06-05*   *31-12-08* |
| 6. | Safety Management Certificate | *MB* | *03-05-05*   *03.05.08* |
| 7. | Load Line | *BV* | *13-10-05*   *31.05.10* |
| 8. | Prevention of Pollution by Oil | *BV* | *18-12-03*   *31-03-10* |
| 9. | Safe Manning Document | *MB* | *04-12-03*   *03.05.08* |
| 10. | Ship Security | *MB* | *22-02-03* |
| 11. | Tonnage | | |
| 12. | Class | | |

d) information on last intermediate or annual survey

|  | date of survey | surveying authority | port / country |
|---|---|---|---|
| 1. | Cargo Ship Safety Equipment | | |
| 2. | Cargo Ship Safety Construction | | |
| 3. | Passenger Ship Safety | | |
| 4. | Cargo Ship Safety Radio | | |
| 5. | Document of Compliance | | |
| 6. | Safety Management Certificate | *21.06.05* | *BV   RIO GRANDE / BRASIL* |
| 7. | Load Line | *21.06.07* | *BV   RIO GRANDE / BRASIL* |
| 8. | Prevention of Pollution by Oil | | |
| 9. | Safe Manning Document | | |
| 10. | Ship Security | | |
| 11. | Tonnage | | |
| 12. | Class | | |

20. Ship related inspection action taken:

☒ Flag State informed      ☒ Class informed      ☐ Next port informed
☐ All deficiencies rectified      ☐ Inspection suspended      ☒ Overriding priority inspection
☒ Ship detained      ☐ Repair port to re-detain      ☐ Next port to re-detain
☐ Ship allowed to sail after detention   ☐ Ship allowed to sail after re-detention
☐ MARPOL investigation      ☐ Ship banned      ☐ Ship expelled

21. Deficiencies:          ☐ No          ☒ Yes (see attached FORM B)   *5* pages

22. Supporting documentation:   ☒ No          ☐ Yes (see annex)

## PORT STATE PARTICULARS

District office:          St. Petersburg

Address:                 16, Gapsalskaya Street, 198035 St. Petersburg, Russia

Telephone:               (812) 327 4194

Telefax:                 (812) 327.4019

E-mail:                  mcuspb@mail.pasp.ru

Name (duly authorized PSCO of reporting authority):

*N. S. TUPAKOV , M. SHELYUBOV*

Signature:

<u>This report must be retained on board for a period of at least two years and must be readily available for consultation by Port State Control Officers at all times.</u>

FORM B

REPORT OF INSPECTION, IN ACCORDANCE WITH THE PARIS MEMORANDUM OF UNDERSTANDING ON PORT STATE CONTROL

Federal Maritime Administration
Koshetnvalka St., 1/1
109012 Moscow, Russian Federation
+7 095 926 1000, +7 095 926 1311
marmtrand@gpm.ru

copy to:   - master
           - head office
           - PSCO

If ship is detained, copy to:  - flag State
                                - recognised organisation, if applicable

1. Name of ship: ..N.I.C.H.O.L.A.S.......... .M.............    2. IMO number: ..7.6.3.7.1.5.2.-3. Date of final report: .11.06.08.....   4. Place of inspection: St. Petersburg

| Group code | Deficiencies | Nature of defect(s) | Convention ref.[*] | Action taken[*] | Additional comments | Class resp.[*] |
|---|---|---|---|---|---|---|
| 04.11. | CARGO SECUR. | WITH DRAWN | | 17/10 | BY BV AS PER MODIFICATION | |
| | SAFETY CONSTRUC | | | | DATED 28.12.03. | |
| | VI.CN. | | | | | |
| 01.99 | CERTIFICATES | WITH DRAWN | | 17/10 | CLASS CERTIFICATE — | |
| | | | | | WITHDRAWN BY BV | |
| | | | | | AS PER NOTIFICATION | |
| | | | | | DATED 28.12.03 | |
| 22.03. | SECUR. GU. | AS | | 17 | NOT MAN. VISITORS DELITIFIED | |
| | RELATED DEFECTS | REQUIRED | | | | |
| 04.56. | GANGWAK- | WAS A GE | | 17/10 | LOWER PLATFORM | |
| 02.30. | MANNING | MISSING | | 23/10 | 2ND OFFICER MISSING | |
| | SPEC. HED. BY | | | | | |
| | MINIMUM SAFE | | | | | |
| | MANNING DOC. | | | | | |
| 06.20 | LIFE JACKETS | NOT A.T. | | 17/10 | LIJKS NOT FIXED PROPERLY | |
| | | REQUIRED | | | | |

Name: (duly authorised PSCO of reporting authority) ..V.STUPAKOU.......M.SKELETIKOU..........   Signature

*** Masters, Shipowners and/or Operators are advised that detailed information on this inspection or this report may be subject to publication (www.parismou.org)
[*] This inspection was not a full survey and deficiencies listed may not be the complete list. In the event of a detention, it is recommended that a full survey is carried out and all deficiencies rectified before an application for re-inspection is made.
[*] For passenger ships in the event of a detention (for subsequent ion ships <500 (?) for reference only)
[*] See reverse side of form B for full table.

FORM B

2/5

**REPORT OF INSPECTION IN ACCORDANCE WITH THE PARIS MEMORANDUM OF UNDERSTANDING ON PORT STATE CONTROL**

Federal Maritime Administration.
Rozhdestwenka St., 1/1
109012 Moscow, Russian Federation
+7 095 926 1000, +7 095 926 1311
morsecam@gmna.ru

copy to:  - master
          - head office
          - PSCO

If ship is detained, copy to:  - flag State
                               - recognised organisation, if applicable

1. Name of ship .... *NICHOLAS* ........  2. IMO number: *7433 852*  3. Date of final report ... *11.01.08* ......  4. Place of inspection: **St. Petersburg**

| Group code | Defective item | Nature of defect *) | Convention ref. *) | Action taken *) | Additional comments |
|---|---|---|---|---|---|
| *1420* | *INSULATION* | *INSUFFICIENT* | | *17/10* | *MDO PURIFIER, L.O PURIFIER* |
| | *WATER THROUGH (OIL)* | | | | *M.E., A.E* |
| *1420* | *CLEANLINESS* | *INSUFFICIENT* | | *17* | |
| | *OF E.R* | | | | |
| *0520* | *LIG.KATING* | *INCOMPLETE* | | *17/10* | *SOME LIGHTS UNLIT* |
| *0411* | *VENTILATION* | *DIRTY FILTERS* | | *18/10* | *A.C GALLEY* |
| *0133* | *OBSTRUCTION* | *UNSAFE* | | *17* | *SOME UNSECURED SPARE* |
| *0544* | *STEAM PIPES* | *UNSAFE* | | *17* | *PARTS IN E.R* |
| | *AND PRESSURE* | | | | *EXHAUST PIPE IN E.R* |
| | *PIPES* | | | | *HOLED* |
| *6533* | *OBSTRUCTION/* | *UNSAFE* | | *17* | *WOODEN GRATINGS IN* |
| | *SLIPPING* | | | | *PROVISION STORE DAMAGED* |
| | | | | | *ROLL/S.T.B.D BUTTONS* |
| *0945* | *SIGNS INDICATORS* | *NOT AS REQUIRED* | | *18/10* | *NOT MARKED IN STEERING GEAR ROOM* |

Name (duly authorized PSCO of reporting authority) *M. STREPKOV ... M.SKRETNYUGAV* ............ Signature

*) Masters, Ship Owners and/or Operators are advised that detailed information on the inspection may be subject to publication (www.parismou.org)
b) This inspection was not a full survey and deficiencies listed may not be exhaustive. In the event of a detention, it is recommended that a full survey is carried out and all defects are rectified before an application for re-inspection is made.
*) To be completed in the event of a detention (for Polyntervention ships <300 or for transfer made only)
*) See reverse side of form B for full labels.

FORM B

3/5

# REPORT OF INSPECTION IN ACCORDANCE WITH THE PARIS MEMORANDUM OF UNDERSTANDING ON PORT STATE CONTROL

Federal Maritime Administration
Rozhdestvenka St., 1/1
109012 Moscow, Russian Federation
+7 095 926 1000, +7 095 926 1311
mishnoard@mma.ru

copy to: - master
- inspection
- PSCO

If ship is detained, copy to: - flag state
- recognized organization, if applicable

1. Name of ship: ....NICAROLAS.......

3. IMO number: 7433452    3. Date of final report: 19.01.08
4. Place of inspection: St. Petersburg

## DEFICIENCIES FOUND AND ACTIONS TAKEN

| Group/role | Details of item | Nature or date(s) | Convention ref | Action taken | Additional comments | Class resp. |
|---|---|---|---|---|---|---|
| 07.20 | FIRE FIGHTING EQUIPMENT MUD | NOT REQUIRED | | 17/10 | FIRE EXTINGUISKER IN ER - | ☐ |
| | APPLIANCES | | | | MOBILE MISSING. FIRE | ☐ |
| 13.99 | MOORING | OTHER | | 17/10 | BOXES DAMAGED. MUD HOLED | ☐ |
| | | | | | SOME PAY GUARDS. | ☐ |
| 13.99 | MOORING | OTHER | | | MISSING. | ☐ |
| | | | | | SOME FAIRLEADS BROKE AND | ☐ |
| 0.985 | BULKHEAD - | HOLED | SH PP88/89 PP 30/17 | | ACT SEIZED. | ☐ |
| | CORROSION | | SH 124/05 / R | | BULKHEADS AND FRON MAIN | ☐ |
| | | | | | DERIK TO STERE ROOM | ☐ |
| 0.985 | BULKHEAD - | HOLED | SH 9/93 90/94 PP 30/17 | | P/S HOLED. | ☐ |
| | CORROSION | | | | LEAKAGE FROM BILGE | ☐ |
| | | | | | COMPARTING VTUK #9 | ☐ |
| | | | | | (MAX. CAPACITY 39.8 CUBM) | ☐ |
| | | | | | INTO ER | ☐ |
| 1.220 | MARPOL - | NOT UP TO | | 15/10 | LAST NM GUBOARD 22.11.02) | ☐ |
| | PUBLICATION | DATE | | | | ☐ |

Name (fully authorized PSCO of reporting authority) .....M. STUDINSKI.....    M. STUDINSKI    Signature

[official seal: State Control]

*) Masters, Shipowners and/or Operators are advised that detailed information on the inspection may be subject to publication (www.parismou.org)
b) This inspection was not a full survey and deficiencies listed may not be exhaustive. In the event of a detention, its recommended that a full survey is carried out and all deficiencies on application for re-inspection is made.
c) To be completed in the event of a detention. (for non-convention ships <500 Gt for reference only)
d) See reverse side of form B for full labels.

