LENNON, MURPHY & LENNON, LLC
Attorneys for Defendant
CONGENTRA A.G.
The GrayBar Building
420 Lexington Avenue, Suite 300
New York, New York 10170
Telephone:    (212) 490-6050
Facsimile:    (212) 490-6070
Kevin J. Lennon

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
SIXTEEN THIRTEEN MARINE S.A.,              :        08 CV 1318 (HB)
                                            :
                 Plaintiff,                 :        ECF CASE
                                            :
          - against -                       :
                                            :
CONGENTRA A.G.,                             :
                                            :
                 Defendant.                 :
------------------------------------------------------------X


# MEMORANDUM OF LAW IN SUPPORT
## OF MOTION TO VACATE MARITIME ATTACHMENT

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................1

STATEMENT OF FACTS ..................................................................................................2

ARGUMENT .......................................................................................................................6

POINT ONE

IT IS PLAINTIFF'S BURDEN TO SHOW CAUSE WHY
THE ATTACHMENT SHOULD NOT BE VACATED ..................................................6

POINT TWO

PLAINTIFF'S  ATTACHMENT SHOULD BE VACATED AS ITS UNDERLYING CLAIMS
ARE SO LACKING IN MERIT AS TO BE FRIVOLOUS AND/OR ARE OTHERWISE
MANIFSTLY INEQUITABLE ..........................................................................................8

POINT THREE

PLAINTIFF'S MISREPRESENTATION OF FACTS TO THE COURT IN ITS AMENDED
VERIFIED COMPLAINT WARRANTS VACATEUR ................................................. 13

POINT FOUR

PLAINTIFF CANNOT RECOVER ON ITS ALLEGED CLAIMS AGAINST CONGENTRA
AS A MATTER OF ENGLISH LAW ..............................................................................14

POINT FIVE

ALTERNATIVELY, PURSUANT TO SUPPLEMENTAL ADMIRALTY RULE E(6), THE
COURT SHOULD REDUCE THE AMOUNT OF THE ATTACHMENT TO AN AMOUNT
COMMENSURATE WITH PLAINTIFF'S PROVABLE DAMAGES, IF ANY...........................18

CONCLUSION ...................................................................................................................20

## PRELIMINARY STATEMENT

Defendant, Congentra A.G. (hereinafter "Congentra" or "Defendant"), by its undersigned counsel, Lennon, Murphy & Lennon, LLC, submits the within Memorandum of Law in Support of its Motion to Vacate, or, alternatively, Reduce the Amended Ex Parte Order of Maritime Attachment dated February 20, 2008 (hereinafter "Ex Parte Order") pursuant to Rules E(4)(f) and E(6) of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure (hereinafter "Admiralty Rules").

Pursuant to its Amended Verified Complaint, the Plaintiff, Sixteen Thirteen Marine S.A. (hereinafter "STM" or "Plaintiff"), seeks to attach Congentra's property as security for its fallacious claims based on Congentra's breach of a charter party dated October 10, 2007 ("charter party") and also based on alleged tortious interference with Plaintiff's business relations. *See Plaintiff's Amended Verified Complaint attached as Exhibit 1 to Declaration of Kevin J. Lennon ("Lennon Decl.").*

At Plaintiff's request on February 20, 2008 the Court issued an Amended Ex Parte Order that permitted the attachment of Defendant's property in the amount of $4,141,118.32. *See Amended Ex Parte Order attached as Exhibit 2 to Lennon Decl.* Upon information and belief, funds in the amount of about $212,170.00 have been attached in the district as a result of STM's service of the Ex Parte Order and Process of Maritime Attachment and Garnishment (hereinafter "PMAG") issued pursuant to the Ex Parte Order.

STM's so called claims asserted in its Amended Verified Complaint will be ultimately decided in London arbitration with English law to apply. The subject action is ancillary to the arbitration and was ostensibly filed by STM to seek security for its claims.

## STATEMENT OF FACTS

On or about October 10, 2007, STM as vessel owner, and Congentra as charterer, entered into a time charter party for the charter of the M/V NICHOLAS M ("Vessel") for one time charter trip for a duration of about 60 days (without guarantee) for the intended carriage of "soyabean meal" from Argentina to St. Petersburg, Russia. *See Charter Party attached as Exhibit 1 to Congentra's Verified Answer.*

The vessel arrived in San Lorenzo, Argentina on October 18 and thereafter commenced loading of cargo. *See Loadport Statement of Facts ("Loadport SOF") attached as Exhibit 3 to Lennon Decl.* She arrived at St. Petersburg on December 1, 2007 although cargo discharge did not start until 3 December due to customs formalities and snow. *See Discharge Statement of Facts ("Discharge SOF") attached as Exhibit 3 to Lennon Decl.*

While the Vessel was in the midst of cargo discharging at St. Petersburg, Plaintiff "fixed" the Vessel for her next employment with non-party Britannia Bulkers ("BB") on December 20, 2007. *See Exhibit 3 attached to Congentra's Verified Answer.* Notwithstanding that the Vessel was still discharging, and even though STM conceded that she would likely not finish discharging until December 27 (*see Exhibit 3, Item 15 (page 7 of 12) attached to Congentra's Verified Answer*), the STM – BB charter party laycan[1] contained in the STM - BB fixture was from December 24 – December 31, 2007. *See* Item 4 (page 9 of 12) – Exhibit 4.

