UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------x

SIXTEEN THIRTEEN MARINE S.A.,                08 CV 1318 (HB)

                                    Plaintiff,      ECF CASE

-against-

CONGENTRA AG,

                                    Defendant.

------------------------------------------------------------------x

### Declaration of Konstantin Petrunin

I, **Konstantin Petrunin**, BEING DULY SWORN DEPOSES AND SAYS:

1      I was involved in operating the m/v Nicholas M during her time charter trip to St.
       Petersburg for Congentra AG of 6301 Bahnhofstrasse 12, Zug, Switzerland.

2      I am authorised by Congentra AG, the Defendant, to make this Declaration on
       their behalf.

3      There is now produced and shown to me a bundle of true copy documents
       marked "KP1" where numbers appear in square brackets during the course of this
       Declaration there are references to page numbers in the bundle.

4      I read, write and speak English.

5      I have read the Declaration of Edward Eurof Lloyd-Lewis and can confirm that the
       contents of paragraphs 5 to 12 are correct.  For ease of reference I adopt the
       same definitions as those in the declaration of Edward Eurof Lloyd-Lewis.

6      Following the information from the agent Anteks that the cargo was likely to be
       wet damaged, SGS, an internationally recognised surveying company, was
       requested by Euroweg Zerno to inform them regarding the condition and quantity
       of the damaged cargo. On 3 December, 2007 they issued a Letter of Reserve to
       the Vessel in which they stated that the whole surface of the Cargo in hold no. 4

6016603

was found to be wet and there was mould along the perimeter. According to SGS the Cargo had strong musty smell and yellow brown colour, the wetting went down to about 1 metre and that the Cargo was wet, musty and found to have an abnormal temperature [pg. 1].

7    Discharge of undamaged Cargo from hold no. 5 commenced as per Master's message at 02:25 hours on 3 December 2007 following completion of customs formalities and an improvement in weather conditions [pg 2].

8    On 3 December 2007, the Marinex-ILCS surveyor, Alexey Zagumennyy appointed by AXA Corporate Solutions Cargo Underwriters presented a Letter of Protest to the Owners and Master with regard to the presence of wet and mould damaged Cargo in the middle and corners of hold no. 4. The Letter of Protest went on to state that the total quantity of damaged Cargo would be determined in the course of discharge [pg 3]

9    On 3 December 2007, Wakefield Inspection Services (Russia) ("Wakefield"), who had been appointed by the American P&I Club ("Owners' Club") took samples of the damaged Cargo in hold no. 4.

10   Subsequently, Wakefield issued Sampling Statement Number 1 dated 3 December 2007 [pg 4]. This document wrongly recorded that Anteks was Euroweg Zerno's representative for the purpose of taking samples. The same day Congentra and Euroweg Zerno wrote to Wakefield to ask that these errors be corrected and they reserved their rights as to the binding nature of the sampling exercise [pg 4A]. In addition, the following information was requested:

10.1   How the samples had been drawn and the methodology employed to ensure that they were representative of the damaged portion of the Cargo. For example, was the GAFTA 124 sampling regime employed.

10.2   The current whereabouts of each sample drawn.

10.3   The contact details of the laboratory where the samples were sent and the likely time-line for the publication of the results of their analysis.

10.4    Owners' proposals for sorting sound from damaged Cargo so that Cargo Interests could determine the damaged quantity. In this regard, there was an issue as to whether the Russian Authorities would permit the landing of damaged Cargo which would have had an impact on Cargo Interests and damages claimed.

11    Whilst Wakefield acknowledged receipt of our message on 4 December [pg 5] and stated that they would amend Sampling Statement No. 1 I do not believe we have ever received the amended document. Wakefield also refused when pressed, to disclose the identity of the laboratory which was analysing the samples without the consent of Owners' Club [pg 6]. Neither we, Euroweg Zerno, Cargo Interests' Surveyors or BLG have ever received any information from Wakefield and/or Owners as to which laboratory was used to analyse these samples. Nor have they revealed testing protocols. All Owners have done through their lawyers is assert that the Cargo was wetted by fresh water thus indicating that the damage was caused pre-shipment.

12    The Russian authorities condemned the damaged cargo in hold no.4 prohibiting its discharge unless it was for destruction.

13    On 6 December 2007, BLG wrote to Owners and their managers, Chian Spirit Maritime Enterprises Inc via brokers Billmar Chartering to inform them *inter alia* that SGS was to oversee the discharge and segregation operation for Cargo Interests.

14    On 15 December 2007 special trucks for transporting waste arrived at the Vessel to transport the wet damaged Cargo for destruction as required by the Russian Authorities. SGS also attended the Vessel in order to take samples of the damaged Cargo and to supervise the segregation operation. Segregation of the Cargo had to take place on board the Vessel as there were no suitable storage facilities for soybeanmeal ashore.

15    At 11:00 a.m. on 15 December 2007, Sergey Stefansky, an Inspector with SGS arrived on board the Vessel.

16    Mr Stefansky attempted to give a letter confirming his appointment to the Master. The Master however refused to accept the letter and then denied him access to the hold.  Mr Stefansky was therefore not able to do his job as he required access to the hold.

17    Upon information and belief, the discharge of soybeanmeal in St. Petersburg is usually effected into railway wagons, but not into trucks. However, since the discharge of the damaged cargo ex. hold no. 4 to customers by railway wagons was impossible due to prohibition of Russian Authorities, Euroweg Zerno had to discharge the damaged cargo into trucks to transport the cargo for destruction. Special trucks from OOO Profimpex permitted to perform destruction were ordered. But as a consequence of the Master's refusal to permit access to the hold the trucks were kept waiting all day whilst BLG and Owners' Club negotiated access.

18    Eventually at about 19:30 local time, the trucks having waited most of the day left empty.

19    Notwithstanding the fact that discharge of hold no. 4 could not commence, discharging of hold no. 1 continued and was completed that day and discharge also took place from hold no. 6.  The same day, however, wet Cargo was also found in hold no. 2.  Accordingly, discharge of the damaged cargo from hold no. 2 was prohibited by the Russian authorities except for destruction.

20    On 16 December 2007, discharge continued from hold no. 6.

21    On 18 December 2007, the SGS Inspector returned to the Vessel following lengthy negotiations between BLG and Owners' Club with regard to access.  It had been necessary for Cargo Interests to threaten proceedings before the English Court.  However, when the inspector re-attended the Master once again refused him access.  Eventually, at 22.10 hours local time, the Master granted permission to the SGS Inspector access to the holds.

22    Discharge continued until 28 December 2007.

6016603                                                                                          4

23    I understand that Owners have alleged that Cargo Interests in bad faith refused throughout to discharge the Cargo and to segregate it as to good and damaged ashore, thereby extensively delaying the Vessel from completing her discharge operations. This is completely untrue. As I have stated in paragraph 14 above there is no on-shore storage facilities in the port of St Petersburg where soyabeanmeal can be sorted. Furthermore, I understand that the Master has actually stated in his comments to the Statement of Facts that despite the fact that the commencement of discharge from hold nos. 2 and 4 was delayed discharging progress and the overall discharging time was not affected [pg 7 - 8]. I therefore do not understand how Owners can now make such an allegation.

24    On 28 December 2007, BLG made a request to Owners' Club for permission for surveyors from Marinex and SGS to conduct an ultrasonic test on the hatch covers of hold nos. 2 and 4. When the SGS surveyor attended the Vessel on the evening of 28 December he was however refused access to the holds by the Master. Notwithstanding the Master's refusal it was decided not to pursue the matter further by making an application to the English Court because Congentra wanted to re-deliver the Vessel.

25    At about 20:30 local time, we were informed by Mr Drozdov, the SGS surveyor, that the ship's class certificates had been withdrawn because of a problem with hatch cover no. 6, and the crew being under strength. Later that evening, we also received a message from the Master [pg.9] to say that the Vessel had to wait for the weather to improve so that the pilot who would shift the Vessel to anchorage could be dropped off safely. Accordingly, the Vessel's sailing and re-delivery would be delayed. The Master's message made no mention of the fact BV had withdrawn the Vessel's certificates and therefore could not sail.

26    On the morning of 29 December Congentra protested to the Master with regard to the delay in the Vessel sailing after it had given instructions for re-delivery [pg 10]. To our surprise however, the next thing we heard was that the Vessel was being inspected by St Petersburg Port State Control and was detained at 15:30 hours local time. At the time we were informed that Port State Control had detained the Vessel because the Cargo Ship Safety Construction Certificate and the Class

Certificates had been withdrawn.  We also understood that the Vessel did not have its full complement of crew [pg 11-20].

27    I understand that Owners are alleging before this Court that Congentra, Euroweg Zerno and Anteks persuaded Port State Control Officials to go on board and detain the ship for a number of days in an attempt to gather evidence against the Vessel.  This is absolute nonsense and I can categorically deny that there is any truth in this allegation.  Prior to the Vessel's detention Congentra had absolutely no contact with Port State Control.

28    Following Owners' application to this Court Congentra has made extensive enquiries of a number of organisations in an effort to establish why Port State Control visited the Vessel on 29 December 2007.

29    I have spoken with Sergey Fishov, who is the International Transport Workers' Federation's Russian representative.   He informed me that whilst the Vessel was in St Petersburg he had received complaints from members of the crew.  They complained about the arrangements for their repatriation and health and safety at work issues and according to him 'feared for their lives'.  For example, they informed him that there was a problem with the ballasting tank on the Vessel and the bilge pump[1].  Mr Fishov told me that as a consequence he reported these deficiencies to Port State Control.

30    I have also spoken with Anton Chuprina of Nordweg who conducted repairs to the hatch cover of hold no. 6.  He informed me that after BV had confiscated the Vessel's certificates, they had visited the Vessel on 29 December in order to examine hold no. 6 and to provide a quotation.  However, because of the Russian Christmas and New Year holidays, work could not commence on repairing hatch cover no. 6 until 3 January such works being completed, he informed me, on or about 8 January 2008.  This account is corroborated by:

    i)    The Vessel's Manager's e-mail correspondence with Britannia Bulk, the Vessel's next charterers in which they complain that on-shore repairs

6016603

6

cannot commence any earlier than 3 January 2008 because of the Russian holidays [pg 21-23].

ii)     An e-mail from the Master to the Managers on 7 January informing them that the repairs to the hatch cover are continuing and are not expected to be completed until 8 January [pg 24].

31      I have also made enquiries of BV, the Vessel's Classification Society. It is my understanding that they attended the Vessel on 28 December 2007 because when the Vessel had previously been in Maceio, Brazil, a recommendation had been imposed by BV because of the presence of an oil leakage on the hatch covers and the hydraulic cylinders were to repaired and tested. The time limit on this recommendation expired on 28 December 2007 [pg 25]. I assume Owners asked BV to attend the Vessel whilst it was in St Petersburg in order to obtain a time extension for the recommendation but during their visit they discovered that the aft hatch cover on hold no. 6 could not be closed. According to the letter BV left with the Master it was this defect and the impossibility of repairing it prior to the ship's departure which led the BV surveyor to confiscate the Vessel's classification certificate and Cargo Ship's Safety Construction Certificate [pg 26].

32      I understand that the Safety of the Life at Sea Convention ("SOLAS"), Chapter 1, Part B, paragraph (c), imposes an obligation on a Classification Society to report the withdrawal of a vessel's Classification Certificate and Cargo Ship Safety Certificate to the local Port State Control [pg 27-32]. Therefore, BV being mindful of its obligations under SOLAS very likely reported its actions to Port State Control.

33      Russia is signatory of the Paris Memorandum of Understanding on Port State Control ("the Paris MoU"). The Paris MoU aims to eliminate the operation of sub-standard ships through a harmonized system of Port State Control. The Maritime Authorities of 25 nations including Canada, France and the UK are parties to the convention.

---

[1]     The PSC report states that bilge collecting tank no. 9 was leaking and thus a ground for detention.

34    The Paris MOU sets out a number of criteria which are used to identify vessels which merit the attention of Port State Control and should be subjected to inspection. Section 3.1 of the Memorandum [pg 33] provides *inter alia* that:

"In the absence of valid certificates or documents or if there are clear grounds[2] for believing that the condition of a ship or its equipment, or its crew does not substantially meet the requirements of a relevant instrument[3] a more detailed inspection will be carried out[4]...."

