UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x

SIXTEEN THIRTEEN MARINE S.A.,                08 CV 1318 (HB)

                                      Plaintiff    ECF CASE

-against-

CONGENTRA AG,

                                      Defendant.

-----------------------------------------------------------------x

### Declaration of the Hon. Sir Anthony Colman

1. I am asked by Barlow Lyde & Gilbert ("BLG") London solicitors acting for Congentra AG ("the Charterers"), to provide a Report on the manner in which English law would operate on the facts as alleged by the parties to a dispute relating to the carriage and discharge at St. Petersburg of a cargo of bulk soya bean meal by the vessel m.v. NICHOLAS M ("the Vessel") during October 2007 to January 2008. My professional background and experience is listed in Appendix 1.

2. This opinion is provided on the basis of the documents listed in Appendix 2 (copies of which have been provided to me). I exhibit to this statement a bundle of documents entitled "**AC1**" to which I refer below.

3. Since this dispute has been referred to arbitration in London, the arbitral tribunal will apply English Law in accordance with the choice of law clause in the Charterparty, see clause 37 of the "Furia R" charter which is incorporated into the Charterparty (**AC1 tab 1**).

4. By a time trip charter made on 10th October 2007, Sixteen Thirteen Marine SA, "the Owners", let on hire to Congentra AG as charterers the Vessel for time trip via River Plate in Argentina to St. Petersburg, Russia of duration about 60 days without guarantee.

5. The vessel was delivered at 1300 on 11th October 2007 on dropping outward pilot at Porto Alegre, Brazil, from where it proceeded to San Lorenzo, Argentina, where loading of a bulk cargo of Argentina Hipro soya bean meal commenced on 18th October 2007 and was completed on 30th October 2007.

6. The vessel arrived at St Petersburg on 1st December 2007 but discharge did not commence until 3rd December 2007 because of customs formalities and the presence of snow at the port (AC1 tab 4).

7. Meanwhile, shortly after the Vessel's arrival, the No.4 hold hatch was opened and it was found that the cargo in that hold was wet-damaged. On 3rd December 2007 that cargo was jointly sampled by Wakefield, surveyors instructed by the Owners' P and I Club (the American P and I Club) and the Russian State Grain Control/RSGC.

8. The Russian authorities subsequently condemned as unfit a quantity of 500 mt of that cargo and discharge of cargo from No. 4 hold was prohibited.

9. On 6th December 2007 BLG, acting on behalf of Cargo Interests including Charterers, wrote to the managers of the Vessel, Chian Spirit Maritime Enterprises Inc. informing them that BLG had been instructed to act for Cargo Interests, that SGS had been appointed by Cargo Interests to attend the discharge of the Vessel, take samples of the cargo and supervise segregation of damaged cargo and that BLG was asking, on behalf of Cargo Interests, for security for the value of the damaged cargo together with interest and costs.

10. The Owners and their managers did not reply and, in their letter dated 11th December 2007, BLG wrote directly to the American P and I Club. By 24th December 2007 security had been provided on behalf of the Owners in the form of the P and I Club's letter of undertaking.

2

11. In the meantime, on 15th December 2007, representatives of SGS requested the Master of the Vessel to permit to them access to the No. 4 hold but the Master declined this request.

12. On 15th December 2007 it was discovered that No. 2 hold also contained wet-damaged cargo. Discharge of cargo from that hold was also prohibited.

13. On 18th December 2007, after Cargo Interests had threatened to apply to the English Court for an order for access to inspect the cargo on board, the Master allowed SGS access to No. 4 hold.

14. On 28th December 2007 discharge of all the cargo was completed at 1840.

15. On the same day BLG requested the American P and I Club to obtain Owners' permission for SGS and Marinex-ILCS to perform ultra sonic tests on holds 2 and 4 in order to establish whether they were watertight. However, at 2000 on that day the SGS Surveyor was refused permission by the Master to conduct such tests.

16. Also on 28 December 2007, following completion of discharge, the Vessel's Classification Society removed either the cargo ship safety construction certificate (as alleged by Owners) in the London arbitration or both that certificate and the certificate of classification (as alleged by the Charters and conceded in paragraph 11 of Owners' complaint in the proceedings **(AC1 tab 2)**). I return to the evidence on this issue in paragraph 18 below.

