UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
SIXTEEN THIRTEEN MARINE S.A.,                    08 CV 1318 (HB)

                                    Plaintiff,    **ECF CASE**

-against-

CONGENTRA AG,

                                    Defendant.
-------------------------------------------------------------------x

### Declaration of Edward Eurof Lloyd-Lewis

I, EDWARD EUROF LLOYD-LEWIS BEING DULY SWORN, DEPOSE AND SAY:

1.       I am a solicitor of the Supreme Court of England and Wales and am
         employed as an Associate by Barlow Lyde & Gilbert LLP of Beaufort House
         15 St Botolph Street, LONDON, EC3A 7NJ, United Kingdom. I was admitted
         as a solicitor in December 1993. I have the conduct of this matter subject to
         the supervision of Richard Black, a partner.

2.       I am authorised by Congentra AG, the Defendant Charterers, to make this
         declaration on their behalf in response to the Amended Verified Complaint
         made by Michael E Unger of Freehill Hogan & Mahar LLP in support of the
         Plaintiff's application for relief pursuant to Rule B of the Supplemental Rules
         of Certain Admiralty and Maritime Claims.

3.       Where I have direct knowledge of the matters referred to in this Declaration
         they are true. Otherwise I set out the source of my information and belief.

4.       There is now produced and shown to me paginated bundles of true copy
         documents marked "EEL-L1", "EEL-L2" and "EEL-L3". Where numbers
         appear in square brackets during the course of this declaration they are
         references to page numbers in the bundle.

### BACKGROUND

5.       On 10 October 2007 Congentra AG ("Congentra") entered into a straight time
         trip charter of the MV NICHOLAS M ("the Vessel") via the River Plate,

Argentina to St Petersburg, Russia with the Plaintiff, Sixteen Thirteen Maritime SA ("the Owners") of Monrovia, Liberia ("the Charter") [pgs. 1 to 37]. Contrary to Mr Unger's assertion that the Plaintiff is a disponent Owner they are in fact the Head Owner [ pg 4].

6.     The duration of the Charter was stated to be about 60 days "without guarantee".

7.     Hire was stated to be US$38,000 per day payable every 15 days in advance plus gross ballast bonus of US$575,000.

8.     The Vessel was delivered at 13:00 hours on 11 October 2007 on dropping outward pilot Porto Alegre, Brazil.   The estimated redelivery date at the commencement of the charter was therefore on or around 10 December 2007.

9.     After encountering some delays on the approach voyage the Vessel arrived in San Lorenzo on 18 October, tendered NOR and loading commenced [pgs. 50 to 53]. However loading was interrupted between 21 and 27 October because the starboard windlass motor was burnt.  Accordingly, the Vessel was offhire for this period and was further delayed by losing its turn at the terminal. Loading being only completed on 30 October 2007.  This delay in loading, attributable entirely to Owners, had the effect of prolonging the charter and advancing the estimated re-delivery date.

10.    The Vessel loaded in total 30,204 mt of Argentine origin Hipro Soyabean Meal ("the Cargo").  Subsequently, bills of lading were issued naming OOO Euroweg Zerno as consignee.  Upon completion of loading the Vessel sailed for St Petersburg, Russia and arrived on 1 December 2007.

11.    Upon arrival Sea Protest was declared by the Master with regard to the weather the Vessel had encountered during the voyage especially during the period 24 to 26 November  2007.  The Master alleging that the Vessel had encountered weather of Beaufort Wind Scale 8 to 9 [pg 54].

12.    On 1 December 2007 Anteks, who had been appointed by Charterers and Owners as the Vessel's agent and the consignee's forwarder reported to Charterers and the consignee that a visual examination of hold no.4 had

revealed that the Cargo had been wet damaged. Upon receipt of this information Congentra immediately notified Owners via the broker Billmar Chartering   and AXA Corporate Solutions, the cargo underwriters. Subsequently, on 15 December wet damaged cargo was also discovered in hold no. 2 (hereafter referred to as "the Cargo Claim").

### CLAIM FOR SECURITY

13.    Following the discovery of the damaged cargo Barlow Lyde & Gilbert LLP ("BLG") was instructed by Congentra AG, OOO Euroweg Zerno and AXA Corporate Solutions (hereinafter referred to as "Cargo Interests") to;

    a)    Protect their interests; and

    b)    Negotiate security for the Cargo Claim.

14.    On 6 December 2007 BLG wrote to the Owners and managers of the Vessel, Chian Spirit Maritime Enterprises Inc. informing them that we had been instructed to act for Cargo Interests, that SGS would be appointed by Cargo Interests to take samples and supervise segregation of damaged cargo. We also asked for security for the Cargo Claim [pgs 55 to 56].

15.    The Owners and their managers did not reply to our correspondence. Accordingly, on 11 December 2007, BLG wrote directly to the American P and I Club ("Owners' Club") who had the Vessel's entry [pgs 59 to 60]

16.    During our negotiations with Owners' Club they asserted that the damage had been caused pre-shipment but that the quantity was no more than 5 mt. We also encountered a reluctance on their part to give a legally binding undertaking to provide security to Cargo Interests. Owners' Club suggesting that we should wait until discharge had been completed before they would negotiate security. In the absence of a legally binding agreement this offered no security to Cargo Interests and was unacceptable. Ultimately, it became necessary to instruct a firm of Russian lawyers to write to Owners' Club to put them on notice that they had been instructed to obtain security for the claim and would, if necessary, arrest the Vessel.

17.    Following the intervention of Cargo Interests' Russian lawyers security for the Cargo Claim was negotiated by 24 December in the sum of US$322,271 plus

interest and costs. Security was provided in the form of a Club letter of undertaking in favour of Euroweg Zerno and Cargo underwriters [pgs 62 to 63].

## DISCHARGE OF DAMAGED CARGO

18.    On 15 December 2007 trucks arrived at the Vessel to take the damaged cargo away for destruction as prescribed by the Russian authorities.

19.    However, when SGS's inspector boarded the Vessel at about 11.00 hours the Master refused to grant him access to hold no. 4. The Master also refused access to hold no. 2 when later that day wet damaged cargo was also discovered in this hold.

20.    As a consequence of Owners' obstructive attitude towards Cargo Interests' surveyors, BLG was instructed to demand an undertaking in terms that they would permit Cargo Interests' surveyors access to the Vessel's holds to supervise segregation and to take samples failing which an application would be made to the English High Court for relief [pgs 61A to 61B].

21.    Eventually, after lengthy negotiations between this firm and Owners' Club, Owners relented and permitted access to hold nos. 2 and 4 but not until the evening of 18 December 2007.

## BRITANNIA BULK CHARTER

22.    From the recap provided by Owners' Greek based solicitor I understand Owners' fixed the next charter for the vessel on 20 December 2007. I note however that although the Vessel was fixed with a laycan of 23 to 31 December 2007 the recap states that Owners did not anticipate redelivery of the Vessel from its current fixture, i.e. the Congentra Charter, until 27 December 2007 [pgs 38 to 49].

## THE ULTRASONIC TEST

23.    The idea for the ultrasonic test originated from Cargo Underwriters' local surveyor, Alexy Zagumennyy of Marinex-ILCS. He had asked the Master for permission to conduct an ultrasonic test on hold nos. 2 and 4 but, the Master

refused permission to conduct such a test on the basis that he was unable to contact the Owners and/or their managers because of the Christmas and New Year holidays and he was unwilling to accept responsibility for making such a decision. I understand that such a test is used to determine whether a hatch cover is watertight. The test can only be conducted when the holds are empty and as discharge was coming to an end this was obviously the appropriate time at which to conduct the test. A hose test on the hatch covers was not a practical option as the temperature in St. Petersburg at the time was below freezing.

24.    I informed Congentra and Euroweg Zerno of this. They said that they also wanted SGS to be permitted to conduct such a test. As a consequence, BLG sent an e-mail to Owners' Club on 28 December to request permission for Marinex and SGS to conduct this test [pg 64].

25.    I also telephoned Owners' Club and spoke with Ms Dorothea Ioannou, a colleague of Ms Liouta, with whom I had negotiated the Club Letter of Undertaking, who was away from the office on holiday.

26.    No response was forthcoming to our email and when I spoke again with Ms Ioannou later again in the day she informed me that that she was unable to obtain instructions from their member. In the meantime, Congentra and Euroweg Zerno had received a message from the Master to say that he had no instructions from the Vessel's Owners or managers to permit the test. In addition, he referred to clause 67 of the Charter which provided that charterers had the option to conduct a hose or ultrasonic test on the Vessel's hatch covers at the load port [pg 65].

27.    Later that day, the Master wrote to Congentra to complain about the presence of an SGS inspector who had arrived at the Vessel in order to carry out the ultrasonic test in anticipation of Owners' agreeing to permit the inspection. The Master also went on to say that following completion of discharge earlier that evening, the Vessel was currently awaiting for an improvement in weather conditions so that the pilot could shift the Vessel to the anchorage and then be dropped off safely. The Vessel's agent's would revert once a pilot became available and allowed to sail. The Master's message made no mention of the

appeared that the Master had acted negligently in not conducting a sounding of the bunkering Vessel's tanks prior to and after bunkering.

29. On 29 December 00:29 hours local time Congentra gave instructions to the Master to proceed for re-delivery DLOSP St Petersburg and to give re-delivery notice as per the Charter [pg 67].

30. On 29 December 2007, Owners' Club responded by email with a blanket denial and inexplicably sought to attack BLG's handling of the dispute [pg 69].

31. Later that day I learned that the Vessel had been detained for various deficiencies by Port State Control.

32. Accordingly I wrote to Owners' Club to say *inter alia* that we had learned that Class had withdrawn the Vessel's certificates and that Port State Control had detained the Vessel because of a number of deficiencies. These were clearly very serious matters which required urgent rectification. The Vessel remaining in St Petersburg served none of the parties' interests. Accordingly, Congentra reserved all their rights in this regard and placed the Vessel off-hire until re-delivery could take place in accordance with the terms of the charter. Furthermore, Congentra would claim any additional costs and expenses incurred, e.g., berth fees, as a consequence of the delay in departure. With regard to the ultrasonic test in hold nos. 2 and 4 as it appeared that the Vessel could not sail until certain works had been carried out, we repeated Cargo Interests' earlier demand to be permitted to conduct such test before it sailed. If the Club wanted to have a surveyor or member of the crew present at the same time, Cargo Interests had no objection. We were of the view that this request was entirely reasonable in the circumstances. We asked that they consult with their member on this issue as a matter of urgency [pgs 70 to 71].

33. No response was forthcoming to my email of 29 December.

34. Accordingly, on 2 January my colleague, Andrew Speake contacted Victoria Liouta by telephone. She said that she would take instructions but she did not think that the test was necessary. We confirmed our request by email [pg 72].

We wrote again to Owners' Club at 15:32[1] hours to say that unless Owners confirmed by 09:30 hours UK time 3 January that they were prepared to consent to the test we intended to apply to the English High Court for an order [pg 73]. Later that day we at last received a response from Victoria Liouta who said that the ultrasonic testing was destructive in nature and on this basis they would not consent [pg 74].

35.     At 20:32 hours on 2 January 2008 we wrote to Owners' Club (the message was copied to the Vessel's managers and their solicitors) to inform them that Congentra was holding their member in repudiatory breach of the charter as a consequence of the Vessel's class certificate being withdrawn [pg 75].

36.     On 3 January 2008 at 10:53 hours we wrote to Owners' Club to say that they were incorrect that the ultrasonic testing was destructive [pg 76]. The test was to check on the integrity of the hatchcovers for water tightness. The test involved dropping a receiver into the Cargo hold and checking each hatchcover with an electronic receiver to measure its water tight integrity. No paint would be removed nor would any contact be made with the hold and the test is entirely non-destructive. Furthermore the test would take between half an hour and one hour.

37.     Later that day we received an email from the Club to say that their member would not consent to the ultrasonic testing. Owners' Club alleged that our clients were engaged in a fishing expedition for evidence but made no mention of an allegation that they were deliberately seeking to delay the Vessel [pg 77].

38.     Ultimately however, no application was made to the English High Court.

39.     On 4 January 2008 we wrote again to Owners' Club to express our clients' disappointment at Owners' continued refusal to allow ultrasonic testing of the hatch covers [pg 79].

40.     On 8 January 2008 we received an email from Owners, Greek based solicitor, The Law Office of John Krzywkowski demanding security for an unquantified and unspecified claim under the charter [pgs 80 to 81].

---

[1] Unless otherwise stated all timings are references to UK time.

41.    We replied on 10 January to ask *inter alia* that they confirm the amount and alleged basis of their client's claim. We also asked that they confirm that their clients would provide security under the charterparty for Congentra's claims [pg 82 to 83].

42.    No response was forthcoming.

43.    The first we learned that Owners were commencing arbitration proceedings against Congentra was an email on 7 February 2008 from The Law Office of John Krzywkowski informing us of the appointment of Mr Kazantzis as their client's arbitrator and inviting Congentra to appoint their arbitrator in accordance with the terms of the charterparty [pg 84 to 85].    Congentra appointed Mr Christopher Moss as its arbitrator on 11 February 2008 [pg 86].

**I declare under penalty of perjury and the laws of the United States of America that the foregoing is true and correct.**

**Executed this 4th day of March 2008, London, UNITED KINGDOM.**

Signed:

# EXHIBIT EEL-1

**Freight**

От:                                    Operations Congentra [operations@congentra.com]
Отправлено:                            10 октября 2007 г. 15:11
Кому:                                  Billmar Chartering Ltd
Тема:                                  RE: LgINT Message {REF:077332700}


OK Confirm


-----Original Message-----
From: Billmar Chartering Ltd [mailto:chartering@billmar.gr]
Sent: Wednesday, October 10, 2007 3:15 PM
To: Operations Congentra
Subject: LgINT Message {REF:077332700}
Importance: High

TELIX MSG: 73327-00 10/10/07 14:14

BILLMAR CHARTERING LTD
TEL:+30210 4282290
FAX:+30210 4282294
E-MAIL: chartering@billmar.gr


PAVEL/ZACHOS

RE : MV NICHOLAS M ~ CONGENTRA

Further to our phone conversation herebalow recap of fixture as per our correspondence
notes

Pls go through and confirm same and pls lift subs in time

--- recap    ---


--- vsl's full t/c description ---

01) NAME: M.V "NICHOLAS M."

02) EX NAMES INCLUDING DATE LAST NAME CHANGE: "MED UNITY" (2003)
    "LAURA G" (1998) - "FORUM PRODUCT" (1992) - "RAFAELA" (1991).

03) TYPE OF VESSEL: BULK CARRIER

04) ENGINE AND BRIDGE SITUATED: AFT

05) DWAT AND DRAFT SUMMER/WINTER/FRESH/TROPICAL/TROPICAL FRESH:
    SUMMER DEADWEIGHT     39,498 METRIC TONS ON 11.169 METRES
    WINTER DEADWEIGHT     38,402 METRIC TONS ON 10.937 METRES
    TROPICAL DEADWEIGHT   40,608 METRIC TONS ON 11.401 METRES

06) DWAT ON 17/18/19/20/32/32.5/33/33.5 FEET FRESH WATER
    FEET      METRES      FRESHWATER DEADWEIGHT
    17.0      5.18        11,462
    18.0      5.48        12,766
    19.0      5.79        14,115
    20.0      6.10        15,468
    32.0      9.75        31,731
    32.5      9.90        32,417
    33.0      10.06       33,151
    33.5      10.21       33,840

                              1

07) TPC 48 AT SUMMER DRAFT

08) LOA/LBP/EXTREME BEAM/DEPTH MOULDED: 200.90/191.00/27.20/15.20  METRES.

09) CONSTANTS EXCLUDING FRESHWATER:  250 METRIC TONS

10) FRESHWATER CAPACITY: 305 METRIC TONS

11) IF FITTED WITH EVAPORATOR/DAILY PRODUCTION: 10 METRIC TONS / 24  HOURS

12) NUMBER HOLDS/HATCHES: 7/7

13) HATCH TYPE AND SIZES: STEEL HATCH COVER FOLDING TYPE (MACGREGOR)

```
NO.1    9.8 X 12.64 METRES
NO.2   17.6 X 12.64 METRES
NO.3    9.6 X 12.64 METRES
NO.4   17.6 X 12.64 METRES
NO.5    9.6 X 12.64 METRES
NO.6   17.6 X 12.64 METRES
NO.7    9.6 X 12.64 METRES
```

14) HOLDS LENGTHS: NO.1 16.80/ NO.2 26.50/ NO.3 16.80/ NO.4 26.40/ NO.5  16.80/
                   NO.6 26.40/ NO.7 16.00

15) TANK TOP DIMENSIONS:

```
NO.1   HOLD   16.60 X 17.00
NO.2   HOLD   26.50 X 19.20
NO.3+5 HOLDS  16.80 X 19.20
NO.4+6 HOLDS  26.40 X 19.20
NO.7   HOLD   16.00 X 18.50
(LENGTH AT CENTRE LINE - BREADTH AT HALF OF LENGTH)
```

16) MAXIMUM UNIFORM LOADS TANK TOPS/WEATHER DECK/WEATHER DECK  HATCHES;

```
NO.1     HOLD       18.50 METRIC TONS/SQUARE METRE
NO.2-4-6 HOLDS      15    METRIC TONS/SQUARE METRE
NO.3-5-7 HOLDS      23.5  METRIC TONS/SQUARE METRE
MAIN DECK           3.4   METRIC TONS/SQUARE METRE
HATCH COVER         1.75  METRIC TONS/SQUARE METRE
```

17) CUBIC CAPACITY IN MAIN HOLDS - GRAIN/BALE:
    GRAIN  47,199 CUBIC METRES
    BALE   43,423 CUBIC METRES

18) CUBIC BREAKDOWN PER HOLD - GRAIN/BALE IN CUBIC METRES:

|      | GRAIN   | BALE   |
|------|---------|--------|
| NO.1 | 4,946   | 4,550  |
| NO.2 | 9,638   | 7,947  |
| NO.3 | 5,488   | 5,049  |
| NO.4 | 8,689   | 7,994  |
| NO.5 | 5,488   | 5,049  |
| NO.6 | 8,694   | 7,998  |
| NO.7 | 5,256   | 4,836  |

19) ANY PILLARS/CENTRE LINE BULK HARDS/OBSTRUCTIONS IN HOLDS: NO

20) TYPE OF VENTILATION CARGO HOLDS   : NATURAL VENTILATION

21) IF BUILT WITH TOP SIDE TANKS      : YES

22) IF BUILT WITH HOPPER TANKS        : YES

2

23) TANK TOP SURFACE                      : FLAT

24) IF SUITABLE FOR GRAB DISCHARGE        : YES

25) DISTANCE FROM SHIP'S RAIL TO HATCH COAMING: CLEAR DISTANCE 5.50
    METRES

26) DISTANCE WATER LINE/HATCH COAMING FULL BALLAST/LIGHT/FULLY LADEN:

    FULL  BALLAST  =  8.65 METRES
    LIGHT BALLAST  = 11.45 METRES
    FULLY LOADED   =  5.70 METRES

27) AIR DRAFT LIGHT/BALLAST/FULLY LADEN: 41.50/ 39.10/ 36.14 METRES

28) DISTANCE KEEL TO TOP OF RADAR MAST: 47.30 METRES

29) CARGO GEAR                            : GEARLESS

30) CARGO GEAR OUTREACH                   : N/A

31) CARGO GEAR DISTRIBUTION AND HOLDS SERVING  : N/A

32) IF FULLY GRAIN FITTED                 : YES

33) IF SELFTRIMMER                        : YES

34) CO2 FITTED                            : NO

35) GRAB FITTED/TYPE AND CAPACITY/HOW OPERATED : N/A

36) AUSTRALIAN HOLD LADDERS FITTED        : YES

37) IF PANAMA CANAL FITTED                : YES

38) SPEED AND CONSUMPTION                 :

ABOUT 12.5 KNOTS ON ABOUT 26 MTS (BALLAST)/ABOUT 12.0 KNOTS ON ABOUT 28  MTS
(LADDEN) INTERMEDIATE FUEL OIL 180 CENTISTOKES RME 25 ISO DIS 8217

PLUS

ABOUT 2.5 MTS (AT SEA)/2.0 MTS (AT PORT/WHEN IDLE) MARINE DIESEL OIL  DMB ISO 8217.

Speed and consumption warrantees are given in good weather conditions  only and no
adverse currents.

ithin the context of this charterparty,good weather conditions are  understood to mean
inds up to and including Beaufort force 4 and/or Douglas Sea  state 3.

About is understood to mean 0.5knot downwards in the speed and 5pct  upwards in the
consumption.

For performance evaluation purposes, the overall performance of the  vessel is to be
reviewed on all laden and ballast passages during the currency of  the charterparty.
Weather periods in excess to Beaufort 4 and or Douglas  Sea state 3, are to be expressly
excluded from calculations.

Owners liberty vessel to burn diesel oil when manoeuvring/approaching  and leaving
ports/navigating in canals/rivers or congested/confined/shallow  waters or in cold
weather for boiler/heating.

39) NO SUITABLE FOR ALTERNATIVE LOADING IN ACCORDANCE WITH SOLAS  CHAPTER XII,REGULATION
14 WITH EFFECT FROM 01st JULY 2006

3

40) ENGINE TYPE AND BHP/RPM: B&W 13100 BHP/128 RPM

41) NUMBER OF GENERATORS, TYPE AND BHP/RPM:
   - MAN MEP-MAN G6V 23.5/33PL (2 SETS) S/N 6017-6022
   - BAUD W - HOLEBY DIESEL MODEL 5T23LH-2 (1SET) SN 164801
   - 780 BHP EACH / 600 RPM EACH

42) BUNKER CAPACITIES: INTERMEDIATE FUEL OIL: 2,617 METRIC TONS   (100%)/MARINE DIESEL OIL: 316 METRIC TONS (100%)

43) YEAR AND MONTH BUILT AND WHERE BUILT: MARCH 12, 1980/ BRASIL

44) FLAG : ST. VINCENT & THE GRENADINES

45) PORT OF REGISTRY                         : KINGSTOWN

46) REGISTERED NUMBER                        : 9152

47) LLOYDS NUMBER                            : N/A

48) IMO NUMBER                               : 7433452

49) INTERNATIONAL/ SUEZ/ PANAMA GRT/NRT OR GT/NT:

INTERNATIONAL : 22,912 / 12,300
SUEZ          : 21,341 / 19,040
PANAMA        :        / 19,090

50) CLASS SOCIETY: BUREAU VERITAS

51) CLASS RATING:  I 3/3 E BULK CARRIER ESP DEEP SEA

52) LAST DRYDOCK: MAY, 2005

53) LAST SPECIAL SURVEY: MAY, 2005

54) CALL SIGN: J B B 2 6 8 0 (JBB2680)

55) TELEX SYSTEM/NUMBER: INMARSAT-C / 437738810-1

56) FASCIMILE NUMBER: 763662742

57) P & I CLUB ENTERED WITH: THE AMERICAN P+I CLUB

58) H & M VALUE: U.S. $ 6,250,000 (SIX MILLION TWO HUNDRED AND FIFTY  THOUSAND DOLLARS) PLUS $ 1,250,000 IV (ONE MILLION TWO HUNDRED AND FIFTY  THOUSAND DOLLARS). INSURERS: LLOYD'S UNDERWRITERS "BRIT SYNDICATE" (AS  LEADERS).

59) REGISTERED OWNERS FULL STYLE AND FULL ADDRESS: SIXTEEN THIRTEEN  MARINE
                                         S.A., MONROVIA,  LIBERIA.

60) MANAGER'S NAME, ADRESS / COMMUNICATION DETAILS/ M.I.C.

    CHIAN SPIRIT MARITIME ENTERPRISES INC.

    10 ANT. AMPATIELOU,
    GR-18536 PIRAEUS,
    GREECE.
    TELEPHONE: +30 210 429 4777
    FASCIMILE: +30 210 459 9099
    E-MAIL : operations@chianspirit.gr

All details are given in good faith as "about" wog

--- end of vsl's t/c description ---

4

- - -

- CHARTS GNTEE THAT THE FIXTURE WILL BE KEPT STRICTLY P+C AND SHALL NOT  REPORT
  SAME IN ANY FIXTURE REPORT INCL BUT NOT LIMITED BALTIC INDICES AND/OR  TO ANY
  OTHER THIRD PARTY.

- ON ARRIVAL AT 1ST LOADPORT AFTER THE VESSEL'S DELIVERY HOLDS TO BE  READY FOR
  PERMITTED CARGO ORDINARY SERVICE, CLEAN, SWEPT, WASHED DOWN AND  DRIED UP SO
  AS TO RECEIVE CHARTERERS INTENDED CARGO TO THE SATISFACTION OF THE  SHIPPERS'
  SURVEYORS IN THE UNLIKELY EVENT THE VSL NOT BE APPROVED BY THE  SURVEYOR THEN
  THE VESSEL TO BE PLACED OFF HIRE AND ALL RELATED EXPENSES THEREOF  TO BE FOR
  OWNERS ACCOUNT.

  MORE SPECIFICALLY IN CASE OF VESSEL'S FAILURE TO FULLY PASS ABOVE  PRELOADING
  CARGO HOLDS INSPECTION VSL TO BE PLACED OFF HIRE, or pro rata of  hire
  according to the number of holds which failed PROVIDED LOCAL  REGULATION
  PERMIT LOADING OF VESSEL WITH PARTIALLY UNCLEAN HOLDS AND SHIPPERS  HAVE
  DECIDED TO COMMENCE LOADING OF THE ALREADY PASSED HOLDS OTHERWISE  VESSEL TO
  BE FULLY OFF- HIRE FROM REJECTION UNTIL THE VSL PASSES THE SAME
  INSPECTION/TEST AND ANY ACTUALLY TIME LOST/DIRECT EXPENSES INCURRED  HEREBY TO
  BE FOR OWS ACCOUNT.

OWNERS WARRANT FULL:



- VSL IS SELFTRIMMING SINGLE DECK BULKCARRIER (AND WAS ORIGINALLY
  CONSTRUCTED AS A BULKCARRIER) WITH ENGINE/BRIDGE AND ACCOMMODATION  AFT.

- VSL IS SD SELF-TRIMING BC/BRIDGE N ENG ROOM IS AFT

- VSLS T/T IS FLAT AND SUITABLE FOR GRAB DISCHARGING

- VSL DOES NOT HAVE A CENTERLINE BULKHEAD/BEAM OR ANY OTHER  OBSTRUCTIONS

ALSO DURING THE ENTIRE CURRENCY OF C/P

- VSL SHALL NOT CHANGE OWNERSHIP OR CLASS OR FLAG THROUGHOUT THE
  WHOLE T/C PERIOD;

- VSL IS FULLY ISPS CERTIFIED. (ISPS CERTIFICATE TO BE SENT BY OWNERS
  UPON REQUEST)

- OWS GTE TT VSLS H.COVERS ARE TB WATERTIGHT ALL THROUGHOUT THIS  C/PERIOD N IF
  ANY H.COVER FOUND DEFECTIVE, SAME TB RECTIFIED AT OWS TIME N EXPNS  TO CLASS
  SURVEYOR SATISFACTION IN WHICH CASE VSL TO BE PLACED PRO RATA  OFF-HIRE
  ACCORDING TO THE NUMBER OF HATCHES WHICH FOUND DEFECTIVE AND THE  LOADING
  OPERATIONS WERE ACTUALLY PREVENTED.

OWS GTEE VSL IS P&I COVERED WITH THE "AMERICAN P&I CLUB" AND CLASSED  WITH
"B.V, OR IN OWNERS OPTION WITH ANY OTHER MEMBER OF THE INTERNATIONAL  P&I
GROUP OR IACS MEMBER CLASS RESPECTIVELY, AND SHALL REMAIN SO  THROUGHOUT THE
WHOLE T/C PERIOD;

- OWS GTEE VSL IS SD SELF-TRIMING BC/BRIDGE N ENG ROOM IS AFT

- OWS GTEE VSLS T/T IS FLAT AND SUITABLE FOR GRAB DISCHARGING


FOR

1. VESSEL: MV "Nicholas M." (ex- "Med Unity") AS DESCRIBED ABOVE

2. ACCOUNT : "CONGENTRA AG of Zug, Switzerland"

   add...6301 Bahnhofstrasse 12, Zugm Switzerland

ph.nr...+41793079407
email...operations@congentra.com
mic...Lance Ranger

Charterers very brief background as given and guaranteed by them as  true and
accurate:

Congentra for your reference now has under tc m/v Athena and m/v
Rotterdam trader (ex- FOREST PIONEER), Also you can contact Richard  Burger
from Azure for references or BNP Paribas (Suisse) Daniel Ruiz
+41229062253

3. DELIVERY: ON DOP PORTO ALEGRE, BRAZIL ATDNSHINC

4. LAY/CAN : 12:00 HRS LT 10TH OCT 2007 - 24:00HRS LT 13TH OCT 2007

5. ALLOWED TRADING : ONLY 1 STRAIGHT TCT VIA RIVER PLATE, ARGENTINA TO
   ST.PETERSBURG (RUSSIA) AND/OR POLAND, WHICH IS ALLOWED ONLY IN THE  EVENT
   ST.PETERSBURG IS FROZEN, ALWAYS VIA SAFE PORT (S), SAFE BERTH (S),SAFE
   ANCHORAGE (S) ALWAYS AFLOAT (EXCEPT FOR RIVER PLATE ONLY WHEREVER NAABSA
   APPLICABLE AS PER NYPE) ALWAYS WITHIN INSTITUTE WARRANTY LIMITS (CROPT TO BREACE INL
FOR WHICH PLS SEE RELEVANT PROVISION HERE BELOW) AND ALWAYS EXCLUDING WAR OR WARLIKE
ZONES (CONWARTIME 2004 TO APPLY), IN/OUT GEO ROTATION.

   DURATION ABT 60 DAYS WOG

   If during the currency of this c/p discharging area is considered out
   of INL/IWL Charterers shall have the privilege of breaking INL/IWL ,
   Charterers paying any extra Inaurance
premium thereby
   incurred, provided not exeeding london Lloyds scale and bimco ice clause for
   tc parties to apply. This extra insurance to be covered by owners with their
   h&m underwriters and to be reimbursed by the Charterers against presentation
   of relevant supportive invoice prior redelivery with emailed copies always
   acceptable.

6. ALLOWED CARGO: ONLY HARMLESS GRAINS/GRNPRODS/AGRIPRODS IN BULK AND  MORE
   SPECIFICALLY "CORN/SOYABEANMEAL" IN BULK.

   IT IS UNDERSTOOD THAT CHARTERERS MAY LOAD ANY GRAIN/AGRICULTURAL  PRODUCTS,
   PROVIDED THAT CARGO WILL BE LOADED IN STRICT ACCORDANCE WITH  INTERNATIONAL
   IMO REGULATIONS AND TO BE HARMLESS/NON- IMO DANGEROUS CARGO FOR THE
   LOADING,STORAGE AND CARRIAGE OF WHICH THE VESSEL IS NOT REQUIRED TO  BE CO2
   FITTED OR NO APPENDIX B REQUIREMENTS APPLY OR REQUIRED BY CHARTERERS  AND/OR
   SHIPPERS AND/OR CARGO AND/OR VESSELS OR CARGO UNDERWRITERS AND/OR ANY  OTHER
   COMPETENT AUTHORITY. PALM KERNEL EXPELLERS,SUNFLOWER SEED  EXPELLERS,PELLETS
   ALWAYS TO BE EXCLUDED.

   IF MORE THAN ONE GRADES, CGO TO BE NATURALLY SEPARATED BY VSL'S.  HOLDS

7. REDELY : ON DLOSP ST.PETERSBURG, RUSSIA ATDNSHINC.

8. HIRE USD 38,000 DAILY HIRE PLUS USD 575,000 GBB - DAILY HIRE TO  INCLUDE
   OT/FW/LUBES AND TO BE PAYABLE EVERY 15 DAYS IN ADVANCE

   UPON DELY CHARTS TO PAY 15 DAYS HIRE PLUS GBB PLUS FULL VALUE OF  BUNKERS AS
   ON BOARD AT THE DATE OF DELIVERY WITH NO DEDUCTIONS OF ESTIMATED  BUNKERS
   VALUE ON REDELIVERY. ANY SUCH DEDUCTION TO BE MADE FROM THE LAST  SUBSEQUENT
   SUFFICIENT HIRE PAYMENT.

