UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------x

**SIXTEEN THIRTEEN MARINE S.A.,** **08 CV 1318 (HB)**

**Plaintiff** **ECF CASE**

**-against-**

**CONGENTRA AG,**

**Defendant.**

-----------------------------------------------------------------------x

**Declaration of the Hon. Sir Anthony Colman**

1. I am asked by Barlow Lyde & Gilbert ("BLG") London solicitors acting for Congentra AG ("the Charterers"), to provide a Report on the manner in which English law would operate on the facts as alleged by the parties to a dispute relating to the carriage and discharge at St. Petersburg of a cargo of bulk soya bean meal by the vessel m.v. NICHOLAS M ("the Vessel") during October 2007 to January 2008. My professional background and experience is listed in Appendix 1.

2. This opinion is provided on the basis of the documents listed in Appendix 2 (copies of which have been provided to me). I exhibit to this statement a bundle of documents entitled **"AC1"** to which I refer below.

3. Since this dispute has been referred to arbitration in London, the arbitral tribunal will apply English Law in accordance with the choice of law clause in the Charterparty, see clause 37 of the "Furia R" charter which is incorporated into the Charterparty **(AC1 tab 1).**

4. By a time trip charter made on 10th October 2007, Sixteen Thirteen Marine SA, "the Owners", let on hire to Congentra AG as charterers the Vessel for time trip via River Plate in Argentina to St. Petersburg, Russia of duration about 60 days without guarantee.

5. The vessel was delivered at 1300 on 11th October 2007 on dropping outward pilot at Porto Alegre, Brazil, from where it proceeded to San Lorenzo, Argentina, where loading of a bulk cargo of Argentina Hipro soya bean meal commenced on 18th October 2007 and was completed on 30th October 2007.

6. The vessel arrived at St Petersburg on 1st December 2007 but discharge did not commence until 3rd December 2007 because of customs formalities and the presence of snow at the port (AC1 tab 4).

7. Meanwhile, shortly after the Vessel's arrival, the No.4 hold hatch was opened and it was found that the cargo in that hold was wet-damaged. On 3rd December 2007 that cargo was jointly sampled by Wakefield, surveyors instructed by the Owners' P and I Club (the American P and I Club) and the Russian State Grain Control/RSGC.

8. The Russian authorities subsequently condemned as unfit a quantity of 500 mt of that cargo and discharge of cargo from No. 4 hold was prohibited.

9. On 6th December 2007 BLG, acting on behalf of Cargo Interests including Charterers, wrote to the managers of the Vessel, Chian Spirit Maritime Enterprises Inc. informing them that BLG had been instructed to act for Cargo Interests, that SGS had been appointed by Cargo Interests to attend the discharge of the Vessel, take samples of the cargo and supervise segregation of damaged cargo and that BLG was asking, on behalf of Cargo Interests, for security for the value of the damaged cargo together with interest and costs.

10. The Owners and their managers did not reply and, in their letter dated 11th December 2007, BLG wrote directly to the American P and I Club. By 24th December 2007 security had been provided on behalf of the Owners in the form of the P and I Club's letter of undertaking.

11. In the meantime, on 15th December 2007, representatives of SGS requested the Master of the Vessel to permit to them access to the No. 4 hold but the Master declined this request.

12. On 15th December 2007 it was discovered that No. 2 hold also contained wet-damaged cargo. Discharge of cargo from that hold was also prohibited.

13. On 18th December 2007, after Cargo Interests had threatened to apply to the English Court for an order for access to inspect the cargo on board, the Master allowed SGS access to No. 4 hold.

14. On 28th December 2007 discharge of all the cargo was completed at 1840.

15. On the same day BLG requested the American P and I Club to obtain Owners' permission for SGS and Marinex-ILCS to perform ultra sonic tests on holds 2 and 4 in order to establish whether they were watertight. However, at 2000 on that day the SGS Surveyor was refused permission by the Master to conduct such tests.

16. Also on 28 December 2007, following completion of discharge, the Vessel's Classification Society removed either the cargo ship safety construction certificate (as alleged by Owners) in the London arbitration or both that certificate and the certificate of classification (as alleged by the Charters and conceded in paragraph 11 of Owners' complaint in the proceedings **(AC1 tab 2)**). I return to the evidence on this issue in paragraph 18 below.

17. It is to be observed that although the vessel could in theory put to sea without either certificate the absence of either certificate would prevent it from lawful trading to any port.

18. I interpose that such evidence as there is indicates unequivocally that Bureau Veritas ("BV"), the Classification Society, removed both certificates by reason of the fact that the metal hinges on the hatch to No. 6 hold had been torn out and/or defects in the hydraulic lifting mechanism and the hatch could not be closed, see:

    (i) Owners' Complaint, para 11 **(AC1 tab 2)**;

    (ii) BV's formal notification issued on 28th December 2007 **(AC1 tab 3)**;

      (iii) The Statement of Facts prepared by Anteks, the Charterers' agents and cargo receivers forwarding agents at St. Petersburg **(AC1 tab 4).**

I have no doubt an English Court, or an arbitral tribunal applying English law, would accept this compelling evidence.

19. On 29 December 2007 at 1530 the St. Petersburg Port State Control ("PSC"), in effect the relevant port authority, detained the Vessel on the following eight grounds **(AC1 tab 5)**:-

- The removal by class of cargo ship safety construction certificate (which Port State Control received notice of on 28th December 2007);

- The removal by class of class certificate (which Port State Control received notice of on 28th December 2007);

- Bulkhead from main deck to store room holed;

- Leakage from bilge collecting tank no.9 into engine room;

- Hatch cover damaged (metal hinges torn out from base in hold no. 6 due to damage to hydraulic system);

- Hatch covers, coamings, compression bars all heavily corroded;

- Insufficient crew and, in particular, the vessel had no second officer (although it would appear that a new second officer arrived on 30th December 2007); and

- Exhaust pipe in engine room holed.

20. According to a report dated 2nd January 2008, signed by the Master, the first six items were all to be rectified and approved to the satisfaction of the Classification Society before the departure of the Vessel.

21. The Vessel was released from detention by the PSC on 11th January 2008.

22. There is an issue between Owners and Charterers as to when the required repairs to the Vessel, in particular the No. 6 hatch mechanism, were completed and as to when BV returned the Vessel's class certificates. The Owners' Complaint, paragraph 15, asserts

that such repair was carried out prior to 31st December 2007 and that the certificates were returned after that. However, the emails sent by the Master on 7th January 2008 **(AC1 tab 6)** state that the two certificates were not returned by BV until 6th January 2008 and further that the repairs to the No. 6 hatch mechanism were still "in progress" on 7th January and not expected to be completed until the following day. These emails provide compelling evidence that, contrary to the Owners' Complaint para 15, the class certificates were not returned until 6th January 2008, at the earliest and No. 6 hatch was not repaired until 8th January 2008 at the earliest.

23. The claim by Owners in the London arbitration, in respect of which by these proceedings the Owners seek security, is expressed in two documents as follows:

(i) The notice of commencement of the arbitration proceedings **(AC1 tab 7)** stated:

> *"... all disputes arising out of the captioned charter including, but not limited to, claims by Owners for breach of the said charter and/or claims for damages in tort arising from a factual matrix in which Congentra unjustifiably, and with malicious intent, either directly or indirectly delayed the vessel during her discharge operations at St. Petersburg (for the purposes of falsely justifying certain cargo claims which Owners consider to relate to pre-shipment damage) – such that the vessel missed her cancelling date for her next fixture out of that port.*

(ii) The Owners' fax dated 14 February 2008 **(AC1 tab 8)** stated that their claims for breach of contract by late re-delivery of the vessel and in particular:

> *"the late redelivery was caused by Congentra's refusal to discharge the damaged cargo for a period of 16 days between 2 December 2007 when the damaged cargo was discovered in No. 4 hold and 18 December 2007. During that time they unreasonably insisted that segregation of the damaged cargo should take place on board rather than ashore. They also delayed matters by insisting on ultrasound tests concerning the hatches...*
>
> *Congentra, and their sister company Euroweg, the receivers, unreasonably and uncontractually delayed completion of the discharge operations until 28 December 2007 dispute giving a "60 day WOG" duration for the voyage... The excess time beyond 60 days was a result of Congentra's unreasonable delaying tactics concerning discharge orders...*
>
> *...the Port State Control were 'persuaded' to attend on board to detain the vessel as much as three weeks after the damaged cargo was found and Congentra and their local sister companies had exhausted all other methods of hoping to obtain damming evidence about the vessel to support their cargo claims."*

24. The Owners' case is further developed in the Complaint in these proceedings in the following manner **(AC1 tab 2)**:

(A) *"...In bad faith, Defendant CONGENTRA and non-parties Euroweg, and Anteks refused throughout the material period to discharge the cargo and to segregate it as to good and damaged ashore, thereby extensively delaying the vessel from completing her cargo operations"* (Complaint, paragraph 10).

(B) *"CONGENTRA and non-parties Euroweg, and Anteks sought to delay the vessel further by requesting Ultrasound tests in the holds"* (Complaint, paragraph 11).

(C) *"CONGENTRA and non-parties Euroweg, and Anteks ...'persuaded' Russian Port State Control officials to go on board and detain the ship for a number of days in an attempt to gather evidence against the vessel to help support their dubious claims"* (Complaint, paragraph 12).

It is further alleged in paragraph 19 that due to the delays caused by the *"unwarranted and improper interferences of Defendant CONGENTRA and its agents"* the Vessel lost its employment under another fixture, to which I refer as "the Britannia charter" and which is discussed at paragraph 29 below. It is also pleaded that there had been a breach of the charter and wrongful interference in the Owners' business by the charterers and a conspiracy between the Charterers and non-parties Euroweg (the consignees) and Anteks (paragraph 23).

25. The Owners formulate their alleged losses for the purposes of the present proceedings in the following manner. They allege that the Charterers' breaches of contract and/or duty caused the loss of the Britannia charter (about 45 days at USD$40,000 per day to South America) and of a further prospective fixture from there to the Far East (a further 52.5 days at USD42,000 per day) together with a ballast bonus of USD$550,000. The total losses are therefore quantified at USD$1.8 million under the Britannia charter and USD2.755 million under the subsequent fixture, giving an aggregate of USD$4.505 million plus interest (USD$560,000) and costs (USD$200,000).

26. Before considering how English law would operate on these claims, it is necessary to maintain two further matters which arise on the evidence.

27. I first refer to the causes of the delay in completion of discharge at St. Petersburg between 2nd December 2007 and 28th December 2007. According to remarks made by the Master on the Statement of Facts **(AC1 tab 9)**, the slow discharge of the vessel during the period 2-18 December was caused by the fact that for much of the time receivers were working the vessel with one gang rather than two and by delays due to lack of availability of wagons. The Master's remarks explicitly reject the suggestions that delay in discharge of cargo from the No. 2 and 4 holds delayed the overall discharge operation, which was proceeding from other holds during the periods when those holds could not be discharged. Then when the discharge of all holds had been completed on the evening of 28th December, bad weather conditions and the consequential lack of a pilot would have prevented the vessel from sailing until noon on 29th December 2007. The Master expressed the position thus:

> "*- Despite the fact that commencement of cargo discharge from holds no.2 and 4 was delayed..., the discharging progress and the overall discharging time were not affected as the vessel was always able to provide the required gangs from other available holds. Therefore no delays from Vessel's side were occurred during discharging operations*
>
> *- From commencement of discharge until completion of same, discharging operations were carried out with 1 (one) and some very few limited times with 2 (two) gangs. Also always availability of wagons was very tight.*
>
> *- On 28 Dec last minute ultrasonic test was not carried out for reasons explained to Charterers in writing...*
>
> *- On 28 Dec after completion of discharge vessel was waiting pilotage due to bad weather conditions (as per agent msg pilot was not to be expected before 29th noon sub weather improvement)...*"

28. There is therefore compelling evidence that the prohibition on discharge of the Nos. 2 and 4 holds by the Russian authorities did not lengthen the overall discharging time, such cargo being discharged by 28th December 2007.

29. On 20th December 2007 the Owners entered into the Britannia charter on terms similar to those of the m.v. NICHOLAS M **(AC1 tab 10)**. The cancelling date was 31st December

2007, delivery on dropping off last sea pilot at St. Petersburg. In the answer given by the Owners to question 15 of the fixture questionnaire as to the vessel's present position as at 20th December 2007, it was stated that *"due to lack of trucks completion (of discharge under the NICHOLAS M charter) may be realistically expected around 26 – 27 Dec AGW WP UCE."* The Vessel having missed the cancelling date, Britannia duly cancelled the Britannia Charter on 10th January 2008.

30. Although it is unclear whether sea conditions could have permitted the Vessel to proceed under pilotage from St. Petersburg by 31 December 2007, there is very strong evidence, as set out in paragraphs 16 to 22 above, that the Vessel could not have been validly delivered under the Britannia charter by 31st December in as much as there is compelling evidence that the class certificate had been removed by BV on 28th December 2007 and was not returned to the vessel until 6th January 2008.

31. As mentioned above, the evidence suggests that the Vessel's class certificates were not returned until 6th January 2008 at the earliest. Up until that point, the vessel could not be validly delivered under the Britannia charter, for it was not tight, staunch, strong and in every way fitted for the service. Apart from the condition of the No. 6 hatch and other defects in condition listed by PSC as grounds for detention of the vessel, its class certificate and its safety construction certificates had been removed and was therefore not fitted for the service. Furthermore, I note that under the terms of the Britannia charter, the Owners provided a guarantee that the Vessel was classed with BV *"and shall remain so throughout the whole T/C period"*. The effect of these deficiencies would have been to prevent the Vessel from tendering a valid notice of readiness under clause 14 of the NYPE form, see *Time Charters* (Wilford) at paragraph 8.1 **(AC1 tab 11)**.

32. It is to be noted that neither in their complaint in these proceedings nor in their communications with the arbitrators have Owners alleged that the removal of the class certificates was caused by any breach of contract or duty by the Charterers.

33. Indeed, the discharge of the cargo had been completed by 1840 on 28th December and from then onwards the vessel was at the disposal of the owners and but for the removal of the vessel's class certificates and the adverse sea conditions they were from that date free

to deploy it for their own purposes including delivery under the Britannia charter until 15:30 on 29th December when it was detained by the PSC.

34. Assuming that the class certificates were returned on or around 6th January 2008 and that the repairs to No. 6 hatch were completed on 8th January 2008, delivery into service under the Britannia charter would thereafter only have been prevented by the detention of the Vessel by the PSC. However, it seems to me significant that, the evidence as described above suggests that the detention by the PSC was simply the consequence of the removal of the Vessel's class certificates. As I understand it, the Owners nowhere allege that the removal of the class certificates was *caused* by any act of the Charterers. Thus, although it is ultimately a question of fact for the arbitral tribunal to decide, it may well be the case that the conclusion reached is that the detention of the Vessel up to and beyond 10th January 2008, when the Britannia charter was cancelled, was caused by the problems with the Vessel which led to the removal of the class certificates and not by any act of the Charterers or their associated companies.

35. I set out below the principles of English law which would be relevant to an assessment of the Owners' claims that the Charterers and their associated companies were responsible for this detention and are liable in damages as a result.

36. Firstly, the Charterparty expressly provides that the redelivery of the Vessel is to take place "ON DLOSP ST. PETERSBURG" (i.e. on dropping last outwards sea pilot). The Charterparty therefore continued to subsist after the completion of discharge of the cargo on 28th December 2007. Whether or not there has been a breach of the terms of the Charterparty by the Charterers in relation to the detention of the Vessel by the PSC will therefore turn on the facts as found by the arbitral tribunal. I would however point out that, as I have explained at paragraph 19 above, the PSC's expressly stated grounds for detaining the vessel all related to physical problems with her hull and equipment. It is not clear to me what evidence the Owners intend to put forward in support of their contention that the detention of the Vessel was in fact instigated by the Charterers or their associated companies. I can only say that no Court or arbitral tribunal applying English law would be likely to accept the Owners' assertions unless concrete evidence were

produced which established that, on the balance of probabilities, the Charterers had in fact acted as alleged.

37. It also seems to me that there is an inherent improbability in the case being advanced by the Owners. Under the terms of the Charterparty, the Charterers are liable to pay to the Owners daily hire in the sum of US$38,000 for so long as the Charterparty continues. In such circumstances, it appears inherently unlikely that the Charterers would seek to deliberately *prolong* the Charterparty by acting to prevent the Vessel from leaving St Petersburg. The arbitral tribunal will no doubt be strongly influenced by this point when it comes to consider whether the Owners have established that the Charterers procured or persuaded PSC to prevent the Vessel from sailing.

38. As for the Charterers' references to claims in tort, I consider that, given the way in which the Owners' allegations have been advanced, three separate causes of action are potentially relevant. These are (i) inducing a breach of contract; (ii) causing loss by unlawful means and (iii) conspiracy. Before examining those causes of action in more detail, I should say that I have not seen any detailed articulation of the legal claims advanced by the Owners in this case. The Complaint which has been filed before the New York Court employs the terminology of "wrongful interference" but does not provide any further details of the actual causes of action being relied upon (aside from breach of the Charterparty). What follows below are therefore my views in relation to the Owners' case insofar as I am able to understand it from the relatively brief details provided thus far.

39. The law in relation to the so-called "economic torts" of inducing a breach of contract and causing loss by unlawful means has recently been considered by the House of Lords in ***OBG Ltd v. Allan*** [2008] 1 AC 1 **(AC1 tab 12)**. Three conjoined appeals were under consideration and the issues involved were complex. For present purposes, all that is necessary is to explain the essential elements of the relevant causes of action under English law. The burden of proof in establishing that those elements are in fact satisfied rests in each case with the claimant, i.e. the Owners in this case.

40. Inducing a breach of contract is a tort whereby the defendant is alleged to have done some act which has the effect of procuring a breach of contract between the claimant and the third party. It is an essential element of the tort that the relevant act is done by the defendant with the *intention* of procuring the breach of contract. The requirements of intention are explored in the speech of Lord Hoffmann at paragraphs 39-44 of his judgment. If the claimant is able to prove the constituent elements of the tort, then damages may be awarded to compensate the claimant for the loss suffered as a result of the breaches of contract which have been induced.

41. When such a cause of action is advanced, the usual complaint by a claimant is that the defendant has intentionally caused a third party to breach his contract with the claimant. It is difficult to apply such an analysis here since the Owners do not say, as I understand it, that the Charterers have somehow induced Britannia to break its contract with the Owners. Rather, on the facts, the case actually advanced seems to be that the effect of the alleged breaches of the Charterparty by the Charterers had the knock-on effect of causing the Owners to breach the Britannia Charter. That is essentially an allegation of breach of contract not of the tort of inducing a breach of contract.

42. I am therefore of the view that the tort of inducing a breach of contract is not relevant to the case being advanced by the Owners.

43. As for the tort of causing loss by unlawful means, the ambit of this tort has been greatly restricted by ***OBG Ltd v. Allan.*** It applies where a defendant can be shown to have acted so as to interfere with the freedom of a third party to deal with the claimant. It is essential for the claimant to prove (i) that the defendant intended to cause loss to the claimant and (ii) the defendant's acts were unlawful as against the third party and would have been actionable at the suit of the third party.

44. Again, such tort is unsustainable on the present facts. The Owners do not appear to be alleging that the Charterers have unlawfully interfered with the ability of Britannia to deal with the Owners in a manner which would be actionable by Britannia. As I have described above, the claim actually advanced is that the Charterers' breaches of the

Charterparty have resulted in a situation where the Owners have found themselves exposed to the cancellation of the Britannia charter at the option of Britannia.

45. The tort of conspiracy is traditionally divided into two categories, 'conspiracy to use unlawful means' and 'conspiracy to injure', see ***Lonrho plc v. Fayed*** [1992] 1 AC 448 **(AC1 tab 13)**. The first type requires that the conspirators use unlawful means to injure the claimant whereas the second type is intended to encompass a situation where the acts done by the conspirators are in themselves lawful but are done with a deliberate intention to damage the claimant. As with the causes of action described above, damages are awarded on compensatory principles.

46. A case in conspiracy is plainly highly fact-sensitive and in this case, whether the case is made out will depend on the detailed findings of fact made by the arbitral tribunal. I would however observe that even in the 'unlawful means' version of the tort, an intention to injure the claimant must be proven[1] (***Lonrho v. Fayed***). It is not sufficient for either form of conspiracy that the defendant's actions (whether unlawful or not) merely have the *effect* of causing loss to the claimant. In order for liability to be established, it would therefore be necessary for Owners to establish either:

(1) That the Charterers and their associated companies had combined to use unlawful means with the intention of causing injury to the Owners (albeit that such intention was not necessarily their "predominant purpose"), or

(2) That the Charterers and their associated companies had combined to act with the predominant purpose of injuring and causing loss to the Owners.

47. By way of postscript I should add that if the Owners are able to establish the commission of a breach of contract or tort then, under English law, damages would be recoverable on the basis of their lost *profit* and not their lost *revenue*. This is a matter of basic principle and reflects the compensatory aim of an award of damages under English law. In the context of a late redelivery under a time charter therefore the amount of damages payable

[1] Albeit that such intention need not be the defendant's "predominant purpose" as with the second form of conspiracy.

must take into account the costs of performance of the lost fixture and any additional hire received under the original charter as a result of its prolonged duration.

**I declare under penalty of perjury and the laws of the United States of America that the foregoing is true and correct.**

**Executed this 26th day of February 2008, London, England.**

Signed: ..........................................

**Appendix 1**

**Sir Anthony Colman**

**Judicial Career**

Judge of the Commercial Court, in the High Court, London from 1992 to 2007, specialising in commercial litigation of all kinds, including in particular

(i) international oil and gas industry disputes,

(ii) international sole agency, sole distributorship and joint-venture disputes,

(iii) primary insurance and reinsurance disputes, including marine and aircraft insurance,

(iv) international banking and credit disputes,

(v) commercial fraud,

(vi) cases involving issues of American Law

(vii) carriage of goods by sea

and hearing innumerable cases on arbitration law and practice, including the applicability of the New York Convention eg. Westacre Investments v. Jugoimport SDPR Holding Co Ltd [1999] QB 740 and A v. B [2007] All ER (Comm) p.571

Judge in Charge of the Commercial Court (1996-7)
Report of the Re-Opened Investigation into the Loss of MV Derbyshire 2000
Special Adviser to the Ministry of Justice of the Czech Republic on civil procedure (2000-2001), Consultant to the European Commission on Czech Republic's accession to the EU (2002) and on Slovakia's accession to the EU (2003).
Co-founder and member of the management committee of the European Commercial Judges Forum (2002-2007).
Honorary President of the Italian Society for Mediation (2002-present).
Award by the Czech Republic (Gratias Agit Award) for services to Czech judicial reform and judicial education (2006).
Principal of the Faculty of Mediation and Vice President of the Academy of Experts, London, (2002-present).

**Publications and Lectures**

Author and co-editor of The Practice and Procedure of the Commercial Court (LLP); General Editor and contributor to the Encyclopedia of International Commercial Litigation (Kluwer Law).

Numerous lectures and talks throughout the World on inter alia:

(i) the conduct of commercial courts,

(ii) the use of mediation in commercial litigation and arbitration,

(iii) international arbitration: court supervisory jurisdiction,

(iv) case management in commercial litigation,

(v) the New York Convention.

Report to the UK and Czech Republic Governments on the state of Commercial Litigation in the Czech Republic and the need for change in Czech Procedural Law 2000.

**Education**

Educated Harrogate Grammar School and Trinity Hall, Cambridge, scholar and Double First in Law Tripos.

**Career at the English Bar**

Practised as a barrister of Gray's Inn at the Commercial Bar 1962-1992, specialising in primary insurance and reinsurance including marine insurance, maritime disputes, banking and international trade and distributorship agreements, ICC and ICSID arbitrations, including acting as ICC, LCIA and ICSID arbitrator. Until 1993 Fellow of the Chartered Institute of Arbitrators.

Appointed Queen's Counsel 1977, Master of the Bench of Gray's Inn, (1986-present), Chairman of the Commercial Bar Association (COMBAR) 1991-2

**Appendix 2**

Documents provided by Barlow, Lyde & Gilbert.

1. Charterparty recap dated 10 October 2007 between Sixteen Thirteen Marine SA and Congentra AG.

2. Bills of lading issued in respect of holds 2 and 4.

3. Master's comments on the Statement of Facts.

4. Statement of Facts issued by the Charterers and the cargo receivers.

5. Maritime attachment and garnishment of the US District Court, Southern District of New York against Congentra AG.

6. Verified Complaint.

7. Documents obtained from Port State Control, St Petersburg.

8. Charterparty recap between Sixteen Thirteen Marine SA and Britannia Bulk Plc dated 20 December 2007.

9. Documents obtained from H B J Gateley Wareing LLP, the solicitors acting for Britannia Bulk Plc.

10. Correspondence with Law Office of John Krzywkowski and the London arbitral tribunal.

# M.V. "NICHOLAS M"

## Charterparty dated 10.10.07

---

## INDEX TO BUNDLE

---

1   Charterparty recap dated 10 October 2007 between Sixteen Thirteen Marine SA ("Owners") and Congentra AG ("Charterers") ("the Congentra Charter");

2   Verified Complaint;

3   Bureau Veritas Notification dated 28 December 2007;

4   Statement of Facts issued by Charterers and Cargo Receivers;

5   Documents obtained from Port State Control of St Petersburg notifying the detention of the vessel;

6   Emails sent by the Master on 7 January 2008;

7   Owners' notice of commencement of arbitration;

8   Fax from Owners dated 14 February 2008;

9   Master's comments on the Statement of Facts;

10  Charterparty recap between Sixteen Thirteen Marine SA and Britannia Bulk Plc dated 20 December 2007 ("the Britannia Charter");

11  Wilford on Time Charters, paragraph 8.1;

12  OBG Ltd v. Allan [2008] 1 AC 1;

13  Lonrho plc v. Fayed [1992] 1 AC 448.

Exhibits to the Declaration are being filed electronically due to their volume.

AC 1

## Freight

От: Operations Congentra [operations@congentra.com]
Отправлено: 10 октября 2007 г. 15:11
Кому: Billmar Chartering Ltd
Тема: RE: LgINT Message (REF:077332700)

OK Confirm

-----Original Message-----
From: Billmar Chartering Ltd [mailto:chartering@billmar.gr]
Sent: Wednesday, October 10, 2007 3:15 PM
To: Operations Congentra
Subject: LgINT Message (REF:077332700)
Importance: High

TELiX MSG: 73327-00 10/10/07 14:14

BILLMAR CHARTERING LTD
TEL:+30210 4282290
FAX:+30210 4282294
E-MAIL: chartering@billmar.gr

PAVEL/ZACHOS

RE : MV NICHOLAS M - CONGENTRA

Further to our phone conversation herebelow recap of fixture as per our correspondence notes

Pls go through and confirm same and pls lift subs in time

=== recap ===

--- vsl's full t/c description --

01) NAME: M.V "NICHOLAS M."

02) EX NAMES INCLUDING DATE LAST NAME CHANGE: "MED UNITY" (2003) "LAURA G" (1998) - "FORUM PRODUCT" (1997) - "RAFAELA" (1991).

03) TYPE OF VESSEL: BULK CARRIER

04) ENGINE AND BRIDGE SITUATED: AFT

05) DWAT AND DRAFT SUMMER/WINTER/FRESH/TROPICAL/TROPICAL FRESH:
SUMMER DEADWEIGHT 39,498 METRIC TONS ON 11.169 METRES
WINTER DEADWEIGHT 38,402 METRIC TONS ON 10.937 METRES
TROPICAL DEADWEIGHT 40,608 METRIC TONS ON 11.401 METRES

06) DWAT ON 17/18/19/20/32/32.5/33/33.5 FEET FRESH WATER

| FEET | METRES | FRESHWATER DEADWEIGHT |
|---|---|---|
| 17.0 | 5.18 | 11,462 |
| 18.0 | 5.48 | 12,766 |
| 19.0 | 5.79 | 14,115 |
| 20.0 | 6.10 | 15,468 |
| 32.0 | 9.75 | 31,731 |
| 32.5 | 9.90 | 32,417 |
| 33.0 | 10.06 | 33,151 |
| 33.5 | 10.21 | 33,840 |

07) TPC 48 AT SUMMER DRAFT

08) LOA/LBP/EXTREME BEAM/DEPTH MOULDED: 200.90/191.00/27.20/15.20 METRES.

09) CONSTANTS EXCLUDING FRESHWATER: 250 METRIC TONS

10) FRESHWATER CAPACITY: 305 METRIC TONS

11) IF FITTED WITH EVAPORATOR/DAILY PRODUCTION: 10 METRIC TONS / 24 HOURS

12) NUMBER HOLDS/HATCHES: 7/7

13) HATCH TYPE AND SIZES: STEEL HATCH COVER FOLDING TYPE (MACGREGOR)

NO.1 9.8 X 12.64 METRES
NO.2 17.6 X 12.64 METRES
NO.3 9.6 X 12.64 METRES
NO.4 17.6 X 12.64 METRES
NO.5 9.6 X 12.64 METRES
NO.6 17.6 X 12.64 METRES
NO.7 9.6 X 12.64 METRES

14) HOLDS LENGTHS: NO.1 16.80/ NO.2 26.50/ NO.3 16.80/ NO.4 26.40/ NO.5 16.80/ NO.6 26.40/ NO.7 16.00

15) TANK TOP DIMENSIONS:

NO.1 HOLD 16.60 X 17.00
NO.2 HOLD 26.50 X 19.20
NO.3+5 HOLDS 16.30 X 19.20
NO.4+6 HOLDS 26.40 X 19.20
NO.7 HOLD 16.00 X 18.50
(LENGTH AT CENTRE LINE - BREADTH AT HALF OF LENGTH)

16) MAXIMUM UNIFORM LOADS TANK TOPS/WEATHER DECK/WEATHER DECK HATCHES;

| | | |
|---|---|---|
| NO.1 | HOLD | 18.50 METRIC TONS/SQUARE METRE |
| NO.2-4-6 | HOLDS | 15 METRIC TONS/SQUARE METRE |
| NO.3-5-7 | HOLDS | 23.5 METRIC TONS/SQUARE METRE |
| MAIN DECK | | 3.4 METRIC TONS/SQUARE METRE |
| HATCH COVER | | 1.75 METRIC TONS/SQUARE METRE |

17) CUBIC CAPACITY IN MAIN HOLDS - GRAIN/BALE:
GRAIN 47,199 CUBIC METRES
BALE 43,423 CUBIC METRES

18) CUBIC BREAKDOWN PER HOLD - GRAIN/BALE IN CUBIC METRES:

| | GRAIN | BALE |
|---|---|---|
| NO.1 | 4,946 | 4,550 |
| NO.2 | 8,638 | 7,947 |
| NO.3 | 5,488 | 5,049 |
| NO.4 | 8,689 | 7,994 |
| NO.5 | 5,488 | 5,049 |
| NO.6 | 8,694 | 7,998 |
| NO.7 | 5,256 | 4,836 |

19) ANY PILLARS/CENTRE LINE BULK HARDS/OBSTRUCTIONS IN HOLDS: NO

20) TYPE OF VENTILATION CARGO HOLDS : NATURAL VENTILATION

21) IF BUILT WITH TOP SIDE TANKS : YES

22) IF BUILT WITH HOPPER TANKS : YES

23) TANK TOP SURFACE : FLAT

24) IF SUITABLE FOR GRAB DISCHARGE : YES

25) DISTANCE FROM SHIP'S RAIL TO HATCH COAMING: CLEAR DISTANCE 5.50 METRES

26) DISTANCE WATER LINE/HATCH COAMING FULL BALLAST/LIGHT/FULLY LADEN:

FULL BALLAST = 8.65 METRES
LIGHT BALLAST = 11.45 METRES
FULLY LOADED = 5.70 METRES

27) AIR DRAFT LIGHT/BALLAST/FULLY LADEN: 41.50/ 39.10/ 36.14 METRES

28) DISTANCE KEEL TO TOP OF RADAR MAST: 47.30 METRES

29) CARGO GEAR : GEARLESS

30) CARGO GEAR OUTREACH : N/A

31) CARGO GEAR DISTRIBUTION AND HOLDS SERVING : N/A

32) IF FULLY GRAIN FITTED : YES

33) IF SELFTRIMMER : YES

34) CO2 FITTED : NO

35) GRAB FITTED/TYPE AND CAPACITY/HOW OPERATED : N/A

36) AUSTRALIAN HOLD LADDERS FITTED : YES

37) IF PANAMA CANAL FITTED : YES

38) SPEED AND CONSUMPTION :

ABOUT 12.5 KNOTS ON ABOUT 26 MTS (BALLAST)/ABOUT 12.0 KNOTS ON ABOUT 28 MTS (LADDEN) INTERMEDIATE FUEL OIL 180 CENTISTOKES RME 25 ISO DIS 8217

PLUS

ABOUT 2.5 MTS (AT SEA)/2.0 MTS (AT PORT/WHEN IDLE) MARINE DIESEL OIL DMB ISO 8217.

Speed and consumption warrantees are given in good weather conditions only and no adverse currents.

Within the context of this charterparty,good weather conditions are understood to mean winds up to and including Beaufort force 4 and/or Douglas Sea state 3.

About is understood to mean 0.5knot downwards in the speed and 5pct upwards in the consumption.

For performance evaluation purposes, the overall performance of the vessel is to be reviewed on all laden and ballast passages during the currency of the charterparty. Weather periods in excess to Beaufort 4 and or Douglas Sea state 3, are to be expressly excluded from calculations.

Owners liberty vessel to burn diesel oil when manoeuvring/approaching and leaving ports/navigating in canals/rivers or congested/confined/shallow waters or in cold weather for boiler/heating.

39) NO SUITABLE FOR ALTERNATIVE LOADING IN ACCORDANCE WITH SOLAS CHAPTER XII,REGULATION 14 WITH EFFECT FROM 01st JULY 2006

40) ENGINE TYPE AND BHP/RPM: B&W 13100 BHP/128 RPM

41) NUMBER OF GENERATORS, TYPE AND BHP/RPM:
- MAN MEP-MAN G6V 23.5/33TL (2 SETS) S/N 6017-6022
- BACO W - HOLEBY DIESEL MODEL 5T23LH-2 (1SET) SN 164801
- 780 BHP EACH / 600 RPM EACH

42) BUNKER CAPACITIES: INTERMEDIATE FUEL OIL: 2,617 METRIC TONS (100%)/MARINE DIESEL OIL: 316 METRIC TONS (100%)

43) YEAR AND MONTH BUILT AND WHERE BUILT: MARCH 12, 1980/ BRASIL

44) FLAG ; ST. VINCENT & THE GRENADINES

45) PORT OF REGISTRY : KINGSTOWN

46) REGISTERED NUMBER : 9152

47) LLOYDS NUMBER : N/A

48) IMO NUMBER : 7433452

49) INTERNATIONAL/ SUEZ/ PANAMA GRT/NRT OR GT/NT:

INTERNATIONAL : 22,912 / 12,300
SUEZ : 21,341 / 19,040
PANAMA : / 19,090

50) CLASS SOCIETY: BUREAU VERITAS

51) CLASS RATING: I 3/3 E BULK CARRIER ESP DEEP SEA

52) LAST DRYDOCK: MAY, 2005

53) LAST SPECIAL SURVEY: MAY, 2005

54) CALL SIGN: J 8 B 2 6 8 0 (J8B2680)

55) TELEX SYSTEM/NUMBER: INMARSAT-C / 437738810-1

56) FASCIMILE NUMBER: 763662742

57) P & I CLUB ENTERED WITH: THE AMERICAN P+I CLUB

58) H & M VALUE: U.S. $ 6,250,000 (SIX MILLION TWO HUNDRED AND FIFTY THOUSAND DOLLARS) PLUS $ 1,250,000 IV (ONE MILLION TWO HUNDRED AND FIFTY THOUSAND DOLLARS). INSURERS: LLOYD'S UNDERWRITERS "BRIT SYNDICATE" (AS LEADERS).

59) REGISTERED OWNERS FULL STYLE AND FULL ADDRESS: SIXTEEN THIRTEEN MARINE S.A., MONROVIA, LIBERIA.

60) MANAGER'S NAME, ADRESS / COMMUNICATION DETAILS/ M.I.C.

CHIAN SPIRIT MARITIME ENTERPRISES INC.

10 ANT. AMPATIELOU,
GR-18536 PIRAEUS,
GREECE.
TELEPHONE: +30 210 429 0777
FASCIMILE: +30 210 459 9099
E-MAIL : operations@chianspirit.gr

All details are given in good faith as "about" wog

--- end of vsl's t/c description ---

---

- CHARTS GNTEE THAT THE FIXTURE WILL BE KEPT STRICTLY P+C AND SHALL NOT REPORT SAME IN ANY FIXTURE REPORT INCL BUT NOT LIMITED BALTIC INDICES AND/OR TO ANY OTHER THIRD PARTY.

- ON ARRIVAL AT 1ST LOADPORT AFTER THE VESSEL'S DELIVERY HOLDS TO BE READY FOR PERMITTED CARGO ORDINARY SERVICE, CLEAN, SWEPT, WASHED DOWN AND DRIED UP SO AS TO RECEIVE CHARTERERS INTENDED CARGO TO THE SATISFACTION OF THE SHIPPERS' SURVEYORS IN THE UNLIKELY EVENT THE VSL NOT BE APPROVED BY THE SURVEYOR THEN THE VESSEL TO BE PLACED OFF HIRE AND ALL RELATED EXPENSES THEREOF TO BE FOR OWNERS ACCOUNT.

  MORE SPECIFICALLY IN CASE OF VESSEL'S FAILURE TO FULLY PASS ABOVE PRELOADING CARGO HOLDS INSPECTION VSL TO BE PLACED OFF HIRE, or pro rata of hire according to the number of holds which failed PROVIDED LOCAL REGULATION PERMIT LOADING OF VESSEL WITH PARTIALLY UNCLEAN HOLDS AND SHIPPERS HAVE DECIDED TO COMMENCE LOADING OF THE ALREADY PASSED HOLDS OTHERWISE VESSEL TO BE FULLY OFF- HIRE FROM REJECTION UNTIL THE VSL PASSES THE SAME INSPECTION/TEST AND ANY ACTUALLY TIME LOST/DIRECT EXPENSES INCURRED HEREBY TO BE FOR OWS ACCOUNT.

OWNERS WARRANT FOLL:

- VSL IS SELFTRIMMING SINGLE DECK BULKCARRIER (AND WAS ORIGINALLY CONSTRUCTED AS A BULKCARRIER) WITH ENGINE/BRIDGE AND ACCOMMODATION AFT.

- VSL IS SD SELF-TRIMING BC/BRIDGE N ENG ROOM IS AFT

- VSLS T/T IS FLAT AND SUITABLE FOR GRAB DISCHARGING

- VSL DOES NOT HAVE A CENTERLINE BULKHEAD/BEAM OR ANY OTHER OBSTRUCTIONS

ALSO DURING THE ENTIRE CURRENCY OF C/P

- VSL SHALL NOT CHANGE OWNERSHIP OR CLASS OR FLAG THROUGHOUT THE WHOLE T/C PERIOD;

- VSL IS FULLY ISPS CERTIFIED. (ISPS CERTIFICATE TO BE SENT BY OWNERS UPON REQUEST)

- OWS GTE TT VSLS H.COVERS ARE TB WATERTIGHT ALL THROUGHOUT THIS C/PERIOD N IF ANY H.COVER FOUND DEFECTIVE, SAME TB RECTIFIED AT OWS TIME N EXPNS TO CLASS SURVEYOR SATISFACTION IN WHICH CASE VSL TO BE PLACED PRO RATA OFF-HIRE ACCORDING TO THE NUMBER OF HATCHES WHICH FOUND DEFECTIVE AND THE LOADING OPERATIONS WERE ACTUALLY PREVENTED.

- OWS GTEE VSL IS P&I COVERED WITH THE "AMERICAN P&I CLUB" AND CLASSED WITH "B.V, OR IN OWNERS OPTION WITH ANY OTHER MEMBER OF THE INTERNATIONAL P&I GROUP OR IACS MEMBER CLASS RESPECTIVELY, AND SHALL REMAIN SO THROUGHOUT THE WHOLE T/C PERIOD;

- OWS GTEE VSL IS SD SELF-TRIMING BC/BRIDGE N ENG ROOM IS AFT

- OWS GTEE VSLS T/T IS FLAT AND SUITABLE FOR GRAB DISCHARGING

FOR

1. VESSEL: MV "Nicholas M." (ex- "Med Unity") AS DESCRIBED ABOVE

2. ACCOUNT : "CONGENTRA AG of Zug, Switzerland"

   add...6301 Bahnhofstrasse 12, Zugm Switzerland

ph.nr...+41793079407
email...operations@congentra.com
mic...Lance Ranger

Charterers very brief background as given and guaranteed by them as true and accurate:

Congentra for your reference now has under tc m/v Athena and m/v Rotterdam trader (ex- FOREST PIONEER), Also you can contact Richard Burger from Azure for references or BNP Paribas (Suisse) Daniel Ruiz +41229062253

3. DELIVERY: ON DOP PORTO ALEGRE, BRAZIL ATDNSHINC

4. LAY/CAN : 12:00 HRS LT 10TH OCT 2007 - 24:00HRS LT 13TH OCT 2007

5. ALLOWED TRADING : ONLY 1 STRAIGHT TCT VIA RIVER PLATE, ARGENTINA TO ST.PETERSBURG (RUSSIA) AND/OR POLAND, WHICH IS ALLOWED ONLY IN THE EVENT ST.PETERSBURG IS FROZEN, ALWAYS VIA SAFE PORT (S), SAFE BERTH (S),SAFE ANCHORAGE (S) ALWAYS AFLOAT (EXCEPT FOR RIVER PLATE ONLY WHEREVER NAABSA APPLICABLE AS PER NYPE) ALWAYS WITHIN INSTITUTE WARRANTY LIMITS (CHOPT TO BREACH IWL FOR WHICH PLS SEE RELEVANT PROVISION HERE BELOW) AND ALWAYS EXCLUDING WAR OR WARLIKE ZONES (CONWARTIME 2004 TO APPLY), IN/OUT GEO ROTATION.

DURATION ABT 60 DAYS WOG

If during the currency of this c/p discharging area is considered out of INL/IWL Charterers shall have the privilege of breaking INL/IWL , Charterers paying any extra insurance premium thereby incurred, provided not exceeding london Lloyds scale and bimco ice clause for tc parties to apply. This extra insurance to be covered by owners with their h&m underwriters and to be reimbursed by the Charterers against presentation of relevant supportive invoice prior redelivery with emailed copies always acceptable.

6. ALLOWED CARGO: ONLY HARMLESS GRAINS/GRNPRODS/AGRIPRODS IN BULK AND MORE SPECIFICALLY "CORN/SOYABEANMEAL" IN BULK.

IT IS UNDERSTOOD THAT CHARTERERS MAY LOAD ANY GRAIN/AGRICULTURAL PRODUCTS, PROVIDED THAT CARGO WILL BE LOADED IN STRICT ACCORDANCE WITH INTERNATIONAL IMO REGULATIONS AND TO BE HARMLESS/NON- IMO DANGEROUS CARGO FOR THE LOADING,STORAGE AND CARRIAGE OF WHICH THE VESSEL IS NOT REQUIRED TO BE CO2 FITTED OR NO APPENDIX B REQUIREMENTS APPLY OR REQUIRED BY CHARTERERS AND/OR SHIPPERS AND/OR CARGO AND/OR VESSELS OR CARGO UNDERWITERS AND/OR ANY OTHER COMPETENT AUTHORITY. PALM KERNEL EXPELLERS,SUNFLOWER SEED EXPELLERS,PELLETS ALWAYS TO BE EXCLUDED.

IF MORE THAN ONE GRADES, CGO TO BE NATURALLY SEPARATED BY VSL'S HOLDS

7. REDELY : ON DLOSP ST.PETERSBURG, RUSSIA ATDNSHINC.

8. HIRE USD 38,000 DAILY HIRE PLUS USD 575,000 GBB - DAILY HIRE TO INCLUDE CT/FW/LUBES AND TO BE PAYABLE EVERY 15 DAYS IN ADVANCE

UPON DELY CHARTS TO PAY 15 DAYS HIRE PLUS GBB PLUS FULL VALUE OF BUNKERS AS ON BOARD AT THE DATE OF DELIVERY WITH NO DEDUCTIONS OF ESTIMATED BUNKERS VALUE ON REDELIVERY. ANY SUCH DEDUCTION TO BE MADE FROM THE LAST SUBSEQUENT SUFFICIENT HIRE PAYMENT.

CHARTERERS NO TO MAKE ANY DEDUCTION IN RESPECT OF OWNERS EXPENSES AT ANY PORT OF CALL DURING THIS CHARTER PARTY OWNERS SETTLING ALL OWNERS' EXPENSES DIRECTLY WITH AGENTS HOWEVER CHARTERERS' AGENTS TO ATTEND VESSEL'S MINOR MATTERS SUCH AS CASH TO MASTER, CHANGES OF PART OF CREW ETC WITHOUT CHARGING AGENCY FEE. FOR MAJOR SHIP'S HUSBANDRY MATTERS SUCH AS EMERGENCY DRYDOCKING

OWNERS TO MAKE THEIR OWN ARRANGEMENT WITH AGENTS. OWNERS TO ALWAYS HAVE THE RIGHT TO APPOINT THEIR OWN PROTECTING AGENTS AT BOTH ENDS.

9. BUNKERS ON DELY ABT 110 IFO AND ABT 50 MDO AT USD 450PMT AND USD 750 RESPECTIVELY.

BUNKERS ON REDELIVERY ABT SAME QUANTITIES AT SAME PRICES AS ON DELIVERY.

CHARTERERS TO PAY FULL VALUE OF BUNKERS ON DELY AS ON BOARD.

BOTH CHARTERERS AND OWNERS TO HAVE THE PRIVILEGE TO BUNKER THE VESSEL PRIOR TO DELIVERY/REDELIVERY PROVIDED SAME DOES NOT INTERFERE WITH VESSEL'S OPERATIONS OR ITINERARY IN WHICH CASE SAME TO BE SUBJECT TO BOTH PARTIES MUTUAL AGREEMENT

CHARTS TO HAVE THE RIGHT TO DEDUCT FROM THE LAST SUFFICIENT HIRE PAYMENT(S)
BUT GIVEN THE ANTICIPATED C/P DURATION IN NO CASE FROM THE FIRST 50 DAYS, THE ESTIMATED VALUE OF BUNKERS ON REDELIVERY

CHARTERERS TO PAY FULL VALUE OF BUNKERS ON DELY AS ON BOARD.

10. ON HIRE/OFF HIRE SURVEYS TO BE CARRIED OUT AT CHARTS TIME AND EXPENSES OWNERS APPOINTING MASTER TO ATTEND ON THEIR BEHALF.

11. ANY ADD WAR PREMIUM DURING THIS C/P (IF ANY) TO BE FOR CHRS' ACCT AGAINST FAXED VOUCHERS; MORE SPECIFICALLY CONWARTIME 2004 TO APPLY.

12. ILOCH

CHARTERERS HAVE THE OPTION OF REDELIVERING THE VESSEL WITHOUT CLEANING HOLDS CHARTERERS PAYING USD 5000 LUMPSUM

13. C/V/E USD 1,250 PER MONTH PRO RATA

14. OWNERS TO ALLOW CHARTERERS TO DISCHARGE CARGO WITHOUT PRESENTATION OF ORIGINAL BILL(S)/LADING BY PROVIDING WITH LETTER OF INDEMNITY IN ACCORDANCE WITH OWNERS P N I CLUB FORM AND WORDING BEFORE DISCHARGING. LETTER OF INDEMNITY TB SIGNED BY CHARTERERS ONLY.

Neither the Charterers nor their agents shall permitt the issue of any B(s)/L (whether or not signed on behalf of the Owners or on the charterers behalf of any sub-charterers) incorporating the Hamburg Rules or any legislation giving effect to the Hamburg Rules or any other legislation imposing liabilities in excess of Hague-Visby rules. The Charterers shall indeminify the Owners against any liability, loss or damage which may result from any breach of the forgoing provision of the clause. No liner Bills or Way Bills of Lading and no through transhipment or combined transport Bills of Lading to be issued

15. BIMCO ISM/ISPS/NON-PAYMENT OF HIRE/ ICE-CLAUSE/EVIDENCE OF PERFORMANCE/FUEL SULPHUR CONTENT/ U.S. SECURITY/U.S.CUSTOMS ADVANCE NOTIFICATION/AMS BIMCO CLAUSES FOR TIME CHARTER PARTIES CLAUSES TO APPLY

16. FOR THE PURPOSE OF COMPUTING HIRE PAYMENTS, THE TIME FOR DELIVERY/REDELIVERY SHALL BE ADJUSTED TO G.M.T

17. ANY OFF HIRE DEDUCTION UNDER THIS CHARTER PARTY DUE TO VSLS INEFFICIENCY ARREST, DETENTION, SEIZURE, MACHINERY BREAKDOWN ETC...BY ANY AUTHORITY AND FOR ANY REASON TO BE MADE ON THE BASIS OF THE ACTUAL TIME LOST DUE TO THE VESSELS INEFFICIENCY ARREST, DETENTION, SEIZURE, MACHINERY BREAKDOWN ETC... AND NOT FOR THE WHOLE PERIOD OF THE SAME.

IT IS HEREBY UNCONDITIONALLY AGREED THAT THIS CLAUSE IS A "NET/ACTUAL

TIME LOST CLAUSE"

18.GENERAL AVERAGE IN LONDON ACCORDING TO YORK-ANTWERP RULES 1994 / ENGLISH LAW TO APPLY

19.NO WAY BILLS, NO LINER OUT BS/L, HAGUE-VISBY RULES TO BE INCORPORATED IN ANY B/L ISSUED UNDER THIS C/P.

20.ALL TAXES AND DUES AND CHARGES ON THE VSL AND/OR CARGO AND/OR FRT AND/OR HIRE ARISING OUT OF CARGOES CARRIED OR PORTS VISITED OR COUNTRIES TRADED THROUGH UNDER THIS CHARTER TO BE FOR CHTRS ACCT.

21.COMM 3.75% TTL COMM INCL 1,25% TO BILLMAR CHARTERING

22.SUB ONLY CHARTS RECONFIRMATION TO BE LIFTED LATEST 13:30 GENEVA TIME TODAY TUE 10TH OCT 2007.

23.OTHERWISE AS PER PROFORMA C/P OF M/V "FURIA R." ACC OLDENDORFF DD 18TH MAY 2006 STRICTLY AND LOGICALLY AMENDED AS PER MAIN TERMS AGREED AS WELL AS BELOW C/P DETAILS/ALTERATIONS;

IT IS WELL UNDERSTOOD AND AGREED THAT ALL TERMS/CONDITIONS IN ABOVE MAIN TERMS AGREEMENT WILL SUPERSEDE ALL TERMS/CONDITIONS/CLAUSES OF SAME MEANING/WORDING OF PROFORMA C/P AND FORM PART OF IT:

MAIN BODY

---------

DELETE LINES AS FROM 1 TILL 19 : SAME TO BE AMMENDED AS PER MAIN TERMS AGREED BUT LINES 16/17 TO REMAIN AS PRINTED

LINES:45/46/47 : DELETE AS NON APPLICABLE

LINE 95 : DELETE 'GIVEN WRITTEN NOR' INSERT 'DELIVERED'

LINES 145-150: DELETE ALL LINES AS N/A (VSL IS GRLSS) EXCEPT IN LINE 150 WHERE THE SENTENCE 'VESSEL TO WORK....REQUIRED BY CHARTERERS' TO REMAIN

RIDER CLAUSES

-------------

CLAUSE 29 : TO BE TITLED "ALLOWED CARGO" AND TO BE AMENDED AS PER PARA "6" OF MAIN TERMS.

CLAUSE 30 : TO BE TITLED "ALLOWED TRADING" AND TO BE AMENDED AS PER PARA "5" OF MAIN TERMS.

CLAUSE 33 : AMEND PER MAIN TERMS PARA 12, OWISE AS PER C/P EXCEPT 2ND LINE DELETE AS FROM 'INCLUDING, IF PERMITTED"... TILL THE END OF THE CLAUSE

CLAUSE 38 : 3RD LINE DELETE "REMAINS UNDER ARREST OR" OTHERWISE AS PER ABOVE PARA 17 OF MAIN TERMS.

CLAUSE 39 : DELETE FOR 9TH PARAGRAPH I.E. AS FROM " CHARTERERS HAVE THE OPTION .... TILL ....OF LINER BILLS OF LADING" INSERT " NO LINER OUT BILLS OF LADING UNDER THIS CHARTER PARTY"

CLAUSE 41 : PARA 1 THRU 7 AMENDED AS PER MAIN TERMS (IE QTTIES/PRICES/SPECS ETC) OWISE TO REMAIN AS PER C/P EXCEPT REPLACE "DRAWN BY THE SUPPLIER" WITH "TAKEN FROM THE VESSEL'S MANIFOLD DURING THE SUPPLY"

CLAUSE 44 : DELETE AND TO BE AMENDED AS PER ABOVE PARA 8 OF MAIN TERMS.

CLAUSE 49 : 1ST LINE AFTER "SUPERCARGO(ES)" INSERT " UPON REASONABLE REQUEST AND JUSTIFIED REQUEST"

CLAUSE 51 : DELETE AS NON APPLICABLE

CLAUSE 54 : ADD AT THE END "THIS IS A 'NET ACTUAL TIME LOST CLAUSE' FOR THE TIME THEREBY ACTUAL LOST AND NOT A PERIOD CLAUSE"

CLAUSE 56 : TO BE DELETED AND TO READ AS PER ABOVE PARA 10 OF MAIN TERMS.

CLAUSE 58 : DELETE "COURIER" INSERT "E-MAIL IF REQUIRED"

CLAUSE 59 : DELETE WHOLE AS N/A

CLAUSE 60 : ADD "AND SAME TO BE INCORPORATED TO ANY BILLS OF LADING ISSUED HEREUNDER"

CLAUSE 62 : REPLACE "WITHIN 3 BANKING DAYS AFTER VESSEL'S" WITH "ON" DELETE PARA "CHARTERERS ARE ENTITLED...DISBURSEMENT DIRECTLY)"

CLAUSE 71 : AS PER C/P EXCEPT
LINE 1 DELETE 'JAPAN,' INSERT 'RUSSIA OR ARGENTINA'
DELETE 'DENMARK' INSERT 'FINLAND'
ADD AT END 'PROVIDED NO CARGO ONBOARD'

CLAUSE 72 : DELETE WHOLE AS N/A

CLAUSE 76 : DELETE WHOLE AS N/A

END

rdgs

Tramp Maritime Inc.
5, 5th Merarchias Street · 16636 Piraeus
Tel: +30 210 4113326 / Fax: +30 210 4113529
E-Mail: chartering@trampmaritime.gr

Working Copy

# Time Charter

GOVERNMENT FORM

*Approved by the New York Produce Exchange*

November 6th, 1913 – Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946

**This Charter Party,** made and concluded in *Hamburg,* ............ *18th*, day of *May 2006* ......... 19...

Between *Polinas Maritime Ltd., Malta* ............

Owners of the good *Malta flag* ............ ~~Steamship~~/Motorship *" FURIA R "* ............ of ............

~~of .......... tons gross register, and .......... tons net register, having engines of .......... indicated horse power and with hull, machinery and equipment in a thoroughly efficient state, and classed~~ *for vessel's description see Clause 82* ~~at .......... of about .......... cubic feet bale capacity, and about .......... tons of 2240 lbs. deadweight capacity (cargo and bunkers, including fresh water and stores not exceeding one and one-half percent of ship's deadweight capacity, allowing a minimum of fifty tons) on a draft of .......... feet .......... inches on .......... Summer freeboard, inclusive of permanent bunkers, which are of the capacity of about .......... tons of fuel, and capable of steaming, fully laden, under good weather conditions about .......... knots on a consumption of about .......... tons of best Welsh coal – best grade fuel oil – best grade Diesel oil~~

*now trading* ............

............ and *Oldendorff Carriers GmbH & Co. KG* ........ Charterers of the City of *Lübeck, Germany*.......

**Witnesseth,** That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for about *1 (one) timecharter trip via India with harmless/lawful cargoes, intention steel products (slabs, coils, pipes etc.), trading always via safe and icefree port(s)/berth(s)/anchorage(s), always safely afloat, always within International Navigating Conditions (01/11/03) and* ............ within below mentioned trading limits.

Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remaining responsible for the fulfillment of this Charter Party. *Acceptance of delivery of the vessel by the Charterers shall not prejudice their rights against Owners under this Charter Party.*

Vessel to be placed at the disposal of the Charterers, at *on dropping last outward sea pilot KARACHI/BIN QASIM at any time, day/night, Sundays and holidays included.* ............

~~in such dock or at such wharf or place (where she may safely lie, always afloat, at all times of tide, except as otherwise provided in clause No. 6), as the Charterers may direct. If such dock, wharf or place be not available time to count as provided for in clause No. 5.~~ Vessel on her *arrival first loadport* delivery to be

ready to receive *any permissible* cargo *(see Clause 49). On delivery and throughout the charter vessel to be* ~~with clean swept holds and~~ tight, staunch, strong and in every way fitted for the service, having water ballast, ~~winches~~ *cranes* and donkey boiler with sufficient steam power, or if not equipped with donkey boiler, then other power sufficient to run all the winches/*cranes* at one and the same time (and with full complement of officers, seamen, engineers ~~and firemen~~ for a vessel of her tonnage), to be employed, in carrying lawful merchandise, ~~including petroleum or its products, in proper containers,~~ excluding *- see Clause 29 -* ~~(vessel is not to be employed in the carriage of Live Stock, but Charterers are to have the privilege of shipping a small number on deck at their risk, all necessary fittings and other requirements to be for account of Charterers),~~ in such lawful trades, between safe port and/or ports *and/or safe places* in ~~British North America, and/or United States of America, and/or West Indies, and/or Central America, and/or Caribbean Sea, and/or Gulf of Mexico, and/or Mexico, and/or South America~~ ............ ~~and/or Europe and/or Africa, and/or Asia, and/or Australia, and/or Tasmania, and/or New Zealand, but excluding Magdalena River, River St. Lawrence between October 31st and May 15th, Hudson Bay and all unsafe ports; also excluding, when out of season, White Sea, Black Sea and the Baltic,~~

*Trading Exclusions: See Clause 30* ............

as the Charterers or their Agents shall direct, on the following conditions:

1. That the Owners shall provide and pay for all provisions, wages and consular shipping and discharging fees of the Crew *and gangway watchman; gangway watchmen for cargo and all compulsory shore gangway watchmen to be for Charterers' account; compulsory garbage removal to be for Charterers' account;* shall pay for the insurance of the vessel, also for all the cabin, deck, engine-room and other necessary stores, including boiler water and maintain her class and keep the vessel in a thoroughly efficient state in hull, *cargo spaces,* machinery and equipment *with all certificates necessary to comply with current requirements at ports of call* for and during the service.

2. That *whilst on hire* the Charterers shall provide and pay for all the fuel except as otherwise agreed, Port Charges, Pilotages, Agencies *(except agency fee directly related to Owners' matters),* Commissions, *stevedoring/tugs/river dues/canal dues, taxes/dues/fees/vat on cargoes/vessel/freight/hire/flag*

Consular Charges (except those pertaining to the Crew), and all other usual expenses except those before stated, but when the vessel puts into a port for causes for which vessel *and/or her Owners is are* responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered because of illness of the crew to be for Owners account. Fumigations ordered because of cargoes carried or ports visited while vessel is employed under this charter to be for Charterers account. ~~All other fumigations to be for Charterers account after vessel has been on charter for a continuous period of six months or more.~~ *Pilotage Grena/Spodsbjerg, Bosporous Strait, Torres Strait and Great Belt to be for Charterers' account.*

Charterers are to provide necessary dunnage and shifting boards, also any extra fittings requisite for a special trade or unusual cargo, but Owners to allow them the use of any dunnage and shifting boards *and any other fittings* already aboard vessel. Charterers to have the privilege of using shifting boards for dunnage, they making good any damage thereto.

3. ~~That the Charterers, at the port of delivery, and the Owners, at the port of re-delivery, shall take over and pay for all fuel remaining on board the vessel at the current prices in the respective ports, the vessel to be delivered with not less than~~ *See Clause 41* ~~tons and not more than ... tons and to be re-delivered with not less than ... tons and not more than ... tons.~~

4. That the Charterers shall pay for the use and hire of the said Vessel at the rate of *US$ 15,000.- (fifteenthousand) per day/pro rata including overtime, payable every 15 days in advance* ~~United States Currency per ton on vessel's total deadweight carrying capacity, including bunkers and stores, on ... summer freeboard, per Calendar Month,~~ commencing on and from the day *and time* of her delivery, as aforesaid, and at and after the same rate for any part of a month *day*; hire to continue until the hour of the day of her re-delivery in like good order and condition, ordinary wear and tear excepted, to the Owners (unless lost) at *on dropping last outward seapilot one safe port BOSTON/TAMPICO range, port in Charterers' option (intention US Gulf, New Orleans or Houston), at any time, day/night, Sundays and holidays included* unless otherwise mutually agreed. Charterers are to give Owners not less than *15/10* days *approximate and 8/5/3/1 day(s) definite* notice of vessels expected date of re-delivery, and probable port.

5. Payment of said hire to be made *to Owners' bank* ~~in New York~~ in cash in United States Currency, ~~semi-monthly~~ *every 15 days* in advance, and for the last ~~half month~~ *15 days* or part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day, as it becomes due, if so required by Owners, unless bank guarantee or deposit is made by the Charterers, otherwise failing the punctual and regular payment of the hire, *or any other amount due to Owners by Charterers* or bank guarantee *or deposit*, or on any *fundamental* breach of this Charter Party, the Owners shall be at liberty to withdraw the vessel from the service of the Charterers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers. ~~Time to count from 7 a.m. on the working day following that on which written notice of readiness has been given to Charterers or their Agents before 4 p.m., but if required by Charterers, they to have the privilege of using vessel at once, such time used to count as hire.~~ *See also Clause 62*

Cash for vessel's ordinary disbursements at any port may be advanced as required by the Captain, by the Charterers or their Agents, subject to 2 1/2% commission and such advances shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the application of such advances.

6. That the cargo or cargoes be laden and/or discharged in any *safe* dock or at any *safe* wharf or *safe* place *or safe anchorage in port* that Charterers or their Agents may direct, provided the vessel can safely lie always afloat at any time of tide, except at such places where it is customary for similar size vessels to safely lie aground.

7. That the whole reach of the Vessel's Hold, Decks, and usual places of loading (not more than she can reasonably stow and carry), also accommodations for Supercargo *at Charterers' risk and expense*, if carried, shall be at the Charterers' disposal, reserving only proper and sufficient space for Ship's officers, crew, tackle, apparel, furniture, provisions, stores and fuel. ~~Charterers have the privilege of passengers as far as accommodations allow, Charterers paying Owners ... per day per passenger for accommodations and meals. However, it is agreed that in case any fines or extra expenses are incurred in the consequences of the carriage of passengers, Charterers are to bear such risk and expense.~~ *No passengers allowed.*

8. That the Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew and boats *equipment*. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and agency; and Charterers are to load, stow, and trim, *secure, lash, unlash, tally, unless tally is required by Owners in which case will be for Owners' account and discharge* the cargo at their expense under the supervision of the Captain, who is to sign *or, when required by Charterers, authorize the Charterers or their agents to sign* Bills of Lading *on his behalf* for cargo as presented, *strictly* in conformity with Mate's ~~or Tally Clerk's~~ receipts.

9. That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments.

10. That the Charterers shall have permission to appoint a Supercargo, who shall accompany the vessel and see that voyages are prosecuted with the utmost despatch. He is to be furnished with free accommodation, and same fare as provided for Captain's table, Charterers paying at the rate of *US$ 10.00* ~~$1.00~~ per day. Owners to victual Pilots and Customs Officers, and also, when authorized by Charterers or their Agents, to victual Tally Clerks, Stevedore's Foreman, etc., Charterers *to compensate Owners lumpsum US$ 1,250.- per month/pro rata in respect of Charterers'* ~~paying at the current rate per meal, for all such~~ victualling, *communication and representation.*

11. That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, and the Captain shall keep a full and correct Log of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish the Charterers, their Agents or Supercargo, when required, with a true copy of daily *deck and engine* Logs, showing the course of the vessel and distance run and the consumption of fuel *as well as revolutions of main engine and velocity of and direction of wind and sea, all in English language.*

12. That the Captain shall use diligence in caring for the ventilation of the cargo. *Vessel has natural ventilation.*

13. ~~That the Charterers shall have the option of continuing this charter for a further period of ... on giving written notice thereof to the Owners or their Agents ... days previous to the expiration of the first-named term, or any declared option.~~

14. That if required by Charterers, time not to commence before *19th May, 2006 - noon* ... and should vessel not have given written notice of readiness on or before *23rd May, 2006 - 24.00 hours* ... ~~but not later than 4 p.m.~~ Charterers or their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's readiness.

15. That in the event of the loss of time from deficiency *and/or default and/or strike* of men or *deficiency of* stores, fire, breakdown or damages to hull, machinery or equipment, *unless such event has been caused due to stevedores' mishandling,* grounding, detention by average accidents to ship or cargo, drydocking for the purpose of examination or painting bottom, or by any other cause preventing the full working of the vessel, the payment of hire shall cease for the time thereby lost *unless such deficiency caused by Charterers or by*

*their agents or by their servants and all extra directly related, proven and substantiated expenses may be deducted from the hire.* ~~and if upon the voyage the speed be reduced by~~ defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence thereof, and all extra *directly related, proven and substantiated* expenses shall be deducted from the hire.

16. That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas, Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.

The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the purpose of saving life and property.

17. *See Arbitration Clause 38* ~~That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to three persons at New York, one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them, shall be final, and for the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be commercial men.~~

18. That the Owners shall have a lien upon all cargoes, and all sub-freights/*sub-hires* for any amounts due under this Charter, including General Average contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which might have priority over the title and interest of the owners in the vessel.

19. That all derelicts and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and Crew's proportion. General Average shall be adjusted, stated and settled, according to ~~Rules 1 to 15, inclusive, 17 to 22, inclusive, and Rule F of~~ York-Antwerp Rules *1994 and subsequent revisions at London.* ~~1924, at such port or place in the United States as may be selected by the carrier, and as to matters not provided for by these Rules, according to the laws and usages at the port of New York.~~ In such adjustment disbursements in foreign currencies shall be exchanged into United States money at the rate prevailing on the dates made and allowances for damage to cargo claimed in foreign currency shall be converted at the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement or bond and such additional security, as may be required by the carrier, must be furnished before delivery of the goods. Such cash deposit as the carrier or his agents may deem sufficient as additional security for the contribution of the goods and for any salvage and special charges thereon, shall, if required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery. Such deposit shall, at the option of the carrier, be payable in United States money and be remitted to the adjuster. When so remitted the deposit shall be held in a special account at the place of adjustment in the name of the adjuster pending settlement of the General Average and refunds or credit balances, if any, shall be paid in United States money. *Charter hire not to contribute to General Average.*

~~In the event of accident, danger, damage, or disaster, before or after commencement of the voyage resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract, or otherwise, the goods, the shipper and the consignee, jointly and severally, shall contribute with the carrier in general average to the payment of any sacrifices, losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully and in the same manner as if such salving ship or ships belonged to strangers.~~

~~Provisions as to General Average in accordance with the above are to be included in all bills of lading issued hereunder.~~

20. Fuel used by the vessel while off hire, ~~also for cooking, condensing water, or for grates and stoves to be agreed to as to quantity, and the~~ cost of replacing same, to be allowed by Owners.

21. ~~That as the vessel may be from time to time employed in tropical waters during the term of this Charter, Vessel is to be docked at a convenient place, bottom cleaned and painted whenever Charterers and Captain think necessary, at least once in every six months, reckoning from time of last painting, and payment of the hire to be suspended until she is again in proper state for the service.~~

22. Owners shall maintain the gear of the ship as fitted, providing gear (for all derricks/*cranes*) capable of handling lifts up to *their maximum capacity in accordance with the description clause.* ~~three tons, also providing ropes, falls, slings and blocks. If vessel is fitted with derricks capable of handling heavier lifts, Owners are to provide necessary gear for same, otherwise equipment and gear for heavier lifts shall be for Charterers' account.~~ Owners also to provide on the vessel *power and electric light on deck and in cargo holds sufficient for night work in all holds simultaneously.* ~~lanterns and oil for night work, and vessel to give use of electric light when so fitted, but any additional lights over those on board to be at Charterers' expense.~~ The Charterers to have the use of any gear on board the vessel.

23. Vessel to work night and day, if required by Charterers, and all ~~winches~~ *cranes* to be at Charterers' disposal during loading and discharging; ~~steamer to provide one winchman per hatch to work winches day and night, as required, Charterers agreeing to pay officers, engineers, winchmen, deck hands and donkeymen for overtime work done in accordance with the working hours and rates stated in the ship's articles. If the rules of the port, or labor unions, prevent crew from driving winches~~ shore *cranemen* ~~Winchmen~~ to be *employed and* paid by Charterers. In the event of a disabled *crane or cranes* ~~winch or winches, or~~ insufficient power to operate ~~winches~~ *crane or cranes,* Owners to pay for shore engine, or engines, in lieu thereof *in which case the vessel to remain on-hire,* if required, and pay any loss of time *and directly related extra expenses including standby expenses,* occasioned thereby. *Any time lost due to crane breakdown and/or insufficient power to be deducted pro-rata to the number of gangs affected, unless shore gear has been employed by the Owners.*

24. It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions from liability contained in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessels; etc.," in respect of all cargo shipped under this charter to or from the United States of America. It is further subject to *General Clause Paramount* ~~the following clauses, both of which are~~ *is* to be included in all bills of lading issued hereunder: *See Clause 62*

~~U. S. A. Clause Paramount~~

~~This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April 16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading be repugnant to said Act to any extent, such term shall be void to that extent, but no further.~~

~~Both-to-Blame Collision Clause~~

~~If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the other or non-carrying ship or her owners as part of their claim against the carrying ship or carrier.~~

25. The vessel shall not be required to enter any ice-bound port, or any port where lights or light-ships have been or are about to be withdrawn by reason of ice, or where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter the port or to get out after having completed loading or discharging. *Vessel not to force ice or to follow ice breakers.*

26. Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The owners to remain responsible for the navigation of the vessel, insurance, crew, *acts of pilots and tugboats* and all other matters, same as when trading for their own account.

27. A commission of ~~1 to~~ *1.25* per cent is payable by the Vessel and Owners to *TGM Trans-Globe Monitor Shipping GmbH, Hamburg* plus 1.25% to Tramp Maritime Inc. on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.

28. An address commission of ~~2 1/2~~ *3.75* per cent payable to *Charterers* on the hire earned and paid under this Charter.

*Clauses 29 through 84 are fully incorporated in this Charter Party. The rider clauses headings are for easy reference only and not part of this Charter Party.*

*THE OWNERS:*

*THE CHARTERERS:*

This Charter Party is a computer generated copy of the NYPE (Revised 3rd October, 1946) form printed under licence from the Association of Ship Brokers & Agents (U.S.A.), Inc., using software which is the copyright of Strategic Software Limited.

It is a precise copy of the original document which can be modified, amended or added to only by the striking out of original characters, or the insertion of new characters, such characters being clearly highlighted by underlining or use of colour or use of a larger font and marked as having been made by the licensee or end user as appropriate and not by the author.



Tramp Maritime Inc.

Trans-Globe Monitor Shipping GmbH

**ADDITIONAL CLAUSES TO CHARTER PARTY MV "FURIA R"**
**DATED HAMBURG, 18th MAY 2006**

**Clause 29 – Cargo Exclusions**

None of the cargoes, goods, or substances listed below are to be loaded during the currency of this charter:

All corrosive, dangerous, explosive, hazardous, inflammable, injurious and toxic substances or goods/all goods or substances as defined by IMO-IMDG code as amended, including but not limited, as follows:

Acids/antiques/art objects and curios/arms and ammunitions/asbestos/ashes/asphalt /automobiles or cars or trucks or lorries or any other vehicles/banknotes or other forms of currency/bonds or other negotiable instruments/bones or bone meals/borax/bullion/calcium carbide/calcium nitrate/calcium oxychloride/cement in bulk, cement clinker/cocoa/containers/copra /corrosives/creosote and creosoted goods/devco coal/steam coal / pond coal / dross / drugs or narcotics / dynamite / esparto grass / fire briquettes / fishmeal/fishscrap /gypsum/hides/jewellery, metals, stones or other objects of a rare or precious nature/jute/lime/logs /locomotives /livestock/manioc and manioc pellets/nepheline syenite/organic peroxides/petroleum derivatives and all petroleum products/pitch/potash/radioactive substances, products or wastes/rags/ refrigerated cargo/skimmings/salt/rock salt /soda/soda ash/scrap metal in any form including motorblocks, metal borings, shavings and turnings/skins and furs/solvents/stone blocks/war and war like materials/boycott cargoes and any other goods affecting immediately or on long term the safety of the vessel and/or the crew and all cargoes listed in the Appendix B of IMO Code of Safe Practice For Solid Bulk Cargoes.

Any IMO cargo for which Owners' permission has been given to be loaded same is to be loaded/stowed/trimmed and discharged in accordance with IMO regulations/recommendations at Charterers' time/responsibility and expense.

Scrap metal, non oily, excluding metal borings, shavings and turnings is allowed to be loaded with Soft Loading Clause.

**Clause 30. – Trading Exclusions**

The vessel is not permitted to load, discharge, bunker, to force ice or to follow Icebreakers, to trade or call for any purpose in countries, places, zones or areas where:

(a) war has been declared, is about to be declared or has broken out without any such declaration or where hostilities are imminent or in progress, including civil war, insurrection, revolution etc.

(b) in Australia / Alaska / Azov Sea / Burma / Cabinda / Cambodia (Kampuchea) / Cuba / all C.I.S Pacific ports / Eritrea / Ethiopia /Faroe Islands / Greenland / Great Lakes / Haiti / Iceland / Iran / Iraq / Israel / Laos / Liberia / Mozambique but Maputo is allowed / Myanmar / New Guinea / New Zealand and its territories / North Korea / Orinoco River not West of Matanzas / Papua / Scandinavia (Norway / Sweden / Finland / Denmark) / Somalia / Sri Lanka / Sierra Leone / Sudan / Syria / Tasmania / Turkish occupied Cyprus / Vanino / South and North Yemen / Zaire

(c) in UN or USA or EU sanctioned or embargoed countries/areas

(d) in high-risk, for gipsy moth or other insect infested port(s) or area(s) as defined by USDA, APHIS, PPQ including the Japanese ports: Chiba, Hachinoe, Hakodate, Hirosima, Oita, Sakata, Shimizu, Tomakomai

(e) no direct trading between P.R. of China and Taiwan or vice versa, is allowed

Trading subject always to CONWARTIME 2004 Clause as attached.

**Clause 31. – Crew Service**

With reference to Clause 8 of this Charter Party "customary assistance" shall include, but not be limited to: *(to be continued...)*

Trans-Globe Monitor Shipping GmbH

Tramp Maritime Inc.

**ADDITIONAL CLAUSES TO CHARTER PARTY MV "FURIA R"**
**DATED HAMBURG, 18th MAY 2006**

*Clause 31 (continued):*

a) All opening and closing of hatches, when and where required, if permitted by local regulations.
b) Raising and lowering of derricks and rigging cranes, if fitted, and/or gangways in preparation for loading and discharging.
c) Shaping up vessel's holds/hatches and cranes prior arrival at loading and/or discharging places so as to immediately commence loading and/or discharging operations subject to weather conditions and the safety of the crew.

The above services shall be considered as a minimum and shall in no way be construed as an alternative to or reduction in the standard of services from Officers and Crew required under this Charter Party.

A, B, C to be carried out provided shore and labour unions regulations permit, otherwise shore labour to be used at Charterers' account.

**Clause 32. - Grab Fitting/Operation**
*Deleted*

**Clause 33. - In Lieu Of Hold Cleaning**
Charterers shall have the option of redelivering the vessel without cleaning of holds against paying the Owners a lumpsum of US$ 4,000.- including, if permitted by local regulations/stevedores, crew to collect from vessel's holds the lashing materials/dunnage/debris which to be disposed on deck for removal by the Charterers at Charterers' time and expense. If not permitted by local regulations/stevedores the Charterers to arrange for the removal and disposal of the above.

Charterers to use dunnage material permitted for vessel's intended trade according to loading/discharging ports.

**Clause 34. - Intermediate Hold Cleaning**
*Deleted*

**Clause 35 – Houseflag/Markings**
The Charterers shall have the liberty to fly their own houseflag and paint the funnel only with their own colours. Expenses and time in this connection including changing back to Owners' colours prior redelivery to be for Charterers' account.

**Clause 36 – Additional Fittings**
Charterers shall be at liberty to fit/weld at their time/expense any additional equipment/fittings for loading/discharging and or securing cargo. Such work shall be done at the Charterers' expense and time and Charterers shall remove such equipment and fitting at their expense prior to redelivery, if Owners so request. The meaning of this Clause shall include but not limited to welding of padeyes for lashing/securing of cargo in holds on deck.

**Clause 37 – Dispute Resolution Clause - English Law, London Arbitration**
(a) This Contract shall be governed by and construed in accordance with English law and any dispute arising out of or in connection with this Contract shall be referred to arbitration in London in accordance with the Arbitration Act 1996 or any statutory modification or re-enactment thereof save to the extent necessary to give effect to the provisions of this Clause.

The arbitration shall be conducted in accordance with the London Maritime Arbitrators Association (LMAA) Terms current at the time when the arbitration proceedings are commenced.

*(to be continued...)*

Tramp Maritime Inc.
9 II Merarchias Street - 18535 Piraeus
Tel: +30210 4512345 / Fax: +30210 4512333
E-Mail: chartering@trampmaritime.gr

**ADDITIONAL CLAUSES TO CHARTER PARTY MV "FURIA R"**
**DATED HAMBURG, 18th MAY 2006**

*Clause 37 (continued):*

The reference shall be to three arbitrators. A party wishing to refer a dispute to arbitration shall appoint its arbitrator and send notice of such appointment in writing to the other party requiring the other party to appoint its own arbitrator within 14 calendar days of that notice and stating that it will appoint its arbitrator as sole arbitrator unless the other party appoints its own arbitrator and gives notice that it has done so within the 14 days specified. If the other party does not appoint its own arbitrator and give notice that it has done so within the 14 days specified, the party referring a dispute to arbitration may, without the requirement of any further prior notice to the other party, appoint its arbitrator as sole arbitrator and shall advise the other party accordingly. The award of a sole arbitrator shall be binding on both parties as if he had been appointed by agreement.

Nothing herein shall prevent the parties agreeing in writing to vary these provisions to provide for the appointment of a sole arbitrator.

In cases where neither the claim nor any counterclaim exceeds the sum of USD 50,000 (or such other sum as the parties may agree) the arbitration shall be conducted in accordance with the LMAA Small Claims Procedure current at the time when the arbitration proceedings are commenced.

(b) Notwithstanding the above, the parties may agree at any time to refer to mediation any difference and/or dispute arising out of or in connection with this Contract.

In the case of a dispute in respect of which arbitration has been commenced under the above, the following shall apply:-

(i) Either party may at any time and from time to time elect to refer the dispute or part of the dispute to mediation by service on the other party of a written notice (the "Mediation Notice") calling on the other party to agree to mediation.

(ii) The other party shall thereupon within 14 calendar days of receipt of the Mediation Notice confirm that they agree to mediation, in which case the parties shall thereafter agree a mediator within a further 14 calendar days, failing which on the application of either party a mediator will be appointed promptly by the Arbitration Tribunal ("the Tribunal") or such person as the Tribunal may designate for that purpose. The mediation shall be conducted in such place and in accordance with such procedure and on such terms as the parties may agree or, in the event of disagreement, as may be set by the mediator.

(iii) If the other party does not agree to mediate, that fact may be brought to the attention of the Tribunal and may be taken into account by the Tribunal when allocating the costs of the arbitration as between the parties.

(iv) The mediation shall not affect the right of either party to seek such relief or take such steps as it considers necessary to protect its interest.

(v) Either party may advise the Tribunal that they have agreed to mediation. The arbitration procedure shall continue during the conduct of the mediation but the Tribunal may take the mediation timetable into account when setting the timetable for steps in the arbitration.

(vi) Unless otherwise agreed or specified in the mediation terms, each party shall bear its own costs incurred in the mediation and the parties shall share equally the mediator's costs and expenses.

(vii) The mediation process shall be without prejudice and confidential and no information or documents disclosed during it shall be revealed to the Tribunal except to the extent that they are disclosable under the law and procedure governing the arbitration.

Tramp Maritime Inc.
9 F Vergottozi Street 185 35 Piraeus
Tel:(+30)2104131276/Fax:(+30)2104135588
E-Mail: chartering@trampmaritime.gr

Trans-Globe Monitor Shipping GmbH

**ADDITIONAL CLAUSES TO CHARTER PARTY MV "FURIA R"**
**DATED HAMBURG, 18th MAY 2006**

Clause 38 – Arrest

Should the vessel be arrested during the currency of this Charter at the suit of any person including Charterers having or purporting to have a claim against or any interest in the vessel, hire under this Charter Party shall not be payable in respect of any period whilst the vessel remains under arrest or remains unemployed as a result of such arrest, only direct related expenses incurred by and/or during seizure or detention or arrest or delay to be for Owners' account.

This clause shall not apply should the arrest be caused through any fault on the part of Charterers their agents and/or servants.

Clause 39 – Bills Of Lading

Charterers' Bills of Lading to be used if required by Charterers. All original Bills of Lading to be couriered to the Owners'/Managers' office, when available to Charterers.

In case the original Bill(s) of Lading are not available upon vessel's arrival at discharging port, Owners/Master to release the entire cargo against Charterers' Letter of Indemnity which to be inline with Owners' standard P & I Club format and which to be signed by Charterers only.

Discharge to commence on receipt by Owners of faxed copy of the LOI.

Should Charterers require vessel to change discharging port after Bills of Lading have been issued Owners to comply with such instructions upon receipt of a faxed copy of a single LOI signed by Charterers only and issued in conformity with Owners' standard P & I Club form.

Attached please find the standard forms of Letters of Indemnity to be given in return for:

a) Delivery cargo without production of the original Bill of Lading.

b) Delivering cargo at a port other than that stated in the Bill of Lading.

c) Delivering cargo at a port other than that stated in the Bill of Lading and without production of the original Bill of Lading.

Charterers may place one original Bill of Lading on board the vessel against marking all original Bills of Lading with the following Clause: "One original Bill of Lading carried on board on which the cargo may be properly released against instructions received from the Charterers".

Owners are herewith instructed to discharge against such Bill of Lading carried on board and will do so unless instructed otherwise by Charterers.

No through-, nor way- Bills of Lading are to be issued under this Charter Party.

Charterers have the option to use in house Bills of Lading and liner Bills of Lading. Charterers to undertake directly to cover for their account all relevant expenses arising from issuance of liner Bills of Lading-

Bills of Lading to be in conformity with Mate's receipt.

All Letter of Indemnity text subject to running changes from the association of P & I Clubs.

Clause 40. - Bulldozers

Charterers to have the option to use bulldozers in vessel's holds, provided not exceeding the tank top strength.

If required, vessel to lift onboard, shift from hold to hold and discharge the bulldozers by use of vessel's gear, provided not exceeding vessels gear capacity.

 Trans-Globe Monitor Shipping GmbH

Tramp Maritime Inc.
9, II Merarchias Street - 185 35 Piraeus
Tel: +30 210 4173230 Fax: +30 210 4173535
E-Mail: chartering@trampmaritime.gr

**ADDITIONAL CLAUSES TO CHARTER PARTY MV "FURIA R"
DATED HAMBURG, 18th MAY 2006**

**Clause 41. - Bunkers**

Vessel to be delivered with about 700 metric tons IFO and about 125 metric tons MDO and vessel to be redelivered with about same quantities as on delivery.

Bunker prices at both ends: US$ 340.- per metric ton IFO and
US$ 640.- per metric ton MDO

Charterers to take over and pay for bunkers on delivery together with the first hire payment.

Owners have the right to bunker the vessel, prior redelivery for their own account, provided this operation does not interfere with Charterers' cargo operations.

The Charterers have the option to deduct value of bunkers on redelivery from the last sufficient hire payment(s).

Charterers are allowed to bunker vessel for own account prior delivery provided same does not interfere with vessel's operations.

Charterers to provide the vessel with bunkers in accordance with the ISO Standard 8217:1996 as follows:

IFO 380 CST Class RMG 35 / MDO Class DMB

In order to comply with the terms and conditions of the various bunker suppliers, the sample to govern quality shall be the sample drawn by the supplier and witnessed by the ship's Chief Engineer or Surveyor appointed by Owners. Analysis of said sample in accordance with the recognised ISO test methods at a mutual agreed reputable and dedicated laboratory shall be binding and conclusive for both parties.

Quantity supplied shall be finally determined by sounding of the tanks of the delivering barge or by reading of meters at shore installation or by independent surveyor, if any independent surveyor is appointed, and there is a contradiction the surveyors finding to be the accepted ones.

In case for full vessel's bunkering the availability of empty/available tanks to be taken into consideration after Charterers have consulted with the Master, in order avoid mixing/contamination of not compatible bunkers.

**Clause 42. - Cargo Claims/P & I Club**

Owners guarantee that the vessel is entered and shall remain entered in a Protection and Indemnity Association which is a member of the Group of International P & I Clubs, for the duration of this Charter Party. Entry shall include, but not be limited to, ordinary cover for cargo claims. Charterers confirm that they will remain covered with a first class P and I Club for the duration of this Charter Party.

It shall be considered a fundamental breach by Owners if the vessel's P & I cover or class is cancelled or suspended during the currency of this charter.

In the case of damage to and/or loss of cargo carried on the vessel in which Owners' and/or Charterers' liability could be involved under the terms of this Charter Party, as the case may be, the Owners and/or the Charterers shall on request grant reasonable time extension for commencement of suit in each and every occurrence. Such extensions shall not prejudice the ultimate responsibility of both parties. Liability for cargo claims as between Owners and Charterers shall be apportioned as specified by the Interclub New York Produce Exchange Agreement effective from 1996, and its subsequent amendments.

If required by Charterers, Owners to provide valid Certificate of Entry confirming that the vessel is fully covered for P and I and that collection of premiums are up-to-date. *(to be continued...)*

Tramp Maritime Inc.
9 Vasileos ... Street, 185 ... Piraeus
Tel ... Fax ...
E-Mail: chartering@trampmaritime.gr

Trans-Globe Monitor Shipping GmbH

**ADDITIONAL CLAUSES TO CHARTER PARTY MV "FURIA R"**
**DATED HAMBURG, 18th MAY 2006**

*Clause 42 (continued):*

No claim is to be settled by one party without prior consent and agreement of the other party. Same to apply for time limits extension.

Owners' P and I Club : West Of England
Charterers' P and I Club : U.K. Club

Clause 43. - Certificates/Vaccinations

Owners are obliged to deliver and maintain throughout the currency of this Charter Party the vessel, her Crew and anything pertaining thereto supplied with up-to-date and complete certificates (including Oil Pollution Certificates), approvals, equipment and fittings, enabling the vessel and her Crew to trade within the trading limits and to load, carry and discharge all cargoes permitted under this Charter Party.

Officers and Crew to comply with vaccination and sanitary regulations in all ports of call and corresponding certificates to be available onboard, enabling the vessel to obtain free pratique by radio.

If requested, Owners to provide Charterers with copies of any and all such certificates/approvals.

Any time lost and all extra directly related expenses resulting from Owners' non compliance with the above to be for Owners' account and same may be deducted from hire.

Clause 44. - Deductions

The Charterers may deduct from the charter hire any amount disbursed for Owners' account. In addition Charterers may deduct from the last hire payments the reasonable estimated expenses incurred by Charterers for Owners' account, but maximum US$ 500.- per port, notwithstanding that vouchers may not then have reached Charterers for submission to Owners.

Clause 45. - Delivery/Redelivery Time

Hire to be settled basis Greenwich Mean Time but lay/can to be based on local time.

Clause 46. - Double Banking

Charterers have the right to load and/or discharge on double banking basis or by any other means available at loading and/or discharging port or place always subject to Master's reasonable satisfaction and any additional equipment/facilities such as fenders whenever considered necessary by the Master, are to be supplied by the Charterers in their time and at their expense.

Charterers to notify Owners well in advance about such procedure in order Owners arrange timely insurance cover.

If at any time during the operation, the Master reasonably considers it unsafe to continue due to adverse weather conditions etc. he may order the other vessel(s) and/or barge(s) away from his vessel or remove his own vessel in order to avoid prejudicing the safety of the vessel(s). Any additional insurance premium net of all rebates, if required by vessel's Underwriters to be for Charterers' account. Amount not to exceed the premium obtainable on the London market.

Clause 47. - Hold Condition

Vessel's holds on arrival at first loading port to be clean swept/washed down by fresh water and dried up so as to receive Charterers' intended cargoes in all respects free of salt, loose rust scale and previous cargo residues to the satisfaction of Charterers'/Shippers' surveyor.

Should the vessel not be approved by the surveyor the vessel to be placed off-hire. Owners warrant vessel's holds will be free of rust scale, clean, dry and suitable in every way for carriage of Charterers' intended cargo and hatchcovers are absolutely watertight.

 Trans-Globe Monitor Shipping GmbH

Tramp Maritime Inc.
E-mail: chartering@trampmaritime.gr

**ADDITIONAL CLAUSES TO CHARTER PARTY MV "FURIA R"**
**DATED HAMBURG, 18th MAY 2006**

**Clause 48. - ITF/Boycott**
Owners warrant that the vessel's Crew is and will be during the period of this Charter Party employed under a Bona Fide Union Agreement, the standard of which is fully acceptable to the I.T.F. and Union in all countries not excluded in this Charter Party.

In the event of the vessel being denied or restricted in the use of port and/or loading and/or discharging facilities or shore labour and/or tug or pilotage assistance or of any other restriction, detention or any loss of time whatsoever due to boycott or arrest of the vessel or due to government restrictions all caused by the vessel and/or by reason of the terms and conditions on which members of the Crew are employed or by reason of any trading of this or any other vessel under same ownership or operation or control, the payment of hire shall cease for the time thereby lost and all extra directly related expenses incurred due to above are to be for Owners' account and may be deducted from hire. Owners are also responsible for any claim that may be presented by third party unless same is caused by Charterers and/or their servants/agents.

**Clause 49. - Inspection**
The Charterers and/or their Supercargo(es) shall have free and unlimited access to the whole vessel including but not limited to bridge, holds, engine room, all vessel's tanks including bunker, lubricating oil, sludge, ballast water, freshwater tanks during the charter period. Whenever required, the Master, if possible, must bring the vessel to an even trim to ensure correct bunker soundings. The Charterers and/or their Supercargo(es) and/or Surveyor(s) to have free and unlimited access to the vessel's deck and engine log books, tank plans, calibration scales, and CAP/GA/Midship Section Plans.

**Clause 50. Insurance/Basic War Risk**
Basic annual war risk insurance premium to be for Owners' account. Any additional war risk insurance premium including blocking and trapping and crew war bonus to be for Charterers' account and to be paid against presentation of original invoices. Additional premium not to exceed London Lloyd's Underwriters' scale. "Conwartime 2004 and subsequent amendements" Clause to be incorporated in this Charter Party and in all Bills of Lading.

**Clause 51. - Laying Up/Return Insurance**
Charterers shall have the right to order the laying up of the vessel at any time and for any period of time at a mutually agreed safe berth or safe place, sheltered anchorage, and in the event of such lay-up, the Owners shall promptly take steps to effect all the economy savings in operating costs including insurance, which may be possible and give prompt credit to the Charterers in respect of all such economy savings.
At the request of the Charterers the Owners shall at any time provide an estimate of the economy savings which would be possible in the event of laying up of the vessel.
The Charterers to have the benefit of any return insurance premium received by the Owners from their Underwriters as and when received by reason of the vessel being in port for minimum 30 (thirty) days, provided the vessel is on hire. In case of vessel's lay-up all cost involved in and for reactivation including dry dock if needed to be for Charterers' account and time.

**Clause 52. - Loading Of Steel**
If the vessel is nominated to load a full or part cargo of steel products the Owners to appoint a vessel's P & I Surveyor to perform a "pre loading cargo condition survey" provided that such survey is required or recommended by the Owners' P and I Club. Such survey is to take place in Charterers' time and cost to be equally shared between Owners and Charterers. Copy of such survey to be given to Charterers without delay.

Charterers to give sufficient notice to Owners for their intention to load steel cargoes.

Trans-Globe-Mentor Shipping GmbH

Tramp Maritime Inc.
E-Mail: chartering@trampmaritime.gr

**ADDITIONAL CLAUSES TO CHARTER PARTY MV "FURIA R"
DATED HAMBURG, 15th MAY 2006**

Clause 53. - Notices
Owners/Master to give notices for vessel's expected delivery on fixing and daily.

Clause 54. - Off-Hire
Should the vessel put back whilst on voyage by reason of any accident or breakdown or in the event of loss of time either in port or at sea or deviation upon the course of the voyage caused by sickness of or accident to the Crew or any person travelling onboard the vessel (other than supercargo travelling by request of the Charterers) or by reason of the refusal of the Master or Crew to perform their duties, or oil pollution or capture/seizure, or detention or threatened detention by any authority including arrest, the hire shall be suspended from the time of the inefficiency until the vessel is again efficient in the same or equidistant position, and voyage resumed therefrom. All extra directly related expenses incurred including bunkers consumed during period of suspended hire shall be for Owners' account.

During any off-hire period estimated to exceed 8 days, the Owners to give the Charterers not less than 5 days definite notice of resumption of the service.

Clause 55. - Oil Pollution
Owners guarantee to provide and maintain during the entire time charter period, at their expense and carry onboard the vessel a valid U.S. Certificate of Financial Responsibility. Owners also guarantee to have secured current certificates for other countries/federal states or municipal or other division or authority thereof, where guarantees are required. All such certificates to be valid throughout the entire timecharter period.

The Charterers shall in no case be liable for any damage as a result of the Owners' failure to obtain the aforementioned certificates. Time lost by non compliance to be considered as off hire and may be deducted from hire.

Clause 56. - On/Off Hire Survey
On hire/off hire survey to be held at Charterers' time and expense. Owners appointing Master/Chief Engineer to carry out on their behalf joint survey (practically, on/off hire survey is taking place during vessel's operation and there is no separate time for it).

Clause 57. - Panama-/Suez Canal
Owners warrant that the vessel is fitted for the transit of the Suez and Panama Canal in loaded and/or ballast condition and complies with all and any regulations of the relevant canal authority and shall not be subject to any conditions of transit not customarily required by the relevant canal authority whether pursuant to their regulations or otherwise. Should the vessel not comply with the warranties contained in this clause and/or any regulations or conditions of transit laid down by the relevant canal authority, Charterers may suspend hire for all time lost and Owners to pay all expenses resulting as a consequence of Owners' failure to comply with this warranty.

Clause 58. - Plans
Owners to courier to the Charterers the Capacity Plan, Deadweight Scale, and General Arrangement Plan as soon as possible.

Clause 59. - Power Clause
The vessel to supply free of expense to Charterers 440 volt 3 phase 60 cycles and 40 kva per crane from the power supply panel in each crane house. Charterers have the right to fit/connect magnets, grabs or other loading/discharging equipment customary to the trade onto vessel's cranes and/or power supply.

Trans-Globe Monitor Shipping GmbH

Tramp Maritime Inc.
E-mail: chartering@trampmaritime.gr

**ADDITIONAL CLAUSES TO CHARTER PARTY MV "FURIA R"
DATED HAMBURG, 18th MAY 2006**

<u>Clause 60. - Protective Clauses</u>
Conwartime 2004, New Both-to-Blame Collision Clause, New Jason Clause, General Clause Paramount, U.S.- and Canadian Clause Paramount and Club Nuclear Clause to apply.

<u>Clause 61. - Punctual Payment</u>
With reference to Clause 5, Owners to give Charterers 3 (three) New York banking days written notice excluding Sundays and holidays to rectify a failure to make punctual and regular payment before exercising their right of withdrawal.

<u>Clause 62. - Bankers</u>

| | |
|---|---|
| The Royal Bank of Scotland Plc. | |
| 45, Akti Miaouli | |
| Piraeus - Greece | |
| Bank's Swift Code | : RBOSGRAA |
| IBAN | : GR98 0640 0010 0055 5546 6128 100 |
| Favour of Polinos Maritime Ltd. | |
| Account No | : 466128 USD 100 |
| Correspondent Bank in New York J.P. Morgan-Chase | |

First hire and value of bunkers on delivery to paid within 3 banking days after vessel's delivery. Charterers entitled to deduct from last sufficient hire payments value of bunkers on redelivery plus estimated Owners' expense US$ 500.- per calling port unless a higher amount has been authorized by the Owners (or Owners to arrange with agents and settle Owners' disbursement directly).

<u>Clause 63. - Sea Carrier Initiative Agreement</u>
Owners and Charterers confirm they are both signatories to the Sea Carrier Initiative Agreement in order to co-operate with the U.S. Customs Service in the fight against the drug menace.

<u>Clause 64. - Stevedore Damage</u>
Should any damage be caused to the vessel or her fittings by the Charterers or their stevedores the Master is to:

A) Give written notice to the Charterers immediately after the occurrence of full particulars of the damage caused of the party allegedly responsible for the damage.

B) Promptly but within 24 hours after occurrence give written notice to the party allegedly responsible giving full particulars of the damage and its alleged cause, and obtain the written acknowledgement of liability from such party or failing that, the acknowledgement of receipt of such notice.

C) Immediately arrange, in conjunction with Charterers' agents for the damage to be surveyed and an estimate of the repair costs given.

Failing the aforementioned the Charterers are not to be responsible for such damage and/or loss of time, except for hidden damage, which must be attended to as per the above procedure immediately it is discovered but latest upon completion of the voyage in question.

In case responsible party refuse to sign then the Master will immediately inform Charterers or their agents accordingly.

Any unrepaired damage not affecting seaworthiness and/or her working capacity/class, may be repaired in Owners' time during next regular drydocking and Charterers to pay repair expenses against voucher.

*(to be continued...)*

Trans-Globe Monitor Shipping GmbH

Tramp Maritime Inc.
8, II Verachias Street - 18538 Piraeus
Tel: ... Fax: ...
E-Mail: chartering@trampmaritime.gr

**ADDITIONAL CLAUSES TO CHARTER PARTY MV "FURIA R"**
**DATED HAMBURG, 18th MAY 2006**

*Clause 64 (continued):*

If during the performance of the Charter Party stevedores employed by the Charterers should cause such damage to the vessel which affects her seaworthiness and/or her working capacity/class and if such damage should then not be repaired by such stevedore, Charterers will be responsible for cost of such necessary repairs and the vessel shall remain on hire during such repairs, provided Master has fully complied with a/b/c above.

**Clause 65. - Taxes**

Taxes and/or dues and/or charges whatsoever, imposed on cargo by any local or national authorities, arising out of trade under this Charter Party to be borne by Charterers. Taxes levied by governments other then that of Owners' domicile or vessel's flag on earnings under this Charter Party other than the hire payable to Owners shall be for Charterers' account.

**Clause 66. - Warranties**

Owners warrant that the vessel:

- is not blacklisted by Arab countries nor anywhere else within the agreed trading limits,
- has not traded Cuba and Israel, and,
- is eligible for bunkers in the United States of America, its territories and possessions in accordance with directives from the United States Department of Commerce, Office of International Trade.

**Clause 67. - Watertight Hatches**

The Owners guarantee that on vessel's delivery and throughout the currency of this Charter the vessel's hatch covers are watertight. All hatches are to be carefully attended by the Crew to prevent leakage.

Hatch Test

The Charterers have the option to hose test or ultrasonic test the vessel's hatch covers at loading port(s) at their time/expense and should same not be watertight, Owners have the obligation to arrange necessary measures in order to make the hatch covers fully watertight. Owners shall be given by Charterers three working days to rectify the situation after which if the hatch covers are not water-tight, Charterers have the right to cancel this Charter Party and redeliver the vessel, provided no cargo on board.

**Clause 68. – Ocean Route Clause**

Charterers may supply "ocean routes" or "fleetweather" or similar advise to the Master throughout the voyage specified by the Charterers. The Master to comply with the reporting procedure of routing service, but it is understood that final routing is always at Master's discretion for safe navigation and choice of route. For the purpose of the charter party 'good weather condition' are to be defined as weather conditions in wind speeds not exceeding Beaufort force 4, evidence of weather condition to be taken from the vessel's deck logs and independent weather bureau's reports. In the event of a consistent discrepancy between deck logs and independent weather bureau's reports the independent weather bureau's reports shall be final and binding by both parties.

**Clause 69. - Drydocking**

No drydocking under this Charter Party except in case of emergency.

**Clause 70. - Towage, Pilotage, Etc.**

The Owners authorize the Charterers, as agents of and on behalf of the Owners and/or the vessel to arrange and contract for loading/discharging operations in the ports for any towage, pilotage or the like service on usual or customary terms and/or those terms offered or required by towing/pilotage companies employed where such services are furnished.



Tramp Maritime Inc.
[illegible]
E-Mail: chartering@trampmaritime.gr

Trans-Globe Xonitor Shipping GmbH

**ADDITIONAL CLAUSES TO CHARTER PARTY MV "FURIA R"**
**DATED HAMBURG, 18th MAY 2006**

__Clause 71. - War Cancellation__
In the event of war, whether declared or undeclared involving Japan, Greece or Denmark, or between any two or more countries of U.S.A., C.I.S., United Kingdom, People's Republic of China, directly affecting the performance of this Charter either party has the right to cancel this Charter or any remaining portion thereof.

not applicable

__Clause 72. - Cement Holes__
If the vessel is not already fitted with suitable cargo inlets/loading holes Charterers have the option to fit the vessel with same as per requirements of the port/shippers for Charterers' account and expense. Cutting/closing (re-welding/screw fastening) of such openings on completion of loading to be under Master's supervision/satisfaction and responsibility. The cost of classification society's approval of this work to be for Charterers' account.

__Clause 73. - ISM Code__
From the date coming into force of the International Safety Management (I.S.M.) code in relation to the vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the vessel and "The Company" (as defined by the I.S.M. Code) shall comply with the requirements of the I.S.M. code. Upon request the Owners shall provide a copy of the relevant Document of Compliance (D.O.C.) and Safety Management Certificate (S.M.C.) to the Charterers. Any loss, damage, expenses or delay caused by failure on the part of the Owners or "The Company" to comply with the I.S.M. Code shall be for the Owners account.

__Clause 74. - Lien__
In the event that Charterers have a contractual or statutory right of lien over cargo carried on board for hire, freight, deadfreight or demurrage Owners shall co-operate as much as Owners' P + I Rules permit with Charterers.

__Clause 75. - Comingling__
Whilst Charterers have the option to load two or more cargoes in the same holds, Charterers are to supply, erect, dismantle and dispose of any and all separations at their time, risk and expense.
Any claims arising from contamination or admixture to cargo carried in the same hold to be the responsibility of Charterers/Shippers and Receivers and to be for their account.

[illegible]able

__Clause 76. - Deck Cargo__
Charterer's option to load intended cargo on deck/hatchcover at Charterers' risk/expense in accordance with vessel's deck/hatchcover strength and vessel's stability at Master's discretion. Bills of Lading for deck cargo to be marked "Shipped on deck at Charterers'/Shippers'/Receivers' risk and expense without liability of the carrier for loss or damage howsoever caused".

__Clause 77. - Ballast/Deballast Clause__
Any detergent/disinfectant required by authorities to be added to ballast water in order to enable vessel to ballast/deballast holds/spaces within national waters of respective countries to be supplied by Charterers and this to be done at Charterers' time, risk and expense.

__Clause 78. - Sale Option__
*Deleted*

__Clause 79. - Hamburg Rules__
Neither the Charterers nor their agents shall permit the issue of any Bills of Lading, waybill, or other documents evidencing a contract of carriage (whether or not signed on behalf of the Owners or on the Charterers' behalf or on behalf of any sub-Charterers) incorporating where not compulsorily applicable, the Hamburg Rules or any other legislation giving effect to the Hamburg Rules or any other legislation imposing liabilities in excess of Hague or Hague/Visby Rules. *(to be continued...)*

Trans-Globe Monitor Shipping GmbH

Tramp Maritime Inc.
9.5 Vetrithias Street 185 35 Piraeus
Tel: +30210 4135256/Fax: +30210 4135235
E-mail: chartering@trampmaritime.gr

**ADDITIONAL CLAUSES TO CHARTER PARTY MV "FURIA R"**
**DATED HAMBURG, 18th MAY 2006**

*Clause 79 (continued):*

The Charterers shall indemnify the Owners against any liability, loss or damage which may result from any breach of the foregoing provisions of this clause.

<u>Clause 80. - Declaration Of Optional Period</u>
*Deleted*

<u>Clause 81.</u>
If the vessel is encountering prolonged stay, minimum 30 days in a port and there is strong reason to believe that the vessel's hull has acquired excessive marine growth affecting vessel's speed/consumption due to the stay at this specific port, Owners are to arrange for diver inspection.

Should the result of this diver inspection indicate there is excessive marine growth on the hull, Owners/Charterers to arrange underwater scrubbing of the hull in Charterers time and expense, prior to vessel's departure from the port, if same can be done without reasonable delay. If the underwater scrubbing is not available or can not be carried out at the port in question same to be carried out in Charterer's time in the next convenient port.

Charterers agree no claim for underperformance of the vessel for the passage from the port in question until underwater scrubbing is carried out.

Dry dock can be carried out in case of emergency.

<u>Clause 82. - Description Of Vessel</u>
M/V "Furia R" ex "Fairy Queen"
BC, Malta Flag, Built 1996, Class NK
46,664 MTDW (summer) on 11.62M SSW
LOA/B/D : 189.8/31.0/16.5 M
GRT/NRT : 27,011/16,011
5 Ho/Ha Grain/Bale : 59,820/57,237 M3
Folding Type Hydraulic Driven Hatch Covers
Hatch Sizes : No.1: 17.60 x 17.16, No.2-5: 20.8 x 17.16M
Cranes : 4 x 30 MT

Speed/consumption, based on b/scale under 4 and no adverse current:
- abt 13,5 knots on abt 25,0 mt MARINE IFO 380CST + abt 1,8 mt MDO in ballast
- abt 13,5 knots on abt 27,5 mt MARINE IFO 380CST + abt 1,8 mt MDO in laden
- At port:
  abt 0,8 mt MARINE IFO 380CST + abt 1,5 mt MDO - W/W: abt 3,8 mt MDO

Vessel to be supplied with bunkers:
-IFO max 380 CST-grade RMG 35 in accordance with ISO 8217
-MDO grade DMB in accordance with ISO 8217

When manoeuvring and steaming in rivers, canals, dense traffic areas and operating under a load of abt 35 pct or less the vessel is burning MDO.

All details are 'about' excluding bunker grade

As per vessel's classification note (as per SOLAS): "the ship is not allowed to sail with any cargo hold loaded to less than 10 pct of the holds maximum allowable cargo weight when in the full load condition".

Previous cargoes: grains from USA, steels from Black Sea to USA, and before vessel's holds had been sandblasted + painted. *(to be continued...)*

Tramp Maritime Inc.
9.P. Peraichias Street - 185 35 Piraeus
Tel: ... Fax: ...
E-Mail: chartering@trampmarit.me.gr

Trans-Globe Monitor Shipping GmbH

**ADDITIONAL CLAUSES TO CHARTER PARTY MV "FURIA R"**
**DATED HAMBURG, 18th MAY 2006**

*Clause 82 (continued):*

- Owners to confirm vessel has not been detained by any countries during the last 24 months and has no outstanding deficiencies from port state controls. - Yes but as from February '05 since the vessel has been under present Owners.
- Owners guarantee that the terms and conditions of employment of the crew of the vessel for the period of the Charter Party are covered by a bonafide trade union agreement acceptable to the itf. Owners warrant vessel and Owners are fully ISM (BIMCO ISM Clause to apply) and P and I covered with IACS member throughout the duration of this Charter Party.
- Owners confirm vessel has no centreline beams/bulkheads or any other obstruction on decks or holds which would interfere with loading/discharging operations and use/or use of bulldozers/payloaders.

**MV FURIA R - "BIMCO" BALTIC EXCHANGE DRY CARGO QUESTIONNAIRE**

1. **General**

1.1 Vessel's name : "FURIA R"
1.2 Vessel's previous name(s) : "FAIRY QUEEN"
1.3 Flag : MALTA
1.4 Month/year and where built : JAN 1996 - JAPAN
1.5 Yard name and number : MITSUI ENGINEERING AND SHIPBUILDING TOMANO WORKS, JAPAN
1.6 Official class register number/Lloyds number : :
1.7 Class of vessel : NKK NS BULK CARRIER, (ESP) MNS
1.8 Port of registry : VALETTA, MALTA
1.9 Owners (full style and contact numbers) : POLINOS MARITIME LTD, VALETTA - CONTACT C/O MANAGERS
1.10 Managers : J.G.ROUSSOS SHIPPING S.A, GREECE
1.11 Disponent Owners for the purpose of this C/P (if applicable)

2 **Particulars of vessel**

2.1 Type of vessel : BULK CARRIER
2.2 State following:

| Deadweight all told: | | Draft | TPI/TPC (m/tons) |
|---|---|---|---|
| Summer | : 46.664 | 11,62m | 51,5 |
| Winter | : 45.420 | 11,38m | 51,4 |
| Tropical | : 47.912 | 11,862m | 51,6 |
| Fresh Water | : 46.664 | 11,884m | 51,6 |
| Tropical FW | : 47.885 | 12,126m | 51,6 |

2.3 Is vessel fitted for transit of:
A) Panama Canal : YES
B) Suez canal : YES
C) St. Lawrence Seaway : NO

2.7 GT/NT:
International : 27,011 / 16,011
Suez : 27,757.29 / 24,983.30

*(to be continued..)*

Trans-Globe Reederei Shipping GmbH

Tramp Maritime Inc.
9 Vasileos Street ... Piraeus
Tel: ... Fax: ...
E-Mail: chartering@trampmaritime.gr

**ADDITIONAL CLAUSES TO CHARTER PARTY MV "FURIA R"**
**DATED HAMBURG, 18th MAY 2006**

*Clause 82 (continued):*

Panama : 27,011 / 22,454

2.8 Length overall (meters) : 189,80

2.9 Length between Perpendiculars (meters) : 181,00

2.10 Extreme breadth (meters) and depth moulded : 31,00 / 16,50

2.11 Distance from waterline to top of hatch coaming:
A. Fully loaded condition : HATCH NR 1/3/5: 7.31/7.11/7.11m
B. Full Ballast condition (ballast holds not flooded) : HATCH NR 1/3/5: 14.83/13.77/12.67
C. Full ballast condition (ballast holds flooded) : HATCH NR 1/3/5: 10.93/10.67/10.40

2.12 State vessel's deballasting time in metric tons per hour : about 1.000 m3 per hour

2.15 State capacity of
A. Ballast tanks
B. Hold ballast capacity (state which hold):
HOLD NR 3 FLOODABLE WITH SEA WATER - CAPACITY 12,589 M3

2.16 Constant excluding fresh water : about 350 mt
Daily freshwater consumption : abt 9mt
Fresh water capacity : 343.0 M3
State capacity and daily production of evaporators : abt 10mt
Normal fresh water reserve : abt 200mt

2.17 Vessel is fitted with shaft generator : NO

2.18 State vessel's onboard electrical supply : (440v / 60 Hz)

3. **Cargo arrangements**
3.1 Holds:
A. Number of holds: FIVE (5)
B. Are vessels holds clear and free of any obstructions: YES
D. Grain/bale capacities by hold including hatch ways (CUBM/CBFT)
GRAIN/BALE: 59,820.4/57,236.7 M3 (2.112.557/2.021.315 CBFT)
GR/BL INCL. HATCHES
(1): 10,355.5(365.704) / 9,885.6
(2): 12,547.2(443.104) / 11,974.7
(3): 12,583.4(444.383) / 11,930.9
(4): 12,679.7(447.784) / 12,137.1
(5): 11,654.8(411.582) / 11,308.4
E. Is vessel strengthened for the carriage of heavy cargoes: YES
F. Is tanktops steel and suitable for grab discharge: YES
G. corrugations: vertical
H. Tank top strength (metric tons per SQM)
STRENGTHS: TANK TOP HO 1/3/5: 24MT/M2
HO 2/4 : 17MT/M2
I. Are holds CO2 fitted: NO

*(to be continued...)*

Trans-Globe Monitor Shipping GmbH

Tramp Maritime Inc.
E-Mail: chartering@trampmaritime.gr

**ADDITIONAL CLAUSES TO CHARTER PARTY MV "FURIA R"
DATED HAMBURG, 18th MAY 2006**

*Clause 82 (continued):*

J. Are holds fitted with smoke detection system: NO
K. Is vessel fitted with Australian type approved hold ladders: YES
L. Has vessel a loadmaster computer/loadicator or other type of mechanical stowage calculator: YES
M. Are holds hoppered at:
Hold side: YES
Forward bulkhead: NO
Aft bulkhead: NO
Can vessel's holds be described as box shaped: NO
N. Measurement of any tank slopes/hoppering (height and distance from vessel's side at tank (top): HEIGHT: 3.62m / DISTANCE: 3,80 m
O. Flat floor measurement of cargo holds at tank top:
TANK TOP DIM: (1): 27,50 X 8,00m FWD
X 23,54m AFT
(2): 27,60 X 23,54m
(3): 27,60 X 23,54m
(4): 28,00 X 23,54m
(5): 28,00 X 23,54m
P. Is vessel electrical ventilated: NO

3.2 **Hatches**
A. Number of hatches: FIVE (5)
B. Type of hatch covers: FOLDING TYPE HYDRAULIC DRIVEN
C. Hatch sizes: (1): 17,60 X 17,16
(2): 20,80 X 17,16
(3): 20,80 X 17,16
(4): 20,80 X 17,16
(5): 20,80 X 17,16
D. Strength of hatch covers in metric tons per SQM:
HA COVERS: 1/2/3/4/5: 2,45MT/M2
E. Distance from ship's rail to edge of hatch covers/coaming each side:
ABOUT 6M EACH SIDE, EXCEPT NR 1 FWD WHICH IS LESS
F. Distance from bow to for of 1st hold opening: ABT 19,60M
G. Distance from stern to aft of last hold opening: ABT 25,16M
H. Is vessel fitted with cement holes: YES

4 **Speed/consumption/fuel engine** (up to beaufort scale force 4/douglas sea scale 3):
-abt 13,50 kn on abt 25,0 mt MARINE IFO 380CST plus abt 1,8 mt MDO in ballast
-abt 13,50 kn on abt 27,5 mt MARINE IFO 380CST plus abt 1,8 mt MDO in laden
-At port abt 1,2 mt MARINE IFO 380CST plus abt 1,8 mt MDO
- W/W: abt 3,8 mt MDO

Vessel to be supplied with bunkers:
-IFO MAX 380 CST-GRADE RMG 35 IN ACCORDANCE WITH ISO 8217
-MDO GRADE DMB IN ACCORDANCE WITH ISO 8217

When manoeuvering and steaming in rivers, canals, dence traffic areas and operating under a load of abt 35 pct or less the vessel is burning MDO

All details are 'about' excl bunker grade

*(to be continued...)*

 31 Jan 07 11:58 J G R 00302109881991 p.20

Trans-Globe Monitor Shipping GmbH

Tramp Maritime Inc

ADDITIONAL CLAUSES TO CHARTER PARTY MV "FURIA R"
DATED HAMBURG, 18th MAY 2006

*Clause 82 (continued):*

4.1
4.2 Bunker grades IFO/MDO: AS STATED ABOVE
4.3 Permanent usable bunker capacities IFO/MDO (excluding unpumpables which are: abt 10 mts
4.4 Port consumption per 24 hours idle/working 8/24 hours: AS STATED ABOVE
4.5 Engine Make and type: MITSUI-MAN B+W 6S50MC(MK5)
4.6 Max output BHP/RPM: 11100

5. Banking information: AS PER THE CHARTER PARTY
5.1 Full style and address of Owners bank for freight/hire remittance: AS PER THE CHARTER PARTY

6. Classification society, surveys and certificates
6.1 Name of Classification society: NKK
6.2 Date of last special survey: 23/12/2005
6.3 Date of last annual survey
6.4 A. Is vessel entered in a classification approved enhanced survey program: NO
B. Date of last inspection
C. Date of next inspection
6.5 Date and last place of last drydock: 23/12/05
6.6 Has vessel been involved in any pollution incidents in the last 12 months:
NO (AS FROM THE TIME OF PRESENT OWNERSHIP)
6.7 Has vessel been involved in any groundings or collision in the last 12 months:
NO, AS FROM THE TIME OF PRESENT OWNERSHIP.
6.8 Is vessel ISM certified: YES
6.11 Is vessel's crew covered by full ITF or bone fide trade union agreement acceptable to ITF: YES

7 Communication
7.1 Call sign : 9 H B X 8
7.6 Inmarsat C Telex number : 421582010

8 Insurance
8.1 Hull and machinery value:
USD 24 MILLIONS, INCREASED VALUE USD 6 MILLIONS, TOTAL USD 30 MILLIONS
8.2 Name of Owners' P and I insurers: WEST OF ENGLAND

9 Crew
9.1 Number of crew : PRESENTLY 23
9.2 Name and nationality of master : PRESENTLY CPT IGOR BUSHUYEV (UKRAINIAN)
9.3 Nationality of officers : PRESENTLY UKRAINIANS
9.4 Nationality of crew : PRESENTLY UKRAINIANS

10 Miscellaneous
10.1 Has vessel called at C.I.S. (Russian) Far East Pacific ports in the last 18 months: NO
10.2 State last 5 (five) cargoes carried with load and discharge port(s)
10.3 Is vessel fitted for carriage of grain in accordance with chapter IV of Solas 1974 and amendments without requiring bagging strapping and securing when loading a full cargo (deadweight) of heavy grain in bulk (stowage factor 42 CBFT) with ends untrimmed? YES
10.4 State number of holds which may be left slack without requiring bagging, strapping and securing: ACCORDING TO THE STABILITY CALCULATION

*(to be continued...)*

Tramp Maritime Inc

Trans-Globe Monitor Shipping GmbH

**ADDITIONAL CLAUSES TO CHARTER PARTY MV "FURIA R"
DATED HAMBURG, 18th MAY 2006**

*Clause 82 (continued):*

| | | |
|---|---|---|
| 11 | **Cargo gear** (only to be completed if applicable) | |
| 11.1 | If geared state make and type | : IHI |
| 11.2 | Number and capacity of cranes/derricks and where situated | : 4x30 mts between hatches |
| | 1-2, 2-3, 3-4, 4-5 | |
| 11.3 | Outreach of gear beyond ship's rail | : 10,50 meters |
| 11.4 | If gantry cranes/horizontal slewing cranes state minimum clearance distance crane hook to top of hatch coaming | : NO |
| 11.5 | Time needed for full cycle with maximum cargo lift on hook | : |
| 11.6 | Slewing/luffing/hoisting speeds | : |
| 11.7 | Is gear combinable for heavy lift | : NO |
| 11.8 | Are winches electro-hydraulic | : YES |
| 11.9 | Consumption of MDO working cranes per 24 hours | : ABT 3,5mt |
| 11.10 | Has vessel grabs onboard | : NO |
| 11.11 | Is vessel fitted with sufficient lights at each hatch for night work | : YES |

<u>Clause 83. - BIMCO ISPS/MTSA Clause For Time Charter Parties 2005</u>

(a) (i) The Owners shall comply with the requirements of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) relating to the Vessel and "the Company" (as defined by the ISPS Code). If trading to or from the United States or passing through United States waters, the Owners shall also comply with the requirements of the US Maritime Transportation Security Act 2002 (MTSA) relating to the Vessel and the "Owner" (as defined by the MTSA).

(ii) Upon request the Owners shall provide the Charterers with a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) and the full style contact details of the Company Security Officer (CSO).

(iii) Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Owners or "the Company"/"Owner" to comply with the requirements of the ISPS Code/MTSA or this Clause shall be for the Owners' account, except as otherwise provided in this Charter Party.

(b) i) The Charterers shall provide the Owners and the Master with their full style contact details and, upon request, any other information the Owners require to comply with the ISPS Code/MTSA. Where sub-letting is permitted under the terms of this Charter Party, the Charterers shall ensure that the contact details of all sub-charterers are likewise provided to the Owners and the Master. Furthermore, the Charterers shall ensure that all sub-charter parties they enter into during the period of this Charter Party contain the following provision:

*"The Charterers shall provide the Owners with their full style contact details and, where sub-letting is permitted under the terms of the charter party, shall ensure that the contact details of all sub-charterers are likewise provided to the Owners".*

(ii) Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account, except as otherwise provided in this Charter Party.

(c) Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code/MTSA including, but not limited to, security guards, launch services, vessel escorts, security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the negligence of the Owners, Master or crew. *(to be continued...)*



Trans-Globe Xonitor Shipping GmbH

Tramp Maritime In.

**ADDITIONAL CLAUSES TO CHARTER PARTY MV "FURIA R"**
**DATED HAMBURG, 18th MAY 2006**

*Clause 83 (continued):*

All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

(d) If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

*Footnote: This Clause replaces previously published ISPS Clause for Time Charter Parties AND the US Security Clause for Time Charter Parties, both of which are now officially withdrawn.*

<u>Clause 84. - BIMCO U.S. Customs Advance Notification/AMS Clause For Time Charter Parties</u>

(a) If the Vessel loads or carries cargo destined for the U.S. or passing through U.S. ports in transit, the Charterers shall comply with the current U.S. Customs Regulations (19 CFR 4.7) or any subsequent amendments thereto and shall undertake the role of carrier for the purposes of such regulations and shall, in their own name, time and expense :

- i) Have in place a SCAC (Standard Carrier Alpha Code);
- ii) Have in place an ICB (International Carrier Bond);
- iii) Provide the Owners with a timely confirmation of i) and ii) above; and
- iv) Submit a cargo declaration by AMS (Automated Manifest System) to the U.S. Customs and provide the Owners at the same time with a copy thereof.

(b) The Charterers assume liability for and shall indemnify, defend and hold harmless the Owners against any loss and/or damage whatsoever (including consequential loss and/or damage) and/or any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Charterers' failure to comply with any of the provisions of sub-clause (a). Should such failure result in any delay then, notwithstanding any provision in this Charter Party to the contrary, the Vessel shall remain on hire.

(c) If the Charterers' ICB is used to meet any penalties, duties, taxes or other charges which are solely the responsibility of the Owners, the Owners shall promptly reimburse the Charterers for those amounts.

(d) The assumption of the role of carrier by the Charterers pursuant to this Clause and for the purpose of the U.S. Customs Regulations (19 CFR 4.7) shall be without prejudice to the identity of carrier under any Bill of Lading, other contract, law or regulation.

*************

 Trans-Globe Monitor Shipping GmbH

Tramp Maritime Inc.
[illegible]
E-Mail: [illegible]

**ADDITIONAL CLAUSES TO CHARTER PARTY MV "FURIA R"
DATED HAMBURG, 18th MAY 2006**

**NEW JASON CLAUSE**

"In the event of accident, danger, damage or disaster before or after commencement of the voyage resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract, or otherwise, the cargo, shippers, consignees, or Owners of the goods shall contribute with the carrier in general average to the payment of any sacrifices, losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the cargo.

If a salvage ship is owned or operated by the carrier, salvage shall be paid for as fully as if such salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, shippers, consignees or Owners of the cargo to the carrier before delivery."

**NEW BOTH TO BLAME COLLISION CLAUSE**

"If the vessel comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, Mariner, Pilot or the Servants of the carrier in the navigation or in the management of the vessel, the Owners of the cargo carried hereunder will indemnify the carrier against all loss or liability to the other or non-carrying ship or her Owners in so far as such loss or liability represents loss of or damage to or any claim whatsoever of the Owners of said cargo, paid or payable by the other or non-carrying ship or her Owners to the Owners of the said cargo and set off, recouped or recovered by the other or non-carrying ship or her Owners as part of their claim against the carrying vessel or carrier.

The foregoing provisions shall also apply where the Owners, operators or those in charge of any ship or ships or objects other than, or in addition to the colliding ships or objects are at fault in respect to a collision or contact."

**BIMCO BUNKER FUEL SULPHUR CONTENT CLAUSE FOR TIME CHARTER PARTIES 2005**

(a) Without prejudice to anything else contained in this Charter Party, the Charterers shall supply fuels of such specifications and grades to permit the Vessel, at all times, to comply with the maximum sulphur content requirements of any emission control zone when the Vessel is ordered to trade within that zone.

The Charterers also warrant that any bunker suppliers, bunker craft operators and bunker surveyors used by the Charterers to supply such fuels shall comply with Regulations 14 and 18 of MARPOL Annex VI, including the Guidelines in respect of sampling and the provision of bunker delivery notes.

The Charterers shall indemnify, defend and hold harmless the Owners in respect of any loss, liability, delay, fines, costs or expenses arising or resulting from the Charterers' failure to comply with this Sub-clause (a).

(b) Provided always that the Charterers have fulfilled their obligations in respect of the supply of fuels in accordance with Sub-clause (a), the Owners warrant that:

(i) the Vessel shall comply with Regulations 14 and 18 of MARPOL Annex VI and with the requirements of any emission control zone; and

(ii) the Vessel shall be able to consume fuels of the required sulphur content

when ordered by the Charterers to trade within any such zone.

Subject to having supplied the Vessel with fuels in accordance with Sub-clause (a), the Charterers shall not otherwise be liable for any loss, delay, fines, costs or expenses arising or resulting from the Vessel's failure to comply with Regulations 14 and 18 of MARPOL Annex VI.

(c) For the purpose of this Clause, "emission control zone" shall mean zones as stipulated in MARPOL Annex VI and/or zones regulated by regional and/or national authorities such as, but not limited to, the EU and the US Environmental Protection Agency.

**BIMCO ICE CLAUSE FOR TIME CHARTER PARTIES**

(a) The vessel shall not be obliged to force ice but, subject to the Owners' prior approval having due regard to its size, construction and class, may follow ice-breakers.

(b) The Vessel shall not be required to enter or remain in any icebound port or area, nor any port or area where lights, lightships, markers or buoys have been or are about to be withdrawn by reason of ice, nor where on account of ice there is, in the Master's sole discretion, a risk that, in the ordinary course of events, the Vessel will not be able safely to enter and remain at the port or area or to depart after completion of loading or discharging. If, on account of ice, the Master in his sole discretion considers it unsafe to proceed to, enter or remain at the place of loading or discharging for fear of the Vessel being frozen in and/or damaged, he shall be at liberty to sail to the nearest ice-free and safe place and there await the Charterers' instructions.

Trans-Globe Monitor Shipping GmbH

Tramp Maritime Inc.
E-Mail: chartering@trampmaritime.gr

# ADDITIONAL CLAUSES TO CHARTER PARTY MV "FURIA R" DATED HAMBURG, 18th MAY 2006

(c) Any delay or deviation caused by or resulting from ice shall be for the Charterers' account and the Vessel shall remain on-hire.

(d) Any additional premiums and/or calls required by the Vessel's underwriters due to the Vessel entering or remaining in any icebound port or area, shall be for the Charterers' account.

## WAR RISKS CLAUSE FOR TIME CHARTERS, 2004
## Code Name: CONWARTIME 2004

(a) For the purpose of this Clause, the words:

(i) Owners" shall include the shipowners, bareboat charterers, disponent owners, managers or other operators who are charged with the management of the Vessel, and the Master; and

(ii) War Risks" shall include any actual, threatened or reported: war; act of war; civil war; hostilities; revolution; rebellion; civil commotion; warlike operations; laying of mines; acts of piracy; acts of terrorists; acts of hostility or malicious damage; blockades (whether imposed against all vessels or imposed selectively against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever); by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the Vessel, her cargo, crew or other persons on board the Vessel.

(b) The Vessel, unless the written consent of the Owners be first obtained, shall not be ordered to or required to continue to or through, any port, place, area or zone (whether of land or sea), or any waterway or canal, where it appears that the Vessel, her cargo, crew or other persons on board the Vessel, in the reasonable judgement of the Master and/or the Owners, may be, or are likely to be, exposed to War Risks. Should the Vessel be within any such place as aforesaid, which only becomes dangerous, or is likely to be or to become dangerous, after her entry into it, she shall be at liberty to leave it.

(c) The Vessel shall not be required to load contraband cargo, or to pass through any blockade, whether such blockade be imposed on all vessels, or is imposed selectively in any way whatsoever against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever, or to proceed to an area where she shall be subject, or is likely to be subject to a belligerents' right of search and/or confiscation.

(d) (i) The Owners may effect war risks insurance in respect of the Hull and Machinery of the Vessel and their other interests (including, but not limited to, loss of earnings and detention, the crew and their protection and Indemnity Risks), and the premiums and/or calls therefor shall be for their account.

(ii) If the Underwriters of such insurance should require payment of premiums and/or calls because, pursuant to the Charterers' orders, the Vessel is within, or is due to enter and remain within, or pass through any area or areas which are specified by such Underwriters as being subject to additional premiums because of War Risks, then the actual premiums and/or calls paid shall be reimbursed by the Charterers to the Owners at the same time as the next payment of hire is due, or upon redelivery, whichever occurs first.

(e) If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then the actual bonus or additional wages paid shall be reimbursed to the Owners by the Charterers at the same time as the next payment of hire is due, or upon redelivery, whichever occurs first.

(f) The Vessel shall have liberty:-

(i) to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery, or in any other way whatsoever, which are given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government, body or group whatsoever acting with the power to compel compliance with their orders or directions;

(ii) to comply with the order, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance;

(iii) to comply with the terms of any resolution of the Security Council of the United Nations, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;

(iv) to discharge at any other port any cargo or part thereof which may render the Vessel liable to confiscation as a contraband carrier;

(v) to call at any other port to change the crew or any part thereof or other persons on board the Vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions.

Tramp Maritime Inc.
9,9 ... Street, 185 35 Piraeus
Tel: ... Fax: ...
E-Mail: chartering@trampmaritime.gr

Trans-Globe Bonitor Shipping GmbH

**ADDITIONAL CLAUSES TO CHARTER PARTY MV "FURIA K"**
**DATED HAMBURG, 18th MAY 2006**

(g). If in accordance with their rights under the foregoing provisions of this Clause, the Owners shall refuse to proceed to the loading or discharging ports, or any one or more of them, they shall immediately inform the Charterers. No cargo shall be discharged at any alternative port without first giving the Charterers notice of the Owners' intention to do so and requesting them to nominate a safe port for such discharge. Failing such nomination by the Charterers within 48 hours of the receipt of such notice and request, the Owners may discharge the cargo at any safe port of their own choice.

(h). If in compliance with any of the provisions of sub-clauses (b) to (g) of this Clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfilment of this Charter Party.

## CARRIAGE OF NUCLEAR MATERIALS

"Notwithstanding any provision whether written or printed contained in this Charter, it is agreed that nuclear fuels or radioactive waste or products are specifically excluded from the cargo permitted to be loaded or carried under this Charter Party. This exclusion does not apply to radio isotopes used or intended to be used for any industrial, commercial, agricultural, medical or scientific purpose, provided Owners' prior approval has been obtained to the loading thereof."

## CANADIAN CLAUSE PARAMOUNT

All the terms, provisions and conditions of the Canadian Water Carriage of Goods Act, 1936, and of the Rules comprising the schedule thereto are, so far as applicable, to govern the contract contained in this Bill of Lading and the Shipowners are to be entitled to the benefit of all privileges, rights and immunities contained in such Act and in the schedule thereto as if the same were herein specifically set out.
If anything herein contain be inconsistent with the said provisions, it shall to the extent of such inconsistency and no further be null and void.

The Carrier shall be under no responsibility whatsoever for loss of or damage to goods howsoever and wheresoever occurring when such loss or damage arises prior to the loading on and/or subsequent to the discharge from the Carrier's ship.

## U.S.A. CLAUSE PARAMOUNT

If the vessel load in the U.S.A., the U.S.A. Clause Paramount shall be incorporated in all Bills of Lading and shall read as follows:

"The Bill of Lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April 16th, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the Carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any terms of this Bill of Lading be repugnant to said Act to any extent, such term shall be void to that extent but no further".

Tramp Maritime Inc
E-Mail: chartering@trampmaritime.gr

Trans-Globe Monitor Shipping GmbH

**ADDITIONAL CLAUSES TO CHARTER PARTY MV "FURIA R"**
**DATED HAMBURG, 18th MAY 2006**

**STANDARD FORM LETTER OF INDEMNITY TO BE GIVEN IN RETURN FOR DELIVERING CARGO AT A PORT OTHER THAN THAT STATED IN THE BILL OF LADING**

To: *(insert name of Owners)* *(insert date)*
The Owners of the *(insert name of ship)*

Dear Sirs,

Ship: *(insert name of ship)*

Voyage: *(insert load and discharge ports as stated in the bill of lading)*

Cargo: *(insert description of cargo)*

Bill of Lading: *(insert identification numbers, date and place of issue)*

The above cargo was shipped on the above ship by *(insert name of shipper)* and consigned to *(insert name of consignee or party to whose order the bill of lading is made out, as appropriate)* for delivery at the port of *(insert name of discharge port stated in the bill of lading)* but we, *(insert name of party requesting substituted delivery)*, hereby request you to order the ship to proceed to and deliver the said cargo at *(insert name of substitute port or place of delivery)* against production of at least one original bill of lading.

In consideration of your complying with our above request, we hereby agree as follows:-

1. To indemnify you, your servants and agents and to hold all of you harmless in respect of any liability, loss, damage or expense of whatsoever nature which you may sustain by reason of the ship proceeding and giving delivery of the cargo against production of at least one original bill of lading in accordance with our request.

2. In the event of any proceedings being commenced against you or any of your servants or agents in connection with the ship proceeding and giving delivery of the cargo as aforesaid, to provide you or them on demand with sufficient funds to defend the same.

3. If, in connection with the delivery of the cargo as aforesaid, the ship, or any other ship or property in the same or associated ownership, management or control, should be arrested or detained or should the arrest or detention thereof be threatened, or should there be any interference in the use or trading of the vessel (whether by virtue of a caveat being entered on the ship's registry or otherwise howsoever), to provide on demand such bail or other security as may be required to prevent such arrest or detention or to secure the release of such ship or property or to remove such interference and to indemnify you in respect of any liability, loss, damage or expense caused by such arrest or detention or threatened arrest or detention or such interference, whether or not such arrest or detention or threatened arrest or detention or such interference may be justified.

4. The liability of each and every person under this indemnity shall be joint and several and shall not be conditional upon your proceeding first against any person, whether or not such person is party to or liable under this indemnity.

5. This indemnity shall be governed by and construed in accordance with English law and each and every person liable under this indemnity shall at your request submit to the jurisdiction of the High Court of Justice of England.

Yours faithfully

For and on behalf of
*(insert name of Requestor)*

The Requestor

.............................................
Signature

Tramp Maritime Inc

Trans-Globe Monitor Shipping GmbH

**ADDITIONAL CLAUSES TO CHARTER PARTY MV "FURIA R"
DATED HAMBURG, 18th MAY 2006**

STANDARD FORM LETTER OF INDEMNITY TO BE GIVEN IN RETURN FOR DELIVERING CARGO AT A PORT OTHER THAN THAT STATED IN THE BILL OF LADING AND WITHOUT PRODUCTION OF THE ORIGINAL BILL OF LADING

To: *(insert name of Owners)* *(insert date)*
The Owners of the *(insert name of ship)*

Dear Sirs,

Ship: *(insert name of ship)*

Voyage: *(insert load and discharge ports as stated in the bill of lading)*

Cargo: *(insert description of cargo)*

Bill of Lading: *(insert identification numbers, date and place of issue)*

The above cargo was shipped on the above vessel by *(insert name of shipper)* and consigned to *(insert name of consignee or party to whose order the bill of lading are made out, as appropriate)* for delivery at the port of *(insert name of discharge port stated in the bill of lading)* but we, *(insert name of party requesting substituted delivery)*, hereby request you to order the vessel to proceed to and deliver the said cargo at *(insert name of substitute port or place of delivery)* to *(insert name of party to whom delivery is to be made)* without production of the original bill of lading.

In consideration of your complying with our above request, we hereby agree as follows:-

1. To indemnify you, your servants and agents and to hold all of you harmless in respect of any liability, loss, damage or expense of whatsoever nature which you may sustain by reason of the ship proceeding and giving delivery of the cargo in accordance with our request.

2. In the event of any proceedings being commenced against you or any of your servants or agents in connection with the ship proceeding and giving delivery of the cargo as aforesaid, to provide you or them on demand with sufficient funds to defend the same.

3. If, in connection with the delivery of the cargo as aforesaid, the ship, or any other ship or property in the same or associated ownership, management or control, should be arrested or detained or should the arrest or detention thereof be threatened, or should there be any interference in the use or trading of the vessel (whether by virtue of a caveat being entered on the ship's registry or otherwise howsoever), to provide on demand such bail or other security as may be required to prevent such arrest or detention or to secure the release of such ship or property or to remove such interference and to indemnify you in respect of any liability, loss, damage or expense caused by such arrest or detention or threatened arrest or detention or such interference, whether or not such arrest or detention or threatened arrest or detention or such interference may be justified.

4. If the place at which we have asked you to make delivery is a bulk liquid or gas terminal or facility, or another ship, lighter or barge, then delivery to such terminal, facility, ship, lighter or barge shall be deemed to be delivered to the party to whom we have requested you to make such delivery.

5. As soon as all original bills of lading for the above cargo shall have come into our possession, to deliver the same to you, or otherwise to cause all original bills of lading to be delivered to you.

6. The liability of each and every person under this indemnity shall be joint and several and shall not be conditional upon your proceeding first against any person, whether or not such person is party to or liable under this indemnity.

7. This indemnity shall be governed by and construed in accordance with English law and each and every person liable under this indemnity shall at your request submit to the jurisdiction of the High Court of Justice of England.

Yours faithfully

For and on behalf of
*(insert name of Requestor)*

The Requestor

.................................................
Signature



31 Jan 07 12:05 J G R 00302109881891 P.28

Trans-Globe Monitor Shipping GmbH

Tramp Maritime Inc.

**ADDITIONAL CLAUSES TO CHARTER PARTY MV "FURIA R" DATED HAMBURG, 18th MAY 2006**

STANDARD FORM LETTER OF INDEMNITY TO BE GIVEN IN RETURN FOR DELIVERING CARGO WITHOUT PRODUCTION OF THE ORIGINAL BILL OF LADING

To: *(insert name of Owners)* *(insert date)*
The Owners of the *(insert name of ship)*
*(insert address)*

Dear Sirs,

Ship: *(insert name of ship)*

Voyage: *(insert load and discharge ports as stated in the bill of lading)*

Cargo: *(insert description of cargo)*

Bill of Lading: *(insert identification numbers, date and place of issue)*

The above cargo was shipped on the above ship by *(insert name of shipper)* and consigned to *(insert name of consignee or party to whose order the bill of lading is made out, as appropriate)* for delivery at the port of *(insert name of discharge port stated in the bill of lading)* but the Bills of Lading have not arrived and we, *(insert name of party requesting delivery)*, hereby request you to deliver the said cargo to *(insert name of party to whom delivery is to be made)* at *(insert place where delivery is to be made)* without production of the original Bill(s) of Lading.

In consideration of your complying with our above request, we hereby agree as follows:-

1. To indemnify you, your servants and agents and to hold all of you harmless in respect of any liability, loss, damage or expense of whatsoever nature which you may sustain by reason of the vessel proceeding and giving delivery of the cargo in accordance with our request.

2. In the event of any proceedings being commenced against you or any of your servants or agents in connection with the delivery of the cargo as aforesaid, to provide you or them on demand with sufficient funds to defend the same.

3. If, in connection with the delivery of the cargo as aforesaid, the ship, or any other ship or property in the same or associated ownership, management or control, should be arrested or detained or should the arrest or detention thereof be threatened, or should there be any interference in the use or trading of the vessel (whether by virtue of a caveat being entered on the ship's registry or otherwise howsoever), to provide on demand such bail or other security as may be required to prevent such arrest or detention or to secure the release of such ship or property or to remove such interference and to indemnify you in respect of any liability, loss, damage or expense caused by such arrest or detention or threatened arrest or detention or such interference, whether or not such arrest or detention or threatened arrest or detention or such interference may be justified.

4. If the place at which we have asked you to make delivery is a bulk liquid or gas terminal or facility, or another ship, lighter or barge, then delivery to such terminal, facility, ship, lighter or barge shall be deemed to be delivered to the party to whom we have requested you to make such delivery.

5. As soon as all original bills of lading for the above cargo shall have come into our possession, to deliver the same to you, or otherwise to cause all original bills of lading to be delivered to you, whereupon our liability hereunder shall cease.

6. The liability of each and every person under this indemnity shall be joint and several and shall not be conditional upon your proceeding first against any person, whether or not such person is party to or liable under this indemnity.

7. This indemnity shall be governed by and construed in accordance with English law and each and every person liable under this indemnity shall at your request submit to the jurisdiction of the High Court of Justice of England.

Yours faithfully

For and on behalf of
*(insert name of Requestor)*

The Requestor

................................................
Signature

# AC 2

78-08/MEU/SL
FREEHILL HOGAN & MAHAR, LLP
Attorneys for Plaintiff
SIXTEEN THIRTEEN MARINE S.A.
80 Pine Street
New York, NY 10005
(212) 425-1900
(212) 425-1901 fax
Michael E. Unger (MU 0045)

RECEIVED FEB 08 2008 U.S.D.C. S.D. N.Y. CASHIERS

JUDGE BAER

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

SIXTEEN THIRTEEN MARINE S.A.,

Plaintiff,

-against-

CONGENTRA AG,

Defendant.

---------------------------------------------------------------x

08 CV 1318

08 Civ ______ (____)

**VERIFIED COMPLAINT**

Plaintiff, SIXTEEN THIRTEEN MARINE S.A. (hereinafter "STM") for its Verified Complaint against Defendant CONGENTRA AG (hereinafter "CONGENTRA") alleges upon information and belief as follows:

1. This is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure in that it involves a claim for the breach of a maritime contract of charter party. This case also falls under this Court's admiralty and maritime jurisdiction pursuant to 28 U.S.C. §1333 and the Court's federal question jurisdiction pursuant to 28 U.S.C. §1331 in that the action arises under the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards, codified at 9 U.S.C. §201 *et seq.* and/or the Federal Arbitration Act, 9 U.S.C. §1 *et seq.*

2. At all times material hereto, Plaintiff STM was and still is a foreign business entity duly organized under the laws of a foreign country with an address at 80 Broad Street, Monrovia, Liberia.

3. At all times relevant hereto, Defendant CONGENTRA was and still is a foreign business entity duly organized and existing under the laws of a foreign country with an address at 6301 Bahnhofstrasse 12, Zug, Switzerland.

4. On or about October 10, 2007, Plaintiff STM, as disponent owner of the M/V NICHOLAS M, entered into a maritime contract of charter party with Defendant CONGENTRA, as charterer, at an agreed rate of hire, to carry a cargo of 30,204 metric tons of soyabean meal from San Lorenzo in Argentina to St. Petersburg in Russia, with the charter expected to take approximately 60 days.

5. At 1100hrs on 2nd December 2007, during discharge at St. Petersburg, a relatively small quantity of damaged/wetted cargo was found below the surface layer of the cargo in Hold No. 4 only. At 1525hrs on 15th December 2007 a smaller quantity of damaged/wetted cargo was found in hold No. 2.

6. The amount of damaged cargo found by the Russian official inspectors was 150.12 metric tons in No.4 hold and 64.12 metric tons in No.2 hold.

7. After the discovery of the damaged cargo, Defendant CONGENTRA, the cargo receivers - Euroweg, and their agents - Anteks, acting in concert, demanded security for US$2,790,000 and threatened to arrest the vessel.

8. On 24th December 2007, the vessel's P&I Club (insurance company), The American Steamship Owners Mutual Protection and Indemnity Association Inc., posted security in the amount of US$322,271 plus interest and costs.

9. Testing of the cargo during the period in question determined that none of the damage was caused by contact with seawater damage – meaning that the damage was all due to pre-shipment conditions for which Plaintiff, STM, was neither liable nor responsible.

10. Nonetheless, and in bad faith, Defendant CONGENTRA and non-parties Euroweg, and Anteks refused throughout the material period to discharge the cargo and to segregate it as to good and damaged ashore, thereby extensively delaying the vessel from completing her discharge operations.

11. On or about 29th December 2007, Defendant CONGENTRA and non-parties Euroweg, and Anteks sought to delay the vessel further by requesting ultrasound tests within the holds. They had a contractual right to carry out such testing at the loadport but did not opt to do so. They threatened to obtain an order of the English High Court. Pliantiff STM pointed out that the requests were only seeking to delay the vessel and refused. No order of the English High Court was ever presented to the vessel thereafter. At about this time, Defendant CONGENTRA and non-parties Euroweg, and Anteks learned that the vessel's classification society had temporarily withdrawn the vessel's certificate of class pending repairs to a hydraulic lifting mechanism for the hatch covers of No.6 hold [where no cargo damage was found].

12. Defendant CONGENTRA and non-parties Euroweg, and Anteks at this point in time "persuaded" Russian Port State Control officials to go on board and detain the ship for a number of days in an attempt to gather evidence against the vessel to help support their dubious claims. The Russian Port State Control eventually released the vessel without any serious deficiencies having been found that would warrant detention. No explanation has been provided as to why Defendant CONGENTRA waited over three weeks after the first discovery of damaged cargo on board to involve the Russian Port State Control.

13.   As a result of the improper actions of Defendant CONGENTRA and non-parties Eurowegm, and Anteks, the vessel missed the December 31, 2007 cancelling date, a date extended from the original December 23, 2007 cancelling date (ie. date on which the vessel must be delivered into service or the charterer has the option of cancelling the charter) for her next charter to non-party Britannia Bulkers.

14.   Given that the market rate for like vessels was at that time decreasing and the NICHOLAS M could be replaced by Britannia at a cheaper rate, Britannia cancelled the charter.

15.   On or about January 2, 2008, it was determined that the vessel had no problems which justified her detention by the Russian Port State Control authorities, the classification society having previously returned the certificate of class after the hydraulic mechanism was repaired prior to December 31, 2007.

16.   Plaintiff STM had entered into the Britannia charter (a time charter trip for about 45 days at US$40,000/day to South America) with the objective of thereafter securing a cargo from South America to the Far East so as to be in the Far East for her scheduled dry-docking and Class intermediate survey in April 2008. In the Far East, repair costs are roughly a third of what they are in Europe.

17.   Had the Britannia charter been performed, the vessel would have earned US$1,800,000 for Plaintiff STM.

18.   Had the South America to Far East fixture been performed, Plaintiff STM estimates that it would have earned a further US$2,205,000 (52.5 days x US$42,000) plus an additional ballast bonus of US$550,000.

19.   As a result of the delays due to the unwarranted and improper interference of Defendant CONGENTRA and its agents, the vessel lost its employment with Britannia.

20.    The vessel stayed within St. Petersburg waters for as long as possible seeking to gain alternative employment but was eventually forced out into the Gulf of Finland.

21.    Because the vessel is over 20 years of age and is no longer physically present within the port of St. Petersburg, it is not permitted to enter another port in the area to take a cargo due to the Baltic Ice Campaign Regulations.

22.    Plaintiff STM has accordingly directed the vessel to depart the Gulf of Finland with no present employment.

23.    As a result of the breach of charter and/or wrongful interference in its business by Defendant CONGENTRA and the conspiracy between Defendant CONGENTRA and non-parties Euroweg, and Anteks, Plaintiff STM has been damaged as near as best can be presently estimated in the sum of US$4,505,000.

24.    The charter party provides for the application of English law and disputes between the parties to be resolved by arbitration in London, England and STM specifically reserves its right to arbitrate the substantive matters at issue. Arbitration has been commenced as Plaintiff STM has appointed its arbitrator and given notice of the appointment to Defendant CONGENTRA which has, despite obtaining security from STM's P&I Club, not appointed its arbitrator.

25.    This action is brought *inter alia* pursuant to 9 U.S.C. §8 in order to obtain security for Plaintiff STM's claims made or to be made in arbitration in London under English law, as agreed by the parties.

26.    As a regular feature of English law and arbitration, attorneys fees are awarded to the successful litigant, along with costs, disbursements, the cost of the arbitration, and interest, all of which constitutes a part of the Plaintiff's main claim and the amount sued for herein.

27. Plaintiff STM estimates, as nearly as can presently be computed, that the legal expenses and costs of prosecuting its claims in London arbitration will be $200,000. Interest anticipated to be awarded is estimated to be $560,000 (calculated at the rate of 7% per annum compounded quarterly for a period of 2 years, the estimated time for completion of the proceedings in London).

28. In all, the claim for which Plaintiff STM sues in this action, as near as presently may be estimated, totals $5,260,000, no part of which has been paid by Defendant CONGENTRA. Plaintiff STM specifically reserves its right to amend this figure and to seek an increase in the amount of security should such sum appear to be insufficient to fully secure STM.

**Request for Rule B Relief**

29. Upon information and belief, and after investigation, Defendant cannot be "found" within this District for the purpose of Rule B of the Supplemental Rules of Certain Admiralty and Maritime Claims, but Plaintiff believes that Defendant has, or will shortly have, assets within this District comprising, *inter alia*, cash, funds, escrow funds, credits, debts, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire, of, belonging to, due or for the benefit of Defendant CONGENTRA AG (collectively hereinafter, "ASSETS"), including but not limited to ASSETS in its name and/or being transferred for its benefit at, moving through, or being transferred and/or wired to or from banking institutions or such other garnishees who may be served with a copy of the Process of Maritime Attachment and Garnishment issued herein.

30. The total amount sought to be attached pursuant to the above is $5,260,000.

WHEREFORE, Plaintiff SIXTEEN THIRTEEN MARINE S.A. prays:

a. That process in due form of law according to the practice of this Court may issue

against Defendant citing it to appear and answer the foregoing;

b. That if Defendant cannot be found within this District pursuant to Supplemental Rule B that all tangible or intangible property of Defendant up to and including $5,260,000 be restrained and attached, including, but not limited to any cash, funds, escrow funds, credits, debts, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire, of, belonging to, due or being transferred from or for the benefit of Defendant CONGENTRA AG, including but not limited to ASSETS in its name and/or being transferred for its benefit at, through, or within the possession, custody or control of such banking institutions and/or any such other garnishees who may be served with a copy of the Process of Maritime Attachment and Garnishment issued herein;

c. That this Court retain jurisdiction over the matter for any further or supplemental proceedings as may be necessary, including but not limited to the recognition and enforcement of any award entered against the Defendant in the London proceedings; and

d. For such other, further and different relief as this Court may deem just and proper in the premises.

Dated: New York, New York
February 8, 2008

FREEHILL HOGAN & MAHAR, LLP
Attorneys for Plaintiff
SIXTEEN THIRTEEN MARINE S.A.

By: ______________________________
Michael E. Unger (MU 0045)
80 Pine Street
New York, NY 10005
(212) 425-1900

**ATTORNEY VERIFICATION**

State of New York )
) ss.:
County of New York )

MICHAEL E. UNGER, being duly sworn, deposes and says as follows:

1. I am an associate with the law firm of Freehill Hogan & Mahar, LLP, attorneys for Plaintiff in this action, I have read the foregoing Verified Complaint and know the contents thereof, and the same is true to the best of my knowledge, information and belief.

2. The sources of my information and the grounds for my belief are communications, information and documentation provided by our client and/or by solicitors representing our client.

3. The reason this verification is made by an attorney and not by the Plaintiff is because the Plaintiff is a foreign entity, none of whose officers are presently within this Judicial District.

Michael E. Unger

Sworn to before me this
8th day of February 2008

Notary Public

MELISSA COLFORD
Commissioner of Deeds
City of New York-No. 5-1692
Certificate Filed in New York
Commission Expires 4/1/ 08

# AC 3

M/V NICHOLAS M.
9IOW76

ST. PETERSBURG
28/12/2007

NOTIFICATION

DUE TO THE PROBLEM WITH CLOSING OF AFT HATCH COVER OF CARGO HOLD N. 6 AND IMPOSSIBILITY TO REPAIR PRIOR SHIPS DEPARTURE, CERTIFICATE OF CLASSIFICATION NR. LPRO/KTS/20051014115530 HAS BEEN TEMPORARILY WITHDRAWN AS WELL AS CARGO SHIP SAFETY CONSTRUCTION CERTIFICATE NR. LPRO/KTS/20051013182942

EVGENY ZAVYALOV
SURVEYOR TO BUREAU VERITAS

MASTER OF
M/V NICHOLAS M.

# AC 4

| 1. Agents<br>ANTEKS / ST.PETERSBURG | | STANDART STATEMENT OF FACTS (short form) RECOMENDED BY THE BALTIC AND INTERNATIONAL MARITIME CONFERENCE (BIMCO) AND THE FEDERATION OF NATIONAL ASSOCIATION OF SHIP BROKERS AND AGENTS | |
|---|---|---|---|
| 2. Vessel's name<br>m/v " NICHOLAS M. " | | 3. Port of Place<br>ST.PETERSBURG / Berth # 39 and # 23 | |
| 4. Owners/ Disponent Owners<br>SIXTEEN THIRTEEN MARINE S.A. | | 5. Vessel moored<br>01.12.07 1045 | |
| | | 6. Loading commenced | 8. Loading completed |
| 8. Cargo SOYBEANMEAL HIPRO IN BULK | | 9. Discharging commenced<br>03.12.07 0225 | 10. Discharging completed<br>28.12.07 1840 |
| | | 11. | 12. |
| 13. Charter Party dated | | 14. Working/meal hours of the port<br>0800-2000; 2000-0800 working hrs<br>1300-1400; 0100-0200 meal hrs<br>0700-0800; 1900-2000 shift gangs | 15. |
| 16. Bill of Lading quantity<br>30204.00 mtns | 17. Outturn quantity | 18. Cargo documents on board | 19. Vessel sailed |
| 20.Vessel arrived at anchorage<br>01.12.07 0125 | 21. Pilot on board<br>01.12.07 0610 | 22. Draft on arrival (fore and aft)<br>F/8,80 m A/10,38 m | 23.Draft on sailing (fore and aft)<br>F/ m A/ m |
| 24. Notice of readiness tendered<br>01.12.07 0000 | | 25. Vessel arrived from<br>SAN LORENZO | 26. Vessel sailed to |
| 27. Next tide available | 28. Weighed anchor<br>01.12.07 0510 | 29. FIRST ROPE:<br>01.12.07 1000 | |
| 30. Free Pratique given<br>01.12.07 1300 | | 31. | |

DETAILS OF DAILY WORKING

| Date | Day | Hours worked From | Hours worked To | Hours stopped From | Hours stopped To | Quantity Load./dis | Remarks |
|---|---|---|---|---|---|---|---|
| 01/12 | SAT | | | | 0000 | | E.O.S.P./N.O.R.T./Vessel arrived at pilot station |
| | | | | 0000 | 0125 | | Vessel anchored at p/st area |
| | | | | 0125 | 0510 | | Awaiting pilotage due to one way traffic at sea canal* |
| | | | | 0510 | 0610 | | Weighed anchor, vessel proceeds to the pilot |
| | | | | 0610 | 1000 | | P.O.B./ Pilotage into the port |
| | | | | 1000 | 1045 | | Mooring operations/two tugboats used |
| | | | | 1045 | 1100 | | Preparation of gangway |
| | | | | 1100 | 1145 | | Awaiting inward clearance due to lack of customs, immigrations officers |
| | | | | 1145 | 1200 | | Inward clearance by customs, immigrations and quarantines officers |
| | | | | 1200 | 2400 | | Awaiting Customs clearance of cargo |
| 02/12 | SUN | | | 0000 | 0920 | | Awaiting Customs clearance of cargo |
| | | | | | 1100 | | Wetting in hold no.4 found. Discharge from hold No.4 prohibited by state authorities due to damaged cargo |
| | | | | 0920 | 2000 | | No discharging due to snow |
| | | | | 2000 | 2130 | | Awaiting discharging due to lack of wagons |
| | | | | 2130 | 2400 | | No discharging due to snow |
| 03/12 | MON | | | 0000 | 0225 | | Awaiting discharging due to lack of wagons |
| | | 0225 | 0305 | | | | Discharging commenced |
| | | | | 0305 | 0355 | | No discharging/stevedores breaktime |
| | | 0355 | 0730 | | | | Discharging |
| | | | | 0730 | 0840 | | No discharging/stevedores breaktime |
| | | 0840 | 1100 | | | | Discharging |
| | | | | 1100 | 1150 | | No discharging/stevedores breaktime |
| | | 1150 | 1305 | | | | Discharging |
| | | | | | | | Awaiting discharging due to lack of wagons |
| | | | | 1305 | 1720 | | Awaiting discharging due to lack of wagons |
| | | | | 1720 | 2400 | | No discharging due to snow |
| 04/12 | TUE | | | 0000 | 0515 | | No discharging due to snow |
| | | 0515 | 0725 | | | | Discharging |
| | | | | 0725 | 1100 | | No discharging due to snow |
| | | 1100 | 1515 | | | | Discharging |
| | | | | 1515 | 1615 | | No discharging/stevedores breaktime |
| | | 1615 | 1820 | | | | Discharging |
| | | | | 1820 | 2020 | | No discharging due to lack of wagons |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | 2020 | 2210 | | | | Discharging |
| | | | | 2210 | 2400 | | No discharging due to lack of wagons |
| 05/12 | WED | | | 0000 | 0100 | | No discharging due to lack of wagons |
| | | 0100 | 0305 | | | | Discharging |
| | | | | 0305 | 0435 | | No discharging/stevedores breaktime |
| | | 0435 | 0630 | | | | Discharging |
| | | | | 0630 | 0805 | | No discharging/stevedores breaktime |
| | | | | 0805 | 0830 | | No discharging due to rain |
| | | | | 0830 | 1225 | | No discharging due to lack of wagons |
| | | 1225 | 1520 | | | | Discharging |
| | | | | 1520 | 1630 | | No discharging/stevedores breaktime |
| | | 1630 | 1910 | | | | Discharging |
| | | | | 1910 | 2010 | | No discharging/stevedores breaktime |
| | | 2010 | 2135 | | | | Discharging |
| | | | | 2135 | 2400 | | No discharging due to lack of wagons |
| 06/12 | THU | | | 0000 | 0120 | | No discharging due to lack of wagons |
| | | 0120 | 0300 | | | | Discharging |
| | | | | 0300 | 0415 | | No discharging/stevedores breaktime |
| | | 0415 | 0520 | | | | Discharging |
| | | | | 0520 | 1505 | | No discharging due to lack of wagons |
| | | | | 1505 | 1535 | | No discharging due to rain |
| | | | | 1535 | 2000 | | No discharging due to lack of wagons |
| | | | | 2000 | 2330 | | POB/Shifting fm berth # 39 to berth # 23 / three tugs used |
| | | | | 2330 | 2400 | | No discharging due to lack of wagons |
| 07/12 | FRI | | | 0000 | 1855 | | No discharging due to lack of wagons |
| | | 1855 | 2015 | | | | Discharging |
| | | | | 2015 | 2045 | | No discharging/stevedores breaktime |
| | | 2045 | 2330 | | | | Discharging |
| | | | | 2330 | 2400 | | No discharging/stevedores breaktime |
| 08/12 | SAT | | | 0000 | 0030 | | No discharging/stevedores breaktime |
| | | 0030 | 0400 | | | | Discharging |
| | | | | 0400 | 0630 | | No discharging due to rain |
| | | | | 0630 | 0725 | | No discharging/stevedores breaktime |
| | | | | 0725 | 0745 | | No discharging due to rain |
| | | | | 0745 | 1250 | | No discharging due to lack of wagons |
| | | | | 1250 | 1405 | | No discharging due to rain |
| | | 1405 | 1830 | | | | Discharging |
| | | | | 1830 | 1940 | | No discharging/stevedores breaktime |
| | | | | 1940 | 2030 | | No discharging due to rain |
| | | 2030 | 2400 | | | | Discharging |
| 09/12 | SUN | 0000 | 0010 | | | | Discharging |
| | | | | 0010 | 0315 | | No discharging due to lack of wagons |
| | | 0315 | 0650 | | | | Discharging |
| | | | | 0650 | 0820 | | No discharging/stevedores breaktime |
| | | 0820 | 1155 | | | | Discharging |
| | | | | 1155 | 1400 | | No discharging/stevedores breaktime |
| | | 1400 | 1815 | | | | Discharging |
| | | | | 1815 | 2400 | | No discharging due to lack of wagons |
| 10/12 | MON | | | 0000 | 0430 | | No discharging due to lack of wagons |
| | | 0430 | 0715 | | | | Discharging |
| | | | | 0715 | 0820 | | No discharging/stevedores breaktime |
| | | 0820 | 1225 | | | | Discharging |
| | | | | 1225 | 1415 | | No discharging/stevedores breaktime |
| | | 1415 | 1925 | | | | Discharging |
| | | | | 1925 | 2020 | | No discharging/stevedores breaktime |
| | | 2020 | 2305 | | | | Discharging |
| | | | | 2305 | 2400 | | No discharging due to rain |
| 11/12 | TUE | | | 0000 | 0140 | | No discharging due to rain |
| | | | | 0140 | 0810 | | No discharging due to lack of wagons |
| | | | | 0810 | 2130 | | No discharging due to rain |
| | | | | 2130 | 2400 | | No discharging due to lack of wagons |
| 12/12 | WED | | | 0000 | 2400 | | No discharging due to lack of wagons |
| 13/12 | THU | | | 0000 | 0010 | | No discharging due to lack of wagons |
| | | | | 0010 | 0950 | | No discharging due to snow |
| | | 0950 | 1230 | | | | Discharging |
| | | | | 1230 | 1405 | | No discharging/stevedores breaktime |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | 1405 | 1905 | | | | Discharging |
| | | | | 1905 | 2020 | | No discharging/stevedores breaktime |
| | | 2020 | 2200 | | | | Discharging |
| | | | | 2200 | 2400 | | No discharging/stevedores breaktime |
| 14/12 | FRI | | | 0000 | 0200 | | No discharging/stevedores breaktime |
| | | 0200 | 0650 | | | | Discharging |
| | | | | 0650 | 0920 | | No discharging/stevedores breaktime |
| | | 0920 | 1150 | | | | Discharging |
| | | | | 1150 | 1405 | | No discharging/stevedores breaktime |
| | | 1405 | 1900 | | | | Discharging |
| | | | | 1900 | 2040 | | No discharging/stevedores breaktime |
| | | 2040 | 2140 | | | | Discharging |
| | | | | 2140 | 2400 | | No discharging/stevedores breaktime |
| 15/12 | SAT | | | 0000 | 0215 | | No discharging/stevedores breaktime |
| | | 0215 | 0415 | | | | Discharging |
| | | | | 0415 | 0440 | | No discharging/stevedores breaktime |
| | | 0440 | 0730 | | | | Discharging |
| | | | | 0730 | 0840 | | No discharging/stevedores breaktime |
| | | | | | 1100 | | Trucks arrived to take damaged cargo from hold 4 No discharge from hold 4 because SGS inspector was not allowed by Master to access the hold to take samples and supervise segregation. |
| | | | | | 1147 | | Completed discharging ex hold 1, discharging in progress from hold 6 only |
| | | 0840 | 1245 | | | | Discharging |
| | | | | 1245 | 1405 | | No discharging/stevedores breaktime |
| | | | | | 1525 | | Wetting found in hold 2. Discharging from hold 2 prohibited by state authorities due to damaged cargo |
| | | | | | 1930 | | Trucks left the berth empty as no segregation was possible. No discharging ex holds 2 and 4 due to prohibition of state authorities to discharge cargo from holds with damaged cargo cargo, discharging ex hold 6 only with one gang. |
| | | 1405 | 1845 | | | | Discharging |
| | | | | 1845 | 2030 | | No discharging/stevedores breaktime |
| | | 2030 | 2400 | | | | Discharging |
| 16/12 | SUN | | | | 0000 | | During the whole Sunday no discharging ex holds 2 and 4 due to prohibition of state authorities to discharge cargo from holds with damaged cargo, discharging ex hold 6 only with one gang |
| | | 0000 | 0025 | | | | Discharging (from hold 6 only, 2 and 4 prohibited) |
| | | | | 0025 | 0225 | | No discharging/stevedores breaktime |
| | | 0225 | 0400 | | | | Discharging (from hold 6 only, 2 and 4 prohibited) |
| | | | | 0400 | 0420 | | No discharging/stevedores breaktime |
| | | 0420 | 0700 | | | | Discharging (from hold 6 only, 2 and 4 prohibited) |
| | | | | 0700 | 0840 | | No discharging/stevedores breaktime |
| | | 0840 | 1035 | | | | Discharging (from hold 6 only, 2 and 4 prohibited) |
| | | | | 1035 | 1735 | | No discharging due to lack of wagons |
| | | 1735 | 1915 | | | | Discharging (from hold 6 only, 2 and 4 prohibited) |
| | | | | 1915 | 2020 | | No discharging/stevedores breaktime |
| | | 2020 | 2400 | | | | Discharging (from hold 6 only, 2 and 4 prohibited) |
| 17/12 | MON | | | | 0000 | | During the whole Monday no discharging ex holds 2 and 4 due to prohibition of state authorities to discharge cargo from holds with damaged cargo, discharging ex hold 6 only with one gang |
| | | 0000 | 0025 | | | | Discharging (except h. 2, 4, which are prohibited) |
| | | | | 0025 | 0215 | | No discharging/stevedores breaktime |
| | | 0215 | 0255 | | | | Discharging (except h. 2, 4, which are prohibited) |
| | | | | 0255 | 0600 | | No discharging due to lack of wagons |
| | | 0600 | 0710 | | | | Discharging (except h. 2, 4, which are prohibited) |
| | | | | 0710 | 0900 | | No discharging/stevedores breaktime |
| | | 0900 | 1050 | | | | Discharging (except h. 2, 4, which are prohibited) |
| | | | | 1050 | 1230 | | No discharging/stevedores breaktime |
| | | 1230 | 1515 | | | | Discharging (except h. 2, 4, which are prohibited) |
| | | | | 1515 | 1635 | | No discharging/stevedores breaktime |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | 1635 | 1925 | | | | Discharging (except h. 2, 4, which are prohibited) |
| | | | | 1925 | 2400 | | No discharging due to lack of wagons |
| 18/12 | TUE | | | | 0000 | | During the whole Tuesday no discharging ex holds 2 and 4 due to prohibition of state authorities to discharge cargo from holds with damaged cargo, discharging ex hold 6 only with one gang |
| | | | | 0000 | 0240 | | No discharging due to lack of wagons |
| | | 0240 | 0655 | | | | Discharging (except h. 2, 4, which are prohibited) |
| | | | | 0655 | 0900 | | No discharging/stevedores breaktime |
| | | 0900 | 0955 | | | | Discharging (except h. 2, 4, which are prohibited) |
| | | | | 0955 | 1215 | | No discharging due to lack of wagons |
| | | 1215 | 1240 | | | | Discharging (except h. 2, 4, which are prohibited) |
| | | | | 1240 | 1425 | | No discharging/stevedores breaktime |
| | | 1425 | 1840 | | | | Discharging (except h. 2, 4, which are prohibited) |
| | | | | 1840 | 2225 | | No discharging/stevedores breaktime |
| | | | | | 2000 | | Trucks arrived to take damaged cargo from Hold 2 and 4 |
| | | | | 2020 | 2210 | | No discharging from holds 2 and 4 because SGS inspector was not allowed by Master to access the holds to supervise segregation |
| | | | | | 2210 | | Permission granted by the Master to SGS inspector to access the holds to take samples and supervise segregation |
| | | 2220 | 2310 | | | | Discharging damaged cargo ex hold 2 into trucks |
| | | 2310 | 2400 | | | | Discharging damaged cargo ex hold 4 into trucks |
| 19/12 | WED | 0000 | 0030 | | | | Discharging damaged cargo ex hold 4 into trucks and discharging ex hold 6 |
| | | | | 0030 | 0215 | | No discharging/stevedores breaktime |
| | | 0215 | 0300 | | | | Discharging damaged cargo ex hold 4 into trucks (only utilization allowed) and discharging ex hold 6 |
| | | | | 0300 | 0450 | | No discharging due to lack of wagons |
| | | 0450 | 0613 | | | | Discharging ex hold 6 |
| | | | | | 0613 | | Completed discharging ex hold 6 |
| | | | | 0613 | 2400 | | No discharging ex holds 2 and 4 due to prohibition of state authorities to discharge cargo from holds with damaged cargo, |
| | | 1435 | 1510 | | | | Discharging damaged cargo ex hold 4 |
| | | | | | | | Awaiting trucks for discharging damaged cargo |
| | | 2225 | 2320 | | | | Discharging damaged cargo from hold no.4 |
| | | 2345 | 2350 | | | | Discharging damaged cargo from hold no.2 |
| | | | | | | | No discharging ex holds 2 and 4 due to prohibition of state authorities to discharge cargo from holds with damaged cargo |
| 20/12 | THU | | | 0000 | 0355 | | No discharging due to prohibition of state authorities to discharge cargo from holds with damaged cargo |
| | | 0355 | 0410 | | | | Discharging damaged cargo from hold no.2, only discharging of damaged cargo into trucks allowed |
| | | | | 0410 | 1620 | | No discharging due to prohibition of state authorities to discharge cargo from holds with damaged cargo |
| | | 1620 | 1710 | | | | Discharging damaged cargo from hold no.2, only discharging of damaged cargo into trucks allowed |
| | | | | | 2100 | | Received permission from state grain control for discharging hold no.2 |
| | | | | 2100 | 2400 | | No discharging due to lack of wagons |
| 21/12 | FRI | | | | 0000 | | No discharging ex hold 4 due to prohibition of state authorities to discharge cargo from hold with damaged cargo. Discharging ex hold 2 only with one gang |
| | | | | | | | No discharging due to lack of wagons |
| | | 0215 | 0300 | | | | Discharging damaged cargo from hold no.4, only discharging of damaged cargo into trucks allowed |
| | | | | 0300 | 0320 | | No discharging due to lack of wagons |
| | | 0320 | 0400 | | | | Discharging |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | 0400 | 0830 | | No discharging due to rain |
| | | 0830 | 1040 | | | | Discharging |
| | | | | 1040 | 1220 | | No discharging/stevedores breaktime |
| | | 1220 | 1235 | | | | Discharging damaged cargo from hold no.4, only discharging of damaged cargo into trucks allowed |
| | | | | 1235 | 1420 | | No discharging/stevedores breaktime |
| | | 1420 | 1430 | | | | Discharging damaged cargo from hold no.4, only discharging of damaged cargo into trucks allowed |
| | | | | 1430 | 1555 | | No discharging/stevedores breaktime |
| | | 1555 | 1935 | | | | Discharging |
| | | | | 1935 | 2050 | | No discharging/stevedores breaktime |
| | | 2050 | 2235 | | | | Discharging |
| | | | | 2235 | 2400 | | No discharging due to lack of wagons |
| | | 2305 | 2325 | | | | Discharging damaged cargo from hold no.4, only discharging of damaged cargo into trucks allowed |
| 22/12 | SAT | | | | 0000 | | No discharging ex hold 4 due to prohibition of state authorities to discharge cargo from hold with damaged cargo. Discharging ex hold 2 only with one gang |
| | | | | 0000 | 0345 | | No discharging due to lack of wagons |
| | | 0325 | 0340 | | | | Discharging damaged cargo from hold no.4, only discharging of damaged cargo into trucks allowed |
| | | 0340 | 0415 | | | | Discharging only ex h.no.2 with 1 gang |
| | | 0415 | 0430 | | | | Discharging damaged cargo from hold no.4, only discharging of damaged cargo into trucks allowed |
| | | 0430 | 0650 | | | | Discharging |
| | | | | 0650 | 0815 | | No discharging/stevedores breaktime |
| | | 0815 | 1145 | | | | Discharging |
| | | | | 1145 | 1410 | | No discharging/stevedores breaktime |
| | | 1410 | 1630 | | | | Discharging |
| | | | | | 2300 | | Received permission from state grain control for discharging hold no.4 |
| | | | | 1630 | 2400 | | No discharging due to lack of wagons |
| 23/12 | SUN | | | 0000 | 0500 | | No discharging due to lack of wagons |
| | | 0500 | 0715 | | | | Discharging |
| | | | | 0715 | 0830 | | No discharging/stevedores breaktime |
| | | 0830 | 1530 | | | | Discharging |
| | | | | 1530 | 2400 | | No discharging due to rain |
| 24/12 | MON | | | 0000 | 0330 | | No discharging due to rain |
| | | 0330 | 0705 | | | | Discharging |
| | | | | 0705 | 1510 | | No discharging due to lack of wagons |
| | | | | 1510 | 1700 | | No discharging due to rain |
| | | 1700 | 1910 | | | | Discharging |
| | | | | 1910 | 2010 | | No discharging/stevedores breaktime |
| | | 2010 | 2400 | | | | Discharging |
| 25/12 | TUE | 0000 | 0035 | | | | Discharging |
| | | | | 0035 | 0215 | | No discharging/stevedores breaktime |
| | | 0215 | 0635 | | | | Discharging |
| | | | | 0635 | 1130 | | No discharging due to lack of wagons |
| | | 1130 | 1240 | | | | Discharging |
| | | | | 1240 | 1415 | | No discharging due to snow |
| | | 1415 | 1620 | | | | Discharging |
| | | | | 1620 | 1805 | | No discharging due to snow |
| | | 1805 | 1900 | | | | Discharging |
| | | | | 1900 | 2100 | | No discharging due to snow |
| | | 2100 | 2400 | | | | Discharging |
| 26/12 | WED | 0000 | 0030 | | | | Discharging |
| | | | | 0030 | 0240 | | No discharging/stevedores breaktime |
| | | 0240 | 0625 | | | | Discharging |
| | | | | 0625 | 0940 | | No discharging due to snow |
| | | 0940 | 1225 | | | | Discharging |
| | | | | 1225 | 1415 | | No discharging/stevedores breaktime |
| | | 1415 | 1930 | | | | Discharging |
| | | | | 1930 | 2020 | | No discharging/stevedores breaktime |
| | | 2020 | 2400 | | | | Discharging |
| 27/12 | THU | 0000 | 0020 | | | | Discharging |
| | | | | 0020 | 0215 | | No discharging/stevedores breaktime |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | 0215 | 0450 | | | | Discharging |
| | | | | 0450 | 0550 | | No discharging due to lack of wagons |
| | | 0550 | 0630 | | | | Discharging |
| | | | | 0630 | 0845 | | No discharging/stevedores breaktime |
| | | 0845 | 1240 | | | | Discharging |
| | | | | 1240 | 1415 | | No discharging/stevedores breaktime |
| | | 1415 | 1855 | | | | Discharging |
| | | | | 1855 | 2215 | | No discharging/stevedores breaktime |
| | | 2215 | 2400 | | | | Discharging |
| 28/12 | FRI | | | | | | Cargo Ship Safety Construction certificate and Class Certificate were withdrawn by BV inspector |
| | | 0000 | 0010 | | | | Discharging |
| | | | | 0010 | 0215 | | No discharging/stevedores breaktime |
| | | 0215 | 0735 | | | | Discharging |
| | | | | 0735 | 0850 | | No discharging/stevedores breaktime |
| | | | | 0850 | 1045 | | No discharging due to snow |
| | | 1045 | 1120 | | | | Discharging |
| | | | | 1120 | 1405 | | No discharging due to snow |
| | | 1405 | 1840 | | | | Discharging |
| | | | 1840 | | | | Discharging completed. |
| | | | | | | | Vessel can not sail due to metal hinges hold no.6 torn out from base , hatch cover not closed and without ship's certificates |
| | | | | | 2000 | | SGS surveyor was denied performance of ultra sonic test |
| | | | | | | | ** Signed on behalf of Congentra AG as time-charterers and Euroweg Zerno OOO as cargo receivers without prejudice and under reservation of all their rights |
| | | | | | | | For the avoidance of doubt, Euroweg Zerno OOO and/or Congentra AG disagree with all of the Master's remarks in the Statement of Facts. Accordingly, in signing this Statement of Facts on their behalf, we do so strictly under reservation of all their rights and on a without prejudice basis. |

General Remark *According to sailing rules of Port of St.Petersburg there is One way traffic for liner, passenger and/or for vessels with length more than 155 mtrs

| Place and date<br>*St.Petersburg* | Name and signature (Master) |
|---|---|
| Name and signature (Agents) **<br>*ANTEKS / Alexander Konyukhov* | |

# AC 5

FORM A/1

REPORT OF INSPECTION IN ACCORDANCE WITH THE PARIS MEMORANDUM OF UNDERSTANDING ON PORT STATE CONTROL *)

Federal Maritime Administration
Rozhdestvenka St., 1/1
109012 Moscow, Russian Federation
+7 095 926 1000, +7 095 926 1311
memorand@pma.ru

copy to: - master
- head office
- PSCO

If ship is detained, copy to:
- flag State
- recognised organisation, if applicable

**SHIP PARTICULARS**

1. Name of ship: NICHOLAS M
2. Flag of ship: ST. VINCENT & GRENADINES
3. Type of ship: BULKER
4. Call sign: J8B2680
5. IMO number: 7433452
6. Gross tonnage: 22912
7. Date keel laid / major conversion commenced: 1977
8. Deadweight (where applicable): ...

9a. Classification society(ies) responsible for issuance of class certificates:
BV WITHDRAWN 28.12.07

9b. Classification society(ies) responsible for issuance of certificates on behalf of the flag State:
BV, INSB

10. Full particulars of company (identical to particulars as in the ISM DoC) **):
OCEAN SPIRIT MARITIME ENTERPRISES INC.
126 KOLOKOTRONI STR., 18535 PIRAEUS, GREECE

11. Name & address of charterer: (Only ships carrying liquid or solid cargoes in bulk, pref. 1st charterer record.)

☐ Demise Charter ☒ Time Charter ☐ Voyage Charter ☐ Not applicable
☐ First Charterer ☐ Last Charterer ☐ Not available

CONGENTRA AG
ZUG, SWITZERLAND

12. Name and signature of master to certify that the information under 11 is correct:

Name: AMADO C. APIGADO Signature: [signature]

**INSPECTION PARTICULARS ***)**

13. Date of first boarding: 29.12.07
13b. Date of final report: 11.01.2008
14. Place of inspection: St. Petersburg
15. If vessel is detained - date of issue of detention notice: 29.12.07

16. Type of inspection:
☐ Initial inspection ☒ More detailed inspection ☐ Expanded inspection
☐ Follow-up inspection ☐ Follow-up detention ☐ (C)LC
☐ Operational control

17. Operational controls (if any):
☐ Abandon Ship ☐ Fire drill ☒ Oily Water Sep. tested
☒ Emerg. Fire Pump ☒ Emergency Generator ☒ Emergency Steering
☒ Communication eq. ☒ Damage control ☒ Other: S/S. L.B. ENGINE BLACKOUT

18. Areas inspected:
☒ Navigation Bridge ☒ Cargo hold(s) / tank(s) ☐ Ballast tank(s)
☒ Accommodation / Galley ☒ Steering gear room / Engine room
☒ Decks/ Fo'c'sle ☐ Passenger spaces ☐ Car deck

*) This inspection report has been issued solely for the purpose of informing the master and other port States that an inspection by the port State, mentioned in the heading, has taken place.
This inspection report cannot be construed as a seaworthiness certificate in excess of the certificates the ship is required to carry.
**) Non-ISM ships: Master to supply and sign under 12. for correct full particulars of company
***) Masters, Shipowners and/ or Operators are advised that detailed information on the inspection may be subject to publication (www.parismou.org)

FORM A/2

Name of ship ......NICHOLAS M IMO number ....7433452

19. Relevant certificate(s):

| a) title | b) issuing authority | c) dates of issue and expiry | |
|---|---|---|---|
| 1. Cargo Ship Safety Equipment | BV | 13.05.07 | 12.01.08 |
| 2. Cargo Ship Safety Construction | | | |
| 3. Passenger Ship Safety | | | |
| 4. Cargo Ship Safety Radio | BV | 13.08.07 | 12.01.08 |
| 5. Document of Compliance | INSB | 04.12.02 | 14.10.12 |
| 6. Safety Management Certificate | INSB | 04.05.02 | 03.05.08 |
| 7. Load Line | BV | 13.12.05 | 31.03.10 |
| 8. Prevention of Pollution by Oil | BV | 13.12.05 | 31.03.10 |
| 9. Safe Manning Document | Flag | 19.05.06 | |
| 10. Ship Security | INSB | 04.12.07 | 03.05.08 |
| 11. Tonnage | Flag | 28.02.03 | |
| 12. Class | | | |

d) information on last intermediate or annual survey

| | date of survey | surveying authority | port / country |
|---|---|---|---|
| 1. Cargo Ship Safety Equipment | | | |
| 2. Cargo Ship Safety Construction | | | |
| 3. Passenger Ship Safety | | | |
| 4. Cargo Ship Safety Radio | | | |
| 5. Document of Compliance | | | |
| 6. Safety Management Certificate | | | |
| 7. Load Line | 21.06.07 | BV | RIO GRANDE / BRASIL |
| 8. Prevention of Pollution by Oil | 21.06.07 | BV | RIO GRANDE / BRASIL |
| 9. Safe Manning Document | | | |
| 10. Ship Security | | | |
| 11. Tonnage | | | |
| 12. Class | | | |

20. Ship related inspection action taken:

- [x] Flag State informed
- [x] Class informed
- [ ] Next port informed
- [ ] All deficiencies rectified
- [ ] Inspection suspended
- [x] Overriding priority inspection
- [x] Ship detained
- [ ] Repair port to re-detain
- [ ] Next port to re-detain
- [ ] Ship allowed to sail after detention
- [ ] Ship allowed to sail after re-detention
- [ ] MARPOL investigation
- [ ] Ship banned
- [ ] Ship expelled

21. Deficiencies: [ ] No [x] Yes (see attached FORM B) 5 pages

22. Supporting documentation: [x] No [ ] Yes (see annex)

**PORT STATE PARTICULARS**

District office: St. Petersburg

Address: 10, Gapsalskaya Street, 198035 St. Petersburg, Russia

Telephone: (812) 327 4194

Telefax: (812) 327 4019

E-mail: mousp@mail.pasp.ru

Name (duly authorized PSCO of reporting authority): N. S. TYRAKOV, M. SKELYUBOV

Signature: [signatures] [stamp: Port State Control 208 St. Petersburg]

This report must be retained on board for a period of at least two years and must be readily available for consultation by Port State Control Officers at all times.

*FORM B*

**REPORT OF INSPECTION IN ACCORDANCE WITH THE PARIS MEMORANDUM OF UNDERSTANDING ON PORT STATE CONTROL**

1/5

Federal Maritime Administration
Rozhdestvenka St., 1/1
109012 Moscow, Russian Federation
+7 095 926 1000, +7 095 926 1311
memorand@pma.ru

copy to: - master
- head office
- PSCO

If ship is detained, copy to: - flag State
- recognised organisation, if applicable

1. Name of ship: NICHOLAS M 2. IMO number: 7432452 3. Date of final report: 11.01.08 4. Place of inspection: **St. Petersburg**

**DEFICIENCIES FOUND AND FOLLOW UP ACTIONS ***)**

| Group code | Defective item | Nature of defect | Convention ref. | Action taken | Additional comments | Class resp. |
|---|---|---|---|---|---|---|
| 0111 | CARGO SHIP | WITHDRAWN | | 17/10 | BY RV AS PER NOTIFICATION | ☐ |
| | SAFETY CONSTRUC- | | | | DATED 28.12.07 | ☐ |
| | TION | | | | | ☐ |
| 0199 | CERTIFICATES | WITHDRAWN | | 17/10 | CLASS CERTIFICATE - | ☐ |
| | | | | | WITHDRAWN BY RV | ☐ |
| | | | | | AS PER NOTIFICATION | ☐ |
| | | | | | DATED 28.12.07 | ☐ |
| 2705 | SECURITY | NOT AS | | 17 | NOT ALL VISITORS IDENTIFIED | ☐ |
| | RELATED DEFECTS | REQUIRED | | | | ☐ |
| 0956 | GANGWAY | UNSAFE | | 17/10 | LOWER PLATFORM | ☐ |
| 0230 | MANNING | MISSING | | 17/10 | 2ND OFFICER MISSING | ☐ |
| | SPECIFIED BY | | | | | ☐ |
| | MINIMUM SAFE | | | | | ☐ |
| | MANNING DOC | | | | | ☐ |
| 0660 | LIFEJACKETS | NOT AS REQUIRED | | 17/10 | LIGHTS NOT FIXED PROPERLY | ☐ |

Name (duly authorized PSCO of reporting authority) N. STUPAKOV, M. SKELYUBOV Signature [signature]

[Stamp: Port State Control St. Petersburg]

***) Masters, Shipowners and/or Operators are advised that detailed information on the inspection may be subject to publication (www.parismou.org)
¹) This inspection was not a full survey and deficiencies listed may not be exhaustive. In the event of a detention, it is recommended that a full survey is carried out and all deficiencies are rectified before an application for re-inspection is made.
²) To be completed in the event of a detention (for non-convention ships <500 GT for reference only)
³) See reverse side of form B for full labels.



FORM B

REPORT OF INSPECTION IN ACCORDANCE WITH THE PARIS MEMORANDUM OF UNDERSTANDING ON PORT STATE CONTROL

2/5

Federal Maritime Administration
Rozhdestvenka St., 1/1
109012 Moscow, Russian Federation
+7 095 926 1000, +7 095 926 1311
mstnotrand@pma.ru

copy to: - master
- head office
- PSCO

If ship is detained, copy to: - flag State
- recognised organisation, if applicable

1. Name of ship: NICHOLAS M 2. IMO number: 7433452 3. Date of final report: 11.01.08 4. Place of inspection: St. Petersburg

DEFICIENCIES FOUND AND FOLLOW UP ACTIONS ***)

| Group code | Defective item | Nature of defect | Convention ref. | Action taken [1]) | Additional comments | Class resp.[2]) |
|---|---|---|---|---|---|---|
| 1470 | INSULATION | INSUFFICIENT | | 17/10 | MDO PURIFIER, LO PURIFIER, | ☐ |
| | WETTED THROUGH | | | | ME, AE | ☐ |
| | (OIL) | | | | | ☐ |
| 1420 | CLEANLINESS | INSUFFICIENT | | 17 | | ☐ |
| | OF ER | | | | | ☐ |
| 0520 | LIGHTING | INCOMPLETE | | 17/10 | SOME LIGHTS UNLIT | ☐ |
| 0411 | VENTILATION | DIRTY FILTERS | | 17/10 | AT GALLEY | ☐ |
| 0533 | OBSTRUCTION | UNSAFE | | 17 | SOME UNSECURED SPARE | ☐ |
| 0543 | STEAM PIPES | UNSAFE | | 17 | PARTS IN ER | ☐ |
| | AND PRESSURE | | | | EXHAUST PIPE IN ER | ☐ |
| | PIPES | | | | HOLED | ☐ |
| 0533 | OBSTRUCTION/ | UNSAFE | | 17 | WOODEN GRATINGS IN | ☐ |
| | SLIPPING | | | | PROVISION STORE DAMAGED | ☒ |
| 0915 | SIGNS, INDICATIONS | NOT AS | | 17/10 | PORT/STBD BUTTONS | ☐ |
| | | REQUIRED | | | NOT MARKED IN STEERING GEAR ROOM | ☐ |

Name (duly authorized PSCO of reporting authority) N. STUPAKOV, M. SHELYUGOV Signature [signatures]

***) Masters, Shipowners and/or Operators are advised that detailed information on the inspection may be subject to publication (www.parismou.org)
[1]) This inspection was not a full survey and deficiencies listed may not be exhaustive. In the event of a detention, it is recommended that a full survey is carried out and all deficiencies are rectified before an application for re-inspection is made.
[2]) To be completed in the event of a detention (for non-convention ships <500 GT for reference only).
[3]) See reverse side of form B for full labels.

FORM B

# REPORT OF INSPECTION IN ACCORDANCE WITH THE PARIS MEMORANDUM OF UNDERSTANDING ON PORT STATE CONTROL

3/5

Federal Maritime Administration
Rozhdestvenka St., 1/1
109012 Moscow, Russian Federation
+7 095 926 1000, +7 095 926 1311
memorand@pmta.ru

copy to: - master
- head office
- PSCO

If ship is detained, copy to: - flag State
- recognised organisation, if applicable

1. Name of ship: NICKOLAS M 2. IMO number: 7433952 3. Date of final report: 11.01.08 4. Place of inspection: St. Petersburg

DEFICIENCIES FOUND AND FOLLOW-UP ACTIONS***)

| Group code | Defective item | Nature of defect*) | Convention ref.*) | Action taken*) | Additional comments | Class resp.*) |
|---|---|---|---|---|---|---|
| 0730 | FIRE FIGHTING EQUIPMENT AND APPLIANCES | NOT AS REQUIRED | | 17/10 | FIRE EXTINGUISHER IN ER - NOZZLE MISSING, FIRE BOXES DAMAGED AND HOLED | ☐ |
| 1399 | MOORING | OTHER | | 17/10 | SOME RAT GUARDS MISSING | ☐ |
| 1399 | MOORING | OTHER | | 17/10 | SOME FAIRLEADS FORE AND AFT SEIZED | ☒ |
| 0985 | BULKHEAD - CORROSION | HOLED | S74P88/C1/R1 30/17 S74P88/C1/R1 | | BULKHEAD FROM MAIN DECK TO STORE ROOM P/S HOLED | ☐ |
| 0985 | BULKHEAD - CORROSION | HOLED | S74P88/C1/R1 30/17 | | LEAKAGE FROM BILGE COLLECTING TANK #9 (MAX. CAPACITY 39,8 CUB.M) INTO ER | ☐ |
| 1570 | NAUTICAL PUBLICATION | NOT UP TO DATE | | 17/10 | LAST NM ONBOARD (29.11.07) | ☐ |

Name (duly authorized PSCO of reporting authority) M. STUPAROV, M. SHEVYAKOV Signature [signature]

[Stamp: Port State Control ... St. Petersburg]

***) Masters, Shipowners and/or Operators are advised that detailed information on the inspection may be subject to publication (www.parismou.org).
*) This inspection was not a full survey and deficiencies listed may not be exhaustive. In the event of a detention, it is recommended that a full survey is carried out and all deficiencies are rectified before an application for re-inspection is made.
*) To be completed in the event of a detention (for non-convention ships <500 GT for reference only)
*) See reverse side of form B for full labels.

FORM B

REPORT OF INSPECTION IN ACCORDANCE WITH THE PARIS MEMORANDUM OF UNDERSTANDING ON PORT STATE CONTROL

4/5

Federal Maritime Administration
Rozhdestvenka St., 1/1
109012 Moscow, Russian Federation
+7 095 926 1000, +7 095 926 1311
memorand@pma.ru

copy to: - master
- head office
- PSCO

if ship is detained, copy to: - flag State
- recognised organisation, if applicable

1. Name of ship: NICHOLAS M 2. IMO number: 7433452 3. Date of final report: 11.01.98 4. Place of inspection: St. Petersburg

DEFICIENCIES FOUND

| Group code | Defective item | Nature of defect | Convention ref. | Action taken | Additional comments | Class resp. |
|---|---|---|---|---|---|---|
| 1240 | CARGO HATCHWAYS | DAMAGED | LL66/ANI/R14 | 30/99 | METAL HINGES TORN OUT | ☐ |
| | | | | | FROM BASE (HOLD No. 6) | ☐ |
| | | | | | DUE TO DAMAGE OF | ☐ |
| | | | | | HYDRAULIC SYSTEM | ☐ |
| 1240 | CARGO HATCHWAYS | CORRODED | | 17/17 | HATCHCOVERS, COAMINGS, | ☒ |
| | | | | | COMPRESSION BARS ETC. | ☐ |
| | | | | | OF ALL THE HOLDS | ☐ |
| | | | | | HEAVILY CORRODED AND | ☐ |
| | | | | | SHOULD BE PROPERLY | ☐ |
| | | | | | INSPECTED AND REPAIRED | ☐ |
| | | | | | UNDER CLASS SUPERVISION | ☐ |
| 2545 | REPORTS OF | NOT ACCORDING | → | | FLAG AUTHORITIES, CLASS | ☐ |
| | NON-CONFORMITY, | SMS | S.74/C1/RMC. | 30 | SOCIETY AND PORT AUTHO- | ☐ |
| | ACCIDENTS & | | /SMC/SS.19/18 | | RITIES NOT INFORMED | ☐ |
| | HAZARDOUS OCCUR. | | | | REGARDING ACCIDENTS OCCURED | ☐ |

Name (duly authorized PSCO of reporting authority) M. STUPAKOV, M. SHELYUGOV Signature [signature] [stamp: Port State Control ... St. Petersburg 206]

***) Masters, Shipowners and/or Operators are advised that detailed information on the inspection may be subject to publication (www.parismou.org)
[1]) This inspection was not a full survey and deficiencies listed may not be exhaustive. In the event of a detention, it is recommended that a full survey is carried out and all deficiencies are rectified before an application for re-inspection is made.
[2]) To be completed in the event of a detention (for non-convention ships <500 GT for reference only)
[3]) See reverse side of form B for full labels.

FORM B

# REPORT OF INSPECTION IN ACCORDANCE WITH THE PARIS MEMORANDUM OF UNDERSTANDING ON PORT STATE CONTROL

5/5

Federal Maritime Administration
Rozhdestvenka St., 1/1
109012 Moscow, Russian Federation
+7 095 926 1000, +7 095 926 1311
memorand@pmu.ru

copy to: - master
- head office
- PSCO

If ship is detained, copy to: - flag State
- recognized organisation, if applicable

1. Name of ship: NICHOLAS M 2. IMO number: 7733457 3. Date of final report: 17.01.08 4. Place of inspection: St. Petersburg

DEFICIENCIES FOUND AND FOLLOW UP ACTIONS (***)

| Group code | Defective item | Nature of defect(s) | Convention ref. | Action taken | Additional comments | Class resp. |
|---|---|---|---|---|---|---|
| 0695 | ONBOARD | LACK OF |  | 17/10 | 3RD OFFICER CAN'T | ☐ |
|  | TRAINING AND | TRAINING |  |  | INDICATE TYPE OF | ☐ |
|  | INSTRUCTION |  |  |  | IMMERSION SUIT | ☐ |
| 1623 | MF/HF RADIO | NOT AS |  | 17/10 | NO EVIDENCE OF MF/HF | ☐ |
|  | INSTALLATION | REQUIRED |  |  | DSC EXTERNAL TEST/ | ☐ |
|  |  |  |  |  | WORKING CONDITION | ☒ |
|  |  |  |  |  | CAN'T BE TESTED | ☐ |
| 2010 | MUSTER LIST | INCOMPLETE |  | 17/10 | NO CORRECTION DUE TO | ☐ |
|  |  |  |  |  | 2ND OFFICER ABSENCE | ☐ |
|  |  |  |  |  | FOR MORE THAN 7 DAYS | ☐ |
|  |  |  |  |  | (CREW CHANGE) | ☐ |
| 1550 | LIGHTS, SHAPES, | INOPERATIVE |  | 17/10 | P/S NAVIGATION LIGHT | ☐ |
|  | SOUND SIGNALS |  |  |  | UNIT, STERN SUBSTITUTE | ☐ |
|  |  |  |  |  | LIGHT UNIT | ☐ |
| 2011 | OPERATION OF | LACK OF |  | 17/10 | LONG PERIOD (30 MIN) OF TEST | ☐ |
|  | GMDSS EQUIPMENT | FAMILIARITY |  |  | BY CHIEF OFF. NO RESULT | ☐ |

Name (duly authorized PSCO of reporting authority) M. STUPAKOV, M. SPELYUGOV Signature [signature] [stamp]

***) Masters, Shipowners and/or Operators are advised that detailed information on the inspection may be subject to publication (www.parismou.org)
[1]) This inspection was not a full survey and deficiencies listed may not be exhaustive. In the event of a detention, it is recommended that a full survey is carried out and all deficiencies are rectified before an application for re-inspection is made.
[2]) To be completed in the event of a detention (for non-convention ships <500 GT for reference only).
[3]) See reverse side of form B for full labels.

CALL PSC FOR REINSPECTION BEFORE DEPARTURE

m/v NICHOLAS M.
9IOW76

St. PETERSBURG
28/12/2007

NOTIFICATION

DUE TO THE PROBLEM WITH CLOSING OF AFT. HATCH COVER OF CARGO HOLD N. 6 AND IMPOSSIBILITY TO REPAIR PRIOR SHIPS DEPARTURE, CERTIFICATE OF CLASSIFICATION Nr. LPRO/KTS/20051074155 30 HAS BEEN TEMPORARILY WITHDRAWN AS WELL AS CARGO SHIP SAFETY CONSTRUCTION CERTIFICATE Nr. LPRO/KTS/2005101371 942

EVGENY ZAVYALOV
SURVEYOR TO BUREAU VERITAS

MASTER OF
m/v NICHOLAS M.



St.Petersburg Office

11/01/2008 Nr. LNG0/2007/J0100/hull

m/v NICHOLAS M
BV # 910W76
St.Petersburg, RF

LIST OF RECOMMENDATIONS FURTHER TO DETENTION AND SURVEY - TO BE DEALT WITH AT COMING DRY-DOCK / INTERMEDIATE SURVEY OF HULL, LATEST 31 MARCH 2008.

1. Overall inspection of hatch covers and coamings of all cargo holds has been carried out Temporary repair of hatch covers presently carried out. Damaged foundation in way of hydraulic cylinders PS/SB of cargo hold Nr.6 presently definitely repaired by workshop. Hatch covers of cargo hold Nr.6 tested in operation with satisfactory results. Definitive repair of hatch covers to be performed as per the results of ultrasonic thickness measurements required by BV Rules in force.
2. Leakage of hydraulic cylinders at cargo holds to be eliminated. Leaking hydraulic cylinders to be replaced.
3 Upon completion of definitive repair of hatch covers, a complete tightness test of all hatch covers to be performed in presence of BV surveyor.
4. Bilge water tank Nr.9 presently temporarily repaired by divers (coupler installed on the bottom plating. Cement box installed from the internal side of the tank). Definitive repair to be performed.
5. Bulkhead between main deck and crew dressing room temporarily repaired by insert. Permanent access to the space between main deck and crew dressing room to be provided. Definitive repair of the bulkhead to be performed.
6. Australian ladders in the cargo holds Nr. 2,4,6 to be repaired.

E.Zavyalov
Surveyor to Bureau Veritas

Master of m/v NICHOLAS M

Postal address:
CJSC "Bureau Veritas Rus"
nab. reki Fontanki, d. 130A
190005 St. Petersburg
Russia

Contacts:
Phone: +7 (812) 324 7124
Fax: +7 (812) 324 7125
E-mail: bv@bureauveritas.ru
Http:// www.bureauveritas.ru

**PORT STATE CONTROL**
**NOTICE OF DETENTION FOR THE MASTER**

No.

The undersigned:
Harbour Master of the port of St. Petersburg, duly authorized by the Maritime Administration of the Russian Federation, herewith notifies you that:

the ship: NICHOLAS M
call sign: J8B2630
IMO number: 7433452
gross tonnage: 22912
port of registry: KINGSTOWN
flag state: St. Vincent & Grenadines
type of ship: BULK CARRIER
date on which keel was laid: 1977
owner: CHIAN SPIRIT MARITIME ENTERPRISES INC.
master: AMADO C. APILADO
agents: "ANTEKS"
classification society: BV (WITHDRAWN)
berthed at: BERTH NR. 23

has been detained in accordance with the provisions of Section 3 of Paris Memorandum of Understanding on Port State Control and Article 80 of the Merchant Shipping Code of the Russian Federation,

on account of:

- [x] one or more of the criteria for detention set out in Section 9 of Paris Memorandum on Port State Control;
- [ ] crew members being unable to provide proof of professional proficiency for the duties assigned to them as specified in the Annex to the International Convention on Standards of Training, Certification and Watchkeeping for Seafarers, 1978/95, as amended;
- [ ] master or crew unable to comply with operational requirements as contained in the Conventions mentioned in Section 2 of Paris Memorandum on Port State Control;
- [ ] other deficiencies which, individually or together, are clearly hazardous to safety, health or environment;
- [ ] the fact that the Port State Control Officer was obstructed in the execution of his duties.

For further details see the Report of Inspection, forms A and B enclosed to this Notice for the Master.

On account of the above it is prohibited to shift the ship to another berth without the prior consent of the Harbour Master, or to proceed to sea without a proper Notice of Release of ship from detention.

Place: Port of St. Petersburg
Date: December 29, 2007;
Time: 15.30 LT

The above mentioned Harbour Master:

HEAD OF ST. PETERSBURG FSC/PSC
Capt. ALEXANDER G. KARPENKO

PORT STATE CONTROL

NOTICE OF RELEASE OF SHIP FROM DETENTION FOR THE MASTER

No.

NICHOLAS M; ST. VINCENT & GR. 7433452 Release of ship from detention
[Ship's name, flag, IMO No.]

The undersigned:

Harbour Master of the port of ST. PETERSBURG duly authorized by the Maritime Administration of the Russian Federation, herewith notifies you that the Maritime Authority of the Russian Federation has carried out a re-inspection of the above ship on 11.01.2008 at the port of ST. PETERSBURG AT 19.10 LT

(Insert comments in free text, if any).

Enclosed please find a copy of the Report of inspection, forms A and B.

Yours faithfully,

[Harbour Master's name and signature]

HEAD OF ST. PETERSBURG PSC/FSC
Capt. ALEXANDER G. KARPENKO

# EXHIBIT 6

# AC 6

**Master NicholasM**

**From:** "Master NicholasM" <Master.NicholasM@telaurus.net>
**To:** "technical dept." <technical@chianspirit.gr>
**Cc:** "operations department" <operations@chianspirit.gr>
**Sent:** Monday, January 07, 2008 8:15 AM
**Subject:** PSC DEFICIENCY 2545

FM: MV NICHOLAS M
TO: C.S.M.E./TECH DEPT.
REF: 025/07-JAN-08

DEAR SIR,

REF TO PSC DEFICIENCY 2545 "REPORT OF NON-CONFORMITY ACCIDENTS & HAZARDOUS OCCUR", KINDLY ARRANGE TO SEND COPY TO SHIP, CORRESPONDENCE WITH FLAG STATE TO OFFICE AS PER ADVISE BY BV SURVEYOR IN ORDER TO CLOSE THIS ITEM. THANK YOU.

BEST REGARDS,
MASTER

**Master NicholasM**

**From:** "Master NicholasM" <Master.NicholasM@telaurus.net>
**To:** "operations department" <operations@chianspirit.gr>
**Cc:** "technical dept." <technical@chianspirit.gr>
**Sent:** Monday, January 07, 2008 8:42 AM
**Subject:** PSC DEFICIENCIES PROGRESS REPORT

FM: MV NICHOLAS M
TO: C.S.M.E./OPER DEPT.
REF: 026/07-JAN-08

DEAR SIR,

PLEASE FIND FOLLOWING DEFICIENCIES RECTIFIED

| GROUP CODE DEFECT | ACTION TAKEN |
|---|---|
| 0111 CGO SHIP SAFETY CONSTRUCTION CERTIFICATE | RCVD 06-JAN-08 |
| 0199 CLASS CERTIFICATE HULL ANNEX TO CLASS | RCVD 06-JAN-08 |
| | STILL WITH BV, TO CORRECT |
| 1420 CLEANLINESS OF E/R | CONTINOUS IN PROGRESS |
| 1570 NAUTICAL PUBLICATIONS | RECTIFIED RCVD NTM 49, 50,51,52/2007 & 01/2008 |
| 1399 MOORING LEADS | IN PROGRESS 3 PEAR MORE TO FREE FORWARD |
| 1240 CARGO HATCHWAYS DAMAGED | IN PROGRESS BY SHORE REPAIR, EXPECT TO COMPLETE PM 08/01/08 |

REMARKS: RE-SWEEPING OF TANK TOP IN CARGO HOLDS IN PROGRESS.

BEST REGARDS,
MASTER

**Master NicholasM**

From: "Operations CHIAN SPIRIT" <operations@chianspirit.gr>
To: <Master.NicholasM@telaurus.net>
Sent: Monday, January 07, 2008 4:54 PM
Subject: M/V NICHOLAS M.- PSC inspection carried out at port of St. Petersburg ** MSG#:<16886>

MSGNO : 16886
DATE : 07-Jan-2008 16:54

To: M/V "Nicholas M'
Attn:Master

As per your message ref 025/07-JAN-08, regarding PSC Deficiency 2454, please find here below confirmation from Flag Administration that Statutory surveys can be postponed until March 2008.

Confirm receipt.

Best Regards,

Cpt. Costas Bourdis
Operations Manager
C.s.m.e.(as agents only)
------------------ Original Message ------------------
Received Inc.MSG.: 87499 Date: Fri 04/Jan/2008 09:25
From: SVG GEN <"SVG Quality And Technical Division" <qualtech@svg-marad.com>>
Subject: FW: M/V NICHOLAS M. ** MSG#:<16687>
TO : <<grc_cpi@gr.bureauveritas.com>>, <<ioannis.rallis@gr.bureauveritas.com>>
CC : <<technical@chianspirit.gr>>

Dear Sirs,

The vessel was detained on 29.12.2007.
Anniversary date of statutory surveys is 31.03.2008 (window dates 31.12.07 - 30.06.08)
Considering that the vessel is scheduled to undergo for Dry-docking and Intermediate Survey at the end of March 2008, this Administration agrees in order to have the carrying out of the statutory surveys at the end of March 2008.

Best regards

Armando Capurro

Quality and Technical Division
Maritime Administration
St Vincent and the Grenadines

-----Original Message-----
From: Technical CHIAN SPIRIT [mailto:technical@chianspirit.gr]
Sent: 03 January 2008 12:39
To: qualtech@svg-marad.com
Cc: grc_cpi@gr.bureauveritas.com; ioannis.rallis@gr.bureauveritas.com

Subject: M/V NICHOLAS M. ** MSG#:<16687>

MSGNO : 16687
DATE  : 03-Jan-2008 13:38

To: Messrs "St. Vincent & The Grenadines"
Attn: Mr. Capurro

Cc: BV Piraeus
Attn: Mr. Rallis

Re: M/V "Nicholas M." - PSC inspection carried out at port of St. Petersburg

Dear Sir,

Further to the PSC inspection at St. Petersburg, please be informed that the
above-mentioned vessel is scheduled to undergo for Dry-docking and
Intermediate Survey on the end of March 2008. Taking into consideration the
facts that St. Petersburg's port is not convenient and the short remaining
period till the next dry-docking and Intermediate survey, you are kindly
requested to postpone the implementation of paragraphs 1 and 2 of SVG's
Circular No. PSC 018 till the end of March 2008.

Best Regards & happy new year,

Argyris Stathopoulos
Technical Manager
C.S.M.E.(as agents only)

126, KOLOKOTRONI STR.
185 35 PIRAEUS, GREECE
TEL: +30 210 4294 777
FAX: +30 210 4599 099
EMAIL: TECHNICAL@CHIANSPIRIT.GR

**Master NicholasM**

From: "Master NicholasM" <Master.NicholasM@telaurus.net>
To: "operations department" <operations@chianspirit.gr>
Sent: Monday, January 07, 2008 6:15 PM
Subject: PSC DEFICIENCIES PROGRESS REPORT

FM: MV NICHOLAS M
TO: C.S.M.E./OPER DEPT.
REF: 029/07-JAN-08

DEAR SIR,

PLEASE FIND FOLLOWING DEFICIENCIES RECTIFIED
GROUP CODE DEFECT ACTION TAKEN
0199 CLASS CERTIFICATE RCVD 06-JAN-08
HULL ANNEX TO CLASS STILL WITH BV, TO CORRECT
1420 CLEANLINESS OF E/R CONTINOUS IN PROGRESS
1399 MOORING FREE THREE FROZEN (3) PEAR LEADS FWD 07-JAN-08
1240 IN PROGRESS BY SHORE REPAIR, EXPECT TO COMPLETE 08/01/08 PM
0543 EXHAUST PIPE IN E/R HOLED HOLE COVERED TODAY UPPER PART NEED TO BE COVERED, ABT 1 DAY JOB AS PER C/E ESTIMATE
0956 GANGWAY UNSAFE INSTALL ADDITIONAL RAILINGS AT LOWER PLATFORM AS PER BV SURVEYOR ADVISE.

REMARKS: FYG EXPERIENCED FRESH WATER PIPE BURSTING THIS AFTERNOON IN THREE DIFFERENT LOCATIONS. TWO (2) AT STBD BATHROOM MAIN DECK CEILING AND ONE (1) AT ELECTRICIAN'S BATHROOM.

RE-SWEEPING OF TANK TOP IN CARGO HOLDS IN PROGRESS.

BEST REGARDS,
MASTER

# AC 7


Matthew Montgomery/MET/BLG_INT1
26/02/2008 13:27

To
cc
bcc
Subject Fw: "NICHOLAS M" - CP dtd 10.10.2007 - at St. Petersburg

Andrew Speake/MET/BLG_INT1
07/02/2008 12:57

To elloyd-lewis@blg.co.uk
cc
Subject Fw: "NICHOLAS M" - CP dtd 10.10.2007 - at St. Petersburg

Looks like a claim is coming....

----- Forwarded by Andrew Speake/MET/BLG_INT1 on 07/02/2008 12:56 -----

"John Krzywkowski" <johnk@k-law.gr>
07/02/2008 12:55

To "Andrew Speake" <aspeake@blg.co.uk>
cc
Subject RE: "NICHOLAS M" - CP dtd 10.10.2007 - at St. Petersburg

Dear Sirs,

I write to notify your clients, Congentra AG of Zug, Switzerland, that Mr. Alec Kazantzis has today accepted an appointment by my clients, Sixteen Thirteen Marine S.A. of Monrovia, Liberia ("Owners"), to act as an arbitrator pursuant to clause 37 of the charter.

Mr. Kazantzis details are as follows:

14 Kildare Terrace

London W2 5LX

Tel: + 44 20 7221 0955

Fax: + 44 20 7221 0912

Mr Kazantzis has been appointed to resolve all disputes arising out of the captioned charter including, but not limited to, claims by Owners for breach of the said charter and/or claims for damages in tort arising from a factual matrix in which Congentra unjustifiably, and with malicious intent, either directly or indirectly delayed the vessel during her discharge operations at St. Petersburg (for the purposes of falsely justifying certain cargo claims which Owners consider to relate to pre-shipment damage) - such that the vessel missed her

cancelling date for her next fixture out of that port.

Congentra are required to notify Owners of the appointment of their arbitrator within 14 days.

+++++

Best regards,

John Krzywkowski

---

**Information in this e-mail (and any attachment) is confidential and may be legally privileged. It is intended solely for the attention of the addressee(s). If you have received it in error, please notify us by return e-mail and then immediately delete this message from your system. Please do not copy it or use it for any purpose, or disclose its contents to any other person: to do so could be a breach of confidence.**

**Law Office of John Krzywkowski**

**18 Leosthenous Street & Filellinon, Piraeus 185 36, Athens, Greece.**

**Tel: (+30) 210 452 1200 Fax: (+30) 210 452 1210**

---

# AC 8

**LAW OFFICE OF JOHN KRZYWKOWSKI**
2nd Floor • 18 Leosthenous & Filellinon •185 36 Piraeus •Greece

| | | | | |
|---|---|---|---|---|
| Telephone | +30 210 45 21 200 | Date | : | 14th February 2008 |
| Fax | +30 210 45 21 210 | Our Reference | : | JNK/003 |
| E-Mail | johnk@k-law.gr | Total Pages | : | 3 |

**CONFIDENTIALITY** • If you or your organization are not a named addressee of this fax, you must please refrain from reading, copying or disclosing the contents to any other person. Kindly telephone us immediately to enable us to re-send the fax

| | | |
|---|---|---|
| To | : | Mr. A. J. Kazantzis |
| Your Ref. | : | AJK/8/10 |
| Fax No. | : | 00 44 20 7221 0912 |
| To | : | Mr. C. Moss |
| Your Ref. | : | Unknown |
| Fax No. | : | 00 44 20 7233 7035 |
| CC | : | Mr. E. Lloyd-Lewis |
| Organization | : | Messrs. Barlow Lyde & Gilbert |
| Your Ref. | : | 170196-8/RZB/ELL/3.71A |
| Fax No. | : | 00 44 20 7071 9601 |
| From | : | John Krzywkowski |
| RE | : | "NICHOLAS M" – c/p dtd 10.10.2007 - Congentra |

Dear Sirs,

1. I write further to the three page fax from Messrs. Barlow Lyde & Gilbert today.

2. In their first paragraph, BLG are wrong to suggest that my clients' claims are limited to a tortious claim for malicious intent. My clients' claims are founded primarily in contract for late redelivery. The late redelivery was caused by Congentra's refusal to discharge the damaged cargo for a period of 16 days between 2nd December 2007 when the damaged cargo was discovered in No.4 hold and 18th December 2007. During that time, they unreasonably insisted that segregation of the damaged cargo should take place on board rather than ashore. They also delayed matters by insisting on Ultrasound tests concerning the hatches – in relation to which they threatened to obtain an order of the English High Court. However, the threatened order never materialised – perhaps because the Court refused the application on the basis that (a) there was no evidence of seawater damage to the cargo [quite the contrary in fact] and (b) Congentra had a contractual right to such tests at the load port and failed to exercise the right.

3. Congentra, and their sister company Euroweg, the receivers, unreasonably and uncontractually delayed completion of the discharge operations until 28th December 2007 despite giving a "60 day WOG" duration for the voyage. The vessel was delivered on 11th October 2007. The excess time beyond 60 days was a result of Congentra's unreasonable delaying tactics concerning discharge orders.

4. It is relevant to know that damaged cargo (analysed with negligible traces of chlorides) was only found in Hold Nos 2 and 4. The amount of damaged cargo found was 150.12 tons in Hold No.4 and 64.12 tons in Hold No.2. Such relatively small amounts of pre-shipment damaged cargo (found just

under the top surface of the cargo in those two holds) should have been immediately discharged without delay and segregated ashore into available trucks.

5.      Regarding the amount of security that the New York court has considered appropriate, the situation is as follows:

(a) The cancelled Britannia charter was for a duration of 45 days at US$40,000/day, namely a total revenue of US$1,800,000;

(b) The Britannia charter would have positioned the vessel off South America where she could easily and very profitably pick up a cargo for the Far East. The vessel was due to drydock and undergo her intermediate class survey in April 2008. Being in the Far East after a trip from South America would have been very economical to Owners since repairs costs in the Far East are about a third of what they are on the Continent or in North America. This would have meant a saving of in excess of US$1,500,000 on those overall drydock/repair costs;

(c) A charter from South America to the Far East would have produced a revenue of about US$2,205,000 (52.5 days @ US$42,000/day) plus a ballast bonus of US$550,000;

(d) Interest of 7% per annum for two years on the amount of US$4,555,000 would be US$637,700;

(e) Only US$200,000 was sought as security for costs.

6.      The vessel was unable to obtain alternative employment from St. Petersburg and, eventually, orders were given for her to sail from the Gulf of Finland to seek employment elsewhere. If and when such alternative employment surfaces, the security amount will be amended. It should however be noted that:

(a) If the alternative employment does not get the vessel to the Far East in time, factored into the claim will have to be the increased costs of the drydocking and repairs at the alternative location less the revenue earned;

(b) The above figures do not take into account the bunkers that are being currently consumed to bring the vessel to a location where she may obtain alternative employment.

7.      Regarding the second paragraph of BLG's fax of today, security issues are causative of disruption that my clients know only too well from the conduct of Congentra and her sister companies. I note that BLG put forward no proposals whatsoever for the provision of security. There is absolutely nothing unusual in this case from the many situations faced by Owners when they have to provide security. The Claimant is entitled to the usual reasonable period of time to gather evidence, consult with experts and permit his solicitor to liaise with Counsel to have the Claim presented properly and forcefully. I repeat that there are no special grounds for shortening the usual time given to Claimants to serve their Claim Submissions.

8.      Regarding the third paragraph of BLG's fax of today, the fact remains that Congentra consider that they have a claim under the charter on an alleged balance of accounts – and yet it was my clients who commenced arbitration before Congentra. My clients have no reason to delay the process of their claim. What they will not do is permit themselves to be bushwhacked into preparing their Claim Submissions in a hurry and without due and careful process. In response to the allegations that the Port Authority detained the vessel, my clients are entitled to due process of their claim that the Port State Control were "persuaded" to attend on board to detain the vessel as much as three weeks after the damaged cargo was found and Congentra and their local sister companies had exhausted all other methods of hoping to obtain damning evidence about the vessel to support their cargo claims. As to the allegation that Class was withdrawn, which is rejected, the situation was that during operations in Hold No.6 (of no relevance to the damaged cargo found) a hydraulic mechanism for the opening and closing

of the hatch covers was damaged and required repair. Class temporarily withdrew their Safety Construction certificate pending repairs, however the vessel remained in Class throughout. Repairs were completed within a short period of time and the certificate was restored to the vessel.

9. The fourth paragraph of BLG's fax of today is entirely rejected. My clients want to be secured for their claim. The amount sought at this stage is seemingly large because of the very fact that the parties are at a very early stage and the prospects of mitigation are unknown. For the record, it is denied that my clients' recovery is limitable to the revenue under the cancelled Britannia charter.

10. The fifth paragraph of BLG's fax of today is entirely rejected. It is one thing to apply for an attachment on a *prima facie* arguable case. It is quite a separate exercise to finalise the evidence to support full Claim Submissions in a London arbitration.

11. The sixth paragraph of BLG's fax of today is entirely rejected. BLG are just making up law as they go along. My clients have persuaded a New York judge that they are entitled to a Rule B attachment of Congentra's assets. Such procedure does not require the provision of countersecurity. The same applies to arresting vessels under the English Admiralty procedure.

12. In light of my submissions above, I need make no additional comments concerning the final paragraph of the fax from BLG – unless the Tribunal have any specific questions. Again, this situation involves security issues which are normally resolved without troubling the appointed Tribunal. It is regretted that Congentra seek to trouble you rather than to engage, as is normal, in making proper proposals for securing my clients' claims.

Best regards,

John Krzywkowski

# AC 9

I write in connection with your clients' message below to my clients.

As you should be well aware, your clients and Uniapro are beneficially owned/controlled by the same entities. The fact that Uniapro recently chartered the vessel and the faultless condition of the cargo on outturn under that recent charter at St. Petersburg should have led you to question the appropriateness of your clients' allegations that the vessel was in some way responsible for the cargo damage found on outturn at St. Petersburg. Vessels' conditions do not deteriorate so rapidly that your clients should insist on blaming the vessel when the evidence is so clear [all analyses show little (irrelevant) if any salt water in the damaged cargo] that the damage is of a pre-shipment nature. I note that you have failed to respond in any way to Owners' observations that the damage was pre-shipment.

Regarding the remarks which the Master was willing to add to the Statement of Facts, in my nearly thirty years as a shipping lawyer I have seen many such documents where the parties were properly prepared for both sides to include their remarks so that the document would reflect a comprehensive picture of the relevant events albeit not necessarily accepted by both parties. For some unknown reason, your clients were not prepared to follow this customary practice. In fact, it is my understanding that the Master has a clear right [and possibly an obligation] to record his objections to any aspect of the SOF. [I need hardly suggest as an example a tribunal questioning why a master failed to record his opposition to the contents of an SOF on its face.] My clients see this as yet another example of your clients' unnecessarily difficult behaviour and modus operandi - and my clients reserve their rights to claim damages against your clients.

As you have seen fit to support your clients' frankly indefensible attitude to the incorporation of the Master's comments on the SOF, for the record, I set out the comments that the Master was prepared to add to the SOF:

QUOTE:

1. DESPITE THE FACT THAT COMMENCEMENT OF CARGO DISCHARGE FROM HOLDS NR 2 AND 4 WAS DELAYED FOR REASONS BEYOND VESSEL'S AND/OR OWNERS CONTROL AND RESPONSIBILITY, THE DISCHARGING PROGRESS AND THE OVERALL DISCHARGING TIME WERE NOT AFFECTED AS THE VESSEL WAS ALWAYS ABLE TO PROVIDE THE REQUIRED GANGS (ONLY 1 AND DURING SOME VERY LIMITED PERIODS 2 GANGS) FROM OTHER AVAILABLE HOLDS. THEREFORE NO DELAYS FROM VESSEL'S SIDE OCCURED DURING DISCHARGING OPERATIONS.

2. FROM COMMENCEMENT OF DISCHARGE UNTIL COMPLETION OF SAME, DISHARGING OPERATIONS WERE CARRIED OUT WITH 1(ONE) AND DURING SOME VERY FEW LIMITED PERIODS WITH 2(TWO) GANGS.  ALSO THE AVAILABILITY OF WAGONS WAS ALWAYS VERY TIGHT.

3. ON 28TH DEC 2007, LAST MINUTE ULTRASOUND TEST WAS NOT CARRIED OUT FOR THE REASONS EXPLAINED TO CHARTERERS IN WRITING, WELL IN ADVANCE AND PRIOR BOARDING OF THEIR SURVEYOR (SGS). RELEVANT MSG IS AVAILABLE HERE AND DISCLOSABLE ON ANY COMPETENT AUTHORITY'S REQUEST.

4. ON 28TH DEC 2007, AFTER COMPLETION OF DISCHARGE, VESSEL WAS AWAITING PILOT DUE TO BAD WEATHER CONDITIONS (AS PER AGENT MSG, PILOT WAS NOT TO BE EXPECTED BEFORE 29TH NOON SUBJECT TO WEATHER IMPROVEMENT). RELEVANT MSG IS AVAILABLE HERE AND DISCLOSABLE ON ANY COMPETENT AUTHORITY'S REQUEST.

5. THE TOTAL QUANTITY OF CARGO DISCHARGED FROM HOLDS NR 2 AND 4 AS 'DAMAGED' OR 'SUSPECTED AS DAMAGED' WAS 214MTS (TWO HUNDRED AND FOURTEEN) AS PER CARGO UNDERWRITERS' AND ATTENDING PARTIES' CALULATIONS.  AGENTS HAVE CONFIRMED SAME AND RELEVANT MSG IS AVAILABLE HERE AND DISCLOSABLE ON ANY COMPETENT AUTHORITY'S REQUEST.

6. TIME OF AUTHORITIES' PERMISSION TO COMMENCE DISCHARGE FROM HOLDS 2 AND 4 AS PER

AGENTS' MESSAGES. RELEVANT MSGS ARE AVAILABLE HERE AND DISCLOSABLE ON ANY COMPETENT AUTHORITY'S REQUEST.

7. MASTER HAS SIGNED THIS SOF WITHOUT PREJUDICE AND WITH THE RESERVATION OF VESSEL'S AND/OR HER P&I CLUB AND/OR OWNERS' AND/OR THEIR MANAGERS' RIGHTS FOR ALL AND ANY, DIRECT OR INDIRECT, DAMAGE OR LOSS THEY MAY SUFFER FROM CHARTERERS' AND/OR RECEIVERS' AND/OR THEIR PRINCIPALS' AND/OR THEIR AGENTS, ACTS OR OMISSIONS.

8. ALL CARGO DISCHARGED AS PER B/L AND CARGO MANIFEST.

9. AFTER COMPLETION DISCHARGING, HOLDS NOS. 1, 2 , 3, 4, 5, 6, AND 7 INSPECTED AND FOUND NO CARGO REMAINING ONBOARD, ALL HOLDS WELL EMPTIED AND SWEPT.

Name and signature (Agents) CAPT. AMADO C.
APILADO
ANTEKS/Alexander Konyukhov MASTER/M.V. " NICHOLAS M
"
UNQUOTE

For the record, it is denied that Owners or the crew were disruptive and unreasonable. My clients reserve their rights to claim damages in respect of your clients' actions at St. Petersburg.

Finally, my clients made you clearly aware of the circumstances in which Class was temporarily suspended pending repairs to mechanisms relating to No.6 hatchcover - which suddenly suffered problems during discharge operations. Hold No.6 appears to have no connection whatsoever with the locations in which damaged cargo was found, whatever the cause of that damage. Accordingly, your questionable reference to the temporary suspension of Class, or indeed to the more inflammatory suggestion that Class was entirely withdrawn, as having any connection with the factual matrix of the cargo damage for which we are both instructed, is very regrettable, unprofessional and lacking the integrity normally required of marine solicitors to reduce, rather than exascerbate, the difficulties faced by disputing parties in order to resolve them as cost-effectively as is reasonably possible.

Best regards,

John Krzywkowski

-----------------------------------------------------------------------------------------------------------

Information in this e-mail (and any attachment) is confidential and may be legally privileged. It is intended solely for the attention of the addressee(s). If you have
received it in error, please notify us by return e-mail and then immediately delete this message from your system. Please do not copy it or use it for any purpose, or disclose its contents to any other person: to do so could be a breach of confidence.

Law Office of John Krzywkowski
18 Leosthenous Street & Filellinon, Piraeus 185 36, Athens, Greece.
Tel: (+30) 210 452 1200 Fax: (+30) 210 452 1210

-----------------------------------------------------------------------------------------------------------

-----Original Message-----
From: Operations Congentra [mailto:operations@congentra.com]
Sent: Tuesday, January 08, 2008 11:36 AM
To: Billmar Chartering Ltd; victoria.liouta@scb-hellas.com
Cc: Operations Congentra; anne.modock@axa-corporatesolutions.com; chartering@billmar.gr; master.nicholasm@telaurus.net;

operations@chianspirit.gr; johnk@k-law.gr; Andrew Speake; Richard Black; Caroline Brader-Smith; Eurof Lloyd-Lewis
Subject: RE: LgINT Message (REF:08029CD00)

We write further to Owners' message of yesterday received via the broker.

Firstly, we do not understand Owners continuing desire to establish a connection between charterers, cargo receivers and now Uniapro. As Owners' P & I Club has previously been advised this is wholly irrelevant to the issues which have arisen between Owners and Charterers and Owners and Cargo Interests. We would only add on this occasion that Anteks are simply a forwarding agent which is why their name appeared in the original bills issued and they have absolutely no knowledge of the nature of the relationship between ourselves and Cargo Interests and any such statements are wholly speculative. Owners rely upon them at their peril!

Secondly, the Statement of Facts ("SoF") is a document jointly prepared by Owners/Master, Charterers and Receivers. Charterers and Cargo Interests are not obliged to to agree Master's amendments to the SoF and we object to their inclusion on the basis that they distort what we consider to be true position. We deny that our approach in this regard is unprofessional. Indeed, before Owners' make such assertions they should perhaps examine their own conduct during discharge which has clearly been calculated to be disruptive and unreasonable.

We shall be writing to Owners further setting out our position with regard to final accounting. In the meantime, Charterers continue to reserve all their rights.

Yours faithfully

Congentra AG

************************************************************************

Barlow Lyde & Gilbert LLP
Beaufort House, 15 St. Botolph Street, London EC3A 7NJ.

Telephone : +44 (0)20 7247 2277
Fax : +44 (0)20 7643 8500
Web Site : http://www.blg.co.uk
VAT Number: 243202705

CONFIDENTIALITY NOTICE

This e-mail may contain confidential or privileged information.If you have received this e-mail in error, you must not disclose to any other person, nor take copies of, the contents of this e-mail and/or any attachment to it.

We try to ensure that our communications are free of viruses but do not accept responsibility for any loss or damage that viruses may cause. You should take your own steps to ensure that communications are free of viruses.

# AC 10

Print Copy for : KAVVADIA ANNA

---

Received Inc.MSG.: 84937         Date: Thu 20/Dec/2007 18:02
From: CHIAN SPIRIT MARITIM <"Chian Spirit Maritime Enterprises Inc."
<chartering@chianspirit.gr>>
Subject: LgINT Message (REF:071002B00)
Included (3) Attachment Files: <LOI_FORM_A.TIF> <LOI_FORM_B..TIF>
<LOI_FORM_C..TIF>
TO : <operations@chianspirit.gr>


TELiX MSG: 1002B-00 20/12/07 18:00

From: C.S.M.E/ Chartering Dept.
To:   Billmar Chartering

Re:   MV "Nicholas M." - Acc "BRITANNIA BULKERS A/S," cp dd 18th Dec 2007


zack/nicholas

thnks charrs last confirming acceptance of owns last regarding c/p dets as well
as lifting charrs subjects.

therefore here below is the fixture recap clean on all subjects; if charrs have
any correction pls let us become aware of same otherwise we shall consider same
as final for our file / all parties including master and our operations dept
reference.

pls advise where delivery cable will be sent by the master as well as confirm
that detailed voyage instructions will be sent by your side at your first
convenience.

mtime pls be advised that current charrs maintain their etr for 24th dec agw wp
uce so pls consider same as notice on fixing, always given on a back to back
basis.

thanks all parties kind efforts leading to this fixture.

regards,

chartering dept.
c.s.m.e(as agents only)


=== recap of fixture (main terms+cp dets) clean on all subjects ===


--- vsl's full t/c description ---

01) NAME: M.V "NICHOLAS M."

02) EX NAMES INCLUDING DATE LAST NAME CHANGE: "MED UNITY" (2003)
    "LAURA G" (1998) - "FORUM PRODUCT" (1997) - "RAFAELA" (1991).

03) TYPE OF VESSEL: BULK CARRIER

04) ENGINE AND BRIDGE SITUATED: AFT

05) DWAT AND DRAFT SUMMER/WINTER/FRESH/TROPICAL/TROPICAL FRESH:

SUMMER DEADWEIGHT 39,498 METRIC TONS ON 11.169 METRES
WINTER DEADWEIGHT 38,402 METRIC TONS ON 10.937 METRES
TROPICAL DEADWEIGHT 40,608 METRIC TONS ON 11.401 METRES

06) DWAT ON 17/18/19/20/32/32.5/33/33.5 FEET FRESH WATER

| FEET | METRES | FRESHWATER DEADWEIGHT |
|---|---|---|
| 17.0 | 5.18 | 11,462 |
| 18.0 | 5.48 | 12,766 |
| 19.0 | 5.79 | 14,115 |
| 20.0 | 6.10 | 15,468 |
| 32.0 | 9.75 | 31,731 |
| 32.5 | 9.90 | 32,417 |
| 33.0 | 10.06 | 33,151 |
| 33.5 | 10.21 | 33,840 |

07) TPC 48 AT SUMMER DRAFT

08) LOA/LBP/EXTREME BEAM/DEPTH MOULDED: 200.90/191.00/27.20/15.20 METRES.

09) CONSTANTS EXCLUDING FRESHWATER: 250 METRIC TONS

10) FRESHWATER CAPACITY: 305 METRIC TONS

11) IF FITTED WITH EVAPORATOR/DAILY PRODUCTION: 10 METRIC TONS / 24 HOURS

12) NUMBER HOLDS/HATCHES: 7/7

13) HATCH TYPE AND SIZES: STEEL HATCH COVER FOLDING TYPE (MACGRECOR)

NO.1 9.8 X 12.64 METRES
NO.2 17.6 X 12.64 METRES
NO.3 9.6 X 12.64 METRES
NO.4 17.6 X 12.64 METRES
NO.5 9.6 X 12.64 METRES
NO.6 17.6 X 12.64 METRES
NO.7 9.6 X 12.64 METRES

14) HOLDS LENGTHS: NO.1 16.80/ NO.2 26.50/ NO.3 16.80/ NO.4 26.40/ NO.5 16.80/ NO.6 26.40/ NO.7 16.00

15) TANK TOP DIMENSIONS:

NO.1 HOLD 16.60 X 17.00
NO.2 HOLD 26.50 X 19.20
NO.3+5 HOLDS 16.80 X 19.20
NO.4+6 HOLDS 26.40 X 19.20
NO.7 HOLD 16.00 X 18.50
(LENGTH AT CENTRE LINE - BREADTH AT HALF OF LENGTH)

16) MAXIMUM UNIFORM LOADS TANK TOPS/WEATHER DECK/WEATHER DECK HATCHES;

| | | |
|---|---|---|
| NO.1 | HOLD | 18.50 METRIC TONS/SQUARE METRE |
| NO.2-4-6 | HOLDS | 15 METRIC TONS/SQUARE METRE |
| NO.3-5-7 | HOLDS | 23.5 METRIC TONS/SQUARE METRE |
| MAIN DECK | | 3.4 METRIC TONS/SQUARE METRE |
| HATCH COVER | | 1.75 METRIC TONS/SQUARE METRE |

17) CUBIC CAPACITY IN MAIN HOLDS - GRAIN/BALE:
GRAIN 47,199 CUBIC METRES
BALE 43,423 CUBIC METRES

18) CUBIC BREAKDOWN PER HOLD - GRAIN/BALE IN CUBIC METRES:

| | GRAIN | BALE |
|---|---|---|
| NO.1 | 4,946 | 4,550 |
| NO.2 | 8,638 | 7,947 |
| NO.3 | 5,488 | 5,049 |
| NO.4 | 8,689 | 7,994 |
| NO.5 | 5,488 | 5,049 |
| NO.6 | 8,694 | 7,998 |
| NO.7 | 5,256 | 4,836 |

19) ANY PILLARS/CENTRE LINE BULK HARDS/OBSTRUCTIONS IN HOLDS: NO

20) TYPE OF VENTILATION CARGO HOLDS : NATURAL VENTILATION

21) IF BUILT WITH TOP SIDE TANKS : YES

22) IF BUILT WITH HOPPER TANKS : YES

23) TANK TOP SURFACE : FLAT

24) IF SUITABLE FOR GRAB DISCHARGE : YES

25) DISTANCE FROM SHIP'S RAIL TO HATCH COAMING: CLEAR DISTANCE 5.50 METRES

26) DISTANCE WATER LINE/HATCH COAMING FULL BALLAST/LIGHT/FULLY LADEN:

FULL BALLAST = 8.65 METRES
LIGHT BALLAST = 11.45 METRES
FULLY LOADED = 5.70 METRES

27) AIR DRAFT LIGHT/BALLAST/FULLY LADEN: 41.50/ 39.10/ 36.14 METRES

28) DISTANCE KEEL TO TOP OF RADAR MAST: 47.30 METRES

29) CARGO GEAR : GEARLESS

30) CARGO GEAR OUTREACH : N/A

31) CARGO GEAR DISTRIBUTION AND HOLDS SERVING : N/A

32) IF FULLY GRAIN FITTED : YES

33) IF SELFTRIMMER : YES

34) CO2 FITTED : NO

35) GRAB FITTED/TYPE AND CAPACITY/HOW OPERATED : N/A

36) AUSTRALIAN HOLD LADDERS FITTED : YES

37) IF PANAMA CANAL FITTED : YES

38) SPEED AND CONSUMPTION :

ABOUT 12.5 KNOTS ON ABOUT 26 MTS (BALLAST)/ABOUT 12.0 KNOTS ON ABOUT 28 MTS (LADDEN) INTERMEDIATE FUEL OIL 180 CENTISTOKES RME 25 ISO DIS 8217

PLUS

ABOUT 2.5 MTS (AT SEA)/2.0 MTS (AT PORT/WHEN IDLE) MARINE DIESEL OIL DMB ISO 8217.

Speed and consumption warrantees are given in good weather conditions only and no adverse currents.

Within the context of this charterparty,good weather conditions are understood to mean winds up to and including Beaufort force 4 and/or Douglas Sea state 3.

About is understood to mean 0.5knot downwards in the speed and 5pct upwards in the consumption.

For performance evaluation purposes, the overall performance of the vessel is to be reviewed on all laden and ballast passages during the currency of the charterparty. Weather periods in excess to Beaufort 4 and or Douglas Sea state 3, are to be expressly excluded from calculations.

Owners liberty vessel to burn diesel oil when manoeuvring/approaching and leaving ports/navigating in canals/rivers or congested/confined/shallow waters or in cold weather for boiler/heating.

39) NO SUITABLE FOR ALTERNATIVE LOADING IN ACCORDANCE WITH SOLAS CHAPTER XII,REGULATION 14 WITH EFFECT FROM 01st JULT 2006

40) ENGINE TYPE AND BHP/RPM: B&W 13100 BHP/128 RPM

41) NUMBER OF GENERATORS, TYPE AND BHP/RPM:
    - MAN MEP-MAN G6V 23.5/33TL (2 SETS) S/N 6017-6022
    - BAUD W - HOLEBY DIESEL MODEL 5T23LH-2 (1SET) SN 164801
    - 780 BHP EACH / 600 RPM EACH

42) BUNKER CAPACITIES: INTERMEDIATE FUEL OIL: 2,617 METRIC TONS (100%)/MARINE DIESEL OIL: 316 METRIC TONS (100%)

43) YEAR AND MONTH BUILT AND WHERE BUILT: MARCH 12, 1980/ BRASIL

44) FLAG : ST. VINCENT & THE GRENADINES

45) PORT OF REGISTRY                            : KINGSTOWN

46) REGISTERED NUMBER                           : 9152

47) LLOYDS NUMBER                               : N/A

48) IMO NUMBER                                  : 7433452

49) INTERNATIONAL/ SUEZ/ PANAMA GRT/NRT OR GT/NT:

INTERNATIONAL : 22,912 / 12,300
SUEZ          : 21,341 / 19,040
PANAMA        :        / 19,090

50) CLASS SOCIETY: BUREAU VERITAS

51) CLASS RATING:  I 3/3 E BULK CARRIER ESP DEEP SEA

52) LAST DRYDOCK: MAY, 2005

53) LAST SPECIAL SURVEY: MAY, 2005

54) CALL SIGN: J 8 B 2 6 8 0 (J8B2680)

55) TELEX SYSTEM/NUMBER: INMARSAT-C / 437738810-1

56) FASCIMILE NUMBER: 763662742

57) P & I CLUB ENTERED WITH: THE AMERICAN P+I.

DURING THE FORTHCOMING RENEWAL (FEB 2008) OWNS HAVE THE RIGHT TO ENTER WITH ANY OTHER MEMBER WITHIN THE INTERNATIONAL P&I GROUP.

58) H & M VALUE: U.S. $ 7,250,000 (SEVEN MILLION TWO HUNDRED AND FIFTY THOUSAND DOLLARS) PLUS $ 1,750,000 IV (ONE MILLION SEVEN HUNDRED AND FIFTY THOUSAND DOLLARS). INSURERS: LLOYD'S UNDERWRITERS "BRIT SYNDICATE" (AS LEADERS).

OWNS HAVE THE RIGHT TO INCREASE ANY OF THE ABOVE VALUES DURING THIS C/P.

59) REGISTERED OWNERS FULL STYLE AND FULL ADDRESS: SIXTEEN THIRTEEN MARINE S.A., MONROVIA, LIBERIA.

60) MANAGER'S NAME, ADRESS / COMMUNICATION DETAILS/ M.I.C.

CHIAN SPIRIT MARITIME ENTERPRISES INC.

10 ANT. AMPATIELOU,
GR-18536 PIRAEUS,
GREECE.
TELEPHONE: +30 210 429 4777

FASCIMILE: +30 210 459 9099
E-MAIL : operations@chianspirit.gr

All details are given in good faith as "about" wog

--- end of vsl's t/c description ---

---

--- charts' qnaire ---

1. HEADOWNER'S FULL STYLE WITH ADDRESS AND COMMUNICATIONS DETAILS.

SIXTEEN THIRTEEN MARINE S.A. of 80 BROAD STR., MONROVIA, LIBERIA.

For correspondence only c/o their managers...

CHIAN SPIRIT MARITIME ENTERPRISES INC.

10 ANT. AMPATIELOU,
GR-18536 PIRAEUS,

GREECE.
TELEPHONE: +30 210 429 4777
FASCIMILE: +30 210 459 9099
E-MAIL : operations@chianspirit.gr

2. NAME OF PERSON BEHIND OWNING COMPANY IE ACTUAL OWNER...

VARIOUS INTERESTS WHICH WE HAVE NO AUTHORITY TO DISCLOSE

3. MANAGERS NAME/STYLE OR DISPONENT OWNERS

SAME AS GIVEN ABOVE IN ITEM 1.

4. NAME OF VESSELS UNDER SAME MANAGEMENT

- MV CAPTAIN P. EGGLEZOS - 76,559 DWY BLT 2007
- MV PANAMAX PEPPOU    - 61,539 DWT BLT 1983

- MV PANAMAX ANNA - 64,700 DWT BLT 1982
- MV MARIA N.M. - 41,520 DWT BLT 1982
- MV NICHOLAS M. - 40,153 DWT BLT 1980
- MV IRENE E.M. - 38,143 DWT BLT 1980

OWNERS BANK AND BENEFICIARY

...reverting after fully fixed.

5. P AND I CLUB AND ADDRESS/ COMMUNICATIONS DETAILS

THE AMERICAN P&I CLUB c/o SCB (HELLAS) INC.

51 Akti Miaouli-4th floor
Piraeus 185 36, greece
ph. 210-429-4990
fax 210-429-4187
email: claims@scb-hellas.com

6. H + M VALUE AND INSURER

H & M VALUE: U.S. $ 7,250,000 (SEVEN MILLION TWO HUNDRED AND FIFTY THOUSAND DOLLARS) PLUS $ 1,750,000 IV (ONE MILLION SEVEN HUNDRED AND FIFTY THOUSAND DOLLARS).

U/WS' LEADER: "BRIT SYNDICATE" (LLOYD'S UNDERWRITERS).

7. VESSEL'S CLASS

BUREAU VERITAS

8. HAS VESSEL SUFFERED ANY SERIOUS ACCIDENT, BREAKDOWN, STRANDING OR SERIOUS CARGO CLAIMS IN PAST 12 MONTHS ?

NIL

9. HAS VESSEL ANY OUTSTANDING CLASS RECOMMENDATIONS, AND IF SO PLS ADVISE DETAILS

NIL

11. STATUS FOLLOWING CLASS SURVEYS:
A) HULL SPECIAL SURVEY - LAST DONE 25/05/2005 - NEXT DUE 31/03/2010
B) DRYDOCKING SURVEY - LAST DONE 06/04/2005 - NEXT DUE 06/04/2008
C) HULL ANNUAL SURVEY - LAST DONE 19/06/2007 - NEXT DUE 30/06/2008

12. LAST 3 CARGOES AND NAME OF CHARTERER :

- BULK GRAINS ON TCT ACC CONGENTRA FROM UP RIVER TO ST.PETERSBURG
- BULK MOP ON VOYAGE ACC BPC FROM KLAIPEDA TO MACEIO & PORTO ALEGRE
- BULK GRAINS ON TCT ACC UNIAPRO UP RIVER TO ST.PETERSBURG

13. PLS ADVISE IF ANY CLAIMS DURING PAST 12 MONTHS:

NIL

14. OWNS CONFIRM THAT VSL HAVE NOT SUFFERED ANY CASUALTY (GENERAL AVERAGE/COLLISIONS/GROUNDINGS/POLLUTIONS ETC) DURING LAST 36 MONTHS:

IN MAY 2005 VSL RUN AGROUND AT GELIBOLU ANCHORAGE WHILE DROPPING HER ANCHOR AND REFLOATED WITH THE ASSISTANCE OF TUGS AFTER SIGNING T.O.F;

G/A CLAIM ALREADY FULLY SETTLED.

15. PRESENT POSITION, FULL ITINERARY + AGENTS LAST/NXT PORT:

VSL CURRENTLY AT PORT OF ST.PETERSBURG WITH A BALANCE OF ABT 13.000MTS
GRAINS TO BE DISCHARGED AND ETC/S 23RD DEC AS PER CHARRS REDELY NOTICES
AGW WP UCE. OWNS OPINION IS THAT DUE TO LACK OF TRUCKS COMPLETION MAY BE
REALISTICALLY EXPECTED AROUND 26-27TH DEC AGW WP UCE.

Agents...reverting

16. CONTANTS + EST BOD + WLTOHC + TYPE OF HATCH COVERS
OWNERS TO CONFIRM MOULDED DEPTH DOES NOT EXCEED 16M

CONTANTS + EST BOD + WLTOHC + TYPE OF HATCH COVERS ALL AS GIVEN IN VSL'S
ABOVE T/C DESCRIPTION AND BELOW OFFER/MAIN TERMS

OWNS CONFIRM THAT MOULDED DEPTH DOES NOT EXCEED 16M

17. VESSEL TO BE FULLY INSURED AND P+I COVERED INCLUDING WAR
RISKS FOR THE DURATION OF THE CHARTER PARTY

YES

18. OWS CONFIRM TT VSL IS IN POSSESION OF VALID CERTS ACCORDING TO
LATEST SOLAS REGS

YES

19. OWNERS TO SUPPLY DOCUMENT OF COMPLIANCE (CERTIFIED TRUE COPY TO BE
PHOTOCOPIED OK)

ON CHARTS REQUEST PROVIDED VSL FULLY FIXED

20. OWNERS TO CONFIRM OWNERS/VESSEL IS FULLY ISPS COMPLIANT

YES

21. IF SO REQUIRED OWNERS TO FILL IN RECEIVERS QUESTIONAIRE

ON CHARTS REQUEST PROVIDED MAIN TERMS AGREED.

22. OWNER TO SEND VSLS ISM CODE SAFETY MANAGEMENT/DOC/CLASS/ISPS/PNI CERTS

ON CHARTS REQUEST PROVIDED MAIN TERMS AGREED


--- charts' qnaire / end ---


- All negotiations and any subsequent fixture to be kept strictly private
and confidential.

- ON ARRAL AT 1ST LOADPORT, VSL`S HOLDS TB READY FOR PERMITTED CARGO SERVICE,
CLEAN, SWEPT, WASHED DOWN AND DRIED UP SO AS TO RECEIVE CHTRS INTD CGO IN ALL
RESPECTS FREE PREVIOUS CARGO RESIDUES TO THE SATISFACTION OF THE RELEVANT
SURVEYOR. SHOULD THE VSL NOT BE APPROVED BY THE SURVEYOR THEN THE VESSEL TO
BE PLACED OFF-HIRE FM FAILURE OF INSPECTIONS UNTILL VSL IS FULLY ACCEPTED AND
ANY DIRECTLY RELATED EXPENSES THEREOF TB FOR OWS ACCT.

MORE SPECIFICALLY IN CASE OF VESSEL'S FAILURE TO FULLY PASS ABOVE PRELOADING
CARGO HOLDS INSPECTION VSL TO BE PLACED OFF HIRE OR PRO RATA OFF HIRE
(ACCORDING TO THE NUMBER OF HOLDS WHICH WERE NOT READY AND THE LOADING

OPERATIONS WERE ACTUALLY PREVENTED) FROM REJECTION UNTIL THE VSL PASSES THE SAME INSPECTION/TEST AGAIN AND ANY TIME/DIRECT EXPENSES INCURRED HEREBY TO BE FOR OWS ACCOUNT.

HOWEVER NOTWITHSTANDING ANYTHING ELSE CONTAINED HERE, IT IS HEREBY AGREED THAT IN VIEW OF ST.PETERSBURG AS LOADING PORT, TAKING INTO ACCOUNT THAT VSL WILL NOT HAVE SUFFICIENT TIME (INTERVAL BETWEEN DISCHARGE COMLETION/DELIVERY TIME) TO PREPARE CARGO HOLDS AS AGREED ABOVE, OWNERS TO HAVE THE RIGHT TO DELIVER VSL TO CHARTS AT ANCHORAGE WITH UNCLEAN HOLDS, AND OWNERS TO UNDERTAKE TO HAVE THE VSL READY TO THE STANDARDS ABOVE AGREED, MASTER DOING HIS OUTMOST IN ORDER TO MINIMIZE CARGO HOLDS PREPARATION TIME, WITHIN 18HRS. IT IS WELL UNDERSTOOD THAT CARGO HOLDS CLEANING REMAINS MASTER AND/OR OWNERS RESPONSIBILITY AND THAT IN CASE CLEANING OPERATIONS TAKE MORE THAN THE ABOVE ALLOWED 18HRS THEN VSL IS TO BE PLACED OFF HIRE UNTIL MASTER DECLARE THAT VSL'S HOLDS ARE READY FOR INSPECTION, PROVIDED ALWAYS THAT VSL IS REQUIRED TO PROCEED FOR IMMEDIATE LOADING AND HER HOLDS ARE NOT READY YET, IN OTHER WORDS PROVIDED THAT THERE IS ACTUAL DELAY TO THE VSL'S ITINERARY.

- OWS GTEE VSL IS SD SELF-TRIMING BC/BRIDGE N ENG ROOM IS AFT
- OWS GTEE VSLS T/T IS FLAT AND SUITABLE FOR GRAB DISCHARGING
- OWS GTE TT VSLS H.COVERS ARE TB WATERTIGHT ALL THROUGHOUT THIS C/PERIOD N IF ANY H.COVER FOUND DEFECTIVE, SAME TB RECTIFIED AT OWS TIME N EXPNS TO CLASS SURVEYOR SATISFACTION IN WHICH CASE VSL TO BE PLACED PRO RATA OFF-HIRE (ACCORDING TO THE NUMBER OF HATCHES WHICH FOUND DEFECTIVE AND THE LOADING OPERATIONS WERE ACTUALLY PREVENTED)
- OWS GTEE VSL IS P&I COVERED WITH THE "AMERICAN P&I CLUB", CLASSED WITH "B.V" AND SHALL REMAIN SO THROUGHOUT THE WHOLE T/C PERIOD;

OWNERS ALSO WARRANT:

- VESSEL WILL NOT BE SCHEDULED FOR BREAK UP OR SOLD FOR SCRAP DURING THIS CHARTER OR UPON COMPLETION OF THIS CHARTER.
- VESSEL'S CREW AND OFFICERS SHALL BE ITF APPROVED OR ITS EQUIVALENT AS APPLICABLE/REQUIRED BY THE COMPETENT AUTHORITY OF THE VESSEL'S FLAG.
- VESSEL SHALL NOT CHANGE OWNERSHIP AND/OR CLASS WITHOUT CHARTERERS' WRITTEN CONSENT

FOR

1. MV "NICHOLAS M." (EX- MED UNITY) AS DESCRIBED ABOVE
2. Account "BRITANNIA BULKERS A/S" a company under the same group with "BRITANNIA BULK PLC, UK"/C

add... DK-5700 SVENBORG DENMARK

ph.nr........

email........

mic..........

(comments: pls provide charrs full style for cp purposes/our ops dept easy ref)

3. DELIVERY: ON DLOSP ST.PETERSBURG, RUSSIA ATDNSHINC

4. LAY/CANCELLING DATE: 00:00HRS LT 23rd DEC 2007 - 24:00 HRS 31ST DEC 2007

5. ALLOWED TRADING : ONLY 1 STRAIGHT TCT VIA ST. PETERSBURG, RUSSIA TO BRAZIL AND/OR ARGENTINA AND/OR URUGUAY (intn:........) ALWAYS VIA SAFE PORT (S), SAFE BERTH (S),SAFE ANCHORAGE (S) ALWAYS AFLOAT (EXCEPT FOR ECSA ONLY WHEREVER NAABSA APPLICABLE AS PER NYPE) ALWAYS WITHIN INSTITUTE WARRANTY LIMITS (IWL/INL), EXCEPT FOR PETERSBURG ONLY WHICH IS ALLOWED AS LOADING PORT AS AGREED, AND ALWAYS EXCLUDING WAR OR WARLIKE ZONES (CONWARTIME 2004 TO APPLY), IN/OUT GEO ROTATION.

IT IS WELL UNDERSTOOD AND AGREED THAT IN VIEW OF THE VESSEL'S TRADE, BIMCO "ICE CLAUSE" AND "BUNKER FUEL SULPHUR CONTENT 2005" CLAUSES FOR TIME CHARTER PARTIES SHALL APPLY.

DURATION ABT 45 DAYS WOG

6. ALLOWED CARGO: ONLY HARMLESS FERTILIZERS IN BULK (intn:......).

IF MORE THAN ONE GRADES CARGO TO BE NATURALLY SEPARATED BY THE VSL'S HOLDS ONLY.

IT IS UNDERSTOOD THAT CHARTERERS MAY LOAD ANY FERTILIZERS IN BULK, PROVIDED THAT CARGO WILL BE LOADED IN STRICT ACCORDANCE WITH INTERNATIONAL IMO REGULATIONS AND TO BE HARMLESS/NON- IMO DANGEROUS CARGO FOR THE LOADING,STORAGE AND CARRIAGE OF WHICH THE VESSEL IS NOT REQUIRED TO BE CO2 FITTED OR NO APPENDIX B REQUIREMENTS APPLY OR REQUIRED BY CHARTERERS AND/OR SHIPPERS AND/OR CARGO AND/OR VESSELS OR CARGO UNDERWITERS AND/OR ANY OTHER COMPETENT AUTHORITY. PALM KERNEL EXPELLERS,SUNFLOWER SEED EXPELLERS,PELLETS ALWAYS TO BE EXCLUDED.

7. REDELY : ON DLOSP 1SP WITHIN VITORIA - BAHIA BLANCA RANGE, ATDNSHINC

8. HIRE U$D 40,000 DAILY HIRE - DAILY HIRE TO INCLUDE OT/FW/LUBES AND TO BE PAYABLE EVERY 15 DAYS IN ADVANCE

UPON DELY CHARTS TO PAY 15 DAYS HIRE PLUS FULL VALUE OF BUNKERS AS ON BOARD AT THE DATE OF DELIVERY WITH NO DEDUCTIONS OF ESTIMATED BUNKERS VALUE ON REDELIVERY. ANY SUCH DEDUCTION TO BE MADE FROM THE LAST SUBSEQUENT SUFFICIENT HIRE PAYMENT.

CHARTERERS NO TO MAKE ANY DEDUCTION IN RESPECT OF OWNERS EXPENSES AT ANY PORT OF CALL DURING THIS CHARTER PARTY OWNERS SETTLING ALL OWNERS' EXPENSES DIRECTLY WITH AGENTS, HOWEVER CHARTERERS' AGENTS TO ATTEND VESSEL'S MINOR MATTERS SUCH AS CASH TO MASTER, CHANGES OF PART OF CREW ETC WITHOUT CHARGING EXTRA AGENCY FEE. FOR MAJOR SHIP'S HUSBANDRY MATTERS SUCH AS EMERGENY DRYDOCKING OWNERS TO MAKE THEIR OWN ARRANGEMENT WITH AGENTS. OWNERS TO ALWAYS HAVE THE RIGHT TO APPOINT THEIR OWN PROTECTING AGENTS AT BOTH ENDS.

9. BUNKERS ON DELY ABT 300 IFO AND ABT 50 MDO AT U$D 500PMT AND U$D 800 RESPECTIVELY.

BUNKERS ON REDELIVERY ABT SAME QUANTITIES AT SAME PRICES AS ON DELIVERY.

CHARTERERS TO PAY FULL VALUE OF BUNKERS ON DELY AS ON BOARD.

BOTH CHARTERERS AND OWNERS TO HAVE THE PRIVILEGE TO BUNKER THE VESSEL PRIOR TO DELIVERY/REDELIVERY PROVIDED SAME DOES NOT INTERFERE WITH VESSEL'S OPERATIONS OR ITINERARY IN WHICH CASE SAME TO BE SUBJECT TO BOTH PARTIES MUTUAL AGREEMENT WHICH NOT BE UNREASONABLY WITHELD.

CHARTS TO HAVE THE RIGHT TO DEDUCT FROM THE LAST SUFFICIENT HIRE PAYMENT(S)

BUT NOT FROM THE FIRST 30 DAYS THE ESTIMATED VALUE OF BUNKERS ON REDELIVERY

OWNERS ALLOW CHARTERERS TO BUNKER THE VESSEL AT SOUTH AMERICA WITH FUEL ACCORDING TO PETROBRAS SPECIFICATIONS BUT ALWAYS WITH BUNKERS WITHIN THE SPECIFICATIONS OF THE VSL'S ABOVE FULL T/C DESCRIPTION.

10.ON HIRE/OFF HIRE SURVEYS TO BE CARRIED OUT AT CHARTS TIME AND EXPENSES OWNERS APPOINTING MASTER TO ATTEND ON THEIR BEHALF.

11.ANY ADD WAR PREMIUM DURING THIS C/P (IF ANY) TO BE FOR CHRS' ACCT AGAINST FAXED VOUCHERS; MORE SPECIFICALLY CONWARTIME 2004 TO APPLY.

12.ILOCH

CHARTERERS HAVE THE OPTION OF REDELIVERING THE VESSEL WITHOUT CLEANING HOLDS CHARTERERS PAYING U$D 6500 LUMPSUM

13.C/V/E USD 1,250 PER MONTH PRO RATA

14.OWNERS TO ALLOW CHARTERERS TO DISCHARGE CARGOS WITHOUT PRESENTATION OF ORIGINAL BILL(S)/LADING BY PROVIDING WITH LETTER OF INDEMNITY IN ACCORDANCE WITH OWNERS P N I CLUB FORM AND WORDING BEFORE DISCHARGING. LETTER OF INDEMNITY TB SIGNED BY CHARTERERS ONLY.

CHARTERERS, THEIR AGENTS OR THEIR NOMINEES ARE AUTHORISED TO SPLIT BILL(S) OF LADING INTO DELIVERY ORDERS PROVIDED A FULL SET OF ORIGINAL BILL(S) OF LADING ARE AVAILABLE TO OWNERS AND AGAINST CHARTERERS LETTER OF INDEMNITY AS PER OWNERS' P&I CLUB WORDING, PRIOR TO SPLITTING. OWNERS ARE NOT RESPONSIBLE FOR ANY CARGO SHORTAGE CLAIM DUE TO SUCH BILLS OF LADING SPLITTING.

15.BIMCO ISM/ISPS/NON-PAYMENT OF HIRE/ ICE-CLAUSE/EVIDENCE OF PERFORMANCE/FUEL SULPHUR CONTENT/BUNKER QUALITY CONTROL/U.S. SECURITY/U.S.CUSTOMS ADVANCE NOTIFICATION/AMS BIMCO CLAUSES FOR TIME CHARTER PARTIES CLAUSES TO APPLY

16.FOR THE PURPOSE OF COMPUTING HIRE PAYMENTS, THE TIME FOR DELIVERY/REDELIVERY SHALL BE ADJUSTED TO G.M.T

17.ANY OFF HIRE DEDUCTION UNDER THIS CHARTER PARTY DUE TO VSLS INEFFICIENCY ARREST,DETENTION,SEIZURE, MACHINERY BREAKDOWN ETC...BY ANY AUTHORITY AND FOR ANY REASON TO BE MADE ON THE BASIS OF THE ACTUAL TIME LOST DURING THE PERIOD OF THE VESSELS INEFFICIENCY ARREST, DETENTION, SEIZURE,MACHINERY BREAKDOWN ETC... LIMITED TO, BUT NOT EXCEEDING, THE WHOLE PERIOD OF THE SAME.

IT IS HEREBY UNCONDITIONALLY AGREED THAT THIS CLAUSE IS A "NET/ACTUAL TIME LOST CLAUSE"

18.GENERAL AVERAGE IN LONDON ACCORDING TO YORK-ANTWERP RULES 1994 / ENGLISH LAW AS WELL AS LMAA SMALL CLAIMS (UPTO $75,000) PROCEDURE TO APPLY

19.Add. Comm 3.75% due to charrs + 1,25 % due to Lightsip + 1,25 TO Billmar

20.NO WAY BILLS, NO LINER OUT BS/L , HAGUE-VISBY RULES TO BE INCORPORATED IN ANY B/L ISSUED UNDER THIS C/P.

21.ALL TAXES AND DUES AND CHARGES ON THE VSL AND/OR CARGO AND/OR FRT AND/OR HIRE ARISING OUT OF CARGOES CARRIED OR PORTS VISITED OR COUNTRIES TRADED THROUGH UNDER THIS CHARTER TO BE FOR CHTRS ACCT.

22.Neither the Charterers nor their agents shall permitt the issue of any B(s)/L (whether or not signed on behalf of the Owners or on the charterers behalf of any sub-charterers) incorporating the Hamburg Rules or any legislation giving effect to the Hamburg Rules or any other legislation

imposing liabilities in excess of Hague-Visby rules. The Charterers shall indeminify the Owners against any liability, loss or damage which may result from any breach of the forgoing provision of the clause. No liner Bills or Way Bills of Lading and no through transhipment or combined transport Bills of Lading to be issued

23. OTHERWISE SUB CP DETAILS/FUTHER TERMS AS PER PROFORMA C/P OF M/V "FURIA R." ACC "OLDENDORFF CARRIERS GMBH & CO.KG" DD 18TH MAY 2006 STRICTLY AND LOGICALLY AMENDED AS PER MAIN TERMS AGREED AS WELL AS BELOW C/P DETAILS/ALTERATIONS;

IT IS WELL UNDERSTOOD AND AGREED THAT ALL TERMS/CONDITIONS IN ABOVE MAIN TERMS AGREEMENT AS WELL AS BELOW FURTHER C/P DETAILS/ALTERATIONS WILL SUPERSEDE ALL TERMS/CONDITIONS/CLAUSES OF SAME MEANING/WORDING OF PROFORMA C/P AND FORM PART OF IT:

MAIN BODY
---------

DELETE LINES AS FROM 1 TILL 19 : SAME TO BE AMMENDED AS PER MAIN TERMS AGREED BUT LINES 16/17 TO REMAIN AS PRINTED

LINE 43: AFTER 'CHRTS ACCOUNT.' INSERT 'IN CASE OF OPTIONAL PILOTAGE COST OF SAME TO BE PAID BY CHRTS IN THEIR DISCRETION AND AFTER CONSIDERATION OF MASTERS REASONABLE AND SENSIBLE REQUEST WHICH NOT TO BE UNREASONABLE WITHELD'

LINES:45/46/47 : DELETE AS NON APPLICABLE

LINE 57 : DELETE ',AND PROBABLE PORT' AND INSERT

'.LATEST TOGETHER WITH 15 DAYS APPROXIMATE NOTICE OF REDELIVERY CHARTERERS TO ADVISE THE FINAL REDELIVERY PORT'

LINE 95 : DELETE 'GIVEN WRITTEN NOR' INSERT 'DELIVERED'

LINES 145-150: DELETE ALL LINES AS N/A (VSL IS GRLSS) EXCEPT IN LINE 145 WHERE THE SENTENCE 'VESSEL TO WORK...REQUIRED BY CHARTERERS' TO REMAIN

RIDER CLAUSES
-------------

CLAUSE 29 : TO BE TITLED "ALLOWED CARGO" AND TO BE AMENDED AS PER PARA "6" OF MAIN TERMS.

CLAUSE 30 : TO BE TITLED "ALLOWED TRADING" AND TO BE AMENDED AS PER PARA "5" OF MAIN TERMS.

CLAUSE 33 : AMEND PER MAIN TERMS PARA 12, OWISE AS PER C/P EXCEPT 2ND LINE DELETE AS FROM 'INCLUDING, IF PERMITTED"... TILL THE END OF THE CLAUSE

CLAUSE 38 : 3RD LINE DELETE "REMAINS UNDER ARREST OR" OTHERWISE AS PER ABOVE PARA 17 OF MAIN TERMS.

CLAUSE 39 : REPLACE 9TH PARAGRAPH I.E. AS FROM " CHARTERERS HAVE

THE OPTION .... TILL ....OF LINER BILLS OF LADING" WITH " NO
LINER OUT BILLS OF LADING UNDER THIS CHARTER PARTY"

OTHERWISE TO BE ALSO AMENDED SO AS TO INCORPORATE THE PROVISIONS OF
MAIN TERMS ABOVE RELEVANT PARA 14.

CLAUSE 41 : PARA 1 THRU 7 AMENDED AS PER MAIN TERMS (IE QTTIES/PRICES/SPECS
ETC) OWISE TO REMAIN AS PER C/P EXCEPT AFTER 'SUPPLIER' INSERT
'FROM THE VESSEL'S MANIFOLD'

CLAUSE 44 : DELETE AND TO BE AMENDED AS PER ABOVE PARA 8 OF MAIN TERMS.

CLAUSE 49 : 1ST LINE AFTER "SUPERCARGO(ES)" INSERT " UPON REASONABLE REQUEST"

CLAUSE 51 : DELETE AS NON APPLICABLE

CLAUSE 54 : ADD AT THE END "THIS IS A 'NET ACTUAL TIME LOST CLAUSE'
FOR THE TIME THEREBY ACTUAL LOST AND NOT A PERIOD CLAUSE"

CLAUSE 56 : TO BE DELETED AND TO READ AS PER ABOVE PARA 10 OF MAIN TERMS.

CLAUSE 58 : DELETE "COURIER" INSERT "E-MAIL IF REQUIRED"

CLAUSE 59 : DELETE WHOLE AS N/A

CLAUSE 60 : ADD "AND SAME TO BE INCORPORATED TO ANY BILLS OF
LADING ISSUED HEREUNDER"

CLAUSE 62 : DELETE AS FROM "WITHIN 3 BANKING DAYS TILL END OF THE
CLAUSE" INSERT "ON DELIVERY"

CLAUSE 63 : DELETE IN FULL AS N/A.

CLAUSE 71 : AS PER C/P EXCEPT
LINE 1 DELETE 'JAPAN,' INSERT 'RUSSIA"
DELETE 'DENMARK' INSERT 'ARGENTINA OR BRAZIL OR URUGUAY"
ADD AT END 'PROVIDED NO CARGO ONBOARD'

CLAUSE 72 : DELETE WHOLE AS N/A

CLAUSE 76 : DELETE WHOLE AS N/A

- PLS ALSO REPLACE THE ATTACHED TO THE PROFORMA SET OF LOIS (TTL 3) WITH
THE NEW ONE AS ATTACHED HEREWITH.


=== recap of fixture (main terms+cp dets) clean on all subjects / end ===

END

# AC 11

# TIME CHARTERS

FIFTH EDITION BY

MICHAEL WILFORD
*Solicitor*
*Former Partner, Clyde & Co.*

TERENCE COGHLIN
*Former Chairman, Thomas Miller & Co.*

JOHN D. KIMBALL
*New York, Attorney*
*Healy & Baillie, LLP*

LONDON HONG KONG
2003

CHAPTER 8

# State of the Ship on Delivery

"21. . . . Vessel on her delivery to be
22. ready to receive cargo with clean-swept holds and tight, staunch, strong and in every way fitted for the service, having water ballast, winches and
23. donkey boiler with sufficient steam power, or if not equipped with donkey boiler, then other power sufficient to run all the winches at one and the same
24. time (and with full complement of officers, seamen, engineers and firemen for a vessel of her tonnage),"

## eneral

**8.1** If the ship is not in the state required by Lines 21 to 24 of the New York Produce form, a valid notice of readiness cannot be given under Clause 14, the cancelling clause; and upon the expiry of the time allowed in Line 95 the charterers may exercise their option to cancel the charter. The charterers have the same right under Clause 21 of the 2001 revision of the Baltime form if by the end of the agreed day the ship has not been delivered "in every way fitted for ordinary cargo service" as required by Line 25 of Clause 1. This right of the charterers arises irrespective of any fault or breach of contract by the owners. It is discussed in detail in chapter 24.

**8.2** Quite separately from the potential operation of the cancelling clause, other consequences may follow from the failure of the owners to have the ship in the state required for delivery, as where they are in breach of the obligation as to seaworthiness or where the ship does not meet her description in the charter.

**8.3** It may be helpful, therefore, to summarise here the potential consequences of such defects in the state of the ship:

(1) The charterers may become entitled to cancel the charter under the cancelling clause: see above and chapter 24.

(2) Time may not start to count for the purposes of the payment of hire; in the New York Produce form the starting of time under Clause 5 depends upon the giving of a (valid) notice of readiness, see paragraph 8.6, and time will not start to run under the Baltime form until the ship is "in every way fitted for ordinary cargo service" under Line 25 of Clause 1, below.

(3) If the state of the ship is due to a breach of any of the owners' obligations under the charter, the charterers will normally be entitled to damages if they have suffered loss as a result: see *Thomas Nelson* v. *Dundee East Coast Shipping*, 1907 S.C. 927 and *The Democritos* [1975] 1 Lloyd's Rep. 386.

(4) The charterers may decline to accept delivery until the defects have been made good (see paragraphs 3.74 *et seq.*) and if this is not or cannot be done without such delay as will frustrate the object of the contract the charterers may treat the charter as discharged: see paragraphs 3.81 *et seq.*

# AC 12

# The Law Reports

Appeal Cases

Volume 1

---

House of Lords

## OBG Ltd and another *v* Allan and others

## Douglas and others *v* Hello! Ltd and others (No 3)

## Mainstream Properties Ltd *v* Young

[2007] UKHL 21

2006 Nov 13–16, 20, 21–23, 27, 28; 2007 May 2

Lord Nicholls of Birkenhead, Lord Hoffmann, Lord Walker of Gestingthorpe, Baroness Hale of Richmond and Lord Brown of Eaton-under-Heywood

*Confidential information — Breach of confidence — Damages — Celebrity couple granting magazine exclusive rights to publish selected photographs of wedding — Photography forbidden at wedding except by couple's official photographer — Publication by rival magazine of photographs taken surreptitiously — Whether authorised publisher having cause of action against rival publisher for economic torts of unlawful interference with business or conspiracy to injure*

*Tort — Cause of action — Inducing breach of contract — Claimant's employees acting in breach of employment contract by carrying out property development scheme for their own benefit — Scheme financed by defendant after being assured by employees that scheme not in conflict with employees' duties to claimant — Whether defendant liable to claimant for inducing breach of contract*

*Tort — Cause of action — Procuring breach of contract — Invalidly appointed receivers assuming control of company's contracts — Whether wrongful interference with contractual relations — Whether conversion of company's contracts*

In the first appeal, the claimants, a civil engineering company and its associated company, got into dire financial difficulties. The third defendant, an unsecured creditor of the claimants, acting on the advice of its solicitors, the fourth defendant, purported to appoint the first and second defendants as joint administrative receivers of the claimants. The receivers attended at the premises of the first claimant and took control of the business. Steps subsequently taken by them included terminating the contracts of the majority of the claimants' subcontractors and settling claims under the contracts which the first claimant had made. Shortly afterwards the claimants went into liquidation. They subsequently brought proceedings against the defendants claiming that the receivers had been invalidly appointed and that, inter alia, they had suffered loss as a result of the receivers' wrongful interference with their contractual relations and conversion of their contracts. The judge found that

the receivers' appointment had been invalid and that but for their appointment the claimants would, through their liquidators, have obtained a substantially better settlement of their outstanding contracts than the receivers had in fact achieved. The judge awarded the claimants damages for wrongful interference with contractual relations but dismissed the claim for conversion. The Court of Appeal, by a majority, allowed the defendants' appeal, and held that the receivers' actions lacked the intention to procure a breach of contract or the non-performance of a primary obligation of a contract, which was an essential ingredient of the tort of wrongful interference with contractual relations. The Court of Appeal also dismissed the claimants' cross-appeal on the ground that as a matter of law there could be no conversion of a chose in action.

In the second appeal, the first and second claimants were well-known film actors who entered into an agreement with the third claimant, the publisher of an English celebrity magazine, granting it exclusive rights for a period of nine months to publish photographs, approved by them, of their wedding in New York on 18 November 2000. The contract further provided that the first and second claimants retained any rights not expressly granted to the third claimant. The first and second claimants hired an official photographer, and jointly owned copyright in the photographs taken. It was a term of the contract that the first and second claimants would take all reasonable steps to restrict access to the wedding so that no photographs were made available to third party media. Guests were informed that no photographs were to be taken, and tight security measures were put in place. Despite those measures, the wedding reception was infiltrated by a freelance photographer who surreptitiously took photographs. He then sold the exclusive right to publish the unauthorised photographs to the first defendant, the publisher in England of a celebrity magazine in competition with the third claimant. On learning that the first defendant intended to publish unauthorised photographs, the claimants sought an interlocutory injunction restraining publication, which was granted without notice on 20 November 2000 and continued on notice the following day, but lifted by the Court of Appeal on 23 November 2000. The first defendant distributed copies of its issue containing the unauthorised photographs on 23 November for sale on 24 November. The third claimant brought forward its own publication, thereby incurring expenses. The first of its two issues featuring the authorised photographs also went on sale on November 24, with a second issue containing further photographs appearing a week later. The claimants sought damages as a result of the first defendant's unauthorised publication and further defendants were joined. The judge held, inter alia, that the third claimant was entitled to damages from the first defendant for loss of profit from the exploitation of the authorised photographs attributable to the publication of the unauthorised photographs but rejected the third claimant's claim against the first defendant based on the economic torts of deliberate interference with the third claimant's business or conspiracy to injure by lawful or unlawful means. The Court of Appeal allowed the first defendant's appeal and held that the third claimant had no right to commercial confidence enforceable against the first defendant in relation to the details of the wedding or the photographic images portraying them. The Court of Appeal also dismissed the third claimant's cross-appeal and held that the economic tort was not made out since, on the judge's findings, the first defendant had not aimed, directed or targeted its conduct at the third claimant, and therefore it did not have the subjective intention to cause harm to the third claimant.

In the third appeal, the claimant was a property development company which employed the first and second defendants to find suitable properties for development by the claimant. In breach of their contracts with the claimant, the two defendants diverted the purchase of development land to a joint venture consisting of themselves and the sixth defendant, who financed the project. The claimant brought proceedings against the first and second defendants for damages for loss of the

opportunity to develop the site, and against the sixth defendant for damages for inducing a breach of the first and second defendants' contracts of employment with the claimant. The judge upheld the claim against the first and second defendants but dismissed the claim against the sixth defendant on the ground that although the sixth defendant knew of the first and second defendants' duties towards the claimant he had sought and been given assurances by them that there was no conflict of interest with the claimant and therefore he did not intend to procure a breach of the first and second defendants' contracts of employment or otherwise interfere with their performance. The Court of Appeal dismissed the claimant's appeal and held that the tort of interference with contractual rights required a specific subjective intention on the defendant's part to cause harm to the claimant and the sixth defendant had no such intention.

On appeals by the claimants in the first appeal, the third claimant in the second appeal and the claimant in the third appeal—

*Held*, (1) that the unified theory which treated causing loss by unlawful means as an extension of the tort of inducing a breach of contract was confusing and misleading and should be abandoned; and that, accordingly, inducing breach of contract and causing loss by unlawful means were two separate torts, each with its own conditions for liability (post, paras 33, 38, 188–189, 264, 303, 306, 319).

*Lumley v Gye* (1853) 2 E & B 216, *Allen v Flood* [1898] AC 1, HL(E), *Quinn v Leathem* [1901] AC 495, HL(I), *GWK Ltd v Dunlop Rubber Co Ltd* (1926) 42 TLR 376 and *D C Thomson & Co Ltd v Deakin* [1952] Ch 646, CA considered.

(2) That inducing a breach of contract was a tort of accessory liability, and an intention to cause a breach of contract was a necessary and sufficient requirement for liability; that in order to be liable a person had to know that he was inducing a breach of contract and to intend to do so with knowledge of the consequences; that a conscious decision not to inquire into the existence of a fact could be treated as knowledge for the purposes of the tort; that a person who knowingly induced a breach of contract as a means to an end had the necessary intent even if he was not motivated by malice but had acted with the motive of securing an economic advantage for himself; that, however, a breach of contract which was neither an end in itself nor a means to an end but was merely a foreseeable consequence of a person's acts did not give rise to liability; and that there could be no secondary liability without primary liability, and therefore a person could not be liable for inducing a breach of contract unless there had in fact been a breach by the contracting party (post, paras 8, 39–44, 172, 173, 191, 192, 264, 302, 303, 319).

*Emerald Construction Co Ltd v Lowthian* [1966] 1 WLR 691, CA and *Torquay Hotel Co Ltd v Cousins* [1969] 2 Ch 106, CA considered.

*Millar v Bassey* [1994] EMLR 44, CA disapproved.

*Merkur Island Shipping Corpn v Laughton* [1983] 2 AC 570, HL(E) not followed.

(3) That causing loss by unlawful means was a tort of primary liability, and acts against a third party counted as unlawful means only if they were actionable by that third party if he had suffered loss; that (per Lord Hoffmann, Lord Walker of Gestingthorpe, Baroness Hale of Richmond and Lord Brown of Eaton-under-Heywood) unlawful means consisted of acts intended to cause loss to the claimant by interfering with the freedom of a third party in a way which was unlawful as against that third party and which was intended to cause loss to the claimant, but did not include acts which might be unlawful against a third party but which did not affect his freedom to deal with the claimant (post, paras 8, 45–64, 270, 302, 320).

*Allen v Flood* [1898] AC 1, HL(E), *Quinn v Leathem* [1901] AC 495, HL(I), *J T Stratford & Son Ltd v Lindley* [1965] AC 269, HL(E), *Lonrho Ltd v Shell Petroleum Co Ltd (No 2)* [1982] AC 173, HL(E) and *Isaac Oren v Red Box Toy Factory Ltd* [1999] FSR 785 considered.

(4) That in the first appeal, the only possible causes of action which could arise out of the alleged interference with contractual relations were the tort of procuring a breach of contract or the tort of causing loss by unlawful means; that none of the

requirements of either of those torts could be established; that there had been no breach or non-performance of any contract, and therefore there was no wrong to which accessory liability for procuring a breach of contract could attach; that the receivers had acted in good faith and had neither employed unlawful means nor intended to cause any loss to the claimant; and that, accordingly, there was no primary liability for causing loss by unlawful means (post, paras 86, 218, 264, 301–303, 319, 330).

(5) Dismissing the first appeal, (Lord Nicholls of Birkenhead and Baroness Hale of Richmond dissenting) that strict liability for conversion applied only to an interest in chattels and not to choses in action; that it would be too drastic a reshaping of the law to extend the tort of conversion to apply also to choses in action and thereby impose strict liability for pure economic loss on receivers who had been appointed and had acted in good faith for conversion of the claimants' contracts; and that, accordingly, the claim against the receivers failed (post, paras 95–100, 105, 106, 271, 319, 321, 322, 330).

(6) Allowing the second appeal (Lord Nicholls of Birkenhead and Lord Walker of Gestingthorpe dissenting) that although information about the wedding generally was information that anyone was free to communicate, the photographic images of the wedding were not publicly available and were therefore confidential information; that there was no conceptual reason why the obligation of confidence should not be imposed only in respect of the photographs if the third claimants were willing to pay for the right to be the only source of that particular form of information and did not mind that others were free to communicate other information about the wedding; that the photographs of the wedding constituted information of commercial value over which the first and second claimants had sufficient control to enable them to impose an obligation of confidence and there was no public policy reason why the law of confidence should not protect that obligation; that the third claimant, having bought the benefit of the obligation of confidence imposed by the first and second claimants on those present at the wedding, was entitled to protect the right to that benefit against any third party who intentionally destroyed it; that the duty of confidence imposed by the first and second claimants was binding upon the unauthorised photographer, and, by reason of the circumstances in which the first defendant had acquired the photographs, the duty of confidentiality had also been binding upon the first defendant when it had published the photographs to the detriment of the third claimants; that the fact that the third claimant had published its authorised photographs before the defendants had published the unauthorised photographs did not necessarily mean that the photographic images were by then in the public domain so that they could no longer be the subject of confidence; that whether information was in the public domain and whether there was still any point in enforcing the obligation of confidence thereafter depended on the nature of the information and the facts of the case; that the purpose of publishing the photographs had not merely been to convey the information that the first and second claimants had got married, but to convey the visual information of their wedding, and the transaction entered into between the claimants was that each picture would be treated as a separate piece of information which the third claimant would have the exclusive right to publish; that, therefore, publication of the authorised pictures had not put all the pictures in the public domain, and the duty of confidentiality continued in respect of any pictures of the wedding; and that, accordingly, the third claimants were entitled to damages against the first defendant for breach of confidence (post, paras 113–117, 119, 122–124, 127–136, 302, 325–330).

(7) That, in the second appeal (per Lord Hoffmann, Baroness Hale of Richmond and Lord Brown of Eaton-under-Heywood), although the defendants had made the third claimant's contractual rights less profitable than they would otherwise have been, they had done nothing to interfere with the first and second claimants' ability to deal with the third claimant or to perform their contractual obligations to the third claimant; that, however, the Court of Appeal had erred in holding that the defendants

A had no intention to cause loss to the third claimant and had only intended to maintain their own sales; that causing loss to the third claimant was the means whereby the defendants had intended to attain their desired end and the loss was not merely a foreseeable consequence of attaining that end; and that, accordingly, the defendants had the necessary intention to cause loss but they were not liable in tort because they had not interfered by unlawful means with the actions of the first and second claimants (post, paras 129–136, 302, 303, 319, 329).

B (8) Dismissing the third appeal, that, on the judge's unchallenged findings, the sixth defendant had honestly believed that assisting the first and second defendants with the joint venture would not involve them in breaches of their contractual obligations; that the sixth defendant had not been indifferent as to whether there was a breach of contract or not, nor had he made a conscious decision not to inquire in case he discovered a disagreeable truth; and that, accordingly, he had not intended to cause a breach of contract nor had he caused loss by unlawful means (post, C paras 67–69, 199, 200, 202, 203, 301, 318, 330).

Decision of the Court of Appeal in *OBG Ltd v Allan* [2005] EWCA Civ 106; [2005] QB 762; [2005] 2 WLR 1174; [2005] 2 All ER 602 affirmed.

Decision of the Court of Appeal in *Douglas v Hello! Ltd (No 3)* [2005] EWCA Civ 595; [2006] QB 125; [2005] 3 WLR 881; [2005] 4 All ER 128 reversed.

Decision of the Court of Appeal in *Mainstream Properties Ltd v Young* [2005] EWCA Civ 861; [2005] IRLR 964 affirmed.

D The following cases are referred to in the opinions of their Lordships:

*A v B plc* [2002] EWCA Civ 337; [2003] QB 195; [2002] 3 WLR 542; [2002] 2 All ER 545, CA
*Albert (Prince) v Strange* (1849) 2 De G & S 652
*Allen v Flood* [1895] 2 QB 21, CA; [1898] AC 1, HL(E)
*Anns v Merton London Borough Council* [1978] AC 728; [1977] 2 WLR 1024; [1977] 2 All ER 492, HL(E)
E *Argyll (Duchess) v Argyll (Duke)* [1967] Ch 302; [1965] 2 WLR 790; [1965] 1 All ER 611
*Attorney General v Guardian Newspapers Ltd (No 2)* [1990] 1 AC 109; [1988] 3 WLR 776; [1988] 3 All ER 545, HL(E)
*Australian Broadcasting Corpn v Lenah Game Meats Pty Ltd* (2001) 208 CLR 199
*Ayres v French* (1874) 41 Conn 142
*Bakewell Management Ltd v Brandwood* [2004] UKHL 14; [2004] 2 AC 519; [2004] F 2 WLR 955; [2004] 2 All ER 305, HL(E)
*Barretts & Baird (Wholesale) Ltd v Institution of Professional Civil Servants* [1987] IRLR 3
*Bradshaw Construction Ltd v Bank of Nova Scotia* [1993] 1 WWR 596
*British Industrial Plastics Ltd v Ferguson* [1938] 4 All ER 504, CA; [1940] 1 All ER 479, HL(E)
*CBS Songs Ltd v Amstrad Consumer Electronics plc* [1988] AC 1013; [1988] 2 WLR G 1191; [1988] 2 All ER 484, HL(E)
*Campbell v MGN Ltd* [2004] UKHL 22; [2004] 2 AC 457; [2004] 2 WLR 1232; [2004] 2 All ER 995, HL(E)
*Coco v A N Clark (Engineers) Ltd* [1969] RPC 41
*Creation Records Ltd v News Group Newspapers Ltd* [1997] EMLR 444
*D v L* [2003] EWCA Civ 1169; [2004] EMLR 1, CA
*Daily Mirror Newspapers Ltd v Gardner* [1968] 2 QB 762; [1968] 2 WLR 1239; H [1968] 2 All ER 163, CA
*Dimbleby & Sons Ltd v National Union of Journalists* [1984] 1 WLR 67; [1984] 1 All ER 117, CA; [1984] 1 WLR 427; [1984] 1 All ER 751, HL(E)
*Donoghue v Stevenson* [1932] AC 562, HL(Sc)
*Douglas v Hello! Ltd* [2001] QB 967; [2001] 2 WLR 992; [2001] 2 All ER 289, CA
*Ellerman Lines Ltd v Read* [1928] 2 KB 144, CA

*Elvis Presley Trade Marks* [1999] RPC 567, CA A
*Emerald Construction Co Ltd v Lowthian* [1966] 1 WLR 691; [1966] 1 All ER 1013, CA
*Fowler v Hollins* (1872) LR 7 QB 616, CA; sub nom *Hollins v Fowler* (1875) LR 7 HL 757, HL(E)
*Fraser v Evans* [1969] 1 QB 349; [1968] 3 WLR 1172; [1969] 1 All ER 8, CA
*GWK Ltd v Dunlop Rubber Co Ltd* (1926) 42 TLR 376
*Garret v Taylor* (1620) Cro Jac 567 B
*Gilbert v Star Newspaper Co Ltd* (1894) 11 TLR 4
*Greig v Insole* [1978] 1 WLR 302; [1978] 3 All ER 449
*Hargreaves v Bretherton* [1959] 1 QB 45; [1958] 3 WLR 463; [1958] 3 All ER 122
*Hellewell v Chief Constable of Derbyshire* [1995] 1 WLR 804; [1995] 4 All ER 473
*Hill (Edwin) & Partners v First National Finance Corpn plc* [1989] 1 WLR 225; [1988] 3 All ER 801, CA
*Hoath v Connect Internet Services Pty Ltd* [2006] NSWSC 158 C
*Hollywood Silver Fox Farm Ltd v Emmett* [1936] 2 KB 468; [1936] 1 All ER 825
*Hunter v Canary Wharf Ltd* [1997] AC 655; [1997] 2 WLR 684; [1997] 2 All ER 426, HL(E)
*Irvine v Talksport Ltd* [2002] EWHC 367 (Ch); [2002] 1 WLR 2355; [2002] 2 All ER 414
*Kaye v Robertson* [1991] FSR 62, CA
*Kremen v Online Classifieds Inc* (2003) 337 F 3d 1024 D
*Kuwait Airways Corpn v Iraqi Airways Co (Nos 4 and 5)* [2002] UKHL 19; [2002] 2 AC 883; [2002] 2 WLR 1353; [2002] 3 All ER 209; [2002] 1 All ER (Comm) 843, HL(E)
*Lloyds Bank Ltd v Chartered Bank of India, Australia and China* [1929] 1 KB 40, CA
*Lonrho Ltd v Shell Petroleum Co Ltd (No 2)* [1982] AC 173; [1981] 3 WLR 33; [1981] 2 All ER 456, HL(E)
*Lonrho plc v Fayed* [1990] 2 QB 479; [1989] 3 WLR 631; [1989] 2 All ER 65, CA; [1992] 1 AC 448; [1991] 3 WLR 188; [1991] 3 All ER 303, HL(E) E
*Lumley v Gye* (1853) 2 E & B 216
*McKennitt v Ash* [2005] EWHC 3003 (QB); [2006] EMLR 178
*McLachlan v Canadian Imperial Bank of Commerce* (1987) 13 BCLR (2d) 300; (1989) 57 DLR (4th) 687
*Manifest Shipping Co Ltd v Uni-Polaris Insurance Co Ltd* [2001] UKHL 1; [2003] 1 AC 469; [2001] 2 WLR 170; [2001] 1 All ER 743, HL(E) F
*Merkur Island Shipping Corpn v Laughton* [1983] 2 AC 570; [1983] 2 WLR 778; [1983] 2 All ER 189, HL(E)
*Millar v Bassey* [1994] EMLR 44, CA
*Millar v Taylor* (1769) 4 Burr 2303
*Mogul Steamship Co Ltd v McGregor Gow & Co* (1889) 23 QBD 598, CA; [1892] AC 25, HL(E)
*Morison v London County and Westminster Bank Ltd* [1914] 3 KB 356, CA G
*Morris v Kanssen* [1946] AC 459; [1946] 1 All ER 586, HL(E)
*National Phonograph Co Ltd v Edison-Bell Consolidated Phonograph Co Ltd* [1908] 1 Ch 335, CA
*Oren (Isaac) v Red Box Toy Factory Ltd* [1999] FSR 785
*Philip v Pennell* [1907] 2 Ch 577
*Phipps v Boardman* [1967] 2 AC 46; [1966] 3 WLR 1009; [1966] 3 All ER 721, HL(E) H
*Pollard v Photographic Co* (1888) 40 Ch D 345
*Quinn v Leathem* [1901] AC 495, HL(I)
*RCA Corpn v Pollard* [1983] Ch 135; [1982] 3 WLR 1007; [1982] 3 All ER 771, CA
*Rogers v Kelly* (1809) 2 Camp 123
*Rookes v Barnard* [1964] AC 1129; [1964] 2 WLR 269; [1964] 1 All ER 367, HL(E)

A    *Royal Bank of Canada v W Got & Associates Electric Ltd* (1994) 150 AR 93; (1997)
          196 AR 241; [1999] 3 SCR 408
     *Royal British Bank v Turquand* (1856) 6 E & B 327
     *Shelley Films Ltd v Rex Features Ltd* [1994] EMLR 134
     *Smith v Lloyds TSB Group plc* [2001] QB 541; [2000] 3 WLR 1725; [2001] 1 All
          ER 424, CA
     *Smithies v National Association of Operative Plasterers* [1909] 1 KB 310, CA
B    *Solihull Metropolitan Borough v National Union of Teachers* [1985] IRLR 211
     *Sorrell v Smith* [1925] AC 700, HL(E)
     *South Wales Miners' Federation v Glamorgan Coal Co Ltd* [1905] AC 239, HL(E)
     *Stratford (JT) & Son Ltd v Lindley* [1965] AC 269; [1964] 3 WLR 541; [1964] 3 All
          ER 102, HL(E)
     *Tarleton v M'Gawley* (1794) Peake 270
     *Telecom Vanuatu Ltd v Optus Networks Pty Ltd* [2005] NSWSC 951
C    *Theakston v MGN Ltd* [2002] EWHC 137 (QB); [2002] EMLR 398
     *Thomson (DC) & Co Ltd v Deakin* [1952] Ch 646; [1952] 2 All ER 361, CA
     *Thyroff v Nationwide Mutual Insurance Co* (unreported) 21 August 2006, US Court
          of Appeals Second Circuit; (2007) 832 NYS 2d 873
     *Torquay Hotel Co Ltd v Cousins* [1969] 2 Ch 106; [1969] 2 WLR 289; [1969] 1 All
          ER 522, CA
     *Tuttle v Buck* (1909) 119 NW 946
     *Unilever plc v Chefaro Proprietaries Ltd* [1994] FSR 135, CA
D    *Van Camp Chocolates Ltd v Aulsebrooks Ltd* [1984] 1 NZLR 354
     *Victoria Park Racing and Recreation Grounds Co Ltd v Taylor* (1937) 58 CLR 479
     *Wainwright v Home Office* [2003] UKHL 53; [2004] 2 AC 406; [2003] 3 WLR 1137;
          [2003] 4 All ER 969, HL(E)
     *Welsh Development Agency v Export Finance Co Ltd* [1992] BCLC 148, CA

     The following additional cases were cited in argument in *OBG Ltd v Allan*:
E    *Bank of Montreal v Tourangeau* (1980) 118 DLR (3d) 293
     *Belmont Finance Corpn Ltd v Williams Furniture Ltd (No 2)* [1980] 1 All ER 393,
          CA
     *Concord Trust v The Law Debenture Trust Corpn plc* [2005] UKHL 27; [2005]
          1 WLR 1591; [2005] 1 All ER (Comm) 699, HL(E)
     *Corbin, decd, In re Estate of* (1980) 391 So 2d 731
     *Cruikshank (R) Ltd v Chief Constable of Kent County Constabulary* [2002]
F         EWCA Civ 1840; The Times, 27 December 2002, CA
     *Deutsche Morgan Grenfell Group plc v Inland Revenue Comrs* [2006] UKHL 49;
          [2007] 1 AC 558; [2006] 3 WLR 781; [2007] 1 All ER 449, HL(E)
     *Gainers Inc v Pocklington Holdings Inc* (2000) 194 DLR (4th) 109
     *Goldburg, In re (No 2); Ex p Page* [1912] 1 KB 606
     *Granby Marketing Services Ltd v Interlego AG* [1984] RPC 209
     *Gulf Insurance Ltd v Central Bank of Trinidad and Tobago* [2005] UKPC 10;
G         66 WIR 297, PC
     *Lubenham Fidelities and Investments Co Ltd v South Pembrokeshire District
          Council* (1986) 33 BLR 39, CA
     *MCC Proceeds Inc v Lehman Bros International (Europe)* [1998] 4 All ER 675, CA
     *Middlebrook Mushrooms Ltd v Transport and General Workers' Union* [1993]
          ICR 612, CA
     *Payne v Elliott* (1880) 54 Cal 339
H    *Pritchard v Briggs* [1980] Ch 338; [1979] 3 WLR 868; [1980] 1 All ER 294, CA
     *Simms, In re; Ex p Trustee* [1934] Ch 1, CA
     *Smith v Morrison* [1974] 1 WLR 659; [1974] 1 All ER 957
     *Stocznia Gdanska SA v Latvian Shipping Co* [2002] EWCA Civ 889; [2002] 2 Lloyd's
          Rep 436, CA
     *Vaughan, Ex p; In re Riddeough* (1884) 14 QBD 25, DC

The following additional cases were cited in argument in *Douglas v Hello! Ltd*: A

*Acrow (Automation) Ltd v Rex Chainbelt Inc* [1971] 1 WLR 1676; [1971] 3 All ER 1175, CA
*Associated British Ports v Transport and General Workers' Union* [1989] 1 WLR 939; [1989] 3 All ER 822, HL(E)
*Beaudesert Shire Council v Smith* (1966) 120 CLR 145
*Crofter Hand Woven Harris Tweed Co Ltd v Veitch* [1942] AC 435; [1942] 1 All ER 142, HL(Sc) B
*Indata Equipment Supplies Ltd v ACL Ltd* [1998] FSR 248, CA
*Mustad & Son v Dosen* [1964] 1 WLR 109; [1963] 3 All ER 416, HL(E)
*Northern Territory of Australia v Mengel* (1995) 185 CLR 307
*Venables v News Group Newspapers Ltd* [2001] Fam 430; [2001] 2 WLR 1038; [2001] 1 All ER 908

The following additional cases were cited in argument in *Mainstream Properties Ltd v Young*: C

*Lubenham Fidelities & Investments Co Ltd v South Pembrokeshire District Council* (1986) 33 BLR 39, CA
*Twinsectra Ltd v Yardley* [2002] UKHL 12; [2002] 2 AC 164; [2002] 2 WLR 802; [2002] 2 All ER 377, HL(E)
*White v Riley* [1921] 1 Ch 1, CA

D

APPEALS from the Court of Appeal

*OBG Ltd v Allan*

By leave of the House of Lords (Lord Nicholls of Birkenhead, Lord Hope of Craighead and Lord Brown of Eaton-under-Heywood) granted on 28 July 2005, the claimants, OBG Ltd and OBG (Plant and Transport Hire) Ltd, E appealed from a decision of the Court of Appeal (Peter Gibson, Mance and Carnwath LJJ) on 9 February 2005 allowing an appeal by the defendants, Iain John Allan, Michael Francis Stevenson, Raymond International Ltd (formerly Raymond Centriline Ltd) and Penningtons, and dismissing the claimants' cross-appeal from a decision of Judge Maddocks who, sitting as a judge of the Chancery Division in Manchester on 24 February 2004, had F given judgment for the claimants in the sum of £1,854,000 plus interest in their claim against the defendants for wrongful interference with contractual relations, but had dismissed the claim for conversion.

The facts are stated in the speech of Lord Hoffmann.

*Douglas v Hello! Ltd (No 3)*

G

By leave of the House of Lords (Lord Nicholls of Birkenhead, Lord Hope of Craighead and Lord Brown of Eaton-under-Heywood) granted on 28 July 2005, the third claimant, Northern & Shell plc, publishers of "OK!" magazine, appealed from a decision of the Court of Appeal (Lord Phillips of Worth Matravers MR, Clarke and Neuberger LJJ) on 18 May 2005, allowing an appeal by the first defendant, Hello! Ltd, from decisions of H Lindsay J who on 11 April 2003 and 7 November 2003 had held the first defendant liable in damages to the third claimant for breach of confidence, and assessed the damages at £1,026,706 for loss of profit from the exploitation of unauthorised photographs.

The facts are stated in the speech of Lord Hoffmann.

*Mainstream Properties Ltd v Young*

By leave of the House of Lords (Lord Nicholls of Birkenhead, Lord Hope of Craighead and Baroness Hale of Richmond) granted on 9 November 2005, the claimant, Mainstream Properties Ltd, appealed from a decision of the Court of Appeal (Sedley and Arden LJJ and Aikens J) on 13 July 2005 dismissing the claimant's appeal from a decision of Judge Norris QC who, sitting as a judge of the Chancery Division in the Birmingham District Registry on 10 September 2004, had dismissed the claimant's claim against the sixth defendant, Joseph De Winter, for damages for inducing a breach by the first defendant, Paul Colin Young, and the second defendant, Jeffrey William Broad, of their contracts with the claimant.

The facts are stated in the speech of Lord Hoffmann.

*John Randall QC, Alistair Wyvill* and *Marc Brown* for the claimants in *OBG Ltd v Allan*. The claim is for interference by what has been termed prevention rather than procurement. A's interference has taken the form of non-consensual action affecting B, rather than persuading B to act in accordance with A's suggestion. [Reference was made to Simester and Chan: "Inducing Breach of Contract: One Tort or Two?" [2004] CLJ 132 and *GWK Ltd v Dunlop Rubber Co Ltd* (1926) 42 TLR 376.]

Although actionable interference often takes the form of inducing or procuring voluntary action on the part of one of the parties to a contract, it need not necessarily do so. A party who permanently takes full control and benefit of a contract away from a contracting party commits the most serious and extensive interference possible with that party's contractual rights. [Reference was made to *Dimbleby & Sons v Ltd v National Union of Journalists* [1984] 1 WLR 67; *Lumley v Gye* (1853) 2 E & B 216; *Merkur Island Shipping Corpn v Laughton* [1983] 2 AC 570; *Torquay Hotel Co Ltd v Cousins* [1969] 2 Ch 106; *Quinn v Leathem* [1901] AC 495 and *Allen v Flood* [1898] AC 1.]

Since the receivers' appointment was unlawful all their actions were taken without lawful authority and that is a critical element for their liability. The interference was on any view direct, committed with knowledge of the contracts and without justification. The receivers' intention was to discharge their duties as administrative receivers, which necessarily required them to exclude the directors from control over the claimants' valuable assets and then to realise those assets for the benefit of their appointor and, through their fees, themselves. Their taking control of the claimants' contracts was deliberate rather than accidental.

The receivers' honest belief in the lawfulness of their appointment affords them no defence. Provided there is the requisite knowledge of the contract or other source of the protected right that has been interfered with, the intention for the tort has been established. Alternatively, if any greater intention is required, a defendant's intention to bring about the reasonable and probable consequences or the necessary or inevitable consequences of his action will suffice. There is no separate requirement that the acts should be aimed or directed against the claimants. Neither malice nor an intention to injure is required for the *Lumley v Gye* tort. [Reference was made to *Kuwait Airways Corpn v Iraqi Airways Co (Nos 4 and 5)* [2002] 2 AC 883; *South Wales Miners' Federation v Glamorgan Coal Co Ltd* [1905] AC 239;

*Smithies v National Association of Operative Plasterers* [1909] KB 310; *Edwin Hill & Partners v First National Finance Corpn plc* [1989] 1 WLR 225; *Douglas v Hello! Ltd* [2001] QB 967; *Lonrho plc v Fayed* [1990] 2 QB 479; *Greig v Insole* [1978] 1 WLR 302; *Belmont Finance Corpn Ltd v Williams Furniture Ltd (No 2)* [1980] 1 All ER 393 and *Pritchard v Briggs* [1980] Ch 338.]

There are no compelling policy reasons why interference by the receivers in the present circumstances should not be held to be within the scope of protection under the law of tort. There are clear and compelling reasons why interference in such circumstances as the present should be held to be within the scope of legal protection. It is wrong in principle for the victim of unauthorised interference with his contractual rights to be forced by the law to adopt as his agents those who interfered or to waive the tort. [Reference was made to *Deutsche Morgan Grenfell Group plc v Inland Revenue Comrs* [2007] 1 AC 558.]

An invalidly appointed administrative receiver who, by asserting the validity of his appointment, takes or obtains exclusive possession of, control over, or enjoyment of a company's assets, and then realises those assets for the benefit of the appointor thereby permanently depriving the company of them, commits the tort of conversion in relation to all of those assets, including intangible property. The tort of conversion committed in relation to intangible property is a freestanding tort which is not dependent upon the commission of any tort in relation to tangible property. Alternatively, the intangible property is sufficiently associated with the tangible property such that, when assessing damages for the wrong committed to the latter, the value of the former is treated as included within it. The nature of the wrong does not vary according to whether or not, but for the receivers' interference, the company would have survived.

There is no absolute rule in English law that there can be no conversion of a chose in action. Choses in action are part of modern life and must be protected from unlawful and damaging acts. Choses in action should be treated as on the same side of the line as tangible assets when, in a case with the features of the present case, the claimant has legal title to the contractual rights in question and they have been dealt with by a third party in a manner sufficient to satisfy the test for conversion. That would amount to a modest incremental development of the law. [Reference was made to *Ex p Vaughan; In re Riddeough* (1884) 14 QBD 25; *In re Simms; Ex p Trustee* [1934] Ch 1; *In re Goldburg (No 2); Ex p Page* [1912] 1 KB 606; *Payne v Elliott* (1880) 54 Cal 339; *Kremen v Online Classifieds Inc* (2003) 337 F 3d 1024; *Ayres v French* (1874) 41 Conn 142; *In re Estate of Corbin, decd* (1980) 391 So 2d 731; *Telecom Vanuatu Ltd v Optus Networks Pty Ltd* [2005] NSWSC 951; *Hoath v Connect Internet Services Pty Ltd* [2006] NSWSC 158; *Thyroff v Nationwide Mutual Insurance Co* (unreported) 21 August 2006 and *Gulf Insurance Ltd v Central Bank of Trinidad and Tobago* (2005) 66 WIR 297.]

The Human Rights Act 1998 does not apply since the unlawful taking of the claimants' property occurred before 2 October 2000 when the Act came into force. However the jurisprudence of the European Court of Human Rights illustrates that it is important that domestic courts develop the common law in the context of rights to property derived from article 1 of the First Protocol to the Convention for the Protection of Human Rights and

Fundamental Freedoms. Under article 13 the United Kingdom has a positive duty to ensure that the claimants have an effective remedy for any violation of Convention rights. If it is held that the common law of England and Wales does not afford the claimants any effective remedy for the loss of the value of their intangible property, their remedy would then have to be in proceedings against the United Kingdom in the European Court of Human Rights for violation of their Convention rights.

*Gregory Mitchell QC* and *Paul Greenwood* for the defendants. The conventional requirements for inducing breach of contract are that (1) there is a breach of contract, (2) causing loss to the claimant, and (3) which has been induced or procured by the defendant. That is the classic *Lumley v Gye* case. The concept of inducing or procuring carries with it the intention to bring about a breach of contract. That intention necessarily involves an intention to cause loss, in the sense of depriving the claimant of the benefit of the contract. The requirements of the tort of wrongful interference with trade are that there has been a use of unlawful means, which may involve breach of contract, breach of statutory duty or some other wrongful conduct including, but not limited to deceit. The two economic torts of inducing breach of contract and wrongful interference with trade will overlap in many cases: see *J T Stratford & Son Ltd v Lindley* [1965] AC 269; *Merkur Island Shipping Corpn v Laughton* [1983] 2 AC 570; *Torquay Hotel Co Ltd v Cousins* [1969] 2 Ch 106 and *Dimbleby & Sons Ltd v National Union of Journalists* [1984] 1 WLR 67.

There is a fault condition for liability in economic tort which requires proof against the defendant of a violation of the claimant's legal rights. Unlawful interference with trade also requires proof of the intentional infliction of harm by the use of unlawful means. The trial judge needs to investigate and decide as a fact the actual and subjective intention with which the defendant acted. In the present case it was not alleged that the receivers acted other than in the mistaken but genuine belief that they were lawfully appointed as administrative receivers and entitled to act. They did not procure or induce any breaches of contract which caused the claimants any harm or damage.

The receivers mistakenly believed they were lawfully appointed because they had been so advised by solicitors. There was no analysis whatsoever of the content or nature of their mistake and of whether it was properly classifiable as one of fact or law. They acted in good faith in the belief that they were legally entitled so to act. Thus, they cannot have had an intention to use unlawful means or an intention to cause harm thereby.

Genuine mistake, whether of fact or of law, is a complete defence to a claim in economic tort, where its effect is to negative the requisite intention. Whether or not a mistake does negative intention in a particular case is a matter for the judge to find as a fact when deciding a defendant's state of mind. Economic tort can be reconciled with principles of equity. A fault condition of intention to use unlawful means will come as close as possible to that reconciliation. If a fault condition is required then the claimants' case will fail.

Liability in economic tort can only arise in exceptional circumstances for good policy reasons. There are powerful remedies provided by the law, both in equity and by the insolvency legislation, against invalidly appointed

receivers. The claimants have not pleaded those remedies. English law does not need to be extended to provide a remedy to the claimants. [Reference was made to *J T Stratford & Son Ltd v Lindley* [1965] AC 269; *Merkur Island Shipping Corpn v Laughton* [1983] 2 AC 570; *Torquay Hotel Co Ltd v Cousins* [1969] 2 Ch 106; *Dimbleby & Sons v Ltd v National Union of Journalists* [1984] 1 WLR 67; *Smith v Morrison* [1974] 1 WLR 659; *Granby Marketing Services Ltd v Interlego AG* [1984] RPC 209; *Lubenham Fidelities and Investments Co Ltd v South Pembrokeshire District Council* (1986) 33 BLR 39; *Edwin Hill & Partners v First National Finance Corpn plc* [1989] 1 WLR 225; *Welsh Development Agency v Export Finance Co Ltd* [1992] BCLC 148; *Middlebrook Mushrooms Ltd v Transport and General Workers' Union* [1993] ICR 612; *Stocznia Gdanska SA v Latvian Shipping Co* [2002] 2 Lloyd's Rep 436; *R Cruikshank Ltd v Chief Constable of Kent County Constabulary* [2002] EWCA Civ 1840; The Times, 27 December 2002; *Concord Trust v The Law Debenture Trust Corpn plc* [2005] 1 WLR 1591 and *Gainers Inc v Pocklington Holdings Inc* (2000) 194 DLR (4th) 109.]

Conversion is a tort of strict liability designed to protect a person who owns, or is in, or is entitled to, possession of tangible goods against all (other than purely involuntary) acts, which in fact exclude or usurp his proprietary or possessory rights to those goods. Conversion is therefore replete with features inconsistent with the notion of its application to choses in action.

The central issue of principle is whether on their appointment, by virtue of accepting their appointment and without more, the receivers ought to be held strictly liable in tort for the entire value of the business and undertaking in respect of which they were appointed. A tort of strict liability is exceptional and requires sound justification and a nexus between the tortfeasor, his conduct and the claimant. In the context of conversion that nexus is provided by the requirement of a tangible thing, the existence of which is or ought to be obvious to the tortfeasor, and in respect of each such thing there is a limited class of potential claimants, defined by reference to the requirement of a possessory or proprietary right. By contrast, in the context of interference in economic interests, the touchstone of tortious liability is fault, and the requisite nexus is provided by reference to the defendant's intention and his deliberate use of unlawful means.

It is not generally the policy of English law to impose strict liability in tort in respect of the violation of economic or intangible interests. There is no reason to impose on innocent administrative receivers or other similar office holders, whether or not validly appointed, strict liability in respect of the entire value of the whole business and undertaking of a company. Neither is that the scheme anticipated by the insolvency legislation.

The claimants are wrong to say that there is no absolute rule that a chose in action cannot be converted and that there are significant exceptions into which this case falls. Under English law, the only exception to the requirement of corporeal personal property comprises documents such as title deeds, cheques, negotiable instruments and other securities with a value greater than that of a mere piece of paper. However, in none of those cases have the courts awarded damages for conversion of a cause of action. None of the cases cited by the claimants provide true exceptions to the rules of conversion. [Reference was made to *MCC Proceeds Inc v Lehman Bros*

*International (Europe)* [1998] 4 All ER 675; *In re Simms; Ex p Trustee* [1934] Ch 1; *Morison v London County and Westminster Bank Ltd* [1914] 3 KB 356; *Bank of Montreal v Tourangeau* (1980) 118 DLR (3d) 293 and *Gulf Insurance Ltd v Central Bank of Trinidad and Tobago* 66 WIR 297.]

*Randall QC* replied.

*Richard Millett QC, Richard Slowe*, solicitor, and *Paul Stanley* for the third claimant in *Douglas v Hello! Ltd.* The publication of the unauthorised photographs constituted a breach of confidence vis-à-vis the third claimant for which they are entitled to recover damages. In order to award them damages it is not necessary to develop the law or to overrule previous authority. It is simply a case of establishing well established principles correctly to the facts as the judge did and the Court of Appeal did not.

A duty of confidence arises whenever information comes to the knowledge of a person who knows, or is on notice of or who has agreed the fact that it is confidential, such that it would be just in all the circumstances that he should be precluded from disclosing it to others. Whether information has the quality of confidence is a question of fact which depends on all the circumstances. The duty is owed to all those persons whom the defendant knows, or reasonably ought to know, have a reasonable expectation that the information will remain inaccessible to the public. Thus the information need not be available to, accessible to or owned by claimant A in order for the duty of confidence to be owed to him by defendant B, provided (1) that there is another person to whom the duty is also owed and to whom that information is available (in the present case the Douglases) and (2) that the claimant has a reasonable expectation, based on a legitimate interest, of the defendant's knowledge of that confidence being maintained. [Reference was made to *Phipps v Boardman* [1967] 2 AC 46; *Coco v A N Clark (Engineers) Ltd* [1969] RPC 41; *Fraser v Evans* [1969] 1 QB 349; *Attorney General v Guardian Newspapers Ltd (No 2)* [1990] 1 AC 109; *Shelley Films Ltd v Rex Features Ltd* [1994] EMLR 134; *Creation Records Ltd v News Group Newspapers Ltd* [1997] EMLR 444; *Venables v News Group Newspapers Ltd* [2001] Fam 430; *A v B plc* [2003] QB 195 and *Campbell v MGN Ltd* [2004] 2 AC 457.] The question that arises from the authorities is: is it just, in all the circumstances, to make the person who put the information in the public domain legally responsible to those who have a legitimate interest and a reasonable expectation of it being kept secret?

It would be wrong and unjustified to adopt an overfine approach to what is always a highly fact-sensitive and conscience based cause of action, whether it is called a tort or whether it is called an invocation of equitable relief. It would narrow the class of persons who could sue for breach of confidence to require them to show not only that they had a legitimate interest in the maintenance of confidentiality but also a right to the information itself. That would be an unjustified and retrograde development of the law of confidentiality and not an application of it. The law of confidence is not about having information. It is about keeping secrets. The defendants knew that although the unauthorised photographs they intended to publish were not chosen by the Douglases, the third claimant had an interest in maintaining their secrecy.

If the defendants' conduct was not directly a breach of the duty of confidence owed by the defendants to the third claimant, the tort of unlawful interference becomes important. The Court of Appeal was right in concluding that the actions of the defendants in publishing the unauthorised photographs was an unlawful act for the purposes of the tort of unlawful interference at the suit of the third claimant. The unlawful act was the commission of the tort of breach of confidence vis-à-vis the Douglases. They Court of Appeal was also right to say that for the purposes of the tort of unlawful interference there was sufficient nexus between the unlawful act and the injury to the third claimant, and that it was not necessary for the unlawful means to amount to an actionable infringement of the claimant's own rights. Those conclusions mean that the issue is a narrow one, namely, whether the Court of Appeal was right to say that there was a high test of intention: see [2006] QB 125, paras 221–223. The Court of Appeal failed to distinguish between an intention to harm and a desire to harm and applied far too high a test.

Conduct may be aimed at a claimant even though a defendant's predominant purpose or motive is to advance the defendant's own personal or commercial interests, even though it prejudices or harms the claimant and even though it is not part of his actuating motive. Conduct can be aimed at a claimant even though the principal target of the defendant's action is a third party and not the claimant himself. Conduct can be aimed at a claimant even though the defendant derives no satisfaction from the position that he is placed in and even if he regrets it. Conduct can be aimed at a claimant even though the defendant hopes that the claimant will actually avoid any economic loss. [Reference was made to *Mogul Steamship Co Ltd v McGregor Gow & Co* (1889) 23 QBD 598; *Allen v Flood* [1898] AC 1; *Quinn v Leathem* [1901] AC 495; *Sorrell v Smith* [1925] AC 700; *Crofter Hand Woven Harris Tweed Co Ltd v Veitch* [1942] AC 435; *Lonrho Ltd v Shell Petroleum Co Ltd (No 2)* [1982] AC 173; *Lonrho plc v Fayed* [1990] 2 QB 479; *D C Thomson & Co Ltd v Deakin* [1952] Ch 646; *Rookes v Barnard* [1964] AC 1129; *J T Stratford & Son Ltd v Lindley* [1965] AC 269; *Torquay Hotel Co Ltd v Cousins* [1969] 2 Ch 106; *Acrow (Automation) Ltd v Rex Chainbelt Inc* [1971] 1 WLR 1676; *Merkur Island Shipping Corpn v Laughton* [1983] 2 AC 570; *Dimbleby & Sons Ltd v National Union of Journalists* [1984] 1 WLR 67; *Associated British Ports v Transport and General Workers' Union* [1989] 1 WLR 939; *Barretts & Baird (Wholesale) Ltd v Institution of Professional Civil Servants* [1987] IRLR 3; *Van Camp Chocolates Ltd v Aulsebrooks* [1984] 1 NZLR 354; *Millar v Bassey* [1994] EMLR 44; *Isaac Oren v Red Box Toy Factory Ltd* [1999] FSR 785 and *RCA Corpn v Pollard* [1983] Ch 135.] The defendants cannot say that although they knew the consequences of the unlawful act, they did not intend it. Knowledge should be enough for the commission of the tort.

*Stanley* followed.

*James Price QC* and *Giles Fernando* for the defendants. The information was not confidential. What a bride and bridegroom look like at their wedding is not a trade secret for the purposes of being exploited commercially. It is private and it is the subject of rights of human dignity

and autonomy but it is not a trade secret. Alternatively, if it is a trade secret, it is not one which the third claimant shared in.

The well established law of confidence requires one to start by asking whether the confidant owed an obligation of confidence, the confidant being the person either to whom the information has been confided or who has obtained the information in some improper way. Anyone else becomes liable because of his knowledge of the obligation of confidence owed by the confidant. In the present case the confidant, namely, the intruder at the wedding, owed no such obligation.

At the time of the defendants' publication, which took place simultaneously with the third claimant's publication, the information had been put in the public domain by the confider, the third claimant. The third claimant must establish that the trade secret remained a secret throughout the period of a fortnight in which the claimants' publication was being marketed. Where an obligation is based on confidence, that confidence cannot survive the allegedly confidential information being put into the public domain by the confider.

The images have to be divided into two categories: those the Douglases wanted published and those that they did not want published. The third claimant did not share any rights in the later category of images. Persons from whom confidential information is withheld cannot claim to be owed a duty of confidence. [Reference was made to *Gilbert v Star Newspaper Co Ltd* (1894) 11 TLR 4; *Shelley Films Ltd v Rex Features Ltd* [1994] EMLR 134; *Creation Records Ltd v News Group Newspapers Ltd* [1997] EMLR 444 and *Mustad & Son v Dosen* [1964] 1 WLR 109.]

The Douglases' rights derived from the Human Rights Convention and relate to privacy. There must be a distinction between privacy and confidentiality. Privacy responds to human autonomy and dignity. What happens at a wedding is private but not confidential. Privacy is not a tradeable right. Confidence does not protect trivia although privacy might do.

The right asserted by the third claimant is neither a right of privacy nor a right to confidentiality, but a quasi proprietary image right which is unaffected by the publication of the pictorial information by or with the consent of the subject, and which is not recognised in English law. A bride and groom have a reasonable expectation of privacy with respect to their wedding, but information about events at a wedding, including photographic images of the wedding are not confidential.

The photographs which the third claimant claims were the subject of an obligation of confidentiality were never disclosed to it by the Douglases, but were kept private to themselves, and all rights to them were retained by the Douglases. The intruder who took the unauthorised photographs came under no obligation to keep them confidential, and accordingly there is no basis on which a person who obtained the photographs from him can come under any obligation of confidentiality. Confidentiality in the images which the third claimant seeks to protect was lost on publication to the world by the third claimant.

The tort of unlawful interference with trade or business is typically concerned with unlawful actions in the course of trade or business competition. It is a natural and probable consequence of competing that some competitors will suffer. The mental element suggested by the third

claimant would come close to reducing the tort to one of acting unlawfully in a competitive situation. The mental element required for the tort of unlawful interference with business is a specific intent to cause economic harm to the claimant, and the trial judge found as a fact that the defendants did not have such an intent. Respect for the value which underlies the right of privacy and the coherent development of intellectual property and related rights require that neither misuse of private information nor breach of confidence should be capable of constituting unlawful means for the purpose of the tort of unlawful interference with business. It is clearly established that trespass abroad is not actionable in this country. Therefore trespass by the intruder in New York cannot serve as an unlawful act for the purposes of the economic tort. [Reference was made to *Isaac Oren v Red Box Toy Factory Ltd* [1999] FSR 785; *Lonrho Ltd v Shell Petroleum Co Ltd (No 2)* [1982] AC 173; *Lonrho plc v Fayed* [1992] 1 AC 448; *Acrow (Automation) Ltd v Rex Chainbelt Inc* [1971] 1 WLR 1676; *Beaudesert Shire Council v Smith* (1966) 120 CLR 145; *Indata Equipment Supplies Ltd v ACL Ltd* [1998] FSR 248; *Northern Territory of Australia v Mengel* (1995) 185 CLR 307 and *RCA Corpn v Pollard* [1983] Ch 135.]

Depriving a claimant of exclusivity of a publication cannot be regarded as an intention to harm. Exclusivity can have no special status.

At the time of the defendants' decision to publish the Human Rights Act 1998 had not come into effect and the whole topic of privacy in English law was subject to uncertainty because of the absence of a an effective law of privacy. The defendants could not have foreseen the subsequent developments in the law which have made them liable to the third claimant if such liability is established. The information was in the public domain by the time the defendants published.

*Millett QC* replied.

*John Randall QC* and *John de Waal* for the claimant in *Mainstream Properties Ltd v Young*. The single issue is whether it is an essential element of the tort of inducing a breach of contract that the alleged tortfeasor had the subjective belief that his actions would bring about a breach of contract.

Provided the requisite knowledge of the contract has been established, the requirement for intention should be the same as that for the intentional torts of conversion and trespass, namely, that the defendant's actions were deliberate and not accidental. If any greater intention is required, a defendant's intention to bring about the reasonable and probable consequences, or alternatively, at least the necessary or inevitable consequences, of his actions will be judged objectively and/or imputed to him by presumption or inference. [Reference was made to *Welsh Development Agency v Export Finance Co Ltd* [1992] BCLC 148; *Solihull Metropolitan Borough v National Union of Teachers* [1985] IRLR 211; *Lubenham Fidelities and Investments Co Ltd v South Pembrokeshire District Council* 33 BLR 39; *White v Riley* [1921] 1 Ch 1; *Greig v Insole* [1978] 1 WLR 302; *British Industrial Plastics Ltd v Ferguson* [1940] 1 All ER 479; *South Wales Miners' Federation v Glamorgan Coal Co Ltd* [1905] AC 239 and *Twinsectra Ltd v Yardley* [2002] 2 AC 164.]

The law will infer the necessary intention from the actions of a defendant who knew of the existence of the contract. The requisite intention is to be

inferred at least in respect of consequences which will necessarily result from achieving the object of a defendant's conduct. At least in cases of direct interference the requisite intention is also to be inferred in respect of consequences which will naturally and probably result from achieving the object of the defendant's conduct.

Provided the requisite knowledge of the contract has been established, any requirement of subjective intention is limited to intention to commit the act which results in interference with the contract in question, and does not have to extend to an intention that such act should bring about a contractual interference or injury to the claimant. In the present case the sixth defendant acted deliberately with knowledge of the contract, including the general nature of the relevant terms. He therefore necessarily appreciated and intended the consequences. That satisfies the requirement for limited subjective intention in the sense of voluntary or deliberate conduct coupled with the requisite knowledge. Further, even on the facts as told to and believed by the sixth defendant, as a matter of law the first and second defendants' actions were breaches of their duty towards the claimant.

Ignorantia juris non excusat is an accepted maxim of the law. The principle is well recognised in the criminal law, but is equally applicable to the civil law, and in particular the law of tort. It applies even if legal advice has been sought, obtained and relied upon.

Recklessness should be a recognised equivalent to intention. The sixth defendant was reckless in that he failed to make any reasonable inquiry about the obvious risk that he was being invited to provide funding which would enable the commission of serious breaches of duty towards the claimant.

A person who directly interferes with another's contract, knowing of its existence and without justification, should be liable for the reasonable and probable, or alternatively, at least the necessary or inevitable consequences of his actions in accordance with the principle in *Lumley v Gye* 2 E & B 216.

*Gordon Pollock QC* and *Barry Isaacs* for the sixth defendant. The tort of interference with contractual relations or inducing breach of contract is a tort of subjective and specific intent. The abandonment of the requirement of a specific subjective intent and a substitution of a test based on the reasonableness of the defendant's beliefs leads inevitably to the position that before acting every individual owed a duty of care to the world to ascertain the existence and terms of any contract on which his actions may impinge, and to ascertain whether his actions may bring about or assist in the breach of that contract by one of those who is a party to it. Such a wide and uncontrolled duty of care is wholly inconsistent with the policy of English law. [Reference was made to *D C Thomson & Co Ltd v Deakin* [1952] Ch 646; *British Industrial Plastics Ltd v Ferguson* [1938] 4 All ER 504; *Solihull Metropolitan Borough v National Union of Teachers* [1985] IRLR 211; *Pritchard v Briggs* [1980] Ch 338 and *Greig v Insole* [1978] 1 WLR 302.]

The tort of inducing a breach of contract requires proof of a subjective state of mind on the part of the alleged tortfeasor. His honest belief that no breach of contract will be committed is sufficient. The tort cannot be committed negligently or on the basis of a presumed state of mind.

The trial judge's finding of fact was that the sixth defendant genuinely believed that no breach of contract would occur. That finding is necessarily

inconsistent with an allegation of recklessness. The claimant cannot now attack that finding of fact.

*Randall QC* replied

Their Lordships took time for consideration.

2 May 2007. LORD HOFFMANN

*The three appeals*

1 My Lords, these three appeals are principally concerned with claims in tort for economic loss caused by intentional acts.

(a) In *OBG Ltd v Allan* [2005] QB 762 the defendants were receivers purportedly appointed under a floating charge which is admitted to have been invalid. Acting in good faith, they took control of the claimant company's assets and undertaking. The claimant says that this was not only a trespass to its land and a conversion of its chattels but also the tort of unlawful interference with its contractual relations. It claims that the defendants are liable in damages for the value of the assets and undertaking, including the value of the contractual claims, as at the date of their appointment. Alternatively, it says the defendants are liable for the same damages in conversion.

(b) In *Douglas v Hello! Ltd (No 3)* [2006] QB 125 the magazine "OK!" contracted for the exclusive right to publish photographs of a celebrity wedding at which all other photography would be forbidden. The rival magazine "Hello!" published photographs which it knew to have been surreptitiously taken by an unauthorised photographer pretending to be a waiter or guest. "OK!" says that this was interference by unlawful means with its contractual or business relations or a breach of its equitable right to confidentiality in photographic images of the wedding.

(c) In *Mainstream Properties Ltd v Young* [2005] IRLR 964 two employees of a property company, in breach of their contracts, diverted a development opportunity to a joint venture in which they were interested. The defendant, knowing of their duties but wrongly thinking that they would not be in breach, facilitated the acquisition by providing finance. The company says that he is liable for the tort of wrongfully inducing breach of contract.

2 It will therefore be seen that the claimants in these three appeals rely upon at least five different wrongs, or alleged wrongs, which they say provide them with causes of action for economic loss: inducing breach of contract (*Mainstream*), causing loss by unlawful means (*Hello!*) interference with contractual relations (*OBG*); breach of confidence (*Hello!*) and conversion (*OBG*). I shall put aside the last two until I come to deal with the facts of the cases in which they arise. But I propose to start with some general observations on the first three torts.

*Inducing breach of contract*

3 Liability for inducing breach of contract was established by the famous case of *Lumley v Gye* (1853) 2 E & B 216. The court based its decision on the general principle that a person who procures another to commit a wrong incurs liability as an accessory. As Erle J put it, at p 232:

"It is clear that the procurement of the violation of a right is a cause of action in all instances where the violation is an actionable wrong, as in violations of a right to property, whether real or personal, or to personal security: he who procures the wrong is a joint wrongdoer, and may be sued, either alone or jointly with the agent, in the appropriate action for the wrong complained of."

4 For a court in 1853, the difficulty about applying this principle to procuring a breach of contract was that the appropriate action for the wrong committed by the contracting party lay in contract but no such action would lie against the procurer. Only a party to the contract could be sued for breach of contract. The answer, said the court, was to allow the procurer to be sued in tort, by an action on the case. There was a precedent for this mixing and matching of the forms of action in the old action on the case for enticing away someone else's servant: see Gareth Jones "Per Quod Servitium Amisit" (1958) 74 LQR 39. Some lawyers regarded that action as a quaint anomaly, but the court in *Lumley v Gye* treated it as a remedy of general application.

5 The forms of action no longer trouble us. But the important point to bear in mind about *Lumley v Gye* is that the person procuring the breach of contract was held liable as accessory to the liability of the contracting party. Liability depended upon the contracting party having committed an actionable wrong. Wightman J made this clear when he said, at p 238:

"It was undoubtedly prima facie an unlawful act on the part of Miss Wagner to break her contract, and therefore a tortious act of the defendant maliciously to procure her to do so . . ."

*Causing loss by unlawful means*

6 The tort of causing loss by unlawful means has a different history. It starts with cases like *Garret v Taylor* (1620) Cro Jac 567, in which the defendant was held liable because he drove away customers of Headington Quarry by threatening them with mayhem and vexatious suits. Likewise, in *Tarleton v M'Gawley* (1794) Peake 270 Lord Kenyon held the master of the *Othello*, anchored off the coast of West Africa, liable in tort for depriving a rival British ship of trade by the expedient of using his cannon to drive away a canoe which was approaching from the shore. In such cases, there is no other wrong for which the defendant is liable as accessory. Although the immediate cause of the loss is the decision of the potential customer or trader to submit to the threat and not buy stones or sell palm oil, he thereby commits no wrong. The defendant's liability is primary, for intentionally causing the plaintiff loss by unlawfully interfering with the liberty of others.

7 These old cases were examined at some length by the House of Lords in *Allen v Flood* [1898] AC 1 and their general principle approved. Because they all involved the use of unlawful threats to intimidate potential customers, *Salmond on Torts*, 1st ed (1907) classified them under the heading of "Intimidation" and the existence of a tort of this name was confirmed by the House of Lords in *Rookes v Barnard* [1964] AC 1129. But an interference with the liberty of others by unlawful means does not require threats. If, for example, the master of the *Othello* in *Tarleton v M'Gawley* Peake 270 had deprived the plaintiff of trade by simply sinking the

approaching vessel with its cargo of palm oil, it is unlikely that Lord Kenyon would have regarded this as making any difference. Salmond's tort of intimidation is therefore only one variant of a broader tort, usually called for short "causing loss by unlawful means", which was recognised by Lord Reid in *J T Stratford & Son Ltd v Lindley* [1965] AC 269, 324:

> "the respondents' action [in calling a strike] made it practically impossible for the appellants to do any new business with the barge hirers. It was not disputed that such interference with business is tortious if any unlawful means are employed."

8 The tort of causing loss by unlawful means differs from the *Lumley v Gye* principle, as originally formulated, in at least four respects. First, unlawful means is a tort of primary liability, not requiring a wrongful act by anyone else, while *Lumley v Gye* created accessory liability, dependent upon the primary wrongful act of the contracting party. Secondly, unlawful means requires the use of means which are unlawful under some other rule ("independently unlawful") whereas liability under *Lumley v Gye* 2 E & B 216 requires only the degree of participation in the breach of contract which satisfies the general requirements of accessory liability for the wrongful act of another person: for the relevant principles see *CBS Songs Ltd v Amstrad Consumer Electronics plc* [1988] AC 1013 and *Unilever plc v Chefaro Proprietaries Ltd* [1994] FSR 135. Thirdly, liability for unlawful means does not depend upon the existence of contractual relations. It is sufficient that the intended consequence of the wrongful act is damage in any form; for example, to the claimant's economic expectations. If the African canoeists had been delivering palm oil under a concluded contract of which notice had been given to the master of the *Othello*, Lord Kenyon would no doubt have considered that an a fortiori reason for granting relief but not as making a difference of principle. Under *Lumley v Gye*, on the other hand, the breach of contract is of the essence. If there is no primary liability, there can be no accessory liability. Fourthly, although both are described as torts of intention (the pleader in *Lumley v Gye* used the word "maliciously", but the court construed this as meaning only that the defendant intended to procure a breach of contract), the *results* which the defendant must have intended are different. In unlawful means the defendant must have intended to cause damage to the claimant (although usually this will be, as in *Tarleton v M'Gawley* Peake 270, a means of enhancing his own economic position). Because damage to economic expectations is sufficient to found a claim, there need not have been any intention to cause a breach of contract or interfere with contractual rights. Under *Lumley v Gye*, on the other hand, an intention to cause a breach of contract is both necessary and sufficient. Necessary, because this is essential for liability as accessory to the breach. Sufficient, because the fact that the defendant did not intend to cause damage, or even thought that the breach of contract would make the claimant better off, is irrelevant. In *South Wales Miners' Federation v Glamorgan Coal Co Ltd* [1905] AC 239 the miners' union said that their intention in calling a strike (inducing miners to break their contracts of employment) was, OPEC-like, to restrict production of coal and thereby raise its price. So far from wishing to cause the mine owners loss, they intended to make both owners and miners better off. The House of Lords said that this made no difference. It was sufficient that the union intended

the employment contracts to be broken. It was no defence, as Lord Macnaghten put it, at p 246, that "if the masters had only known their own interest they would have welcomed the interference of the federation".

*Allen v Flood: the torts kept separate*

9 The Law Lords who formed the majority in *Allen v Flood* [1898] AC 1 showed a clear recognition that *Lumley v Gye* 2 E & B 216 and causing loss by unlawful means are separate torts, each with its own conditions for liability. The difficulty for the plaintiffs in *Allen v Flood* was that, although the jury found that the defendants had acted "maliciously" in procuring the shipyard not to employ them, the defendants had neither used unlawful means nor procured any breach of contract. In the Court of Appeal [1895] 2 QB 21 the plaintiffs had argued successfully that the essence of *Lumley v Gye* was that the defendant had acted maliciously. A breach of contract was not essential. But the majority in the House of Lords said that liability had been as accessory to the breach of contract. Lord Watson quoted from the judgments in the Court of Queen's Bench and said, at p 106, that they embodied "an intelligible and a salutary principle":

> "He who wilfully induces another to do an unlawful act which, but for his persuasion, would or might never have been committed, is rightly held to be responsible for the wrong he has procured" (p 107).

10 Likewise Lord Herschell said, at p 123, that he was satisfied that "the procuring what was described as an unlawful act—namely, a breach of contract, was regarded as the gist of the action".

11 Lord Macnaghten reserved his opinion on whether *Lumley v Gye* had been rightly decided but there can be no doubt about what principle he thought it laid down, see pp 151–152:

> "where the act itself to which the loss is traceable involves some breach of contract or some breach of duty, and amounts to an interference with legal rights . . . the immediate agent is liable, and it may well be that the person in the background who pulls the strings is liable too, though it is not necessary in the present case to express any opinion on that point."

12 When the case was argued before the House of Lords (see Lord Herschell, at p 132), the weight of the plaintiffs' argument was shifted to the *Garret v Taylor* Cro Jac 567 and *Tarleton v M'Gawley* Peake 270 line of authority, which were said to support the proposition that any unjustified interference with trade or employment was actionable. But the majority said that it was essential to liability in those cases that the defendant had injured the plaintiff by using unlawful means against a third party. Lord Watson, at p 104, described them as "cases in which an act detrimental to others, but affording no remedy against the immediate actor, had been procured by illegal means". Lord Herschell said, at p 137: "In all of them the act complained of was in its nature wrongful; violence, menaces of violence, false statements."

13 Thus the facts of *Allen v Flood* did not fall within *Lumley v Gye* because no breach of contract or other unlawful act had been procured and did not fall within the unlawful means tort because no unlawful means had been used. The majority did not accept that there was any other basis for

liability. In particular, the fact that the defendant deliberately caused damage "maliciously" in the sense of having a bad or improper motive was rejected as a ground for imposing liability. As Lord Watson (whose, views, said Lord Macnaghten in *Quinn v Leathem* [1901] AC 495, 509 "represent the views of the majority better far than any other single judgment delivered in the case") summed up [1898] AC 1, 96:

> "There are, in my opinion, two grounds only upon which a person who procures the act of another can be made legally responsible for its consequences. In the first place, he will incur liability if he knowingly and for his own ends induces that other person to commit an actionable wrong. In the second place, when the act induced is within the right of the immediate actor, and is therefore not wrongful in so far as he is concerned, it may yet be to the detriment of a third party; and in that case according to the law laid down by the majority in *Lumley v Gye* 2 E & B 216, 232, the inducer may be held liable if he can be shewn to have procured his object by the use of illegal means directed against that third party."

(Like Lord Macnaghten in *Quinn v Leathem* [1901] AC 495, 510, I think that the reference to *Lumley v Gye* in support of the second cause of action is a slip—"a rare occurrence in a judgment of Lord Watson's"—because it obviously applies to the first cause of action).

14 Some writers regret the failure of English law to accept bad motive as a ground for liability, as it is in the United States and Germany: see for example *Heydon, Economic Torts*, 2nd ed (1978), p 28. But I agree with Tony Weir's opinion, forcibly expressed in his Clarendon Law Lectures on *Economic Torts* (1997), that we are better off without it. It seems to have created a good deal of uncertainty in the countries which have adopted such a principle. Furthermore, the rarity of actions for conspiracy (in which a bad motive can, exceptionally, found liability) suggests that it would not have made much practical difference.

*Quinn v Leathem: the seeds of confusion*

15 *Quinn v Leathem* [1901] AC 495 is nowadays regarded as a case on lawful means conspiracy, which established that an improper motive can anomalously found a cause of action which, under the principle in *Allen v Flood* [1898] AC 1, would not lie against an individual. But this was by no means clear at the time and the case contains some discussion of both *Lumley v Gye* 2 E & B 216 and causing loss by unlawful means. Lord Macnaghten, in a well-known passage, at p 510, considered the basis of *Lumley v Gye*:

> "I have no hesitation in saying that I think the decision was right, not on the ground of malicious intention—that was not, I think, the gist of the action—but on the ground that a violation of legal right committed knowingly is a cause of action, and that it is a violation of legal right to interfere with contractual relations recognised by law if there be no sufficient justification for the interference."

16 I rather doubt whether Lord Macnaghten's view of what *Lumley v Gye* 2 E & B 216 decided had altered since his opinion in *Allen v Flood* three

years earlier. But the *Quinn v Leathem* formulation is open to the construction that there can be liability for "interfering" with contractual relations without being accessory to any breach of contract. Of course if this is done by unlawful means with the intention of causing damage, it will fall within the unlawful means tort. But Lord Macnaghten made no mention of unlawful means and in any case, under that tort, interference with contractual relations is not a necessary part of the cause of action. Any intentionally inflicted damage will do. The dictum was therefore capable of giving rise to confusion.

17 Lord Lindley went even further and said, at p 535, that the *Lumley v Gye* tort was an example of causing loss by unlawful means:

> "If the above reasoning is correct, *Lumley v Gye* was rightly decided, as I am of opinion it clearly was. Further, the principle involved in it cannot be confined to inducements to break contracts of service, nor indeed to inducements to break any contracts. The principle which underlies the decision reaches all wrongful acts done intentionally to damage a particular individual and actually damaging him."

18 There are two objections to this analysis. First, it reflects neither the reasoning of the court in *Lumley v Gye* nor the analysis of the case in *Allen v Flood*. Secondly, to say that the defendant in *Lumley v Gye* did a wrongful act is circular. It was only wrongful because the court in *Lumley v Gye* said that inducing a breach of contract was tortious. It is circular then to say that it was tortious because it involved a wrongful act.

19 One reason, I think, why it seemed to Lord Lindley and others that *Lumley v Gye* and the unlawful means tort were illustrations of the same principle was that quite often, particularly in cases of torts committed in the course of commercial competition or industrial disputes, both could be regarded as unlawful ways of carrying on the competition or the dispute. That was how it appeared to Bowen LJ in *Mogul Steamship Co Ltd v McGregor Gow & Co* (1889) 23 QBD 598, 614:

> "No man, whether trader or not, can, however, justify damaging another in his commercial business by fraud or misrepresentation. Intimidation, obstruction, and molestation are forbidden; so is the intentional procurement of a violation of individual rights, contractual or other, assuming always that there is no just cause for it. The intentional driving away of customers by shew of violence: *Tarleton v M'Gawley* Peake 270; the obstruction of actors on the stage by preconcerted hissing: *Clifford v Brandon* 2 Camp 358; *Gregory v Brunswick* 6 Man & G 205; the disturbance of wild fowl in decoys by the firing of guns: *Carrington v Taylor* 11 East 571, and *Keeble v Hickeringill* 11 East 574n; the impeding or threatening servants or workmen: *Garret v Taylor* Cro Jac 567; the inducing persons under personal contracts to break their contracts: *Bowen v Hall* 6 QBD 333; *Lumley v Gye* 2 E & B 216; all are instances of such forbidden acts."

20 These are, it is true, all instances of unlawful ways of causing economic damage. But that does not mean (and I do not think that Bowen LJ meant) that there is a single principle which makes them all unlawful. Disturbing the wild fowl may have been unlawful because it constituted a nuisance (compare *Hollywood Silver Fox Farm Ltd v Emmett*

[1936] 2 KB 468); the people who hissed in the theatre may have been liable for malicious *Quinn v Leathem* conspiracy; *Lumley v Gye* 2 E & B 216 was accessory liability and *Tarleton v M'Gawley* Peake 270 was true primary unlawful means liability.

21 Furthermore, there is no reason why the same facts should not give rise to both accessory liability under *Lumley v Gye* and primary liability for using unlawful means. If A, intending to cause loss to B, threatens C with assault unless he breaks his contract with B, he is liable as accessory to C's breach of contract under *Lumley v Gye* and he commits the tort of causing loss to B by unlawful means. The areas of liability under the two torts may be intersecting circles which cover common ground. This often happened in 20th century industrial disputes, where, for example, a union would use unlawful means (inducing members to break their contracts of employment) to put pressure upon the employer to break his contract with someone else who was the union's real target. Leaving aside statutory defences, this would make the union liable both under *Lumley v Gye* as accessory to the employer's breach of contract and for causing loss to the target by unlawful means. That does not make *Lumley v Gye* and unlawful means the same tort. But the close proximity of the circumstances in which they could be committed, particularly in industrial disputes, may explain why they were often thought to be manifestations of the same principle.

*Muddle: GWK Ltd v Dunlop Rubber Co Ltd*

22 Muddle set in with the influential case *GWK Ltd v Dunlop Rubber Co Ltd* (1926) 42 TLR 376. The GWK company made motor cars and the ARM company made tyres. GWK contracted to fit all their new cars with ARM tyres and to show them with ARM tyres at trade exhibitions. On the night before a motor show in Glasgow, Dunlop employees removed the ARM tyres from two GWK cars on the exhibition and substituted Dunlop tyres. The evidence showed that Dunlop knew of ARM's contractual right to have their tyres displayed.

23 Lord Hewart CJ held Dunlop liable. He referred to the dicta of Lord Macnaghten and Lord Lindley in *Quinn v Leathem* [1901] AC 495, which I have already cited, and said 42 TLR 376, 377:

> "In [my] opinion the defendants . . . knowingly committed a violation of the ARM company's legal rights by interfering, without any justification whatever, with the contractual relations existing between them and the GWK company, and [I think] that the defendants so interfered with the intention of damaging the ARM company, and that that company has been thereby damnified."

24 The case is a good example of intentionally causing loss by unlawful means. There was a finding of an intention to damage the ARM company (as a means of advancing the interests of the Dunlop company, but more of that later) and although there is no express reference to unlawful means in the passage I have cited, it is implied both by the reference to Lord Lindley's statement of principle and the separate finding of trespass to the goods of the GWK company.

25 Lord Hewart, however, made no reference to the tort of causing loss by unlawful means, possibly because the only form in which it was then

recognised in the textbooks was *Salmond's* tort of intimidation. *GWK Ltd v Dunlop Rubber Co Ltd* was clearly not a case of intimidation. Dunlop had not threatened anyone but had achieved its ends more directly by a trespass against the property of the GWK company. It had nevertheless interfered with the freedom of the ARM company to fit its vehicles with tyres in accordance with its agreement with GWK. Nowadays we would not regard the fact that this was achieved by direct action rather than threats as making any difference: in both cases, intended loss is caused by unlawful means used against a third party. But Lord Hewart looked for a different pigeonhole and the way he formulated his reasons ("committed a violation of the ARM company's legal rights by interfering . . . with the contractual relations existing between them and the GWK company") shows that he found it in Lord Lindley's extended definition of the *Lumley v Gye* tort. As Sir Jeremy Lever QC pointed out in an elegant essay written nearly 50 years ago, before *Rookes v Barnard* [1964] AC 1129 and *J T Stratford & Son Ltd v Lindley* [1965] AC 269, this analysis is unsatisfactory because it "ignores the importance of the means employed and over-emphasises the interest of the victim which is affected": see "Means, Motives and Interests in the Law of Torts", in *Oxford Essays in Jurisprudence* (1961), p 53.

*Adoption of the unified theory: DC Thomson & Co Ltd v Deakin*

26 The law was analysed in great depth by the Court of Appeal in *DC Thomson & Co Ltd v Deakin* [1952] Ch 646, in which argument by eminent counsel extended over nine days. The judgment of Jenkins LJ in particular has directed the course of the law ever since. He fully adopted the theory, originating with Lord Lindley in *Quinn v Leathem* and supported (possibly unintentionally) by Lord Macnaghten's dictum in the same case, that the principle of *Lumley v Gye* extended to all interference with contractual relations by unlawful means. "Direct persuasion or procurement or inducement applied by the third party to the contract breaker" was "regarded as a wrongful act in itself" and constituted the "primary form" of the tort: see p 694. But other forms of interference with contracts by unlawful means, such as *GWK Ltd v Dunlop Rubber Co Ltd* 42 TLR 376 ("a striking example") came within the same tort. From the dicta of Lord Macnaghten and Lord Lindley in *Quinn v Leathem* [1901] AC 495, Jenkins LJ, at p 693, deduced two propositions:

> "First . . . there may . . . be an actionable interference with contractual rights where other means of interference than persuasion or procurement or inducement, in the sense of influence of one kind or another brought to bear on the mind of the contract breaker to cause him to break his contract, are used by the interferer; but, secondly, that (apart from conspiracy to injure, which, as I have said, is not in question so far as this motion is concerned) acts of a third party lawful in themselves do not constitute an actionable interference with contractual rights merely because they bring about a breach of contract, even if they were done with the object and intention of bringing about such breach."

27 The unified theory thus treated procuring breach of contract, the old *Lumley v Gye* tort, as one species of a more general tort of actionable interference with contractual rights.

28 My Lords, I think that one reason why the Court of Appeal in *DC Thomson & Co Ltd v Deakin* [1952] Ch 646 adopted the unified theory was that there was an inadequate appreciation at that time of the scope, possibly even the existence, of the tort of causing loss by unlawful means. The reasoning of the Court of Appeal proceeded on the footing that no such tort existed. On that assumption, there was clearly a compelling case for creating a cause of action to cover cases in which the defendant used unlawful means to cause damage by interfering with the performance of a contract without any voluntary or even compelled participation on the part of the contracting party. As Sir Raymond Evershed MR put it, at pp 677–678:

> "It was suggested in the course of argument by Sir Frank Soskice and by Mr Lindner, that the tort must still be properly confined to such direct intervention, that is, to cases where the intervener or persuader uses by personal intervention persuasion on the mind of one of the parties to the contract so as to procure that party to break it. I am unable to agree that any such limitation is logical, rational or part of our law. In such cases where the intervener (if I may call him such) does so directly act upon the mind of a party to the contract as to cause him to break it, the result is, for practical purposes, as though in substance he, the intervener, is breaking the contract, although he is not a party to it . . . At any rate, it is clear that, when there is such a direct intervention by the intervener, the intervention itself is thereby considered wrongful. I cannot think that the result is any different if the intervener, instead of so acting upon the mind of the contracting party himself, by some other act, tortious in itself, prevents the contracting party from performing the bargain. A simple case is where the intervener, for example, physically detains the contracting party so that the contracting party is rendered unable by the detention to perform the contract."

29 The Court of Appeal thought that the only way to give a remedy in such cases was by an extension of *Lumley v Gye* along the lines proposed by Lord Lindley. Today one can see that an alternative analysis was available: that the person who physically detained the contracting party would indeed incur liability, but not accessory liability under the principle in *Lumley v Gye*. It would be primary liability for intentionally causing loss by unlawfully interfering with the liberty of a third party, under the principle derived from *Garret v Taylor* Cro Jac 567 and *Tarleton v M'Gawley* Peake 270.

30 My Lords, I do not wish to exaggerate the difficulties which have arisen from the adoption of the unified theory. To some extent it is a matter of nomenclature. If, as Jenkins LJ made clear, liability outside the primary form of the tort requires the use of unlawful means, does it matter whether the tort is classified as causing loss by unlawful means or an extension of *Lumley v Gye*? In most cases, the question of taxonomy will make no difference. It is not easy to point to cases which were wrongly decided because the court had adopted the unified theory rather than the two-tort analysis of *Allen v Flood*.

31 Is there something to be said in principle for a unified theory? Tony Weir, in the Clarendon Law Lectures to which I have referred, makes a bravura case for a one. Not, it is true, the version adopted in *DC Thomson v*

*Deakin*, which he thinks paid too much attention to the contractual nature of the claimant's rights. Weir would prefer *Lumley v Gye* to be swallowed up by the tort of intentionally causing loss by unlawful means, treating the "seduction" of the contracting party as a species of unlawful means and not distinguishing between interference with contractual rights and damage to economic expectations. The example of what Lord Atkin achieved for negligence in *Donogue v Stevenson* [1932] AC 562 always beckons: see Weir, at p 25. But this too is a form of seduction which may lure writers onto the rocks.

32 In my opinion the principle of accessory liability for breach of contract, the first of Lord Watson's principles of liability for the act of another in *Allen v Flood*, cannot be subsumed in the tort of causing loss by unlawful means (the second of Lord Watson's principles in *Allen v Flood*) simply by classifying "seduction" as unlawful means. That only adds a pejorative description to a circular argument: see para 18 above. To induce a breach of contract is unlawful means when the breach is used to cause loss to a third party, as in *J T Stratford & Son Ltd v Lindley* [1965] AC 269, but it makes no sense to say that the breach of contract itself has been caused by unlawful means. Philip Sales and Daniel Stilitz, in their illuminating article "Intentional Infliction of Harm by Unlawful Means" (1999) 115 LQR 411, 433, make it clear that *Lumley v Gye* was "founded on a different principle of liability than the intentional harm tort". It treats contractual rights as a species of property which deserve special protection, not only by giving a right of action against the party who breaks his contract but by imposing secondary liability on a person who procures him to do so. In this respect it is quite distinct from the unlawful means principle, which is concerned only with intention and wrongfulness and is indifferent as to the nature of the interest which is damaged. I therefore do not think that the two causes of action can be brought within a unified theory and agree with Professor Peter Cane, "Mens Rea in Tort Law" (2000) 20 Oxford JLS 533, 552, that

> "The search for 'general principles of liability' based on types of conduct is at best a waste of time, and at worst a potential source of serious confusion; and the broader the principle, the more is this so. Tort law is a complex interaction between protected interests, sanctioned conduct, and sanctions; and although there *are* what might be called 'principles of tort liability', by and large, they are not very 'general'. More importantly, they cannot be stated solely in terms of the sorts of conduct which will attract tort liability. Each principle must refer, as well, to some interest protected by tort law and some sanction provided by tort law."

33 That said, I would not expect your Lordships to reject the unified theory adopted in *DC Thomson & Co Ltd v Deakin* [1952] Ch 646 unless it had serious practical disadvantages. After all, in *Merkur Island Shipping Corpn v Laughton* [1983] 2 AC 570, 607, Lord Diplock said that for 30 years the judgment of Jenkins LJ had been regarded as authoritative and that no benefit was gained by "raking over once again the previous decisions", as I must confess to have done. But I do think that it has been a source of confusion in more than one respect and that it would therefore be better to abandon it and return to the two torts identified by Lord Watson in

*Allen v Flood* [1898] AC 1. To these problems created by the unified theory I now turn.

*Direct and indirect interference*

34 The distinction between the original *Lumley v Gye* tort and its extension in *DC Thomson & Co Ltd v Deakin* has been described in later cases as a distinction between "direct" and "indirect" interference. The latter species requires the use of independently unlawful means while the former requires no more than inducement or persuasion. But the use of these terms seems to me to distract attention from the true questions which have to be asked in each case. For example, in *Daily Mirror Newspapers Ltd v Gardner* [1968] 2 QB 762 the Federation of Retail Newsagents resolved to boycott the "Daily Mirror" for a week to put pressure on the publishers to allow its members higher margins. The federation advised their members to stop buying the paper from wholesalers. The publishers claimed an injunction on the ground that the federation was procuring a breach of the wholesalers' running contracts with the publishers to take a given number of copies each day. Counsel for the federation (see the judgment of Lord Denning MR, at p 781) said that it was a case of indirect inducement because the federation "did not exert directly any pressure or inducement on the wholesalers: but at most they only did it indirectly by recommending the retailers to give stop orders". Lord Denning said that it did not matter whether one procured a breach of contract "by direct approach to the one who breaks the contract or by indirect influence through others". There seems to me much sense in this observation, although whether it leads to the conclusion that the defendant should be liable in both cases or neither is another matter.

35 In *Torquay Hotel Co Ltd v Cousins* [1969] 2 Ch 106, 138–139, Lord Denning changed his mind. He said that there was a distinction between "direct persuasion", which was "unlawful in itself", and bringing about a breach by indirect methods, which had to involve independently unlawful means. On reconsideration of the *Daily Mirror* case he thought the federation had "interfered directly by getting the retailers as their agents to approach the wholesalers".

36 This treats the distinction as turning simply upon whether there was communication, directly or through an agent, between the defendant and the contract-breaker. But, like Lord Denning in the *Daily Mirror* case, I cannot see why this should make a difference. If that is what the distinction between "direct" and "indirect" means, it conceals the real question which has to be asked in relation to *Lumley v Gye* 2 E & B 216: did the defendant's acts of encouragement, threat, persuasion and so forth have a sufficient causal connection with the breach by the contracting party to attract accessory liability? The court in *Lumley v Gye* made it clear that the principle upon which a person is liable for the act of another in breaking his contract is the same as that on which he is liable for the act of another in committing a tort. It follows, as I have said, that the relevant principles are to be found in cases such as *CBS Songs Ltd v Amstrad Consumer Electronics plc* [1988] AC 1013 and *Unilever plc v Chefaro Proprietaries Ltd* [1994] FSR 135. By the test laid down in these cases, the federation could not have incurred any liability. They were not encouraging or assisting the

wholesalers in breaking their contracts. They were simply advising their members to exercise their own freedom to buy whatever newspapers they liked. The wholesalers had no right to the co-operation of the retailers in enabling them to perform their contracts. Liability could not depend upon the accident of whether the federation had communicated (directly or through an intermediary) with the wholesalers. The distinction between direct and indirect interference was therefore irrelevant and misleading.

37 The distinction between direct and indirect interference has the further disadvantage that it suggests that the "primary form" of the *Lumley v Gye* tort and the extension of the tort are mutually exclusive. Interference cannot be both direct and indirect. But, as I have said earlier, there is no reason why the same act should not create both accessory liability for procuring a breach of contract and primary liability for causing loss by unlawful means.

38 In my opinion, therefore, the distinction between direct and indirect interference is unsatisfactory and it is time for the unnatural union between the *Lumley v Gye* tort and the tort of causing loss by unlawful means to be dissolved. They should be restored to the independence which they enjoyed at the time of *Allen v Flood*. I shall therefore proceed to discuss separately the essential elements of each.

*Inducing breach of contract: elements of the Lumley v Gye tort*

39 To be liable for inducing breach of contract, you must know that you are inducing a breach of contract. It is not enough that you know that you are procuring an act which, as a matter of law or construction of the contract, is a breach. You must actually realize that it will have this effect. Nor does it matter that you ought reasonably to have done so. This proposition is most strikingly illustrated by the decision of this House in *British Industrial Plastics Ltd v Ferguson* [1940] 1 All ER 479, in which the plaintiff's former employee offered the defendant information about one of the plaintiff's secret processes which he, as an employee, had invented. The defendant knew that the employee had a contractual obligation not to reveal trade secrets but held the eccentric opinion that if the process was patentable, it would be the exclusive property of the employee. He took the information in the honest belief that the employee would not be in breach of contract. In the Court of Appeal [1938] 4 All ER 504, 513, MacKinnon LJ observed tartly that in accepting this evidence the judge had "vindicated his honesty . . . at the expense of his intelligence" but he and the House of Lords agreed that he could not be held liable for inducing a breach of contract.

40 The question of what counts as knowledge for the purposes of liability for inducing a breach of contract has also been the subject of a consistent line of decisions. In *Emerald Construction Co Ltd v Lowthian* [1966] 1 WLR 691 union officials threatened a building contractor with a strike unless he terminated a subcontract for the supply of labour. The defendants obviously knew that there was a contract—they wanted it terminated—but the court found that they did not know its terms and, in particular, how soon it could be terminated. Lord Denning MR said, at pp 700–701:

"Even if they did not know the actual terms of the contract, but had the means of knowledge—which they deliberately disregarded—that would be enough. Like the man who turns a blind eye. So here, if the officers deliberately sought to get this contract terminated, heedless of its terms, regardless whether it was terminated by breach or not, they would do wrong. For it is unlawful for a third person to procure a breach of contract knowingly, or recklessly, indifferent whether it is a breach or not."

41 This statement of the law has since been followed in many cases and, so far as I am aware, has not given rise to any difficulty. It is in accordance with the general principle of law that a conscious decision not to inquire into the existence of a fact is in many cases treated as equivalent to knowledge of that fact: see *Manifest Shipping Co Ltd v Uni-Polaris Insurance Co Ltd* [2003] 1 AC 469. It is not the same as negligence or even gross negligence: in *British Industrial Plastics Ltd v Ferguson* [1940] 1 All ER 479, for example, Mr Ferguson did not deliberately abstain from inquiry into whether disclosure of the secret process would be a breach of contract. He negligently made the wrong inquiry, but that is an altogether different state of mind.

42 The next question is what counts as an intention to procure a breach of contract. It is necessary for this purpose to distinguish between ends, means and consequences. If someone knowingly causes a breach of contract, it does not normally matter that it is the means by which he intends to achieve some further end or even that he would rather have been able to achieve that end without causing a breach. Mr Gye would very likely have preferred to be able to obtain Miss Wagner's services without her having to break her contract. But that did not matter. Again, people seldom knowingly cause loss by unlawful means out of simple disinterested malice. It is usually to achieve the further end of securing an economic advantage to themselves. As I said earlier, the Dunlop employees who took off the tyres in *GWK Ltd v Dunlop Rubber Co Ltd* 42 TLR 376 intended to advance the interests of the Dunlop company.

43 On the other hand, if the breach of contract is neither an end in itself nor a means to an end, but merely a foreseeable consequence, then in my opinion it cannot for this purpose be said to have been intended. That, I think, is what judges and writers mean when they say that the claimant must have been "targeted" or "aimed at". In my opinion the majority of the Court of Appeal was wrong to have allowed the action in *Millar v Bassey* [1994] EMLR 44 to proceed. Miss Bassey had broken her contract to perform for the recording company and it was a foreseeable consequence that the recording company would have to break its contracts with the accompanying musicians, but those breaches of contract were neither an end desired by Miss Bassey nor a means of achieving that end.

44 Finally, what counts as a breach of contract? In *Torquay Hotel Co Ltd v Cousins* [1969] 2 Ch 106, 138 Lord Denning said that there could be liability for preventing or hindering performance of the contract on the same principle as liability for procuring a breach. This dictum was approved by Lord Diplock in *Merkur Island Shipping Corpn v Laughton* [1983] 2 AC 570, 607–608. One could therefore have liability for interference with contractual relations even though the contracting party committed no

breach. But these remarks were made in the context of the unified theory which treated procuring a breach as part of the same tort as causing loss by unlawful means. If the torts are to be separated, then I think that one cannot be liable for inducing a breach unless there has been a breach. No secondary liability without primary liability. Cases in which interference with contractual relations has been treated as coming within the *Lumley v Gye* tort (like *Dimbleby & Sons Ltd v National Union of Journalists* [1984] 1 WLR 67 and [1984] 1 WLR 427) are really cases of causing loss by unlawful means.

*Causing loss by unlawful means: elements of the tort*

45 The most important question concerning this tort is what should count as unlawful means. It will be recalled that in *Allen v Flood* [1898] AC 1, 96, Lord Watson described the tort thus:

> "when the act induced is within the right of the immediate actor, and is therefore not wrongful in so far as he is concerned, it may yet be to the detriment of a third party; and in that case . . . the inducer may be held liable if he can be shewn to have procured his object by the use of illegal means directed against that third party."

46 The rationale of the tort was described by Lord Lindley in *Quinn v Leathem* [1901] AC 495, 534–535:

> "a person's liberty or right to deal with others is nugatory, unless they are at liberty to deal with him if they choose to do so. Any interference with their liberty to deal with him affects him. If such interference is justifiable in point of law, he has no redress. Again, if such interference is wrongful, the only person who can sue in respect of it is, as a rule, the person immediately affected by it; another who suffers by it has usually no redress; the damage to him is too remote, and it would be obviously practically impossible and highly inconvenient to give legal redress to all who suffer from such wrongs. But if the interference is wrongful and is intended to damage a third person, and he is damaged in fact—in other words, if he is wrongfully and intentionally struck at through others, and is thereby damnified—the whole aspect of the case is changed: the wrong done to others reaches him, his rights are infringed although indirectly, and damage to him is not remote or unforeseen, but is the direct consequence of what has been done."

47 The essence of the tort therefore appears to be (a) a wrongful interference with the actions of a third party in which the claimant has an economic interest and (b) an intention thereby to cause loss to the claimant. The old cases of interference with potential customers by threats of unlawful acts clearly fell within this description. So, for the reasons I have given, did *GWK Ltd v Dunlop Rubber Co Ltd* 42 TLR 376. Recent cases in which the tort has been discussed have also concerned wrongful threats or actions against employers with the intention of causing loss to an employee (as in *Rookes v Barnard* [1964] AC 1129) or another employer (as in *J T Stratford & Son Ltd v Lindley* [1965] AC 269). In the former case, the defendants conspired to threaten the employer that unless the employee was dismissed, there would be an unlawful strike. In the latter, the union committed the

*Lumley v Gye* tort of inducing breaches of the contracts of the employees of barge hirers to prevent them from hiring the plaintiff's barges.

48 In the *Stratford* case, at pp 329–330, Viscount Radcliffe expressed some disquiet about using the question of whether the actual or threatened strike was or would have been in breach of contract as the touchstone of whether the union or its officers were liable for causing loss by secondary action. These remarks were made in the context of industrial relations, where the use of secondary action has since been comprehensively regulated by statute. In principle, the cases establish that intentionally causing someone loss by interfering with the liberty of action of a third party in breach of a contract with him is unlawful.

49 In my opinion, and subject to one qualification, acts against a third party count as unlawful means only if they are actionable by that third party. The qualification is that they will also be unlawful means if the only reason why they are not actionable is because the third party has suffered no loss. In the case of intimidation, for example, the threat will usually give rise to no cause of action by the third party because he will have suffered no loss. If he submits to the threat, then, as the defendant intended, the claimant will have suffered loss instead. It is nevertheless unlawful means. But the threat must be to do something which *would* have been actionable if the third party had suffered loss. Likewise, in *National Phonograph Co Ltd v Edison-Bell Consolidated Phonograph Co Ltd* [1908] 1 Ch 335 the defendant intentionally caused loss to the plaintiff by fraudulently inducing a third party to act to the plaintiff's detriment. The fraud was unlawful means because it would have been actionable if the third party had suffered any loss, even though in the event it was the plaintiff who suffered. In this respect, procuring the actions of a third party by fraud (dolus) is obviously very similar to procuring them by intimidation (metus).

50 *Lonrho plc v Fayed* [1990] 2 QB 479 was arguably within the same principle as the *National Phonograph Co* case. The plaintiff said that the defendant had intentionally caused it loss by making fraudulent statements to the directors of the company which owned Harrods, and to the Secretary of State for Trade and Industry, which induced the directors to accept his bid for Harrods and the Secretary of State not to refer the bid to the Monopolies Commission. The defendant was thereby able to gain control of Harrods to the detriment of the plaintiff, who wanted to buy it instead. In the Court of Appeal, Dillon LJ, at p 489, referred to the *National Phonograph* case as authority for rejecting an argument that the means used to cause loss to the plaintiff could not be unlawful because neither the directors nor the Secretary of State had suffered any loss. That seems to me correct. The allegations were of fraudulent representations made to third parties, which would have been actionable by them if they had suffered loss, but which were intended to induce the third parties to act in a way which caused loss to the plaintiff. The Court of Appeal therefore refused to strike out the claim as unarguable and their decision was upheld by the House of Lords: see [1992] 1 AC 448.

51 Unlawful means therefore consists of acts intended to cause loss to the claimant by interfering with the freedom of a third party in a way which is unlawful as against that third party and which is intended to cause loss to the claimant. It does not in my opinion include acts which may be unlawful

against a third party but which do not affect his freedom to deal with the claimant.

52 Thus in *RCA Corpn v Pollard* [1983] Ch 135 the plaintiff had the exclusive right to exploit records made by Elvis Presley. The defendant was selling bootleg records made at Elvis Presley concerts without his consent. This was an infringement of section 1 of the Dramatic and Musical Performers' Protection Act 1958, which made bootlegging a criminal offence and, being enacted for the protection of performers, would have given Elvis Presley a cause of action: see Lord Diplock in *Lonrho Ltd v Shell Petroleum Co Ltd (No 2)* [1982] AC 173, 187. The Court of Appeal held that the infringement of the Act did not give RCA a cause of action. The defendant was not interfering with the liberty of the Presley estate to perform the exclusive recording contract which, as Oliver LJ noted, at p 149, was "no more than an undertaking that he will not give consent to a recording by anybody else". Nor did it prevent the Presley estate from doing any other act affecting the plaintiffs. The bootlegger's conduct, said Oliver LJ, at p 153: "merely potentially reduces the profits which [the plaintiffs] make as the result of the performance by Mr Presley's executors of their contractual obligations."

53 It is true that there was no allegation that the defendant intended to cause loss to the plaintiff, although, given that the defendant was selling records in competition with the plaintiff, such an allegation would have been easy to make. But I do not think that it would have made any difference. The wrongful act did not interfere with the estate's liberty of action in relation to the plaintiff.

54 Likewise in *Isaac Oren v Red Box Toy Factory Ltd* [1999] FSR 785, one of the claimants was the exclusive licensee of a registered design. The defendant sold articles alleged to infringe the design right. The registered owner had a statutory right to sue for infringement. But the question was whether the licensee could sue. In the case of some intellectual property rights, an exclusive licensee has a statutory right of action: see, for example, section 67(1) of the Patents Act 1977. But the exclusive licensee of a registered design has no such right. So the licensee claimed that the defendant was intentionally causing him loss by the unlawful means of infringing the rights of the registered owner. Jacob J rejected the claim on the principle of *RCA Corpn v Pollard*. The defendant was doing nothing which affected the relations between the owner and licensee. The exclusive licence meant that the licensee was entitled to exploit the design and that the owner contracted not to authorise anyone else to do so. As Jacob J said, at p 798, para 33: "It is true that the exploitation of the licence may not have been so successful commercially by reason of the infringement, but the contractual relations and their performance remain completely unaffected."

55 *Lonrho Ltd v Shell Petroleum Co Ltd (No 2)* [1982] AC 173 was an attempt to found a cause of action simply on the fact that the conduct alleged to have caused loss was contrary to law. The defendant's conduct was alleged to be a criminal offence but not actionable by anyone. In this respect it was unlike *RCA v Pollard* and *Isaac Oren v Red Box Toy Factory Ltd*, in which it could at least be said that the conduct was a wrong against someone in contractual relations with the claimant. Lonrho owned and operated a refinery in Rhodesia supplied by a pipeline from the port of Beira. When Rhodesia declared independence in 1965, the UK imposed sanctions which

made it unlawful for anyone to supply the country with oil. As a result, the refinery and pipeline stood idle until the independence regime came to an end. Lonrho alleged that Shell had prolonged the regime by unlawfully supplying Rhodesia with oil through other routes and thereby caused it loss. The House of Lords decided that the alleged illegality gave rise to no cause of action on which Lonrho could rely. Again, there was no allegation that Shell had intended to cause loss to Lonrho, but I cannot see how that would have made any difference. Shell did not interfere with any third party's dealings with Lonrho and even if it had done so, its acts were not wrongful in the sense of being actionable by such third party.

56 Your Lordships were not referred to any authority in which the tort of causing loss by unlawful means has been extended beyond the description given by Lord Watson in *Allen v Flood* [1898] AC 1, 96 and Lord Lindley in *Quinn v Leathem* [1901] AC 495, 535. Nor do I think it should be. The common law has traditionally been reluctant to become involved in devising rules of fair competition, as is vividly illustrated by *Mogul Steamship Co Ltd v McGregor Gow & Co* [1892] AC 25. It has largely left such rules to be laid down by Parliament. In my opinion the courts should be similarly cautious in extending a tort which was designed only to enforce basic standards of civilised behaviour in economic competition, between traders or between employers and labour. Otherwise there is a danger that it will provide a cause of action based on acts which are wrongful only in the irrelevant sense that a third party has a right to complain if he chooses to do so. As Jacob J said in *Isaac Oren v Red Box Toy Factory Ltd* [1999] FSR 785, 800, para 42:

> "the right to sue under intellectual property rights created and governed by statute are inherently governed by the statute concerned. Parliament in various intellectual property statutes has, in some cases, created a right to sue, and in others not. In the case of the 1988 Act it expressly re-conferred the right on a copyright exclusive licensee, conferred the right on an exclusive licensee under the new form of property called an unregistered design right (see section 234) but did not create an independent right to sue on a registered design exclusive licensee. It is not for the courts to invent that which Parliament did not create."

57 Likewise, as it seems to me, in a case like *Lonrho Ltd v Shell Petroleum Co Ltd (No 2)* [1982] AC 173, it is not for the courts to create a cause of action out of a regulatory or criminal statute which Parliament did not intend to be actionable in private law.

58 It is not, I think, sufficient to say that there must be a causal connection between the wrongful nature of the conduct and the loss which has been caused. If a trader secures a competitive advantage over another trader by marketing a product which infringes someone else's patent, there is a causal relationship between the wrongful act and the loss which the rival has suffered. But there is surely no doubt that such conduct is actionable only by the patentee.

59 Philip Sales and Daniel Stilitz, "Intentional Infliction of Harm by Unlawful Means" (1999) 115 LQR 411–437, take a very wide view of what can count as unlawful means, arguing that any action which involves a civil wrong against another person or breach of a criminal statute ("any act that

the defendant is not at liberty to commit") should be sufficient. In their opinion, a requirement of a specific intention to "target" the claimant should keep the tort within reasonable bounds. Tony Weir in the Clarendon Law Lectures "Economic Torts" is of much the same opinion. But other writers consider that it would be arbitrary and illogical to make liability depend upon whether the defendant has done something which is wrongful for reasons which have nothing to do with the damage inflicted on the claimant: see Roderick Bagshaw's review of Weir in "Can the Economic Torts be Unified" (1998) 18 Oxford JLS 729–739, at p 732. I agree.

60 I do not think that the width of the concept of "unlawful means" can be counteracted by insisting upon a highly specific intention, which "targets" the plaintiff. That, as it seems to me, places too much of a strain on the concept of intention. In cases in which there is obviously no reason why a claimant should be entitled to rely on the infringement of a third party's rights, courts are driven to refusing relief on the basis of an artificially narrow meaning of intention which causes trouble in later cases in which the defendant really has used unlawful means. This, as I shall in due course explain, is what may have happened in the *Hello!* case.

61 I would only add one footnote to this discussion of unlawful means. In defining the tort of causing loss by unlawful means as a tort which requires interference with the actions of a third party in relation to the plaintiff, I do not intend to say anything about the question of whether a claimant who has been compelled by unlawful intimidation to act to his own detriment, can sue for his loss. Such a case of "two party intimidation" raises altogether different issues.

62 Finally, there is the question of intention. In the *Lumley v Gye* tort, there must be an intention to procure a breach of contract. In the unlawful means tort, there must be an intention to cause loss. The ends which must have been intended are different. *South Wales Miners' Federation v Glamorgan Coal Co Ltd* [1905] AC 239 shows that one may intend to procure a breach of contract without intending to cause loss. Likewise, one may intend to cause loss without intending to procure a breach of contract. But the concept of intention is in both cases the same. In both cases it is necessary to distinguish between ends, means and consequences. One intends to cause loss even though it is the means by which one achieved the end of enriching oneself. On the other hand, one is not liable for loss which is neither a desired end nor a means of attaining it but merely a foreseeable consequence of one's actions.

63 The master of the *Othello* in *Tarleton v M'Gawley* Peake 270 may have had nothing against the other trader. If he had gone off to make his fortune in other waters, he would have wished him well. He simply wanted a monopoly of the local trade for himself. But he nevertheless intended to cause him loss. This, I think, is all that Woolf LJ was intending to say in a passage in *Lonrho plc v Fayed* [1990] 2 QB 479, 494 which has proved controversial:

> "Albeit that he may have no desire to bring about that consequence in order to achieve what he regards as his ultimate ends, from the point of view of the plaintiff, whatever the motive of the defendant, the damage which he suffers will be the same."

64 On the other hand, I think that Henry J was right in *Barretts & Baird (Wholesale) Ltd v Institution of Professional Civil Servants* [1987] IRLR 3 when he decided a strike by civil servants in the Ministry of Agriculture in support of a pay claim was not intended to cause damage to an abattoir which was unable to obtain the certificates necessary for exporting meat and claiming subsidies. The damage to the abattoir was neither the purpose of the strike nor the means of achieving that purpose, which was to put pressure on the government.

*Back to the three appeals*

65 My Lords, after this somewhat lengthy clearing of the ground I can come to the three appeals before the House. In arriving at these statements of general principle, I have derived great assistance from many who have written on the subject in addition to those whom I have specifically cited and in particular, if what I have said does anything to clarify what has been described as an extremely obscure branch of the law, much is owing to Hazel Carty's book *An Analysis of the Economic Torts* (2001).

*Mainstream Properties Ltd v Young*

66 I shall start with the *Mainstream* case, because it is the easiest and provides a useful stepping stone to the other two. Mainstream was a development company owned and controlled by Mr Moriarty. He engaged Mr Young as a working director and Mr Broad as a manager and left the business to them. In 2000 they diverted the purchase of development land at Findern in Derbyshire to a joint venture consisting of themselves and the respondent Mr De Winter, who financed the project. Judge Norris QC, in a detailed and lucid judgment, found that this was a breach of their contractual and fiduciary duties to obtain the property for Mainstream.

67 There is no challenge to these findings but the question in this appeal is whether Mr De Winter is liable in tort for inducing Mr Young and Mr Broad to break their contracts. The cause of action is therefore the original *Lumley v Gye* tort, based on accessory liability. The judge found that Mr Young and Mr Broad could not have acquired the property without Mr De Winter's financial assistance. His participation was therefore causative. He also knew that they were employed by Mainstream and that there was an obvious potential conflict between their duties to Mainstream and their participation in the joint venture. But the judge found that Mr De Winter was a cautious man who had raised the question of conflict of interest with Mr Young and Mr Broad and had received an assurance that there was no conflict because Mainstream had been offered the site but refused it. This was untrue but Mr Winter genuinely believed it. He had been given a similar (and more truthful) assurance concerning another project which Mr Young and Mr Broad had brought to him in the previous year and that, said the judge, "was now proceeding smoothly without objection".

68 On these findings of fact the judge found that Mr Winter did not intend to procure a breach of the contracts of employment or otherwise interfere with their performance. The claim against him was therefore dismissed. This finding was upheld [2005] IRLR 964 by the Court of Appeal (Sedley, Arden LJJ and Aikens J).

69 In my opinion this case comes squarely within *British Industrial Plastics Ltd v Ferguson* [1940] 1 All ER 479. On the finding of the judge, Mr De Winter honestly believed that assisting Mr Young and Mr Broad with the joint venture would not involve them in the commission of breaches of contract. Nor can Mr De Winter be said to have been indifferent to whether there was a breach of contract or not, as in *Emerald Construction Co Ltd v Lowthian* [1966] 1 WLR 691, or made a conscious decision not to inquire in case he discovered a disagreeable truth. He therefore did not intend to cause a breach of contract and the conditions for accessory liability under the *Lumley v Gye* tort are not satisfied. Nor is there any question of his having caused loss by unlawful means. He neither intended to cause loss to Mainstream nor used any unlawful means.

70 Your Lordships were referred by Mr Randall, who appeared for Mainstream, to a number of authorities. But they concerned different questions and none of them cast any doubt upon the proposition that one cannot be liable for inducing a breach of contract unless one intended to cause a breach. For example, in *Smithies v National Association of Operative Plasterers* [1909] 1 KB 310 the union undoubtedly intended to cause a breach of the workmen's contracts of service. But they claimed to be entitled to do so because the employer had not adhered to a collective agreement. The Court of Appeal rejected this defence but the case has nothing to do with the requirements of knowledge and intention. In *Greig v Insole* [1978] 1 WLR 302 the International Cricket Conference knew that the cricketers were contracted to play for Mr Kerry Packer's company but put pressure upon them to withdraw, indifferent as to whether this would cause breaches of contract or not. As Slade J observed, the case fell within the principle of *Emerald Construction Co Ltd v Lowthian* [1966] 1 WLR 691. This case clearly does not. The other cases cited by Mr Randall were similarly concerned with indifference, conscious decision not to inquire or different torts.

71 Finally, Mr Randall said that even if the judge's findings exonerated Mr De Winter from the charge of inducing a breach of the obligation of good faith which required Mr Young and Mr Broad to make the Findern property available to Mainstream, it did not provide any answer to a claim that he had induced a breach of their obligation to give their full time and attention to Mainstream's business. Mr De Winter did not say he had inquired into whether they had asked Mr Moriarty for permission to participate in the joint venture; the evidence was that they had not asked and that if they had, permission would not have been given.

72 This is a point which appeared for the first time in supplemental submissions to the Court of Appeal. The Court of Appeal did not deal with it. There had been no suggestion at the trial that Mainstream was making a separate claim for loss of the services of Mr Young and Mr Broad while they were working for the joint venture. Nothing was put to Mr De Winter about whether he thought they were free to do so. No attempt was made to assess what might have been the damage flowing from such a breach. In my opinion it is not open to Mainstream now to reformulate its case in this way. I would dismiss the Mainstream appeal.

*OBG Ltd v Allan*

73 OBG Ltd and OBG (Plant and Transport Hire) Ltd (which I shall refer to together as OBG as if they were one company, which for practical purposes they were) carried on business laying and maintaining underground pipes. OBG's main customer was North West Water Ltd ("NWW"), with whom it had a profitable running contract in Civil Engineers Conditions of Contract form for laying and maintaining water pipes, under which it was paid monthly against engineer's certificates. There were also other customers. OBG employed a specialist subcontractor called Raymond Centriline Ltd ("Centriline") to line pipes with mortar mix or epoxy resin.

74 In the spring of 1992 OBG had the misfortune to fall out with NWW, which took the view that recent work had been substandard and that it had been overcharged. There was an investigation as a result of which the engineer "decertified" substantial past payments. NWW set off the decertified sums against money due on current certificates and withheld further orders. The result was that OBG's cash flow dried up and it became insolvent in the sense of being unable to pay its debts as they fell due.

75 OBG attempted to obtain financial support from Centriline, which had an interest in its future not only as a subcontractor but also as a creditor to the tune of over £1m. In the course of these negotiations Centriline took an assignment from Royal Bank of Scotland of an all-moneys debenture secured by the floating charge over OBG's assets and undertaking. The negotiations fell through and on 9 June 1992 Centriline appointed the defendants, Mr Allan and Mr Stevenson, as administrative receivers under the floating charge.

76 Unfortunately OBG had owed nothing to the bank and no secured debt was assigned with the debenture. Centriline was advised by its solicitors that it could tack its own unsecured debt onto the empty debenture. This advice is admitted to have been wrong; indeed, negligent. Centriline was therefore not entitled to appoint receivers. But it and the receivers believed in good faith that the appointment was valid.

77 The receivers went into possession of the premises and chattels owned by OBG and took control of its affairs. NWW elected to treat the insolvency of OBG as an event of default and terminated its contracts. The receivers arranged for the completion of the contracts with other customers. There followed lengthy negotiations with NWW, with the receivers claiming that OBG was owed money under the contracts and NWW asserting cross-claims. Eventually, in November 1993, the receivers agreed in principle to accept £400,000 in full and final settlement.

78 By this time it was clear that OBG was challenging the validity of the appointment of the receivers. The company had gone into creditors' voluntary liquidation on 19 June 1992, ten days after the appointment of the receivers. The liquidator had taken advice on the validity of the appointment. NWW was reluctant to conclude a settlement with the receivers unless the liquidator also became a party. On 19 October 1995 OBG, acting by the liquidator, issued these proceedings, claiming a declaration that the appointment had been invalid and damages. On 15 August 1997 the settlement with NWW was finally executed, with the liquidator concurring.

79 Judge Maddocks QC tried the case in stages. After hearing argument on the validity of the appointment, he made a declaration on 31 January 2001 that it had been invalid. There is no challenge to this ruling. He adjourned the question of what damages, if any, OBG could in consequence claim.

80 There followed some interlocutory hearings and pleadings in which OBG was asked to state the basis on which it made its claim. This was put in various ways, but I need not concern myself with the claims that it would have survived to become profitable or that its assets would have been realised more advantageously in administration, because the judge found on the facts that neither of these things would have happened. Insolvent liquidation was inevitable.

81 OBG's case, as it emerged, was that by taking control of OBG's assets and undertaking on 9 June 1992, the receivers became liable in damages for their value on that date. Liability was alleged to be strict. The cause of action giving rise to this liability was, as to the land and chattels, trespass and conversion, and as to the contractual claims, wrongful interference with contractual relations. The defendants admitted liability for trespass to the land and conversion of the chattels, but denied that they had unlawfully interfered with the contractual rights. OBG's alternative case was that the receivers had converted the entire assets and undertaking, including the contractual claims. The answer of the receivers was that conversion is a tort against chattels and not against contractual claims.

82 The judge dealt with the case on the basis that if he found that either of these causes of action was well founded, he was concerned only to value the company's assets and undertaking on 9 June 1992 and then to give credit for the sums for which the receivers had accounted to the liquidator. The rest was damages. He assessed this figure at £1,854,000, most of which was attributable to the difference between the value which he put on the claims against NWW as at 9 June 1992 and the £400,000 for which the company had agreed to settle them five years later.

83 There was no allegation that the receivers had been negligent. Nor was it regarded as necessary to ask whether the assumption of control by the receivers had caused the disparity between the value at that date and the amount subsequently realised—whether, for example, the value of the assets had fallen for a reason which had nothing to do with who was in control of them. The receivers were alleged to be strictly liable, on one basis or the other, for the value of the assets on the day they were appointed. Nothing that happened after that date, or would have happened if they had not been appointed, was regarded as relevant.

84 The judge found that OBG had a cause of action for interference with contractual relations. He referred to Lord Macnaghten's dictum in *Quinn v Leathem* [1901] AC 495 and to *Greig v Insole* [1978] 1 WLR 302. It was true that the receivers had not interfered with performance of the contracts, still less caused them to be breached. They had conducted negotiations in the bona fide belief that they were entitled to act on behalf of OBG. But, he said, "that factor serves only to create the interference more directly". He rejected the alternative claim for conversion of contractual rights.

85 The Court of Appeal (Peter Gibson, Mance and Carnwath LJJ) [2005] QB 762 unanimously upheld the judge's rejection of the conversion

claim but by a majority (Mance LJ dissenting) allowed the appeal against the finding of wrongful interference with contractual rights. OBG pursued both causes of action in the appeal to your Lordships' House and I shall deal with them in turn.

*Interference with contractual relations*

86 The present case amply illustrates the dangers of a broad reading of Lord Macnaghten's reference to "interference" in *Lumley v Gye* (1853) 2 E & B 216 and the promiscuous application of cases on accessory liability (such as *Greig v Insole* [1978] 1 WLR 302) to a case which, on any view, can only be a case of primary liability. There are only two possible causes of action: procuring a breach of contract in a way which creates accessory liability under *Lumley v Gye* or causing loss by unlawful means. It is, I think, plain and obvious that the requirements for liability under neither of these torts were satisfied. There was no breach or non-performance of any contract and therefore no wrong to which accessory liability could attach. And the receivers neither employed unlawful means nor intended to cause OBG any loss.

87 I must, however, advert to the grounds upon which Mance LJ dissented on this point. He said, at para 86, that a "central question" was

> "whether the tort of interference in the execution of a contract is capable of covering the situation of an unauthorised agent, who takes over the handling of a contract with a view to its performance by settlement of mutual contractual rights and obligations but with the result that the 'principal' suffers a loss which he would not otherwise have suffered. The generality of the phrase 'interference in the execution of a contract' has so far only been held to extend to the 'procurement of a breach' or the 'prevention' or 'hindrance' of 'performance'. The tort is not, however, limited to protecting contractual interests, and it must in my view extend to some situations where a person's pre-existing legal position is adversely affected in a more general manner than falls directly within any of the latter phrases."

88 I would first observe that there was no finding that as a *result* of the unauthorised taking over of the handling of the contracts by the receivers, OBG suffered a loss which it would not otherwise have suffered. As the claim was formulated by OBG, this question of causation was treated as irrelevant. The judge simply held the receivers liable for the value of the contracts on 9 June 1992.

89 Secondly, if there had been an investigation of this question, it is doubtful whether a causal connection between the assumption of control and the putative loss could have been established. Mance LJ suggested that the acts of the receivers might have been binding upon OBG, and thereby committed it to a disadvantageous settlement, by virtue of section 232 of the Insolvency Act 1986:

> "The acts of an individual as administrator, administrative receiver, liquidator or provisional liquidator of a company are valid notwithstanding any defect in his appointment, nomination or qualifications."

90 For my part, I rather doubt, as the judge did, whether this section would have applied to the administrative receivers in this case. In *Morris v Kanssen* [1946] AC 459, 471 this House considered the effect of a similar provision relating to the acts of directors, which was then contained in section 143 of the Companies Act 1929. Lord Simonds said:

> "There is, as it appears to me, a vital distinction between (a) an appointment in which there is a defect or, in other words, a defective appointment, and (b) no appointment at all. In the first case it is implied that some act is done which purports to be an appointment but is by reason of some defect inadequate for the purpose; in the second case there is not a defect, there is no act at all. The section does not say that the acts of a person acting as director shall be valid notwithstanding that it is afterwards discovered that he was not appointed a director. Even if it did, it might well be contended that at least a purported appointment was postulated. But it does not do so, and it would, I think, be doing violence to plain language to construe the section as covering a case in which there has been no genuine attempt to appoint at all. These observations apply equally where the term of office of a director has expired, but he nevertheless continues to act as a director, and where the office has been from the outset usurped without the colour of authority."

91 In this case there was no colour of authority for the appointment of the receivers. Although it is unnecessary to express a concluded view, I think that it follows from *Morris v Kanssen* that section 232 would have had no application. If it had, it would have operated for the benefit of the receivers as well as anyone who dealt with them. There is nothing in its language to suggest that its application is in any way restricted. (One may compare the explicit language of many other provisions for the protection of outside parties, such as section 14(6) of the Insolvency Act 1986.)

92 That does not mean that a contract made by a person dealing in good faith with someone purporting to be a receiver, as in this case, can be repudiated by the company. As Lord Simonds went on to point out in *Morris v Kanssen* [1946] AC 460, such a person can rely on the principle of ostensible authority which in company law goes under the name of the rule in *Royal British Bank v Turquand* (1856) 6 E & B 327. In this case, however, it was unnecessary to invoke either that rule or section 232, because NWW refused to rely upon the ostensible authority of the receivers. They insisted upon the liquidator joining in the settlement. The liquidator was at liberty to refuse, but he did so. In order to establish a causal connection between the conduct of negotiations by the receivers and a loss which the company would not otherwise have suffered, it would be necessary to show that those negotiations somehow prejudiced the position of the company in a way which the liquidator could not repair by insisting that the deal be renegotiated.

93 Be all that as it may, the question remains as to whether there is a tort of the breadth contemplated by Mance LJ, by which a purported agent can be strictly liable for causing the principal loss by making him liable, by virtue of ostensible authority, under a disadvantageous contract. In my opinion, there is not the slightest authority for such a tort. It may be that, in some of the examples of unauthorised agency postulated by Mance LJ, there will be an implied contract which makes him liable for exceeding his actual

authority, just as the agent gives an implied warranty of authority to the third party with whom he deals. But there is, in my opinion, no such liability outside contract. Mance LJ said [2005] QB 762, 789, para 90, "the tort protects from interference legal interests beyond the merely contractual". If that is a reference to the tort of causing loss by unlawful means, then so it does. But it requires unlawful means and an intention to cause loss, neither of which were present in this case.

*Conversion*

94 The case in conversion was unanimously rejected by all the judges who heard the *OBG* case and it might therefore be sufficient to say that I agree with them. But the claim was given considerable prominence in argument, with a good deal of reference to North American authorities, and I shall therefore deal with it at greater length.

95 Everyone agrees that conversion is historically a tort against a person's interest in a chattel, being derived from the action for trover, which included a fictitious allegation that the plaintiff had lost the chattel and that the defendant had found it. Secondly, and consistently with its ancient origin, conversion is a tort of strict liability. Anyone who converts a chattel, that is to say, does an act inconsistent with the rights of the owner, however innocent he may be, is liable for the loss caused which, if the chattel has not been recovered by the owner, will usually be the value of the goods. *Fowler v Hollins* (1872) LR 7 QB 616 was a claim for conversion of bales of cotton bought in good faith through a broker in Liverpool. The purchasers were nevertheless held strictly liable. Cleasby B said robustly, at p 639, that:

> "the liability under it is founded upon what has been regarded as a salutary rule for the protection of property, namely, that persons deal with the property in chattels or exercise acts of ownership over them at their peril."

96 Advising the House of Lords on appeal from this decision, Blackburn J was more sympathetic. He said, *Hollins v Fowler* (1875) LR 7 HL 757, 765 that the result was hard on the innocent purchasers but added:

> "If, as is quite possible, the changes in the course of business since the principles of law were established make them cause great hardships or inconvenience, it is the province of the legislature to alter the law."

97 Parliament has responded with legislation such as the Factors Act 1889 (52 & 53 Vict c 45), section 4 of the Cheques Act 1957 (which protects a collecting bank against liability for conversion of a cheque to which its customer had no title) and section 234(3) of the Insolvency Act 1986, which, in the absence of negligence, protects an administrative receiver who "seizes or disposes of any property which is not property of the company" against liability. But there are no such protective provisions in relation to anything other than chattels. Why not? Obviously because Parliament thought them to be unnecessary. It would never have occurred to Parliament that strict liability for conversion could exist for anything other than chattels. The whole of the statutory modification of the law of conversion has been on the assumption that it applies only to chattels. There has been no discussion of

the question of whether an extension of conversion to choses in action would require a corresponding or even greater degree of protection for people acting in good faith.

98 Mr Randall, who appeared for OBG, drew attention to paras 829 and 830 of the Report of the Review Committee on Insolvency Law and Practice (the Cork Committee) (1982) (Cmnd 8558), which endorsed a recommendation of the Jenkins Committee (Cmnd 1749) (1962) that the court should be given power to relieve an invalidly appointed receiver from liability for acts which would have been lawful if the appointment had been valid. Parliament has not given effect to this recommendation. He suggested that this omission should be regarded as somehow justifying a drastic *extension* of the liability of such receivers for conversion. The fallacy in this reasoning does not need to be underlined.

99 By contrast with the approving attitude of Cleasby B to the protection of rights of property in chattels, it is a commonplace that the law has always been very wary of imposing any kind of liability for purely economic loss. The economic torts which I have discussed at length are highly restricted in their application by the requirement of an intention to procure a breach of contract or to cause loss by unlawful means. Even liability for causing economic loss by negligence is very limited. Against this background, I suggest to your Lordships that it would be an extraordinary step suddenly to extend the old tort of conversion to impose strict liability for pure economic loss on receivers who were appointed and acted in good faith. Furthermore, the effects of such a change in the law would of course not stop there. *Hunter v Canary Wharf Ltd* [1997] AC 655, 694 contains a warning from Lord Goff of Chieveley (and other of their Lordships) against making fundamental changes to the law of tort in order to provide remedies which, if they are to exist at all, are properly the function of other parts of the law.

100 As to authority for such a change, it hardly needs to be said that in English law there is none. I need go no further than *Halsbury's Laws of England*, 4th ed reissue vol 45(2) (1999), para 547, which says "The subject matter of conversion or trover must be specific personal property, whether goods or chattels". The Law Revision Committee was invited, in 1967, to consider "whether any changes are desirable in the law relating to conversion and detinue". In its 18th Report (Conversion and Detinue) in 1971 (Cmnd 4774) the committee treated them both as confined to wrongful interference with chattels. They made various recommendations for changes in the law but none for the extension of conversion to intangible choses in action. On the contrary, the Torts (Interference with Goods) Act 1977, which was passed as a result of their recommendations, defined "wrongful interference with goods" to include "conversion of goods" (section 1) and defined "goods" in section 14(1) to include "all chattels personal other than things in action and money".

101 Mr Randall relied upon authorities in Canada and the United States. I can find no discussion in the Canadian cases of whether a claim for conversion can be made in respect of a chose in action. These cases are analysed by Peter Gibson LJ in his judgment in the Court of Appeal [2005] QB 762, 777–778 and I do not think that I should lengthen this judgment by adding to his comments. For the reasons which he gives, I derive no assistance from them. There are certainly cases in the United States which

support Mr Randall's submission and which form part of the profligate extension of tort law which has occurred in that country. Perhaps the most remarkable is the decision of the Federal Court of Appeals (9th Circuit) in *Kremen v Online Classifieds Inc* (2003) 337 F 3d 1024, in which it was held that a publicly-funded company which provided gratuitous registration of internet domain names could be liable in conversion, on a footing of strict liability, for transferring a registered name to a third party, having acted in good faith on the authority of a forged letter. The court held that the domain name was intangible property which could be converted in the same way as a chattel and that the registration company could be liable for its value. I have no difficulty with the proposition that a domain name may be intangible property, like a copyright or trade mark, but the notion that a registrar of such property can be strictly liable for the common law tort of conversion is, I think, foreign to English law.

102 The American cases make a good deal of the line of authority, which in England goes back to the beginning of the 19th century or earlier, by which a person who misappropriates a document which constitutes or evidences title to a debt can be liable in conversion for the face value of the document. Surely, it was said, in such cases the action is in substance for conversion of the debt, a chose in action, and if that is right, then why not have conversion of any chose in action?

103 But the document cases have been recognised to be an anomaly created by the judges to solve a particular problem, namely that a person who wrongfully secures payment of money due to another cannot be sued by the true creditor for money had and received to his use. That is because the creditor is not the owner of the money. The wrongful payment was treated as a matter between the paying party and the recipient which did not affect the creditor's position. Thus in *Rogers v Kelly* (1809) 2 Camp 123 a bank had mistakenly paid the defendant some money which the plaintiff had deposited. Lord Ellenborough said: "There is no privity between the parties to this suit. The plaintiff's claim is on the bankers, and they must seek their remedy against the defendant the best way they can."

104 But in cases in which the title to the debt was evidenced by a negotiable instrument, or even in some cases where it was not negotiable, the wrongful misappropriation of the document could cause actual loss to the true creditor, who might not be able to recover the debt. That left a gap in the law. The judges filled it by treating the misappropriation as a conversion of a chattel equal in value to the debt which it evidenced. In *Morison v London County and Westminster Bank Ltd* [1914] 3 KB 356, 379 Phillimore LJ was not altogether confident about explaining the basis of the rule:

> "The defendant bank was the holder of the cheques . . . and . . . collected the proceeds in its own right . . . Therefore, the defendant bank converted the cheques. That the damages for such conversion are (at any rate where the drawer has sufficient funds to his credit and the drawee bank is solvent) the face value of the cheques is established in a series of cases . . . so well established that it is not necessary to inquire into the principle which may underlie the authority. But the principle probably is that, though the plaintiff might at any moment destroy the cheques while they remained in his possession, they are potential instruments whereby

the sums they represent may be drawn from his bankers, and, if they get into other hands than his, he will be the loser to the extent of the sums which they represent. It may be also that anyone who has obtained its value by presenting a cheque is estopped from asserting that it has only a nominal value."

105 In *Lloyds Bank Ltd v Chartered Bank of India, Australia and China* [1929] 1 KB 40, 55–56, Scrutton LJ recognised the anomalous and limited nature of the principle:

"Conversion primarily is conversion of chattels, and the relation of bank to customer is that of debtor and creditor. As no specific coins in a bank are the property of any specific customer there might appear to be some difficulty in holding that a bank, which paid part of what it owed its customer to some other person not authorised to receive it, had converted its customer's chattels; but a series of decisions binding on this court, culminating in *Morison's* case [1914] 3 KB 356 and *Underwood's* case [1924] 1 KB 775 have surmounted the difficulty by treating the conversion as of the chattel, the piece of paper, the cheque under which the money was collected, and the value of the chattel converted as the money received under it: see the explanation of Phillimore LJ in *Morison's* case, at p 378."

106 There do not appear to be any judicial statements offering a better explanation. It is in my opinion an insecure base on which to erect a comprehensive system of strict liability for interference with choses in action.

107 The only point on which I would differ from Peter Gibson LJ in his admirable judgment in the Court of Appeal is in his expression of regret (in para 58) that the liquidator had no cause of action. This is not a case in which a wrongful appointment of receivers caused damage to a solvent company. The judge found that the company was inevitably headed for insolvent liquidation. The liquidator sought immediate advice on the legality of the appointment of the receivers and then stood back for over three years, leaving the receivers to negotiate with NWW. The receivers acted in good faith throughout and the liquidator concurred in the settlement they reached. The liquidator then put his case on the basis of an allegation of strict liability which precluded any investigation into his own conduct or whether he could have produced a better result. I can see no reason why such a claim should have succeeded. I would therefore dismiss the liquidator's appeal.

*Douglas v Hello! Ltd*

108 Northern & Shell plc publishes "OK!" magazine and I shall refer to it as "OK!". In November 2000 "OK!" entered into a contract with Michael Douglas and Catherine Zeta-Jones, whom I shall call "the Douglases", for the exclusive right to publish photographs of their forthcoming wedding on 18 November 2000 at the Plaza Hotel, New York. The Douglases dealt with "OK!", who paid them £1m for the rights, in preference to the rival magazine "Hello!", published by the respondent. The Douglases agreed to engage a photographer and to supply "OK!" with pictures they had chosen.

By clause 6 of the agreement they agreed to use their best efforts to ensure that no one else would take any photographs.

109 The Douglases went to some lengths to comply with this obligation and no criticism is made of their security precautions, but a freelance photographer named Rupert Thorpe infiltrated the wedding and took photographs which he sold to "Hello!". "OK!" obtained an ex parte injunction restraining publication by "Hello!" but on 23 November 2000 the injunction was discharged by the Court of Appeal and the photographs were published on the following day. A few hours earlier on the same day "OK!" published its own photographs, having brought forward its date of publication on account of what it knew to be the imminent publication by "Hello!" Also on the same day, some of the unauthorised pictures were, without objection by "Hello!", published in national daily newspapers.

110 "OK!" sued "Hello!" for breach of confidence and for the tort of causing loss by unlawful means. (The Douglases brought separate proceedings against "Hello!" and recovered modest damages, but these are not in issue in this appeal, to which the Douglases are not parties.)

111 Lindsay J [2003] 3 All ER 996 held "Hello!" liable for breach of confidence. He applied the well-known criteria summarised by Megarry J in *Coco v AN Clark (Engineers) Ltd* [1969] RPC 41, 47:

> "First, the information itself . . . must have the necessary quality of confidence about it. Secondly, that information must have been imparted in circumstances importing an obligation of confidence. Thirdly, there must be an unauthorised use of that information to the detriment of the party communicating it."

112 For this purpose the judge identified the information as being photographic images of the wedding. Not information about the wedding generally; anyone was free to communicate the information that the Douglases had been married, describe what the bride wore and so forth. The claim was only that there had been a breach of an obligation of confidence in respect of photographic images.

113 Linday J held that the three conditions were satisfied. As for the first, photographs of the wedding were confidential information in the sense that none were publicly available. As to the second, the Douglases had made it clear that anyone admitted to the wedding was not to make or communicate photographic images. They allowed people to witness their marriage, but only on the basis that the information which the spectators thereby obtained was not communicated in the form of a photographic image. The judge said, at para 197:

> "the very facts that 'Hello!' and 'OK!' competed for exclusivity as they did and that each was ready to pay so much for it points to the commercial confidentiality of coverage of the event. The event was private in character and the elaborate steps to exclude the uninvited, to include only the invited, to preclude unauthorised photography, to control the authorised photography and to have had the claimants' intentions in that regard made clear all conduce to that conclusion. Such images as were, so to speak, radiated by the event were imparted to those present, including Mr Thorpe and his camera, in circumstances importing an obligation of confidence. Everyone there knew that was so."

114 Furthermore, everyone knew that the obligation of confidence was imposed for the benefit of "OK!" as well as the Douglases. To no one could this have been clearer than to Mr Thorpe. The judge then went on to make findings about the circumstances in which "Hello!" had acquired his photographs:

"198. As for the 'Hello!' defendants, their consciences were, in my view, tainted; they were not acting in good faith nor by way of fair dealing. Whilst their position might have been worse had I held that the taking of unauthorised pictures for use by them had been truly commissioned in advance, even without that there is in my view enough to afflict their conscience. They knew that 'OK!' had an exclusive contract; as persons long engaged in the relevant trade, they knew what sort of provisions any such contract would include and that it would include provisions intended to preclude intrusion and unauthorised photography. Particularly would that be so where, as they knew, a very considerable sum would have had to have been paid for the exclusive rights which had been obtained . . . The surrounding facts were such that a duty of confidence should be inferred from them. The 'Hello!' defendants had indicated to paparazzi in advance that they would pay well for photographs and they knew the reputation of the paparazzi for being able to intrude. The unauthorised pictures themselves plainly indicated they were taken surreptitiously. Yet these defendants firmly kept their eyes shut lest they might see what they undeniably knew would have become apparent to them."

115 The obligation of confidence was therefore binding upon "Hello!" and the third *Coco* requirement of use to the detriment of "OK!" was plainly satisfied. Lindsay J therefore decided that "Hello!" was liable to "OK!" for the loss caused by the publication, which he later assessed at £1,033,156.

116 The Court of Appeal [2006] QB 125 (Lord Phillips of Worth Matravers MR, Clarke and Neuberger LJJ) reversed the judge's decision on the ground that the obligation of confidence for the benefit of "OK!" attached only to the photographs which the Douglases authorised them to publish. They did not have the benefit of an obligation of confidence in respect of any other photographs. Their publication may have invaded a residual right of privacy retained by the Douglases but did not infringe any right of "OK!".

117 In my opinion Lindsay J was right. The point of which one should never lose sight is that "OK!" had paid £1m for the benefit of the obligation of confidence imposed upon all those present at the wedding in respect of *any* photographs of the wedding. That was quite clear. Unless there is some conceptual or policy reason why they should not have the benefit of that obligation, I cannot see why they were not entitled to enforce it. And in my opinion there are no such reasons. Provided that one keeps one's eye firmly on the money and why it was paid, the case is, as Lindsay J held, quite straightforward.

118 It is first necessary to avoid being distracted by the concepts of privacy and personal information. In recent years, English law has adapted the action for breach of confidence to provide a remedy for the unauthorised disclosure of personal information: see *Campbell v MGN Ltd* [2004] 2 AC 457. This development has been mediated by the analogy of the right to

privacy conferred by article 8 of the European Convention on Human Rights and has required a balancing of that right against the right to freedom of expression conferred by article 10. But this appeal is not concerned with the protection of privacy. Whatever may have been the position of the Douglases, who, as I mentioned, recovered damages for an invasion of their privacy, "OK!'s" claim is to protect commercially confidential information and nothing more. So your Lordships need not be concerned with Convention rights. "OK!" has no claim to privacy under article 8 nor can it make a claim which is parasitic upon the Douglases' right to privacy. The fact that the information happens to have been about the personal life of the Douglases is irrelevant. It could have been information about anything that a newspaper was willing to pay for. What matters is that the Douglases, by the way they arranged their wedding, were in a position to impose an obligation of confidence. They were in control of the information.

119 Is there any conceptual problem about the fact that the obligation of confidence was imposed only in respect of a particular form of information, namely, photographic images? I do not see why there should be. If "OK!" was willing to pay for the right to be the only source of that particular form of information and did not mind that others were free to communicate other forms of information about the wedding, then I think the Douglases should be able to impose a suitably limited obligation of confidence.

120 Lord Nicholls of Birkenhead and Lord Walker of Gestingthorpe, are troubled by the fact that the information in the photographic images was not intended to be kept secret but to be published to the world by "OK!" and was so published at much the same time as the unauthorised photographs in "Hello!". But I see no reason why there should not be an obligation of confidence for the purpose of enabling someone to be the only source of publication if that is something worth paying for. Why should a newspaper not be entitled to impose confidentiality on its journalists, sub-editors and so forth to whom it communicates information about some scoop which it intends to publish next day? That does not of course prevent publication by someone who receives the information otherwise than under an obligation of confidence. And I say nothing about cases in which there is a public interest in communicating the information to others or the public at large. But otherwise it is simply information of commercial value.

121 Lord Nicholls, is also of opinion that once the approved photographs were published, the publication of the unauthorised photographs was not a breach of confidence. I cannot understand this. Mr Thorpe was subject to an obligation of confidence in respect of the pictures which he took. "Hello!", by reason of the circumstances in which they acquired the pictures, were subject to the same obligation. How could it be destroyed by "OK!'s" publication of other photographs a few hours earlier? He says that the differences between the photographs were "insufficiently significant to call for legal protection"; "the unapproved pictures contained nothing not included in the approved pictures".

122 My Lords, it is certainly the case that once information gets into the public domain, it can no longer be the subject of confidence. Whatever the circumstances in which it was obtained, there is no point in the law providing protection. But whether this is the case or not depends on the nature of the information. Whether there is still a point in enforcing the

obligation of confidence depends on the facts. If the purpose of publishing the pictures was simply to convey the information that the Douglases had married, the bride wore a wedding dress and so forth, then the publication of any photographs would have put that information in the public domain. So would a description of the event. In this case, however, the point of the transaction was that each picture would be treated as a separate piece of information which "OK!" would have the exclusive right to publish. The pictures published by "OK!" were put into the public domain and it would have had to rely on the law of copyright, not the law of confidence, to prevent their reproduction. But no other pictures were in the public domain and they did not enter the public domain merely because they resembled other pictures which had. Why was "Hello!" willing to pay Mr Thorpe so much money for information which was already in the public domain? Why did the judge find that the publication of information which did not, in Lord Nicholls's words, "call for legal protection", had caused substantial financial loss to "OK!"? My Lords, this seems to me a point on which theory is in danger of losing touch with reality.

123 The Court of Appeal's analysis, which treats the obligation of confidence as having been imposed in favour of "OK!" only in respect of the photographs with which it was supplied by the Douglases, also seems to me to make no commercial sense. The essential purpose of the security arrangements and the prohibition of unauthorised photography were to impose an obligation of confidence in respect of *any* pictures of the wedding. Only in that way could the commercial interests of "OK!" be protected. And it was clear to everyone, Mr Thorpe and Señor Sanchez Junco in particular, that this obligation was imposed for the benefit of "OK!" as well as the Douglases. As the Court of Appeal put it when stating "OK!'s" argument, [2006] QB 125, para 138 "the photographs published by "Hello!" fell within a generic class of commercially confidential information . . . which "OK!" were entitled to protect".

124 Is there any reason of public policy why the law of confidence should not protect information of this form and subject matter? There is in my opinion no question of creating an "image right" or any other unorthodox form of intellectual property. The information in this case was capable of being protected, not because it concerned the Douglases' image any more than because it concerned their private life, but simply because it was information of commercial value over which the Douglases had sufficient control to enable them to impose an obligation of confidence. Some may view with distaste a world in which information about the events of a wedding, which Warren and Brandeis in their famous article on privacy "The Right to Privacy" (1890) 4 Harvard LR 193 regarded as a paradigm private occasion, should be sold in the market in the same way as information about how to make a better mousetrap. But being a celebrity or publishing a celebrity magazine are lawful trades and I see no reason why they should be outlawed from such protection as the law of confidence may offer.

125 I therefore think that the Court of Appeal was wrong to reverse the judge on this point. Mr Price, who appeared for "Hello!", also relied upon two other arguments. First, he said that to hold that participants in a "celebrity event" can impose a duty of confidence upon those who attend would give rise to inconsistency with the "carefully constructed" scheme of

statutory performing rights in Part II of the Copyright, Designs and Patents Act 1988. I cannot see how there can be a conflict between such statutory rights and any additional rights which may exist under the common law. One might as well say that the law of contract is inconsistent because it allows for the possibility of a performer bargaining for greater rights than he would have under the statute.

126 Secondly, Mr Price submitted that under the law of New York Mr Thorpe owed no obligation to keep the information confidential. The statement of facts and issues records that under New York law "there would have been no inhibition upon Mr Thorpe publishing the photographs which he had taken". We are not told the basis of this statement. The judge found that Mr Thorpe must have been "at least a trespasser" by the law of New York. It may be that, under the First Amendment, he was entitled to publish in New York notwithstanding the circumstances in which the photographs were obtained. But that does not mean that he or anyone deriving title from him is entitled to publish in England. There is nothing to suggest that an obligation of confidence cannot be imposed in New York, even though it may be overridden by a constitutional right to freedom of expression. But the question of whether that obligation of confidence can entitle the beneficiary to restrain publication in England is a matter of English law.

127 I would therefore allow the appeal of "OK!" and restore the order of the judge. Mr Price submitted that the award of damages should not be allowed in full because, on the evidence, a substantial part of the loss was caused by the publication of the unauthorised photographs in national daily newspapers rather than in "Hello!" But the judge considered this point in his supplemental judgment on damages [2004] EMLR 13 and came to the conclusion that the full losses were "sufficiently consequential upon the breach and sufficiently foreseeable as to make 'Hello!' liable for them in the ordinary way": para 48. Further, in para 53, he said:

> "I do not regard the newspaper publications of the pictures as so remote a consequence of Hello!'s publication as not to be laid at Hello!'s door and plainly the newspaper publications would not have occurred as they did but for Hello!'s publication of the unauthorised photographs."

128 In the light of these findings of fact I would not disturb the judge's award.

129 In view of my conclusion that "OK!" was entitled to sue for breach of an obligation of confidentiality to itself, it is a little artificial to discuss the alternative claim on the footing that the obligation was owed solely to the Douglases. I would have considerable difficulty in reconciling such a hypothetical claim with *RCA Corpn v Pollard* [1983] Ch 135 and *Isaac Oren v Red Box Toy Factory Ltd* [1999] FSR 785. Neither Mr Thorpe nor "Hello!" did anything to interfere with the liberty of the Douglases to deal with "OK!" or perform their obligations under their contract. All they did was to make "OK!'s" contractual rights less profitable than they would otherwise have been.

130 On the other hand, I should make it clear that in my opinion such a claim should not have failed for the reasons given by the judge and the Court of Appeal, namely that "Hello!" did not intend to cause loss to "OK!".

131 Their conclusion was based upon the evidence of Señor Sanchez Junco, the controlling shareholder of "Hello!'s" Spanish holding company,

who had made the decision to publish. The judge set out this evidence [2003] 3 All ER 996, paras 245–249, from which I shall quote extracts. First, there was his written evidence:

> "I want to state categorically that there was never an intention to cause damage to any of the claimants . . . because we have always treated them in 'Hello!' with deference and sympathy, in accordance with the magazine style. In our 60-year history we have never tried to damage anyone. Therefore, we would not want to do it to people whom we have always treated fairly and objectively in our reports portraying them in the best possible light. With respect to 'OK!' we took it for granted that, without a doubt, they would have a great editorial success, as they had a great exclusive and consequently, the magazine would be sold under excellent conditions as was the case. Our main purpose was to inform our readers about an event which had been publicised all over the media for weeks before the wedding, which shows that this wedding was of interest for the United Kingdom. We did not wish to disappoint our readers. It was never our aim or intention to damage the third claimant, our prime motivation was only to give our readers information on the wedding of two celebrities, about whom, without doubt, our readers expected to read in 'Hello!' . . ."

132 Then there was his oral evidence, summarised by the judge, at para 246:

> "Señor Sanchez Junco disavowed having acted in revenge against the Douglases for his not getting the exclusive he so wished; rather he wanted, despite losing the exclusive, to publish an edition that would interest his readers, the event being one which had captured the imagination of the public. His act, he said, was not of revenge but of salvage. He denied having the intention of spoiling 'OK!'s' sales adding . . . 'my motive was never to spoil the exclusive of 'OK!'. I repeat, I wanted to defend as far as I could my publication . . . My priority was to save my publication after having, in the light of a very important big loss, and that is that of the exclusive, and I didn't think of the possible damage that I could inflict on 'OK!' or the Douglases . . .'"

133 The judge concluded, at para 249:

> "I . . . accept the evidence Señor Sanchez Junco gave on this subject. Whilst I recognise that for a defendant to act out of self-interest does not, of itself, disprove that he had no intent to injure another, here I find on the evidence that there was no intent to injure by unlawful means because there was no intent to injure at all."

134 Thus the position of Señor Sanchez Junco was that he wished to defend his publication against the damage it might suffer on account of having lost the exclusive. But that, it seems to me, is precisely the position of every competitor who steps over the line and uses unlawful means. The injury which he inflicted on "OK!" in order to achieve the end of keeping up his sales was simply the other side of the same coin. His position was no different from Mr Gye saying that he had no wish to injure Mr Lumley and had the greatest respect for Her Majesty's Theatre but his intention was to improve attendance at his own theatre, or the master of the *Othello* saying that his intention was to buy more palm oil: *Tarleton v M'Gawley* 1 Peake

NPC 270. Lord Sumner made this point pungently in *Sorrell v Smith* [1925] AC 700, 742:

> "How any definite line is to be drawn between acts, whose real purpose is to advance the defendants' interests, and acts, whose real purpose is to injure the plaintiff in his trade, is a thing which I feel at present beyond my power. When the whole object of the defendants' action is to capture the plaintiff's business, their gain must be his loss. How stands the matter then? The difference disappears."

The injury to "OK!" was the means of attaining Señor Sanchez Junco's desired end and not merely a foreseeable consequence of having done so.

135 The analysis of intention by the Court of Appeal in my opinion illustrates the danger of giving a wide meaning to the concept of unlawful means and then attempting to restrict the ambit of the tort by giving a narrow meaning to the concept of intention. The effect is to enable virtually anyone who really has used unlawful means against a third party in order to injure the plaintiff to say that he intended only to enrich himself, or protect himself from loss. The way to keep the tort within reasonable bounds is to restrict the concept of unlawful means to what was contemplated in *Allen v Flood*; not to give an artificially narrow meaning to the concept of intention.

136 I would therefore have held that "Hello!" had the necessary intention to cause loss but not that they interfered by unlawful means with the actions of the Douglases.

LORD NICHOLLS OF BIRKENHEAD

137 My Lords, before your Lordships' House are three appeals. They were heard consecutively because the legal issues overlap. The first appeal, *OBG Ltd v Allan* [2005] QB 762, concerns a claim by a company in liquidation for damages in respect of losses sustained by the company through acts done by administrative receivers whose appointment was later held to be invalid. The causes of action relied upon are conversion and wrongful interference with contractual relations.

138 The second appeal, *Douglas v Hello! Ltd (No 3)* [2006] QB 125, concerns the publication of photographs taken surreptitiously at a celebrity wedding held in private. The causes of action relied upon are breach of confidence and unlawful interference with economic interests. In the third appeal, *Mainstream Properties Ltd v Young* [2005] IRLR 964, the cause of action is wrongful interference with contractual relations. The context is breaches by directors of their obligations to their company.

139 Counsel's submissions were wide-ranging. In particular the House is called upon to consider the ingredients of the tort of interference with a business by unlawful means and the tort of inducing breach of contract. These are much vexed subjects. Nearly 350 reported decisions and academic writings were placed before the House. There are many areas of uncertainty. Judicial observations are not always consistent, and academic consensus is noticeably absent. In the words of one commentator, the law is in a "terrible mess". So the House faces a daunting task. For good measure your Lordships have also to review the scope of the tort of conversion.

140 I shall consider first the ingredients of the relevant economic torts.

*Interference with the claimant's business by unlawful means*

141 I start with the tort comprising interference with a trade or business by unlawful means or, more shortly, the tort of unlawful interference. The gist of this tort is intentionally damaging another's business by unlawful means. Intention is an essential ingredient. The tort is not one of strict liability for harm inflicted on another's business, nor is it a tort based on negligence. The defendant must have intended to inflict the harm of which complaint is made. That is the starting point. I shall have to return to this point later.

142 But intent to harm is not enough. Intentional harm of another's business is not of itself tortious. Competition between businesses regularly involves each business taking steps to promote itself at the expense of the other. One retail business may reduce its prices to customers with a view to diverting trade to itself and away from a competitor shop. Far from prohibiting such conduct, the common law seeks to encourage and protect it. The common law recognises the economic advantages of competition.

*Unlawful means*

143 This is not to say that in this field of economic rivalry anything goes. Business people are not free to promote their own businesses at the expense of others by whatever means they may choose. There are limits. The common law has long recognised that some forms of conduct, intentionally damaging other traders, are not acceptable. A well-known passage from the judgment of Bowen LJ in the Court of Appeal in *Mogul Steamship Co Ltd v McGregor Gow & Co* (1889) 23 QBD 598, 614, merits repetition:

> "What, then, are the limitations which the law imposes on a trader in the conduct of his business as between himself and other traders? There seem to be no burdens or restrictions in law upon a trader which arise merely from the fact that he is a trader, and which are not equally laid on all other subjects of the Crown. His right to trade freely is a right which the law recognises and encourages, but it is one which places him at no special disadvantage as compared with others. No man, whether trader or not, can, however, justify damaging another in his commercial business by fraud or misrepresentation. Intimidation, obstruction, and molestation are forbidden; so is the intentional procurement of a violation of individual rights, contractual or other, assuming always that there is no just cause for it . . . But the defendants have been guilty of none of these acts. They have done nothing more against the plaintiffs than pursue to the bitter end a war of competition waged in the interest of their own trade. To the argument that a competition so pursued ceases to have a just cause or excuse when there is ill-will or a personal intention to harm, it is sufficient to reply . . . that there was here no personal intention to do any other or greater harm to the plaintiffs than such as was necessarily involved in the desire to attract to the defendants' ships the entire tea freights of the ports, a portion of which would otherwise have fallen to the plaintiffs' share."

144 A similar approach has been adopted in cases involving labour disputes. In *Allen v Flood* [1898] AC 1, 164, Lord Shand likened the labour

dispute in that case to one of "competition in labour", which he said "is in all essentials analogous to competition in trade, and to which the same principles must apply". Lord Lindley adopted the same stance in another trade union case, *Quinn v Leathem* [1901] AC 495, 532–535. Lord Lindley approved Bowen LJ's observations quoted above. He said the underlying principles are that an act "otherwise lawful", although harmful, does not become actionable because it is done simply with intent to annoy or harm. But "all wrongful acts" done intentionally to damage a particular individual and actually damaging him are remediable.

145 Since then the common law of England has adhered to the view that "unlawful" conduct is a prerequisite of liability under the tort of unlawful interference with trade. In the American case of *Tuttle v Buck* (1909) 119 NW 946 the court held a rich banker liable for spitefully driving the claimant barber out of business by opening a rival barber's shop and undercutting him. That is not the law in England. In this country intentionally causing damage without using unlawful means is not of itself actionable.

146 The English approach has not lacked critics. On the "unlawful conduct" approach the tort is parasitic on conduct defined as unlawful otherwise than because it amounts to a wrong to the claimant. This, it is said, is inherently unsatisfactory. It is inherently unsatisfactory because it means that a tort concerned with the regulation of trade is geared to commission of illegalities which were created for altogether different reasons: see *Heydon, Economic Torts*, 2nd ed (1978), p 124. A wrong designed for some other purpose is being used as the criterion for deciding whether an act done with an intention to harm is acceptable. This ingredient "imposes an arbitrary and illogical limit on the development of a rational general principle to explain this part of the law": *Salmond & Heuston, Law of Torts*, 21st ed (1996), p 346. It "can produce capricious results in which the distinction between permissible and impermissible . . . comes to turn on fictitious and, from a practical viewpoint, even irrelevant factors": *Fleming, The Law of Torts*, 9th ed (1998), p 761. In *J T Stratford & Son Ltd v Lindley* [1965] AC 269, 330, Viscount Radcliffe expressed unhappiness about this aspect of English law. He said the trade dispute in that case should be resolved "according to its substance, without the comparatively accidental issue whether breaches of contract are looked for and involved".

147 These criticisms have force. The contrary, pragmatic view is that in this difficult and uncertain area of the law there is perhaps something to be said for having an objective element of unlawfulness as the boundary of liability. A defendant is not liable under this tort unless he has resorted to "unlawful" means to achieve his end. Tony Weir, a staunch supporter of this approach, says this requirement is "entirely correct, sensible and practical": *Weir, Economic Torts* (1997), p 3.

148 I do not propose to enter upon the pros and cons of this particular debate. Your Lordships are not writing on a clean slate. English courts have long recognised they are not best equipped to regulate competitive practices at large. Parliament is better placed to decide what interests need protection and by what means. Fry LJ said that "To draw a line between fair and unfair competition, between what is reasonable and unreasonable, passes the power of the courts": *Mogul Steamship Co Ltd v McGregor Gow & Co* (1889) 23 QBD 598, 625–626. Since then Parliament has intervened on

many occasions. The courts have taken, as their foothold, conduct which is unlawful. In English law it is now well established that "unlawful means" is an essential ingredient of this tort. This goes back to the decision in *Allen v Flood* [1898] AC 1. I shall proceed on this footing.

149 Although the need for "unlawful means" is well established, the same cannot be said about the content of this expression. There is some controversy about the scope of this expression in this context.

150 One view is that this concept comprises, quite simply, all acts which a person is not permitted to do. The distinction is between "doing what you have a legal right to do and doing what you have no legal right to do": Lord Reid in *Rookes v Barnard* [1964] AC 1129, 1168–1169. So understood, the concept of "unlawful means" stretches far and wide. It covers common law torts, statutory torts, crimes, breaches of contract, breaches of trust and equitable obligations, breaches of confidence, and so on.

151 Another view is that in this context "unlawful means" comprise only civil wrongs. Thus in *Allen v Flood* itself Lord Watson described illegal means as "means which in themselves are in the nature of civil wrongs": [1898] AC 1, 97–98. A variant on this view is even more restricted in its scope: "unlawful means" are limited to torts and breaches of contract.

152 The principal criticism of the first, wider view is that it "tortifies" criminal conduct. The principal criticism of the second, narrower view is that it would be surprising if criminal conduct were excluded from the category of "unlawful" means in this context. In the classical "three-party" form of this tort the defendant seeks to injure the claimant's business through the instrumentality of a third party. By this means, as Lord Lindley said, the claimant is "wrongfully and intentionally struck at through others, and is thereby damnified": *Quinn v Leathem* [1901] AC 495, 535. It would be very odd if in such a case the law were to afford the claimant a remedy where the defendant committed or threatened to commit a tort or breach of contract against the third party but not if he committed or threatened to commit a crime against him. In seeking to distinguish between acceptable and unacceptable conduct it would be passing strange that a breach of contract should be proscribed but not a crime. In *Rookes v Barnard* [1964] AC 1129, 1206–1207, Lord Devlin noted it was "of course" accepted that a threat to commit a crime was an unlawful threat and continued:

> "It cannot be said that every form of coercion is wrong. A dividing line must be drawn and the natural line runs between what is lawful and unlawful as against the party threatened."

153 These different views are founded on different perceptions of the rationale underlying the unlawful interference tort. On the wider interpretation of "unlawful means" the rationale is that by this tort the law seeks to curb clearly excessive conduct. The law seeks to provide a remedy for intentional economic harm caused by unacceptable means. The law regards all unlawful means as unacceptable in this context.

154 On the narrower interpretation this tort has a much more limited role. On this interpretation the function of the tort of unlawful interference is a modest one. Its function is to provide a claimant with a remedy where intentional harm is inflicted indirectly as distinct from directly. If a defendant intentionally harms a claimant directly by committing an actionable wrong against him, the usual remedies are

available to the claimant. The unlawful interference tort affords a claimant a like remedy if the defendant intentionally damages him by committing an actionable wrong against a third party. The defendant's civil liability is expanded thus far, but no further, in respect of damage intentionally caused by his conduct.

155 In my view the former is the true rationale of this tort. The second interpretation represents a radical departure from the purpose for which this tort has been developed. If adopted, this interpretation would bring about an unjustified and unfortunate curtailment of the scope of this tort.

156 On either interpretation complications may arise in the application of this tort in certain types of cases, notably where the civil rights of a third party infringed by the defendant are statute-based. The existence of these perceived complications is not a pointer in favour of either interpretation.

157 Take the case of a patent. A manufacturer seeks to steal a march on his rival by employing a novel, patented process. In order to sell his product more cheaply, he does so without paying any licence fee to the owner of the patent. By means of this patent infringement he undercuts his law-abiding rival. He has damaged his rival's business by an unlawful means. But this conduct, however reprehensible, cannot afford the rival manufacturer a cause of action for damages for interference with trade by unlawful means. Parliament has specified the nature and extent of the remedies available for infringement of patents. Remedial relief for infringement of a patent is available to patentees and exclusive licensees. It would be inconsistent with the statutory scheme if the common law tort were to afford a remedy more widely.

158 Thus in *Oren v Red Box Toy Factory Ltd* [1999] FSR 785, 800, para 42, Jacob J said in the context of a claim for unlawful interference with contractual relations:

> "the right to sue under intellectual property rights created and governed by statute are inherently governed by the statute concerned. Parliament in various intellectual property statutes has, in some cases, created a right to sue, and in others not. In the case of the [Copyright, Designs and Patents Act 1988] it expressly re-conferred the right on a copyright exclusive licensee, conferred the right on an exclusive licensee under the new form of property called an unregistered design right . . . but did not create an independent right to sue on a registered design exclusive licensee. It is not for the courts to invent that which Parliament did not create."

159 The difficulties here are more apparent than real. The answer lies in keeping firmly in mind that, in these three-party situations, the function of the tort is to provide a remedy where the claimant is harmed through the *instrumentality* of a third party. That would not be so in the patent example.

160 Similarly with the oft-quoted instance of a courier service gaining an unfair and illicit advantage over its rival by offering a speedier service because its motorcyclists frequently exceed speed limits and ignore traffic lights. The unlawful interference tort would not apply in such a case. The couriers' criminal conduct is not an offence committed against the rival company in any realistic sense of that expression.

161 Nor am I persuaded that the effect of the broader interpretation of "unlawful means" is to impose civil liability on a defendant simply because

he reached his victim through an agent rather than directly. I am far from satisfied that, in a two-party situation, the courts would decline to give relief to a claimant whose economic interests had been deliberately injured by a crime committed against him by the defendant.

162 For these reasons I accept the approach of Lord Reid and Lord Devlin and prefer the wider interpretation of "unlawful means". In this context the expression "unlawful means" embraces all acts a defendant is not permitted to do, whether by the civil law or the criminal law.

163 I add a brief observation on the decision of the House in *Lonrho Ltd v Shell Petroleum Co Ltd (No 2)* [1982] AC 173. There the House held that Shell and BP's alleged criminal breaches of the sanctions orders against Southern Rhodesia did not afford a civil remedy to Lonrho. That decision does not assist either way on the point now under consideration. The House was not considering the scope of the unlawful interference tort. In that case there was no allegation that Shell and BP's alleged acts in contravention of the sanctions orders were done to injure Lonrho. The case proceeded on the footing that this essential ingredient of the unlawful interference tort was not present.

*Intent to injure*

164 I turn next, and more shortly, to the other key ingredient of this tort: the defendant's intention to harm the claimant. A defendant may intend to harm the claimant's business either as an end in itself or as a means to an end. A defendant may intend to harm the claimant as an end in itself where, for instance, he has a grudge against the claimant. More usually a defendant intentionally inflicts harm on a claimant's business as a means to an end. He inflicts damage as the means whereby to protect or promote his own economic interests.

165 Intentional harm inflicted against a claimant in either of these circumstances satisfies the mental ingredient of this tort. This is so even if the defendant does not wish to harm the claimant, in the sense that he would prefer that the claimant were not standing in his way.

166 Lesser states of mind do not suffice. A high degree of blameworthiness is called for, because intention serves as the factor which justifies imposing liability on the defendant for loss caused by a wrong otherwise not actionable by the claimant against the defendant. The defendant's conduct in relation to the loss must be deliberate. In particular, a defendant's foresight that his unlawful conduct may or will probably damage the claimant cannot be equated with intention for this purpose. The defendant must *intend* to injure *the claimant*. This intent must be a cause of the defendant's conduct, in the words of Cooke J in *Van Camp Chocolates Ltd v Aulsebrooks Ltd* [1984] 1 NZLR 354, 360. The majority of the Court of Appeal fell into error on this point in the interlocutory case of *Miller v Bassey* [1994] EMLR 44. Miss Bassey did not breach her recording contract with the intention of thereby injuring any of the plaintiffs.

167 I add one explanatory gloss to the above. Take a case where a defendant seeks to advance his own business by pursuing a course of conduct which he knows will, in the very nature of things, necessarily be injurious to the claimant. In other words, a case where loss to the claimant is the obverse side of the coin from gain to the defendant. The defendant's

gain and the claimant's loss are, to the defendant's knowledge, inseparably linked. The defendant cannot obtain the one without bringing about the other. If the defendant goes ahead in such a case in order to obtain the gain he seeks, his state of mind will satisfy the mental ingredient of the unlawful interference tort. This accords with the approach adopted by Lord Sumner in *Sorrell v Smith* [1925] AC 700, 742:

> "When the whole object of the defendants' action is to capture the plaintiff's business, their gain must be his loss. How stands the matter then? The difference disappears. The defendants' success is the plaintiff's extinction, and they cannot seek the one without ensuing the other."

*The tort of inducing a breach of contract*

168 The other tort requiring consideration is the tort of inducing a breach of contract. This tort is known by various names, reflecting differing views about its scope. At its inception in 1853 this tort was concerned with a simple tripartite situation of a non-party to a contract inducing a contracting party to break her contract. Did the other party to the contract have a cause of action against the non-party?

169 The facts in *Lumley v Gye* 2 E & B 216 are familiar to every law student. The well-known opera singer Johanna Wagner had contracted with Mr Lumley to perform exclusively at the Queen's Theatre. Mr Gye, the owner of Her Majesty's Theatre, "enticed and procured" Miss Wagner to break her contract. The action came before the court on a plea of demurrer. The question was whether the counts disclosed a cause of action against Mr Gye. The court, by a majority, held they did.

170 The reasoning of the judges differed in its generality. It was established law that a person who knowingly procured a servant to leave his master's service committed an actionable wrong. Crompton J saw no reason to confine this principle to contracts for services of any particular description. Erle J reasoned more widely. He said, at p 232, that the principle underlying the master and servant cases is that procurement of the violation of a right is a cause of action:

> "It is clear that the procurement of the violation of a right is a cause of action in all instances where the violation is an actionable wrong, as in violations of a right to property, whether real or personal, or to personal security: *he who procures the wrong is a joint wrongdoer*, and may be sued, either alone or jointly with the agent, in the appropriate action for the wrong complained of." (Emphasis added.)

This principle, of liability for procurement of a wrong, applies to a breach of contract as well as an actionable wrong: p 233. Wightman J expressed himself similarly, at p 238: "It was undoubtedly prima facie an unlawful act on the part of Miss Wagner to break her contract, and therefore a tortious act of the defendant knowingly *to procure her to do so*." (Emphasis added.)

171 This "procurement" analysis commended itself to Lord Watson in *Allen v Flood* [1898] AC 1. Lord Watson approved Erle J's reasoning as quoted above, and continued, at pp 106–107:

> "These statements embody an intelligible and a salutary principle, and they contain a full explanation of the law upon which the case was

decided. He who wilfully induces another to do an unlawful act which, but for his persuasion, would or might never have been committed, is rightly held responsible for the wrong which he procured."

172 Thus understood, the rationale and the ingredients of the "inducement" tort differ from those of the "unlawful interference" tort. With the inducement tort the defendant is responsible for the third party's breach of contract which he procured. In that circumstance this tort provides a claimant with an additional cause of action. The third party who breached his contract is liable for breach of contract. The person who persuaded him to break his contract is also liable, in his case in tort. Hence this tort is an example of civil liability which is secondary in the sense that it is secondary, or supplemental, to that of the third party who committed a breach of his contract. It is a form of accessory liability.

173 This form of liability is to be contrasted with the tort of unlawful interference. This is a "stand-alone" tort of wide scope, imposing primary liability on a defendant for his own conduct, irrespective of whether on the facts anyone else may also be liable, either in contract or in tort. On this I agree with Philip Sales and Daniel Stilitz in their stimulating article "Intentional Infliction of Harm by Unlawful Means" (1999) 115 LQR 411, 433.

*Preventing performance of a contract: "interfering with contractual relations"*

174 I must move now to more troubled waters. In *Quinn v Leathem* [1901] AC 495 the House upheld the decision in *Lumley v Gye* 2 E & B 216. In doing so their Lordships expressed the principle underlying that decision in broad terms. Lord Macnaghten, at p 510, said that *Lumley v Gye* was rightly decided, not on the ground of malicious intention, but

> "on the ground that a violation of legal right committed knowingly is a cause of action, and that it is a violation of legal right *to interfere with contractual relations* recognised by law if there be no sufficient justification for the interference." (Emphasis added.)

Lord Lindley said the "principle which underlies the decision [in *Lumley v Gye*] reaches all wrongful acts done intentionally to damage a particular individual and actually damaging him": p 535.

175 These broad, indeed, sweeping affirmations made no mention of the need for inducement of breach of contract in *Lumley v Gye* cases. Lord Macnaghten spoke quite generally of "interfering with contractual relations" as a violation of legal right. Lord Lindley expressed the underlying rationale in even wider terms. On the face of these observations the *Lumley v Gye* tort is not confined to cases where the defendant *induced* a contracting party to break his contract. These observations could be taken to suggest that the *Lumley v Gye* tort covers also cases where the defendant with intent to damage the claimant *prevented* a party to a contract from performing his contractual obligations.

176 In *GWK Ltd v Dunlop Rubber Co Ltd* (1926) 42 TLR 376 Lord Hewart CJ applied these statements in a "prevention" case. GWK, a car manufacturer, agreed with a tyre manufacturer Associated Rubber Manufacturers ("ARM"), that the latter's tyres would be fitted on all

GWK cars exhibited for sale. Two of GWK's cars were exhibited at the Glasgow motor show. On the eve of the show Dunlop wrongfully removed ARM's tyres from the cars and replaced them with its own Dunlop tyres.

177 Clearly, Dunlop did not induce GWK to break its contract with ARM. Equally plainly, Dunlop was liable to ARM for unlawful interference with its business. Dunlop intended to damage ARM by unlawful means, namely, by trespass to the goods of GWK. But Lord Hewart followed a different route. He gave effect to the broad observations of Lord Macnaghten and Lord Lindley in *Quinn v Leatham* [1901] AC 495. Dunlop had knowingly committed a violation of ARM's legal rights by interfering without justification with the contractual relations existing between ARM and GWK and had done so with intent to damage ARM.

178 With hindsight it is evident that application of the *Lumley v Gye* tort to a "prevention" case was unfortunate. There is a crucial difference between cases where the defendant induces a contracting party not to perform his contractual obligations and cases where the defendant prevents a contracting party from carrying out his contractual obligations. In inducement cases the very act of joining with the contracting party and inducing him to break his contract is sufficient to found liability as an accessory. In prevention cases the defendant does not join with the contracting party in a wrong (breach of contract) committed by the latter. There is no question of accessory liability. In prevention cases the defendant acts independently of the contracting party. The defendant's liability is a "stand-alone" liability. Consistently with this, tortious liability does not arise in prevention cases unless, as was the position in *GWK*, the preventative means used were independently unlawful.

179 Jenkins LJ made this point in *D C Thomson & Co Ltd v Deakin* [1952] Ch 646, 693:

> "acts of a third party *lawful in themselves* do not constitute an actionable interference with contractual rights merely because they bring about a breach of contract, even if they were done with the object and intention of bringing about such breach." (Emphasis added.)

Evershed MR was of the same view. Suppose, he said, a defendant buys up all the commodities of a particular character with the object of preventing performance of a contract whereby the claimant would receive a supply of those commodities. The defendant would not act tortiously in such a case: p 680.

180 Given this difference between prevention and inducement, it is confusing and misleading to treat prevention cases as part and parcel of the same tort as inducement cases. The rationale is not the same, nor are the ingredients. But the rationale and ingredients of liability in prevention cases are the same as those of the tort of interference with a business by unlawful means. Prevention cases should be recognised for what they are: straightforward examples of the latter tort, rather than as exemplifying a wider version of *Lumley v Gye* labelled "interference with contractual relations".

*A step too far*

181 A regrettable consequence of treating "preventing performance" as an extension of the *Lumley v Gye* tort has been to widen the ambit of this tort in an unprincipled fashion. It has meant that a defendant who intentionally harmed a plaintiff may be liable even though he did *not* use unlawful means *nor* did he induce a party to break his contract. A defendant may be held liable for intentional harm even though he did not cross the Rubicon by doing something he had no legal right to do. He is liable for intentional harm effected by lawful means.

182 This step was taken by the Court of Appeal in the well known case of *Torquay Hotel Co Ltd v Cousins* [1969] 2 Ch 106. A trade union and its officials blacked supplies of oil to the Imperial Hotel in Torquay. This prevented the oil company Esso from performing its contractual obligation to supply oil to the hotel. The Court of Appeal held this was actionable at the suit of the hotel.

183 In reaching this conclusion Lord Denning MR said Lord Macnaghten, in the passage quoted above from *Quinn v Leathem* [1901] AC 495, 510, extended the principle of *Lumley v Gye*. The time has come, Lord Denning stated, to extend the principle further, to cover deliberate and direct interference with the performance of a contract without causing any breach. The interference must be "direct". Unlawful means was an ingredient of liability if, but only if, the interference was "indirect", as in Evershed MR's example of cornering the market in a commodity. In the instant case the interference was direct. So liability arose irrespective of whether the means used by the defendants to prevent performance of Esso's supply contract was lawful or not.

184 The court went further in another respect. The court held that the tort applied even though the interference did not give rise to a breach of contract. Esso's supply contract included a force majeure clause. This mattered not. What mattered was that Esso was prevented or hindered from performing its contractual obligations. This view of the law was approved by your Lordships' House in *Merkur Island Shipping Corpn v Laughton* [1983] 2 AC 570, 608, per Lord Diplock.

185 With the very greatest respect I have difficulty with Lord Denning's extension of *Lumley v Gye* 2 E & B 216. The effect of this extension is that a person who directly prevents performance of a contract by wholly lawful means, and thereby intentionally inflicts damage on the claimant, is liable to the claimant. No reason was given, and none is discernible, for this fundamental extension of the law. Why should a defendant, acting wholly *lawfully*, be liable in such a case, although the use of *unlawful* means is a prerequisite of liability if he intentionally inflicts damage in any other way?

186 Nor is the basis of the distinction between direct and indirect interference apparent. One would suppose the outcome on liability would be the same whether a person sought to achieve his end by direct or indirect means. It would be remarkable if this were not so.

187 This extension of the *Lumley v Gye* tort must be going too far. To hold a defendant liable where the intentional harm is inflicted by lawful means runs counter to the limit on liability long established in English law. So long as this general limit is maintained in respect of other forms of

interference with a claimant's business, and Lord Denning did not suggest this should be changed, the extension in liability proposed by him and seemingly approved by Lord Diplock is irrational. Despite the high authority of these cases, I have to say that on this occasion these distinguished judges fell into error. They were led astray by the width of Lord Macnaghten's observations made in 1901, long before the unlawful interference tort became shaped. The jurisprudence of the economic torts had not then been thought through.

188 For these reasons this extension of the inducement tort of *Lumley v Gye* cannot stand consistently with the economic torts having a coherent framework. This extension is productive of obscurity and, hence, uncertainty. This, in turn, as Lord Diplock himself once said, is destructive of the rule of law: see *Merkur Island Shipping Corpn v Laughton* [1983] 2 AC 570, 612.

189 I feel bound to say therefore that the ambit of the *Lumley v Gye* tort should properly be confined to inducing a breach of contract. The unlawful interference tort requires intentional harm effected by unlawful means, and there is no in-between hybrid tort of "interfering with contractual relations". In so far as authorities suggest or decide otherwise they should not now be followed. I leave open the question of how far the *Lumley v Gye* principle applies equally to inducing a breach of other actionable obligations such as statutory duties or equitable or fiduciary obligations.

190 On this footing the "force majeure" point seems largely to disappear. It can hardly arise in inducement cases. An exemption clause can scarcely apply to a contracting party who chooses to default. Nor would the existence of an exemption clause have any obvious relevance in unlawful interference cases. If a defendant prevents performance of a contract by unlawful means, the existence of an exemption clause will be neither here nor there. The question will always be: how much loss did this interference cause to the claimant?

*Inducing a breach of contract: the mental element*

191 I turn next to the mental ingredient of the *Lumley v Gye* tort. The mental ingredient is an intention by the defendant to procure or persuade ("induce") the third party to break his contract with the claimant. The defendant is made responsible for the third party's breach because of his intentional causative participation in that breach. Causative participation is not enough. A stranger to a contract may know nothing of the contract. Quite unknowingly and unintentionally he may procure a breach of the contract by offering an inconsistent deal to a contracting party which persuades the latter to default on his contractual obligations. The stranger is not liable in such a case. Nor is he liable if he acts carelessly. He owes no duty of care to the victim of the breach of contract. Negligent interference is not actionable.

192 The additional, necessary factor is the defendant's intent. He is liable if he intended to persuade the contracting party to breach the contract. Intentional interference presupposes knowledge of the contract. With that knowledge the defendant proceeded to induce the other contracting party to act in a way the defendant knew was a breach of that party's obligations

A under the contract. If the defendant deliberately turned a blind eye and proceeded regardless he may be treated as having intended the consequence he brought about. A desire to injure the claimant is not an essential ingredient of this tort.

193 For completeness I mention, but without elaboration, that a defence of justification may be available to a defendant in inducement tort cases. A defendant may, for instance, interfere with another's contract in B order to protect an equal or superior right of his own, as in *Edwin Hill & Partners v First National Finance Corpn plc* [1989] 1 WLR 225.

*A bird's-eye view*

194 It may be helpful to pause and take on overall look at where this leaves the law. The effect of the views expressed above is to draw a sharp C distinction between two economic torts. One tort imposes primary liability for intentional and unlawful interference with economic interests. The other tort imposes accessory liability for inducing a third party to commit an actionable wrong, notably a breach of contract, but possibly some other actionable civil wrongs as well.

195 This overall framework, it is to be hoped, should assist in the more D coherent development of the economic torts. On this I am comforted by noting that this twofold structure substantially accords with the views of at least some commentators, including *Hazel Carty, An Analysis of the Economic Torts,* (2001), pp 271–276, and Ken Oliphant (1999) 62 MLR 320, 322.

E *Mainstream Properties Ltd v Young*

196 Against that legal background I turn at last to the three appeals, starting with *Mainstream Properties Ltd v Young*.

197 Mainstream was a residential property development company concentrating on the Derbyshire area. The defendant Mr Young was a director of the company and the defendant Mr Broad a manager. They were the company's two most senior employees. In late 2000 and early 2001 F Mr Young and Mr Broad appropriated to themselves the opportunity to develop a site at Findern. This was in breach of the contractual and fiduciary duties they owed to Mainstream. They developed the site as a joint venture with the defendant Mr De Winter. Mr De Winter provided the necessary finance. Without his assistance the other two could not have proceeded with the development.

G 198 Mainstream sued all three of them. The claims against Mr Young and Mr Broad succeeded. The company's claim against Mr De Winter was that he induced the other two to break their contracts of employment; in other words, a straightforward *Lumley v Gye* claim. The judge, Judge Norris QC, dismissed this claim. Mainstream appealed, and the Court of Appeal, comprising Sedley, Arden LJJ and Aikens J, dismissed Mainstream's appeal [2005] IRLR 964. Before the House is a further appeal H by Mainstream.

199 The relevant findings of the trial judge were these. Mr De Winter knew Mr Young and Mr Broad had contracts of employment, although not their precise terms. He knew sufficient to spot the conflict problem. He raised this issue with the others. In the light of what they told him Mr De

Winter genuinely believed their participation in the Findern venture would not occasion a conflict between their duty and their interest. Accordingly Mainstream failed to establish that Mr De Winter intended to procure a breach of the others' employment contracts.

200 These are factual findings, which were not disturbed by the Court of Appeal. On these findings the appeal must fail. The burden of proving Mr De Winter intended to persuade Mr Young and Mr Broad to break their contracts lay on Mainstream. Mainstream failed to discharge this onus.

201 Mr Randall sought to avoid the difficulty posed by the judge's findings by drawing attention to Mr De Winter's written statements. These showed that Mr Broad told Mr De Winter that Mainstream was not interested in buying the land at Findern. Mr De Winter believed what he was told. On this basis he believed the joint venture would not entail a breach by the others of their contracts with Mainstream. This, submitted counsel, was not good enough. The matters on which Mr De Winter relied did not, as a matter of law, leave Mr Broad and Mr Young free to compete with Mainstream over the development of the Findern land while still working as full-time executives of the company in that area. Mr De Winter was relying on his own, erroneous, legal conclusion. He was not entitled to escape liability by relying on his own mistaken assessment of the legal position.

202 I cannot accept this. An honest belief by the defendant that the outcome sought by him will not involve a breach of contract is inconsistent with him intending to induce a breach of contract. He is not to be held responsible for the third party's breach of contract in such a case. It matters not that his belief is mistaken in law. Nor does it matter that his belief is muddle-headed and illogical, as was the position in *British Industrial Plastics Ltd v Ferguson* [1940] 1 All ER 479. As Lord Devlin said in *Rookes v Barnard* [1964] 1129, 1212, the defendant must know of the contract "and of the fact that the act induced will be a breach of it". Counsel referred the House to several authorities where a contrary view seems to have been expressed; for instance, *Solihull Metropolitan Borough v National Union of Teachers* [1985] IRLR 211, 213, paras 7–10, and *Welsh Development Agency v Export Finance Co Ltd* [1992] BCLC 148, 179. If and in so far as observations in those cases depart from the principle outlined above they were wrong.

203 I would dismiss Mainstream's appeal.

*OBG Ltd v Allan*

204 OBG Ltd carried on a substantial business as a civil engineering contractor, specialising in laying and maintaining underground pipes. An associated company provided plant and transport. For present purposes they can be treated as a single entity.

205 In 1992 OBG had the misfortune to fall out with its main customer North West Water Ltd. OBG's cash flow dried up and it became unable to pay its debts. In June 1992 one of its subcontractors, Raymond Centriline Ltd, appointed joint administrative receivers under a floating charge assigned to Centriline by OBG's bankers. It later turned out that this appointment was invalid because at the date of the assignment OBG did not

owe any money to the bank under the charge. But at the time Centriline and the receivers, acting in good faith, believed the appointment was valid.

206 The receivers went into possession of OBG's property and took control of its business on 9 June 1992. They did what receivers do in these circumstances. They dismissed employees, terminated contracts, disposed of assets and settled claims. Work ceased on the sites on 12 June. One week later OBG went into creditors' voluntary liquidation.

207 North West Water treated the appointment of the receivers as an event of default, entitling it to determine its contracts with OBG. Disputes arose. In November 1992 the receivers agreed to accept £400,000 in settlement. OBG's contracts with other customers were completed on the instructions of the receivers.

208 Meanwhile the liquidators were questioning the validity of the receivers' appointment. In October 1995 OBG, acting by its liquidators, started these proceedings claiming a declaration that the appointment was invalid and consequential relief including damages. In August 1997 the settlement negotiated by the receivers with North West Water was finally signed, with the concurrence of the liquidators.

209 In January 2001 Judge Maddocks held that the receivers' appointment was invalid. He directed an assessment of damages. OBG advanced claims for damages for trespass over and conversion of its land and chattels and all its other assets; alternatively, unlawful interference with contractual relations in respect of its contracts. OBG based its damages claims on the value of these assets on the date they were wrongfully taken over by the receivers, that is, 9 June 1992.

210 The judge rejected OBG's claim for conversion of its contractual rights. The tort of conversion is confined to tangible property. The judge upheld the claim based on interference with contractual relations. In reaching the latter conclusion the judge relied upon the passage from the speech of Lord Macnaghten in *Quinn v Leathem* [1901] AC 495, 510, which I set out above when considering the "prevention of performance" aberration.

211 As to quantum, there was no difficulty in assessing the value of the land or the value of the plant and equipment. Before the judge the factual dispute centred on the value of OBG's contracts with North West Water ("the NWW contracts") and its contracts with other customers ("the non-NWW contracts"). Valuation of these contracts called for an assessment, as at 9 June 1992, of the amount these contracts could reasonably have been expected to yield to OBG had the receivers not been appointed. The judge assessed this amount at £1,400,000 for the NWW contracts and £420,000 for the non-NWW contracts.

212 This amount contrasted with the sums realised by the receivers for these items: £400,000 paid to the receivers pursuant to the settlement they negotiated with North West Water, and £353,000 in respect of the non-NWW contracts. The judge gave reasons why the values he attributed to the contracts could not be equated with the amounts actually realised by the receivers. He also held that, although the liquidators joined in the North West Water settlement document, there was no question of estoppel, acquiescence or ratification. This was throughout a hostile receivership. The receivers were not affected in their conduct of the receivership by anything done or not done by the liquidators. The liquidators never

accepted the validity of the receivers' appointment, nor were the liquidators in a position to renegotiate the settlement reached by the receivers with North West Water. None of these matters was in issue before your Lordships.

213 The outcome was that Judge Maddocks ordered the receivers to pay £1,854,000 to OBG plus interest. This amount comprised £244,000 in respect of the land, plant and equipment, and £1,910,000 in respect of OBG's contracts and other debtors and cash at bank. The judge deducted £300,000 in respect of estimated liquidation costs OBG would have incurred in any event.

214 The Court of Appeal, comprising Peter Gibson, Mance and Carnwath LJJ, allowed [2005] QB 762 an appeal by the receivers on the interference with contractual relations claim and dismissed a cross-appeal by OBG on the conversion claim. The Court of Appeal deleted from the judge's order all the amounts awarded by him save those for land, plant and equipment. This reduced the amount of the damages from £1,854,000 to £244,000.

215 The effect of the Court of Appeal's order was that OBG received nothing for the loss of its debts and other contractual rights. Valued altogether at nearly £2m, these disallowed items represented almost 90% of OBG's assets. But in respect of the receivers' misappropriation of these substantial items OBG received no recompense at all.

216 That was the effect of the order of the Court of Appeal. But I should note that the receivers have not sought to leave OBG in this position. They accept they are liable to account for their net realisations. This means, in financial terms, that the continuing dispute concerns the difference of £1,067,000 between the judge's assessment of the value of the NWW and non-NWW contracts and the amounts actually realised by the receivers for these assets.

217 Peter Gibson LJ said he reached his conclusion on the legal issues with regret. The wrongful taking of control of intangible assets by an invalidly appointed receiver leading to loss which but for the receivership would have been avoided ought to have consequences in law. Carnwath LJ's "initial instinct" was that the receivers should be strictly liable for all the consequences of their unlawful misappropriation of OBG's business, by analogy with the long-established principles applied to unlawful receiverships under the law of trespass and conversion. But he agreed that course was not open to the Court of Appeal. Mance LJ dissented on the interference with contractual relations claim. On this ground he would have upheld the judge's order.

*The economic torts*

218 I agree with the majority in the Court of Appeal that OBG's claim based on the economic torts fails. I can state my reasons very shortly, because they will be apparent from the views I have already expressed on the ingredients of these torts. The receivers did not intend to "induce" OBG to breach of any of its contracts. The receivers honestly believed they were entitled to act on behalf of OBG in exercise of their powers as administrative receivers. So the tort of inducing a breach of contract does not avail OBG. Nor does the tort of interference with a business by

unlawful means assist OBG. The receivers did not have any intent to injure OBG.

219 OBG's claim based on the tort of conversion, a tort of strict liability, is an altogether different matter. To that I now turn.

*Conversion*

220 In this case the receivers, acting in good faith but without any lawful right, took over OBG's business and assets. They sold the company's land, its plant and its equipment. They wound down its outstanding contracts and negotiated a deal with its biggest customer. The receivers are liable for their unauthorised dealings with the company's land and chattels. That is not in dispute. But, it is said, they are not liable for their unauthorised dealings with the company's debts and other contractual rights.

221 This prompts the question: why not? The receivers took over the entirety of the company's business and assets. Why should they be liable strictly in respect of their unauthorised dealings with some parts of the company's property but not others? This distinction makes no sense. It lacks any rhyme or reason.

222 The distinction, it is said, follows from the limited scope of the tort of conversion. The tort of conversion provides a remedy in damages for the misappropriation of chattels, but not for the misappropriation of intangibles. Conversion applies to choses in possession, not choses in action, to use the historic labels.

223 There can be no better place to start consideration of this subject than to remember Sir John Salmond's famous words:

> "Forms of action are dead, but their ghosts still haunt the precincts of the law. In their life they were powers of evil, and even in death they have not wholly ceased from troubling. In earlier days they filled the law with formalism and fiction, confusion and complexity, and though most of the mischief which they did has been buried with them, some portion of it remains inherent in the law of the present day. Thus if we open a book on the law of torts, howsoever modern and rationalised, we can still hear the echoes of the old controversies . . . and we are still called upon to observe distinctions and subtleties that have no substance or justification in them, but are nothing more than an evil inheritance from the days when forms of action and of pleading held the legal system in their clutches. In no branch of the law is this more obvious than in that which relates to the different classes of wrongs which may be committed with respect to chattels. In particular the law of trover and conversion is a region still darkened with the mists of legal formalism, through which no man will find his way by the light of nature . . ."

Salmond was writing in the Law Quarterly Review at the beginning of the last century: "Observations on Trover and Conversion" (1905) 21 LQR 43. But his observations still have a ring of truth in this area of the law.

224 The cause of action, formerly known as trover but now known as conversion, was founded on a fiction. The standardised plea was that the plaintiff possessed certain goods, that he casually lost them, that the defendant found them, and that the defendant did not return them but

instead "converted them to his own use". The defendant was not permitted to deny the losing and finding, and so the only issues were the plaintiff's right to possession and the conversion itself. In due course this became the standard remedy for the unauthorised assumption of the powers of the true owner. Any chattel could be lost and found, and so it could be converted. But land could not be lost and found, nor could intangible property. And so originally the rule was that intangibles could not be converted.

225 With the expansion of commerce and the increase in dealings with intangible property this rule, described by Professor Prosser as a "hoary limitation", had to be relaxed. The law provided, in respect of the misappropriation of intangibles, no remedy equivalent to that provided by conversion for the misappropriation of tangibles. So the courts resorted to another legal fiction. They held that in appropriate cases a document embodying or recording a debt or obligation should be treated as having the same value as the debt or obligation.

226 As would be expected, the reach of this useful tool gradually expanded. Now it is not confined to documents of title and negotiable instruments. It includes insurance policies, guarantees, share certificates and much else. In *Clerk & Lindsell* the principle is said to extend to "any document which is specially prepared in the ordinary course of business as evidence of a debt or obligation": *Clerk & Lindsell on Torts*, 19th ed (2006), para 17-35.

227 In the past some unconvincing efforts were made to justify this extension as a particular application of the ordinary principles of damages. Now it is openly recognised that this extension involves a legal fiction: see, for instance, Pill and Potter LJJ in *Smith v Lloyds TSB Group plc* [2001] QB 541, 551, 557, and Mance LJ in the present case [2005] QB 762, 784, para 76.

228 Legal fictions, of their nature, conceal what is going on. They are a pretence. They represent an unacknowledged departure from existing principle. By resorting to the fiction of equating the value of a document as a chattel or piece of paper with the value of the rights embodied or recorded on it the courts concealed the reality. The reality is that English law does sometimes provide a remedy for the misappropriation, or conversion, of intangible rights. To that extent the tort of conversion has already jumped the gap between tangibles and intangibles. It did so a long time ago.

229 This prompts a further question: why should this extension of the tort of conversion be confined to cases where the intangible rights are specially recorded in a document? I would like to think that, as a mature legal system, English law has outgrown the need for legal fictions. There was a time when John Doe and Richard Roe were popular characters. They had to be parties to some forms of action. When they were in their prime their names appeared again and again in the law reports. English law has moved on. John Doe and Richard Roe are no more. So here, if there is to be a limit to the types of intangibles which attract a remedy in conversion, this limit should be capable of being articulated and justified openly, not by reference to fiction piled upon fiction.

230 Rationally the dividing line cannot be the existence or not of a piece of paper. The existence of a document is essentially irrelevant. Intangible rights can be misappropriated even if they are not recorded in a document.

In principle an intangible right not recorded in writing may merit protection just as much as a right which is recorded in this way.

231 In practice misappropriation is more likely to occur with a right embodied in a document such as a cheque which passes through several hands in the ordinary course of business. But that is no reason for withholding protection in other cases. This is especially so today when information is increasingly stored and communicated, and transactions are effected, by electronic means.

232 The better approach today is to discard the fictional significance of a piece of paper. Instead one should seek to identify the common characteristic of the intangible rights in respect of whose misappropriation English law, as a matter of reality, already provides the remedy of conversion. The common characteristic, it seems to me, is that the rights protected in this way are contractual rights. No principled reason is apparent for attempting, for this purpose, to distinguish between different kinds of contractual rights.

233 The time has surely come to recognise this and, additionally, to recognise that the tort of conversion applies to contractual rights irrespective of whether they are embodied or recorded in writing. I would so hold. This would be a modest but principled extension of the scope of the tort of conversion. It would rid the law of an artificial limitation derived from the limited scope of an enabling legal fiction.

234 This step would not run counter to any legislation. Parliament has not enacted any general relieving provision from strict liability for conversion. Parliament has enacted specific relieving provision in respect of particular types of dealings with goods, for instance, the Factors Acts, and particular types of dealings with intangibles, for instance, the Cheques Act 1957. Abolishing the need for a piece of paper would not cut across any legislative scheme.

235 The receivers placed reliance on the Torts (Interference with Goods) Act 1977. This Act excludes "things in action" from the scope of "conversion of goods" as defined in that Act. This definition accords with the existing law by seemingly embracing the fiction that pieces of paper are deemed to be worth the value of the rights embodied or recorded in them. But Parliament cannot be taken to have intended to preclude the courts from developing the common law tort of conversion if this becomes necessary to achieve justice.

236 The receivers also drew attention to section 234(3) of the Insolvency Act 1986. This provision protects administrative receivers and liquidators, in the absence of negligence, from liability if they seize or dispose of property which is not the property of the company. "Property" includes things in action: section 436. In *Welsh Development Agency v Export Finance Co Ltd* [1992] BCLC 148, the Court of Appeal held that "property" in section 234(3) does not include intangibles because they cannot be "seized". So, the argument runs, this is a legislative recognition that protection was not needed in respect of intangibles. I do not agree. The difficulty I have with this submission lies in the Court of Appeal's restrictive interpretation of "property". Contrary to the decision of the Court of Appeal, I see no reason to suppose Parliament intended to exclude the wrongful disposal of contractual rights from the scope of this relieving provision.

237 Whether the law on conversion should extend beyond contractual rights and embrace other forms of intangibles is not a matter to be pursued on this occasion. This further step has been taken elsewhere in some parts of the common law world. But other forms of intangible rights, such as intellectual property, raise problems of their own. These problems are best considered when they arise.

238 Accordingly I would hold that in the present case the receivers committed the tort of conversion by their wrongful misappropriation of OBG's debts and OBG's contractual rights against North West Water and other contractors.

239 Mr Mitchell submitted that the tort of conversion should not be extended. OBG has a good remedy, which it has chosen not to pursue, against the other parties to OBG's contracts. By accepting that the receivers gave a good discharge to OBG's debtors and contractors despite the invalidity of the receivers' appointment, OBG accepted that the receivers acted as OBG's agents. OBG's remedy against the receivers lay, not in conversion, but in suing the receivers for breach of their fiduciary duties.

240 I cannot accept this. OBG acting by its liquidators could hardly be expected to pursue the company's debtors and contractors for non-payment, on the ground that the receivers were not able to give them a good receipt. That would be utterly unreasonable. OBG's failure to take this course cannot be treated as a waiver of the receivers' torts. OBG cannot thereby be taken to have accepted that the receivers were acting as agents of the company. In the case of North West Water, OBG joined in the settlement document. But, here again, as already noted, the judge rejected the suggested defences of estoppel, acquiescence and waiver.

241 I would allow this appeal and restore the order of Judge Maddocks.

*Douglas v Hello! Ltd*

242 In the third appeal the dispute is between two magazines, "OK!" and "Hello!". "OK!" and "Hello!" are keen rivals in the celebrity magazine market. On 18 November 2000 Mr Michael Douglas and Miss Catherine Zeta-Jones, well known film stars, were married at the Plaza Hotel, New York. The Douglases exercised tight control over their wedding photographs. They took steps to ensure no one was present except for 350 invited guests, authorised photographers, authorised hotel staff, security personnel and the like. They also made arrangements to see that, apart from the authorised photographers, nobody took any photographs. Despite the enormous media interest, this was, as the judge put it, a private wedding.

243 In order to satisfy the media demand for photographs and reduce the risk of unauthorised and intrusive photographs the Douglases entered into an agreement with "OK!" on 10 November 2000. In outline the agreement provided that the Douglases transferred to "OK!" the world wide exclusive right to publish, and authorise others to publish, wedding photographs approved by the Douglases. In return "OK!" paid the Douglases £1m. The Douglases were to hire photographers, and do their best to ensure no other photographers or media had access to the wedding and that no guests or anyone else took photographs. Any rights not specifically granted to "OK!" were reserved to the Douglases.

244 So this was a private wedding, subject to this: many photographs, approved by the Douglases, were to be made publicly available at once.

245 The best laid plans can go astray. A photographer called Rupert Thorpe somehow, by deceit or subterfuge, infiltrated the wedding and the reception. Surreptitiously he took some indifferent photographs. Early the next day these photographs were offered on the market and sent electronically to "Hello!'s" picture editor Ms Neal in London. They were then sent on from London to Madrid for Señor Sanchez Junco, "Hello!'s" editor-in-chief, to decide whether to buy them. The upshot was that "Hello!" agreed to pay £125,000 for the exclusive right to publish six photographs in the United Kingdom, France and Spain.

246 "Hello!" then prepared the photographs and accompanying text for publication in issue 639. On Monday, 20 November the Douglases obtained an ex parte injunction restraining publication. This was discharged by the Court of Appeal on Thursday, 23 November. Edition 639 of "Hello!" containing the six unauthorised photographs went on sale on the following day, Friday, 24 November, on the same day as issue 241 of "OK!" which included "OK!'s" coverage of the wedding. "OK!" had hurriedly brought forward this publication. "Hello!'s" sales figures for issue 639, about 523,000, were some 150,000 above average.

*The proceedings*

247 In the proceedings the Douglases and Northern and Shell plc, the publisher of "OK!", claimed damages for breach of confidence. "OK!" also claimed damages for interference with its business by unlawful means.

248 In a comprehensive judgment Lindsay J held that "Hello!" did not, by its publication of the unauthorised pictures, commit the tort of inducing a breach of contract. The Douglases did not break their contract. They fulfilled their contractual obligation to do the best they could to exclude the media and the public from the wedding. Nor did "Hello!" commit the tort of interfering with "OK!'s" business by unlawful means. "Hello!" did not intend to injure "OK!". But "Hello!" was liable to the Douglases and "OK!" for breach of confidence [2003] All ER 996. In a supplemental judgment the judge [2004] EMLR 2 awarded damages of £1,047,756, divisible as to £14,600 to the Douglases and the balance to "OK!".

249 The Court of Appeal, comprising Lord Phillips of Worth Matravers MR, and Clarke and Neuberger LJJ, upheld the judge's decision on the Douglases' breach of confidence claim and on "OK!'s" claims based on economic torts. The court [2006] QB 125 reversed the judge's decision on "OK!'s" breach of confidence claim. The overall outcome was that the Douglases' breach of confidence claim succeeded but "OK!'s" claims wholly failed.

250 "OK!" appealed to your Lordships' House. "Hello!" did not appeal against the decision in favour of the Douglases.

*Misuse of private information*

251 Photographs are much the best way of conveying an impression of how everybody looked at a wedding. Photographs make one a spectator at the wedding. Information communicated in other ways, in sketches or descriptive writing or by word of mouth, cannot be so complete or accurate.

The Douglases and "OK!" claim that, save to the extent "OK!" published authorised photographs, photographic information about their wedding was private. Publication of this information without the Douglases' approval was misuse of this information.

252 Mr and Mrs Douglas sought to keep this information private primarily to protect their "image". Film directors take into account the public perception of actors and actresses when casting for films. Miss Zeta-Jones said the "hard reality of the film industry is that preserving my image, particularly as a woman, is vital to my career". Mr Douglas said his name and likeness are valuable assets to him. It is important for him, for professional reasons, to protect his name and likeness and prevent unauthorised use of either.

253 Given the understandable importance to Mr and Mrs Douglas of their public image, it is necessary first to mention and put on one side certain points in this regard. The identity of this couple made their wedding an eminently newsworthy event. By publishing pictures of the wedding "Hello!" was exploiting that fact. In principle that was unexceptionable. Publication of wedding photographs in "Hello!" was not, *of itself*, improper exploitation of the reputation, name or likeness of the Douglases such as may be protected in some circumstances in the United States of America: see *Corpus Juris Secundum*, vol 77, pp 591–592, para 51. Nor did "Hello!'s" publication of pictures of this event constitute "character merchandising" or, still less, a case of "false endorsement" as discussed by Laddie J in *Irvine v Talksport Ltd* [2001] 1 WLR 2355. Thus it is unnecessary to consider how far English law has developed, or should develop, in these fields.

254 Nor is it necessary to consider further the legal foundation for the Douglases' claim. This is not an issue on this appeal. Your Lordships are concerned only with "OK!'s" claim. "OK!'s" claim is based solely on breach of confidence.

*Confidential information*

255 As the law has developed breach of confidence, or misuse of confidential information, now covers two distinct causes of action, protecting two different interests: privacy, and secret ("confidential") information. It is important to keep these two distinct. In some instances information may qualify for protection both on grounds of privacy and confidentiality. In other instances information may be in the public domain, and not qualify for protection as confidential, and yet qualify for protection on the grounds of privacy. Privacy can be invaded by further publication of information or photographs already disclosed to the public. Conversely, and obviously, a trade secret may be protected as confidential information even though no question of personal privacy is involved. This distinction was recognised by the Law Commission in its report on Breach of Confidence (1981) (Cmnd 8388), pp 5–6.

256 "OK!'s" claim is that "Hello!" committed a breach of confidence by publishing a confidential secret. "OK!'s" interest was wholly commercial, in maximising the financial advantage flowing from having an exclusive right to publish the authorised pictures. Accordingly, as my noble and learned

friend, Lord Walker of Gestingthorpe, says, "OK!'s" claim has to be based on a right to short-term confidentiality for a commercial secret.

257 So the first step is to identify the "secret". The secret information cannot lie in the differences between the unapproved photographs and the approved photographs. The secret cannot lie there, because the six unapproved photographs contained nothing not included in the approved photographs. That is common ground. This being so, the inevitable differences, in expression and posture and so on, cannot constitute "confidential" information for the purposes of this equitable principle. The expression of the bride in one wedding photograph compared with her expression in another is insufficiently significant to call for legal protection. It has not been suggested that the unapproved photographs were embarrassing in any way, or that they were detrimental to the Douglases' image. Accordingly, once the approved pictures were published, albeit simultaneously, publication of the unapproved pictures was not a breach of confidence.

258 "OK!" sought to avoid this difficulty by defining the commercial secret in wider terms. The secret comprised photographic information about the entire wedding as an event, and not just the particular wedding photographs "OK!" was permitted to publish. Publication of the approved photographs did not destroy the confidentiality of the remainder of the information.

259 Let me assume, without deciding, that this generic class of information was confidential at the outset. Even so, this formulation of the commercial secret leads nowhere, for the same reason as applies to the narrower formulation of the secret: the unapproved pictures contained nothing not included in the approved pictures, and the approved photographs were published at much the same time as the unapproved photographs.

260 For these reasons I am unable to accept "OK!'s" claim based on confidentiality.

*Unlawful interference with business*

261 I turn finally to "OK!'s" claim based on the tort of intentionally causing loss by unlawful means. This is a "two party" situation. There is no question of Hello! injuring "OK!" through an intermediary. Thus the first question is whether the harm caused to "OK!" by "Hello!'s" publication of the unapproved photographs was effected by unlawful means. In my view this claim fails at this point. I have rejected "OK!'s" claim based on breach of confidence. The only other conduct which may constitute unlawful means is Rupert Thorpe's trespass at the wedding. But he was not "Hello's" agent. The background was that "Hello!'s" bid of £1m for the exclusive right to the wedding photographs was rejected by the Douglases. Thereafter, before the wedding, "Hello!" indicated to paparazzi that it would pay well for photographs. "Hello!" knew the reputation of the paparazzi for being able to intrude. By its actions "Hello!" was encouraging the paparazzi to do just that. The six photographs themselves plainly indicated they were taken covertly. "Yet", the judge said, "these defendants firmly kept their eyes shut lest they might see what they undeniably knew

would have become apparent to them." Even so, I do not see how "Hello!" can be held liable for the photographer's trespass.

262 This being so, "OK!'s" case does not get off the ground. "Hello!" did not use unlawful means. I would dismiss this appeal.

LORD WALKER OF GESTINGTHORPE

*The economic torts*

263 My Lords, I have had the privilege of reading in draft the opinions of my noble and learned friends, Lord Nicholls of Birkenhead and Lord Hoffmann, both of which cast welcome light on the obscurities of the so-called economic torts. In relation to these torts there is (as I see it) a large measure of agreement between my noble and learned friends, though with some differences in emphasis, and some more substantial differences.

264 Both my noble and learned friends agree that the "unified theory" of the economic torts, attractive though it is, must be rejected. The tort of intentionally inducing a breach of contract is essentially different from inflicting harm by unlawful means, although in some factual situations they may overlap. The majority decision of the Court of Appeal in *Millar v Bassey* [1994] EMLR 44 was mistaken. The decision of this House in *Merkur Island Shipping Corpn v Laughton* [1983] 2 AC 570 should not be followed, so far as it holds that inducing an actual breach of contract is not a necessary ingredient of the *Lumley v Gye* tort. On these points Lord Nicholls and Lord Hoffmann are at one, and I respectfully concur in their reasoning and conclusions.

265 I must however set out briefly my views on those points on the economic torts on which my noble and learned friends seem to differ; and on the tort of conversion, on which they certainly differ. I must also set out the reasons why, in respectful disagreement with the majority, I would for my part dismiss the appeal in *Douglas v Hello! Ltd*.

266 On the economic torts, the most important difference is in the identification of the control mechanism needed in order to stop the notion of unlawful means getting out of hand—for example, a pizza delivery business which obtains more business, to the detriment of its competitors, because its drivers regularly exceed the speed limit and jump red lights. Lord Hoffmann sees the rationale of the unlawful means tort as encapsulated in Lord Lindley's reference (in *Quinn v Leatham* [1901] AC 495, 534) to interference with "a person's liberty or right to deal with others." In his view acts against a third party count as unlawful means only if they are (or would be if they caused loss) actionable at the suit of the third party.

267 Lord Hoffmann does not question the correctness of the decisions of the Court of Appeal in *RCA Corpn v Pollard* [1983] Ch 135 or of Jacob J in *Isaac Oren v Red Box Toy Factory Ltd* [1999] FSR 785, which show that a bootlegger's activities, although actionable by the owner of the intellectual property rights in question, are not actionable (by statute or at common law) by a contractual licensee entitled to exploit those rights, even if the licensee's profits are demonstrably reduced by the unlawful activities. As Oliver LJ said in *RCA Corpn v Pollard* [1983] Ch 135, 153,

> "the defendant's conduct involves no interference with the contractual relationships of the plaintiffs but merely potentially reduces the profits

which they make as the result of the performance by Mr Presley's executors of their contractual obligations."

268 Lord Nicholls also accepts the correctness of *Isaac Oren v Red Box Toy Factory Ltd* (and also, I infer, the correctness of *RCA Corpn v Pollard*). He proposes a wider test of unlawful means relying on the notion of instrumentality as the appropriate control mechanism.

269 Faced with these alternative views I am naturally hesitant. I would respectfully suggest that neither is likely to be the last word on this difficult and important area of the law. The test of instrumentality does not fit happily with cases like *RCA Corpn v Pollard,* since there is no doubt that the bootlegger's acts were the direct cause of the plaintiff's economic loss. The control mechanism must be found, it seems to me, in the nature of the disruption caused, as between the third party and the claimant, by the defendant's wrong (and not in the closeness of the causal connection between the defendant's wrong and the claimant's loss).

270 I do not, for my part, see Lord Hoffmann's proposed test as a narrow or rigid one. On the contrary, that test (set out in para 51 of his opinion) of whether the defendant's wrong interferes with the freedom of a third party to deal with the claimant, if taken out of context, might be regarded as so flexible as to be of limited utility. But in practice it does not lack context. The authorities demonstrate its application in relation to a wide variety of economic relationships. I would favour a fairly cautious incremental approach to its extension to any category not found in the existing authorities.

*Conversion*

271 Lord Nicholls makes a powerful case for extending the tort of conversion so as to cover the appropriation of choses in action. But in my opinion his proposals would involve too drastic a reshaping of this area of the law of tort. The reshaping would be inconsistent with the basis on which Parliament enacted the Torts (Interference with Goods) Act 1977, after long consideration by the Law Revision Committee. It would have far-reaching consequences which this House is not in a position to explore or assess fully. This is an area in which reform must come from Parliament, after further consideration by the Law Commission. In any case the confused facts of the *OBG* appeal (in which the liquidators eventually concurred in the settlement with NWW) makes it a singularly unsuitable case for a major change in the law.

*Privacy and confidence: introduction*

272 I now turn to breach of confidence. This House has quite recently reaffirmed that English law knows no common law tort of invasion of privacy: *Wainwright v Home Office* [2004] 2 AC 406. But the law of confidentiality has been, and is being developed in such a way as to protect private information. The process of development is referred to in the speech of my noble and learned friend, Lord Hoffmann, in *Wainwright v Home Office* [2004] 2 AC 406, paras 28–30 and in all the speeches in *Campbell v MGN Ltd* [2004] 2 AC 457 (Lord Nicholls of Birkenhead at paras 11–22, Lord Hoffmann at paras 43–52, Lord Hope of Craighead at paras 85–86 and 105–113, Baroness Hale of Richmond at paras 132–141 and Lord

Carswell at paras 166–167). The most important single step in the course of the law's recent development has been the speech of Lord Goff of Chieveley in *Attorney General v Guardian Newspapers Ltd (No 2)* [1990] 1 AC 109, 280 (his speech was not in terms concurred in by the other members of the appellate committee but Lord Goff's exposition of the law has commanded general acceptance). In an important passage, at pp 281–282, Lord Goff stated a broad general principle of confidence subject to three limiting principles: (1) "the principle of confidentiality only applies to information to the extent that it is confidential"; (2) it "applies neither to useless information, nor to trivia"; and (3) the public interest protecting confidence "may be outweighed by some other countervailing public interest which favours disclosure". (It was on the application of this third principle to a borderline factual situation that this House was divided in *Campbell v MGN Ltd.*)

273 The first issue in this appeal raises questions as to whether and how far the law of confidence should be developed further. The most important of these questions, to my mind, are (i) whether claimants can simultaneously assert rights of confidence for the protection of both personal privacy and short-term commercial secrecy (until profitable publication in the mass media of an "exclusive" which waives personal privacy on a selective basis); and (ii) what special rules apply to the publication of photographs of individual claimants.

274 It is unnecessary, by way of introduction, to go again over the ground covered in *Wainwright v Home Office* and *Campbell v MGN Ltd.* But it is perhaps worth noting that there is not a complete jurisprudential void between *Prince Albert v Strange* (1849) 2 De G & Sm 652 and the cases which can be seen as the beginning of the modern line of authority (*Duchess of Argyll v Duke of Argyll* [1967] Ch 302, *Coco v AN Clark (Engineers) Ltd* [1969] RPC 41 and *Fraser v Evans* [1969] 1 QB 349). The cases cited in the three last-mentioned decisions show a continuous, if hardly abundant, stream of authority. *Philip v Pennell* [1907] 2 Ch 577 is of some interest as it shows the court addressing the distinction between intellectual property rights in the form of a communication and confidentiality in its substance. It was concerned with letters written by James M'Neill Whistler (who had died in 1903). The letters were lawfully in the hands of two authors who had been commissioned to write a biography of Whistler, but his executrix applied for an injunction to restrain both publication of the letters and dissemination of information contained in them. The judgment of Kekewich J harked back to the great controversy as to whether at common law there was any copyright in published works: see *Millar v Taylor* (1769) 4 Burr 2303, which, with its background and sequels, is well described in *Laddie, Prescott and Vitoria, The Modern Law of Copyright and Designs*, 3rd ed (2000) paras 3.2–3.7. Kekewich J rightly distinguished between property in the letters as tangible property; copyright in the linguistic contents of the letters as literary compositions; and the more debatable right to restrain misuse of confidential information contained in the letters. On the last point he remarked, at p 587: "It cannot be said that the confidence runs with the letters."

275 That observation still holds good in that information, even if it is confidential, cannot properly be regarded as a form of property. Its practical significance has been overtaken by *Attorney General v Guardian*

*Newspapers Ltd (No 2)* [1990] 1 AC 109. Kekewich J's judgment is also of interest as an early recognition, or at least a hint, that a celebrity's private life may be a saleable commodity, at p 589:

> "It is a recognised duty of every man, and more especially of a successful man in any profession, to make his life and experience useful to others, and it would be inconsistent with this to hold that a writer of letters must be presumed to have intended that those letters should not be used at some time or other, on a proper occasion and in a proper manner, towards that end."

This may be compared with Sedley LJ's view (expressed in the present case when the Court of Appeal gave its reasons for discharging the injunction [2001] QB 967, para 140) that Mr Douglas and his bride "had sold most of the privacy which they now seek to protect to ['OK!'] for a handsome sum". I start with some sympathy for what I take to be Sedley LJ's instinctive feeling that it is not obvious why a claimant should be able to invoke the law's protection for the confidentiality of his or her private life (this claim being based on the high principle of respect for human autonomy and dignity) and also to invoke its protection for the commercial confidentiality of the same or similar material, as a trade secret, until it is to be disclosed for profit at a time of his or her own choosing.

276 In order to investigate that problem it is necessary to enquire more closely into what is happening, in legal terms, when a court makes an order for the protection of confidential information. If the person disclosing the information is in contractual relations with the claimant, the most natural claim will be for breach of an express or implied term in the contract. That was the basis for the decision in *Pollard v Photographic Co* (1888) 40 Ch D 345 (the case of the commercial photographer who was commissioned to take photographs of the Pollard family, and started selling prints of Mrs Pollard as a Christmas card). Where there is no contractual tie the cause of action is the equitable jurisdiction to restrain (or if it cannot be restrained, to award compensation or an account of profits for) breach of confidence. This jurisdiction does not depend on treating confidential information as property, although it is often referred to, loosely or metaphorically, in those terms. Professor Finn has written in *Fiduciary Obligations* (1977), para 293: "Perhaps the most sterile of the debates which have arisen around the subject of information received in confidence is whether or not such information should be classified as property." There is also a valuable discussion of the whole topic in *Toulson & Phipps, Confidentiality* (1996), paras 2-12 to 2-18.

277 Before your Lordships, Mr Millett (for the appellant "OK!") strongly disclaimed any reliance on confidential information as property, referring to the speech of Lord Upjohn in *Phipps v Boardman* [1967] 2 AC 46, 127–128, as well as to *Toulson & Phipps*. He did so advisedly, since although clause 2 of the contract between the Douglases and "OK!" was expressed as a transfer of exclusive rights to publish (and licence republication of) approved photographs, that way of putting his case (if otherwise sound) would not catch the publication of different, pirated photographs. Mr Millett relied instead on pictorial information about the wedding as an abstract, generic concept in which the Douglases enjoyed rights of confidentiality, and in which "OK!" became entitled, by contract

rather than by assignment, to concurrent rights of confidentiality. This approach was noted (but not accepted) by the Court of Appeal in this case [2006] QB 125, para 138:

> "If we are wrong in our conclusions that OK! had no right of commercial confidence in the information portrayed by Hello!'s photographs, this can only be on the basis that the photographs published by Hello! fell within the generic class of commercially confidential information to which OK! were party and which OK! were entitled to protect."

278 The authorised photographs taken at the wedding (and later selected and approved by Mr and Mrs Douglas) gave a lot of information, so far as still photographs could, about the event: what the bride wore, how she and the groom conducted themselves towards each other, what the wedding cake looked like, and so on. The unauthorised photographs disclosed the same sort of information (aptly summed up by Sedley LJ [2001] QB 967, para 138, as "the simple information: 'This is what the wedding and the happy couple looked like'"). They disclosed it in a different and by most standards obviously inferior manner (though the informality of the unposed and sometimes unfocused images has a certain appeal). Mr and Mrs Douglas would have been most unlikely to have selected any of the unauthorised pictures for publication, but it has not been suggested that they disclosed anything embarrassing (such as a fleeting moment of disharmony between the happy couple). The information which they impart is, on the way Mr Millett put his case, essentially the same, and entitled to protection as confidential information.

*The judgments below*

279 There are four sets of reported judgments in the case: the reasons of the Court of Appeal (Brooke, Sedley and Keene LJJ) [2001] QB 967, given on 21 December 2000, for lifting the injunction by its order of 23 November 2000; the judgment of Lindsay J on liability given on 11 April 2003 and reported as *Douglas v Hello! Ltd (No 3)* [2003] 3 All ER 996; the judgment of Lindsay J on quantum, given on 31 July 2003 and reported as *Douglas v Hello! Ltd (No 6)* [2004] EMLR 13; and the judgment of the Court of Appeal (Lord Phillips of Worth Matravers MR, Clarke and Neuberger LJJ) now under appeal, given on 18 May 2005 and reported as *Douglas v Hello! Ltd (No 3)* [2006] QB 125. I need not comment on Lindsay J's judgment on quantum, but the other judgments call for mention.

280 The first decision of the Court of Appeal was interlocutory in nature and (as Brooke LJ noted in para 62 of his judgment) it was reached after oral submissions prepared and made under severe time constraints. It is therefore not surprising that this Court of Appeal decision concentrated on the alleged invasion of the privacy of the individual claimants as the claim for which an award of damages was least likely to be an adequate remedy. Nevertheless all three members of the court noted that the wedding was not an ordinary private occasion. Brooke LJ stated, at para 95:

> "So far as privacy is concerned, the case of the first and second claimants is not a particularly strong one. They did not choose to have a private wedding, attended by a few members of their family and a few

friends, in the normal sense of the words 'private wedding'. There is nothing in the court's papers to belie the suggestion, at p 88 of the disputed issue 639 of 'Hello!' that they invited 250 guests, and the trappings of privacy in this context are identical with the trappings of confidentiality to which I have alluded earlier in this judgment."

I have already set out what Sedley LJ said, at para 140 (he developed the point in paras 141 and 142). Keene LJ observed, at para 169:

> "In the present case, it is of considerable relevance that very widespread publicity was to be given in any event to the wedding very soon afterwards by way of photographs in 'OK!' magazine. The occasion thereby lost much of its private nature. The claimants were by their security measures and by their agreements with the service companies seeking not so much to protect the privacy of the first two claimants but rather to control the form of publicity which ensued."

281 Lindsay J [2003] 3 All ER 996 made a thorough survey of the developing law of confidentiality. He noted, at para 186, the effect of the Human Rights Act 1998 and referred to Council of Europe Resolution 1165 of 1998, para 6 quoted by the Court of Appeal in *A v B plc* [2003] QB 195, para 11(xii) that, "people's private lives have become a highly lucrative commodity for certain sectors of the media. The victims are essentially public figures, since details of their private lives serve as a stimulus to sales." Lindsay J went on to hold, at paras 196 and 197:

> "that the claimants had here a valuable trade asset, a commodity the value of which depended, in part at least, upon its content at first being kept secret and then of its being made public in ways controlled by Miss Zeta-Jones and Mr Douglas for the benefit of them and of the third claimant. I quite see that such an approach may lead to a distinction between the circumstances in which equity affords protection to those who seek to manage their publicity as part of their trade or profession and whose private life is a valuable commodity and those whose is not but I am untroubled by that; the law which protects individual confidences and a law of privacy may protect the latter class and provide no reason to diminish protection for the former. So far as concerns 'OK!', the right to exclusivity of photographic coverage of the wedding was, in contrast with the nature of the confidence as to the first and second claimants, even more plainly a right in the nature of a trade secret. I thus regard photographic representation of the wedding reception as having had the quality of confidence about it. Of course, the general appearance of both Mr Douglas and Miss Zeta-Jones was no secret; what they looked like was well known to the public. But that does not deny the quality of commercial confidentiality to what they looked like on the exceptional occasion of their wedding."

The judge did not to my mind fully explain why he was not troubled by the thought that the persons whom the Council of Europe termed "the victims" were themselves cashing in their "valuable trade asset" in a manner and at a time of their own choosing.

282 The Court of Appeal dealt with this part of the case in a judgment of the court [2006] QB 125, paras 122–137. It observed, at para 128, that

Lindsay J treated information about the wedding "rather as if it were property" when he referred to its being shared between co-owners. Whether or not there is force in that observation (it is in practice quite difficult to address the subject of confidential information without slipping into metaphorical language literally appropriate only to property rights) it is clear that that is not how "OK!'s" case is now put. In fact much of Mr Millett's criticism of the Court of Appeal was for having fallen into precisely the same error—treating confidential information as an item of property—as that for which the Court of Appeal had criticised the judge.

283 The heart of the Court of Appeal's reasoning on this part of the case is in para 136:

> "On analysis, OK!'s complaint is not that Hello! published images which they had been given the exclusive right to publish, but that Hello! published other images, which no one with knowledge of their confidentiality had any right to publish. The claimants themselves argued that 'the unauthorised photographs were taken at different moments to the authorised ones, showed different and informal incidents at the reception, and were naturally much less posed.' These photographs invaded the area of privacy which the Douglases had chosen to retain. It was the Douglases, not OK!, who had the right to protect this area of privacy or confidentiality. Clause 10 of the OK! contract expressly provided that any rights not expressly granted to OK! were retained by the Douglases."

Whereas the judge saw the arrangement as a sharing of confidentiality in photographic information about the wedding, the Court of Appeal analysed it as the retention (by Mr and Mrs Douglas alone) of part of that information (that is, all except the information in the authorised photographs published by OK!).

*The scope of breach of confidence*

284 Expressed in these terms, both competing submissions seem to me to be on the way to becoming so abstract as to risk losing touch with reality. Reality was, if I may respectfully say so, restored when on the third day of the hearing my noble and learned friend, Lord Nicholls of Birkenhead observed, "It is not the same, is it, because obviously a picture of the bride looking nice is different from a picture of the bride caught at an unfortunate moment". The Douglases were content to have wedding photos published, for a handsome fee, so long as they had strict control over the selection of the pictures. This was reflected in the evidence of Miss Zeta-Jones herself, quoted by Lindsay J [2003] 3 All ER 996, para 195:

> "Both Michael and I are in the business of 'name and likeness.' Any photographs of us that are published are important to us, not just personally but professionally as well. People go to see movies specifically because either Michael or I are in them and they have expectations, among other things, of the way we will look. Those expectations are created to a significant degree by the images they see of us in the media. Directors take into account the public's perception of actors and actresses when casting for films. The hard reality of the film industry is that preserving my image, particularly as a woman, is vital to my career."

285 In short, the confidentiality which the Douglases claimed, and which OK! also claims, is of a specialised commercial character, far removed from the sort of intrusion on the privacy of a seriously ill patient which the Court of Appeal considered (but felt unable to remedy) in *Kaye v Robertson* [1991] FSR 62. Their claims come close to claims to a "character right" protecting a celebrity's name and image such as has consistently been rejected in English law: see *Elvis Presley Trademarks* [1999] RPC 567, 580–582, 597–598, and also Brooke LJ in the interlocutory appeal in this case [2001] QB 967, paras 74 and 75. The present limits of the law of passing off as a protection of a celebrity complaining of "false endorsement" were thoroughly reviewed by Laddie J in *Irvine v Talksport Ltd* [2002] 1 WLR 2355.

286 Both Lindsay J and the Court of Appeal referred to the decision of the High Court of Australia in *Australian Broadcasting Corpn v Lenah Game Meats Pty Ltd* (2001) 208 CLR 199, a case concerned with the public interest defence to unauthorised and clandestine filming in an abattoir. Your Lordships were not referred to the earlier case in the High Court, discussed in the *Australian Broadcasting Corpn* case, of *Victoria Park Racing and Recreation Grounds Co Ltd v Taylor* (1937) 58 CLR 479. In that case the defendant built a platform on his land, which bordered the plaintiff's racecourse, and allowed race commentaries to be broadcast from it. The plaintiff failed in a claim for an injunction. The claim was put primarily in the law of nuisance, but confidence and copyright (in the board displaying the numbers of starters and winners) was also relied on. Latham CJ said, at pp 496–497:

> "I find difficulty in attaching any precise meaning to the phrase 'property in a spectacle.' A 'spectacle' cannot be 'owned' in any ordinary sense of that word. Even if there were any legal principle which prevented one person from gaining an advantage for himself or causing damage to another by describing a spectacle produced by that other person, the rights of the latter person could be described as property only in an metaphorical sense. Any appropriateness in the metaphor would depend upon the existence of the legal principle. The principle cannot itself be based upon such a metaphor."

287 In this case the claimants did not claim any quasi-proprietorial rights in the spectacle of the wedding. They claimed non-proprietorial rights of confidence in wedding photographs as a generic class, regardless of who owned the copyright in those photographs. English law has (especially in the decision of this House in *Campbell v MGN Ltd* [2004] 2 AC 457) recognised that there may be something special about photographs, but I think that it is necessary to see how far this approach has gone.

288 In *Campbell* some of your Lordships mentioned the familiar saying that "a picture is worth a thousand words." My noble and learned friend, Lord Hoffmann, was rather less enthusiastic about the saying, observing, at para 72:

> "In my opinion a photograph is in principle information no different from any other information. It *may* be a more vivid form of information than the written word ('a picture is worth a thousand words')." (Emphasis supplied.)

Photographs are in a special position in that if a photograph is a blatant and obviously unjustifiable invasion of personal privacy, its publication by the perpetrator will not give him a "public domain" defence for further publication: see the Court of Appeal's judgment [2006] QB 125, paras 84–90, citing *Theakston v MGN Ltd* [2002] EMLR 398, para 78 (Ouseley J) and *D v L* [2004] EMLR 1, para 23 (Waller LJ). Photographs are also regarded (despite the ample opportunities for manipulation which modern technology affords) as providing powerful corroboration of written reports of conduct which the person photographed might wish to deny. But this is not that sort of case. The world was not in doubt that the Douglases did get married at the Plaza Hotel in New York on 18 November 2000; and the photographs published by "Hello!" may have been un-posed and un-focused, but none of them was even faintly embarrassing.

289 Your Lordships were referred to two interlocutory decisions at first instance in which injunctions were granted to restrain publication of unauthorised photographs of scenes which were claimed to be entitled to commercial confidentiality. In *Shelley Films Ltd v Rex Features Ltd* [1994] EMLR 134, a photographer had found his way onto a film set where "Mary Shelley's Frankenstein" was being filmed. It was a high-budget film with several big stars. There was a conflict of evidence as to whether the photographer evaded security guards and ignored notices forbidding photography. The claim was put primarily as a breach of copyright in costumes and prosthetic features (especially those of Robert de Niro, the "sharp featured man" who was to be hanged and brought back to life by Frankenstein). The judge accepted that there was an arguable case on copyright infringement but also considered breach of confidence, and found that the claimant had an arguable case there also. He seems to have accepted counsel's submission that there was a legitimate interest in the confidentiality of making this film of Mary Shelley's gothic tale, especially, at p 139:

> "that Robert de Niro's appearance, mainly as 'the creature' but also as 'the sharp featured man' should be kept secret so as to maintain the interest of the public in one of the essential elements of the film, namely, the appearance of Dr Frankenstein's creation."

That was, in the context of a serious film with a $40m budget, not a trivial matter.

290 The other case is *Creation Records Ltd v News Group Newspapers Ltd* [1997] EMLR 444, in which a photographer had taken pictures (again, with a conflict of evidence as to the circumstances) of a photo shoot for a poster for a forthcoming Oasis album. The poster was to show a white Rolls Royce apparently emerging from a swimming pool, with the members of the group and various other unrelated objects also in the picture. The most striking feature of the case, to my mind, is the lengths to which the record company's counsel went in seeking to establish an arguable case as to the infringement of some recognised intellectual property right. He argued that the Rolls Royce, the group members and the other objects were (i) a dramatic work or (ii) a sculpture or (iii) a collage or (iv) a work of artistic craftsmanship. So the barrel of intellectual property rights was thoroughly scraped before the judge came to the claim for breach of confidence, which he regarded as arguable. Lloyd J said, at pp 454–455,

"Mr Garnett argues that, despite all of that, no arguable case is made out for breach of confidence, or indeed for the existence of confidentiality, and says correctly that merely because a well-known person tries to stop people taking photographs of him or her it does not follow that any picture taken in evasion or defiance of those attempts is in breach of confidentiality. That seems to me to be a perfectly sound proposition but very far from this case."

Lloyd J went on to stress the evidence as to restrictions on intrusion.

291 In the Oasis case the defendants seem not to have relied on Lord Goff's second limiting principle (in *Attorney General v Guardian Newspapers Ltd (No 2)* [1990] 1 AC 109, 282), that the law of confidence does not protect trivia. Photographs of a white Rolls Royce in a swimming pool may be thought to be a fairly trivial trade secret. The argument that information is trivial or anodyne carries much less weight in a case concerned with facts about an individual's private life which he or she reasonably expects to be kept confidential: *McKennitt v Ash* [2006] EMLR 178, para 58 (Eady J).

*Conclusions on breach of confidence*

292 In *Attorney General v Guardian Newspapers Ltd (No 2)* [1990] 1 AC 109 the law took an important step forward with the holding that an actual, deliberate confiding of private information is not necessary to establishing a cause of action for breach of confidence. But there would be some danger of that principled and progressive step turning into an uncontrolled and unprincipled explosion if we were to disregard Lord Goff's three limiting factors, of which the first ("the principle of confidentiality only applies to information to the extent that it is confidential") and the second ("it applies neither to useless information, nor to trivia") are potentially relevant to this appeal. Uncontrolled growth of the law of confidence would also tend to bring incoherence into the law of intellectual property.

293 Although the position is different in other jurisdictions, under English law it is not possible for a celebrity to claim a monopoly in his or her image, as if it were a trademark or brand. Nor can anyone (whether celebrity or nonentity) complain simply of being photographed. There must be something more: either that the photographs are genuinely embarrassing (*Theakston v MGN Ltd* [2002] EMLR 398) or that their publication involves a misuse of official powers (*Hellewell v Chief Constable of Derbyshire* [1995] 1 WLR 804) or that they disclose something which merits temporary protection as a commercial secret (*Shelley Films Ltd v Rex Features Ltd* [1994] EMLR 134, in which a photograph of Robert De Niro in the guise of Frankenstein's creature would no doubt have been worth a thousand words of description).

294 There was nothing embarrassing or offensive about the "Hello!" photographs of the wedding, apart from the fact that Mr and Mrs Douglas did not want them to be taken, and indeed were contractually bound to do their best to see that they were not taken. The fact that stringent security arrangements were in place cannot by itself invest the wedding reception with the quality of confidentiality, if it did not otherwise attract it: see the observations of Lloyd J in *Creation Records Ltd v News Group Newspapers Ltd* [1997] EMLR 444, 454–455, which I have already quoted.

295 There is no cross-appeal by "Hello!" against the Court of Appeal's dismissal of its appeal challenging the judge's award to the individual claimants, Mr and Mrs Douglas. That issue is not therefore before your Lordships, and I should not be taken as expressing the view that the judge and the Court of Appeal were wrong about the modest awards of damages made in their favour. Mr and Mrs Douglas had both a personal and a commercial interest in the matter, even if the two sat uneasily together. But the interest of "OK!" was wholly commercial, and its case on breach of confidence must stand or fall on the ground of a right to short-term confidentiality for a trade secret.

296 In *Gilbert v Star Newspaper Co Ltd* (1894) 11 TLR 4, W S Gilbert obtained protection for the plot of his forthcoming comic opera, but only until its first night, and in the *Shelley Films* case [1994] EMLR 134 it was recognised that the injunction could not continue after the film was released. In this case [1994] EMLR 134, by contrast, the wedding was over before any photographs were published, and the "Hello!" photographs and the first batch of "OK!" photographs were published almost simultaneously. "OK!" had no intellectual property rights in the "Hello!" photographs, or in the "spectacle" of the wedding (compare the Australian *Victoria Park* case 58 CLR 479 and the risible arguments advanced in *Creation Records Ltd v News Group Newspapers Ltd*). The appellant's reliance on a generic class of photographic information about the wedding is ingenious, but I share the view of the Court of Appeal that it is unsound. "OK!" no more had a monopoly in any possible photograph of the spectacle than it had in the spectacle itself, or in any other event of which it hoped to carry exclusive coverage.

297 I have already noted that neither Lord Nicholls nor Lord Hoffmann regards *RCA Corpn v Pollard* [1983] Ch 135 and *Isaac Oren v Red Box Toy Factory Ltd* [1999] FSR 785 (both unsuccessful claims by exclusive licensees) as having been wrongly decided. It would in my opinion be anomalous if the principle in *RCA Corpn v Pollard* and *Isaac Oren v Red Box Toy Factory Ltd* were limited to exclusive licences of copyright or other intellectual property rights protected by an exhaustive statutory code, and were not applied to the analogous case of "OK!'s" exclusive contractual licence in respect of what might loosely be called quasi-copyright (not protected by statute). In respectful disagreement with Lord Hoffmann I think it would go some way to creating an unorthodox and exorbitant form of intellectual property.

298 My Lords, my respectful dissent from the views of the majority arises not from any distaste for the modern celebrity world but from my perception (shared, no doubt, by all of us) of the need for consistent and rational development of the law of confidentiality. My initial inclination was to conclude that "Hello!" was liable to pay damages to "OK!" under the "unlawful means" tort. But in my opinion it would be impossible to reach that conclusion without either overturning *RCA Corpn v Pollard* or distinguishing it on unsatisfactory grounds. An exclusive licensee of real intellectual property rights suffers economic loss as a direct result of a bootlegger's activities, but has no cause of action against him because his exclusive licence remains intact as a matter of law. One reason for the decision was the Court of Appeal's conclusion that there was an exhaustive statutory code. But another, simpler reason was that the exclusive licence

was not destroyed; it was simply made less valuable. The fact that it was no longer truly exclusive did not alter that conclusion.

299 Can the licensee's lack of a remedy under the "unlawful means" tort be made good by relying on the law of confidence, even in a case where there is no separate element of unlawful means? The answer must be (in a case where personal privacy is not an issue) that the law of confidence can be invoked only if the information in question meets the law's requirements for the protection of information that is, in the eyes of the law, confidential. Lord Hoffmann suggests, in an appeal to economic realities, that if "OK!" thought that it was worth paying £1m for its "exclusive" contractual right (and "Hello!" was willing to pay the same price) then there is no reason why there should not be an obligation of confidentiality. But the confidentiality of any information must depend on its nature, not on its market value.

300 For instance, a newspaper or television company might be willing to pay a large sum to the promoter of some important sporting event for the "exclusive" right to all motion pictures and photographs of the event, and it might go to great lengths to publicise its exclusive right (partly to attract custom, and partly in the hope of engaging the law of confidence). If the event (for instance, figure-skating or show-jumping) was held in a relatively small indoor venue, with tight security, the hoped-for exclusivity might actually be achieved. If the event was a motor rally or a marathon foot-race held on public roads it would be unachievable (although the newspaper or television company might still make a worthwhile profit). But in neither case, in my opinion, should the law of confidentiality afford the protection of exclusivity in a spectacle (the term used by the High Court of Australia in *Victoria Park Racing and Recreation Grounds Co Ltd v Taylor* 58 CLR 479). That would stretch the law of confidence from its proper function (in this commercial context, the protection of trade secrets) and would in effect confer on the exclusive licensee a form of property right which the courts have (in cases like *RCA Corpn v Pollard* [1983] Ch 135) rightly withheld from exclusive licensees of established intellectual property rights.

301 I would therefore dismiss all three appeals.

BARONESS HALE OF RICHMOND

302 My Lords, I have read your Lordships' opinions with admiration. On many issues, in particular the general shape of the economic torts, there is complete agreement. On three issues, there is disagreement. On two of these, I agree with the conclusions and reasoning of my noble and learned friend, Lord Hoffmann: these are "what should count as unlawful means" in the tort of causing economic loss by unlawful means and "what should count as a secret" in the law of breach of confidence. On the third issue, the application of the tort of conversion to contractual rights of action, I agree with the conclusions and reasoning of Lord Nicholls of Birkenhead.

303 On the first two issues, Lord Hoffmann's view is shared by a majority. The least said by the rest of us who take the same view, therefore, the better. There should be no doubt, and no room for argument, about what has been decided and why. Any perceived inconsistency between what I say and what he says is to be resolved in favour of the latter. Indeed, there would be much to be said for our adopting the practice of other supreme courts in having a single majority opinion to which all have contributed and all can subscribe without further qualification or explanation. There would

be less grist to the advocates' and academics' mills, but future litigants might thank us for that.

304 On the third issue, on the other hand, Lord Nicholls and I are in the minority. I can do less harm, therefore, by contributing my own twopenn'orth to the debate. Once again, however, any perceived inconsistency between what I say and what he says is to be resolved in his favour. As my noble and learned friend, Lord Walker of Gestingthorpe, acknowledges, Lord Nicholls makes a powerful case. Peter Gibson LJ reached the conclusion that such a development was not open to the Court of Appeal "with regret" [2005] QB 762, para 58. Carnwath LJ's "initial instinct" was also

> "that the receivers should be strictly liable for all the consequences of their unlawful appropriation of the business, by analogy with the long-established principles applied to unlawful receiverships under the law of trespass and conversion": para 115.

305 For those of us who share that general view, the question is whether this is simply the development of established principles of the common law to meet the demands of the modern world or whether it is a more radical step which should be left to Parliament. The great strength of the common law is that the judges are free to develop it on a case by case basis as new factual situations arise. There comes a point when, as Scrutton LJ once said, "If there is no authority for this it is time that we made one": see *Ellerman Lines Ltd v Read* [1928] 2 KB 144, 152. But on what basis do the judges decide to make authority where there was none before? Or to modify or adapt such authority as there is? There is no easy answer to this. Whatever we do must be consistent with the underlying principles and policy of the law. It must not overstep that indefinable line between the development and elaboration of existing principles and the making of brand new law which is unquestionably the province of Parliament. It must work with, rather than against, the grain of legal policy. It must go forward when the law is going forward and draw back when the law is drawing back.

306 That is why I have no difficulty with the first two issues. The underlying rationale of both the *Lumley v Gye* (1853) 2 E & B 216 and the unlawful means torts is the same: the defendant is deliberately striking at his target through a third party. But the means used to strike must be unlawful: see *Allen v Flood* [1898] AC 1. They may either be a wrong committed by the third party against the target or be a wrong committed by the defendant against the third party. But the rules governing each are different: in particular, the intention is different and the damage procured is different. Nevertheless, the common thread is striking through a third party who might otherwise be doing business with your target, whether by buying his goods, hiring his barges or working for him or whatever. The refinement proposed by my noble and learned friend, Lord Hoffmann, is entirely consistent with the underlying principles to be deduced from the decided cases. It is also consistent with legal policy to limit rather than to encourage the expansion of liability in this area. In the modern age, Parliament has shown itself more than ready to legislate to draw the line between fair and unfair trade competition or between fair and unfair trade union activity. This can involve major economic and social questions which are often politically sensitive and require more complicated answers than the courts

can devise. Such things are better left to Parliament. The common law need do no more than draw the lines that it might be expected to draw: procuring an actionable wrong between the third party and the target or committing an actionable (in the sense explained by Lord Hoffmann at para 49 above) wrong against the third party inhibiting his freedom to trade with the target. I too have found the discussion by my former colleague, Hazel Carty, in *An Analysis of the Economic Torts* (2001), ch 5, most helpful.

307 Commercial confidentiality is a different matter. It is moving forward rather than drawing back. The law took a big leap forward with the *Spycatcher* case (*Attorney General v Guardian Newspapers Ltd (No 2)* [1990] 1 AC 109). It was, incidentally, a leap which would have been impossible had the Law Commission's Report on Breach of Confidence (1981) (Law Com No 110) (Cmnd 8558) been implemented by statute. Rather as *Lumley v Gye* had expanded liability for breach of contract beyond the contract breaker to the person who persuaded him to break his contract, *Spycatcher* expanded liability for failing to keep a secret beyond the person to whom it had originally been confided to the person who knowingly took advantage of the secret. There are some secrets which the law will not protect. They may be so trivial or useless that the law should not concern itself with them. There may be a public interest in disclosure greater than the private interest in secrecy. But we have not been given any principled reason why photographic images of this wedding should not be protected. They were undoubtedly a secret unless and until "OK!" chose to publish the images authorised by the Douglases. "Hello!" did its best to break what it knew was a secret. There may not have been an entirely identical case before but it is consistent with existing principles to apply them to this case, as the judge did. I confess to having some difficulty in understanding what this has to do with the law of intellectual property. Parliament has devised ways in which an author, inventor or creator can continue to profit from his creativity long after the product has passed into the public domain. Although in both cases the subject matter can be called information, one set of remedies is about rewarding its creator, the other about keeping it quiet. Parliament has intervened in the former but not the latter.

308 Conversion is another area of judge made law, of much greater antiquity than the other two, and hence it has undergone even more momentous developments than they have done. The common law, as is well known, lacked any general proprietary remedy equivalent to the Roman law vindicatio. It provided three separate remedies for wrongfully taking away, keeping, or disposing of another's goods: trespass, detinue and trover or conversion. Conversion had distinct procedural advantages over the other two and rapidly extended its boundaries to cover much the same ground as they did: see John W Salmond, "Observations on Trover and Conversion" (1905) 21 LQR 43, 47. The contrivances used to achieve this desirable end led to many technicalities and controversies which continued to plague the law long after the reason for them had gone: ibid, at p 43. But of one thing there could be no doubt: although nominally tortious, conversion had become the remedy to protect the ownership of goods: see *Kuwait Airways Corpn v Iraqi Airways Co (Nos 4 and 5)* [2002] 2 AC 883, per Lord Nicholls of Birkenhead at para 77. It follows that fault is irrelevant: "An honest but mistaken claim of right on the part of the defendant is just as much a

conversion as a fraudulent purpose to retain another's property is": Salmond, loc cit, at p 49. The remedy is either the value of what has been lost or (following the Torts (Interference with Goods) Act 1977) the return of the goods.

309 In a logical world, there would be such a proprietary remedy for the usurpation of all forms of property. The relevant question should be, not "is there a proprietary remedy?", but "is what has been usurped property?" Rights of action were not seen as property in the 15th and 16th centuries when the tort of conversion was first developing. The essential feature of property is that it has an existence independent of a particular person: it can be bought and sold, given and received, bequeathed and inherited, pledged or seized to secure debts, acquired (in the olden days) by a husband on marrying its owner. So great was the medieval fear of maintenance that the law took a very long time to recognise any right of action (even a reversionary right to tangible property) as having this quality: see W S Holdsworth, "The History of the Treatment of Choses in Action by the Common Law" (1920) 33 Harvard Law Review 997. But it is noteworthy that, when new forms of chose in action which could be assigned were developed during the 17th and 18th centuries, the remedy of conversion was adapted to accommodate them: it did so by pretending that the document or other token representing or evidencing the obligation had the same value as the obligation itself.

310 The point was well made by Park CJ, in the Supreme Court of Errors in the State of Connecticut, in *Ayres v French* (1874) 41 Conn R 142, 150:

> "There is really no difference in any important respect between [a share of stock] and other kinds of personal property. A man purchases a share of stock and pays one hundred dollars for it. He afterwards purchases a horse, and pays the same price. The one was bought in the market as readily as the other and can be sold and delivered as readily. The one can be pledged as collateral security as easily as the other; as easily attached to secure a debt; and its value as easily estimated. The one enriches a man as much as the other, and fills as important a place in the inventory of his estate."

Once the law recognises something as property, the law should extend a proprietary remedy to protect it. Our law is prepared, according to *Clerk & Lindsell*, to apply the remedy of conversion to "any document which is specially prepared in the ordinary course of business as evidence of a debt or obligation": see *Clerk & Lindsell on Torts*, 19th ed (2006), para 17-35. The reliance on a document or some other tangible token of the existence of the obligation may be understandable as a relic of the history, but it is not principled. It is at once too wide and too narrow. There may be a document evidencing an obligation of a purely personal kind, which ought not to attract a proprietary remedy. On the other hand, there are many debts and some other obligations which can now be readily assigned, attached, form part of an insolvent estate, and enjoy all the other characteristics of property, but which are not represented by a specific document. It is not surprising that the law has not yet taken the logical step of applying the same principle to them, because it is much more difficult wrongly to deprive someone of his rights of action than it is to deprive him of his wallet or his coat. But, to my

mind, it is no greater step for the law to do this than it is for the law to recognise that photographs of the Douglas wedding enjoy the same protection as more conventional trade secrets. It is not only entirely consistent with principle. It is inconsistent with principle not to do so.

311 The facts of the *OBG* case make the point more clearly than I could ever do. The defendants took control over all the company's assets. They entered the company's premises and changed the locks. They took charge of all its plant and machinery and other chattels. They had no right to do so. No one disputes that they are strictly liable in trespass to land and conversion no matter how bona fide their belief that they were entitled to do this. They also took charge of the company's business and closed it down. The judge found that the company was doomed, so that there was no goodwill to be attached to disposing of it as a going concern. But among the company's assets were the debts and other contractual liabilities it was owed. The judge found that the defendants obtained less for these assets than would have been obtained in an orderly winding up. This is not improbable. The receivers' obligations and priorities were different from those of the company, its other creditors and shareholders. They might well result in lower realisations than the company might have achieved for itself. Accepting, as we must, the judge's findings on this, it makes no sense that the defendants should be strictly liable for what was lost on the tangible assets but not for what was lost on the intangibles.

312 There could, of course, be an objection to extending the scope of an invalidly appointed receiver's liability if Parliament had considered that receivers should be granted relief from liability in trespass to land or conversion of goods and had enacted that relief in terms which could not be applied to the conversion of contractual rights. But Parliament has not done so. Parliament's failure to act is not a reason to make the extension proposed: it merely negates a possible objection to doing so.

313 Nor do I see the Torts (Interference with Goods) Act 1977 as an obstacle. The Law Reform Committee, whose 18th Report (Conversion and Detinue) (1971) (Cmnd 4774) preceded the 1977 Act, were specifically asked to consider the torts relating to interference with chattels. It was in that context that they recommended a new tort of wrongful interference with chattels from which other forms of property, including land, money and choses in action would expressly be excluded, at para 29. They were not asked to consider, and did not consider, whether the tort of conversion should be applied to intangible property. Indeed, they excluded from their consideration its application to the infringement of copyright by the Copyright Act 1956, at para 4. Furthermore, while recommending a new tort, the committee deliberately did not recommend a complete codification of the common law of conversion; rather, they recommended that it should be retained save in so far as modified by their proposals, at para 32. In the event, Parliament did not even enact a new tort. It merely enacted a new label identifying the torts, including "conversion of goods", to which the new rules would apply. Those new rules were of very limited scope. None of them is inconsistent with applying the common law tort to contractual choses in action (or indeed to other forms of intangible property, but we are not concerned with these).

314 The committee did consider the measure of damages applicable to the conversion of "tokens". By this they meant "any article (usually, but not

necessarily, a document) of small inherent value which constitutes or
evidences some right in its possessor as respects property or other benefits",
at para 90. There was some doubt about whether the rule applicable to
negotiable and quasi-negotiable instruments applied to such things and the
committee were of the view that arguably it already did and certainly
it should (consistently with the view now taken by *Clerk & Lindsell*,
para 17-35). They recommended that the measure of damages in conversion
should always be the true loss suffered by reason of the defendant's acts,
at para 91. That view was adopted in the decision of this House in *Kuwait
Airways Corpn v Iraqi Airways Co (Nos 4 and 5)* [2002] 2 AC 883, para 68.
In that case, the effect was to limit the damages which would otherwise be
payable but the principle is the same. It means that the law of conversion has
already been adapted by the courts in a significant respect which is consistent
with its application to contractual rights of action: cf Val D Ricks, "The
Conversion of Intangible Property: Bursting the Ancient Trover Bottle with
New Wine" (1991) 4 Brigham Young University Law Review 1681, where
this was seen as the major problem in the current US developments.

315  Reforming the common law by statute is not an easy task (the
difficulties are vividly described in *R Oerton, A Lament for the Law
Commission* (1987)). One of the difficulties is that the common law is
constantly developing. The state of the law when the reforms are originally
proposed may be different from the state of the law if and when they are
eventually enacted. Indeed, the law may continue to move on even after the
reforms have been enacted. The law reformer will rarely wish to preclude
such organic development unless (unlike the 1977 Act) the reform is
intended to be a complete codification. It is quite possible that a later
development in the common law will take away the case for a reform which
has been enacted on the basis of what the law was previously thought to be.
A recent example of this is *Bakewell Management Ltd v Brandwood* [2004]
2 AC 519. But that will not deter the courts from developing the law unless
it is clearly inconsistent with what Parliament has enacted, which this is not.
I do not, therefore, see the 1977 Act as any obstacle to the incremental
development of the common law of conversion.

316  If, however, a majority of your lordships would prefer to leave the
matter to Parliament, then I very much hope that the Law Commission can
be persuaded to include it in their tenth programme of law reform. The
commission would be bound to consider developments in other common
law jurisdictions. There are Canadian authorities which look at it from the
point of view of invalid receivership. They establish, at the very least, that
where a receiver wrongfully takes control and a business fails as a result,
then the value of the company's intangible assets is included in the measure
of damages: *McLachlan v Canadian Imperial Bank of Commerce* (1987)
13 BCLR (2d) 300; approved on appeal (1989) 57 DLR (4th) 687; *Bradshaw
Construction Ltd v Bank of Nova Scotia* [1993] 1 WWR 596; and *Royal
Bank of Canada v W Got & Associates Electric Ltd* (1994) 150 AR 93,
confirmed on appeal by the Alberta Court of Appeal (1997) 196 AR 241 and
by the Supreme Court of Canada [1999] 3 SCR 408.

317  In the United States, the *American Law Institute, Restatement of
the Law, Torts*, 2d (1965) merely refers to "documents in which intangible
rights are merged", but the commentary, at p 242, observes:

> "It is at present the prevailing view that there can be no conversion of an ordinary debt not represented by a document, or of such intangible rights as the goodwill of a business or the names of customers. The process of extension has not, however, necessarily terminated; and nothing that is said in this section is intended to indicate that in a proper case liability for intentional interference with some other kind of intangible rights may not be found."

Even before then, some seeds of such a development had been sown: see "Conversion of Choses in Action" (1941) 10 Fordham Law Review 415. Since then a few states have extended the tort beyond contractual obligations to intangibles such as computer records and data: see most recently, *Thyroff v Nationwide Mutual Insurance Co* (2007) 832 NYS 2d 873. These raise far more formidable questions than the one with which we are concerned: it is questionable whether the subject matter has sufficient proprietary quality to attract a proprietary remedy. But they certainly point to a problem with our present reliance on tangible tokens: the reason why (if it be the case) an e-ticket cannot be converted is that it is non-assignable, not that it exists in cyber-space rather than on paper. We do not have to venture into these difficult issues to resolve the present case in favour of OBG. The Law Commission, however, would almost certainly have to do so. Such questions are already rearing their heads in Australia as well as the United States: see *Telecom Vanuatu Ltd v Optus Networks Pty Ltd* [2005] NSWSC 951; *Hoath v Connect Internet Services Pty Ltd* [2006] NSWSC 158. I would quite understand it if the commission were to consider this a more suitable topic for the case by case development of the common law than for comprehensive statutory reform. I regret that by this decision we appear to be ruling that out.

318 For these reasons, I would allow the appeals in the cases of OBG and "OK!" but, in agreement with all your Lordships, I would dismiss the appeal in the Mainstream case.

LORD BROWN OF EATON-UNDER-HEYWOOD

319 My Lords, I have had the privilege of reading in draft the opinions of my noble and learned friends, Lord Nicholls of Birkenhead, Lord Hoffmann and Lord Walker of Gestingthorpe. All three agree on many of the issues arising in these appeals and where that is so I too agree. Where, however, they disagree—notably with regard to (i) the precise nature and ambit of the economic tort of causing loss by unlawful means, (ii) whether the tort of conversion should be extended to cover the appropriation of choses in action, and (iii) "OK's" claim based on confidentiality—I have come in the end to accept in each instance the reasoning and conclusions of Lord Hoffmann. I add only the following brief observations.

*Causing loss by unlawful means*

320 As Lord Hoffmann explains, any liability for this tort is primary (unlike the accessory liability which arises under the principle in *Lumley v Gye* (1853) 2 E & B 216 where the defendant induces a contracting party to commit an actionable wrong against the claimant) and it arises where the defendant, generally to advance his own purposes, intentionally injures the claimant's economic interests by unlawfully interfering with a third party's

freedom to deal with him. In this tort there is no question of the third party's conduct (which ex hypothesi will have been inhibited or obstructed by the defendant's actions) being unlawful vis-à-vis the claimant; if it were, the case would be one of *Lumley v Gye* secondary liability. Rather the unlawfulness is that of the defendant towards the third party and the defendant's conduct must be such as would be actionable at the suit of the third party had he suffered loss. To define and circumscribe the tort in this way seems to be not only faithful to its origins as described by Lord Lindley in *Quinn v Leatham* [1901] AC 495, 535, and consistent with the great bulk of authority which has considered the tort over the ensuing century, but also to confine it to manageable and readily comprehensible limits. This whole area of economic tort has been plagued by uncertainty for far too long. Your Lordships now have the opportunity to give it a coherent shape. This surely is an opportunity to be taken.

*Conversion*

321 In common with Lord Hoffmann and Lord Walker I too would regard the expansion of the tort of conversion to cover the appropriation of things in action, as proposed by Lord Nicholls, to involve too radical and fundamental a change in the hitherto accepted nature of this tort (see particularly the Torts (Interference with Goods) Act 1977) to be properly capable of achievement under the guise of a development of the common law. Lord Nicholls suggests that this would represent merely "a modest but principled extension of the scope of the tort". I see it rather differently—as no less than the proposed severance of any link whatever between the tort of conversion and the wrongful taking of physical possession of property (whether a chattel or document) having a real and ascertainable value. Indeed, I respectfully question whether such a proposed development in the law ought in any event to be welcomed. I recognise, of course, that the tort has long since been extended to encompass a variety of documents, not merely documents of title and negotiable instruments but also any business document which in fact evidences some debt or obligation. But to my mind there remains a logical distinction between the wrongful taking of a document of this character and the wrongful assertion of a right to a chose in action which properly belongs to someone else. One (the document) has a determinable value as at the date of its seizure. The other, as so clearly demonstrated by this very case (OBG), does not. It is one thing for the law to impose strict liability for the wrongful taking of a valuable document; quite a different thing now to create strict liability for, as here, wrongly (though not knowingly so) assuming the right to advance someone else's claim.

322 As Lord Hoffmann points out, there is really no explanation in OBG's case for the trial judge's conclusion that causes of action in respect of the terminated North West Water contracts which were finally settled in November 1993 for £400,000 had in June 1992 been worth three and a half times that sum: £1,400,000. Certainly there is no suggestion that the receivers here acted incompetently in negotiating the settlement, still less that the supposed value of these contracts in June 1992 was in fact then realisable in that sum. As Lord Walker observes, this is "a singularly unsuitable case for a major change in the law".

*Confidentiality*

323 The facts giving rise to the claim by "OK!" against "Hello!" are sufficiently summarised by Lord Hoffmann, at paras 108–109, and by Lord Nicholls, at paras 242–246 (and are to be found in altogether greater detail in the judgments below). Nobody disputes that the Douglases were perfectly entitled, quite irrespective of any right of privacy, to sell the exclusive right to publish photographs of their wedding, and nobody doubts that the right was worth the £1m which "OK!" paid for it. Indeed "Hello!" had earlier made an unsuccessful bid for the same right in the same sum. It is no less plain that in publishing as they did the rogue photographs deceitfully taken by an infiltrator at the wedding, "Hello!" not only lent themselves to this outwitting of the strenuous efforts made by the Douglases to safeguard "OK!'s" exclusive but intentionally destroyed the very right itself.

324 The loss of their exclusive right cost "OK!" £1m; that was the judge's assessment of damages here and there are no good grounds for impugning it. "Hello!", however, contend that vis-à-vis "OK!" they committed no actionable wrong: all is fair in love and war and so too, they submit, between publishers of celebrity magazines. Spike your competitor's exclusive if you can and use whatever means you must.

325 If the law were indeed to sanction such an approach I for my part would regret it. Having paid £1m for an exclusive right it seems to me that "OK!" ought to be in a position to protect that right and to look to the law for redress were a third party intentionally to destroy it. Like Lord Hoffmann, I would uphold "OK!'s" claim, as Lindsay J did at first instance, on the ground of breach of confidence.

326 What is the information to which the confidence here attached? Plainly the information as to how the wedding looked—the photographic images which bring the event to life and make the viewer a virtual spectator at it. How can one doubt that this was commercially confidential information or, if one prefers, a trade secret? It was, after all, secret information for which "OK!" had been prepared to pay £1m, in the expectation, obviously, that it was to remain secret until they chose to make use of it. And that is certainly how it would also have been perceived by "Hello!" (who had themselves hoped to acquire and exploit the secret in the same way).

327 Like Lord Hoffmann I find the Court of Appeal's criticism of the judge, at para 136 of their judgment, unpersuasive. I cannot agree that "OK!'s" complaint, properly analysed, is not about "Hello!'s" breach of their exclusive right to publish authorised photographs but rather that "Hello!" published images which no one had a right to publish and about which only the Douglases had a right to complain. This to my mind entirely overlooks that the Douglases had granted "OK!" the exclusive right to publish any photographic images of the wedding and had undertaken to do their best to ensure that no photographs were taken by anyone else so that nobody else would be in a position to defeat their exclusive right.

328 Assume, for example, that the Douglases were themselves magazine publishers and had wished to market the visual images of their wedding as an exclusive in their own magazine. Could it then be suggested that they had no right to complain against "Hello!" for behaving as they did here? Surely not. Or assume that the contract had stipulated that if other

photographs of the wedding came to be published, the £1m paid by "OK!" (or, say, £½m) would be repayable. Would not the Douglases have been entitled to claim that loss against "Hello!" on the ground of breach of confidence? Why then not "OK!" too?

329 The one hesitation I must own to having had with regard to the claim for breach of confidence concerns the situation which arises upon publication by "OK!" of the authorised photographs in pursuance of their exclusive right. At that moment, it may be suggested, the secret is out, the world now knows what the wedding looks like, and no commercial confidence remains to be protected. The answer, however, I am persuaded is this. The secret consists no less of each and every visual image of the wedding than of the wedding as a whole. Assume, for example, that "OK!" had chosen to publish photographs of the bride and groom in one issue, the guests in the next, and the presents later still. The confidence would, I think, continue throughout and I see no reason why at some point bootlegged photographs should suddenly become acceptable on the grounds that the look of the wedding was now in the public domain so that no confidentiality in its photographic image remained to be protected.

*Conclusion*

330 It follows from all this that I too would dismiss the appeals respectively by OBG and by Mainstream Properties but allow the appeal by "OK!" on the ground of breach of confidence, reinstating Lindsay J's damages award accordingly.

*Appeal in OBG Ltd v Allan dismissed.*
*Appeal in Douglas v Hello! Ltd allowed.*
*Appeal in Mainstream Properties Ltd v Young dismissed.*

*Solicitors: Hammonds, Leeds; Reynolds Porter Chamberlain; S J Berwin; M Law; Smith Partnership, Derby; Leigh Davis.*

S H

# AC 13

[HOUSE OF LORDS] A

LONRHO PLC. . . . . RESPONDENT AND CROSS-APPELLANT

AND

FAYED AND OTHERS . . . APPELLANTS AND CROSS-RESPONDENTS

1991 April 22, 23, 24, 25, 29, 30; May 1; June 27 — Lord Bridge of Harwich, Lord Brandon of Oakbrook, Lord Templeman, Lord Goff of Chieveley and Lord Jauncey of Tullichettle B

*Tort—Cause of action—Unlawful interference with business—Take-over bid—Misrepresentations to Secretary of State to prevent bid being referred to Monopolies and Mergers Commission—Competitor prevented from bidding for share capital—Whether case to be met—Whether statement of claim to be struck out* C

*Tort—Cause of action—Conspiracy—Unlawful act—Business rivals allegedly making false statements to prevent take-over bid being referred to Monopolies and Mergers Commission—Predominant purpose protection of own legitimate business interests—Whether conspiracy to interfere with unsuccessful competitor's business—Whether pleadings disclosing cause of action*

The plaintiff wished to acquire control over another company but was prevented from increasing its stake of the share capital by an undertaking given to the Secretary of State pending the outcome of a reference to the Monopolies and Mergers Commission. The first three defendants, through the medium of the fourth defendant, made a rival bid for 100 per cent. of the share capital of the company. That offer was approved by the directors of the company, was not referred to the commission and the defendants gained control of the company. The plaintiff issued a writ against the defendants and by its statement of claim alleged, inter alia, that the first three defendants, by false statements about their financial capacity to acquire the share capital and develop the company's business, had persuaded the board of directors to accept their bid and the Secretary of State not to refer their bid to the commission; that, by such action the defendants had tortiously interfered with the plaintiff's right to bid for the shares, alternatively, had conspired against the plaintiff. It was alleged against the fifth and sixth defendants, merchant bankers to the other defendants, that they were fraudulent in that they were reckless as to the truth of the representations and against the sixth defendants that they acted negligently and in breach of the duty of care owed to the plaintiff. D E F

The defendants applied for an order striking out the statement of claim on the ground that it disclosed no cause of action. The application was rejected by the master but was granted by the judge in chambers and the action was dismissed. The plaintiff appealed save in respect of the claim in negligence. It was accepted before the Court of Appeal that since the statement of claim did not allege that the predominant purpose of the alleged conspiracy was to injure the plaintiff the court was bound by previous authority to hold that the pleaded cause of action in conspiracy must fail, but the plaintiff reserved the right to contest that issue in the House of Lords. The Court of Appeal allowed the appeal. G H

On appeal by the defendants and cross-appeal by the plaintiff in respect of the claim in conspiracy:—

*Held*, dismissing the appeal and allowing the cross-appeal, (1) that where the primary or predominant purpose of conspirators was to further or protect their own legitimate interests but there was also the intent to injure the plaintiff, it sufficed to make their conduct tortious that they used unlawful means; that accordingly, albeit the plaintiff did not dispute the defendants' pleaded intention that to cause injury to the plaintiff was not the predominant purpose of their alleged unlawful conduct, that was not necessarily fatal to the claim in conspiracy and therefore did not constitute a separate ground for striking out that part of the pleading (post, pp. 463C–D, 465G–466A, 468E–H, 470H–471A, C–D).

Dictum of Lord Wilberforce in *Allen v. Gulf Oil Refining Ltd.* [1981] A.C. 1001, 1010–1011, H.L.(E.) applied.

*Lonrho Ltd. v. Shell Petroleum Co. Ltd. (No. 2)* [1982] A.C. 173, H.L.(E.) considered.

*Metall und Rohstoff A.G. v. Donaldson Lufkin & Jenrette Inc.* [1990] 1 Q.B. 391, C.A. overruled.

(2) That at the interlocutory stage of the proceedings the two pleaded causes of action stood or fell together, and that if the defendants failed to establish that the plaintiff's primary pleading alleging the tort of interference with business by unlawful means should be struck out they were in no stronger position in respect of the claim in conspiracy; that the inherent difficulty of the issues raised by the proceedings could in no wise be described as plain and obvious, nor could the plaintiff's cause of action be characterised as unarguable or almost incontestably bad; and that, therefore, it was not an appropriate case for striking out but should proceed to trial (post, pp. 468H–469B, F–G, 470E, H–471A, C–D).

Decision of the Court of Appeal [1990] 2 Q.B. 479; [1989] 3 W.L.R. 631; [1989] 2 All E.R. 65 reversed in part.

The following cases are referred to in their Lordships' opinions:

*Allen v. Gulf Oil Refining Ltd.* [1981] A.C. 1001; [1981] 2 W.L.R. 188; [1981] 1 All E.R. 353, H.L.(E.)

*Crofter Hand Woven Harris Tweed Co. Ltd. v. Veitch* [1942] A.C. 435; [1942] 1 All E.R. 142, H.L.(Sc.)

*Drummond-Jackson v. British Medical Association* [1970] 1 W.L.R. 688; [1970] 1 All E.R. 1094, C.A.

*Dyson v. Attorney-General* [1911] 1 K.B. 410, C.A.

*Hubbuck & Sons Ltd. v. Wilkinson, Heywood & Clark Ltd.* [1899] 1 Q.B. 86, C.A.

*Lonrho Ltd. v. Shell Petroleum Co. Ltd. (No. 2)* (unreported), 1 December 1980, Parker J.; 6 March 1981; Court of Appeal (Civil Division) Transcript No. 51 of 1981, C.A.; [1982] A.C. 173; [1981] 3 W.L.R. 33; [1981] 2 All E.R. 456, H.L.(E.)

*Metall und Rohstoff A.G. v. Donaldson Lufkin & Jenrette Inc.* [1990] 1 Q.B. 391; [1989] 3 W.L.R. 563; [1989] 3 All E.R. 14, C.A.

*Nagle v. Feilden* [1966] 2 Q.B. 633; [1966] 2 W.L.R. 1027; [1966] 1 All E.R. 689, C.A.

*Quinn v. Leathem* [1901] A.C. 495, H.L.(I.)

*Rookes v. Barnard* [1964] A.C. 1129; [1964] 2 W.L.R. 269; [1964] 1 All E.R. 367, H.L.(E.)

*Sorrell v. Smith* [1925] A.C. 700, H.L.(E.)

*Ware and De Freville Ltd. v. Motor Trade Association* [1921] 3 K.B. 40, C.A. A

*Williams and Humbert Ltd. v. W. & H. Trade Marks (Jersey) Ltd.* [1986] A.C. 368; [1986] 2 W.L.R. 24; [1986] 1 All E.R. 129, H.L.(E.)

The following additional cases were cited in argument:

*Acrow (Automation) Ltd. v. Rex Chainbelt Inc.* [1971] 1 W.L.R. 1676; [1971] 3 All E.R. 1175, C.A. B

*Allen v. Flood* [1898] A.C. 1, H.L.(E.)

*Anns v. Merton London Borough Council* [1978] A.C. 728; [1977] 2 W.L.R. 1024; [1977] 2 All E.R. 492, H.L.(E.)

*Associated British Ports v. Transport and General Workers' Union* [1989] 1 W.L.R. 939; [1989] I.C.R. 557; [1989] 3 All E.R. 796; [1989] 3 All E.R. 822, C.A. and H.L.(E.)

*Brekkes Ltd. v. Cattel* [1972] Ch. 105; [1971] 2 W.L.R. 647; [1971] 1 All E.R. 1031 C

*Chaplin v. Hicks* [1911] 2 K.B. 786, C.A.

*Canada Cement La Farge Ltd. v. British Columbia Lightweight Aggregate Ltd.* (1983) 145 D.L.R. (3d) 385

*Daily Mirror Newspapers Ltd. v. Gardner* [1968] 2 Q.B. 762; [1968] 2 W.L.R. 1239; [1968] 2 All E.R. 163, C.A.

*Dominion Rent A Car Ltd. v. Budget Rent A Car Systems (1970) Ltd.* [1987] 2 N.Z.L.R. 395 D

*Donoghue v. Stevenson* [1932] A.C. 562, H.L.(Sc.)

*Fairbairn, Wright & Co. v. Levin & Co.* (1914) 34 N.Z.L.R. 1

*Geary & Son (Pty.) Ltd. v. Gove*, 1964 (1) S.A. 434

*Greenhalgh v. Mallard* [1947] 2 All E.R. 255, C.A.

*Hadmor Productions Ltd. v. Hamilton* [1983] 1 A.C. 191; [1982] 2 W.L.R. 322; [1982] 1 All E.R. 1042, H.L.(E.)

*Hollywood Silver Fox Farm Ltd. v. Emmett* [1936] 2 K.B. 468; [1936] 1 All E.R. 825 E

*Island Records Ltd., Ex parte* [1978] Ch. 122; [1978] 3 W.L.R. 23; [1978] 3 All E.R. 795, C.A.

*Kearney v. Lloyd* (1889) 26 Ir. 268

*Keeble v. Hickeringill* (1706) 11 East 574n

*Lumley v. Gye* (1853) 2 E. & B. 216

*Merkur Island Shipping Corporation v. Laughton* [1983] 2 A.C. 570; [1983] 2 W.L.R. 778; [1983] 2 All E.R. 189, H.L.(E.) F

*Midland Bank Trust Co. Ltd. v. Green (No. 3)* [1979] Ch. 496; [1979] 2 W.L.R. 594; [1979] 2 All E.R. 193

*Mogul Steamship Co. Ltd. v. McGregor, Gow & Co.* (1889) 23 Q.B.D. 598, C.A.; [1892] A.C. 25, H.L.(E.)

*National Phonograph Co. Ltd. v. Edison-Bell Consolidated Phonograph Co. Ltd.* [1908] 1 Ch. 335, C.A. G

*R.C.A. Corporation v. Pollard* [1983] Ch. 135; [1982] 3 W.L.R 1007; [1982] 3 All E.R. 771, C.A.

*Reg. v. Scott* [1975] A.C. 819; [1974] 3 W.L.R. 741; [1974] 3 All E.R. 1032, H.L.(E.)

*Reg. v. Secretary of State for Trade and Industry, Ex parte Lonrho Plc.* [1989] 1 W.L.R. 525; [1989] 2 All E.R. 609, H.L.(E.)

*Salaman v. Warner* (1891) 65 L.T. 132, C.A. H

*Stratford (J.T.) & Son Ltd. v. Lindley* [1965] A.C. 269; [1964] 3 W.L.R. 541; [1964] 3 All E.R. 102, H.L.(E.)

*Thomson (D.C.) & Co. Ltd. v. Deakin* [1952] Ch. 646; [1952] 2 All E.R. 361, C.A.

*Torquay Hotel Co. Ltd. v. Cousins* [1969] 2 Ch. 106; [1969] 2 W.L.R 289; [1969] 1 All E.R. 522, C.A.
*Van Camp Chocolates Ltd. v. Aulsebrooks Ltd.* [1984] 1 N.Z.L.R. 354
*Volkswagen Canada Ltd. v. Spicer* (1978) 91 D.L.R. (3d) 42
*Warnink (Erven) Besloten Vennootschap v. J. Townend & Sons (Hull) Ltd.* [1979] A.C. 731; [1979] 3 W.L.R 68; [1979] 2 All E.R. 927, H.L.(E.)

APPEAL and CROSS-APPEAL from the Court of Appeal.

This was an appeal by the defendants, Mohamed Al-Fayed, Salah Fayed, Ali Fayed, House of Fraser Holdings Plc., John MacArthur and Kleinwort Benson Ltd., the first, second, third, fourth, fifth and sixth defendants respectively and a cross-appeal by the plaintiff, Lonrho Plc., both by leave dated 14 December 1989 of the House of Lords (Lord Bridge of Harwich, Lord Brandon of Oakbrook and Lord Jauncey of Tullichettle) from the judgment and order dated 2 March 1989 of the Court of Appeal (Dillon, Ralph Gibson and Woolf L.JJ.) [1990] 2 Q.B. 479 whereby it was ordered, inter alia, that the plaintiff's appeal be allowed and that the order of Pill J. [1990] 1 Q.B. 490, dated 22 June 1988, be set aside save in so far as the order struck out paragraphs 42 to 47 (inclusive) and paragraphs 55 to 56 (inclusive) of the statement of claim and the words "and/or conspiracy and/or breach of duty" in paragraph 57 thereof.

The facts are stated in the opinion of Lord Bridge of Harwich.

*Lord Irvine of Lairg Q.C.*, *David Oliver Q.C.*, *Alastair Walton* and *Philip Sales* for the first four defendants. The appeal concerns the proper limits of the tort of interfering with the trade or business of another by unlawful means. To establish the tort it must be shown that the unlawful means used by the defendant were specifically directed at the plaintiff.

Where a person who happens to be in competition to acquire an asset uses unlawful means for the purpose of promoting his bid for that asset, those means cannot be said also to be aimed or directed at any competitor or competitors who may exist, where the self-same unlawful means would have been used by the defendant to promote his own bid out of his desire to acquire that asset had no competitors existed.

Nothing that the Al Fayeds (the first three defendants) did interfered with any business assets of Lonrho (the plaintiff). The tort in its widest formulation is "interfering with business by unlawful means." Lonrho recognises that to succeed it has to show that the lost opportunity of bidding for House of Fraser was an asset. This is too nebulous to qualify as a business interest. Further the tort requires as an essential element that the unlawful means used were directed at the plaintiff. It must be an actual intention on the part of the defendant to strike at the plaintiff so that but for that intention he would not have practised the unlawful means on the third party: see the second limb of the dictum of Lord Watson in *Allen v. Flood* [1898] A.C. 1, 96; *Quinn v. Leathem* [1901] A.C. 495, 534–535 and *National Phonograph Co. Ltd. v. Edison-Bell Consolidated Phonograph Co. Ltd.* [1908] 1 Ch. 335, 356, 359, 360. As to later developments relating to the ambit of the tort see *D. C. Thomson & Co. Ltd. v. Deakin* [1952] Ch. 646, 690, 691, 693; *Rookes*

*v. Barnard* [1964] A.C. 1129, 1167, 1181, 1182, 1208; *J. T. Stratford & Son Ltd. v. Lindley* [1965] A.C. 269, 323–324, 326D, 329G, 337F and *Torquay Hotel Co. Ltd. v. Cousins* [1969] 2 Ch. 106, 133E, 137, 138G–H.

To impose liability where the reasons which actuate the defendant to use unlawful means are wholly independent of a wish to interfere with the plaintiffs' business, and any interference is no more than an incidental consequence foreseen by and gratifying to the defendant, would be stretching the tort too far: see *Van Camp Chocolates Ltd. v. Aulsebrooks Ltd.* [1984] 1 N.Z.L.R. 354, 360, *per* Cooke J. In other words, the intent to cause injury to the plaintiff must be the effective cause of the defendants' conduct. Lonrho does not allege that the predominant purpose of the Al Fayeds was to harm Lonrho. Therefore the predominant purpose of the Al Fayeds in making the false statements was to further their own interests. To the question: was the pleaded intent a simple actual intent to cause injury to the plaintiff? The answer is manifestly in the negative.

There is no question that the Al Fayeds made the false statements outside the context of acquiring House of Fraser for themselves. It would be preposterous that they should have made them for the purpose of injuring Lonrho. This is not alleged. It follows that a sufficient cause for making the false statements was the furtherance of the Al Fayeds' own interest. Since, therefore, the statements were not made with the purpose of injuring Lonrho the intent pleaded in paragraph 19 of the statement of claim is not an actuating intent. It has no causal effect whatever. The tort on the pleadings is not made out.

Lonrho's reliance on *Hadmor Productions Ltd. v. Hamilton* [1983] 1 A.C. 191 is misconceived, for the plaintiffs there had a right to exploit their film programmes without interference with themselves or with those who wished to do business with them.

A mere opportunity to bid is not a sufficient business interest for the purposes of establishing the tort. [Reference was made to *Reg. v. Secretary of State for Trade and Industry, Ex parte Lonrho Plc.* [1989] 1 W.L.R. 525, 536A–B.]

*Anthony Grabiner Q.C.* and *Nicolas Bratza Q.C.* for the fifth and sixth defendants. The essential difference between the first four defendants and the present defendants (the merchant bankers) is that the latter acted as financial advisers to the Al Fayeds. It is alleged that the bank acted recklessly in advising the Al Fayed brothers. The Court of Appeal based its judgment on the premise that the boundaries of the tort of unlawful interference with business had not been established and, therefore, it was not apposite to strike out the statement of claim. The tort, however, is not so wide as to include Lonrho's claim.

Essential elements of the tort have not been satisfied. (1) There is no pleaded business right or asset which is capable of protection in law. (2) Even if Lonrho's opportunity to bid could constitute a legitimate business interest, on the pleaded case nothing said or done by the defendants interfered with a relevant business interest of Lonrho, nor did the bankers use any unlawful means of which Lonrho can complain. Nothing that was done could have affected the decision of the Secretary of State. (3) On Lonrho's own pleaded case there was no sustainable

case of an intent to injure Lonrho's business interests. (4) Nothing alleged or said to have been done by the bankers affected the freedom of Lonrho to buy shares in or bid for House of Fraser.

As to (1), it is not alleged by Lonrho and could not be alleged that either their existing contractual relationships or their future contractual relationships have been interfered with, nor is it alleged that there has been any interference with Lonrho's ability to carry on its general trade or business. Nevertheless it is asserted that the ability to bid for House of Fraser while a competitor to whom Lonrho had sold its entire shareholding was prevented from doing so amounted to a business asset which the law can and should protect. But whatever are the boundaries of this tort the circumstances here do not come within the ambit of a protectable interest: see *R.C.A. Corporation v. Pollard* [1983] Ch. 135, 138E–F, 150, 152, 153E–F, 155G and *Ex parte Island Records Ltd.* [1978] Ch. 122, 131D. The interest claimed is too amorphous and nebulous.

On (2), two questions arise. (i) Assuming a protectable legal interest is disclosed, did the defendants interfere with that interest? *Pre-acquisition*. Nothing which the defendants are alleged to have said or done prevented Lonrho from bidding for the share capital of House of Fraser in March 1985. Further, the pleaded fraud was not only not causative of the deferment of the release of Lonrho's undertaking it was also not causative of the acquisition by Holdings of over the 50 per cent. level of the share capital of House of Fraser: [1990] 2 Q.B. 479, 490. In these circumstances no nexus whatever has been shown to exist between the pleaded wrongful acts and the pleaded business interest. *Post-acquisition*. A fortiori, there can have been no interference with Lonrho's opportunity to bid for House of Fraser *after* the acquisition by Holdings, since no such opportunity arose.

(ii) Do the unlawful acts complained of constitute unlawful means on which Lonrho can rely in asserting an unlawful interference with that interest? As to unlawful means, the authorities on which Lonrho rely all relate to private law claims. The unlawful matters complained of are public law matters. The Fair Trading Act 1973 provides no remedy for a private person to complain of maladministration. At the relevant time there was no relevant offence of making false statements to the Secretary of State. The legislation has since been amended: see section 151 of the Companies Act 1989. There are very powerful policy reasons for not allowing private litigants to use public law for claiming private law remedies. For the structure of the Fair Trading Act 1973, see sections 4, 5, 63, 64, 69, 70, 72, 73, 75, 84, 88, 90, Schedule 8, para. 14. Even if in principle that Act was applicable there are too many imponderables for it to be applicable in the circumstances of the present case. The wrongful act of which complaint is made is the alleged deception of the Secretary of State. But Lonrho can be in no better position in seeking to rely on this wrongful act than the plaintiffs were in *Lonrho Ltd. v. Shell Petroleum Co. Ltd. (No. 2)* [1982] A.C. 173 and *R.C.A. Corporation v. Pollard* [1983] Ch. 135.

Lonrho accepts that an essential element of the tort is an intent to injure a particular person: *Allen v. Flood* [1898] A.C. 1 and *R.C.A.*

*Corporation* v. *Pollard* [1983] Ch. 135. But it cannot show that what the defendants did was directed at them.

*Sydney Kentridge Q.C.*, *Ian Geering Q.C.* and *David Pannick* for the plaintiff. The tort of unlawful interference with business is an innominate tort and it is still developing. It extends beyond damage to property, a legal right to property so-called or financial damage to a plaintiff. It is a tort which may involve undue pressure being placed on a third party. Historically and on the authorities, it can be defined as consisting of the doing of an intentional unlawful act, namely, an act done with the intent of causing damage in the form of economic loss to the plaintiff or an act in some way directed at the plaintiff and actually causing him damage. The tort has developed out of situations where damage having been done indirectly against the plaintiff, there was no cause of action. It has been necessary to limit the scope of the tort because in the 19th century any intent to injure the plaintiff was claimed to be a tort. The element of unlawfulness was brought in to limit its ambit: see *Allen* v. *Flood* [1898] A.C. 1.

Predominant motive or purpose is not an element of the tort. In trade competition there is never a single motive. A trader always seeks to benefit himself. It is only in certain types of conspiracy that the courts have considered the question of predominant purpose. Motives are often mixed: *Sorrell* v. *Smith* [1925] A.C. 700, 741, 742.

The origins of the tort are to be found in the 18th century: see *Holdsworth, A History of English Law*, 2nd. ed., vol. VIII (1937), pp. 425, 426, 431 and *Keeble* v. *Hickeringill* (1706) 11 East 574n. For the locus classicus in this field, see the judgment of Bowen L.J. in *Mogul Steamship Co. Ltd.* v. *McGregor, Gow & Co.* (1889) 23 Q.B.D. 598, 611, 613 et seq. There is no suggestion in that case that the wrongful means have to be independently actionable. Thus the misrepresentation does not have to be actionable misrepresentation. No subsequent case has suggested limiting the ambit of Bowen L.J.'s judgment in the *Mogul* case. It was approved in *Allen* v. *Flood* [1898] A.C. 1, 94. As early as *Lumley* v. *Gye* (1853) 2 E. & B. 216, 233, 236, it was held that knowingly to interfere with lawful contractual relations without sufficient reason gave rise to a cause of action. "Unlawful means" in the present context includes any means which in law the defendant is not at liberty to employ: fraud, violence, deliberate misrepresentation.

It is hard to believe that any court would hold that deliberate deceit did not amount to "unlawful means." The defendants' intention was to ensure that Lonrho did not have the opportunity to bid for the House of Fraser. The intention was that the Al Fayeds by using unlawful means should obtain the House of Fraser before Lonrho had the opportunity to bid. The interest which was damaged caused the plaintiff economic loss, whether it is called an opportunity or a spes. The defendants contend that Lonrho had no business interest. This is in essence the "floodgates" argument.

The public interest for the purposes of the Fair Trading Act is much wider than has been contended for by the defendants.

The cases show a gradual development of the tort. In this branch of the law, there is no case comparable to *Donoghue v. Stevenson* [1932] A.C. 562 or *Anns v. Merton London Borough Council* [1978] A.C. 728 in the field of negligence. [Reference was made to *National Phonograph Co. Ltd. v. Edison-Bell Consolidated Phonograph Co. Ltd.* [1908] 1 Ch. 335; *Fairbairn, Wright & Co. v. Levin & Co.* (1914) 34 N.Z.L.R. 1; *Rookes v. Barnard* [1964] A.C. 1129; *J. T. Stratford & Son Ltd. v. Lindley* [1965] A.C. 269; *Daily Mirror Newspapers Ltd. v. Gardner* [1968] 2 Q.B. 762; *Acrow (Automation) Ltd. v. Rex Chainbelt Inc.* [1971] 1 W.L.R. 1676; *Brekkes Ltd. v. Cattel* [1972] Ch. 105; *Volkswagen Canada Ltd. v. Spicer* (1978) 91 D.L.R. (3d) 42; *R.C.A. Corporation v. Pollard* [1983] Ch. 135; *Merkur Island Shipping Corporation v. Laughton* [1983] 2 A.C. 570; *Hadmor Productions Ltd. v. Hamilton* [1983] 1 A.C. 191 and *Associated British Ports v. Transport and General Workers' Union* [1989] 1 W.L.R. 939.]

There evolved from the 19th century cases the clear and salutary principle that a person who does an intentional unlawful act in the furtherance of his own business interest, or who aims to injure another and as a result causes damage to that other in the form of economic loss, or alternatively, economic loss relating to his business, has committed an actionable tort. As early as *Allen v. Flood* [1898] A.C. 1 it was seen that *Lumley v. Gye*, 2 E. & B. 216 was an example of a broader principle than that laid down in that case. It punishes only a deliberate wrongdoing which is aimed at a particular person. But there is no reason why the court should be tender to prevent the extension of the tort when the wrongdoing consists of fraud or deceit. For the defendants to invoke the public interest on the facts pleaded verges on the absurd. The proper approach should be that adopted by this House in *Erven Warnink Besloten Vennootschap v. J. Townend & Sons (Hull) Ltd.* [1979] A.C. 731, 742E et seq.

Four aspects of the tort call for enlargement: (1) unlawful means, (2) intention, (3) business interests or expectations, (4) causation.

(1) Fraud has been an unlawful means since the decision in *Mogul Steamship Co. Ltd. v. McGregor, Gow & Co.*, 23 Q.B.D. 598. As to the representations made to the Secretary of State, they constituted "unlawful means" for the purposes of the tort because deceitful means used in order to steal a march on one's competitor constitute such unlawful means.

(2) The intention required is an intention which is directed at the particular plaintiff and must initially do harm to the particular plaintiff, but the intention does not have to be a predominant intention. *Van Camp Chocolates Ltd. v. Aulsebrooks Ltd.* [1984] 1 N.Z.L.R. 354 is not consistent with English law: see *Sorrell v. Smith* [1925] A.C. 700, 739, 742. Further, it is distinguishable on its facts: the defendant in that case was very remote from the plaintiff. [Reference was made to *Dominion Rent A Car Ltd. v. Budget Rent A Car Systems (1970) Ltd.* [1987] 2 N.Z.L.R. 395, 438]. *Geary & Son (Pty.) Ltd. v. Gove*, 1964 (1) S.A. 434 is an example of a case in a civil law jurisdiction where a tort comparable to that alleged in the present case has been recognised.

(3) In none of the cases is there any attempt to limit the ambit of economic loss. In English law the courts have time and again decided that the destruction of an expectation which is of value sounds in damages. Damages have been awarded for the loss of an expectation even where it is subject to a complex series of contingencies: see *Chaplain v. Hicks* [1911] 2 K.B. 786 and *McGregor on Damages*, 15th ed. (1988), pp. 224 et seq.

(4) It is Lonrho's case that but for the wrongful acts of the defendants, the Secretary of State would, prior to or after 14 March 1985, have referred to the Monopolies and Mergers Commission the bid made by the fourth defendant ("Holdings") for House of Fraser on 4 March 1985 which resulted in Holdings acquiring a 50 per cent. share of House of Fraser by 11 March. But for those wrongful acts the bid would have been referred to the commission prior to 11 March 1985 and Holdings would not have acquired a 50 per cent. share holding in House of Fraser. Consequently, on or after 14 March 1985 (but for the wrongful acts complained of) Lonrho could have bid for House of Fraser, whether or not in competition with Holdings and the Fayeds. It is also Lonrho's case that the acquisition by Holdings of more than 50 per cent. of the shares in House of Fraser was a step in the fraudulent scheme alleged by Lonrho. The defendants would not have taken the risk of acquiring part or all of the shares in House of Fraser save in contemplation of their deception of the authorities and consequent freedom from Monopolies and Mergers Commission reference which would otherwise have been inevitable, as would a report from the commission adverse to the interests of Holdings.

The case is not a case which should be dealt with by striking it out. It is a substantial case which should go to trial. [Reference was made to *Quinn v. Leathem* [1901] A.C. 495, 535, 537 and *Associated British Ports v. Transport and General Workers' Union* [1989] 1 W.L.R. 939, 952F–953D, 954H–959B, 961A–H, 965D–966G.]

*The cross-appeal: the tort of conspiracy.*

It is well established that there are two types of conspiracy actionable in tort: (i) conspiracy to injure by the use of lawful means and (ii) conspiracy to perform an unlawful act or to use unlawful means.

The main issue on this aspect of the appeal is whether an essential element in the tort of conspiracy by unlawful conduct is that the defendants' predominant purpose was to injure the plaintiff, or whether it suffices that the defendants knew and intended that the plaintiff would be injured by the relevant acts, albeit the defendants' primary purpose was to benefit themselves.

This issue raises the question: what is the proper interpretation of *Lonrho Ltd. v. Shell Petroleum Co. Ltd. (No. 2)* [1982] A.C. 173. That decision has given rise to considerable difficulty in the lower courts. Hitherto it has been generally understood that a claim in tort for conspiracy to perform an unlawful act or use unlawful means did not depend upon the plaintiff showing that the defendant's predominant purpose was to injure the plaintiff but required only the presence of an intention to injure. But a detailed analysis in *Metall und Rohstoff A.G.*

*v. Donaldson Lufkin & Jenrette Inc.* [1990] 1 Q.B. 391 of the single speech in the *Lonrho* case concluded that if there were two purposes in an alleged conspiracy and the intent to injure was not the predominant purpose the claim in conspiracy would fail. The present appeal, therefore, is, in effect, an appeal from the decision of the Court of Appeal in the *Metall* case. In the *Lonrho* case [1982] A.C. 172, 180C, 182, 183D, the point in issue was whether it sufficed to found the claim in conspiracy to cause foreseeable damage rather than intentional damage to the plaintiff.

To ascertain the narrow field to which the tort of conspiracy is confined it is necessary to refer to the earlier cases. There is an accurate survey of the purport of the three early cases in this House (*Mogul Steamship Co. Ltd. v. McGregor, Gow & Co.* [1892] A.C. 25; *Allen v. Flood* [1898] A.C. 1 and *Quinn v. Leathem* [1901] A.C. 495) by Professor A. V. Dicey in (1902) 18 L.Q.R. 1 et seq. [Reference was also made to *Ware and De Freville Ltd. v. Motor Trade Association* [1921] 3 K.B. 40, 67, 90 and *Sorrell v. Smith* [1925] A.C. 700, 712, 714.] It is plain from the foregoing cases that the defendants acted for the predominant purpose of advancing their own self-interest and that that was a defence only in situations where such self-interest was legitimate and they had not used unlawful means. This principle is reinforced by the later cases of *Crofter Hand Woven Harris Tweed Co. Ltd. v. Veitch* [1942] A.C. 435, 443–447, 450–453, 462, 469, 472, 477, 486; *Greenhalgh v. Mallard* [1947] 2 All E.R. 255, 259 and *Rookes v. Barnard* [1964] A.C. 1129, 1170, 1204.

The approach of the Court of Appeal in the *Metall* case [1990] 1 Q.B. 391, in analysing in detail the speech of Lord Diplock in the *Lonrho* case, was misconceived. It cannot be that Lord Diplock intended merely by implication to overthrow the previous law. The House of Lords does not overthrow sub silentio. The alternative proposition is that in an appeal the House has the task of deciding the specific issues before it.

In *Lonrho v. Shell* Parker J. held that the plaintiffs were attempting to bring into the law of conspiracy a conspiracy where there was only *foreseeable injury*. He held that there was no intention to harm the plaintiffs and therefore no conspiracy. In the House of Lords [1982] A.C. 173, Lord Diplock approved Parker J.'s judgment. He was concerned with this question and no other. In the *Metall* case [1990] 1 Q.B. 391, 459–460 the Court of Appeal stated that Lord Diplock's speech in *Lonrho v. Shell* was in conflict with the judgments in the Court of Appeal in that case when, in fact, all the judgments in the Court of Appeal were approved. If it were to be held that Slade L.J.'s analysis of the *Lonrho* case in the *Metall* case was correct then the House should depart from its previous decision.

Lord Diplock's observations on conspiracy in *Hadmor Productions Ltd. v. Hamilton* [1983] 1 A.C. 191, 228G–H do not advance the defendants' argument on conspiracy.

Where deliberate unlawful means are used which are directed against a particular plaintiff there seems to be no reason of policy why there should have to be a predominant purpose to injure the plaintiff and not

a mixed purpose. The existence of a predominant intention or purpose is necessary only as a limiting factor where there is no other unlawfulness involved. The House should not endorse the view expressed in the *Metall* case [1990] 1 Q.B. 391, 412, 466. In *Midland Bank Trust Co. Ltd. v. Green (No. 3)* [1979] Ch. 496 there was no allegation of a predominant intent to injure pleaded, nor could there have been on the facts of that case. Nevertheless, it was held that the plaintiff was entitled to succeed in conspiracy.

*Lord Irvine of Lairg Q.C.* in reply. The argument for the plaintiff has glossed over whether Lonrho is complaining of loss of an opportunity to bid simpliciter, or of loss of an opportunity to bid *without competition from the Al Fayeds*. The relevant opportunity is the latter, as a matter of pleading and fact. The argument has accordingly failed to make the point that Lonrho's complaint is, in substance, not of any interference by the Al Fayeds with Lonrho's private, economic or business interests, but an interference by the Al Fayeds with the due operation of procedures under the Fair Trading Act 1973.

As to intention "directed at," the plaintiff is constrained to accept this requirement on the authorities but contends (i) that it is satisfied where the defendant knows that loss to the plaintiff will result from his act and (ii) that, in a competition case, the gain to the defendant necessarily results in a loss to the plaintiff, so that the defendant's intention to benefit himself is to be treated also as an intention to harm the plaintiff.

As regards business or economic interest, nothing that the Al Fayeds said to the Secretary of State caused him to take any action against Lonrho injurious to its economic or business interests. The Secretary of State's actions which were injurious to Lonrho's business interest (i.e. the three references and the extraction of the undertaking) represented decisions of the Secretary of State unaffected by anything said or done by the Al Fayeds. The Al Fayeds by their alleged lies induced the Secretary of State to abstain from action which would have been injurious to the Al Fayeds' business interests.

It was sought to maintain that Lonrho's claim as pleaded represented either an application of existing law or no more than a modest incremental advance upon it. That is not so. What distinguishes the present case from the ordinary interference with business interest cases (e.g. *J. T. Stratford & Son Ltd. v. Lindley* [1965] A.C. 269; *Hadmor Productions Ltd. v. Hamilton* [1983] 1 A.C. 191 and *National Phonograph Co. Ltd. v. Edison-Bell Consolidated Phonograph Co. Ltd.* [1908] 1 Ch. 335) is that the future contracts said to have been lost in those cases depended only upon ordinary, existent contingencies in the commercial state of affairs inherent in the situation at the date of the interference. On the facts of those cases, the plaintiff's private business interests had been interfered with.

By contrast, Lonrho's ordinary, private, economic or business interest to make a bid for House of Fraser has not been interfered with by the Al Fayeds, although it has been interfered with by the legitimate actions of the Secretary of State. Lonrho's complaint is of interference by the Al Fayeds with the implementation of public administrative procedures

and not with Lonrho's private economic interests. There has been a similar failure to meet the argument that the remedy for which Lonrho argues would cut across the remedies which the Act of 1973 and public law provide: see section 64(4)(*b*). Moreover, an interested party may always seek judicial review of any administrative decisions taken under the Act. Thus the Act itself, and public law, provide a correcting mechanism where it is alleged that the Secretary of State has been materially misled. In the present case, Lonrho has exhausted these public law remedies available to it, and there is no reason in policy why a private law remedy should be created to add to Lonrho's public law remedies.

On the analogy with breach of statutory duty, it is plain that in *Lonrho v. Shell (No. 2)* [1982] A.C. 173 Lord Diplock treated the breaches of the statutory orders, which conferred no cause of action on Lonrho, as equivalent to lawful means, in that they required a predominant purpose to injure for conspiracy involving such breaches. It would be highly anomalous if that which was not unlawful means for conspiracy were to be treated as unlawful means for the tort of interference with business by unlawful means.

The House of Lords' decision in the *Lonrho* case is soundly based in public policy: where Parliament cannot be regarded as having intended to give a plaintiff a remedy for breach of a statutory duty, the common law ought not to supply a remedy itself. This is particularly true in the case of the Fair Trading Act 1973, which creates a statutory framework for the implementation of high economic policy and is not intended to confer rights upon any private individual. Lonrho's present case cannot be stronger than it would have been had the present statutory duty in section 93B (as inserted by section 151 of the Companies Act 1989) of the Fair Trading Act 1973 existed in 1984–1985.

The tort requires that the unlawful acts of the defendant, practised upon a third party, be directed at the plaintiff: *Allen v. Flood* [1898] A.C. 1, 96; *Quinn v. Leathem* [1901] A.C. 495, 535; *National Phonograph Co. Ltd. v. Edison-Bell Consolidated Phonograph Co. Ltd.* [1908] 1 Ch. 335; *Rookes v. Barnard* [1964] A.C. 1129 and *Merkur Island Shipping Corporation v. Laughton* [1983] 2 A.C. 570. An actual and actuating intention to harm the plaintiff is required. It is not sufficient that a mere incidental consequence, which is foreseen, is harmful to the plaintiff. The gap between mere foresight of harm to the plaintiff and aiming at him is vast. To equate the two would be to extend the tort far beyond its true limits as laid down. *Van Camp Chocolates Ltd. v. Aulsebrooks Ltd.* [1984] 1 N.Z.L.R. 354 gives the only possible content to the requirement of "directed at." The distinction between direct interference with the plaintiffs' rights and indirectly attacking the plaintiff by unlawful means practised on a third party but aimed at the plaintiff is expressly recognised in the authorities. In *Allen v. Flood* [1898] A.C. 1, 96, Lord Watson stated that there were two distinct principles. See also *National Phonograph Co. Ltd. v. Edison-Bell Consolidated Phonograph Co. Ltd.* [1908] 1 Ch. 335; *D.C. Thomson & Co. v. Deakin* [1952] Ch. 646, 695–698; *Torquay Hotel Co. Ltd. v. Cousins* [1969] 2 Ch. 106, 139B and *Associated British Ports v. Transport*

*and General Workers' Union* [1989] 1 W.L.R. 939, 963D–G, 965B–C. The argument for Lonrho would deprive the "directed at" requirement of the tort of its ordinary meaning since mere foresight of harm to the plaintiff would suffice. The test in the *Van Camp* case [1984] 1 N.Z.L.R. 354 is the only coherent test which gives proper meaning to "directed at" and explains all the cases. The test is not the same as the predominant purpose requirement in the tort of conspiracy.

As to conspiracy to injure, *Metall und Rohstoff A.G. v. Donaldson Lufkin & Jenrette Inc.* [1990] 1 Q.B. 391 was rightly decided. Alternatively, if it was wrongly decided, the mental element required in a case of conspiracy to injure by unlawful means is that the conspiracy be directed at or aimed at the plaintiff: see the *Lonrho* case, 1 December 1980, Parker J.; 6 March 1981; Court of Appeal (Civil Division) Transcript No. 51 of 1981. That mental element is the same as that for the tort of interference with business by unlawful means and so cannot be satisfied in this case.

In any event, if the tort of conspiracy to injure by unlawful means is to be treated as different from conspiracy to injure by lawful means, the unlawful means in question should be independently actionable by the plaintiff. They are not in this case if either the interest which Lonrho asserts has been damaged is not an interest protected by the wrongful interference tort, or if the acts of the Al Fayeds are not to be treated as having been aimed at Lonrho. The effect of a plea of conspiracy in cases of conspiracy to injure by unlawful means is to seek to render the conspirators jointly liable for the actionable wrongs committed in the course of implementing the conspiracy: *Kearney v. Lloyd* (1889) 26 Ir. 268, 280–283; *Salaman v. Warner* (1891) 65 L.T. 132, 134; *D. C. Thomson & Co. Ltd. v. Deakin* [1952] Ch. 646, 673–674 and *Rookes v. Barnard* [1964] A.C. 1129, 1204.

*Grabiner Q.C.*, replying on the issue of unlawful interference with business, referred to *Keeble v. Hickeringill*, 11 East. 574n; *Allen v. Flood* [1898] A.C. 1; *Hollywood Silver Fox Farm Ltd. v. Emmett* [1936] 2 K.B. 468; *Mogul Steamship Co. Ltd. v. McGregor, Gow & Co.*, 23 Q.B.D. 598; *National Phonograph Co. Ltd. v. Edison-Bell Consolidated Phonograph Co. Ltd.* [1908] 1 Ch. 335; *Fairbairn, Wright & Co. v. Levin & Co.*, 34 N.Z.L.R. 1; *Rookes v. Barnard* [1964] A.C. 1129; *Daily Mirror Newspapers Ltd. v. Gardner* [1968] 2 Q.B. 762; *Acrow (Automation) Ltd. v. Rex Chainbelt Inc.* [1971] 1 W.L.R. 1676; *Volkswagen Canada Ltd. v. Spicer*, 91 D.L.R. (3d) 42; *R.C.A. Corporation v. Pollard* [1983] Ch. 135; *Merkur Island Shipping Corporation v. Laughton* [1983] 2 A.C. 570 and *Hadmor Productions Ltd. v. Hamilton* [1983] 1 A.C. 191.

As to conspiracy, in *Lonrho Ltd. v. Shell Petroleum Co. Ltd. (No. 2)* [1982] A.C. 173 the House of Lords concluded that it was free to decide whether or not the tort of conspiracy should be confined to the case where the predominant purpose of the conspirators was to injure the plaintiff or whether it should be extended to include the case of an "unlawful means" conspiracy even without a predominant purpose to injure. In his speech Lord Diplock (at p. 189C) (with whom the rest of their Lordships agreed) "unhesitatingly" decided to restrict the tort of

conspiracy. The Court of Appeal in *Metall und Rohstoff A.G. v. Donaldson Lufkin & Jenrette Inc.* [1990] 1 Q.B. 391 unanimously decided that this was the correct interpretation of the decision of your Lordships' House in *Lonrho v. Shell*, and your Lordships should reach the same conclusion. The courts in Canada have construed the *Lonrho* decision in the House of Lords in the same way although they have decided not to follow it: *Canada Cement La Farge Ltd. v. British Columbia Lightweight Aggregate Ltd.* (1983) 145 D.L.R. (3d) 385.

*Kentridge Q.C.*, in reply on the issue of conspiracy, referred to *Reg. v. Scott* [1975] A.C. 819; *Lonrho Ltd. v. Shell Petroleum Co. Ltd. (No. 2)* [1982] A.C. 173 and *Clerk & Lindsell on Torts*, 16th ed. (1989), pp. 850–891.

Their Lordships took time for consideration.

27 June. LORD BRIDGE OF HARWICH. My Lords; the litigation giving rise to this interlocutory appeal and cross-appeal is another instalment of the long-running dispute about the take-over in 1985 of House of Fraser Plc., the company which owns, inter alia, Harrods department store. The plaintiff in this action, Lonrho Plc., had been anxious to acquire control of House of Fraser since early 1981. Following a reference by the Secretary of State for Trade and Industry to the Monopolies and Mergers Commission ("the M.M.C.") under section 64 of the Fair Trading Act 1973 of the "merger situation" arising from the proposed acquisition and a report of the M.M.C. dated 9 December 1981, Lonrho gave an undertaking to the Secretary of State not to acquire more than 30 per cent. of the equity share capital in House of Fraser. A further reference relating to the proposed acquisition by Lonrho was made to the M.M.C. on 31 May 1984. The M.M.C.'s report on this reference was expected to be made not later than 28 February 1985. If this report were favourable to Lonrho, it was to be expected that the Secretary of State would release it from the undertaking and that Lonrho would be free to proceed to bid for control of House of Fraser.

The first three defendants in the action are brothers named Fayed. The Fayeds own and control a company now called House of Fraser Holdings Plc. ("Holdings"). In November 1984 Holdings acquired most of Lonrho's shares in House of Fraser and were intending to acquire a controlling interest. This gave rise to a new merger situation under section 64 of the Act of 1973. If the Secretary of State had referred this merger situation to the M.M.C., the Fayeds and Holdings would have been prevented from acquiring control of House of Fraser unless and until the M.M.C. had made a favourable report on the reference. In the event no such reference was made. On 3 March 1985 Holdings made a cash offer of 400p. per share for the whole of the issued ordinary share capital of House of Fraser which was recommended to the shareholders by the board of directors of House of Fraser and was publicly announced on 4 March. By 11 March Holdings had acquired more than 50 per cent. of the shares. Following a favourable report by the M.M.C. on the May 1984 reference relating to Lonrho's proposed acquisition of House of Fraser the Secretary of State,

on 14 March 1985, released Lonrho from the undertaking given in December 1981.

Lonrho's pleaded case, in very short summary, is as follows. Lonrho at all material times intended to acquire control of House of Fraser. The Fayeds and Holdings induced the Secretary of State to abstain from referring their proposed acquisition of House of Fraser to the M.M.C. by false and fraudulent representations about themselves, their commercial background and the source of the finance available to them for the acquisition of House of Fraser. If the Secretary of State had known the truth, he would have made a reference either before or after Holdings had acquired control. If the reference had been made before Holdings had acquired control, this would have left Lonrho, when released from its undertaking, in a position to bid for control of House of Fraser without competition from the Fayeds or Holdings. If the reference had been made after Holdings acquired control, this would probably have led to an order under the Act of 1973 requiring Holdings to divest itself of its controlling interest, which again Lonrho would have had the opportunity to acquire.

The fifth and sixth defendants to the action are Mr. MacArthur, a director of Kleinwort Benson Ltd., and Kleinwort Benson Ltd., the merchant bankers who were advising the Fayeds and Holdings in connection with the take-over. Lonrho pleads that some of the relevant false statements which induced the Secretary of State not to refer Holdings' proposed acquisition to the M.M.C. were made by these defendants fraudulently, not in the sense that they knew of the falsity, but in the sense that they acted recklessly not caring whether the statements were true or false.

As against all the defendants, Lonrho's statement of claim pleads that their intention was both to benefit the Fayeds and Holdings by furthering their interest in the acquisition of House of Fraser and to injure Lonrho by preventing them from acquiring House of Fraser. Lonrho claims to have lost the opportunity to acquire House of Fraser by bidding for the shares without competition from the Fayeds or Holdings and thereby to have suffered damage. Lonrho asserts that these facts are sufficient to establish a cause of action for the common law tort of interfering with business by unlawful means. But the statement of claim also relies additionally or alternatively on the same allegations of fact as establishing the tort of conspiracy to injure and, as against Mr. MacArthur and Kleinworts, it originally pleaded a distinct cause of action claiming damages for negligence.

The defendants applied by summons to strike out the statement of claim under R.S.C., Ord. 18, r. 19 on the ground that it disclosed no cause of action, was frivolous and vexatious and an abuse of the process of the court. Master Topley dismissed the application, but an appeal against his decision was allowed by Pill J. [1990] 1 Q.B. 490. Lonrho did not appeal against the striking out of the claim in negligence against Mr. MacArthur and Kleinworts, accepting no doubt that these defendants did not owe Lonrho any duty of care, but did appeal against the remainder of Pill J.'s order. It was, however, accepted in the Court of Appeal that the statement of claim had not alleged that the *predominant* purpose of the alleged conspiracy was to injure Lonrho and that accordingly the Court of Appeal were bound by their own decision in *Metall und Rohstoff A.G. v.*

*Donaldson Lufkin & Jenrette Inc.* [1990] 1 Q.B. 391 to hold that the pleaded cause of action in conspiracy could not succeed. The Court of Appeal (Dillon, Ralph Gibson and Woolf L.JJ.) [1990] 2 Q.B. 479 allowed the appeal in relation to the cause of action founded on the tort of interfering with business by unlawful means. The defendants now appeal and Lonrho cross-appeals in relation to the cause of action in conspiracy by leave of your Lordships' House.

It will be convenient to consider first the clear cut issue of law which arises on the cross-appeal. In the *Metall* case the Court of Appeal interpreted the decision of this House in *Lonrho Ltd. v. Shell Petroleum Co. Ltd. (No. 2)* [1982] A.C. 173 as holding it to be an essential ingredient in the civil tort of conspiracy to establish that the predominant purpose of the conspirators was to injure the plaintiff irrespective of whether the means they used to effect that purpose were lawful or unlawful. In inviting us to overrule the *Metall* case, Mr. Kentridge submits that the true position in law is that the tort of conspiracy to injure, whilst requiring *an* intention to injure the plaintiff, may be established *either* by showing that this intention was the predominant purpose of the conspirators, even though the means used were lawful, *or* by showing that unlawful means were used. Where the primary or predominant purpose of the conspirators is to further or protect some legitimate interest of their own, but they also have the intention of injuring the plaintiff, it is sufficient to make their action tortious that they used unlawful means. This, Mr. Kentridge, submits, is the law as it was always understood before the decision in *Lonrho v. Shell* and it is inconceivable that this House should have intended to overturn that understanding in a case where no issue arose with respect to predominant purpose and the point was never argued.

In *Rookes v. Barnard* [1964] A.C. 1129, 1204, Lord Devlin said:

> "There are, as is well known, two sorts of conspiracies, the *Quinn v. Leathem* [1901] A.C. 495 type which employs only lawful means but aims at an unlawful end, and the type which employs unlawful means."

Of these two types of tortious conspiracy the *Quinn v. Leathem* type, where no unlawful means are used, is now regarded as an anomaly for the reasons so clearly explained by Lord Diplock in *Lonrho v. Shell* [1982] A.C. 173 in the following passage, at pp. 188–189:

> "Why should an act which causes economic loss to A but is not actionable at his suit if done by B alone become actionable because B did it pursuant to an agreement between B and C? An explanation given at the close of the nineteenth century by Bowen L.J. in the *Mogul* case when it was before the Court of Appeal (1889) 23 Q.B.D. 598, 616 was: 'The distinction is based on sound reason, for a combination may make oppressive or dangerous that which if it proceeded only from a single person would be otherwise.' But to suggest today that acts done by one street-corner grocer in concert with a second are more oppressive and dangerous to a competitor than the same acts done by a string of supermarkets under a single ownership or that a multinational conglomerate such as Lonrho or oil company such as Shell or B.P. does not exercise greater economic

power than any combination of small businesses, is to shut one's eyes to what has been happening in the business and industrial world since the turn of the century and, in particular, since the end of World War II. The civil tort of conspiracy to injure the plaintiff's commercial interests where that is the predominant purpose of the agreement between the defendants and of the acts done in execution of it which caused damage to the plaintiff, must I think be accepted by this House as too well-established to be discarded however anomalous it may seem today. It was applied by this House 80 years ago in *Quinn v. Leathem* [1901] A.C. 495, and accepted as good law in the *Crofter* case [1942] A.C. 435, where it was made clear that injury to the plaintiff and not the self-interest of the defendants must be the predominant purpose of the agreement in execution of which the damage-causing acts were done."

But this reasoning has no relevance to the second type of conspiracy which employs unlawful means. Of this type Lord Devlin said in his speech in *Rookes v. Barnard* [1964] A.C. 1129, 1204, immediately following the passage I have just cited: "In the latter type . . . the element of conspiracy is usually only of secondary importance since the unlawful means are actionable by themselves."

It is no doubt for the reason mentioned by Lord Devlin that there is no direct authority, unless it be *Rookes v. Barnard* itself, establishing the negative proposition that the tort of conspiracy to injure by unlawful means may be established without proof that the intention to injure the plaintiff was the predominant purpose of the conspirators. But in the many cases where plaintiffs have asserted a conspiracy to injure, but have been unable to prove that any unlawful means were used, judgments in the Court of Appeal and speeches in your Lordships' House emphasising the requirement of a predominant purpose to injure have repeatedly included dicta indicating that this requirement does not apply where the means used to effect the conspirator's purpose are unlawful. I need do no more than cite some outstanding examples.

In *Ware and De Freville Ltd. v. Motor Trade Association* [1921] 3 K.B. 40, 67, Scrutton L.J. said:

"I take the *Mogul* case [1892] A.C. 25 as deciding that a combination to do acts, the natural consequence of which was to injure another in his business, was not actionable, *if those acts were not otherwise unlawful*, such as assaults, or threats of assaults, and were done in furtherance of the trade interests of those combining."

In *Sorrell v. Smith* [1925] A.C. 700, 712, Viscount Cave L.C. said:

"I deduce as material for the decision of the present case two propositions of law, which may be stated as follows:—(1) A combination of two or more persons wilfully to injure a man in his trade is unlawful and, if it results in damage to him, is actionable. (2) If the real purpose of the combination is, not to injure another, but to forward or defend the trade of those who enter into it, then no wrong is committed and no action will lie, although damage to another ensues. The distinction between the two classes of case is

sometimes expressed by saying that in cases of the former class there is not, while in cases of the latter class there is, just cause or excuse for the action taken."

He added, at p. 714:

> "The second proposition, of course, *assumes the absence of means which are in themselves unlawful*, such as violence or the threat of violence or fraud."

In *Crofter Hand Woven Harris Tweed Co. Ltd. v. Veitch* [1942] A.C. 435, 445, Viscount Simon L.C. said:

> "It is enough to say that if there is more than one purpose actuating a combination, liability must depend on ascertaining the predominant purpose. If that predominant purpose is to damage another person and damage results, that is tortious conspiracy. If the predominant purpose is the lawful protection or promotion of any lawful interest of the combiners (*no illegal means being employed*), it is not a tortious conspiracy, even though it causes damage to another person."

In the same case Lord Wright said, at pp. 461–462:

> "The concept of a civil conspiracy to injure has been in the main developed in the course of the last half century, particularly since the great case of the *Mogul Steamship Co. v. McGregor & Co.* [1892] A.C. 25. Its essential character is described by Lord Macnaghten in *Quinn v. Leathem* [1901] A.C. 495, 510, basing himself on Lord Watson's words in *Allen v. Flood* [1898] A.C. 1, 108: 'a conspiracy to injure might give rise to civil liability even though the end were brought about by conduct and acts which by themselves and apart from the element of combination or concerted action could not be regarded as a legal wrong.' In this sense the conspiracy is the gist of the wrong, though damage is necessary to complete the cause of action. . . . The rule may seem anomalous, so far as it holds that conduct by two may be actionable if it causes damage, whereas the same conduct done by one, causing the same damage, would give no redress. In effect the plaintiff's right is that he should not be damnified by a conspiracy to injure him, and it is in the fact of the conspiracy that the unlawfulness resides. *It is a different matter if the conspiracy is to do acts in themselves wrongful*, such as to deceive or defraud, to commit violence, or to conduct a strike or lock-out by means of conduct prohibited by the Conspiracy and Protection of Property Act 1875, or which contravenes the Trade Disputes and Trade Unions Act 1927."

The emphasis added in each of these passages is mine.

The reasoning in these passages is both clear and cogent. Where conspirators act with the predominant purpose of injuring the plaintiff and in fact inflict damage on him, but do nothing which would have been actionable if done by an individual acting alone, it is in the fact of their concerted action for that illegitimate purpose that the law, however anomalous it may now seem, finds a sufficient ground to condemn their action as illegal and tortious. But when conspirators intentionally injure

the plaintiff and use unlawful means to do so, it is no defence for them to show that their primary purpose was to further or protect their own interests; it is sufficient to make their action tortious that the means used were unlawful.

Did the House in *Lonrho v. Shell* [1982] A.C. 173 depart from this reasoning and lay down for the first time a new principle that a plaintiff, seeking to establish the tort of conspiracy to injure, must in every case prove that the intention to injure him was the predominant purpose of the defendants, whether the means used were lawful or unlawful? Lonrho Ltd., as plaintiffs in that case, owned and operated a pipeline designed to carry oil from a port on the coast of Mozambique to an oil refinery in Southern Rhodesia. Following the unilateral declaration of independence ("U.D.I.") by the Government of Southern Rhodesia, the United Kingdom enacted the Southern Rhodesia Act 1965 and the Southern Rhodesia (Petroleum) Order 1965 (S.I. 1965 No. 2140), made under that Act, prohibited Shell and B.P., as companies incorporated in the United Kingdom, from supplying oil to Southern Rhodesia. The facts to be assumed for the purpose of answering the questions of law posed in the consultative case stated by arbitrators which brought the matter before the courts were that Shell and B.P., by assuring the Government of Southern Rhodesia that they would maintain the supply of oil to Southern Rhodesia, in spite of sanctions, had influenced both the inception and the continuation of U.D.I., and by supplying oil in breach of the sanctions Order of 1965 had prolonged the period during which Lonrho's pipeline was prevented from operating and thereby caused Lonrho foreseeable damage. But it was throughout common ground that the respondents had no intention to injure Lonrho.

The only questions considered in detail when the case came before this House were, first, whether breach of the sanctions Order gave rise to a right of action for breach of statutory duty and, secondly, in a question referred to in the consultative case as Question 5(b) "whether the claimants have a cause of action for damage alleged to have been caused by such breaches by virtue only of the allegation that there was an agreement to effect them." Both questions had been answered in the negative by Parker J. at first instance (unreported), 1 December 1980 and by Lord Denning M.R., Eveleigh and Fox L.JJ. in the Court of Appeal (unreported), 6 March 1981; Court of Appeal (Civil Division) Transcript No. 51 of 1981. They were similarly answered by the unanimous judgment of the House in which Lord Diplock delivered the only speech.

As the judgments in both courts below and the speech of Lord Diplock make clear, the fact dictating a negative answer to the second question was the absence of any intention to injure Lonrho. Parker J. said:

> "The claimants accept that there is no case in which an undirected crime, not itself a civil wrong, committed without intent to injure, has been held, or, I think, even alleged to be actionable on the mere ground that it was committed pursuant to agreement."

He concluded his judgment by saying:

> "I answer Question 5(b) in the negative on the specific ground that if the acts done in combination are not done with intent to harm the

plaintiff and are not themselves actionable, the tort of conspiracy is not committed."

Lord Denning M.R. said:

"So this point of law arises directly: Is an agreement to do an unlawful act actionable at the suit of anyone who suffers damage from it which is reasonably foreseeable? Even though the agreement is not directed at him, nor done with intent to injure him? In discussing this point of law I put aside the many modern cases on conspiracy—in which there is an agreement by two or more to do a *lawful* act. It is now settled by the House of Lords that such an agreement is actionable if it is done with the predominant motive of injuring the plaintiff and does in fact injure him: see *Crofter Hand Woven Harris Tweed Co. Ltd. v. Veitch* [1942] A.C. 435, where Lord Simon L.C. said, at p. 445: 'Liability must depend on ascertaining the predominant purpose. If that predominant purpose is to damage another person and damage results, that is tortious conspiracy.' Here we are concerned with a different problem altogether. It is an agreement by two or more to do an *unlawful* act. . . . I think there is a cause of action when it is remembered that the tort is a conspiracy *to injure*. I would suggest that a conspiracy to do an *unlawful* act—when there is no intent to injure the plaintiff and it is not aimed or directed at him—is not actionable, even though he is damaged thereby. But if there is an intent to injure him then it is actionable. The intent to injure may not be the predominant motive. It may be mixed with other motives. In this context, when the agreement is to do an *unlawful* act, we do not get into the 'quagmire of mixed motives,' as Lord Simon L.C. described them in the *Crofters* case at p. 445. It is sufficient if the conspiracy is aimed or directed at the plaintiff, and it can reasonably be foreseen that it may injure him, and does in fact injure him. That is what Parker J. thought. I agree with him."

The relevant passage from Lord Diplock's speech in this House is at [1982] A.C. 173, 188:

"Question 5(b), to which I now turn, concerns conspiracy as a civil tort. Your Lordships are invited to answer it on the assumption that the purpose of Shell and B.P. in entering into the agreement to do the various things that it must be assumed they did in contravention of the sanctions Order, was to forward their own commercial interests; *not* to injure those of Lonrho. So the question of law to be determined is whether an intent by the defendants to injure the plaintiff is an essential element in the civil wrong of conspiracy, even where the acts agreed to be done by the conspirators amount to criminal offences under a penal statute. It is conceded that there is no direct authority either way upon this question to be found in the decided cases; so if this House were to answer it in the affirmative, your Lordships would be making new law."

Then, following the passage which I have already cited earlier in this opinion pointing to the anomalous character of the *Quinn v. Leathem*

[1901] A.C. 495 type of conspiracy, Lord Diplock continued [1982] A.C. 173, 189:

"My Lords, in none of the judgments in decided cases in civil actions for damages for conspiracy does it appear that the mind of the author of the judgment was directed to a case where the damage-causing acts although neither done for the purpose of injuring the plaintiff nor actionable at his suit if they had been done by one person alone, were nevertheless a contravention of some penal law. I will not recite the statements in those judgments to which your Lordships have been referred by the appellants as amounting to dicta in favour of the view that a civil action for conspiracy does lie in such a case. Even if the authors' minds had been directed to the point, which they were not, I should still find them indecisive. This House, in my view, has an unfettered choice whether to confine the civil action of conspiracy to the narrow field to which alone it has an established claim or whether to extend this already anomalous tort beyond those narrow limits that are all that common sense and the application of the legal logic of the decided cases require. My Lords, my choice is unhesitatingly the same as that of Parker J. and all three members of the Court of Appeal. I am against extending the scope of civil tort of conspiracy beyond acts done in execution of an agreement entered into by two or more persons for the purpose not of protecting their own interests but of injuring the interests of the plaintiff. So I would answer Question 5(b): 'No.'"

In the *Metall* case [1990] 1 Q.B. 391 Slade L.J. delivering the judgment of the court, whilst expressly disclaiming any intention to construe Lord Diplock's speech as if it were a statute, nevertheless subjected it to a detailed textual analysis leading to the conclusion that it laid down a rule of law that the tort of conspiracy to injure required proof in every case not merely of an intention to injure the plaintiff but also that injury to the plaintiff was the predominant purpose of the conspiracy.

My Lords, I am quite unable to accept that Lord Diplock or the other members of the Appellate Committee concurring with him, of whom I was one, intended the decision in *Lonrho v. Shell* [1982] A.C. 173 to effect, sub silentio, such a significant change in the law as it had been previously understood. The House, as is clear from the parties' printed cases, which we have been shown, had never been invited to take such a step. Moreover, to do so would have been directly contrary to the view of Lord Denning M.R. expressed in the judgment which the House was affirming and inconsistent with the dicta in what Lord Diplock described, at p. 188, as "Viscount Simon L.C.'s now classic speech in *Crofter Hand Woven Harris Tweed Co. Ltd. v. Veitch* [1942] A.C. 435, 439." I would overrule the *Metall* case in this respect.

It follows from this conclusion that Lonrho's acceptance that the pleaded intention on the part of the appellants to cause injury to Lonrho was not the predominant purpose of their alleged unlawful action is not necessarily fatal to the pleaded cause of action in conspiracy and therefore affords no separate ground for striking out that part of the pleading. If the appellants fail to establish that Lonrho's primary pleading asserting the tort

of interference with business by unlawful means should be struck out, they are in no stronger position in relation to the pleaded cause of action in conspiracy. It is not, I think, necessary for present purposes to consider whether the pleaded conspiracy adds anything of substance or raises any significantly different issues from those on which the rest of the pleading depends. At this interlocutory stage it is sufficient to say that the two pleaded causes of action must stand or fall together. Either both should be struck out or both should go to trial.

It is trite law that the summary procedure for striking out pleadings under Ord. 18, r. 19, the successor to Ord. XXV, r. 4 is not the same as the old procedure by demurrer and is only to be used in plain and obvious cases. In *Hubbuck & Sons Ltd. v. Wilkinson, Heywood & Clark Ltd.* [1899] 1 Q.B. 86, 90-91, Sir Nathaniel Lindley M.R. said:

> "Order XXV abolished demurrers and substituted a more summary process for getting rid of pleadings which show no reasonable cause of action or defence. Two courses are open to a defendant who wishes to raise the question whether, assuming a statement of claim to be proved, it entitles the plaintiff to relief. One method is to raise the question of law as directed by Ord. XXV, r. 2; the other is to apply to strike out the statement of claim under Ord. XXV, r. 4. The first method is appropriate to cases requiring argument and careful consideration. The second and more summary procedure is only appropriate to cases which are plain and obvious, so that any master or judge can say at once that the statement of claim as it stands is insufficient, even if proved, to entitle the plaintiff to what he asks."

In *Dyson v. Attorney-General* [1911] 1 K.B. 410, 414, Sir H. H. Cozens-Hardy M.R. said that the procedure "ought not to be applied to an action involving serious investigation of ancient law and questions of general importance" and Fletcher Moulton L.J. in the same case, at p. 419, thought it should be confined to cases where the cause of action was "obviously and almost incontestably bad." More recently Salmon L.J. said in *Nagle v. Feilden* [1966] 2 Q.B. 633, 651:

> "It is well settled that a statement of claim should not be struck out and the plaintiff driven from the judgment seat unless the case is unarguable."

Of course, it is true, as was pointed out by Sir Gordon Willmer in *Drummond-Jackson v. British Medical Association* [1970] 1 W.L.R. 688, 700, that "the question whether a point is plain and obvious does not depend upon the length of time it takes to argue." However, it is not the length of arguments in this case, but the inherent difficulty of the issues which they have to address which persuades me that the case cannot by any stretch of language be properly described as plain and obvious, nor can Lonrho's pleaded cause of action be characterised as unarguable or almost incontestably bad.

It may sometimes be appropriate, where proceedings to strike out have reached this House on appeal and have been fully argued, to relax the rigour of these criteria in exceptional circumstances: see, for example, *Williams and Humbert Ltd. v. W. & H. Trade Marks (Jersey) Ltd.* [1986]

A.C. 368. But here the only possible reason for departing from the application of the ordinary tests would be if the House were satisfied that it was possible to distill from the pleadings a clearly defined issue of law which it would have been appropriate to determine as a preliminary question if the correct procedure to that end had been followed and which can be answered in a way which disposes of the action. But here it is important to remember how frequently the House has protested, where parties have agreed the terms of a preliminary question of law, at being required to answer difficult questions of law on hypothetical and disputed facts stated in general terms. In the course of the argument, counsel for the appellants were invited to formulate the terms of any question of law which they were able to submit would have been appropriate for preliminary determination, but I do not believe that any of the formulations suggested would have been accepted as appropriate for preliminary determination if a contested application had come before the court under Ord. 33, r. 3. In a passage which seems to me peculiarly apt to the circumstances of this case, Lord Wilberforce said in *Allen v. Gulf Oil Refining Ltd.* [1981] A.C. 1001, 1010-1011:

> "My Lords, I and other of your Lordships have often protested against the procedure of bringing, except in clear and simple cases, points of law for preliminary decision. The procedure indeed exists and is sometimes useful. In other cases, and this is frequently so where they reach this House, they do not serve the cause of justice. The present is such an example. . . . The fact is that the result of the case must depend upon the impact of detailed and complex findings of fact upon principles of law which are themselves flexible. There are too many variables to admit of a clear-cut solution in advance."

For these reasons, and for the reasons given in the judgments of the Court of Appeal, I have reached the conclusion that it would be inappropriate to strike out the statement of claim and that the case must accordingly proceed to trial. In the circumstances it would be inappropriate to embark upon any discussion of the issues canvassed in counsels' submissions on the hearing of the appeal. I would emphasise that the only question of law which, in my opinion, it is appropriate for the House to decide at this stage is that involved in overruling the *Metall* case [1990] 1 Q.B. 391. The facts pleaded in the statement of claim are strongly disputed. When the facts have been found at trial they may or may not give rise to important questions of law requiring resolution, but for the present purposes it suffices to say that the appellants fail to demonstrate that Lonrho's claim is obviously doomed to fail. Nothing in this opinion should be understood as saying any more than that.

I would dismiss the appeal, allow the cross-appeal, and set aside so much of the orders of the courts below as order the striking out of paragraphs 55 and 56 of the statement of claim and the words "and/or conspiracy" in paragraph 57. I see no reason to disturb the orders for costs made in the Court of Appeal, but I would order the appellants to pay the respondent's costs in this House.

LORD BRANDON OF OAKBROOK. My Lords, I have had the advantage

A of reading in draft the speeches prepared by my noble and learned friends, Lord Bridge of Harwich and Lord Templeman. I agree with both speeches and for the reasons given in them I would dismiss the appeal and allow the cross-appeal.

LORD TEMPLEMAN. My Lords, In my opinion, the Court of Appeal having refused to strike out the statement of claim in this case, the plaintiff B should not be prevented from proceeding with this action. I agree with my noble and learned friend, Lord Bridge of Harwich, that some of the observations of Slade L.J. in *Metall und Rohstoff A.G. v. Donaldson Lufkin & Jenrette Inc.* [1990] 1 Q.B. 391 were not in accordance with previous authorities. Without encouraging the continuation or initiation of litigation by the present or any future disputants, I apprehend that the C ambit and ingredients of torts of conspiracy and unlawful interference may hereafter require further analysis and reconsideration by the courts. I agree with the order proposed by Lord Bridge.

LORD GOFF OF CHIEVELEY. My Lords, I have had the advantage of reading in draft the speeches prepared by my noble and learned friends, Lord Bridge of Harwich and Lord Templeman. I agree with both speeches D and for the reasons given in them I would dismiss the appeal and allow the cross-appeal.

LORD JAUNCEY OF TULLICHETTLE. My Lords, I have had the advantage of reading in draft the speeches of my noble and learned friends, Lord Bridge of Harwich and Lord Templeman. I agree with the reasons therein E stated and with the order which they propose.

*Appeal dismissed.*
*Cross-appeal allowed.*

*Solicitors: Herbert Smith; Slaughter and May; Denton Hall Burgin &* F *Warrens.*

J. A. G.

G

---

H