78-08/MEU

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

SIXTEEN THIRTEEN MARINE S.A.,

                              Plaintiff,

         - against -

                                                    08 CV 1318 (HB)

CONGENTRA A.G.,

                              Defendant.

PLAINTIFF'S MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANT'S MOTION TO VACATE

FREEHILL HOGAN & MAHARL, LLP
Attorneys for Plaintiff
Sixteen Thirteen Marine S.A.
80 Pine Street
New York, NY 10005
(212) 425-1900
(212) 425-1901 (fax)

Of Counsel:
Michael E. Unger (MU 0045)

# TABLE OF CONTENTS

TABLE OF AUTHORITIES...................................................................... ii

RESTATEMENT OF FACTS..................................................................... 2

ARGUMENT............................................................................................ 10

## POINT I

IN ORDER TO SUSTAIN THE ATTACHMENT, PLAINTIFF
NEED ONLY SHOW THAT IT HAS A PRIMA FACIE MARITIME
CLAIM AND NEED NOT PROVE THE MERITS OF ITS CLAIM.................. 10

    A.    Owners' Prima Facie Valid Claims Are Not Frivolous................. 11

    B.    Owners Have Made No Misrepresentations to The Court............ 12

    C.    The Claims Asserted By Owners Are Recoverable
        Under English Law.................................................................. 17

## POINT II

THERE ARE NO EQUITABLE GROUNDS TO VACATE THE
ATTACHMENT................................................................................ 21

## POINT III

THE QUANTUM OF SECUIRTY SHOULD NOT BE REDUCED....... 22

CONCLUSION ........................................................................................ 25

# TABLE OF AUTHORITIES

## Cases

Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.,
460 F.3d 434 (2006) ............................................................................................ 10,11, 21

Bergesen v. Lindholm,
760 F. Supp. 976 (D. Conn.. 1991) ................................................................................ 22

Daeshin Shipping Co., Ltd. v. Meridian Bulk Carriers, Ltd.,
2005 U.S. Dist. LEXIS 22409 (S.D.N.Y. Oct. 3, 2005) ............................................... 23

Dongbu Express Co. v. Navios Corp.,
944 F. Supp. 235 (S.D.N.Y. 1996) ......................................................................... 22, 23

Finecom Shipping Ltd. v. Multi Trade Enterprises AG,
2005 U.S. Dist. LEXIS 25761 (S.D.N.Y. Oct. 25, 2005) ................................... 11, 12, 24

Glidden Co. v. Hellenic Lines, Ltd.,
315 F.2d 162 (2d Cir. 1963) ........................................................................................ 23

Lonrho PLC v. Fayed,
[1992] 1 AC 448 ........................................................................................................... 19

North Offshore AS v. Rolv Berg Drive AS,
2007 U.S. Dist. LEXIS 87648 (S.D.N.Y. Nov. 29, 2007) ............................................. 20

Palette Marine, Ltd. v. Pacific Ocean Resources Ltd.,
S.D.N.Y. 06 CIV 13141 (RLC) (unreported) (J. Jones) ............................................... 24

Rolls Royce Ind. Power (India) v. M.V. FRATZIS M,
1996 A.M.C. 390 (S.D.N.Y. 1995) ......................................................................... 21, 22

Rosemary d/b/a R M Martin Supplies and Services v. Jaldhi Overseas Pte Ltd.,
2008 U.S. Dist. LEXIS 1728 (S.D.N.Y. Jan. 4, 2008) ................................................. 20

Sea Transport Contractors, Ltd. v. Indus. Chemiques du Senegal,
411 F. Supp.2d 386 (S.D.N.Y. 2006) (citing Rule E(6)) ......................................... 22, 23

The Rice Co. v. Express Sea Transport Corp.,
2007 U.S. Dist. LEXIS 84300 (S.D.N.Y. 2007) ...................................................... 21, 24

Tide Line, Inc. v. Eastrade Commodities, Inc.,

2006 U.S. Dist. LEXIS 95870 (S.D.N.Y. Aug. 15, 2006)).................................................. 10, 11, 21

Transportes Navieros Y Terrestes, S.A. de D.V.  v. Fairmount Heavy Transport,

2007 U.S. Dist. LEXIS 50260 (S.D.N.Y. July 6, 2007) ............................................. 10, 11, 12, 23

Whitney-Fidalgo Seafoods v. MISS TAMMY,

542 F. Supp. 1302 (W.D.WA. 1982) ............................................................................... 22

Winter Storm Shipping Ltd. v. TPI, 310 F.3d 263 (2002)............................................................. 10

Wolters Kluwer Fin. Servs. Inc. v. Scivantage, 525 F. Supp. 448 (S.D.N.Y. 2007).................... 21

## Secondary Authorities

BENEDICT ON ADMIRATY § 3.02  ................................................................................................... 22

## PRELIMINARY STATEMENT

This Memorandum of Law is submitted on behalf of Plaintiff Sixteen Thirteen Marine S.A. (hereinafter "Owners"), together with the Declarations of Captain Costas Bourdis, Captain Dionysios Drymonis and John Krzywkowski, in opposition to Defendant Congentra A.G. (hereinafter "Charterers")'s motion to vacate the attachment, or alternatively, to reduce the amount of security.

Owners' dispute with Charterers essentially stems from a rather unremarkable cargo claim. Owners provided Charterers a vessel to transport cargo from South America to be delivered to Euroweg Zerno, the Consignee and a company affiliated with Charterers, at St. Petersburg, Russia. Upon arriving at St. Petersburg, a portion of the cargo was found wet and moldy. Despite the fact that the cargo damage was caused by a pre-shipment condition for which Owners are not liable, Euroweg Zerno and Charterers demanded security from Owners in excess of $1.3 million, but eventually agreed to accept $322,271 instead. Charterers, in an effort to obtain "evidence" to rebut the clear fact that the results of laboratory testing which had been conducted on the damaged cargo showed no indication of sea water wetting and thus excused Owners from liability, repeatedly sought to conduct ultrasonic testing of the ship's hatch covers to which they were not contractually entitled and which was not warranted given the pre-shipment nature of the damage. Upon Owners' refusal to permit the testing, Charterers undertook to create difficulties for Owners by causing the vessel to be delayed so that she could not meet the delivery date under her next charter with non-party Britannia Bulkers.

