UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------

SIXTEEN THIRTEEN MARINE S.A.,

                Plaintiff,

    - against -

                                  08 CV 1318 (HB)

CONGENTRA A.G.,

                Defendant.

------------------------------------------------

## DECLARATION OF JOHN KRZYWKOWSKI

    I, JOHN KRZYWKOWSKI, pursuant to Section 1746 of Title 28 of the United States Code, hereby declare and say the following under penalty of perjury:

    1.    I am a solicitor of the Supreme Court of England and Wales and am the founding partner of the law firm of the Law Office of John Krzywkowski. Prior to establishing my own practice four years ago, I was a partner in the City of London maritime law practice of Holman, Fenwick and Willan, during which time I was senior partner of their Hong Kong office and later their Greek office, and thereafter senior litigation partner in the Greek office of the City of London maritime law practice, Watson, Farley & Williams. The Law Office of John Krzywkowski was retained to act as legal counsel for Plaintiff Sixteen Thirteen Marine S.A. ("Owners") through their Protection and Indemnity insurers, The American P&I Club, in connection with its dispute with Defendant Congentra A.G. ("Charterers") arising out of the charter for the M/V NICHOLAS M which disputes are the subject of a pending arbitration in London. I am the attorney in charge of this matter and am fully familiar with the facts and proceedings heretofore had herein.

2

2.    Charterers have argued in their motion papers that the attachment should be vacated on the grounds that: 1) Owners' claims are so lacking in merit as to be frivolous and/or are otherwise manifestly inequitable; 2) Owners' have misrepresented the facts in their Amended Verified Complaint; and 3) Owners cannot recover in the London arbitration on their claims as a matter of English law. Alternatively Charterers request the Court to reduce the amount of the attachment to an amount commensurate with Owners' provable damages. I submit this Declaration on behalf of Owners in opposition to Charterer's Motion to Vacate the Attachment. In particular, this Declaration will serve to correct the record and point out the many misrepresentations in Charterer's motion which should be denied in all respects.

3.    Insofar as the contents of this Declaration are within my own knowledge, they are true. Insofar as the contents of this Declaration are not within my own direct knowledge, they are true to the best of my information and belief based upon my review of relevant documents and discussions with persons having direct knowledge of the facts.

4.    I attach hereto as Exhibit A is a true and correct copy of Owners' Claim Submission in the London arbitration which sets forth in detail the facts and circumstances supporting Owners' claims in contract and in tort as a matter of English law. Subject to paragraph 3 above, I hereby verify that the facts set forth in the Claim Submission are true and correct and I adopt same by reference.

### OWNERS' CLAIMS

5.    Owners have claims against Charters both in contract under the terms of the charterparty and in tort for wrongdoings committed against Owners by Charterers in conspiracy with their associated companies and others at St. Petersburg, Russia.

6.    In particular, Owners have a claim pursuant to a balance in their favour due under the charterparty final hire statement in the amount of US$347,449.05. (The final hire

3

statement is attached hereto as Exhibit A at 1-2). Owners also have claims in contract for damages resulting from delays to the vessel caused by Charterers' failure to discharge the vessel within a reasonable period of time at St. Petersburg. Owners have further claims in contract for damages resulting from Charterers' conduct in failing to pay hire on time which conduct amounted to a repudiation of the charterparty and which entitled Owners to terminate the charterparty, alternatively for Charterers' repudiatory conduct in wrongfully terminating the charterparty on 2nd January 2008. Additionally, Owners have claims in tort in relation to acts on the part of the Charterers in which Charterers conspired with others with the predominant intention to deliberately injure and cause loss to Owners at St. Petersburg at the conclusion of the cargo discharge operations. All of the above are good arguable claims under English law.

7.    I have reviewed the Declaration of Sir Anthony Colman ("SAC") which was submitted by Charterers to provide an opinion as to the application of English law to this case. SAC sets forth at length his understanding of the facts, with which Owners strongly disagree, and based upon this mistaken understanding concludes that there is an "inherent improbability" in the breach of contract case being advanced by Owners succeeding. SAC states at Paragraph 37 of his Declaration that he believes it would be unlikely that Charterers would have deliberately prolonged the charterparty by delaying the vessel.

8.    SAC, however, concedes in that same paragraph that whether the charterparty has been breached is subject to the arbitrators' consideration of the facts in dispute – not the view of the facts taken by him. At no point does SAC state that the arbitrators would reject Owners' claims on their face or that they are frivolous.

9.    In fact, SAC makes no such suggestion in his submission. Rather, SAC at paragraph 36 expressly acknowledges that "Whether or not there has been a breach of the

4

terms of the charterparty by the Charterers in relation to the detention of the vessel by the PSC [Port State Control] will therefore turn on the facts as found by the arbitral tribunal." Accordingly, it cannot truthfully be said that the breach of charterparty claims advanced by Owners have no merit and are frivolous as a matter of English law.

10.    As to Owners' tort claims, SAC similarly admits that he has only a limited understanding of the Owners' claims. Notwithstanding this limitation as to the facts and claims, Mr. Colman, perhaps unsurprisingly, concludes that of his perceived view of the three potential causes of action two of the three will not succeed. Significantly, with respect to the conspiracy claim, SAC agrees that such claim is "highly fact-sensitive and in this case, whether the case is made out will depend upon the detailed findings of fact made by the arbitral tribunal."

11.    SAC's acknowledgment that the tort claims are necessarily fact dependent is consistent with the English law case of Lonrho PLC v. Fayed [1992] 1 AC 448 (copy attached to SAC's Declaration at AC1 tab. 13) which holds that the English courts will hold to account, in damages, a tortfeasor who is adjudged on the facts to have conspired with others with the deliberate and predominant intention to injure another party – and that such facts should be decided by a trial, or in this case, by a panel of commercial arbitrators in London appointed by the parties.

12.    I believe that the panel of commercial arbitrators will wish to fully consider the threats made by Charterers' Mr. Pavel Priymak during the late afternoon of 28th December 2007 to Captain Costas Bourdis, the vessel's operations manager, and the aftermath of those threats when the gentleman did not obtain from Owners what he was demanding; namely, the subsequent extreme change in fortunes of the vessel and her Owners almost immediately thereafter. I believe that Charterers have a case to answer.

5

13.    Perhaps most significant in opposition to Charterers' motion is the fact, as is clear from the vessel's Classification Society's Class Maintained Certificate (pp. 96-98), that at all times while the ship was in St. Petersburg she remained in class. The Class Maintained Certificate was provided in response to Owners' request made to the Classification Society seeking clarification due to the confusion caused by the physical removal of the Class Certificate and the Cargo Ship Safety Construction Certificate by the local Class surveyor. It was this confusion which resulted in the various references in the documents attached to the Claim Submissions and the allegation in the Amended Complaint filed in New York that Class had been "withdrawn". What took place in St. Petersburg in so far as the local Class surveyor was concerned was certainly not an official expression or requirement of the Classification Society.

14.    Accordingly, had Charterers not caused the vessel to be delayed by: (a) failing to provide a pilot based on the dubious excuse of bad weather when the ship was ready to sail on 28th December; (b) conspiring with the Class surveyor to physically remove the two certificates from the ship and changing his position to require that the welding repairs to the No.6 hold aft hatch covers starboard hinge support be performed by Class certified shore labour rather than the vessel's fitters as he had initially authorized and (c) causing the Port State Control detention of the ship (based upon the removed certificates and "missing" Second Officer (which Charterers' agents Anteks conveniently failed to timely deliver to the ship from the airport on his arrival), and other minor deficiencies which were all capable of being quickly remedied); the vessel would have been delivered validly and lawfully delivered to Britannia Bulkers on time.

15.    SAC declares that, in way of damages, Owners can only claim lost profits rather than lost revenue. At the time of obtaining the attachment against Charterers, Owners were only in a position to assess the likely revenue that had been lost up to 5th April 2008

NYDOCS1/301153.1

6

because they had yet to fix the vessel for alternative business. The attached Claim Submissions have now dealt with the sums that have been earned to-date and the daily rate going forward to 5th April 2008 so that Owners' lost profit claim can be assessed and presented to the arbitrators. (See Ex. A Claim Submission at pp. 20-21)

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Dated: Piraeus, Greece
     March 20, 2008

          John Krzywkowski

# EXHIBIT A



## LAW OFFICE OF JOHN KRZYWKOWSKI
2nd Floor ▪ 18 Leosthenous & Filellinon ▪ 185 36 Piraeus ▪ Greece
Telephone: +30 210 452 1200   Fax: +30 210 452 1210

**Mr. A. J. Kazantzis**
14 Kildare Terrace
London W2 5LX
United Kingdom.                               Our Ref:      JNK/001
(Ref: AJK/8/10)


**Mr. C. J. W. Moss**                         Date:       19th March 2008
4 Charlotte Place
Wilton Road
London SW1V 1DP
United Kingdom


Dear Sirs,

### "NICHOLAS M" – C/P dated 10.10.2007

We act for Sixteen Thirteen Marine S.A. ("Owners") in relation to their claims against Congentra AG ("Charterers"). Please accept this letter as Owners' Claim Submissions.

Attached is a bundle of documents with an index to which we will be referring in the course of these submissions. References to page numbers in square brackets are to pages in the said bundle.

**A.      Introduction.**

A1.     Owners have claims against the Charterers both in contract under the terms of a charterparty and in tort for wrongdoings committed against Owners in St. Petersburg, Russia.

A2.     Owners have a claim under the charterparty final hire statement in the amount of US$347,449.05 [1-2].

A3.     Owners have claims in contract for damages resulting from delays to the vessel caused by Charterers' failure to discharge the vessel within a reasonable period of time at St. Petersburg.

A4.     Owners have claims in contract for damages resulting from Charterers' conduct in failing to pay hire on time which conduct amounted to a repudiation of the charterparty and which entitled Owners to terminate the charterparty, alternatively for Charterers' repudiatory conduct in wrongfully terminating the charterparty on 2nd January 2008.

A5.    Owners have claims in tort in relation to acts on the part of the Charterers in which they conspired with others with the predominant intention to deliberately injure and cause loss to Owners at St. Petersburg at the conclusion of the cargo discharge operations.

**B.    Contractual Terms.**

B1.    A fixture recap was agreed on 10th October 2007 by Owners and Charterers for a trip time charter of the 1980 built bulk carrier "NICHOLAS M" **[3-11]** with a reference to terms not specifically mentioned in the recap being in accordance with a pro forma charter of "FURIA R" dated 18th May 2006 **[12-40]**.

B2.    The agreed trip time charter was to be from a delivery at Porto Alegre in Brazil via the River Plate in Argentina to St. Petersburg in Russia with redelivery on dropping last outward sea pilot at St. Petersburg. It was stated that the duration of the trip would be about 60 days without guarantee.

B3.    In addition to agreeing a daily hire rate of US$38,000 payable 15 days in advance, the parties agreed to the following further contractual provisions:

Recap:

"On arrival at first loadport after the vessel's delivery, holds to be ready for permitted cargo ordinary service, clean, swept, washed down and dried up so as to receive Charterers' intended cargo to the satisfaction of the shippers' surveyors. In the unlikely event the vsl not be approved by the surveyor then the vessel to be placed off hire and all related expenses thereof to be for Owners' account."

"More specifically, in case of vessel's failure to fully pass above preloading cargo holds inspection vsl to be placed off hire, or pro rata of hire according to the number of holds which failed provided local regulation permit loading of vessel with partially unclean holds and shippers have decided to commence loading of the already passed holds otherwise vessel to be fully off- hire from rejection until the vsl passes the same inspection/test and any actually time lost/direct expenses incurred hereby to be for owners' account."

"Owners guarantee that vsl's hatch covers are to be watertight all throughout this charter period and if any hatch cover found defective, same to be rectified at Owner's time and expense to class surveyor satisfaction in which case vsl to be placed pro rata off-hire according to the number of hatches which found defective and the loading operations were actually prevented."

Incorporation of the BIMCO non-payment of hire clause.

Pro forma "FURIA" charter:

Clause 37:    This contract shall be governed by and construed in accordance with English law and any dispute arising out of or in connection with this Contract shall be referred to arbitration in London.

Clause 42:    .... It shall be considered a fundamental breach by Owners if the vessel's P&I cover or class is cancelled or suspended during the currency of this charter.

Clause 47:    .... Owners warrant .... hatchcovers are absolutely watertight.

Clause 67:    Watertight Hatches
The Owners guarantee that on vessel's delivery and throughout the currency of this Charter the vessel's hatch covers are watertight. All hatches are to be carefully attended by the Crew to prevent leakage.
Hatch Test
The Charterers have the option to hose test or ultrasonic test the vessel's hatch covers at loading port(s) at their time.expense and should same not be watertight, Owners have the obligation to arrange necessary measures in order to make the hatch covers fully watertight...

## C.    Facts.

C1.    The vessel was delivered by Owners to Charterers on dropping the pilot at Porto Allegre at 1300hrs (GMT) on 11th October 2007. From that point, the vessel proceeded to the port of San Lorenzo in Argentina where she arrived on 18th October 2007[1]. The holds were inspected and were found to be clean, dry and fit for the carriage of the intended soyabean meal cargo. Loading commenced on the same day and was completed on 30th October 2007. At no time at San Lorenzo did the port authorities or the surveyors attending on behalf of Charterers, Shippers or Receivers criticise the condition of the vessel and her hatch covers nor did Charterers take up their option to carry out a hose test or ultrasonic test of the hatch covers. The condition of the hatch covers, coamings and other parts relevant to hold watertightness was visible during the loading operations whilst the hatches were open and Charterers' representatives were obviously satisfied with their condition because no adverse comments were made nor tests considered necessary.

C2.    The vessel loaded 30,204 mt of Argentine Hipro Soyabean Meal in bulk. On completion of loading, the hatch covers were sealed with ramneck tape. The vessel sailed from San Lorenzo at 1700hrs (LT) on 1st November 2007 for St. Petersburg – where the consignee was Euroweg Zerno, who Owners understand are an associated company with the Charterers.

C3.    The vessel arrived at St. Petersburg anchorage and tendered her notice of readiness at 0000hrs on 1st December 2007. During the voyage, the prospects for berthing at the port were reasonably good and in fact the vessel berthed at 1045hrs on the day she arrived and the vessel's formalities were all cleared by 1200hrs on the same day. Discharging was expected to take about 24 days.

C4.    Conditions at the port were very cold with snow every day. The ambient temperatures were between -2°C and -15°C.

C5.    As soon as the vessel berthed, Mr Bessonov of Anteks, reportedly Charterers' appointed agents at St. Petersburg, attended on board together with Russian state surveyors in order to sample the cargo. The hatches were opened for this purpose and then closed. Owners also understand Anteks to be an associated company with Charterers [41]. During the sampling procedures, it is understood that Mr Bessonov could smell the presence of mould in No.4 hold.

---

[1]    On arrival at the river port, the vessel went alongside and loaded one parcel of cargo in No.4 hold. The hold was topped off and then the shifted back to an anchoring position in the river where she dropped both anchors as is customary in the river. When the vessel was called upon to shift to her next terminal, the electric motor of the starboard windlass malfunctioned and was damaged. It took from 0300hrs on 21st October 2007 until 0500hrs on 27th October 2007 for the problem to be rectified – by sending the motor to Buenos Aires to have the motor rewound.

C6.     The cargo was cleared by Customs at 0920hrs on 2nd December 2007. During that morning, Mr Bessonov having reported the smell from No.4 hold to the consignees, an associated company, a surveyor from Marinex ILCS, appointed by cargo underwriters, attended on board and apprised the Master of the suspicion that the cargo in No.4 hold was damaged by wetting. Accordingly, the Master informed Owners whereupon surveyors were appointed by Falcon P&I Ltd., the local representatives for The American Club, the vessel's P&I Club. The surveyors appointed by Falcon on behalf of the vessel were Wakefield Inspection Services (Russia) Ltd ("Wakefield"). Mr. Zacharov of Wakefield attended the vessel later on 2nd December 2007. He noted the smell of mould but found, in conjunction with the other surveyors, that the surface of the cargo in No. 4 hold was not significantly different from the cargo in the other holds. The top surface of the cargo in No.4 hold was dry.

C7.     Despite that fact that no smell was noted to come from the other holds, discharge did not commence until 0225hrs on 3rd December 2007. Later that day, a survey of the cargo in No.4 hold was conducted jointly by all concerned parties (including Anteks as "forwarder") together with a visual inspection of the cargo in all of the other six holds. SGS were also present acting for consignees. The cargo in Holds 1, 2, 3, 5, 6 and 7 was found to be in good condition. However, due to the fact that it was suspected that the cargo in No.4 hold had been wetted, the dry top surface of the cargo in the hold was removed by a shore crane and a layer of the cargo in the central part of the hold was found to be wetted, mouldy, of a brown colour and with a higher temperature than the remaining undamaged cargo. Some photographs were taken [42-47]. It was concluded from this condition that the wetting had taken place a considerable time before the vessel's arrival at St. Petersburg[2].

C8.     The representative of the "Grain Quality Estimation Centre", a Russian federal state institution, took samples using the GAFTA 124 system of sampling and sent them for analysis to the Russian Federation Ministry of Agricultural. Samples taken by Wakefield, together with all of the other representative surveyors, were in accordance with the GAFTA 124 system of sampling.

C9.     By 7th December 2007, analyses were specially prepared by the Russian federal state Centre for tests and certification; which confirmed that the damaged cargo had not been wetted by sea water - as chlorine traces were negligible [48-51].

C10.    On 14th December 2007, by Resolution No.14 [52-53], it was declared by the Russian authorities that a quantity of the soyabean meal cargo shipped to Euroweg Zerno "through" Anteks in No.4 hold was damaged and did not meet the required specification (later found on outturn to be 150.12 metric tons). The damaged cargo was found to have a "moisture and volatile matter" content of 32.6%. Accordingly, the consignees were directed by the Russian state authorities that it was not permitted to import the damaged cargo into Russia for the purposes of livestock feed and they were ordered to send it away separately for destruction.

C11.    During the morning of 15th December 2007, some trucks (for the specific purpose of transporting away the damaged cargo in No.4 hold for destruction) arrived at the berth. The vessel and stevedores were ready to remove the damaged cargo from No. 4 hold at which point a surveyor from SGS came to the vessel, allegedly acting for the Charterers, to supervise the unloading of the damaged cargo and to take further samples. However, he had no written authorisation so he was

---

[2]     The location of the wetting had all the hallmarks of pre-shipment excessive moisture/wetting especially after analyses showed little if any traces of chlorides in the damaged cargo (see paragraphs C9 and C13). Hold No.4 was also loaded at a different location to the other cargo.

prevented from boarding. As a result, the Charterers, in breach of their contractual obligation not to unnecessarily delay the discharging operations, refused to permit discharge of the damaged cargo from No.4 hold and the trucks left the berth empty.

C12.   During the afternoon of 15th December 2007, wet cargo was also found in No.2 hold so discharging was halted from that hold whilst state officials took samples of the damaged cargo found in the hold.

C13.   On 19th December 2007, by Resolution No.15 [54-55], it was declared by the Russian authorities that a quantity of the soyabean meal cargo shipped to Euroweg Zerno "through" Anteks in No.2 hold was also damaged and did not meet the required specification (later found on outturn to be 64.12 metric tons). It was found to have a "moisture and volatile matter" content of 26.3%. Accordingly, the consignees were directed that it was not permitted to import that damaged cargo into Russia for the purposes of livestock feed and they were ordered to send it away separately for destruction. Similar analyses were performed (on samples taken from the damaged cargo in No.2 hold) as mentioned in paragraph C9 above and returned results of even smaller traces of chlorides [56-59].

C14.   However, by 2220hrs on 18th December 2007, the Charterers finally started to fulfil their obligation to remove the damaged cargo from the vessel. In all, four trucks came to the vessel and, by 0300hrs on 19th December 2007, all of the visually damaged cargo was discharged from Nos. 2 and 4 holds. Later on 19th December 2007, samples were taken of cargo which did not appear damaged in both No.2 hold and No.4 hold and it was directed that some further cargo should be considered unfit for import as livestock feed. The further removal of damaged cargo from No.2 hold was completed at 2100hrs on 20th December 2007 and the total weights of damaged cargo from that hold provided to the trucks for destruction was calculated to be 64.12.metric tons. Out of No.4 hold, the removal of damaged cargo was finally completed at 0330hrs on 24th December 2007 whereupon it was calculated that the total amount from that hold  was 150.12 metric tons.

C15.   On 20th December 2007, Owners agreed a fixture recap with Britannia Bulkers A/S for a trip charter [60-71] to run upon completion of the charter mentioned in paragraph B1 above with Charterers. It was agreed that delivery to Britannia would occur at the same time as redelivery from Charterers, namely on dropping the last outward sea pilot at St. Petersburg. Charterers were at that time giving notices for redelivery on 24th December 2007. Britannia had agreed to give Owners a period of time immediately after delivery to clean the holds. They had also agreed that up to 18 hours of such cleaning operations would be on-hire on an unconditional basis. Owners were obliged to deliver the vessel to Britannia at the anchorage at St. Petersburg within 31st December 2007, the expiry date of the agreed laycan period.

C16.   Despite claims on 19th December 2007 by Messrs Barlow Lyde & Gilbert ("BLG"), the Charterers' and Consignees' London solicitors, on behalf of consignees, that upwards of 1,000 metric tons of cargo was damaged, and requests by them on 24th December 2007 for security in excess of US$1.3million, The American Club eventually persuaded them that their requests were excessive and posted security in the principal amount of US$322,271 plus interest and costs [72-73] on 24th December 2007.

C17.   When discharge of cargo from No.6 hold was completed at 0613hrs on 19th December 2007, the crew were directed to clean the hold[3] and to stop cleaning and close the hatch covers if it

---

3         Which activity requires the hatch covers to be open.

was snowing. It was snowing each day and during one of the closing operations on 24th December 2007, the hydraulic cylinder which provides power to lift up the No.6 aft hatch covers was incorrectly operated and damage was done to the structural support steelwork surrounding the cylinder which is welded to the main deck and on which the starboard hinge is mounted (please see Section D below).

C18.    The vessel's 2nd Officer (Mr Felipe Diloy) was repatriated on 22nd December 2007 at 1700hrs due to illness. Anteks, the Charterers' agents (and associated company), dealt with all of the formalities for the repatriation and transported Mr. Diloy to St. Petersburg airport.

C19.    On 25th December 2007, a local Bureau Veritas[4] ("BV") surveyor (Mr. Evgeny Zavyalov) attended on board the vessel at Owners' request (of the day before) to survey all of the hatch cover hydraulic cylinders on deck for leakages of hydraulic oil in order for consideration to be given for an extension of a recommendation relating to them (please see Section D below).

C20.    The BV surveyor's attention was drawn to the damaged structural support/base of the hydraulic cylinder. The BV surveyor carried out his survey of the other hydraulic cylinders for leakages and agreed that an extension could be given as requested by Owners. He was also fully satisfied that the damaged support structure could be adequately repaired by the fitters on board (a hotwork certificate had been given to the vessel when the vessel was in St Petersburg four months earlier and he stated that the same would apply on this occasion for the work involved). The surveyor appreciated that the vessel needed to shift to the anchorage as soon as discharge was completed for the redelivery of the vessel from the current charterer and delivery to the next, whereafter the vessel would return into the port to load her next cargo. The repairs to the steel support structure of the cylinder were discussed with the BV surveyor and he fully accepted that the repairs could be effected on board at the anchorage by the ship's two fitters and he could then reinspect on the vessel's return inside the port for loading. He concluded his attendance by promising to return on board with the extension confirmation (please see Section D below).

C21.    Cargo discharge operations were finally completed on 28th December 2007 at 1840hrs and, but for bad weather alleged by Anteks at the last moment during the evening of 28th December 2007, Anteks had already arranged for the pilot to take the vessel down river to the anchorage - where the charter redelivery would take place as the pilot was dropped off **[74]**. Charterers had already arranged for a surveyor to attend on board for the off-hire survey and the survey was completed during the evening **[75]**.

C22.    Meanwhile, in the early afternoon of 28th December 2008, BLG had written to The American Club on behalf of both the consignees and the Charterers **[76]**. BLG started by insisting on consignees being able to carry out ultrasound testing of Nos. 2 and 4 holds. Owners were averse to such testing. Owners feared that this would delay the vessel. In addition, Owners could not understand why such a testing was relevant given that the analyses carried out by Russian federal laboratories had confirmed that seawater had not been the wetting agent of the damaged cargo in those two holds and they assumed that the consignees had obtained similar analyses. BLG also demonstrated that the Charterers already knew clearly that Owners were intending to load their next cargo out of St. Petersburg and, curiously, as if Charterers were perhaps not willing for some reason to proceed to redeliver the vessel with despatch in the normal way, reserved their "rights" as to whether Owners were permitted to so load another cargo. Owners' impression was clear – that for

---

[4]      The vessel's classification society.

reasons best known to Charterers, but in no way connected with the normal and proper performance of the charter, Charterers wished to delay the vessel within the port of St. Petersburg.

C23.    In separate communications with The American Club on the phone during the afternoon of 28th December 2007, BLG continually pressed for the ultrasonic testing and threatened to apply to the High Court in London for an order compelling Owners to permit the testing.

C24.    In parallel with their London solicitors, Charterers/consignees were taking their own steps to pressure Owners into agreeing to ultrasonic testing – albeit in a dissimilar fashion. As the attached note [77] from Captain Costas Bourdis of Chian Spirit Maritime[5] sets out, Mr Pavel Priymak of Congentra rang him whilst he was taking a short break from the office during the festive season. When Captain Bourdis would not readily agree to ultrasonic testing, he made it very plain with clear and menacing threats that he would create problems for the vessel and Owners at St. Petersburg.

C25.    The effect of Mr. Priymak's threats on behalf of Charterers and the consignees, in retrospect, are clear to see – although, at the time, Owners could not have realised the extent of the measures that the Charterers would adopt in colluding with others to injure Owners. Those measures began to take effect during the late evening of 28th December 2007.

C26.    During the evening of 28th December 2007, the BV surveyor returned on board. The Master was expecting the extension papers for the recommendation regarding the leaking hydraulic cylinders however the BV surveyor changed his previous position and said that he would provide the confirmation of the extension when the repairs to the damaged steelwork support for the No.6 aft starboard hydraulic cylinder and hatch covers hinge had been completed and inspected by him on the vessel's return inside the port. In addition, the BV surveyor explained that he would like to hold on to the Class Certificate and the Cargo Ship Safety Construction Certificate so that he could cover himself that he had taken steps to ensure that the vessel did not sail away without the repairs having been completed to his satisfaction. He explained that this was not a formality as there was no issue with the vessel's Class status. His actions were explained to the Master as being to make him feel comfortable about the vessel's shifting to the anchorage. He wrote in manuscript a "notification" [78]. In all the circumstances, the Master, with Owners' permission, agreed with the BV surveyor's request to temporarily take control of the two certificates.

C27.    Very late at night on 28th December 2007, after the BV surveyor had left the vessel, BLG's instructions from the Charterers and consignees appeared to change dramatically in an e-mail to the American Club [79-80]. In that message, BLG stated that their consignee clients did not desire to delay the vessel and so would not be applying for an order to the High Court. They stated that their Charterer clients were ready to redeliver the vessel however[6] they had learned that the vessel could not sail because allegedly:

     (a)     a hatchcover of No.6 hold could not be closed[7]; and

     (b)     the vessel's complement of crew was below the minimum to proceed to sea[8].

---

[5]     The vessel's managers.

[6]     Apparently forgetting that they knew that the vessel would be loading her next cargo, potash, from St. Petersburg.

[7]     This was not strictly correct. The aft hatch cover of No.6 hold could not be closed by the ship's own hydraulic power means (see Section D below). It could be closed by other means such as by shore/portable crane power and this had already been arranged by the BV surveyor with a shore team from Nordweg for the following morning using a shore crane.

C28.  Owners' noted the contents of the above message from BLG during the following morning[9] and realised that, contrary to the normal approach of a timecharterer whose trip had been completed with the end of discharge operations, namely to get the vessel redelivered as soon as possible, the Charterers appeared intent that the vessel be delayed at St Petersburg on any pretext, pursuant to Mr Priymak's threats. They showed a preference to get involved in claiming that the vessel was off-hire rather than to have the vessel proceed down river for five hours to the charter redelivery point. If, as the Charterers believed, the vessel was not going to be able to sail from the port, it seemed irreconcilable that the consignees should be stating that they had decided not to proceed with an application to the High Court as it might delay the vessel. It is submitted that the consignees and the Charterers had a hidden agenda.

C29.  On the morning of 29th December 2007, the vessel was expecting to be able to sail down the river to the anchorage and to be redelivered from the Charterers on dropping the pilot. Nordweg attended on board just after 0700hrs to arrange for the proper closure of No.6 aft hatch covers using a shore crane. All of the hatch covers were therefore closed in preparation for the shifting. However, to the surprise of the crew, at 1022hrs LT, officers of the Port State Control came on board [81-82]. They did not give any specific reason for their attendance on board, despite the fact that their timing was most unusual[10], but proceeded to thoroughly inspect the vessel (see Section E below). Whilst the said port authority inspectors were still not even halfway through their inspection, the Master received a message from Charterers at 1159hrs LT [83] stating that the port authorities were prohibiting the vessel from leaving the port and that she would have to move to another berth. Charterers declared that the vessel was off-hire. At that time, the vessel had not been notified of any such prohibition. It is submitted that the timing of this message demonstrates that they had earlier than possible knowledge of the outcome of the Port State Control inspection.

C30.  At 1028hrs on 29/12, (six minutes after the port authority inspectors arrived at the vessel) three technicians from Nordweg came on board and, within 15 minutes, they had arranged the proper closure of No.6 aft hatch covers by liaising with a shore crane operator. They then left the vessel at 1043hrs.

C31.  At 1530hrs LT on 29th December 2007[11], the Port State Control officers provided a notice/order for detention of the vessel by the St. Petersburg port authority [84]. This notification was the first and only notice received by the vessel from the St. Petersburg port authorities that the vessel was to be detained (please see Section E below for Owners' detailed submissions concerning the inspection by the port authorities). It occurred to Owners and the Master that it was strange and certainly irregular that Charterers would know about the ultimate decision of the port authorities well in advance of their inspection being completed and the issuance of the detention order. It is submitted that the Charterers directed the Port State Control to detain the vessel.

C32.  The Port State Control officers left the vessel at 1553hrs on 29th December 2007 [81]. Mr Romeo Mendizabal, the new 2nd Officer, arrived on board at 1559hrs on 29th December 2007 [81-82]. Anteks, the Charterers' agents and associated company, were well aware of the arrival of Mr

---

[8]      This was also incorrect as the vessel had no intention of proceeding to sea. In addition, all concerned, especially Anteks – Charterers' agents, knew that the replacement for the incapacitated 2nd Officer (repatriated suddenly due to illness) was arriving the following lunchtime (see paragraphs C32, C33 and F1 below).

[9]      29th December 2007.

[10]     Just as the vessel was ready to sail to the anchorage.

[11]     3 hours and 31 minutes after the Master had received the message from Congentra [83] notifying him that the port authorities were prohibiting the vessel from sailing from St. Petersburg

Mendizabal. They had been notified in advance [85-86] that he was arriving at 1325hrs on 29th December 2007 at St. Petersburg airport. The flight arrived on time. Nevertheless, Anteks allegedly experienced delays in getting him to the vessel until 1559hrs, six minutes after the Port State Control officers had left the vessel, the latter having raised as a ground for detention of the vessel the fact that the vessel did not have a 2nd Officer. They appeared unable to take into account the fact that the 2nd Officer had already landed at the airport and was on his way to the vessel accompanied by Anteks, the vessel's agents.

C33.    The previous day, Anteks had booked a pilot to take the vessel down river to the anchorage in full knowledge of the fact that the vessel did not have a 2nd Officer on board. They had informed the Master that this was acceptable for the shifting to the anchorage. If they had stated that it was a problem, Owners would have obtained a permission from the flag state administration for the five hour shifting to the anchorage. The passage to the anchorage was too short to require designated officers for watchkeeping purposes and the granting of such permission by the flag state would have been a formality.

C34.    As soon as the port authority inspectors had left the vessel, the Master notified the BV inspector of the detention. The BV surveyor responded that, contrary to the understanding of 25th December 2007, he had now altered his position and decided that the repairs to the damaged steelwork support would have to be done by Class certified welders and not by the ship's fitters. Despite the Master's protests, the BV surveyor insisted on this course of action. Having received the direction from the BV surveyor, at 1750hrs on 29th December 2007 a pilot came on board to shift the vessel to a lay-up berth where it was designated by the port authorities that repairs could be carried out on board. This operation was completed by 2020hrs.

C35.    By the evening of 29th December 2007, BLG notified Owners that Charterers considered the vessel off hire as a result of the Port State Control detention.

C36.    Due to the holiday season, the shore workshops were closed and so Owners were prevented from carrying out the repairs required to the damaged steelwork support and shifting to the anchorage[12] in advance of the expiry of the laycan period under the charter with Britannia. From that point in time, with the serious downward correction in the freight market at the time, it was likely that Britannia would cancel the charter of the vessel.

C37.    On 31st December 2007, Nordweg were given instructions to repair the steelwork support although they made it clear that work could not start in any event before 3rd January 2008.

C38.    Owners had been chasing Charterers for outstanding hire and on 2nd January 2008 at 1700hrs GMT, Owners gave Charterers 12 hours notice that the vessel would be withdrawn [87-89]. On the very same 2nd January 2008, and prior to the expiry of the 12 hours notice provided by Owners, Charterers terminated the charter for alleged repudiatory breach by Owners. They based the termination on an allegation that the vessel was no longer in Class[13]. As the vessel's Class status was in no way adversely affected during her stay at St. Petersburg, Charterers' conduct in terminating the charter was repudiatory. They also demonstrated an intention to again apply to the High Court in London for an order compelling Owners to permit ultrasonic testing by asking

---

[12]    Hold cleaning/disposal of cargo residues was not permitted inside the port so it was essential to shift to the anchorage in order to prepare the vessel's deliverable condition for the Britannia charter.
[13]    This was incorrect. See paragraph D1 below.

Owners to appoint solicitors in London to accept service of proceedings in that regard[14]. Owners continued to refuse to accede to these requests as the wetting had nothing whatsoever to do with the hatch cover watertightness to which such tests were related. The analyses of the damaged cargo evidenced that the wetting was not of seawater origin.

C39    On 4th January 2008, BLG stated that it was Charterers' position that Owners were not entitled to withdraw the vessel for non-payment of hire and that they stood by their termination of the charter for the reasons given on 2nd January 2008. It was also alleged that the Port State Contol had "identified serious problems with the hatchcovers, coamings and compression bars of all holds". It was additionally alleged that the crew were repairing the hatchcovers. Pursuant to the remarks of the Port State Control officers, and as finally inspected by the BV surveyor, the crew had been (a) removing loose rust and (b) painting the exposed areas of the hatch openings.

C40.    For details of how the deficiencies were rectified, see Section E below.

C41.    On instructions from the Owners' managers, this firm wrote to BLG on 8th January 2008 [90-92]. At that time, it was understood by the managers[15] that the requests of BV surveyor amounted to "circumstances in which Class was temporarily suspended pending repairs" to the structural support steelwork surrounding the starboard hydraulic cylinder for No.6 aft hatch covers. On subsequent investigation, Owners understand the true situation to have been as set out in paragraph C26 above. Nevertheless, BLG responded on 10th January 2008 [93] continuing to incorrectly link the damage to the steelwork in question with the watertight condition of the hatch covers and to incorrectly state that the vessel was no longer in Class.

C42.    Britannia gave Owners notice of cancellation of the charter dated 20th December 2007 on 10th January 2008 [94].

C43.    The Port State Control reinspected the vessel on 11th January 2008 and released her from detention [95].

**D.    The vessel's Classification position.**

D1.    Since the vessel was purchased by Owners in February 2003, she has been classed with BV. Despite allegations to the contrary by Charterers/consignees, the vessel has been continually in class during her stay in St. Petersburg in December 2007 and January 2008 - as the attached Class Maintained Certificate confirms [96-97].

D2.    As the attached Class Visa page No.3 [98] demonstrates, there was a Class recommendation with a limit date of 28th December 2007 for the hydraulic cylinders for the opening of the hatch covers to be repaired and tested in relation to observed leakages of hydraulic fuel - which was imposed by BV on 28th September 2007 at Maceio in Brazil. The main concern was a possible relatively minor pollution issue to which the crew were directed to pay particular attention. The leaking condition of the cylinders did not affect the watertight integrity of the hatch covers.

D3.    Owners had decided upon a rectification programme in which a spare hydraulic cylinder would be used to gradually improve the condition of the cylinders overall. The spare would be overhauled at a workshop ashore and then would be sent to the ship and would be used to replace a

---

[14]    Despite the fact that Owners provided BLG with the details of solicitors in London to accept service of such proceedings, to Owners' knowledge the sapplication was never made or was made ex parte and failed.

[15]    This was due to the wording of the BV surveyor's notification dated 28th December 2007 [78].

leaking cylinder – which would then be removed from the vessel for overhaul so as to replace the next cylinder and so on. There are four smaller holds (Nos. 1, 3, 5 and 7) and three larger holds (Nos. 2, 4 and 6). The smaller holds have two such cylinders each (one forward and one aft – located amidships). The larger holds have four cylinders each, one at each corner by the hinges. There are a total of 20 cylinders. The scheme had reduced the number of leaking cylinders to four by the time the vessel had reached St. Petersburg in December 2007, having just received the overhauled spare on passing through Skagen/Danish Straits - which had been despatched there from Greece after being overhauled. Once fitted, that would leave three further cylinders to overhaul before full reconditioning at her next drydocking - scheduled for 6th April 2008.

D4.    Given the work that was on-going in relation to the cylinders, Owners were expecting that BV would grant a three month extension to complete the scheme and achieve a deletion of the recommendation. Correspondence with BV took place to that end [99-102] and on 25th December 2007, a local BV surveyor attended on board, surveyed the cylinders and then agreed to provide the extension. In addition, the BV surveyor inspected damage to the steel support structure for the No.6 aft hydraulic cylinder which had been damaged the previous day. Discharge was completed in No.6 hold on 19th December 2007 and the crew were directed to start preliminary cleaning of the hold whenever the weather conditions permitted the opening of its hatch covers. They would close the hatch covers when it was snowing. Opening and closing of the hatch covers of Hold No.6 took place on a number of occasions during the next few days. In the extremely low prevailing temperatures, it was essential to preheat the hydraulic oil in the cylinders. It is most likely, from the damage that occurred, that the crew members failed to adequately pre-heat the oil and when the pressure was applied to the oil in the aft starboard cylinder for No.6 hold, the extreme pressure generated in a hydraulic system, coupled with the very cold oil, caused an abnormal surge/movement in the cylinder which in turn caused damage to the steel support as shown in the attached photograph [103]. Another photograph shows the steel support in its repaired condition [104].

D5.    It was explained to the BV surveyor that the vessel wished to shift to the anchorage immediately after completion of discharge so that the redelivery of the vessel from the current charterer and delivery to another (which would involve returning into the port to load a cargo of potash) could be effected as soon as possible. He accepted without any hesitation that the damaged steelwork of the support structure holding the starboard hinge of No.6 aft hatch covers could be replaced by the fitters within the crew on board. The necessary repairs were discussed with the BV surveyor and he fully accepted that the repairs could be completed on board at the anchorage and he could then inspect on the vessel's return inside the port for loading. Having surveyed the damage with the No.6 aft hatch covers in the open condition, the BV surveyor suggested that the aft hatch covers be kept closed and accordingly they were closed by the use of shore crane power during the morning of 29th December 2007. The BV surveyor also considered and agreed with the alternative fall-back scheme that if any problems occurred in the repair of the damaged structural support, the vessel could still return inside the port for loading leaving the aft hatch covers remaining closed and with loading through the forward half of the hatch opening. He therefore concluded by indicating that he would return before the vessel shifted down river to the anchorage with the paperwork confirming an extension of the deadline in relation to the remaining leaking hydraulic cylinders

D6.    During the evening of 28th December 2007, the BV surveyor returned on board. He had promised to return to provide the vessel with the confirmation papers for the extension that he had agreed for the recommendation concerning the remaining hydraulic cylinders that were leaking. However, he immediately made a request to the Master that had not been made previously. He explained that, whilst he understood that the vessel was to return into the port after going to the

anchorage, he would prefer to hold on to the Class Certificate and the Cargo Ship Safety Construction Certificate so that he could cover himself that he had taken steps to ensure that the vessel did not sail away. He was asked whether this meant that the vessel was out of class – which, as explained to him, would be an incredible result of the inconsequential damage to the hydraulic cylinder structural base[16]. He confirmed that there was no issue with the vessel's Class status (as is confirmed by the Class Maintained Certificate). Accordingly, Owners had no objection to assisting the BV surveyor to feel confortable about the vessel's movements. At no time during the evening of 28th December 2007 did the BV surveyor suggest that the vessel would not be permitted to shift down river to the anchorage to carry out the repairs and to clean her holds before returning to load again under a new charter. In fact, it was because he was aware that the vessel was waiting to shift at the earliest possible moment that his notification [78] stated that the repairs could not be done prior to the vessel's departure[17]. In all the circumstances, the Master, with Owners' permission, acceded to the BV surveyor's request to temporarily hold on to the two certificates. They were not aware of Charterers' hidden agenda that involved the BV surveyor and the Port State Control officers (see paragraphs C29-30 above).

D7.    Accordingly, the circumstances did not amount to a withdrawal or suspension of valid BV classification status. The BV surveyor accepted the reasons why the vessel had to shift to the anchorage immediately for contractual purposes and then to return into port to load a potash cargo and that the vessel had Romanian fitters on board capable of carrying out the repair at the anchorage. He led the Master to believe that he simply wished to have some assurance of the fact that the vessel would actually return into the port by taking custody of two of the vessel's class certificates as set out in his handwritten note [78].

D8.    Irrespective of the BV surveyor's request to hold on to the two certificates on a temporary basis whilst the vessel was at the anchorage, under the arrangements originally discussed and agreed with the BV surveyor on 25th December 2007, the two fitters on board the vessel could have completed the necessary repairs to the damaged steelwork support of the hydraulic cylinder and hatch covers hinge within about 16 hours; namely, prior to any further requirement to open the No.6 aft hatch covers. That would have been at the very earliest when the vessel re-entered St. Petersburg to open No.6 hold in order to load the potash cargo under the next charter with Britannia. In fact, it was always open to Owners to leave No.6 aft hatch covers closed and to load through the forward half of the hatch. However, in retrospect, the request for personal retention of the two certificates by the BV surveyor provided the excuse for the sudden and irregular attendance of the Port State Control officers for the purpose of detaining the vessel for the alleged lack of class certificates. However, the BV surveyor had no official requirement for the personal custody of the two certificates, especially if the vessel was remaining in the port at a layby berth to effect the repairs.

D9.    The Master notified the BV surveyor of the port authority detention at about 1600hrs on 29th December 2007. Immediately, the BV surveyor informed the Master that he had decided, entirely contrary to his previous position, that the repairs to the damaged steelwork support would have to be done by Class certified welders. Despite the Master's protests, the BV surveyor insisted on this course of action. This insistence inevitably meant that Owners would need to employ a shore team - as the ships' fitters were not so certified. However, the fact that the fitters were not so certified had not posed a problem for the BV surveyor on 25th December 2007 when fully discussed; nor indeed

---

[16]    As the hatch cover could still be lowered by alternative means of power and No.6 hold sealed in the normal way without adversely affecting the integrity of the hold. The recommendation concerning the hydraulic cylinders were not associated with the integrity of the holds. It was related to a matter of possible minor pollution on the main deck caused by leaking hydraulic oil.
[17]    For the anchorage.

during the evening of 28th December 2007 when it was only the fact that the fitters would do the work at the anchorage (rather than inside the port) that provided the BV surveyor with the pretext to ask to hold on to the two class certificates. It is submitted that the repairs required to the damaged steelwork support were not particularly demanding or difficult work and he would have the opportunity to inspect the work in any event on the vessel's return to load. In addition, the repairs were no more demanding nor more difficult than the hotwork carried out by the fitters on the vessel's previous visit to St. Petersburg four months previously when there had been no insistence on the use of certified welders.

D10.    The change in attitude of the BV surveyor on 29th December 2007[18] differed starkly from the attitude displayed during the vessel's previous visit to St. Petersburg four months earlier. On that earlier occasion, the BV surveyor had no problem with the fitters doing hotwork of a similar complexity to that required in December 2007. On this occasion, the sudden insistence on Class certified welders doing the work meant delays to the vessel because the BV surveyor was fully aware that:

     (a)    the repair shops were all closed or working very slowly because of the festive season[19];

     (b)    the vessel had to get to the anchorage to clean her holds so as to be delivered under her next charter. The prohibition on the fitters from doing the necessary hotwork meant that it would not be until after the start of January 2008 that the vessel could have any chance of getting to the anchorage which meant it was highly likely that the vessel's next charter would be cancelled.

### E.    The intervention of Port State Control on 29th December 2007.

E1.    The last ten years of the history of Port State Control inspections of the vessel in the Paris MOU and US Coastguard regimes are attached [105-106]. Also attached are the PSC records provided to the Tribunal by BLG attached to their fax of 15th February 2008 [107-115]. Owners took over the vessel from her previous owners between the PSC inspections of May 2002 (Tarragona) and June 2002 (Elefsis). As the vessel has been trading mostly across the Atlantic to the Continent during her current ownership, save for a period when she was under charter to Micron Shipping (H. Dantas), there were only three port state inspections outside the Paris MOU and US Coastguard regimes, as follows:

| Date | Port | Detained | Deficiencies |
|---|---|---|---|
| 06/2005 | Bourgas | No | 6 |
| 03/2006 | P.Queqjen, Arg. | No | 0 |
| 09.2006 | B. Blanca, Arg | No | 5 |

E2.    Prior to what took place at St. Petersburg on 29th December 2007, during Owners' 5½ year stewardship the vessel had been detained on two occasions:

    -    24.7.2003 at Bilbao; and
    -    01.4.2007 at Nantes.

---

[18]    Which in fact commenced during the evening of 28th December 2007 when the BV surveyor suggested that he remove the two Class certificates from the vessel - for no official reason.
[19]    In August 2007, when the fitters were permitted to do the hotwork repairs, the actual need for such permission was much less as the workshops ashore were all working normally.

E3.    The vessel was the subject of an inspection by the Port State Control at St. Petersburg as recently as 7th August 2007. On that occasion, the vessel had arrived at the port on 31st July 2007 and berthed on 2nd August 2007. The Port State Control officers attended on board on 7th August 2007 for their inspection. There were no items warranting detention. The twenty deficiencies noted were able to be rectified by the crew during the 17 days which remained before her cargo operations were completed and she sailed on 24th August 2007.

E4.    It is submitted that what took place in St Petersburg in August 2007, in so far as the Port State Control were concerned, followed normal and expected procedure. Port State Control officers generally plan to attend a vessel for inspection as early as possible in the vessel's attendance at a port. If, as is usually the case, deficiencies are found on a vessel, they can be rectified prior to the vessel's scheduled departure avoiding delay to the vessel and possible port congestion. Attached is a list of the dates when inspections were conducted by Port State Control officers since June 2002 and the relationship of that date with the period in which the vessel's cargo operations were being conducted [116]. The list of dates shown clearly demonstrate that if Port State Control are intending in the normal observation of the Paris MOU and other regimes to inspect the vessel, they will do so early in the vessel's stay at their port. It is submitted therefore that there must be an exceptional reason for the Port State Control to attend on board after the completion of cargo operations and whilst the vessel is awaiting a break in reported bad weather[20], especially where it is about to sail out to the anchorage before returning in again to load another cargo. An intervention in those particular circumstances, which would delay the shifting to the anchorage, especially where they will have the opportunity to inspect her when she re-enters to load, must be the result of extremely compelling and urgent circumstances.

E5.    Owners do not say that the port authorities were not entitled to inspect the vessel under the provisions of the Paris MOU on 29th December 2007. What they say is that:

(a)    the facts demonstrate that no such inspection was intended nor reasonably contemplated; and

(b)    the facts show that, contrary to the explanations provided by Charterers as to why the port authorities suddenly decided to inspect the vessel – which all fall away on proper analysis, the inspection and the inspectors' irregular directions thereafter only took place because the Charterers persuaded the port authorities, with the complicity of the BV surveyor, to delay the vessel from being able to sail down river to the anchorage so that redelivery could take place – which eventually led to the vessel being late for her next charter with Britannia.

E6.    The timing of the inspection by the port authorities on 29th December 2007 was most unusual. Attending on board on that day and in those circumstances could only be for a specific and so serious a purpose that the inspection could not await the vessel's return into the port a few days later for further cargo operations.

E7.    The attitude of the Port State Control officers on 29th December 2007 and thereafter differed starkly from the inspection and its follow-up during the vessel's previous visit to St. Petersburg four months earlier. If they had inspected the vessel early on in her discharge operations, or even waited until the start of her loading operations when the vessel would have had 3-4 days of time to deal with the deficiencies, there would have been plenty of time to satisfy the inspectors - and the shore

---

[20]    As reported by Anteks [117], the Charterers' agents at St. Petersburg (and associated company).

workshops would have resumed their normal trading after the holidays. The timing was well planned to cause maximum injury to Owners.

E8.    The Charterers have made statements that the Port State Control were obliged to inspect the vessel – and thereafter detain her – because of two reasons. Those two reasons, on any analysis were spuriously contrived and actually non-existent. However, those reasons in themselves demonstrate a conspiracy of wrongdoing between the Port State Control surveyor, the BV surveyor and Anteks, the Charterers' agents and associated company, that was directed by the Charterers pursuant to the threats made by Mr. Pavel Priymak during the late afternoon of 28th December 2008 because Owners would not agree to ultrasonic testing of the cargo holds.

E9.    The deficiencies found by the port authorities on 29th December 2007 are set out in the attached report **[118-125]**.

E10.    The Charterers have made statements that the inspection was decided upon because she did not have all of her Class certificates and because of a missing 2nd Officer. As is set out in Section D above, the two certificates in question were not removed because of a Class status problem. They were removed by the BV surveyor for his own personal reasons and which had no connection with a specific Class rule or because the vessel had lost her classification status. When the Port State Control officers were asked to verify the situation with the BV surveyor, they refused to do so. As for the "missing" 2nd Officer, please see paragraphs C32 and C33 above. It is most surprising that such a matter was not first checked with Anteks, the agents, who could have confirmed that the replacement 2nd Officer was due to arrive at the airport at about noon that day. The reluctance of the Port State Control and Anteks to properly clarify the situation and their insistence instead to intensify it into a contrived excuse to inspect the vessel at that particular time is most unusual and evidences the conspiracy to delay the vessel on any pretext.

E11.    Of the other deficiencies found, Owners' submissions are as follows:

   (a)    Identification of visitors.

   The officers criticised the identification of visitors on the daily log sheet **[81]**. It is understood that they objected to Russian visitors names being entered in cyrillic manuscript. This was hardly a weighty matter requiring an urgent inspection of the vessel – especially as the reason why it was done is that the visitors' identification/business cards were in that script and therefore the crewman on duty asked them to write their names on the log. The deficiency was rectified immediately by the Master directing the crewman to refuse access to any visitor who could not produce identification in the internationally used roman script.

   (b)    Unsafe lower gangway.

   The officers criticised the fact that the lower platform was unsafe as it hang from its ropes. The problem was the rectified immediately by changing the angle of the gangway and resting it on the pier on its runners.

   (c)    Lifejacket lights not properly located.

   This criticism arose because the officers considered that the lights on the lifejackets were not in the proper position. The problem was rectified quickly by the BV surveyor being directed

to the fact that there are no specific rules as to the exact location of the lights on lifejackets. He agreed.

(d)     The insulation for the diesel and lube oil purifiers and the main engine and generators were wetted with oil.

It was extreme zeal which was the basis of this criticism by the officers. Insulation generally becomes stained with oil in the engine room spaces. Class had no criticisms of the functioning of these units. However, the engineers performed some extra cleaning but without any significant change to the appearance of the insulation and the BV surveyor accepted the outcome.

(e)     Dirty engine room.

Owners explained that the criticism was related to a specific area in the engine room which was about to be cleaned. The cleanliness of the engine room was in general satisfactory. However, the engineers had collected their garbage during their stay at St. Petersburg in a specific location and it had just been removed. The space where it had been collected was about to be cleaned and this was done immediately. There were some minor leakages from machinery in the engine room and they were rectified within a few hours.

(f)     Light bulbs.

The officers found some light bulbs that were not working. They were replaced immediately from spares on board.

(g)     Dirty filters in the galley ventilation.

Despite the filters being checked on 23rd December 2007 by port captain Drymonis and found clean, the officers considered them dirty during their inspection six days later. The increased cooking over Christmas may have caused this. The cook should have checked the filters after the Christmas festivities. The filters were cleaned immediately.

(h)     Unsecured spare parts.

The spares were found by the officers in their designated location however they noticed that some securing bolts were missing. The crew found or fabricated the necessary bolts and the deficiency was rectified within 3-4 hours.

(i)     Hole in exhaust pipe in engine room.

The officers noticed this very small hole because of the fact that work to repair it was in progress by the engineers and staging had been erected for the purposes. The officers nevertheless insisted on listing it as a deficiency. The repairs would take no more than two days and could have been done by the engineers at the anchorage whilst hold cleaning was in progress.

(j)     Wooden grating in the provisions store.

The officers found the floor grating damaged. This was due to a lack of proper reporting by the crew members who regularly enter the provisons store. The repairs could have taken less than a day but, in the time inevitably available following the detention, Owners chose to entirely replace the grating with new wood.

(k)    Steering gear room – port and starboard buttons not marked.

The officers insisted that the port and starboard buttons should be marked as to their intended direction despite the fact that their positioning makes it perfectly clear. Markings were immediately provided.

(l)    Engine room fire extinguisher nozzle missing. Fire boxes damaged and holed.

These criticisms were rectified within one hour. The safety officer had failed in his duties to note these matters and instructions were given for better vigilance. However, in relation to the "missing" nozzle, it was explained to the officers that the nozzle was in use – on standby for the on-going works to the holed exhaust pipe. Nevertheless, the officers insisted on listing the nozzle as missing.

(m)    Missing rat guards.

The guards fell from the ropes due to strong winds. They were replaced within 5 minutes.

(n)    Seized fairleads.

Despite a periodical check by the crew on 15th December 2007, they had seized due to the extremely cold weather conditions. Rectification took less than an hour.

(o)    Hole in fwd accommodation bulkhead between the main deck and the stevedore toilet.

This was considered a detainable item by the officers. The toilet is only accessible from the deck and no deficiency was found with the internal bulkhead of the toilet and the accomodation. The officers had actually found the hole because of on-going routine maintainance by the crew. Prior to arrival at St. Petersburg, the crew had been directed to chip that area to remove rust and the small hole had been discovered after arrival at the port under the surface rust solely because of the chipping. It was left unpainted. As the vessel was in port, the crew were waiting for clement weather (before departure to sea) in order to weld an insert into the bulkhead plating. There was no risk of any flooding[21] into that hole whilst the vessel was at the port of St Petersburg or at the anchorage. The insert was welded by the ships' fitters to BV satisfaction within December during a period of about three hours.

(p)    Hole in bilge collecting tank #9.

This had been recently discovered by the engineers. The leakage was minor and under investigation and had not yet been notified to the Master. The matter was rectifiable within three hours.

---

[21]    Any improbable flooding would have been restricted to the toilet only.

(q)     Notice to Mariners.

The officers noted that the last one on the bridge was dated 29th November 2007. However, it was explained that the three latest NTMs were on board, having been despatched to the vessel at St. Petersburg with other items such as spare parts but, due to customs regulations, they could not be used whilst the vessel was in port. The vessel was therefore supplied locally with the necessary NTMs to satisfy the officers.

(r)     Damaged steel support for No.6 aft starboard hydraulic cylinder and hatch covers hinge.

As stated above, such damage can occur in sub-zero conditions with crew negligence. The damage could have been repaired at the anchorage by the fitters but the BV surveyor insisted on Class certified welders to do the work. With the holiday closures of the shore workshops, the repairs were not completed until 8th January 2008. The estimated time for the work was two days but holiday closures and lack of pace delayed the repair.

(s)     Corrosion of hatch covers, hatch coamings and compression bars.

This finding by the officers was most dubious. The hatches were closed during the inspection. It is submitted that the officers could not ascertain the condition of the compression bars with the hatches closed. The BV surveyor had not made any adverse comments when he had attended on board and the hatches were open. The crew removed rust where necessary and eventually painted. After removal of the rust, the BV surveyor inspected what had been done to his satisfaction. There were no holes found through which Charterers and consignees could argue seawater ingress.

(t)     Non-conformity reporting

The officers criticised the Master's regime of reporting accidents such as the damaged steel support (No.6 aft starboard hydraulic cylinder and hatch covers hinge) and the engine room leakage from the bilge water tank. Owners' port captain discussed this with the Master.

(u)     3rd Officer's knowledge/training.

The officers criticised the 3rd Officer for his failings regarding an immersion suit. Owners had employed an officer who was certified in the matters found wanting by the officers. The said 3rd Officer was immediately replaced.

(v)     MF/HF Radio – suspected not to be working.

The officers were not convinced that the GMDSS equipment was working properly. Owners appointed shore personnel to demonstrate that the equipment was working properly.

(w)     Muster list.

With the repatriation of the 2nd Officer on 22nd December 2007, and the imminent arrival of the new 2nd Officer, the muster list had not been amended. This was rectified immediately.

(x)     Navigation light bulbs not functioning.

The vessel had been in port for nearly a month. Due to lack of routine testing, and probably due to the low temperatures, the bulbs had broken and not been replaced. This was immediately rectified.

(y)    Chief Officer's lack of familiarity with the GMDSS equipment.

This apparent lack of knowledge in a certified officer was rectified immediately by particular training by the Master.

E12.    It is submitted that none of the above alleged deficiencies in actual fact warranted the urgent extraordinary inspection conducted by the Port State Control officers in circumstances in which the vessel was due to shift to the anchorage and then return into the port to load a further cargo. It is submitted that the last minute inspection and the above attitude of the officers, in addition to their failure to ascertain the reason why the BV surveyor had taken the two class certificates and to the whereabouts of the replacement 2nd Officer, coupled with the failure of Anteks and/or the BV surveyor to clarify the positions regarding the 2nd Officer and the class certificates, and the BV surveyors sudden insistence on using unavailable shore-based certified welders, all in the light of the threats made by Mr Pavel Priymak and their timing, demonstrates a conspiracy directed by Charterers to delay the vessel and injure Owners.

**F.    Charterers' allegations concerning the crew and ITF.**

F1.    It is denied that the vessel was undermanned at any material time. The vessel's Minimum Safe Manning Certificate is attached [126]. The crew list on arrival at St. Petersburg is attached [127]. The crew list as at 31st December 2007 is attached [128]. The circumstances concerning the "missing" 2nd Officer is set out above at paragraphs C32 and C33.

F2.    It is denied that the ITF were concerned about problems on board as alleged by Charterers in the US proceedings. Attached is the only written communication from the ITF to Owners concerning the vessel whilst at St Petersburg during December 2007/January 2008 [129]. It is submitted that if the allegations made by Charterers were true they would have been referred to in the said communication.

**G.    Claim in tort for conspiracy to injure.**

G1.    In all the premises, and supported by **LONRHO PLC v FAYED 1992 1 A.C. p448**, Owners claim damages from Charterers in tort for their losses flowing from delays caused as a result of Charterers' conspiracy – with Anteks, Mr. Evgeny Zavyalov of BV in St. Petersburg, and officers of the Port State Control in St. Petersburg – the predominant purpose of which was to injure Owners for their refusal to permit ultrasonic testing of the cargo holds.

G2.    The conspiracy had a subsidiary purpose – to help support a dubious claim by consignees, Charterers' associated company, for damage to cargo caused by alleged ingress of water into hold Nos. 2 and 4 during the laden passage from South America to Russia. In that regard, the analyses of the damaged cargo demonstrate that the cargo was not wetted by seawater ingress. Furthermore, the watertight reliability of the vessel's hatch covers is confirmed by the absence of any liability for claims for sweater ingress through the hatch covers during the period of Owners' ownership of the vessel - as per the attached letter from P&I brokers, Britannia Insurance Brokers Ltd. Corp. dated 12th March 2008 [130].

**H.    Owners' actions to mitigate their losses and particulars of claim.**

H1.    The Britannia charter, a trip time charter of about 45 days duration at US$40,000/day with a cargo from St. Petersburg to South America was very attractive to Owners. The vessel would become free in an area with many lucrative fixtures providing a ballast bonus for cargoes to the Far East – where Owners wished to be located to benefit from the much cheaper drydocking/repair costs. She was scheduled for Class inspections by 6th April 2008 and the Britannia fixture was the basis for lucrative trading from early January 2008 up to 5th April 2008 plus the added benefit of ending up in a very attractive area[22] for her next Class intermediate survey[23].

H2.    From Britannia, the vessel would have earned US$1,800,000 for the 45 day period charter, completing about 13th February 2008.

H3.    From South America to Singapore/Japan range, a period fixture of about 50/55 days, because she would have been at the desired delivery area, she would have earned a ballast bonus of about US$550,000 plus a daily rate of about US$42,000. A charter duration of 52.5 days would have provided a total revenue of about US$2,755,000.

H4.    Owners' projected earnings for 2008 up to about 5th April 2008 (starting with the Britannia charter at St. Petersburg to South America and thereafter with a charter from South America to the Far East ) were therefore US$4,555,000.

H5.    Following the cancellation of the charter by Britannia on 10th January 2008, Owners were in a predicament. As they were in the port of St. Petersburg, they considered that the best chance of obtaining similar employment to that planned within the area of the Gulf of Finland was to remain within the limits of the port and seek to obtain a cargo from St. Petersburg. They were unable to obtain a cargo from St. Petersburg or nearby ports in the Gulf of Finland. The vessel shifted from inside the port of St. Petersburg to the anchorage on 16th January 2008. After some days, the vessel was requested to shift further out to sea to await orders and eventually, on 8th February 2008, she saile from the Gulf of Finland without having secured a fixture.

H6.    Eventually, in mitigation of their losses, Owners fixed the vessel to Oldendorff Gmbh & Co. KG on 15th February 2008 at a rate of US$32,750 per day for a trip from passing Gibraltar, where she was delivered to Oldendorff on 18th February 2008 at 0000hrs, to Conakry where she loaded a cargo of 33,214 mt of bulk bauxite bound for Dneprobugskiy in Ukraine. She has completed discharging operations there today and has been redelivered - and delivered back to Oldendorff in direct continuation at US$34,000 per day. Her total revenue to-date for 2008 will have been US$1,080,750. For the remaining days up to 5th April 2008, she will earn US$578,000 for the 17 day period under the new Oldendorff charter. In total therefore, Owners will have earned US$1,658,750 in mitigation of their losses.

H7.    Owners damages therefore amount to US$2,896,250 for the period from the beginning of January 2008 until 5th April 2008.

**OWNERS THEREFORE CLAIM:**

(i)    Under the Final Hire Statement:                                    US$ 347,449.05

---

22    Price-wise: repair costs in the Far East are 60% of what they are on the European continent or USA.
23    BV have now extended until the end of June the date for commencement of the vessel's intermediate survey .

**LAW OFFICE OF JOHN KRZYWKOWSKI**

(ii)    Damages for breach of contract to be assessed.

(iii)    Damages in tort:                               US$2,896,250.00

(iv)    Interest pursuant to statute.

(v)    Costs.

Yours faithfully,

**John Krzywkowski**

CC    **Messrs. Barlow Lyde & Gilbert LLP**
        Beaufort House
        15 Botolph Street
        London EC3A 7NJ
        United Kingdom

        **For the attention of: Mr. Eurof Lloyd-Lewis**

# M/V NICHOLAS M / CONGENTRA - C/P 10/10/07

## FINAL HIRE STATEMENT

| | | | | |
|---|---|---|---|---|
| Delivered: | 11/10/2007 13:00 | GMT | DLOSP PORTO ALLEGRE | |
| Vessel withdrawn | 03/01/2007 05:00 | GMT | ST PETERSBURG | |
| Total Days | 83.66666 | | | |
| Rate/Day | USD38.000 | | | |
| Address Commission | 2.50% | | | |
| Brokers Commission | 1.25% | Billmar - payable directly by Owners | | |

|  |  |  |  |  |  |  |  | USD |
|---|---|---|---|---|---|---|---|---|
| Hire | | 83.66666 | days | at | USD | | 38.000 | 3,179,333.33 |
| Time from berth to agreed redelivery point (DLOSP) | | 0.18750 | days | at | USD | | 38.000 | 7,125.00 |
| Offhire | 21/10/2007 3:00 | - 6.08333 | days | at | USD | | 38.000 | - 231,166.67 |
| | 27/10/2007 5:00 | | | | | | | |
| Gross BB | | | | | | | | 575,000.00 |
| **Net hire** | | 77.7707 | days | | | | | **3,530,291.66** |
| **Address Commission** | | **2.50%** | | | | | | **- 88,259.29** |
| **Brokers Commission** | | | | | | | | **0.00** |
| Bunkers on Delivery | IFO | | | 111,00 | MT | at | 450 | 49,950.00 |
| | MDO | | | 54,50 | MT | at | 750 | 40,875.00 |
| **Bunkers ROB upon** | **IFO** | | | **247,83** | **MT** | **at** | **450** | **- 111,523.50** |
| **withdrawal** | **MDO** | | | **38,46** | **MT** | **at** | **750** | **- 28,845.00** |
| Bunkers consumable | IFO | | | | MT | at | 450 | 0.00 |
| to redelivery point | MDO | | | 6,36 | MT | at | 750 | 4,770.00 |
| ILOHC | | | | | | | | 5,000.00 |
| Comm./Representation | | at USD | 1,250 | | monthly | | | 3,045.14 |
| Extra Insurance : | | | | | | | | 10,862.49 |
| Offhire expenses | | | | | | | | |
| | IFO | | | | MT | at | | 0.00 |
| | MDO | | | 12.167 | MT | at | 750 | - 9,125.25 |

Additional Charterers' expenses at loadport with Messrs. Orion
which remain unpaid and will be settled directly by Owners          19,412.51

St. Petersburg port expenses for Charterers' account,
settled by Owners following withdrawal

|  |  |
|---|---|
| Tonnage dues (out) | 1,980.05 |
| Light dues (out) | 707.16 |

*l*

| | | | |
|---|---|---|---|
| Pier dues | | 871.62 | |
| Canal dues (out) | | 4,657.83 | |
| Navigation dues (out) | | 5,562.00 | |
| Ice dues (out) ( winter ) | | 5,814.21 | |
| Pilotage dues ( out ) | | 2,028.38 | |
| Tugs' assistance (out) | | 6,727.86 | 28,349.11 |

**Charterers' remittances:**

| S/N | Date | | |
|---|---|---|---|
| 1st | 15/10/07 | | - 1,207,825.00 |
| 2nd | 31/10/07 | | - 316,407.78 |
| 3rd | 13/11/07 | | - 556,248.26 |
| 4th | 29/11/07 | | - 551,449.52 |
| | 30/11/07 | Adjustment on 4th hire | - 10,000.00 |
| 5th | 11/12/07 | | - 280,007.17 |
| 6th | 19/12/07 | | - 185,416.09 |

**Balance due to    Owners**                                    **USD347,449.05**

2

## Freight

От:                                           Operations Congentra [operations@congentra.com]
Отправлено:                                   10 октября 2007 г. 16:11
Кому:                                         Billmar Chartering Ltd
Тема:                                         RE: LgINT Message (REF:077332700)

OK Confirm

-----Original Message-----
From: Billmar Chartering Ltd [mailto:chartering@billmar.gr]
Sent: Wednesday, October 10, 2007 3:15 PM
To: Operations Congentra
Subject: LgINT Message (REF:077332700)
Importance: High

TELIX MSG: 73327-00 10/10/07 14:14

BILLMAR CHARTERING LTD
TEL:+30210 4282290
FAX:+30210 4282294
E-MAIL: chartering@billmar.gr


PAVEL/ZACHOS

RE : MV NICHOLAS M - CONGENTRA

Further to our phone conversation herebelow recap of fixture as per our correspondence
notes

Pls go through and confirm same and pls lift subs in time

--- recap ---

--- vsl's full t/c description ---

01) NAME: M.V "NICHOLAS M,"

02) EX NAMES INCLUDING DATE LAST NAME CHANGE: "MED UNITY" (2003)
"LAURA G" (1998) - "FORUM PRODUCT" (1997) - "RAFAELA" (1991).

03) TYPE OF VESSEL: BULK CARRIER

04) ENGINE AND BRIDGE SITUATED: AFT

05) DWAT AND DRAFT SUMMER/WINTER/FRESH/TROPICAL/TROPICAL FRESH:
SUMMER DEADWEIGHT   39,498 METRIC TONS ON 11.169 METRES
WINTER DEADWEIGHT   38,402 METRIC TONS ON 10.937 METRES
TROPICAL DEADWEIGHT 40,608 METRIC TONS ON 11.401 METRES

06) DRAFT ON 17/18/19/20/32/32.5/33/33.5 FEET FRESH WATER

| FEET | METRES | FRESHWATER DEADWEIGHT |
|------|--------|------------------------|
| 27.0 | 5.18   | 11,662                 |
| 18.0 | 5.48   | 12,766                 |
| 19.0 | 5.79   | 14,115                 |
| 20.0 | 6.10   | 15,468                 |
| 32.0 | 9.75   | 31,731                 |
| 32.5 | 9.90   | 32,417                 |
| 33.0 | 10.06  | 33,151                 |
| 33.5 | 10.21  | 33,840                 |

1

3

07) TPC 48 AT SUMMER DRAFT

08) LOA/LBP/EXTREME BEAM/DEPTH MOULDED: 200.50/191.00/27.20/15.20  METRES.

09) CONSTANTS EXCLUDING FRESHWATER:  250 METRIC TONS

10) FRESHWATER CAPACITY: 305 METRIC TONS

11) IF FITTED WITH EVAPORATOR/DAILY PRODUCTION: 10 METRIC TONS / 24  HOURS

12) NUMBER HOLDS/HATCHES: 7/7

13) HATCH TYPE AND SIZES: STEEL HATCH COVER FOLDING TYPE (MACGRECOR)

    NO.1    9.8 X 12.64 METRES
    NO.2   17.6 X 12.64 METRES
    NO.3    9.6 X 12.64 METRES
    NO.4   17.6 X 12.64 METRES
    NO.5    9.6 X 12.64 METRES
    NO.6   17.6 X 12.64 METRES
    NO.7    9.6 X 12.64 METRES

14) HOLDS LENGTHS: NO.1 16.80/ NO.2 26.50/ NO.3 16.80/ NO.4 26.40/ NO.5  16.80/
    NO.6 26.40/ NO.7 16.00 .

15) TANK TOP DIMENSIONS:

    NO.1  HOLD    16.60 X 17.00
    NO.2  HOLD    26.50 X 19.20
    NO.3+5 HOLDS  16.80 X 19.20
    NO.4+6 HOLDS  26.40 X 19.20
    NO.7  HOLD    16.00 X 18.50
    (LENGTH AT CENTRE LINE - BREADTH AT HALF OF LENGTH)

16) MAXIMUM UNIFORM LOADS TANK TOPS/WEATHER DECK/WEATHER DECK  HATCHES:

    NO.1        HOLD      18.50 METRIC TONS/SQUARE METRE
    NO.2-4-6  HOLDS       15    METRIC TONS/SQUARE METRE
    NO.3-5-7  HOLDS       23.5  METRIC TONS/SQUARE METRE
    MAIN DECK             3.4   METRIC TONS/SQUARE METRE
    HATCH COVER           1.75  METRIC TONS/SQUARE METRE

17) CUBIC CAPACITY IN MAIN HOLDS - GRAIN/BALE:
    GRAIN  47,199 CUBIC METRES
    BALE   43,423 CUBIC METRES

18) CUBIC BREAKDOWN PER HOLD - GRAIN/BALE IN CUBIC METRES:

|      | GRAIN | BALE  |
|------|-------|-------|
| NO.1 | 4,946 | 4,550 |
| NO.2 | 8,638 | 7,947 |
| NO.3 | 5,488 | 5,049 |
| NO.4 | 8,689 | 7,994 |
| NO.5 | 5,488 | 5,049 |
| NO.6 | 8,694 | 7,998 |
| NO.7 | 5,256 | 4,836 |

19) ANY PILLARS/CENTRE LINE BULK HEADS/OBSTRUCTIONS IN HOLDS: NO

20) TYPE OF VENTILATION CARGO HOLDS   : NATURAL VENTILATION

21) IF BUILT WITH TOP SIDE TANKS      : YES

22) IN BUILT WITH HOPPER TANKS        : YES

2

23) TANK TOP SURFACE                     : FLAT

24) IF SUITABLE FOR GRAB DISCHARGE       : YES

25) DISTANCE FROM SHIP'S RAIL TO HATCH COAMING: CLEAR DISTANCE 5.50
METRES

26). DISTANCE WATER LINE/HATCH COAMING FULL BALLAST/LIGHT/FULLY LADEN:

    FULL   BALLAST   =  8.65 METRES
    LIGHT BALLAST    = 11.45 METRES
    FULLY LOADED     =  5.70 METRES

27) AIR DRAFT LIGHT/BALLAST/FULLY LADEN: 41.50/ 39.10/ 36.14 METRES

28) DISTANCE KEEL TO TOP OF RADAR MAST: 47.30 METRES

29) CARGO GEAR                           : GEARLESS

30) CARGO GEAR OUTREACH                  : N/A

31) CARGO GEAR DISTRIBUTION AND HOLDS SERVING  : N/A

32) IF FULLY GRAIN FITTED                : YES

33) IF SELF/TRIMMER                      : YES

34) CO2 FITTED                           : NO

35) GRAB FITTED/TYPE AND CAPACITY/HOW OPERATED : N/A

36) AUSTRALIAN HOLD LADDERS FITTED       : YES

37) IF PANAMA CANAL FITTED               : YES

38) SPEED AND CONSUMPTION                :

ABOUT 12.5 KNOTS ON ABOUT 26 MTS (BALLAST)/ABOUT 12.0 KNOTS ON ABOUT 28  MTS
(LADDEN) INTERMEDIATE FUEL OIL 180 CENTISTOKES RME 25 ISO DIS 8217

PLUS

ABOUT 2.5 MTS (AT SEA)/2.0 MTS (AT PORT/WHEN IDLE) MARINE DIESEL OIL  DMB ISO 8217.

Speed and consumption warrantees are given in good weather conditions  only and no
adverse currents.

Within the context of this charterparty, good weather conditions are  understood to mean
winds up to and including Beaufort force 4 and/or Douglas Sea  state 3.

About is understood to mean 0.5knot downwards in the speed and 5pct  upwards in the
consumption.

For performance evaluation purposes, the overall performance of the  vessel is to be
reviewed on all laden and ballast passages during the currency of  the charterparty.
Weather periods in excess to Beaufort 4 and or Douglas Sea state 3, are to be expressly
excluded from calculations.

Owners liberty vessel to burn diesel oil when manoeuvring/approaching  and leaving
ports/navigating in canals/rivers or congested/confined/shallow  waters or in cold
weather for boiler/heating.

39) NO SUITABLE FOR ALTERNATIVE LOADING IN ACCORDANCE WITH SOLAS  CHAPTER XII, REGULATION
14 WITH EFFECT FROM 01st JULY 2006

3

5

40) ENGINE TYPE AND BHP/RPM: B&W 13100 BHP/128 RPM

41) NUMBER OF GENERATORS, TYPE AND BHP/RPM:
   - MAN MEP-MAN G6V 23.5/33TL (2 SETS) S/N 6017-6022
   - BAUD W - BOLEBY DIESEL MODEL 5Y23LH-2 (1SET) SN 164801
   - 780 BHP EACH / 600 RPM EACH

42) BUNKER CAPACITIES: INTERMEDIATE FUEL OIL: 2,617 METRIC TONS  (100%)/MARINE DIESEL
OIL: 316 METRIC TONS (100%)

43) YEAR AND MONTH BUILT AND WHERE BUILT: MARCH 12, 1980/ BRASIL

44) FLAG : ST. VINCENT & THE GRENADINES

45) PORT OF REGISTRY                            : KINGHTOWN

46) REGISTERED NUMBER                           : 9152

47) LLOYDS NUMBER                               : N/A

48) IMO NUMBER                                  : 7433452

49) INTERNATIONAL/ SUEZ/ PANAMA GRT/NRT OR GT/NT:

INTERNATIONAL : 22,932 / 12,360
SUEZ          : 21,341 / 19,040
PANAMA        :        / 19,090

50) CLASS SOCIETY: BUREAU VERITAS

51) CLASS RATING:   I 3/3 E BULK CARRIER ESP DEEP SEA

52) LAST DRYDOCK: MAY, 2005

53) LAST SPECIAL SURVEY: MAY, 2005

54) CALL SIGN: J 8 B 2 6 8 O (J8B2680)

55) TELEX SYSTEM/NUMBER: INMARSAT-C / 437738810-1

56) FASCIMILE NUMBER: 763662742

57) P & I CLUB ENTERED WITH: THE AMERICAN P+I CLUB

58) H & M VALUE: U.S. $ 6,250,000 (SIX MILLION TWO HUNDRED AND FIFTY  THOUSAND
DOLLARS) PLUS $ 1,250,000 IV (ONE MILLION TWO HUNDRED AND FIFTY  THOUSAND
DOLLARS). INSURERS: LLOYD'S UNDERWRITERS "BAIT SYNDICATE" (AS  LEADERS).

59) REGISTERED OWNERS FULL STYLE AND FULL ADDRESS: SIXTEEN THIRTEEN  MARINE
                                                S.A., MONROVIA,  LIBERIA.

60) MANAGER'S NAME, ADRESS / COMMUNICATION DETAILS/ N.I.C.

   CHIAN SPIRIT MARITIME ENTERPRISES INC.

   10 ANT. AMPATIELOU,
   GR-18536 PIRAEUS,
   GREECE.
   TELEPHONE: +30 210 429 4777
   FASCIMILE: +30 210 459 9099
   E-MAIL : operations@chianspirit.gr

All details are given in good faith as "about" wog

--- end of vsl's t/c description ---

4

6

- CHARTS GNTEE THAT THE FIXTURE WILL BE KEPT STRICTLY P+C AND SHALL NOT REPORT SAME IN ANY FIXTURE REPORT INCL BUT NOT LIMITED BALTIC INDICES AND/OR TO ANY OTHER THIRD PARTY.

- ON ARRIVAL AT 1ST LOADPORT AFTER THE VESSEL'S DELIVERY HOLDS TO BE READY FOR PERMITTED CARGO ORDINARY SERVICE, CLEAN, SWEPT, WASHED DOWN AND DRIED UP SO AS TO RECEIVE CHARTERERS INTENDED CARGO TO THE SATISFACTION OF THE SHIPPERS' SURVEYORS IN THE UNLIKELY EVENT THE VSL NOT BE APPROVED BY THE SURVEYOR THEN THE VESSEL TO BE PLACED OFF HIRE AND ALL RELATED EXPENSES THEREOF TO BE FOR OWNERS ACCOUNT.

MORE SPECIFICALLY IN CASE OF VESSEL'S FAILURE TO FULLY PASS ABOVE PRELOADING CARGO HOLDS INSPECTION VSL TO BE PLACED OFF HIRE, or pro rata of hire according to the number of holds which failed PROVIDED LOCAL REGULATION PERMIT LOADING OF VESSEL WITH PARTIALLY UNCLEAN HOLDS AND SHIPPERS HAVE DECIDED TO COMMENCE LOADING OF THE ALREADY PASSED HOLDS OTHERWISE VESSEL TO BE FULLY OFF- HIRE FROM REJECTION UNTIL THE VSL PASSES THE SAME INSPECTION/TEST AND ANY ACTUALLY TIME LOST/DIRECT EXPENSES INCURRED HEREBY TO BE FOR OWS ACCOUNT.

OWNERS WARRANT FULL:

- VSL IS SELFTRIMMING SINGLE DECK BULKCARRIER (AND WAS ORIGINALLY CONSTRUCTED AS A BULKCARRIER) WITH ENGINE/BRIDGE AND ACCOMMODATION AFT.

- VSL IS SD SELF-TRIMING BC/BRIDGE N ENG ROOM IS AFT

- VSLS T/T IS FLAT AND SUITABLE FOR GRAB DISCHARGING

- VSL DOES NOT HAVE A CENTERLINE BULKHEAD/BEAM OR ANY OTHER OBSTRUCTIONS

ALSO DURING THE ENTIRE CURRENCY OF C/P

- VSL SHALL NOT CHANGE OWNERSHIP OR CLASS OR FLAG THROUGHOUT THE WHOLE T/C PERIOD;

- VSL IS FULLY ISPS CERTIFIED. (ISPS CERTIFICATE TO BE SENT BY OWNERS UPON REQUEST)

- OWS GTE TT VSLS H.COVERS ARE TB WATERTIGHT ALL THROUGHOUT THIS C/PERIOD N IF ANY H.COVER FOUND DEFECTIVE, SAME TB RECTIFIED AT OWS TIME N EXPNS TO CLASS SURVEYOR SATISFACTION IN WHICH CASE VSL TO BE PLACED PRO RATA OFF-HIRE ACCORDING TO THE NUMBER OF HATCHES WHICH FOUND DEFECTIVE AND THE LOADING OPERATIONS WERE ACTUALLY PREVENTED.

- OWS GTEE VSL IS P&I COVERED WITH THE "AMERICAN P&I CLUB" AND CLASSED WITH "B.V. OR IN OWNRS OPTION WITH ANY OTHER MEMBER OF THE INTERNATIONAL P&I GROUP OR IACS MEMBER CLASS RESPECTIVELY, AND SHALL REMAIN SO THROUGHOUT THE WHOLE T/C PERIOD;

- OWS GTEE VSL IS SD SELF-TRIMING BC/BRIDGE N ENG ROOM IS AFT

- OWS GTEE VSLS T/T IS FLAT AND SUITABLE FOR GRAB DISCHARGING


FOR

1. VESSEL: MV "Nicholas M." (ex- "Med Unity") AS DESCRIBED ABOVE

2. ACCOUNT : "CONCENTRA AG of Zug, Switzerland"

   add...6301 Bahnhofstrasse 12, Zugm Switzerland

5

ph.nr...+41793079407
email...operations@congentra.com
mic...Lance Ranger

Charterers very brief background as given and guaranteed by them as   true and
accurate:

Congentra for your reference now has under tc m/v Athena and m/v
Rotterdam trader (ex- FOREST PIONEER). Also you can contact Richard  Burger
from Amire for references or BNP Paribas (Suisse) Daniel Ruiz
+41229062253

3. DELIVERY: ON DOP PORTO ALEGRE, BRAZIL ATDNSHINC

4. LAY/CAN : 12:00 HRS LT 10TH OCT 2007 - 24:00HRS LT 13TH OCT 2007

5. ALLOWED TRADING : ONLY 1 STRAIGHT TCT VIA RIVER PLATE, ARGENTINA TO
   ST.PETERSBURG (RUSSIA) AND/OR POLAND, WHICH IS ALLOWED ONLY IN THE  EVENT
   ST.PETERSBURG IS FROZEN, ALWAYS VIA SAFE PORT (S), SAFE BERTH (S),SAFE
   ANCHORAGE (S) ALWAYS AFLOAT (EXCEPT FOR RIVER PLATE ONLY WHEREVER NAABSA
   APPLICABLE AS PER NYPE) ALWAYS WITHIN INSTITUTE WARRANTY LIMITS (CROPT TO BAECH IWL
   FOR WHICH PLS SEE RELEVANT PROVISION HERE BELOW) AND ALWAYS EXCLUDING WAR OR WARLIKE
   ZONES (CONWARTIME 2004 TO APPLY), IN/OUT GEO ROTATION.

   DURATION ABT 50 DAYS WOG

   If during the currency of this c/p discharging area is considered out
   of INL/IWL Charterers shall have the privilege of breaking INL/IWL ,
   Charterers paying any extra Insurance
   premium thereby
   incurred, provided not exeeding London lloyds scale and bimco ice clause for
   tc parties to apply. This extra insurance to be covered by owners with their
   h&m underwriters and to be reimbursed by the Charterers against presentation
   of relevant supportive invoice prior redelivery with emailed copies always
   acceptable.

6. ALLOWED CARGO: ONLY HARMLESS GRAINS/GRNPRODS/AGRIPRODS IN BULK AND  MORE
   SPECIFICALLY "CORN/SOYABEANMEAL" IN BULK.

   IT IS UNDERSTOOD THAT CHARTERERS MAY LOAD ANY GRAIN/AGRICULTURAL  PRODUCTS,
   PROVIDED THAT CARGO WILL BE LOADED IN STRICT ACCORDANCE WITH  INTERNATIONAL
   IMO REGULATIONS AND TO BE HARMLESS/NON- IMO DANGEROUS CARGO FOR THE
   .LOADING,STORAGE AND CARRIAGE OF WHICH THE VESSEL IS NOT REQUIRED TO  BE CO2
   FITTED OR NO APPENDIX B REQUIREMENTS APPLY OR REQUIRED BY CHARTERERS  AND/OR
   SHIPPERS AND/OR CARGO AND/OR VESSELS OR CARGO UNDERWRITERS AND/OR ANY  OTHER
   COMPETENT AUTHORITY. PALM KERNEL EXPELLERS,SUNFLOWER SEED  EXPELLERS, PELLETS
   ALWAYS TO BE EXCLUDED.

   IF MORE THAN ONE GRADES, CGO TO BE NATURALLY SEPARATED BY VSL'S  HOLDS

7. REDELY : ON DLOSP ST.PETERSBURG, RUSSIA ATONSHINC.

8. HIRE USD 38,000 DAILY HIRE PLUS USD 575,000 GBP - DAILY HIRE TO  INCLUDE
   OT/FW/LUBES AND TO BE PAYABLE EVERY 15 DAYS IN ADVANCE

   .UPON DELY CHRTRS TO PAY 15 DAYS HIRE PLUS GBP FULL VALUE OF  BUNKERS AS
   ON BOARD AT THE RATE OF DELIVERY WITH NO DEDUCTIONS OF ESTIMATED  BUNKERS
   VALUE ON REDELIVERY. ANY SUCH DEDUCTION TO BE MADE FROM THE LAST  SUBSEQUENT
   SUFFICIENT HIRE PAYMENT.

   CHARTERERS NO TO MAKE ANY DEDUCTION IN RESPECT OF OWNERS EXPENSES AT  ANY
   PORT OF CALL DURING THIS CHARTER PARTY OWNERS SETTLING ALL OWNERS'
   EXPENSES
   DIRECTLY WITH AGENTS HOWEVER CHARTERERS' AGENTS TO ATTEND VESSEL'S  MINOR
   MATTERS SUCH AS CASH TO MASTER, CHANGES OF PART OF CREW ETC WITHOUT  CHARGING
   AGENCY FEE. FOR MAJOR SHIP'S HUSBANDRY MATTERS SUCH AS EMERGENCY  DRYDOCKING

6

8

OWNERS TO MAKE THEIR OWN ARRANGEMENT WITH AGENTS. OWNERS TO ALWAYS HAVE THE RIGHT TO APPOINT THEIR OWN PROTECTING AGENTS AT BOTH ENDS.

9. BUNKERS ON DELY ABT 110 IFO. AND ABT 50 MDO AT USD 450PMT AND USD 750 RESPECTIVELY.

BUNKERS ON REDELIVERY ABT SAME QUANTITIES AT SAME PRICES AS ON DELIVERY.

CHARTERERS TO PAY FULL VALUE OF BUNKERS ON DELY AS ON BOARD.

BOTH CHARTERERS AND OWNERS TO HAVE THE PRIVILEGE TO BUNKER THE VESSEL PRIOR TO DELIVERY/REDELIVERY PROVIDED SAME DOES NOT INTERFERE WITH VESSEL'S OPERATIONS OR ITINERARY IN WHICH CASE SAME TO BE SUBJECT TO BOTH PARTIES MUTUAL AGREEMENT

CHARTS TO HAVE THE RIGHT TO DEDUCT FROM THE LAST SUFFICIENT HIRE PAYMENT(S)
BUT GIVEN THE ANTICIPATED C/P DURATION IN NO CASE FROM THE FIRST 50 DAYS, THE ESTIMATED VALUE OF BUNKERS ON REDELIVERY

CHARTERERS TO PAY FULL VALUE OF BUNKERS ON DELY AS ON BOARD.

10. ON HIRE/OFF HIRE SURVEYS TO BE CARRIED OUT AT CHARTS TIME AND EXPENSES OWNERS APPOINTING MASTER TO ATTEND ON THEIR BEHALF.

11. ANY ADD WAR PREMIUM DURING THIS C/P (IF ANY) TO BE FOR CHRS' ACCT AGAINST FAXED VOUCHERS; MORE SPECIFICALLY CONWARTIME 2004 TO APPLY.

12. ILOCH

CHARTERERS HAVE THE OPTION OF REDELIVERING THE VESSEL WITHOUT CLEANING HOLDS CHARTERERS PAYING USD 5000 LUMPSUM

13. C/V/E USD 1,250 PER MONTH PRO RATA

14. OWNERS TO ALLOW CHARTERERS TO DISCHARGE CARGO WITHOUT PRESENTATION OF ORIGINAL BILL(S)/LADING BY PROVIDING WITH LETTER OF INDEMNITY IN ACCORDANCE WITH OWNERS P N I CLUB FORM AND WORDING BEFORE DISCHARGING. LETTER OF INDEMNITY TB SIGNED BY CHARTERERS ONLY.

Neither the Charterers nor their agents shall permit the issue of any B(s)/L (whether or not signed on behalf of the Owners or on the charterers behalf of any sub-charterers) incorporating the Hamburg Rules or any legislation giving effect to the Hamburg Rules or any other legislation imposing liabilities in excess of Hague-Visby rules. The Charterers shall indemnify the Owners against any liability, loss or damage which may result from any breach of the forgoing provision of the clause. No liner Bills or Way Bills of Lading and no through transhipment or combined transport Bills of Lading to be issued

15. BIMCO ISM/ISPS/NON-PAYMENT OF HIRE/ ICE-CLAUSE/EVIDENCE OF PERFORMANCE/FUEL SULPHUR CONTENT/ U.S. SECURITY/U.S.CUSTOMS ADVANCE NOTIFICATION/AMS BIMCO CLAUSES FOR TIME CHARTER PARTIES CLAUSES TO APPLY

16. FOR THE PURPOSE OF COMPUTING HIRE PAYMENTS, THE TIME FOR DELIVERY/REDELIVERY SHALL BE ADJUSTED TO G.M.T

17. ANY OFF HIRE DEDUCTION UNDER THIS CHARTER PARTY DUE TO VSLS INEFFICIENCY ARREST, DETENTION, SEIZURE, MACHINERY BREAKDOWN ETC...BY ANY AUTHORITY AND FOR ANY REASON TO BE MADE ON THE BASIS OF THE ACTUAL TIME LOST DUE TO THE VESSELS INEFFICIENCY ARREST, DETENTION, SEIZURE, MACHINERY BREAKDOWN ETC... AND NOT FOR THE WHOLE PERIOD OF THE SAME.

IT IS HEREBY UNCONDITIONALLY AGREED THAT THIS CLAUSE IS A "NET/ACTUAL

7

TIME LOST CLAUSE"

18. GENERAL AVERAGE IN LONDON ACCORDING TO YORK-ANTWERP RULES 1994 / ENGLISH LAW TO APPLY

19. NO WAY BILLS, NO LINER OUT BS/L, HAGUE-VISBY RULES TO BE INCORPORATED IN ANY B/L ISSUED UNDER THIS C/P.

20. ALL TAXES AND DUES AND CHARGES ON THE VSL AND/OR CARGO AND/OR FRT AND/OR HIRE ARISING OUT OF CARGOES CARRIED OR PORTS VISITED OR COUNTRIES TRADED THROUGH UNDER THIS CHARTER TO BE FOR CHTRS ACCT.

21. COMM 3.75% TTL COMM INCL 1.25% TO BILLMAR CHARTERING

22. SUB ONLY CHARTS RECONFIRMATION TO BE LIFTED LATEST 15:30 GENEVA TIME TODAY TUE 10TH OCT 2007.

23. OTHERWISE AS PER PROFORMA C/P OF M/V "FURIA R." ACC OLDENDORFF DD 18TH MAY 2006 STRICTLY AND LOGICALLY AMENDED AS PER MAIN TERMS AGREED AS WELL AS BELOW C/P DETAILS/ALTERATIONS;

IT IS WELL UNDERSTOOD AND AGREED THAT ALL TERMS/CONDITIONS IN ABOVE MAIN TERMS AGREEMENT WILL SUPERSEDE ALL TERMS/CONDITIONS/CLAUSES OF SAME MEANING/WORDING OF PROFORMA C/P AND FORM PART OF IT;

MAIN BODY
--------------

DELETE LINES AS FROM 1 TILL 19 :   SAME TO BE AMENDED AS PER MAIN
                                   TERMS AGREED BUT LINES 16/17 TO REMAIN  AS
                                   PRINTED

LINES:45/46/47 :                   DELETE AS NON APPLICABLE

LINE 95 :                          DELETE 'GIVEN WRITTEN NOR' INSERT
'DELIVERED'

LINES 145-150:                     DELETE ALL LINES AS N/A (VSL IS GRLSS)
EXCEPT
                                   IN LINE 150 WHERE THE SENTENCE 'VESSEL  TO
                                   WORK...REQUIRED BY CHARTERERS' TO  REMAIN

RIDER CLAUSES
----------------

CLAUSE 29 : TO BE TITLED "ALLOWED CARGO" AND TO BE AMENDED AS PER
            PARA "6" OF MAIN TERMS.

CLAUSE 30 : TO BE TITLED "ALLOWED TRADING" AND TO BE AMENDED AS PER
            PARA "5" OF MAIN TERMS.

CLAUSE 33 : AMEND PER MAIN TERMS PARA 12, OWISE AS PER C/P EXCEPT 2ND  LINE
            DELETE AS FROM 'INCLUDING, IF PERMITTED'... TILL THE END OF  THE
            CLAUSE

CLAUSE 38 : 3RD LINE DELETE "REMAINS UNDER ARREST OR" OTHERWISE AS
            PER ABOVE PARA 17 OF MAIN TERMS.

CLAUSE 39 : DELETE FOR 9TH PARAGRAPH I.E. AS FROM ".CHARTERERS HAVE
            THE OPTION .... TILL ....OF LINER BILLS OF LADING' INSERT."
NO
            LINER OUT BILLS OF LADING UNDER THIS CHARTER PARTY"

8

CLAUSE 41 : PARA 1 THRU 7 AMENDED AS PER MAIN TERMS (IE QTTIES/PRICES/SPECS
ETC) OWISE TO REMAIN AS PER C/P EXCEPT REPLACE "DRAWN BY THE
SUPPLIER" WITH "TAKEN FROM THE VESSEL'S MANIFOLD DURING THE SUPPLY"

CLAUSE 44 : DELETE RMQ TO BE AMENDED AS PER ABOVE PARA 8 OF MAIN TERMS.

CLAUSE 49 : 1ST LINE AFTER "SUPERCARGO(ES)" INSERT " UPON REASONABLE REQUEST
AND JUSTIFIED REQUEST"

CLAUSE 51 : DELETE AS NOW APPLICABLE

CLAUSE 54 : ADD AT THE END "THIS IS A 'NET ACTUAL TIME LOST CLAUSE'
FOR THE TIME THEREBY ACTUAL LOST AND NOT A PERIOD CLAUSE"

CLAUSE 56 : TO BE DELETED AND TO READ AS PER ABOVE PARA 10 OF MAIN TERMS.

CLAUSE 58 : DELETE "COURIER" INSERT "E-MAIL IF REQUIRED"

CLAUSE 59 : DELETE WHOLE AS N/A

CLAUSE 60 : ADD "AND SAME TO BE INCORPORATED TO ANY BILLS OF
LADING ISSUED HEREUNDER"

CLAUSE 62 : REPLACE "WITHIN 3 BANKING DAYS AFTER VESSEL'S" WITH "ON"
DELETE PARA "CHARTERERS ARE ENTITLED...DISBURSEMENT DIRECTLY)"

CLAUSE 71 : AS PER C/P EXCEPT
LINE 1 DELETE 'JAPAN,' INSERT 'RUSSIA OR ARGENTINA'
DELETE 'DENMARK' INSERT 'FINLAND'
ADD AT END 'PROVIDED NO CARGO ONBOARD'

CLAUSE 72 : DELETE WHOLE AS N/A

CLAUSE 76 : DELETE WHOLE AS N/A

END

rdgs

S1 Jan 07 11:46    J B R              00902108801831              P.1

Tramp Maritime Inc.                Working Copy

## Time Charter

**GOVERNMENT FORM**
Approved by the New York Produce Exchange
November 6th 1913 - Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946



**This Charter Party,** made and concluded in *Hamburg,* ...... 18th ..day of *May 2006* ...... 19...

Between *Pollnas Maritime Ltd., Malta.* ...................................................................................................

Owners of the good *Media flag* ..................... *steamship/motorship "FURIA R "* ..................... of ...........................................

of ........................................................................................... *gross register tons/net register tons, having engines of* .........................................

and ..with.. hull,.. machinery.. and.. equipment.. in.. a.. thoroughly.. efficient.. state,.. and.. classed.... *for vessel's description see Clause 83*

of ........ of about ........ cubic feet bale capacity and about ........ tons of 2240 lbs.

deadweight capacity (cargo and bunkers, including fresh water and stores not exceeding ........ tons and one-half percent of ship's deadweight capacity,

allowing a minimum of fifty tons) on a draft of ........ feet ........ inches on ........ *Summer freeboard, inclusive of permanent bunkers,*

which are of the capacity of about ........ tons, and fully loaded capable of steaming, fully laden, under good weather

conditions about ........ knots on a consumption of about ........ *best Welsh coal - best grade fuel oil - best grade Diesel oil*

now trading ........................................................................................................................................

........................................... and *Oldendorff Carriers GmbH & Co. KG* ........ Charterer of the City of *Lübeck, Germany.* ............

**Witnesseth,** That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for

about 1 (one) timecharter trip to India with harmless/lawful cargo(s), intention steel products (slabs, coils, pipes etc.), trading

always via safe and before port(s)/berth(s)/anchorage(s), always safely afloat, always within International Navigating

Conditions (01/11/03) and ........................................................................................................................................

Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remaining responsible for

the fulfilment of this Charter Party. Acceptance of delivery of the vessel by the Charterers shall not prejudice their rights against

Owners under this Charter Party.

Vessel to be placed at the disposal of the Charterers, at on dropping last outward sea pilot *KARACHI/BIN QASIM at any time, day/night,*

Sundays and holidays included.

In such dock or at such whatf or place (where she may safely lie, always afloat, at all times of tide, except at places where it shall be customary for similar vessels to await, as

the Charterers may direct. If such dock, wharf or place be not available due to most as specified he in clause *Nine* Vessel on her arrival first load port

delivery to be ........................................................................................................................................

ready to receive any permissible cargo (see Clause 49). On delivery and throughout the Charter vessel to be with clean swept holds and

tight, staunch, strong and in every way fitted for the service, having water ballast, winches cranes and

donkey boiler with sufficient steam power, or if not equipped with donkey boiler, then other power sufficient to run all the winches/cranes at one and the same

time (and with full compliment of officers, seamen, engineers and firemen for a vessel of her tonnage), to be employed, in carrying lawful merchan-

dise, including petroleum or its products in proper containers excluding - see Clause 39 - ........................................................

(vessel is not to be employed in the carriage of Live Stock, but Charterers are to have the privilege of shipping a small amount on deck at their risk

all sundry filings and other requirements to be for account of Charterers), in such lawful trades, between safe port and/or safe places in

British North

America and/or West Indies and/or West Indies and/or Central America and/or Caribbean Sea, and/or Gulf of Mexico and/or

Mexico and/or South America ........................................................................................................................................

and/or Europe

and/or Africa and/or Asia and/or Australia and/or Tasmania and/or New Zealand but excluding Magdalena River, River St. Lawrence between

October 31st and May 15th, Hudson Bay and all trade ports the including when out of season, White Sea, Black Sea and the Baltic.

Trading Exclusions: See Clause 38. ........................................................................................................................................

........................................................................................................................................

the Owners or their Agents shall abide, on the following conditions

1.    That the Owners shall provide and pay for all provisions, wages and consular shipping and discharging fees of the Crew and gangway watchman;

gangway watchman for cargo and all compulsory shore gangway watchmen to be for Charterers' account; compulsory garbage

removal to be for Charterers' account; shall pay for the

insurance of the vessel, also for all the cabin, deck, engineroom and other necessary stores, including boiler water and maintain her class and keep

the vessel in a thoroughly efficient state in hull, cargo spaces, machinery and equipment with all certificates necessary to comply with current

requirements at ports of call for and during the service.

2.    That whilst on hire the Charterers shall provide and pay for all the fuel except as otherwise agreed, Port Charges, Pilotage, Agencies (except

agency fee directly related to Owners' matters), Commissions, stevedoring/tugs/hoses dues/canal dues, stevedores/fees etc on

cargo gear/vessel/freight/hire/flag

Consular Charges (except those pertaining to the Crew), and all other usual expenses except those before stated, but when the vessel puts into

a port for causes for which vessel and/or her Owners is/are responsible, then all such charges incurred shall be paid by the Owners. Fumigation ordered

because of

Illness of the crew to be for Owners account. Fumigations ordered because of cargoes carried or ports visited while vessel is employed under this

charter to be for Charterers account. All other fumigations to be for the Charterers account. After vessel has been on hire for a continuous period

of six months or more. Pilotage Groms/Spootsbjerg, Bosporus Strait, Torres Strait and Great Belt to be for Charterers' account.

31 Jan 07 11:46     J G R                    00302109881991          p. 2

45  Charterers are to provide necessary dunnage and shifting boards, also any extra fittings requisite for a special trade or unusual cargo, but
46  Owners to allow them the use of any dunnage and shifting boards *and any other fittings* already aboard vessel. Charterers to have the privilege of using
    shifting boards
47  for dunnage, they making good any damage thereto.
48      3.   ~~That the Charterers, at the port of delivery, and the Owners, at the port of re-delivery shall take over and pay for all fuel remaining on~~
50  *See Clause 47* ~~board the vessel at the current price being the respective ports, the vessel to be delivered with not less than~~
51      4.   That the Charterers shall pay for the use and hire of the said Vessel at the rate of  US$ 15,000.—  (fifteenthousand) per dayhire rate
52  including overtime, payable every 15 days in advance United States Currency per day as worth total deadweight carrying capacity, including
    bunkers and
54  and after that same rate for any part of a month day; hire at termination until the hour of the day of her re-delivery in like good order and condition, ordinary
55  wear and tear excepted, to the Owners (unless lost) at one dropping last outward supplied one safe port BOSTON/TAMPICO range, post to
57  *Charterers' option* (inclusive US Gulf, New Orleans or Houston), at any time, day/night, Sundays and holidays included unless otherwise mutually agreed. Charterers are to give the Owners not less than 15/10 days approximate and 85/5/1 day(s) definite
58  notice of expected expected time of re-delivery, and probable port

59      5.   Payment of said hire to be made in Owners' bank in New York in cash in United States Currency, semi-monthly every 15 days in advance, and
    for the last half-month 15 days or
60  part of same the approximate amount of hire, and should same not cover the actual hire, hire is to be paid for the balance day by day, as it becomes
    due, if so required by Owners, unless such guarantee or deposit is made by the Charterer, otherwise failing the punctual and regular payment of the
    hire, or any other amount due to Owners by Charterers at least payment or deposit, or in any fundamental breach of this Charter Party, the
    Owners shall be at liberty to withdraw the vessel from the service of the Charterers. True to come. Over 3 am on the working day
    known, without prejudice to any claim they (the Owners) may otherwise have on the Charterers.
    following that on which notice of readiness has been given to Charterers or their Agents before 1 p.m., but if required by Charterers they
    to have the privilege of using and of prosecuting the next.  See also Clause 62
65  Cash for vessel's ordinary disbursements at any port may be advanced as required by the Captain, by the Charterers or their Agents, subject
    to 2 ¼% commission and such advances shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the application
6   of such advances.

68      6.   That the cargo or cargoes be laden and/or discharged in any safe dock or at any safe wharf or safe place or safe discharge in port that
    Charterers or their Agents may
69  direct, provided the vessel can safely lie always afloat at any time of tide, except at such places where it is customary for similar size vessels to safely
    lie aground.

71      7.   That the whole reach of the Vessel's Hold, Decks, and usual places of loading (not more than she can reasonably stow and carry), also
72  accommodations for Supercargo of Charterers' risk and expense, if carried, shall be at the Charterers' disposal, reserving only proper and sufficient space
    for Ship's officers, crew,
73  tackle, apparel, furniture, provisions, stores and fuel. Charterers have the privilege of passengers as far as accommodations will permit, the
    paying Owners
74  ~~Owners to~~   ~~For day per passenger for accommodation and meals. However, it is agreed that in case any fines or other expenses are~~
75  ~~incurred in the consequence of the carriage of passengers, Charterers are to bear such risk and expense. No passengers allowed.~~
76      8.   That the Captain shall prosecute his voyages with the utmost dispatch, and shall render all customary assistance with ship's crew and
77  boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and
    agency; and Charterers are to load, stow, and trim, secure, lash, unlash, tally, unless tally is required by Owners in which case will be for
    Owners' account and discharge the cargo at their expense under the supervision of the Captain, who is to sign or, when required by Charterers,
    authorize the Charterers or their agency to sign Bills of Lading on his behalf for
    cargo as presented, strictly in conformity with Mate's or Tally Clerk's receipts.

79      9.   That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on
80  receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments.
81      10.  That the Charterers shall have permission to appoint a Supercargo, who shall accompany the vessel and see that voyages are prosecuted
    with the utmost dispatch. He is to be furnished with free accommodation, and same fare as provided for Captain's table. Charterers paying at the
84  rate of US$ 16.00 $5.00 per day. Owners to victual Pilots and Customs Officers, and also, when authorized by Charterers or their Agents to victual Tally
85  Clerks, Stevedore's Foreman, etc., Charterers to compensate Owners hire/at US$ 1,250.— per month/pro rata in respect of Charterers'
    paying all the amounts per meal, for all such victualling, communication and representation.
86      11.  That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, and the
88  Captain shall keep a full and correct Log of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish the Char-
    terers, their Agents or Supercargo, when required, with a true copy of daily deck and engine Logs, showing the course of the vessel and distance run and the
    con-
89  sumption of fuel as well as revolutions of main engines and velocity and direction of wind each day, all in English language.

90      12.  That the Captain shall use diligence in caring for the ventilation of the cargo, Vessel has natural ventilation.
91      13.  ~~That the Charterers shall have the option of continuing this charter for a further period of~~

93
95  ~~on giving written notice thereof to the Owners or their Agents~~     ~~days previous to the expiration of the first stated term, or any declared option,~~
13      14.  If required by Charterers, hire not to commence before 19th May, 2006 - NOON
    and have given written notice of readiness on or before 23rd May, 2006 - 24.00 hours                                     and should vessel
16  their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's readiness.       Cancellation clause. Charterers or
17      15.  That in the event of the loss of time ~~from~~ deficiency and/or default and/or strike of men or deficiency of stores, fire, breakdown or damages
    to hull, machinery or equipment, unless such sound lists have been caused due to stevedores' mishandling,
8   grounding, detention by average accidents to ship or cargo, dry-docking for the purpose of examination or painting bottom, or by any other cause
9   preventing the full working of the vessel, the payment of hire shall cease for the time thereby lost unless such deficiency caused by Charterers or by

13

31 Jan 07 11:48      J G R                    00802109881831           p.2

45  Charterers are to provide necessary dunnage and shifting boards, also any extra fittings requisite for a special trade or unusual cargo, but
46  Owners to allow them the use of any dunnage and shifting boards and any other fittings already aboard vessel. Charterers to have the privilege of using
     shifting boards
47  for dunnage, they making good any damage thereto.
48  3.    That the Charterers, at the port of delivery, and the Owners at the port of re-delivery shall take over and pay for all fuel remaining on
49  board thereof at the current price in the respective ports, the vessel to be delivered with not less than ...................... and not more than
50  See Clause 41 ..... tons and to be re-delivered with not less than ....................................................................................................
51  4.    That the Charterers shall pay for the use and hire of the said Vessel at the rate of US$ 13,000.-- (Thirteenthousand) per day/pro rata
52  including overtime, payable every 15 days in advance United States Currency pit rat as month total including twenty/fey monthly including

53  .........................................................United States Currency Monthly, commencing on and from the day and hour of her delivery, as aforesaid, and til
54  and after the same rate for any part of a month day; hire to continue until the hour of the day of her re-delivery in like good order and condition, ordinary
55  wear and tear excepted, to the Owners (unless lost) at on dropping last outward unsplied one safe port BOSTON/TAMPICO range, port in
56  Charterers' option, (between US Gulf, New Orleans or Houston), at any place, day/night, Sundays and holidays included unless
57  otherwise mutually agreed. Charterers are to give Owners, not less than 15/16 days approximate and 8/25/1 day(s) definite
58  notice of Vessels expected date of re-delivery, and probable port.

59  Payment of said hire to be made to Owners' bank in Italian/New in tanks in United States Currency, semi-monthly every 15 days in advance, and
60  for in last half month 15 days or
     part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day, as it becomes
61  due, if so required by Owners, unless bank guarantee or deposit is made by the Charterers, otherwise failing the punctual and regular payment of the
62  hire, or any other amount due to Owners by Charterers or bank guarantee or deposit, or on any fundamental breach of this Charter Party, the
63  Owners shall be at liberty to withdraw the vessel from the service of the Charterers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers. Time to count from 7 a.m. on the working day
64  following that on which written notice of readiness has been given to Charterers or their Agents before 4 p.m. but if required by Charterers they to have the privilege of using vessel at once, such time used to count as hire. See also Clause 62
65  Cash for vessel's ordinary disbursements at any port may be advanced as required by the Captain, by the Charterers or their Agents, subject
     to 2 1/2% commission and such advances shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the application
     of such advances.
66  6.    That the cargo or cargoes be laden and/or discharged in any dock or at any safe wharf or safe place or safe anchorage in port that
     Charterers or their Agents may direct, provided the vessel can safely lie always afloat at any time of tide, except at such places where it is customary for similar size vessels to safely
69  lie aground.
70  7.    That the whole reach of the Vessels Hold, Decks, and usual places of loading (not more than she can reasonably stow and carry), also
71  accommodations for Supercargo, if carried, shall be at the Charterers' risk and expense, it carried, shall be at the Charterers' disposal, reserving only proper and sufficient space
72  for Ship's officers, crew,
73  tackle, apparel, furniture, provisions, stores and fuel. Charterers have the privilege of passengers as far as accommodations allow, Owners paying Charterers ................ per day per passenger for accommodations used, such Hire to, it is agreed that in every case Owners are
     insured in the arrangement of the storage of passengers, Charterers are to bear risk and expense. No passengers allowed.
76  8.    That the Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew and
77  boats equipment. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and
78  agency; and Charterers are to load, stow, and trim, secure, lash, unlash, tally, and/or discharge the cargo at their expense under the supervision of the Captain, who is to sign or, when required by Charterers,
     authorize the Charterers or their agents to sign Bills of Lading on his behalf for
79  cargo as presented, strictly in conformity with Mate's or tally-clerk's receipts.
80  9.    That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on
81  receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments.
82  10.   That the Charterers shall have permission to appoint a Supercargo, who shall accompany the vessel and see that voyages are prosecuted
83  with the utmost despatch. He is to be furnished with free accommodation, and same fare as provided for Captain's table. Charterers paying at the
     rate of US$ 10.00 17.00 per day. Owners to victual Pilots and Customs Officers, and also, when authorized by Charterers or their Agents, to victual Tally
     Clerks, Stevedore's Foreman, etc., Charterers to compensate Owners lumpsum US$ 1,250.- per month/pro rata in respect of Charterers'
     paying on the current rate per meal, for all such victualling, communication and representation.
11.   That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, and the
84  Captain shall keep a full and correct Log of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish the Charterers, their Agents or Supercargo, when required, with a true copy of daily deck and engine Logs, showing the course of the vessel and distance run and the
     consumption of fuel as well as revolutions of main engines and velocity of and direction of wind and sea, all in English language.
89  12.   That the Captain shall use diligence in caring for the ventilation of the cargo. Vessel has natural ventilation.
90  13.   That the Charterers shall have the option of continuing this charter for a further period of ...................................................................
91
92  .........................................................................................................................................................................
93  are giving written notice thereof to the Owners or their Agents ....................................................... day(s) previous to the expiration of the first named term or any declared option.
94  14.   That if required by Charterers, time not to commence before 19th May, 2006 -- noon ..................................... and should vessel
95  not have given written notice of readiness on or before 23rd May, 2006 - 16.00 hours ................................... but not later than 4 p.m. Charterers or
     their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's readiness.
     15.   That in the event of the loss of time from deficiency and/or default and/or strike of men or deficiency of stores, fire, breakdown or damages
     to hull, machinery or equipment, unless such event has been caused by want of due diligence by Owners or their servants' unseaworthiness,
     grounding, detention by average accident to ship or cargo, drydocking for the purpose of examination or painting bottom, or by any other cause
     preventing the full working of the vessel, the payment of hire shall cease for the time thereby lost unless such deficiency caused by Charterers or by

14

31 Jan 07 11:47     J G R                    00302109861091          p.3

their agents or by their servants and all extra directly related, proven and substantiated expenses may be deducted from the hire; and if was the voyage be speed be reduced by

100  defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence

101  thereof, and all extra *directly related, proven and substantiated* expenses shall be deducted from the hire.

102  16. That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be

103  returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and incidents of the Seas,

104  Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.

105  The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the

106  purpose of saving life and property.

107  17.  *See Arbitration Clause 38* That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to three

108  ~~persons at New York,~~

109  ~~one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them, shall be final, and for~~

110  ~~the purpose of enforcing any award, this agreement maybe made a rule of the Court. The Arbitrators shall be commercial men~~

111  18.  That the Owners shall have a lien upon all cargoes, and all sub-freights/*sub-hire* for any amounts due under this Charter, including General Average

112  contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess

113  deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which

114  might have priority over the title and interest of the owners in the vessel.

115  19.  That all derelict and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and

116  Crew's proportion. General Average shall be adjusted, stated and settled, according to Rules 1 to 15, inclusive, 17 to 22, inclusive, and Rule F of

*York-Antwerp Rules 1994 and subsequent revisions at London,* 1924, as such part or place in the United States as may be selected by the party, and

~~in any case no adjustment for hire items~~

~~Rules according to the General usage at the port at New York in such adjustment disbursements in foreign currency shall be exchanged into~~

117  United States money at the rate prevailing on the date such and allowance for damage to cargo claimed in foreign currency shall be converted at

118  the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreements or

119  bond and such additional security, as may be required by the carrier, must be furnished before delivery of the goods. Such cash deposit as the carrier

120  or his agents may deem sufficient as additional security for the contribution of the goods and for any salvage and special charges thereon, shall, if

121  required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery. When so remitted the deposit shall, at the option of the

carrier, be payable in United States money and be remitted to the adjuster. When so remitted the deposit shall be held in a special account at the

place of adjustment in the name of the adjuster pending settlement of the General Average and refunds or credit balances, if any, shall be paid in

United States money.  *Charter hire not to contribute to General Average.*

~~In the event of accident, danger, damage, or disaster, before or after commencement of the voyage resulting from any cause whatsoever,~~

~~whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract, or otherwise, the~~

~~goods, the shippers and the consignees, jointly and severally, shall contribute with the carrier in general average to the payment of any sacrifices,~~

~~losses, or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the~~

~~goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers.~~

~~Provisions as to General Average in accordance with above are to be included in all bills of lading issued hereunder~~

133  20.  Fuel used by the vessel while at Hire, also for cooking, condensing water, or for grates and stoves to be agreed to as to quantity, and the

134  cost of replacing same, to be allowed by Owners.

135  21.  That as the vessel may be from time to time employed in tropical waters during the term of this Charter, Vessel is to be docked at a

136  convenient place, bottom cleaned and painted whenever Charterers and Captain think necessary, at least once in every six months reckoning from

137  time of last painting, and payment of the hire to be suspended until she is again in proper state for the service.

140  22.  Owners shall maintain the gear of the ship as fitted, providing gear (for all derricks/*cranes*) capable of handling lifts up to *their maximum*

*capacity in accordance with the description clause.* Won loss, also

providing ropes, falls, slings and blocks. If vessel is fitted with motor winches capable of handling heavier lifts, Owners are to provide necessary gear the

141  same Wire/also equipment and gear. Otherwise, this shall be for Charterers' account, Owners also to provide on the vessel power and electric light on deck

142  and in cargo holds sufficient for night work in all holds simultaneously, if required, and also for

143  night work, and vessel to give any of electric light when so fitted, but any additional light or two there on board in the use of Charterers' winches. The

144  Charterers to have the use of any gear on board the vessel.

145  23.  Vessel to work night and day, if required by Charterers, and all winches/*cranes* to be at Charterers' disposal during loading and discharging.

146  steamer to give free use winches man lights for such winches, day and night, as required. Charterers agreeing to pay officers, engineers, winchmen,

147  deck hands and stewards for overtime work done in accordance with the working hours and rules stated in the ship's articles. If the costs of the

overtime or crews which so incident, or

149  insufficient power to operate winches *CRANE or CRANES*, Owners to pay for those extra, or engines, or winches, in lieu thereof *in which case the vessel to remain*

150  thereby. Any time lost due to crane breakdown and/or insufficient power to be deducted pro-rata to the number of gangs affected.

unless shown gear has been employed by the Owner.

151  24.  It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions from liability contained

152  in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessels

153  etc.," in respect of all cargo shipped under this charter to or from the United States of America. It is further subject to *General Clause Paramount* the

~~following clauses both~~

of which are to be included in all bills of lading issued hereunder:  *See Clause 52*

~~U.S.A. Clause Paramount~~

~~This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States approved April~~

~~16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of~~

~~any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of said bill of lading~~

~~be repugnant to said Act to any extent such term shall be void to that extent, but no further.~~

15

31 Jan 07 11:48    J G 2                    00302100001001        p.4

Both-to-Blame Collision Clause

160
161    If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the
162    Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried
163    hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss or
164    liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-carrying
165    ship to the owners of said goods and set-off, recouped or recovered by the other or non-carrying ship or her
166    owners as part of their claim against the carrying ship or carrier.
167    25.    The vessel shall not be required to enter any ice-bound port, or any port where lights or light-ships have been or are about to be with-
168    drawn by reason of ice, or where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter the
169    port or to get out after having completed loading or discharging. Vessel may be forced ice or to follow ice breakers.
170    26.    Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The owners to remain responsible for the
171    navigation of the vessel, insurance, crew, etc.

    27.    A commission of 1.25 percent is payable by the Vessel and Owners to TGM Trans-Globe Maritime Shipping GmbH, Hamburg
172    PLUS 3.75% to KRAMP MARITIME INC.
173
174
175    on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.
       28.    An address commission of 2.00 3.75 per cent payable to Charterers                                on the hire earned and paid under this Charter.

Clauses 29 through 84 are fully incorporated in this Charter Party. The older clauses headings are for easy reference only until
Not part of this Charter Party.


THE OWNERS:                                        THE CHARTERERS



This Charter Party is a computer generated copy of the NYPE (Revised 3rd October, 1946) form printed under licence from the Association of Ship
Brokers & Agents (U.S.A.) Inc. using software which is the copyright of Strategic Software Limited.

It is a precise copy of the original document which can be modified, amended or added to only by the striking out of original characters, or the
insertion of new characters, such characters being clearly highlighted by underlining or use of colour or use of a larger font and marked as having
been made by the Brokers or user as appropriate and not by the number.

16

31 Jan 07 11:48     J & R                    00302109981891                    p.15



Trans-Globe Kemter Shipping GmbH

Tramp Maritime Inc.

---

ADDITIONAL CLAUSES TO CHARTER PARTY MV "FURIA E".
DATED HAMBURG, 10th MAY 2006

**Clause 29 – Cargo Exclusions**
None of the cargoes, goods, or substances listed below are to be loaded during the currency of this charter:

All corrosive, dangerous, explosive, hazardous, inflammable, injurious and toxic substances or goods/all goods or substances as defined by IMO-IMDG code as amended, including but not limited, as follows:

Acids/antiques/art objects and curios/arms and ammunitions/asbestos/ashes/asphalt /automobiles or vans or trucks or lorries or any other vehicles/banknotes or other forms of currency/bonds or other negotiable instruments/bones or bone meals/borax/bullion/calcium carbide/calcium nitrate/calcium oxychloride/cement in bulk, cement clinker/cocoa/containers/copra /corrosives/creosote and creosoted goods/dayco coal/citrus coal / pond coal / dross / drugs or narcotics / dynamite / esparto grass / fire briquettes / fishmeal/fishscrap /gypsum/hides/jewellery, metals, stones or other objects of a rare or precious nature/jute/lime/logs /locomotives /livestock/manioc and manioc pellets/nepheline syenite/organic peroxides/petroleum derivatives and all petroleum products/pitch/potash/radioactive substances, products or wastes/rags/ refrigerated cargo/skinnings/salt/rock salt /soda/soda ash/scrap metal in any form including motorblocks, metal borings, shavings and turnings/skins and furs/solvents/stone blocks/wet and war like materials/boycott cargoes and any other goods affecting immediately or on long term the safety of the vessel and/or the crew and all cargoes listed in the Appendix B of IMO Code of Safe Practice For Solid Bulk Cargoes.

Any IMO cargo for which Owners' permission has been given to be loaded same is to be loaded/stowed/trimmed and discharged in accordance with IMO regulations/recommendations at Charterers' time/responsibility and expense.

Scrap metal, non oily, excluding metal borings, shavings and turnings is allowed to be loaded with Soft Loading Clause.

**Clause 30. – Trading Exclusions**
The vessel is not permitted to load, discharge, bunker, to force ice or to follow icebreakers, to trade or call for any purpose in countries, places, zones or areas where:

(a) war has been declared, is about to be declared or has broken out without any such declaration or where hostilities are imminent or in progress, including civil war, insurrection, revolution etc.

(b) in Australia / Alaska / Azov Sea / Burma / Cabinda / Cambodia (Kampuchea) / Cuba / all C.I.S Pacific ports / Eritrea / Ethiopia /Faroe islands / Greenland / Great Lakes / Haiti / Iceland / Iran / Iraq / Israel / Laos / Liberia / Mozambique but Maputo is allowed / Myanmar / New Guinea / New Zealand and its territories / North Korea / Orinoco River not West of Matanzas / Papua / Scandinavia (Norway / Sweden / Finland / Denmark) / Somalia / Sri Lanka / Sierra Leone / Sudan / Syria / Tasmania/ Turkish occupied Cyprus / Vaaino / South and North Yemen / Zaire

(c) in UN or USA or EU sanctioned or embargoed countries/areas

(d) in high-risk, for gipsy moth or other insect infested port(s) or area(s) as defined by USDA, APHIS, PPQ including the Japanese ports: Chiba, Hachinoe, Hakodate, Hirosima, Oita, Sakata, Shimizu, Tomakomai

(e) no direct trading between P.R. of China and Taiwan or vice versa, is allowed

Trading subject always to CONWARTIME 2004 Clause as attached.

**Clause 31. – Crew Service**
With reference to Clause 8 of this Charter Party "customary assistance" shall include, but not be limited to:                                    *(to be continued...)*

Tramp Maritime Inc.

 Trans-Globe Maritime Shipping GmbH

### ADDITIONAL CLAUSES TO CHARTER PARTY MV "FURIA E."
### DATED HAMBURG, 18th MAY 2006

*Clause 31 (continued):*

a) All opening and closing of hatches, when and where required, if permitted by local regulations.

b) Raising and lowering of derricks and rigging cranes, if fitted, and/or gangways in preparation for loading and discharging.

c) Shaping up vessel's holds/hatches and cranes prior arrival at loading and/or discharging places so as to immediately commence loading and/or discharging operations subject to weather conditions and the safety of the crew.

The above services shall be considered as a minimum and shall in no way be construed as an alternative to or reduction in the standard of services from Officers and Crew required under this Charter Party.

A, B, C to be carried out provided shore and labour unions regulations permit, otherwise shore labour to be used at Charterers' account.

### Clause 32. – Grab Fitting/Operation
*Deleted*

### Clause 33. – In Lieu Of Hold Cleaning
Charterers shall have the option of redelivering the vessel without cleaning of holds against paying the Owners a lumpsum of US$ 4,000.- including, if permitted by local regulations/stevedores, crew to collect from vessel's holds the lashing materials/dunnage/debris which to be disposed on deck for removal by the Charterers at Charterers' time and expense. If not permitted by local regulations/stevedores the Charterers to arrange for the removal and disposal of the above.

Charterers to use dunnage material permitted for vessel's intended trade according to loading/discharging ports.

### Clause 34. – Intermediate Hold Cleaning
*Deleted*

### Clause 35 – Houseflag/Markings
The Charterers shall have the liberty to fly their own houseflag and paint the funnel only with their own colours. Expenses and time in this connection including changing back to Owners' colours prior redelivery to be for Charterers' account.

### Clause 36 – Additional Fittings
Charterers shall be at liberty to fit/weld at their time/expense any additional equipment/fittings for loading/discharging and/or securing cargo. Such work shall be done at the Charterers' expense and time and Charterers shall remove such equipment and fitting at their expense prior to redelivery, if Owners so request. The meaning of this Clause shall include but not limited to welding of padeyes for lashing/securing of cargo in holds on deck.

### Clause 37 – Dispute Resolution Clause - English Law, London Arbitration
(a) This Contract shall be governed by and construed in accordance with English law and any dispute arising out of or in connection with this Contract shall be referred to arbitration in London in accordance with the Arbitration Act 1996 or any statutory modification or re-enactment thereof save to the extent necessary to give effect to the provisions of this Clause.

The arbitration shall be conducted in accordance with the London Maritime Arbitrators Association (LMAA) Terms current at the time when the arbitration proceedings are commenced.

*(to be continued...)*

2



Trans-Globe Maritime Shipping GmbH

Tramp Maritime Inc.
9 N Vernreal Street, 18525 Piraeus
Tel: +30210138891/931-3/210-401321
E-Mail: trance[@] tramp.cut.tms.gr

---

## ADDITIONAL CLAUSES TO CHARTER PARTY MV "FURIA R" DATED HAMBURG, 18th MAY 2006

*Clause 37 (continued):*

The reference shall be to three arbitrators. A party wishing to refer a dispute to arbitration shall appoint its arbitrator and send notice of such appointment in writing to the other party requiring the other party to appoint its own arbitrator within 14 calendar days of that notice and stating that it will appoint its arbitrator as sole arbitrator unless the other party appoints its own arbitrator and gives notice that it has done so within the 14 days specified. If the other party does not appoint its own arbitrator and give notice that it has done so within the 14 days specified, the party referring a dispute to arbitration may, without the requirement of any further prior notice to the other party, appoint its arbitrator as sole arbitrator and shall advise the other party accordingly. The award of a sole arbitrator shall be binding on both parties as if he had been appointed by agreement.

Nothing herein shall prevent the parties agreeing in writing to vary these provisions to provide for the appointment of a sole arbitrator.

In cases where neither the claim nor any counterclaim exceeds the sum of USD 50,000 (or such other sum as the parties may agree) the arbitration shall be conducted in accordance with the LMAA Small Claims Procedure current at the time when the arbitration proceedings are commenced.

(b) Notwithstanding the above, the parties may agree at any time to refer to mediation any difference and/or dispute arising out of or in connection with this Contract.

In the case of a dispute in respect of which arbitration has been commenced under the above, the following shall apply:-

(i)    Either party may at any time and from time to time elect to refer the dispute or part of the dispute to mediation by service on the other party of a written notice (the "Mediation Notice") calling on the other party to agree to mediation.

(ii)   The other party shall thereupon within 14 calendar days of receipt of the Mediation Notice confirm that they agree to mediation, in which case the parties shall thereafter agree a mediator within a further 14 calendar days, failing which on the application of either party a mediator will be appointed promptly by the Arbitration Tribunal ("the Tribunal") or such person as the Tribunal may designate for that purpose. The mediation shall be conducted in such place and in accordance with such procedure and on such terms as the parties may agree or, in the event of disagreement, as may be set by the mediator.

(iii)  If the other party does not agree to mediate, that fact may be brought to the attention of the Tribunal and may be taken into account by the Tribunal when allocating the costs of the arbitration as between the parties.

(iv)   The mediation shall not affect the right of either party to seek such relief or take such steps as it considers necessary to protect its interest.

(v)    Either party may advise the Tribunal that they have agreed to mediation. The arbitration procedure shall continue during the conduct of the mediation but the Tribunal may take the mediation timetable into account when setting the timetable for steps in the arbitration.

(vi)   Unless otherwise agreed or specified in the mediation terms, each party shall bear its own costs incurred in the mediation and the parties shall share equally the mediator's costs and expenses.

(vii)  The mediation process shall be without prejudice and confidential and no information or documents disclosed during it shall be revealed to the Tribunal except to the extent that they are disclosable under the law and procedure governing the arbitration.

3

19

Tramp Maritime Inc.



Trans-Globe Monitor Shipping GmbH

---

**ADDITIONAL CLAUSES TO CHARTER PARTY MV "FURIA R"
DATED HAMBURG, 18th MAY 2006**

**Clause 38 – Arrest**
Should the vessel be arrested during the currency of this Charter at the suit of any person including Charterers having or purporting to have a claim against or any interest in the vessel, hire under this Charter Party shall not be payable in respect of any period whilst the vessel remains under arrest or remains unemployed as a result of such arrest, only direct related expenses incurred by and/or during seizure or detention or arrest or delay to be for Owners' account.

This clause shall not apply should the arrest be caused through any fault on the part of Charterers their agents and/or servants.

**Clause 39 – Bills Of Lading**
Charterers' Bills of Lading to be used if required by Charterers. All original Bills of Lading to be couriered to the Owners'/Managers' office, when available to Charterers.

In case the original Bill(s) of Lading are not available upon vessel's arrival at discharging port, Owners/Master to release the entire cargo against Charterers' Letter of Indemnity which to be inline with Owners' standard P & I Club format and which to be signed by Charterers only.

Discharge to commence on receipt by Owners of faxed copy of the LOI.

Should Charterers require vessel to change discharging port after Bills of Lading have been issued Owners to comply with such instructions upon receipt of a faxed copy of a single LOI signed by Charterers only and issued in conformity with Owners' standard P & I Club form.

Attached please find the standard forms of Letters of Indemnity to be given in return for:

   a)  Delivery cargo without production of the original Bill of Lading.

   b)  Delivering cargo at a port other than that stated in the Bill of Lading.

   c)  Delivering cargo at a port other than that stated in the Bill of Lading and without production of the original Bill of Lading.

Charterers may place one original Bill of Lading on board the vessel against marking all original Bills of Lading with the following Clause; "One original Bill of Lading carried on board on which the cargo may be properly released against instructions received from the Charterers".

Owners are herewith instructed to discharge against such Bill of Lading carried on board and will do so unless instructed otherwise by Charterers.

No through-, nor way- Bills of Lading are to be issued under this Charter Party.

Charterers have the option to use in house Bills of Lading and liner Bills of Lading. Charterers to undertake directly to cover for their account all relevant expenses arising from issuance of liner Bills of Lading.

Bills of Lading to be in conformity with Mate's receipt.

All Letter of Indemnity text subject to running changes from the association of P & I Clubs.

**Clause 40. – Bulldozers**
Charterers to have the option to use bulldozers in vessel's holds, provided not exceeding the tank top strength.

If required, vessel to lift onboard, shift from hold to hold and discharge the bulldozers by use of vessel's gear, provided not exceeding vessels gear capacity.

4

31 Jan 07 11:51     J G R                     0030210001891          P-9



Trans-Globe Monitor Shipping GmbH

Tramp Maritime Inc.
[illegible address lines]

---

ADDITIONAL CLAUSES TO CHARTER PARTY MV "FURIA B"
DATED HAMBURG, 18th MAY 2006

**Clause 61. - Bunkers**

Vessel to be delivered with about 700 metric tons IFO and about 125 metric tons MDO and vessel to be redelivered with about same quantities as on delivery.

Bunker prices at both ends:     US$ 340.- per metric ton IFO and
                                US$ 640.- per metric ton MDO

Charterers to take over and pay for bunkers on delivery together with the first hire payment.

Owners have the right to bunker the vessel, prior redelivery for their own account, provided this operation does not interfere with Charterers' cargo operations.

The Charterers have the option to deduct value of bunkers on redelivery from the last sufficient hire payment(s).

Charterers are allowed to bunker vessel for own account prior delivery provided same does not interfere with vessel's operations.

Charterers to provide the vessel with bunkers in accordance with the ISO Standard #217:1996 as follows:

IFO 380 CST Class RMG 35 / MDO Class DMB

In order to comply with the terms and conditions of the various bunker suppliers, the sample to govern quality shall be the sample drawn by the supplier and witnessed by the ship's Chief Engineer or Surveyor appointed by Owners. Analysis of said sample in accordance with the recognised ISO test methods at a mutual agreed reputable and dedicated laboratory shall be binding and conclusive for both parties.

Quantity supplied shall be finally determined by sounding of the tanks of the delivering barge or by reading of meters at shore installation or by independent surveyor, if any independent surveyor is appointed, and there is a contradiction the surveyors finding is to be the accepted ones.

In case for full vessel's bunkering the availability of empty/available tanks to be taken into consideration after Charterers have consulted with the Master, in order avoid mixing/contamination of not compatible bunkers.

**Clause 62. - Cargo Claims/P & I Club**

Owners guarantee that the vessel is entered and shall remain entered in a Protection and Indemnity Association which is a member of the Group of International P & I Clubs, for the duration of this Charter Party. Entry shall include, but not be limited to, ordinary cover for cargo claims. Charterers confirm that they will remain covered with a first class P and I Club for the duration of this Charter Party.

It shall be considered a fundamental breach by Owners if the vessel's P & I cover or class is cancelled or suspended during the currency of this charter.

In the case of damage to and/or loss of cargo carried on the vessel in which Owners' and/or Charterers' liability could be involved under the terms of this Charter Party, as the case may be, the Owners and/or the Charterers shall on request grant reasonable time extension for commencement of suit in each and every occurrence. Such extensions shall not prejudice the ultimate responsibility of both parties. Liability for cargo claims as between Owners and Charterers shall be apportioned as specified by the Interclub New York Produce Exchange Agreement effective from 1996, and its subsequent amendments.

If required by Charterers, Owners to provide valid Certificate of Entry confirming that the vessel is fully covered for P and I and that collection of premiums are up-to-date.     *(to be continued...)*

5

21

31 Jan 07 11:52    J G R    00302198881693    p.10

Tramp Maritime Inc.
9 # Vesselman Street, 145 29 Annex
To (1)5298102823-9001-5)9045-8921
5-Link: chartering@trkingmarine.g.y


Trans-Globe Bonslar Shipping GmbH

---

## ADDITIONAL CLAUSES TO CHARTER PARTY M.V. "FURIA II" DATED HAMBURG, 15th MAY 2006

**Clause 42 (continued):**

No claim is to be settled by one party without prior consent and agreement of the other party. Same to apply for time limits extension.

Owners' P and I Club    : West Of England
Charterers' P and I Club    : U.K. Club

**Clause 43. - Certificates/Vaccinations**

Owners are obliged to deliver and maintain throughout the currency of this Charter Party the vessel, her Crew and anything pertaining hereto supplied with up-to-date and complete certificates (including Oil Pollution Certificates), approvals, equipment and fittings, enabling the vessel and her Crew to trade within the trading limits and to load, carry and discharge all cargoes permitted under this Charter Party.

Officers and Crew to comply with vaccination and sanitary regulations in all ports of call and corresponding certificates to be available onboard, enabling the vessel to obtain free pratique by radio.

If requested, Owners to provide Charterers with copies of any and all such certificates/approvals.

Any time lost and all extra directly related expenses resulting from Owners' non compliance with the above to be for Owners' account and same may be deducted from hire.

**Clause 44. - Deductions**

The Charterers may deduct from the charter hire any amount disbursed for Owners' account. In addition Charterers may deduct from the last hire payments the reasonable estimated expenses incurred by Charterers for Owners' account, but maximum US$ 500.- per port, notwithstanding that vouchers may not then have reached Charterers for submission to Owners.

**Clause 45. - Delivery/Redelivery Time**

Hire to be settled basis Greenwich Mean Time but lay/can to be based on local time.

**Clause 46. - Double Banking**

Charterers have the right to load and/or discharge on double banking basis or by any other means available at loading and/or discharging port or place always subject to Master's reasonable satisfaction and any additional equipment/facilities such as fenders whenever considered necessary by the Master, are to be supplied by the Charterers in their time and at their expense.

Charterers to notify Owners well in advance about such procedure in order Owners arrange timely insurance cover.

If at any time during the operation, the Master reasonably considers it unsafe to combine due to adverse weather conditions etc. he may order the other vessel(s) and/or barge(s) away from his vessel or remove his own vessel in order to avoid prejudicing the safety of the vessel(s). Any additional insurance premium net of all rebates, if required by vessel's Underwriters to be for Charterers' account. Amount not to exceed the premium obtainable on the London market.

**Clause 47. - Hold Condition**

Vessel's holds on arrival at first loading port to be clean swept/washed down by fresh water and dried up so as to receive Charterers' intended cargoes in all respects free of salt, loose rust scale and previous cargo residues to the satisfaction of Charterers/Shippers' surveyor.

Should the vessel not be approved by the surveyor the vessel to be placed off-hire. Owners warrant vessel's holds will be free of rust scale, clean, dry and suitable in every way for carriage of Charterers' intended cargo and hatchcovers are absolutely watertight.

6

22

31 Jan 07 11:53    J S R    00302109861851    p.11

 Trans-Globe Monitor Shipping GmbH

Tramp Maritime Inc.

## ADDITIONAL CLAUSES TO CHARTER PARTY MV "BURIA R"
### DATED HAMBURG, 18th MAY 2006

**Clause 48. - ITF/Boycott**
Owners warrant that the vessel's Crew is and will be during the period of this Charter Party employed under a Bona Fide Union Agreement, the standard of which is fully acceptable to the I.T.F. and Union in all countries not excluded in this Charter Party.

In the event of the vessel being denied or restricted in the use of port and/or loading and/or discharging facilities or shore labour and/or tug or pilotage assistance or of any other restriction, detention or any loss of time whatsoever due to boycott or arrest of the vessel or due to government restrictions all caused by the vessel and/or by reason of the terms and conditions on which members of the Crew are employed or by reason of any trading of this or any other vessel under same ownership or operation or control, the payment of hire shall cease for the time thereby lost and all extra directly related expenses incurred due to above are to be for Owners' account and may be deducted from hire. Owners are also responsible for any claim that may be presented by third party unless same is caused by Charterers and/or their servants/agents.

**Clause 49. - Inspection**
The Charterers and/or their Supercargo(es) shall have free and unlimited access to the whole vessel including but not limited to bridge, holds, engine room, all vessel's tanks including bunker, lubricating oil, sludge, ballast water, freshwater tanks during the charter period. Whenever required, the Master, if possible, must bring the vessel to an even trim to ensure correct bunker soundings. The Charterers and/or their Supercargo(es) and/or Surveyor(s) to have free and unlimited access to the vessel's deck and engine log books, tank plans, calibration scales, and CAP/GA/Midship Section Plans.

**Clause 50. Insurance/Basic War Risk**
Basic annual war risk insurance premium to be for Owners' account. Any additional war risk insurance premium including blocking and trapping and crew war bonus to be for Charterers' account and to be paid against presentation of original invoices. Additional premium not to exceed London Lloyd's Underwriters' scale. "Conwartime 2004 and subsequent amendments" Clause to be incorporated in this Charter Party and in all Bills of Lading.

**Clause 51. - Laying Up/Return Insurance**
Charterers shall have the right to order the laying up of the vessel at any time and for any period of time at a mutually agreed safe berth or safe place, sheltered anchorage, and in the event of such lay-up, the Owners shall promptly take steps to effect all the economy savings in operating costs including insurance, which may be possible and give prompt credit to the Charterers in respect of all such economy savings.
At the request of the Charterers the Owners shall at any time provide an estimate of the economy savings which would be possible in the event of laying up of the vessel.
The Charterers to have the benefit of any return insurance premium received by the Owners from their Underwriters as and when received by reason of the vessel being in port for minimum 30 (thirty) days, provided the vessel is on hire. In case of vessel's lay-up all cost involved in and for reactivation including dry dock if needed to be for Charterers' account and time.

**Clause 52. - Loading Of Steel**
If the vessel is nominated to load a full or part cargo of steel products the Owners to appoint a vessel's P & I Surveyor to perform a "pre loading cargo condition survey" provided that such survey is required or recommended by the Owners' P and I Club. Such survey is to take place in Charterers' time and cost to be equally shared between Owners and Charterers. Copy of such survey to be given to Charterers without delay.

Charterers to give sufficient notice to Owners for their intention to load steel cargoes.

7

23

31 Jan 07 11:54     J G R                                 00302109991091                P.12



Trans-Globe Monitor Shipping GmbH

Tramp Maritime Inc.
P.P. Branch, Street 1859 P-set.4
Tel:+30034735514+1/1214-7001
E-mail tramp@trampmaritime.g

---

**ADDITIONAL CLAUSES TO CHARTER PARTY MV "FUNJA R"
DATED HAMBURG, 13TH MAY 2005**

---

**Clause 53. – Notices**
Owners/Master to give notices for vessel's expected delivery on fixing and daily.

**Clause 54. – Off-Hire**
Should the vessel put back whilst on voyage by reason of any accident or breakdown or in the event of loss of time either in port or at sea or deviation upon the course of the voyage caused by sickness of or accident to the Crew or any person travelling onboard the vessel (other than supercargo travelling by request of the Charterers) or by reason of the refusal of the Master or Crew to perform their duties, or oil pollution or capture/seizure, or detention or threatened detention by any authority including arrest, the hire shall be suspended from the time of the inefficiency until the vessel is again efficient in the same or equidistant position, and voyage resumed therefrom. All extra directly related expenses incurred including bunkers consumed during period of suspended hire shall be for Owners' account.

During any off-hire period estimated to exceed 5 days, the Owners to give the Charterers not less than 5 days definite notice of resumption of the service.

**Clause 55. – Oil Pollution**
Owners guarantee to provide and maintain during the entire time charter period, at their expense and carry onboard the vessel a valid U.S. Certificate of Financial Responsibility. Owners also guarantee to have secured current certificates for other countries/federal states or municipal or other division or authority thereof, where guarantees are required. All such certificates to be valid throughout the entire timecharter period.

The Charterers shall in no case be liable for any damage as a result of the Owners' failure to obtain the aforementioned certificates. Time lost by non compliance to be considered as off hire and may be deducted from hire.

**Clause 56. – On/Off Hire Survey**
On hire/off hire survey to be held at Charterers' time and expense. Owners appointing Master/Chief Engineer to carry out on their behalf joint survey (practically, on/off hire survey is taking place during vessel's operation and there is no separate time for it).

**Clause 57. – Panama-Suez Canal**
Owners warrant that the vessel is fitted for the transit of the Suez and Panama Canal in loaded and/or ballast condition and complies with all and any regulations of the relevant canal authority and shall not be subject to any conditions of transit not customarily required by the relevant canal authority whether pursuant to their regulations or otherwise. Should the vessel not comply with the warranties contained in this clause and/or any regulations or conditions of transit laid down by the relevant canal authority, Charterers may suspend hire for all time lost and Owners to pay all expenses resulting as a consequence of Owners' failure to comply with this warranty.

**Clause 58. – Plans**
Owners to courier to the Charterers the Capacity Plan, Deadweight Scale, and General Arrangement Plan as soon as possible.

**Clause 59. – Power Clause**
The vessel to supply free of expense to Charterers 440 volt 3 phase 50 cycles and 40 kva per crane from the power supply panel in each crane house. Charterers have the right to fit/connect magnets, grabs or other loading/discharging equipment customary to the trade onto vessel's cranes and/or power supply.

3

24

31 Jan 07 11:55      J & R                    00302109881881      P.13

 Trans-Globe Monitor Shipping GmbH

Tramp Maritime Inc.
8.1 Vener~ as Street - NA 38 Pireaus
T: +4-210-9819273/Fex:+-210-9819200
E-mel: chartsang@trampmaritime.gr

---

**ADDITIONAL CLAUSES TO CHARTER PARTY MV "FURIA R"**
**DATED HAMBURG, 18ᵗʰ MAY 2006**

**Clause 60. - Protective Clauses**
Conwartime 2004, New Both-to-Blame Collision Clause, New Jason Clause, General Clause Paramount, U.S.- and Canadian Clause Paramount and Club Nuclear Clause to apply.

**Clause 61. - Punctual Payment**
With reference to Clause 5, Owners to give Charterers 3 (three) New York banking days written notice excluding Sundays and holidays to rectify a failure to make punctual and regular payment before exercising their right of withdrawal.

**Clause 62. - Bankers**

The Royal Bank of Scotland Plc.
45, Akti Miaouli
Piraeus - Greece
Bank's Swift Code : RDOSGRAA
IBAN          : GR98 0640 0070 0055 5546 6128 100
Favour of Polinos Maritime Ltd.
Account No    : 466128 USD 100
Correspondent Bank in New York: J.P. Morgan-Chase

First hire and value of bunkers on delivery to paid within 3 banking days after vessel's delivery. Charterers entitled to deduct from last sufficient hire payments value of bunkers on redelivery plus estimated Owners' expense US$ 500.- per calling port unless a higher amount has been authorized by the Owners (or Owners to arrange with agents and settle Owners' disbursement directly).

**Clause 63. - Sea Carrier Initiative Agreement**
Owners and Charterers confirm they are both signatories to the Sea Carrier Initiative Agreement in order to co-operate with the U.S. Customs Service in the fight against the drug menace.

**Clause 64. - Stevedore Damage**
Should any damage be caused to the vessel or her fittings by the Charterers or their stevedores the Master is to:

A) Give written notice to the Charterers immediately after the occurrence of full particulars of the damage caused of the party allegedly responsible for the damage.

B) Promptly but within 24 hours after occurrence give written notice to the party allegedly responsible giving full particulars of the damage and its alleged cause, and obtain the written acknowledgement of liability from such party or failing that, the acknowledgement of receipt of such notice.

C) Immediately arrange, in conjunction with Charterers' agents for the damage to be surveyed and an estimate of the repair costs given.

Failing the aforementioned the Charterers are not to be responsible for such damage and/or loss of time, except for hidden damage, which must be attended to as per the above procedure immediately it is discovered but latest upon completion of the voyage in question.

In case responsible party refuse to sign then the Master will immediately inform Charterers or their agents accordingly.

Any unrepaired damage not affecting seaworthiness and/or her working capacity/class, may be repaired in Owners' time during next regular drydocking and Charterers to pay repair expenses against voucher.

*(to be continued...)*

9



Tramp Maritime Inc.

Trans-Globe Monitor Shipping GmbH

### ADDITIONAL CLAUSES TO CHARTER PARTY MV "FURIA R"
### DATED HAMBURG, 18TH MAY 2006

*Clause 64 (continued):*
If during the performance of the Charter Party stevedores employed by the Charterers should cause such damage to the vessel which affects her seaworthiness and/or her working capacity/plans and if such damage should then not be repaired by such stevedore, Charterers will be responsible for cost of such necessary repairs and the vessel shall remain on hire during such repairs, provided Master has fully complied with n/b/a above.

**Clause 65. - Taxes**
Taxes and/or dues and/or charges whatsoever, imposed on cargo by any local or national authorities, arising out of trade under this Charter Party to be borne by Charterers. Taxes levied by governments other than that of Owners' domicile or vessel's flag on earnings under this Charter Party other than the hire payable to Owners shall be for Charterers' account.

**Clause 66. - Warranties**
Owners warrant that the vessel:
- is not blacklisted by Arab countries nor anywhere else within the agreed trading limits,
- has not traded Cuba and Israel, and,
- is eligible for bunkers in the United States of America, its territories and possessions in accordance with directives from the United States Department of Commerce, Office of International Trade.

**Clause 67. - Watertight Hatches**
The Owners guarantee that on vessel's delivery and throughout the currency of this Charter the vessel's hatch covers are watertight. All hatches are to be carefully attended by the Crew to prevent leakage.

*Hatch Test*
The Charterers have the option to hose test or ultrasonic test the vessel's hatch covers at loading port(s) at their time/expense and should same not be watertight, Owners have the obligation to arrange necessary measures in order to make the hatch covers fully watertight. Owners shall be given by Charterers three working days to rectify the situation after which if the hatch covers are not watertight, Charterers have the right to cancel this Charter Party and redeliver the vessel, provided no cargo on board.

**Clause 68. - Ocean Route Clause**
Charterers may supply "ocean routes" or "fleetweather" or similar advise to the Master throughout the voyage specified by the Charterers. The Master to comply with the reporting procedure of routing service, but it is understood that final routing is always at Master's discretion for safe navigation and choice of route. For the purpose of the charter party 'good weather condition' are to be defined as weather conditions in wind speeds not exceeding Beaufort force 4, evidence of weather condition to be taken from the vessel's deck logs and independent weather bureau's reports. In the event of a consistent discrepancy between deck logs and independent weather bureau's reports the independent weather bureau's reports shall be final and binding by both parties.

**Clause 69. - Drydocking**
No drydocking under this Charter Party except in case of emergency.

**Clause 70. - Towage, Pilotage, Etc.**
The Owners authorize the Charterers, as agents of and on behalf of the Owners and/or the vessel to arrange and contract for loading/discharging operations in the ports for any towage, pilotage or the like service on usual or customary terms and/or those terms offered or required by towing/pilotage companies employed where such services are furnished.

31 Jan 07 11:58    J G R    00302108981991    P.15



Trans-Globe Monitor Shipping GmbH

Tramp Maritime Inc.

---

### ADDITIONAL CLAUSES TO CHARTER PARTY MV "TURIA R"
### DATED HAMBURG, 18th MAY 2006

**Clause 71. - War Cancellation**
In the event of war, whether declared or undeclared involving Japan, Greece or Denmark, or between any two or more countries of U.S.A., C.I.S., United Kingdom, People's Republic of China, directly affecting the performance of this Charter either party has the right to cancel this Charter or any remaining portion thereof.

**Clause 72. - Cement Holes**
If the vessel is not already fitted with suitable cargo inlets/loading holes Charterers have the option to fit the vessel with same as per requirements of the port/shippers for Charterers' account and expense. Cutting/closing (re-welding/screw fastening) of such openings on completion of loading to be under Master's supervision/satisfaction and responsibility. The cost of classification society's approval of this work to be for Charterers' account.

**Clause 73. - ISM Code**
From the date coming into force of the International Safety Management (I.S.M.) code in relation to the vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the vessel and "The Company" (as defined by the I.S.M. Code) shall comply with the requirements of the I.S.M. code. Upon request the Owners shall provide a copy of the relevant Document of Compliance (D.O.C.) and Safety Management Certificate (S.M.C.) to the Charterers. Any loss, damage, expenses or delay caused by failure on the part of the Owners or "The Company" to comply with the I.S.M. Code shall be for the Owners account.

**Clause 74. - Lien**
In the event that Charterers have a contractual or statutory right of lien over cargo carried on board for hire, freight, deadfreight or demurrage Owners shall co-operate as much as Owners' P + I Rules permit with Charterers.

**Clause 75. - Conteaching**
Whilst Charterers have the option to load two or more cargoes in the same holds, Charterers are to supply, erect, dismantle and dispose of any and all separations at their time, risk and expense.
Any claims arising from contamination or admixture to cargo carried in the same hold to be the responsibility of Charterers/Shippers and Receivers and to be for their account.

**Clause 76. - Deck Cargo**
Charterer's option to load intended cargo on deck/hatchcover at Charterers' risk/expense in accordance with vessel's deck/hatchcover strength and stability at Master's discretion. Bills of Lading for deck cargo to be marked "Shipped on deck at Charterers'/Shippers'/Receivers' risk and expense without liability of the carrier for loss or damage howsoever caused".

**Clause 77. - Ballast/Deballast Clause**
Any detergent/disinfectant required by authorities to be added to ballast water in order to enable vessel to ballast/deballast holds/spaces within national waters of respective countries to be supplied by Charterers and this to be done at Charterers' time, risk and expense.

**Clause 78. - Sale Option**
*Deleted*

**Clause 79. - Hamburg Rules**
Neither the Charterers nor their agents shall permit the issue of any Bills of Lading, waybill, or other documents evidencing a contract of carriage (whether or not signed on behalf of the Owners or on the Charterers' behalf or on behalf of any sub-Charterers) incorporating where not compulsorily applicable, the Hamburg Rules or any other legislation giving effect to the Hamburg Rules or any other legislation imposing liabilities in excess of Hague or Hague/Visby Rules.    *(to be continued...)*

11

27

31 Jan 07 11:57     J G R                    00202109801091         p. 16

Tramp Maritime, Inc.



Trans-Globe Bunker Shipping GmbH

---

**ADDITIONAL CLAUSES TO CHARTER PARTY MV "FURIA R"
DATED HAMBURG, 18th MAY 2006**

*Clause 70 (continued):*

The Charterers shall indemnify the Owners against any liability, loss or damage which may result from any breach of the foregoing provisions of this clause.

Clause 80. – Declaration Of Optional Period
*Deleted*

Clause 81.

If the vessel is encountering prolonged stay, minimum 30 days in a port and there is strong reason to believe that the vessel's hull has acquired excessive marine growth affecting vessel's speed/consumption due to the stay at this specific port, Owners are to arrange for diver inspection.

Should the result of this diver inspection indicate there is excessive marine growth on the hull, Owners/Charterers to arrange underwater scrubbing of the hull in Charterers time and expense, prior to vessel's departure from the port, if same can be done without reasonable delay. If the underwater scrubbing is not available or can not be carried out at the port in question same to be carried out in Charterer's time in the best convenient port.

Charterers agree no claim for underperformance of the vessel for the passage from the port in question until underwater scrubbing is carried out.

Dry dock can be carried out in case of emergency.

Clause 82. – Description Of Vessel
M/V "Furia R" ex "Fairy Queen"
BC, Malta Flag, Built 1996, Class NK
46,664 MTDW (summer) on 11.62M SSW
LOA/B/D          : 189.3/31.0/16.5 M
GRT/NRT          : 27,011/16,011
5 Ho/Ha Grab/Bale  : 59,820/57,237 M3
Folding Type Hydraulic Driven Hatch Covers
Hatch Sizes      : No.1: 17.60 x 17.16, No.2-5: 20.8 x 17.16M
Cranes           : 4 x 30 MT

Speed/consumption, based on b/scale under d and no adverse current:
- abt 13,5 knots on abt 25,0 mt MARINE IFO 380CST + abt 1,8 mt MDO in ballast
- abt 13,5 knots on abt 27,5 mt MARINE IFO 380CST + abt 1,8 mt MDO in laden.

At port:
abt 0,8 mt MARINE IFO 380CST + abt 1,5 mt MDO - W/W: abt 3,8 mt MDO

Vessel to be supplied with bunkers:
-IFO max 380 CST-grade RMG 35 in accordance with ISO 8217
-MDO grade DMB in accordance with ISO 8217

When manoeuvring and steaming in rivers, canals, dense traffic areas and operating under a load of abt 35 pct or less the vessel is burning MDO.

All details are 'about' excluding bunker grade

As per vessel's classification note (as per SOLAS): "the ship is not allowed to sail with any cargo hold loaded to less than 10 pct of the holds maximum allowable cargo weight when in the full load condition".

Previous cargoes: grains from USA, steels from Black Sea to USA, and before vessel's holds had been sandblasted + painted.
                                                                        *(to be continued...)*

12

31 Jan 07 11:58    J G R    0030210**21831    p.17



Trans-Globe Monitor Shipping GmbH

Tramp Maritime Inc.

---

ADDITIONAL CLAUSES TO CHARTER PARTY MV "FURIA R"
DATED HAMBURG, 18th MAY 2006

---

*Clause 82 (continued):*

- Owners to confirm vessel has not been detained by any countries during the last 24 months and has no outstanding deficiencies from port state controls. - Yes but as from February '05 since the vessel has been under present Owners.

- Owners guarantee that the terms and conditions of employment of the crew of the vessel for the period of the Charter Party are covered by a bonafide trade union agreement acceptable to the itf. Owners warrant vessel and Owners are fully ISM, (BIMCO ISM Clause to apply) and P and I covered with IACS member throughout the duration of this Charter Party.

- Owners confirm vessel has no centreline beams/bulkheads or any other obstruction on decks or holds which would interfere with loading/discharging operations and use/or use of bulldozers/payloaders.



MV FURIA R – "BIMCO" BALTIC EXCHANGE DRY CARGO QUESTIONNAIRE

1.    General
1.1   Vessel's name                      : "FURIA R"
1.2   Vessel's previous name(s)          : "FAIRY QUEEN"
1.3   Flag                               : MALTA
1.4   Month/year and where built         : JAN 1996 - JAPAN
1.5   Yard name and number               : MITSUI ENGINEERING AND SHIPBUILDING TOMANO
                                           WORKS, JAPAN
1.6   Official class register
      number/Lloyds number               : ;
1.7   Class of vessel                    : NKK NS BULK CARRIER, (ESP) MNS
1.8   Port of registry                   : VALETTA, MALTA
1.9   Owners (full style and
      contact numbers)                   : POLINOS MARITIME LTD, VALETTA - CONTACT C/O
                                           MANAGERS
1.10  Managers                           : J.G.ROUSSOS SHIPPING S.A, GREECE
1.11  Disponent Owners for the
      purpose of this C/P (if applicable)

2     Particulars of vessel
2.1   Type of vessel                     : BULK CARRIER
2.2   State following:
      Deadweight all told:        Draft      TPI/TPC   (m/tons)
      Summer    : 46.664    11,62m     51,5
      Winter    : 45.420    11,33m     51,4
      Tropical  : 47.912    11,862m    ·51,6
      Fresh Water : 46.664  11,834m    51,6 ·
      Tropical FW : 47.885  12,126m    51,6

2.3   Is vessel fitted for transit of:
      A) Panama Canal    : YES
      B) Suez canal      : YES
      C) St. Lawrence Seaway : NO

2.7   GT/NT:
      International : 27,011  / 16,011
      Suez         : 27,757.29 / 24,983.30

*(to be continued...)*

13

29

Tramp Maritime Inc.
B.v vessels bree rss Brout
3KV+32HCH1321.fari.E.21CHE
fulak zeans@tramprantime.gr

Trans-Globe Bunker Shipping GmbH

## ADDITIONAL CLAUSES TO CHARTER PARTY M/V "FURIA X"
## DATED HAMBURG, 18th MAY 2006

*Clause 2 (continued):*

Panama      : 27,611   / 22,454

2.8   Length overall (meters)                    : 189,80

2.9   Length between Perpendiculars (meters)     : 181,00

2.10  Extreme breadth (meters) and depth moulded  : 31,00 / 16,50

2.11  Distance from waterline to top of hatch coaming:
      A. Fully loaded condition                            : HATCH NR 1/3/5: 7.11/7.11/7.11m
      B. Full Ballast condition (ballast holds not flooded) : HATCH NR 1/3/5: 14.83/13.77/12.67
      C. Full ballast condition (ballast holds flooded)     : HATCH NR 1/3/5: 10.93/10.67/10.40

2.12  State vessel's deballasting time in metric tons per hour   : about 1.000 m3 per hour

2.15  State capacity of
      A. Ballast tanks
      B. Hold ballast capacity (state which hold):
      HOLD NR 3 FLOODABLE WITH SEA WATER - CAPACITY 12,589 M3

2.16  Constant excluding fresh water            : about 350 mt
      Daily freshwater consumption              : abt 9mt
      Fresh water capacity                      : 343.0 M3
      State capacity and daily production of evaporators : abt 10mt
      Normal fresh water reserve                : abt 200mt

2.17  Vessel is fixed with shaft generator     : NO

2.18  State vessel's onboard electrical supply  : ( 440v / 60 Hz)

3.    Cargo arrangements
3.1   Holds:
      A. Number of holds: FIVE (5)
      B. Are vessels holds clear and free of any obstructions: YES
      D. Grain/bale capacities by hold including hatch ways (CUBM/CBFT)
         GRAIN/BALE: 59,820.4/57,236.7 M3 (2,112.557/2,021.315 CBFT)
         GR/BL INCL. HATCHES
         (1): 10,355.5(365.704) / 9,885.6
         (2): 12,547.2(443.104) / 11,974.7
         (3): 12,583.4(444.383) / 11,930.9
         (4): 12,679.7(447.784) / 12,157.1
         (5): 11,654.8(411.582) / 11,308.4
      E. Is vessel strengthened for the carriage of heavy cargoes: YES
      F. Is tanktope steel and suitable for grab discharge: YES
      G. corrugations: vertical
      H. Tank top strength (metric tons per SQM)
         STRENGTHS: TANK TOP  HO 1/3/5: 24MT/M2
                              HO 2/4 : 17MT/M2

      I.  Are holds CO2 fitted: NO                          *(to be continued...)*

                                                                    14



Trans-Globe Maritime Shipping GmbH

Tramp Maritime Inc.

ADDITIONAL CLAUSES TO CHARTER PARTY MV "FURIA R"
DATED HAMBURG, 12th MAY 2006

*Clause 32 (continued):*

    J.  Are holds fitted with smoke detection system: NO
    K.  Is vessel fitted with Australian type approved hold ladders: YES
    L.  Has vessel a loadmaster computer/loadicator or other type of mechanical stowage
        calculator: YES
    M.  Are holds hoppered at:
        Hold side: YES
        Forward bulkhead: NO
        Aft bulkhead: NO
        Can vessel's holds be described as box shaped: NO
    N.  Measurement of any tank slopes/hoppering (height and distance from vessel's side at
        tank (top): HEIGHT: 3,62m / DISTANCE: 3,80 m
    O.  Flat floor measurement of cargo holds at tank top:
        TANK TOP DIM:  (1): 27,50  X  8,00m FWD
                                  X 23,54m AFT
                    (2): 27,60  X 23,54m
                    (3): 27,60  X 23,54m
                    (4): 28,00  X 23,54m
                    (5): 28,00  X 23,54m
    P.  Is vessel electrical ventilated: NO

3.2    Hatches
    A.  Number of hatches: FIVE (5)
    B.  Type of hatch covers: FOLDING TYPE HYDRAULIC DRIVEN
    C.  Hatch sizes:  (1): 17,60 X 17,16
                   (2): 20,80 X 17,16
                   (3): 20,80 X 17,16
                   (4): 20,80 X 17,16
                   (5): 20,80 X 17,16
    D.  Strength of hatch covers in metric tons per SQM:
        HA COVERS:  1/2/3/4/5: 2,45MT/M2
    E.  Distance from ship's rail to edge of hatch covers/coaming each side:
        ABOUT 6M EACH SIDE, EXCEPT NR. 1 FWD WHICH IS LESS
    F.  Distance from bow to far of 1st hold opening: ABT 19,60M
    G.  Distance from stern to aft of last hold opening: ABT 25,16M
    H.  Is vessel fitted with cement holes: YES

4    Speed/consumption/fuel engine (up to beaufort scale force 4/douglas sea scale 3):
    -abt 13,50 kn on abt 25,0 mt MARINE IFO 380CST plus abt 1,8 mt MDO in ballast
    -abt 13,50 kn on abt 27,5 mt MARINE IFO 380CST plus abt 1,8 mt MDO in laden
    -At port abt 1,2 mt MARINE IFO 380CST plus abt 1,8 mt MDO
    - W/W: abt 3,8 mt MDO

    Vessel to be supplied with bunkers:
    -IFO MAX 380 CST-GRADE RMG 35 IN ACCORDANCE WITH ISO 8217
    -MDO GRADE DMB IN ACCORDANCE WITH ISO 8217

    When manoeuvering and steaming in rivers, canals, dense traffic areas and operating under a load
    of abt 35 pct or less the vessel is burning MDO

    All details are 'about' excl bunker grade                    *(to be continued...)*

                                                         15

 Trans-Globe Monitor Shipping GmbH

Tramp Maritime Inc
[address lines illegible]

---

**ADDITIONAL CLAUSES TO CHARTER PARTY MV "NUBIA 2"**
**DATED HAMBURG, 18th MAY 2006**

Clause 92 (continued):

4.1
4.2    Bunker grades IFO/MDO: AS STATED ABOVE
4.3    Permanent usable bunker capacities IFO/MDO (excluding unpumpables which are: abt 10 mts
4.4    Port consumption per 24 hours Idle/working 3/24 hours: AS STATED ABOVE
4.5    Engine Make and type: MITSUI-MAN B+W 6S50MC(MK5)
4.6    Max output BHP/RPM: 11100

5.     Banking information: AS PER THE CHARTER PARTY
5.1    Full style and address of Owners bank for freight/hire remittance: AS PER THE CHARTER PARTY

6.     Classification society, surveys and certificates
6.1    Name of Classification society: NKK
6.2    Date of last special survey: 23/12/2005
6.3    Date of last annual survey
6.4    A. Is vessel entered in a classification approved enhanced survey program: NO
       B. Date of last inspection
       C. Date of next inspection
6.5    Date and last place of last drydock: 23/12/05
6.6    Has vessel been involved in any pollution incidents in the last 12 months:
       NO (AS FROM THE TIME OF PRESENT OWNERSHIP)
6.7    Has vessel been involved in any groundings or collision in the last 12 months:
       NO, AS FROM THE TIME OF PRESENT OWNERSHIP.
6.8    Is vessel ISM certified: YES
6.11   Is vessel's crew covered by full ITF or bona fide trade union agreement acceptable to ITF: YES

7      Communication
7.1    Call sign          : 9 H B X 8
7.6    Inmarsat C Telex number  : 4215822010

8      Insurance
8.1    Hull and machinery value:
       USD 24 MILLIONS, INCREASED VALUE USD 6 MILLIONS, TOTAL USD 30 MILLIONS
8.2    Name of Owners' P and I insurer: WEST OF ENGLAND

9      Crew
9.1    Number of crew          : PRESENTLY 23
9.2    Name and nationality of master : PRESENTLY CPT IGOR BUSNUYEV (UKRAINIAN)
9.3    Nationality of officers  : PRESENTLY UKRAINIANS
9.4    Nationality of crew      : PRESENTLY UKRAINIANS

10     Miscellaneous
10.1   Has vessel called at C.I.S. (Russian) Far East Pacific ports in the last 18 months: NO
10.2   State last 5 (five) cargoes carried with load and discharge port(s)
10.3   Is vessel fitted for carriage of grain in accordance with chapter IV of Solas 1974 and
       amendments without requiring bagging strapping and securing when loading a full cargo
       (deadweight) of heavy grain in bulk (stowage factor 42 CBFT) with ends untrimmed? YES
10.4   State number of holds which may be left slack without requiring bagging, strapping and
       securing: ACCORDING TO THE STABILITY CALCULATION

(to be continued...)

16

32

31 Jan 07 12:00    J G R    0030210988189l    P.21



Tramp Maritime Int
[illegible address lines]

Trans-Globe Maritime Shipping GmbH

---

**ADDITIONAL CLAUSES TO CHARTER PARTY MV "FURIA II"**
**DATED HAMBURG, 16th MAY 2006**

*Clause 82 (continued):*

| | | |
|---|---|---|
| 11 | Cargo gear (only to be completed if applicable) | |
| 11.1 | If grated state make and type | : IHI |
| 11.2 | Number and capacity of cranes/derricks and where situated | : 4x30 mts between hatches |
| 1-2, 2-3, 3-4, 4-5 | | |
| 11.3 | Outreach of gear beyond ship's rail | : 10,50 meters |
| 11.4 | If gantry cranes/horizontal slewing (cranes state minimum clearance distance crane hook to top of hatch coaming | : NO |
| 11.5 | Time needed for full cycle with maximum cargo lift on hook | : |
| 11.6 | Slewing/luffing/hoisting speeds | : |
| 11.7 | Is gear combinable for heavy lift | : NO |
| 11.8 | Are winches electro-hydraulic | : YES |
| 11.9 | Consumption of MDO working cranes per 24 hours | : ABT 3,8mt |
| 11.10 | Has vessel grabs onboard | : NO |
| 11.11 | Is vessel fitted with sufficient lights at each hatch for night work | : YES |

**Clause 83. – BIMCO ISPS/MTSA Clause For Time Charter Parties 2005**

(a)  (i)   The Owners shall comply with the requirements of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) relating to the Vessel and "the Company" (as defined by the ISPS Code). If trading to or from the United States or passing through United States waters, the Owners shall also comply with the requirements of the US Maritime Transportation Security Act 2002 (MTSA) relating to the Vessel and the "Owner" (as defined by the MTSA).

(ii)   Upon request the Owners shall provide the Charterers with a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) and the full style contact details of the Company Security Officer (CSO).

(iii)  Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Owners or "the Company"/"Owner" to comply with the requirements of the ISPS Code/MTSA or this Clause shall be for the Owners' account, except as otherwise provided in this Charter Party.

(b)  (i)   The Charterers shall provide the Owners and the Master with their full style contact details and, upon request, any other information the Owners require to comply with the ISPS Code/MTSA. Where sub-letting is permitted under the terms of this Charter Party, the Charterers shall ensure that the contact details of all sub-charterers are likewise provided to the Owners and the Master. Furthermore, the Charterers shall ensure that all sub-charter parties they enter into during the period of this Charter Party contain the following provision:

*"The Charterers shall provide the Owners with their full style contact details and, where sub-letting is permitted under the terms of the charter party, shall ensure that the contact details of all sub-charterers are likewise provided to the Owners".*

(ii)  Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account, except as otherwise provided in this Charter Party.

(c)  Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code/MTSA including, but not limited to, security guards, launch services, vessel escorts, security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the negligence of the Owners, Master or crew.                 *(to be continued...)*

17

33

31 Jan 07 12:01    J G R                    00302109881092        P.22



Trans-Globe Monitor Shipping GmbH

Tramp Maritime in.
6 N verwenden Sirt † ml 2. sau
Munhuurhulbliwc-y j of ul
E-Mail chartering@corsai.com ;

---

**ADDITIONAL CLAUSES TO CHARTER PARTY MV "FURIA R"
DATED HAMBURG, 18th MAY 2006**

*Clause 83 (continued):*

All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

(d) If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

*Footnote: This Clause replaces previously published ISPS Clause for Time Charter Parties AND the US Security Clause for Time Charter Parties, both of which are now officially withdrawn.*

**Clause 84. – BIMCO U.S. Customs Advance Notification/AMS Clause For Time Charter Parties**

(a) If the Vessel loads or carries cargo destined for the U.S. or passing through U.S. ports in transit, the Charterers shall comply with the current U.S. Customs Regulations (19 CFR 4.7) or any subsequent amendments thereto and shall undertake the role of carrier for the purpose of such regulations and shall, in their own name, time and expense :

   i)   Have in place a SCAC (Standard Carrier Alpha Code);
   ii)  Have in place an ICB (International Carrier Bond);
   iii) Provide the Owners with a timely confirmation of i) and ii) above; and
   iv)  Submit a cargo declaration by AMS (Automated Manifest System) to the U.S. Customs and provide the Owners at the same time with a copy thereof.

(b) The Charterers assume liability for and shall indemnify, defend and hold harmless the Owners against any loss and/or damage whatsoever (including consequential loss and/or damage) and/or any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Charterers' failure to comply with any of the provisions of sub-clause (a). Should such failure result in any delay then, notwithstanding any provision in this Charter Party to the contrary, the Vessel shall remain on hire.

(c) If the Charterers' ICB is used to meet any penalties, duties, taxes or other charges which are solely the responsibility of the Owners, the Owners shall promptly reimburse the Charterers for these amounts.

(d) The assumption of the role of carrier by the Charterers pursuant to this Clause and for the purpose of the U.S. Customs Regulations (19 CFR 4.7) shall be without prejudice to the identity of carrier under any Bill of Lading, other contract, law or regulation.

**************

12

*34*

31 Jan 07 12:02    J & R                    00302109881881         p. 29



Trans-Globe Bunker Shipping GmbH

Tramp Maritime Inc.

### ADDITIONAL CLAUSES TO CHARTER PARTY MV "FURIA R"
### DATED HAMBURG, 18th MAY 2006

#### NEW JASON CLAUSE

"In the event of accident, danger, damage or disaster before or after commencement of the voyage resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequences of which, the carrier is not responsible, by statute, contract, or otherwise, the cargo, shippers, consignees, or Owners of the goods shall contribute with the carrier in general average to the payment of any sacrifices, losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the cargo.

If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if such salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, shippers, consignees or Owners of the cargo to the carrier before delivery."

#### NEW BOTH TO BLAME COLLISION CLAUSE

"If the vessel comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, Mariner, Pilot or the Servants of the carrier in the navigation or in the management of the vessel, the Owners of the cargo carried hereunder will indemnify the carrier against all loss or liability to the other or non-carrying ship or her Owners in so far as such loss or liability represents loss of or damage to or any claim whatsoever of the Owners of said cargo, paid or payable by the other or non-carrying ship or her Owners to the Owners of the said cargo and set off, recouped or recovered by the other or non-carrying ship or her Owners as part of their claim against the carrying vessel or carrier.

The foregoing provisions shall also apply where the Owners, operators or those in charge of any ship or ships or objects other than, or in addition to the colliding ships or objects are at fault in respect to a collision or contact."

#### BIMCO BUNKER FUEL SULPHUR CONTENT CLAUSE FOR TIME CHARTER PARTIES 2005

(a) Without prejudice to anything else contained in this Charter Party, the Charterers shall supply fuels of such specifications and grades to permit the Vessel, at all times, to comply with the maximum sulphur content requirements of any emission control zone when the Vessel is ordered to trade within that area.

The Charterers also warrant that any bunker suppliers, bunker craft operators and bunker surveyors used by the Charterers to supply such fuels shall comply with Regulations 14 and 18 of MARPOL Annex VI, including the Guidelines in respect of sampling and the provision of bunker delivery notes.

The Charterers shall indemnify, defend and hold harmless the Owners in respect of any loss, liability, delay, fines, costs or expenses arising or resulting from the Charterers' failure to comply with this Sub-clause (a).

(b) Provided always that the Charterers have fulfilled their obligations in respect of the supply of fuels in accordance with Sub-clause (a), the Owners warrant that:

(i)     the Vessel shall comply with Regulations 14 and 18 of MARPOL Annex VI and with the requirements of any emission control zone; and

(ii)    the Vessel shall be able to consume fuels of the required sulphur content

when ordered by the Charterers to trade within any such zone.

Subject to having supplied the Vessel with fuels in accordance with Sub-clause (a), the Charterers shall not otherwise be liable for any loss, delay, fines, costs or expenses arising or resulting from the Vessel's failure to comply with Regulations 14 and 18 of MARPOL Annex VI.

(c) For the purpose of this Clause, "emission control zone" shall mean zones as stipulated in MARPOL Annex VI and/or zones regulated by regional and/or national authorities such as, but not limited to, the EU and the US Environmental Protection Agency.

#### BIMCO ICE CLAUSE FOR TIME CHARTER PARTIES

(a) The Vessel shall not be obliged to force ice but, subject to the Owners' prior approval having due regard to its size, construction and class, may follow ice-breakers.

(b) The Vessel shall not be required to enter or remain in any icebound port or area, nor any port or area where lights, lightships, markers or buoys have been or are about to be withdrawn by reason of ice, nor where there on account of ice there is, in the Master's sole discretion, a risk that, in the ordinary course of events, the Vessel will not be able safely to enter and remain at the port or area or to depart after completion of loading or discharging. If, on account of ice, the Master in his sole discretion considers it unsafe to proceed to, enter or remain at the place of loading or discharging for fear of the Vessel being frozen in and/or damaged, he shall be at liberty to sail to the nearest ice-free and safe place and there await the Charterers' instructions.

19

31 Jan 07 12:02    J E R                    0030210988189l           p.24



Trans-Globe Humber Shipping GmbH

Tramp Maritime Inc.

---

**ADDITIONAL CLAUSES TO CHARTER PARTY MV "YURIA II"**
**DATED HAMBURG, 15ᵗʰ MAY 2006**

(c)  Any delay or deviation caused by or resulting from ice shall be for the De Charterers' account and the Vessel shall remain on-hire.

(d)  Any additional premiums and/or calls required by the Vessels underwriters due to the Vessel entering or remaining in any ice-bound port or area, shall be for the Charterers' account.

#### WAR RISKS CLAUSE FOR TIME CHARTERS, 2004
Code Name: CONWARTIME 2004

(a)  For the purpose of this Clause, the words:
   (i)  "Owners" shall include the shipowners, bareboat charterers, disponent owners, managers or other operators who are charged with the management of the Vessel, and the Master; and
   (ii)  "War Risks" shall include any actual, threatened or reported: war; act of war; civil war; hostilities; revolution; rebellion; civil commotion; warlike operations; laying of mines; acts of piracy; acts of terrorists; acts of hostility or malicious damage; blockades (whether imposed against all Vessels or imposed selectively against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever); by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the Vessel, her cargo, crew or other persons on board the Vessel.

(b)  The Vessel, unless the written consent of the Owners be first obtained, shall not be ordered to or required to continue to or through, any port, place, area or zone (whether of land or sea), or any waterway or canal, where it appears that the Vessel, her cargo, crew or other persons on board the Vessel, in the reasonable judgement of the Master and/or the Owners, may be, or are likely to be, exposed to War Risks Should the Vessel be within any such place as aforesaid, which only becomes dangerous, or is likely to be or to become dangerous, after her entry into it, she shall be at liberty to leave it.

(c)  The Vessel shall not be required to load contraband cargo, or to pass through any blockade, whether such blockade be imposed on all vessels, or is imposed selectively in any way whatsoever against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever, or to proceed to an area where she shall be subject, or is likely to be subject to a belligerents' right of search and/or confiscation.

(d)  (i)  The Owners may effect war risks insurance in respect of the Hull and Machinery of the Vessel and their other interests (including, but not limited to, loss of earnings and detention, the crew and their protection and indemnity Risks), and the premiums and/or calls therefor shall be for their account.
    (ii)  If the Underwriters of such insurance should require payment of premiums and/or calls because, pursuant to the Charterers' orders, the Vessel is within, or is due to enter and remain within, or pass through any area or areas which are specified by such Underwriters as being subject to additional premiums because of War Risks, then the actual premiums and/or calls paid shall be reimbursed by the Charterers to the Owners at the same time as the next payment of hire is due, or upon redelivery, whichever occurs first.

(e)  If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then the actual bonus or additional wages paid shall be reimbursed to the Owners by the Charterers at the same time as the next payment of hire is due, or upon redelivery, whichever occurs first.

(f)  The Vessel shall have liberty:-
   (i)  to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery, or in any other way whatsoever, which are given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government, body or group whatsoever acting with the power to compel compliance with their orders or directions;
   (ii)  to comply with the order, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance;
   (iii)  to comply with the terms of any resolution of the Security Council of the United Nations, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;
   (iv)  to discharge at any other port any cargo or part thereof which may render the Vessel liable to confiscation as a contraband carrier;
   (v)  to call at any other port to change the crew or any part thereof or other persons on board the Vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions.

20

31 Jan 07 12:03    J S R              00302103981891        p. 28

Tramp Maritime Inc.

 Trans-Globe Monitor Shipping GmbH

## ADDITIONAL CLAUSES TO CHARTER PARTY MV "FURIA R"
### DATED HAMBURG, 18th MAY 2006

(g). If in accordance with their rights under the foregoing provisions of this Clause, the Owners shall refuse to proceed to the loading or discharging ports, or any one or more of them, they shall immediately inform the Charterers. No cargo shall be discharged at any alternative port without first giving the Charterers notice of the Owners' intention to do so and requesting them to nominate a safe port for such discharge. Failing such nomination by the Charterers within 48 hours of the receipt of such notice and request, the Owners may discharge the cargo at any safe port of their own choice.

(h). If in compliance with any of the provisions of sub-clauses (b) to (g) of this Clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfilment of this Charter Party.

### CARRIAGE OF NUCLEAR MATERIALS

"Notwithstanding any provision whether written or printed contained in this Charter, it is agreed that nuclear fuels or radioactive waste or products are specifically excluded from the cargo permitted to be loaded or carried under this Charter Party. This exclusion does not apply to radio isotopes used or intended to be used for any industrial, commercial, agricultural, medical or scientific purpose, provided Owners' prior approval has been obtained to the loading thereof."

### CANADIAN CLAUSE PARAMOUNT

All the terms, provisions and conditions of the Canadian Water Carriage of Goods Act, 1936, and of the Rules comprising the schedule thereto are, so far as applicable, to govern the contract contained in this Bill of Lading and the Shipowners are to be entitled to the benefit of all privileges, rights and immunities contained in such Act and in the schedule thereto as if the same were herein specifically set out.

If anything herein contained be inconsistent with the said provisions, it shall to the extent of such inconsistency and no further be null and void.

The Carrier shall be under no responsibility whatsoever for loss of or damage to goods however and whensoever occurring when such loss or damage arises prior to the loading on and/ or subsequent to the discharge from the Carrier's ship.

### U.S.A. CLAUSE PARAMOUNT

If the vessel load in the U.S.A., the U.S.A. Clause Paramount shall be incorporated in all Bills of Lading and shall read as follows:

"The Bill of Lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April 16th, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the Carrier of any of its rights or immunities of an increase of any of its responsibilities or liabilities under said Act. If any terms of this Bill of Lading be repugnant to said Act to any extent, such term shall be void to that extent but no further".

21

Tramp Maritime Inc

Trans-Globe Maritiem Shipping GmbH

---

**ADDITIONAL CLAUSES TO CHARTER PARTY MV "FURIA R"**
**DATED HAMBURG, 18th MAY 2006**

---

STANDARD FORM LETTER OF INDEMNITY TO BE GIVEN IN RETURN FOR DELIVERING CARGO
AT A PORT OTHER THAN THAT STATED IN THE BILL OF LADING

To:         (insert name of Owners)                              (insert date)
            The Owners of the (insert name of ship)

Dear Sirs,

Ship:       (insert name of ship)

Voyage: (insert load and discharge ports as stated in the bill of lading)

Cargo:      (insert description of cargo)

Bill of Lading:    (insert identification numbers, date and place of issue)

The above cargo was shipped on the above ship by (insert name of shipper) and consigned to (insert name of
consignee or party to whose order the bill of lading is made out, as appropriate) for delivery at the port of (insert
name of discharge port stated in the bill of lading) but we, (insert name of party requesting substituted delivery),
hereby request you to order the ship to proceed to and deliver the said cargo at (insert name of substitute port or place
of delivery) against production of at least one original bill of lading.

In consideration of your complying with our above request, we hereby agree as follows:-

1.   To indemnify you, your servants and agents and to hold all of you harmless in respect of any liability, loss,
     damage or expense of whatsoever nature which you may sustain by reason of the ship proceeding and giving
     delivery of the cargo against production of at least one original bill of lading in accordance with our request.

2.   In the event of any proceedings being commenced against you or any of your servants or agents in connection
     with the ship proceeding and giving delivery of the cargo as aforesaid, to provide you or them on demand with
     sufficient funds to defend the same.

3.   If, in connection with the delivery of the cargo as aforesaid, the ship, or any other ship or property in the same or
     associated ownership, management or control, should be arrested or detained or should the arrest or detention
     thereof be threatened, or should there be any interference in the use or trading of the vessel (whether by virtue of a
     caveat being entered on the ship's registry or otherwise howsoever), to provide on demand such bail or other
     security as may be required to prevent such arrest or detention or to secure the release of such ship or property or
     to remove such interference and to indemnify you in respect of any liability, loss, damage or expense caused by
     such arrest or detention or threatened arrest or detention or such interference, whether or not such arrest or
     detention or threatened arrest or detention or such interference may be justified.

4.   The liability of each and every person under this indemnity shall be joint and several and shall not be conditional
     upon your proceeding first against any person, whether or not such person is party to or liable under this
     indemnity.

5.   This indemnity shall be governed by and construed in accordance with English law and each and every person
     liable under this indemnity shall at your request submit to the jurisdiction of the High Court of Justice of England.

Yours faithfully

For and on behalf of
(insert name of Requestor)

The Requestor

.....................................
Signature

                                                                                                22

                                                                                    *38*

31 Jan 07 12:05    J & R    00302103881891    P.27



Tramp Maritime Inc
3.A Messinias Sert..? '95..' 3.4?rxx.
'9.4-125(0333)-ba.=.2. 1?1??253?
EAhil: tracking@tramps:r?mx??

Trans-Globe Mariier Shipping GmbH

---

## ADDITIONAL CLAUSES TO CHARTER PARTY MV "FURIA E"
## DATED HAMBURG, 18ᵗʰ MAY 2006

STANDARD FORM LETTER OF INDEMNITY TO BE GIVEN IN RETURN FOR DELIVERING CARGO AT A PORT OTHER THAN THAT STATED IN THE BILL OF LADING AND WITHOUT PRODUCTION OF THE ORIGINAL BILL OF LADING

To:        [insert name of Owner]                           [insert date]
           The Owners of the [insert name of ship]

Dear Sirs,

Ship:      [insert name of ship]

Voyage:    [insert load and discharge ports as stated in the bill of lading]

Cargo:     [insert description of cargo]

Bill of Lading:  [insert identification numbers, date and place of issue]

The above cargo was shipped on the above vessel by [insert name of shipper] and consigned to [insert name of consignee or party to whom order the bill of lading are made out, as appropriate] for delivery at the port of [insert name of discharge port stated in the bill of lading] but we, [insert name of party requesting substituted delivery], hereby request you to order the vessel to proceed to and deliver the said cargo at [insert name of substitute port or place of delivery] to [insert name of party to whom delivery is to be made] without production of the original bill of lading.

In consideration of your complying with our above request, we hereby agree as follows:-

1. To indemnify you, your servants and agents and to hold all of you harmless in respect of any liability, loss, damage or expense of whatsoever nature which you may sustain by reason of the ship proceeding and giving delivery of the cargo in accordance with our request.

2. In the event of any proceedings being commenced against you or any of your servants or agents in connection with the ship proceeding and giving delivery of the cargo as aforesaid, to provide you or them on demand with sufficient funds to defend the same.

3. If, in connection with the delivery of the cargo as aforesaid, the ship, or any other ship or property in the same or associated ownership, management or control, should be arrested or detained or should the arrest or detention thereof be threatened, or should there be any interference in the use or trading of the vessel (whether by virtue of a caveat being entered on the ship's registry or otherwise howsoever), to provide on demand such bail or other security as may be required to prevent such arrest or detention or to secure the release of such ship or property or to remove such interference and to indemnify you in respect of any liability, loss, damage or expense caused by such arrest or detention or threatened arrest or detention or such interference, whether or not such arrest or detention or threatened arrest or detention or such interference may be justified.

4. If the place at which we have asked you to make delivery is a bulk liquid or gas terminal or facility, or another ship, lighter or barge, then delivery to such terminal, facility, ship, lighter or barge shall be deemed to be delivered to the party to whom we have requested you to make such delivery.

5. As soon as all original bills of lading for the above cargo shall have come into our possession, to deliver the same to you, or otherwise to cause all original bills of lading to be delivered to you.

6. The liability of each and every person under this indemnity shall be joint and several and shall not be conditional upon your proceeding first against any person, whether or not such person is party to or liable under this indemnity.

7. This indemnity shall be governed by and construed in accordance with English law and each and every person liable under this indemnity shall at your request submit to the jurisdiction of the High Court of Justice of England.

Yours faithfully

For and on behalf of
[insert name of Requestor]

The Requestor

-----------------------------------------------
Signature

23

31 Jan 07 12:05     J B R          0090210881891          p. 28

 Trans-Globe Monitor Shipping GmbH

Tramp Maritime Inc.

## ADDITIONAL CLAUSES TO CHARTER PARTY MV "FURIA E"
## DATED HAMBURG, 18ᵗʰ MAY 2006

**STANDARD FORM LETTER OF INDEMNITY TO BE GIVEN IN RETURN FOR DELIVERING CARGO WITHOUT PRODUCTION OF THE ORIGINAL BILL OF LADING**

To:                    (Insert name of Owners)                    (Insert date)
                       The Owners of the (Insert name of ship)
                       (Insert address)

Dear Sirs,

Ship:          (Insert name of ship)

Voyage:     (Insert load and discharge ports as stated in the bill of lading)

Cargo:        (Insert description of cargo)

Bill of Lading:    (Insert identification number, date and place of issue)

The above cargo was shipped on the above ship by (insert name of shippers) and consigned to (insert name of consignee or party to whose order the bill of lading is made out, as appropriate) for delivery at the port of (insert name of discharge port stated in the bill of lading) but the Bills of Lading have not arrived and we, (insert name of party requesting delivery), hereby request you to deliver the said cargo to (insert name of party to whom delivery is to be made) at (insert place where delivery is to be made) without production of the original Bill(s) of Lading.

In consideration of your complying with our above request, we hereby agree as follows:-

1.  To indemnify you, your servants and agents and to hold all of you harmless in respect of any liability, loss, damage or expense of whatsoever nature which you may sustain by reason of the vessel proceeding and giving delivery of the cargo in accordance with our request.

2.  In the event of any proceedings being commenced against you or any of your servants or agents in connection with the delivery of the cargo as aforesaid, to provide you or them on demand with sufficient funds to defend the same.

3.  If, in connection with the delivery of the cargo as aforesaid, the ship, or any other ship or property in the same or associated ownership, management or control, should be arrested or detained or should the arrest or detention thereof be threatened, or should there be any interference in the use or trading of the vessel (whether by virtue of a caveat being entered on the ship's registry or otherwise howsoever), to provide on demand such bail or other security as may be required to prevent such arrest or detention or to secure the release of such ship or property or to remove such interference and to indemnify you in respect of any liability, loss, damage or expense caused by such arrest or detention or threatened arrest or detention or such interference, whether or not such arrest or detention be threatened, unjust or detention or such interference may be justified.

4.  If the place at which we have asked you to make delivery is a bulk liquid or gas terminal or facility, or another ship, lighter or barge, then delivery to such terminal, facility, ship, lighter or barge shall be deemed to be delivered to the party to whom we have requested you to make such delivery.

5.  As soon as all original bills of lading for the above cargo shall have come into our possession, to deliver the same to you, or otherwise to cause all original bills of lading to be delivered to you, whereupon our liability hereunder shall cease.

6.  The liability of each and every person under this indemnity shall be joint and several and shall not be conditional upon your proceeding first against any person, whether or not such person is party to or liable under this indemnity.

7.  This indemnity shall be governed by and construed in accordance with English law and each and every person liable under this indemnity shall at your request submit to the jurisdiction of the High Court of Justice of England.

Yours faithfully

For and on behalf of
(Insert name of Requestor)

The Requestor

..................................................
Signature

24

**Subject:** FW: [Nicholas M repudiatory breach of charter]

---

**Message 89802 Details**

**Subject:** Nicholas M repudiatory breach of charter
**Attachments:** Οθρόμξ.html
**Date:** Mon, 14 Jan 2008 15:53:44
**From:** "Operations Congentra" <operations@congentra.com>
**To:** Operations CHIAN SPIRIT <operations@chianspirit.gr>

---

Attn: Cpt.Costas Bourdis,

Pls note that the following has been received from Charterers a half an hour before:

Quote:

===============================================

Attn: Antex

Dear Mr. Bessonov,

Pls note the charter with the M/V Nicholas M is cancelled due to their repudiatory breach (withdrawal of the class certificates).

Based on this Congentra bears no responsibility for the shifting of the vessel, which is solely for owners account.

You have been duly informed on the fact that the charter was cancelled and that you should address the matter of shifting to the owners.

All our rights remain reserved.

Regards,

Congentra AG

===============================================

Unquote

W/Brgds,

Pavel Bessonov

41



42



43



44



45



46



47

Page 1 of 1

Subject: FW: [m/v "Nicholas M", ETA 01/12/2007, voyage from San Lorenzo to Saint-Petersburg, results of analisis (WIS), 03/12/2007] ** MSG#:<15833>

**Message 82200 Details**

Subject: m/v "Nicholas M", ETA 01/12/2007, voyage from San Lorenzo to Saint-Petersburg, results of analisis (WIS), 03/12/2007
Attachments:
Date: Fri, 07 Dec 2007 19:52:08
From: STP-OPERATIONS@wakefieldinspection.com
To: Victoria Liouta <victoria.liouta@scb-hellas.com>, operations@chianspirit.gr

Dear Igor,

please be informed that m/v 'Nicholas M' was moored at berth #23 in the evening on 06/12/2007.

The cargo in hold #5 was almost comletely discharged.

Yesterday I visited State Grain Control in order to see the results of analisis. They answered that they take samples of cargo only. The samples of State Grain Control were sent to Agricultural Control of Russian Federation for analisis and issue Resolution about damaged cargo.

The results of samples which were taken by surveyor of WIS (Russia) in presence of all representatives on 03/12/2007 were received from the independent laboratory.  See table below.

|  | Central part of cargo hold (sample 1) | Portside corner of forward part of cargo hold (sample 2) | Starboardside of forward part of cargo hold (sample 3) |
|---|---|---|---|
| Moisture % | 46,4 | 16,6 | 16,7 |
| Chlorides % | 0,23 | | |

According to certificate of quality and weight the moisture of cargo in hold #4 was 10,39 %.

According to GOST 12220-96 of Soybean Meal the moisture should be  12 %.

Chlorides test was performed to determine whether the cargo was wetted with sea water or fresh water. The low content of chlorides means that the cargo was not wetted with sea water.

Best regards,

Slava Zakharov.
————————————————————————————
Wakefield  Inspection  Services ( Russia )  Ltd.
apartments 105, 1 Gapsalskaya Street,
St. Petersburg, Russia, 198035,
tel/fax: +7 812 3357635 / 36 / 37 / 38
www.wakefieldinspection.com

UNQUOTE

Best regards
Alexandra Pilarinou
Ops dept.
C.S.M.E

48

Federal agency of technical adjustment and metrology
Federal state institution "Centre of tests and certification St Petersburg" (FSI "Test-s-St Petersburg")
System of certification quality management in accordance with ISO 9001:2000
Accredited test laboratory of food and raw materials
(Certificate of accreditation No Ross Ru 0001.21 PN 87)
190103, St Petersburg, Kurlyandskaya street, b. 1, tel: 575-01-39, fax: 575-01-20
E-mail: info@ailtest.spb.ru http://www.ailtest.spb.ru

**Protocol of laboratory tests No 142696 of 07.12.2007**

| | |
|---|---|
| Client | "Wakefield Inspection Services (Russia)" Ltd. |
| Subject of tests | Argentine Hipro Soyabean Meal in Bulk |

Ship date: 18.10.2007

Shipper: Nidera S.A. on behalf of Cymes Agricultural Commodities Ltd., Harlaw

Chambers, The Valley Anguilla, British West Indies.

A sample of 0,7 kg in weight has been provided for testing in plastic bag sealed

# 818255

Sampling was carried out in accordance with GAFTA, № 124

Producer:

Country:

Date of production:

Best before:

Grounds for test:        Act of sampling of 05.12.2007

Sampling done by:      V. Zakharov, surveyor

Sample tested for:      determination of actual factors

Condition of testing:   in accordance with the requirements of ND

Dates of testing:        05.12.2007 – 07.12.2007

**Test Results**

| Names of factors | Normative documents for testing methods | Values permitted by normative documents | Test results |
|---|---|---|---|
| **Moisture part by weight, %** | GOST 13979.1-68 | - | 16,7 ± 0,3 |

Notes:

1. Errors in the measurements do not exceed the ones mentioned in the ND for testing methods
2. The present document cannot be fully or partially copied or reprinted without consent of Accredited test laboratory of food and raw materials.

Head of laboratory     *signature*     Serazhutdinova L.D.

Stamp of "Centre of tests and certification St Petersburg"

49

Federal agency of technical adjustment and metrology
Federal state institution "Centre of tests and certification St Petersburg" (FSI "Test-s-St Petersburg")
System of certification quality management in accordance with ISO 9001:2000
Accredited test laboratory of food and raw materials
(Certificate of accreditation No Ross Ru 0001.21 PN 87)
190103, St Petersburg, Kurlyandskaya street, b. 1, tel: 575-01-39, fax: 575-01-20
E-mail: info@ailtest.spb.ru http://www.ailtest.spb.ru

**Protocol of laboratory tests No 142695 of 07.12.2007**

| | |
|---|---|
| Client | "Wakefield Inspection Services (Russia)" Ltd. |
| Subject of tests | Argentine Hipro Soyabean Meal in Bulk |

Ship date: 18.10.2007

Shipper: Nidera S.A. on behalf of Cymes Agricultural Commodities Ltd., Harlaw Chambers, The Valley Anguilla, British West Indies.

A sample of 0,7 kg in weight has been provided for testing in plastic bag sealed # 818244

Sampling was carried out in accordance with GAFTA, № 124

| | |
|---|---|
| Producer: | |
| Country: | |
| Date of production: | |
| Best before: | |
| Grounds for test: | Act of sampling of 05.12.2007 |
| Sampling done by: | V. Zakharov, surveyor |
| Sample tested for: | determination of actual factors |
| Condition of testing: | in accordance with the requirements of ND |
| Dates of testing: | 05.12.2007 – 07.12.2007 |

**Test Results**

| Names of factors | Normative documents for testing methods | Values permitted by normative documents | Test results |
|---|---|---|---|
| **Moisture part by weight, %** | GOST 13979.1-68 | - | 16,6 ± 0,3 |

Notes:

1. Errors in the measurements do not exceed the ones mentioned in the ND for testing methods
2. The present document cannot be fully or partially copied or reprinted without consent of Accredited test laboratory of food and raw materials.

Head of laboratory     *signature*     Serazhutdinova L.D.

Stamp of "Centre of tests and certification St Petersburg"

50

Federal agency of technical adjustment and metrology
Federal state institution "Centre of tests and certification St Petersburg" (FSI "Test-s-St Petersburg")
System of certification quality management in accordance with ISO 9001:2000
Accredited test laboratory of food and raw materials
(Certificate of accreditation No Ross Ru 0001.21 PN 87)
190103, St Petersburg, Kurlyandskaya street, b. 1, tel: 575-01-39, fax: 575-01-20
E-mail: info@ailtest.spb.ru http://www.ailtest.spb.ru

**Protocol of laboratory tests No 142694 of 07.12.2007**

| | |
|---|---|
| Client | "Wakefield Inspection Services (Russia)" Ltd. |
| Subject of tests | Argentine Hipro Soyabean Meal in Bulk |

Ship date: 18.10.2007

Shipper: Nidera S.A. on behalf of Cymes Agricultural Commodities Ltd., Harlaw

Chambers, The Valley Anguilla, British West Indies.

A sample of 0,7 kg in weight has been provided for testing in plastic bag sealed

# 818254

Sampling was carried out in accordance with GAFTA, № 124

Producer:

Country:

Date of production:

Best before:

Grounds for test:    Act of sampling of 05.12.2007

Sampling done by:    V. Zakharov, surveyor

Sample tested for:    determination of actual factors

Condition of testing:    in accordance with the requirements of ND

Dates of testing:    05.12.2007 – 07.12.2007

**Test Results**

| Names of factors | Normative documents for testing methods | Values permitted by normative documents | Test results |
|---|---|---|---|
| Moisture part by weight, % | GOST 13979.1-68 | - | 46,4 ± 0,3 |
| Chloride part by weight, % | GOST 26186-84 | - | 0,23 ± 0,14 |

Notes:
1. Errors in the measurements do not exceed the ones mentioned in the ND for testing methods
2. The present document cannot be fully or partially copied or reprinted without consent of Accredited test laboratory of food and raw materials.

Head of laboratory    *signature*    Serazhutdinova L.D.

| |
|---|
| Stamp of "Centre of tests and certification St Petersburg" |

51

MINISTRY OF AGRICULTURE OF RUSSIAN FEDERATION
Federal Service of Veterinary and Phytosanitary Supervision Department of St.
Petersburg and Leningradskaya region
27, Staro-Petergofskiy Avenue, St. Petersburg, 190020, tel. 3371292, tel./fax 3371295

APPROVED
by acting Head of Department of
Plant Protection's, Agricultural
Chemistry's Supervision,
Providing with State
Control of Grain Quality and
Safety
_____*signature*_____ Shilov A.A.

| Stamp of "Federal Service of Veterinary and Phytosanitary Supervision" 78 |
| --- |
| Federal Service of Veterinary and Phytosanitary Supervision Department of St. Petersburg and Leningradskaya region 02 |
| Phytosanitary Supervision |

Resolution #_____14_____

Saint-Petersburg                                           14 December, 2007

Government controller of Department of Plant Protection's, Agricultural Chemistry's Supervision, Providing with State Control of Grain Quality and Safety of Federal Service of Veterinary and Phytosanitary Supervision Department of St. Petersburg and Leningradskaya region Kolonistova T.Y. considered material (Decision of Experts, Sampling Statement) # 9 dated 13.12.2007 of Soyabean Meal owner – OOO "EUROWEG ZERNO", 3 build., 18-20-22, Bersenevskaya naberezhnaya, Moscow, 109072 and ascertained:

while making quality and safety examination of Soyabean Meal imported from Argentine, producer "LOUIS DREYFUS SAS", onboard of m/v "Nicholas M" to OOO "Euroweg Zerno" through OOO "Anteks", arrival 689 dated 01.12.2007, violations of requirements of GOST 12220-96 "Toasted Soyabean Meal as livestock feed. Specifications" were discovered in hold #4. Soyabean Meal of 150,12 t. in weight did not satisfy with the requirements of GOST 12220-96 "Toasted Soyabean Meal as livestock feed. Specifications" according to factors:
colour – brown, in accordance with ND from light yellow to light brown;
moisture and volatile matter part by weight – 32,6%, in accordance with ND – 8,5-10,0 %;
general toxicity – toxic, in accordance with ND – excluded.

Soyabean Meal declared to be low-quality and dangerous production (Protocol of Tests of Test Centre of Federal State Institution "Federal Centre of Safety and Quality of Grain

52

and Cereals", St. Petersburg branch # 9566 dated 11.12.2007, Decision of Experts of Department of ROSSELKHOZNADZOR # 8 dated 13.12.2007).

Under clause 9 of Federal Statute dated 5 December, 1998 # 183-FZ "On State Supervision and Control of Quality and Safety of Grain and Cereals", clause 25 of Federal Statute dated 2 January, 2000 # 29-FZ "On Quality and Safety of Foodstuffs", Regulations of Government of Russian Federation dated 4 August, 2005 # 491 "On Measures of State Control of Quality and Safety of Grain and Ingredients for its Production and Cereals", dated 29 September, 1997 #1263 "On Approval of Regulations of Making Examination of Low-Quality and Dangerous Raw Materials and Foodstuffs, its Use or Utilization"

### IT WAS DECIDED:

1. Import of Soyabean Meal imported from Argentine, producer "LOUIS DREYFUS SAS" onboard of m/v "Nicholas M " to OOO "Euroweg Zerno" through OOO "Anteks", arrival 689 dated 01.12.2007, of 150,12 (one hundred point twelve) t. in weight, to the territory of Russian Federation **is prohibited**                     .
2.               Soyabean Meal               should be               utilized               .
3. Expenses      for utilization      are bore by the owner      OOO "Euroweg Zerno"     .
4. Utilization of low-quality and dangerous production should be performed at the areas of ZAO "Vuoly-Eco", OOO "Ecomonitoring", OOO "Novyy Svet-Ecl", ZAO "Zavod KPO", OOO "Promotkhody".
5. Resolution should be carried out by the time of 24th of December, 2007, in support of that, documents confirming utilization of low-quality and dangerous production should be produced to Federal Service of Veterinary and Phytosanitary Supervision Department of St. Petersburg and Leningradskaya region (204 of., 27, Staro-Petergofskiy Avenue, St. Petersburg) within 3 days after utilization.


Government Controller of Department of
Plant Protection's, Agricultural Chemistry's
Supervision, Providing with State Control of
Grain Quality and Safety                    *signature*                    Kolonistova T.Y.


Resolution was receipted by Bessonov P.V.              *signature*       *14.12.2007*

53

MINISTRY OF AGRICULTURE OF RUSSIAN FEDERATION
Federal Service of Veterinary and Phytosanitary Supervision Department of St. Petersburg and Leningradskaya region
27, Staro-Petergofskiy Avenue, St. Petersburg, 190020, tel. 3371292, tel./fax 3371295

APPROVED
by acting Head of Department of Plant Protection's, Agricultural Chemistry's Supervision, Providing with State Control of Grain Quality and Safety
___*signature*___ Shilov A.A.

| Stamp of "Federal Service of Veterinary and Phytosanitary Supervision" 78 |
|---|
| Federal Service of Veterinary and Phytosanitary Supervision Department of St. Petersburg and Leningradskaya region 02 |
| Phytosanitary Supervision |

Resolution #_____15_____

Saint-Petersburg                                                    19 December, 2007

Government controller of Department of Plant Protection's, Agricultural Chemistry's Supervision, Providing with State Control of Grain Quality and Safety of Federal Service of Veterinary and Phytosanitary Supervision Department of St. Petersburg and Leningradskaya region Kolonistova T.Y.
considered material (Decision of Experts, Sampling Statement) # 9 dated 13.12.2007
of Soyabean Meal                                                                                        ,
owner – OOO "EUROWEG ZERNO", 3 build., 18-20-22, Bersenevskaya naberezhnaya, Moscow, 109072
and **ascertained:**

while making quality and safety examination of Soyabean Meal imported from Argentine, producer "LOUIS DREYFUS SAS", onboard of m/v "Nicholas M" to OOO "Euroweg Zerno" through OOO "Anteks", arrival 689 dated 01.12.2007, violations of requirements of GOST 12220-96 "Toasted Soyabean Meal as livestock feed. Specifications" were discovered in hold #2. Soyabean Meal of 64,12 t. in weight did not satisfy with the requirements of GOST 12220-96 "Toasted Soyabean Meal as livestock feed. Specifications" according to factors:
colour – brown, in accordance with ND from light yellow to light brown;
smell – putrescent, in accordance with ND, without extraneous smells;
moisture and volatile matter part by weight – 26,3%, in accordance with ND – 8,5-10,0 %;
general toxicity – toxic, in accordance with ND – excluded.

Soyabean Meal declared to be low-quality and dangerous production (Protocol of Tests of Test Centre of Federal State Institution "Federal Centre of Safety and Quality of Grain

, 54

and Cereals", St. Petersburg branch # 9832 dated 19.12.2007, Decision of Experts of Department of ROSSELKHOZNADZOR # 8 dated 13.12.2007).

Under clause 9 of Federal Statute dated 5 December, 1998 # 183-FZ "On State Supervision and Control of Quality and Safety of Grain and Cereals", clause 25 of Federal Statute dated 2 January, 2000 # 29-FZ "On Quality and Safety of Foodstuffs", Regulations of Government of Russian Federation dated 4 August, 2005 # 491 "On Measures of State Control of Quality and Safety of Grain and Ingredients for its Production and Cereals", dated 29 September, 1997 #1263 "On Approval of Regulations of Making Examination of Low-Quality and Dangerous Raw Materials and Foodstuffs, its Use or Utilization"

### IT WAS DECIDED:

1. Import of Soyabean Meal imported from Argentine, producer "LOUIS DREYFUS SAS" onboard of m/v "Nicholas M " to OOO "Euroweg Zerno" through OOO "Anteks", arrival 689 dated 01.12.2007, of 64,12 (sixty four point twelve) t. in weight, to the territory of Russian Federation **is prohibited                                        **.
2.             Soyabean Meal            should be                 utilized                 .
3. Expenses      for utilization    are bore by the owner      OOO "Euroweg Zerno"    .
4. Utilization of low-quality and dangerous production should be performed at the areas of ZAO "Vuoly-Eco", OOO "Ecomonitoring", OOO "Novyy Svet-Ecl", ZAO "Zavod KPO", OOO "Promotkhody".
5. Resolution should be carried out by the time of 29th of December, 2007, in support of that, documents confirming utilization of low-quality and dangerous production should be produced to Federal Service of Veterinary and Phytosanitary Supervision Department of St. Petersburg and Leningradskaya region (204 of., 27, Staro-Petergofskiy Avenue, St. Petersburg) within 3 days after utilization.

Government Controller of Department of
Plant Protection's, Agricultural Chemistry's
Supervision, Providing with State Control of
Grain Quality and Safety                    *signature*                Kolonistova T.Y.

Resolution was receipted by Bessonov P.V.              *signature*           19.12.2007

55

Federal agency of technical adjustment and metrology
Federal state institution "Centre of tests and certification St Petersburg" (FSI "Test-s-St Petersburg")
System of certification quality management in accordance with ISO 9001:2000
Accredited test laboratory of food and raw materials
(Certificate of accreditation No Ross Ru 0001.21 PN 87)
190103, St Petersburg, Kurlyandskaya street, b. 1, tel: 575-01-39, fax: 575-01-20
E-mail: info@ailtest.spb.ru  http://www.ailtest.spb.ru

**Protocol of laboratory tests No 143801 of 20.12.2007**

| | |
|---|---|
| Client | "Wakefield Inspection Services (Russia)" Ltd. |
| Subject of tests | Argentine Hipro Soyabean Meal in Bulk |

Ship date: 28.10.2007

Shipper: Vicentin S.A.I.C. on behalf of Upriver Agribulk, Corp. Federico Boyd Avenue, 9th Floor, Scotia Plaza Building, City of Panama, Republic of Panama

A sample of 2,0 kg in weight has been provided for testing in plastic bag sealed # 17046028

| | |
|---|---|
| Producer: | |
| Country: | |
| Date of production: | |
| Best before: | |
| Grounds for test: | Act of sampling of 18.12.2007 |
| Sampling done by: | V. Zakharov, surveyor, Kupriyanova S.V., representative of Centre of Grain Quality Estimation |
| Sample tested for: | determination of actual factors |
| Condition of testing: | in accordance with the requirements of ND |
| Dates of testing: | 18.12.2007 – 20.12.2007 |

**Test Results**

| Names of factors | Normative documents for testing methods | Values permitted by normative documents | Test results |
|---|---|---|---|
| Moisture part by weight, % | GOST 13979.1-68 | - | 37,9 ± 0,3 |
| Chlorides part by weight, % | MU 1-40/3805-91 | - | 1,18 ± 0,14 |

Notes:

1. Errors in the measurements do not exceed the ones mentioned in the ND for testing methods
2. The present document cannot be fully or partially copied or reprinted without consent of Accredited test laboratory of food and raw materials.

Test results spread to present sample only.

Head of laboratory        *signature*        Serazhutdinova L.D.

Stamp of "Centre of tests and certification St Petersburg"

56

Federal agency of technical adjustment and metrology
Federal state institution "Centre of tests and certification St Petersburg" (FSI "Test-s-St Petersburg")
System of certification quality management in accordance with ISO 9001:2000
Accredited test laboratory of food and raw materials
(Certificate of accreditation No Ross Ru 0001.21 PN 87)
190103, St Petersburg, Kurlyandskaya street, b. 1, tel: 575-01-39, fax: 575-01-20
E-mail: info@alltest.spb.ru http://www.alltest.spb.ru

**Protocol of laboratory tests No 144568 of 29.12.2007**

Client                    "Wakefield Inspection Services (Russia)" Ltd.
Subject of tests          Argentine Hipro Soyabean Meal in Bulk

                          Ship date: 18.10.2007

                          Shipper: Nidera S.A. on behalf of Cymes Agricultural Commodities Ltd., Harlaw

                          Chambers, The Valley Anguilla, British West Indies.

                          A sample of 3,0 kg in weight has been provided for testing in plastic bag sealed

                          # 818251

Producer:

Country:

Date of production:

Best before:

Grounds for test:         Act of sampling of 26.12.2007

Sampling done by:         V. Zakharov, surveyor

Sample tested for:        determination of actual factors

Condition of testing:     in accordance with the requirements of ND

Dates of testing:         26.12.2007 – 29.12.2007

**Test Results**

| Names of factors | Normative documents for testing methods | Values permitted by normative documents | Test results |
|---|---|---|---|
| Moisture part by weight, % | GOST 13979.1-68 | - | 11,0 ± 0,3 |

Notes:

1. Errors in the measurements do not exceed the ones mentioned in the ND for testing methods
2. The present document cannot be fully or partially copied or reprinted without consent of Accredited test laboratory of food and raw materials.


Head of laboratory    *signature*    Serazhutdinova L.D.

Stamp of "Centre of tests and certification St Petersburg"

*57*

Federal agency of technical adjustment and metrology
Federal state institution "Centre of tests and certification St Petersburg" (FSI "Test-s-St Petersburg")
System of certification quality management in accordance with ISO 9001:2000
Accredited test laboratory of food and raw materials
(Certificate of accreditation No Ross Ru 0001.21 PN 87)
190103, St Petersburg, Kurlyandskaya street, b. 1, tel: 575-01-39, fax: 575-01-20
E-mail: info@alltest.spb.ru http://www.alltest.spb.ru

**Protocol of laboratory tests No 144569 of 29.12.2007**

Client           "Wakefield Inspection Services (Russia)" Ltd.
Subject of tests  Argentine Hipro Soyabean Meal in Bulk

Ship date: 28.10.2007

Shipper: Vicentin S.A.I.C. on behalf of Upriver Agribulk, Corp. Federico Boyd

Avenue, 9th Floor, Scotia Plaza Building, City of Panama, Republic of Panama

A sample of 3,0 kg in weight has been provided for testing in plastic bag sealed

# 818252

Sampling was carried out in accordance with GAFTA, № 124

Producer:

Country:

Date of production:

Best before:

Grounds for test:    Act of sampling of 26.12.2007

Sampling done by:   V. Zakharov, surveyor
Sample tested for:   determination of actual factors

Condition of testing:  in accordance with the requirements of ND

Dates of testing:    26.12.2007 – 29.12.2007

**Test Results**

| Names of factors | Normative documents for testing methods | Values permitted by normative documents | Test results |
|---|---|---|---|
| Moisture part by weight, % | GOST 13979.1-68 | - | 14,6 ± 0,3 |

Notes:
1. Errors in the measurements do not exceed the ones mentioned in the ND for testing methods
2. The present document cannot be fully or partially copied or reprinted without consent of Accredited test laboratory of food and raw materials.

Head of laboratory    *signature*    Serazhutdinova L.D.

Stamp of "Centre of tests and certification St Petersburg"

*58*

Federal agency of technical adjustment and metrology
Federal state institution "Centre of tests and certification St Petersburg" (FSI "Test-s-St Petersburg")
System of certification quality management in accordance with ISO 9001:2000
Accredited test laboratory of food and raw materials
(Certificate of accreditation No Ross Ru 0001.21 PN 87)
190103, St Petersburg, Kurlyandskaya street, b. 1, tel: 575-01-39, fax: 575-01-20
E-mail: info@ailtest.spb.ru http://www.ailtest.spb.ru

**Protocol of laboratory tests No 144570 of 29.12.2007**

| | |
|---|---|
| Client | "Wakefield Inspection Services (Russia)" Ltd. |
| Subject of tests | Argentine Hipro Soyabean Meal in Bulk |

Ship date: 18.10.2007

Shipper: Nidera S.A. on behalf of Cymes Agricultural Commodities Ltd., Harlaw

Chambers, The Valley Anguilla, British West Indies.

A sample of 3,0 kg in weight has been provided for testing in plastic bag sealed

# 1194867

Producer:

Country:

Date of production:

Best before:

| | |
|---|---|
| Grounds for test: | Act of sampling of 26.12.2007 |
| Sampling done by: | V. Zakharov, surveyor |
| Sample tested for: | determination of actual factors |
| Condition of testing: | in accordance with the requirements of ND |
| Dates of testing: | 26.12.2007 – 29.12.2007 |

**Test Results**

| Names of factors | Normative documents for testing methods | Values permitted by normative documents | Test results |
|---|---|---|---|
| **Moisture part by weight, %** | GOST 13979.1-68 | - | **14,5 ± 0,3** |

Notes:
1. Errors in the measurements do not exceed the ones mentioned in the ND for testing methods
2. The present document cannot be fully or partially copied or reprinted without consent of Accredited test laboratory of food and raw materials.

Head of laboratory     *signature*     Serazhutdinova L.D.

| |
|---|
| Stamp of "Centre of tests and certification St Petersburg" |

*59*

Print Copy for : KAVVADIA ANNA

Received Inc.MSG.: 84937          Date: Thu 20/Dec/2007 18:02
From: CHIAN SPIRIT MARITIM <"Chian Spirit Maritime Enterprises Inc."
<chartering@chianspirit.gr>>
Subject: LgINT Message (REF:071002B00)
Included (3) Attachment Files: <LOI_FORM_A.TIF> <LOI_FORM_B..TIF>
<LOI_FORM_C..TIF>
TO : <operations@chianspirit.gr>

TELiX MSG: 1002B-00 20/12/07 18:00

From: C.S.M.E/ Chartering Dept.
To:   Billmar Chartering

Re:   MV "Nicholas M." - Acc "BRITANNIA BULKERS A/S," cp dd 18th Dec 2007

zack/nicholas

thnks charrs last confirming acceptance of owns last regarding c/p dets as well
as lifting charrs subjects.

therefore here below is the fixture recap clean on all subjects; if charrs have
any correction pls let us become aware of same otherwise we shall consider same
as final for our file / all parties including master and our operations dept
reference.

pls advise where delivery cable will be sent by the master as well as confirm
that detailed voyage instructions will be sent by your side at your first
convenience.

mtime pls be advised that current charrs maintain their etr for 24th dec agw wp
uce so pls consider same as notice on fixing, always given on a back to back
basis.

thanks all parties kind efforts leading to this fixture.

regards,

chartering dept.
c.s.m.e(as agents only)


=== recap of fixture (main terms+cp dets) clean on all subjects ===


--- vsl's full t/c description ---

01) NAME: M.V "NICHOLAS M."

02) EX NAMES INCLUDING DATE LAST NAME CHANGE: "MED UNITY" (2003)
    "LAURA G" (1998) - "FORUM PRODUCT" (1997) - "RAFAELA" (1991).

03) TYPE OF VESSEL: BULK CARRIER

04) ENGINE AND BRIDGE SITUATED: AFT

05) DWAT AND DRAFT SUMMER/WINTER/FRESH/TROPICAL/TROPICAL FRESH:

```
     SUMMER DEADWEIGHT   39,498 METRIC TONS ON 11.169 METRES
     WINTER DEADWEIGHT   38,402 METRIC TONS ON 10.937 METRES
     TROPICAL DEADWEIGHT 40,608 METRIC TONS ON 11.401 METRES
```

06) DWAT ON 17/18/19/20/32/32.5/33/33.5 FEET FRESH WATER

```
     FEET     METRES        FRESHWATER DEADWEIGHT
     17.0     5.18               11,462
     18.0     5.48               12,766
     19.0     5.79               14,115
     20.0     6.10               15,468
     32.0     9.75               31,731
     32.5     9.90               32,417
     33.0     10.06              33,151
     33.5     10.21              33,840
```

07) TPC 48 AT SUMMER DRAFT

08) LOA/LBP/EXTREME BEAM/DEPTH MOULDED: 200.90/191.00/27.20/15.20 METRES.

09) CONSTANTS EXCLUDING FRESHWATER:  250 METRIC TONS

10) FRESHWATER CAPACITY: 305 METRIC TONS

11) IF FITTED WITH EVAPORATOR/DAILY PRODUCTION: 10 METRIC TONS / 24
HOURS

12) NUMBER HOLDS/HATCHES: 7/7

13) HATCH TYPE AND SIZES: STEEL HATCH COVER FOLDING TYPE (MACGRECOR)

```
     NO.1    9.8 X 12.64 METRES
     NO.2   17.6 X 12.64 METRES
     NO.3    9.6 X 12.64 METRES
     NO.4   17.6 X 12.64 METRES
     NO.5    9.6 X 12.64 METRES
     NO.6   17.6 X 12.64 METRES
     NO.7    9.6 X 12.64 METRES
```

14) HOLDS LENGTHS: NO.1 16.80/ NO.2 26.50/ NO.3 16.80/ NO.4 26.40/ NO.5 16.80/
                   NO.6 26.40/ NO.7 16.00

15) TANK TOP DIMENSIONS:

```
     NO.1    HOLD    16.60 X 17.00
     NO.2    HOLD    26.50 X 19.20
     NO.3+5 HOLDS   16.80 X 19.20
     NO.4+6 HOLDS   26.40 X 19.20
     NO.7    HOLD    16.00 X 18.50
     (LENGTH AT CENTRE LINE - BREADTH AT HALF OF LENGTH)
```

16) MAXIMUM UNIFORM LOADS TANK TOPS/WEATHER DECK/WEATHER DECK
HATCHES;

```
     NO.1       HOLD        18.50 METRIC TONS/SQUARE METRE
     NO.2-4-6  HOLDS        15   METRIC TONS/SQUARE METRE
     NO.3-5-7  HOLDS        23.5 METRIC TONS/SQUARE METRE
     MAIN DECK               3.4 METRIC TONS/SQUARE METRE
     HATCH COVER             1.75 METRIC TONS/SQUARE METRE
```

17) CUBIC CAPACITY IN MAIN HOLDS - GRAIN/BALE:
GRAIN  47,199 CUBIC METRES
BALE   43,423 CUBIC METRES

18) CUBIC BREAKDOWN PER HOLD - GRAIN/BALE IN CUBIC METRES;

| | GRAIN | BALE |
|------|-------|-------|
| NO.1 | 4,946 | 4,550 |
| NO.2 | 8,638 | 7,947 |
| NO.3 | 5,488 | 5,049 |
| NO.4 | 8,689 | 7,994 |
| NO.5 | 5,488 | 5,049 |
| NO.6 | 8,694 | 7,998 |
| NO.7 | 5,256 | 4,836 |

19) ANY PILLARS/CENTRE LINE BULK HARDS/OBSTRUCTIONS IN HOLDS: NO

20) TYPE OF VENTILATION CARGO HOLDS   : NATURAL VENTILATION

21) IF BUILT WITH TOP SIDE TANKS      : YES

22) IF BUILT WITH HOPPER TANKS        : YES

23) TANK TOP SURFACE                  : FLAT

24) IF SUITABLE FOR GRAB DISCHARGE    : YES

25) DISTANCE FROM SHIP'S RAIL TO HATCH COAMING: CLEAR DISTANCE 5.50 METRES

26) DISTANCE WATER LINE/HATCH COAMING FULL BALLAST/LIGHT/FULLY LADEN:

    FULL  BALLAST  = 8.65 METRES
    LIGHT BALLAST = 11.45 METRES
    FULLY LOADED  = 5.70 METRES

27) AIR DRAFT LIGHT/BALLAST/FULLY LADEN: 41.50/ 39.10/ 36.14 METRES

28) DISTANCE KEEL TO TOP OF RADAR MAST: 47.30 METRES

29) CARGO GEAR                        : GEARLESS

30) CARGO GEAR OUTREACH               : N/A

31) CARGO GEAR DISTRIBUTION AND HOLDS SERVING : N/A

32) IF FULLY GRAIN FITTED             : YES

33) IF SELFTRIMMER                    : YES

34) CO2 FITTED                        : NO

35) GRAB FITTED/TYPE AND CAPACITY/HOW OPERATED : N/A

36) AUSTRALIAN HOLD LADDERS FITTED    : YES

37) IF PANAMA CANAL FITTED            : YES

38) SPEED AND CONSUMPTION             :

ABOUT 12.5 KNOTS ON ABOUT 26 MTS (BALLAST)/ABOUT 12.0 KNOTS ON ABOUT 28 MTS (LADDEN) INTERMEDIATE FUEL OIL 180 CENTISTOKES RME 25 ISO DIS 8217

PLUS

ABOUT 2.5 MTS (AT SEA)/2.0 MTS (AT PORT/WHEN IDLE) MARINE DIESEL OIL DMB ISO 8217.

Speed and consumption warrantees are given in good weather conditions only and
no adverse currents.

Within the context of this charterparty,good weather conditions are understood
to mean winds up to and including Beaufort force 4 and/or Douglas Sea state 3.

About is understood to mean 0.5knot downwards in the speed and 5pct upwards
in the consumption.

For performance evaluation purposes, the overall performance of the vessel is
to be reviewed on all laden and ballast passages during the currency of the
charterparty. Weather periods in excess to Beaufort 4 and or Douglas Sea state
3, are to be expressly excluded from calculations.

Owners liberty vessel to burn diesel oil when manoeuvring/approaching and
leaving ports/navigating in canals/rivers or congested/confined/shallow waters
or in cold weather for boiler/heating.

39) NO SUITABLE FOR ALTERNATIVE LOADING IN ACCORDANCE WITH SOLAS CHAPTER
XII,REGULATION 14 WITH EFFECT FROM 01st JULT 2006

40) ENGINE TYPE AND BHP/RPM: B&W 13100 BHP/128 RPM

41) NUMBER OF GENERATORS, TYPE AND BHP/RPM:
    - MAN MEP-MAN G6V 23.5/33TL (2 SETS) S/N 6017-6022
    - BAUD W - HOLEBY DIESEL MODEL 5T23LH-2 (1SET) SN 164801
    - 780 BHP EACH / 600 RPM EACH

42) BUNKER CAPACITIES: INTERMEDIATE FUEL OIL: 2,617 METRIC TONS (100%)/MARINE
DIESEL OIL: 316 METRIC TONS (100%)

43) YEAR AND MONTH BUILT AND WHERE BUILT: MARCH 12, 1980/ BRASIL

44) FLAG : ST. VINCENT & THE GRENADINES

45) PORT OF REGISTRY                        : KINGSTOWN

46) REGISTERED NUMBER                       : 9152

47) LLOYDS NUMBER                           : N/A

48) IMO NUMBER                              : 7433452

49) INTERNATIONAL/ SUEZ/ PANAMA GRT/NRT OR GT/NT:

INTERNATIONAL : 22,912 / 12,300
SUEZ          : 21,341 / 19,040
PANAMA        :        / 19,090

50) CLASS SOCIETY: BUREAU VERITAS

51) CLASS RATING:  I 3/3 E BULK CARRIER ESP DEEP SEA

52) LAST DRYDOCK: MAY, 2005

53) LAST SPECIAL SURVEY: MAY, 2005

54) CALL SIGN: J 8 B 2 6 8 0 (J8B2680)

55) TELEX SYSTEM/NUMBER: INMARSAT-C / 437738810-1

56) FASCIMILE NUMBER: 763662742

57) P & I CLUB ENTERED WITH: THE AMERICAN P+I.

DURING THE FORTHCOMING RENEWAL (FEB 2008) OWNS HAVE THE RIGHT TO ENTER WITH
ANY OTHER MEMBER WITHIN THE INTERNATIONAL P&I GROUP.

58) H & M VALUE: U.S. $ 7,250,000 (SEVEN MILLION TWO HUNDRED AND FIFTY THOUSAND
DOLLARS) PLUS $ 1,750,000 IV (ONE MILLION SEVEN HUNDRED AND FIFTY THOUSAND
DOLLARS). INSURERS: LLOYD'S UNDERWRITERS "BRIT SYNDICATE" (AS LEADERS).

OWNS HAVE THE RIGHT TO INCREASE ANY OF THE ABOVE VALUES DURING THIS C/P.

59) REGISTERED OWNERS FULL STYLE AND FULL ADDRESS: SIXTEEN THIRTEEN MARINE
S.A., MONROVIA, LIBERIA.

60) MANAGER'S NAME, ADRESS / COMMUNICATION DETAILS/ M.I.C.

CHIAN SPIRIT MARITIME ENTERPRISES INC.

10 ANT. AMPATIELOU,
GR-18536 PIRAEUS,
GREECE.
TELEPHONE: +30 210 429 4777

FASCIMILE: +30 210 459 9099
E-MAIL : operations@chianspirit.gr

All details are given in good faith as "about" wog

--- end of vsl's t/c description ---

---

--- charts' qnaire ---


1. HEADOWNER'S FULL STYLE WITH ADDRESS AND COMMUNICATIONS DETAILS.

SIXTEEN THIRTEEN MARINE S.A. of 80 BROAD STR., MONROVIA, LIBERIA.

For correspondence only c/o their managers...

CHIAN SPIRIT MARITIME ENTERPRISES INC.

10 ANT. AMPATIELOU,
GR-18536 PIRAEUS,


GREECE.
TELEPHONE: +30 210 429 4777
FASCIMILE: +30 210 459 9099
E-MAIL : operations@chianspirit.gr

2. NAME OF PERSON BEHIND OWNING COMPANY IE ACTUAL OWNER...

VARIOUS INTERESTS WHICH WE HAVE NO AUTHORITY TO DISCLOSE

3. MANAGERS NAME/STYLE OR DISPONENT OWNERS

SAME AS GIVEN ABOVE IN ITEM 1.

4. NAME OF VESSELS UNDER SAME MANAGEMENT

- MV CAPTAIN P. EGGLEZOS - 76,559 DWY BLT 2007
- MV PANAMAX PEPPOU      - 61,539 DWT BLT 1983

```
- MV PANAMAX ANNA       - 64,700 DWT BLT 1982
- MV MARIA N.M.         - 41,520 DWT BLT 1982
- MV NICHOLAS M.        - 40,153 DWT BLT 1980
- MV IRENE E.M.         - 38,143 DWT BLT 1980
```

OWNERS BANK AND BENEFICIARY

...reverting after fully fixed.

5. P AND I CLUB AND ADDRESS/ COMMUNICATIONS DETAILS

THE AMERICAN P&I CLUB c/o SCB (HELLAS) INC.

51 Akti Miaouli-4th floor
Piraeus 185 36, greece
ph. 210-429-4990
fax 210-429-4187
email: claims@scb-hellas.com

6. H + M VALUE AND INSURER

H & M VALUE: U.S. $ 7,250,000 (SEVEN MILLION TWO HUNDRED AND FIFTY
THOUSAND DOLLARS) PLUS $ 1,750,000 IV (ONE MILLION SEVEN HUNDRED AND FIFTY
THOUSAND DOLLARS).

U/WS' LEADER: "BRIT SYNDICATE" (LLOYD'S UNDERWRITERS).

7. VESSEL'S CLASS

BUREAU VERITAS

8. HAS VESSEL SUFFERED ANY SERIOUS ACCIDENT, BREAKDOWN,
STRANDING OR SERIOUS CARGO CLAIMS IN PAST 12 MONTHS ?

NIL

9. HAS VESSEL ANY OUTSTANDING CLASS RECOMMENDATIONS, AND IF SO
PLS ADVISE DETAILS

NIL

11. STATUS FOLLOWING CLASS SURVEYS:
A) HULL SPECIAL SURVEY - LAST DONE 25/05/2005 - NEXT DUE 31/03/2010
B) DRYDOCKING SURVEY   - LAST DONE 06/04/2005 - NEXT DUE 06/04/2008
C) HULL ANNUAL SURVEY  - LAST DONE 19/06/2007 - NEXT DUE 30/06/2008

12. LAST 3 CARGOES AND NAME OF CHARTERER :

- BULK GRAINS ON TCT ACC CONGENTRA FROM UP RIVER TO ST.PETERSBURG
- BULK MOP ON VOYAGE ACC BPC FROM KLAIPEDA TO MACEIO & PORTO ALEGRE
- BULK GRAINS ON TCT ACC UNIAPRO UP RIVER TO ST.PETERSBURG

13. PLS ADVISE IF ANY CLAIMS DURING PAST 12 MONTHS:

NIL

14. OWNS CONFIRM THAT VSL HAVE NOT SUFFERED ANY CASUALTY (GENERAL
AVERAGE/COLLISIONS/GROUNDINGS/POLLUTIONS ETC) DURING LAST 36 MONTHS:

IN MAY 2005 VSL RUN AGROUND AT GELIBOLU ANCHORAGE WHILE DROPPING HER
ANCHOR AND REFLOATED WITH THE ASSISTANCE OF TUGS AFTER SIGNING T.O.F;

G/A CLAIM ALREADY FULLY SETTLED.

15. PRESENT POSITION, FULL ITINERARY + AGENTS LAST/NXT PORT:

VSL CURRENTLY AT PORT OF ST.PETERSBURG WITH A BALANCE OF ABT 13.000MTS GRAINS TO BE DISCHARGED AND ETC/S 23RD DEC AS PER CHARRS REDELY NOTICES AGW WP UCE. OWNS OPINION IS THAT DUE TO LACK OF TRUCKS COMPLETION MAY BE REALISTICALLY EXPECTED AROUND 26-27TH DEC AGW WP UCE.

Agents...reverting

16. CONTANTS + EST BOD + WLTOHC + TYPE OF HATCH COVERS
OWNERS TO CONFIRM MOULDED DEPTH DOES NOT EXCEED 16M

CONTANTS + EST BOD + WLTOHC + TYPE OF HATCH COVERS ALL AS GIVEN IN VSL'S ABOVE T/C DESCRIPTION AND BELOW OFFER/MAIN TERMS

OWNS CONFIRM THAT MOULDED DEPTH DOES NOT EXCEED 16M

17. VESSEL TO BE FULLY INSURED AND P+I COVERED INCLUDING WAR
RISKS FOR THE DURATION OF THE CHARTER PARTY

YES

18. OWS CONFIRM TT VSL IS IN POSSESION OF VALID CERTS ACCORDING TO
LATEST SOLAS REGS

YES

19. OWNERS TO SUPPLY DOCUMENT OF COMPLIANCE (CERTIFIED TRUE COPY TO BE
PHOTOCOPIED OK)

ON CHARTS REQUEST PROVIDED VSL FULLY FIXED

20. OWNERS TO CONFIRM OWNERS/VESSEL IS FULLY ISPS COMPLIANT

YES

21. IF SO REQUIRED OWNERS TO FILL IN RECEIVERS QUESTIONAIRE

ON CHARTS REQUEST PROVIDED MAIN TERMS AGREED.

22. OWNER TO SEND VSLS ISM CODE SAFETY MANAGEMENT/DOC/CLASS/ISPS/PNI CERTS

ON CHARTS REQUEST PROVIDED MAIN TERMS AGREED

--- charts' qnaire / end ---

- All negotiations and any subsequent fixture to be kept strictly private
and confidential.

- ON ARRAL AT 1ST LOADPORT, VSL`S HOLDS TB READY FOR PERMITTED CARGO SERVICE, CLEAN, SWEPT, WASHED DOWN AND DRIED UP SO AS TO RECEIVE CHTRS INTD CGO IN ALL RESPECTS FREE PREVIOUS CARGO RESIDUES TO THE SATISFACTION OF THE RELEVANT SURVEYOR. SHOULD THE VSL NOT BE APPROVED BY THE SURVEYOR THEN THE VESSEL TO BE PLACED OFF-HIRE FM FAILURE OF INSPECTIONS UNTILL VSL IS FULLY ACCEPTED AND ANY DIRECTLY RELATED EXPENSES THEREOF TB FOR OWS ACCT.

MORE SPECIFICALLY IN CASE OF VESSEL'S FAILURE TO FULLY PASS ABOVE PRELOADING CARGO HOLDS INSPECTION VSL TO BE PLACED OFF HIRE OR PRO RATA OFF HIRE (ACCORDING TO THE NUMBER OF HOLDS WHICH WERE NOT READY AND THE LOADING

OPERATIONS WERE ACTUALLY PREVENTED) FROM REJECTION UNTIL THE VSL PASSES THE
SAME INSPECTION/TEST AGAIN AND ANY TIME/DIRECT EXPENSES INCURRED HEREBY TO BE
FOR OWS ACCOUNT.

HOWEVER NOTWITHSTANDING ANYTHING ELSE CONTAINED HERE, IT IS HEREBY AGREED
THAT IN VIEW OF ST.PETERSBURG AS LOADING PORT, TAKING INTO ACCOUNT THAT VSL
WILL NOT HAVE SUFFICIENT TIME (INTERVAL BETWEEN DISCHARGE COMLETION/DELIVERY
TIME) TO PREPARE CARGO HOLDS AS AGREED ABOVE, OWNERS TO HAVE THE RIGHT TO
DELIVER VSL TO CHARTS AT ANCHORAGE WITH UNCLEAN HOLDS, AND OWNERS TO
UNDERTAKE TO HAVE THE VSL READY TO THE STANDARDS ABOVE AGREED, MASTER DOING
HIS OUTMOST IN ORDER TO MINIMIZE CARGO HOLDS PREPARATION TIME, WITHIN 18HRS.
IT IS WELL UNDERSTOOD THAT CARGO HOLDS CLEANING REMAINS MASTER AND/OR OWNERS
RESPONSIBILITY AND THAT IN CASE CLEANING OPERATIONS TAKE MORE THAN THE ABOVE
ALLOWED 18HRS THEN VSL IS TO BE PLACED OFF HIRE UNTIL MASTER DECLARE THAT
VSL'S HOLDS ARE READY FOR INSPECTION, PROVIDED ALWAYS THAT VSL IS REQUIRED TO
PROCEED FOR IMMEDIATE LOADING AND HER HOLDS ARE NOT READY YET, IN OTHER WORDS
PROVIDED THAT THERE IS ACTUAL DELAY TO THE VSL'S ITINERARY.


- OWS GTEE VSL IS SD SELF-TRIMING BC/BRIDGE N ENG ROOM IS AFT

- OWS GTEE VSLS T/T IS FLAT AND SUITABLE FOR GRAB DISCHARGING

- OWS GTE TT VSLS H.COVERS ARE TB WATERTIGHT ALL THROUGHOUT THIS C/PERIOD N IF
  ANY H.COVER FOUND DEFECTIVE, SAME TB RECTIFIED AT OWS TIME N EXPNS TO CLASS
  SURVEYOR SATISFACTION IN WHICH CASE VSL TO BE PLACED PRO RATA OFF-HIRE
  (ACCORDING TO THE NUMBER OF HATCHES WHICH FOUND DEFECTIVE AND THE LOADING
  OPERATIONS WERE ACTUALLY PREVENTED)

- OWS GTEE VSL IS P&I COVERED WITH THE "AMERICAN P&I CLUB", CLASSED WITH
  "B.V" AND SHALL REMAIN SO THROUGHOUT THE WHOLE T/C PERIOD;

OWNERS ALSO WARRANT:

- VESSEL WILL NOT BE SCHEDULED FOR BREAK UP OR SOLD FOR SCRAP DURING
  THIS CHARTER OR UPON COMPLETION OF THIS CHARTER.

- VESSEL'S CREW AND OFFICERS SHALL BE ITF APPROVED OR ITS EQUIVALENT AS
  APPLICABLE/REQUIRED BY THE COMPETENT AUTHORITY OF THE VESSEL'S FLAG.

- VESSEL SHALL NOT CHANGE OWNERSHIP AND/OR CLASS WITHOUT
  CHARTERERS' WRITTEN CONSENT


FOR

1. MV "NICHOLAS M." (EX- MED UNITY) AS DESCRIBED ABOVE

2. Account "BRITANNIA BULKERS A/S" a company under the same group with
        "BRITANNIA BULK PLC, UK"/C

    add...    DK-5700 SVENBORG DENMARK

    ph.nr........

    email.......

    mic.........

    (comments: pls provide charrs full style for cp purposes/our ops dept easy
    ref)

3. DELIVERY: ON DLOSP ST.PETERSBURG, RUSSIA ATDNSHINC

4. LAY/CANCELLING DATE: 00:00HRS LT 23rd DEC 2007 - 24:00 HRS 31ST DEC 2007

5. ALLOWED TRADING : ONLY 1 STRAIGHT TCT VIA ST. PETERSBURG, RUSSIA TO BRAZIL
   AND/OR ARGENTINA AND/OR URUGUAY (intn:........) ALWAYS VIA SAFE PORT (S),
   SAFE BERTH (S),SAFE ANCHORAGE (S) ALWAYS AFLOAT (EXCEPT FOR ECSA ONLY
   WHEREVER NAABSA APPLICABLE AS PER NYPE) ALWAYS WITHIN INSTITUTE WARRANTY
   LIMITS (IWL/INL), EXCEPT FOR PETERSBURG ONLY WHICH IS ALLOWED AS LOADING
   PORT AS AGREED, AND ALWAYS EXCLUDING WAR OR WARLIKE ZONES (CONWARTIME 2004
   TO APPLY), IN/OUT GEO ROTATION.

   IT IS WELL UNDERSTOOD AND AGREED THAT IN VIEW OF THE VESSEL'S TRADE, BIMCO
   "ICE CLAUSE" AND "BUNKER FUEL SULPHUR CONTENT 2005" CLAUSES FOR TIME CHARTER
   PARTIES SHALL APPLY.

   DURATION ABT 45 DAYS WOG

6. ALLOWED CARGO: ONLY HARMLESS FERTILIZERS IN BULK (intn:......).

   IF MORE THAN ONE GRADES CARGO TO BE NATURALLY SEPARATED BY THE VSL'S HOLDS
   ONLY.

   IT IS UNDERSTOOD THAT CHARTERERS MAY LOAD ANY FERTILIZERS IN BULK, PROVIDED
   THAT CARGO WILL BE LOADED IN STRICT ACCORDANCE WITH INTERNATIONAL IMO
   REGULATIONS AND TO BE HARMLESS/NON- IMO DANGEROUS CARGO FOR THE
   LOADING,STORAGE AND CARRIAGE OF WHICH THE VESSEL IS NOT REQUIRED TO BE CO2
   FITTED OR NO APPENDIX B REQUIREMENTS APPLY OR REQUIRED BY CHARTERERS AND/OR
   SHIPPERS AND/OR CARGO AND/OR VESSELS OR CARGO UNDERWITERS AND/OR ANY OTHER
   COMPETENT AUTHORITY. PALM KERNEL EXPELLERS,SUNFLOWER SEED EXPELLERS,PELLETS
   ALWAYS TO BE EXCLUDED.

7. REDELY : ON DLOSP 1SP WITHIN VITORIA - BAHIA BLANCA RANGE, ATDNSHINC

8. HIRE U$D 40,000 DAILY HIRE - DAILY HIRE TO INCLUDE OT/FW/LUBES AND TO BE
   PAYABLE EVERY 15 DAYS IN ADVANCE

   UPON DELY CHARTS TO PAY 15 DAYS HIRE PLUS FULL VALUE OF BUNKERS AS
   ON BOARD AT THE DATE OF DELIVERY WITH NO DEDUCTIONS OF ESTIMATED BUNKERS
   VALUE ON REDELIVERY. ANY SUCH DEDUCTION TO BE MADE FROM THE LAST SUBSEQUENT
   SUFFICIENT HIRE PAYMENT.

   CHARTERERS NO TO MAKE ANY DEDUCTION IN RESPECT OF OWNERS EXPENSES AT ANY
   PORT OF CALL DURING THIS CHARTER PARTY OWNERS SETTLING ALL OWNERS' EXPENSES
   DIRECTLY WITH AGENTS, HOWEVER CHARTERERS' AGENTS TO ATTEND VESSEL'S MINOR
   MATTERS SUCH AS CASH TO MASTER, CHANGES OF PART OF CREW ETC WITHOUT CHARGING
   EXTRA AGENCY FEE. FOR MAJOR SHIP'S HUSBANDRY MATTERS SUCH AS EMERGENY
   DRYDOCKING OWNERS TO MAKE THEIR OWN ARRANGEMENT WITH AGENTS. OWNERS TO
   ALWAYS HAVE THE RIGHT TO APPOINT THEIR OWN PROTECTING AGENTS AT BOTH ENDS.

9. BUNKERS ON DELY ABT 300 IFO AND ABT 50 MDO AT U$D 500PMT AND U$D 800
   RESPECTIVELY.

   BUNKERS ON REDELIVERY ABT SAME QUANTITIES AT SAME PRICES AS ON DELIVERY.

   CHARTERERS TO PAY FULL VALUE OF BUNKERS ON DELY AS ON BOARD.

   BOTH CHARTERERS AND OWNERS TO HAVE THE PRIVILEGE TO BUNKER THE VESSEL PRIOR
   TO DELIVERY/REDELIVERY PROVIDED SAME DOES NOT INTERFERE WITH VESSEL'S
   OPERATIONS OR ITINERARY IN WHICH CASE SAME TO BE SUBJECT TO BOTH PARTIES
   MUTUAL AGREEMENT WHICH NOT BE UNREASONABLY WITHELD.

   CHARTS TO HAVE THE RIGHT TO DEDUCT FROM THE LAST SUFFICIENT HIRE PAYMENT(S)

BUT NOT FROM THE FIRST 30 DAYS THE ESTIMATED VALUE OF BUNKERS ON
REDELIVERY

OWNERS ALLOW CHARTERERS TO BUNKER THE VESSEL AT SOUTH AMERICA
WITH FUEL ACCORDING TO PETROBRAS SPECIFICATIONS BUT ALWAYS WITH BUNKERS
WITHIN THE SPECIFICATIONS OF THE VSL'S ABOVE FULL T/C DESCRIPTION.

10.ON HIRE/OFF HIRE SURVEYS TO BE CARRIED OUT AT CHARTS TIME AND EXPENSES
OWNERS APPOINTING MASTER TO ATTEND ON THEIR BEHALF.

11.ANY ADD WAR PREMIUM DURING THIS C/P (IF ANY) TO BE FOR CHRS' ACCT AGAINST
FAXED VOUCHERS; MORE SPECIFICALLY CONWARTIME 2004 TO APPLY.

12.ILOCH

CHARTERERS HAVE THE OPTION OF REDELIVERING THE VESSEL WITHOUT CLEANING HOLDS
CHARTERERS PAYING U$D 6500 LUMPSUM

13.C/V/E USD 1,250 PER MONTH PRO RATA

14.OWNERS TO ALLOW CHARTERERS TO DISCHARGE CARGOS WITHOUT
PRESENTATION OF ORIGINAL BILL(S)/LADING BY PROVIDING WITH LETTER OF
INDEMNITY IN ACCORDANCE WITH OWNERS P N I CLUB FORM AND WORDING
BEFORE DISCHARGING. LETTER OF INDEMNITY TB SIGNED BY CHARTERERS ONLY.

CHARTERERS, THEIR AGENTS OR THEIR NOMINEES ARE AUTHORISED TO SPLIT BILL(S)
OF LADING INTO DELIVERY ORDERS PROVIDED A FULL SET OF ORIGINAL BILL(S) OF
LADING ARE AVAILABLE TO OWNERS AND AGAINST CHARTERERS LETTER OF INDEMNITY AS
PER OWNERS' P&I CLUB WORDING, PRIOR TO SPLITTING. OWNERS ARE NOT RESPONSIBLE
FOR ANY CARGO SHORTAGE CLAIM DUE TO SUCH BILLS OF LADING SPLITTING.

15.BIMCO ISM/ISPS/NON-PAYMENT OF HIRE/ ICE-CLAUSE/EVIDENCE OF PERFORMANCE/FUEL
SULPHUR CONTENT/BUNKER QUALITY CONTROL/U.S. SECURITY/U.S.CUSTOMS ADVANCE
NOTIFICATION/AMS BIMCO CLAUSES FOR TIME CHARTER PARTIES CLAUSES TO APPLY

16.FOR THE PURPOSE OF COMPUTING HIRE PAYMENTS, THE TIME FOR
DELIVERY/REDELIVERY SHALL BE ADJUSTED TO G.M.T

17.ANY OFF HIRE DEDUCTION UNDER THIS CHARTER PARTY DUE TO VSLS INEFFICIENCY
ARREST,DETENTION,SEIZURE, MACHINERY BREAKDOWN ETC...BY ANY AUTHORITY AND FOR
ANY REASON TO BE MADE ON THE BASIS OF THE ACTUAL TIME LOST DURING THE
PERIOD OF THE VESSELS INEFFICIENCY ARREST, DETENTION, SEIZURE,MACHINERY
BREAKDOWN ETC... LIMITED TO, BUT NOT EXCEEDING, THE WHOLE PERIOD OF THE
SAME.

IT IS HEREBY UNCONDITIONALLY AGREED THAT THIS CLAUSE IS A "NET/ACTUAL
TIME LOST CLAUSE"

18.GENERAL AVERAGE IN LONDON ACCORDING TO YORK-ANTWERP RULES 1994 / ENGLISH LAW
AS WELL AS LMAA SMALL CLAIMS (UPTO $75,000) PROCEDURE TO APPLY

19.Add. Comm 3.75% due to charrs + 1,25 % due to Lightsip + 1,25 To Billmar

20.NO WAY BILLS, NO LINER OUT BS/L , HAGUE-VISBY RULES TO BE INCORPORATED IN
ANY B/L ISSUED UNDER THIS C/P.

21.ALL TAXES AND DUES AND CHARGES ON THE VSL AND/OR CARGO AND/OR FRT AND/OR
HIRE ARISING OUT OF CARGOES CARRIED OR PORTS VISITED OR COUNTRIES TRADED
THROUGH UNDER THIS CHARTER TO BE FOR CHTRS ACCT.

22.Neither the Charterers nor their agents shall permitt the issue of any
B(s)/L (whether or not signed on behalf of the Owners or on the
charterers behalf of any sub-charterers) incorporating the Hamburg Rules or
any legislation giving effect to the Hamburg Rules or any other legislation

imposing liabilities in excess of Hague-Visby rules. The Charterers shall indeminify the Owners against any liability, loss or damage which may result from any breach of the forgoing provision of the clause. No liner Bills or Way Bills of Lading and no through transhipment or combined transport Bills of Lading to be issued

23. OTHERWISE SUB CP DETAILS/FUTHER TERMS AS PER PROFORMA C/P OF M/V "FURIA R." ACC "OLDENDORFF CARRIERS GMBH & CO.KG" DD 18TH MAY 2006 STRICTLY AND LOGICALLY AMENDED AS PER MAIN TERMS AGREED AS WELL AS BELOW C/P DETAILS/ALTERATIONS;

IT IS WELL UNDERSTOOD AND AGREED THAT ALL TERMS/CONDITIONS IN ABOVE MAIN TERMS AGREEMENT AS WELL AS BELOW FURTHER C/P DETAILS/ALTERATIONS WILL SUPERSEDE ALL TERMS/CONDITIONS/CLAUSES OF SAME MEANING/WORDING OF PROFORMA C/P AND FORM PART OF IT:

MAIN BODY
---------

DELETE LINES AS FROM 1 TILL 19 :  SAME TO BE AMMENDED AS PER MAIN TERMS AGREED BUT LINES 16/17 TO REMAIN AS PRINTED

LINE 43:  AFTER 'CHRTS ACCOUNT.' INSERT 'IN CASE OF OPTIONAL PILOTAGE COST OF SAME TO BE PAID BY CHRTS IN THEIR DISCRETION AND AFTER CONSIDERATION OF MASTERS REASONABLE AND SENSIBLE REQUEST WHICH NOT TO BE UNREASONABLE WITHELD'

LINES:45/46/47 :  DELETE AS NON APPLICABLE

LINE 57 :  DELETE ',AND PROBABLE PORT' AND INSERT

'.LATEST TOGETHER WITH 15 DAYS APPROXIMATE NOTICE OF REDELIVERY CHARTERERS TO ADVISE THE FINAL REDELIVERY PORT'

LINE 95 :  DELETE 'GIVEN WRITTEN NOR' INSERT 'DELIVERED'

LINES 145-150:  DELETE ALL LINES AS N/A (VSL IS GRLSS) EXCEPT IN LINE 145 WHERE THE SENTENCE 'VESSEL TO WORK...REQUIRED BY CHARTERERS' TO REMAIN

RIDER CLAUSES
-------------

CLAUSE 29 : TO BE TITLED "ALLOWED CARGO" AND TO BE AMENDED AS PER PARA "6" OF MAIN TERMS.

CLAUSE 30 : TO BE TITLED "ALLOWED TRADING" AND TO BE AMENDED AS PER PARA "5" OF MAIN TERMS.

CLAUSE 33 : AMEND PER MAIN TERMS PARA 12, OWISE AS PER C/P EXCEPT 2ND LINE DELETE AS FROM 'INCLUDING, IF PERMITTED"... TILL THE END OF THE CLAUSE

CLAUSE 38 : 3RD LINE DELETE "REMAINS UNDER ARREST OR" OTHERWISE AS PER ABOVE PARA 17 OF MAIN TERMS.

CLAUSE 39 : REPLACE 9TH PARAGRAPH I.E. AS FROM " CHARTERERS HAVE

THE OPTION .... TILL ....OF LINER BILLS OF LADING" WITH " NO
LINER OUT BILLS OF LADING UNDER THIS CHARTER PARTY"

OTHERWISE TO BE ALSO AMENDED SO AS TO INCORPORATE THE PROVISIONS OF
MAIN TERMS ABOVE RELEVANT PARA 14.

CLAUSE 41 : PARA 1 THRU 7 AMENDED AS PER MAIN TERMS (IE QTTIES/PRICES/SPECS
ETC) OWISE TO REMAIN AS PER C/P EXCEPT AFTER 'SUPPLIER' INSERT
'FROM THE VESSEL'S MANIFOLD'

CLAUSE 44 : DELETE AND TO BE AMENDED AS PER ABOVE PARA 8 OF MAIN TERMS.

CLAUSE 49 : 1ST LINE AFTER "SUPERCARGO(ES)" INSERT " UPON REASONABLE REQUEST"

CLAUSE 51 : DELETE AS NON APPLICABLE

CLAUSE 54 : ADD AT THE END "THIS IS A 'NET ACTUAL TIME LOST CLAUSE'
FOR THE TIME THEREBY ACTUAL LOST AND NOT A PERIOD CLAUSE"

CLAUSE 56 : TO BE DELETED AND TO READ AS PER ABOVE PARA 10 OF MAIN TERMS.

CLAUSE 58 : DELETE "COURIER" INSERT "E-MAIL IF REQUIRED"

CLAUSE 59 : DELETE WHOLE AS N/A

CLAUSE 60 : ADD "AND SAME TO BE INCORPORATED TO ANY BILLS OF
LADING ISSUED HEREUNDER"

CLAUSE 62 : DELETE AS FROM "WITHIN 3 BANKING DAYS TILL END OF THE
CLAUSE" INSERT "ON DELIVERY"

CLAUSE 63 : DELETE IN FULL AS N/A.   .

CLAUSE 71 : AS PER C/P EXCEPT
LINE 1 DELETE 'JAPAN,' INSERT 'RUSSIA"
DELETE 'DENMARK' INSERT 'ARGENTINA OR BRAZIL OR URUGUAY"
ADD AT END 'PROVIDED NO CARGO ONBOARD'

CLAUSE 72 : DELETE WHOLE AS N/A

CLAUSE 76 : DELETE WHOLE AS N/A

- PLS ALSO REPLACE THE ATTACHED TO THE PROFORMA SET OF LOIS (TTL 3) WITH
  THE NEW ONE AS ATTACHED HEREWITH.


=== recap of fixture (main terms+cp dets) clean on all subjects / end ===

END

AMERICAN STEAMSHIP OWNERS MUTUAL PROTECTION AND INDEMNITY ASSOCIATION, INC. Page 1 of 2



SHIPOWNERS CLAIMS BUREAU, INC., MANAGER
ONE BATTERY PARK PLAZA - 31ST FLOOR   NEW YORK, NEW YORK 10004   USA
TEL: +1.212.847.4500   FAX: +1.212.847.4599   WEB: WWW.AMERICAN-CLUB.COM

**To:**      Euroweg Zerno OOO and their insurers (the "Claimants"),
             c/o Barlow Lyde & Gilbert LLP, Beaufort House, 15 St Botolph
             Street, London EC3A 7NJ

**Date:**    24 December 2007

**Ship:**    m.v. "NICHOLAS M" (the "Vessel")

**Bill of
Lading:**    Bills of Lading Nos.1 dated 18 October 2007, Nos 2 and 3 dated 28
             October 2007 , Nos. 4 and 5 and 6 and 7 and 8 dated 30 October 2007.

**Cargo:**   30,204   m.t. ( thirty thousand two hundred and four metric tons)
             Argentine Origin Hipro-Soyabean Meal in Bulk (the "Cargo")

**Voyage:**  San Lorenzo, Argentina to St Petersburg, Russia ("the Voyage").

**Claim:**     For damages/indemnification and/or other appropriate relief in
             respect of all liabilities, losses, damage, cost and expenses arising
             from the alleged damage to the Cargo during the Voyage (excluding
             any claim for hire and/or losses arising out of any additional time
             taken to discharge the Cargo).

In consideration of the Claimants refraining from taking any action resulting in
the arrest or detention of any ships or property in the ownership, associated
ownership or management of the Owners or any other action against any other
assets of the Owners for the purpose of obtaining security for the above claim,
we hereby undertake to pay to the Claimants within 21 days of a first written
demand such sum or sums as may be due to them from the Owners in respect
of the Claim either by agreement between the parties or by final unappealable
award of a London Tribunal or judgment of the English Court provided always
that our liability hereunder shall not exceed the sum of US $322,271.00 (three
hundred and twenty two thousand two hundred and seventy one United States
Dollars) plus interest and costs to be adjudged or agreed by the parties.

Nothing in this undertaking shall amount to or be construed as (a) an admission
of liability on the part of the Owners or (b) a waiver on the part of the Owners
of any right which it may have to limit its liability in any available jurisdiction
and under any applicable provisions.

It is further agreed that Claimants are entitled to request reasonable additional
security for the purpose of obtaining reasonable additional security if in the
future it reasonably appears that this undertaking may be insufficient to cover
the Claim. It is also agreed that Owners are entitled to request Claimants to
reduce the value of the security if in the future it reasonably appears that the

sum secured is excessive in relation to the actual value of the claim. Claimants are not entitled to arrest the vessel or any other asset in respect of the above request.

We warrant that:

(i)      the Vessel was not demise chartered at any material time;

(iii)     we have received irrevocable authority from the Owners to instruct solicitors as aforesaid and to give this Letter of Undertaking in these terms.

This undertaking shall be governed by and construed in accordance with English law and we irrevocably and unconditionally agree to submit to the exclusive jurisdiction of the English High Court of Justice for the purpose of any process for the enforcement hereof or for the resolution of any other action brought in connection with this undertaking.

We further undertake that we shall, within 14 days of the receipt from the Claimants of a request to do so, instruct London solicitors to accept on behalf of the Vessel and/or the Owners service of proceedings brought by the Claimants and to file acknowledgement of service thereof.

We confirm that the parties to the above mentioned claim and all claims between them in respect of the above Voyage should be subject to English law and to the exclusive jurisdiction of the English High Court of Justice.

It is understood and agreed that Shipowners Claims Bureau, Inc., in its capacity as Manager, is duly authorized to execute this Letter of Undertaking for and on behalf of American Steamship Owners Mutual Protection and Indemnity Association, Inc.

It is further understood and agreed that the execution of this letter by the signatory is not and shall not under any circumstances be construed as binding on him personally, nor binding upon Shipowners Claims Bureau, Inc., but is binding only upon American Steamship Owners Mutual Protection and Indemnity Association, Inc.

Very truly yours,
Shipowners Claims Bureau Inc.
As Manager for and behalf of the
American Steamship Owners Mutual Protection and Indemnity Association Inc.

Victoria Liouta
Manager

24/12/2007

Print Copy for : DIMOU NIKOLAOS

---

Received Inc.MSG.: 86469        Date: Fri 28/Dec/2007 20:11
From: JSC "ANTEKS" <ANTEKS <anteks@mail.cplus.ru>>
Subject: Re[4]: M/V "NICHOLAS M."  DAILY INFO
TO : <CONGENTRA <operations@congentra.com>>
CC : <CHINAN SPIRIT <operations@chianspirit.gr>>


DEAR SIRS,

PLEASE NOTE DISCHARGING COMPLETED
28/12 1840LT
FROM 1840 AWAITING PILOTAGE DUE TO BAD
WEATHER AT PILOT STATION
ETS 29/12 NOON AGW WP


 BRGDS,
 ALEX
 ANTEKS                    mailto:anteks@mail.cplus.ru

 **Lars Krogius Russia Group**
ООО «Ларс Крогиус»
St. Petersburg • Moscow • Novorossiysk • Taganrog • Yeisk • Murmansk • Kandalaksha

  Allianz ⑪  WKW
WK Webster

SURVEY AGENT

## ANNEX TO

| PORT & BERTH | St. Petersburg, berth 23 | | VESSEL | | NICHOLAS M |
|---|---|---|---|---|---|
| DATE & TIME | 28.12.2007, 21:00 LT | | FLAG | | St.Vincent & The Grenad. |
| OPERATION | Bunker survey | | PORT OF REG. | | Kingstown |
| DENSITY | As per documents | | IMO No. | | 7433452 |
| SEA WATER TEMPERATURE | | 1 | DRAFT FORE | MIDDLE AFT | HEEL |
| ENGINE ROOM TEMPERATURE | 22 | 3,35 | | 5,39 | TRIM 2,04 |

| Tank No. | Grade | Sounding, m | Temp. deg. C | Volume cu. m. | Density at 15 deg.C mt/cu. m. | VCF ASTM 54B | Weigth mt |
|---|---|---|---|---|---|---|---|
| 1 PS | IFO 180 LS | 0.0 | 1,00 | 0,065 | 0,94320 | 1,01010 | 0,060 |
| 1 Stb | IFO 180 LS | 0,57 | 1,00 | 66,479 | 0,94320 | 1,01010 | 63,349 |
| 3 PS | IFO 180 LS | 0,32 | 1,00 | 55,544 | 0,94320 | 1,01010 | 52,920 |
| 3 Stb | IFO 180 LS | 0.0 | 1,00 | 0,119 | 0,94320 | 1,01010 | 0,110 |
| 14 | IFO 180 LS | 5,1 | 1,00 | 50,283 | 0,94320 | 1,01010 | 47,910 |
| 15 | IFO 180 LS | 0.0 | 1,00 | 0,084 | 0,94320 | 1,01010 | 0,080 |
| SETTLING Tk | IFO 180 LS | GAUGE | 22,00 | 48,000 | 0,94320 | 0,99490 | 45,040 |
| SERVICE Tk | IFO 180 LS | GAUGE | 22,00 | 46,700 | 0,94320 | 0,99490 | 43,820 |
| OVERFLOW Tk | IFO 180 LS | 0,22 | 1,00 | 1,000 | 0,90000 | 1,01080 | 0,910 |
| | | | | | | | |
| TOTAL | | | | 268,274 | | | 254,190 |

| Tank No. | Grade | Sounding, m | Temp. deg. C | Volume cu. m. | Density at 15 deg.C mt/cu. m. | VCF ASTM 54B | Weigth mt |
|---|---|---|---|---|---|---|---|
| 18 PS | MDO | 1,22 | 1,00 | 27,431 | 0,89260 | 1,01090 | 24,750 |
| 18 Stb | MDO | 0.0 | 1,00 | 0,514 | 0,89260 | 1,01090 | 0,460 |
| SETTLING Tk | MDO | GAUGE | 22,00 | 16,100 | 0,89260 | 0,99450 | 14,290 |
| SERVICE Tk | MDO | GAUGE | 22,00 | 14,700 | 0,89260 | 0,99450 | 13,050 |
| | | | | | | | |
| TOTAL | | | | 58,745 | | | 52,550 |

**REMARKS**

Data for Volumes of Ship' tanks as provided by Master / Chief Engineer

Densities used for calculations as per documents provided by Master / Chief Engineer

*Signed on behalf of CONCENTRA AG*
*without prejudice and under*
*reservation of all*
*their rights.*

| SURVEYOR | MASTER | CHIEF ENGINEER |
|---|---|---|
| O. Romanov | | ALFREDO B. ILUSTRISIMO |

Address
3, Gapsalskaya Str.
St. Petersburg, 198035, Russia

Phone
+7 (812) 322 5717
+7 (812) 251 6517

E-mail
survey@krogius.ru

75

**Subject:** FW: URGENT - Nicholas M - Club ref: 20071397

**From:** Matthew Montgomery [mailto:Mmontgomery@blg.co.uk]
**Sent:** Friday, December 28, 2007 2:10 PM
**To:** Victoria Liouta; Dorothea Ioannou
**Cc:** operations; anne.modock@axa-corporatesolutions.com; Eurof Lloyd-Lewis; Andrew Speake
**Subject:** URGENT

Dear Sirs

We write further to our telephone conversation this morning (Lloyd-Lewis / Ioannou).

We confirm that Underwriters' surveyor from Marinex and Consignees' surveyor from SGS Vostok wish to carry out an ultrasound of holds two and four upon completion of discharge. We will let you have the identifications of the surveyors concerned shortly.

The Master is currently refusing access to the holds on the grounds that he is unable to contact his Owners because of the Christmas and New Year holidays. We are surprised at this assertion as Owners are corresponding via Brokers with Charterers. In the circumstances please confirm immediately if Underwriters' and Consignees' surveyors will be permitted access to the holds.

We understand that the vessel is scheduled to complete discharge during the course of today and Owners, although they have not discussed the same with Charterers, are intending to ship the vessel to another berth in order to load a cargo of potash. Charterers' rights with regard to whether owners are permitted to do this are reserved.

It follows that this letter should be dealt with as a matter of priority.

We have also previously requested that Owners provide copies of the vessels log books for the period whilst she was loading. However we have not received anything. Nor indeed have the surveyors. Would the Club please remind Owners of their obligations under the Charterparty to produce such information.

Despite several requests we are also waiting to learn of the contact details to which owners P & I Club surveyor has sent their cargo samples for analysis. Would the Club now please provide this information.

We will be writing to you later today to inform you of the identities of Underwriters' and Consignees' surveyors.

Regards

Barlow Lyde & Gilbert LLP


**********************************************************************
Barlow Lyde & Gilbert LLP
Beaufort House, 15 St. Botolph Street, London EC3A 7NJ.

Telephone : +44 (0)20 7247 2277
Fax : +44 (0)20 7643 8500
Web Site : http://www.blg.co.uk
VAT Number: 243202705

## NICHOLAS M

### Note of telephone call.

### Capt. Costas Bourdis - Operations Manager - Chian Spirit Maritime.

Time:         approximately 1600hrs (Greek time) on 28.12.2007.
Location:     Trikala, Thessaly province, Greece.
Activity:     short Christmas holiday away from Athens with family.

Call received by CB on mobile phone number: + 30 6942 841734.

Caller:       Mr Pavel Priymak

The call consisted roughly of the following interchange:

PP:    I am Pavel Priymak of Congentra.

CB:    What can I do for you?

PP:    I have learned that you are the decision maker for NICHOLAS M.

CB:    Your information is incorrect. I am the operations manager. I am away from
       the office on holiday.

PP:    I want to carry out ultrasonic tests in all the holds [*later just for Nos. 2 and 4*]

CB:    I understand that P&I, lawyers and local reps are dealing with this. Since no
       seawater ingress, I cannot assist you.

PP:    [*Very hostile and menacing*] Listen to me, I have the ship in my port. I control
       it. If you do not agree to testing of No.2 and No.4 hatches, I will f**k you,
       your ship and your company. Understand me, your ship is in St. Petersburg –
       my home – I can f**k you. [*PP continued in the same threatening vein for a
       short while*]

CB:    You are not a serious person. I do not want to speak to you anymore.

CB then called Nicholas Madias of Chian Spirit Maritime to report the threats and
then switched off his phone.

..................................................................
**Captain Costas Bourdis**
**8th March 2008**

77

m/v NICHOLAS M.
910 W 76
St. Petersburg
28/12/2007

### NOTIFICATION

Due to the problem with closing of aft.
hatch cover of cargo hold N. 6 and
impossibility to repair prior ships
departure, certificate of classification
Nr. LPRO/KTS/2005 1014 1155 30 has been
temporarily withdrawn as well as
cargo ship safety construction
certificate Nr. LPRO/KTS/2005 1013 183 942.



Evgeny Zavyalov
Surveyor to Bureau Veritas

Master of
m/v NICHOLAS M.

78

Subject:              FW: MV Nicholas M

From: Kevin Oram [mailto:koram@blg.co.uk]
Sent: Friday, December 28, 2007 11:02 PM
To: Victoria Liouta
Cc: anne.modock@axa-corporatesolutions.com; operations@congentra.com;
chartering@billmar.gr; dorothea.ionnou@scb-hellas.com;
master.nicholasm@telaurus.net
Subject: MV Nicholas M

We write further to our telephone calls and emails of earlier today.

The Master has continued to refuse access to holds 2 and 4 to the surveyors appointed by Cargo
Underweg Zerno to permit them to conduct an ultrasonic test. The Master has
purportedly done so on the basis that he is unable to obtain instructions from the shipowner as to
whether he is permitted to allow such inspection. This is despite the fact that Charterers have
received a number of communications from the Vessel's managers during the course of the day.
This appears to be yet another attempt by Owners to obstruct Cargo Interests in conducting a
proper and full investigation into the cause of the damage to the cargo.

As a consequence we are instructed by Congentra AG to inform you that they shall rely on this
further conduct as an additional ground to place the Vessel offhire for the relevant period.

Our clients have no desire to delay the Vessel further by making an application to the Commercial
Court in London for an order compelling Owners' to permit such survey. However, in any
subsequent proceedings under the charter and/or bills of lading they reserve the right to refer the
court or tribunal to such conduct and invite them to draw the necessary adverse inference from
Owners' refusal to permit such survey.

All cargo has now been discharged and following completion of the offhire survey Congentra is ready
to redeliver the Vessel. They have however, learned that the Vessel is unable to close hatchcover
number 6 and its complement of crew is below the minimum necessary to enable it to proceed to sea.
If as a consequence of these defects redelivery is delayed Charterers will rely upon these additional
grounds to place the Vessel offhire until redelivery can take place in accordance with the charter.

With regard to Owners' provisional final hire statement at this stage Congentra simply wishes to say
that it disputes the same and the claim for AP but they shall write to Owners further in this regard
with their detailed comments shortly. However, Owners will not be surprised to learn that as a
consequence of their breaches of contract that discharge has taken considerably longer than it
should have done and hire should not be payble under the charter in respect of such delay.

Finally, with regard to bunkering prior to redelivery, Charterers will be considering this further but
it
seems to them at the very least that the Master has acted negligently in not conducting a sounding
of the bunkering vessel's tanks prior to and after bunkering.

For the avoidance of doubt, this message is sent under reservation of all our clients' rights.

Eurof Lloyd-Lewis
Associate
Marine, Energy & Trade
Direct telephone: +44 (0)20 76 43 74 47

                              1

                                                              79

Direct fax: +44 (0)20 70 71 96 01
Mobile telephone: +44 (0)78 24 35 59 55

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
Barlow Lyde & Gilbert LLP
Beaufort House, 15 St. Botolph Street, London EC3A 7NJ.

Telephone :    +44 (0)20 7247 2277
Fax :          +44 (0)20 7643 8500
Web Site :     http://www.blg.co.uk
VAT Number:    243202705

2

80

COMPANY NAME: _____    COMPANY CONFIDENTIAL    VESSEL'S NAME: M/V NICHOLAS H

# DAILY LOG SHEET FOR VESSEL'S VISITORS

COUNTRY: _____    PORT: St. Peter Bridge    TERMINAL: _____

| WHITE COPY: ONBOOK | FOR MASTER | YELLOW COPY: S.S.O. |
|---|---|---|

| DATE | ENTRY TIME | VISITORS CARD No | VISITORS FULL NAME and TYPE/NUMBER OF IDENTIFICATION DOCUMENT | CHECK BAGGAGE | VISITORS TITLE/POSITION | VISITORS COMPANY NAME | SCOPE AND PURPOSE OF VISIT ONBOARD | VESSEL'S OFFICER RESPONSIBLE | DEPART TIME | CREW MEMBER ON DUTY (NAME/SIGN) |
|---|---|---|---|---|---|---|---|---|---|---|

(handwritten entries — illegible)

CHECKED AND REVIEWED BY: _____

MASTER (NAME/SIGN/DATE): _____    SECURITY OFFICER (NAME/SIGN/DATE): _____

81

ST. PETERSBURG                          DATE 29 DEC 2007 SATURDAY

## REMARKS

PSC ON BOARD. P.I.D. NORDWEG ON BOARD 1015- NORDWEG LEFT

1130 - CARRIED OUT INSPECTION OF CREWS CABIN, MESSROOM, GALLEY, PROVISION STORES & FRESH WATER

WENT ON BOARD

### ENGINE PERFOMANCE

| ICE | SPEED BY ENGINE | AVERAGE R.P.M. | AVERAGE SLIP (PERCENT) | FUEL OIL CONSUMED (BARRELS) | FUEL OIL ON HAND (BARRELS) | FRESH WATER CONSUMED (TONS) | FRESH WATER ON HAND (TONS) | NUMBER BOILERS IN USE | TOTAL AVERAGE SLIP (PERCENT) | TOTAL DISTANCE BY ENGINE | DETENTION STEAMING |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | |

- AGENT STEPANOV ON BOARD
- AGENT LEFT  1623- AGENT STEPANOV LEFT
3rd AGENT 2 PSC OFFICER LEFT 1850 3/O ON BOARD (R. MENDIZABAL)
AGENT KONYUKHOV ON BOARD 1843- AGENT KONYUKHOV LEFT
- AGENT KONYUKHOV LEFT

| BALLAST TANKS PORT, CENTER, STARBOARD | | | REFRIGERATION (CARGO) | | | | | | DRAFT OF VESSEL | |
|---|---|---|---|---|---|---|---|---|---|---|
| LAST FILLED | INCHES | TONS | COMPARTMENT | TEMPERATURE | | | | | | |
| | | | | 4 | 8 | 12 | A.M. | P.M. | | |

DRAFT OF VESSEL

Sailing: _____ Forward _____ Aft
Arriving _____ Forward _____ Aft
Mean _____

A.M. — Forward _____ Aft _____ Mean _____
P.M. — Forward _____ Aft _____ Mean _____

FUEL OIL AND WATER

Sailing: Bbls. Fuel Oil _____ Water, Tons _____
Arriving: Bbls. Fuel Oil _____ Water, Tons _____
Received/Bbls. Fuel Oil _____ Water, Tons _____

_____ Chief Mate

_____ Master

82

Received Inc.MSG.: 86546          Date: Sat 29/Dec/2007 12:52
From: NICHOLAS M. <"Master NicholasM" <Master.NicholasM@telaurus.net>>
Subject: Fw: NICHOLAS M
TO : <"operations department" <operations@chianspirit.gr>>

FM: MV NICHOLAS M
TO: C.S.M.E./OPER DEPT.
REF: 244/29-DEC-07

PLS FIND LATEST MSG RCVD FM CONGENTRA.

- QUOTE-
----- Original Message -----
From: "Operations" <operations@congentra.com>
To: "Master NicholasM" <Master.NicholasM@telaurus.net>
Sent: Saturday, December 29, 2007 11:39 AM
Subject: FW: NICHOLAS M

>
> _____
>
> From: Operations
> Sent: Saturday, December 29, 2007 12:58 PM
> To: victoria.liouta@scb-hellas.com
> Cc: anne.modock@axa-corporatesolutions.com; chartering@billmar.gr;
> dorothea.ionnou@scb-hellas.com; master.nicholasm@telaurus.net;
> Subject: NICHOLAS M
>
> DEAR SIRS,
>
> IN VIEW OF TECHNICAL CONDITION, THE VESSEL WAS PROHIBITED BY PORT
> AUTHORITIES TO EXIT THE PORT. AS A RESULT OF THAT, THE VESSEL WILL NOT BE
> ABLE TO EXIT THE PORT TODAY BECAUSE THE VESSEL LOST THE WINDOW WHEN IT
> COULD
> BE DONE. FURTHEMORE, IT WAS REQUESTED TO TAKE THE VESSEL FROM THE BERTH TO
> ANOTHER BERTH SINCE THE CURRENT BERTH IS DEMANDED FOR OTHER VESSELS. ALL
> THESE MANIPULATIONS CAUSE ADDITIONAL SUBSTANTIAL COSTS.
>
> WHILST FOR THE AVOIDANCE OF DOUBT THE VESSEL IS OFF-HIRE ANYWAY, WE
> HEREWITH
> HOLD YOU FULLY RESPONSIBLE FOR ALL DETRIMENTAL CONSEQUANCES AND COSTS
> ARISING THEREOF AND RESERVE ALL OUR RIGHTS.
>
> BRGDS,
>
> CONGENTRA AG
>
-UNQUOTE-
BEST REGARDS
MASTER

83

**PORT STATE CONTROL**
**NOTICE OF DETENTION FOR THE MASTER**

No.

The undersigned: _St. Petersburg_, duly authorized by the Maritime
Harbour Master of the port of _St. Petersburg_, duly authorized by the Maritime
Administration of the Russian Federation, herewith notifies you that

the ship: _NICHOLAS M_          call sign: _J8B2680_

IMO number: _7433452_          gross tonnage: _22918_

port of registry: _KINGSTOWN_          flag state: _St. Vincent & Grenadines_

type of ship: _BULK CARRIER_          date on which keel was laid: _1977_

owner: _CHIAN SPIRIT MARITIME ENTERPRISES INC._     master: _AMADO C. APILADO_

agents: _"ANTEKS"_          classification society: _BV_

berthed at: _BERTH Nr 23_

has been detained in accordance with the provisions of Section 3 of Paris Memorandum of
Understanding on Port State Control and Article 80 of the Merchant Shipping Code of the Russian
Federation,.

on account of:

☒ one or more of the criteria for detention set out in Section 9 of Paris Memorandum on Port State
Control;

☐ crew members being unable to provide proof of professional proficiency for the duties assigned
to them as specified in the Annex to the International Convention on Standards of Training,
Certification and Watchkeeping for Seafarers, 1978/95, as amended;

☐ master or crew unable to comply with operational requirements as contained in the Conventions
mentioned in Section 2 of Paris Memorandum on Port State Control;

☐ other deficiencies which, individually or together, are clearly hazardous to safety, health or
environment;

☐ the fact that the Port State Control Officer was obstructed in the execution of his duties.

For further details see the Report of inspection, forms A and B enclosed to this Notice for the Master.

On account of the above it is prohibited to shift the ship to another berth without the prior consent of
the Harbour Master, or to proceed to sea without a proper Notice of Release of ship from detention.

Place: _Port of St. Petersburg_          Date: _December 29, 2007,_
                                              _Time: 15.30 LT_

The above mentioned Harbour Master:

HEAD OF ST. PETERSBURG FSC/PSC
Capt. ALEXANDR G. KARPENKO

84

Print Copy for : DIMOU NIKOLAOS
_____

SENT OK Out.MSG.: 16439        Date: Thu 27/Dec/2007 12:46
TO :JSC "ANTEKS",NICHOLAS M.,BRIGHT MARITIME CORP
Subject: M/V NICHOLAS M-2/O Arrival
Included (1) Attachment Files: <MANILA - ST. PETERSBURG TICKETS.pdf>


Dear Sir

Attached herewith please E-Ticket for the 2/O Mr MENDIZABAL
who will fly tomorrow from MANILA to Saint Petersburg as
per schedule contained in the attachment

Please meet him at the airport arrange his visa and transportation
to the vessel.

Messrs Bright Maritime to prepare the seaman to fly in time


Master reading in copy to keep in contact with the agents for
the 2/O arrival.

Please Confirm by return

Best Regards
Capt.Nikolaos Dimou
Crewing Department
C.S.M.E.
(as agents only)

85

```
>FROM ASPIDA TRAVEL 27DEC2007
>
>ATT.CAPTAIN DIMOU N.
>
>4 SEAMEN
>
>MANILA          28DEC LH  789  DEP.2100  ARR.0600  29DEC OK
>FRANKFURT       29DEC LH 3216  DEP.0840  ARR.1325        OK
>ST.PETERSBURG
>
>RESERVATION CODE 3SLHSX
>
>ELECTRONIC TICKETS 2204608998883/884/885/886 COLLECT FROM
>LUFTHANSA CHECK-IN MANILA AIRPORT
>
>COST EURO 412.00 X 4
>
>BEST REGARDS/CHRONIS
```

86

**Subject:**        RE: MV "Nicholas M." Acc "CONGENTRA AG" cpdd 10TH OCT 2007 / Ultrasonic test -
             Vessel's withdrawl due to overdue payments

TELiX MSG: 0013D-00 02/01/08 17:59

From: C.S.M.E/ Chartering Dept.
To:  Billmar Chartering S.A.

Cc:  C.S.M.E/ Accounting - Operations Depts.

Cc:  SCB (Hellas)
Attn: Vicky Liouta

Cc:  John Krzywkowski

Re:  MV "Nicholas M." Acc "CONGENTRA AG" cpdd 10TH OCT 2007 / Ultrasonic
test- Vessel's withdrawl due to overdue payments

without prejudice

with much to our surprise we have noted charrs reactivated and in all respects
unreasonable persistence to carry out watertightness test of holds 2 & 4 by
the use of an ultrasonic test.

on receipt of said request owners opinion/position regarding the same was
made known to the charrs by the master's below message and same opinion
has been shared by the vsl's p&i club (pls see below msgs) and remains
unaltered. we demand that "claimants" take serious consideration of these
messages as well as of the present one and to be obliged to disclose it to
any court if they go through with their threats.

as it was pointed out in the vessel's p&i relevant msg... "charterers have
already gotten their securities and should not delay further the vessel and
her operations" and please allow as to add obviously for a fictitious quantity
of cargo.

as far as charrs lawyers' comments concerned regarding the recent
developments and the vsl's strange detention truly speaking just on
sailing, after almost 30 days there and without any previous notice for
boarding of PSC as usual, we fully agree with the opinion expressed therein
that... "the record speaks for itself" and that their lawyers ... "should be
entirely comfortable with their conduct".

furthermore, charrs cannot disregard that as it is usual for them they have
not paid hire and other amounts due to the vsl and her owns since
26th dec 24:00hrs and the most important it is now obvious that they do
not intend to do so, consisting this a fundamental breach of the governing
c/p from their side.

if despite their agreement at the time of receiving the agreed LOU

1

87

"claimants" and/or their lawyers attempt to link the issue of the unpaid funds with the "damaged" cargo case it goes without saying that these two cases are completely IRRELEVANT as well as that the charrs and receivers, obviously being the same entity, have already gotten their mutually agreed securities and should not delay or interfere further with the vessel and her operations.

owns have always been very patient with charrs attitude and their standard practice not to be "professional" in all respects; owners and their brokers have sent to charrs numerous reminders/notices of unpaid hire but as expected unfortunately all of them in vain, so this time owners cannot be patient any more and in an effort to minimize their losses they have decided to exercise their right under the provisions of the governing c/p and in particular, under the incorporated thereto "Non-Payment of Hire Clause for Time Charter Parties", to withdraw the vessel in line with para (b) of same by giving hereby 12 running hours last and definite written notice of vessel's withdrawl vessel, a right which clearly is not dependent upon the Owners first exercising the right to suspend performance of their obligations under this Charter Party pursuant to sub - clause (a) of the relevant clause as well as pursuant to the same sub- clause such exercise of right of withdrawal shall be without prejudice to an other rights that the Owners may have under this Charter Party.

owners, to make the long story shall not repeat in full all the contents of the incorporated in the governing c/p BIMCO "Non-Payment of Hire Clause for Time Charter Parties" as unfortunately same are well known to them from all the previous times same was required to be reminded to the charrs and shall only request them to refer therein if they feel the need to do so.

lastly, owners would like also to comment on the "claimants" lawyers "suggestion" sufficient funds to be sent in advance to charrs agents in respect of the vsl's forthcoming expenses due to her detention; owners are surprised to see that "claimants" lawyers now also represent the local agents who as per their message are reluctant to continue to act as vsl's agents. while the owners are now in the process of appointing another firm to act as owners protecting agents, it is well understood that mainly for but not limited to typical reasons (port formalities) current agents are obliged to continue rendering their 'services' unless they receive our further instructions since otherwise cannot be done under the circumstances.

same lawyers also not to disregard, because we believe that it is already known to them as it is known to their clients (charrs/receivers), the black listing of their agents messrs "anteks" for money laundry by U.S banking authorities for which in case vessel's managers attempt a third time to send money to them (or to their nominee "Sinson LLC OY"" this will lead to the characterization of our bank account as "suspected" account (see attached msg received here from American Express via our bankers). this is only one of the numerous other issues and problems we have faced with charrs and their agents and which the mind of a fair and professional shipping man could have never imagine.

claimants and their lawyers as well as all parties reading us in copy to be

2

88

guided according to the contents of this message, which we remind you that we demand "claimants" and their lawyers to take serious consideration of same and if they decide so, along with the below and the attached message(s) as well, to be obliged to disclose it to any court if they go through with their threats.

we hope that above is clear enough.

thanks/regards,

chartering dept.
c.s.m.e(as agents only)

END

3

89

**John Krzywkowski**

| | |
|---|---|
| From: | John Krzywkowski [johnk@k-law.gr] |
| Sent: | 08 January 2008 21:36 |
| To: | Andrew Speake |
| Subject: | RE: NICHOLAS M - at St. Petersburg |

Dear Sirs,

I write in connection with your clients' message below to my clients.

As you should be well aware, your clients and Uniapro are beneficially owned/controlled by the same entities. The fact that Uniapro recently chartered the vessel and the faultless condition of the cargo on outturn under that recent charter at St. Petersburg should have led you to question the appropriateness of your clients' allegations that the vessel was in some way responsible for the cargo damage found on outturn at St. Petersburg. Vessels' conditions do not deteriorate so rapidly that your clients should insist on blaming your clients when the evidence is so clear [all analyses show little (irrelevant) if any salt water in the damaged cargo] that the damage is of a pre-shipment nature.  I note that you have failed to respond in any way to Owners' observations that the damage was pre-shipment.

Regarding the remarks which the Master was willing to add to the Statement of Facts, in my nearly thirty years as a shipping lawyer I have seen many such documents where the parties were properly prepared for both sides to include their remarks so that the document would reflect a comprehensive picture of the relevant events albeit not necessarily accepted by both parties. For some unknown reason, your clients were not prepared to follow this customary practice. In fact, it is my understanding that the Master has a clear right [and possibly an obligation] to record his objections to any aspect of the SOF. [I need hardly suggest as an example a tribunal questioning why a master failed to record his opposition to the contents of an SOF on its face.] My clients see this as yet another example of your clients' unnecessarily difficult behaviour and modus operandi - and my clients reserve their rights to claim damages against your clients.

As you have seen fit to support your clients' frankly indefensible attitude to the incorporation of the Master's comments on the SOF, for the record, I set out the comments that the Master was prepared to add to the SOF:

QUOTE:

1. DESPITE THE FACT THAT COMMENCEMENT OF CARGO DISCHARGE FROM HOLDS NR 2 AND 4 WAS DELAYED FOR REASONS BEYOND VESSEL'S AND/OR OWNERS CONTROL AND RESPONSIBILITY, THE DISCHARGING PROGRESS AND THE OVERALL DISCHARGING TIME WERE NOT AFFECTED AS THE VESSEL WAS ALWAYS ABLE TO PROVIDE THE REQUIRED GANGS  (ONLY 1 AND DURING SOME VERY LIMITED PERIODS 2 GANGS) FROM OTHER AVAILABLE HOLDS. THEREFORE NO DELAYS FROM VESSEL'S SIDE OCCURED DURING DISCHARGING OPERATIONS.

2. FROM COMMENCEMENT OF DISCHARGE UNTIL COMPLETION OF SAME, DISHARGING OPERATIONS WERE CARRIED OUT WITH 1(ONE) AND DURING SOME VERY FEW LIMITED PERIODS WITH 2(TWO) GANGS.  ALSO THE AVAILABILITY OF WAGONS WAS ALWAYS VERY TIGHT.

3. ON 28TH DEC 2007, LAST MINUTE ULTRASOUND TEST WAS NOT CARRIED OUT FOR THE REASONS EXPLAINED TO CHARTERERS IN WRITING, WELL IN ADVANCE AND PRIOR BOARDING OF THEIR SURVEYOR (SGS). RELEVANT MSG IS AVAILABLE HERE

90

AND DISCLOSABLE ON ANY COMPETENT AUTHORITY'S REQUEST.

4. ON 28TH DEC 2007, AFTER COMPLETION OF DISCHARGE, VESSEL WAS AWAITING PILOT DUE TO BAD WEATHER CONDITIONS (AS PER AGENT MSG, PILOT WAS NOT TO BE EXPECTED BEFORE 29TH NOON SUBJECT TO WEATHER IMPROVEMENT). RELEVANT MSG IS AVAILABLE HERE AND DISCLOSABLE ON ANY COMPETENT AUTHORITY'S REQUEST.

5. THE TOTAL QUANTITY OF CARGO DISCHARGED FROM HOLDS NR 2 AND 4 AS 'DAMAGED' OR 'SUSPECTED AS DAMAGED' WAS 214MTS (TWO HUNDRED AND FOURTEEN) AS PER CARGO UNDERWRITERS' AND ATTENDING PARTIES' CALULATIONS. AGENTS HAVE CONFIRMED SAME AND RELEVANT MSG IS AVAILABLE HERE AND DISCLOSABLE ON ANY COMPETENT AUTHORITY'S REQUEST.

6. TIME OF AUTHORITIES' PERMISSION TO COMMENCE DISCHARGE FROM HOLDS 2 AND 4 AS PER AGENTS' MESSAGES. RELEVANT MSGS ARE AVAILABLE HERE AND DISCLOSABLE ON ANY COMPETENT AUTHORITY'S REQUEST.

7. MASTER HAS SIGNED THIS SOF WITHOUT PREJUDICE AND WITH THE RESERVATION OF VESSEL'S AND/OR HER P&I CLUB AND/OR OWNERS' AND/OR THEIR MANAGERS' RIGHTS FOR ALL AND ANY, DIRECT OR INDIRECT, DAMAGE OR LOSS THEY MAY SUFFER FROM CHARTERERS' AND/OR RECEIVERS' AND/OR THEIR PRINCIPALS' AND/OR THEIR AGENTS, ACTS OR OMISSIONS.

8. ALL CARGO DISCHARGED AS PER B/L AND CARGO MANIFEST.

9. AFTER COMPLETION DISCHARGING, HOLDS NOS. 1, 2 , 3, 4, 5, 6, AND 7 INSPECTED AND FOUND NO CARGO REMAINING ONBOARD, ALL HOLDS  WELL EMPTIED AND SWEPT.


Name and signature (Agents)              CAPT. AMADO C. APILADO
ANTEKS/Alexander Konyukhov               MASTER/M.V. " NICHOLAS  M "
UNQUOTE

For the record, it is denied that Owners or the crew were disruptive and unreasonable. My clients reserve their rights to claim damages in respect of your clients' actions at St. Petersburg.

Finally, my clients made you clearly aware of the circumstances in which Class was temporarily suspended pending repairs to mechanisms relating to No.6 hatchcover - which suddenly suffered problems during discharge operations. Hold No.6 appears to have no connection whatsoever with the locations in which damaged cargo was found, whatever the cause of that damage. Accordingly, your questionable reference to the temporary suspension of Class, or indeed to the more inflammatory suggestion that Class was entirely withdrawn, as having any connection with the factual matrix of the cargo damage for which we are both instructed, is very regrettable, unprofessional and lacking the integrity normally required of marine solicitors to reduce, rather than exasperate, the difficulties faced by disputing parties in order to resolve them as cost-effectively as is reasonably possible.

Best regards,

John Krzywkowski

---------------------------------------------------------------------------------------------------
Information in this e-mail (and any attachment) is confidential and may be legally privileged. It is intended solely for the attention of the addressee(s). If you have received it in error, please notify us by return e-mail and then immediately delete this message from your system. Please do not copy it or use it for any purpose, or

91

disclose its contents to any other person: to do so could be a breach of confidence.
Law Office of John Krzywkowski
18 Leosthenous Street & Filellinon, Piraeus 185 36, Athens, Greece.
Tel: (+30) 210 452 1200  Fax: (+30) 210 452 1210
-------------------------------------------------------------------------------------------------

-----Original Message-----
From: Operations Congentra [mailto:operations@congentra.com]
Sent: Tuesday, January 08, 2008 11:36 AM
To: Billmar Chartering Ltd; victoria.liouta@scb-hellas.com
Cc: Operations Congentra; anne.modock@axa-corporatesolutions.com;
chartering@billmar.gr; master.nicholasm@telaurus.net;
operations@chianspirit.gr; johnk@k-law.gr; Andrew Speake; Richard Black;
Caroline Brader-Smith; Eurof Lloyd-Lewis
Subject: RE: LgINT Message (REF:08029CD00)


We write further to Owners' message of yesterday received via the
broker.

Firstly, we do not understand Owners continuing desire to establish a
connection between charterers, cargo receivers and now Uniapro. As
Owners' P & I Club has previously been advised this is wholly irrelevant
to the issues which have arisen between Owners and Charterers and Owners
and Cargo Interests. We would only add on this occasion that Anteks are
simply a forwarding agent which is why their name appeared in the
original bills issued and they have absolutely no knowledge of the
nature of the relationship between ourselves and Cargo Interests and any
such statements are wholly speculative. Owners rely upon them at their
peril!

Secondly, the Statement of Facts ("SoF") is a document jointly prepared
by Owners/Master, Charterers and Receivers. Charterers and Cargo
Interests are not obliged to to agree Master's amendments to the SoF and
we object to their inclusion on the basis that they distort what we
consider to be true position.  We deny that our approach in this regard
is unprofessional.  Indeed, before Owners' make such assertions they
should perhaps examine their own conduct during discharge which has
clearly been calculated to be disruptive and unreasonable.

We shall be writing to Owners further setting out our position with
regard to final accounting.  In the meantime, Charterers continue to
reserve all their rights.

Yours faithfully


Congentra AG

3

92

# John Krzywkowski

| | |
|---|---|
| **From:** | Andrew Speake [aspeake@blg.co.uk] |
| **Sent:** | 10 January 2008 16:38 |
| **To:** | John Krzywkowski |
| **Cc:** | elloyd-lewis@blg.co.uk; operations@congentra.com |
| **Subject:** | RE: NICHOLAS M - at St. Petersburg |
| **Expires:** | 09 January 2009 12:36 |

Dear Sirs,

We refer to your recent messages.

1.     We note that Waterson Hicks have been instructed to accept service.   In the circumstances, please confirm to whom any future correspondence should be addressed.

2.     As you will be aware, the fact that the vessel may have previously carried some cargoes without damage does not prove the hatchcovers were in good condition.   Further, as advised, we are instructed on behalf of two separate companies, and we do not intend to debate with you the ownership of those companies.

3.     In relation to the SOF, the concerns of each party have been recorded in the correspondence, and we see no reason to incur further costs in debating the position.   Your comments as to the conduct of our Clients are denied.

4.     We are extremely surprised that you consider that we have acted unprofessionally in referring to the fact that the vessel had its Class withdrawn (as was recorded in the PSC report).   The concerns of Class over the conditions of a hatchcover (no. 6 or otherwise) is of course extremely relevant - it is rare for Class to be withdrawn, and indicates concerns of Class over the condition of the ship.   That is a very serious matter.   Further, the status of Class is of course relevant to the charterer, hence the provision in the charter dealing with the issue of Class.   We simply have no idea how you can realistically consider that this fact is irrelevant, or that it was unprofessional to mention it.

5.     Our Clients consider that the damage occurred on board.   The cargo was in good condition when loaded.   The hatchcovers are evidently in poor condition, as confirmed by the concerns and comments of PSC.   You will appreciate that our concerns over the condition of the vessel have been greatly increased by your Clients refusal to allow ultrasonic testing of the watertightness of the hatchcovers.

6.     We also understand from Antex that your Clients are pressing PSC to delete their comments regarding the hatchcovers on the basis that the condition of the hatchcover cannot be determined by a visual inspection.   If correct, this appears to make your Client's stance regarding ultrasonic testing indefensible, as their position appears to be that (i) even though the hatchcovers appeared to be in poor condition to the PSC, their condition cannot be determined by a visual inspection, but (ii) ultrasonic testing to confirm the condition of the hatchcovers should not be allowed.

7.     We have previously requested copies of the analyses, referred to by Owners, which have been carried out by Owners on the damaged cargo.   Please supply a copy of these analyses by return.   Please also confirm that copies of the log books and statement of facts will be supplied immediately - these have been requested many times.

8.     Finally, we note your request for security.   Please confirm the amount and alleged basis of your claim.   Please also confirm that your Clients are prepared to provide security for Congentra's claim under the charterparty for any losses suffered.

Regards,

Andrew Speake
Tel: +44 (0) 20 7643 7675
Fax: +44 (0) 20 7071 9601
**************************************************************************
Barlow Lyde & Gilbert LLP
Beaufort House, 15 St. Botolph Street, London EC3A 7NJ.

Telephone : +44 (0)20 7247 2277

10/01/2008

93

Subject:                    FW: m/v "Nicholas M." acc Britannia Bulkers A/S cp dd 18.12.07 ** MSG#:<17088>

From:Billmar Chartering Ltd <chartering@billmar.gr>
To:chartering@chianspirit.gr
Sent:Thu, 10 Jan 2008 17:16:09 +0200
Subject:LgINT Message (REF:080588E00)

TELiX MSG: 0588E-00 10/01/08 17:16
BILLMAR CHARTERING LTD
TEL:+30210 4282290
FAX:+30210 4282294
E-MAIL: chartering@billmar.gr

FROM CHRTS
URGENT
nicholas M/BBL

we have now recvd the flw notice of cancellation from chrs
+++++
Ref mv NICHOLAS M

Gd day,

BB A/S are in receipt of owners massage indicating that the NICHOLAS M will
probably be tendering for delivery pm on the 11th January 2008.  As BB A/S
indicated before, the late delivery has heavily disrupted trading and whilst
it was hoped that the vessel could be used it transpires this is not
possible.  Consequently in order that Owners are not disadvantaged once the
NICHOLAS M is fit for trading, BB A/S hereby give notice under Clause 14 it
is exercising its option to cancel the charterparty.  BB A/S are truly sorry
Owners were unable to present a fit ship within time and that BB A/S's trade
could not be adapted or modified to use the ship.

BB A/S do not want to get into discussions concerning the bunker stem for
the charterparty is clear enough and suffice it to say that even if, which
is impossible to imagine, supplying bunkers after the cancelling date (but
well before the vessel was presented to BB A/S) could in some way be
regarded as a representation of some sort, Owners could not possibly have
suffered any detriment first because if the stem was not put on board Owners
would still have had to deliver to BB A/S; secondly as the ship was not
ready to trade and Owners did not know when she would be ready (they
certainly did not tell BB A/S) she could not have been re-fixed on the
market.  Therefore Owners will doubtless make arrangement to pay bunker
suppliers before leaving St. Petersburg

Regards
Zhivko Venkov
Britannia Bulkers as

UNQTE

94

**PORT STATE CONTROL**
**NOTICE OF RELEASE OF SHIP FROM DETENTION FOR THE MASTER**

No.

_NICHOLAS M, ST. VINCENT & GR. 7433452_ Release of ship from detention
[Ship's name, flag, IMO No.]

The undersigned:

Harbour Master of the port of _ST. PETERSBURG_ , duly authorized by the Maritime

Administration of the Russian Federation, herewith notifies you that the Maritime Authority of the

Russian Federation has carried out a re-inspection of the above ship on _11.01.2008_ at the port

of _ST. PETERSBURG AT 19.10 LT_

(Insert comments in free text, if any).

...............................................................................................................................................

...............................................................................................................................................

...............................................................................................................................................

...............................................................................................................................................

...............................................................................................................................................

...............................................................................................................................................

...............................................................................................................................................

...............................................................................................................................................

...............................................................................................................................................

...............................................................................................................................................

...............................................................................................................................................

...............................................................................................................................................

...............................................................................................................................................

...............................................................................................................................................

...............................................................................................................................................

Enclosed please find a copy of the Report of Inspection, forms A and B.

Yours faithfully,

[Harbour Master's name and signature] FSC/PSC

Capt. ALEXANDR G. KARPENKO

95



**BUREAU VERITAS**

## ATTESTATION

### No LPR0/IOR/20080314094118

Issued within the scope of Bureau Veritas Marine Division General Conditions
*Délivrée dans le cadre des Conditions Generales de la Division Marine du Bureau Veritas*

| | |
|---|---|
| Name of Ship | : NICHOLAS M |
| Register No. | : 910W76 |
| Flag | : **Saint Vincent And The Grenadines** |
| Gross tonnage | : **22912** |

-:-:-:-:-:-:-:-:-:-:-:-:-

This is to certify that, according to the records, the ship's Class was maintained from 01-Nov-07 to 31-Jan-08.

Whereof the present attestation has been issued for chartering purposes.

Done at Piraeus, on the 14 March 2008

D. Bouttier
By Order of the Secretary

**Notice :** This certificate is subject to the enclosed General Conditions of the Bureau Veritas Marine Division, which form part of this certificate. Reliance on this certificate implies full acceptance of those General Conditions, inter alia, limitation of liability and jurisdiction clause.

The latest published Rules of the Bureau Veritas Marine Division and the General Conditions are applicable.
*La derniere edition des Reglements de la Division Marine du Bureau Veritas ainsi que les conditions Generales sont applicables.*

| | |
|---|---|
| Any person not a party to the contract pursuant to which this certificate is delivered may not assert a claim against Bureau Veritas for any liability arising out of errors or omissions which may be contained in said certificate, or for errors of judgement, fault or negligence committed by personnel of the Society or of its Agents in the establishment or issuance of this certificate, and in connection with any activities for which it may provide. | Toute personne qui n'est pas partie au contrat aux termes duquel ce document est delivre ne pourra engager la responsabilite du Bureau Veritas pour les inexactitudes ou omissions qui pourraient y etre relevees ainsi que pour les erreurs de jugement, fautes ou negligences commises par le personnel de la Societe ou par ses agents dans l'etablissement de ce document et dans l'execution des interventions qu'il comporte. |

1

96



# MARINE DIVISION
# GENERAL CONDITIONS

**ARTICLE 1**

1.1. - BUREAU VERITAS is a Society the purpose of whose Marine Division (the "Society") is the classification ("Classification") of any ship or vessel or structure of any type or part of it or system therein collectively hereinafter referred to as a "Unit" whether linked to shore, river bed or sea bed or not, whether operated or located at sea or in inland waters or partly on land, including submarines, hovercrafts, drilling rigs, offshore installations of any type and of any purpose, their related and ancillary equipment, subsea or not, such as well head and pipelines, mooring legs and mooring points or otherwise as decided by the Society.

The Society:
- prepares and publishes Rules for classification, Guidance Notes and other documents ("Rules");
- issues Certificates, Attestations and Reports following its interventions ("Certificates");
- publishes Registers.

1.2. - The Society also participates in the application of National and International Regulations or Standards, in particular by delegation from different Governments. Those activities are hereafter collectively referred to as "Certification".

1.3. - The Society can also provide services related to Classification and Certification such as ship and company safety management certification; ship and port security certification, training activities; all activities and duties incidental thereto such as documentation on any supporting means, software, instrumentation, measurements, tests and trials on board.

1.4. - The interventions mentioned in 1.1., 1.2. and 1.3. are referred to as "Services". The party and/or its representative requesting the services is hereinafter referred to as the "Client". The Services are prepared and carried out on the assumption that the Clients are aware of the International Maritime and/or Offshore Industry (the "industry") practices.

1.5. - The Society is neither and may not be considered as an Underwriter, Broker in ship's sale or chartering, Expert in Unit's valuation, Consulting Engineer, Controller, Naval Architect, Manufacturer, Shipbuilder, Repair yard, Charterer or Shipowner who are not relieved of any of their expressed or implied obligations by the interventions of the Society.

**ARTICLE 2**

2.1. - Classification is the appraisement given by the Society for its Client, at a certain date, following surveys by its Surveyors along the lines specified in Articles 3 and 4 hereafter on the level of compliance of a Unit to its Rules or part of them. This appraisement is represented by a class entered on the Certificates and periodically transcribed in the Society's Register.

2.2. - Certification is carried out by the Society along the same lines as set out in Articles 3 and 4 hereafter and with reference to the applicable National and International Regulations or Standards.

2.3. - It is incumbent upon the Client to maintain the condition of the Unit after surveys, to present the Unit for surveys and to inform the Society without delay of circumstances which may affect the given appraisement or cause to modify its scope.

2.4. - The Client is to give to the Society all access and information necessary for the performance of the requested Services.

**ARTICLE 3**

3.1. - The Rules, procedures and instructions of the Society take into account at the date of their preparation the state of currently available and proven technical knowledge of the industry. They are not a code of construction neither a guide for maintenance or a safety handbook.

Committees consisting of personalities from the industry contribute to the development of those documents.

3.2. - The Society only is qualified to apply its Rules and to interpret them. Any reference to them has no effect unless it involves the Society's intervention.

3.3. - The Services of the Society are carried out by professional Surveyors according to the Code of Ethics of the Members of the International Association of Classification Societies (IACS).

3.4. - The operations of the Society in providing its Services are exclusively conducted by way of random inspections and do not in any circumstances involve monitoring or exhaustive verification.

**ARTICLE 4**

4.1. - The Society, acting by reference to its Rules:
- reviews the construction arrangements of the Units as shown on the documents presented by the Client;
- conducts surveys at the place of their construction;
- classes Units and enters their class in its Register;
- surveys periodically the Units in service to note that the requirements for the maintenance of class are met.

The Client is to inform the Society without delay of circumstances which may cause the date or the extent of the surveys to be changed.

**ARTICLE 5**

5.1. - The Society acts as a provider of services. This cannot be construed as an obligation bearing on the Society to obtain a result or as a warranty.

5.2. - The certificates issued by the Society pursuant to 5.1. here above are a statement on the level of compliance of the Unit to its Rules or to the documents of reference for the Services provided for.

In particular, the Society does not engage in any work relating to the design, building, production or repair checks, neither in the operation of the Units or in their trade, neither in any advisory services, and cannot be held liable on those accounts. Its certificates cannot be construed as an implied or express warranty of safety, fitness for the purpose, seaworthiness of the Unit or of its value for sale, insurance or chartering.

5.3. - The Society does not declare the acceptance or commissioning of a Unit, nor of its construction in conformity with its design, that being the exclusive responsibility of its owner or builder, respectively.

5.4. - The Services of the Society cannot create any obligation bearing on the Society or constitute any warranty of proper operation, beyond any representation set forth in the Rules, of any Unit, equipment or machinery, computer software of any sort or other comparable concepts that has been subject to any survey by the Society.

**ARTICLE 6**

6.1. - The Society accepts no responsibility for the use of information related to its Services which was not provided for the purpose by the Society or with its assistance.

6.2. - If the Services of the Society cause to the Client a damage which is proved to be the direct and reasonably foreseeable consequence of an error or omission of the Society, its liability towards the Client is limited to ten times the amount of fee paid for the Service having caused the damage, provided however that this limit shall be subject to a minimum of eight thousand (8,000) Euro, and to a maximum which is the greater of eight hundred thousand (800,000) Euro and one and a half times the above mentioned fee.

The Society bears no liability for indirect or consequential loss such as e.g. loss of revenue, loss of profit, loss of production, loss relative to other contracts and indemnities for termination of other agreements.

6.3. - All claims are to be presented to the Society in writing within three months of the date when the Services were supplied or (if later) the date when the events which are relied on of were first known to the Client, and any claim which is not so presented shall be deemed waived and absolutely barred.

**ARTICLE 7**

7.1. - Requests for Services are to be in writing.

7.2. - Either the Client or the Society can terminate as of right the requested Services after giving the other party thirty days' written notice, for convenience, and without prejudice to the provisions in Article 8 hereunder.

7.3. - The class granted to the concerned Units and the previously issued certificates remain valid until the date of effect of the notice issued according to 7.2. hereabove subject to compliance with 2.3. hereabove and Article 8 hereunder.

**ARTICLE 8**

8.1. - The Services of the Society, whether completed or not, involve the payment of fee upon receipt of the invoice and the reimbursement of the expenses incurred.

8.2. - Overdue amounts are increased as of right by interest in accordance with the applicable legislation.

8.3. - The class of a Unit may be suspended in the event of non-payment of fee after a first unfruitful notification to pay.

**ARTICLE 9**

9.1. - The documents and data provided to or prepared by the Society for its Services, and the information available to the Society, are treated as confidential. However:
- Clients have access to the data they have provided to the Society and, during the period of classification of the Unit for them, to the classification file consisting of survey reports and certificates which have been prepared at any time by the Society for the classification of the Unit;
- copy of the documents made available for the classification of the Unit and of available survey reports can be handed over to another Classification Society Member of the International Association of Classification Societies (IACS) in case of the Unit's transfer of class;
- the data relative to the evolution of the Register, to the class suspension and to the survey status of the Units are passed on to IACS according to the association working rules;
- the certificates, documents and information relative to the Units classed with the Society may be reviewed during judicial proceedings and be disclosed upon order of the concerned governmental or inter-governmental authorities of a Court having jurisdiction.

The documents and data are subject to a file management plan.

**ARTICLE 10**

10.1. - Any delay or shortcoming in the performance of its Services by the Society arising from an event not reasonably foreseeable by or beyond the control of the Society shall be deemed not to be a breach of contract.

**ARTICLE 11**

11.1. - In case of diverging opinions during surveys between the Client and the Society's surveyor, the Society may designate another of its surveyors at the request of the Client.

11.2. - Disagreements of a technical nature between the Client and the Society can be submitted by the Society to the advice of its Marine Advisory Committee.

**ARTICLE 12**

12.1. - Disputes over the Services carried out by delegation of Governments are assessed within the framework of the applicable agreements with the States, International Conventions and national rules.

12.2. - Disputes arising out of the payment of the Society's invoices by the Client are submitted to the Court of Nanterre, France.

12.3. - Other disputes over the present General Conditions or over the Services of the Society are exclusively submitted to arbitration, by three arbitrators, in London according to the Arbitration Act 1996 or any statutory modification or re-enactment thereof. The contract between the Society and the Client shall be governed by English law.

**ARTICLE 13**

13.1. - These General Conditions constitute the sole contractual obligations binding together the Society and the Client, to the exclusion of all other representation, statements, terms, conditions whether express or implied. They may be varied in writing by mutual agreement.

13.2. - The invalidity of one or more stipulations of the present General Conditions does not affect the validity of the remaining provisions.

13.3. - The definitions herein take precedence over any definitions serving the same purpose which may appear in other documents issued by the Society.

BV Mod. Ad. ME 545 J – 18 February 2004



**Visa Page No  3**
*Página de visados n°*
**to the Hull Annex***
*del Anexo  Casco*

No LPR0/GSA/20050519180535

NAME OF SHIP/*Nombre del Buque*   : NICHOLAS M
Register No /N° *de Registro*  :    910W76

| | |
|---|---|
| Visa/*Visado*  No** : 9 <br><br> Occasional survey of hull afloat <br> Rec.6.1,6.2,6.3&7.2 were dealt with <br> Rec.7.1 partially done,cancelled for <br> postponement. <br> Rec.9.1: Oil leakage on hatch covers <br> hydraulic cylinders to be repaired and <br> tested.Meanwhile the leaked oil should <br> be cleaned to prevent pollution. <br> Limit Date: 28 December 2007 <br><br> At/*En* :Maceio, Brazil <br> On/*El* : 28 September 2007 <br> Stamp/*Sello* | Visa/*Visado*  No** : 11 <br><br> (CONTINUATION) <br> Rec.11.2: <br> Repair as per attached list of <br> recommendationsNr.LNG0/2007/J0100/hull <br> to be performed at coming dry-dock / <br> intermediate survey. Limit date: <br> 31 March 2008 <br><br> At/*En* :St.Petersburg <br> On/*El* :11 January 2008 <br> Stamp/*Sello* |
| Visa/*Visado*  No** : 10 <br><br> (CONTINUATION OF VISA 9) <br> Rec.10.1: Cargo Hold Nr.1 forward <br> hatch cover girders found wasted to be <br> cropped and renewed. <br> Limit Date: 06 April 2008 <br><br><br> At/*En* :Maceio, Brazil <br> On/*El* : 28 September 2007 <br> Stamp/*Sello* | Visa/*Visado*  No** : <br><br><br><br><br><br> At/*En* : <br> On/*El* : <br> Stamp/*Sello* |
| Visa/*Visado*  No** : 11 <br><br> Occaional survey of hull afloat <br> further to detention by PSC. <br> Rec. 9.1 presently postponed. <br> Rec.11.1: Oil leakage on hatch covers <br> hydraulic cylinders to be repaired and <br> tested.Meanwhile the leaked oil should <br> be cleaned to prevent pollution. <br> Limit Date: 28 March 2008 <br><br> At/*En* :St.Petersburg <br> On/*El* :11 January 2008 <br> Stamp/*Sello* | At : St.Petersburg <br> *Expedido en* <br><br> On:    10 January 2008 <br> *El* <br><br><br><br> By Order of the Secretary <br> *Por Orden del Secretario* <br> E.ZAVYALOV  |

NEH 412a - Page 1/1

98

Print Copy for : SAMIOTAKI NIKOLETTA

SENT OK Out.MSG.: 16353          Date: Mon 24/Dec/2007 12:11
TO :office@gr.bureauveritas.com,B.V. GREECE
Subject: M/V NICHOLAS M. - B.V. No: 910W76

TO: BUREAU VERITAS GREECE
ATT: MR. RALLIS
C.C: PERSON IN CHARGE

SUB: M/V NICHOLAS M. - B.V. No: 910W76
        RECOMMENDATION 9.1
          "Oil Leakages on hatch covers hydraulic cylinders to be repaired and
tested.
          Meanwhile the leaked oil should be cleaned to prevent oil pollution"

SIRS GOOD DAY AND MERRY CHRISTMAS,

PLEASE BE ADVISED THAT REGARDING ABOVE MENTIONED RECOMMENDATION OF OIL LEAKAGES
ON HATCH COVERS, WE HAVE PROCEEDED AS FOLLOWS:
1. WE HAVE ELIMINATED THE OIL LEAKAGE OF CYLINDERS ON HATCH COVERS
2. WE HAVE SENT TWO SPARE CYLINDERS ON BOARD IN ORDER TO CHANGE THE CYLINDERS
ON HATCH COVERS 1    AND 2. DUE TO EXTREME WEATHER CONDITIONS (VERY LOW
TEMPERATURE) AND VESSEL'S CONTINUOUS    OPERATION THE JOB COULD NOT BE
COMPLETED.

THEREFORE WE KINDLY REQUEST YOU TO GRANT US WITH AN EXTENSION OF THREE (3)
MONTHS UNTIL VESSEL'S DRY DOCKING (6 APRIL 2008), IN ORDER TO COMPLETE ABOVE
MENTIONED JOB AND DELETION OF ABOVE RECOMMENDATION.

THANK YOU IN ADVANCE FOR YOUR KIND ATTENTION.

YOUR PROMPT AND URGENT REPLY WOULD BE HIGHLY APPRECIATED.

BEST REGARDS
A. STATHOPOULOS
TECHNICAL DEPARTMENT
CHIAN SPIRIT
(as agents only)

Print copy for :SAMIOTAKI NIKOLETTA

Message 85581 Details
Subject: # Ref : CPI/2007/019556/GMA - Re: M/V NICHOLAS M. - B.V. No: 910W76 ** MSG#:<16353>
Attachments:
Date: Mon, 24 Dec 2007 14:14:26
From: grc_cpi@gr.bureauveritas.com
To: Technical CHIAN SPIRIT <technical@chianspirit.gr>

Season's Greetings,

We regret to advise you that no postponement/extensions of surveys or recommendation can be considered prior to an occasional survey
to ascertain ship's satisfactory condition and re-examination of surveys/parts concerned.
Please make arrangements for the survey ,advising us accordingly.

Best regards
George Margaritis

Created by : Technical CHIAN SPIRIT <technical@chianspirit.gr> on the : 24/12/2007 00:00:00

Send To : BvgreeceMail@VERITAS, GRC_CPI@VERITAS
Copy To :
Subject : M/V NICHOLAS M. - B.V. No: 910W76 ** MSG#:<16353>

MSGNO : 16353
DATE   : 24-Dec-2007 12:14

TO: BUREAU VERITAS GREECE
ATT: MR. RALLIS
C.C: PERSON IN CHARGE

SUB: M/V NICHOLAS M. - B.V. No: 910W76
     RECOMMENDATION 9.1
     ?Oil Leakages on hatch covers hydraulic cylinders to be repaired and
tested.
        Meanwhile the leaked oil should be cleaned to prevent oil pollution"

SIRS GOOD DAY AND MERRY CHRISTMAS,

PLEASE BE ADVISED THAT REGARDING ABOVE MENTIONED RECOMMENDATION OF OIL LEAKAGES
ON HATCH COVERS, WE HAVE PROCEEDED AS FOLLOWS:
1. WE HAVE ELIMINATED THE OIL LEAKAGE OF CYLINDERS ON HATCH COVERS
2. WE HAVE SENT TWO SPARE CYLINDERS ON BOARD IN ORDER TO CHANGE THE CYLINDERS
ON HATCH COVERS 1    AND 2. DUE TO EXTREME WEATHER CONDITIONS (VERY LOW
TEMPERATURE) AND VESSEL'S CONTINUOUS    OPERATION THE JOB COULD NOT BE
COMPLETED.

THEREFORE WE KINDLY REQUEST YOU TO GRANT US WITH AN EXTENSION OF THREE (3)
MONTHS UNTIL VESSEL'S DRY DOCKING (6 APRIL 2008), IN ORDER TO COMPLETE ABOVE
MENTIONED JOB AND DELETION OF ABOVE RECOMMENDATION.

THANK YOU IN ADVANCE FOR YOUR KIND ATTENTION.

YOUR PROMPT AND URGENT REPLY WOULD BE HIGHLY APPRECIATED.

BEST REGARDS
A. STATHOPOULOS
TECHNICAL DEPARTMENT

about:blank

CHIAN SPIRIT
(as agents only)

Memo Received No : LPR/2007/044124
------------------------------------------------- Original Message by Technical CHIAN SPIRIT
<technical@chianspirit.gr>------------------------------------------------------

NOTICE: This message contains information which is confidential and the copyright of our company or a third party. If you are not the intended recipient of this message please delete it and destroy all copies. If you are the intended recipient of this message you should not disclose or distribute this message to third parties without the consent of our company. Our company does not represent, warrant and/or guarantee that the integrity of this message has been maintained nor that the communication is free of virus, interception or interference. The liability of our company is limited by our General Conditions of Services.
Nota : Ce message contient des informations confidentielles propri?t? de notre soci?t? et/ou d'un tiers. Si vous n'?tes pas parmi les destinataires d?sign?s de ce message, merci de l'effacer ainsi que toutes ses copies. Si vous ?tes parmi les destinataires d?sign?s de ce message, pri?re de ne pas le divulguer ni de le transmettre ? des tiers sans l'accord de notre soci?t?. Notre soci?t? ne peut garantir que l'int?grit? de ce message a ?t? pr?serv?e ni que la pr?sente communication est sans virus, interception ou interf?rence. La responsabilit? de notre soci?t? est limit?e par nos Conditions G?n?rales de Services.

about:blank

Print Copy for : SAMIOTAKI NIKOLETTA

SENT OK Out.MSG.: 16371        Date: Mon 24/Dec/2007 14:32
TO :B.V. GREECE,alexander.bondarev@ru.bureauveritas.com
Subject: M/V NICHOLAS M - BUREAU VERITAS

TO: BUREAU VERITAS RUSSIA
ATT: MR. ALEXANDER BONDAREV

CC: BUREAU VERITAS GREECE
ATT: MR. MARGARITIS

SUB: M/V NICHOLAS M. - B.V. No: 910W76
        RECOMMENDATION 9.1
     "Oil Leakages on hatch covers hydraulic cylinders to be repaired and
tested.
        Meanwhile the leaked oil should be cleaned to prevent oil pollution"
        DUE DATE: 28 DEC 2007

MR ALEXANDER GOOD DAY AND MERRY CHRISTMAS,

YOU ARE KINDLY REQUESTED TO ARRANGE SURVEYOR'S ATTENDANCE IN ORDER TO DELETE
ABOVE MENTIONED RECOMMENDATION.

FOR VESSEL'S EXACT LOCATION PLEASE CONTACT OUR AGENTS:
JSC "Anteks"
6,of.244, Dvinskaya str.,
St.Petersburg 198035
RUSSIAN FEDERATION
Tel:007812335667-3
Fax:007812335667
Email:anteks@mail.cplus.ru
Contact:Alexandr Konyukhov AOH: +7-906-2262934

THANK YOU IN ADVANCE FOR YOUR KIND ATTENTION.

YOUR PROMPT AND URGENT REPLY, REGARDING YOUR ARRANGEMENTS OF ATTENDANCE WOULD
BE HIGHLY APPRECIATED.

BEST REGARDS
A. STATHOPOULOS
TECHNICAL DEPARTMENT
CHIAN SPIRIT
(as agents only)



103



104

Equasis - Ship search - Result list

| Authority | Country | Port | Date | | | |
|---|---|---|---|---|---|---|
| Paris MoU | Russia | Saint petersburg | 2007-12-29 | Y | 13 | 28 |
| Paris MoU | Russia | Saint petersburg | 2007-08-07 | N | 0 | 20 |
| Paris MoU | France | Nantes | 2007-04-10 | Y | 9 | 28 |
| Paris MoU | United Kingdom | Belfast | 2007-01-03 | N | 0 | 18 |
| US Coast Guard | U.S.A. | New Orleans, Louisiana | 2006-12-04 | N | 0 | 4 |
| US Coast Guard | U.S.A. | Philadelphia, Pennsylvania | 2006-11-05 | N | 0 | 7 |
| US Coast Guard | U.S.A. | Philadelphia, Pennsylvania | 2006-10-30 | N | 0 | 0 |
| Paris MoU | Spain | Alicante | 2005-03-18 | N | 0 | 1 |
| Paris MoU | United Kingdom | Bristol | 2004-11-22 | N | 0 | 4 |
| Paris MoU | Portugal | Lisbon | 2004-11-17 | N | 0 | 1 |
| Paris MoU | France | Montoir/bret | 2004-05-03 | N | 0 | 2 |
| Paris MoU | France | Montoir/bret | 2004-04-29 | N | 0 | 5 |
| Paris MoU | Poland | Gdynia | 2004-01-27 | N | 0 | 0 |
| Paris MoU | Poland | Gdynia | 2004-01-07 | N | 0 | 5 |
| Paris MoU | France | Brest | 2003-12-22 | N | 0 | 12 |
| Paris MoU | Poland | Szczecin | 2003-08-07 | N | 0 | 1 |
| Paris MoU | Spain | Bilbao | 2003-07-24 | Y | 6 | 25 |
| Paris MoU | France | Rouen | 2003-05-15 | N | 0 | 8 |
| US Coast Guard | U.S.A. | Baltimore (Activities) | 2003-04-04 | N | 0 | 9 |
| US Coast Guard | U.S.A. | MSO Hampton Roads | 2002-12-26 | N | 0 | 0 |
| Paris MoU | Greece | Eleusis | 2002-06-04 | N | 0 | 0 |
| Paris MoU | Spain | Tarragona | 2002-05-21 | N | 0 | 6 |
| US Coast Guard | U.S.A. | MSO Philadelphia | 2001-08-07 | N | 0 | 4 |
| US Coast Guard | U.S.A. | MSO Portland (me) | 2001-04-02 | N | 0 | 5 |
| US Coast Guard | U.S.A. | Baltimore (Activities) | 2001-02-27 | N | 0 | 1 |
| US Coast Guard | U.S.A. | MSO Hampton Roads | 2001-02-23 | N | 0 | 0 |
| US Coast Guard | U.S.A. | MSO New Orleans | 2000-11-14 | N | 0 | 1 |

105

Equasis - Ship search - Result list

6/3/2008

| | | | | | | |
|---|---|---|---|---|---|---|
| US Coast Guard | U.S.A. | MSO Houston-Galveston | 2000-06-12 | N | 0 | 1 |
| Paris MoU | Germany | Hamburg | 1999-08-25 | N | 0 | 1 |
| Paris MoU | Germany | Hamburg | 1999-08-23 | N | 0 | 4 |
| US Coast Guard | U.S.A. | MSO Houston-Galveston | 1999-07-17 | N | 0 | 1 |
| Paris MoU | Netherlands | Vlaardingen | 1999-03-10 | Y | 13 | 22 |
| Paris MoU | Netherlands | Terneuzen | 1998-01-13 | N | 0 | 2 |

http://www.equasis.org/EquasisWeb/restricted/ShipInspection?fs=ShipInfo

106

15. FEB. 2008 14:34     02076438506     NO. 3311   P. 11/19

Equasis - Ship search - Result list     Page 1 of 1

## Port State control info

| PSC Organisation : | Paris MoU |
|---|---|
| Authority : | United Kingdom |
| Port of inspection : | Belfast |
| Date of report : | 2007-01-03 |
| Detention : | No |
| Number of deficiencies : | 18 |
| Type of inspection : | Expanded inspection |

▶ **PARTICULARS AT THE TIME OF THE INSPECTION**

| IMO number : | 7433452 |
|---|---|
| Name of ship : | NICHOLAS H |
| Call sign : | J082680 |
| Gross tonnage : | 22912 |
| Type of ship : | Bulk Carrier |
| Year of build : | 1977 |
| Flag : | St Vincent and Grenadines |

▶ **STATUTORY SURVEYS AT THE TIME OF THE INSPECTION**

| Statutory inspections and certificate | Class/Flag | Issue date | Expiry date |
|---|---|---|---|
| Cargo ship safety equipment | Bureau Veritas | 2005-10-13 | 2010-03-31 |
| Cargo ship safety construction | Bureau Veritas | 2005-10-13 | 2010-03-31 |
| Cargo ship safety radio | Bureau Veritas | 2005-10-13 | 2010-03-31 |
| Oil pollution prevention (Iopp) | Bureau Veritas | 2005-10-13 | 2010-03-31 |
| Load lines certificates | Bureau Veritas | 2005-10-13 | 2010-03-31 |
| Document of compliance (DoC) | International Naval Surveys Bureau | 2003-01-21 | 2007-10-17 |

▶ **CLASSIFICATION SURVEYS AT THE TIME OF THE INSPECTION**

| Class | Last survey | Status |
|---|---|---|
| Bureau Veritas | 2005-10-13 | Delivered |

▶ **NUMBER OF DEFICIENCIES PER CATEGORY**

| Category | Number |
|---|---|
| Fire Safety measures | 5 |
| Food and catering | 3 |
| ISM related deficiencies | 1 |
| Life saving appliances | 3 |
| Load lines | 3 |
| Propulsion & aux. | 2 |
| Safety of navigation | 1 |

▶ **CHARTERERS**

| Charterer | Type of charterer | Address |
|---|---|---|
| RICE COMPANY | Voyage charterer | Roseville California U.S.A. |

© Copyright 2000-2006; Version : prodPV_2_1_0; Developed and hosted by : France-Ministry for Transport -DAM/SI

http://www.equasis.org/EquasisWeb/restricted/DetailsPSC?fs=ShipInspection     2/15/2008

/67

15. FEB. 2008 14:34    02076438506    NO. 3311    P. 12/19

## Port state control info

| PSC Organisation : | Paris MoU |
| --- | --- |
| Authority : | France |
| Port of Inspection : | Nantes |
| Date of report : | 2007-04-10 |
| Detention : | Yes |
| Duration : | 9 |
| Number of deficiencies : | 26 |
| Type of inspection : | More detailed inspection |

▶ PARTICULARS AT THE TIME OF THE INSPECTION

| IMO number : | 7433452 |
| --- | --- |
| Name of ship : | NICHOLAS M |
| Call sign : | J8B2680 |
| Gross tonnage : | 22912 |
| Type of ship : | Bulk Carrier |
| Year of build : | 1977 |
| Flag : | St Vincent and Grenadines |

▶ STATUTORY SURVEYS AT THE TIME OF THE INSPECTION

| Statutory inspections and certificates | Class/Flag | Issue date | Expiry date |
| --- | --- | --- | --- |
| Cargo ship safety equipment | Bureau Veritas | 2007-06-16 | 2007-06-15 |
| Cargo ship safety construction | Bureau Veritas | 2005-10-13 | 2010-03-31 |
| Cargo ship safety radio | Bureau Veritas | 2005-10-13 | 2010-03-31 |
| Oil pollution prevention (Iopp) | Bureau Veritas | 2005-10-13 | 2010-03-31 |
| Load lines certificates | Bureau Veritas | 2005-10-13 | 2010-03-31 |
| Document of compliance (DoC) | International Naval Surveys Bureau | 2003-01-21 | 2007-10-17 |

▶ CLASSIFICATION SURVEYS AT THE TIME OF THE INSPECTION

| Class | Last survey | Status |
| --- | --- | --- |
| Bureau Veritas | 2005-10-13 | Delivered |

▶ NUMBER OF DEFICIENCIES PER CATEGORY

| Category | Number |
| --- | --- |
| Accommodation | 2 |
| Alarm signals | 1 |
| Bulk carriers | 1 |
| Fire Safety measures | 5 |
| Propulsion & aux. | 6 |
| Working spaces and accident prevention | 4 |

▶ GROUNDS FOR DETENTION

| Deficiency | Number | Class related deficiency |
| --- | --- | --- |
| Fire-dampers | 1 | No |

108

Equasis - Ship search - Result list                                        Page 2 of 2

| | | |
|---|---|---|
| Emergency fire pump | 1 | No |
| Sanitary facilities | 2 | No |
| Propulsion main engine | 2 | No |
| Cleanliness of engine room | 1 | No |
| Maintenance of the ship and equipment | 1 | No |
| Means of control (opening, pumps) Machinery spaces | 1 | No |

▶ CHARTERERS

| Charterer | Type of charterer | Address |
|---|---|---|
| TRAMP MEDITERRANEE | Voyage charterer | PYRAEUS Greece |

© Copyright 2000-2006; Version : prodPV_2_1_0; Developed and hosted by : France-Ministry for Transport -DAM/ST

http://www.equasis.org/EquasisWeb/restricted/DetailsPSC?fs=ShipInspection          2/15/2008

109

Equasis - Ship search - Result list                                              Page 1 of 2

## Port state control info

| PSC Organisation : | Paris MoU |
| Authority : | Russia |
| Port of Inspection : | Saint petersburg |
| Date of report : | 2007-08-97 |
| Detention : | No |
| Number of deficiencies : | 20 |
| Type of inspection : | More detailed inspection |

▶ PARTICULARS AT THE TIME OF THE INSPECTION

| IMO number : | 7433452 |
| Name of ship : | NICHOLAS N |
| Call sign : | J8D2880 |
| Gross tonnage : | 23912 |
| Type of ship : | Bulk Carrier |
| Year of build : | 1977 |
| Flag : | St Vincent and Grenadines |

▶ STATUTORY SURVEYS AT THE TIME OF THE INSPECTION

| Statutory Inspections and certificates | Class/Flag | Issue date | Expiry date |
|---|---|---|---|
| Cargo ship safety equipment | Bureau Veritas | 2007-08-21 | 2007-08-21 |
| Cargo ship safety radio | Bureau Veritas | 2007-06-21 | 2007-08-21 |
| Cargo ship safety construction | Bureau Veritas | 2005-10-13 | 2010-03-31 |
| Oil pollution prevention (Iopp) | Bureau Veritas | 2005-10-13 | 2010-03-31 |
| Load lines certificates | Bureau Veritas | 2005-10-13 | 2010-03-31 |
| Document of compliance (DoC) | International Naval Surveys Bureau | 2005-01-21 | 2007-10-17 |

▶ CLASSIFICATION SURVEYS AT THE TIME OF THE INSPECTION

| Class | Last survey | Status |
|---|---|---|
| Bureau Veritas | 2005-10-13 | Delivered |

▶ NUMBER OF DEFICIENCIES PER CATEGORY

| Category | Number |
|---|---|
| Accident prevention (ILO147) | 2 |
| Crew certificates | 1 |
| Fire Safety measures | 4 |
| ISM related deficiencies | 1 |
| Life saving appliances | 1 |
| Load lines | 4 |
| MARPOL annex I | 1 |
| Propulsion & aux. | 2 |
| Safety of navigation | 2 |
| Structural Safety | 1 |
| Working spaces and accident prevention | 1 |

http://www.equasis.org/EquasisWeb/restricted/DetailsPSC?fs=ShipInspection          2/15/2008

110

Equasis - Ship search - Result list                                    Page 2 of 2

▶ CHARTERERS

| Charterer | Type of charterer | Address |
|---|---|---|
| TRAMP MEDITERRANEE | Voyage charterer | PYRAEUS Greece |
| UNIAPRO OY | Time charterer | Finland |

© Copyright 2000-2006; Version : prodPV_2_1_0; Developed and hosted by : France-Ministry for Transport -DAM/SI

http://www.equasis.org/EquasisWeb/restricted/DetailsPSC?fs=ShipInspection          2/15/2008

/11

15. FEB. 2008 14:35    02076438506    NO. 3311    P. 16/19

Equasis - Ship search - Result list                                                        Page 1 of 2

### Port state control info

| PSC Organisation : | Paris MoU |
|---|---|
| Authority : | Russia |
| Port of inspection : | Saint petersburg |
| Date of report : | 2007-12-29 |
| Detention : | Yes |
| Duration : | 13 |
| Number of deficiencies : | 28 |
| Type of inspection : | More detailed inspection |

▶ PARTICULARS AT THE TIME OF THE INSPECTION

IMO number : 7433452
Name of ship : NICHOLAS H
Call sign : J8B2660
Gross tonnage : 22912
Type of ship : Bulk Carrier
Year of build : 1977
Flag : St Vincent and Grenadines

▶ STATUTORY SURVEYS AT THE TIME OF THE INSPECTION

| Statutory inspections and certificates | Class/Flag | Issue date | Expiry date |
|---|---|---|---|
| Document of compliance (DoC) | International Naval Surveys Bureau | 2007-12-04 | 2012-10-17 |
| Safety management certificat (SMC) | International Naval Surveys Bureau | 2007-12-04 | 2008-05-03 |
| Cargo ship safety equipment | Bureau Veritas | 2007-08-13 | 2008-01-12 |
| Cargo ship safety radio | Bureau Veritas | 2007-08-13 | 2008-01-12 |
| Load lines certificate | Bureau Veritas | 2005-10-13 | 2010-03-31 |
| Oil pollution prevention (Iopp) | Bureau Veritas | 2005-10-13 | 2010-03-31 |

▶ NUMBER OF DEFICIENCIES PER CATEGORY

| Category | Number |
|---|---|
| Crew certificates | 1 |
| Fire Safety measures | 1 |
| Food and catering | 1 |
| Life saving appliances | 2 |
| Load lines | 1 |
| Maritime Security | 1 |
| Mooring arrangements (ILO 147) | 2 |
| Operational deficiencies | 2 |
| Propulsion & aux. | 2 |
| Radiocommunications | 1 |
| Safety of navigation | 2 |
| Ship's certificates and documents | 2 |
| Structural Safety | 2 |
| Working spaces and accident prevention | 4 |

▶ GROUNDS FOR DETENTION

http://www.equasis.org/EquasisWeb/restricted/DetailsPSC?fs=ShipInspection        2/15/2008

/112

Equasis - Ship search - Result list                     Page 2 of 2

| Deficiency | Number | | Class related deficiency |
|---|---|---|---|
| Bulkheads corrosion | 2 | No | |
| Cargo and other hatchways | 1 | No | |
| Report and analysis of non-conformities, accidents | 1 | No | |

▶ CHARTERERS

| Charterer | Type of charterer | Address |
|---|---|---|
| CONGENTRA AG | Time charterer | Zugm Switzerland |

© Copyright 2000-2006; Version : prodPV_2_1_0; Developed and hosted by : France-Ministry for Transport -DAM/S1

113

Equasis - Ship search - Result list

Page 1 of 1



## PCS human element deficiencies

| PSC Organisation : | Paris MoU |
|---|---|
| Authority : | Russia |
| Port of inspection : | Saint petersburg |
| Date of report : | 2007-08-07 |
| Human element deficiencies : | 4 |

Following information is available :

> Human element deficiencies per category

**▶ HUMAN ELEMENT DEFICIENCIES PER CATEGORY**

| Category | Numbers |
|---|---|
| Accident prevention (ILO147) | 2 |
| Crew certificates | 1 |
| Working spaces and accident prevention | 1 |

© Copyright 2000-2006; Version : prodPV_2_1_0; Developed and hosted by : France-Ministry for Transport -DAM/SI

114

Equasis - Ship search - Result list                                         Page 1 of 1

| Home | Welcome Mr Kevin Lennen |
| Contact us | ▶ UPDATE YOUR PROFILE |
| Statistics | You can : |
| Help | ▶ REPORT AN ERROR |
| FAQ | ▶ GIVE YOUR OPINION |

| About Equasis | Ship search | Company search |

▶ Ship info   ▶ Certification   ▶ Inspection & manning   ▶ History   ▶ Recorded error

## PCS human element deficiencies

| P&C Organisation : | Paris MoU |
| Authority : | Russia |
| Port of inspection : | Saint petersburg |
| Date of report : | 2007-12-29 |
| Human element deficiencies : | 8 |

Following information is available :

» human element deficiencies per category

▶ HUMAN ELEMENT DEFICIENCIES PER CATEGORY

| Category | Numbers |
|---|---|
| Crew certificates | 1 |
| Food and catering | 1 |
| Mooring arrangements (ILO 147) | 2 |
| Working spaces and accident prevention | 4 |

© Copyright 2000-2006) Version : prodPV_2_3_9) Developed and hosted by : France-Ministry for Transport -DAM/SI

115

# NICHOLAS M

## PSC Inspections – Relevant Dates

| | PORT | DOA[1] | DOI[2] | DOD[3] |
|---|---|---|---|---|
| 1. | PHIMS | 24/03/2003 | 24/03/2003 | 02/04/2003 |
| 2. | BALTIMORE | 03/04/2003 | 04/04/2003 | 09/04/2003 |
| 3. | GENT | 24/04/2003 | 25/04/2003 | 28/04/2003 |
| 4. | ROUEN[4] | 06/05/2003 | 15/05/2003 | 16/05/2003 |
| 5. | BILBAO | 23/07/2003 | 24/07/2003 | 30/07/2003 |
| 6. | SZCZECIN | 05/08/2003 | 07/08/2003 | 08/08/2003 |
| 7. | BREST | 22/12/2003 | 22/12/2003 | 23/12/2003 |
| 8. | GDYNIA | 29/12/2003 | 07/01/2004 | 15/01/2004 |
| 9. | PARANAGUA | 12/03/2004 | 12/03/2004 | 15/03/2004 |
| 10. | MONTOIR | 28/04/2004 | 29/04/2004 | 04/05/2004 |
| 11. | NECOCHEA | 19/08/2004 | 20/08/2004 | 23/08/2004 |
| 12. | LISBON | 17/11/2004 | 17/11/2004 | 18/11/2004 |
| 13. | BRISTOL | 21/11/2004 | 24/11/2004 | 27/11/2004 |
| 14. | RECALADA | 20/12/2004 | 30/12/2004 | 10/01/2005 |
| 15. | BOURGAS | 28/05/2005 | 03/06/2005 | 20/06/2005 |
| 16. | NECHOCEA | 12/03/2006 | 13/03/2006 | 13/03/2006 |
| 17. | RIO DE JANEIRO | 01/09/2006 | 05/09/2006 | 14/09/2006 |
| 18. | DELAWARE | 04/11/2006 | 05/11/2006 | 16/11/2006 |
| 19. | NEW ORLEANS | 29/11/2006 | 04/12/2006 | 07/12/2006 |
| 20. | BELFAST[5] | 31/12/2006 | 03/01/2007 | 04/01/2007 |
| 21. | NANTES (MONTOIR) | 04/04/2007 | 10/04/2007 | 20/04/2007 |
| 22. | LA PLATA | 26/06/2007 | 26/06/2007 | 01/07/2007 |
| 23. | ST. PETERSBURG | 31/07/2007 | 07/08/2007 | 24/08/2007 |
| 24. | ST. PETERSBURG | 01/12/2007 | 29/12/2007 | 15/02/2008 |
| 25. | CONACRY | 23/02/2008 | 24/02/2008 | 26/02/2008 |

---

[1]    Date of arrival.
[2]    Date of inspection.
[3]    Date of departure.
[4]    PSC attended on board late in the vessel's stay after receiving information from the ITF that there were problems with the vessel's radar. During the inspection the radar was found to work properly.
[5]    Short say over public holidays.

116

Page 1 of 1

Print Copy for : KAVVADIA ANNA

(5d)

Received Inc.MSG.: 86469        Date: Fri 28/Dec/2007 20:11
From: JSC "ANTEKS" <ANTEKS <anteks@mail.cplus.ru>>
Subject: Re[4]: M/V "NICHOLAS M."  DAILY INFO
TO : <CONGENTRA <operations@congentra.com>>
CC : <CHINAN SPIRIT <operations@chianspirit.gr>>


DEAR SIRS,

PLEASE NOTE DISCHARGING COMPLETED
28/12 1840LT
FROM 1840 AWAITING PILOTAGE DUE TO BAD
WEATHER AT PILOT STATION
ETS 29/12 NOON AGW WP


 BRGDS,
 ALEX
 ANTEKS                      mailto:anteks@mail.cplus.ru

*117*

*FORM A/1*



**REPORT OF INSPECTION IN ACCORDANCE WITH THE PARIS MEMORANDUM**
**OF UNDERSTANDING ON PORT STATE CONTROL \*)**

Federal Maritime Administration
Rozhdestvenka St., 1/1
109012 Moscow, Russian Federation
+7 095 926 1000, +7 095 926 1311
memorand@pma.ru

copy to:        - master
                - head office
                - PSCO

if ship is detained, copy to:
                - flag State
                - recognised organisation, if applicable

### SHIP PARTICULARS

1. Name of ship: *NICHOLAS M*     2. Flag of ship: *ST. VINCENT & GRENADINES*

3. Type of ship: *BULKER*     4. Call sign: *J8B2680*

5. IMO number: *7433452*     6. Gross tonnage: *22!912*

7. Date keel laid / major conversion commenced     *1977*

8. Deadweight (where applicable): ........................................

9a. Classification society(ies) responsible for issuance of class certificates:
*BV*

9b. Classification society(ies) responsible for issuance of certificates on behalf of the flag State:
*BV , INSB*

10. Full particulars of company (identical to particulars as in the ISM DoC) \*\*):
*CHIAN SPIRIT MARITIME ENTERPRISES INC.*
*126 KOLOKOTRONI STR., 185.35 PIRAEUS , GREECE*

11. Name & address of charterer: (Only ships carrying liquid or solid cargoes in bulk, pref. 1st charterer record.)

☐ Demise Charter    ☒ Time Charter    ☐ Voyage Charter    ☐ Not applicable
☐ First Charterer    ☐ Last Charterer    ☐ Not available

*CONGENTRA AG*
*ZUGM , SWITZERLAND*

12. Name and signature of master to certify that the information under 11 is correct:

Name: *AMADO C. APILADO*     Signature: _(signature)_

### INSPECTION PARTICULARS \*\*)

13. Date of first boarding: *29.12.07*     13b. Date of final report: *11.01.2008*

14. Place of inspection: **St. Petersburg**     *29.12.07*

15. If vessel is detained : date of issue of detention notice

16. Type of inspection:
☐ Initial inspection    ☒ More detailed inspection    ☐ Expanded inspection
☐ Follow-up inspection    ☐ Follow-up detention    ☐ (C.)I.C.
☐ Operational control

17. Operational controls (if any):
☐ Abandon Ship    ☐ Fire drill    ☒ Oily Water Sep. tested
☒ Emerg. Fire Pump    ☒ Emergency Generator    ☒ Emergency Steering
☒ Communication eq.    ☒ Damage control    ☒ Other *S/S, LR ENGINE BLACKOUT*

18. Areas inspected:
☒ Navigation Bridge    ☒ Cargo hold(s) / tank(s)    ☐ Ballast tank(s)
☒ Accommodation / Galley    ☒ Steering-gear room / Engine room    ☐ Car deck
☒ Decks / Fo'c'sle    ☐ Passenger spaces

---

\*) This inspection report has been issued solely for the purpose of informing the master and other port States that an inspection by the port State, mentioned in the heading, has taken place.
This inspection report cannot be construed as a seaworthiness certificate in excess of the certificates the ship is required to carry.
\*\*) Non-ISM ships: Master to supply and sign under 12. for correct full particulars of company
\*\*\*) Masters, Shipowners and/or Operators are advised that detailed information on the inspection may be subject to publication
(www.parismou.org)

118

FORM A/2

Name of ship ....... *NICHOLAS M*    IMO number ...... *7433452*

19. Relevant certificate(s):

| a) title | b) issuing authority | c) dates of issue and expiry |
|---|---|---|
| 1. Cargo Ship Safety Equipment | *BV* | *13-08-07    12.01.08* |
| 2. Cargo Ship Safety Construction | | |
| 3. Passenger Ship Safety | | |
| 4. Cargo Ship Safety Radio | *BV* | *13.08.07    12.01.08* |
| 5. Document of Compliance | *BV* | *04.12.07    12.11.08* |
| 6. Safety Management Certificate | *NKB* | *04.12.07    03.05.08* |
| 7. Load Line | *BV* | *13.10.05    13.10.10* |
| 8. Prevention of Pollution by Oil | *BV* | *13.10.05    31.03.10* |
| 9. Safe Manning Document | *BV* | *19.05.06* |
| 10. Ship Security | *NKB* | *04.12.07    03.05.08* |
| 11. Tonnage | *BV* | *28.02.03* |
| 12. Class | | |

d) information on last intermediate or annual survey

| | date of survey | surveying authority | port / country |
|---|---|---|---|
| 1. Cargo Ship Safety Equipment | | | |
| 2. Cargo Ship Safety Construction | | | |
| 3. Passenger Ship Safety | | | |
| 4. Cargo Ship Safety Radio | | | |
| 5. Document of Compliance | | | |
| 6. Safety Management Certificate | *27.06.07* | *BV  RIO GRANDE / BRASIL* | |
| 7. Load Line | *27.06.07* | *BV  RIO GRANDE / BRASIL* | |
| 8. Prevention of Pollution by Oil | | | |
| 9. Safe Manning Document | | | |
| 10. Ship Security | | | |
| 11. Tonnage | | | |
| 12. Class | | | |

20. Ship related inspection action taken:

☒ Flag State informed            ☒ Class informed           ☐ Next port informed
☐ All deficiencies rectified     ☐ Inspection suspended     ☒ Overiding priority inspection
☒ Ship detained                  ☐ Repair port to re-detain ☐ Next port to re-detain
☐ Ship allowed to sail after detention  ☐ Ship allowed to sail after re-detention
☐ MARPOL investigation           ☐ Ship banned              ☐ Ship expelled

21. Deficiencies:              ☐ No            ☒ Yes (see attached FORM B)  *5* pages

22. Supporting documentation:  ☒ No            ☐ Yes (see annex)

## PORT STATE PARTICULARS

District office:      St. Petersburg
Address:              10, Gapsalskaya Street, 198035 St. Petersburg, Russia
Telephone:            (812) 327 4194
Telefax:              (812) 327 4019
E-mail:               mouspb@mail.pasp.ru

Name (duly authorized PSCO of reporting authority):  *N. STUPAKOV ,  M. SHELYUGOV*

Signature:

**This report must be retained on board for a period of at least two years and must be readily available for consultation by Port State Control Officers at all times.**

119

REPORT OF INSPECTION IN ACCORDANCE WITH THE PARIS MEMORA _UM OF UNDERSTANDING ON PORT STATE CONTROL

copy to: - master
- head office
- PSCO

if ship is detained, copy to: - flag State
- recognised organisation, if applicable

Federal Maritime Administration
Rozhdestvenka Str., 1/1
109012 Moscow, Russian Federation
+7 095 926 1000, +7 095 926 1311
memoram@gmn.ru

1. Name of ship: ...N.I.C.H.O.L.A.S......M.....   2. IMO number: 7.4.3.2.4.1.5.2...3. Date of final report: ...11.01.08.....   4. Place of inspection: St. Petersburg

DEFICIENCIES FOUND AND FOLLOW-UP ACTIONS ***)

| Group code | Defective item | Nature of defect¹) | Convention ref.²) | Action taken³) | Additional comments | Class repr.⁴) |
|---|---|---|---|---|---|---|
| 0.1.1.1 | CARGO SHIP SAFETY CONSTRUC-TION | WITH DRAWN | | 17/10 | BY BV AS PER NOTIFICATION DATED 28.12.07. | ☐ |
| 01.99 | CERTIFICATES | WITHDRAWN | | 17/10 | CLASS CERTIFICATE - WITHDRAWN BY BV AS PER NOTIFICATION DATED 28.12.07 | ☑ |
| | | | | 17 | NOT ALL VISITORS IDENTIFIED | ☐ |
| 2705 | SECURITY RELATED DEFECTS | NOT AS REQUIRED | | 17/10 | LOWER PLATFORM. | ☐ |
| 0.956 | GANGWAY | UNSAFE | | 17/10 | 2ND OFFICER MISSING | ☐ |
| 02.30 | MANNING SPECIFIED BY MINIMUM SAFE MANNING DOC | MISSING | | | | ☐ |
| 0.6.5.0 | LIFEJACKETS | NOT AS REQUIRED | | 17/10 | LIBKS NOT FIXED PROPERLY | ☐ |

Name (duly authorized PSCO of reporting authority) ...N.S.T.I.P.A.K.O.U...M.S.K.E.L.Y.U.S.O.U...   Signature

***) Masters, Shipowners and/ or Operators are advised that detailed information on the inspection may be subject to publication (www.parismou.org)
¹) This inspection was not a full survey and deficiencies listed may not be exhaustive. In the event of a detention, it is recommended that a full survey is carried out and all deficiencies described below and an application for re-inspection is made.
²) To be completed in the event of a detention (for non-convention ships <500 GT for reference only)
³) See reverse side of form B for full labels.

120

FOR...

2/5

REPORT OF INSPECTION IN ACCORDANCE WITH THE PARIS MEMORANDUM OF UNDERSTANDING ON PORT STATE CONTROL

Federal Maritime Administration
Rozhdestvenka St. 1/1
109012 Moscow, Russian Federation
+7 095 926 1000, +7 095 926 1311
memorandum@gms.ru

copy to: - master
- head office
- PSCO

if ship is detained, copy to: - flag State
- recognised organisation, if applicable

1. Name of ship: NICHOLAS ... M
2. IMO number: 7433452
3. Date of final report: 11.01.08
4. Place of inspection: St. Petersburg

### DEFICIENCIES FOUND AND FOLLOW UP ACTIONS ***)

| Group code | Defective item | Nature of defect[a] | Convention ref[b] | Action taken[c] | Additional comments | Class rep[d] |
|---|---|---|---|---|---|---|
| 1120 | INSULATION | INSUFFICIENT | | 17/10 | MDO PURIFIER L.O. PURIFIER | |
| | VENTED THROUGH | | | | M.E. / A.E. | |
| | (E.L.) | | | 17 | | |
| 1420 | CLEANLINESS | INSUFFICIENT | | | | |
| | OF E.R. | | | 17/10 | SOME LIGHTS UNLIT | |
| 0520 | LIGHTING | INCOMPLETE | | 17/10 | AT GALLEY | |
| 9411 | VENTILATION | DIRTY FILTERS | | | SOME UNSECURED SPARES | |
| 0533 | OBSTRUCTION | UNSAFE | | 17 | PARTS IN E.R. | |
| 0543 | STEAM PIPES | UNSAFE | | 17 | EXHAUST PIPE IN ER | |
| | H.D. PRESSURE | | | | HOLED | |
| | PIPES | | | 17 | WOODEN GRATINGS IN | |
| 0533 | OBSTRUCTION/ | UNSAFE | | | PROVISION STORE DAMAGED | |
| | SHIPPING | | | 17/10 | PORT/STB.D BUTTONS | |
| 0945 | SIGNS INDICATIONS | NOT AS | | | NOT MARKED IN STEERING | |
| | | REQUIRED | | | GEAR ROOM | |

Name (duly authorized PSCO of reporting authority) N. STUPAKOV / M. SKELYUGOV ... Signature

****) Masters, Shipowners and/ or Operators are advised that detailed information on the inspection may be subject to publication (www.parismou.org)
[a]) This inspection was not a full survey and deficiencies listed may not be exhaustive. In the event of a detention, it is recommended that a full survey is carried out and all deficiencies are rectified before an application for re-inspection is made.
[b]) To be completed in the event of a detention (for non-convention ships <500 GT for reference only)
[c]) To be completed in the event of form b for full labels.
[d]) See reverse side of form b for full labels.

12/

FORM

3/5

REPORT OF INSPECTION IN ACCORDANCE WITH THE PARIS MEMORANDUM OF UNDERSTANDING ON PORT STATE CONTROL

Federal Maritime Administration
Rozhdestvenka St., 1/1
109012 Moscow, Russian Federation
+7 095 926 1000, +7 095 926 1311
memorandum@pma.ru

copy to: - master
         - head office
         - PSCO

if ship is detained, copy to: - flag State
                               - recognised organisation, if applicable

1. Name of ship: ...NICKOLAS....M......  2. IMO number: 7433532  3. Date of final report: ...11.01.08......  4. Place of inspection: St. Petersburg

### DEFICIENCIES FOUND AND FOLLOW UP ACTIONS ***)

| Group code | Deficient item | Nature of defect⁴) | Convention ref.²) | Action taken²) | Additional comments | Class rep.⁵) |
|---|---|---|---|---|---|---|
| 0.7.5.0 | FIRE FIGHTING EQUIPMENT AND APPLIANCES | NO X. N.S. REQUIRED | | 17/10 | FIRE EXTINGUISHER IN ER - NOZZLE MISSING, FIRE BOXES DAMAGED AND HOLED | |
| 13.99 | MOORING | OTHER | | 17/10 | SOME RAT GUARDS MISSING | |
| 13.9.9 | MOORING | OTHER | | 17/10 | SOME FAIRLEADS FORE AND AFT SEIZED | |
| 0.985 | BULKHEAD - CORROSION | HOLED | S74PR6/RM.30/47 S74188/C.1/RM. | | BULKHEAD FROM MAIN DECK TO STORE ROOM P/S HOLED | |
| 0.985 | BULKHEAD - CORROSION | HOLED | S74P28/C1/P4.30/47 | | LEAKAGE FROM BILGE COLLECTING TANK #9 (MAX CAPACITY 3.7.8 C.U.B.M) IN NO E.R. | |
| 1570 | NAUTICAL PUBLICATION | NOT UP TO DATE | | 17/10 | LAST N.M. ONBOARD (29.11.07) | |

Name (duly authorized PSCO of reporting authority) K. STUPAKOV , M. SEELYUGBU   Signature

***) Masters, Shipowners and/or Operators are advised that detailed information on the inspection may be subject to publication (www.parismou.org)
a) This inspection was not a full survey and deficiencies listed may not be exhaustive. In the event of a detention, it is recommended that a full survey is carried out and all deficiencies require an application for re-inspection is made.
²) To be completed in the event of a detention (for non-convention ships <500 GT for reference only)
⁴) See reverse side of form B for full labels.

122

FORM A

REPORT OF INSPECTION IN ACCORDANCE WITH THE PARIS MEMORANDUM OF UNDERSTANDING ON PORT STATE CONTROL

Federal Maritime Administration
Rozhdestvenka St., 1/1
109012 Moscow, Russian Federation
+7 095 926 1000, +7 095 926 1311
memoran@gma.ru

copy to: - master
- head office
- PSCO

if ship is detained, copy to: - flag State
- recognised organisation, if applicable

1. Name of ship: NIKKO GAS M.    2. IMO number: 7433752    3. Date of final report: 11.01.08    4. Place of inspection: St. Petersburg

## DEFICIENCIES FOUND AND FOLLOW UP OF ACTIONS (***)

| Group code | Defective item | Nature of deficit(¹) | Convention ref(²) | Action taken(³) | Additional comments | Class resp.(³) |
|---|---|---|---|---|---|---|
| 1.2.40 | CARGO HATCHWAYS | DAMAGED | LL66/ANN/244 | 30/40 | METAL HINGES TORN OUT FROM BASE (HOLD No.6) DUE TO DAMAGE OF HYDRAULIC SYSTEM | |
| 12.40 | CARGO HATCHWAYS | CORRODED | | 17/47 | HATCH COVERS, COAMINGS, COMPRESSION BARS, ETC. OF ALL THE HOLDS HEAVILY CORRODED AND SHOULD BE PROPERLY INSPECTED AND REPAIRED UNDER CLASS SUPERVISION | |
| 25.YS. | REPORTS OF NON-CONFORMITY, ACCIDENTS & HAZARDOUS OCCUR | NOT ACCORDING SMS | S.34/C.1/R.MC.30 1.SMC./S.9 19/18 | | FLAG AUTHORITIES CLASS SOCIETY AND PORT AUTHO-RITIES NOT INFORMED REGARDING ACCIDENTS OCCURED | |

Name (duly authorized PSCO of reporting authority) N. STEPNOV    M. SKEZZYUGOV    Signature

***) Masters, Shipowners and/or Operators are advised that detailed information on the inspection may be subject to publication (www.parismou.org)
¹) This inspection was not a full survey and deficiencies listed may not be exhaustive. In the event of a detention, it is recommended that a full survey is carried out and all deficiencies are rectified before an application for re-inspection is made.
²) To be completed in the event of a detention (for non-convention ships <500 GT for reference only)
³) See reverse side of form B for full labels.

123

FORM.

5/5

REPORT OF INSPECTION IN ACCORDANCE WITH THE PARIS MEMORANDUM OF UNDERSTANDING ON PORT STATE CONTROL

Federal Maritime Administration
Rozhdestvenka St., 1/1
109012 Moscow, Russian Federation.
+7 095 926 1000, +7 095 926 1311
memoran@gma.ru

copy to: - master
- head office
- PSCO

if ship is detained, copy to: - flag State
- recognised organisation, if applicable

1. Name of ship: .....N.I.C.H.O.L.A.S...... M......    2. IMO number: ..7.9.3.3.4.5.2.. 3. Date of final report: .11.0.1.08..    4. Place of inspection: St. Petersburg

Class resp.*

DEFICIENCIES FOUND AND FOLLOW UP ACTIONS ***)

| Group code | Defective item | Nature of defect*) | Convention ref.*) | Action taken *) | Additional comments |
|---|---|---|---|---|---|
| 06.95 | ON.BOARD | LACK. OF | | | 3RD. OFFICER. CAN'T |
| | TRAINING. AND | TRAINING. | | .17/10 | INDICATE. TYPE. OF |
| | INSTRUCTION | | | | IMMERSION. SUIT. |
| 18.2.3 | MF/HF. RADIO | NOT. AS | | .17/10 | NO. EVIDENCE. OF. MF/HF |
| | INSTALLATION. | REQUIRED. | | | DSC. EXTERNAL. TEST. / |
| | | | | | WORKING. CONDITION) |
| | | | | | CAN'T. BE. TESTED. |
| 20.10 | MUSTER. LIST. | INCOMPLETE | | .17/10 | NO. CORRECTION. DUE. TO |
| | | | | | 2ND. OFFICER. ABSENCE. |
| | | | | | FOR. MORE. THAN. 7. DAYS. |
| | | | | | (CREW. CHANGE.) |
| 1.5.5.O. | LIGHTS. SHAPES. | INOPERATIVE | | .17/10 | P/S. NAVIGATION. LIGHT. |
| | SOUND. SIGNALS | | | | UNLIT. STERN. SUBSTITUTE |
| | | | | | LIGHT. UNLIT. |
| 28.44 | OPERATION. OF. | LACK. OF. | | .18/10 | NO. LONG. PERIOD. (30. MIN.) OF. TEST |
| | GMDSS. EQUIPMENT | FAMILIARITY | | | BY. CHIEF. OFF. |

Name (duly authorized PSCO of reporting authority) .M..S.T.U.R.A.K.O.V.....M..S.K.E.L.C.H.I.G.O.V....    Signature

***) Masters, Shipowners and/ or Operators are advised that detailed information on the inspection may be subject to publication (www.parismou.org)
*) This inspection was not a full survey and deficiencies listed may not be exhaustive. In the event of a detention, it is recommended that a full survey is carried out and all deficiencies are rectified before application for re-
inspection is made.
²) To be completed in the event of a detention (for non-convention ships <500 GT for reference only)
³) See reverse side of form B for full labels.

124

CALL    PSC    BEFORE    DEPARTURE.

## Deficiency Action Taken Codes   (Form B)

| | |
|---|---|
| 10 | deficiency rectified |
| 15 | rectify deficiency at next port |
| 16 | rectify deficiency within 14 days |
| 17 | rectify deficiency before departure |
| 18 | rectify non conformity within 3 months |
| 19 | rectify major non-conformity before departure |
| 25 | Competent Security Authority informed |
| 30 | detainable deficiency |
| 47 | as in the agreed class condition |
| 55 | flag state consulted |
| 65 | operation stopped |
| 70 (tickbox)** | classification society (responsibility in case of detainable deficiency) |
| 80 | temp. substitution of equipment |
| 81 | temp. repair to be carried out |
| 95 | letter of warning issued |
| 96 | letter of warning withdrawn |

## PSC Inspection Action Taken Codes   (Form A)

| | |
|---|---|
| 12 (tickbox) | all deficiencies rectified |
| 20 (tickbox) | ship banned |
| 27 (tickbox) | ship expelled on security grounds |
| 30 (tickbox)* | ship detained |
| 35 (tickbox) | ship allowed to sail after detention |
| 36 (tickbox) | ship allowed to sail after re-detention |
| 40 (tickbox) | next port informed |
| 45 (tickbox) | rectify detainable deficiencies at next port (next port to re-detain) |
| 46 (tickbox) | rectify detainable deficiencies at agreed repair port (repair port to re-detain) |
| 50 (tickbox) | flag state/consul informed |
| 60 (tickbox) | inspection suspended |
| 70 (tickbox)** | classification society informed |
| 85 (tickbox) | investigation of contravention of discharge provision (MARPOL) |

125



ST. VINCENT AND THE GRENADINES

MARITIME ADMINISTRATION

# MINIMUM SAFE MANNING CERTIFICATE

Issued under the provisions of Regulation V/14(2) of the
INTERNATIONAL CONVENTION FOR THE SAFETY OF LIFE AT SEA, 1974 as Amended

| Name of Ship | Official Number/IMO | Port of Registry | Gross Tonnage |
|---|---|---|---|
| NICHOLAS M. | 9152/IMO 7433452 | KINGSTOWN | 22912 |
| Type of Ship | Propulsion Power | Navigation Area | |
| Bulk Carrier | 1 X 10000 kW | UNRESTRICTED | |

THIS IS TO CERTIFY THAT the ship named in this certificate is considered to be safely manned if, whenever she proceeds to sea, she carries not less than the number and grades of personnel given in the following table, regarding the principles and guidelines set forth in IMO Resolutions A.890 (21), A.955 (23) and the Shipping Act, 2004 and always subject to the following provision:

Provision: A shortage during a voyage of one Officer or Rating resulting from unforeseen circumstances such as illness or injury, is permitted until the voyage is completed, provided the Master is satisfied that safe navigation and the operation of the ship is maintained with the shortage. Any further shortage should be referred to the St. Vincent and the Grenadines Maritime Administration for approval prior to leaving port.

| Grade / Capacity | STCW | Nr | Grade / Capacity | STCW | Nr | Grade / Capacity | STCW | Nr |
|---|---|---|---|---|---|---|---|---|
| Master | II/2 | 1 | Chief Engineer | III/2 | 1 | Deck Rating – watch | II/4 | 3 |
| Chief Mate | II/2 | 1 | Second Engineer | III/2 | 1 | Deck Rating | - | 3 |
| Deck Officer | II/1 | 2 | Engineer Officer | III/1 | 1 | Engine rating – watch | III/4 | 2 |
| Radio Officer | - | - | | | | Engine Rating | - | 1 |
| Cook | - | 1 | | | | Other | | |

Remarks : Two deck watch keeping officers to hold GMDSS General Operator Certificate.

THIS CERTIFICATE IS SUBJECT TO THE VALIDITY OF THE CERTIFICATE OF REGISTRY.

Issued on 19 May 2006 at Monaco.

THE COMMISSIONER FOR MARITIME AFFAIRS

126

| CHIAN SPIRIT MARITIME ENTERPRISES INC<br>**SAFETY MANAGEMENT SYSTEM MANUAL**<br>**RESOURCES AND PERSONNEL** | Developed by: D.P<br>Authorised by: M.D.<br>Issue No.: 1<br>Amendment : 2<br>Date : 07-01-05 |
|---|---|
| Reference: IMO Resolution A 741/18 | Chapter: 6 | Page: 1 of 1 |

Form D06-02

**ARRIVAL CREW LIST**

PORT : ST. PETERSBURG, RUSSIA
DATE. : 01 DECEMBER 2007
M/V  NICHOLAS M.

| NO | NAME | RANK | SEAMAN'S BOOK OR PASSPORT NO. | NAT/LITY | AGE | SIGNED ON DATE-PLACE | |
|---|---|---|---|---|---|---|---|
| 1 | APILADO, AMADO | MASTER | B0477863 | FILIPINO | 51 | KLAIPEDA | 28/08/07 |
| 2 | COLANZE, DANTE | CH. MATE | B010829 | FILIPINO | 42 | KLAIPEDA | 28/08/07 |
| 3 | DILOY, FELIPE III | 2ND.MATE | A943693 | FILIPINO | 32 | MONTOIR | 06/04/07 |
| 4 | DUSABAN, LORENICK | 3RD. MATE | B085159 | FILIPINO | 42 | MONTOIR | 06/04/07 |
| 5 | GABASA, VICTORIANO JR. | CH. ENG | B123047 | FILIPINO | 50 | MONTOIR | 05/04/07 |
| 6 | CLET, AVELINO | 3RD. ENG | B036007 | FILIPINO | 46 | MONTOIR | 05/04/07 |
| 7 | RABOR, RALPH | 4TH. ENG | A712187 | FILIPINO | 36 | MONTOIR | 06/04/07 |
| 8 | CADAVICIO, MARIO | ELECT. | B056967 | FILIPINO | 54 | MONTOIR | 05/04/07 |
| 9 | JALANDONI, RODOLFO | BOSUN | A776525 | FILIPINO | 43 | MONTOIR | 29/04/07 |
| 10 | DEGALA, ALVIN | A/B | B0329273 | FILIPINO | 30 | LAS PALMAS | 10/05/07 |
| 11 | POGOY, IKE | A/B | B313999 | FILIPINO | 27 | LAS PALMAS | 10/05/07 |
| 12 | RAGAS, GREGORIO | A/B | A688649 | FILIPINO | 39 | LAS PALMAS | 10/05/07 |
| 13 | DINOY, EUSEBIO JR. | A/B | B0143324 | FILIPINO | 35 | KLAIPEDA | 29/05/07 |
| 14 | CABAHUG, RONNIE | O/S | B158565 | FILIPINO | 27 | MONTOIR | 05/04/07 |
| 15 | TUNGOLH, MILO | O/S | B0331153 | FILIPINO | 28 | KLAIPEDA | 29/05/07 |
| 16 | CIOARA, IONEL | FITTER | 3257CT | ROMANIA | 51 | ST.PETERSBURG | 08/08/07 |
| 17 | AVRAM, IOSIF | FITTER | 15996CT | ROMANIA | 51 | ST.PETERSBURG | 08/08/07 |
| 18 | INTILA, MODESTO JR. | FITTER | A726339 | FILIPINO | 43 | MONTOIR | 05/04/07 |
| 19 | LAPITAN, EDGAR | OILER | A934481 | FILIPINO | 37 | MONTOIR | 05/04/07 |
| 20 | SILAWAN, DARWIN | OILER | A704753 | FILIPINO | 35 | MONTOIR | 05/04/07 |
| 21 | MONTECASTRO, JOSE DANNY | OILER | B110606 | FILIPINO | 35 | MONTOIR | 05/04/07 |
| 22 | QUIAMCO, DINDO ANTONIO | WIPER | A964397 | FILIPINO | 35 | MONTOIR | 05/04/07 |
| 23 | ROSELL, ROY ANTHONY | COOK | A637413 | FILIPINO | 32 | KLAIPEDA | 29/05/07 |
| 24 | CABALIT, CHRYCE FARO | M/BOY | B0158793 | FILIPINO | 24 | KLAIPEDA | 29/05/07 |
| 25 | SISON, BRYAN | M/BOY | B0163968 | FILIPINO | 27 | KLAIPEDA | 29/05/07 |
| 26 | ARONIS, ANDREAS | SUPT. ENGR. | 824-1E | GREEK | 46 | LA PLATA | 16/10/07 |

**CAPT. AMADO C. APILADO**
**MASTER**

127

**CHIAN SPIRIT**

# CREW LIST

F0602
Approved by: DP
Revision no: 00
Rev.date: 20.08.07
Page 1 of 1

M.V. " NICHOLAS  M "          ST. PETERSBURG              31.12.2007
Ship's Name.                  Port (if not at sea).            Date.

| no | Name. | Rank. | Seaman's Book number. | Signed on date. |
|----|-------|-------|----------------------|-----------------|
| 1 | APILADO, AMADO  C. | Master | B0477863 | 28 AUG 2007 |
| 2 | COLANZE, DANTE  M. | Ch. Officer | B010829 | 28 AUG 2007 |
| 3 | MENDIZABAL, ROMEO  F. | 2nd Officer | B0476371 | 29 DEC 2007 |
| 4 | DUSABAN, LORENICK  Y. | 3rd Officer | B085159 | 06 APR 2007 |
| 5 | ILUSTRISIMO, ALFREDO  B. | Ch. Engineer | B0193999 | 13 DEC 2007 |
| 6 | TOLOSA, GASPAR  T. | 2nd Engineer | B057450 | 13 DEC 2007 |
| 7 | CLET, AVELINO  B. | 3rd Engineer | B036007 | 05 APR 2007 |
| 8 | RABOR, RALPH  A. | 4th Engineer | A712187 | 06 APR 2007 |
| 9 | GOROSPE, ADRIANO  A. | Electrician | MM0904709 | 13 DEC 2007 |
| 10 | JALANDONI, RODOLFO  T. | Bosun | A776525 | 29 APR 2007 |
| 11 | DEGALA, ALVIN  D. | A/B | B0329273 | 10 MAY 2007 |
| 12 | POGOY, IKE  S. | A/B | B313999 | 10 MAY 2007 |
| 13 | RAGAS, GREGORIO  C. | A/B | A688649 | 10 MAY 2007 |
| 14 | DINOY, EUSEBIO JR.  M. | A/B | B0143324 | 29 APR 2007 |
| 15 | CABAHUG, RONNIE  D. | O/S | B0158565 | 05 APR 2007 |
| 16 | TUNGOLH, MILO  L. | O/S | B0331153 | 29 APR 2007 |
| 17 | NICHIFOR, GRIGORE | Fitter | 0025123 | 20 DEC 2007 |
| 18 | DINCU, MARIAN | Fitter | 0012742 | 20 DEC 2007 |
| 19 | INTILA, MODESTO JR. B. | Fitter | A726339 | 05 APR 2007 |
| 20 | LAPITAN, EDGAR  L. | Oiler | A934481 | 05 APR 2007 |
| 21 | SILAWAN, DARWIN  D. | Oiler | A704753 | 05 APR 2007 |
| 22 | MONTECASTRO, JOSE DANNY  F. | Oiler | B110606 | 05 APR 2007 |
| 23 | QUIAMCO, DINDO ANTONIO  S. | Wiper | A964397 | 05 APR 2007 |
| 24 | ROSELL, ROY ANTHONY  C. | Ch. Cook | A637413 | 29 APR 2007 |
| 25 | CABALIT, CHRYCE FARO  P. | M/Boy | B0158793 | 29 APR 2007 |
| 26 | SISON, BRYAN  A. | M/Boy | B0163968 | 29 APR 2007 |

*To be issued with every crew change / To be filed in Crew file 01*
*Send one copy to Office*

*128*



**Print copy for :DIMOU NIKOLAOS**

**Message 88347 Details**

**Subject:** Nicholas M - St. Vincent and the Grenadines - 7433452
**Attachments:**
**Date:** Tue, 08 Jan 2008 09:16:44
**From:** fishov_sergey@itf.org.uk
**To:** crewing@chianspirit.gr
**CC:** Barcellona_Fabrizio@itf.org.uk

Dear Captain Nikolaos Dimou,

Further to our phone conversations which were before New Year untill now the problem with repatriation of 3 crewmembers has not been resolved. The holidays in Russia have finished and you have a good opportunity to replace 3 Philipino officers in Saint-Petersburg.
Furthermore you didn't answer for my suggestion to conclude ITF Approved Agreement.
Now your vessel is under detention of PSC of Saint-Petersburg. In order to avoid any delay in voyage of our ship I strongly recommend you to undertake all candidate actions and reptriate 3 crewmembers.
I also hereby reguest that without delay you enter into and sign a Collective Agreement which covers all Officers and Rating on board and which meets at least with the minimum standards adopted by the ITF's maririme Affiliates.
In order to conclude the Agreement the Master of the vessel should be authorized, in writing to sign the Special Agreement and related documentation on behalf of the owner and to make arrangements for payment of the ITF entrance/membership fees and Welfare Fund Contribution of USD 319.00 per crewmemeber per year (Total USD 7,656.00).
I look forward to your prompt and positive response.

Best Regards,

Sergey Fishov
ITF Coordinator Russia

129

12-MAR-2008  16:45  FROM                              TO  2104599699        P.02


**BRITANNIA**
Ltd. Corp. - Panama

Athens 12/03/2008

13 Xasioti Street
151 23 N. Filothei-Maroussi
Athens, Greece
Telephone: 6857686/7
Fax: 6858577

CHIAN SPIRIT MARITIME ENTERPRISES INC
126, Kolokotroni Str,
185 35 Piraeus,
Greece

Attn: Capt. Costas Bourdis

Dear Capt. Bourdis,

Re: "Nicholas M" –P&I claims 2001-2007 policy years

With reference to the above matter we can advise that we have covered the vessel "Nicholas M" for P&I risks with the
West of England P&I Association during the policy years 20/2/2003-20/2/2004 & 20/2/2004-20/2/2005.

To the best of our knowledge and understanding we can advise that the vessel "Nicholas M" during the above policy
years had the following cargo claims:

Year 20/2/2003-20/2/04
NIL

Year 20/2/2004-20/2/05
Wet damage to Soya pellets from Ballast Manhole – (claim is closed for € 17,641.14)

We can also confirm that with effect from 20/2/2005 we have covered the vessel "Nicholas M" for P&I risks with the
American Club.

To the best of our knowledge and understanding we can advise that the vessel "Nicholas M" had the following cargo
claims with the American Club:

Year 20/2/2005-20/2/06
9/12/2005-Wet Damage to Wheat ·  (claim is closed-No liability)

Year 20/2/2006-20/2/07
NIL

Year 20/2/07-20/2/08
NIL

We will remain at your disposal should you need any further assistance.

Best regards,

Michael Mathioudakis

Branch:
13 Hasioti str.,N. Filothei
Maroussi 151 23 Athens - Greece
Tel: +30 210 6857686-7 Fax: +30 210 6858577
e-mail: info@britannia.gr

Member of
HIBA
Hellenic Insurance
Brokers Association
TOTAL P.02

130