FORM B

REPORT OF INSPECTION IN ACCORDANCE WITH THE PARIS MEMORANDUM OF UNDERSTANDING ON PORT STATE CONTROL

Federal Maritime Administration
Rozhdestvenka St., 1/1
109012 Moscow, Russian Federation
+7 095 926 1000, +7 095 926 1311
msuamsu@msu.ru

1. Name of ships: ........ NICKO CAS

2. IMO number: .. 7531752 .. 3. Date of final report: .. 11.01.98

4. Place of inspection: St. Petersburg

copy to: – master
– head office
– RSRO

if ship is detained, copy to: – flag State
– recognised organisation, if applicable

DEFICIENCIES FOUND AND ACTION TAKEN (*) (see notes)

| Group code | Defective item | Nature of deficiency | Convention (ref.*) | Action taken* | Additional comments | Class resp.* |
|---|---|---|---|---|---|---|
| 1.24.0 | CARGO HATCHWAYS | DAMAGED | LL 66/ANN1/pg. | 30/49 | METAL NUMBERS TOTAL OUT FROM BASE (HOLD No. 6) DUE TO DAMAGE. RE HYDRAULIC SYSTEM. | □□□□□ |
| 12.1.0 | CARGO HATCHWAYS | CORRODED | | 17/3 | HATCH COVERS, COAMINGS, COMPRESSION BARS, ETC. OF ALL THE HOLDS HEAVILY CORRODED AND SHOULD RE PROPERLY INSPECTED AND REPAIRED UNDER CLASS SUPERVISION | |
| 25.V.T. | REPAIRS OF NON-CONFORMITY, ACCORDING 2 HAZARDOUS OCCUR | NOT ACCORDING SMS | S.74/C.1/Reg. 79 13/MC.1/Seg.19/18 | | FROM AUTHORITIES CLASS SOCIETY AND PORT AUTHO-RITIES NOT INFORMED REGARDING ACCIDENTS OCCURED | □□□□□□□□ |

Name (only authorized PSCO or reporting authority) N. STUPAKOU / N. STEPPCUCHEU  Signature .......

FORM B

5/5

**REPORT OF INSPECTION IN ACCORDANCE WITH THE PARIS MEMORANDUM OF UNDERSTANDING ON PORT STATE CONTROL**

Federal Maritime Administration
Rozhdestvenska St., 1/1
109012 Moscow, Russian Federation
+7 095 926 1000, +7 095 926 1311
mmoram@rosru

copy to: - master
- held office
- RROO

if ship is detained, copy to: - flag State
- recognized organization, if applicable.

1. Name of ship: ...N.I.C.C.O.L.A.S....  2. IMO number: ...7435422... 3. Date of final report: ...11.01.08....  4. Place of inspection: St. Petersburg

| Group code | Deficient item | Nature of deficiency | Convention ref.[5] | Action taken[6] | Additional comments | Class resp.[7] |
|---|---|---|---|---|---|---|
| 06.95 | ONBOARD | LACK OF | | | 3RD. OFFICER. CAUST | |
| | TRAINING AND | TRAINING.... | | 15/99.0 | INDICATE. T-IRE. OF | |
| | INSTRUCTION | | | | INVERSION. SUIT. | |
| 18.23 | MF/HF. RADIO | NOT. AS. | | 70/10 | NO. EVIDENCE. OF. MF/HF | |
| | INSTALLATION | REQUIRED. | | | DSC. EXTERNAL. TEST. | |
| | | | | | MARKING. COULDN'T.ON. | |
| 10.10 | | | | | CAN'T. BE. TESTED. | |
| | MUSTER. LIST | INCOMPLETE. | | 99/10 | NO. CORRELATION. DUE. TO | |
| | | | | | 2ND OFFICER. ABSENCE. | |
| | | | | | FOR. MORE. THAN. 72.DAYS | |
| | | | | | (CREW. CHANGE) | |
| 1.55.0 | LIGHTS. SHAPES. | INADEQUATE. | | 28/10 | P/S. NAVIGATION. LIGHT | |
| | SOUND. SIGNALS. | | | | UNLIT. STERN. SUBSTITUTE | |
| | | | | | LIGHT. UNLIT. | |
| 28.99 | OPERATION. OF. | LACK. OF. | | 17/10 | NO. LONG. PERIOD (30 MIN) OF TEST | |
| | GMDSS EQUIPMENT | FAMILIARITY | M. STRUKOV. | N. STRELNIKOV | BY. CHIEF. OFF. NO RESULT | |

Name (duly authorized PSCO of reporting authority) M. STRUKOV / N. STRELNIKOV   Signature

***) Masters, Shipowners and/or Operators are advised that detailed information on the inspection may be subject to publication (www.parismou.org)
5) This inspection was not a full survey and the deficiencies listed may not be exhaustive. In the event of a detention, it is recommended that a full survey is carried out and all deficiencies are rectified before application for re-inspection is made.
6) To be completed in the event of a detention (for non-convention ships <500 GT for reference only.)
7) See reverse side of form B for full labels.

C.A.L.C.   P.S.C.   FOR   REINSPECTION   BEFORE   DEPARTURE

m/v NICHOLAS M.
910 W 76
St. PETERSBURG
28/12/2007

NOTIFICATION

DUE TO THE PROBLEM WITH CLOSING OF AFT
HATCH COVER OF CARGO HOLD N. 6 AND
IMPOSSIBILITY TO REPAIR PRIOR SHIPS
DEPARTURE, CERTIFICATE OF CLASSIFICATION
No. LPRO/KTS/2005104411SS30 HAS BEEN
TEMPORARILY WITHDRAWN AS WELL AS
CARGO SHIP SAFETY CONSTRUCTION
CERTIFICATE No. LPRO/KTS/2005101318S742





EVGENY ZAVIALOV                                  MASTER of
SURVEYOR TO BUREAU VERITAS              m/v NICHOLAS M.



St.Petersburg Office

11/01/2008                                           Nr. LNG0/2007/J0100/hull
m/v NICHOLAS M
BV # 910W76
St.Petersburg, RF

## LIST OF RECOMMENDATIONS FURTHER TO DETENTION AND SURVEY
## - TO BE DEALT WITH AT COMING DRY-DOCK / INTERMEDIATE
## SURVEY OF HULL, LATEST 31 MARCH 2008.

1. Overall inspection of hatch covers and coamings of all cargo holds has been carried out. Temporary repair of hatch covers presently carried out. Damaged foundation in way of hydraulic cylinders PS/SB of cargo hold Nr.6 presently definitely repaired by workshop. Hatch covers of cargo hold Nr.6 tested in operation with satisfactory results.
Definitive repair of hatch covers to be performed as per the results of ultrasonic thickness measurements required by BV Rules in force.
2. Leakage of hydraulic cylinders at cargo holds to be eliminated. Leaking hydraulic cylinders to be replaced.
3 Upon completion of definitive repair of hatch covers, a complete tightness test of all hatch covers to be performed in presence of BV surveyor.
4. Bilge water tank Nr.9 presently temporarily repaired by divers (doubler installed on the bottom plating. Cement box installed from the internal side of the tank). Definitive repair to be performed.
5. Bulkhead between main deck and crew dressing room temporarily repaired by insert. Permanent access to the space between main deck and crew dressing room to be provided. Definitive repair of the bulkhead to be performed.
6. Australian ladders in the cargo holds Nr. 2,4,6 to be repaired.

E.Zavyalov
Surveyor to Bureau Veritas

Master of m/v NICHOLAS M

Postal address:
CJSC "Bureau Veritas Rus"
nab. reki Fontanki, d. 130A
130005 St. Petersburg
Russia

Contacts:
Phone:    +7 (812) 324 7124
Fax:      +7 (812) 324 7125
E-mail:   bv@bureauveritas.ru
Http://   www.bureauveritas.ru

**PORT STATE CONTROL**
**NOTICE OF DETENTION FOR THE MASTER**

No.

The undersigned:
Harbour Master of the port of ...St. Petersburg..., duly authorized by the Maritime
Administration of the Russian Federation, herewith notifies you that

the ship: ...NICHOLAS  M...          call sign: ...J882630...

IMO number: ...7413452...          gross tonnage: ...22912...

port of registry: ...KINGSTOWN...          flag state: ...St. Vincent & Grenadines...

type of ship: ...BULK  CARRIER...          date on which keel was laid: ...1977...

owner: CHIAN  SPIRIT  MARITIME ENTERPRISES INC.    master: ...AMADO C. APILADO...

agents: "ANTEKS"          classification society: ...BV (WITHDRAWN)...

berthed at: BERTH  NR. 23

has been detained in accordance with the provisions of Section 3 of Paris Memorandum of
Understanding on Port State Control and Article 80 of the Merchant Shipping Code of the Russian
Federation,

on account of:

☒ one or more of the criteria for detention set out in Section 9 of Paris Memorandum on Port State
Control;

☐ crew members being unable to provide proof of professional proficiency for the duties assigned
to them as specified in the Annex to the International Convention on Standards of Training,
Certification and Watchkeeping for Seafarers, 1978/95, as amended;

☐ master or crew unable to comply with operational requirements as contained in the Conventions
mentioned in Section 2 of Paris Memorandum on Port State Control;

☐ other deficiencies which, individually or together, are clearly hazardous to safety, health or
environment;

☒ the fact that the Port State Control Officer was obstructed in the execution of his duties.

For further details see the Report of inspection, forms A and B enclosed to this Notice for the Master.

On account of the above it is prohibited to shift the ship to another berth without the prior consent of
the Harbour Master, or to proceed to sea without a proper Notice of Release of ship from detention.

Place: Port of  St. Petersburg          Date: December 29, 2007;
                                        Time:  15.30 LT

The above mentioned Harbour Master:

HEAD OF ST. PETERSBURG  FSC/PSC
Capt. ALEXANDR G. KARPENKO

**PORT STATE CONTROL**
**NOTICE OF RELEASE OF SHIP FROM DETENTION FOR THE MASTER**

No.

*NICHOLAS M. St. VINCENT d GR. 7433452* Release of ship from detention
[Ship's name, flag, IMO No.]

The undersigned:

Harbour Master of the port of *St. PETERSBURG* ......, duly authorized by the Maritime

Administration of the Russian Federation, herewith notifies you that the Maritime Authority of the

Russian Federation has carried out a re-inspection of the above ship on *11.01.2008* ... at the port

of *St. PETERSBURG* *AT 19.10 LT*

(insert comments in free text, if any).

........................................................................................................
........................................................................................................
........................................................................................................
........................................................................................................
........................................................................................................
........................................................................................................
........................................................................................................
........................................................................................................
........................................................................................................
........................................................................................................
........................................................................................................
........................................................................................................
........................................................................................................

Enclosed please find a copy of the Report of Inspection, forms A and B.

Yours faithfully,

Harbour Master's name ............ FSC/PSC

Capt. ALEXANDR G. KARPENKO

# EXHIBIT 3

## PARIS MEMORANDUM OF UNDERSTANDING ON PORT STATE CONTROL

The Maritime Authorities of
    Belgium
    Bulgaria [1]
    Canada [2]
    Croatia [3]
    Cyprus [4]
    Denmark
    Estonia [5]
    Finland
    France
    Germany (Federal Republic of)
    Greece
    Iceland [6]
    Ireland
    Italy
    Latvia [7]
    Lithuania [8]
    Malta [9]
    Netherlands
    Norway
    Poland [10]
    Portugal
    Romania [11]
    Russian Federation [12]
    Slovenia [13]
    Spain
    Sweden
    United Kingdom of Great Britain and Northern Ireland
hereinafter referred to as 'the Authorities'

---

[1]    The Maritime Authority of Bulgaria adhered to the Memorandum on 10 May 2007; for the Maritime Authority of Bulgaria the Memorandum took effect on 1 July 2007.

[2]    The Maritime Authority of Canada adhered to the Memorandum on 3 May 1994; for the Maritime Authority of Canada the Memorandum took effect on 3 May 1994.