Vessel delivery under the BB fixture was on dropping off last sea pilot St Petersburg with a cancelling date of December 31, 2007. Stated otherwise, if STM did not (or could not lawfully) give a valid notice of readiness prior to December 31, 2007, then BB had the right to cancel the charter.

---

[1] The range of days between which a vessel Owner may lawfully tender a Vessel's Notice of Readiness to commence performance under a charter party

In this regard, STM would not have been in a position to give a valid notice unless the vessel was tight, staunch, strong and in every way fitted for the service and with full complement of officers

The vessel completed discharge of cargo at 1840 hrs on December 28, 2007. *See Discharge SOF – Ex. 3 to Lennon Decl.* However, the Vessel's Classification Society[2] withdrew certain vessel certificates at some time on December 28, 2007 due to, *inter alia*, problems with cargo hold no. 6 hatch cover hydraulics. Thereafter, on December 29, 2007, Russian Port State Control ("PSC") detained the vessel. *See Port State Control Report attached as Exhibit 4 to Lennon Decl.* The Port State Control report shows that the vessel was detained due to various deficiencies including the following:

(a) The withdrawal by class of safety construction certificate;

(b) The withdrawal by class of class certificate;

(c) Bulkhead from main deck to store room holed;

(d) Leakage from bilge collecting tank no.9 into engine room;

(e) Hatch cover damaged (metal hinges torn out from base in hold no. 6 due to damage to hydraulic system);

(f) Hatch covers, coamings, compression bars all heavily corroded;

(g) Insufficient crew and, in particular, the vessel had no second officer; and

(h) Exhaust pipe in engine room holed.

---

[2] In the shipping, classification societies are non-governmental organizations or groups of professionals, ship surveyors and representatives of offices that promote the safety and protection of the environment of ships and offshore structures. Classification societies set technical rules, confirm that designs and calculations meet these rules, survey ships and structures during the process of construction and commissioning, and periodically survey vessel to ensure that they continue to meet the rules. Classification societies are also responsible for classing oil platforms, other offshore structures, and submarines. Included in the survey process is the survey and certification of diesel engines, large or critical pumps such as fire or main bilge pumps, and other machinery vital to the function of the ship. This is frequently done at the manufacturer's plant, which may be hundreds of miles from the shipyard or drydock. *See* http://en.wikipedia.org/wiki/Classification_society.

*Id.*

STM admits in its Amended Verified Complaint that "the vessel's classification society had temporarily withdrawn the vessel's certificate of class pending repairs to the hydraulic lifting mechanism for the hatch covers of No.6 hold…" *See Amended Verified Complaint at ¶11, Ex. 1 – Lennon Decl.* However, it then proceeds to <u>falsely</u> state that "on or about January 2, 2008 it was determined that the vessel had ***no problems which justified here*** detention …" and that vessel's classification society returned the certificate <u>prior to December 31, 2007</u>. *Id. ¶15, Ex. 1 – Lennon Decl.* (emphasis added).

These assertions are belied by an e-mail sent by the Vessel's Master to the Vessel's commercial managers, Chian Spirit Maritime Enterprises Inc., dated January 7, 2008, in which he related, *inter alia,* the vessel's class certificate *and* the cargo ship safety construction certificate were not received back until January 6, 2008. *See emails attached as Exhibit 6 to Lennon Decl.* These assertions are further belied by non-conformity reports, including one dated January 2, 2008 signed by the Master, indicating that items (a) - (f) were all to be rectified and inspected to class satisfaction before vessel departure. *See non-conformity reports attached as Exhibit 7 to Lennon Decl.* Further, the Port State Control Report itself provides that the Vessel was not released from detention until January 11, 2008. *See Exhibit 5, Lennon Decl.* Thus, what STM has alleged in its Amended Verified Complaint is simply false.

For the foregoing reasons and for those reasons explained in the accompanying Declarations of Honorable Sir Anthony Colman, Edward Eurof Lloyd-Lewis, Pavel Primak, Konstantin Petrunin, Matthew Lloyd Montgomery, Alexander Nikolaevich Konykhov and Kevin J. Lennon, STM's Amended Ex Parte Order should be vacated because: (1) STM's alleged facts set out in its Amended Verified Complaint patently misrepresented and misled this Court to issue the maritime

4

attachment; (2) STM's claim are so lacking in merit as to be characterized as frivolous. and (3) STMs' alleged claims are, in any event, unrecoverable under the English law that governs the claims.

The Court is directed to the following supporting Declarations which address various issues raised by STM's Amended Verified Complained filed against Congentra.