35    Examples of 'clear grounds' include [pg 36];

i)    Ships which have been the subject of a report or complaint by *inter alia* a crew member, or any person or organisation with legitimate interest in the safe operation of the ship[5];

ii)    Loss of classification certificates[6].

36    The Vessel was therefore an obvious candidate for an overriding priority inspection.

37    It is, I believe, highly significant that the reason given by BV to Owners for temporarily withdrawing the Vessel's certificates was the damage to the aft hatch cover of hold no. 6 and the fact that repairs could not be carried out before the Vessel sailed. This particular defect also constituted one of the grounds for the Vessel's detention. This I submit is evidence of the fact that BV and Port State Control were both in agreement as to the seriousness of this defect. It follows that statement in paragraph no. 12 of the Amended Verified Complaint that Russian Port State Control eventually released the Vessel without any serious deficiencies having been found that would warrant detention is entirely false and misleading.

---

[2]    See Annex 1 Section 4 for examples of 'clear grounds' Section 4.1 Ship has been identified as a priority case for inspection under Section 1.1.
[3]    See Paris MoU Section 2 [pg 37-38]
[4]    See Paris MoU Section 3.1.
[5]    See Annex 1 Section 1.1.4 [pg 34].
[6]    See Annex 1 Section 1.1.6 [pg 34].

6016603                                                                    8

38    It is also entirely false and misleading for Owners to state in their Amended Verified Complaint at paragraph no. 15 that on or about 2 January that it was determined that the Vessel had no problems which justified her detention by Port State Control, and that BV had by this stage returned the Vessel's certificates after the hydraulic system had been repaired prior to 31 December 2007.  As is clear from the Master's email of 7 January to the Vessel's managers, BV returned some certificates on 6 January but still retained the Hull annex to certificate of classification and repairs were continuing.  Indeed, according to Nordweg were not completed until at least 8 January 2008.

**I declare under penalty of perjury and the laws of the United States of America that the foregoing is true and correct.**

**Executed this 4th day of March 2008, Moscow, Russian Federation.**

Signed:    ...................................

# EXHIBIT KP-1

From: unknown    Page: 1/1    Date: 05/12/2007 16:02:15

ТЕЛ:    5 ДЕК 2007 15:99    СТР1

ОТ:

# SGS

| | WORKING SHEETS DRY PRODUCTS | AGRI/WS/D/16 Revision: 02 Issue Date: 10/09/04 |
|---|---|---|
| AGRICULTURAL SERVICES | LETTER OF RESERVE | |

## ORDER REFERENCES / ДЕТАЛИ РАБОТЫ:

| | | | |
|---|---|---|---|
| Order number: Номер работы: | 1229/A-Sp-07 | Destination/Origin: Назначение / происхождение: | / Argentina |
| Mean of transport: Транспортное средство: | m/v "NICHOLAS M" | Date: Дата: | 03/12/07 |
| Place/Terminal/Berth: Место погрузки/Терминал: | S-Petersburg, STP-39 | Quantity/MT: Количество/MT: | 30,209,000 |
| Commodity: Груз: | Soyabean meal in bulk | Agent: Агент: | ANTEX |
| Client/Principal: Клиент/Заказчик: | EUROWEG ZERNO | Contradiction: | |
| Loading/Discharge: Погрузка/Выгрузка: | Discharge | Other parties: Третьи стороны: | |
| TO: / КОМУ: | MASTER | | |
| CC: /Копия: | EUROWEG ZERNO | | |
| CC: /Копия: | ANTEX | | |
| CC: /Копия: | | | |
| Your ref.: Ваш.: | | | |

## LETTER OF RESERVE / ПИСЬМО РЕЗЕРВА

During the discharge of the above vessel, we observed the following point(s) which could be detrimental to correct quality/quantity ascertainment or indicate further investigation may be necessary:

Во время выгрузки вышеуказанного судна мы наблюдали следующую ситуацию, следствием которой могут быть недостоверные данные по качеству/количеству, или в результате которой может возникнуть необходимость последующего вмешательства:

On 02/12/07 during the examination and sampling of the cargo ex the hold No. 4 the whole surface of the cargo was found to be wet. Along the perimeter of the hold it was notices the mould.

The cargo was found to have strong-musty smell and yellow-brown colour.

The cargo was checked by grab bucket in the middle of the hold approximately on the depth of 1 meter previously. Thus it was found wet and musty cargo; the cargo has abnormal temperature.

In view of the above, we reserve the right of our principal to revert to this matter should the need arise in future.

В соответствии с этим мы оставляем право за нашим клиентом предпринимать дальнейшие действия в случае, если в таковых возникнет необходимость.

This letter is issued on behalf of our principals without prejudice to the rights and privileges of any / all parties concerned.

Настоящее письмо выпущено от имени нашего клиента без ущерба прав и привилегий любой другой заинтересованной стороны.

SGS Vostok Ltd.
ОЖС Восток Лтд.

insp. TRIFONOV A.

27

**Acknowledged / Received by**
Принято к сведению / Получено (ким)

ВРУЧЕНО 03.12.07
КАПИТАН ОТ ПОДПИСИ ОТКАЗАЛСЯ.

SGS services are rendered according to the General Conditions (www.sgs.com/general).

This fax was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com



"Operations Congentra"
<operations@congentra.co
m>

02/03/2008 08:21

To "Eurof Lloyd-Lewis" <elloyd-Lewis@blg.co.uk>

cc

bcc

Subject FW: NOON DAILY CARGO REPORT

-----Original Message-----
From: Master NicholasM [mailto:Master.NicholasM@telaurus.net]
Sent: Monday, December 03, 2007 4:04 PM
To: Operations Congentra
Cc: operations department
Subject: NOON DAILY CARGO REPORT

FM: MV NICHOLAS M
TO: CONGENTRA AG
REF: 016/03-DEC-07

NOON DAILY CARGO REPORT 12:00 LT 02-DEC-2007
1. CARGO LOADED PAST 24 HRS: N/A
2  CARGO DISVHARGE PAST 24 HRS: 795.9 MT
   AS PER SHIP DRAFT SURVEY
3. TOTAL CARGO ONBOARD: 29,408.1 MT
4. BUNKERS ROB: FO/247.32MT   DO/50.50MT
5. ETD: 22-DEC WP/AGW
REMARKS:
02-DEC-07  1315  B/L NO. 6 RECEIVED ONBOARD COVERING
                             CARGO QTY 3,730 MT FOR HOLD NO. 5 AS PER
                             YR CONFIRMATION BY PHONE.
03-DEC-07  0225  COMMENCED DISCHARGING IN HOLD NO. 5
                             0305-0355 STOP DISCHARGING, STEVS BREAK TIME
                             0730-0840 STP DISCHARGING, STEVS BREAK TIME
                             1100-1148 STP DISCHARGING STEVS BREAK TIME

BEST REGARDS
MASTER

2

FROM :NICHOLASM          FAX NO. : 8128740145 5022550      -23-DCC  2007 05:03m  P1



**International Loss Adjusters,**
**Consultants and Surveyors**
**MARINEX-ILCS Ltd.**

O/ref.:                                    To:   Owners and Master.
Date : 03.12.07                        of m/v "NICHOLAS M."

## LETTER OF PROTEST

We are, survey bureau MARINEX-ILCS Ltd., acting at the appointment and on behalf of the cargo
interests involved, did perform inspection of cargo of Soya
Meal in bulk delivered on board m/v "NICHOLAS M"
to St Petersburg.

   Wet damage to cargo was noted in the course
of inspection of cargo hold No. 4. Wet and
moulded cargo of Soya Meal in bulk was
found to be located in the middle and
in the corners of the cargo hold no 4.

   Total quantity of damaged cargo will be
determined in the course of discharging

In accordance with the above, in the name of the cargo interests involved and without prejudice to our
principal's liability, we hereby hold the Carrier liable for any consequential losses of material and/or
immaterial nature.

Please consider this letter as an official Protest given in due form and way and have your P&I Club,
surveyor appointed for joint inspection.

Yours faithfully,

Alexey ZAGUMENNYY
Attending surveyor
MARINEX-ILCS Ltd./St.Petersburg

Please acknowledge the receipt of this letter.      ACKNOWLEDGE RECEIPT ONLY

Date 03-PEL-2007  Time 15:36 H   Signature



12, Tambovskaya Str., St.Petersburg, 192007, Russia
Tel.: (812) 740-1441, Fax: (812) 740-1877
E-mail: office@ilcs.ru



3

 **ООО «Вэйкфилд Инспекшн Сервисис (Раша)»**

198035, Санкт-Петербург, ул. Гапсальская, д. 1, оф. 105

Тел./Факс: (812) 335 76 35 / 36

**АКТ ОТБОРА ПРОБ (ОБРАЗЦОВ) / SAMPLING STATEMENT No.** _1_

1. Дата составления / Date of issue: 03.12.2007
2. Место составления / Place of issue: m/v „NICHOLAS M", Berth N 20.
3. Акт составлен инспектором / Statement issued by inspector: V. Zakharov
4. Отбор проб произведен с участием представителей / The following representative took participation in sampling: 1. Bessonov P.V. representative of consignee JSC Aptake 2 Zagumennyy A.A. representative of insurance company.
5. Наименование товара / Goods description: Argentine Hipro Soyabeanmeal in bulk
6. Поставщик (Страна, компания) / Shipper (Country, Company): Cumex Agency Nitlon SERIES LTD Haskan Chambers, P40, Valley, Nachtis, SERIES West Indies.
7. Транспортный документ / Transport document № B/L N 1 dated 18.11.200
8. Транспортное средство / m/v „NICHOLAS M"
9. Дата отгрузки / Date of loading 16.11.2007.
10. Дата поступления товара / Date of goods delivering:
10.1 На станцию / порт назначения / On r. w. station / port destination: Saint-Petersburg
10.2 На склад получателя / On receiver's warehouse: ____
11. Количество / Quantity: 4937,000 MT.
11.1 мест / pieces: —
11.2 масса / weight : брутто / gross: ——— нетто / net ———
12. Вид упаковки / Type of packing: in bulk

Настоящий акт составлен в том, что / This statement was issued that on 03.12.2007
(дата / date)
отобраны пробы для / sampling was carried out for laboratory analysis
(цель отбора проб / sampling target)

№№ мест, из которых отобраны образцы / pieces No. which were used for sampling: Hold N 1

11. Пробы отобраны в соответствии с / Sampling was carried out in accordance with: ____
(правила, которым соответствует при отборе проб / rules which used for sampling procedure)

13. Количество товара, изъятого для изготовления проб, число и их масса (размер) в отдельности / Goods quantity which were taken for samples' making, quantity and weight (size) per each sample: 1. Sample N 1 - 0.7 kg 2. Sample N 2 - 0.5 kg 3. Sample N 3 - 40.7 kg

14. Пробы помещены / Samples placed into plastic sachet
Опломбированы / sealed by ____
15. Отобранные пробы направлены / Taken samples were delivered to laboratory

Инспектор / Inspector:            Представители / Representatives:
V. Zakharov                       1. Bessonov P.V.
                                  2. Zagumennyy A.A.

4

## Operations Congentra

| От: | Operations Congentra |
| Отправлено: | 3 декабря 2007 г. 21:38 |
| Кому: | Billmar Chartering Ltd |
| Тема: | FW: Nicholas M |
| Отменить: | 3 декабря 2008 г. 20:18 |

Pls pass on to the owners:

Dear Sirs

**Nicholas M**
**Voyage – San Lorenzo to St Petersberg**
**Bill of lading No 1 dated 18 October 2007**
**Wet damaged cargo – Hold Number 4**



We have been sent a copy of Sampling Statement No 1. We write to inform you that the document is in error in that its states that the bill of lading and date of shipment is 18 November 2007. The correct date of shipment and the bill of lading is 18 October 2007. Please correct the document accordingly.

We further note that the Statement records that Bessonov PV attended the sampling together with Owners' and cargo insurers' representatives. The cargo has been consigned to OOO Euroweg Zerno and Mr Bessonov is not their representative for the purpose of taking samples. In this respect therefore we must expressly reserve our rights as to the binding nature of the sampling exercise. That said however, please provide the following information immediately so that we can consider the same:

1. How were the samples drawn and methodology employed to ensure that they are representative of the damaged portion of the cargo, for example, was the GAFTA 124 sampling regime employed?

2. The current whereabouts of each sample drawn?

3. The contact details of the laboratory to where the samples drawn will be sent and the likely time line for the publication of the results of their analysis.