17. It is to be observed that although the vessel could in theory put to sea without either certificate the absence of either certificate would prevent it from lawful trading to any port.

18. I interpose that such evidence as there is indicates unequivocally that Bureau Veritas ("BV"), the Classification Society, removed both certificates by reason of the fact that the metal hinges on the hatch to No. 6 hold had been torn out and/or defects in the hydraulic lifting mechanism and the hatch could not be closed, see:

   (i) Owners' Complaint, para 11 **(AC1 tab 2)**;

   (ii) BV's formal notification issued on 28th December 2007 **(AC1 tab 3)**;

3

  (iii) The Statement of Facts prepared by Anteks, the Charterers' agents and cargo receivers forwarding agents at St. Petersburg **(AC1 tab 4)**.

I have no doubt an English Court, or an arbitral tribunal applying English law, would accept this compelling evidence.

19. On 29 December 2007 at 1530 the St. Petersburg Port State Control ("PSC"), in effect the relevant port authority, detained the Vessel on the following eight grounds **(AC1 tab 5)**:-

- The removal by class of cargo ship safety construction certificate (which Port State Control received notice of on 28th December 2007);

- The removal by class of class certificate (which Port State Control received notice of on 28th December 2007);

- Bulkhead from main deck to store room holed;

- Leakage from bilge collecting tank no.9 into engine room;

- Hatch cover damaged (metal hinges torn out from base in hold no. 6 due to damage to hydraulic system);

- Hatch covers, coamings, compression bars all heavily corroded;

- Insufficient crew and, in particular, the vessel had no second officer (although it would appear that a new second officer arrived on 30th December 2007); and

- Exhaust pipe in engine room holed.

20. According to a report dated 2nd January 2008, signed by the Master, the first six items were all to be rectified and approved to the satisfaction of the Classification Society before the departure of the Vessel.

21. The Vessel was released from detention by the PSC on 11th January 2008.

22. There is an issue between Owners and Charterers as to when the required repairs to the Vessel, in particular the No. 6 hatch mechanism, were completed and as to when BV returned the Vessel's class certificates. The Owners' Complaint, paragraph 15, asserts

4

that such repair was carried out prior to 31st December 2007 and that the certificates were returned after that. However, the emails sent by the Master on 7th January 2008 (**AC1 tab 6**) state that the two certificates were not returned by BV until 6th January 2008 and further that the repairs to the No. 6 hatch mechanism were still "in progress" on 7th January and not expected to be completed until the following day. These emails provide compelling evidence that, contrary to the Owners' Complaint para 15, the class certificates were not returned until 6th January 2008, at the earliest and No. 6 hatch was not repaired until 8th January 2008 at the earliest.

23. The claim by Owners in the London arbitration, in respect of which by these proceedings the Owners seek security, is expressed in two documents as follows:

    (i) The notice of commencement of the arbitration proceedings (**AC1 tab 7**) stated:

    "... *all disputes arising out of the captioned charter including, but not limited to, claims by Owners for breach of the said charter and/or claims for damages in tort arising from a factual matrix in which Congentra unjustifiably, and with malicious intent, either directly or indirectly delayed the vessel during her discharge operations at St. Petersburg (for the purposes of falsely justifying certain cargo claims which Owners consider to relate to pre-shipment damage) – such that the vessel missed her cancelling date for her next fixture out of that port.*

    (ii) The Owners' fax dated 14 February 2008 (**AC1 tab 8**) stated that their claims for breach of contract by late re-delivery of the vessel and in particular:

    "*the late redelivery was caused by Congentra's refusal to discharge the damaged cargo for a period of 16 days between 2 December 2007 when the damaged cargo was discovered in No. 4 hold and 18 December 2007. During that time they unreasonably insisted that segregation of the damaged cargo should take place on board rather than ashore. They also delayed matters by insisting on ultrasound tests concerning the hatches...*

    *Congentra, and their sister company Euroweg, the receivers, unreasonably and uncontractually delayed completion of the discharge operations until 28 December 2007 dispute giving a "60 day WOG" duration for the voyage... The excess time beyond 60 days was a result of Congentra's unreasonable delaying tactics concerning discharge orders...*

    *...the Port State Control were 'persuaded' to attend on board to detain the vessel as much as three weeks after the damaged cargo was found and Congentra and their local sister companies had exhausted all other methods of hoping to obtain damming evidence about the vessel to support their cargo claims.*"

5

24. The Owners' case is further developed in the Complaint in these proceedings in the following manner **(AC1 tab 2)**:

   (A) *"...In bad faith, Defendant CONGENTRA and non-parties Euroweg, and Anteks refused throughout the material period to discharge the cargo and to segregate it as to good and damaged ashore, thereby extensively delaying the vessel from completing her cargo operations"* (Complaint, paragraph 10).