   CHARTERERS NO TO MAKE ANY DEDUCTION IN RESPECT OF OWNERS EXPENSES AT  ANY
   PORT OF CALL DURING THIS CHARTER PARTY OWNERS SETTLING ALL OWNERS'
EXPENSES
   DIRECTLY WITH AGENTS HOWEVER CHARTERERS' AGENTS TO ATTEND VESSEL'S  MINOR
   MATTERS SUCH AS CASH TO MASTER, CHANGES OF PART OF CREW ETC WITHOUT  CHARGING
   AGENCY FES. FOR MAJOR SHIP'S HUSBANDRY MATTERS SUCH AS EMERGENCY  DRYDOCKING

OWNERS TO MAKE THEIR OWN ARRANGEMENT WITH AGENTS. OWNERS TO ALWAYS HAVE THE
RIGHT TO APPOINT THEIR OWN PROTECTING AGENTS AT BOTH ENDS.

9. BUNKERS ON DELY ABT 110 IFO AND ABT 50 MDO AT USD 450PMT AND USD 750
RESPECTIVELY.

BUNKERS ON REDELIVERY ABT SAME QUANTITIES AT SAME PRICES AS ON DELIVERY.

CHARTERERS TO PAY FULL VALUE OF BUNKERS ON DELY AS ON BOARD.

BOTH CHARTERERS AND OWNERS TO HAVE THE PRIVILEGE TO BUNKER THE VESSEL PRIOR
TO DELIVERY/REDELIVERY PROVIDED SAME DOES NOT INTERFERE WITH VESSEL'S
OPERATIONS OR ITINERARY IN WHICH CASE SAME TO BE SUBJECT TO BOTH PARTIES
MUTUAL AGREEMENT

CHARTS TO HAVE THE RIGHT TO DEDUCT FROM THE LAST SUFFICIENT HIRE
PAYMENT(S)
BUT GIVEN THE ANTICIPATED C/P DURATION IN NO CASE FROM THE FIRST 50 DAYS,
THE ESTIMATED VALUE OF BUNKERS ON REDELIVERY

CHARTERERS TO PAY FULL VALUE OF BUNKERS ON DELY AS ON BOARD.

10. ON HIRE/OFF HIRE SURVEYS TO BE CARRIED OUT AT CHARTS TIME AND EXPENSES
OWNERS APPOINTING MASTER TO ATTEND ON THEIR BEHALF.

11. ANY ADD WAR PREMIUM DURING THIS C/P (IF ANY) TO BE FOR CHRS' ACCT AGAINST
FAXED VOUCHERS; MORE SPECIFICALLY CONWARTIME 2004 TO APPLY.

12. ILOCH

CHARTERERS HAVE THE OPTION OF REDELIVERING THE VESSEL WITHOUT CLEANING HOLDS
CHARTERERS PAYING USD 5000 LUMPSUM

13. C/V/E USD 1,250 PER MONTH PRO RATA

14. OWNERS TO ALLOW CHARTERERS TO DISCHARGE CARGO WITHOUT
PRESENTATION OF ORIGINAL BILL(S)/LADING BY PROVIDING WITH LETTER OF
INDEMNITY IN ACCORDANCE WITH OWNERS P N I CLUB FORM AND WORDING
BEFORE DISCHARGING. LETTER OF INDEMNITY TB SIGNED BY CHARTERERS ONLY.

Neither the Charterers nor their agents shall permitt the issue of any
B(s)/L (whether or not signed on behalf of the Owners or on the
charterers behalf of any sub-charterers) incorporating the Hamburg Rules or
any legislation giving effect to the Hamburg Rules or any other legislation
imposing liabilities in excess of Hague-Visby rules. The Charterers shall
indemnify the Owners against any liability, loss or damage which may result
from any breach of the forgoing provision of the clause. No liner Bills or
Way Bills of Lading and no through transhipment or combined transport Bills
of Lading to be issued



15. BIMCO ISM/ISPS/NON-PAYMENT OF HIRE/ ICE-CLAUSE/EVIDENCE OF PERFORMANCE/FUEL
SULPHUR CONTENT/ U.S. SECURITY/U.S.CUSTOMS ADVANCE NOTIFICATION/AMS BIMCO
CLAUSES FOR TIME CHARTER PARTIES CLAUSES TO APPLY

16. FOR THE PURPOSE OF COMPUTING HIRE PAYMENTS, THE TIME FOR
DELIVERY/REDELIVERY SHALL BE ADJUSTED TO G.M.T

17. ANY OFF HIRE DEDUCTION UNDER THIS CHARTER PARTY DUE TO VSLS INEFFICIENCY
ARREST,DETENTION,SEIZURE, MACHINERY BREAKDOWN ETC...BY ANY AUTHORITY AND FOR
ANY REASON TO BE MADE ON THE BASIS OF THE ACTUAL TIME LOST DUE TO THE
VESSELS INEFFICIENCY ARREST, DETENTION, SEIZURE,MACHINERY BREAKDOWN ETC...
AND NOT FOR THE WHOLE PERIOD OF THE SAME.

IT IS HEREBY UNCONDITIONALLY AGREED THAT THIS CLAUSE IS A "NET/ACTUAL

7

TIME LOST CLAUSE"

18. GENERAL AVERAGE IN LONDON ACCORDING TO YORK-ANTWERP RULES 1994 /  ENGLISH LAW
    TO APPLY

19. NO WAY BILLS, NO LINER OUT BS/L, HAGUE-VISBY RULES TO BE  INCORPORATED IN
    ANY B/L ISSUED UNDER THIS C/P.

20. ALL TAXES AND DUES AND CHARGES ON THE VSL AND/OR CARGO AND/OR FRT  AND/OR
    HIRE ARISING OUT OF CARGOES CARRIED OR PORTS VISITED OR COUNTRIES  TRADED
    THROUGH UNDER THIS CHARTER TO BE FOR CHTRS ACCT.

21. COMM 3.75% TTL COMM INCL 1,25% TO BILLMAR CHARTERING

22. SUB ONLY CHARTS RECONFIRMATION TO BE LIFTED LATEST 13:30 GENEVA TIME  TODAY TUE 10TH
    OCT 2007.

23. OTHERWISE AS PER PROFORMA C/P OF M/V "FURIA R." ACC OLDENDORFF DD  18TH MAY
    2006 STRICTLY AND LOGICALLY AMENDED AS PER MAIN TERMS AGREED AS WELL  AS
    BELOW C/P DETAILS/ALTERATIONS;

    IT IS WELL UNDERSTOOD AND AGREED THAT ALL TERMS/CONDITIONS IN ABOVE  MAIN
    TERMS AGREEMENT WILL SUPERSEDE ALL TERMS/CONDITIONS/CLAUSES OF SAME
    MEANING/WORDING OF PROFORMA C/P AND FORM PART OF IT:

MAIN BODY
----------

DELETE LINES AS FROM 1 TILL 19 :   SAME TO BE AMMENDED AS PER MAIN
                                   TERMS AGREED BUT LINES 16/17 TO REMAIN  AS
                                   PRINTED

LINES:45/46/47 :                   DELETE AS NON APPLICABLE

LINE 95 :                          DELETE 'GIVEN WRITTEN NOR' INSERT
'DELIVERED'

LINES 145-150:                     DELETE ALL LINES AS N/A (VSL IS GRLSS)
EXCEPT
                                   IN LINE 150 WHERE THE SENTENCE 'VESSEL  TO
                                   WORK...REQUIRED BY CHARTERERS' TO  REMAIN


RIDER CLAUSES
----------------

CLAUSE 29 :  TO BE TITLED "ALLOWED CARGO" AND TO BE AMENDED AS PER
             PARA "6" OF MAIN TERMS.

CLAUSE 30 :  TO BE TITLED "ALLOWED TRADING" AND TO BE AMENDED AS PER
             PARA "5" OF MAIN TERMS.

CLAUSE 33 :  AMEND PER MAIN TERMS PARA 12, OWISE AS PER C/P EXCEPT 2ND  LINE
             DELETE AS FROM 'INCLUDING, IF PERMITTED'... TILL THE END OF  THE
             CLAUSE

CLAUSE 38 :  3RD LINE DELETE "REMAINS UNDER ARREST OR" OTHERWISE AS
             PER ABOVE PARA 17 OF MAIN TERMS.

CLAUSE 39 :  DELETE FOR 9TH PARAGRAPH I.E. AS FROM " CHARTERERS HAVE
             THE OPTION .... TILL ....OF LINER BILLS OF LADING" INSERT ."
NO
             LINER OUT BILLS OF LADING UNDER THIS CHARTER PARTY"

8

CLAUSE 41 : PARA 1 THRU 7 AMENDED AS PER MAIN TERMS (IE  QTTIES/PRICES/SPECS
            ETC) OWISE TO REMAIN AS PER C/P EXCEPT REPLACE "DRAWN BY  THE
            SUPPLIER" WITH "TAKEN FROM THE VESSEL'S MANIFOLD DURING THE  SUPPLY"

CLAUSE 44 : DELETE AND TO BE AMENDED AS PER ABOVE PARA 8 OF MAIN TERMS.

CLAUSE 49 : 1ST LINE AFTER "SUPERCARGO(ES)" INSERT " UPON REASONABLE  REQUEST
            AND JUSTIFIED REQUEST"

CLAUSE 51 : DELETE AS NON APPLICABLE

CLAUSE 54 : ADD AT THE END "THIS IS A 'NET ACTUAL TIME LOST CLAUSE'
            FOR THE TIME THEREBY ACTUAL LOST AND NOT A PERIOD CLAUSE"

CLAUSE 56 : TO BE DELETED AND TO READ AS PER ABOVE PARA 10 OF MAIN  TERMS.

CLAUSE 58 : DELETE "COURIER" INSERT "E-MAIL IF REQUIRED"

CLAUSE 59 : DELETE WHOLE AS N/A

CLAUSE 60 : ADD "AND SAME TO BE INCORPORATED TO ANY BILLS OF
            LADING ISSUED HEREUNDER"

CLAUSE 62 : REPLACE "WITHIN 3 BANKING DAYS AFTER VESSEL'S" WITH "ON"
            DELETE PARA "CHARTERERS ARE ENTITLED...DISBURSEMENT  DIRECTLY)"

CLAUSE 71 : AS PER C/P EXCEPT
            LINE 1 DELETE 'JAPAN,' INSERT 'RUSSIA OR ARGENTINA'
            DELETE 'DENMARK' INSERT 'FINLAND'
            ADD AT END 'PROVIDED NO CARGO ONBOARD'

CLAUSE 72 : DELETE WHOLE AS N/A

CLAUSE 76 : DELETE WHOLE AS N/A

END

rdgs

9

OD3D2109861981                                p. 1

**Tramp Maritime Inc.**
9,P Mesurados Street, 16625 Pretoria
Tel.+10210413328/Fax (+20)21013355
E-mail: chartering@trampmaritime.gr

## Working Copy

# Time Charter

GOVERNMENT FORM
*Approved by the New York Produce Exchange*
November 6th, 1913 - Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946

1   **This Charter Party,** made and concluded in Hamburg,............................18th, day of May 2006.........19..
2   Between Foitzos Maritime Ltd., Malta...........................................................................................
3   Owners of the good Malta flag ~~Steamship/Motorship~~ " PURIA R "...............................................of.....
4   of........................ ~~the gross register, and........ nett registers, having engines of........ indicated horse power~~
5   ~~and with hull, machinery and equipment in a thoroughly efficient state, and classed~~ for vessel's description see Clause 82
6   at........................of about ........ ~~cubic feet in capacity, and about........~~ tons of 2240 lbs.
7   ~~Gradweight capacity, (cargo and bunkers, including fresh water and stores not exceeding one and one half percent of ship's deadweight capacity~~
8   ~~allowing a minimum of fifty tons) on a Draft of........feet........inches, on........Summer freeboard, inclusive of permanent bunkers~~
9   ~~which are of the custody of about........tons of fuel and capable of steaming, fully laden, and in good weather~~
10  ~~and clean bottom........knots on a consumption of about........tons of best Welsh coal best grade fuel oil - best grade Diesel oil,~~
11  now trading................................................................................................................................
12  ..................................and Oldendorff Carriers GmbH & Co. KG...............Charterers of the City of Lübeck, Germany..........

13  **Witnesseth,** That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for
14  about 1 (one) timecharter trip via India with harmless/lawful cargoes, intention steel products (slabs, coils, pipes etc.), trading
15  always via safe and (setfree port(s)/berth(s)/anchorage(s), always safely afloat, always within International Navigating
    Conditions (01/11/03) and ........................................................within below mentioned trading limits.
    Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remaining responsible for
    the fulfilment of this Charter Party. Acceptance of delivery of the vessel by the Charterers shall not prejudice their rights against
    Owners under this Charter Party.
18  Vessel to be placed at the disposal of the Charterers, at on dropping last outward sea pilot KARACHI/BIN QASIM at any time, day/night,
19  Sundays and holidays included............................................................................
20  ~~in such dock or at such wharf or place (where she may safely lie, always afloat, at all times of tide, except as otherwise provided in clause No. 6), as~~
21  ~~the Charterers may direct. If such dock, wharf or place be not available time to count as provided for in clause No. 5.~~ Vessel on her arrival first loadport
    delivery to be
22  ready to receive any permissible cargo (see Clause 49). On delivery and throughout the charter vessel to be with clean swept holds and
    tight, staunch, strong and in every way fitted for the service, having water ballast, winches cranes and
23  donkey boiler with sufficient steam power, or if not equipped with donkey boiler, then other power sufficient to run all the winches/cranes at one and the same
24  time (and with full complement of officers, seamen, engineers and firemen for a vessel of her tonnage), to be employed, in carrying lawful merchan-
25  dise, including petroleum or its products, in paper maximum excluding - see Clause 29 -
26  ~~(vessel is not to be employed in the carriage of Live Stock, but Charterers are to have the privilege of shipping a small number on deck at their risk,~~
27  ~~all necessary fittings and other requirements to be for account of Charterers),~~ in such lawful trades, between safe port and/or ports and/or safe places in
28  ~~America and/or United States of America and/or West Indies, and/or Central America, and/or Caribbean Sea, and/or Gulf of Mexico, and/or~~
29  ~~Mexico, and/or South America........................................................and/or Europe~~
30  ~~and/or Africa, and/or Asia, and/or Australia, and/or Tasmania, excl. New Zealand, but excluding Magdalena Grass, River St. Lawrence between~~
31  ~~October 31st and May 15th, Hudson Bay and all unsafe ports, also excluding, when out of season, White Sea, Black Sea and the Baltic,~~
    Trading Exclusions: See Clause 30...........................................................................

as the Charterers or their Agents shall direct, on the following conditions:

1.   That the Owners shall provide and pay for all provisions, wages and consular shipping and discharging fees of the Crew **and gangway watchmen;**
     **gangway watchmen** for cargo and all compulsory shore gangway watchmen to be for Charterers' account; compulsory garbage
     removal to be for Charterers' account; shall pay for the
     insurance of the vessel, also for all the cable, deck, engine-room and other necessary stores, including boiler water and maintain her clean and keep
     the vessel in a thoroughly efficient state in hull, cargo spaces, machinery and equipment with all certificates necessary to comply with current
     requirements at ports of call for and during the service.

2.   That whilst on hire the Charterers shall provide and pay for all the fuel except as otherwise agreed, Port Charges, Pilotages, Agencies (except
     agency fee directly related to Owners' matters), Commissions, stevedoring/tugs/river dues/canal dues, taxes/dues/fees/vat on
     cargo/vessel/freight/hire/tug

     Consular Charges (except those pertaining to the Crew), and all other usual expenses except those before stated, but when the vessel puts into
     a port for causes for which vessel and/or her Owners are responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered
     because of
     illness of the crew to be for Owners account. Fumigations ordered because of cargoes carried or ports visited while vessel is employed under this
     charter to be for Charterers account. All other fumigations to be for Charterers account that vessel has been on charter for a continuous period
     of six months or more. Pilotage Grena/Spodsbjerg, Bosporous Strait, Torres Strait and Great Belt to be for Charterers' account.

10

00302109681991    P.2

45  Charterers are to provide necessary dunnage and shifting boards, also any extra fittings requisite for a special trade or unusual cargo, but
46  Owners to allow them the use of any dunnage and shifting boards *and any other fittings already aboard vessel*. Charterers to have the privilege of using
    shifting boards
47  for dunnage, they making good any damage thereto.
48  3. ~~That the Charterers, at the port of delivery, and the Owners, at the port of re-delivery, shall take over and pay for all fuel remaining on~~
49  ~~board the vessel at the current price in the respective ports, the vessel to be delivered with not less than~~
50  *See Clause 41* ~~tons and to be re-delivered with not less than~~ ~~tons and not more than~~
51  ~~tons~~
52  4.  That the Charterers shall pay for the use and hire of the said Vessel at the rate of US$ 15,000.– *(fifteenthousand) per day/pro rata*
    *including overtime, payable every 15 days in advance* ~~United States Currency per ton on vessel's total deadweight carrying capacity including~~
53  ~~bunkers, etc.~~ ~~tons on Summer freeboard, per Calendar Month,~~ commencing from and from the day and *time* of her delivery, as aforesaid, and at
54  and after the same rate for any part of a month *day*; hire to continue until the hour of the day of her re-delivery in like good order and condition, ordinary
55  wear and tear excepted, to the Owners (unless lost) at *on dropping last outward seapilot one safe port BOSTON/TAMPICO range, port in*
56  *Charterers' option (intention US Gulf, New Orleans or Houston), at any time, day/night, Sundays and holidays included* unless
    otherwise mutually agreed. Charterers are to give Owners not less than 15/10 days *approximate* and 8/5/3/1 day(s) *definite*
57  notice of vessels expected date of re-delivery, and probable port.
58  5.  Payment of said hire to be made in *Owners' bank* in New York in cash in United States Currency, ~~semi-monthly~~ *every 15 days in advance*, and
59  for the last half-month 15 days or
60  part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day, as it becomes
61  due, if so required by Owners, unless bank guarantee or deposit is made by the Charterers, otherwise failing the punctual and regular payment of the
    Owners shall be at liberty to withdraw the vessel from the service of the Charterers or bank guarantee or *deposit, or on any fundamental breach of this Charter Party, the*
62  hirers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers. ~~Time to count from 4 a.m. on the working day~~
63  ~~following that on which written notice of readiness has been given to Charterers or their Agents before 4 p.m. but if required by Charterers they~~
64  ~~to have the privilege of using vessel at once, such time used to count as hire. See also Clause 62~~
65  *Cash for vessel's ordinary disbursements at any port may be advanced as required by the Captain, by the Charterers or their Agents, subject*
    to 2 1/2% commission and such advances shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the application
    of such advances.
69  6.  That the cargo or cargoes be laden and/or discharged in any *safe* dock or at any *safe* wharf or *safe* place or *safe* anchorage in port that
70  Charterers or their Agents may
71  direct, provided the vessel can safely lie always afloat at any time of tide, except at such places where it is customary for similar size vessels to safely
    lie aground.
72  7.  That the whole reach of the Vessel's Hold, Decks, and usual places of loading (not more than she can reasonably stow and carry), also
    accommodations for Supercargo *at Charterers' risk and expense*, if carried, shall be at the Charterers' disposal, reserving only proper and sufficient space
73  for Ship's officers, crew,
74  tackle, apparel, furniture, provisions, stores and fuel. Charterers have the privilege of passengers as far as accommodations allow. Charterers
75  paying Owners ~~per day per passenger for the earnings of passengers, Charterers are to bear such risk and expense. However, it is agreed that in case any State room accomodation are~~
76  ~~retained in the accomodations of the earnings of passengers, Charterers are to bear such risk and expense. However, it is agreed that in case any State room accomodation are~~
77  8.  That the Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew and
    boats. *No passengers allowed.*
78  *hose equipment*. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and
    agency; and Charterers are to load, stow, and trim, *secure, lash, unlash, tally, unless tally is required by Owners in which case will be for*
    *Owners' account and discharge the* cargo at their expense under the supervision of the Captain, who is to sign or, *when required by Charterers*
    *authorize the Charterers or their agents to sign* Bills of Lading on his behalf for
79  cargo as presented, strictly to conformity with Mate's or Tally Clerk's receipts.
80  9.  That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on
81  receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments.
82  10.  That the Charterer shall have permission to appoint a Supercargo, who shall accompany the vessel and see that voyages are prosecuted
83  with the utmost despatch. He is to be furnished with free accommodation, and same fare as provided for Captain's table, Charterers paying at the
84  rate of US$ 12.00 ~~2.00~~ per day. Owners to victual Pilots and Customs Officers, and also, when authorized by Charterers or their Agents, to victual Tally
85  Clerks, Stevedore's Foreman, etc., Charterers *to compensate Owners lumpsum US$ 1,250.– per month/pro rata in respect of Charterers'*
    paying at the current rate per ~~month for all such~~ victualling, *communication and representation.*
    11.  That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, and the
87  *ptain shall keep a full and correct Log of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish the Char-*
    ~~wers, their Agents or Supercargo,~~ when required, with a true copy of said *deck and engine* Logs, showing the course of the vessel and distance run and the
    ~~as~~umption of fuel *as well as revolutions of main engine and velocity of and direction of wind and sea.*
90  12.  That the Captain shall use diligence in caring for the ventilation of the cargo. *Vessel has natural ventilation.*
91  13.  ~~That the Charterers shall have the option of continuing this charter for a further period of~~
92
93  ~~on giving written notice thereof to the Owners or their Agents.~~
94  14.  That if required by Charterers, time not to commence before *19th May, 2006 – noon* ~~days previous to the expiration of the first named term, or any declared option~~
15  not have given written notice of readiness on or before *23rd May, 2006 – 24.00 hours* ~~but not later than 4 p.m.~~ Charterers or
6   their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's readiness. *and should vessel*
7   15.  That in the event of the loss of time from deficiency *and/or default and/or strike* of men or *deficiency* of stores, fire, breakdown or damages
    to hull, machinery or equipment, *unless such event has been caused due to stevedores' misshandling,*
    grounding, detention by average accidents to ship or cargo, drydocking for the purpose of examination or painting bottom, or by any other cause
    preventing the full working of the vessel, the payment of hire shall cease for the time thereby lost *unless such deficiency caused by Charterers or by*

00302103881891     P.3

*their* agents or by their servants and all extra directly related, proven and substantiated expenses may be deducted from the hire; and if upon the voyage the speed be reduced by
defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence
thereof, and all extra *directly related, proven and substantiated* expenses shall be deducted from the hire.

16. That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be
returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas,
Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.

The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the
purpose of saving life and property.

17. *See Arbitration Clause 38* ~~That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to three
persons at New York,~~

~~one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them, shall be final, and for
the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be commercial men.~~

18. That the Owners shall have a lien upon all cargoes, and all sub-freights/sub-hires for any amounts due under this Charter, including General Average contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess
deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which
might have priority over the title and interest of the owners in the vessel.

19. That all demurrage and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and
Crew's proportion. General Average shall be adjusted, stated and settled, according to Rules 1 to 15, inclusive, 17 to 22, inclusive, and Rule F of
York-Antwerp Rules *1994 and subsequent revisions at London.* ~~1924, at such port or place in the United States as may be selected by the carrier, and
as to matters not provided for by these Rules, according to the laws and usages at the port of New York. In such adjustment disbursements in foreign currencies shall be exchanged into
United States money at the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement or
the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement or
bond and such additional security, as may be required by the carrier, must be furnished before delivery of the goods. Such cash deposit as the carrier
or his agents may deem sufficient as additional security for the contribution of the goods and for any salvage and special charges thereon, shall, if
required, be made by the goods, shippers, consignees or owner of the goods to the carrier before delivery. Such deposit shall, at the option of the
carrier, be payable in United States money and be remitted to the adjuster. When so remitted the deposit shall be held in a special account at the
place of adjustment in the name of the adjuster pending settlement of the General Average and refunds or credit balances, if any, shall be paid in
United States money.~~ *Charter hire not to contribute to General Average.*

~~20. In the event of accident, danger, damage or disaster, before or after commencement of the voyage resulting from any cause whatsoever,
whether due to negligence or not, for which, or for the consequences of which, the carrier is not responsible, by statute, contract or otherwise, the
goods, the shipper and the consignee, jointly and severally, shall contribute with the carrier in general average to the payment of any sacrifices,
losses or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the
goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully and in the same manner as if such salving ship or
ships belonged to strangers.~~

~~Provisions as to General Average in accordance with the above are to be included in all bills of lading issued hereunder.~~

20. Fuel used by the vessel while off hire, also in seeking anchorage under, or for grain and sleep to be included in all bills of lading hereunder
cost of replacing same, to be allowed by Owners.

21. That as the vessel may be from time to time employed in tropical waters during the term of this Charter, Vessel is to be docked at a
convenient place, bottom cleaned and painted whenever Charterers and Captain think necessary, at least once in every six months, reckoning from
time of last painting, and payment of the hire to be suspended until she is again in proper state for the service.

_____

22. Owners shall maintain the gear of the ship as fitted, providing gear (for all derricks/cranes) capable of handling lifts up to *their maximum*
capacity *in accordance with the description clause,* three tons, also providing ropes, falls, slings and blocks. If vessel is fitted with derricks capable of handling heavier lifts, Owners are to provide on the vessel necessary gear for
same, otherwise equipment and gear Owners-to-hire. She shall be for Charterers' account. Owners also to provide on the vessel power and electric light on deck
and in cargo holds sufficient for night work in all holds simultaneously, tackles and all for
night work, and vessel to give use of their light when as think but any additional right or as there as board is to a Charterers' expense. The
Charterers to have the use of any gear on board the vessel.

23. Vessel to work night and day, if required by Charterers, and all winches ~~cranes~~ to be at Charterers' disposal during loading and discharging;
neither to provide one winchman per hatch in work winches day and night, as required, Charterers agreeing to pay officers, engineers, winchmen,
deck hands and donkeyman for overtime work done in accordance with the working hours and rates stated in the ship's articles; if the rules of the
port, or labor unions, prevent crew from driving winches, shore ~~crewmen~~ winchmen to be *employed and paid by Charterers, in the event of a disabled
crane or cranes which winches, or* insufficient power to operate winches ~~crane or cranes,~~ Owners to pay for shore engine, or engines, in lieu thereof in which case the vessel to remain
on-hire, if required, and pay any loss of time and *directly related* extra *expenses including standby expenses,* occasioned
thereby. *Any time lost due to crane breakdown and/or insufficient power to be deducted pro-rata to the number of gangs affected,*
unless shore gear has been employed by the Owners.

24. It is also the mutually agreed that this Charter is subject in all the terms and provisions of and all the exemptions from liability contained
in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessels,
etc.," in respect of all cargo shipped under that charter to or from the United States of America. It is further subject to *General Clause Paramount* the
following clause- both of which are to be included in all bills of lading issued hereunder: *See Clause 62*

U.S.A. Clause Paramount

~~This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April
16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of
any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading
be repugnant to said Act to any extent, such term shall be void to that extent, but no further.~~

00302109881891
P. 4

```
160    If the ship comes into collision with another ship as a result of the negligence of the other ship and any act neglect or default of the
161    Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried
162    Ship-to-Blame Collision Clause
163    hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss
164    or liability represents loss of or damage to or any claim whatsoever of the owners of said goods paid or payable by the other or non-
165    carrying ship or her owners to the owners of said goods and set off recouped or recovered by the other or non-carrying ship or her
166    owners as part of their claim against the carrying ship or carrier.
167    25.  The vessel shall not be required to enter any ice-bound port, or any port where lights or light-ships have been or are about to be with-
168    drawn by reason of ice, or where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter the
169    port or to get out after having completed loading or discharging. Vessel not to force ice or to follow ice breakers.
170    26.  Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The owners to remain responsible for the
171    navigation of the vessel, insurance, crew, acts of pilots and tugboats and all other matters, same as when trading for their own account.
172    27.  A commission of 3 1/2 1.25 per cent is payable by the Vessel and Owners to TGM Trans-Globe Monitor Shipping GmbH, Hamburg
173    plus 1.25% to Primo Maritime Inc.
174    on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.
175    28.  An address commission of 3 1/2 3.75 per cent payable to Charterers............................................on the hire earned and paid under this Charter.
```

Clauses 29 through 84 are fully incorporated in this Charter Party. The rider clauses headings are for easy reference only and not part of this Charter Party.

THE OWNERS:

THE CHARTERERS:

This Charter Party is a computer generated copy of the NYPE (Revised 3rd October, 1946) form printed under license from the Association of Ship Brokers & Agents (U.S.A.), Inc. using software which is the copyright of Strategic Software Limited.

It is a precise copy of the original document which can be modified, amended or added to only by the striking out of original characters, or the insertion of new characters, such characters being clearly highlighted by underlining or use of colour or use of a larger font and marked as having been made by the licensee or end user as appropriate and not by the author.

13

S1 Jan 07 11:48    J G R    00302109881891    p.5

Tramp Maritime Inc.
9.H Heracleous Street- 186 36 Pireaus
Tel +302104133273/Fax +302104133532
E-Mail: chartering@tramp-maritime.gr

 Trans-Globe Monitor Shipping GmbH

---

## ADDITIONAL CLAUSES TO CHARTER PARTY MV "FURIA R"
## DATED HAMBURG, 18th MAY 2006

### Clause 29 – Cargo Exclusions
None of the cargoes, goods, or substances listed below are to be loaded during the currency of this charter:

All corrosive, dangerous, explosive, hazardous, inflammable, injurious and toxic substances or goods/all goods or substances as defined by IMO-IMDG code as amended, including but not limited, as follows:

Acids/antiques/art objects and curios/arms and ammunitions/asbestos/ashes/asphalt /automobiles or cars or trucks or lorries or any other vehicles/banknotes or other forms of currency/bonds or other negotiable instruments/bones or bone meals/borax/bullion/calcium carbide/calcium nitrate/calcium oxychloride/cement in bulk, cement clinker/cocoa/containers/copra /corrosives/creosote and creosoted goods/davco coal/steam coal / pond coal / dross / drugs or narcotics / dynamite / esparto grass / fire briquettes / fishmeal/fishscrap /gypsum/hides/jewellery, metals, stones or other objects of a rare or precious nature/jute/lime/logs /locomotives /livestock/manioc and manioc pellets/nepheline syenite/organic peroxides/petroleum derivatives and all petroleum products/pitch/potash/radioactive substances, products or wastes/rags/ refrigerated cargo/skimmings/salt/rock salt /soda ash/scrap metal in any form including motorblocks, metal borings, shavings and turnings/skins and furs/solvents/stone blocks/war and war like materials/boycott cargoes and any other goods affecting immediately or on long term the safety of the vessel and/or the crew and all cargoes listed in the Appendix B of IMO Code of Safe Practice For Solid Bulk Cargoes.

Any IMO cargo for which Owners' permission has been given to be loaded same is to be loaded/stowed/trimmed and discharged in accordance with IMO regulations/recommendations at Charterers' time/responsibility and expense.

Scrap metal, non oily, excluding metal borings, shavings and turnings is allowed to be loaded with Soft Loading Clause.

### Clause 30. – Trading Exclusions
The vessel is not permitted to load, discharge, bunker, to force ice or to follow icebreakers, to trade or call for any purpose in countries, places, zones or areas where:

(a) war has been declared, is about to be declared or has broken out without any such declaration or where hostilities are imminent or in progress, including civil war, insurrection, revolution etc.

(b) in Australia / Alaska / Azov Sea / Burma / Cabinda / Cambodia (Kampuchea) / Cuba / all C.I.S Pacific ports / Eritrea / Ethiopia /Faroe islands / Greenland / Great Lakes / Haiti / Iceland / Iran / Iraq / israel / Laos / Liberia / Mozambique but Maputo is allowed / Myanmar / New Guinea / New Zealand and its territories / North Korea / Orinoco River not West of Matanzas / Papua / Scandinavia (Norway / Sweden / Finland / Denmark) / Somalia / Sri Lanka / Sierra Leone / Sudan / Syria / Tasmania / Turkish occupied Cyprus / Vanino / South and North Yemen / Zaire

(c) in UN or USA or EU sanctioned or embargoed countries/areas

(d) in high-risk, for gipsy moth or other insect infested port(s) or area(s) as defined by USDA, APHIS, PPQ including the Japanese ports: Chiba, Hachinoe, Hakodate, Hirosima, Oita, Sakata, Shimizu, Tomakomai

(e) no direct trading between P.R. of China and Taiwan or vice versa, is allowed

Trading subject always to CONWARTIME 2004 Clause as attached.

### Clause 31. – Crew Service
With reference to Clause 5 of this Charter Party "customary assistance" shall include, but not be limited to:    *(to be continued...)*

14

 Trans-Globe Monitor Shipping GmbH

Tramp Maritime Inc.
9.1 Kronprinzi Street 'Ξ3 ΣΣ Πειρεις'
Tel (+30)210413222; Fax: 310210413293
E-mail: charter-op@trampmaritime.gr

---

## ADDITIONAL CLAUSES TO CHARTER PARTY M/V "FURIA E"
## DATED HAMBURG, 18ᵗʰ MAY 2006

*Clause 31 (continued):*

a) All opening and closing of hatches, when and where required, if permitted by local regulations.

b) Raising and lowering of derricks and rigging cranes, if fitted, and/or gangways in preparation for loading and discharging.

c) Shaping up vessel's holds/hatches and cranes prior arrival at loading and/or discharging places so as to immediately commence loading and/or discharging operations subject to weather conditions and the safety of the crew.