The instant action was commenced in support of Owners' *prima facie* maritime claims pending in London arbitration for breach of the charter and for tortious interference with Owners' contract with Britannia. Charterers now move to vacate the attachment on the basis that

Owners have asserted frivolous or inequitable claims against Charterers based on misrepresented facts for which Owners cannot recover as a matter of English law. While Charterers deluge the Court with several hundred pages of documents in an attempt to make up in volume what their arguments lack in substance, as will be shown herein, Charterers' motion is baseless. There is a substantial basis, as supported by the true facts set forth in the accompanying Declarations and exhibits, upon which the Court should find that Owners' claims are clearly non-frivolous. Further, there is no valid reason for the Court to exercise its equitable discretion to vacate or reduce the attachment as there has been no misrepresentation or abuse of the Rule B procedure. Accordingly, Owners respectfully submit that the Court should deny Charterers' motion in all respects.

## **RESTATEMENT OF FACTS**

To correct the numerous misrepresentations which appear throughout Charterers' moving papers, a restatement of the salient facts is necessary. A more detailed recitation of the facts is set forth in the accompanying Declarations and in particular in Owners' arbitration Claim Submission attached as Exhibit A to the Declaration of John Krzwkowski (hereinafter Krzwkowski Decl. Ex. A)

On October 10, 2007, Owners entered into a charter party for carriage of a cargo of bulk meal aboard the M/V NICHOLAS M from South America to St. Petersburg. Among other obligations under the charter, Charterers agreed to pay daily hire every 15 days in advance and Owners guaranteed the vessel's hatch covers would remain watertight throughout the charter. Charterers were in control of all loading and discharge operations and were obligated to timely redeliver at the conclusion of the charter. (Krzywkowski Decl. Ex. A ¶B1-B3 and pp. 3-40)

Surveyors attending at the loadport on behalf of Charterers, Shippers and/or Receivers inspected and approved to their satisfaction the condition of the vessel's holds. Although Charterers were provided the option of conducting ultrasonic testing on the hatch covers at the loadport to ensure their watertight integrity, no testing was requested or conducted. (Krzywkowski Decl. Ex. A ¶C1; Bourdis Decl. ¶7) The vessel arrived in St. Petersburg on December 1, 2007. Discharge was expected to take 24 days. Conditions at the port were very cold with temperatures between -2°C and -15°C and snow every day. Representatives of Anteks (Charterers' agent) and Russian state surveyors sampled the cargo prior to discharge and found an odor of mold present in hold No. 4.[1] On December 2, 2007, surveyors representing Consignee Euroweg[2] and Owners attended the vessel to inspect hold No. 4. The surface of the cargo was dry. The following morning, visual inspection of all of the cargo holds was conducted on behalf of all interested parties. The dry surface of the cargo in hold No. 4 was removed revealing wetted cargo in the center of the hold. The cargo in the other holds was found to be in good condition. (Krzywkowski Decl. Ex. A ¶¶C3-C7) The Russian Federal State institution surveyor took samples of the damaged cargo in hold No. 4, utilizing the GAFTA 124 sampling system, and submitted the samples for analysis to the Russian Federation Ministry of Agriculture. The representative surveyors also took samples of the cargo in the same manner. (Krzywkowski Decl. Ex. A ¶C8) Similar cargo damage of a lesser quantity was later discovered in cargo hold No. 2. and also sampled and submitted for analysis. (Krzywkowski Decl. Ex. A ¶¶C12-C13) The Russian State Centre for Tests and Certification prepared an analysis of the

---

[1] The cargo in hold No. 4 had been loaded at a different location and time than the rest of the cargo. (Krzywkowski Decl. Ex. A ¶C7 fn.2)

[2] A company affiliated with Defendant Congentra. (Krzywkowski Decl. Ex. A ¶C2)

respective cargos and confirmed as to both that they had not been wetted by sea water. (Krzywkowski Decl. Ex. A ¶¶C9, C13 and pp. 48-51, 56-59; Bourdis Decl. ¶7)

Russian authorities prohibited the import of the damaged cargo and ordered it be separately transported by truck and destroyed. On December 15, 2007, trucks arrived at the berth to transport the damaged cargo. A surveyor, attending on behalf of Euroweg, sought unauthorized access to the vessel to supervise the unloading and take additional samples of the damaged cargo. When access was denied, Charterers intentionally delayed the vessel in breach of the charter by preventing the discharge of the damaged cargo into the waiting trucks. Eventually, on December 18, 2007, Charterers finally allowed the discharge of the damaged cargo. (Krzywkowski Decl. Ex. A ¶¶C10-14 and pp. 52-53, 54-55)

On December 19, 2007, in response to the cargo claim submitted by Charterers' and Consignee's London solicitors, Barlow Lyde & Gilbert (hereinafter "BLG"), Owners' Protection and Indemnity Club (i.e., insurer), posted security in the amount of $322,271 plus interest and costs, a substantially lesser amount than the $1.3 million which had initially been demanded in security. (Krzywkowski Decl. Ex. A ¶C16 and pp. 72-73)

On December 20, 2007, Owners entered into a fixture with Britannia Bulkers to carry a cargo from St. Petersburg to South America. The Britannia charter had a laycan of December 24-31 (meaning, December 24 was the earliest day and December 31 was the lastest day the vessel was to be delivered to Britannia). Delivery was to occur on dropping of the pilot at the St. Petersburg pilot station (ie. the same time and location Charterers were to redeliver to Owners.) At the time of contracting with Britannia, Charterers were advising that redelivery to Owners would occur on December 24, 2007. (Krzywkowski Decl. Ex. A ¶C15 and pp. 60-71)

Two days later, on December 22, 2007, the vessel's Second Officer fell ill and had to be repatriated. Antek, Charterers' agent, was responsible for arranging the repatriation and transporting his replacement to the vessel. The replacement Second Officer arrived in St. Petersburg at 1325 hours on December 29, 2007. (Krzywkowski Decl. Ex. A ¶¶C18, C32)