[3]    The Maritime Authority of Croatia adhered to the Memorandum on 8 November 1996; for the Maritime Authority of Croatia the Memorandum took effect on 1 January 1997.

[4]    The Maritime Authority of Cyprus adhered to the Memorandum on 12 May 2006; for the Maritime Authority of Cyprus the Memorandum took effect on 1 July 2006.

[5]    The Maritime Authority of Estonia adhered to the Memorandum on 12 May 2005; for the Maritime Authority of Estonia the Memorandum took effect on 1 July 2005.

[6]    The Maritime Authority of Iceland adhered to the Memorandum on 11 May 2000; for the Maritime Authority of Iceland the Memorandum took effect on 1 July 2000.

[7]    The Maritime Authority of Latvia adhered to the Memorandum on 12 May 2005; for the Maritime Authority of Latvia the Memorandum took effect on 1 July 2005.

[8]    The Maritime Authority of Lithuania adhered to the Memorandum on 12 May 2006; for the Maritime Authority of Lithuania the Memorandum took effect on 1 July 2006.

[9]    The Maritime Authority of Malta adhered to the Memorandum on 12 May 2006; for the Maritime Authority of Malta the Memorandum took effect on 1 July 2006.

[10]    The Maritime Authority of Poland adhered to the Memorandum on 27 November 1991; for the Maritime Authority of Poland the Memorandum took effect on 1 January 1992.

[11]    The Maritime Authority of Romania adhered to the Memorandum on 10 May 2007; for the Maritime Authority of Romania the Memorandum took effect on 1 July 2007.

[12]    The Maritime Authority of the Russian Federation adhered to the Memorandum on 10 November 1995; for the Maritime Authority of the Russian Federation the Memorandum took effect on 1 January 1996.

[13]    The Maritime Authority of Slovenia adhered to the Memorandum on 15 May 2003; for the Maritime Authority of Slovenia the Memorandum took effect on 22 July 2003.

**Recalling** the Final Declaration adopted on 2 December 1980 by the Regional European Conference on Maritime Safety which underlined the need to increase maritime safety and the protection of the marine environment and the importance of improving living and working conditions on board ship;

**Noting** with appreciation the progress achieved in these fields by the International Maritime Organization and the International Labour Organization;

**Noting** also the contribution of the European Union towards meeting the above mentioned objectives;

**Mindful** that the principal responsibility for the effective application of standards laid down in international instruments rests upon the authorities of the State whose flag a ship is entitled to fly;

**Recognizing** nevertheless that effective action by port States is required to prevent the operation of substandard ships;
**Recognizing** also the need to avoid distorting competition between ports;

**Convinced** of the necessity, for these purposes, of an improved and harmonized system of port State control and of strengthening co-operation and the exchange of information;

have reached the following understanding:

**Section 1    Commitments**

1.1       Each Authority will give effect to the provisions of the present Memorandum and the Annexes thereto, which constitute an integral part of the Memorandum.

1.2       Each Authority will maintain an effective system of port State control with a view to ensuring that, without discrimination as to flag, foreign merchant ships calling at a port of its State, or anchored off such a port, comply with the standards laid down in the relevant instruments as defined in section 2. Each Authority may also carry out controls on ships at off-shore installations.

1.3       Each Authority will achieve an annual total of inspections corresponding to 25% of the average number of individual foreign merchant ships, hereinafter referred to as 'ships', which entered the ports of its State during the three last calendar years for which statistics are available.

1.4       Each Authority will consult, cooperate and exchange information with the other Authorities in order to further the aims of the Memorandum.

1.5       Each Authority, or any other body, as the case may be, will establish an appropriate procedure for pilot services and port authorities to immediately inform the competent Authority of the port State, whenever they learn in the course of their normal duties that there are deficiencies which may prejudice the safety of the ship, or which may pose a threat of harm to the marine environment.

**Section 2    Relevant instruments**

2.1       For the purposes of the Memorandum 'relevant instruments' are the following instruments:
          .1       the International Convention on Load Lines, 1966 (LOAD LINES 66);
          .2       the Protocol of 1988 relating to the International Convention on Load Lines, 1966 (LL PROT 88);
          .3       the International Convention for the Safety of Life at Sea, 1974 (SOLAS 74);
          .4       the Protocol of 1978 relating to the International Convention for the Safety of Life at Sea, 1974 (SOLAS PROT 78);

|     | .5  | the Protocol of 1988 relating to the International Convention for the Safety of Life at Sea, 1974 (SOLAS PROT 88); |
|-----|-----|---|

.5    the Protocol of 1988 relating to the International Convention for the Safety of Life at Sea, 1974 (SOLAS PROT 88);

.6    the International Convention for the Prevention of Pollution from Ships, 1973, as modified by the Protocols of 1978 and 1997 relating thereto (MARPOL 73/78);

.7    the International Convention on Standards of Training, Certification and Watchkeeping for Seafarers, 1978 (STCW 78);

.8    the Convention on the International Regulations for Preventing Collisions at Sea, 1972 (COLREG 72);

.9    the International Convention on Tonnage Measurement of Ships, 1969 (TONNAGE 69);

.10    the Merchant Shipping (Minimum Standards) Convention, 1976 (ILO Convention No. 147) (ILO 147);

.11    the Protocol of 1996 to the Merchant Shipping (Minimum Standards) Convention, 1976 (ILO Convention No. 147) (ILO147 PROT 96);

.12    the International Convention on Civil Liability for Oil Pollution Damage, 1992.

2.2    With respect to ILO 147 and the ILO Protocol 1996, each Authority will apply the procedures referred to in section 7 of Annex 1 for the application of ILO publication "Inspection of Labour Conditions on board Ship: Guide-lines for procedure".

2.3    Each Authority will apply those relevant instruments which are in force and to which its State is a Party. In the case of amendments to a relevant instrument each Authority will apply those amendments which are in force and which its State has accepted. An instrument so amended will then be deemed to be the 'relevant instrument' for that Authority.

2.4    In applying a relevant instrument, the Authorities will ensure that no more favourable treatment is given to ships of non-Parties or to ships below convention size. The Authorities will thereby apply the procedures specified in section 3 of Annex 1.

## Section 3    Inspection Procedures, Rectification and Detention

3.1    In fulfilling their commitments the Authorities will carry out inspections, which will consist of a visit on board a ship in order to check the certificates and documents as referred to in section 2 of Annex 1. Furthermore the Authorities will satisfy themselves that the crew and the overall condition of the ship, including the engine room and accommodation and including hygienic conditions, meets generally accepted international rules and standards.

In the absence of valid certificates or documents or if there are clear grounds for believing that the condition of a ship or of its equipment, or its crew does not substantially meet the requirements of a relevant instrument, a more detailed inspection will be carried out, as referred to in section 5 of Annex 1. Examples of clear grounds are given in section 4 of Annex 1.

The Authorities will include control on compliance with on board operational requirements in their inspections.

3.2    The Authorities will ensure that an inspection in accordance with the provisions of section 3.1 is carried out on any ship not subject to expanded inspection with a target factor greater than 50 in the SIReNaC information system, provided that a period of at least one month has elapsed since the last inspection carried out in the region of the Memorandum.

3.3    A ship in one of the categories in section 8.2 of Annex 1, is liable to an expanded inspection after a period of twelve months since the last expanded inspection carried out in a port within the region of the Memorandum.

If such a ship is selected for inspection in accordance with section 3.6, an expanded inspection shall be carried out. However an inspection in accordance with section 3.1 may be carried out in the period between two expanded inspections.
The Authorities will ensure that an expanded inspection is carried out on a ship for which the inspection is indicated as mandatory by the SIReNaC system at its first port visited after a period of 12 months since the last expanded inspection.

3.4    In cases where, for operational reasons, an Authority is unable to carry out an inspection or an expanded inspection as referred to in sections 3.2 and 3.3 respectively, the Authority will, without delay, inform the SIReNaC system that such inspection did not take place.

3.5    Nothing in these procedures will be construed as restricting the powers of the Authorities to take measures within its jurisdiction in respect of any matter to which the relevant instruments relate.

3.6    In selecting for inspection ships other than those referred to in sections 3.2 and 3.3, the Authorities will determine the order of priority on the basis of the criteria indicated in section 1 of Annex 1.

3.7    The Authorities will seek to avoid inspecting ships which have been inspected by any of the other Authorities within the previous six months, unless they have clear grounds for inspection. The frequency of inspection does not apply to the ships referred to in 3.6 and in 3.2 in which case the Authorities will seek satisfaction whenever they will deem this appropriate.

3.8    Inspections will be carried out by properly qualified persons authorized for that purpose by the Authority concerned and acting under its responsibility, having regard in particular to Annex 7.
When the required professional expertise cannot be provided by the Authority, the port State control officer of that Authority may be assisted by any person with the required expertise. Port State control officers and the persons assisting them will have no commercial interest, either in the port of inspection or in the ships inspected, nor will port State control officers be employed by or undertake work on behalf of non-governmental organizations which issue statutory and classification certificates or which carry out the surveys necessary for the issue of those certificates to ships.
Each port State control officer will carry a personal document in the form of an identity card issued by his Authority in accordance with the national legislation, indicating that the port State control officer is authorized to carry out inspections.

3.9.1    Each Authority will endeavour to secure the rectification of all deficiencies detected. On the condition that all possible efforts have been made to rectify all deficiencies, other than those referred to in 3.10.1, the ship may be allowed to proceed to a port where any such deficiencies can be rectified.

3.9.2    In exceptional circumstances where, as a result of the initial control and a more detailed inspection, the overall condition of a ship and its equipment, also taking the crew and its living and working conditions into account, is found to be sub-standard, the Authority may suspend an inspection.
The suspension of the inspection may continue until the responsible parties have taken the steps necessary to ensure that the ship complies with the requirements of the relevant instruments.
Prior to suspending an inspection, the Authority must have recorded detainable deficiencies in the areas set out in 9.3.3 and 9.3.4 of Annex 1, as appropriate.
In cases where the ship is detained and an inspection is suspended, the Authority will as soon as possible notify the responsible parties. The notification will include information

about the detention. Furthermore it will state that the inspection is suspended until the Authority has been informed that the ship complies with all relevant requirements.

3.10.1    In the case of deficiencies which are clearly hazardous to safety, health or the environment, the Authority will, except as provided in 3.11, ensure that the hazard is removed before the ship is allowed to proceed to sea. For this purpose appropriate action will be taken, which may include detention or a formal prohibition of a ship to continue an operation due to established deficiencies which, individually or together, would render the continued operation hazardous.

3.10.2    In the case of a detention, the Authority will immediately notify the flag State Administration [*)] in writing, which includes the report of inspection. Like wise, the classification society which has issued the class certificates and the recognized organization that has issued the relevant certificates on behalf of the flag State Administration will be notified, where appropriate. The parties above will also be notified in writing of the release of detention.

3.10.3    Where the ground for a detention is the result of accidental damage suffered on the ship's voyage to a port or during cargo operations, no detention order will be issued, provided that:
    .1    due account has been given to the requirements contained in Regulation I/11(c) of SOLAS 74 regarding notification to the flag State Administration, the nominated surveyor or the recognized organization responsible for issuing the relevant certificate;
    .2    prior to entering a port or immediately after a damage has occurred, the master or ship owner has submitted to the port State control authority details on the circumstances of the accident and the damage suffered and information about the required notification of the flag State Administration;
    .3    appropriate remedial action, to the satisfaction of the Authority, is being taken by the ship, and
    .4    the Authority has ensured, having been notified of the completion of the remedial action, that deficiencies which were clearly hazardous to safety, health or the environment have been rectified.