- ➢ Sir Honorable Sir Anthony Colman's Declaration sets out, *inter alia*, why STM's claims are insufficient as a matter of English law;

- ➢ Edward Eurof Lloyd Lewis, as Congentra's London solicitor, sets out in significant detail in his Declaration the factual background of the subject charter party and fully dispels STM's allegations that vessel delay, and loss of the BB fixture, was caused by Congentra;

- ➢ Pavel Primak's Declaration dispels STM's unsupported falsehoods that Congentra engaged in a conspiracy to involve port state control to detain the Vessel and sets forth his contact with the Russian Port State Control *subsequent to the Vessel's detention and release* regarding why the Vessel was detained and also those steps available to STM to dispute the detention if they truly found the same to be unwarranted;

- ➢ Konstantin Petrunin's Declaration recounts the factual history of the events at St. Petersburg and rejects the allegation that Congentra acted in bad faith and/or conspired to delay the Vessel. His Declaration also discusses his contact with: the International Transport Worker's Federation ("ITF") discussing their involvement with the Vessel and the complaints received from the vessel crew for which a report was made to the Russian Port State Control; Nordweg which performed vessel repairs and which serves to reject the falsehood that vessel repairs were made prior to December 31, 2007; and also Bureau Veritas which withdrew the Vessel's certificates;

5

➢ Matthew Lloyd Montgomery, as Congentra's London solicitor, sets out his contact with the ITF's London office and their confirmation that they reported the Vessel to the Russian Port State Control as early as December 19, 2007 which is entirely inconsistent with STM's conspiracy theory;

➢ Alexander Nikolaevich Konykhov, employed by Anteks which was the Vessel's agent at St. Petersburg, which discusses his understanding of the Vessel detention, details his involvement with the Vessel and refutes the contention that Anteks acted in concert with Congentra to detain the Vessel; and

➢ Kevin J. Lennon, as Congentra's New York counsel, which appends various documents and materials pertinent to this matter .

## ARGUMENT

### POINT I

### IT IS PLAINTIFF'S BURDEN TO SHOW CAUSE
### WHY THE ATTACHMENT SHOULD NOT BE VACATED

As Plaintiff in this maritime attachment action, STM carries the burden at a post-attachment hearing to prove *inter alia* that "it has a valid prima facie admiralty claim against the defendant." *See* Aqua Stoli Shipping Ltd. v. Gardner Smith Pty. Ltd., 460 F.3d 434, 445 (2d Cir. 2006). Supplemental Admiralty Rule E(4)(f) of the Federal Rules of Civil Procedure provides:

> Whenever property is arrested or attached, any person claiming an interest in it shall be entitled to a prompt hearing at which the plaintiff shall be required to show why the arrest or attachment should not be vacated or other relief granted consistent with these rules.

Aqua Stoli, 460 F.3d at 445.

Thus, STM must prove that its attachment is proper. The Second Circuit Court of Appeals commented on Rule E(4)(f) in Aqua Stoli and explained the following standard:

6

[A] district court must vacate an attachment if the plaintiff fails to sustain his burden of showing that he has satisfied the requirements of Rules B and E. We also believe vacatur is appropriate in other limited circumstances. While, as we have noted, the exact scope of a district court's vacatur power is not before us, we believe that a district court may vacate the attachment if the defendant shows at the Rule E hearing that 1) the defendant is subject to suit in a convenient adjacent jurisdiction; 2) the plaintiff could obtain in personam jurisdiction over the defendant in the district where the plaintiff is located; or 3) the plaintiff has already obtained sufficient security for the potential judgment, by attachment or otherwise. n5.

n.5 Rule E(4)(f) clearly places the burden on the plaintiff to show that an attachment was properly ordered and complied with the requirements of Rule B and E. Although Rule E does not explicitly mention a district court's equitable power to vacate an attachment or who bears such a burden, former Local Rule 12 required the defendant to establish any equitable grounds for vacatur, and we believe that defendants still bear that burden under the Supplemental Rules.

Id.

Former Local Rule 12, provides as follows:

Where property is arrested or attached, any person claiming an interest in the property arrested or attached may, upon showing of any improper practice or a manifest want of equity on the part of the plaintiff, be entitled to an order requiring that plaintiff to show cause why the arrest or attachment should not be vacated or other relief granted, consistent with theses rules or the supplemental rules.

Id.

Rule E(4)(f) does not set forth the form of the post-attachment hearing but rather permits a flexible approach dependent on the issues and evidence before the Court. See Salazar v. The Atlantic Sun, 881 F.2d 73, 79 (3d Cir. 1989); Linea Naviera de Cabotaje, C.A. v. Mar Caribe de Navigaciion, C.A., 169 F. Supp.2d 1341, 1357 – 59 (M.D. FL. 2001). It is respectfully submitted, notwithstanding the deference to be afforded to the London arbitrators to determine the substantive merits of the underlying dispute, that this Court should consider fully the evidence submitted to it by Congentra which shows that STM's claims are, at best, flagrant distortions of fact and, in any event, constitute claims for which it cannot recover under English law.

Here, STM must demonstrate that the Amended Ex Parte Order was properly issued. In this respect the Court should be wary of the inescapable fact that the attachment was obtained ex parte and was issued as a result of the misrepresentations set out in the Amended Verified Complaint. Because Congentra herein furnishes to the Court abundant proof that exposes STM's attachment as frivolous, or manifestly inequitable, the attachment should be vacated. Further, for the reasons explained herein, because STM cannot recover under English law on the claims it has asserted against Congentra the attachment must be vacated. Finally, should the court not vacate entirely the attachment, it should, in the exercise of its equitable discretion, and as per Supplemental Rule E(6), reduce the amount of the attachment.