4. Owners' proposals for sorting sound from damaged cargo so that we can determine the damaged quantity. In this regard there may also be an issues as to whether the Russian authorities may permit the landing of damaged cargo and this may also have an impact on cargo interests' damages claim.

We have just seen Owners' managers email to their local P & I Club representative. We are very disappointed with the tone of their communication. The cargo has been clearly damaged. This can only have happened as a consequence of a breach of contract and/or duty on Owners' part in the carriage of the cargo. We shall be writing further to Owners and their P & I Club further in this regard shortly.

In the meantime, we must continue to reserve all our rights.

Yours faithfully

Congentra AG and OOO Euroweg Zerno

4A

YOURS FAITHFULLY,
CONGENTRA AG

**From:** STP-OPERATIONS@wakefieldinspection.com
[mailto:STP-OPERATIONS@wakefieldinspection.com]
**Sent:** Tuesday, December 04, 2007 12:02 PM
**To:** operations@congentra.com
**Subject:** m/v "Nicholas M", reply

Dear Sirs,

we have the following to say about Your letter of 03/12/2007:

1. The samples were drawn in accordance with GAFTA 124 sampling regime.

2. The samples were placed into plastic sachets and sealed

3. The samples will delivered to independent laboratory. The results of analisis will be sent to You as soon as we receive them.

4. The question of sorting sound from damaged cargo is out of our competence.

5. Corrected Sampling Statement #1 will be sent soon.

Best regards,

Slava Zakharov.
_____
Wakefield  Inspection  Services ( Russia ) Ltd.
apartments 105, 1 Gapsalskaya Street.
St. Petersburg, Russia, 198035,
tel/fax: +7 812 3357635 / 36 / 37 / 38
www.wakefieldinspection.com



"Operations Congentra"
<operations@congentra.co
m>
02/03/2008 13:52

To   "Eurof Lloyd-Lewis" <elloyd-Lewis@blg.co.uk>

cc

bcc

Subject  FW: m/v "Nicholas M", reply

**From:** STP-MANAGEMENT@wakefieldinspection.com
[mailto:STP-MANAGEMENT@wakefieldinspection.com] **On Behalf Of**
STP-OPERATIONS@wakefieldinspection.com
**Sent:** Wednesday, December 05, 2007 3:35 PM
**To:** Operations Congentra
**Subject:** RE: m/v "Nicholas M", reply

Dear Sirs,

I could not advise you information about laboratory. I need permission from P&I Club at first.

brgds,
Dmitriy
_____

Wakefield  Inspection  Services ( Russia ) Ltd.
apartments 105, 1 Gapsalskaya Street,
St. Petersburg, Russia, 198035,
tel/fax: +7 812 3357635 / 36 / 37 / 38
www.wakefieldinspection.com

"Operations" <operations@congentra.com>

05.12.2007 14:50

To <STP-OPERATIONS@wakefieldinspection.com>

cc <office@ilcs.ru>, "Billmar Chartering Ltd" <chartering@billmar.gr>

Subject RE: m/v "Nicholas M", reply

TO: WAKEFIELD INSPECTION
CC: MARINEX-ILCS; OWNERS OF M/V NICHOLAS M

DEAR SIRS.

THANK YOU FOR YOUR EMAIL OF YESTERDAY.

HOWEVER, YOU OMITTED TO IDENTIFY THE IDENTITY OF THE INDEPENDENT LABORATORY
WHICH IS CONDUCTING THE ANALYSIS. PLEASE LET US HAVE THIS INFORMATION WITHIN
TODAY. WOULD YOU ALSO ADVISE WHEN YOU EXPECT TO RECEIVE THE RESULTS.

THIS MESSAGE IS SENT UNDER RESERVATION OF ALL OUR RIGHTS.

6



"John Krzywkowski"          To  "Andrew Speake" <aspeake@blg.co.uk>
<johnk@k-law.gr>            cc
08/01/2008 19:33           bcc

                           Subject  RE: NICHOLAS M - at St. Petersburg

History:          ⊠ This message has been forwarded.

Dear Sirs,

I write in connection with your clients' message below to my clients.

As you should be well aware, your clients and Uniapro are beneficially
owned/controlled by the same entities. The fact that Uniapro recently
chartered the vessel and the faultless condition of the cargo on outturn
under that recent charter at St. Petersburg should have led you to question
the appropriateness of your clients' allegations that the vessel was in
some way responsible for the cargo damage found on outturn at St.
Petersburg. Vessels' conditions do not deteriorate so rapidly that your
clients should insist on blaming the vessel when the evidence is so clear
[all analyses show little (irrelevant) if any salt water in the damaged
cargo] that the damage is of a pre-shipment nature. I note that you have
failed to respond in any way to Owners' observations that the damage was
pre-shipment.



Regarding the remarks which the Master was willing to add to the Statement
of Facts, in my nearly thirty years as a shipping lawyer I have seen many
such documents where the parties were properly prepared for both sides to
include their remarks so that the document would reflect a comprehensive
picture of the relevant events albeit not necessarily accepted by both
parties. For some unknown reason, your clients were not prepared to follow
this customary practice. In fact, it is my understanding that the Master
has a clear right [and possibly an obligation] to record his objections to
any aspect of the SOF. [I need hardly suggest as an example a tribunal
questioning why a master failed to record his opposition to the contents of
an SOF on its face.] My clients see this as yet another example of your
clients' unnecessarily difficult behaviour and modus operandi - and my
clients reserve their rights to claim damages against your clients.

As you have seen fit to support your clients' frankly indefensible attitude
to the incorporation of the Master's comments on the SOF, for the record, I
set out the comments that the Master was prepared to add to the SOF:



QUOTE:

1. DESPITE THE FACT THAT COMMENCEMENT OF CARGO DISCHARGE FROM HOLDS NR 2
AND 4 WAS DELAYED FOR REASONS BEYOND VESSEL'S AND/OR OWNERS CONTROL AND
RESPONSIBILITY, THE DISCHARGING PROGRESS AND THE OVERALL DISCHARGING TIME
WERE NOT AFFECTED AS THE VESSEL WAS ALWAYS ABLE TO PROVIDE THE REQUIRED
GANGS  (ONLY 1 AND DURING SOME VERY LIMITED PERIODS 2 GANGS) FROM OTHER
AVAILABLE HOLDS. THEREFORE NO DELAYS FROM VESSEL'S SIDE OCCURED DURING
DISCHARGING OPERATIONS.

2. FROM COMMENCEMENT OF DISCHARGE UNTIL COMPLETION OF SAME, DISHARGING
OPERATIONS WERE CARRIED OUT WITH 1(ONE) AND DURING SOME VERY FEW LIMITED
PERIODS WITH 2(TWO) GANGS.  ALSO THE AVAILABILITY OF WAGONS WAS ALWAYS VERY
TIGHT.

3. ON 28TH DEC 2007, LAST MINUTE ULTRASOUND TEST WAS NOT CARRIED OUT FOR
THE REASONS EXPLAINED IN WRITING, WELL IN ADVANCE AND PRIOR
BOARDING OF THEIR SURVEYOR (SGS). RELEVANT MSG IS AVAILABLE HERE AND
DISCLOSABLE ON ANY COMPETENT AUTHORITY'S REQUEST.

7

4. ON 28TH DEC 2007, AFTER COMPLETION OF DISCHARGE, VESSEL WAS AWAITING PILOT DUE TO BAD WEATHER CONDITIONS (AS PER AGENT MSG, PILOT WAS NOT TO BE EXPECTED BEFORE 29TH NOON SUBJECT TO WEATHER IMPROVEMENT). RELEVANT MSG IS AVAILABLE HERE AND DISCLOSABLE ON ANY COMPETENT AUTHORITY'S REQUEST.

.5. THE TOTAL QUANTITY OF CARGO DISCHARGED FROM HOLDS NR 2 AND 4 AS 'DAMAGED' OR 'SUSPECTED AS DAMAGED' WAS 214MTS (TWO HUNDRED AND FOURTEEN) AS PER CARGO UNDERWRITERS' AND ATTENDING PARTIES' CALULATIONS.  AGENTS HAVE CONFIRMED SAME AND RELEVANT MSG IS AVAILABLE HERE AND DISCLOSABLE ON ANY COMPETENT AUTHORITY'S REQUEST.

6. TIME OF AUTHORITIES' PERMISSION TO COMMENCE DISCHARGE FROM HOLDS 2 AND 4 AS PER AGENTS' MESSAGES. RELEVANT MSGS ARE AVAILABLE HERE AND DISCLOSABLE ON ANY COMPETENT AUTHORITY'S REQUEST.

7. MASTER HAS SIGNED THIS SOF WITHOUT PREJUDICE AND WITH THE RESERVATION OF VESSEL'S AND/OR HER P&I CLUB AND/OR OWNERS' AND/OR THEIR MANAGERS' RIGHTS FOR ALL AND ANY, DIRECT OR INDIRECT, DAMAGE OR LOSS THEY MAY SUFFER FROM CHARTERERS' AND/OR RECEIVERS' AND/OR THEIR PRINCIPALS' AND/OR THEIR AGENTS, ACTS OR OMISSIONS.

8. ALL CARGO DISCHARGED AS PER B/L AND CARGO MANIFEST.

9. AFTER COMPLETION DISCHARGING, HOLDS NOS. 1, 2 , 3, 4, 5, 6, AND 7 INSPECTED AND FOUND NO CARGO REMAINING ONBOARD, ALL HOLDS  WELL EMPTIED AND SWEPT.

Name and signature (Agents)                                      CAPT.
AMADO C. APILADO
ANTEKS/Alexander Konyukhov                              MASTER/M.V.  "
NICHOLAS  M "
UNQUOTE

For the record, it is denied that Owners or the crew were disruptive and unreasonable. My clients reserve their rights to claim damages in respect of your clients' actions at St. Petersburg.

Finally, my clients made you clearly aware of the circumstances in which Class was temporarily suspended pending repairs to mechanisms relating to No.6 hatchcover - which suddenly suffered problems during discharge operations. Hold No.6 appears to have no connection whatsoever with the locations in which damaged cargo was found, whatever the cause of that damage. Accordingly, your questionable reference to the temporary suspension of Class, or indeed to the more inflammatory suggestion that Class was entirely withdrawn, as having any connection with the factual matrix of the cargo damage for which we are both instructed, is very regrettable, unprofessional and lacking the integrity normally required of marine solicitors to reduce, rather than exascerbate, the difficulties faced by disputing parties in order to resolve them as cost-effectively as is reasonably possible.

Best regards,

John Krzywkowski
------------------------------------------------------------------------
-------------------------------------
Information in this e-mail (and any attachment) is confidential and may be legally
privileged. It is intended solely for the attention of the addressee(s). If you have
received it in error, please notify us by return e-mail and then
immediately delete
this message from your system. Please do not copy it or use it for any purpose, or
disclose its contents to any other person: to do so could be a breach of



"Operations Congentra"
<operations@congentra.co
m>

28/12/2007 20:32

To  "Eurof Lloyd-Lewis" <elloyd-Lewis@blg.co.uk>

cc

bcc

Subject  FW: Ultra Sonic Inspection


-----Original Message-----
From: Master NicholasM [mailto:Master.NicholasM@telaurus.net]
Sent: Friday, December 28, 2007 10:48 PM
To: Operations Congentra
Cc: operations department
Subject: Ultra Sonic Inspection

FM: MV NICHOLAS M
TO: CONGENTRA AG
REF: 236/28-DEC-07

i refer to your below message.

 charterers have ignored my previous message and sent on board their
surveyors (sgs) to carry out a survey which for the reasons already
explained neither they have the right to perform nor there is a
significant
reason.

 i do not understand charterers acts and way of thinking! what
charterers
mean "DETRIMENTAL CONSEQUANCES ARISEN THEREOF"??? why to place the
vessel
 "OFF HIRE"???

 master's and owners position regarding said survey remains as stated in
my
last and we expect charterers  to perform all their obligations under
the
c/p.

 case of damage cargo is in charrs and owns lawyers hands and charterers

must
stop threaten vessel and owners.

 finally note that since completion of discharging earlier tonight vsl
is
waiting for improvement of weather conditions in order pilot who will
shift
the vessel to anchorage to be able to be dropped off safely. agents
shall
revert once pilot becomes available and allowed to sail.

 be guided accordingly.

 brgrds,

 master

9



"Operations Congentra"
<operations@congentra.co
m>

28/12/2007 21:29

To  "Master NicholasM" <Master.NicholasM@telaurus.net>

cc  "Eurof Lloyd-Lewis" <elloyd-Lewis@blg.co.uk>

bcc

Subject  RE: Ultra Sonic Inspection

Dear Sirs,

You must have learned from the correspondence with our lawyers regarding
your refusal to allow ultra sonic inspection that we reserve all our
rights and hold you fully responsible for all consequences of such
refusal.
As you know the vessel has to be redelivered as per c/p DLOSP
St.Petersburg.
Therefore you should proceed for redelivery DLOSP St.Petersburg and act
and give redelivery notice as per c/p.
In the meantime we reserve all our rights.