   (B) *"CONGENTRA and non-parties Euroweg, and Anteks sought to delay the vessel further by requesting Ultrasound tests in the holds"* (Complaint, paragraph 11).

   (C) *"CONGENTRA and non-parties Euroweg, and Anteks ...'persuaded' Russian Port State Control officials to go on board and detain the ship for a number of days in an attempt to gather evidence against the vessel to help support their dubious claims"* (Complaint, paragraph 12).

   It is further alleged in paragraph 19 that due to the delays caused by the *"unwarranted and improper interferences of Defendant CONGENTRA and its agents"* the Vessel lost its employment under another fixture, to which I refer as "the Britannia charter" and which is discussed at paragraph 29 below. It is also pleaded that there had been a breach of the charter and wrongful interference in the Owners' business by the charterers and a conspiracy between the Charterers and non-parties Euroweg (the consignees) and Anteks (paragraph 23).

25. The Owners formulate their alleged losses for the purposes of the present proceedings in the following manner. They allege that the Charterers' breaches of contract and/or duty caused the loss of the Britannia charter (about 45 days at USD$40,000 per day to South America) and of a further prospective fixture from there to the Far East (a further 52.5 days at USD42,000 per day) together with a ballast bonus of USD$550,000. The total losses are therefore quantified at USD$1.8 million under the Britannia charter and USD2.755 million under the subsequent fixture, giving an aggregate of USD$4.505 million plus interest (USD$560,000) and costs (USD$200,000).

6

26. Before considering how English law would operate on these claims, it is necessary to maintain two further matters which arise on the evidence.

27. I first refer to the causes of the delay in completion of discharge at St. Petersburg between 2nd December 2007 and 28th December 2007. According to remarks made by the Master on the Statement of Facts (**AC1 tab 9**), the slow discharge of the vessel during the period 2-18 December was caused by the fact that for much of the time receivers were working the vessel with one gang rather than two and by delays due to lack of availability of wagons. The Master's remarks explicitly reject the suggestions that delay in discharge of cargo from the No. 2 and 4 holds delayed the overall discharge operation, which was proceeding from other holds during the periods when those holds could not be discharged. Then when the discharge of all holds had been completed on the evening of 28th December, bad weather conditions and the consequential lack of a pilot would have prevented the vessel from sailing until noon on 29th December 2007. The Master expressed the position thus:

> "- Despite the fact that commencement of cargo discharge from holds no.2 and 4 was delayed..., the discharging progress and the overall discharging time were not affected as the vessel was always able to provide the required gangs from other available holds. Therefore no delays from Vessel's side were occurred during discharging operations
> 
> - From commencement of discharge until completion of same, discharging operations were carried out with 1 (one) and some very few limited times with 2 (two) gangs. Also always availability of wagons was very tight.
> 
> - On 28 Dec last minute ultrasonic test was not carried out for reasons explained to Charterers in writing...
> 
> - On 28 Dec after completion of discharge vessel was waiting pilotage due to bad weather conditions (as per agent msg pilot was not to be expected before 29th noon sub weather improvement)..."

28. There is therefore compelling evidence that the prohibition on discharge of the Nos. 2 and 4 holds by the Russian authorities did not lengthen the overall discharging time, such cargo being discharged by 28th December 2007.

29. On 20th December 2007 the Owners entered into the Britannia charter on terms similar to those of the m.v. NICHOLAS M (**AC1 tab 10**). The cancelling date was 31st December

7

2007, delivery on dropping off last sea pilot at St. Petersburg. In the answer given by the Owners to question 15 of the fixture questionnaire as to the vessel's present position as at 20th December 2007, it was stated that *"due to lack of trucks completion (of discharge under the NICHOLAS M charter) may be realistically expected around 26 – 27 Dec AGW WP UCE."* The Vessel having missed the cancelling date, Britannia duly cancelled the Britannia Charter on 10th January 2008.