The above services shall be considered as a minimum and shall in no way be construed as an alternative to or reduction in the standard of services from Officers and Crew required under this Charter Party.

A, B, C to be carried out provided shore and labour unions regulations permit, otherwise shore labour to be used at Charterers' account.

### Clause 32. – Grab Fitting/Operation
*Deleted*

### Clause 33. – In Lieu Of Hold Cleaning
Charterers shall have the option of redelivering the vessel without cleaning of holds against paying the Owners a lumpsum of US$ 4,000.– including, if permitted by local regulations/stevedores, crew to collect from vessel's holds the lashing materials/dunnage/debris which to be disposed on deck for removal by the Charterers at Charterers' time and expense. If not permitted by local regulations/stevedores the Charterers to arrange for the removal and disposal of the above.

Charterers to use dunnage material permitted for vessel's intended trade according to loading/discharging ports.

### Clause 34. – Intermediate Hold Cleaning
*Deleted*

### Clause 35 – Houseflag/Markings
The Charterers shall have the liberty to fly their own houseflag and paint the funnel only with their own colours. Expenses and time in this connection including changing back to Owners' colours prior redelivery to be for Charterers' account.

### Clause 36 – Additional Fittings
Charterers shall be at liberty to fit/weld at their time/expense any additional equipment/fittings for loading/discharging and or securing cargo. Such work shall be done at the Charterers' expense and time and Charterers shall remove such equipment and fitting at their expense prior to redelivery, if Owners so request. The meaning of this Clause shall include but not limited to welding of padeyes for lashing/securing of cargo in holds on deck.

### Clause 37 – Dispute Resolution Clause – English Law, London Arbitration
(a) This Contract shall be governed by and construed in accordance with English law and any dispute arising out of or in connection with this Contract shall be referred to arbitration in London in accordance with the Arbitration Act 1996 or any statutory modification or re-enactment thereof save to the extent necessary to give effect to the provisions of this Clause.

The arbitration shall be conducted in accordance with the London Maritime Arbitrators Association (LMAA) Terms current at the time when the arbitration proceedings are commenced.

*(to be continued....)*

2

00302103881891                    P-7

 Trans-Globe Monitor Shipping GmbH

Tramp Maritime Inc.
9 B Venizelos Street 16525 Piraeus
Tel:+302401153EB|Fax:+302104153263
E-Mail: chartering@trampmaritime.gr

---

### ADDITIONAL CLAUSES TO CHARTER PARTY MV "FURIA R"
### DATED HAMBURG, 18ᵗʰ MAY 2006

*Clause 37 (continued):*

The reference shall be to three arbitrators. A party wishing to refer a dispute to arbitration shall appoint its arbitrator and send notice of such appointment in writing to the other party requiring the other party to appoint its own arbitrator within 14 calendar days of that notice and stating that it will appoint its arbitrator as sole arbitrator unless the other party appoints its own arbitrator and gives notice that it has done so within the 14 days specified. If the other party does not appoint its own arbitrator and give notice that it has done so within the 14 days specified, the party referring a dispute to arbitration may, without the requirement of any further prior notice to the other party, appoint its arbitrator as sole arbitrator and shall advise the other party accordingly. The award of a sole arbitrator shall be binding on both parties as if he had been appointed by agreement.

Nothing herein shall prevent the parties agreeing in writing to vary these provisions to provide for the appointment of a sole arbitrator.

In cases where neither the claim nor any counterclaim exceeds the sum of USD 50,000 (or such other sum as the parties may agree) the arbitration shall be conducted in accordance with the LMAA Small Claims Procedure current at the time when the arbitration proceedings are commenced.

(b) Notwithstanding the above, the parties may agree at any time to refer to mediation any difference and/or dispute arising out of or in connection with this Contract.

In the case of a dispute in respect of which arbitration has been commenced under the above, the following shall apply:-

(i) Either party may at any time and from time to time elect to refer the dispute or part of the dispute to mediation by service on the other party of a written notice (the "Mediation Notice") calling on the other party to agree to mediation.

(ii) The other party shall thereupon within 14 calendar days of receipt of the Mediation Notice confirm that they agree to mediation, in which case the parties shall thereafter agree a mediator within a further 14 calendar days, failing which on the application of either party a mediator will be appointed promptly by the Arbitration Tribunal ("the Tribunal") or such person as the Tribunal may designate for that purpose. The mediation shall be conducted in such place and in accordance with such procedure and on such terms as the parties may agree or, in the event of disagreement, as may be set by the mediator.

(iii) If the other party does not agree to mediate, that fact may be brought to the attention of the Tribunal and may be taken into account by the Tribunal when allocating the costs of the arbitration as between the parties.

(iv) The mediation shall not affect the right of either party to seek such relief or take such steps as it considers necessary to protect its interest.

(v) Either party may advise the Tribunal that they have agreed to mediation. The arbitration procedure shall continue during the conduct of the mediation but the Tribunal may take the mediation timetable into account when setting the timetable for steps in the arbitration.

(vi) Unless otherwise agreed or specified in the mediation terms, each party shall bear its own costs incurred in the mediation and the parties shall share equally the mediator's costs and expenses.

(vii) The mediation process shall be without prejudice and confidential and no information or documents disclosed during it shall be revealed to the Tribunal except to the extent that they are disclosable under the law and procedure governing the arbitration.

3

コエ Jan 07 11:51      J G R                    00302109891891          p.8

 Trans-Globe Monitor Shipping GmbH


Tramp Maritime Inc.
9.9 Menschliat Street, 126 33, Gairaus
Ed.-e-32(89)41322117er;1-5016803338
E-Mail: tramteing@trampmaritime.gr

---

### ADDITIONAL CLAUSES TO CHARTER PARTY MV "FURIA R"
### DATED HAMBURG, 18ᵗʰ MAY 2006

#### Clause 38 – Arrest

Should the vessel be arrested during the currency of this Charter at the suit of any person including Charterers having or purporting to have a claim against or any interest in the vessel, hire under this Charter Party shall not be payable in respect of any period whilst the vessel remains under arrest or remains unemployed as a result of such arrest, only direct related expenses incurred by and/or during seizure or detention or arrest or delay to be for Owners' account.

This clause shall not apply should the arrest be caused through any fault on the part of Charterers their agents and/or servants.

#### Clause 39 – Bills Of Lading

Charterers' Bills of Lading to be used if required by Charterers. All original Bills of Lading to be couriered to the Owners'/Managers' office, when available to Charterers.

In case the original Bill(s) of Lading are not available upon vessel's arrival at discharging port, Owners/Master to release the entire cargo against Charterers' Letter of Indemnity which to be inline with Owners' standard P & I Club format and which to be signed by Charterers only.

Discharge to commence on receipt by Owners of faxed copy of the LOI

Should Charterers require vessel to change discharging port after Bills of Lading have been issued Owners to comply with such instructions upon receipt of a faxed copy of a single LOI signed by Charterers only and issued in conformity with Owners' standard P & I Club form.

Attached please find the standard forms of Letters of Indemnity to be given in return for:

  a) Delivery cargo without production of the original Bill of Lading.

  b) Delivering cargo at a port other than that stated in the Bill of Lading.

  c) Delivering cargo at a port other than that stated in the Bill of Lading and without production of the original Bill of Lading.

Charterers may place one original Bill of Lading on board the vessel against marking all original Bills of Lading with the following Clause: "One original Bill of Lading carried on board on which the cargo may be properly released against instructions received from the Charterers".

Owners are herewith instructed to discharge against such Bill of Lading carried on board and will do so unless instructed otherwise by Charterers.

No through-, nor way- Bills of Lading are to be issued under this Charter Party.

Charterers have the option to use in house Bills of Lading and liner Bills of Lading. Charterers to undertake directly to cover for their account all relevant expenses arising from issuance of liner Bills of Lading.

Bills of Lading to be in conformity with Mate's receipt.

All Letter of Indemnity text subject to running changes from the association of P & I Clubs.

#### Clause 40. - Bulldozers

Charterers to have the option to use bulldozers in vessel's holds, provided not exceeding the tank top strength.

If required, vessel to lift onboard, shift from hold to hold and discharge the bulldozers by use of vessel's gear, provided not exceeding vessels gear capacity.

4

00302105981891                    P. 5

 Trans-Globe Monitor Shipping GmbH

Tramp Maritime Inc.
9.R Verantbas Street - 188 55 Pireaeus
Tel: (1 3929) 4572295 / Fax: 1 - X 5 1825 1535
E-Mail: chartering@trampmaritime.gr

## ADDITIONAL CLAUSES TO CHARTER PARTY MV "FURIA E"
## DATED HAMBURG, 18th MAY 2006

### Clause 41. - Bunkers
Vessel to be delivered with about 700 metric tons IFO and about 125 metric tons MDO and vessel to be redelivered with about same quantities as on delivery.

Bunker prices at both ends:     US$ 340.- per metric ton IFO and
                                 US$ 640.- per metric ton MDO

Charterers to take over and pay for bunkers on delivery together with the first hire payment.

Owners have the right to bunker the vessel, prior redelivery for their own account, provided this operation does not interfere with Charterers' cargo operations.

The Charterers have the option to deduct value of bunkers on redelivery from the last sufficient hire payment(s).

Charterers are allowed to bunker vessel for own account prior delivery provided same does not interfere with vessel's operations.

Charterers to provide the vessel with bunkers in accordance with the ISO Standard 3217:1996 as follows:

IFO 380 CST Class RMG 35 / MDO Class DMB

In order to comply with the terms and conditions of the various bunker suppliers, the sample to govern quality shall be the sample drawn by the supplier and witnessed by the ship's Chief Engineer or Surveyor appointed by Owners. Analysis of said sample in accordance with the recognised ISO test methods at a mutual agreed reputable and dedicated laboratory shall be binding and conclusive for both parties.

Quantity supplied shall be finally determined by sounding of the tanks of the delivering barge or by reading of meters at shore installation or by independent surveyor, if any independent surveyor is appointed, and there is a contradiction the surveyors finding to be the accepted ones.

In case for full vessel's bunkering the availability of empty/available tanks to be taken into consideration after Charterers have consulted with the Master, in order avoid mixing/contamination of not compatible bunkers.

### Clause 42. - Cargo Claims/P & I Club
Owners guarantee that the vessel is entered and shall remain entered in a Protection and Indemnity Association which is a member of the Group of International P & I Clubs, for the duration of this Charter Party. Entry shall include, but not be limited to, ordinary cover for cargo claims. Charterers confirm that they will remain covered with a first class P and I Club for the duration of this Charter Party.

It shall be considered a fundamental breach by Owners if the vessel's P & I cover or class is cancelled or suspended during the currency of this charter.

In the case of damage to and/or loss of cargo carried on the vessel in which Owners' and/or Charterers' liability could be involved under the terms of this Charter Party, as the case may be, the Owners and/or the Charterers shall on request grant reasonable time extension for commencement of suit in each and every occurrence. Such extensions shall not prejudice the ultimate responsibility of both parties. Liability for cargo claims as between Owners and Charterers shall be apportioned as specified by the Interclub New York Produce Exchange Agreement effective from 1996, and its subsequent amendments.

If required by Charterers, Owners to provide valid Certificate of Entry confirming that the vessel is fully covered for P and I and that collection of premiums are up-to-date.          *(to be continued...)*

5

18

J G R    00302109861891    p.10

Tramp Maritime Inc.
9 n Veteraas Street, ras 14, Piraeus
Tel +3021092213225, fax +302108 73550
E-Mail: chartering@trampmar.com

 Trans-Globe Monitor Shipping GmbH

---

### ADDITIONAL CLAUSES TO CHARTER PARTY MV "FURIA R" DATED HAMBURG, 18th MAY 2006

*Clause 42 (continued):*

No claim is to be settled by one party without prior consent and agreement of the other party. Same to apply for time limits extension.

Owners' P and I Club       : West Of England
Charterers' P and I Club   : U.K. Club

#### Clause 43. - Certificates/Vaccinations
Owners are obliged to deliver and maintain throughout the currency of this Charter Party the vessel, her Crew and anything pertaining hereto supplied with up-to-date and complete certificates (including Oil Pollution Certificates), approvals, equipment and fittings, enabling the vessel and her Crew to trade within the trading limits and to load, carry and discharge all cargoes permitted under this Charter Party.

Officers and Crew to comply with vaccination and sanitary regulations in all ports of call and corresponding certificates to be available onboard, enabling the vessel to obtain free pratique by radio.

If requested, Owners to provide Charterers with copies of any and all such certificates/approvals.

Any time lost and all extra directly related expenses resulting from Owners' non compliance with the above to be for Owners' account and same may be deducted from hire.

#### Clause 44. - Deductions
The Charterers may deduct from the charter hire any amount disbursed for Owners' account. In addition Charterers may deduct from the last hire payments the reasonable estimated expenses incurred by Charterers for Owners' account, but maximum US$ 500.- per port, notwithstanding that vouchers may not then have reached Charterers for submission to Owners.

#### Clause 45. - Delivery/Redelivery Time
Hire to be settled basis Greenwich Mean Time but lay/can to be based on local time.

#### Clause 46. - Double Banking
Charterers have the right to load and/or discharge on double banking basis or by any other means available at loading and/or discharging port or place always subject to Master's reasonable satisfaction and any additional equipment/facilities such as fenders whenever considered necessary by the Master, are to be supplied by the Charterers in their time and at their expense.
Charterers to notify Owners well in advance about such procedure in order Owners arrange timely insurance cover.
If at any time during the operation, the Master reasonably considers it unsafe to continue due to adverse weather conditions etc. he may order the other vessel(s) and/or barge(s) away from his vessel or remove his own vessel in order to avoid prejudicing the safety of the vessel(s). Any additional insurance premium net of all rebates, if required by vessel's Underwriters to be for Charterers' account. Amount not to exceed the premium obtainable on the London market.

#### Clause 47. - Hold Condition
Vessel's holds on arrival at first loading port to be clean swept/washed down by fresh water and dried up so as to receive Charterers' intended cargoes in all respects free of salt, loose rust scale and previous cargo residues to the satisfaction of Charterers'/Shippers' surveyor.

Should the vessel not be approved by the surveyor the vessel to be placed off-hire. Owners warrant vessel's holds will be free of rust scale, clean, dry and suitable in every way for carriage of Charterers' intended cargo and hatchcovers are absolutely watertight.

6

J G R                          00302109981851                      p. 11

 Trans-Globe Maritor Shipping GmbH

Tramo Maritime Inc.
9.?\ Vesarre as Spresos 155.35 Fer2+ re
64..1+3064541220;Fex>+3(2041*5731
E-Mail: chanarop@tnsepmqa-bora.gr

---

### ADDITIONAL CLAUSES TO CHARTER PARTY MV "FURIA R"
### DATED HAMBURG, 18th MAY 2006

#### Clause 48. - ITF/Boycott
Owners warrant that the vessel's Crew is and will be during the period of this Charter Party employed under a Bona Fide Union Agreement, the standard of which is fully acceptable to the I.T.F. and Union in all countries not excluded in this Charter Party.

In the event of the vessel being denied or restricted in the use of port and/or loading and/or discharging facilities or shore labour and/or tug or pilotage assistance or of any other restriction, detention or any loss of time whatsoever due to boycott or arrest of the vessel or due to government restrictions all caused by the vessel and/or by reason of the terms and conditions on which members of the Crew are employed or by reason of any trading of this or any other vessel under same ownership or operation or control, the payment of hire shall cease for the time thereby lost and all extra directly related expenses incurred due to above are to be for Owners' account and may be deducted from hire. Owners are also responsible for any claim that may be presented by third party unless same is caused by Charterers and/or their servants/agents.

#### Clause 49. - Inspection
The Charterers and/or their Supercargo(es) shall have free and unlimited access to the whole vessel including but not limited to bridge, holds, engine room, all vessel's tanks including bunker, lubricating oil, sludge, ballast water, freshwater tanks during the charter period. Whenever required, the Master, if possible, must bring the vessel to an even trim to ensure correct bunker soundings. The Charterers and/or their Supercargo(es) and/or Surveyor(s) to have free and unlimited access to the vessel's deck and engine log books, tank plans, calibration scales, and CAP/GA/Midship Section Plans.

#### Clause 50. Insurance/Basic War Risk
Basic annual war risk insurance premium to be for Owners' account. Any additional war risk insurance premium including blocking and trapping and crew war bonus to be for Charterers' account and to be paid against presentation of original invoices. Additional premium not to exceed London Lloyd's Underwriters' scale. "Conwartime 2004 and subsequent amendements" Clause to be incorporated in this Charter Party and in all Bills of Lading.

#### Clause 51. - Laying Up/Return Insurance
Charterers shall have the right to order the laying up of the vessel at any time and for any period of time at a mutually agreed safe berth or safe place, sheltered anchorage, and in the event of such lay-up, the Owners shall promptly take steps to effect all the economy savings in operating costs including insurance, which may be possible and give prompt credit to the Charterers in respect of all such economy savings.
At the request of the Charterers the Owners, shall at any time provide an estimate of the economy savings which would be possible in the event of laying up of the vessel.
The Charterers to have the benefit of any return insurance premium received by the Owners from their Underwriters as and when received by reason of the vessel being in port for minimum 30 (thirty) days, provided the vessel is on hire. In case of vessel's lay-up all cost involved in and for reactivation including dry dock if needed to be for Charterers' account and time.

#### Clause 52. - Loading Of Steel
If the vessel is nominated to load a full or part cargo of steel products the Owners to appoint a vessel's P & I Surveyor to perform a "pre loading cargo condition survey" provided that such survey is required or recommended by the Owners P and I Club. Such survey is to take place in Charterers' time and cost to be equally shared between Owners and Charterers. Copy of such survey to be given to Charterers without delay.

Charterers to give sufficient notice to Owners for their intention to load steel cargoes.

7

Jan 07 11:54    J G R    00302105881891    p.12

 Trans-Globe Monitor Shipping GmbH

Framp Maritime Inc.
A.P. Mersetzkas Street, 18535 Piraeus
Tel +30210415026 Fax +30210 413533
E-Mail: chartering@frampmaritime.gr

---

## ADDITIONAL CLAUSES TO CHARTER PARTY MV "FURIA R"
## DATED HAMBURG, 18ᵗʰ MAY 2006

### Clause 53. - Notices
Owners/Master to give notices for vessel's expected delivery on fixing and daily.

### Clause 54. - Off-Hire
Should the vessel put back whilst on voyage by reason of any accident or breakdown or in the event of loss of time either in port or at sea or deviation upon the course of the voyage caused by sickness of or accident to the Crew or any person travelling onboard the vessel (other than supercargo travelling by request of the Charterers) or by reason of the refusal of the Master or Crew to perform their duties, or oil pollution or capture/seizure, or detention or threatened detention by any authority including arrest, the hire shall be suspended from the time of the inefficiency until the vessel is again efficient in the same or equidistant position, and voyage resumed therefrom. All extra directly related expenses incurred including bunkers consumed during period of suspended hire shall be for Owners' account.

During any off-hire period estimated to exceed 8 days, the Owners to give the Charterers not less than 5 days definite notice of resumption of the service.

### Clause 55. - Oil Pollution
Owners guarantee to provide and maintain during the entire time charter period, at their expense and carry onboard the vessel a valid U.S. Certificate of Financial Responsibility. Owners also guarantee to have secured current certificates for other countries/federal states or municipal or other division or authority thereof, where guarantees are required. All such certificates to be valid throughout the entire timecharter period.

The Charterers shall in no case be liable for any damage as a result of the Owners' failure to obtain the aforementioned certificates. Time lost by non compliance to be considered as off hire and may be deducted from hire.

### Clause 56. - On/Off Hire Survey
On hire/off hire survey to be held at Charterers' time and expense. Owners appointing Master/Chief Engineer to carry out on their behalf joint survey (practically, on/off hire survey is taking place during vessel's operation and there is no separate time for it).

### Clause 57. - Panama-/Suez Canal
Owners warrant that the vessel is fitted for the transit of the Suez and Panama Canal in loaded and/or ballast condition and complies with all and any regulations of the relevant canal authority and shall not be subject to any conditions of transit not customarily required by the relevant canal authority whether pursuant to their regulations or otherwise. Should the vessel not comply with the warranties contained in this clause and/or any regulations or conditions of transit laid down by the relevant canal authority, Charterers may suspend hire for all time lost and Owners to pay all expenses resulting as a consequence of Owners' failure to comply with this warranty.

### Clause 58. - Plans
Owners to courier to the Charterers the Capacity Plan, Deadweight Scale, and General Arrangement Plan as soon as possible.

### Clause 59. - Power Clause
The vessel to supply free of expense to Charterers 440 volt 3 phase 60 cycles and 40 kva per crane from the power supply panel in each crane house. Charterers have the right to fit/connect magnets, grabs or other loading/discharging equipment customary to the trade onto vessel's cranes and/or power supply.

8



J G R          00302103881891      p. 13



Trans-Globe Monitor Shipping GmbH

Tramp Maritime Inc.
9.** Ver**** 41 Street - 145 16 Piraeus
T: ** +30(210)4113273/Fax: +-(30)210-4113589
E-Mail: chartering@trampmaritime.gr

---

### ADDITIONAL CLAUSES TO CHARTER PARTY MV "FURIA R"
### DATED HAMBURG, 18th MAY 2006

**Clause 60. - Protective Clauses**
Conwartime 2004, New Both-to-Blame Collision Clause, New Jason Clause, General Clause Paramount, U.S.- and Canadian Clause Paramount and Club Nuclear Clause to apply.

**Clause 61. - Punctual Payment**
With reference to Clause 5, Owners to give Charterers 3 (three) New York banking days written notice excluding Sundays and holidays to rectify a failure to make punctual and regular payment before exercising their right of withdrawal.

**Clause 62. - Bankers**

| |
|---|
| The Royal Bank of Scotland Plc. |
| 45, Akti Miaouli |
| Piraeus - Greece |
| Bank's Swift Code : RBOSGRAA |
| IBAN : GR98 0640 0010 0055 5546 6128 100 |
| Favour of Polinos Maritime Ltd. |
| Account No : 466128 USD 100 |
| Correspondent Bank in New York: J.P. Morgan-Chase |

First hire and value of bunkers on delivery to paid within 3 banking days after vessel's delivery. Charterers entitled to deduct from last sufficient hire payments value of bunkers on redelivery plus estimated Owners' expense US$ 500.- per calling port unless a higher amount has been authorized by the Owners (or Owners to arrange with agents and settle Owners' disbursement directly).

**Clause 63. - Sea Carrier Initiative Agreement**
Owners and Charterers confirm they are both signatories to the Sea Carrier Initiative Agreement in order to co-operate with the U.S. Customs Service in the fight against the drug menace.

**Clause 64. - Stevedore Damage**
Should any damage be caused to the vessel or her fittings by the Charterers or their stevedores the Master is to:

A) Give written notice to the Charterers immediately after the occurrence of full particulars of the damage caused of the party allegedly responsible for the damage.

B) Promptly but within 24 hours after occurrence give written notice to the party allegedly responsible giving full particulars of the damage and its alleged cause, and obtain the written acknowledgement of liability from such party or failing that, the acknowledgement of receipt of such notice.

C) Immediately arrange, in conjunction with Charterers' agents for the damage to be surveyed and an estimate of the repair costs given.

Failing the aforementioned the Charterers are not to be responsible for such damage and/or loss of time, except for hidden damage, which must be attended to as per the above procedure immediately it is discovered but latest upon completion of the voyage in question.

In case responsible party refuse to sign then the Master will immediately inform Charterers or their agents accordingly.

Any unrepaired damage not affecting seaworthiness and/or her working capacity/class, may be repaired in Owners' time during next regular drydocking and Charterers to pay repair expenses against voucher.

*(to be continued...)*

9

22



00302109861831          P. 14

  Trans-Globe Monitor Shipping GmbH

Tramp Maritime Inc.
9.11 Vevachska street- 152 32 Piraeus
'0.14 EΠΙθΗΙΠΡΗ:Fax:-31216 F 1252
E-Mail: chartering@trampmaritime.gr

## ADDITIONAL CLAUSES TO CHARTER PARTY MV "YURIA R"
### DATED HAMBURG, 18th MAY 2006

**Clause 64 (continued):**

If during the performance of the Charter Party stevedores employed by the Charterers should cause such damage to the vessel which affects her seaworthiness and/or her working capacity/class and if such damage should then not be repaired by such stevedore, Charterers will be responsible for cost of such necessary repairs and the vessel shall remain on hire during such repairs, provided Master has fully complied with a/b/c above.

**Clause 65. - Taxes**

Taxes and/or dues and/or charges whatsoever, imposed on cargo by any local or national authorities, arising out of trade under this Charter Party to be borne by Charterers. Taxes levied by governments other than that of Owners' domicile or vessel's flag on earnings under this Charter Party other than the hire payable to Owners shall be for Charterers' account.

**Clause 66. - Warranties**

Owners warrant that the vessel:

- is not blacklisted by Arab countries nor anywhere else within the agreed trading limits,
- has not traded Cuba and Israel, and,
- is eligible for bunkers in the United States of America, its territories and possessions in accordance with directives from the United States Department of Commerce, Office of International Trade.

**Clause 67. - Watertight Hatches**

The Owners guarantee that on vessel's delivery and throughout the currency of this Charter the vessel's hatch covers are watertight. All hatches are to be carefully attended by the Crew to prevent leakage.

**Hatch Test**

The Charterers have the option to hose test or ultrasonic test the vessel's hatch covers at loading port(s) at their time/expense and should same not be watertight, Owners have the obligation to arrange necessary measures in order to make the hatch covers fully watertight. Owners shall be given by Charterers three working days to rectify the situation after which if the hatch covers are not watertight, Charterers have the right to cancel this Charter Party and redeliver the vessel, provided no cargo on board.

**Clause 68. – Ocean Route Clause**

Charterers may supply "ocean routes" or "fleetweather" or similar advise to the Master throughout the voyage specified by the Charterers. The Master to comply with the reporting procedure of routing service, but it is understood that final routing is always at Master's discretion for safe navigation and choice of route. For the purpose of the charter party 'good weather condition' are to be defined as weather conditions in wind speeds not exceeding Beaufort force 4, evidence of weather condition to be taken from the vessel's deck logs and independent weather bureau's reports. In the event of a consistent discrepancy between deck logs and independent weather bureau's reports the independent weather bureau's reports shall be final and binding by both parties.

**Clause 69. - Drydocking**

No drydocking under this Charter Party except in case of emergency.

**Clause 70. - Towage, Pilotage, Etc.**

The Owners authorize the Charterers, as agents of and on behalf of the Owners and/or the vessel to arrange and contract for loading/discharging operations in the ports for any towage, pilotage or the like service on usual or customary terms and/or those terms offered or required by towing/pilotage companies employed where such services are furnished.

10

J G R                                           00302109881891            P.15



Trans-Globe Monitor Shipping GmbH

Tramp Maritime Inc.

---

## ADDITIONAL CLAUSES TO CHARTER PARTY MV "FURIA R" DATED HAMBURG, 18ᵗʰ MAY 2006

### Clause 71. - War Cancellation
In the event of war, whether declared or undeclared involving Japan, Greece or Denmark, or between any two or more countries of U.S.A., C.I.S., United Kingdom, People's Republic of China, directly affecting the performance of this Charter either party has the right to cancel this Charter or any remaining portion thereof.

### Clause 72. - Cement Holes
If the vessel is not already fitted with suitable cargo inlets/loading holes Charterers have the option to fit the vessel with same as per requirements of the port/shippers for Charterers' account and expense. Cutting/closing (re-welding/screw fastening) of such openings on completion of loading to be under Master's supervision/satisfaction and responsibility. The cost of classification society's approval of this work to be for Charterers' account.

### Clause 73. - ISM Code
From the date coming into force of the International Safety Management (I.S.M.) code in relation to the vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the vessel and "The Company" (as defined by the I.S.M. Code) shall comply with the requirements of the I.S.M. code. Upon request the Owners shall provide a copy of the relevant Document of Compliance (D.O.C.) and Safety Management Certificate (S.M.C.) to the Charterers. Any loss, damage, expenses or delay caused by failure on the part of the Owners or "The Company" to comply with the I.S.M. Code shall be for the Owners account.

### Clause 74. – Lien
In the event that Charterers have a contractual or statutory right of lien over cargo carried on board for hire, freight, deadfreight or demurrage Owners shall co-operate as much as Owners' P + I Rules permit with Charterers.

### Clause 75. - Comingling
Whilst Charterers have the option to load two or more cargoes in the same holds, Charterers are to supply, erect, dismantle and dispose of any and all separations at their time, risk and expense. Any claims arising from contamination or admixture to cargo carried in the same hold to be the responsibility of Charterers/Shippers and Receivers and to be for their account.

### Clause 76. – Deck Cargo
Charterer's option to load intended cargo on deck/hatchcover at Charterers' risk/expense in accordance with vessel's deck/hatchcover strength and vessel's stability at Master's discretion. Bills of Lading for deck cargo to be marked "Shipped on deck at Charterers'/Shippers'/Receivers' risk and expense without liability of the carrier for loss or damage howsoever caused".

### Clause 77. – Ballast/Deballast Clause
Any detergent/disinfectant required by authorities to be added to ballast water in order to enable vessel to ballast/deballast holds/spaces within national waters of respective countries to be supplied by Charterers and this to be done at Charterers' time, risk and expense.

### Clause 78. - Sale Option
*Deleted*

### Clause 79. - Hamburg Rules
Neither the Charterers nor their agents shall permit the issue of any Bills of Lading, waybill, or other documents evidencing a contract of carriage (whether or not signed on behalf of the Owners or on the Charterers' behalf or on behalf of any sub-Charterers) incorporating where not compulsorily applicable, the Hamburg Rules or any other legislation giving effect to the Hamburg Rules or any other legislation imposing liabilities in excess of Hague or Hague/Visby Rules.        *(to be continued...)*

11

00302103881831    p. 15



Trans-Globe Monitor Shipping GmbH

Tramp Maritime Inc.
9 1. Venstriat Street 455 55 Pireus
Tel:1-2329435521/Fax:1-21-231·2052
E-mail. charter'tr@tramomaritime.gr

---

## ADDITIONAL CLAUSES TO CHARTER PARTY MV "FURIA R"
### DATED HAMBURG, 18ᵗʰ MAY 2006

*Clause 79 (continued):*

The Charterers shall indemnify the Owners against any liability, loss or damage which may result from any breach of the foregoing provisions of this clause.

### Clause 80. - Declaration Of Optional Period
*Deleted*

### Clause 81.
If the vessel is encountering prolonged stay, minimum 30 days in a port and there is strong reason to believe that the vessel's hull has acquired excessive marine growth affecting vessel's speed/consumption due to the stay at this specific port, Owners are to arrange for diver inspection.

Should the result of this diver inspection indicate there is excessive marine growth on the hull, Owners/Charterers to arrange underwater scrubbing of the hull in Charterers time and expense, prior to vessel's departure from the port, if same can be done without reasonable delay. If the underwater scrubbing is not available or can not be carried out at the port in question same to be carried out in Charterer's time in the next convenient port.

Charterers agree no claim for underperformance of the vessel for the passage from the port in question until underwater scrubbing is carried out.

Dry dock can be carried out in case of emergency.

### Clause 82. - Description Of Vessel
M/V "Furia R" ex "Fairy Queen"
BC, Malta Flag, Built 1996, Class NK
46,664 MTDW (summer) on 11.62M SSW
LOA/B/D            : 189.8/31.0/16.5 M
GRT/NRT           : 27,011/16,011
5 Ho/Ha Grain/Bale  : 59,820/57,237 M3
Folding Type Hydraulic Driven Hatch Covers
Hatch Sizes        : No.1: 17.60 x 17.16, No.2-5: 20.8 x 17.16M
Cranes             : 4 x 30 MT

Speed/consumption, based on b/scale under 4 and no adverse current:
- abt 13,5 knots on abt 25,0 mt MARINE IFO 380CST + abt 1,8 mt MDO in ballast
- abt 13,5 knots on abt 27,5 mt MARINE IFO 380CST + abt 1,8 mt MDO in laden

- At port:
  abt 0,8 mt MARINE IFO 380CST + abt 1,5 mt MDO – W/W: abt 3,8 mt MDO

Vessel to be supplied with bunkers:
-IFO max 380 CST-grade RMG 35 in accordance with ISO 8217
-MDO grade DMB in accordance with ISO 8217

When manoeuvring and steaming in rivers, canals, dense traffic areas and operating under a load of abt 35 pct or less the vessel is burning MDO.