On December 24, 2007, the hydraulic cylinder of the No. 6 hold hatch cover was damaged. (Krzywkowski Decl. Ex. A ¶¶C17, D4) The next day, on December 25, 2007, a local surveyor for Bureau Veritas, the vessel's Classification Society, attended aboard at Owners' request. Acknowledging the vessel's back-to-back fixture with Britannia, the surveyor agreed to having the repairs performed by the ship's crew, as had been done with respect to similar repairs during a prior call by the ship at St. Petersburg some four months prior, with the repairs to be re-inspected while the vessel loaded the Britannia cargo. (Krzywkowski Decl. Ex. A ¶¶C19, D2-D5, D10)

On December 28, 2007, Charterers and Consignees, through BLG, wrote to Owners' insurers demanding access to the vessel so as to conduct ultrasonic testing of cargo holds Nos. 2 and 4. Under the terms of the charter, Charterers were not entitled to conduct ultrasonic testing at the discharge port of St. Petersburg. (Bourdis Decl. ¶7). In that same communication, Charterers revealed their knowledge of Owners' back-to-back fixture with Britannia and "reserved their rights" as to whether Owners would be allowed to deliver the vessel in accordance with that fixture. Later that day, BLG contacted Owners' insurers again by phone, to further insist that ultrasonic testing be conducted and threatening to apply to the High Court in London for an order compelling Owners to allow the testing. (Krzywkowski Decl. Ex. A ¶¶C22-23 and pp. 76; Bourdis Decl. ¶7)

Separately, Charterers undertook to persuade Owners to agree to the testing.    On December 28, 2007 at approximately 1600 hours (Greek time)[3], Captain Costas Bourdis the Operations Manager of Chian Spirit Maritime Enterprises Inc., managers of the M/V NICHOLAS M, received a phone call from Mr. Pavel Priymak of Congentra A.G. (Charterers), the transcript of which is set forth by Captain Bourdis in his Declaration as follows:

> Caller:  Mr. Pavel Priymak
> PP:    I am Pavel Priymak of Congengra.
> CB:    What can I do for you?
> PP:    I have learned that you are the decision maker for NICHOLAS M.
> CB:    Your information is incorrect.    I am the operations manager.  I am away from the office on holiday.
> PP:    I want to carry out ultrasonic tests in all the holds [*later just for Nos. 2 and 4*].
> CB:    I understand that P & I, lawyers and local reps are dealing with this.  Since no seawater ingress, I cannot assist you.
> PP:    [*Very hostile and menacing*] Listen to me, I have the ship in my port.  I control it.  If you do not agree to testing of No. 2 and No. 4 hatches, I will f\*\*ck you, your ship and your company.    Understand me, your ship is in St. Petersburg -- my home -- I can f\*\*k you.  [*PP continued in the same threatening vein for a while longer before I decided to terminate the call.*]
> CB:    You are not a serious person.  I do not want to speak with you anymore.

(Krzywkowski Decl. Ex. A ¶C24 and pp. 77; Bourdis Decl. ¶8)

Prior to these communications Charterers and their affiliated companies had not expressed any desire to conduct testing of the hatch covers.  (Bourdis Decl. ¶7)  Strangely, Charterers waited until the completion of discharge operations was only hours away to make their first request.  Indeed, at 1840 hours that day, December 28, 2007, discharge operations were finally completed.  In preparation for redelivery of the vessel to Owners, Anteks purportedly

---

[3]  The country of Greece is one hour behind in time of St. Petersburg.  Therefore, in St. Petersburg, the phone call was took place at approximately 1700 hours on December 28, 2007.

arranged for a pilot to take the vessel to the anchorage where redelivery would take place and for the final off-hire survey, both of which were scheduled to take place that evening. (Krzywkowski Decl. Ex. A ¶C21)

Later that evening, a series of events which together resulted in the further delay of the vessel began to unfold as promised in Mr. Pavel's threat expressed earlier that day. (Krzywkowski Decl. Ex. A ¶C25; Bourdis Dec. ¶9)

First:  The redelivery of the vessel which was scheduled to take place that evening was abruptly cancelled; purportedly due to bad weather, as alleged by Anteks, which prevented transit down river and as a result of the Master's alleged refusal to change the location where the pilot was to be dropped from the pilot station to Big Kronstadt Roads, a location one to two miles closer to port at the immediate mouth of the river leading to the port. (Krzywkowski Decl. Ex. A ¶C21 and pp. 74-75; Bourdis Decl. ¶13-14)

Second:  The Bureau Veritas surveyor returned to the vessel that evening and took physical custody of the vessel's Class Certificate and Cargo Ship Safety Construction Certificate supposedly as a means of easing his own conscience and to serve as "security" to ensure that the vessel did not sail away without having the repairs to the hydraulic cylinder re-inspected.  The removal of the certificates did not affect the vessel's Class status which at all times remained in good standing.  (Krzywkowski Decl. Ex. A ¶C26, D6-D7 and pp. 96-97) Accordingly, Owners were still in position to timely deliver the vessel to Britannia.  After the surveyor departed, BLG's instructions from Charterers appeared to change dramatically.  In an email sent very late that night, BLG stated that while they had been instructed not to apply for an order from the High Court directing the testing, they had learned the vessel could not sail due to the inability to

close the hatch cover to hold No. 6[4] and the vessel's complement of crew was below the minimum to proceed to sea. At the time, however, the vessel was under no restrictions and was free to sail. In any event, the vessel was not scheduled to go to sea since she was scheduled to remain in St. Petersburg to load her next cargo. (Krzywkowski Decl. Ex. A ¶¶C27-C28, E10, E12 and pp. 79-80)