3.10.4    The following procedure is applicable in the absence of ISM certificates:
    .1    Where the inspection reveals that the copy of the Document of Compliance or the Safety Management Certificate issued in accordance with the International Safety Management Code for the Safe Operation of Ships and for Pollution Prevention (ISM Code) are missing on board a vessel to which the ISM Code is applicable at the date of the inspection, the Authority will ensure that the vessel is detained.
    .2    Notwithstanding the absence of the documentation referred to in 3.10.4.1, if the inspection finds no other deficiencies warranting detention the Authority may lift the detention order in order to avoid port congestion. Whenever such a decision is taken, the Authority will immediately inform all other Authorities thereof.
    3.    The Authorities will take the measures necessary to ensure that all ships authorised to leave a port of their State under the circumstances referred to in 3.10.4.2 will be refused access to any port within the States, the Authorities of which are signatories to the Memorandum, except in the situations referred to in 3.12.3, until the owner or operator of the vessel has demonstrated, to the

---

*)    Refer to MSC/Circ. 781 and MEPC 6/Circ 2 "National contact points of Members for safety and pollution prevention" (annexes 1 and 2). When a valid contact point is not available the nearest diplomatic representative should be informed.

satisfaction of the Authority in whose State detention was ordered, that the ship has valid certificates issued in accordance with the ISM Code.

3.10.5      Access refusal measures concerning certain ships

1.      The Authorities will ensure that a ship in one of the categories of Annex 3, section A, is refused access to any port within the region of the Memorandum, except in the situations described in section 3.12.3 if the ship:
   - either flies the flag of a State appearing in the black list as published in the annual report of the MOU, and has been detained more than twice in the course of the preceding 24 months in ports within the region of the Memorandum;
   - or flies the flag of a State described as "very high risk" or "high risk" in the black list as published in the annual report of the MOU, and has been detained more than once in the course of the preceding 36 months in ports within the region of the Memorandum.

The refusal of access shall become applicable immediately the ship has been authorised to leave the port where it has been subject of a second or third detention as appropriate.

2.      For the purpose of paragraph 1, the Authorities will comply with the procedures laid down in Annex 3 section B.

3.11      Where deficiencies which caused a detention as referred to in 3.10.1 cannot be remedied in the port of inspection, the Authority may allow the ship concerned to proceed to the nearest appropriate repair yard available, as chosen by the master and the Authority, provided that the conditions determined by the competent authority of the flag State and agreed by the Authority are complied with. Such conditions, which may include discharging of cargo and/or temporary repairs, will ensure that the ship can proceed without risk to the safety and health of the passengers or crew, or risk to other ships, or without being an unreasonable threat of harm to the marine environment.

Where the decision to send a ship to a repair yard is due to a lack of compliance with IMO Resolution A. 744(18), either with respect to ship's documentation or with respect to ship's structural failures and deficiencies, the Authority may require that the necessary thickness measurements are carried out in the port of detention before the ship is allowed to sail.

If the vessel is detained because it is not equipped with a functioning voyage data recorder system, when its use is compulsory, and this deficiency cannot be readily rectified in the port of detention, the competent authority may allow the ship to proceed to the nearest appropriate port where it shall be readily rectified or require that the deficiency is rectified within a maximum period of 30 days.

In such circumstances the Authority will notify the competent authority of the region State where the next port of call of the ship is situated, the parties mentioned in 3.10.2 and any other authority as appropriate. Notification to Authorities shall include the final report of inspection and the estimated place and time of arrival. Additional notification will be made by means of the SIReNaC system. The Authority receiving such notification will inform the notifying Authority of action taken.

3.12.1      The Authorities will take measures to ensure that:

.1      ships referred to in 3.10.1 or 3.11 which proceed to sea without complying with the conditions determined by the Authority in the port of inspection; or

.2       ships referred to in 3.11 which refuse to comply with the applicable requirements of the relevant instruments by not calling into the indicated repair yard;

will be refused access to any port within the States, the Authorities of which are signatories to the Memorandum, until the owner or operator has provided evidence to the satisfaction of the Authority where the ship was found defective, that the ship fully complies with all applicable requirements of the relevant instruments.

3.12.2    In the circumstances referred to in 3.12.1.1, the Authority where the ship was found defective will immediately alert all other Authorities.
In the circumstances referred to in 3.12.1.2, the Authority in whose State the repair yard lies will immediately alert all other Authorities.
Before denying entry, the Authority may request consultations with the flag State Administration of the ship concerned.

3.12.3    Notwithstanding the provisions of 3.12.1, access to a specific port may be permitted by the relevant authority of that port State in the event of force majeure or overriding safety considerations, or to reduce or minimize the risk of pollution, provided that adequate measures to the satisfaction of the competent authority of such State have been implemented by the owner, the operator or the master of the ship to ensure safe entry.

3.13    The provisions of 3.10.2 and 3.11 are without prejudice to the requirements of relevant instruments or procedures established by international organizations concerning notification and reporting procedures related to port State control.

3.14    The Authorities will ensure that, on the conclusion of an inspection, the master of the ship is provided with a report of inspection, giving the results of the inspection and details of any action taken.

3.15    Should any inspection referred to in 3.1 confirm or reveal deficiencies in relation to the requirements of a relevant instrument warranting the detention of a ship, all costs relating to the inspections in any normal accounting period will be covered by the shipowner or the operator or by his representative in the port State.
All costs relating to inspections carried out by the Authority under the provisions of 3.12.1 will be charged to the owner or the operator of the ship.
The detention will not be lifted until full payment has been made or a sufficient guarantee has been given for the reimbursement of the costs.

3.16    The owner or the operator of a ship or his representative in the State concerned will have a right of appeal against a detention decision or refusal of access taken by the Authority of that State. An appeal will not cause the detention or refusal of access to be suspended. The Authority will properly inform the master of a ship of the right of appeal.

3.17    Each Authority will take necessary measure in order to ensure that information listed in Annex 5 on ships inspected and ships detained is published at least every month.

3.18    When exercising control under the Memorandum, the Authorities will make all possible efforts to avoid unduly detaining or delaying a ship. Nothing in the Memorandum affects rights created by provisions of relevant instruments relating to compensation for undue detention or delay. In any instance of alleged undue detention or delay the burden of proof lies with the owner or operator of the ship.

**Section 4**    **Provision of information**

# EXHIBIT 4

Print Copy for : KAVVADIA ANNA

Received Inc.MSG.: 84937          Date: Thu 20/Dec/2007 18:02
From: CHIAN SPIRIT MARITIM <"Chian Spirit Maritime Enterprises Inc."
<chartering@chianspirit.gr>>
Subject: LgINT Message (REF:071002B00)
Included (3) Attachment Files: <LOI_FORM_A.TIF> <LOI_FORM_B..TIF>
<LOI_FORM_C..TIF>
TO : <operations@chianspirit.gr>


TELiX MSG: 1002B-00 20/12/07 18:00

From: C.S.M.E/ Chartering Dept.
To:   Billmar Chartering

Re:   MV "Nicholas M." - Acc "BRITANNIA BULKERS A/S," cp dd 18th Dec 2007


zack/nicholas

thnks charrs last confirming acceptance of owns last regarding c/p dets as well
as lifting charrs subjects.

therefore here below is the fixture recap clean on all subjects; if charrs have
any correction pls let us become aware of same otherwise we shall consider same
as final for our file / all parties including master and our operations dept
reference.

pls advise where delivery cable will be sent by the master as well as confirm
that detailed voyage instructions will be sent by your side at your first
convenience.

mtime pls be advised that current charrs maintain their etr for 24th dec agw wp
uce so pls consider same as notice on fixing, always given on a back to back
basis.

thanks all parties kind efforts leading to this fixture.

regards,

chartering dept.
c.s.m.e(as agents only)


=== recap of fixture (main terms+cp dets) clean on all subjects ===


--- vsl's full t/c description ---

01) NAME: M.V "NICHOLAS M."

02) EX NAMES INCLUDING DATE LAST NAME CHANGE: "MED UNITY" (2003)
    "LAURA G" (1998) - "FORUM PRODUCT" (1997) - "RAFAELA" (1991).

03) TYPE OF VESSEL: BULK CARRIER

04) ENGINE AND BRIDGE SITUATED: AFT

05) DWAT AND DRAFT SUMMER/WINTER/FRESH/TROPICAL/TROPICAL FRESH:

```
      SUMMER DEADWEIGHT    39,498 METRIC TONS ON 11.169 METRES
      WINTER DEADWEIGHT    38,402 METRIC TONS ON 10.937 METRES
      TROPICAL DEADWEIGHT 40,608 METRIC TONS ON 11.401 METRES
```

06) DWAT ON 17/18/19/20/32/32.5/33/33.5 FEET FRESH WATER
```
      FEET      METRES        FRESHWATER DEADWEIGHT
      17.0      5.18              11,462
      18.0      5.48              12,766
      19.0      5.79              14,115
      20.0      6.10              15,468
      32.0      9.75              31,731
      32.5      9.90              32,417
      33.0      10.06             33,151
      33.5      10.21             33,840
```

07) TPC 48 AT SUMMER DRAFT

08) LOA/LBP/EXTREME BEAM/DEPTH MOULDED: 200.90/191.00/27.20/15.20 METRES.

09) CONSTANTS EXCLUDING FRESHWATER:  250 METRIC TONS

10) FRESHWATER CAPACITY: 305 METRIC TONS

11) IF FITTED WITH EVAPORATOR/DAILY PRODUCTION: 10 METRIC TONS / 24
    HOURS

12) NUMBER HOLDS/HATCHES: 7/7

13) HATCH TYPE AND SIZES: STEEL HATCH COVER FOLDING TYPE (MACGRECOR)

```
      NO.1     9.8 X 12.64 METRES
      NO.2    17.6 X 12.64 METRES
      NO.3     9.6 X 12.64 METRES
      NO.4    17.6 X 12.64 METRES
      NO.5     9.6 X 12.64 METRES
      NO.6    17.6 X 12.64 METRES
      NO.7.    9.6 X 12.64 METRES
```

14) HOLDS LENGTHS: NO.1 16.80/ NO.2 26.50/ NO.3 16.80/ NO.4 26.40/ NO.5 16.80/
                   NO.6 26.40/ NO.7 16.00

15) TANK TOP DIMENSIONS:

```
      NO.1   HOLD    16.60 X 17.00
      NO.2   HOLD    26.50 X 19.20
      NO.3+5 HOLDS   16.80 X 19.20
      NO.4+6 HOLDS   26.40 X 19.20
      NO.7   HOLD    16.00 X 18.50
      (LENGTH AT CENTRE LINE - BREADTH AT HALF OF LENGTH)
```

16) MAXIMUM UNIFORM LOADS TANK TOPS/WEATHER DECK/WEATHER DECK
    HATCHES;

```
      NO.1       HOLD        18.50 METRIC TONS/SQUARE METRE
      NO.2-4-6   HOLDS       15    METRIC TONS/SQUARE METRE
      NO.3-5-7   HOLDS       23.5  METRIC TONS/SQUARE METRE
      MAIN DECK                3.4 METRIC TONS/SQUARE METRE
      HATCH COVER             1.75 METRIC TONS/SQUARE METRE
```