### POINT II

### PLAINTIFF'S ATTACHMENT SHOULD BE VACATED AS ITS UNDERLYING CLAIMS ARE SO LACKING IN MERIT AS TO BE FRIVOLOUS AND/OR ARE OTHERWISE MANIFESTLY INEQUITABLE

In Rolls Royce Industrial Power, (INDIA) v. M.V. FRATZIS, 119 AMC 393, 397, 95 CV 2630 (CSH)(S.D.N.Y.) Judge Haight set out a three-part analysis to be undertaken by the Court to determine, for purposes of maritime attachments, if the underlying claim is so lacking in merit as to be frivolous and/or manifestly inequitable and thus subject to vacatuer. The test is as follows:

> [T]here are three questions which arise out of the authorities cited [including Admiralty Rule E(4)(f), Admiralty Rule E(6) and former Local Admiralty Rule 12] and others, to which I will come...
>
> The first: Is the plaintiffs' claim so lacking in merit as to be characterized as frivolous?
>
> If that question is answered in the negative, then one comes to the second question which is: In obtaining the attachment at issue, have the plaintiffs engaged in improper practices to such a degree, or do the circumstances reveal a want of equity so manifest, as to require that the attachment be vacated in its entirety?
>
> And the third question, if that be answered in the negative, is this: Is the amount attached excessive or is it reasonably necessary to secure the plaintiffs' claims?

Rolls Royce, 119 AMC at 397.

Congentra respectfully submits that this Court should vacate STM's maritime attachment pursuant to Rule E(4)(f) because STM's claim is patently frivolous. As set out above, in a nutshell, STM claims in its Amended Verified Complaint, with not a shred of documentation in support that Congentra engaged in a conspiracy to intentionally delay the Vessel at St. Petersburg thereby causing her to lose a subsequent commercial contract, other lost profits and potential exposure to further damages. Importantly, STM has deceived the Court regarding highly relevant factual details regarding the subsequent fixture and the reasons why it could not perform that fixture.

As explained in great details in the supporting Declarations, STM's inability to perform he BB fixture was due not to any actions committed by Congentra but rather due to the poor Vessel condition and the ensuing removal of classification certificates and port state control detention. In point of fact, STM concedes in its Amended Verified Complaint that Congentra did not have any hand whatsoever in the classification society's removal of the class certificates. *See Amended Verified Complaint at ¶11, Ex. 1 – Lennon Decl.*

There is no basis at all for STM's assertion that Congentra either breached the underlying charter party (in fact its Amended Verified Complaint points to no specific duties allegedly breached by Congentra) or that it tortiously interfered with STM's contractual relations. Where STM claims in its Amended Verified Complaint that Congentra engaged in conspiracy, including not only non-party cargo receivers, Euroweg, but also the Vessel's agent, Anteks, and the Russian Port State Control, it is respectfully submitted that STM should be required to come forward with at least *some documentation and quantification* of these alleged claims since, based on the evidence submitted herewith, such scurrilous accusations are really nothing more than the figment of STM's

9

imagination.

The Court is empowered with the discretion to vacate because "[t]he inherent power to adapt an admiralty rule to the equities of a particular situation is entrusted to the sound discretion of the district judge sitting as an admiralty judge." *See* Greenwich Marine, Inc. v. S.S. Alexandra, 339 F.2d 901, 905 (2d Cir. 1965). By way of further legal authority, notwithstanding that in Aqua Stoli the exact scope of the district court's vacateur power was not squarely before the Second Circuit, the Court held nevertheless that given the exceptional remedy of maritime attachments, a district court has the inherent authority to vacate an abusive or otherwise unfair attachment. *See* Aqua Stoli, 460 F.3d at 442-445.

The Court so held in the context of praising Judge Leval's holding in Integrated Container Serv. Inc. v. Starlines Container Shipping, Ltd., 476 F. Supp. 119 (S.D.N.Y. 1979). "Then-District Judge Leval astutely noted, however, the possibility of abuse by the attaching party in some circumstances." Aqua Stoli, 460 F.3d at 442. One such case of abuse occurs when a party who can be "found" within the Southern District of New York has its property restrained "across the river" in the Eastern District of New York. In Integrated Container, Judge Leval held that where there is an "abusive use of the maritime attachment remedy…the courts may easily remedy the situation by exercising discretion to set aside an unfair attachment." *See* Integrated Container, 476 F.Supp. at 124. Based on the facts of Integrated Container, an "across the river case," Judge Leval held that the attachment was not unfair because "there can be no doubt that the plaintiffs' need for security is real, [and] that their quest for attachment is not a tactic of harassment." Id.; *see also* Central Hudson Gas and Elec. Corp. v. Empresa Naviera Santa, SA, 845 F.Supp. 150, 153 (S.D.N.Y. 1994)("The Rule was not abused, inasmuch as there was a substantial risk that [plaintiff] would not be able to locate sufficient assets to satisfy its claims, which in turn were not frivolous.")