Regards,
Congentra AG

PORT STATE CONTROL
NOTICE OF DETENTION FOR THE MASTER

No.

The undersigned:
Harbour Master of the port of .....St. Petersburg............., duly authorized by the Maritime
Administration of the Russian Federation, herewith notifies you that

the ship: NICHOLAS M

IMO number: 7433452

port of registry: KINGSTOWN

type of ship: BULK CARRIER

owner: CUBAN SPIRIT MARITIME ENTERPRISES INC.

agents: "ANTEKS"

berthed at: BERTH NR. 23

call sign: J8B2680

gross tonnage: 22346

flag state: St. VINCENT & GRENADIN ES

date on which keel was laid: 1977

master: AMADO G. APLABO

classification society: BV

has been detained in accordance with the provisions of Section 3 of Paris Memorandum of
Understanding on Port State Control and Article 80 of the Merchant Shipping Code of the Russian
Federation,

on account of:

☒ one or more of the criteria for detention set out in Section 9 of Paris Memorandum on Port State
Control,

☐ crew members being unable to provide proof of professional proficiency for the duties assigned
to them as specified in the Annex to the International Convention on Standards of Training,
Certification and Watchkeeping for Seafarers, 1978/95, as amended;

☐ master or crew unable to comply with operational requirements as contained in the Conventions
mentioned in Section 2 of Paris Memorandum on Port State Control;

☐ other deficiencies which, individually or together, are clearly hazardous to safety, health or
environment;

☐ the fact that the Port State Control Officer was obstructed in the execution of his duties.

For further details see the Report of Inspection, forms A and B enclosed to this Notice for the Master

On account of the above it is prohibited to shift the ship to another berth without the prior consent of
the Harbour Master, or to proceed to sea without a proper Notice of Release of ship from detention.

Place: Port of St. Petersburg

Date: December 29, 2007.
Time: 15.30 LT

The above mentioned Harbour Master.

HEAD OF ST. PETERSBURG PSC SSC
Capt. ALEXANDR G. KARPENKO

11

Name of ship  _NICHOLAS M_          IMO number ....._7433.452_...          FORM A2

19  Relevant certificate(s)

a) title                              b) issuing authority          c) dates of issue and expiry

1. Cargo Ship Safety Equipment ...........  _RV_  ...........  _13.05.02 - 12.01.08_
2. Cargo Ship Safety Construction ..........................  ............  ............
3. Passenger Ship Safety  .................  ............  ............
4. Cargo Ship Safety Radio  ..............  _RV_  ...........  _13.03.02 - 12.01.08_
5. Document of Compliance  ...............  _RV_  ...........  _04.13.02 - 13.10.08_
6. Safety Management Certificate ...........  _RV_  ...........  _13.10.05 - 31.03.10_
7. Load Line  .........................  _RV_  ...........  _13.10.05 - 31.03.10_
8. Prevention of Pollution by Oil  ..........  _RV_  ...........  _17.05.03_
9. Safe Manning Document  ................  _RV_  ...........  _03.05.08_
10. Ship Security  ......................  _RV_  ...........  
11. Tonnage  .........................  _RV_  ...........  _24.02.02_  ............
12. Class

d) information on last intermediate or annual survey

                                        date of survey          surveying authority          port / country

1. Cargo Ship Safety Equipment  ...........  ............  ............
2. Cargo Ship Safety Construction  .........  ............  ............
3. Passenger Ship Safety  ................  ............  ............
4. Cargo Ship Safety Radio  ..............  ............  ............
5. Document of Compliance  ..............  ............  ............
6. Safety Management Certificate  ..........  ............  ............
7. Load Line  .......................  ............  ............
8. Prevention of Pollution by Oil  ..........  ............  ............
9. Safe Manning Document  ...............  ............  ............
10. Ship Security  .....................  ............  ............
11. Tonnage  ........................  ............  ............
12. Class

20. Ship related inspection action taken:

☒ Flag State informed          ☒ Class informed          ☐ Next port informed
☐ All deficiencies rectified     ☐ Inspection suspended    ☒ Providing priority inspection
☒ Ship detained                ☐ Repair port to re-detain ☐ Next port to re-detain
☐ Ship allowed to sail after detention  ☐ Ship allowed to sail after re-detention
☐ MARPOL investigation        ☐ Ship banned            ☐ Ship expelled

21. Deficiencies:              ☐ No          ☒ Yes (see attached FORM B)  _5_ pages

22. Supporting documentation.   ☒ No          ☐ Yes (see annex)

PORT STATE PARTICULARS

District office:          St. Petersburg
Address:               10, Gapsalskaya Street, 198035 St. Petersburg, Russia
Telephone:             (812) 327 4194
Telefax:               (812) 327 4919
E-mail:                mousph@mail.pasp.ru
Name (duly authorized PSCO of reporting authority):

                       _N. STYPAKOV , M. SHELYUBO_

Signature:

This report must be retained on board for a period of at least two years and shall be readily available for consultation by Port State Control Officers at all times.

12

FORM A/3



REPORT OF INSPECTION IN ACCORDANCE WITH THE PARIS MEMORANDUM
OF UNDERSTANDING ON PORT STATE CONTROL *)

Federal Maritime Administration
Rozhdestvenka St., 1/1
109012 Moscow, Russian Federation
+7 095 926 1800, +7 095 926 1311
memorand@gma.ru

copy to:      - master
              - head office
              - PSCO

if ship is detained, copy to:

              - flag State
              - recognised organisation, if applicable

### SHIP PARTICULARS

1. Name of ship: _NICHOLAS M_

2. Flag of ship: _ST. VINCENT B. GRENADI_

3. Type of ship: _BULKER_

4. Call sign: _J8B2680_

5. IMO number: _7433452_

6. Gross tonnage: _22/012_

7. Date keel laid / major conversion commenced: _1977_

8. Deadweight (where applicable):

9a. Classification society(ies) responsible for issuance of class certificates:
_B.V._

9b. Classification society(ies) responsible for issuance of certificates on behalf of the flag State:
_BV , INSB_

10. Full particulars of company (identical to particulars as in the ISM DoC) **):
_CAIRN   SPIRIT   MARITIME   ENTERPRISES   INC._
_126   KLEOVOTROU   STR. , 185 35   PIRAEUS , GREECE_

11. Name & address of charterers: (Only ships carrying liquid or solid cargoes in bulk, pref. 1st charterer record.)

☐ Demise Charter   ☒ Time Charter   ☐ Voyage Charter   ☐ Not applicable
☐ First Charterer   ☐ Last Charterer   ☐ Not available

_CONGENTRA       AG_
_ZUGM ___ SWITZERLAND_

12. Name and signature of master to certify that the information under 11 is correct:

Name: _AMADO C. APILADO_        Signature: _[signature]_

### INSPECTION PARTICULARS **)

13. Date of first boarding: _23 .12. 07_        13b. Date of final report:

14. Place of inspection:   St. Petersburg

15. If vessel is detained : date of issue of detention notice:

16. Type of inspection:
☐ Initial inspection        ☒ More detailed inspection    ☐ Expanded inspection
☐ Follow-up inspection      ☐ Follow-up detention          ☐ (C.)I.C.
☐ Operational control

17. Operational controls (if any):
☐ Abandon Ship          ☐ Fire drill               ☒ Oily Water Sep. tested
☒ Emerg. Fire Pump      ☒ Emergency Generator      ☒ Emergency Steering
☒ Communication eq.     ☒ Damage control           ☒ Other S/S 4B ENGINE
                                                        BLACKOUT

18. Areas inspected:
☒ Navigation Bridge         ☒ Cargo hold(s) / tank(s)      ☐ Ballast tank(s)
☒ Accommodation / Galley    ☒ Steering-gear room / Engine room
☒ Decks/ Fo'c'sle           ☐ Passenger spaces             ☐ Car deck

*) This inspection report has been issued solely for the purpose of informing the master and other port States that an inspection by the port State, mentioned in the heading, has taken place.
This inspection report cannot be construed as a seaworthiness certificate in excess of the certificates the ship is required to carry.
**) Non-ISM ships: Master to supply and sign under 12, for correct full particulars of company.
***) Masters, Shipowners and/or Operators are advised that detailed information on this inspection may be subject to publication (www.parismou.org)

13

REPORT OF INSPECTION IN ACCORDANCE WITH THE PARIS MEMORANDUM ON UNDERSTANDING ON PORT STATE CONTROL

1/5

Federal Maritime Administration
Rozhdestvenka St, 1/1
115035 Moscow, Russian Federation
+7 095 923 5920, +7 095 924 4115
morskpd@gmn.ru

copy to:  - master
          - head office
          - PSCO

If ship is detained, copy to  - flag State
                              - recognised organisation, if applicable

1. Name of ship: ...*M.I.CARDI, 0.5.*...    2. IMO number: *9663.3.7152*  3. Date of first report: ...........    4. Place of inspection: St. Petersburg

**DEFICIENCIES FOUND AND FOLLOW-UP ACTIONS (***)**

| Group/code | Deficiency | Nature of defect(†) | Convention ref.⁴) | Action taken³) | Additional comments | Class resp.⁶) |
|---|---|---|---|---|---|---|
| 04.01. | CAPTAIN STAMP SAFETY CONTRACT 71.04 | LIMITED DE BAIL | | 17 | BY BV AS PER VERIFICATION DATED 28.12.03 | ☐ |
| 04.99. | CERTIFICATES | MISTO DEBAIL | | 17 | CLASS CERTIFICATE - W. NR. DRAIN BY BV AS PER VERIFICATION DATED 28.12.03 | ☐ |
| 27.01 | SECONDARY RELATED DE RIGS. | NOT A.S. REQUIRED | | 17 | NOT ALL VISITORS IDENTIFIED | ☐ |
| 09.56. | GANGWAY | UNSAFE | | 17 | LOWER PLATFORM | ☐ |
| 09.20. | SPEED FIELD BY MARIHUANA SAFE | MISSING | | 17 | 2ND OFFICER MISSING | ☐ |
| | MARIHUANA DOC | | | | | ☐ |
| 06.60. | LIFE JACKETS | NOT A.S. REQUIRED | | 17 | GUEST NOT FIXED PROPERLY | ☐ |

Name (fully authorized PSCO of inspecting authority): ...*N. STUPAKOV, M. SHCHUKOW*...  Signature ...........

(***) Masters, Shipowners and/or Operators are advised that detailed information on the inspection may be subject to publication (www.parismou.org)
¹) This inspection was not a full survey and deficiencies listed may not be exhaustive. In the event of a detention, it is recommended that a full survey be carried out and all deficiencies rectified before an application to lift the detention is made.
²) to be completed in the event of a detention (for non-convention ships <500 GT for reference only)
³) See reverse side of Annex B IV, full list/list.