30. Although it is unclear whether sea conditions could have permitted the Vessel to proceed under pilotage from St. Petersburg by 31 December 2007, there is very strong evidence, as set out in paragraphs 16 to 22 above, that the Vessel could not have been validly delivered under the Britannia charter by 31st December in as much as there is compelling evidence that the class certificate had been removed by BV on 28th December 2007 and was not returned to the vessel until 6th January 2008.

31. As mentioned above, the evidence suggests that the Vessel's class certificates were not returned until 6th January 2008 at the earliest. Up until that point, the vessel could not be validly delivered under the Britannia charter, for it was not tight, staunch, strong and in every way fitted for the service. Apart from the condition of the No. 6 hatch and other defects in condition listed by PSC as grounds for detention of the vessel, its class certificate and its safety construction certificates had been removed and was therefore not fitted for the service. Furthermore, I note that under the terms of the Britannia charter, the Owners provided a guarantee that the Vessel was classed with BV *"and shall remain so throughout the whole T/C period"*. The effect of these deficiencies would have been to prevent the Vessel from tendering a valid notice of readiness under clause 14 of the NYPE form, see *Time Charters* (Wilford) at paragraph 8.1 **(AC1 tab 11)**.

32. It is to be noted that neither in their complaint in these proceedings nor in their communications with the arbitrators have Owners alleged that the removal of the class certificates was caused by any breach of contract or duty by the Charterers.

33. Indeed, the discharge of the cargo had been completed by 1840 on 28th December and from then onwards the vessel was at the disposal of the owners and but for the removal of the vessel's class certificates and the adverse sea conditions they were from that date free

8

to deploy it for their own purposes including delivery under the Britannia charter until 15:30 on 29th December when it was detained by the PSC.

34. Assuming that the class certificates were returned on or around 6th January 2008 and that the repairs to No. 6 hatch were completed on 8th January 2008, delivery into service under the Britannia charter would thereafter only have been prevented by the detention of the Vessel by the PSC. However, it seems to me significant that, the evidence as described above suggests that the detention by the PSC was simply the consequence of the removal of the Vessel's class certificates. As I understand it, the Owners nowhere allege that the removal of the class certificates was *caused* by any act of the Charterers. Thus, although it is ultimately a question of fact for the arbitral tribunal to decide, it may well be the case that the conclusion reached is that the detention of the Vessel up to and beyond 10th January 2008, when the Britannia charter was cancelled, was caused by the problems with the Vessel which led to the removal of the class certificates and not by any act of the Charterers or their associated companies.

35. I set out below the principles of English law which would be relevant to an assessment of the Owners' claims that the Charterers and their associated companies were responsible for this detention and are liable in damages as a result.

36. Firstly, the Charterparty expressly provides that the redelivery of the Vessel is to take place "ON DLOSP ST. PETERSBURG" (i.e. on dropping last outwards sea pilot). The Charterparty therefore continued to subsist after the completion of discharge of the cargo on 28th December 2007. Whether or not there has been a breach of the terms of the Charterparty by the Charterers in relation to the detention of the Vessel by the PSC will therefore turn on the facts as found by the arbitral tribunal. I would however point out that, as I have explained at paragraph 19 above, the PSC's expressly stated grounds for detaining the vessel all related to physical problems with her hull and equipment. It is not clear to me what evidence the Owners intend to put forward in support of their contention that the detention of the Vessel was in fact instigated by the Charterers or their associated companies. I can only say that no Court or arbitral tribunal applying English law would be likely to accept the Owners' assertions unless concrete evidence were

9

produced which established that, on the balance of probabilities, the Charterers had in fact acted as alleged.

37. It also seems to me that there is an inherent improbability in the case being advanced by the Owners. Under the terms of the Charterparty, the Charterers are liable to pay to the Owners daily hire in the sum of US$38,000 for so long as the Charterparty continues. In such circumstances, it appears inherently unlikely that the Charterers would seek to deliberately *prolong* the Charterparty by acting to prevent the Vessel from leaving St Petersburg. The arbitral tribunal will no doubt be strongly influenced by this point when it comes to consider whether the Owners have established that the Charterers procured or persuaded PSC to prevent the Vessel from sailing.