All details are 'about' excluding bunker grades

As per vessel's classification note (as per SOLAS): "the ship is not allowed to sail with any cargo hold loaded to less than 10 pct of the holds maximum allowable cargo weight when in the full load condition".

Previous cargoes: grains from USA, steels from Black Sea to USA, and before vessel's holds had been sandblasted + painted.                    *(to be continued...)*

12

31 Jan 07 11:58    J G R                    00302109981891        p.17



Trans-Globe Monitor Shipping GmbH

Tramp Maritime Inc.

## ADDITIONAL CLAUSES TO CHARTER PARTY MV "FURIA R"
### DATED HAMBURG, 18ᵗʰ MAY 2006

*Clause 82 (continued):*

* Owners to confirm vessel has not been detained by any countries during the last 24 months and has no outstanding deficiencies from port state controls. - Yes but as from February '05 since the vessel has been under present Owners.

* Owners guarantee that the terms and conditions of employment of the crew of the vessel for the period of the Charter Party are covered by a bonafide trade union agreement acceptable to the itf. Owners warrant vessel and Owners are fully ISM (BIMCO ISM Clause to apply) and P and I covered with IACS member throughout the duration of this Charter Party.

* Owners confirm vessel has no centreline beams/bulkheads or any other obstruction on decks or holds which would interfere with loading/discharging operations and use/or use of bulldozers/payloaders.

## MV FURIA R - "BIMCO" BALTIC EXCHANGE DRY CARGO QUESTIONNAIRE

1. **General**
1.1 Vessel's name : "FURIA R"
1.2 Vessel's previous name(s) : "FAIRY QUEEN"
1.3 Flag : MALTA
1.4 Month/year and where built : JAN 1996 - JAPAN
1.5 Yard name and number : MITSUI ENGINEERING AND SHIPBUILDING TOMANO WORKS, JAPAN
1.6 Official class register number/Lloyds number :
1.7 Class of vessel : NKK NS BULK CARRIER, (ESP) MNS
1.8 Port of registry : VALETTA, MALTA
1.9 Owners (full style and contact numbers) : POLINOS MARITIME LTD, VALETTA - CONTACT C/O MANAGERS
1.10 Managers : J.G.ROUSSOS SHIPPING S.A, GREECE
1.11 Disponent Owners for the purpose of this C/P (if applicable)

2. **Particulars of vessel**
2.1 Type of vessel : BULK CARRIER
2.2 State following:

| Deadweight all told: | | Draft | TPI/TPC | (m/tons) |
|---|---|---|---|---|
| Summer | : 46.664 | 11,62m | 51,5 | |
| Winter | : 45.420 | 11,38m | 51,4 | |
| Tropical | : 47.912 | 11,862m | 51,6 | |
| Fresh Water | : 46.664 | 11,384m | 51,6 | |
| Tropical FW | : 47.885 | 12,126m | 51,6 | |

2.3 Is vessel fitted for transit of:
A) Panama Canal : YES
B) Suez canal : YES
C) St. Lawrence Seaway : NO

2.7 GT/NT:
International : 27,011 / 16,011
Suez : 27,757.29 / 24,983.30

*(to be continued...)*

13

J G R                    00302103881891          p.18



Trans-Globe Monitor Shipping GmbH

Tramp Maritime Inc.
9.11 Veroneze Steet - 18 55 Pireaut
Tac (+33)210-41382.3 - Fac-30,219,1-21652
Subatt: chartering@tmmpmaritime.gr

---

**ADDITIONAL CLAUSES TO CHARTER PARTY MV "FURIA R"**
**DATED HAMBURG, 18th MAY 2006**

*Clause 82 (continued):*

Panama        : 27,011    / 22,454

2.8   Length overall (meters)              : 189,80

2.9   Length between Perpendiculars (meters)    : 181,00

2.10  Extreme breadth (meters) and depth moulded  : 31,00 / 16,50

2.11  Distance from waterline to top of hatch coaming:
      A. Fully loaded condition              : HATCH NR 1/3/5: 7.11/7.11/7.11m
      B. Full Ballast condition (ballast holds not flooded) : HATCH NR 1/3/5: 14.83/13.77/12.67
      C. Full ballast condition (ballast holds flooded)   : HATCH NR 1/3/5: 10.93/10.67/10.40

2.12  State vessel's deballasting time in metric tons per hour    : about 1.000 m3 per hour

2.15  State capacity of
      A. Ballast tanks
      B. Hold ballast capacity (state which hold):
         HOLD NR 3 FLOODABLE WITH SEA WATER - CAPACITY 12,589 M3

2.16  Constant excluding fresh water          : about 350 mt
      Daily freshwater consumption            : abt 9mt
      Fresh water capacity                    : 343.0 M3
      State capacity and daily production of evaporators : abt 10mt
      Normal fresh water reserve              : abt 200mt

2.17  Vessel is fitted with shaft generator    : NO

2.18  State vessel's onboard electrical supply  : ( 440v / 60 Hz)

3.    **Cargo arrangements**
3.1   Holds:
      A. Number of holds: FIVE (5)
      B. Are vessels holds clear and free of any obstructions: YES
      D. Grain/bale capacities by hold including hatch ways (CUBM/CBFT)
         GRAIN/BALE: 59,820.4/57,236.7 M3 (2.112.557/2.021.315 CBFT)
         GR/BL INCL. HATCHES
         (1): 10,555.5(365.704) /  9,385.6
         (2): 12,547.2(443.104) / 11,974.7
         (3): 12,583.4(444.383) / 11,930.9
         (4): 12,679.7(447.784) / 12,137.1
         (5): 11,654.8(411.582) / 11,308.4
      E. Is vessel strengthened for the carriage of heavy cargoes: YES
      F. Is tanktops steel and suitable for grab discharge: YES
      G. corrugations: vertical
      H. Tank top strength (metric tons per SQM)
         STRENGTHS: TANK TOP   HO 1/3/5: 24MT/M2
                               HO 2/4 : 17MT/M2
      I. Are holds CO2 fitted: NO                    *(to be continued...)*

14

Jan 07 11:53    J G R    00302109881891    p.19

 Trans-Globe Monitor Shipping GmbH

Tramp Maritime Inc.
9.3 Mira , Pirali Street , 18526 Piraeus
Tel. (+302)4449756N/Fax (+302)4449755
E-mail: chartering@trampmaritime.gr

---

**ADDITIONAL CLAUSES TO CHARTER PARTY MV "FURIA R"**
**DATED HAMBURG, 18th MAY 2006**

*Clause 82 (continued):*

    J.  Are holds fitted with smoke detection system: NO
    K.  Is vessel fitted with Australian type approved hold ladders: YES
    L.  Has vessel a loadmaster computer/loadicator or other type of mechanical stowage calculator: YES
    M.  Are holds hoppered at:
        Hold side: YES
        Forward bulkhead: NO
        Aft bulkhead: NO
        Can vessel's holds be described as box shaped: NO
    N.  Measurement of any tank slopes/hoppering (height and distance from vessel's side at tank (top): HEIGHT: 3.62m / DISTANCE: 2,80 m
    O.  Flat floor measurement of cargo holds at tank top:
        TANK TOP DIM:  (1): 27,50  X  8,00m FWD
                                X 23,54m AFT
                  (2): 27,60  X 23,54m
                  (3): 27,60  X 23,54m
                  (4): 28,00  X 23,54m
                  (5): 28,00  X 23,54m
    P.  Is vessel electrical ventilated: NO

  3.2   Hatches
    A.  Number of hatches: FIVE (5)
    B.  Type of hatch covers: FOLDING TYPE HYDRAULIC DRIVEN
    C.  Hatch sizes:  (1): 17,60 X 17,16
                  (2): 20,80 X 17,16
                  (3): 20,80 X 17,16
                  (4): 20,80 X 17,16
                  (5): 20,80 X 17,16
    D.  Strength of hatch covers in metric tons per SQM:
        HA COVERS: 1/2/3/4/5: 2,45MT/M2
    E.  Distance from ship's rail to edge of hatch covers/coaming each side:
        ABOUT 6M EACH SIDE, EXCEPT NR 1 FWD WHICH IS LESS
    F.  Distance from bow to for of 1st hold opening: ABT 19,60M
    G.  Distance from stern to aft of last hold opening: ABT 25,16M
    H.  Is vessel fitted with cement holes: YES

  4    Speed/consumption/fuel engine (up to beaufort scale force 4/douglas sea scale 3):
    -abt 13,50 kn on abt 25,0 mt MARINE IFO 380CST plus abt 1,8 mt MDO in ballast
    -abt 13,50 kn on abt 27,5 mt MARINE IFO 380CST plus abt 1,8 mt MDO in laden
    -At port abt 1,2 mt MARINE IFO 380CST plus abt 1,8 mt MDO
    - W/W: abt 3,8 mt MDO

    Vessel to be supplied with bunkers:
    -IFO MAX 380 CST-GRADE RMG 35 IN ACCORDANCE WITH ISO 8217
    -MDO GRADE DMB IN ACCORDANCE WITH ISO 8217

    When manouvering and steaming in rivers, canals, dence traffic areas and operating under a load of abt 35 pct or less the vessel is burning MDO

    All details are 'about' excl bunker grade        *(to be continued...)*

                                              15



Trans-Globe Monitor Shipping GmbH

Tramp Maritime Inc
S.n. Merantiles Street: 18826 Pwsi.
Tel.:(+30)216413328 rfax(+30)2164138
E-Mail: chartering@trampmar.net.gr

## ADDITIONAL CLAUSES TO CHARTER PARTY MV "FURIA R"
### DATED HAMBURG, 18ᵗʰ MAY 2006

*Clause 82 (continued):*

4.1
4.2    Bunker grades IFO/MDO: AS STATED ABOVE
4.3    Permanent usable bunker capacities IFO/MDO (excluding unpumpables which are: abt 10 mts
4.4    Port consumption per 24 hours idle/working 8/24 hours: AS STATED ABOVE
4.5    Engine Make and type: MITSUI-MAN B+W 6S50MC(MK5)
4.6    Max output BHP/RPM: 11180

5.     Banking information: AS PER THE CHARTER PARTY
5.1    Full style and address of Owners bank for freight/hire remittance: AS PER THE CHARTER PARTY

6.     Classification society, surveys and certificates
6.1    Name of Classification society: NKK
6.2    Date of last special survey: 23/12/2005
6.3    Date of last annual survey
6.4    A. Is vessel entered in a classification approved enhanced survey program: NO
       B. Date of last inspection
       C. Date of next inspection
6.5    Date and last place of last drydock: 23/12/05
6.6    Has vessel been involved in any pollution incidents in the last 12 months:
       NO (AS FROM THE TIME OF PRESENT OWNERSHIP)
6.7    Has vessel been involved in any groundings or collision in the last 12 months:
       NO, AS FROM THE TIME OF PRESENT OWNERSHIP.
6.8    Is vessel ISM certified: YES
6.11   Is vessel's crew covered by full ITF or bona fide trade union agreement acceptable to ITF: YES

7      Communication
7.1    Call sign              : 9 H B X 8
7.6    Inmarsat C Telex number : 4215822010

8      Insurance
8.1    Hull and machinery value:
       USD 24 MILLIONS, INCREASED VALUE USD 6 MILLIONS, TOTAL USD 30 MILLIONS
8.2    Name of Owners' P and I insurers: WEST OF ENGLAND

9      Crew
9.1    Number of crew         : PRESENTLY 23
9.2    Name and nationality of master : PRESENTLY CPT IGOR BUSHUYEV (UKRAINIAN)
9.3    Nationality of officers : PRESENTLY UKRAINIANS
9.4    Nationality of crew    : PRESENTLY UKRAINIANS

10     Miscellaneous
10.1   Has vessel called at C.I.S. (Russian) Far East Pacific ports in the last 18 months: NO
10.2   State last 5 (five) cargoes carried with load and discharge port(s)
10.3   Is vessel fitted for carriage of grain in accordance with chapter IV of Solas 1974 and
       amendments without requiring bagging strapping and securing when loading a full cargo
       (deadweight) of heavy grain in bulk (stowage factor 42 CBFT) with ends untrimmed? YES
10.4   State number of holds which may be left slack without requiring bagging, strapping and
       securing: ACCORDING TO THE STABILITY CALCULATION
                                                        *(to be continued...)*

16

J S R                    00302109861891        p.21



Trans-Globe Maritime Shipping GmbH

Tramp Maritime Inc

---

## ADDITIONAL CLAUSES TO CHARTER PARTY MV "FURIA B"
### DATED HAMBURG, 18th MAY 2006

*Clause 82 (continued):*

| | | |
|---|---|---|
| 11 | Cargo gear (only to be completed if applicable) | |
| 11.1 | If geared state make and type | : IHI |
| 11.2 | Number and capacity of cranes/derricks and where situated | : 4x30 mts between hatches |
| | 1-2, 2-3, 3-4, 4-5 | |
| 11.3 | Outreach of gear beyond ship's rail | : 10,50 meters |
| 11.4 | If gantry cranes/horizontal slewing cranes state minimum clearance distance crane hook to top of hatch coaming | : NO |
| 11.5 | Time needed for full cycle with maximum cargo lift on hook | : |
| 11.6 | Slewing/luffing/hoisting speeds | : |
| 11.7 | Is gear combinable for heavy lift | : NO |
| 11.8 | Are winches electro-hydraulic | : YES |
| 11.9 | Consumption of MDO working crane per 24 hours | : ABT 3,8mt |
| 11.10 | Has vessel grabs onboard | : NO |
| 11.11 | Is vessel fitted with sufficient lights at each hatch for night work | : YES |

### Clause 83. - BIMCO ISPS/MTSA Clause For Time Charter Parties 2005

(a) (i) The Owners shall comply with the requirements of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) relating to the Vessel and "the Company" (as defined by the ISPS Code). If trading to or from the United States or passing through United States waters, the Owners shall also comply with the requirements of the US Maritime Transportation Security Act 2002 (MTSA) relating to the Vessel and the "Owner" (as defined by the MTSA).

(ii) Upon request the Owners shall provide the Charterers with a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) and the full style contact details of the Company Security Officer (CSO).

(iii) Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Owners or "the Company"/"Owner" to comply with the requirements of the ISPS Code/MTSA or this Clause shall be for the Owners' account, except as otherwise provided in this Charter Party.

(b) i) The Charterers shall provide the Owners and the Master with their full style contact details and, upon request, any other information the Owners require to comply with the ISPS Code/MTSA. Where sub-letting is permitted under the terms of this Charter Party, the Charterers shall ensure that the contact details of all sub-charterers are likewise provided to the Owners and the Master. Furthermore, the Charterers shall ensure that all sub-charter parties they enter into during the period of this Charter Party contain the following provision:

"The Charterers shall provide the Owners with their full style contact details and, where sub-letting is permitted under the terms of the charter party, shall ensure that the contact details of all sub-charterers are likewise provided to the Owners".

(ii) Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account, except as otherwise provided in this Charter Party.

(c) Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code/MTSA including, but not limited to, security guards, launch services, vessel escorts, security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the negligence of the Owners, Master or crew.                    *(to be continued...)*

17

--- ---- -- - ---- J G R                    00302109881891        P.22

 Trans-Globe Maritar Shipping GmbH

Tramp Maritime In.
B.II Varia intrady Service 'a' 2 Respin
TRL (+)38210413224/fax ~5 7 off 313
E-Mail: chartering@tramp-bai-twea.j

---

### ADDITIONAL CLAUSES TO CHARTER PARTY MV "FURIA R"
### DATED HAMBURG, 18ᵗʰ MAY 2006

*Clause 83 (continued):*

All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

(d) If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

*Footnote: This Clause replaces previously published ISPS Clause for Time Charter Parties AND the US Security Clause for Time Charter Parties, both of which are now officially withdrawn.*

Clause 84. – BIMCO U.S. Customs Advance Notification/AMS Clause For Time Charter Parties

(a) If the Vessel loads or carries cargo destined for the U.S. or passing through U.S. ports in transit, the Charterers shall comply with the current U.S. Customs Regulations (19 CFR 4.7) or any subsequent amendments thereto and shall undertake the role of carrier for the purposes of such regulations and shall, in their own name, time and expense :

  i)   Have in place a SCAC (Standard Carrier Alpha Code);

  ii)  Have in place an ICB (International Carrier Bond);

  iii) Provide the Owners with a timely confirmation of i) and ii) above; and

  iv) Submit a cargo declaration by AMS (Automated Manifest System) to the U.S. Customs and provide the Owners at the same time with a copy thereof.

(b) The Charterers assume liability for and shall indemnify, defend and hold harmless the Owners against any loss and/or damage whatsoever (including consequential loss and/or damage) and/or any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Charterers' failure to comply with any of the provisions of sub-clause (a). Should such failure result in any delay then, notwithstanding any provision in this Charter Party to the contrary, the Vessel shall remain on hire.

(c) If the Charterers' ICB is used to meet any penalties, duties, taxes or other charges which are solely the responsibility of the Owners, the Owners shall promptly reimburse the Charterers for those amounts.

(d) The assumption of the role of carrier by the Charterers pursuant to this Clause and for the purpose of the U.S. Customs Regulations (19 CFR 4.7) shall be without prejudice to the identity of carrier under any Bill of Lading, other contract, law or regulation.

<div align="center">◄◄●●●●▼▼■●▶●</div>

13

00302109881891        P.23



Trans-Globe Monitor Shipping GmbH

Tramp Maritime Inc.
9.4 Vassaras Street. 192 74 Piraeus
Tel +30 2104133203 / Fax +30 104 5050
E-mail: chartering@trampmaritime.gr

## ADDITIONAL CLAUSES TO CHARTER PARTY MV "FURIA R"
### DATED HAMBURG, 18th MAY 2006

#### NEW JASON CLAUSE

"In the event of accident, danger, damage or disaster before or after commencement of the voyage resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequences of which, the carrier is not responsible by statute, contract, or otherwise, the cargo, shippers, consignees, or Owners of the goods shall contribute with the carrier in general average to the payment of any sacrifices, losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the cargo.

If a salvage ship is owned or operated by the carrier, salvage shall be paid for as fully as if such salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, shippers, consignees or Owners of the cargo to the carrier before delivery."

#### NEW BOTH TO BLAME COLLISION CLAUSE

"If the vessel comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, Mariner, Pilot or the Servants of the carrier in the navigation or in the management of the vessel, the Owners of the cargo carried hereunder will indemnify the carrier against all loss or liability to the other or non-carrying ship or her Owners in so far as such loss or liability represents loss of or damage to or any claim whatsoever of the Owners of said cargo, paid or payable by the other or non-carrying ship or her Owners to the Owners of the said cargo and set off, recouped or recovered by the other or non-carrying ship or her Owners as part of their claim against the carrying vessel or carrier.

The foregoing provisions shall also apply where the Owners, operators or those in charge of any ship or ships or objects other than, or in addition to the colliding ships or objects are at fault in respect to a collision or contact."

#### BIMCO BUNKER FUEL SULPHUR CONTENT CLAUSE FOR TIME CHARTER PARTIES 2005

(a) Without prejudice to anything else contained in this Charter Party, the Charterers shall supply fuels of such specifications and grades to permit the Vessel, at all times, to comply with the maximum sulphur content requirements of any emission control zone when the Vessel is ordered to trade within that zone.

The Charterers also warrant that any bunker suppliers, bunker craft operators and bunker surveyors used by the Charterers to supply such fuels shall comply with Regulations 14 and 18 of MARPOL Annex VI, including the Guidelines in respect of sampling and the provision of bunker delivery notes.

The Charterers shall indemnify, defend and hold harmless the Owners in respect of any loss, liability, delay, fines, costs or expenses arising or resulting from the Charterers' failure to comply with this Sub-clause (a).

(b) Provided always that the Charterers have fulfilled their obligations in respect of the supply of fuels in accordance with Sub-clause (a), the Owners warrant that:

   (i) the Vessel shall comply with Regulations 14 and 18 of MARPOL Annex VI and with the requirements of any emission control zone; and

   (ii) the Vessel shall be able to consume fuels of the required sulphur content

when ordered by the Charterers to trade within any such zone.

Subject to having supplied the Vessel with fuels in accordance with Sub-clause (a), the Charterers shall not otherwise be liable for any loss, delay, fines, costs or expenses arising or resulting from the Vessel's failure to comply with Regulations 14 and 18 of MARPOL Annex VI.

(c) For the purpose of this Clause, "emission control zone" shall mean zones as stipulated in MARPOL Annex VI and/or zones regulated by regional and/or national authorities such as, but not limited to, the EU and the US Environmental Protection Agency.

#### BIMCO ICE CLAUSE FOR TIME CHARTER PARTIES

(a) The vessel shall not be obliged to force ice but, subject to the Owners' prior approval having due regard to its size, construction and class, may follow Ice-breakers.

(b) The Vessel shall not be required to enter or remain in any icebound port or area, nor any port or area where lights, lightships, markers or buoys have been or are about to be withdrawn by reason of ice, nor where on account of ice there is, in the Master's sole discretion, a risk that, in the ordinary course of events, the Vessel will not be able safely to enter and remain at the port or area or to depart after completion of loading or discharging. If, on account of ice, the Master in his sole discretion considers it unsafe to proceed to, enter or remain at the place of loading or discharging for fear of the Vessel being frozen in and/or damaged, he shall be at liberty to sail to the nearest ice-free and safe place and there await the Charterers' instructions.

19

.. .... ... .. ..... .. ..... .J G R                          00302109881891          p.24



Trans-Globe Monitor Shipping GmbH

Tramp Maritime Inc.
2.l Vegenerikas Street - 185.35 Finaeus
M: +31029481929; Fax:i-302.0 C`14833
E-Mail: charseiing@traktomark.ma.gr

## ADDITIONAL CLAUSES TO CHARTER PARTY MV "FURIA R"
## DATED HAMBURG, 18ᵗʰ MAY 2006

(c) Any delay or deviation caused by or resulting from loe shall be for the Charterers' account and the Vessel shall remain on-hire.

(d) Any additional premiums and/or calls required by the Vessel's underwriters due to the Vessel entering or remaining in any icebound port or area, shall be for the Charterers' account

### WAR RISKS CLAUSE FOR TIME CHARTERS, 2004
### Code Name: CONWARTIME 2004

(a) For the purpose of this Clause, the words:

(i) Owners" shall include the shipowners, bareboat charterers, disponent owners, managers or other operators who are charged with the management of the Vessel, and the Master; and

(ii) War Risks" shall include any actual, threatened or reported war; act of war; civil war; hostilities; revolution; rebellion; civil commotion; warlike operations; laying of mines; acts of piracy; acts of terrorism; acts of hostility or malicious damage; blockades (whether imposed against all vessels or imposed selectively against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever); by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the Vessel, her cargo, crew or other persons on board the Vessel.

(b) The Vessel, unless the written consent of the Owners be first obtained, shall not be ordered to or required to continue to or through, any port, place, area or zone (whether of land or sea), or any waterway or canal, where it appears that the Vessel, her cargo, crew or other persons on board the Vessel, in the reasonable judgement of the Master and/or the Owners, may be, or are likely to be, exposed to War Risks. Should the Vessel be within any such place as aforesaid, which only becomes dangerous, or is likely to be or to become dangerous, after her entry into it, the shall be at liberty to leave it.

(c) The Vessel shall not be required to load contraband cargo, or to pass through any blockade, whether such blockade be imposed on all vessels, or is imposed selectively in any way whatsoever against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever, or to proceed to an area where she shall be subject, or is likely to be subject to a belligerents' right of search and/or confiscation.

(d) (i) The Owners may effect war risks insurance in respect of the Hull and Machinery of the Vessel and their other interests (including, but not limited to, loss of earnings and detention, the crew and their protection and indemnity Risks), and the premiums and/or calls therefor shall be for their account.

(ii) If the Underwriters of such insurance should require payment of premiums and/or calls because, pursuant to the Charterers' orders, the Vessel is within, or is due to enter and remain within, or pass through any area or areas which are specified by such Underwriters as being subject to additional premiums because of War Risks, then the actual premiums and/or calls paid shall be reimbursed by the Charterers to the Owners at the same time as the next payment of hire is due, or upon redelivery, whichever occurs first.

(e) If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then the actual bonus or additional wages paid shall be reimbursed to the Owners by the Charterers at the same time as the next payment of hire is due, or upon redelivery, whichever occurs first.

(f) The Vessel shall have liberty:-

(i) to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery, or in any other way whatsoever, which are given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government, body or group whatsoever acting with the power to compel compliance with their orders or directions;

(ii) to comply with the order, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance;

(iii) to comply with the terms of any resolution of the Security Council of the United Nations, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;

(iv) to discharge at any other port any cargo or part thereof which may render the Vessel liable to confiscation as a contraband carrier;

(v) to call at any other port to change the crew or any part thereof or other persons on board the Vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions.

20

00302108881881    p.25



Trans-Globe Montior Shipping GmbH

Tramp Maritime Inc.
P.B Green, str. Street. 18558 Piraeus
Tel: +1328141822 Fax:+302104415289
E-Mail: chartering@trampmaritime.gr

---

## ADDITIONAL CLAUSES TO CHARTER PARTY M/V "FURIA R"
### DATED HAMBURG, 18ᵗʰ MAY 2006

(g). If in accordance with their rights under the foregoing provisions of this Clause, the Owners shall refuse to proceed to the loading or discharging ports, or any one or more of them, they shall immediately inform the Charterers. No cargo shall be discharged at any alternative port without first giving the Charterers notice of the Owners' intention to do so and requesting them to nominate a safe port for such discharge. Failing such nomination by the Charterers within 48 hours of the receipt of such notice and request, the Owners may discharge the cargo at any safe port of their own choice.

(h). If in compliance with any of the provisions of sub-clauses (b) to (g) of this Clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfilment of this Charter Party.

### CARRIAGE OF NUCLEAR MATERIALS

"Notwithstanding any provision whether written or printed contained in this Charter, it is agreed that nuclear fuels or radioactive waste or products are specifically excluded from the cargo permitted to be loaded or carried under this Charter Party. This exclusion does not apply to radio isotopes used or intended to be used for any industrial, commercial, agricultural, medical or scientific purpose, provided Owners' prior approval has been obtained to the loading thereof."

### CANADIAN CLAUSE PARAMOUNT

All the terms, provisions and conditions of the Canadian Water Carriage of Goods Act, 1936, and of the Rules comprising the schedule thereto are, so far as applicable, to govern the contract contained in this Bill of Lading and the Shipowners are to be entitled to the benefit of all privileges, rights and immunities contained in such Act and in the schedule thereto as if the same were herein specifically set out.
If anything herein contain be inconsistent with the said provisions, it shall to the extent of such inconsistency and no further be null and void.

The Carrier shall be under no responsibility whatsoever for loss of or damage to goods howsoever and wheresoever occurring when such loss or damage arises prior to the loading on and/ or subsequent to the discharge from the Carrier's ship.

### U.S.A. CLAUSE PARAMOUNT

If the vessel load in the U.S.A., the U.S.A. Clause Paramount shall be incorporated in all Bills of Lading and shall read as follows:

"The Bill of Lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April 16ᵗʰ, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the Carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any terms of this Bill of Lading be repugnant to said Act in any extent, such term shall be void to that extent but no further".

21

00302108891891          P.26

 Trans-Globe Monitor Shipping GmbH

Tramp Maritime Inc
9.II Wharfroad, Sorteria, 1/4.57 Sedsey;
Tel.: +3229341550827921+021 1181 1053C;
E-Mail: chartering@tramtormaid.ms.q:

## ADDITIONAL CLAUSES TO CHARTER PARTY MV "FURIA R" DATED HAMBURG, 18ᵗʰ MAY 2006

STANDARD FORM LETTER OF INDEMNITY TO BE GIVEN IN RETURN FOR DELIVERING CARGO AT A PORT OTHER THAN THAT STATED IN THE BILL OF LADING

To:          (Insert name of Owners)                        (Insert date)
             The Owners of the (Insert name of ship)

Dear Sirs,

Ship:        (Insert name of ship)

Voyage:  (Insert load and discharge ports as stated in the bill of lading)

Cargo:       (Insert description of cargo)

Bill of Lading:   (Insert identification numbers, date and place of issue)

The above cargo was shipped on the above ship by (insert name of shipper) and consigned to (insert name of consignee or party to whose order the bill of lading is made out, as appropriate) for delivery at the port of (insert name of discharge port stated in the bill of lading) but we, (insert name of party requesting substituted delivery), hereby request you to order the ship to proceed to and deliver the said cargo at (insert name of substitute port or place of delivery) against production of at least one original bill of lading.

In consideration of your complying with our above request, we hereby agree as follows:-

1. To indemnify you, your servants and agents and to hold all of you harmless in respect of any liability, loss, damage or expense of whatsoever nature which you may sustain by reason of the ship proceeding and giving delivery of the cargo against production of at least one original bill of lading in accordance with our request.

2. In the event of any proceedings being commenced against you or any of your servants or agents in connection with the ship proceeding and giving delivery of the cargo as aforesaid, to provide you or them on demand with sufficient funds to defend the same.

3. If, in connection with the delivery of the cargo as aforesaid, the ship, or any other ship or property in the same or associated ownership, management or control, should be arrested or detained or should the arrest or detention thereof be threatened, or should there be any interference in the use or trading of the vessel (whether by virtue of a caveat being entered on the ship's registry or otherwise howsoever), to provide on demand such bail or other security as may be required to prevent such arrest or detention or to secure the release of such ship or property or to remove such interference and to indemnify you in respect of any liability, loss, damage or expense caused by such arrest or detention or threatened arrest or detention or such interference, whether or not such arrest or detention or threatened arrest or detention or such interference may be justified.

4. The liability of each and every person under this indemnity shall be joint and several and shall not be conditional upon your proceeding first against any person, whether or not such person is party to or liable under this indemnity,

5. This indemnity shall be governed by and construed in accordance with English law and each and every person liable under this indemnity shall at your request submit to the jurisdiction of the High Court of Justice of England.

Yours faithfully

For and on behalf of
(Insert name of Requestor)

The Requestor

.....................................................
Signature

22

00302108881891        P.27



Trans-Globe Monitor Shipping GmbH

Tramp Maritime Inc
Sun Merchant area Street, 115, st., Piraeus
Tel. +302109882, Fax +2, 100233
E-Mail: smantring@trampma.sire.gr

---

### ADDITIONAL CLAUSES TO CHARTER PARTY MV "FURIA E"
### DATED HAMBURG, 18th MAY 2006

STANDARD FORM LETTER OF INDEMNITY TO BE GIVEN IN RETURN FOR DELIVERING CARGO
AT A PORT OTHER THAN THAT STATED IN THE BILL OF LADING AND WITHOUT PRODUCTION
OF THE ORIGINAL BILL OF LADING

To:           *(insert name of Owners)*                              *(insert date)*
              The Owners of the *(insert name of ship)*

Dear Sirs,

Ship:         *(insert name of ship)*

Voyage:   *(insert load and discharge ports as stated in the bill of lading)*

Cargo:        *(insert description of cargo)*

Bill of Lading:   *(insert identification numbers, date and place of issue)*

The above cargo was shipped on the above vessel by *(insert name of shipper)* and consigned to *(insert name of consignee or party to whose order the bill of lading are made out, as appropriate)* for delivery at the port of *(insert name of discharge port stated in the bill of lading)* but we, *(insert name of party requesting substituted delivery)*, hereby request you to order the vessel to proceed to and deliver the said cargo at *(insert name of substitute port or place of delivery)* to *(insert name of party to whom delivery is to be made)* without production of the original bill of lading.

In consideration of your complying with our above request, we hereby agree as follows:-

1.   To indemnify you, your servants and agents and to hold all of you harmless in respect of any liability, loss, damage or expense of whatsoever nature which you may sustain by reason of the ship proceeding and giving delivery of the cargo in accordance with our request.

2.   In the event of any proceedings being commenced against you or any of your servants or agents in connection with the ship proceeding and giving delivery of the cargo as aforesaid, to provide you or them on demand with sufficient funds to defend the same.

3.   If, in connection with the delivery of the cargo as aforesaid, the ship, or any other ship or property in the same or associated ownership, management or control, should be arrested or detained or should the arrest or detention thereof be threatened, or should there be any interference in the use or trading of the vessel (whether by virtue of a caveat being entered on the ship's registry or otherwise howsoever), to provide on demand such bail or other security as may be required to prevent such arrest or detention or to secure the release of such ship or property or to remove such interference and to indemnify you in respect of any liability, loss, damage or expense caused by such arrest or detention or threatened arrest or detention or such interference, whether or not such arrest or detention or threatened arrest or detention or such interference may be justified.