Third: On the following morning, December 29, 2007, the vessel was re-scheduled for redelivery. As arranged by the Bureau Veritas surveyor, shore workers attended the vessel and manually closed the hatch cover at hold No. 6 in preparation for shifting. To the crew's surprise, at 1022 hours, Port State Control officers unexpectedly boarded the vessel and proceeded to conduct an inspection.[5] While the inspection was still underway, at 1159 hours, Charterers notified the Master that the port authorities were prohibiting the vessel from shifting to the anchorage and the vessel was being required to move to another berth. In fact, no restrictions had been placed on the vessel at that time. At 1530 hours, Port State Control issued a Notice of Detention. None of the deficiencies noted by Port State Control warranted grounds for detention. All but two of the deficiencies were remarkably petty and were easily and quickly rectified by the crew. The other two deficiencies—the alleged withdrawn Class certificates and missing Second Officer—were factually unfounded. (Krzywkowski Decl. Ex. A ¶¶C29-C32, E5-E12 and pp. 118-125; Bourdis Decl. ¶11 and pp. 83-84)

---

[4] The damage hatch cover to cargo hold No. 6 could, in fact, be closed manually, though not via the vessel's hydraulic power. In fact, the Bureau Veritas surveyor had already made arrangements for the morning of December 29, 2007 for shore workers to close the hatch cover manually. (Krzywkowski Decl. Ex. A ¶¶C27 fn.7, C30, D4, D6 fn.16)

[5] Boarding by Port State Control shortly before departure is highly unusual. (Bourdis Decl. ¶10)

Fourth:  At 1553 hours, Port State Control left the vessel.  Anteks, in charge of transporting the replacement crew member, knew the Second Officer had arrived at St. Petersburg airport at 1325 hours but delayed in delivering him until six minutes after Port State Control had departed.  (Krzywkowski Decl. Ex. A ¶¶C32-C33 and pp. 81, 85-86)

Fifth:  That afternoon, the Bureau Veritas surveyor informed the Master that he withdrew his permission to allow the repairs to the hatch cover to be performed by the vessel's crew, and instead ordered the repairs performed by Class certified welders ashore.  The surveyor knew or should have known that owing to the holiday season, the shore workshops were closed and the repairs would not be performed for some time.  A pilot thereafter boarded the vessel to shift her to a repair berth to await repairs which were not commenced until after the New Year.  (Krzywkowski Decl. Ex. A ¶¶C34, C36, D9-D10)

Sixth:  Charterers' London solicitors notified Owners that Charterers were placing the vessel off-hire in light of the action taken by Port State Control.  (Krzywkowski Decl. Ex. A ¶C35)

Seventh:  Owners thereafter gave Charterers 12 hours notice that they would exercise their option to cancel the charter if the hire which had been outstanding for some time was not paid in full.  Before the 12 hours had passed, Charterers themselves purported to terminate the charter on grounds of Owners' alleged repudiatory breach based on the "withdrawal" of her Class certificates.  (Krzywkowski Decl. Ex. A ¶C38 and pp.87-89)

Eighth:  After both sides had held the other in breach and declared the charter at an end, Charterers recommenced their demands to conduct ultrasonic testing of the vessel's cargo holds which remained empty and available for such testing only as a result of her detention.  (Krzywkowski Decl. Ex. A ¶C38; Bourdis Decl. ¶10; Def. Lloyd-Lewis Decl. Ex. EEL 3 pp. 79 )

Ninth: On January 10, 2008, Britannia notified Owners that it was cancelling the fixture of December 20, 2007. (Krzywkowski Decl. Ex. A ¶C42)

Tenth: On January 11, 2008, Port State Control re-inspected the vessel and released her from detention. (Krzywkowski Decl. Ex. A ¶C43)

## ARGUMENT

### POINT I

### IN ORDER TO SUSTAIN THE ATTACHMENT, PLAINTIFF NEED ONLY SHOW THAT IT HAS A *PRIMA FACIE* MARITIME CLAIM AND NEED NOT PROVE THE MERITS OF ITS CLAIM

It is well established that in order for a plaintiff to maintain an attachment pursuant to Rule B, the plaintiff must have asserted a maritime claim against the defendant that is *prima facie* valid. This requirement is made clear from Rules A and B and from the Second Circuit decisions in Winter Storm Shipping Ltd. v. TPI, 310 F.3d 263 (2002) and Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd., 460 F.3d 434 (2006).

The Court's inquiry in the instant vacature motion is a limited one. Transportes Navieros Y Terrestes, S.A. de D.V. v. Fairmount Heavy Transport, 2007 U.S. Dist. LEXIS 50260, at *9 (S.D.N.Y. July 6, 2007). Indeed, in Aqua Stoli, 460 F.3d at 445, the Second Circuit held that a fact-intensive inquiry is "improper because Rule B specifies the sum total of what must be shown for a valid maritime attachment". Judge Preska in Transportes Navieros noted that "many district courts that have examined this issue since Aqua Stoli, have adopted the limited inquiry contemplated by Aqua Stoli". 2007 U.S. Dist. LEXIS 50260, at *9. Under this less burdensome standard, a properly filed Verified Complaint is all that is required to satisfy Rule B and to prevail against a Rule E(4) motion to vacate. Id. at 11 (*citing* Tide Line, Inc. v. Eastrade Commodities, Inc., 2006 U.S. Dist. LEXIS 95870, at *15 (S.D.N.Y. Aug. 15, 2006)). It is

therefore not required that a plaintiff provide any supporting evidence to show that it has a *prima facie* maritime claim.    Tide Line, Inc., 2006 U.S. Dist. LEXIS 95870 at *15-16.    Therefore, plaintiffs are not required to prove their case when defending a motion to vacate an attachment. Transportes Navieros, 2007 U.S. Dist. LEXIS 50260 at *12.

Charterers argue that the attachment should be vacated on the grounds that Owners' claims are so lacking in merit as to be frivolous, that Owners' claims are based on misrepresented facts, and that Owners' claims cannot succeed as a matter of English law.    These arguments are wholly unavailing.    It is clear from the Declarations submitted herewith that Owners have presented valid, non-frivolous *prima facie* admiralty claims against Charterers, Charterers are not found within the District, they have property in the District, and there is no statutory or maritime law bar to the attachment.    Aqua Stoli, 465 F.3d at 445.[6]    It is undisputed that the adjudication of the merits rests with English arbitrators who will apply English law to Owners' claims.    It is for that tribunal to decide which facts it finds to be accurate.