17) CUBIC CAPACITY IN MAIN HOLDS - GRAIN/BALE:
      GRAIN  47,199 CUBIC METRES
      BALE   43,423 CUBIC METRES

18) CUBIC BREAKDOWN PER HOLD - GRAIN/BALE IN CUBIC METRES:

|       | GRAIN | BALE  |
|-------|-------|-------|
| NO.1  | 4,946 | 4,550 |
| NO.2  | 8,638 | 7,947 |
| NO.3  | 5,488 | 5,049 |
| NO.4  | 8,689 | 7,994 |
| NO.5  | 5,488 | 5,049 |
| NO.6  | 8,694 | 7,998 |
| NO.7  | 5,256 | 4,836 |

19) ANY PILLARS/CENTRE LINE BULK HARDS/OBSTRUCTIONS IN HOLDS: NO

20) TYPE OF VENTILATION CARGO HOLDS    : NATURAL VENTILATION

21) IF BUILT WITH TOP SIDE TANKS    : YES

22) IF BUILT WITH HOPPER TANKS    : YES

23) TANK TOP SURFACE    : FLAT

24) IF SUITABLE FOR GRAB DISCHARGE    : YES

25) DISTANCE FROM SHIP'S RAIL TO HATCH COAMING: CLEAR DISTANCE 5.50 METRES

26) DISTANCE WATER LINE/HATCH COAMING FULL BALLAST/LIGHT/FULLY LADEN:

    FULL  BALLAST  = 8.65 METRES
    LIGHT BALLAST  = 11.45 METRES
    FULLY LOADED   = 5.70 METRES

27) AIR DRAFT LIGHT/BALLAST/FULLY LADEN: 41.50/ 39.10/ 36.14 METRES

28) DISTANCE KEEL TO TOP OF RADAR MAST: 47.30 METRES

29) CARGO GEAR    : GEARLESS

30) CARGO GEAR OUTREACH    : N/A

31) CARGO GEAR DISTRIBUTION AND HOLDS SERVING  : N/A

32) IF FULLY GRAIN FITTED    : YES

33) IF SELFTRIMMER    : YES

34) CO2 FITTED    : NO

35) GRAB FITTED/TYPE AND CAPACITY/HOW OPERATED : N/A

36) AUSTRALIAN HOLD LADDERS FITTED    : YES

37) IF PANAMA CANAL FITTED    : YES

38) SPEED AND CONSUMPTION    :

ABOUT 12.5 KNOTS ON ABOUT 26 MTS (BALLAST)/ABOUT 12.0 KNOTS ON ABOUT 28 MTS (LADDEN) INTERMEDIATE FUEL OIL 180 CENTISTOKES RME 25 ISO DIS 8217

PLUS

ABOUT 2.5 MTS (AT SEA)/2.0 MTS (AT PORT/WHEN IDLE) MARINE DIESEL OIL DMB ISO 8217.

Speed and consumption warrantees are given in good weather conditions only and no adverse currents.

Within the context of this charterparty, good weather conditions are understood to mean winds up to and including Beaufort force 4 and/or Douglas Sea state 3.

About is understood to mean 0.5knot downwards in the speed and 5pct upwards in the consumption.

For performance evaluation purposes, the overall performance of the vessel is to be reviewed on all laden and ballast passages during the currency of the charterparty. Weather periods in excess to Beaufort 4 and or Douglas Sea state 3, are to be expressly excluded from calculations.

Owners liberty vessel to burn diesel oil when manoeuvring/approaching and leaving ports/navigating in canals/rivers or congested/confined/shallow waters or in cold weather for boiler/heating.

39) NO SUITABLE FOR ALTERNATIVE LOADING IN ACCORDANCE WITH SOLAS CHAPTER XII,REGULATION 14 WITH EFFECT FROM 01st JULY 2006

40) ENGINE TYPE AND BHP/RPM: B&W 13100 BHP/128 RPM

41) NUMBER OF GENERATORS, TYPE AND BHP/RPM:
   - MAN MEP-MAN G5V 23.5/33TL (2 SETS) S/N 6017-6022
   - BAUD W - HOLEBY DIESEL MODEL 5T23LH-2 (1SET) SN 164801
   - 780 BHP EACH / 600 RPM EACH

42) BUNKER CAPACITIES: INTERMEDIATE FUEL OIL: 2,617 METRIC TONS (100%)/MARINE DIESEL OIL: 316 METRIC TONS (100%)

43) YEAR AND MONTH BUILT AND WHERE BUILT: MARCH 12, 1980/ BRASIL

44) FLAG : ST. VINCENT & THE GRENADINES

45) PORT OF REGISTRY                          : KINGSTOWN

46) REGISTERED NUMBER                         : 9152

47) LLOYDS NUMBER                             : N/A

48) IMO NUMBER                                : 7433452

49) INTERNATIONAL/ SUEZ/ PANAMA GRT/NRT OR GT/NT:

INTERNATIONAL : 22,912 / 12,300
SUEZ          : 21,341 / 19,040
PANAMA        :         / 19,090

50) CLASS SOCIETY: BUREAU VERITAS

51) CLASS RATING:  I 3/3 E BULK CARRIER BSP DEEP SEA

52) LAST DRYDOCK: MAY, 2005

53) LAST SPECIAL SURVEY: MAY, 2005

54) CALL SIGN: J 8 B 2 6 8 0 (J8B2680)

55) TELEX SYSTEM/NUMBER: INMARSAT-C / 437738810-1

56) FASCIMILE NUMBER: 763662742

57) P & I CLUB ENTERED WITH: THE AMERICAN P+I.

DURING THE FORTHCOMING RENEWAL (FEB 2008) OWNS HAVE THE RIGHT TO ENTER WITH ANY OTHER MEMBER WITHIN THE INTERNATIONAL P&I GROUP.

58) H & M VALUE: U.S. $ 7,250,000 (SEVEN MILLION TWO HUNDRED AND FIFTY THOUSAND DOLLARS) PLUS $ 1,750,000 IV (ONE MILLION SEVEN HUNDRED AND FIFTY THOUSAND DOLLARS). INSURERS: LLOYD'S UNDERWRITERS "BRIT SYNDICATE" (AS LEADERS).

OWNS HAVE THE RIGHT TO INCREASE ANY OF THE ABOVE VALUES DURING THIS C/P.

59) REGISTERED OWNERS FULL STYLE AND FULL ADDRESS: SIXTEEN THIRTEEN MARINE
                                              S.A., MONROVIA, LIBERIA.

60) MANAGER'S NAME, ADRESS / COMMUNICATION DETAILS/ M.I.C.

CHIAN SPIRIT MARITIME ENTERPRISES INC.

10 ANT. AMPATIELOU,
GR-18536 PIRAEUS,
GREECE.
TELEPHONE: +30 210 429 4777

FASCIMILE: +30 210 459 9099
E-MAIL : operations@chianspirit.gr

All details are given in good faith as "about" wog

--- end of vsl's t/c description ---

---

--- charts' qnaire ---

1. HEADOWNER'S FULL STYLE WITH ADDRESS AND COMMUNICATIONS DETAILS.

SIXTEEN THIRTEEN MARINE S.A. of 80 BROAD STR., MONROVIA, LIBERIA.

For correspondence only c/o their managers...

CHIAN SPIRIT MARITIME ENTERPRISES INC.

10 ANT. AMPATIELOU,
GR-18536 PIRAEUS,


GREECE.
TELEPHONE: +30 210 429 4777
FASCIMILE: +30 210 459 9099
E-MAIL : operations@chianspirit.gr

2. NAME OF PERSON BEHIND OWNING COMPANY IE ACTUAL OWNER...

VARIOUS INTERESTS WHICH WE HAVE NO AUTHORITY TO DISCLOSE

3. MANAGERS NAME/STYLE OR DISPONENT OWNERS

SAME AS GIVEN ABOVE IN ITEM 1.

4. NAME OF VESSELS UNDER SAME MANAGEMENT

   - MV CAPTAIN P. EGGLEZOS - 76,559 DWY BLT 2007
   - MV PANAMAX PEPPOU    - 61,539 DWT BLT 1983

```
- MV PANAMAX ANNA        - 64,700 DWT BLT 1982
- MV MARIA N.M.          - 41,520 DWT BLT 1982
- MV NICHOLAS M.         - 40,153 DWT BLT 1980
- MV IRENE E.M.          - 38,143 DWT BLT 1980
```

OWNERS BANK AND BENEFICIARY

...reverting after fully fixed.

5. P AND I CLUB AND ADDRESS/ COMMUNICATIONS DETAILS

THE AMERICAN P&I CLUB c/o SCB (HELLAS) INC.

51 Akti Miaouli-4th floor
Piraeus 185 36, greece
ph. 210-429-4990
fax 210-429-4187
email: claims@scb-hellas.com

6. H + M VALUE AND INSURER

H & M VALUE: U.S. $ 7,250,000 (SEVEN MILLION TWO HUNDRED AND FIFTY
THOUSAND DOLLARS) PLUS $ 1,750,000 IV (ONE MILLION SEVEN HUNDRED AND FIFTY
THOUSAND DOLLARS).

U/WS' LEADER: "BRIT SYNDICATE" (LLOYD'S UNDERWRITERS).

7. VESSEL'S CLASS

BUREAU VERITAS

8. HAS VESSEL SUFFERED ANY SERIOUS ACCIDENT, BREAKDOWN,
STRANDING OR SERIOUS CARGO CLAIMS IN PAST 12 MONTHS ?

NIL

9. HAS VESSEL ANY OUTSTANDING CLASS RECOMMENDATIONS, AND IF SO
PLS ADVISE DETAILS

NIL

11. STATUS FOLLOWING CLASS SURVEYS:
A) HULL SPECIAL SURVEY - LAST DONE 25/05/2005 - NEXT DUE 31/03/2010
B) DRYDOCKING SURVEY   - LAST DONE 06/04/2005 - NEXT DUE 06/04/2008
C) HULL ANNUAL SURVEY  - LAST DONE 19/06/2007 - NEXT DUE 30/06/2008

12. LAST 3 CARGOES AND NAME OF CHARTERER :

- BULK GRAINS ON TCT ACC CONGENTRA FROM UP RIVER TO ST.PETERSBURG
- BULK MOP ON VOYAGE ACC BPC FROM KLAIPEDA TO MACEIO & PORTO ALEGRE
- BULK GRAINS ON TCT ACC UNIAPRO UP RIVER TO ST.PETERSBURG

13. PLS ADVISE IF ANY CLAIMS DURING PAST 12 MONTHS:

NIL

14. OWNS CONFIRM THAT VSL HAVE NOT SUFFERED ANY CASUALTY (GENERAL
AVERAGE/COLLISIONS/GROUNDINGS/POLLUTIONS ETC) DURING LAST 36 MONTHS:

IN MAY 2005 VSL RUN AGROUND AT GELIBOLU ANCHORAGE WHILE DROPPING HER
ANCHOR AND REFLOATED WITH THE ASSISTANCE OF TUGS AFTER SIGNING T.O.F;
```

G/A CLAIM ALREADY FULLY SETTLED.

15. PRESENT POSITION, FULL ITINERARY + AGENTS LAST/NXT PORT:

VSL CURRENTLY AT PORT OF ST.PETERSBURG WITH A BALANCE OF ABT 13.000MTS
GRAINS TO BE DISCHARGED AND ETC/S 23RD DEC AS PER CHARRS REDELY NOTICES
AGW WP UCE. OWNS OPINION IS THAT DUE TO LACK OF TRUCKS COMPLETION MAY BE
REALISTICALLY EXPECTED AROUND 26-27TH DEC AGW WP UCE.

Agents...reverting

16. CONTANTS + EST BOD + WLTOHC + TYPE OF HATCH COVERS
OWNERS TO CONFIRM MOULDED DEPTH DOES NOT EXCEED 16M

CONTANTS + EST BOD + WLTOHC + TYPE OF HATCH COVERS ALL AS GIVEN IN VSL'S
ABOVE T/C DESCRIPTION AND BELOW OFFER/MAIN TERMS

OWNS CONFIRM THAT MOULDED DEPTH DOES NOT EXCEED 16M

17. VESSEL TO BE FULLY INSURED AND P+I COVERED INCLUDING WAR
RISKS FOR THE DURATION OF THE CHARTER PARTY

YES

18. OWS CONFIRM TT VSL IS IN POSSESION OF VALID CERTS ACCORDING TO
LATEST SOLAS REGS

YES

19. OWNERS TO SUPPLY DOCUMENT OF COMPLIANCE (CERTIFIED TRUE COPY TO BE
PHOTOCOPIED OK)

ON CHARTS REQUEST PROVIDED VSL FULLY FIXED

20. OWNERS TO CONFIRM OWNERS/VESSEL IS FULLY ISPS COMPLIANT

YES

21. IF SO REQUIRED OWNERS TO FILL IN RECEIVERS QUESTIONAIRE

ON CHARTS REQUEST PROVIDED MAIN TERMS AGREED.

22. OWNER TO SEND VSLS ISM CODE SAFETY MANAGEMENT/DOC/CLASS/ISPS/PNI CERTS

ON CHARTS REQUEST PROVIDED MAIN TERMS AGREED


--- charts' qnaire / end ---


- All negotiations and any subsequent fixture to be kept strictly private
and confidential.

- ON ARRAL AT 1ST LOADPORT, VSL`S HOLDS TB READY FOR PERMITTED CARGO SERVICE,
CLEAN, SWEPT, WASHED DOWN AND DRIED UP SO AS TO RECEIVE CHTRS INTD CGO IN ALL
RESPECTS FREE PREVIOUS CARGO RESIDUES TO THE SATISFACTION OF THE RELEVANT
SURVEYOR. SHOULD THE VSL NOT BE APPROVED BY THE SURVEYOR THEN THE VESSEL TO
BE PLACED OFF-HIRE FM FAILURE OF INSPECTIONS UNTILL VSL IS FULLY ACCEPTED AND
ANY DIRECTLY RELATED EXPENSES THEREOF TB FOR OWS ACCT.

MORE SPECIFICALLY IN CASE OF VESSEL'S FAILURE TO FULLY PASS ABOVE PRELOADING
CARGO HOLDS INSPECTION VSL TO BE PLACED OFF HIRE OR PRO RATA OFF HIRE
(ACCORDING TO THE NUMBER OF HOLDS WHICH WERE NOT READY AND THE LOADING

OPERATIONS WERE ACTUALLY PREVENTED) FROM REJECTION UNTIL THE VSL PASSES THE
SAME INSPECTION/TEST AGAIN AND ANY TIME/DIRECT EXPENSES INCURRED HEREBY TO BE
FOR OWS ACCOUNT.

HOWEVER NOTWITHSTANDING ANYTHING ELSE CONTAINED HERE, IT IS HEREBY AGREED
THAT IN VIEW OF ST.PETERSBURG AS LOADING PORT, TAKING INTO ACCOUNT THAT VSL
WILL NOT HAVE SUFFICIENT TIME (INTERVAL BETWEEN DISCHARGE COMLETION/DELIVERY
TIME) TO PREPARE CARGO HOLDS AS AGREED ABOVE, OWNERS TO HAVE THE RIGHT TO
DELIVER VSL TO CHARTS AT ANCHORAGE WITH UNCLEAN HOLDS, AND OWNERS TO
UNDERTAKE TO HAVE THE VSL READY TO THE STANDARDS ABOVE AGREED, MASTER DOING
HIS OUTMOST IN ORDER TO MINIMIZE CARGO HOLDS PREPARATION TIME, WITHIN 18HRS.
IT IS WELL UNDERSTOOD THAT CARGO HOLDS CLEANING REMAINS MASTER AND/OR OWNERS
RESPONSIBILITY AND THAT IN CASE CLEANING OPERATIONS TAKE MORE THAN THE ABOVE
ALLOWED 18HRS THEN VSL IS TO BE PLACED OFF HIRE UNTIL MASTER DECLARE THAT
VSL'S HOLDS ARE READY FOR INSPECTION, PROVIDED ALWAYS THAT VSL IS REQUIRED TO
PROCEED FOR IMMEDIATE LOADING AND HER HOLDS ARE NOT READY YET, IN OTHER WORDS
PROVIDED THAT THERE IS ACTUAL DELAY TO THE VSL'S ITINERARY.

- OWS GTEE VSL IS SD SELF-TRIMING BC/BRIDGE N ENG ROOM IS AFT

- OWS GTEE VSLS T/T IS FLAT AND SUITABLE FOR GRAB DISCHARGING

- OWS GTE TT VSLS H.COVERS ARE TB WATERTIGHT ALL THROUGHOUT THIS C/PERIOD N IF
  ANY H.COVER FOUND DEFECTIVE, SAME TB RECTIFIED AT OWS TIME N EXPNS TO CLASS
  SURVEYOR SATISFACTION IN WHICH CASE VSL TO BE PLACED PRO RATA OFF-HIRE
  (ACCORDING TO THE NUMBER OF HATCHES WHICH FOUND DEFECTIVE AND THE LOADING
  OPERATIONS WERE ACTUALLY PREVENTED)

- OWS GTEE VSL IS P&I COVERED WITH THE "AMERICAN P&I CLUB", CLASSED WITH
  "B.V" AND SHALL REMAIN SO THROUGHOUT THE WHOLE T/C PERIOD;

OWNERS ALSO WARRANT:

- VESSEL WILL NOT BE SCHEDULED FOR BREAK UP OR SOLD FOR SCRAP DURING
  THIS CHARTER OR UPON COMPLETION OF THIS CHARTER.

- VESSEL'S CREW AND OFFICERS SHALL BE ITF APPROVED OR ITS EQUIVALENT AS
  APPLICABLE/REQUIRED BY THE COMPETENT AUTHORITY OF THE VESSEL'S FLAG.

- VESSEL SHALL NOT CHANGE OWNERSHIP AND/OR CLASS WITHOUT
  CHARTERERS' WRITTEN CONSENT

FOR

1. MV "NICHOLAS M." (EX- MED UNITY) AS DESCRIBED ABOVE

2. Account "BRITANNIA BULKERS A/S" a company under the same group with
        "BRITANNIA BULK PLC, UK"/C

   add...   DK-5700 SVENBORG DENMARK

   ph.nr........

   email........

   mid..........

   (comments: pls provide charrs full style for cp purposes/our ops dept easy
   ref)

3. DELIVERY: ON DLOSP ST.PETERSBURG, RUSSIA ATDNSHINC

4. LAY/CANCELLING DATE: 00:00HRS LT 23rd DEC 2007 - 24:00 HRS 31ST DEC 2007

5. ALLOWED TRADING : ONLY 1 STRAIGHT TCT VIA ST. PETERSBURG, RUSSIA TO BRAZIL
   AND/OR ARGENTINA AND/OR URUGUAY (intn:........) ALWAYS VIA SAFE PORT (S),
   SAFE BERTH (S),SAFE ANCHORAGE (S) ALWAYS AFLOAT (EXCEPT FOR ECSA ONLY
   WHEREVER NAABSA APPLICABLE AS PER NYPE) ALWAYS WITHIN INSTITUTE WARRANTY
   LIMITS (IWL/INL), EXCEPT FOR PETERSBURG ONLY WHICH IS ALLOWED AS LOADING
   PORT AS AGREED, AND ALWAYS EXCLUDING WAR OR WARLIKE ZONES (CONWARTIME 2004
   TO APPLY), IN/OUT GEO ROTATION.

   IT IS WELL UNDERSTOOD AND AGREED THAT IN VIEW OF THE VESSEL'S TRADE, BIMCO
   "ICE CLAUSE" AND "BUNKER FUEL SULPHUR CONTENT 2005" CLAUSES FOR TIME CHARTER
   PARTIES SHALL APPLY.

   DURATION ABT 45 DAYS WOG

6. ALLOWED CARGO: ONLY HARMLESS FERTILIZERS IN BULK (intn:......).

   IF MORE THAN ONE GRADES CARGO TO BE NATURALLY SEPARATED BY THE VSL'S HOLDS
   ONLY.

   IT IS UNDERSTOOD THAT CHARTERERS MAY LOAD ANY FERTILIZERS IN BULK, PROVIDED
   THAT CARGO WILL BE LOADED IN STRICT ACCORDANCE WITH INTERNATIONAL IMO
   REGULATIONS AND TO BE HARMLESS/NON- IMO DANGEROUS CARGO FOR THE
   LOADING,STORAGE AND CARRIAGE OF WHICH THE VESSEL IS NOT REQUIRED TO BE CO2
   FITTED OR NO APPENDIX B REQUIREMENTS APPLY OR REQUIRED BY CHARTERERS AND/OR
   SHIPPERS AND/OR CARGO AND/OR VESSELS OR CARGO UNDERWRITERS AND/OR ANY OTHER
   COMPETENT AUTHORITY. PALM KERNEL EXPELLERS,SUNFLOWER SEED EXPELLERS,PELLETS
   ALWAYS TO BE EXCLUDED.

7. REDELY : ON DLOSP 1SP WITHIN VITORIA - BAHIA BLANCA RANGE, ATDNSHINC

8. HIRE USD 40,000 DAILY HIRE - DAILY HIRE TO INCLUDE OT/FW/LUBES AND TO BE
   PAYABLE EVERY 15 DAYS IN ADVANCE

   UPON DELY CHARTS TO PAY 15 DAYS HIRE PLUS FULL VALUE OF BUNKERS AS
   ON BOARD AT THE DATE OF DELIVERY WITH NO DEDUCTIONS OF ESTIMATED BUNKERS
   VALUE ON REDELIVERY. ANY SUCH DEDUCTION TO BE MADE FROM THE LAST SUBSEQUENT
   SUFFICIENT HIRE PAYMENT.

   CHARTERERS NO TO MAKE ANY DEDUCTION IN RESPECT OF OWNERS EXPENSES AT ANY
   PORT OF CALL DURING THIS CHARTER PARTY OWNERS SETTLING ALL OWNERS' EXPENSES
   DIRECTLY WITH AGENTS, HOWEVER CHARTERERS' AGENTS TO ATTEND VESSEL'S MINOR
   MATTERS SUCH AS CASH TO MASTER, CHANGES OF PART OF CREW ETC WITHOUT CHARGING
   EXTRA AGENCY FEE. FOR MAJOR SHIP'S HUSBANDRY MATTERS SUCH AS EMERGENY
   DRYDOCKING OWNERS TO MAKE THEIR OWN ARRANGEMENT WITH AGENTS. OWNERS TO
   ALWAYS HAVE THE RIGHT TO APPOINT THEIR OWN PROTECTING AGENTS AT BOTH ENDS.

9. BUNKERS ON DELY ABT 300 IFO AND ABT 50 MDO AT USD 500PMT AND USD 800
   RESPECTIVELY.

   BUNKERS ON REDELIVERY ABT SAME QUANTITIES AT SAME PRICES AS ON DELIVERY.

   CHARTERERS TO PAY FULL VALUE OF BUNKERS ON DELY AS ON BOARD.

   BOTH CHARTERERS AND OWNERS TO HAVE THE PRIVILEGE TO BUNKER THE VESSEL PRIOR
   TO DELIVERY/REDELIVERY PROVIDED SAME DOES NOT INTERFERE WITH VESSEL'S
   OPERATIONS OR ITINERARY IN WHICH CASE SAME TO BE SUBJECT TO BOTH PARTIES
   MUTUAL AGREEMENT WHICH NOT BE UNREASONABLY WITHELD.

   CHARTS TO HAVE THE RIGHT TO DEDUCT FROM THE LAST SUFFICIENT HIRE PAYMENT(S)