10

Furthermore, "a district court has the inherent authority to vacate an attachment "upon a showing of 'any improper practice' or a 'manifest want of equity on the part of plaintiff." *See* Blake Mar., Inc. v. Petrom S.A., 05 Civ. 8033, 2005 U.S. Dist. LEXIS 26310, 2005 WL 2875335, at *2 (S.D.N.Y. Oct. 31, 2005) (quoting Southern District of New York Former Local Civil Rule 12 (1986)). While an attachment may surely be vacated where a plaintiff cannot demonstrate that it has satisfied the technical requirements of Rule B, Judge Pauley also recently held that "[c]ourts may also vacate an attachment in certain limited circumstances *where equity so demands*." *See* Flame Maritime Ltd. v. Hassan Ali Rice Export Co., 07 Civ. 4426 (WHP), 2007 U.S. Dist. LEXIS 64470, *4 (S.D.N.Y. August 31, 2007)(citing Aqua Stoli, 460 F.3d at 444). (emphasis added).

The decisions where courts have vacated attachments obtained to secure frivolous claims are instructive in this case because in both instances the attachments were unfair and initiated for improper or abusive purposes. In addition to the Rolls Royce case discussed above, in Bay Casino, LLC v. M/V ROYAL EMPRESS, 1999 U.S. Dist. LEXIS 22357 (S.D.N.Y. 1999), in the context of a defendant's challenge to a maritime attachment, and where the plaintiff had furnished the court with misleading information regarding projected profits and actual costs, the court held that "plaintiff's lost profits claim is frivolous and, therefore, improperly included as part of the security." *See* Bay Casino, 1999 U.S. Dist. LEXIS 22357 at *3-4. The Bay Casino court further held that the claim was frivolous because the very existence of the damages were uncertain, *i.e.*, where profits were speculative at best, and that recovery was unwarranted where the plaintiff could not potentially prove loss to a reasonable certainty standard. "It is well-settled that in an attachment proceeding, the plaintiff need not prove its damages with exactitude but the court must be satisfied that the plaintiff's claims are not frivolous." *Id.* at *3 citing Dongbu Express Co. v. Navios Corp., 944 F. Supp. 235 (S.D.N.Y. 1996). Addressing New York law, the court rejected the plaintiff's lost profits

11

claim and partially vacated the attachment because allowing security for a frivolous claim would have put the plaintiff in a better position than it otherwise would have been without the defendant's involvement. The Bay Casino court held as follows:

> Several grounds for such a finding (that the claim was frivolous) were apparent in both the parties' pleadings and in their representations to the Court in the hearing on this matter.
>
> ***
>
> While the plaintiff has a much lighter burden of proof in this [Rule E(4)(f)] proceeding than at trial, the Court can find no basis in law or in fact to find plaintiff's claim non-frivolous . . .
>
> Additionally, neither in their pleadings, nor in their representations to this Court has plaintiff provided the Court with an evidentiary basis for historical profits that would indicate plaintiff's claims for lost profits constitutes anything more than bald speculation. Absent this, especially in consideration of the fact that plaintiffs are marketing . . . a consumer driven, highly volatile venture [,] plaintiff cannot potentially prove loss to a reasonable certainty.
>
> ***
>
> Defendants cite Rolls Royce v. Fratzis M., 1996 AMC 393, 396 (S.D.N.Y. 1995) in heralding the Court's responsibility to address the question of:
>
>> In obtaining the attachment...have the plaintiffs engaged in improper practices to such a degree or do the circumstances reveal a want of equity so manifest, as to require the attachment to be vacated in its entirety.
>
> In reducing security, this Court is mindful of its discretion under both law and equity. Since plaintiffs will not be able to prove a claim for lost profits based solely on questionable projections, unsupported by historical profits, the Court declines to secure the claim...Considering the facts at bar, this Court considers that clear guidance in determining plaintiff's lost profits claim is frivolous. Thus, plaintiff's claim for lost profits will not be considered in calculating an appropriate security.

Bay Casino, 1999 U.S. Dist. LEXIS 22357 at *4-7.

The above cited decisions provide that district courts are empowered with the authority to vacate frivolous and/or abusive maritime attachments. Applying these principles to this case,

because STM's claim is frivolous, vacateur is appropriate.  The Order should be vacated since STM has amply and repeatedly alleged wholesale inaccuracies and misrepresentations in its Amended Verified Complaint and is seeking to secure an alleged claim that arose due to its own negligence in failing to properly maintain its Vessel and entering into a fixture that it could not validly and timely deliver the Vessel.  None of this is in any way a fault attributable to Congentra, which amply explains the vague, obtuse and misleading allegations in STM's Amended Verified Complaint.

POINT III

### PLAINTIFF'S MISREPRESENTATION OF FACTS TO THE COURT IN ITS AMENDED VERIFIED COMPLAINT WARRANTS VACATEUR

It is well established that the Court is vested with the discretion to address abusive maritime attachment as it deems appropriate.  *See* Contichem LPG v. Parsons Shipping Co., Ltd., 229 F.3d 426, 434-35 (2d Cir. 2000); Aqua Stoli Shipping Ltd. v. Gardner Smith Pty. Ltd., 460 F.3d 434, 445 (2d Cir. 2006); and Great White Fleet Ltd. v. M/V Bosse, 2007 U.S. Dist. LEXIS 75726 (S.D.N.Y. 2007).