14

FORM B

REPORT OF INSPECTION IN ACCORDANCE WITH THE PARIS MEMORANDUM OF UNDERSTANDING ON PORT STATE CONTROL

Federal Maritime Administration
Roztdestvenka St., 1/1
109012 Moscow, Russian Federation
+7 095 926 1000, +7 095 926 1314
E-mail:san@pmc.ru

Copy to: · master
· head office
· PSCO

If ship is detained, copy to: · flag State
· recognized organization, if applicable

1. Name of ship: ...NICHOLAS...

2. IMO number: 7433452   3. Date of final report: ...........

4. Place of inspection: St. Petersburg

**DEFICIENCIES FOUND AND FOLLOW UP ACTIONS ***)**

| Group code | Defective item | Nature of defect(*) | Convention ref.*) | Action taken*) | Additional comments |
|---|---|---|---|---|---|
| 1.17.0 | INSULATION (PH) | INSUFFICIENT | | 17 | MDO PIPELINE, L.C. PURIFIED |
| | WETTED THERMAL | | | | M.E. AE |
| 4.920 | CLEANLINESS | INSUFFICIENT | | 17 | M.E. AE |
| | OF E.R. | | | | |
| 0.520 | LAGGING | INCOMPLETE | | 17 | SOME LIGHTS LIMIT. |
| 0.411 | VENTILATION | DURATA FILTERS | | 17 | NT GALLEY. |
| 0.533 | OBSTRUCTION | UNSAFE | | 17 | SOME UNSECURED SPARE |
| 05.43 | STEAM PIPES | UNSAFE | | 17.7 | PARTS IN E.R. |
| | AND PRESSURE | | | | → EXHAUST PIPE IN M.E. |
| | PIPES | | | | LEAKED |
| 05.33 | OBSTRUCTION | UNSAFE | | 17 | WOODEN GRATINGS IN |
| | SLIPPING | | | | PORT/STBD STORE DAMAGED |
| 0205 | SIGNS INDICATIONS | NOT AR | | 17 | PORT/STBD BUTTONS |
| | | REQUIRED | | | NOT MARKED IN STEERING |
| | | | | | GEAR P.COM |

Name (duly authorized PSCO of reporting authority) A. STUPAKOV, M. SKEZ THEGEN   Signature ....

***) Master, Shipowners and/or Operators are advised that detailed information on the inspection may be subject to publication (www.parismou.org)
*) This inspection was not a full survey and deficiencies listed may not be exhaustive. In the event of a detention, it is recommended that a full survey is carried out and all deficiencies are rectified before an application is for re-inspection is made.
*) In case completed in the event of a detention (for PMO-convention ships +330/4 for reference only)
*) see reverse side of form B for full labels

FORM B

Federal Marine Administration
Rozhestvensky St., 1-1
190017 Moscow, Russian Federation
+7 099 926 1000, +7 099 926 1011
memorbad@gmma.ru

**REPORT OF INSPECTION IN ACCORDANCE WITH THE PARIS MEMORANDUM OF UNDERSTANDING ON PORT STATE CONTROL**

Copy no. - status
- head office
- PSCO

If ship is detained, copy to: - flag State
- recognized organisation, if applicable

3/5

1. Name of ship: NICHOLAS   M   2. IMO number 7433652   3. Date of Final report: ............   4. Place of inspection: St. Petersburg

**DEFICIENCIES FOUND AND FOLLOW UP ACTIONS [**]

| Group code | Defective item | Nature of defect[a] | Convention ref.[b] | Action (date)[c] | Additional comments |
|---|---|---|---|---|---|
| 0.3330 | FIRE FIGHTING EQUIPMENT AND APPLIANCES | NOT A.S. REQUIRED | | 17 | FIRE SIX EXTINGUISHER IN ER ¹ |
| | MOORING | OTHER | | 17 | NOZZLE MISSING. FIRE |
| 13.99 | MOORING | OTHER | | 17 | BOXES DAMAGED AND HOLED |
| | MOORING | | | | SOME RAT GUARDS |
| 1.3.99 | MOORING | NOT KER | | 12 | MISSING. |
| | | | | | SGATE SHURLEDRS FARLE AND |
| 0.985 | BULKHEAD – CORROSION | HOLED | SR.PR06.1/Rd. 30 | 30 | AFT SE12ED |
| | | | SR.PR9/c1/Rn. | | BULKHEAD FROM MAIN |
| | | | | | DECK TO STORE ROOM |
| 0985 | BULKHEAD – CORROSION | HOLED | SR.PR9/c1/pd. 30 | 30 | P.S. HOLED |
| | | | | | (MAX CARGE FROM BILGE |
| | | | | | COLLECTING TANK #9 |
| | | | | | (MAX CAPACITY 32.8 CUBM) |
| 1570 | NAVIGAT PUBLICATION | NOT UP TR DATE | | 17 | LAST AIM ONBOARD (21.11.02) |

Name of duly authorized PSCO attending authority M. STUDAKOV   M. STUDAKOV   Signature

* (*) Masters, Shipowners and/or Operators are advised that detailed information on the inspection and the deficiencies may be subject to publication (www.parismou.org)
a) Each inspection may find a full survey and deficiencies listed may not be exhaustive. In the event of a detention, it is recommended that a full survey, it is carried out and an application &c re-inspection at mode.
b) To be completed in accordance with convention (the instruction (Appendix 36) GT for enforcement.)
c) See inserts code of form B for enforcement.

16

FORM A

4/5

REPORT OF INSPECTION IN ACCORDANCE WITH THE PARIS MEMORANDUM OF UNDERSTANDING ON PORT STATE CONTROL.

Federal Maritime Administration
Hafenstrasse 54, 111
119012 Johnson, Russian Federation
13 (09) 968 2000, +7 095 958 1311
morsamlin@port fc

copy to: master
- head office
- PSCO

1. Name of ship: *NICCO LAS*          N ............          if ship is detained, copy to : flag State
                                                     - recognised organisation, if applicable

2. IMO number: 72.73.52          3. Date of final report: ............    4. Place of inspection: St. Petersburg

**DEFICIENCIES(FREE FOUND AND FOLLOW UP ACTIONS ***)**

| Gr eng ode | Defective item | Nature of deficit(b) | Convention ref.b) | Action taken c) | Additional comments | Class resp.d) |
|---|---|---|---|---|---|---|
| 1240 | CARGO MACHINES | DAMAGED | LL66/ANNEX | 30 | METAL MEMBERS TOTAL OUT FROM BASE (HOLD No. 6) | ☐ |
| ........ | ........ | ........ | ........ | ........ | DUE TO DAMAGE OF HYDRAULIC SYSTEM. | ☐ |
| 1240 | CARGO MACHINES | CORRODED | ........ | AP. | HATCH COVERS, COAMINGS, CROUP PISION BARS, ETC. | ☐ |
| ........ | ........ | ........ | ........ | ........ | OF ALL THE HOLDS | ☐ |
| ........ | ........ | ........ | ........ | ........ | HEAVILY CORRODED AND | ☐ |
| ........ | ........ | ........ | ........ | ........ | SHOULD BE PROPERLY | ☐ |
| ........ | ........ | ........ | ........ | ........ | INSPECTED AND REPAIRED | ☐ |
| ........ | ........ | ........ | ........ | ........ | UNDER CLASS SUPERVISION | ☐ |
| 2535 | REPAIRS OF | NCT ACCORDING | ........ | ........ | FRAG AUTHORITIES CLASS | ☐ |
| ........ | NON-CONFORMITY | SMS | S.74(E)/SMC 30 | SOCIETY AND PORT AUTHO- | ☐ |
| ........ | ACCIDENTS & | ........ | ISMC/59 | RITIES NOT INFORMED | ☐ |
| ........ | HAZARDOUS OCCUR | ........ | ........ | REGARDING ACCIDENTS OCCURED | ☐ |

Name (duly authorised PSCO of reporting authority) N. STURMON — M. SKEZULGER. O.V. Signature ...................

*) Master, Shipowners and/or Operators are advised that detailed information on the inspection may be subject to publication, (www.morsamar.ru)
b) This inspection was not a full survey and deficiencies listed may not be exhaustive. In the event of a detention, it is recommended that a full survey is carried out and all deficiencies are rectified before an application for re-inspection is made.
c) In for completed in the event of a detention, (for non-conventions ships <500 GT for reference only)
• See reverse side of form 5 for full details

FORM B

REPORT OF INSPECTION IN ACCORDANCE WITH THE PARIS MEMORANDUM OF UNDERSTANDING ON PORT STATE CONTROL.

Federal Marit-ime Administration
Rozhdestvenka St. 1/4
109012 Moscow, Russian Federation
+7 095 926 1000 +7 095 926 1111
mursecsea@rmrs.ru

copy to  - master
         - head office
         - PSCO

if ship is detained, copy to  - flag State
                              - recognized organization, if applicable

1. Name of ship  ........ *NICHOLAS* ........... M. .....

2. IMO number: *7433452*    3. Date of final report: .....

............... 4. Place of inspection: St. Petersburg   (Use cap.)

DEFICIENCIES FOUND AND FOLLOW-UP ACTIONS ***)

| Group code | Deficiencies item | Nature of defect(*) | Convention ref.*) | Action taken *) | Additional comments |
|---|---|---|---|---|---|
| 06.95 | ONBOARD TRAINING. AND INSTRUCTION. | LACK OF TRAINING | ............ | 17 | 3RD OFFICER CAN'T DEMONSTRATE TUBE OF IMMERSION SUIT |
| 16.23 | MARINE RADIO INSTALLATION | NOT REQUIRED | ............ | 17 | NO EVIDENCE OF MAINT/TEST DSC EXTERNAL TEST/ WORKING CONDITION. |
| 3.040 | MUSTER LIST | INCOMPLETE ETC. | ............ | 17 | CAN'T BE TESTED NO CORRECTION DUE TO 2ND OFFICER ABSENCE FOR MORE THAN 7 DAYS (CREW CHANGE) |
| 7.150 | LIGHTS, SHAPES, SOUND SIGNALS | INOPERATIVE | ............ | 17 | P/S NAVIGATION LIGHT UNLIT STERN SUBST/VIS LIGHT UNLIT |
| 3.04.. | OPERATION OF GMDSS EQUIPMENT | LACK OF FAMILIARITY | ............ | 17 | LOUIS PERRIN SO WAS OF TEST TO BY CHIEF OFF. DO RESULT |

Name (duly authorized PSCO of reporting authority) *M. STUPRIKOV .....* .. Signature ...........

***) Masters, Shipowners and/or Operators are advised that detailed information on the inspection may be subject to publication (www.parismou.org)
*) This inspection was not a full survey and deficiencies listed may not be exhaustive. In the event of a detention, it is recommended that a full survey is carried out and all deficiencies are rectified before application is re-submitted for inspection.

*) To be completed in the event of a detention after non-conventional ships <500 GT for reference only.)
*) See reverse side of form B for full index.

*CALL DSC    REPORT DEAD AIR TIME*

Deficiency Action Taken Codes  (Form B)

| | |
|---|---|
| 10 | deficiency rectified |
| 15 | rectify deficiency at next port |
| 16 | rectify deficiency within 14 days |
| 17 | rectify deficiency before departure |
| 18 | rectify non conformity within 3 months |
| 19 | rectify major non-conformity before departure |
| 26 | Competent Security Authority Informed |
| 30 | detainable deficiency |
| 47 | as in the agreed class condition |
| 55 | flag state consulted |
| 65 | operation stopped |
| 70 (tickbox)** | classification society (responsibility in case of detainable deficiency) |
| 80 | temp. substitution of equipment |
| 81 | temp. repair to be carried out |
| 95 | letter of warning issued |
| 96 | letter of warning withdrawn |

PSC Inspection Action Taken Codes  (Form A)

| | |
|---|---|
| 12 (tickbox) | all deficiencies rectified |
| 20 (tickbox) | ship banned |
| 27 (tickbox) | ship expelled on security grounds |
| 30 (tickbox)* | ship detained |
| 35 (tickbox) | ship allowed to sail after detention |
| 36 (tickbox) | ship allowed to sail after no-detention |
| 40 (tickbox) | next port informed |
| 45 (tickbox) | rectify detainable deficiencies at next port (next port to re-detain) |
| 46 (tickbox) | rectify detainable deficiencies at agreed repair port (repair port to re-detain) |
| 50 (tickbox) | flag state/consul informed |
| 60 (tickbox) | inspection suspended |
| 70 (tickbox)** | classification society informed |
| 85 (tickbox) | investigation of contravention of discharge provision (MARPOL) |

- DESPITE THE FACT THAT COMMENCEMENT OF CARGO DISCHARGE FROM HOLDS NR 2 AND 4 WAS DELAYED FOR REASONS BEYOND VESSEL'S AND/OR OWNERS CONTROL AND     RESPONSIBILITY, THE DISCHARGING PROGRESS AND THE OVERALL DISCHARGING TIME WERE NOT AFFECTED AS THE VESSEL WAS ALWAYS ABLE TO PROVIDE THE REQUIRED GANGS     (ONLY 1 AND SOME VERY LIMITED TIMES 2 GANGS) FROM OTHER AVAILABLE HOLDS. THEREFORE NO DELAYS FROM VESSEL'S SIDE WERE OCCURED DURING DISCHARGING OPERATIONS.