38. As for the Charterers' references to claims in tort, I consider that, given the way in which the Owners' allegations have been advanced, three separate causes of action are potentially relevant. These are (i) inducing a breach of contract; (ii) causing loss by unlawful means and (iii) conspiracy. Before examining those causes of action in more detail, I should say that I have not seen any detailed articulation of the legal claims advanced by the Owners in this case. The Complaint which has been filed before the New York Court employs the terminology of "wrongful interference" but does not provide any further details of the actual causes of action being relied upon (aside from breach of the Charterparty). What follows below are therefore my views in relation to the Owners' case insofar as I am able to understand it from the relatively brief details provided thus far.

39. The law in relation to the so-called "economic torts" of inducing a breach of contract and causing loss by unlawful means has recently been considered by the House of Lords in **OBG Ltd v. Allan** [2008] 1 AC 1 (**AC1 tab 12**). Three conjoined appeals were under consideration and the issues involved were complex. For present purposes, all that is necessary is to explain the essential elements of the relevant causes of action under English law. The burden of proof in establishing that those elements are in fact satisfied rests in each case with the claimant, i.e. the Owners in this case.

40. Inducing a breach of contract is a tort whereby the defendant is alleged to have done some act which has the effect of procuring a breach of contract between the claimant and the third party. It is an essential element of the tort that the relevant act is done by the defendant with the *intention* of procuring the breach of contract. The requirements of intention are explored in the speech of Lord Hoffmann at paragraphs 39-44 of his judgment. If the claimant is able to prove the constituent elements of the tort, then damages may be awarded to compensate the claimant for the loss suffered as a result of the breaches of contract which have been induced.

41. When such a cause of action is advanced, the usual complaint by a claimant is that the defendant has intentionally caused a third party to breach his contract with the claimant. It is difficult to apply such an analysis here since the Owners do not say, as I understand it, that the Charterers have somehow induced Britannia to break its contract with the Owners. Rather, on the facts, the case actually advanced seems to be that the effect of the alleged breaches of the Charterparty by the Charterers had the knock-on effect of causing the Owners to breach the Britannia Charter. That is essentially an allegation of breach of contract not of the tort of inducing a breach of contract.

42. I am therefore of the view that the tort of inducing a breach of contract is not relevant to the case being advanced by the Owners.

43. As for the tort of causing loss by unlawful means, the ambit of this tort has been greatly restricted by *OBG Ltd v. Allan*. It applies where a defendant can be shown to have acted so as to interfere with the freedom of a third party to deal with the claimant. It is essential for the claimant to prove (i) that the defendant intended to cause loss to the claimant and (ii) the defendant's acts were unlawful as against the third party and would have been actionable at the suit of the third party.

44. Again, such tort is unsustainable on the present facts. The Owners do not appear to be alleging that the Charterers have unlawfully interfered with the ability of Britannia to deal with the Owners in a manner which would be actionable by Britannia. As I have described above, the claim actually advanced is that the Charterers' breaches of the

Charterparty have resulted in a situation where the Owners have found themselves exposed to the cancellation of the Britannia charter at the option of Britannia.

45. The tort of conspiracy is traditionally divided into two categories, 'conspiracy to use unlawful means' and 'conspiracy to injure', see **Lonrho plc v. Fayed** [1992] 1 AC 448 **(AC1 tab 13)**. The first type requires that the conspirators use unlawful means to injure the claimant whereas the second type is intended to encompass a situation where the acts done by the conspirators are in themselves lawful but are done with a deliberate intention to damage the claimant. As with the causes of action described above, damages are awarded on compensatory principles.

46. A case in conspiracy is plainly highly fact-sensitive and in this case, whether the case is made out will depend on the detailed findings of fact made by the arbitral tribunal. I would however observe that even in the 'unlawful means' version of the tort, an intention to injure the claimant must be proven[1] (**Lonrho v. Fayed**). It is not sufficient for either form of conspiracy that the defendant's actions (whether unlawful or not) merely have the *effect* of causing loss to the claimant. In order for liability to be established, it would therefore be necessary for Owners to establish either:

    (1) That the Charterers and their associated companies had combined to use unlawful means with the intention of causing injury to the Owners (albeit that such intention was not necessarily their "predominant purpose"), or

    (2) That the Charterers and their associated companies had combined to act with the predominant purpose of injuring and causing loss to the Owners.