4.   If the place at which we have asked you to make delivery is a bulk liquid or gas terminal or facility, or another ship, lighter or barge, then delivery to such terminal, facility, ship, lighter or barge shall be deemed to be delivered to the party to whom we have requested you to make such delivery.

5.   As soon as all original bills of lading for the above cargo shall have come into our possession, to deliver the same to you, or otherwise to cause all original bills of lading to be delivered to you.

6.   The liability of each and every person under this indemnity shall be joint and several and shall not be conditional upon your proceeding first against any person, whether or not such person is party to or liable under this indemnity.

7.   This indemnity shall be governed by and construed in accordance with English law and each and every person liable under this indemnity shall at your request submit to the jurisdiction of the High Court of Justice of England.

Yours faithfully

For and on behalf of
*(insert name of Requestor)*

The Requestor

...........................................
Signature

23

ɔ̠ ̣ ᴊᴀɴ ᴜ̠ 12:05   J G R                    00302103881891          p. 28

 Trans-Globe Maritime Shipping GmbH

Tramp Maritime Inc.
[fax/contact details illegible]

---

## ADDITIONAL CLAUSES TO CHARTER PARTY MV "FURIA R" DATED HAMBURG, 18ᵗʰ MAY 2006

STANDARD FORM LETTER OF INDEMNITY TO BE GIVEN IN RETURN FOR DELIVERING CARGO WITHOUT PRODUCTION OF THE ORIGINAL BILL OF LADING

To:        (insert name of Owners)                         (insert date)
           The Owners of the (insert name of ship)
           (insert address)

Dear Sirs,

Ship:      (insert name of ship)

Voyage:    (insert load and discharge ports as stated in the bill of lading)

Cargo:     (insert description of cargo)

Bill of Lading:  (insert identification numbers, date and place of issue)

The above cargo was shipped on the above ship by (insert name of shipper) and consigned to (insert name of consignee or party to whose order the bill of lading is made out, as appropriate) for delivery at the port of (insert name of discharge port stated in the bill of lading) but the Bills of Lading have not arrived and we, (insert name of party requesting delivery), hereby request you to deliver the said cargo to (insert name of party to whom delivery is to be made) at (insert place where delivery is to be made) without production of the original Bill(s) of Lading.

In consideration of your complying with our above request, we hereby agree as follows:-

1. To indemnify you, your servants and agents and to hold all of you harmless in respect of any liability, loss, damage or expense of whatsoever nature which you may sustain by reason of the vessel proceeding and giving delivery of the cargo in accordance with our request.

2. In the event of any proceedings being commenced against you or any of your servants or agents in connection with the delivery of the cargo as aforesaid, to provide you or them on demand with sufficient funds to defend the same.

3. If, in connection with the delivery of the cargo as aforesaid, the ship, or any other ship or property in the same or associated ownership, management or control, should be arrested or detained or should the arrest or detention thereof be threatened, or should there be any interference in the use or trading of the vessel (whether by virtue of a caveat being entered on the ship's registry or otherwise howsoever), to provide on demand such bail or other security as may be required to prevent such arrest or detention or to secure the release of such ship or property or to remove such interference and to indemnify you in respect of any liability, loss, damage or expense caused by such arrest or detention or threatened arrest or detention or such interference, whether or not such arrest or detention or threatened arrest or detention or such interference may be justified.

4. If the place at which we have asked you to make delivery is a bulk liquid or gas terminal or facility, or another ship, lighter or barge, then delivery to such terminal, facility, ship, lighter or barge shall be deemed to be delivered to the party to whom we have requested you to make such delivery.

5. As soon as all original bills of lading for the above cargo shall have come into our possession, to deliver the same to you, or otherwise to cause all original bills of lading to be delivered to you, whereupon our liability hereunder shall cease.

6. The liability of each and every person under this indemnity shall be joint and several and shall not be conditional upon your proceeding first against any person, whether or not such person is party to or liable under this indemnity.

7. This indemnity shall be governed by and construed in accordance with English law and each and every person liable under this indemnity shall at your request submit to the jurisdiction of the High Court of Justice of England.

Yours faithfully

For and on behalf of
(insert name of Requestor)

The Requestor

....................................................
Signature

24

# EXHIBIT EEL-2

Print Copy for : KAVVADIA ANNA

Received Inc.MSG.: 84937          Date: Thu 20/Dec/2007 18:02
From: CHIAN SPIRIT MARITIM <"Chian Spirit Maritime Enterprises Inc."
<chartering@chianspirit.gr>>
Subject: LgINT Message (REF:071002B00)
Included (3) Attachment Files: <LOI_FORM_A.TIF> <LOI_FORM_B..TIF>
<LOI_FORM_C..TIF>
TO : <operations@chianspirit.gr>


TELiX MSG: 1002B-00 20/12/07 18:00

From: C.S.M.E/ Chartering Dept.
To:   Billmar Chartering

Re:   MV "Nicholas M." - Acc "BRITANNIA BULKERS A/S," cp dd 18th Dec 2007


zack/nicholas

thnks charrs last confirming acceptance of owns last regarding c/p dets as well
as lifting charrs subjects.

therefore here below is the fixture recap clean on all subjects; if charrs have
any correction pls let us become aware of same otherwise we shall consider same
as final for our file / all parties including master and our operations dept
reference.

pls advise where delivery cable will be sent by the master as well as confirm
that detailed voyage instructions will be sent by your side at your first
convenience.

mtime pls be advised that current charrs maintain their etr for 24th dec agw wp
uce so pls consider same as notice on fixing, always given on a back to back
basis.

thanks all parties kind efforts leading to this fixture.

regards,

chartering dept.
c.s.m.e(as agents only)


=== recap of fixture (main terms+cp dets) clean on all subjects ===


--- vsl's full t/c description ---

01) NAME: M.V "NICHOLAS M."

02) EX NAMES INCLUDING DATE LAST NAME CHANGE: "MED UNITY" (2003)
    "LAURA G" (1998) - "FORUM PRODUCT" (1997) - "RAFAELA" (1991).

03) TYPE OF VESSEL: BULK CARRIER

04) ENGINE AND BRIDGE SITUATED: AFT

05) DWAT AND DRAFT SUMMER/WINTER/FRESH/TROPICAL/TROPICAL FRESH:


file://C:\Documents and Settings\pk.CHIAN\TMP\Message_Number_84937.TXT    08/01/2008

```
SUMMER DEADWEIGHT    39,498 METRIC TONS ON 11.169 METRES
WINTER DEADWEIGHT    38,402 METRIC TONS ON 10.937 METRES
TROPICAL DEADWEIGHT  40,608 METRIC TONS ON 11.401 METRES
```

06) DWAT ON 17/18/19/20/32/32.5/33/33.5 FEET FRESH WATER

| FEET | METRES | FRESHWATER DEADWEIGHT |
|------|--------|-----------------------|
| 17.0 | 5.18   | 11,462                |
| 18.0 | 5.48   | 12,766                |
| 19.0 | 5.79   | 14,115                |
| 20.0 | 6.10   | 15,468                |
| 32.0 | 9.75   | 31,731                |
| 32.5 | 9.90   | 32,417                |
| 33.0 | 10.06  | 33,151                |
| 33.5 | 10.21  | 33,840                |

07) TPC 48 AT SUMMER DRAFT

08) LOA/LBP/EXTREME BEAM/DEPTH MOULDED: 200.90/191.00/27.20/15.20 METRES.

09) CONSTANTS EXCLUDING FRESHWATER:  250 METRIC TONS

10) FRESHWATER CAPACITY: 305 METRIC TONS

11) IF FITTED WITH EVAPORATOR/DAILY PRODUCTION: 10 METRIC TONS / 24
HOURS

12) NUMBER HOLDS/HATCHES: 7/7

13) HATCH TYPE AND SIZES: STEEL HATCH COVER FOLDING TYPE (MACGRECOR)

```
NO.1    9.8 X 12.64 METRES
NO.2   17.6 X 12.64 METRES
NO.3    9.6 X 12.64 METRES
NO.4   17.6 X 12.64 METRES
NO.5    9.6 X 12.64 METRES
NO.6   17.6 X 12.64 METRES
NO.7    9.6 X 12.64 METRES
```

14) HOLDS LENGTHS: NO.1 16.80/ NO.2 26.50/ NO.3 16.80/ NO.4 26.40/ NO.5 16.80/
                   NO.6 26.40/ NO.7 16.00

15) TANK TOP DIMENSIONS:

```
NO.1    HOLD    16.60 X 17.00
NO.2    HOLD    26.50 X 19.20
NO.3+5 HOLDS  16.80 X 19.20
NO.4+6 HOLDS  26.40 X 19.20
NO.7    HOLD    16.00 X 18.50
(LENGTH AT CENTRE LINE - BREADTH AT HALF OF LENGTH)
```

16) MAXIMUM UNIFORM LOADS TANK TOPS/WEATHER DECK/WEATHER DECK
HATCHES;

```
NO.1       HOLD      18.50 METRIC TONS/SQUARE METRE
NO.2-4-6   HOLDS     15    METRIC TONS/SQUARE METRE
NO.3-5-7   HOLDS     23.5  METRIC TONS/SQUARE METRE
MAIN DECK             3.4  METRIC TONS/SQUARE METRE
HATCH COVER          1.75 METRIC TONS/SQUARE METRE
```

17) CUBIC CAPACITY IN MAIN HOLDS - GRAIN/BALE:
    GRAIN  47,199 CUBIC METRES
    BALE   43,423 CUBIC METRES

18) CUBIC BREAKDOWN PER HOLD - GRAIN/BALE IN CUBIC METRES:

|        | GRAIN  | BALE   |
|--------|--------|--------|
| NO.1   | 4,946  | 4,550  |
| NO.2   | 8,638  | 7,947  |
| NO.3   | 5,488  | 5,049  |
| NO.4   | 8,689  | 7,994  |
| NO.5   | 5,488  | 5,049  |
| NO.6   | 8,694  | 7,998  |
| NO.7   | 5,256  | 4,836  |

19) ANY PILLARS/CENTRE LINE BULK HARDS/OBSTRUCTIONS IN HOLDS: NO

20) TYPE OF VENTILATION CARGO HOLDS   : NATURAL VENTILATION

21) IF BUILT WITH TOP SIDE TANKS      : YES

22) IF BUILT WITH HOPPER TANKS        : YES

23) TANK TOP SURFACE                  : FLAT

24) IF SUITABLE FOR GRAB DISCHARGE    : YES

25) DISTANCE FROM SHIP'S RAIL TO HATCH COAMING: CLEAR DISTANCE 5.50 METRES

26) DISTANCE WATER LINE/HATCH COAMING FULL BALLAST/LIGHT/FULLY LADEN:

    FULL  BALLAST  =  8.65 METRES
    LIGHT BALLAST  = 11.45 METRES
    FULLY LOADED   =  5.70 METRES

27) AIR DRAFT LIGHT/BALLAST/FULLY LADEN: 41.50/ 39.10/ 36.14 METRES

28) DISTANCE KEEL TO TOP OF RADAR MAST: 47.30 METRES

29) CARGO GEAR                            : GEARLESS

30) CARGO GEAR OUTREACH                   : N/A

31) CARGO GEAR DISTRIBUTION AND HOLDS SERVING  : N/A

32) IF FULLY GRAIN FITTED                 : YES

33) IF SELFTRIMMER                        : YES

34) CO2 FITTED                            : NO

35) GRAB FITTED/TYPE AND CAPACITY/HOW OPERATED : N/A

36) AUSTRALIAN HOLD LADDERS FITTED        : YES

37) IF PANAMA CANAL FITTED                : YES

38) SPEED AND CONSUMPTION                 :

ABOUT 12.5 KNOTS ON ABOUT 26 MTS (BALLAST)/ABOUT 12.0 KNOTS ON ABOUT 28 MTS (LADDEN) INTERMEDIATE FUEL OIL 180 CENTISTOKES RME 25 ISO DIS 8217

PLUS

ABOUT 2.5 MTS (AT SEA)/2.0 MTS (AT PORT/WHEN IDLE) MARINE DIESEL OIL DMB ISO 8217.

Speed and consumption warrantees are given in good weather conditions only and no adverse currents.

Within the context of this charterparty,good weather conditions are understood to mean winds up to and including Beaufort force 4 and/or Douglas Sea state 3.

About is understood to mean 0.5knot downwards in the speed and 5pct upwards in the consumption.

For performance evaluation purposes, the overall performance of the vessel is to be reviewed on all laden and ballast passages during the currency of the charterparty. Weather periods in excess to Beaufort 4 and or Douglas Sea state 3, are to be expressly excluded from calculations.

Owners liberty vessel to burn diesel oil when manoeuvring/approaching and leaving ports/navigating in canals/rivers or congested/confined/shallow waters or in cold weather for boiler/heating.

39) NO SUITABLE FOR ALTERNATIVE LOADING IN ACCORDANCE WITH SOLAS CHAPTER XII,REGULATION 14 WITH EFFECT FROM 01st JULT 2006

40) ENGINE TYPE AND BHP/RPM: B&W 13100 BHP/128 RPM

41) NUMBER OF GENERATORS, TYPE AND BHP/RPM:
   - MAN MEP-MAN G6V 23.5/33TL (2 SETS) S/N 6017-6022
   - BAUD W - HOLEBY DIESEL MODEL 5T23LH-2 (1SET) SN 164801
   - 780 BHP EACH / 600 RPM EACH

42) BUNKER CAPACITIES: INTERMEDIATE FUEL OIL: 2,617 METRIC TONS (100%)/MARINE DIESEL OIL: 316 METRIC TONS (100%)

43) YEAR AND MONTH BUILT AND WHERE BUILT: MARCH 12, 1980/ BRASIL

44) FLAG : ST. VINCENT & THE GRENADINES

45) PORT OF REGISTRY                    : KINGSTOWN

46) REGISTERED NUMBER                   : 9152

47) LLOYDS NUMBER                       : N/A

48) IMO NUMBER                          : 7433452

49) INTERNATIONAL/ SUEZ/ PANAMA GRT/NRT OR GT/NT:

INTERNATIONAL : 22,912 / 12,300
SUEZ          : 21,341 / 19,040
PANAMA        :        / 19,090

50) CLASS SOCIETY: BUREAU VERITAS

51) CLASS RATING:  I 3/3 E BULK CARRIER ESP DEEP SEA

52) LAST DRYDOCK: MAY, 2005

53) LAST SPECIAL SURVEY: MAY, 2005

54) CALL SIGN: J 8 B 2 6 8 0 (J8B2680)

55) TELEX SYSTEM/NUMBER: INMARSAT-C / 437738810-1

56) FASCIMILE NUMBER: 763662742

57) P & I CLUB ENTERED WITH: THE AMERICAN P+I.



DURING THE FORTHCOMING RENEWAL (FEB 2008) OWNS HAVE THE RIGHT TO ENTER WITH ANY OTHER MEMBER WITHIN THE INTERNATIONAL P&I GROUP.

58) H & M VALUE: U.S. $ 7,250,000 (SEVEN MILLION TWO HUNDRED AND FIFTY THOUSAND DOLLARS) PLUS $ 1,750,000 IV (ONE MILLION SEVEN HUNDRED AND FIFTY THOUSAND DOLLARS). INSURERS: LLOYD'S UNDERWRITERS "BRIT SYNDICATE" (AS LEADERS).

OWNS HAVE THE RIGHT TO INCREASE ANY OF THE ABOVE VALUES DURING THIS C/P.

59) REGISTERED OWNERS FULL STYLE AND FULL ADDRESS: SIXTEEN THIRTEEN MARINE S.A., MONROVIA, LIBERIA.

60) MANAGER'S NAME, ADRESS / COMMUNICATION DETAILS/ M.I.C.

CHIAN SPIRIT MARITIME ENTERPRISES INC.

10 ANT. AMPATIELOU,
GR-18536 PIRAEUS,
GREECE.
TELEPHONE: +30 210 429 4777

FASCIMILE: +30 210 459 9099
E-MAIL : operations@chianspirit.gr

All details are given in good faith as "about" wog

--- end of vsl's t/c description ---

---

--- charts' qnaire ---

1. HEADOWNER'S FULL STYLE WITH ADDRESS AND COMMUNICATIONS DETAILS.

SIXTEEN THIRTEEN MARINE S.A. of 80 BROAD STR., MONROVIA, LIBERIA.

For correspondence only c/o their managers...

CHIAN SPIRIT MARITIME ENTERPRISES INC.

10 ANT. AMPATIELOU,
GR-18536 PIRAEUS,

GREECE.
TELEPHONE: +30 210 429 4777
FASCIMILE: +30 210 459 9099
E-MAIL : operations@chianspirit.gr

2. NAME OF PERSON BEHIND OWNING COMPANY IE ACTUAL OWNER...

VARIOUS INTERESTS WHICH WE HAVE NO AUTHORITY TO DISCLOSE

3. MANAGERS NAME/STYLE OR DISPONENT OWNERS

SAME AS GIVEN ABOVE IN ITEM 1.

4. NAME OF VESSELS UNDER SAME MANAGEMENT

- MV CAPTAIN P. EGGLEZOS - 76,559 DWY BLT 2007
- MV PANAMAX PEPPOU    - 61,539 DWT BLT 1983

```
- MV PANAMAX ANNA      - 64,700 DWT BLT 1982
- MV MARIA N.M.        - 41,520 DWT BLT 1982
- MV NICHOLAS M.       - 40,153 DWT BLT 1980
- MV IRENE E.M.        - 38,143 DWT BLT 1980
```

OWNERS BANK AND BENEFICIARY

...reverting after fully fixed.

5. P AND I CLUB AND ADDRESS/ COMMUNICATIONS DETAILS

THE AMERICAN P&I CLUB c/o SCB (HELLAS) INC.

51 Akti Miaouli-4th floor
Piraeus 185 36, greece
ph. 210-429-4990
fax 210-429-4187
email: claims@scb-hellas.com

6. H + M VALUE AND INSURER

H & M VALUE: U.S. $ 7,250,000 (SEVEN MILLION TWO HUNDRED AND FIFTY
THOUSAND DOLLARS) PLUS $ 1,750,000 IV (ONE MILLION SEVEN HUNDRED AND FIFTY
THOUSAND DOLLARS).

U/WS' LEADER: "BRIT SYNDICATE" (LLOYD'S UNDERWRITERS).

7. VESSEL'S CLASS

BUREAU VERITAS

8. HAS VESSEL SUFFERED ANY SERIOUS ACCIDENT, BREAKDOWN,
   STRANDING OR SERIOUS CARGO CLAIMS IN PAST 12 MONTHS ?

   NIL

9. HAS VESSEL ANY OUTSTANDING CLASS RECOMMENDATIONS, AND IF SO
   PLS ADVISE DETAILS

   NIL

11. STATUS FOLLOWING CLASS SURVEYS:
    A) HULL SPECIAL SURVEY - LAST DONE 25/05/2005 - NEXT DUE 31/03/2010
    B) DRYDOCKING SURVEY   - LAST DONE 06/04/2005 - NEXT DUE 06/04/2008
    C) HULL ANNUAL SURVEY  - LAST DONE 19/06/2007 - NEXT DUE 30/06/2008

12. LAST 3 CARGOES AND NAME OF CHARTERER :

    - BULK GRAINS ON TCT ACC CONGENTRA FROM UP RIVER TO ST.PETERSBURG
    - BULK MOP ON VOYAGE ACC BPC FROM KLAIPEDA TO MACEIO & PORTO ALEGRE
    - BULK GRAINS ON TCT ACC UNIAPRO UP RIVER TO ST.PETERSBURG

13. PLS ADVISE IF ANY CLAIMS DURING PAST 12 MONTHS:

    NIL

14. OWNS CONFIRM THAT VSL HAVE NOT SUFFERED ANY CASUALTY (GENERAL
    AVERAGE/COLLISIONS/GROUNDINGS/POLLUTIONS ETC) DURING LAST 36 MONTHS:

    IN MAY 2005 VSL RUN AGROUND AT GELIBOLU ANCHORAGE WHILE DROPPING HER
    ANCHOR AND REFLOATED WITH THE ASSISTANCE OF TUGS AFTER SIGNING T.O.F;

file://C:\Documents and Settings\pk.CHIAN\TMP\Message_Number_84937.TXT        08/01/2008



G/A CLAIM ALREADY FULLY SETTLED.

15. PRESENT POSITION, FULL ITINERARY + AGENTS LAST/NXT PORT:

    VSL CURRENTLY AT PORT OF ST.PETERSBURG WITH A BALANCE OF ABT 13.000MTS
    GRAINS TO BE DISCHARGED AND ETC/S 23RD DEC AS PER CHARRS REDELY NOTICES
    AGW WP UCE. OWNS OPINION IS THAT DUE TO LACK OF TRUCKS COMPLETION MAY BE
    REALISTICALLY EXPECTED AROUND 26-27TH DEC AGW WP UCE.

    Agents...reverting

16. CONTANTS + EST BOD + WLTOHC + TYPE OF HATCH COVERS
    OWNERS TO CONFIRM MOULDED DEPTH DOES NOT EXCEED 16M

    CONTANTS + EST BOD + WLTOHC + TYPE OF HATCH COVERS ALL AS GIVEN IN VSL'S
    ABOVE T/C DESCRIPTION AND BELOW OFFER/MAIN TERMS

    OWNS CONFIRM THAT MOULDED DEPTH DOES NOT EXCEED 16M

17. VESSEL TO BE FULLY INSURED AND P+I COVERED INCLUDING WAR
    RISKS FOR THE DURATION OF THE CHARTER PARTY

    YES

18. OWS CONFIRM TT VSL IS IN POSSESION OF VALID CERTS ACCORDING TO
    LATEST SOLAS REGS

    YES

19. OWNERS TO SUPPLY DOCUMENT OF COMPLIANCE (CERTIFIED TRUE COPY TO BE
    PHOTOCOPIED OK)

    ON CHARTS REQUEST PROVIDED VSL FULLY FIXED

20. OWNERS TO CONFIRM OWNERS/VESSEL IS FULLY ISPS COMPLIANT

    YES

21. IF SO REQUIRED OWNERS TO FILL IN RECEIVERS QUESTIONAIRE

    ON CHARTS REQUEST PROVIDED MAIN TERMS AGREED.

22. OWNER TO SEND VSLS ISM CODE SAFETY MANAGEMENT/DOC/CLASS/ISPS/PNI CERTS

    ON CHARTS REQUEST PROVIDED MAIN TERMS AGREED


--- charts' qnaire / end ---


- All negotiations and any subsequent fixture to be kept strictly private
  and confidential.

- ON ARRAL AT 1ST LOADPORT, VSL`S HOLDS TB READY FOR PERMITTED CARGO SERVICE,
  CLEAN, SWEPT, WASHED DOWN AND DRIED UP SO AS TO RECEIVE CHTRS INTD CGO IN ALL
  RESPECTS FREE PREVIOUS CARGO RESIDUES TO THE SATISFACTION OF THE RELEVANT
  SURVEYOR. SHOULD THE VSL NOT BE APPROVED BY THE SURVEYOR THEN THE VESSEL TO
  BE PLACED OFF-HIRE FM FAILURE OF INSPECTIONS UNTILL VSL IS FULLY ACCEPTED AND
  ANY DIRECTLY RELATED EXPENSES THEREOF TB FOR OWS ACCT.

  MORE SPECIFICALLY IN CASE OF VESSEL'S FAILURE TO FULLY PASS ABOVE PRELOADING
  CARGO HOLDS INSPECTION VSL TO BE PLACED OFF HIRE OR PRO RATA OFF HIRE
  (ACCORDING TO THE NUMBER OF HOLDS WHICH WERE NOT READY AND THE LOADING

OPERATIONS WERE ACTUALLY PREVENTED) FROM REJECTION UNTIL THE VSL PASSES THE
SAME INSPECTION/TEST AGAIN AND ANY TIME/DIRECT EXPENSES INCURRED HEREBY TO BE
FOR OWS ACCOUNT.

HOWEVER NOTWITHSTANDING ANYTHING ELSE CONTAINED HERE, IT IS HEREBY AGREED
THAT IN VIEW OF ST.PETERSBURG AS LOADING PORT, TAKING INTO ACCOUNT THAT VSL
WILL NOT HAVE SUFFICIENT TIME (INTERVAL BETWEEN DISCHARGE COMLETION/DELIVERY
TIME) TO PREPARE CARGO HOLDS AS AGREED ABOVE, OWNERS TO HAVE THE RIGHT TO
DELIVER VSL TO CHARTS AT ANCHORAGE WITH UNCLEAN HOLDS, AND OWNERS TO
UNDERTAKE TO HAVE THE VSL READY TO THE STANDARDS ABOVE AGREED, MASTER DOING
HIS OUTMOST IN ORDER TO MINIMIZE CARGO HOLDS PREPARATION TIME, WITHIN 18HRS.
IT IS WELL UNDERSTOOD THAT CARGO HOLDS CLEANING REMAINS MASTER AND/OR OWNERS
RESPONSIBILITY AND THAT IN CASE CLEANING OPERATIONS TAKE MORE THAN THE ABOVE
ALLOWED 18HRS THEN VSL IS TO BE PLACED OFF HIRE UNTIL MASTER DECLARE THAT
VSL'S HOLDS ARE READY FOR INSPECTION, PROVIDED ALWAYS THAT VSL IS REQUIRED TO
PROCEED FOR IMMEDIATE LOADING AND HER HOLDS ARE NOT READY YET, IN OTHER WORDS
PROVIDED THAT THERE IS ACTUAL DELAY TO THE VSL'S ITINERARY.



- OWS GTEE VSL IS SD SELF-TRIMING BC/BRIDGE N ENG ROOM IS AFT

- OWS GTEE VSLS T/T IS FLAT AND SUITABLE FOR GRAB DISCHARGING

- OWS GTE TT VSLS H.COVERS ARE TB WATERTIGHT ALL THROUGHOUT THIS C/PERIOD N IF
  ANY H.COVER FOUND DEFECTIVE, SAME TB RECTIFIED AT OWS TIME N EXPNS TO CLASS
  SURVEYOR SATISFACTION IN WHICH CASE VSL TO BE PLACED PRO RATA OFF-HIRE
  (ACCORDING TO THE NUMBER OF HATCHES WHICH FOUND DEFECTIVE AND THE LOADING
  OPERATIONS WERE ACTUALLY PREVENTED)

- OWS GTEE VSL IS P&I COVERED WITH THE "AMERICAN P&I CLUB", CLASSED WITH
  "B.V" AND SHALL REMAIN SO THROUGHOUT THE WHOLE T/C PERIOD;

OWNERS ALSO WARRANT:

- VESSEL WILL NOT BE SCHEDULED FOR BREAK UP OR SOLD FOR SCRAP DURING
  THIS CHARTER OR UPON COMPLETION OF THIS CHARTER.

- VESSEL'S CREW AND OFFICERS SHALL BE ITF APPROVED OR ITS EQUIVALENT AS
  APPLICABLE/REQUIRED BY THE COMPETENT AUTHORITY OF THE VESSEL'S FLAG.

- VESSEL SHALL NOT CHANGE OWNERSHIP AND/OR CLASS WITHOUT
  CHARTERERS' WRITTEN CONSENT



FOR

1. MV "NICHOLAS M." (EX- MED UNITY) AS DESCRIBED ABOVE

2. Account "BRITANNIA BULKERS A/S" a company under the same group with
        "BRITANNIA BULK PLC, UK"/C

   add...   DK-5700 SVENBORG DENMARK

   ph.nr........

   email........

   mic.........


   (comments: pls provide charrs full style for cp purposes/our ops dept easy
   ref)

3. DELIVERY: ON DLOSP ST.PETERSBURG, RUSSIA ATDNSHINC

4. LAY/CANCELLING DATE: 00:00HRS LT 23rd DEC 2007 - 24:00 HRS 31ST DEC 2007

5. ALLOWED TRADING : ONLY 1 STRAIGHT TCT VIA ST. PETERSBURG, RUSSIA TO BRAZIL
   AND/OR ARGENTINA AND/OR URUGUAY (intn:........) ALWAYS VIA SAFE PORT (S),
   SAFE BERTH (S),SAFE ANCHORAGE (S) ALWAYS AFLOAT (EXCEPT FOR ECSA ONLY
   WHEREVER NAABSA APPLICABLE AS PER NYPE) ALWAYS WITHIN INSTITUTE WARRANTY
   LIMITS (IWL/INL), EXCEPT FOR PETERSBURG ONLY WHICH IS ALLOWED AS LOADING
   PORT AS AGREED, AND ALWAYS EXCLUDING WAR OR WARLIKE ZONES (CONWARTIME 2004
   TO APPLY), IN/OUT GEO ROTATION.

   IT IS WELL UNDERSTOOD AND AGREED THAT IN VIEW OF THE VESSEL'S TRADE, BIMCO
   "ICE CLAUSE" AND "BUNKER FUEL SULPHUR CONTENT 2005" CLAUSES FOR TIME CHARTER
   PARTIES SHALL APPLY.

   DURATION ABT 45 DAYS WOG

6. ALLOWED CARGO: ONLY HARMLESS FERTILIZERS IN BULK (intn:......).

   IF MORE THAN ONE GRADES CARGO TO BE NATURALLY SEPARATED BY THE VSL'S HOLDS
   ONLY.

   IT IS UNDERSTOOD THAT CHARTERERS MAY LOAD ANY FERTILIZERS IN BULK, PROVIDED
   THAT CARGO WILL BE LOADED IN STRICT ACCORDANCE WITH INTERNATIONAL IMO
   REGULATIONS AND TO BE HARMLESS/NON- IMO DANGEROUS CARGO FOR THE
   LOADING,STORAGE AND CARRIAGE OF WHICH THE VESSEL IS NOT REQUIRED TO BE CO2
   FITTED OR NO APPENDIX B REQUIREMENTS APPLY OR REQUIRED BY CHARTERERS AND/OR
   SHIPPERS AND/OR CARGO AND/OR VESSELS OR CARGO UNDERWITERS AND/OR ANY OTHER
   COMPETENT AUTHORITY. PALM KERNEL EXPELLERS,SUNFLOWER SEED EXPELLERS,PELLETS
   ALWAYS TO BE EXCLUDED.

7. REDELY : ON DLOSP 1SP WITHIN VITORIA - BAHIA BLANCA RANGE, ATDNSHINC

8. HIRE U$D 40,000 DAILY HIRE - DAILY HIRE TO INCLUDE OT/FW/LUBES AND TO BE
   PAYABLE EVERY 15 DAYS IN ADVANCE

   UPON DELY CHARTS TO PAY 15 DAYS HIRE PLUS FULL VALUE OF BUNKERS AS
   ON BOARD AT THE DATE OF DELIVERY WITH NO DEDUCTIONS OF ESTIMATED BUNKERS
   VALUE ON REDELIVERY. ANY SUCH DEDUCTION TO BE MADE FROM THE LAST SUBSEQUENT
   SUFFICIENT HIRE PAYMENT.

   CHARTERERS NO TO MAKE ANY DEDUCTION IN RESPECT OF OWNERS EXPENSES AT ANY
   PORT OF CALL DURING THIS CHARTER PARTY OWNERS SETTLING ALL OWNERS' EXPENSES
   DIRECTLY WITH AGENTS, HOWEVER CHARTERERS' AGENTS TO ATTEND VESSEL'S MINOR
   MATTERS SUCH AS CASH TO MASTER, CHANGES OF PART OF CREW ETC WITHOUT CHARGING
   EXTRA AGENCY FEE. FOR MAJOR SHIP'S HUSBANDRY MATTERS SUCH AS EMERGENY
   DRYDOCKING OWNERS TO MAKE THEIR OWN ARRANGEMENT WITH AGENTS. OWNERS TO
   ALWAYS HAVE THE RIGHT TO APPOINT THEIR OWN PROTECTING AGENTS AT BOTH ENDS.

9. BUNKERS ON DELY ABT 300 IFO AND ABT 50 MDO AT U$D 500PMT AND U$D 800
   RESPECTIVELY.

   BUNKERS ON REDELIVERY ABT SAME QUANTITIES AT SAME PRICES AS ON DELIVERY.

   CHARTERERS TO PAY FULL VALUE OF BUNKERS ON DELY AS ON BOARD.

   BOTH CHARTERERS AND OWNERS TO HAVE THE PRIVILEGE TO BUNKER THE VESSEL PRIOR
   TO DELIVERY/REDELIVERY PROVIDED SAME DOES NOT INTERFERE WITH VESSEL'S
   OPERATIONS OR ITINERARY IN WHICH CASE SAME TO BE SUBJECT TO BOTH PARTIES
   MUTUAL AGREEMENT WHICH NOT BE UNREASONABLY WITHELD.