## A.    **Owners' *Prima Facie* Valid Claims Are Not Frivolous**

Precisely because Charterers recognize that Owners have met their Rule B *prima facie* showing, they attack Owners' claims on the merits by purporting to argue that the claims are frivolous[7].    At this early stage of the proceedings, though, the Court can only conclude that Owners' claims are not frivolous and the attachment must therefore be maintained.    Finecom Shipping Ltd. v. Multi Trade Enterprises AG, 2005 U.S. Dist. LEXIS 25761, *4 (S.D.N.Y. Oct.

---

[6] Charterers have not asserted that they are not found or there is a statutory bar to the attachment.

[7] It is significant that throughout their motion papers, Charterers concede that the substantive merits of Owners' claims are to be determined in London arbitration.  (Charterers' MOL pp. 7, 14, 17; Colman Decl. ¶¶34, 36, 46).  In doing so, Charterers effectively acknowledge Owners' claims will not be rejected as frivolous under English law.

25, 2005) (a court "should be reluctant to prejudge the merits of claims based essentially on the pleadings and a sparse record consisting of a few documents, in advance of any discovery. This is particularly so when the ultimate merits will be decided not by this Court, but by an arbitration panel in another country"). *See also*, <u>Transportes Navieros</u>, 2007 U.S. Dist. LEXIS 50260.

Owners' claims arise out of a charter party relationship gone awry at the hands of Charterers, their affiliated companies and others. Before commencement of the voyage, the vessel's cargo holds and hatch covers were inspected and passed to Charterers' satisfaction. At that time, Charterers expressed no desire to conduct the ultrasonic testing to which they were entitled. The cargo was loaded and the vessel performed the voyage without incident. Upon arriving at the discharge port of St. Petersburg a portion of the cargo found in two cargo holds was discovered wetted and moldy. All of the evidence pointed to a pre-shipment condition as the cause of the damage and Charterers have yet to provide any evidence to the contrary or even assert otherwise. (Bourdis Decl. ¶12) The facts provided herein, together with those set forth in the accompanying Declarations, clearly satisfy Owners' *prima facie* showing that Charterers had every intention to not only breach the charter party, but to also conspire with others so as to tortiously interfere with Owners' contract with Britannia.

**B.    <u>Owners Have Made No Misrepresentations To The Court</u>**

Charterers argue that certain[8] allegations in Owners' Amended Verified Complaint are "wholesale inaccuracies and misrepresentations". Owners address each, in turn, below.

The cancellation of the Britannia fixture is solely attributable to Charterers' breaches of the charter party and acts of conspiracy to interfere with the vessel's operations at St. Petersburg.

---

[8] Charterers actually state in their brief that "all" of the allegations in the complaint have been "patently" misrepresented but cite to only a few specific factual allegations as being incorrect.

In an effort to shift the focus from this inescapable conclusion, Charterers argue that Owners have misrepresented the facts surrounding the cancellation of the Britannia fixture as supposed proof that Owners deceived the Court into granting the attachment application in the first place.

According to Charterers, Owners entered into a contract with Britannia on terms which Owners could never have honored.  This is false. Owners fixed the vessel with Britannia on December 20th, while the ship was still discharging Charterers' cargo, with an anticipated delivery between December 24th and 31st.  (Krzywkowski Decl. Ex. A ¶C15 and pp. 60-71) Charterers point to a clause in the Britannia fixture noting the vessel would likely not finish discharging until December 27 as supposed support for their argument which fails, however, to take into account the commercial realities of chartering vessels.  It was in Owners' best interest to have the Britannia charter commence as soon Charterers redelivered so as to avoid the vessel being unemployed.  Based on the December 24 delivery date projected by Charterers, Owners' December 24 to 31 laycan for delivery to Britannia reasonably took into account the possibility for brief delay in Charterers' redelivering balanced against Owners' commercial goal of having the vessel continually earn hire.   Notwithstanding the delays encountered during discharge, Owners were, in fact, in position to validly deliver the vessel to Britannia as early as December 28, 2007.

Charterers' argument that the vessel was not in a condition so as to tender a "lawful" and "valid" notice of readiness because she was not "tight, staunch, strong and in every way fitted for service" due to the alleged withdrawal of Class standing and the alleged lack of a full complement of officers  is simply untrue. As documented by the Class Maintained Certificate issued by Bureau Veritas, at all times the vessel was in St. Petersburg she remained in good standing and "in Class" so as to be able to be validly delivered to Britannia. (Krzywkowski

Decl. ¶13, Ex. A pp. 96-97) The Class Maintained Certificate was provided in response to Owners' request made to the Bureau Veritas seeking clarification due to the confusion caused by the physical removal of the Class Certificate and the Cargo Ship Safety Construction Certificate by the local Class surveyor. It was this confusion which resulted in the various references in the documents attached to the Claim Submission and the allegation in the Amended Complaint at ¶11 that Class standing had been "withdrawn". The removal of the certificates by the local Class surveyor was certainly not an official expression or requirement of the Classification Society and had no impact upon the vessel's ability to validly deliver under the Britannia charter. (Krzywkowski Decl. ¶13)

Charterers also point to the Port State Control detention on December 29, 2007, as a reason why the vessel could not be timely delivered to Britannia. Only two of the several deficiencies noted by Port State Control could have warranted the detention—the vessel's "withdrawn" Class certificates and the supposed lack of a Second Officer. Both were entirely contrived by Charterers, their affiliated companies and others to provide the appearance that Port State Control had legitimate reasons to conduct further inspections and to subsequently detain the vessel. (Krzywkowski Decl. Ex. A ¶¶C27-C33, E10, E12 and pp. 79-80) The other deficiencies noted by Port State Control at the time of the vessel's detention were remarkably minor and did not provide a reason to detain the ship. (Krzywkowski Decl. Ex. A ¶¶E11-E12).