BUT NOT FROM THE FIRST 30 DAYS THE ESTIMATED VALUE OF BUNKERS ON REDELIVERY

OWNERS ALLOW CHARTERERS TO BUNKER THE VESSEL AT SOUTH AMERICA WITH FUEL ACCORDING TO PETROBRAS SPECIFICATIONS BUT ALWAYS WITH BUNKERS WITHIN THE SPECIFICATIONS OF THE VSL'S ABOVE FULL T/C DESCRIPTION.

10.ON HIRE/OFF HIRE SURVEYS TO BE CARRIED OUT AT CHARTS TIME AND EXPENSES OWNERS APPOINTING MASTER TO ATTEND ON THEIR BEHALF.

11.ANY ADD WAR PREMIUM DURING THIS C/P (IF ANY) TO BE FOR CHRS' ACCT AGAINST FAXED VOUCHERS; MORE SPECIFICALLY CONWARTIME 2004 TO APPLY.

12.ILOCH

CHARTERERS HAVE THE OPTION OF REDELIVERING THE VESSEL WITHOUT CLEANING HOLDS CHARTERERS PAYING USD 6500 LUMPSUM

13.C/V/E USD 1,250 PER MONTH PRO RATA

14.OWNERS TO ALLOW CHARTERERS TO DISCHARGE CARGOS WITHOUT PRESENTATION OF ORIGINAL BILL(S)/LADING BY PROVIDING WITH LETTER OF INDEMNITY IN ACCORDANCE WITH OWNERS P N I CLUB FORM AND WORDING BEFORE DISCHARGING. LETTER OF INDEMNITY TB SIGNED BY CHARTERERS ONLY.

CHARTERERS, THEIR AGENTS OR THEIR NOMINEES ARE AUTHORISED TO SPLIT BILL(S) OF LADING INTO DELIVERY ORDERS PROVIDED A FULL SET OF ORIGINAL BILL(S) OF LADING ARE AVAILABLE TO OWNERS AND AGAINST CHARTERERS LETTER OF INDEMNITY AS PER OWNERS' P&I CLUB WORDING, PRIOR TO SPLITTING. OWNERS ARE NOT RESPONSIBLE FOR ANY CARGO SHORTAGE CLAIM DUE TO SUCH BILLS OF LADING SPLITTING.

15.BIMCO ISM/ISPS/NON-PAYMENT OF HIRE/ ICE-CLAUSE/EVIDENCE OF PERFORMANCE/FUEL SULPHUR CONTENT/BUNKER QUALITY CONTROL/U.S. SECURITY/U.S.CUSTOMS ADVANCE NOTIFICATION/AMS BIMCO CLAUSES FOR TIME CHARTER PARTIES CLAUSES TO APPLY

16.FOR THE PURPOSE OF COMPUTING HIRE PAYMENTS, THE TIME FOR DELIVERY/REDELIVERY SHALL BE ADJUSTED TO G.M.T

17.ANY OFF HIRE DEDUCTION UNDER THIS CHARTER PARTY DUE TO VSLS INEFFICIENCY ARREST,DETENTION,SEIZURE, MACHINERY BREAKDOWN ETC...BY ANY AUTHORITY AND FOR ANY REASON TO BE MADE ON THE BASIS OF THE ACTUAL TIME LOST DURING THE PERIOD OF THE VESSELS INEFFICIENCY ARREST. DETENTION, SEIZURE,MACHINERY BREAKDOWN ETC... LIMITED TO, BUT NOT EXCEEDING, THE WHOLE PERIOD OF THE SAME.

IT IS HEREBY UNCONDITIONALLY AGREED THAT THIS CLAUSE IS A "NET/ACTUAL TIME LOST CLAUSE"

18.GENERAL AVERAGE IN LONDON ACCORDING TO YORK-ANTWERP RULES 1994 / ENGLISH LAW AS WELL AS LMAA SMALL CLAIMS (UPTO $75,000) PROCEDURE TO APPLY

19.Add. Comm 3.75% due to charrs + 1,25 % due to Lightsip + 1,25 TO Billmar

20.NO WAY BILLS, NO LINER OUT BS/L , HAGUE-VISBY RULES TO BE INCORPORATED IN ANY B/L ISSUED UNDER THIS C/P.

21.ALL TAXES AND DUES AND CHARGES ON THE VSL AND/OR CARGO AND/OR FRT AND/OR HIRE ARISING OUT OF CARGOES CARRIED OR PORTS VISITED OR COUNTRIES TRADED THROUGH UNDER THIS CHARTER TO BE FOR CHTRS ACCT.

22.Neither the Charterers nor their agents shall permitt the issue of any B(s)/L (whether or not signed on behalf of the Owners or on the charterers behalf of any sub-charterers) incorporating the Hamburg Rules or any legislation giving effect to the Hamburg Rules or any other legislation

imposing liabilities in excess of Hague-Visby rules. The Charterers shall indeminify the Owners against any liability, loss or damage which may result from any breach of the forgoing provision of the clause. No liner Bills or Way Bills of Lading and no through transhipment or combined transport Bills of Lading to be issued

23. OTHERWISE SUB CP DETAILS/FUTHER TERMS AS PER PROFORMA C/P OF M/V "FURIA R." ACC "OLDENDORFF CARRIERS GMBH & CO.KG" DD 18TH MAY 2006 STRICTLY AND LOGICALLY AMENDED AS PER MAIN TERMS AGREED AS WELL AS BELOW C/P DETAILS/ALTERATIONS;

IT IS WELL UNDERSTOOD AND AGREED THAT ALL TERMS/CONDITIONS IN ABOVE MAIN TERMS AGREEMENT AS WELL AS BELOW FURTHER C/P DETAILS/ALTERATIONS WILL SUPERSEDE ALL TERMS/CONDITIONS/CLAUSES OF SAME MEANING/WORDING OF PROFORMA C/P AND FORM PART OF IT:

MAIN BODY
---------

DELETE LINES AS FROM 1 TILL 19 : SAME TO BE AMMENDED AS PER MAIN
                                  TERMS AGREED BUT LINES 16/17 TO REMAIN AS
                                  PRINTED

LINE 43:                          AFTER 'CHRTS ACCOUNT.' INSERT 'IN CASE OF
                                  OPTIONAL PILOTAGE COST OF SAME TO BE PAID BY
                                  CHRTS IN THEIR DISCRETION AND AFTER
                                  CONSIDERATION OF MASTERS REASONABLE AND
                                  SENSIBLE REQUEST WHICH NOT TO BE UNREASONABLE
                                  WITHELD'

LINES:45/46/47 :                  DELETE AS NON APPLICABLE

LINE 57 :                         DELETE ',AND PROBABLE PORT' AND INSERT

                                  '.LATEST TOGETHER WITH 15 DAYS APPROXIMATE
                                  NOTICE OF REDELIVERY CHARTERERS TO ADVISE THE
                                  FINAL REDELIVERY PORT'

LINE 95 :                         DELETE 'GIVEN WRITTEN NOR' INSERT 'DELIVERED'

LINES 145-150:                    DELETE ALL LINES AS N/A (VSL IS GRLSS) EXCEPT
                                  IN LINE 145 WHERE THE SENTENCE 'VESSEL TO
                                  WORK...REQUIRED BY CHARTERERS' TO REMAIN

RIDER CLAUSES
-------------

CLAUSE 29 : TO BE TITLED "ALLOWED CARGO" AND TO BE AMENDED AS PER
            PARA "6" OF MAIN TERMS.

CLAUSE 30 : TO BE TITLED "ALLOWED TRADING" AND TO BE AMENDED AS PER
            PARA "5" OF MAIN TERMS.

CLAUSE 33 : AMEND PER MAIN TERMS PARA 12, OWISE AS PER C/P EXCEPT 2ND LINE
            DELETE AS FROM 'INCLUDING, IF PERMITTED'... TILL THE END OF THE
            CLAUSE

CLAUSE 38 : 3RD LINE DELETE "REMAINS UNDER ARREST OR" OTHERWISE AS
            PER ABOVE PARA 17 OF MAIN TERMS.

CLAUSE 39 : REPLACE 9TH PARAGRAPH I.E. AS FROM " CHARTERERS HAVE

THE OPTION .... TILL ....OF LINER BILLS OF LADING" WITH " NO
LINER OUT BILLS OF LADING UNDER THIS CHARTER PARTY"

OTHERWISE TO BE ALSO AMENDED SO AS TO INCORPORATE THE PROVISIONS OF
MAIN TERMS ABOVE RELEVANT PARA 14.

CLAUSE 41 : PARA 1 THRU 7 AMENDED AS PER MAIN TERMS (IE QTTIES/PRICES/SPECS
ETC) OWISE TO REMAIN AS PER C/P EXCEPT AFTER 'SUPPLIER' INSERT
'FROM THE VESSEL'S MANIFOLD'

CLAUSE 44 : DELETE AND TO BE AMENDED AS PER ABOVE PARA 8 OF MAIN TERMS.

CLAUSE 49 : 1ST LINE AFTER "SUPERCARGO(ES)" INSERT " UPON REASONABLE REQUEST"

CLAUSE 51 : DELETE AS NON APPLICABLE

CLAUSE 54 : ADD AT THE END "THIS IS A 'NET ACTUAL TIME LOST CLAUSE'
FOR THE TIME THEREBY ACTUAL LOST AND NOT A PERIOD CLAUSE"

CLAUSE 56 : TO BE DELETED AND TO READ AS PER ABOVE PARA 10 OF MAIN TERMS.

CLAUSE 58 : DELETE "COURIER" INSERT "E-MAIL IF REQUIRED"

CLAUSE 59 : DELETE WHOLE AS N/A

CLAUSE 60 : ADD "AND SAME TO BE INCORPORATED TO ANY BILLS OF
LADING ISSUED HEREUNDER"

CLAUSE 62 : DELETE AS FROM "WITHIN 3 BANKING DAYS TILL END OF THE
CLAUSE" INSERT "ON DELIVERY"

CLAUSE 63 : DELETE IN FULL AS N/A.

CLAUSE 71 : AS PER C/P EXCEPT
LINE 1 DELETE 'JAPAN,' INSERT 'RUSSIA"
DELETE 'DENMARK' INSERT 'ARGENTINA OR BRAZIL OR URUGUAY"
ADD AT END 'PROVIDED NO CARGO ONBOARD'

CLAUSE 72 : DELETE WHOLE AS N/A

CLAUSE 76 : DELETE WHOLE AS N/A

- PLS ALSO REPLACE THE ATTACHED TO THE PROFORMA SET OF LOIS (TTL 3) WITH
THE NEW ONE AS ATTACHED HEREWITH.

=== recap of fixture (main terms+cp dets) clean on all subjects / end ===

END

# EXHIBIT 5

# Port state control info

| | |
|---|---|
| **PSC Organisation :** | Paris MoU |
| **Authority :** | United Kingdom |
| **Port of inspection :** | Belfast |
| **Date of report :** | 2007-01-03 |
| **Detention :** | No |
| **Number of deficiencies :** | 18 |
| **Type of inspection :** | Expanded inspection |

## ▷ PARTICULARS AT THE TIME OF THE INSPECTION

| | |
|---|---|
| **IMO number :** | 7433452 |
| **Name of ship :** | NICHOLAS M |
| **Call sign :** | J8B2680 |
| **Gross tonnage :** | 22912 |
| **Type of ship :** | Bulk Carrier |
| **Year of build :** | 1977 |
| **Flag :** | St Vincent and Grenadines |