As witnessed by the supporting Declarations, and the exhibits attached thereto, STM's Amended Verified Complaint, filed in support of the prayer for issuance of an amended Ex Parte Order, contains myriad untruths and misrepresentations and thus abused the maritime attachment remedy.  In this respect, the inherent power of the court to address improper litigation tactics and purposes should be duly noted.  *See* Wolters Kluwer Financial Services Inc. v. Scivantage, 2007 U.S. Dist. LEXIS 88052 (S.D.N.Y. 2007).

For the foregoing reasons, STM's maritime attachment should be vacated.

POINT IV

## PLAINTIFF CANNOT RECOVER ON ITS ALLEGED CLAIMS AGAINST CONGENTRA AS A MATTER OF ENGLISH LAW

As explained in Honorable Sir Anthony Coleman's Declaration, based on the facts of this

matter, STM cannot recovery its asserted damages under English law.  Sir Anthony Colman's

Declaration sets out, *inter alia*, the following:

- ➢ It is unequivocal that Bureau Veritas, the Classification Society, removed the vessel's certificates by reason of the fact that the metal hinges on the hatch to No. 6 hold had been torn out and/or defects in the hydraulic lifting mechanism such that the hatch could not be closed and that an English Court, or an arbitral tribunal applying English law, would accept this evidence;

- ➢ According to remarks made by the Master on the Statement of Facts, the slow discharge of the vessel during the period 2 - 18 December was caused by the fact that for much of the time receivers were working the vessel with one gang rather than two and by delays due to lack of availability of wagons.  The Master's remarks explicitly reject the suggestions that delay in discharge of cargo from the No. 2 and 4 holds delayed the overall discharge operation, which was proceeding from other holds during the periods when those holds could not be discharged.  Then when the discharge of all holds had been completed on the evening of 28th December, bad weather conditions and the consequential lack of a pilot would have prevented the vessel from sailing until noon on 29th December 2007.  The Master expressed the position thus:

    *"- Despite the fact that commencement of cargo discharge from holds no.2 and 4 was delayed..., the discharging progress and the overall discharging time were not affected as the vessel was always able to provide the required gangs from other available holds. Therefore no delays from Vessel's side were occurred during discharging operations*
    *- From commencement of discharge until completion of same, discharging operations were carried out with 1 (one) and some very few limited times with 2 (two) gangs. Also always availability of wagons was very tight.*
    *- On 28 Dec last minute ultrasonic test was not carried out for reasons explained to Charterers in writing...*
    *- On 28 Dec after completion of discharge vessel was waiting pilotage due to bad weather conditions (as per agent msg pilot was not to be expected before 29th noon sub weather improvement)..."*

- ➢ Compelling evidence shows that the prohibition on discharge of the Nos. 2 and 4 holds by the Russian authorities did not lengthen the overall discharging time;

- ➢ STM's charter to Britannia Bulk contained a cancelling date was of December 31, 2007. However, the Owner's response to question 15 of the fixture questionnaire related that

14

discharge would not be realistically completed until December 26 – 27 and the vessel missed that cancelling date leading to the cancellation by Britannia Bulk.

➤ It is not clear if sea conditions could have permitted the Vessel to proceed under pilotage from St. Petersburg by December 31, 2007, but there is very strong evidence, that the Vessel could not have been validly delivered because the vessel's class certificate was removed by BV and not returned to the vessel until January 6, 2008.

➤ Without vessel class certificates the vessel could not be validly delivered under the Britannia charter, for it was not tight, staunch, strong and in every way fitted for the service. Apart from the condition of the No. 6 hatch and other defects in condition listed by Russian Port State Control as grounds for detention of the vessel, its class certificate and its safety construction certificates had been removed and was therefore not fitted for the service. The terms of the Britannia charter provided STM's guarantee that the Vessel was classed with BV *"and shall remain so throughout the whole T/C period"*. The effect of these deficiencies would have been to prevent the Vessel from tendering a valid notice of readiness.

➤ STM has <u>not</u> alleged that the removal of the class certificates was caused by any breach of contract or duty by the Congentra.

➤ Once cargo discharge was completed on December 28, 2007 the vessel was at the disposal of the STM but for the removal of the vessel's class certificates and ensuing detention by Russian Port State Control.

➤ Detention by the PSC was simply the consequence of the removal of the Vessel's class certificates. It may well be the case that the conclusion reached is that the detention of the Vessel up to and beyond January 10, 2008, when the Britannia charter was cancelled, was caused by the problems with the Vessel which led to the removal of the class certificates and not by any act of the Charterers.

➤ Russian Port State Control's expressly stated grounds for detaining the vessel all related to physical problems with her hull and equipment. It is not clear to me what evidence the Owners intend to put forward in support of their contention that the detention of the Vessel was in fact instigated by the Charterers or their associated companies. I can only say that no Court or arbitral tribunal applying English law would be likely to accept the Owners' assertions unless *concrete evidence* were produced which established that, on the balance of probabilities, the Charterers had in fact acted as alleged.

➤ There appears to an inherent improbability in the case being advanced by the Owners. Congentra was liable to pay to STM daily hire in the sum of US$38,000 for so long as the Charterparty continued. In such circumstances, it appears inherently unlikely that the Congentra would seek to deliberately *prolong* the Charterparty.

➤ Given the manner in which the Owners' allegations have been advanced, three separate causes of action are potentially relevant. (1) inducing a breach of contract; (2) causing loss

15

by unlawful means and (3) conspiracy. I have not seen any detailed articulation of the legal claims advanced by the Owners in this case. The Amended Verified Complaint which has been filed before the New York Court employs the terminology of "wrongful interference" but does not provide any further details of the actual causes of action.

➢ The law in relation to the so-called "economic torts" of inducing a breach of contract and causing loss by unlawful means has recently been considered by the House of Lords in *OBG Ltd v. Allan* [2008] 1 AC 1. Three conjoined appeals were under consideration and the issues involved were complex. For present purposes, all that is necessary is to explain the essential elements of the relevant causes of action under English law. The burden of proof in establishing that those elements are in fact satisfied rests in each case with the claimant, i.e. the Owners in this case.

➢ Inducing a breach of contract is a tort whereby the defendant is alleged to have done some act which has the effect of procuring a breach of contract between the claimant and the third party. It is an essential element of the tort that the relevant act is done by the defendant with the *intention* of procuring the breach of contract. The requirements of intention are explored in the speech of Lord Hoffmann at paragraphs 39-44 of his judgment. If the claimant is able to prove the constituent elements of the tort, then damages may be awarded to compensate the claimant for the loss suffered as a result of the breaches of contract which have been induced.

➢ When such a cause of action is advanced, the usual complaint by a claimant is that the defendant has intentionally caused a third party to breach his contract with the claimant. It is difficult to apply such an analysis here since the Owners do not say, as I understand it, that the Charterers have somehow induced Britannia to break its contract with the Owners. Rather, on the facts, the case actually advanced seems to be that the effect of the alleged breaches of the Charterparty by the Charterers had the knock-on effect of causing the Owners to breach the Britannia Charter. That is essentially an allegation of breach of contract not of the tort of inducing a breach of contract.

➢ I am therefore of the view that the tort of inducing a breach of contract is not relevant to the case being advanced by the Owners.

➢ As for the tort of causing loss by unlawful means, the ambit of this tort has been greatly restricted by *OBG Ltd v. Allan.* It applies where a defendant can be shown to have acted so as to interfere with the freedom of a third party to deal with the claimant. It is essential for the claimant to prove (i) that the defendant intended to cause loss to the claimant and (ii) the defendant's acts were unlawful as against the third party and would have been actionable at the suit of the third party.

➢ Again, such tort is unsustainable on the present facts. The Owners do not appear to be alleging that the Charterers have unlawfully interfered with the ability of Britannia to deal with the Owners in a manner which would be actionable by Britannia. As I have described above, the claim actually advanced is that the Charterers' breaches of the Charterparty have resulted in a situation where the Owners have found themselves exposed to the cancellation

16

of the Britannia charter at the option of Britannia.

➤ The tort of conspiracy is traditionally divided into two categories, 'conspiracy to use unlawful means' and 'conspiracy to injure', see ***Lonrho plc v. Fayed*** [1992] 1 AC 448. Thee first type requires that the conspirators use unlawful means to injure the claimant whereas the second type is intended to encompass a situation where the acts done by the conspirators are in themselves lawful but are done with a deliberate intention to damage the claimant.    As with the causes of action described above, damages are awarded on compensatory principles.

➤ A case in conspiracy is plainly highly fact-sensitive and in this case, whether the case is made out will depend on the detailed findings of fact made by the arbitral tribunal. I would however observe that even in the 'unlawful means' version of the tort, an intention to injure the claimant must be proven (***Lonrho v. Fayed***).    It is not sufficient for either form of conspiracy that the defendant's actions (whether unlawful or not) merely have the *effect* of causing loss to the claimant. In order for liability to be established, it would therefore be necessary for Owners to establish either:

   (1)    That the Charterers and their associated companies had combined to use unlawful means with the intention of causing injury to the Owners (albeit that such intention was not necessarily their "predominant purpose"), or
   (2)    That the Charterers and their associated companies had combined to act with the predominant purpose of injuring and causing loss to the Owners.

➤ By way of postscript I should add that if the Owners are able to establish the commission of a breach of contract or tort then, under English law, damages would be recoverable on the basis of their lost *profit* and not their lost *revenue*.   This is a matter of basic principle and reflects the compensatory aim of an award of damages under English law. In the context of a late redelivery under a time charter therefore the amount of damages payable must take into account the costs of performance of the lost fixture and any additional hire received under the original charter as a result of its prolonged duration.

Congentra demonstrates by way of Sir Anthony Coleman's Declaration and consideration therein of the alleged facts by STM, and the actual facts as set out by Congentra, that STM has no viable basis upon which it may recover on its claims under English law.   Where it is demonstrated that a claim, or counterclaim, has no viable basis, or is completely lacking in merit, the Court should decline to afford security or countersecurity. *See* North Shore AS v. Rolv Berg Drive AS, 2007 U.S. Dist. LEXIS 87648. *7-8.   As a result, the Court should vacate the attachment.

17

## POINT V

### ALTERNATIVELY, PURSUANT TO SUPPLEMENTAL ADMIRALTY RULE E(6), THE COURT SHOULD REDUCE THE AMOUNT OF THE ATTACHMENT TO AN AMOUNT COMMENSURATE WITH PLAINTIFF'S PROVABLE DAMAGES, IF ANY

Alternatively, if the Court declines to vacate the attachment, Congentra moves pursuant to Supplemental Rule E(6) for a reduction of security. Congentra moves on the basis that Plaintiff's damages are either non-existent or grossly exaggerated. Supplemental Admiralty Rule E(6) provides that "Whenever security is taken the court may, on motion and hearing, for good cause shown, reduce the amount of security given. . . ." As set forth, *supra,* the Court "has the power, pursuant to Supplemental Admiralty Rule E(6) to reduce the amount of the attachment when good cause is shown." *See* Sea Transport Contractors, Ltd. v. Indus. Chemiques du Senegal, 411 F. Supp. 2d 396 (S.D.N.Y. 2006).

In Transportes Navieros Y Terrestes v. Fairmount Heavy Transp. N.V., 2007 U.S. Dist. LEXIS 50260, 15-16 (S.D.N.Y. 2007), Judge Preska confirmed the power of the Court to reduce an attachment in its equitable discretion where the facts in support of the claim seem to be questionable at best. In making this decision, Judge Preska cites to Glidden Co. v. Hellenic Lines, Ltd., 315 F.2d 162 (2d Cir. 1963) (holding that a "party injured by breach [of a charter party] cannot recover damages which arise by reason of his own inactivity or imprudence, and are not the necessary and natural consequences of the default of the other party") (internal quotations omitted) and Bay Casino LLC v. M/V Royal Empress, 20 F. Supp. 2d 440, 454 (E.D.N.Y. 1998) (finding the maritime attachment of a vessel to be reasonable to survive a motion to vacate but reminding the plaintiff of its continuing duty to mitigate damages). *Id.*

While "in an attachment proceeding, the plaintiff need not prove its damages with exactitude" the "court must be satisfied that plaintiff's claims are not frivolous." *See* Dongbu

18

Express Co. Ltd. v. Navios Corp., 944 F. Supp. 235 (S.D.N.Y. 1996).  In addition, "Courts have reduced the damages where the plaintiff has offered no evidence to support its claim."  *See* Rice Co. v. Express Sea Transp. Corp., 2007 U.S. Dist. LEXIS 84300, 8-9 (S.D.N.Y. 2007) citing Daeshin Shipping Co. Ltd. v. Meridian Bulk Carriers, Ltd., No. 05 Civ. 7173 (NRB), 2005 U.S. Dist. LEXIS 22409, 2005 WL 2446236, at \*2 (S.D.N.Y. Oct. 3, 2005) (reducing attachment to amount of attachment for which plaintiff offered substantiating evidence) and Sea Transport Contractors, Ltd., 2007 U.S. Dist. LEXIS 50260, 2007 WL 1989309, at \*7 (reducing the attachment because plaintiff admitted to waiting six months before trying to mitigate damages).

It is without question that a district court has the inherent authority to vacate an attachment for any improper practice or manifest want of equity.  *See* Sea Transport Contractors, Ltd., 411 F. Supp. 2d at 391 citing Blake Mar. Inc. v. Petrom S.A., 2005 U.S. LEXIS 26310. (S.D.N.Y. Oct. 31, 2005).  Therefore, Congentra respectfully requests that this Court utilize its discretion, as confirmed by the Second Circuit, to adjust Plaintiff's Amended Ex Parte Order of Maritime Attachment to the equities of this particular situation, and reduce the security provided for therein to a nominal amount.  *See* Greenwich Marine, Inc. v. S.S. Alexandria, 339 F.2d 901, 905 (2d. Cir. 1965).

As shown above, Defendant is required to produce substantiation at the post-attachment hearing to justify its $4,141,118.32 damage claim.  The case law is clear, that a frivolous, unsubstantiated claim for damages cannot stand, and the attachment should be reduced accordingly.

STM's claim is an arbitrary and unreasonably exaggerated figure that it set out in its rule B complaint to intentionally harass and create financial hardship for Congentra.  As a result, the court should exercise its equitable discretion to vacate and/or reduce the attachment.

19

## CONCLUSION

For the foregoing reasons, the Court should vacate the Amended Ex Parte Attachment Order

pursuant to Admiralty Rules E(4)(f) and E(6), or, alternatively, reduce the Amended Ex Parte Order

from $4,141,118.32 to an amount commensurate with the Plaintiff's provable damages, if any.

Dated: March 5, 2008
      New York, NY

           Respectfully submitted,

           The Defendant,
           CONGENTRA A.G.

By: _____
      Kevin J. Lennon

LENNON MURPHY & LENNON, LLC
The GrayBar Building
420 Lexington Ave., Suite 300
New York, NY 10170
(212) 490-6050 - phone
(212) 490-6070 – fax
kjl@lenmur.com

20

## AFFIRMATION OF SERVICE

I hereby certify that on March 5, 2008, a copy of the foregoing Memorandum of Law was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing. Parties may access this filing through the Court's CM/ECF system.

By: _____

Kevin J. Lennon