- FROM COMMENCEMENT OF DISCHARGE UNTILL COMPLETION OF SAME, DISHARGING OPERATIONS WERE CARRIED OUT WITH 1(ONE) AND SOME VERY FEW LIMITED TIMES WITH 2(TWO)
 GANGS. ALSO ALWAYS AVAILABILITY OF WAGONS WAS VERY TIGHT

- ON 28TH DEC LAST MINUTE ULTRASONIC TEST WAS NOT CARRIET OUT FOR THE REASONS EXPLAINED TO CHARTERERS IN WRITTING. WELL IN ADVANCE AND PRIOR BOARDING OF THEIR     SURVEYOR (SGS). RELEVANT MSG IS AVAILABLE HERE/DISCLOSABLE ON ANY COMPETENT AUTHORITY'S REQUEST.

- ON 28TH DEC AFTER COMPLETION OF DISCHARGE VESSEL WAS WAITING PILOTAGE DUE TO BAD WEATHER CONDITIONS (AS PER AGENT MSG PILOT WAS NOT TO BE EXPECTED BEFORE     29TH NOON SUB WEATHER IMPROVEMENT). RELEVANT MSG IS AVAILABLE HERE/DISCLOSABLE ON ANY COMPETENT AUTHORITY'S REQUEST.

- THE TOTAL QUANTITY OF CARGO DISCHARGED FROM HOLDS NR 2 AND 4 AS 'DAMAGED' OR 'SUSPECTED AS DAMAGED' WAS 214MTS (TWO HUNDRED AND FOURTEEN) IN TOTAL AS PER     CARGO UNDERWRITTERS' AND ATTENDING PARTIES CALULATIONS. AGENTS HAVE CONFIRMED SAME AND RELEVANT MSG IS AVAILABLE HERE/DISCLOSABLE ON ANY COMPETENT    AUTHORITY'S REQUEST.

12/29/2007

Page 2 of 2

- TIME OF AUTHORITIES PERMISSION TO COMMENCE DISCHARGE FROM HOLDS 2 AND 4 AS PER AGENTS MESSAGES. RELEVANT MSGS ARE AVAILABLE HERE/DISCLOSABLE ON ANY  COMPETENT AUTHORITY'S REQUEST.

- MASTER HAS SIGNED THIS SOF WITHOUT PREJUDICE AND WITH THE RESERVATION OF VESSEL'S AND/OR HER P&I CLUB AND/OR OWNERS' AND/OR THEIR MANAGERS'  - RIGHTS FOR ALL AND   ANY, DIRECT OR INDIRECT, DAMAGE OR LOSS THEY MAY SUFFER FROM CHARTERERS' AND/OR RECEIVERS' AND/OR THEIR PRINCIPALS' AND/OR THEIR AGENTS,  ACTS OR OMISSIONS.

++++++++++

From Owners broker:

FRM: LIGHTSHIP CHARTERING A/S, GENTOFTE
Zhivko-Slawek-Dimitris/Soeren

good afternoon

nicholas m/BBL
-----------------
with ref to yr last msg, flw from the owners

From: C.S.M.E/ Chartering Dept.
To:   Billmar Chartering

Re:   MV "Nicholas M." Acc. "BRITANNIA BULKERS A/S," cpdd 18th Dec
07 / Update on vsl's loading readiness.

pls urgently relay foll msg to charrs.
------------------------------------------

TOP URGENT

dear sirs,

we refer to our recent exchanges regarding the subject matter;
while you will find in the following lines our reply to your last
we would like once more kindly request charrs to carefully read
both the contents and the attachment of our last msg which will
definitely assist them to comprehend the current situation.

charrs urgency to load the vsl has been duly noted along with the
reservation of their rights"...for any and all possible
consequences arising from this situation".

while the former is fully understood and respected, the latter is
not acceptable since it is obvious that the charrs will accept the
vsl for loading when she will become ready for the same; otherwise
owners fail to comprehend charrs decision and relevant recent
instructions vessel to be supplied with the necessary for the
scheduled voyage 200mts of low sulphur ifo yesterday and
today (delivery now in progress) with the remaining 700mts regular
ifo and 150mts mdo, being them and their agents already aware about
the developments of last saturday's noon and the current status of
the vessel (see also our below msg sent to charrs, for sake of good
order, both directly by the master as well as through the broking
channel).

please be sure that owns do not just rely on charrs understanding
and cooperation practically shown by their decision not to exercise
the right to cancel the vsl and from the very beginning have done
their best in order the vsl to become ready for loading the soonest

03/01/2008

possible. however due to the prevailing
holidays little progress in that direction has been noted as we
have faced most parties involved absolute unwillingness,
irrespectively of cost, to work during the weekend and before new
year's holidays.

more specifically the vessel was detained for the following three
deficiencies;firstly, during final closing operation of cargo hold
nr 6 aft panel due to mishandling the relevant hydraulic cylinder
jack was damaged preventing the opening/closing of said part of
hatch cover and though same was finally closed and until completion
of repair of same prior loading or even prior sailing the vsl could
load with only fore part of hatch cover to be in open position -
attending class surveyor seems to share our opinion - local PSC
authorities considered same as ground for detention(PSC group code:
1240...PSC comments:
metal hinges torn out from base hold nr 6 due to damage of
hydraulic system).secondly, during PSC inspection it was discovered
a small hole in the lowerpart of accommodation superstructure.(PSC
group code: 0985...PSC comments:
bulkhead from main deck to stere room holed).Lastly, it was also
found a temporarily repaired slight leakage of bilge tank (PSC
group code: 0985....PSC comments: leakage from bilge collecting
tank into e/r).

while for the above last one minor deficiency no workshop is
required for its repair (already in progress by the vessel's
fitter) for the other two we have investigated all possibilities
and unfortunately the repair from class approved workshop and
special permissions from port authorities (bureaucracy procedures)
are needed and the problem is ,as it was said, that has now become
obvious that due to the holidays nobody (irrespectively of cost)
wants to work; especially for the repair of the damaged hydraulic
cylinder and its foundation, as far as we understand from our
technical department, same should be dismantled by shore
team and to be taken ashore where its pin will be modified to the
fortunately existing on board spare one.

in order to further reply your questions as imposed in your last,
please also be advised that vessel's class and flag have been
informed by the owns about the vsl's detention and while the class
surveyor has already attended the vessel (he was also onboard
before the incident giving instructions for the repair of nr 6 aft
panel) and stands by for the supervision of the necessary
repairs, all other parties simply do not care and they only request
us to be patient.

another problem the owns have is that they cannot sent on board
their superintends to speed up matters as the consulate is closed
due to holidays and no visa can be provided to them; this is also
relevant to the serious problem the owns have encountered and they
still face with their previous charrs and their agents for the
reasons already briefly explained in their last message to

you (pls read carefully same again). for this reason owners from
the very begining made known to you and your agents their intention
to appoint messrs "rusnautic shipping" to act as owners' protecting
agents, in which case you will also be in position to constantly
have from first hand updates about the vsl's readiness, however
their reply was that they first expect your authorization in order
to accept same which please urgently provide in order
owners to have the assistance of agents who will not only care
about the ship but also protect her and her new charrs interests.
in such case it is well understood that all related there to costs
will be for owners account and for this reason furthermore, in
order to provide charrs with a realistic although under the
circumstances preliminary guidance about the vsl's expected loading
readiness it can be said that actually maximum two working days
after new year's holidays are to be needed for the rectification of
the above items which prevent vsl from her loading; however same
estimation is given on an all going well and
unforeseen circumstances always excepted basis as nobody can rely
on the promises of the local parties involved; otherwise, please be
sure that the vsl's master and owners are doing their outmost to
have the vsl ready for loading the soonest possible which given the
above can be expected on fri 4th jan agw uce wog.

in addition, please also be informed that the master is now in
progress of preparing further vsl's holds in line with the
recommendations of the relevant surveyor as well as that now
obviously there is no any more the necessity vsl to go to the
anchorage and then to proceed for loading; same can now be
arranged to be done directly from the present berth to the
designated loading bert.

honestly speaking, from the very beginning all information
available here was made also available to the vsl's new charrs as
the owns have adopted a straight forward attitude towards the next
charrs who are in rush to load the vessel; this is the only proper,
responsible and hopefully fruitful way of dealing with
situations like the above and the people who do business with them.

lastly, we remind you once more the ultimate necessity of charrs
prompt confirmation directly to messrs "rusnautic shipping" with
regard to their consent for the appointment of them from owners'
side as vsl's protecting agents too.

we thank again charrs nice cooperation so far.

as always we remain,

kind regards,

chartering dept.
c.s.m.e(as agents only)

++++++++++++

03/01/2008

**Master NicholasM**

| | |
|---|---|
| From: | "Master NicholasM" <Master.NicholasM@telaurus.net> |
| To: | "operations department" <operations@chianspirit.gr> |
| Sent: | Monday, January 07, 2008 5:15 PM |
| Subject: | PSC DEFICIENCIES PROGRESS REPORT |

FM: MV NICHOLAS M
TO: C.S.M.E./OPER.DEPT.
REF: 029/07-JAN-08

DEAR SIR,

PLEASE FIND FOLLOWING DEFICIENCIES RECTIFIED
GROUP CODE   DEFECT                    ACTION TAKEN
0199 CLASS CERTIFICATE  ·          RCVD 06-JAN-08
     HULL ANNEX TO CLASS        STILL WITH BV, TO CORRECT
1420 CLEANLINESS OF E/R          CONTINOUS IN PROGRESS
1399 MOORING             FREE THREE FROZEN (3) PEAR LEADS
                          FWD 07-JAN-08
1240 IN PROGRESS BY SHORE REPAIR, EXPECT TO COMPLETE
     08/01/08 PM
0543 EXHAUST PIPE IN E/R HOLED        HOLE COVERED TODAY
                                      UPPER

PART NEED TO

                              BE

COVERED, ABT 1 DAY

                              JOB AS

PER C/E ESTIMATE
0956 GANGWAY UNSAFE      INSTALL ADDITIONAL
                        RAILINGS AT LOWER
                        PLATFORM AS PER BV
                        SURVEYOR ADVISE.


REMARKS: FYG EXPERIENCED FRESH WATER PIPE BURSTING
         THIS AFTERNOON IN THREE DIFFERENT LOCATIONS.
         TWO (2) AT STBD BATHROOM MAIN DECK CEILING
         AND ONE (1) AT ELECTRICIAN'S BATHROOM.

         RE-SWEEPING OF TANK TOP IN CARGO HOLDS IN
         PROGRESS.

BEST REGARDS,
MASTER

1/11/2008



**Visa Page No  3**
*Página de visados n°.*
**to the Hull Annex**
*del Anexo  Casco*

No LPR0/GSA/20050519180535

NAME OF SHIP/*Nombre del Buque* : NICHOLAS M
Register No /*N° de Registro* :  910W76

| | |
|---|---|
| Visa/*Visado* No** : 9.<br><br>Occasional survey of hull afloat<br>Rec.6.1,6.2,6.3&7.2 were dealt with<br>Rec.7.1 partially done,cancelled for<br>postponement.<br>Ref.9.1: Oil leakage on hatch covers<br>hydraulic cylinders to be repaired and<br>tested.Meanwhile the leaked oil should<br>be cleaned to prevent pollution.<br>Limit Date: 28 December 2007<br><br>At/*En* :Maceio, Brazil<br>On/*El* :28 September 2007<br>*Stamp/Sello* | Visa/*Visado* No** : 11<br><br>(CONTINUATION)<br>Rec.11.2:<br>Repair as per attached list of<br>recommendationsNr.ENG0/2007/J0100/hull<br>to be performed at coming dry-dock /<br>intermediate survey. Limit date:<br>31 March 2008<br><br>At/*En* :St.Petersburg<br>On/*El* :11 January 2008<br>*Stamp/Sello* |
| Visa/*Visado* No** : 10<br><br>(CONTINUATION OF VISA 9)<br>Rec.10.1: Cargo hold Nr.1 forward<br>hatch cover girders found wasted to be<br>cropped and renewed.<br>Limit Date: 06 April 2008<br><br><br><br>At/*En* :Maceio, Brazil<br>On/*El* :28 September 2007<br>*Stamp/Sello* | Visa/*Visado* No** :<br><br><br><br><br><br><br><br><br><br><br>At/*En* :<br>On/*El* :<br>*Stamp/Sello* |
| Visa/*Visado* No** : 11<br><br>Occasional survey of hull afloat<br>further to detention by PSC.<br>Rec. 9.1 presently postponed.<br>Rec.11.1: Oil leakage on hatch covers<br>hydraulic cylinders to be repaired and<br>tested.Meanwhile the leaked oil should<br>be cleaned to prevent pollution.<br>Limit Date: 28 March 2008<br><br>At/*En* :St.Petersburg<br>On/*El* :11 January 2008<br>*Stamp/Sello* | At : St.Petersburg<br>*Expedido en*<br><br>On : 10 January 2008<br>*El*<br><br><br><br>By Order of the Secretary<br>*Por Orden del Secretario*<br>R.ZAVYALOV |

m/v NICHOLAS M.
910W76
St. PETERSBURG
28/12/2007

NOTIFICATION

DUE TO THE PROBLEM WITH CLOSING OF AFT
HATCH COVER OF CARGO HOLD N. 6, AND
IMPOSSIBILITY TO REPAIR PRIOR SHIPS
DEPARTURE, CERTIFICATE OF CLASSIFICATION
Ne. LPRO/KTS/2005 1094115530 HAS BEEN
TEMPORARILY WITHDRAWN AS WELL AS
CARGO SHIP SAFETY CONSTRUCTION.
CERTIFICATE Ne. LPRO/KTS/2005 1013 783 942





EUGENY ZAVIALOV
SURVEYOR TO BUREAU VERITAS

MASTER OF
m/v NICHOLAS M.

# SOLAS

## Consolidated Edition, 2004

Consolidated text of
the International Convention for
the Safety of Life at Sea, 1974,
and its Protocol of 1988:
articles, annexes and certificates

*Incorporating all amendments
in effect from 1 July 2004*



# Part A
## *Application, definitions, etc.*

### Regulation 1
*Application*

(a)  Unless expressly provided otherwise, the present regulations apply only to ships engaged on international voyages.

(b)  The classes of ships to which each chapter applies are more precisely defined, and the extent of the application is shown, in each chapter.

### Regulation 2
*Definitions*

For the purpose of the present regulations, unless expressly provided otherwise:

(a)  *Regulations* means the regulations contained in the annex to the present Convention.

(b)  *Administration* means the Government of the State whose flag the ship is entitled to fly.

(c)  *Approved* means approved by the Administration.

(d)  *International voyage* means a voyage from a country to which the present Convention applies to a port outside such country, or conversely.

(e)  A *passenger* is every person other than:

   (i)   the master and the members of the crew or other persons employed or engaged in any capacity on board a ship on the business of that ship; and

   (ii)  a child under one year of age.

(f)  A *passenger ship* is a ship which carries more than twelve passengers.

(g)  A *cargo ship* is any ship which is not a passenger ship.

19

*Chapter 1: General provisions*
Regulation 3

(h)    A *tanker* is a cargo ship constructed or adapted for the carriage in bulk of liquid cargoes of an inflammable* nature.

(i)    A *fishing vessel* is a vessel used for catching fish, whales, seals, walrus or other living resources of the sea.

(j)    A *nuclear ship* is a ship provided with a nuclear power plant.

(k)    *New ship* means a ship the keel of which is laid or which is at a similar stage of construction on or after 25 May 1980.

(l)    *Existing ship* means a ship which is not a new ship.

(m)    A *mile* is 1,852 m or 6,080 ft.

(n)    *Anniversary date* means the day and the month of each year which will correspond to the date of expiry of the relevant certificate.

## Regulation 3
*Exceptions*

(a)    The present regulations, unless expressly provided otherwise, do not apply to:

(i)    Ships of war and troopships.

(ii)    Cargo ships of less than 500 gross tonnage.

(iii)    Ships not propelled by mechanical means.

(iv)    Wooden ships of primitive build.

(v)    Pleasure yachts not engaged in trade.

(vi)    Fishing vessels.

(b)    Except as expressly provided in chapter V, nothing herein shall apply to ships solely navigating the Great Lakes of North America and the River St Lawrence as far east as a straight line drawn from Cap des Rosiers to West Point, Anticosti Island and, on the north side of Anticosti Island, the 63rd meridian.

---

* "Inflammable" has the same meaning as "flammable".

20

## Regulation 4
### Exemptions*

(a)  A ship which is not normally engaged on international voyages but which, in exceptional circumstances, is required to undertake a single international voyage may be exempted by the Administration from any of the requirements of the present regulations provided that it complies with safety requirements which are adequate in the opinion of the Administration for the voyage which is to be undertaken by the ship.

(b)  The Administration may exempt any ship which embodies features of a novel kind from any of the provisions of chapters II-1, II-2, III and IV of these regulations the application of which might seriously impede research into the development of such features and their incorporation in ships engaged on international voyages. Any such ship shall, however, comply with safety requirements which, in the opinion of that Administration, are adequate for the service for which it is intended and are such as to ensure the overall safety of the ship and which are acceptable to the Governments of the States to be visited by the ship. The Administration which allows any such exemption shall communicate to the Organization particulars of same and the reasons therefor which the Organization shall circulate to the Contracting Governments for their information.

## Regulation 5
### Equivalents

(a)  Where the present regulations require that a particular fitting, material, appliance or apparatus, or type thereof, shall be fitted or carried in a ship, or that any particular provision shall be made, the Administration may allow any other fitting, material, appliance or apparatus, or type thereof, to be fitted or carried, or any other provision to be made in that ship, if it is satisfied by trial thereof or otherwise that such fitting, material, appliance or apparatus, or type thereof, or provision, is at least as effective as that required by the present regulations.

(b)  Any Administration which so allows, in substitution, a fitting, material, appliance or apparatus, or type thereof, or provision, shall communicate to the Organization particulars thereof together with a report on any trials made and the Organization shall circulate such particulars to other Contracting Governments for the information of their officers.

---

* Refer to SLS.14/Circ.115, as amended, on the issue of exemption certificates under the 1974 SOLAS Convention and amendments thereto.

21

# Part B
## *Surveys and certificates**

### Regulation 6
*Inspection and survey*

(a)   The inspection and survey of ships, so far as regards the enforcement of the provisions of the present regulations and the granting of exemptions therefrom, shall be carried out by officers of the Administration. The Administration may, however, entrust the inspections and surveys either to surveyors nominated for the purpose or to organizations recognized by it.

(b)   An Administration nominating surveyors or recognizing organizations to conduct inspections and surveys as set forth in paragraph (a) shall as a minimum empower any nominated surveyor or recognized organization to:

   (i)    require repairs to a ship;

   (ii)   carry out inspections and surveys if requested by the appropriate authorities of a port State.

The Administration shall notify the Organization of the specific responsibilities and conditions of the authority delegated to nominated surveyors or recognized organizations.

(c)   When a nominated surveyor or recognized organization determines that the condition of the ship or its equipment does not correspond substantially with the particulars of the certificate or is such that the ship is not fit to proceed to sea without danger to the ship, or persons on board, such surveyor or organization shall immediately ensure that corrective action is taken and shall in due course notify the Administration. If such corrective action is not taken the relevant certificate should be withdrawn and the Administration shall be notified immediately; and, if the ship is in the port of another Party, the appropriate authorities of the port State shall also be notified immediately. When an officer of the Administration, a nominated surveyor or a recognized organization has notified the appropriate authorities of the port State, the Government of the port State concerned shall give such officer, surveyor or organization any necessary assistance to carry out their obligations under this regulation. When

---

* Refer to "Global and uniform implementation of the harmonized system of survey and certification (HSSC)" and to the "Revised survey guidelines under the harmonized system of survey and certification" adopted by the Organization by resolutions A.883(21) and A.948(23) respectively.



applicable, the Government of the port State concerned shall ensure that the ship shall not sail until it can proceed to sea, or leave port for the purpose of proceeding to the appropriate repair yard, without danger to the ship or persons on board.

(d)    In every case, the Administration shall fully guarantee the completeness and efficiency of the inspection and survey, and shall undertake to ensure the necessary arrangements to satisfy this obligation.

## Regulation 7
*Surveys of passenger ships**

(a)    A passenger ship shall be subject to the surveys specified below:

    (i)    an initial survey before the ship is put in service;

    (ii)    a renewal survey once every 12 months, except where regulation 14(b), (e), (f) and (g) is applicable;

    (iii)    additional surveys, as occasion arises.

(b)    The surveys referred to above shall be carried out as follows:

    (i)    the initial survey shall include a complete inspection of the ship's structure, machinery and equipment, including the outside of the ship's bottom and the inside and outside of the boilers. This survey shall be such as to ensure that the arrangements, materials and scantlings of the structure, boilers and other pressure vessels and their appurtenances, main and auxiliary machinery, electrical installation, radio installations including those used in life-saving appliances, fire protection, fire safety systems and appliances, life-saving appliances and arrangements, shipborne navigational equipment, nautical publications, means of embarkation for pilots and other equipment fully comply with the requirements of the present regulations, and of the laws, decrees, orders and regulations promulgated as a result thereof by the Administration for ships of the service for which it is intended. The survey shall also be such as to ensure that the workmanship of all parts of the ship and its equipment is in all respects satisfactory, and that the ship is provided with the lights, shapes, means of making sound signals and distress signals as required by the provisions of the present regulations and the International Regulations for Preventing Collisions at Sea in force;

    (ii)    the renewal survey shall include an inspection of the structure, boilers and other pressure vessels, machinery and equipment, including the outside of the ship's bottom. The survey shall be

---

* Refer to resolution A.794(19) on surveys and inspections of ro–ro passenger ships and MSC/Circ. 956, Guidelines for unscheduled inspections of ro–ro passenger ships by flag States.

23

*Paris Memorandum of Understanding on Port State Control*

.5      the Protocol of 1988 relating to the International Convention for the Safety of Life at Sea, 1974 (SOLAS PROT 88);

.6      the International Convention for the Prevention of Pollution from Ships, 1973, as modified by the Protocols of 1978 and 1997 relating thereto (MARPOL 73/78);

.7      the International Convention on Standards of Training, Certification and Watchkeeping for Seafarers, 1978 (STCW 78);

.8      the Convention on the International Regulations for Preventing Collisions at Sea, 1972 (COLREG 72);

.9      the International Convention on Tonnage Measurement of Ships, 1969 (TONNAGE 69);

.10     the Merchant Shipping (Minimum Standards) Convention, 1976 (ILO Convention No. 147) (ILO 147);

.11     the Protocol of 1996 to the Merchant Shipping (Minimum Standards) Convention, 1976 (ILO Convention No. 147) (ILO147 PROT 96);

.12     the International Convention on Civil Liability for Oil Pollution Damage, 1992.

2.2      With respect to ILO 147 and the ILO Protocol 1996, each Authority will apply the procedures referred to in section 7 of Annex 1 for the application of ILO publication "Inspection of Labour Conditions on board Ship: Guide-lines for procedure".

2.3      Each Authority will apply those relevant instruments which are in force and to which its State is a Party. In the case of amendments to a relevant instrument each Authority will apply those amendments which are in force and which its State has accepted. An instrument so amended will then be deemed to be the 'relevant instrument' for that Authority.

2.4      In applying a relevant instrument, the Authorities will ensure that no more favourable treatment is given to ships of non-Parties or to ships below convention size. The Authorities will thereby apply the procedures specified in section 3 of Annex 1.

**Section 3      Inspection Procedures, Rectification and Detention**

3.1      In fulfilling their commitments the Authorities will carry out inspections, which will consist of a visit on board a ship in order to check the certificates and documents as referred to in section 2 of Annex 1. Furthermore the Authorities will satisfy themselves that the crew and the overall condition of the ship, including the engine room and accommodation and including hygienic conditions, meets generally accepted international rules and standards.

In the absence of valid certificates or documents or if there are clear grounds for believing that the condition of a ship or of its equipment, or its crew does not substantially meet the requirements of a relevant instrument, a more detailed inspection will be carried out, as referred to in section 5 of Annex 1. Examples of clear grounds are given in section 4 of Annex 1.

The Authorities will include control on compliance with on board operational requirements in their inspections.

3.2      The Authorities will ensure that an inspection in accordance with the provisions of section 3.1 is carried out on any ship not subject to expanded inspection with a target factor greater than 50 in the SIReNaC information system, provided that a period of at least one month has elapsed since the last inspection carried out in the region of the Memorandum.

3.3      A ship in one of the categories in section 8.2 of Annex 1, is liable to an expanded inspection after a period of twelve months since the last expanded inspection carried out in a port within the region of the Memorandum.

**Section 1**      **Priority inspections**

1.1              Regardless of the value of the target factor, as referred to in Section 1.2, the following
                 ships shall be considered as an overriding priority for inspection:

    .1    Ships which have been reported by pilots or port authorities in accordance with
        section 1.5 of the Memorandum ;

    .2    Ships carrying dangerous or polluting goods, which have failed to report all
        relevant information concerning the ship's particulars, the ship's movements and
        concerning the dangerous or polluting goods being carried to the competent
        authority of the port and coastal State;

    .3    Ships which have been the subject of a report or notification by another
        Authority;

    .4    Ships which have been the subject of a report or complaint by the master, a
        crew member, or any person or organization with a legitimate interest in the safe
        operation of the ship, shipboard living and working conditions or the prevention of
        pollution, unless the Authority concerned deems the report or complaint to be
        manifestly unfounded; the identity of the person lodging the report or complaint
        must not be revealed to the master or the shipowner of the ship concerned;

    .5    Ships which have been:
        – involved in a collision, grounding or stranding on their way to the port,
        – accused of an alleged violation of the provisions on discharge of harmful
          substances or effluents,
        – manoeuvred in an erratic or unsafe manner whereby routing measures, adopted
          by the IMO, or safe navigation practices and procedures have not been followed,
          or
        – otherwise operated in such a manner as to pose a danger to persons, property or
          the environment;

    .6    Ships which have been suspended or withdrawn from their class for safety reasons in
        the course of the preceding 6 months.

    .7    Ships which cannot be identified in the SIReNaC information system.

1.2              In determining the order of priority for the inspection of ships, the Authority shall take into
                 account the order indicated by the target factor displayed on the SIReNaC information
                 system. The following elements are relevant for the targeting factor:

    .1    Ships visiting a port of a State, the Authority of which is a signatory to the
        Memorandum, for the first time or after an absence of 12 months or more. In the
        absence of appropriate data for this purpose, the Authorities will rely upon the
        available SIReNaC data and inspect those ships which have not been registered in
        the SIReNaC following the entry into force of that database on 1 January 1993;

    .2    Ships not inspected by any Authority within the previous 6 months;

    .3    Ships whose statutory certificates on the ship's construction and equipment, issued in
        accordance with the Conventions, and the classification certificates, have been issued
        by an organization which is not recognized by the Authority;

    .4    Ships flying the flag of a State appearing in the black-list as published in the annual
        report of the MOU

.5 ⸱ Ships which have been permitted by the Authority to leave a port of its State on certain conditions:

a) deficiency to be rectified before departure

b) deficiency to be rectified at the next port

c) deficiencies to be rectified within 14 days

d) deficiencies for which other conditions have been specified

e) if ship related action has been taken and all deficiencies have been rectified;

.6 Ships for which deficiencies have been recorded during a previous inspection, according to the number of deficiencies;

.7 Ships which have been detained in a previous port;

.8 Ships flying the flag of a non-Party to a relevant instrument;

.9 Ships with recognized organization deficiency ratio above average;

.10 Ships in a category referred to in section 8 of this Annex;

.11 Other ships above 13 years old.

**Section 2**     **Examination of certificates and documents**

At the initial inspection the port State control officer will, as a minimum and to the extent applicable, examine the following documents:

.1 International Tonnage Certificate (1969);

.2 Passenger Ship Safety Certificate;

.3 ⸱ Cargo Ship Safety Construction Certificate;

.4 Cargo Ship Safety Equipment Certificate;

.5 Cargo Ship Safety Radio Certificate;

.6 Exemption Certificate and any list of cargoes (as per SOLAS II-2/53.1.3);

.7 Cargo Ship Safety Certificate;

.8 Document of Compliance (SOLAS 74, Regulation II-2/54)

.9 Dangerous goods special list or manifest, or detailed stowage plan;

.10 International Certificate of Fitness for the Carriage of Liquefied Gases in Bulk, or the Certificate of Fitness for the Carriage of Liquefied Gases in Bulk, whichever is appropriate;

.11 International Certificate of Fitness for the Carriage of Dangerous Chemicals in Bulk, or the Certificate of Fitness for the Carriage of Dangerous Chemicals in Bulk, whichever is appropriate;

.12 International Oil Pollution Prevention Certificate;

.13 International Pollution Prevention Certificate for the Carriage of Noxious Liquid Substances in Bulk;

.14 International Load Line Certificate (1966);

.15 International Load Line Exemption Certificate;

.16 Oil Record Book, parts I and II;

.17 Shipboard Oil Pollution Emergency Plan

.18 Cargo Record Book;

.19 Minimum Safe Manning Document;

.20 Certificates issued in accordance with STCW Convention;

.21 Medical certificates (see ILO Convention No. 73);

.22 Table of shipboard working arrangements (see ILO Convention No. 180 and STCW95)

.23 Records of hours of work or rest of seafarers (see ILO Convention No. 180)

.24 Stability information;

.25 Copy of Document of Compliance and Safety Management Certificate issued in accordance with the International Management Code for the Safe Operation of Ships and for Pollution Prevention;

**Section 4**          **Examples of "clear grounds" for a more detailed inspection**

In applying 3.1 of the Memorandum, "clear grounds" which warrant a more detailed inspection include the following:

.1   the ship has been identified as a priority case for inspection, under section 1.1 and section 1.2.3, 1.2.4, 1.2.5b, 1.2.5.c, and 1.2.8 of this Annex;

.2   during examination of the certificates and documents referred to in section 2 of this Annex, inaccuracies have been revealed or the documents have not been properly kept or updated;

.3   indications that the relevant crew members are unable to communicate appropriately with each other, or with other persons on board, or that the ship is unable to communicate with the shore-based authorities either in a common language or in the language of those authorities;

.4   evidence of cargo and other operations not being conducted safely or in accordance with IMO guidelines;

.5   failure of the master of an oil tanker to produce the record of the oil discharge monitoring and control system for the last ballast voyage;

.6   absence of an up-to-date muster list, or crew members not aware of their duties in the event of fire or an order to abandon the ship;

.7   the emission of false distress alerts not followed by proper cancellation procedures;

.8   the absence of principal equipment or arrangements required by the conventions;

.9   evidence from the port State control officer's general impressions and observations that serious hull or structural deterioration or deficiencies exist that may place at risk the structural, watertight or weather tight integrity of the ship;

.10   excessively unsanitary conditions on board the ship;

.11   information or evidence that the master or crew is not familiar with essential shipboard operations relating to the safety of ships or the prevention of pollution, or that such operations have not been carried out;

.12   the absence of a table of shipboard working arrangements or records of hours of work or rest of seafarers (see ILO180).

**Section 5**          **More detailed inspection**

**5.1**          **General**

**5.1.1**        In the absence of valid certificates or documents or after the establishment of clear grounds, the port State control officer will:

.1   conduct a more detailed inspection in the area(s) where clear grounds were established;

.2   carry out a more detailed inspection in other areas at random; and

.3   include further checking of compliance with on-board operational requirements.

**5.1.2**        In the exercise of a more detailed inspection the port State control officer will take into account:

.1   the provisions of this section;

.2   the provisions of the International Maritime Dangerous Goods Code;

.3   the provisions of sections 6 and 7 of this Annex, as appropriate.

**Recalling** the Final Declaration adopted on 2 December 1980 by the Regional European Conference on Maritime Safety which underlined the need to increase maritime safety and the protection of the marine environment and the importance of improving living and working conditions on board ship;

**Noting** with appreciation the progress achieved in these fields by the International Maritime Organization and the International Labour Organization;

**Noting** also the contribution of the European Union towards meeting the above mentioned objectives;

**Mindful** that the principal responsibility for the effective application of standards laid down in international instruments rests upon the authorities of the State whose flag a ship is entitled to fly;

**Recognizing** nevertheless that effective action by port States is required to prevent the operation of substandard ships;

**Recognizing also** the need to avoid distorting competition between ports;

**Convinced** of the necessity, for these purposes, of an improved and harmonized system of port State control and of strengthening co-operation and the exchange of information;

have reached the following understanding:

| Section 1 | Commitments |
|---|---|

1.1      Each Authority will give effect to the provisions of the present Memorandum and the Annexes thereto, which constitute an integral part of the Memorandum.

1.2      Each Authority will maintain an effective system of port State control with a view to ensuring that, without discrimination as to flag, foreign merchant ships calling at a port of its State, or anchored off such a port, comply with the standards laid down in the relevant instruments as defined in section 2. Each Authority may also carry out controls on ships at off-shore installations.

1.3      Each Authority will achieve an annual total of inspections corresponding to 25% of the average number of individual foreign merchant ships, hereinafter referred to as 'ships', which entered the ports of its State during the three last calendar years for which statistics are available.

1.4      Each Authority will consult, cooperate and exchange information with the other Authorities in order to further the aims of the Memorandum.

1.5      Each Authority, or any other body, as the case may be, will establish an appropriate procedure for pilot services and port authorities to immediately inform the competent Authority of the port State, whenever they learn in the course of their normal duties that there are deficiencies which may prejudice the safety of the ship, or which may pose a threat of harm to the marine environment.

| Section 2 | Relevant instruments |
|---|---|

2.1      For the purposes of the Memorandum 'relevant instruments' are the following instruments:

        .1      the International Convention on Load Lines, 1966 (LOAD LINES 66);

        .2      the Protocol of 1988 relating to the International Convention on Load Lines, 1966 (LL PROT 88);

        .3      the International Convention for the Safety of Life at Sea, 1974 (SOLAS 74);

        .4      the Protocol of 1978 relating to the International Convention for the Safety of Life at Sea, 1974 (SOLAS PROT 78);

*Paris Memorandum of Understanding on Port State Control*

.5    the Protocol of 1988 relating to the International Convention for the Safety of Life at Sea, 1974 (SOLAS PROT 88);

.6    the International Convention for the Prevention of Pollution from Ships, 1973, as modified by the Protocols of 1978 and 1997 relating thereto (MARPOL 73/78);

.7    the International Convention on Standards of Training, Certification and Watchkeeping for Seafarers, 1978 (STCW 78);

.8    the Convention on the International Regulations for Preventing Collisions at Sea, 1972 (COLREG 72);

.9    the International Convention on Tonnage Measurement of Ships, 1969 (TONNAGE 69);

.10   the Merchant Shipping (Minimum Standards) Convention, 1976 (ILO Convention No. 147) (ILO 147);

.11   the Protocol of 1996 to the Merchant Shipping (Minimum Standards) Convention, 1976 (ILO Convention No. 147) (ILO147 PROT 96);

.12   the International Convention on Civil Liability for Oil Pollution Damage, 1992.

2.2    With respect to ILO 147 and the ILO Protocol 1996, each Authority will apply the procedures referred to in section 7 of Annex 1 for the application of ILO publication "Inspection of Labour Conditions on board Ship: Guide-lines for procedure".

2.3    Each Authority will apply those relevant instruments which are in force and to which its State is a Party. In the case of amendments to a relevant instrument each Authority will apply those amendments which are in force and which its State has accepted. An instrument so amended will then be deemed to be the 'relevant instrument' for that Authority.

2.4    In applying a relevant instrument, the Authorities will ensure that no more favourable treatment is given to ships of non-Parties or to ships below convention size. The Authorities will thereby apply the procedures specified in section 3 of Annex 1.

**Section 3    Inspection Procedures, Rectification and Detention**

3.1    In fulfilling their commitments the Authorities will carry out inspections, which will consist of a visit on board a ship in order to check the certificates and documents as referred to in section 2 of Annex 1. Furthermore the Authorities will satisfy themselves that the crew and the overall condition of the ship, including the engine room and accommodation and including hygienic conditions, meets generally accepted international rules and standards.

In the absence of valid certificates or documents or if there are clear grounds for believing that the condition of a ship or of its equipment, or its crew does not substantially meet the requirements of a relevant instrument, a more detailed inspection will be carried out, as referred to in section 5 of Annex 1. Examples of clear grounds are given in section 4 of Annex 1.

The Authorities will include control on compliance with on board operational requirements in their inspections.

3.2    The Authorities will ensure that an inspection in accordance with the provisions of section 3.1 is carried out on any ship not subject to expanded inspection with a target factor greater than 50 in the SIReNaC information system, provided that a period of at least one month has elapsed since the last inspection carried out in the region of the Memorandum.

3.3    A ship in one of the categories in section 8.2 of Annex 1, is liable to an expanded inspection after a period of twelve months since the last expanded inspection carried out in a port within the region of the Memorandum.