47. By way of postscript I should add that if the Owners are able to establish the commission of a breach of contract or tort then, under English law, damages would be recoverable on the basis of their lost *profit* and not their lost *revenue*. This is a matter of basic principle and reflects the compensatory aim of an award of damages under English law. In the context of a late redelivery under a time charter therefore the amount of damages payable

---

[1] Albeit that such intention need not be the defendant's "predominant purpose" as with the second form of conspiracy.

12

must take into account the costs of performance of the lost fixture and any additional hire received under the original charter as a result of its prolonged duration.

**I declare under penalty of perjury and the laws of the United States of America that the foregoing is true and correct.**

**Executed this 26th day of February 2008, London, England.**

Signed:   ......................................

**Appendix 1**

**Sir Anthony Colman**

**Judicial Career**

Judge of the Commercial Court, in the High Court, London from 1992 to 2007, specialising in commercial litigation of all kinds, including in particular

(i) international oil and gas industry disputes,

(ii) international sole agency, sole distributorship and joint-venture disputes,

(iii) primary insurance and reinsurance disputes, including marine and aircraft insurance,

(iv) international banking and credit disputes,

(v) commercial fraud,

(vi) cases involving issues of American Law

(vii) carriage of goods by sea

and hearing innumerable cases on arbitration law and practice, including the applicability of the New York Convention eg. Westacre Investments v. Jugoimport SDPR Holding Co Ltd [1999] QB 740 and A v. B [2007] All ER (Comm) p.571

Judge in Charge of the Commercial Court (1996-7)
Report of the Re-Opened Investigation into the Loss of MV Derbyshire 2000
Special Adviser to the Ministry of Justice of the Czech Republic on civil procedure (2000-2001), Consultant to the European Commission on Czech Republic's accession to the EU (2002) and on Slovakia's accession to the EU (2003).
Co-founder and member of the management committee of the European Commercial Judges Forum (2002-2007).
Honorary President of the Italian Society for Mediation (2002-present).
Award by the Czech Republic (Gratias Agit Award) for services to Czech judicial reform and judicial education (2006).
Principal of the Faculty of Mediation and Vice President of the Academy of Experts, London, (2002-present).

**Publications and Lectures**

1

Author and co-editor of The Practice and Procedure of the Commercial Court (LLP); General Editor and contributor to the Encyclopedia of International Commercial Litigation (Kluwer Law).

Numerous lectures and talks throughout the World on inter alia:
- (i) the conduct of commercial courts,
- (ii) the use of mediation in commercial litigation and arbitration,
- (iii) international arbitration: court supervisory jurisdiction,
- (iv) case management in commercial litigation,
- (v) the New York Convention.

Report to the UK and Czech Republic Governments on the state of Commercial Litigation in the Czech Republic and the need for change in Czech Procedural Law 2000.

### Education

Educated Harrogate Grammar School and Trinity Hall, Cambridge, scholar and Double First in Law Tripos.

### Career at the English Bar

Practised as a barrister of Gray's Inn at the Commercial Bar 1962-1992, specialising in primary insurance and reinsurance including marine insurance, maritime disputes, banking and international trade and distributorship agreements, ICC and ICSID arbitrations, including acting as ICC, LCIA and ICSID arbitrator. Until 1993 Fellow of the Chartered Institute of Arbitrators.

Appointed Queen's Counsel 1977, Master of the Bench of Gray's Inn, (1986-present), Chairman of the Commercial Bar Association (COMBAR) 1991-2

2

## **Appendix 2**

Documents provided by Barlow, Lyde & Gilbert.

1. Charterparty recap dated 10 October 2007 between Sixteen Thirteen Marine SA and Congentra AG.

2. Bills of lading issued in respect of holds 2 and 4.

3. Master's comments on the Statement of Facts.

4. Statement of Facts issued by the Charterers and the cargo receivers.

5. Maritime attachment and garnishment of the US District Court, Southern District of New York against Congentra AG.

6. Verified Complaint.

7. Documents obtained from Port State Control, St Petersburg.

8. Charterparty recap between Sixteen Thirteen Marine SA and Britannia Bulk Plc dated 20 December 2007.

9. Documents obtained from H B J Gateley Wareing LLP, the solicitors acting for Britannia Bulk Plc.

10. Correspondence with Law Office of John Krzywkowski and the London arbitral tribunal.