   CHARTS TO HAVE THE RIGHT TO DEDUCT FROM THE LAST SUFFICIENT HIRE PAYMENT(S)

BUT NOT FROM THE FIRST 30 DAYS THE ESTIMATED VALUE OF BUNKERS ON
REDELIVERY

OWNERS ALLOW CHARTERERS TO BUNKER THE VESSEL AT SOUTH AMERICA
WITH FUEL ACCORDING TO PETROBRAS SPECIFICATIONS BUT ALWAYS WITH BUNKERS
WITHIN THE SPECIFICATIONS OF THE VSL'S ABOVE FULL T/C DESCRIPTION.

10. ON HIRE/OFF HIRE SURVEYS TO BE CARRIED OUT AT CHARTS TIME AND EXPENSES
    OWNERS APPOINTING MASTER TO ATTEND ON THEIR BEHALF.

11. ANY ADD WAR PREMIUM DURING THIS C/P (IF ANY) TO BE FOR CHRS' ACCT AGAINST
    FAXED VOUCHERS; MORE SPECIFICALLY CONWARTIME 2004 TO APPLY.

12. ILOCH

    CHARTERERS HAVE THE OPTION OF REDELIVERING THE VESSEL WITHOUT CLEANING HOLDS
    CHARTERERS PAYING U$D 6500 LUMPSUM

13. C/V/E USD 1,250 PER MONTH PRO RATA

14. OWNERS TO ALLOW CHARTERERS TO DISCHARGE CARGOS WITHOUT
    PRESENTATION OF ORIGINAL BILL(S)/LADING BY PROVIDING WITH LETTER OF
    INDEMNITY IN ACCORDANCE WITH OWNERS P N I CLUB FORM AND WORDING
    BEFORE DISCHARGING. LETTER OF INDEMNITY TB SIGNED BY CHARTERERS ONLY.

    CHARTERERS, THEIR AGENTS OR THEIR NOMINEES ARE AUTHORISED TO SPLIT BILL(S)
    OF LADING INTO DELIVERY ORDERS PROVIDED A FULL SET OF ORIGINAL BILL(S) OF
    LADING ARE AVAILABLE TO OWNERS AND AGAINST CHARTERERS LETTER OF INDEMNITY AS
    PER OWNERS' P&I CLUB WORDING, PRIOR TO SPLITTING. OWNERS ARE NOT RESPONSIBLE
    FOR ANY CARGO SHORTAGE CLAIM DUE TO SUCH BILLS OF LADING SPLITTING.

15. BIMCO ISM/ISPS/NON-PAYMENT OF HIRE/ ICE-CLAUSE/EVIDENCE OF PERFORMANCE/FUEL
    SULPHUR CONTENT/BUNKER QUALITY CONTROL/U.S. SECURITY/U.S.CUSTOMS ADVANCE
    NOTIFICATION/AMS BIMCO CLAUSES FOR TIME CHARTER PARTIES CLAUSES TO APPLY

16. FOR THE PURPOSE OF COMPUTING HIRE PAYMENTS, THE TIME FOR
    DELIVERY/REDELIVERY SHALL BE ADJUSTED TO G.M.T

17. ANY OFF HIRE DEDUCTION UNDER THIS CHARTER PARTY DUE TO VSLS INEFFICIENCY
    ARREST,DETENTION,SEIZURE, MACHINERY BREAKDOWN ETC...BY ANY AUTHORITY AND FOR
    ANY REASON TO BE MADE ON THE BASIS OF THE ACTUAL TIME LOST DURING THE
    PERIOD OF THE VESSELS INEFFICIENCY ARREST, DETENTION, SEIZURE,MACHINERY
    BREAKDOWN ETC... LIMITED TO, BUT NOT EXCEEDING, THE WHOLE PERIOD OF THE
    SAME.

    IT IS HEREBY UNCONDITIONALLY AGREED THAT THIS CLAUSE IS A "NET/ACTUAL
    TIME LOST CLAUSE"

18. GENERAL AVERAGE IN LONDON ACCORDING TO YORK-ANTWERP RULES 1994 / ENGLISH LAW
    AS WELL AS LMAA SMALL CLAIMS (UPTO $75,000) PROCEDURE TO APPLY

19. Add. Comm 3.75% due to charrs + 1,25 % due to Lightsip + 1,25 TO Billmar

20. NO WAY BILLS, NO LINER OUT BS/L , HAGUE-VISBY RULES TO BE INCORPORATED IN
    ANY B/L ISSUED UNDER THIS C/P .

21. ALL TAXES AND DUES AND CHARGES ON THE VSL AND/OR CARGO AND/OR FRT AND/OR
    HIRE ARISING OUT OF CARGOES CARRIED OR PORTS VISITED OR COUNTRIES TRADED
    THROUGH UNDER THIS CHARTER TO BE FOR CHTRS ACCT.

22. Neither the Charterers nor their agents shall permitt the issue of any
    B(s)/L (whether or not signed on behalf of the Owners or on the
    charterers behalf of any sub-charterers) incorporating the Hamburg Rules or
    any legislation giving effect to the Hamburg Rules or any other legislation

imposing liabilities in excess of Hague-Visby rules. The Charterers shall indemnify the Owners against any liability, loss or damage which may result from any breach of the forgoing provision of the clause. No liner Bills or Way Bills of Lading and no through transhipment or combined transport Bills of Lading to be issued

23. OTHERWISE SUB CP DETAILS/FUTHER TERMS AS PER PROFORMA C/P OF M/V "FURIA R." ACC "OLDENDORFF CARRIERS GMBH & CO.KG" DD 18TH MAY 2006 STRICTLY AND LOGICALLY AMENDED AS PER MAIN TERMS AGREED AS WELL AS BELOW C/P DETAILS/ALTERATIONS;

IT IS WELL UNDERSTOOD AND AGREED THAT ALL TERMS/CONDITIONS IN ABOVE MAIN TERMS AGREEMENT AS WELL AS BELOW FURTHER C/P DETAILS/ALTERATIONS WILL SUPERSEDE ALL TERMS/CONDITIONS/CLAUSES OF SAME MEANING/WORDING OF PROFORMA C/P AND FORM PART OF IT:

MAIN BODY
---------

DELETE LINES AS FROM 1 TILL 19 :     SAME TO BE AMMENDED AS PER MAIN
                                     TERMS AGREED BUT LINES 16/17 TO REMAIN AS
                                     PRINTED

LINE 43:                             AFTER 'CHRTS ACCOUNT.' INSERT 'IN CASE OF
                                     OPTIONAL PILOTAGE COST OF SAME TO BE PAID BY
                                     CHRTS IN THEIR DISCRETION AND AFTER
                                     CONSIDERATION OF MASTERS REASONABLE AND
                                     SENSIBLE REQUEST WHICH NOT TO BE UNREASONABLE
                                     WITHELD'

LINES:45/46/47 :                     DELETE AS NON APPLICABLE

LINE 57 :                            DELETE ',AND PROBABLE PORT' AND INSERT

                                     '.LATEST TOGETHER WITH 15 DAYS APPROXIMATE
                                     NOTICE OF REDELIVERY CHARTERERS TO ADVISE THE
                                     FINAL REDELIVERY PORT'

LINE 95 :                            DELETE 'GIVEN WRITTEN NOR' INSERT 'DELIVERED'

LINES 145-150:                       DELETE ALL LINES AS N/A (VSL IS GRLSS) EXCEPT
                                     IN LINE 145 WHERE THE SENTENCE 'VESSEL TO
                                     WORK...REQUIRED BY CHARTERERS' TO REMAIN


RIDER CLAUSES
-------------

CLAUSE 29 : TO BE TITLED "ALLOWED CARGO" AND TO BE AMENDED AS PER
            PARA "6" OF MAIN TERMS.

CLAUSE 30 : TO BE TITLED "ALLOWED TRADING" AND TO BE AMENDED AS PER
            PARA "5" OF MAIN TERMS.

CLAUSE 33 : AMEND PER MAIN TERMS PARA 12, OWISE AS PER C/P EXCEPT 2ND LINE
            DELETE AS FROM 'INCLUDING, IF PERMITTED"... TILL THE END OF THE
            CLAUSE

CLAUSE 38 : 3RD LINE DELETE "REMAINS UNDER ARREST OR" OTHERWISE AS
            PER ABOVE PARA 17 OF MAIN TERMS.

CLAUSE 39 : REPLACE 9TH PARAGRAPH I.E. AS FROM " CHARTERERS HAVE

THE OPTION .... TILL ....OF LINER BILLS OF LADING" WITH " NO
LINER OUT BILLS OF LADING UNDER THIS CHARTER PARTY"

OTHERWISE TO BE ALSO AMENDED SO AS TO INCORPORATE THE PROVISIONS OF
MAIN TERMS ABOVE RELEVANT PARA 14.

CLAUSE 41 : PARA 1 THRU 7 AMENDED AS PER MAIN TERMS (IE QTTIES/PRICES/SPECS
           ETC) OWISE TO REMAIN AS PER C/P EXCEPT AFTER 'SUPPLIER' INSERT
           'FROM THE VESSEL'S MANIFOLD'

CLAUSE 44 : DELETE AND TO BE AMENDED AS PER ABOVE PARA 8 OF MAIN TERMS.

CLAUSE 49 : 1ST LINE AFTER "SUPERCARGO(ES)" INSERT " UPON REASONABLE REQUEST"

CLAUSE 51 : DELETE AS NON APPLICABLE

CLAUSE 54 : ADD AT THE END "THIS IS A 'NET ACTUAL TIME LOST CLAUSE'
           FOR THE TIME THEREBY ACTUAL LOST AND NOT A PERIOD CLAUSE"

CLAUSE 56 : TO BE DELETED AND TO READ AS PER ABOVE PARA 10 OF MAIN TERMS.

CLAUSE 58 : DELETE "COURIER" INSERT "E-MAIL IF REQUIRED"

CLAUSE 59 : DELETE WHOLE AS N/A

CLAUSE 60 : ADD "AND SAME TO BE INCORPORATED TO ANY BILLS OF
           LADING ISSUED HEREUNDER"

CLAUSE 62 : DELETE AS FROM "WITHIN 3 BANKING DAYS TILL END OF THE
           CLAUSE" INSERT "ON DELIVERY"

CLAUSE 63 : DELETE IN FULL AS N/A.

CLAUSE 71 : AS PER C/P EXCEPT
           LINE 1 DELETE 'JAPAN,' INSERT 'RUSSIA"
                  DELETE 'DENMARK' INSERT 'ARGENTINA OR BRAZIL OR URUGUAY"
           ADD AT END 'PROVIDED NO CARGO ONBOARD'

CLAUSE 72 : DELETE WHOLE AS N/A

CLAUSE 76 : DELETE WHOLE AS N/A

- PLS ALSO REPLACE THE ATTACHED TO THE PROFORMA SET OF LOIS (TTL 3) WITH
  THE NEW ONE AS ATTACHED HEREWITH.

=== recap of fixture (main terms+cp dets) clean on all subjects / end ===

END

# EXHIBIT EEL-3

**B&G Maritime S.A.**

## STATEMENT OF FACTS

Page 1

| | |
|---|---|
| MOV: | **NICHOLAS M** |
| Flag: | ST. VINCENT & GRENADINES |
| Master: | APILADO, ABADO C. |
| Cargo: | SOYA MEAL IN BULK |

**PORT OF SAN LORENZO**

Bunkers on arrival:    FOIL: 815,03 mt
MDOIL: 179,43 mt FW:    130,00 mt
Bunkers on sailing:    FOIL: 829,95 mt
MDOIL: 155,51 mt FW:    160 mt
Draft on arrival:
Fore:    3,78 mts Aft:    5,54 mts
Draft on sailing:
Fore:    mts Aft:    mts

| | | |
|---|---|---|
| Arrived at roads: | 15/10/2007 - 06:36 | hrs. |
| Berthed: | 18/10/2007 - 11:45 | hrs. |
| Commenced operations: | 18/10/2007 - 14:25 | hrs. |
| Completed operations: | 30/10/2007 - 17:00 | hrs. |
| Sailed: | 30/10/2007 - 16:00 | hrs. |

| Date | Time | Observations |
|---|---|---|
| 15/10/2007 Mon | 13:00 hrs | Arrived at Recalada P.S. |
| | 14:00 hrs | P.O.B. And proceeded. |
| | 23:12 hrs | Arrived and dropped anchors at Common Zone (Rightwing area) to perform owners' matters. |
| | 23:12 hrs | Free pratique and clearance for arrival granted. |
| 16/10/2007 Tue | 02:10 hrs | m/t VALIENTE moored broadside alongside to supply bunkers. |
| | 13:00 hrs | m/t VALIENTE finished bunkers delivery. |
| | 21:40 hrs | Electric motor was delivered on board the m/v NICHOLAS M, as per owners instructions. |
| | 22:29 hrs | Clearance for departure granted. |
| 17/10/2007 Wed | 04:30 hrs | m/t ING. RECCA moored broadside alongside to supply bunkers. |
| | 08:15 hrs | m/t ING. RECCA finished 2nd round of bunkers delivery. |
| | 10:35 hrs | P.O.B. |
| | 11:00 hrs | Proceeded to San Lorenzo. |
| 18/10/2007 Thu | 09:36 hrs | Arrived at San Lorenzo roads. NOTICE OF READINESS tendered by Master to all concerned parties. |
| | 11:00 hrs | First Line ashore. |
| | 11:45 hrs | Made all fast at NIDERA berth. |
| | 13:00 hrs | Clearance for arrival granted. |
| | 14:00 hrs | Cargo holds nos. 1-2-3-4-5-6-7 inspected and approved for loading by Messrs. SIEMASA and SCHUTTER surveyors. |
| | 14:20 hrs | Prior loading no inspection passed. |
| | 14:25 hrs | Commenced loading SBM into no. 4 hold (NIDERA parcel). SHIFT FROM 14:25 HRS TO 16:00 HRS: |
| | | Hold no. 4    2,290,000 kilos |
| | 16:00 hrs | SHIFT FROM 16:00 HRS TO 22:05 HRS: |
| | | Overtime ordered by the charterers/shippers. |
| | | Hold no. 4    2,637,000 kilos |
| | 22:05 hrs | Completed loading at NIDERA berth upon completing total cargo of 4,932,000 kilos of SOYA MEAL in bulk. |
| | | Continue on page 2.- |

Agent's Signature                          Master's Signature

Buenos Aires Office
B&G Maritime S.A.
San Lorenzo Office

50



B&G Maritime S.A.

| M/V: | NICHOLAS M | | Page 2 |
| Flag: | ST. VINCENT & GRENADINES | | PORT OF SAN LORENZO |

| Date | | Time | Observations |
|---|---|---|---|
| 18/10/2007 | Thu | 22:00 hrs | P.O.B. |
| | | 23:15 hrs | Un-moored from NIDERA berth. |
| 19/10/2007 | Fri | 01:50 hrs | Dropped anchors at San Lorenzo roads as TERMINAL 6 was occupied by the m/v WORLD SWAN. |
| | | 12:45 hrs | The m/v WORLD SWAN un-moored from TERMINAL 6. |
| | | 14:00 hrs | The m/v ALTAIR berthed at TERMINAL 6. |
| 20/10/2007 | Sat | | Berth occupied by m/v ALTAIR. |
| 21/10/2007 | Sun | 01:20 hrs | P.O.B. |
| | | 02:45 hrs | Commenced heaving port and starboard anchors. |
| | | 02:50 hrs | The m/v ALTAIR un-moored from TERMINAL 6. |
| | | 03:00 hrs | Stopped heaving port anchor; starboard anchor motor stopped by itself. |
| | | 04:30 hrs | After checking the starboard windlass motor it was found to be burnt. |
| | | 05:07 hrs | Master informed vessel was put in conditions to proceed alongside as the starboard windlass motor was out of order. |
| | | 05:54 hrs | Pilot off. |
| | | 10:20 hrs | The m/v NAVISION LOGGER berthed at TERMINAL 6. |
| 22/10/2007 | Mon | 12:30 hrs | The m/v NAVISION LOGGER un-moored from TERMINAL 6. |
| | | 13:10 hrs | The m/v BROADGATE berthed at TERMINAL 6. |
| 23/10/2007 | Tue | 07:15 hrs | The m/v BROADGATE un-moored from TERMINAL 6. |
| | | 08:00 hrs | The m/v CANOPUS berthed at TERMINAL 6. |
| | | 23:10 hrs | The m/v CANOPUS un-moored from TERMINAL 6. |
| 24/10/2007 | Wed | 01:00 hrs | The m/v CALYPSO N berthed at TERMINAL 6. |
| | | 16:40 hrs | The m/v CALYPSO N un-moored from TERMINAL 6. |
| | | 12:25 hrs | The m/v SITUS STAR berthed at TERMINAL 6. |
| 25/10/2007 | Thu | 01:00 hrs | The m/v SITUS STAR un-moored from TERMINAL 6. |
| | | 02:45 hrs | The m/v SPEEDY FALCON berthed at TERMINAL 6. |
| 26/10/2007 | Fri | | Berth occupied by the m/v SPEEDY FALCON. |
| 27/10/2007 | Sat | 09:00 hrs | Master informed vessel's starboard windlass was repaired and therefore vessel in good conditions to proceed alongside when instructed. Since the m/v SPEEDY FALCON undergoes de-ballasting problems thus being uncertain the completion time at TERMINAL 6-NORTH BERTH so the m/v NICHOLAS M re-scheduled for VICENTIN berth that was occupied by the m/v CLIPPER KITTY. |
| 28/10/2007 | Sun | 09:06 hrs | P.O.B. |
| | | 10:40 hrs | Weighed anchors. |
| | | 12:06 hrs | Dropped anchors back at SAN LORENZO roads due to main engine problems. |
| | | 13:06 hrs | The m/v CLIPPER KITTY un-moored from VICENTIN berth. |
| | | 13:25 hrs | Weighed anchors and proceeded to berth after solving main engine problems. |
| | | 15:12 hrs | Sine fine pilotem. |

Agent's signature    Continues on page 3.    Master's signature

Buenos Aires Office ... B&G Maritime S.A. ... San Lorenzo Office



B&G Maritime S.A.



| M/V: | NICHOLAS M | | Page 3 |
|---|---|---|---|
| Flag: | ST. VINCENT & GRENADINES | | PORT OF SAN LORENZO |

| Date | Time | | Observations |
|---|---|---|---|
| 28/10/2007 | Sun | 15:58 hrs | Made all fast at VICENTIN berth. |
| | | 16:15 hrs | Cargo holds re-inspected. |
| | | 16:20 hrs | Commenced loading VICENTIN parcel by two gangs. |
| | | | SHIFT FROM 16:20 HRS TO 18:00 HRS: |
| | | | Overtime ordered by the charterers. |
| | | | Hold no 2 .......... 1,839.000 kilos |
| | | | Hold no 6 .......... 1,000.000 kilos |
| | | | Total cargo loaded ... 2,839.000 kilos |
| | | | SHIFT FROM 18:00 HRS TO 22:00 HRS: |
| | | | Overtime ordered by the charterers. |
| | | | Hold no 2 .......... 4,529.000 kilos |
| | | | Hold no 6 .......... 1,732.000 kilos |
| | | | Total cargo loaded ... 3,661.000 kilos |
| | | 22:00 hrs | Completed loading at VICENTIN berth with a total cargo of 7,700.000 kilos of SOYA MEAL in bulk. |
| | | 22:30 hrs | F.O.B. |
| | | 23:44 hrs | Un-moored from VICENTIN berth. |
| 29/10/2007 | Mon | 00:03 hrs | Dropped anchors at SAN LORENZO roads at TERMINAL 6 - NORTH BERTH was occupied by the m/v STOLT INTEGRITY. |
| | | 14:48 hrs | F.O.B. |
| | | 15:03 hrs | The m/v STOLT INTEGRITY un-moored from TERMINAL 6. |
| | | 15:45 hrs | m/v NICHOLAS M weighed anchors and proceeded to berth. |
| | | 16:08 hrs | First line ashore. |
| | | 16:50 hrs | Made all fast at TERMINAL 6 - NORTH BERTH. |
| | | 17:30 hrs | Cargo holds re-inspected. |
| | | 17:35 hrs | Commenced loading by two gangs. |
| | | | SHIFT FROM 17:35 HRS TO 18:00 HRS: |
| | | | Hold no 3 .......... 100.000 kilos |
| | | | Hold no 5 .......... 150.000 kilos |
| | | | Total cargo loaded ... 250.000 kilos |
| | | 18:00 hrs | SHIFT FROM 18:00 HRS TO 24:00 HRS: |
| | | | Overtime ordered by the charterers. |
| | | | Hold no 1 .......... 500.000 kilos |
| | | | Hold no 3 .......... 3,412.000 kilos |
| | | | Hold no 5 .......... 3,371.000 kilos |
| | | | Hold no 7 .......... 990.000 kilos |
| | | | Total cargo loaded ... 8,273.000 kilos |
| | | | SHIFT FROM 00:00 HRS TO 06:00 HRS: |
| | | | Overtime ordered by the charterers. |
| 30/10/2007 | Tue | 00:00 hrs | Hold no 1 .......... 2,144.000 kilos |
| | | | Hold no 3 .......... 97.000 kilos |
| | | | Hold no 5 .......... 69.000 kilos |
| | | | Hold no 6 .......... 2,346.000 kilos |
| | | | Hold no 7 .......... 1,050.000 kilos |
| | | | Total cargo loaded ... 5,706.000 kilos |
| | | | Continue on page 4.- | |

Agent Signature

Master's signature

Buenos Aires Office

Marcelo Torcuato de Alvear 624 - 6° Piso - Ofic. 173
Edificio Buenos Aires Plaza - Dique 1
Puerto Madero Este
(1107) Buenos Aires - República Argentina
Phone: (+54 11) 5254.0000 (Rotary lines).

B&G Maritime S.A.

E-mail: oper@maritime.com.ar
        a&g@maritime.com.ar
Web: www.agmaritime.com.ar
Telex: (via satelite) 33208ABQU B
Fax: (+54 11) 5254.0052

San Lorenzo Office

9 de Julio 286
San Lorenzo
(2200) Provincia de Santa Fe
República Argentina
Phone: (+54 3476) 423371/050





| Ms/V: | NICHOLAS M | | Page 4 |
| Flag: | ST. VINCENT & GRENADINES | | PORT OF SAN LORENZO |

| Date | Time | Observations |
|---|---|---|
| 30/10/2007 | Tue  06:00 hrs | SHIFT FROM 06:00 HRS TO 12:00 HRS |
| | | Hold no 1                         556.000 kilos |
| | | Hold no 6                      1.209.000 kilos |
| | | Hold no 7                      1.406.000 kilos |
| | | Total cargo loaded            3.171.000 kilos |
| | 10:30/11:10 hrs | No loading while C/O/F was checking draft and making calculations. |
| | 12:00 hrs | SHIFT FROM 12:00 HRS TO 12:00 HRS |
| | | Hold no 7                          67.000 kilos |
| | | Total cargo loaded              67.000 kilos |
| | 12:00 hrs | P.O.B. |
| | 12:30 hrs | Completed loading at TERMINAL 6 - NORTH BERTH with a total |
| | | cargo of 17.567.000 Kilos of SOYA MEAL in bulk. |
| | 12:42 hrs | Cleared-out by Port Authorities. |
| | 16:00 hrs | Sailed. |
| | | |
| | | Total cargo loaded at SAN LORENZO: 30.204.000 kilos of SOYA MEAL. |
| | | Shippers: |
| | | MOLERA S.A.I.C.                 4.577.000 kilos |
| | | VICENTIN S.A.I.C.             7.788.000 kilos |
| | | BUNGE ARGENTINA S.A.       8.592.000 kilos |
| | | AGD S.A.                         9.097.000 kilos |
| | | |
| | | Loaded per hold: |
| | | Hold no 1    3.250.000 kilos / FULL. |
| | | Hold no 2    5.562.000 kilos / FULL. |
| | | Hold no 3    3.629.000 kilos / FULL. |
| | | Hold no 4    4.537.000 kilos / FULL. |
| | | Hold no 5    3.730.000 kilos / FULL. |
| | | Hold no 6    5.687.000 kilos / FULL. |
| | | Hold no.7    3.473.000 kilos / FULL. |

MARITIMA MERSA S.R.L.
-As Agents Only-

MASTERS REMARK:
28TH OCTOBER
0500-5700 AWAITOR MASTER INSTALLED, VESSEL TENDER
AGED READY FOR BERTHING.
1205-1256 - VESSEL BALLASTED ANCHOR WAITING FOR
BERTH TO BE CLEARED BY OTHER VESSEL

Buenos Aires Office:
Manuela Saenz 323 - 8° Piso - Ofic. 173
Edificio Dubrica Alsa Plaza - Dique III
Puerto Madero Este
(1107) Buenos Aires - República Argentina
Phones: (+54-11) 5354.9080 (Revolving lines)

B&G Maritime S.A.
E-mail: opar@maritima.com.ar
bkg@maritima.com.ar
Web: www.bgmaritima.com.ar
Telex (Mr messges): 22256A/BG S
Fax: (+54 11) 9376.8462

San Lorenzo Office:
9 de Julio 349
San Lorenzo
(2200) Provincia de Santa Fe
República Argentina
Phone: (+54 3476) 433372940

M.V. "NICHOLAS M"                    PORT OF ST. PETERSBURG
KINGSTOWN                            1ST DECEMBER 2007

## MARINE NOTE OF SEA PROTEST

I, Capt. Amado C. Apilado, of legal age Filipino Citizen, Master of M.V. " NICHOLAS M " of 23,912 grt. And 12,300 nrt. With official No. 9152. Registered in Kingstown, St. Vincent & The Grenadines do hereby declare.

Note that the vessel sailed from San Lorenzo, Argentina, on the 30th day of October 2007. With a total cargo of 30,204 mt of Soya Beans Meal in bulk carried inside her cargo holds nos. 1, 2, 3, 4, 5, 6 and 7. That the vessel bound for St. Petersburg, Russia.

That during the voyage and especially on the 24th to 26th of November 2007. The vessel encountered enormous bad weather of beufore wind scale force 8 - 9. A high sea swell from NW'LY - NNW'LY caused a heavy rolling and pitching of the ship causing lashing of provison crane aft to break and damage its roller wheel. High seas entered by force at forecastle deck and on main deck and sea sprays all over the hatch covers.

The hull and engine suffers. These days of bad weather the vessel was sailing with reduced speed and steer various courses in order to minimize the rolling of the ship and to avoid damages. And during the entire voyage all steel doors and hatch covers were tightly closed. Fearing probable damage to ship, her engine and the cargo.

I, Hereby declare the present SEA-PROTEST against all damages which might have been resulted due to the bad weather, reserving all my legal rights to extend same at the time and the place convenient.

Capt. Amado C. Apilado
Master M.V. " NICHOLAS M "

.54



**BARLOW LYDE & GILBERT**

Barlow Lyde & Gilbert LLP
Beaufort House 15 St Botolph Street London EC3A 7NJ
tel +44 (0)20 7247 2277  fax +44 (0)20 7071 9000
DX 155 London CDE

**Fax to**
Chian Spirit Maritime Enterprises Inc, and to
The Owners of the "NICHOLAS M".
c/o Billmar Chartering

**By email**

Fax No: 00 30 210 4282291

**From**
Eurof Lloyd-Lewis/Andrew Speake
(B-ACS/ACS/3.69)

**E-mail**
aspeake@blg.co.uk

**Direct telephone number**
020 7643 7675

**Direct fax number**
020 7071 9601

**No. of pages (including this page)**

2

**Date**
6 December 2007

This fax is intended only for the addressee(s) named above.  As this fax may contain confidential or privileged information, if you are not a named addressee or person responsible for delivering the message to the named addressee(s) please telephone us IMMEDIATELY.  The contents should not be disclosed to any other person nor copies taken.

Dear Sirs

**MV NICHOLAS M ("the Vessel") San Lorenzo to St Petersburg**
**Charterparty dated 10 October 2007.**
**Bill of lading No 1 dated 18 October 2007 for 4,937 mt of Soyabean meal ("the Cargo") -**
**Damage to the Cargo in Hold No 4.**

We are Solicitors based in the City of London and are instructed by Congentra AG, the time charterers under the above-captioned charter, and by OOO Euroweg Zerno, the consignee under the above-captioned bill of lading, and their cargo underwriters.

Congentra AG has passed to us copies of your recent emails. We note your admission in your email of 3 December on behalf of the Vessel's Owners that the Cargo has suffered wet damage during its carriage from Argentina to Russia. It follows that the Vessel's Owners have committed a breach of the charter and of the contract of carriage as evidenced by the bill of lading, and/or a breach of duty. Our clients are thus entitled to compensation for their loss and damage and we would invite your proposals in this regard. You should note however, that we are instructed that a significantly greater quantity than 5mt has been damaged.  In the absence of an immediate settlement we are instructed to negotiate with the Vessel's P&I Club to obtain security for the value of the cargo claim together with interest and costs thereon.

Our clients are anxious to mitigate their losses.  It is therefore imperative that the Cargo is discharged as soon as possible so that the sound can be separated from the unsound.  Our clients intend to appoint SGS to oversee the discharge and segregation operation.  We are

MV NICHOLAS

www.blg.co.uk

Barlow Lyde & Gilbert LLP or an affiliated undertaking has an office in each of the places listed below.

LONDON   HONG KONG   SINGAPORE   SHANGHAI

Barlow Lyde & Gilbert LLP is a limited liability partnership, registered in England and Wales with registered number OC323641.  It is regulated by the Solicitors Regulation Authority.  The term partner is used to refer to a member of Barlow Lyde & Gilbert LLP or an employee or consultant with equivalent standing and qualifications.  A list of members is open to inspection at the registered office, Beaufort House, 15 St Botolph Street, London EC3A 7NJ.

55


**BARLOW LYDE & GILBERT**

Page 2

instructed to invite you to appoint a surveyor to observe this operation so that at its conclusion an agreement may be concluded with regard to the quantity of damaged cargo.

Owners must appreciate the following however: Firstly, the Cargo will have to be Customs cleared. As a consequence our clients will incur a liability to pay VAT and duties (we estimate these to be about US$212,000 on the entire contents of hold number 4) even though it may subsequently be determined that all or some of the damaged cargo has depreciated in value or has no value. Any VAT and duties our clients have been compelled to pay on such cargo will form part of their claim for damages on the basis that this forms part of the costs of mitigation and/or wasted expenditure caused by Owners' breach of contract and/or duty. Secondly, there are no segregation facilities in St Petersburg so the Cargo will have to be separated using grabs into trucks or railway wagons. We anticipate that this procedure will delay discharge and result in additional cost if this is indeed the case and results in any additional cost to our clients it will also form part of their claim.

If Owners' disagree with any of the above please advise us as a matter of urgency. Otherwise our clients will proceed on the basis that Owners are in agreement and we await to learn whom Owners will appoint to observe the segregation operation.

You will be aware that our clients have written separately to Wakefield with regard to the sampling exercise conducted on 3 December. In particular, we await confirmation of the name of the independent laboratory conducting the analysis, and also when they will receive the results. Pending a full and satisfactory answer to the questions our clients have asked we must continue to continue to reserve all their rights with regard to the sampling and joint survey.

Finally, pending a satisfactory resolution of all the issues between our clients and Vessel interests we must continue to reserve all their rights generally.

We wait to hear from you.

Yours faithfully

*Barlow Lyde & Gilbert LLP.*

Barlow Lyde & Gilbert LLP

MV NICHOLAS

**BARLOW LYDE & GILBERT**

Barlow Lyde & Gilbert LLP
Beaufort House  15 St Botolph Street  London  EC3A 7NJ
tel +44 (0)20 7247 2277  fax +44 (0)20 7071 9000
DX 155 London CDE

**Fax to**
Chian Spirit Maritime Enterprises Inc, and to
The Owners of the "NICHOLAS M"
c/o Billmar Chartering

**By email**

fax No: 00 30 210 4282294

**From**
Eurof Lloyd-Lewis/Andrew Speake
(B-ACS/ACS/3.69)

**E-mail**
aspeake@blg.co.uk

**Direct telephone number**
020 7643 7675

**Direct fax number**
020 7071 9801

**No. of pages (including this page)**
2

**Date**
6 December 2007

This fax is intended only for the addressee(s) named above.  As this fax may contain confidential or privileged information, if you are not a named addressee or person responsible for delivering the message to the named addressee(s) please telephone us IMMEDIATELY.  The contents should not be disclosed to any other person nor copies taken.

Dear Sirs

**MV NICHOLAS M ("the Vessel") San Lorenzo to St Petersburg**
**Charterparty dated 10 October 2007.**
**Bill of lading No 1 dated 18 October 2007 for 4,937 mt of Soyabean meal ("the Cargo") –**
**Damage to the Cargo in Hold No 4.**

We are Solicitors based in the City of London and are instructed by Congentra AG, the time charterers under the above-captioned charter, and by OOO Euroweg Zerno, the consignee under the above-captioned bill of lading, and their cargo underwriters.

Congentra AG has passed to us copies of your recent emails. We note your admission in your email of 3 December on behalf of the Vessel's Owners that the Cargo has suffered wet damage during its carriage from Argentina to Russia. It follows that the Vessel's Owners have committed a breach of the charter and of the contract of carriage as evidenced by the bill of lading, and/or a breach of duty. Our clients are thus entitled to compensation for their loss and damage and we would invite your proposals in this regard. You should note however, that we are instructed that a significantly greater quantity than 5mt has been damaged.  In the absence of an immediate settlement we are instructed to negotiate with the Vessel's P&I Club to obtain security for the value of the cargo claim together with interest and costs thereon.

Our clients are anxious to mitigate their losses.  It is therefore imperative that the Cargo is discharged as soon as possible so that the sound can be separated from the unsound.  Our clients intend to appoint SGS to oversee the discharge and segregation operation.  We are

MV NICHOLAS

www.blg.co.uk

Barlow Lyde & Gilbert LLP or an affiliated undertaking has an office in each of the places listed below.

LONDON  HONG KONG  SINGAPORE  SHANGHAI

Barlow Lyde & Gilbert LLP is a limited liability partnership registered in England and Wales with registered number OC325841.  It is regulated by the Solicitors Regulation Authority.  The term partner is used to refer to a member of Barlow Lyde & Gilbert LLP or an employee or consultant with equivalent standing and qualifications.  A list of members is open to inspection at the registered office, Beaufort House, 15 St Botolph Street, London EC3A 7NJ.

**BARLOW LYDE & GILBERT**

Barlow Lyde & Gilbert LLP
Beaufort House 15 St Botolph Street London, EC3A 7NJ
tel +44 (0)20 7247 2277  fax +44 (0)20 7071 9000
DX 155 London CDE

| | |
|---|---|
| **Fax to** | **By email** |
| Chian Spirit Maritime Enterprises Inc, and to The Owners of the "NICHOLAS M" c/o Billmar Chartering | Fax No. 00 30 210 4282294 |
| **From** | **E-mail** |
| Eurof Lloyd-Lewis/Andrew Speake (B-ACS/ACS/3.69) | aspeake@blg.co.uk |
| **Direct telephone number** | **Direct fax number** |
| 020 7643 7875 | 020 7071 9601 |
| **No. of pages (including this page)** | **Date** |
| 2 | 6 December 2007 |

This fax is intended only for the addressee(s) named above. As this fax may contain confidential or privileged information, if you are not a named addressee or person responsible for delivering the message to the named addressee(s) please telephone us IMMEDIATELY. The contents should not be disclosed to any other person nor copies taken.

Dear Sirs

**MV NICHOLAS M ("the Vessel") San Lorenzo to St Petersburg**
**Charterparty dated 10 October 2007.**
**Bill of lading No 1 dated 18 October 2007 for 4,937 mt of Soyabean meal ("the Cargo") – Damage to the Cargo in Hold No 4.**

We are Solicitors based in the City of London and are instructed by Congentra AG, the time charterers under the above-captioned charter, and by OOO Euroweg Zerno, the consignee under the above-captioned bill of lading, and their cargo underwriters.

Congentra AG has passed to us copies of your recent emails. We note your admission in your email of 3 December on behalf of the Vessel's Owners that the Cargo has suffered wet damage during its carriage from Argentina to Russia. It follows that the Vessel's Owners have committed a breach of the charter and of the contract of carriage as evidenced by the bill of lading, and/or a breach of duty. Our clients are thus entitled to compensation for their loss and damage and we would invite your proposals in this regard. You should note however, that we are instructed that a significantly greater quantity than 5mt has been damaged. In the absence of an immediate settlement we are instructed to negotiate with the Vessel's P&I Club to obtain security for the value of the cargo claim together with interest and costs thereon.

Our clients are anxious to mitigate their losses. It is therefore imperative that the Cargo is discharged as soon as possible so that the sound can be separated from the unsound. Our clients intend to appoint SGS to oversee the discharge and segregation operation. We are

MV NICHOLAS

www.blg.co.uk
Barlow Lyde & Gilbert LLP or an affiliated undertaking has an office in each of the places listed below.
LONDON   HONG KONG   SINGAPORE   SHANGHAI

Barlow Lyde & Gilbert LLP is a limited liability partnership, registered in England and Wales with registered number OC325847. It is regulated by the Solicitors Regulation Authority. The term partner is used to refer to a member of Barlow Lyde & Gilbert LLP or an employee or consultant with equivalent standing and qualifications. A list of members is open to inspection at the registered office, Beaufort House, 15 St Botolph Street, London EC3A 7NJ.



**BARLOW LYDE & GILBERT**

Barlow Lyde & Gilbert LLP
Beaufort House 15 St Botolph Street London EC3A 7NJ
tel +44 (0)20 7247 2277 fax +44 (0)20 7071 9000
DX 135 London CDE

**Fax to**
For the attention of: Ms Vicky Liouta
Messrs SCB Hellas, American P&I Club

**Fax number**
VIA E-MAIL
Victoria.liouta@scb-hellas.com

**cc**
For the attention of: Mr Peter Hawkins
Hill Dickinson LLP, Greece

00 30 210 428 4777

Chian Spirit Maritime Enterprises Inc.

VIA E-MAIL
operations@chianspirit.gr

Billmar Chartering

VIA E-MAIL
chartering@billmar.gr

**From**
Eurof Lloyd-Lewis
B-ELL/AADS/ELL/3.71A

**E-mail**
elloyd-lewis@blg.co.uk

**Direct telephone number**
020 7643 7447

**Direct fax number**
020 7071 9601

**No. of pages (including this page)**

2

**Date**
11 December 2007

This fax is intended only for the addressee(s) named above. As this fax may contain confidential or privileged information, if you are not a named addressee or person responsible for delivering the message to the named addressee(s) please telephone us IMMEDIATELY. The contents should not be disclosed to any other person nor copies taken.

# URGENT

Dear Sirs

**MV NICHOLAS M ("the Vessel") San Lorenzo to St Petersburg**
**Time Charterparty dated 10 October 2007**
**Bill of Lading No. 1 dated 18 October 2007 for 4,937 mt of Soyabean meal ("the Cargo")**
**Damage to the Cargo in Hold Number 4**

We are City of London Solicitors instructed by Congentra AG, timecharterers and Euroweg Zerno OOO consignees of the above-captioned bill of lading and their cargo underwriters with

5678840

www.blg.co.uk

Barlow Lyde & Gilbert LLP or an affiliated undertaking has an office in each of the places listed below.

LONDON  HONG KONG  SINGAPORE  SHANGHAI

Barlow Lyde & Gilbert LLP is a limited liability partnership, registered in England and Wales with registered number OC325541. It is regulated by the Solicitors Regulation Authority. The term partner is used to refer to a member of Barlow Lyde & Gilbert LLP or an employee or consultant with equivalent standing and qualifications. A list of members is open to inspection at the registered office, Beaufort House, 15 St Botolph Street, London EC3A 7NJ.

59

**BARLOW LYDE & GILBERT**

Page 2

regard to the damage to the cargo carried by the MV Nicholas M which we understand is entered with your Club.

On 6 December we wrote via Billmar Chartering to your Member with regard to a number of issues arising out of the damage to the Cargo. In particular, we put forward on behalf of our clients, proposals with regard to discharging and segregating the sound from damaged cargo. We also gave an indication of the costs which may be incurred as a consequence. We sought from your member their agreement to appoint a surveyor to observe the discharge and segregation process and an acknowledgement of the liabilities our clients may incur to Russian Customs and others as a consequence. As of yesterday, however, we had received no response. Accordingly, as time is moving on we wrote again via the broker and directly to your Member's managers. As no response had been received by the deadline imposed in our correspondence of yesterday, we telephoned Billmar Chartering this morning to find out what was going on. We were informed that before responding to our correspondence your Member was seeking advice from yourselves and your lawyers whom we assume to be Hill Dickinson. We have still heard nothing further.

We do not understand your Member's hesitancy in these circumstances. The Cargo should be discharged without further delay otherwise there is a risk that the damage will be further exacerbated. Would you please advise as a matter of urgency what your or your Member's position is in this regard.

In the absence of any agreement on this issue our clients will have no choice, but to proceed with discharge without further reference to your Member or the Club. This can only lead to further disputes with regard to the quantity and nature of the damage and will inevitably lead to an increase in costs.

We shall be writing to you further with regard to the issue of security for our clients' claims. In the meantime all of our clients' rights are reserved.

We should be grateful if you would revert as a matter of urgency.

Yours faithfully

Barlow Lyde & Gilbert LLP

5576843

60

```
*   *   *  COMMUNICATION RESULT REPORT ( 11.DEC.2007 19:32 )  *  *  *
```

TTI  02076438506

| TRANSMITTED/STORED 11.DEC.2007 19:31 | | | | |
|---|---|---|---|---|
| FILE | MODE | OPTION | ADDRESS | RESULT | PAGE |
| 3011 | MEMORY TX | | 900302104284777 | OK | 2/2 |

```
REASON FOR ERROR
    E-1) HANG UP OR LINE FAIL          E-2) BUSY
                                       E-4) NO FACSIMILE CONNECTION
```



# BARLOW LYDE & GILBERT

Barlow Lyde & Gilbert LLP
Beaufort House  13 St Botolph Street London  EC3A 7NJ
tel +44 (0)20 7247 2277  fax +44 (0)20 7071 9000
DX 155 London CDE

**Fax to**
For the attention of: Ms Vicky Liouta
Messrs SCB Hellas, American P&I Club

**Fax number**
VIA E-MAIL
Victoria.ljouta@scb-hellas.com

**cc**
For the attention of: Mr Peter Hawkins
Hill Dickinson LLP, Greece

00 30 210 428 4777

Chian Spirit Maritime Enterprises Inc.

VIA E-MAIL
operations@chianspirit.gr

Billmar Chartering

VIA E-MAIL
chartering@billmar.gr

**From**
Eurof Lloyd-Lewis
B-ELL/AADS/ELL/3.71A

**E-mail**
elloyd-lewis@blg.co.uk

**Direct telephone number**
020 7643 7447

**Direct fax number**
020 7071 9601

**No. of pages (including this page)**
2

**Date**
11 December 2007

This fax is intended only for the addressee(s) named above. As this fax may contain confidential or privileged information, if you are not a named addressee or person responsible for delivering the message to the named addressee(s) please telephone us IMMEDIATELY. The contents should not be disclosed to any other person nor copies taken.

## URGENT

Dear Sirs

**MV NICHOLAS M ("the Vessel") San Lorenzo to St Petersburg**
**Time Charterparty dated 10 October 2007**
**Bill of Lading No. 1 dated 18 October 2007 for 4,937 mt of Soyabean meal ("the Cargo")**
**Damage to the Cargo in Hold Number 4**

We are City of London Solicitors instructed by Congentra AG, timecharterers and Euroweg Zemo OOO consignees of the above-captioned bill of lading and their cargo underwriters with

5075640

www.blg.co.uk
Barlow Lyde & Gilbert LLP is an affiliated undertaking has an office in each of the places listed below.
LONDON  HONG KONG  SINGAPORE  SHANGHAI

Barlow Lyde & Gilbert LLP is a limited liability partnership, registered in England and Wales with registered number OC326947. It is regulated by the Solicitors Regulation Authority. The term partner is used to refer to a member of Barlow Lyde & Gilbert LLP or an employee or consultant with equivalent standing and qualifications. A list of members is open to inspection at the registered office, Beaufort House, 13 St Botolph Street, London EC3A 7NJ.

61



Eurof
Lloyd-Lewis/MET/BLG_INT
1
16/12/2007 19:49

To   victoria.liouta@scb-hellas.com

cc   operations@congentra.com, Andrew
     Speake/MET/BLG_INT1@BLG_INT1, Caroline
     Brader-Smith/MET/BLG_INT1@BLG_INT1, Richard
     Black/MET/BLG_INT1@BLG_INT1

bcc

Subject   MV NICHOLAS M - URGENT

We write further to our telephone conversations and SMS messages of 15 December 2007 (Lloyd-Lewis and Liouta).

As you are aware, yesterday, the SGS surveyor appointed by our clients to take samples and to supervise the segregation and discharge of the cargo in hold number 4 attended your Member's Vessel.  However, our clients' surveyor was refused access to hold number 4 for any purpose notwithstanding the Club's assurance that he would be permitted access to hold number 4 to take samples in the presence of a crew member. You have acknowledged that our clients do not have samples of the damaged cargo. It follows, that there is no good reason why SGS should not be permitted access to the hold in order to take such samples.  There is also no good reason why SGS, a firm of international repute, should not be granted access to the hold in order to supervise the segregation and discharge of the cargo. Owners' refusal to grant access is an extremely serious matter. Your Member's conduct is wholly unacceptable and is delaying discharge operations.    As a consequence discharge has been delayed and the costs our clients have incurred in having vehicles and personnel present at the quayside for such operations wasted.

On 6 December we wrote directly to your Member to inform them that our clients had appointed SGS to supervise the discharge and segregation operation and we invited them to appoint someone to observe the process.  The Club's response of 12 December raised no objection to what was proposed. We therefore do not understand why your Member has decided on this course of conduct other than to try to undermine our clients' attempt to gather evidence as to the cause and extent of the damage and possibly to tamper with it; it being reported to our clients that the Vessel's crew may have attempted to bury some of the wet damaged cargo beneath the surface in order to make it appear as though it was wetted pre-shipment.

Our clients intend to try to discharge hold number 4 again on Monday 17 December 2007.  However, before doing so we are instructed to demand an undertaking from your Member that they will permit SGS:

1.    To enter holds numbers 2 and 4 for the purpose of taking samples in the presence of a crew member or a surveyor appointed by the Club.
      2. To supervise the segregation and discharge process.

We are further instructed that unless such an undertaking is received by 11.00 am UK time Monday 17 December 2007 to make an immediate application to the Commercial Court in London pursuant to Section 44 of the Arbitration Act 1996 and, if necessary, to the St Petersburg Court. As part of the relief sought we shall also seek an order for costs against your Member.

In any subsequent proceedings we shall also seek an award of damages in respect of the wasted costs and expenditure caused by your Member's wholly unreasonable conduct of yesterday.

For the avoidance of doubt, this message is sent under reservation of all our clients'

rights.

Regards

| Eurof | | | | | | | | Lloyd-Lewis |
|---|---|---|---|---|---|---|---|---|
| Associate | | | | | | | | |
| Marine, | | Energy | | | & | | | Trade |
| Direct | telephone: | +44 | (0)20 | 76 | 43 | 74 | 47 |
| Direct | fax: | +44 | (0)20 | 70 | 71 | 96 | 01 |
| Mobile telephone: +44 (0)78 24 35 59 55 | | | | | | | | |



AMERICAN STEAMSHIP OWNERS MUTUAL PROTECTION AND INDEMNITY ASSOCIATION, INC. Page 1 of 2

SHIPOWNERS CLAIMS BUREAU, INC., MANAGER
ONE BATTERY PARK PLAZA - 31ST FLOOR   NEW YORK, NEW YORK 10004   USA
TEL: +1.212.847.4500   FAX: +1.212.847.4599   WEB: WWW.AMERICAN-CLUB.COM

**To:**      Euroweg Zerno OOO and their insurers (the "Claimants"),
c/o Barlow Lyde & Gilbert LLP, Beaufort House, 15 St Botolph
Street, London EC3A 7NJ

**Date:**    24 December 2007

**Ship:**    m.v. "NICHOLAS M" (the "Vessel")

**Bill of
Lading:**    Bills of Lading Nos.1 dated 18 October 2007, Nos 2 and 3 dated 28
October 2007 , Nos. 4 and 5 and 6 and 7 and 8 dated 30 October 2007.

**Cargo:**   30,204   m.t. ( thirty thousand two hundred and four metric tons)
Argentine Origin Hipro-Soyabean Meal in Bulk (the "Cargo")

**Voyage:**  San Lorenzo, Argentina to St Petersburg, Russia ("the Voyage").

**Claim:**   For damages/indemnification and/or other appropriate relief in
respect of all liabilities, losses, damage, cost and expenses arising
from the alleged damage to the Cargo during the Voyage (excluding
any claim for hire and/or losses arising out of any additional time
taken to discharge the Cargo).

In consideration of the Claimants refraining from taking any action resulting in
the arrest or detention of any ships or property in the ownership, associated
ownership or management of the Owners or any other action against any other
assets of the Owners for the purpose of obtaining security for the above claim,
we hereby undertake to pay to the Claimants within 21 days of a first written
demand such sum or sums as may be due to them from the Owners in respect
of the Claim either by agreement between the parties or by final unappealable
award of a London Tribunal or judgment of the English Court provided always
that our liability hereunder shall not exceed the sum of US $322,271.00 (three
hundred and twenty two thousand two hundred and seventy one United States
Dollars) plus interest and costs to be adjudged or agreed by the parties.

Nothing in this undertaking shall amount to or be construed as (a) an admission
of liability on the part of the Owners or (b) a waiver on the part of the Owners
of any right which it may have to limit its liability in any available jurisdiction
and under any applicable provisions.

It is further agreed that Claimants are entitled to request reasonable additional
security for the purpose of obtaining reasonable additional security if in the
future it reasonably appears that this undertaking may be insufficient to cover
the Claim. It is also agreed that Owners are entitled to request Claimants to
reduce the value of the security if in the future it reasonably appears that the

sum secured is excessive in relation to the actual value of the claim. Claimants are not entitled to arrest the vessel or any other asset in respect of the above request.

We warrant that:

(i)    the Vessel was not demise chartered at any material time;

(iii)    we have received irrevocable authority from the Owners to instruct solicitors as aforesaid and to give this Letter of Undertaking in these terms.

This undertaking shall be governed by and construed in accordance with English law and we irrevocably and unconditionally agree to submit to the exclusive jurisdiction of the English High Court of Justice for the purpose of any process for the enforcement hereof or for the resolution of any other action brought in connection with this undertaking.

We further undertake that we shall, within 14 days of the receipt from the Claimants of a request to do so, instruct London solicitors to accept on behalf of the Vessel and/or the Owners service of proceedings brought by the Claimants and to file acknowledgement of service thereof.

We confirm that the parties to the above mentioned claim and all claims between them in respect of the above Voyage should be subject to English law and to the exclusive jurisdiction of the English High Court of Justice.

It is understood and agreed that Shipowners Claims Bureau, Inc., in its capacity as Manager, is duly authorized to execute this Letter of Undertaking for and on behalf of American Steamship Owners Mutual Protection and Indemnity Association, Inc.

It is further understood and agreed that the execution of this letter by the signatory is not and shall not under any circumstances be construed as binding on him personally, nor binding upon Shipowners Claims Bureau, Inc., but is binding only upon American Steamship Owners Mutual Protection and Indemnity Association, Inc.

Very truly yours,
Shipowners Claims Bureau Inc.
As Manager for and behalf of the
American Steamship Owners Mutual Protection and Indemnity Association Inc.

Victoria Liouta
Manager



**Matthew Montgomery/MET/BLG_INT 1**

28/12/2007 12:10

To   victoria.liouta@scb-hellas.com,
     dorothea.loannou@scb-hellas.com
cc   operations@congentra.com.,
     anne.madock@axa-corporatesolutions.com, Euraf
     Lloyd-Lewis/MET/BLG_INT1@BLG_INT1, Andrew
     Speake/MET/BLG_INT1@BLG_INT1
bcc

Subject   URGENT

Dear Sirs

We write further to our telephone conversation this morning (Lloyd-Lewis / Ioannou).

We confirm that Underwriters' surveyor from Marinex and Consignees' surveyor from SGS Vostok wish to carry out an ultrasound of holds two and four upon completion of discharge. We will let you have the identifications of the surveyors concerned shortly.

The Master is currently refusing access to the holds on the grounds that he is unable to contact his Owners because of the Christmas and New Year holidays. We are surprised at this assertion as Owners are corresponding via Brokers with Charterers. In the circumstances please confirm immediately if Underwriters' and Consignees' surveyors will be permitted access to the holds.

We understand that the vessel is scheduled to complete discharge during the course of today and Owners, although they have not discussed the same with Charterers, are intending to ship the vessel to another berth in order to load a cargo of potash. Charterers' rights with regard to whether owners are permitted to do this are reserved.

It follows that this letter should be dealt with as a matter of priority.

We have also previously requested that Owners provide copies of the vessels log books for the period whilst she was loading. However we have not received anything. Nor indeed have the surveyors. Would the Club please remind Owners of their obligations under the Charterparty to produce such information.

Despite several requests we are also waiting to learn of the contact details to which owners P & I Club surveyor has sent their cargo samples for analysis. Would the Club now please provide this information.

We will be writing to you later today to inform you of the identities of Underwriters' and Consignees' surveyors.

Regards

Barlow Lyde & Gilbert LLP

64



"Operations"
&lt;operations@congentra.co
m&gt;

28/12/2007 15:42

To    "Euroí Lloyd-Lewis" &lt;elloyd-Lewis@blg.co.uk&gt;

cc

bcc

Subject  FW: NICHOLAS M

-----Original Message-----
From: Master NicholasM [mailto:Master.NicholasM@telaurus.net]
Sent: Friday, December 28, 2007 6:39 PM
To: Congentra AG
Cc: operations department
Subject: RE: NICHOLAS M

FM: MV NICHOLAS M
TO: CONGENTRA AG
REF: 228/28-DEC-07

DEAR SIRS,

YOUR BELOW REQUESTS NOTED.

RE CARGO HOLDS ULTRASONIC TEST PLEASE BE ADVISED THAT WE HAVE NO
INSTRUCTIONS FROM VSLS OWNERS OR MANAGERS TO ALLOW SAME; PLEASE ALSO NOTE
THAT DUE TO CURRENT HOLIDAYS THE MIC IS NOT AT THE OFFICE.

BUT THIS IS NOT THE REASON. I HAVE IN MY HANDS THE C/P DD 10TH OCT 2007
BETWEEN CHARTERERS  AND OWNERS AND AS PER CLAUSE 67 "...THE CHARTERERS HAVE
THE OPTION TO HOSE TEST OR ULTRASONIC TEST THE VESSEL'S HATCH COVERS AT
LOADING PORT(S) AT THEIR TIME/EXPENSE..." AND THIS IS CLEAR ENOUGH.

AS MASTER OF THE VESSEL I CANNOT SEE THE REASON BEYOND CHARTERERS REQUEST
AT
THIS STAGE AFTER COMPLETION OF DISCHARGE AND FURTHERMORE AS THE DAMAGED
CARGO ANALYSIS AND SEA WATER FINDING TESTS RESULTS SHOWN THAT CAUSE OF
DAMAGE WAS NOT SEA WATER INGRESS (CHLORIDE FOUND).

ALSO, THE VESSEL'S CREW IS EXTREMELY OCCUPIED WITH SAILING PREPARATIONS,
HOLDS PREPARATIONS FOR NEXT LOADING AND OTHER OPERATIONAL MATTERS AND IF WE
ACCEPT CHARTERERS UNJUSTIFIED REQUEST THIS WILL RESULT TO FURTHER DELAY IN
VESSEL'S REDELIVERY FROM THEM TO OWNERS WHICH MAY CREATE FURTHER LOSSES TO
OWNERS AS WE HAVE BEEN INFORMED THAT THE CHARTERERS ALREADY OWE OWNERS A
CONSIDERABLE AMOUNT OF MONEY DUE TO THEM.

LASTLY, RE COPIES OF LOG BOOKS WE HAVE NO OBJECTION ON RECEIPT OF OWNERS
AND
THEIR LAWYERS WRITTEN INSTRUCTIONS I WILL FORWARD SAME THROUGH THEM TO
CHARTERERS.

WE HOPE ALL ABOVE ARE CLEAR ENOUGH.

BEST REGARDS
MASTER



"Operations Congentra"
<operations@congentra.co
m>

28/12/2007 20:32

To   "Eurof Lloyd-Lewis" <elloyd-t.ewis@blg.co.uk>

cc

bcc

Subject   FW: Ultra Sonic inspection

-----Original Message-----
From: Master NicholasM [mailto:Master.NicholasM@telaurus.net]
Sent: Friday, December 28, 2007 10:48 PM   .
To: Operations Congentra
Cc: operations department
Subject: Ultra Sonic Inspection

FM: MV NICHOLAS M
TO: CONGENTRA AG
REF: 236/28-DEC-07

i refer to your below message.

charterers have ignored my previous message and sent on board their
surveyors (sgs) to carry out a survey which for the reasons already
explained neither they have the right to perform nor there is a
significant
reason.

i do not understand charterers acts and way of thinking! what
charterers
mean "DETRIMENTAL CONSEQUANCES ARISEN THEREOF"??? why to place the
vessel
"OFF HIRE"???

master's and owners position regarding said survey remains as stated in
my
last and we expect charterers  to perform all their obligations under
the
c/p.

case of damage cargo is in charrs and owns lawyers hands and charterers

must
stop threaten vessel and owners.

finally note that since completion of discharging earlier tonight vsl
is
waiting for improvement of weather conditions in order pilot who will
shift
the vessel to anchorage to be able to be dropped off safely. agents
shall
revert once pilot becomes available and allowed to sail.

be guided accordingly.

brgrds,

master

66



"Operations Congentra"
<operations@congentra.co
m>

28/12/2007 21:29

To  "Master NicholasM" <Master.NicholasM@telaurus.net>

cc  "Eurof Lloyd-Lewis" <elloyd-Lewis@bfg.co.uk>

bcc

Subject  RE: Ultra Sonic Inspection

Dear Sirs,

You must have learned from the correspondence with our lawyers regarding
your refusal to allow ultra sonic inspection that we reserve all our
rights and hold you fully responsible for all consequences of such
refusal.
As you know the vessel has to be redelivered as per c/p DLOSP
St.Petersburg.
Therefore you should proceed for redelivery DLOSP St.Petersburg and act
and give redelivery notice as per c/p.
In the meantime we reserve all our rights.



Regards,
Congentra AG

-----Original Message-----
From: Kevin Oram [mailto:koram@blg.co.uk]
Sent: Friday, December 28, 2007 11:02 PM
To: Victoria Liouta
Cc: anne.modock@axa-corporatesolutions.com; operations@congentra.com;
chartering@billmar.gr; dorothea.ionnou@scb-hellas.com;
master.nicholasm@telaurus.net
Subject: MV Nicholas M

We write further to our telephone calls and emails of earlier today.

The Master has continued to refuse access to holds 2 and 4 to the surveyors
appointed by Cargo Underwriters and Euroweg Zerno to permit them to conduct
an ultrasonic test. The Master has purportedly done so on the basis that he
is unable to obtain instructions from the shipowner as to whether he is
permitted to allow such inspection.  This is despite the fact that
Charterers have received a number of communications from the Vessel's
managers during the course of the day.  This appears to be yet another
attempt by Owners to obstruct Cargo Interests in conducting a proper and
full investigation into the cause of the damage to the cargo.

As a consequence we are instructed by Congentra AG to inform you that they
shall rely on this further conduct as an additional ground to place the
Vessel offhire for the relevant period.

Our clients have no desire to delay the Vessel further by making an
application to the Commercial Court in London for an order compelling
Owners' to permit such survey.  However, in any subsequent proceedings
under the charter and/or bills of lading they reserve the right to refer
the court or tribunal to such conduct and invite them to draw the necessary
adverse inference from Owners' refusal to permit such survey.

All cargo has now been discharged and following completion of the offhire
survey Congentra is ready to redeliver the Vessel.  They have however,
learned that the Vessel is unable to close hatchcover number 5 and its
complement of crew is below the minimum necessary to enable it to proceed
to sea.  If as a consequence of these defects redelivery is delayed
Charterers will rely upon these additional grounds to place the Vessel
offhire until redelivery can take place in accordance with the charter.

With regard to Owners' provisional final hire statement at this stage
Congentra simply wishes to say that it disputes the same and the claim for
AP but they shall write to Owners further in this regard with their
detailed comments shortly.  However, Owners will not be surprised to learn
that as a consequence of their breaches of contract that discharge has
taken considerably longer than it should have done and hire should not be
payble under the charter in respect of such delay.

Finally, with regard to bunkering prior to redelivery, Charterers will be
considering this further but it seems to them at the very least that the
Master has acted negligently in not conducting a sounding of the bunkering
vessel's tanks prior to and after bunkering.

For the avoidance of doubt, this message is sent under reservation of all
our clients' rights.


Eurof Lloyd-Lewis
Associate
Marine, Energy & Trade
Direct telephone: +44 (0)20 76 43 74 47
Direct fax: +44 (0)20 70 71 96 01
Mobile telephone: +44 (0)78 24 35 59 55

Kevin Oram/MET/BLG_INT1    To  "Eurof Lloyd-Lewis" <elloyd-Lewis@blg.co.uk>

29/12/2007 15:33    cc
bcc

Subject  Fw: MV Nicholas M



Eurof

See attached. Don't think its come to you.

K

----- Original Message -----
From: "Victoria Liouta" [victoria.liouta@scb-hellas.com]
Sent: 29/12/2007 09:54 EST
To: Kevin Oram
Cc: <anna.modock@axa-corporatesolutions.com>; <operations@congentra.com>;
<chartering@billmar.gr>; "master.nicholasm@telaurus.net"
<master.nicholasm@telaurus.n0xL182zt>; <operations@chianspirit.gr>;
<johnk@k-law.gr>
Subject: RE: MV Nicholas M

Dear Sirs,

Although owners and their Club have done their best during these days to
facilitate the operations of the vessel in the benefit of owners and
charterers and receivers of the cargo, you continue to create additional
complications without any reason. We fail to understand the scope of your
actions and have never seen any other law firm to make matters more
difficult than they are and not try to assist both their clients and the
other position.

We deny any wrongful and unjustified as well as unlawful allegations you
make to your message below and would suggest you let charterers continue
their business with owners under the agreed c/p and each party to fulfil
their obligations. There is absolutely no point to intervene and try to
manipulate matters and add problems, except if charterers are already in
breach of their obligations and want to be protected with illegal means
however you should advise them that they have to comply with the terms of
their agreements and honour them accordingly.

Your clients may want to rely to whatever allegations they want to make, no
matter if they are commercial people and already know the shipping
practice, however, I assume, you can also give them the legal and
commercial guidance to protect their interests by avoiding delays and
damages which will prove to be against them and claim will escalate further
against your clients' benefit.

I see no other option for you and your clients but to assist and all
owners' rights are fully reserved, as for your clients' as well.

I wish you happy new year.
Victoria Liouta
Manager



Eurof
Lloyd-Lewis/MET/BLG_INT
1
29/12/2007 18:17

To    victoria.flouta@scb-hellas.com

cc    operations@congentra.com,
      anne.modock@axa-corporatesolutions.com,
      chartering@billmar.gr, master.nicholasm@telaurus.net,
      operations@chiansplrit.gr, johnk@k-law.gr, Andrew
      Speake/MET/BLG_INT1@BLG_INT1, Richard
      Black/MET/BLG_INT1@BLG_INT1, Caroline
      Brader-Smith/MET/BLG_INT1@BLG_INT1,
      dorothea.ioannou@scb-hellas.com

bcc

Subject    MV NICHOLAS M

Dear Victoria

We write further to your emails of earlier today.



We do not intend to engage in a blow by blow rebuttal of the allegations contained therein
other than to say that they are denied, that the record speaks for itself and we are entirely
comfortable with our conduct.

In any event, the Vessel remains in St Petersburg which serves none of the parties' interests.
As stated in our email of yesterday evening our clients had learned that the Vessel was
encountering problems in closing hatchcover number 6 and it was without its full
complement of crew. As stated in Congentra's email of this morning as a consequence the
Vessel missed the tide and redelivery was delayed. We have since learned that the Vessel has
been inspected by the Russian Port State Control and they have ordered that it be detained
pending Owners remedying a number of defects. We are also instructed that BV withdrew the
Vessel's class certificate yesterday. Clearly, these are very serious matters and Congentra
must reserve all their rights in this regard. We assume that your Member will be taking steps
to rectify the issues which have been identified by Russian Port State Control as a matter of
urgency. We are further instructed by our clients that the Vessel needs to be shifted to
another berth so that works can be carried out to remedy the defects identified. We write to
inform you that our clients' agents, Anteks are reluctant to continue acting as agents for the
Vessel unless and until they are placed in sufficient funds to cover the costs of shifting to
another berth and other disbursements. Otherwise they are concerned that the Russian Port
Authorities will look to them to pay such costs. These costs have absolutely nothing to do
with the cost of redelivery and are not for Congentra's account. Accordingly, we would ask
that you consult with your Member and make arrangements for Anteks to be placed in funds
to cover these additional costs. We also understand that they may be writing directly to your
Member's manager in this regard.

For the avoidance of doubt, and in addition to the grounds stated in our email of yesterday
evening, whilst the Vessel is detained by Port State Control it is offhire until redelivery can
take place in accordance with the terms of the charter. Furthermore, Congentra shall claim
from your Member any additional costs and expenses they may now incur e.g. berth fees, as a
consequence of the delay in its departure.

Again in our email of yesterday evening we stated that our clients had decided not to seek
relief before the English Court to permit its surveyors to carry out an ultrasonic test in holds 2
and 4 as this would inevitably delay the Vessel and this is not what they wanted. As it would

appear that the Vessel may now be delayed until certain works are carried out we take this opportunity to repeat our clients' demand of yesterday to be permitted to conduct such tests before the Vessel is passed fit to sail. If the Club wishes to have its surveyor or a member of the crew present at the same time our clients have no objection. We remain of the view that our clients' request is entirely reasonable in the circumstances and we should be grateful if you would consult with you Member on this issue as a matter of urgency.

Finally, we are instructed that the quantity of cargo landed does not correspond with quantity evidenced by the bills of lading. Again our clients' rights in this regard are expressly reserved.

We wait to hear from you.

Regards

Eurof Lloyd-Lewis
Associate
Marine, Energy & Trade
Direct telephone: +44 (0)20 76 43 74 47
Direct fax: +44 (0)20 70 71 96 01
Mobile telephone: +44 (0)78 24 35 59 55



**Andrew**
**Speake/MET/BLG_INT1**
02/31/2008 11:56

To  "Victoria Liouta" <victoria.liouta@scb-hellas.com>

cc  "MODOCK Anne"
    <anne.modock@axa-corporatesolutions.com>, "Carolina
    Brader-Smith" <CBrader-Smith@blg.co.uk>,
    chartering@billmar.gr, "Eurof Lloyd-Lewis"
    <elloyd-Lewis@blg.co.uk>, operations@chianspirit.gr,
    operations@congentra.com, "Richard Black"
    <rblack@blg.co.uk>

bcc

Subject  MV NICHOLAS M - URGENT

Dear Victoria

I write further to our earlier telephone conversation, in which I requested urgent confirmation that the
surveyors appointed on behalf of our Clients and their insurers are allowed to undertake ultrasonic
tests of the relevant hatchcovers.

Please revert urgently with confirmation that the tests will be allowed.  The request was made a
significant time ago, and – notwithstanding the recent holidays – Owners should be able to revert
immediately.

In the meantime, all of our Client's rights are reserved, including the right to apply to court, without
further notice to you, for an order authorising the surveyors to carry out the tests.

Regards

Andrew Speake
Tel: +44 (0) 20 7643 7675
Fax: +44 (0) 20 7071 9601

72



**Andrew**
**Speake/MET/BLG_INT1**
02/01/2008 15:32

To  "Victoria Lioufa" <victoria.lioufa@scb-hellas.com>

cc  "MODOCK Anne"
<anne.modock@axa-corporatesolutions.com>, "Caroline
Brader-Smith" <CBrader-Smith@blg.co.uk>,
chartering@billmar.gr, "Eurof Lloyd-Lewis"
<elloyd-Lewis@blg.co.uk>, operations@chianspirit.gr,
operations@congentra.com, "Richard Black"
<rblack@blg.co.uk>

bcc

Subject  MV NICHOLAS M - URGENT

Dear Victoria

I write further to my email of this morning, and my subsequent telephone messages.

Our Clients request to carry out ultrasonic tests is entirely reasonable, and we can see no reason why
Owners have not agreed to this.



Please note that unless Owners confirm by 09.30 English time tomorrow that they are prepared to
allow this testing, we intend to apply to the English court for an order to this effect. As you will be
aware, assuming that an order is granted, Owners are likely to be liable for the costs of this
application.

I await hearing from you as soon as possible.

Regards

Andrew Speake
Tel: +44 (0) 20 7643 7675
Fax: +44 (0) 20 7071 9601





"Victoria Liouta"
<victoria.liouta@scb-hellas
.com>

02/01/2008 16:13

To  "Andrew Speake" <aspeake@blg.co.uk>

cc  "MODOCK Anne"
<anne.modock@axa-corporatesolutions.com>, "Caroline
Brader-Smith" <CBrader-Smith@blg.co.uk>,
<chartering@billmar.gr>, "Eurof Lloyd-Lewis"
<elloyd-Lewis@blg.co.uk>, <operations@chianspirit.gr>,
<operations@congentra.com>, "Richard Black"
<rblack@blg.co.uk>, "John Krzywkowski" <johnk@k-law.gr>

bcc

Subject  RE: MV NICHOLAS M - URGENT

Dear Andrew,

Happy new year.

It seems to me that you continue advising your clients to the opposite effect despite your previous
denial to comment in that respect, which we understand is being done for obvious reasons.



You appreciate that ultrasonic testing is destructive in nature. The paintwork is removed and additional
damage is caused to the vessel. You will also agree with us that the damage to the cargo is a
preshipment condition and would suggest you avoid creating prejudice in this case which owners and
their Club do not accept and therefore fully reject.

In addition, and as owners always act in good will, please be advised that ultrasonics are normally
carried out under Class supervision on a 5 year cycle for special survey purposes and vessel had
already carried out such measurements and hence we do not find necessary your surveyor to carry
out any other such unnecessary test/survey presently.

In the above respect, please advise us and disclose a copy of any application before the Court, if any.

Best regards
**Victoria Liouta, Esq.**
Claims Executive
Shipowners Claims Bureau (Hellas) Inc.
Tel: +30 210 4294 990
Fax: +30 210 4294 187
Mob: +30 6944 53 19 18
liouta@scb-hellas.com

**SEND NEW MATTERS BY FAX TO ENSURE RECEIPT**
**QUOTE Ship name, incident date and our file reference in all messages**
PLEASE NOTE: The information contained in this message is privileged and confidential and is intended only for the use of
the individual named above and others who have been specifically authorized to receive such. If you are not the intended
recipient, you are hereby notified that any dissemination, distribution or copy of this communication is strictly prohibited. If you
received this communication in error, or if any problems occur with transmission, please notify us immediately by telephone -
+30 210 4294 990. Thank you.

**From:** Andrew Speake [mailto:aspeake@blg.co.uk]
**Sent:** Wednesday, January 02, 2008 5:32 PM
**To:** Victoria Liouta
**Cc:** MODOCK Anne; Caroline Brader-Smith; chartering@billmar.gr; Eurof Lloyd-Lewis;
operations@chianspirit.gr; operations@congentra.com; Richard Black
**Subject:** MV NICHOLAS M - URGENT



Andrew
Speake/MET/BLG_INT1
02/01/2008 20:32

To "Victoria Liouta" <victoria.liouta@scb-hellas.com>

cc "MODOCK Anne"
<anne.modock@axa-corporatesolutions.com>, "Caroline
Brader-Smith" <CBrader-Smith@blg.co.uk>,
chartering@billmar.gr, "Eurof Lloyd-Lewis"
<elloyd-Lewis@blg.co.uk>, "John Krzywkowski"
<johnk@k-law.gr>, operations@congentra.com,
operations@chianspirit.gr, "Richard Black"
<rblack@blg.co.uk>.

bcc

Subject RE: MV NICHOLAS M - URGENT

Dear Victoria,

We write further to our earlier exchanges.

As set out in Eurof's message on 29 December at 18:17, we understand that on 28 December BV
withdrew the Vessel's class certificate. In addition, the vessel is currently detained as a result of
various deficiencies noted during a Port State Control Inspection.

We consider that Owners are in repudiatory breach of the charterparty as a result. In particular, it is a
term of the vessel is classed with BV and shall remain so throughout the whole time charter period.

Please note that Charterers, Congentra AG, hereby accept this repudiatory breach to terminate the
charterparty.

In relation to the application to court for an order allowing ultrasonic testing, please would you instruct
English solicitors to accept service of any necessary papers, and advise us of their identity.

The request for ultrasonic testing is made in order that our Clients can properly investigate the cause
of the damage to the cargo, and is not to try and create any prejudice. We would request Owners to
reconsider their current position and confirm that they will allow this testing. We understand the
testing is not destructive. Owners will be aware that the charter expressly allows ultrasonic testing at
the loadport.

Finally, we will respond shortly as necessary to the message of Chian Spirit Maritime Enterprises Inc
sent at 6:09 today. In the meantime, all our Client's rights are reserved, including in relation to the
costs of any application to court.



Kind Regards,

Andrew Speake
Tel: +44 (0) 20 7643 7675
Fax: +44 (0) 20 7071 9601

Caroline
Brader-Smith/MET/BLG_IN
T1

03/01/2008 10:53

To  Andrew Speake/MET/BLG_INT1@BLG_INT1

cc  Eurof Lloyd-Lewis/MET/BLG_INT1@BLG_INT1

bcc

Subject  DRAFT ON MV NICHOLAS M📄

Dear Victoria

I write further to your email below.

With regard to ultrasonic testing, you are incorrect in your assertion that the testing is destructive in
nature. The ultrasonic testing which requires paint to be removed from the hold in order to connect a
probe to the metal is ultrasonic thickness testing as carried out by Class, normally to coincide with
special survey (class renewal) every 5 years.

This is not the test which our client wishes a surveyor to carry out. Rather, our client has persistently
requested permission to carry out ultrasonic testing of the **integrity of the hatchcovers**, for
watertightness (in this regard you are referred to Owners' email dated 2 January timed at 6:09:30pm.
where CMSE state *"we have noted charrs reactivated and in all respects unreasonable persistence to
carry out watertightness test of holds 2 & 4 by the use of an ultrasonic test"* ). This method of testing
involves dropping a receiver into the cargo hold and checking each joint of the hatch covers with an
electronic receiver to measure watertight integrity. No paint will be removed, nor will any contact be
made with the holds. Further, the test will take between half an hour and one hour and is an entirely
non-destructive, approved method of testing. Once again, we cannot understand your member's
unwillingness to allow this test.

Please also note that no hose test will take place as the temperature in St Petersburg is currently
approximately -15°.

We once again invite your member to agree that such testing may now take place. Assuming that the
holds are still empty (which we presume they are, on the basis of the Port State Control Detention)
then this testing may be carried out promptly and without delay. We remind you that if we are required
to attend Court to make an application to permit such testing, your member will likely incur the costs of
such an application.

We await your immediate response.

Best regards

Andrew Speake
Associate
Marine Energy & Trade

Direct Tel:  +44 (0) 20 7643 7675
Direct Fax:  +44 (0) 20 7071 9601
"Victoria Liouta" <victoria.liouta@scb-hellas.com>



"Victoria Liouta"
<victoria.liouta@scb-hel
las.com>

02/01/2008 16:13

To  "Andrew Speake" <aspeake@blg.co.uk>

cc  "MODOCK Anne"
<anne.modock@axa-corporatesolutions.com>, "Caroline
Brader-Smith" <CBrader-Smith@blg.co.uk>,
<chartering@billmar.gr>, "Eurof Lloyd-Lewis"
<elloyd-Lewis@blg.co.uk>, <operations@chianspirit.gr>,
<operations@congentra.com>, "Richard Black"
<rblack@blg.co.uk>, "John Krzywkowski" <johnk@k-law.gr>

Subject  RE: MV NICHOLAS M - URGENT



"Victoria Liouta"
<victoria.liouta@scb-hellas
.com>

03/01/2008 14:41

To "Andrew Speake" <aspeake@blg.co.uk>

cc "MODOCK Anne"
<anne.modock@axa-corporatesolutions.com>, "Caroline
Brader-Smith" <CBrader-Smith@blg.co.uk>,
<chartering@billmar.gr>, "Eurof Lloyd-Lewis"
<elloyd-Lewis@blg.co.uk>, "John Krzywkowski"
<johnk@k-law.gr>, <operations@congentra.com>,
<operations@chianspirit.gr>, "Richard Black"
<rblack@blg.co.uk>

bcc

Subject RE: MV NICHOLAS M - URGENT

Dear Andrew,

On behalf of our members, we note that you purport to terminate the charter for an alleged repudiation
on our members. Whilst our members' rights in relation to that termination and your allegations are
expressly reserved, we should point out that our members had already withdrawn the vessel for
non-payment of hire due to them — so the charter was already effectively terminated when your clients'
purported termination was notified.

Your threatened application to the English High Court is nothing more than a fishing expedition
completely in contradiction of the facts. All analyses of the damaged cargo at disport show freshwater
(and not seawater) damage. We therefore have a cargo damaged before shipment. Accordingly, there
is no reason for the non-contractual request for ultrasonic testing (which you have now clarified to be
the testing that your clients could have carried out before shipment and which they chose not to do).
The cargo was not damaged because of any deficiency of the hatch covers.

For all of the above reasons, neither we nor our members will involve ourselves or appointed lawyers
in assisting you in any way in giving any veil of legitimacy to your threatened abuse of the English legal
system by seeking an order that has no relevance to the facts.

Best regards
**Victoria Liouta, Esq.**
Claims Executive
Shipowners Claims Bureau (Hellas) Inc.
Tel: +30 210 4294 990
Fax: +30 210 4294 187
Mob: +30 6944 53 19 18
liouta@scb-hellas.com

SEND NEW MATTERS BY FAX TO ENSURE RECEIPT
QUOTE Ship name, incident date and our file reference in all messages
PLEASE NOTE: The information contained in this message is privileged and confidential and is intended only for the use of
the individual named above and others who have been specifically authorized to receive such. If you are not the intended
recipient, you are hereby notified that any dissemination, distribution or copy of this communication is strictly prohibited. If you
received this communication in error, or if any problems occur with transmission, please notify us immediately by telephone –
+30 210 4294 990. Thank you.

**From:** Andrew Speake [mailto:aspeake@blg.co.uk]
**Sent:** Wednesday, January 02, 2008 10:32 PM
**To:** Victoria Liouta
**Cc:** MODOCK Anne; Caroline Brader-Smith; chartering@billmar.gr; Eurof Lloyd-Lewis; John
Krzywkowski; operations@congentra.com; operations@chianspirit.gr; Richard Black
**Subject:** RE: MV NICHOLAS M - URGENT

Dear Victoria,

We write further to our earlier exchanges.

As set out in Eurof's message on 29 December at 18:17, we understand that on 28 December BV withdrew the Vessel's class certificate. In addition, the vessel is currently detained as a result of various deficiencies noted during a Port State Control Inspection.

We consider that Owners are in repudiatory breach of the charterparty as a result. In particular, it is a term of the vessel is classed with BV and shall remain so throughout the whole time charter period.

Please note that Charterers, Congentra AG, hereby accept this repudiatory breach to terminate the charterparty.

In relation to the application to court for an order allowing ultrasonic testing, please would you instruct English solicitors to accept service of any necessary papers, and advise us of their identity.

The request for ultrasonic testing is made in order that our Clients can properly investigate the cause of the damage to the cargo, and is not to try and create any prejudice. We would request Owners to reconsider their current position and confirm that they will allow this testing. We understand the testing is not destructive. Owners will be aware that the charter expressly allows ultrasonic testing at the loadport.

Finally, we will respond shortly as necessary to the message of Chian Spirit Maritime Enterprises Inc sent at 6:09 today. In the meantime, all our Client's rights are reserved, including in relation to the costs of any application to court.

Kind Regards,

Andrew Speake
Tel: +44 (0) 20 7643 7675
Fax: +44 (0) 20 7071 9601
*******************************************************************************

Barlow Lyde & Gilbert LLP
Beanfort House, 15 St. Botolph Street, London EC3A 7NJ.

Telephone : +44 (0)20 7247 2277
Fax : +44 (0)20 7643 8500
Web Site : http://www.blg.co.uk
VAT Number: 243202705

CONFIDENTIALITY NOTICE

This e-mail may contain confidential or privileged information.If you have received this e-mail in error, you must not disclose to any other person, nor take copies of, the contents of this e-mail and/or any attachment to it.

We try to ensure that our communications are free of viruses but do not accept responsibility for any loss or damage that viruses may cause. You should take your own steps to ensure that communications are free of viruses.



Andrew
Speake/MET/BLG_INTt
04/01/2008 10:33

To  "Victoria Liouta" <victoria.liouta@scb-hellas.com>

cc  "MODOCK Anne"
<anne.modock@axa-corporatesolutions.com>, "Caroline
Brader-Smith" <CBrader-Smith@blg.co.uk>,
chartering@billmar.gr, "Eurof Lloyd-Lewis"
<elloyd-Lewis@blg.co.uk>, "John Krzywkowski"
<johnk@k-law.gr>, operations@chianspirit.gr,
operations@congentra.com, "Richard Black"
<rblack@blg.co.uk>

bcc

Subject  RE: MV NICHOLAS M - URGENT🖼

Dear Victoria,

We are disappointed to note your response, and Owners continued refusal to allow ultrasonic testing
of the hatchcovers.

In relation to the comments in your first paragraph, Owners were not entitled to withdraw the vessel.
As advised, Charterers have now accepted Owners repudiatory breach of the charter to terminate the
charter.  All future costs relating to the vessel are therefore for Owners' account.

In relation to ultrasonic testing, as explained our Clients are concerned to investigate the cause of the
damage.  We have confirmed with Brookes Bell in London that the ultrasonic test (of the
watertightness of the hatchcovers) will not cause any damage to the vessel. Instead, the test merely
involves a transmitter being placed on the tank top in the middle of the relevant hold, and the surveyor
then taking readings from outside the hatchcover.

We cannot understand why Owners are refusing to allow access, if the hatchcovers are in good
condition, .  This is especially as the vessel is currently detained by Port State Control, so there is
ample time to carry out the test, which will only take a few hours.  If there are no problems with the
hatchcovers, the test will confirm this.

Please therefore explain in detail the reasons for Owners' refusal to allow this testing.

Please note that we intend to request the court & arbitration tribunal to draw an adverse inference from
Owners refusal to allow this testing.  Port State Control have identified serious problems with the
hatchcovers, coamings and compression bars of all holds.  This clearly demonstrates that the
hatchcovers have not been properly maintained, and that Owners are in breach of their obligations
under both the bill of lading contract and the charterparty.  We also understand that work may be
currently being carried out on the hatchcovers, and that they may therefore be in the process of being
repaired, with Owners no doubt being concerned to delay any ultrasonic testing until after the repairs.

We also note that you refer to analyses carried out by Owners show on the damaged cargo.  Please
supply a copy of these analyses.  Please also confirm that copies of the log books and statement of
facts will be supplied immediately.

Finally, your comments in your last paragraph are unhelpful, and we reserve the right to show your
message to the court. Please note that you are also obliged, under the Letter of Undertaking, to
nominate London Solicitors to accept service of proceedings.

Regards,

Andrew Speake
Tel: +44 (0) 20 7643 7675
Fax: +44 (0) 20 7071 9601



"John Krzywkowski"
<johnk@k-law.gr>
08/01/2008 19:33

To  "Andrew Speake" <aspeake@blg.co.uk>

cc

bcc

Subject  RE: NICHOLAS M - at St. Petersburg

History:          ⤷ This message has been forwarded.

Dear Sirs,

I write in connection with your clients' message below to my clients.

As you should be well aware, your clients and Uniagro are beneficially
owned/controlled by the same entities. The fact that Uniagro recently
chartered the vessel and the faultless condition of the cargo on outturn
under that recent charter at St. Petersburg should have led you to question
the appropriateness of your clients' allegations that the vessel was in
some way responsible for the cargo damage found on outturn at St.
Petersburg. Vessels' conditions do not deteriorate so rapidly that your
clients should insist on blaming the vessel when the evidence is so clear
[all analyses show little (irrelevant) if any salt water in the damaged
cargo] that the damage is of a pre-shipment nature.  I note that you have
failed to respond in any way to Owners' observations that the damage was
pre-shipment.

Regarding the remarks which the Master was willing to add to the Statement
of Facts, in my nearly thirty years as a shipping lawyer I have seen many
such documents where the parties were properly prepared for both sides to
include their remarks so that the document would reflect a comprehensive
picture of the relevant events albeit not necessarily accepted by both
parties. For some unknown reason, your clients were not prepared to follow
this customary practice. In fact, it is my understanding that the Master
has a clear right [and possibly an obligation] to record his objections to
any aspect of the SOF. [I need hardly suggest as an example a tribunal
questioning why a master failed to record his opposition to the contents of
an SOF on its face.] My clients see this as yet another example of your
clients' unnecessarily difficult behaviour and modus operandi - and my
clients reserve their rights to claim damages against your clients.

As you have seen fit to support your clients' frankly indefensible attitude
to the incorporation of the Master's comments on the SOF, for the record, I
set out the comments that the Master was prepared to add to the SOF:

QUOTE:

1. DESPITE THE FACT THAT COMMENCEMENT OF CARGO DISCHARGE FROM HOLDS NR 2
AND 4 WAS DELAYED FOR REASONS BEYOND VESSEL'S AND/OR OWNERS CONTROL AND
RESPONSIBILITY, THE DISCHARGING PROGRESS AND THE OVERALL DISCHARGING TIME
WERE NOT AFFECTED AS THE VESSEL WAS ALWAYS ABLE TO PROVIDE THE REQUIRED
GANGS  [ONLY 1 AND DURING SOME VERY LIMITED PERIODS 2 GANGS] FROM OTHER
AVAILABLE HOLDS. THEREFORE NO DELAYS FROM VESSEL'S SIDE OCCURED DURING
DISCHARGING OPERATIONS.

2. FROM COMMENCEMENT OF DISCHARGE UNTIL COMPLETION OF SAME, DISCHARGING
OPERATIONS WERE CARRIED OUT WITH 1(ONE) AND DURING SOME VERY FEW LIMITED
PERIODS WITH 2(TWO) GANGS.  ALSO THE AVAILABILITY OF WAGONS WAS ALWAYS VERY
TIGHT.

3. ON 28TH DEC 2007, LAST MINUTE ULTRASOUND TEST WAS NOT CARRIED OUT FOR
THE REASONS EXPLAINED TO CHARTERERS IN WRITING, WELL IN ADVANCE AND PRIOR
BOARDING OF THEIR SURVEYOR (SGS). RELEVANT MSG IS AVAILABLE HERE AND
DISCLOSABLE ON ANY COMPETENT AUTHORITY'S REQUEST.

4. ON 28TH DEC 2007, AFTER COMPLETION OF DISCHARGE, VESSEL WAS AWAITING PILOT DUE TO BAD WEATHER CONDITIONS (AS PER AGENT MSG, PILOT WAS NOT TO BE EXPECTED BEFORE 29TH NOON SUBJECT TO WEATHER IMPROVEMENT). RELEVANT MSG IS AVAILABLE HERE AND DISCLOSABLE ON ANY COMPETENT AUTHORITY'S REQUEST.

5. THE TOTAL QUANTITY OF CARGO DISCHARGED FROM HOLDS NR 2 AND 4 AS 'DAMAGED' OR 'SUSPECTED AS DAMAGED' WAS 214MTS (TWO HUNDRED AND FOURTEEN) AS PER CARGO UNDERWRITERS' AND ATTENDING PARTIES' CALULATIONS. AGENTS HAVE CONFIRMED SAME AND RELEVANT MSG IS AVAILABLE HERE AND DISCLOSABLE ON ANY COMPETENT AUTHORITY'S REQUEST.

6. TIME OF AUTHORITIES' PERMISSION TO COMMENCE DISCHARGE FROM HOLDS 2 AND 4 AS PER AGENTS' MESSAGES. RELEVANT MSGS ARE AVAILABLE HERE AND DISCLOSABLE ON ANY COMPETENT AUTHORITY'S REQUEST.

7. MASTER HAS SIGNED THIS SOF WITHOUT PREJUDICE AND WITH THE RESERVATION OF VESSEL'S AND/OR HER P&I CLUB AND/OR OWNERS' AND/OR THEIR MANAGERS' RIGHTS FOR ALL AND ANY, DIRECT OR INDIRECT, DAMAGE OR LOSS THEY MAY SUFFER FROM CHARTERERS' AND/OR RECEIVERS' AND/OR THEIR PRINCIPALS' AND/OR THEIR AGENTS, ACTS OR OMISSIONS.

8. ALL CARGO DISCHARGED AS PER B/L AND CARGO MANIFEST.

9. AFTER COMPLETION DISCHARGING, HOLDS NOS. 1, 2 , 3, 4, 5, 6, AND 7 INSPECTED AND FOUND NO CARGO REMAINING ONBOARD, ALL HOLDS WELL EMPTIED AND SWEPT.

```
Name and signature (Agents)                    CAPT.
AMADO C. APILADO
ANTEKS/Alexander Konyukhov                  MASTER/M.V. "
NICHOLAS   M "
UNQUOTE
```

For the record, it is denied that Owners or the crew were disruptive and unreasonable. My clients reserve their rights to claim damages in respect of your clients' actions at St. Petersburg.

Finally, my clients made you clearly aware of the circumstances in which Class was temporarily suspended pending repairs to mechanisms relating to No.6 hatchcover - which suddenly suffered problems during discharge operations. Hold No.6 appears to have no connection whatsoever with the locations in which damaged cargo was found, whatever the cause of that damage. Accordingly, your questionable reference to the temporary suspension of Class, or indeed to the more inflammatory suggestion that Class was entirely withdrawn, as having any connection with the factual matrix of the cargo damage for which we are both instructed, is very regrettable, unprofessional and lacking the integrity normally required of marine solicitors to reduce, rather than exacerbate, the difficulties faced by disputing parties in order to resolve them as cost-effectively as is reasonably possible.

Best regards,

John Krzywkowski
--------------------------------------------------------------------------
---------------------------------------
Information in this e-mail (and any attachment) is confidential and may be legally
privileged. It is intended solely for the attention of the addressee(s). If you have
received it in error, please notify us by return e-mail and then immediately delete
this message from your system. Please do not copy it or use it for any purpose, or
disclose its contents to any other person: to do so could be a breach of

 Andrew
Speake/MET/BLG_INT1
10/01/2008 14:39

To  "John Krzywkowski" <johnk@k-law.gr>

cc  elloyd-lewis@blg.co.uk, operations@congentra.com

bcc

Subject  RE: NICHOLAS M - at St. Petersburg

Dear Sirs,

We refer to your recent messages.

1.    We note that Waterson Hicks have been instructed to accept service.  In the circumstances, please confirm to whom any future correspondence should be addressed.

2.    As you will be aware, the fact that the vessel may have previously carried some cargoes without damage does not prove that the hatchcovers were in good condition.  Further, as advised, we are instructed on behalf of two separate companies, and we do not intend to debate with you the ownership of those companies.

3.    In relation to the SOF, the concerns of each party have been recorded in the correspondence, and we see no reason to incur further costs in debating the position.  Your comments as to the conduct of our Clients are denied.

4.    We are extremely surprised that you consider that we have acted unprofessionally in referring to the fact that the vessel had its Class withdrawn (as was recorded in the PSC report).  The concerns of Class over the conditions of a hatchcover (no. 6 or otherwise) is of course extremely relevant - it is rare for Class to be withdrawn, and indicates concerns of Class over the condition of the ship.  That is a very serious matter.  Further, the status of Class is of course relevant to the charterer, hence the provision in the charter dealing with the issue of Class.  We simply have no idea how you can realistically consider that this fact is irrelevant, or that it was unprofessional to mention it.

5.    Our Clients consider that the damage occurred on board.  The cargo was in good condition when loaded.  The hatchcovers are evidently in poor condition, as confirmed by the concerns and comments of PSC.  You will appreciate that our concerns over the condition of the vessel have been greatly increased by your Clients refusal to allow ultrasonic testing of the watertightness of the hatchcovers.

6.    We also understand from Antex that your Clients are pressing PSC to delete their comments regarding the hatchcovers on the basis that the condition of the hatchcover cannot be determined by a visual inspection.  If correct, this appears to make your Client's stance regarding ultrasonic testing indefensible, as their position appears to be that (i) even though the hatchcovers appeared to be in poor condition to the PSC, their condition cannot be determined by a visual inspection, but (ii) ultrasonic testing to confirm the condition of the hatchcovers should not be allowed.

7.    We have previously requested copies of the analyses, referred to by Owners, which have been carried out by Owners on the damaged cargo.  Please supply a copy of these analyses by return.  Please also confirm that copies of the log books and statement of facts will be supplied immediately - these have been requested many times.

8.    Finally, we note your request for security.  Please confirm the amount and alleged basis of your claim.  Please also confirm that your Clients are prepared to provide security for Congentra's claim under the charterparty for any losses suffered.

Regards,

Andrew Speake
Tel: +44 (0) 20 7643 7675
Fax: +44 (0) 20 7071 9601



Andrew
Speake/MET/BLG_INT1     To  Eurof Lloyd-Lewis/MET/BLG_INT1@BLG_INT1
07/02/2008 13:19        cc

                        Subject  Fw: "NICHOLAS M" - CP dtd 10.10.2007 - at St. Petersburg

Andrew Speake
Tel: +44 (0) 20 7643 7675
Fax: +44 (0) 20 7071 9601
—— Forwarded by Andrew Speake/MET/BLG_INT1 on 07/02/2008 13:19 ——



"John Krzywkowski"
<johnk@k-law.gr>        To  "Andrew Speake" <aspeake@blg.co.uk>
07/02/2008 12:55        cc

                        Subject  RE: "NICHOLAS M" - CP dtd 10.10.2007 - at St. Petersburg

Dear Sirs,

I write to notify your clients, Congentra AG of Zug, Switzerland, that Mr. Alec Kazantzis has today accepted an appointment by my clients, Sixteen Thirteen Marine S.A. of Monrovia, Liberia ("Owners"), to act as an arbitrator pursuant to clause 37 of the charter.

Mr. Kazantzis details are as follows:

14 Kildare Terrace

London W2 5LX

Tel: + 44 20 7221 0955

Fax: + 44 20 7221 0912

Mr Kazantzis has been appointed to resolve all disputes arising out of the captioned charter including, but not limited to, claims by Owners for breach of the said charter and/or claims for damages in tort arising from a factual matrix in which Congentra unjustifiably, and with malicious intent, either directly or indirectly delayed the vessel during her discharge operations at St. Petersburg (for the purposes of falsely justifying certain cargo claims which Owners consider to relate to pre-shipment damage) - such that the vessel missed her cancelling date for her next fixture out of that port.

Congentra are required to notify Owners of the appointment of their arbitrator within 14 days.

+++++

Best regards,

John Krzywkowski

84

Information in this e-mail (and any attachment) is confidential and may be legally

privileged. It is intended solely for the attention of the addressee(s). If you have

received it in error, please notify us by return e-mail and then immediately delete

this message from your system. Please do not copy it or use it for any purpose, or

disclose its contents to any other person: to do so could be a breach of confidence.

Law Office of John Krzywkowski

18 Leosthenous Street & Fileilinon, Piraens 185 36, Athens, Greece.

Tel: (+30) 210 452 1200 Fax: (+30) 210 452 1210

**BARLOW LYDE & GILBERT**

Barlow Lyde & Gilbert LLP
Beaufort House  15 St Botolph Street  London  EC3A 7NJ
tel +44 (0)20 7247 2277  fax +44 (0)20 7071 9000
DX 155 London CDE

**Fax to**
Mr Christopher Moss
LMAA Arbitrator

**Fax number**

020 7233 7035

**From**
Eurof Lloyd-Lewis
170196-6/RZB/ELL/3.71a

**E-mail**

Elloyd-lewis@blg.co.uk

**Direct telephone number**
020 7643 7447

**Direct fax number**
020 7071 9601

**No. of pages (including this page)**

**Date**
11 February 2008

This fax is intended only for the addressee(s) named above.  As this fax may contain confidential or privileged information, if you are not a named addressee or person responsible for delivering the message to the named addressee(s) please telephone us IMMEDIATELY.  The contents should not be disclosed to any other person nor copies taken.

Dear Sir

**M.V. "NICHOLAS M"**
**Time Charterparty dated 10 October 2007**
**Owners: Sixteen Thirteen Marine S.A. of Monrovia, Liberia**
**Charterers: Congentra AG of Zug, Switzerland**

We are instructed by Congentra AG, the Charterers under the above-captioned time charter.

On 7 February 2008 the Owners of the m.v. "NICHOLAS M", Sixteen Thirteen Marine S.A. commenced arbitration proceedings against our client.  They have appointed Mr Alec Kazantzis as their arbitrator in accordance with clause 37 of the charter.  Mr Kazantzis' contact details are 14 Kildare Terrace, London, W12 5LX, Tel 020 7221 0955, Fax 020 7221 0912.

We have today appointed you as our clients' arbitrator in respect of all disputes arising out of the above-captioned charterparty and should be grateful if you would kindly confirm acceptance of your appointment.

Yours faithfully

Barlow Lyde & Gilbert LLP

0977947.doc

www.blg.co.uk

Barlow Lyde & Gilbert LLP or an affiliated undertaking has an office in each of the places listed below.

LONDON  HONG KONG  SINGAPORE  SHANGHAI