The physical absence of the certificates, resulting from the undue pressure placed upon the local Bureau Veritas surveyor by Charterers following Owners' refusal to allow the testing of the hatch covers provided the pretext for Port State Control to not only inspect but to also detain the vessel for allegedly being out of Class. As explained above, there was, in fact, no valid basis for the detention since Class status was never withdrawn. The fact that Port State Control

refused, without explanation, to contact Bureau Veritas directly to verify the vessel's Class status upon the Master's request further suggests that the decision to delay the ship for whatever reason which could be found, legitimate or not, had already been taken.[9]  (Krzywkowski Decl. Ex. A ¶¶C26, D7-D8, E10 and pp. 96-97)

Charterers' argument that Owners "concede in [their] Amended Verified Complaint [at ¶11] that [Charterers] did not have any hand whatsoever in the classification society's removal of the class certificates" (Charterers' Memorandum of Law at 9) is misplaced.  Such a reading denies Owners' position that Charterers had conspired with the Class surveyor to remove the certificates from the vessel, that Charterers "learned" the certificates had been removed by the surveyor as planned, and Charterers used this pretext to encourage, with or without complicity by the Port State Control inspectors, the detention of the ship.

Turning to the vessel's alleged lack of a Second Officer, manipulation by Anteks, Charterers' agents, to delay the arrival of the "missing" crew member until shortly after Port State Control had left the ship fits neatly into Owners' conspiracy theory.  Anteks was in control of the repatriation of the ill Second Officer and the transportation of the replacement Second Officer.  Anteks knew the replacement Second Officer had arrived at St. Petersburg airport on December 29, 2007 at 1325 hours but neither Anteks nor Charterers informed Port State Control that the Second Officer was on his way to the vessel. (Krzywkowski Decl. ¶14 Ex. A ¶¶C18, C32-C33, E10, E12)

In addition, it is untrue that the hatch cover at hold No. 6 was unable to be closed.  While the hydraulic mechanism was not working, the cover could be and was closed by manual means

---

[9] This is supported by the fact that Charterers' knew the vessel was to be detained and would have to move to a repair berth, and so informed the Master, hours before the Port State Control inspection was completed.  (Krzywkowski Decl. Ex. A ¶¶C29, E12 and p. 83)

even in its damaged condition.  The repairs could have easily been made by the vessel's crew (which had performed similar repairs as permitted by Bureau Veritas during a call in the same port some four months prior) at the berth or while at anchorage where the vessel was to be redelivered before expiration of the laycan of the Britannia fixture.  It was again pressure by Charterers on the Class surveyor which caused him to withdraw his prior authorization for the crew to make the repairs.  In any event, while one or more of the minor deficiencies noted by Port State Control, could have been grounds which Britannia would seek to place the vessel off-hire, but would not have prevented the vessel from being delivered, tendering notice of readiness and commencing the contractual relationship between Owners and Britannia.  (Krzywkowski Decl. Ex. A ¶¶C27 fn.7, C30, C34, D4, D6 fn.16, D8-D10)

It clear from the above that more than sufficient evidence exists to support Owners' allegation that the cancellation of the Britannia fixture was solely due to Charterers' actions in breaching the charter party and intentionally causing the vessel to be delayed by manipulating the Bureau Veritas surveyor's removal of the Class certificates and reversal of permission for the repairs to be performed by the ship's crew which provided the foundation for the contrived Port State Control detention to follow.

To the extent that the Amended Complaint incorrectly stated at ¶11 that the vessel's classification society had temporarily withdrawn the vessel's certificate of class pending repairs to the hydraulic lifting mechanism for the hatch covers of No. 6 hold and at ¶15 that the certificates had been returned prior to December 31, 2007, these are inadvertent inaccuracies and there was no effort made to mislead the Court as to the true facts which are as set forth above.  It is respectfully submitted that had the Amended Complaint stated that the Class status had never been "withdrawn" and provided the correct date the certificates were physically returned to the

ship, the Court certainly would have authorized the issuance of the attachment under those circumstances as well. (Krzywkowski Decl. Ex. A ¶D7 and pp. 96-97) These minor mistakes in the wording of the pleadings by undersigned counsel in haste to submit the application to the Court have no bearing on the validity of the attachment. Owners are prepared and welcome the opportunity to file a Second Amended Complaint so as to correct any misdescription in the Amended Complaint.

**C.**     **The Claims Asserted By Owners Are Recoverable Under English Law**

Owners have a claim pursuant to a balance in their favor due under the charter party final hire statement in the amount of $347,449.05. (Krzywkowski Decl. Ex. A pp.1-2). Owners also have claims in contract for damages resulting from delay to the vessel caused by Charterers' failure to discharge the vessel within a reasonable period of time and resulting from Charterers' conduct in failing to pay hire on time which conduct amounted to a repudiation of the charter party and which entitled Owners to terminate the charter party. Alternatively, Owners claim for Charterers' repudiatory conduct in wrongfully terminating the charter party on January 2, 2008. Additionally, Owners have claims in tort in relation to acts on the part of Charterers who conspired with others with the predominant intention to deliberately injure and cause loss to Owners at St. Petersburg at the conclusion of the cargo discharge operations. (Krzywkowski Decl. Ex. A ¶A1-A5) According to the Owners' solicitor, John Krzywkowski, all of the above are good arguable claims under English law. (Krzywkowski Decl. ¶6)

Charterers rely upon the Declaration of Sir Anthony Colman ("SAC") in support of their position that Owners' claims will not succeed as a matter of English law. SAC sets forth at length <u>his</u> understanding of the facts as presented to him by Charterers, not the actual facts which will be proved in the arbitration, and based upon a mistaken understanding of the facts concludes

that there is an "inherent improbability" of the breach of contract claims advanced by Owners succeeding. In the view of SAC, he believes it would be unlikely Charterers would have deliberately prolonged the charter party by delaying the vessel.[10] (Colman Decl. ¶37) SAC, however, concedes in that same paragraph that whether the charter party has been breached is subject to the arbitrators' consideration of the facts in dispute – not the view of the facts taken by him and what evidence he may or may not find "compelling", or for that matter the views of Owners' solicitor. (Colman Decl. ¶36) This important concession follows his statement at paragraph 36 of his Declaration which expressly acknowledges that, "Whether or not there has been a breach of the terms of the charter party by the Charterers in relation to the detention of the vessel by the PSC [Port State Control] will therefore turn on the facts as found by the arbitral tribunal." (Colman Decl. ¶¶34, 36) Most importantly, at no point does SAC state that the arbitrators would likely reject Owners' claims on their face or that they are frivolous. Accordingly, it cannot truthfully be said that the breach of charter party claims advanced by Owners have no merit and are frivolous as a matter of English law. (Krzywkowski Decl. ¶¶8-9)

As to Owners' tort claims, SAC similarly admits that he has only a limited understanding of the Owners' claims. (Colman Decl. ¶38) Notwithstanding this limitation as to the facts and claims, Mr. Colman, perhaps unsurprisingly, concludes that of his perceived view of the three potential causes of action only two of the three will not succeed. Significantly, with respect to the conspiracy claim, the object of which was to injure Owners by interfering with the Britannia charter, SAC agrees that such claim is "highly fact-sensitive [as is clear from the volume of materials submitted in connection with this motion] and in this case, whether the case is made

---

[10] SAC's view ignores the fact that Charterers had placed the vessel off-hire and subsequently terminated the charter. Thus, Charterers apparently viewed that they did not have any financial risk arising from the delay.

out will depend upon the detailed findings of fact made by the arbitral tribunal." (Colman Decl. ¶45) Accordingly, Charterers' own submission acknowledges the validity of the claims, and only disputes whether Owners will prevail on the merits - which must be left to determination by the arbitrators per the contractual agreement of the parties.

SAC's acknowledgment that the tort claims are necessarily fact dependent is consistent with the English law case of <u>Lonrho PLC v. Fayed</u> [1992] 1 AC 448 (copy attached to SAC's Declaration at AC1 tab. 13) which holds that the English courts will hold to account, in damages, a tortfeasor who is adjudged on the facts to have conspired with others with the deliberate and predominant intention to injure another party – and that such facts should be decided by a trial, or in this case, by a panel of commercial arbitrators in London appointed by the parties. (Krzywkowski Decl. ¶11) Notably, now that the Class Maintained Certificate has been provided by Bureau Veritas, which makes clear the vessel remained in good standing as to Class throughout the relevant period, the SAC opinions must be discounted as the foundation upon which they are largely based has proven to be inaccurate.

The opinion by SAC that Owners' claims are not viable under the facts, as fed to him by Charterers, is countered by that of Mr. Krzywkowski who opines the claims are meritorious. Where two English lawyers come to differing opinions as to the viability of a claim, absent some issue of credibility there should be no finding that the claim is frivolous. When analyzed more closely, it is apparent that there can be no finding of frivolity here based on Charterers' Colman Declaration which does not say that there is no basis in English law for Owners' claims, but only rather that he doubts whether Owners' can succeed. Owners' solicitor, Mr. Krzywkowski, on the other hand, establishes quite clearly that there is a sound basis in English law for Owners' claims. (Krzywkowski Decl. ¶ 5-12).

Judge McMahon's recent decision in <u>Rosemary d/b/a R M Martin Supplies and Services v. Jaldhi Overseas Pte Ltd.</u>, 2008 U.S. Dist. LEXIS 1728 (S.D.N.Y. Jan. 4, 2008) is instructive here.  In <u>Rosemary</u>, the plaintiff and defendant asserted claims against each other (which were respectively denied).  <u>Id</u>. at 8-9.  The claims were essentially the "flip side" of one another and only one set of allegations could be true.  <u>Id</u>.  On such facially equivalent grounds, and without discovery or any evidence as to credibility, the Court refused to take sides and found the merits should be determined in London arbitration.  <u>Id</u>.

Charterers' reliance upon <u>North Offshore AS v. Rolv Berg Drive AS</u>, 2007 U.S. Dist. LEXIS 87648 (S.D.N.Y. Nov. 29, 2007) for the proposition that where it is demonstrated that a claim has no viable basis or is completely lacking in merit security should be denied is misplaced.  In that case, the defendant sought counter-security for lost profits in connection with a side agreement which it claimed the plaintiff had failed to honor.  <u>Id</u>. at 3.  Judge Stein refused to order counter-security because the condition precedent for the side agreement to have taken effect never actually occurred.  <u>Id</u>. at 8.  Accordingly, the contract did not take effect and no obligation could have been breached by the plaintiff for which the defendant would need counter-security.  Nothing in <u>North</u> bears even the slightest resemblance to any of the facts or circumstances in the instant matter and the case has no import here.

There are simply no grounds which support a finding that Owners' claims in this action are frivolous, based upon misrepresented facts, or not viable as a matter of English law and Charterers' argument on this point should be rejected.

## POINT II

### THERE ARE NO EQUITABLE GROUNDS TO VACATE THE ATTACHMENT

Following the Second Circuit's opinion in Aqua Stoli, 460 F.3d 434, 447 (2006) it is clear that as long as the procedural requirements of Rule B are met, vacatur on equitable grounds is only available in certain limited circumstances such as 1) where the defendant is subject to suit in a convenient adjacent jurisdiction; 2) the plaintiff could obtain in personam jurisdiction over the defendant in the district where the plaintiff is located; and 3) the plaintiff has already obtained sufficient security for the potential judgment, by attachment or otherwise. The burden is on the defendant to demonstrate equitable grounds for vacature exist. The Rice Co. v. Express Sea Transport Corp., 2007 U.S. Dist. LEXIS 84300, at *8-9 (S.D.N.Y. 2007)  The equities here do not warrant vacatur.

Wolters Kluwer Fin. Servs. Inc. v. Scivantage, 525 F. Supp. 448 (S.D.N.Y. 2007), cited by Charterers is clearly inapposite on its facts as the plaintiff in that case made numerous and significant misrepresentations of the facts knowingly and in bad faith in an attempt to mislead the court in granting expedited relief. This is not a case where the Plaintiff has unclean hands, which would necessitate a detailed review of the merits which is not permitted under Rule B or Rule E (4)(f), Id., see also Tide Line, 2006 U.S. Dist. LEXIS 95870, at *15-16, or where Plaintiff has misled the Court so as to have the attachment order issued. Rolls Royce Ind. Power (India) v. M.V. FRATZIS M, 1996 A.M.C. 390 (S.D.N.Y. 1995). The formal requirements for attachment have been satisfied and Owners have a legitimate and well founded claim against Charterers. Charterers' argument in favor of equitable vacature should be summarily rejected.

## POINT III

## <u>THE QUANTUM OF SECURITY SHOULD NOT BE REDUCED</u>

The balance of Charterers' motion, while characterized as an attack on the quantum of the attachment, is little more than a regurgitation of their previous unavailing arguments which are utterly devoid of any merit, as demonstrated in Point I above. Despite Charterers' effort to come at this same argument from two different angles, their request for reduction always comes back to the same point – a belief Owners' are unlikely to prevail on the merits in the London arbitration. This argument is insufficient to meet Charterers' burden.

At the outset, it is important to bear in mind that the defendant has the greater burden of showing that the amount of security is excessive. *See* Benedict on Admiralty § 3.02[D][7] *citing* Whitney-Fidalgo Seafoods v. MISS TAMMY, 542 F. Supp. 1302, 1304-05 (W.D.WA. 1982) (defendant's burden in seeking a reduction of an attachment is to supply proof that the quantum attached "is clearly excessive as compared to the claim figure"); Sea Transport Contractors, Ltd. v. Indus. Chemiques du Senegal, 411 F. Supp.2d 386, 396 (S.D.N.Y. 2006) (*citing* Rule E(6)).

To maintain an attachment under Rule B for the quantum requested, the plaintiff need only demonstrate a reasonable basis for the calculation of its claim. "It is well-settled that in an attachment proceeding, the plaintiff need not prove its damages with exactitude." Dongbu Express Co. v. Navios Corp., 944 F. Supp. 235, 237 (S.D.N.Y. 1996), *citing* Bergesen v. Lindholm, 760 F. Supp. 976, 986 (D. Conn.. 1991) (all that is required of the plaintiff is "a fair and reasonable estimate of damages"); M/V FRATZIS M., 1996 A.M.C. at 402 ("Plaintiff need not prove its damages with exactitude". All that is necessary is for the Court to determine that the plaintiff's claims are not frivolous.) As set forth above, based upon the Declarations of Mr.

Krzwkowski, Capt. Bourdis and Capt. Drymonis, the claims asserted by Owners are well founded in fact and under the applicable English law and clearly pass the low threshold required for the attachment to be upheld.

Charterers' suggestion that despite the non-frivolous nature of the claims, the Court should exercise its equitable discretion to reduce the quantum of the security should similarly be rejected. Contrary to Charterers' contention, Owners' claim has not been trumped up to harass and create financial hardship for Charterers. In fact, it was Charterers' actions in breaching the charter party and in conspiring with its associated companies and agents to injure Owners which have brought the parties before this Court. The cases cited by Charterers in support of their request for reduction are, even upon cursory review, factually inapposite. In <u>Sea Transport Contractors</u>, 411 F. Supp.2d at 386, security was reduced because plaintiff's claim for security for 30 years of damages arising from the breach of a contract that was purportedly to run "interminably" was unsupported by the language of the contract which provided for automatic renewal every two years provided neither party was in material breach. Likewise, in <u>Transportes Navieros,</u> 2007 U.S. Dist. LEXIS 50260, security was reduced because plaintiff failed to act for over 6 months to mitigate damages, allowing damages to accumulate. *See accord*, <u>Glidden Co. v. Hellenic Lines, Ltd.</u>, 315 F.2d 162 (2d Cir. 1963). The other cases cited are equally unavailing. <u>Dongbu Express Co. Ltd.</u>, 944 F.Supp. 235 (reducing security because the total amount restrained in the U.S. and Korea exceeded plaintiff's provable damages); <u>Daeshin Shipping Co., Ltd. v. Meridian Bulk Carriers, Ltd.</u>, 2005 U.S. Dist. LEXIS 22409 (S.D.N.Y. Oct. 3, 2005) (limiting security to amount supported by evidence submitted).

In light of the evidence submitted by Owners, at this juncture where only limited proof in support of the claimed damages is required, this Court can only conclude that the quantum of

Owners' claims are not frivolous under English law and the attachment must therefore be maintained *in toto*. Finecom Shipping Ltd., 2005 U.S. Dist. LEXIS 25761, *4 (at this early stage in the proceedings, a court "should be reluctant to prejudge the merits of claims based essentially on the pleadings and a sparse record consisting of a few documents, in advance of any discovery. This is particularly so when the ultimate merits will be decided not by this Court, but by an arbitration panel in another country"); see also, Palette Marine, Ltd. v. Pacific Ocean Resources Ltd., S.D.N.Y. 06 CIV 13141 (RLC) (unreported) (Jones J.); The Rice Co., 2007 U.S. Dist. LEXIS 84300 at * 8-9 (request to reduce security denied where plaintiff's claim found to be non-frivolous based upon evidence of market rate supporting its claim).

### Quantum Of Security Sought By Owners

At the time of filing of the Complaint in early February 2008 the vessel had not found substitute employment for the cancelled Britannia charter. By the time the Amended Complaint was filed some 9 days later, in an effort to mitigate damages, Owners had fixed the vessel on a substitute voyage and reduced the level of security sought. Since that time Owner's losses have become crystalized. Accordingly, Owners request security in the total amount of $3,926,512 - representing a principal claim of $3,243,600 together with interest in the sum of $482,912 and costs of the arbitration in the sum of $200,000. The basis for the principal claims figures is explained in Owners' Claim Submission. (Krzywkowski Decl. Ex. A ¶H1-H7)

## CONCLUSION

For all the foregoing reasons, Defendant's motion to vacate and/or reduce the attachment should be denied.

Dated: New York, New York
      March 21, 2008

<div style="margin-left: 40%;">

FREEHILL HOGAN & MAHAR, LLP
Attorneys for Plaintiff
Sixteen Thirteen Marine S.A.

By: _____
Michael E. Unger (MU 0045)
80 Pine Street
New York, NY 10005
(212) 425-1900 / (212) 425-1901 fax

</div>