## ▷ STATUTORY SURVEYS AT THE TIME OF THE INSPECTION

| Statutory inspections and certificates | Class/Flag | Issue date | Expiry date |
|---|---|---|---|
| Cargo ship safety equipment | Bureau Veritas | 2005-10-13 | 2010-03-31 |
| Cargo ship safety construction | Bureau Veritas | 2005-10-13 | 2010-03-31 |
| Cargo ship safety radio | Bureau Veritas | 2005-10-13 | 2010-03-31 |
| Oil pollution prevention (Supp) | Bureau Veritas | 2005-10-13 | 2010-03-31 |
| Load lines certificates | Bureau Veritas | 2005-10-13 | 2010-03-31 |
| Document of compliance (DoC) | International Naval Surveys Bureau | 2003-01-21 | 2007-10-17 |

## ▷ CLASSIFICATION SURVEYS AT THE TIME OF THE INSPECTION

| Class | Last survey | Status |
|---|---|---|
| Bureau Veritas | 2005-10-13 | Delivered |

## ▷ NUMBER OF DEFICIENCIES PER CATEGORY

| Category | Number |
|---|---|
| Fire Safety measures | 5 |
| Food and catering | 3 |
| ISM related deficiencies | 1 |
| Life saving appliances | 3 |
| Load lines | 3 |
| Propulsion & aux. | 2 |
| Safety of navigation | 1 |

## ▷ CHARTERERS

| Charterer | Type of charterer | Address |
|---|---|---|
| RICE COMPANY | Voyage charterer | Roseville California U.S.A. |

© Copyright 2000-2006; Version : prodPV_2_1_0; Developed and hosted by : France-Ministry for Transport -DAM/SI

# Port state control info

| PSC Organisation : | Paris MoU |
|---|---|
| Authority : | France |
| Port of inspection : | Nantes |
| Date of report : | 2007-04-10 |
| Detention : | Yes |
| Duration : | 9 |
| Number of deficiencies : | 28 |
| Type of inspection : | More detailed inspection |

### ⋗ PARTICULARS AT THE TIME OF THE INSPECTION

| | |
|---|---|
| IMO number : | 7433452 |
| Name of ship : | NICHOLAS M |
| Call sign : | J8B2680 |
| Gross tonnage : | 22912 |
| Type of ship : | Bulk Carrier |
| Year of build : | 1977 |
| Flag : | St Vincent and Grenadines |

### ⋗ STATUTORY SURVEYS AT THE TIME OF THE INSPECTION

| Statutory inspections and certificates | Class/Flag | Issue date | Expiry date |
|---|---|---|---|
| Cargo ship safety equipment | Bureau Veritas | 2007-04-16 | 2007-06-15 |
| Cargo ship safety construction | Bureau Veritas | 2005-10-13 | 2010-03-31 |
| Cargo ship safety radio | Bureau Veritas | 2005-10-13 | 2010-03-31 |
| Oil pollution prevention (iopp) | Bureau Veritas | 2005-10-13 | 2010-03-31 |
| Load lines certificates | Bureau Veritas | 2005-10-13 | 2010-03-31 |
| Document of compliance (DoC) | International Naval Surveys Bureau | 2003-01-21 | 2007-10-17 |

### ⋗ CLASSIFICATION SURVEYS AT THE TIME OF THE INSPECTION

| Class | Last survey | Status |
|---|---|---|
| Bureau Veritas | 2005-10-13 | Delivered |

### ⋗ NUMBER OF DEFICIENCIES PER CATEGORY

| Category | Number |
|---|---|
| Accommodation | 2 |
| Alarm signals | 1 |
| Bulks carriers | 1 |
| Fire Safety measures | 5 |
| Propulsion & aux. | 6 |
| Working spaces and accident prevention | 4 |

### ⋗ GROUNDS FOR DETENTION

| Deficiency | Number | Class related deficiency |
|---|---|---|
| Fire-dampers | 1 | No |

| | | |
|---|---|---|
| Emergency fire pump | 1 | No |
| Sanitary facilities | 2 | No |
| Propulsion main engine | 2 | No |
| Cleanliness of engine room | 1 | No |
| Maintenance of the ship and equipment | 1 | No |
| Means of control (opening, pumps) Machinery spaces | 1 | No |

**> CHARTERERS**

| Charterer | Type of charterer | Address |
|---|---|---|
| TRAMP MEDITERRANEE | Voyage charterer | PYRAEUS Greece |

℗ Copyright 2000-2006; Version : prodPV_2_1_0; Developed and hosted by : France-Ministry for Transport -DAM/SI

## Port state control info

| PSC Organisation : | Paris MoU |
|---|---|
| Authority : | Russia |
| Port of inspection : | Saint petersburg |
| Date of report : | 2007-08-07 |
| Detention : | No |
| Number of deficiencies : | 20 |
| Type of inspection : | More detailed inspection |

### > PARTICULARS AT THE TIME OF THE INSPECTION

| | |
|---|---|
| IMO number : | 7433452 |
| Name of ship : | NICHOLAS M |
| Call sign : | J5B2680 |
| Gross tonnage : | 22912 |
| Type of ship : | Bulk Carrier |
| Year of build : | 1977 |
| Flag : | St Vincent and Grenadines |

### > STATUTORY SURVEYS AT THE TIME OF THE INSPECTION

| Statutory Inspections and certificates | Class/Flag | Issue date | Expiry date |
|---|---|---|---|
| Cargo ship safety equipment | Bureau Veritas | 2007-05-21 | 2007-08-21 |
| Cargo ship safety radio | Bureau Veritas | 2007-05-21 | 2007-08-21 |
| Cargo ship safety construction | Bureau Veritas | 2005-10-13 | 2010-03-31 |
| Oil pollution prevention (Iopp) | Bureau Veritas | 2005-10-13 | 2010-03-31 |
| Load lines certificates | Bureau Veritas | 2005-10-13 | 2010-03-31 |
| Document of compliance (DoC) | International Naval Surveys Bureau | 2003-01-21 | 2007-10-17 |

### > CLASSIFICATION SURVEYS AT THE TIME OF THE INSPECTION

| Class | Last survey | Status |
|---|---|---|
| Bureau Veritas | 2005-10-13 | Delivered |

### > NUMBER OF DEFICIENCIES PER CATEGORY

| Category | Number |
|---|---|
| Accident prevention (ILO147) | 2 |
| Crew certificates | 1 |
| Fire Safety measures | 4 |
| ISM related deficiencies | 1 |
| Life saving appliances | 1 |
| Load lines | 4 |
| MARPOL annex I | 1 |
| Propulsion & aux. | 2 |
| Safety of navigation | 2 |
| Structural Safety | 1 |
| Working spaces and accident prevention | 1 |

> **CHARTERERS**

| Charterer | Type of charterer | Address |
|---|---|---|
| TRAMP MEDITERRANEE | Voyage charterer | PYRAEUS Greece |
| UNIAPRO OY | Time charterer | Finland |

© Copyright 2000-2005; Version : predPV_2_1_0; Developed and hosted by : France-Ministry for Transport -DAM/SI

## Port state control info

| PSC Organisation : | Paris MoU |
|---|---|
| Authority : | Russia |
| Port of inspection : | Saint petersburg |
| Date of report : | 2007-12-29 |
| Detention : | Yes |
| Duration : | 13 |
| Number of deficiencies : | 29 |
| Type of inspection : | More detailed inspection |

### ⋗ PARTICULARS AT THE TIME OF THE INSPECTION

| | |
|---|---|
| IMO number : | 7433452 |
| Name of ship : | NICHOLAS M |
| Call sign : | J8B2680 |
| Gross tonnage : | 22912 |
| Type of ship : | Bulk Carrier |
| Year of build : | 1977 |
| Flag : | St Vincent and Grenadines |

### ⋗ STATUTORY SURVEYS AT THE TIME OF THE INSPECTION

| Statutory inspections and certificates | Class/Flag | Issue date | Expiry date |
|---|---|---|---|
| Document of compliance (DoC) | International Naval Surveys Bureau | 2007-12-04 | 2012-10-17 |
| Safety management certificat (SMC) | International Naval Surveys Bureau | 2007-12-04 | 2008-05-03 |
| Cargo ship safety equipment | Bureau Veritas | 2007-08-13 | 2008-01-12 |
| Cargo ship safety radio | Bureau Veritas | 2007-08-13 | 2008-01-12 |
| Load lines certificates | Bureau Veritas | 2005-10-13 | 2010-03-31 |
| Oil pollution prevention (Iopp) | Bureau Veritas | 2005-10-13 | 2010-03-31 |

### ⋗ NUMBER OF DEFICIENCIES PER CATEGORY

| Category | Number |
|---|---|
| Crew certificates | 1 |
| Fire Safety measures | 1 |
| Food and catering | 1 |
| Life saving appliances | 2 |
| Load lines | 1 |
| Maritime Security | 1 |
| Mooring arrangements (ILO 147) | 2 |
| Operational deficiencies | 2 |
| Propulsion & aux. | 2 |
| Radiocommunications | 1 |
| Safety of navigation | 2 |
| Ship's certificates and documents | 2 |
| Structural Safety | 2 |
| Working spaces and accident prevention | 4 |

### ⋗ GROUNDS FOR DETENTION

| Deficiency | Number | | Class related deficiency |
|---|---|---|---|
| Bulkheads corrosion | 2 | No | |
| Cargo and other hatchways | 1 | No | |
| Report and analysis of non-conformities, accidents | 1 | No | |

### ▷ CHARTERERS

| Charterer | Type of charterer | Address |
|---|---|---|
| CONGENTRA AG | Time charterer | Zugm Switzerland |

③ Copyright 2000-2006; Version : prodPV_2_1_0; Developed and hosted by : France-Ministry for Transport -DAM/S: