UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SIXTEEN THIRTEEN MARINE S.A., | |
| Plaintiff, | |
| - against - | 08 CV 1318 (HB) |
| CONGENTRA A.G., | |
| Defendant. | |

## DECLARATION OF CAPTAIN KONSTANTINOS BOURDIS

I, CAPTAIN KONSTANTINOS ("COSTAS") BOURDIS, pursuant to Section 1746 of Title 28 of the United States Code, hereby declare and say the following under penalty of perjury:

1.      I am Operations Manager for Chian Spirit Maritime Enterprises Inc.   I am instructed on behalf of Plaintiff Sixteen Thirteen Marine S.A. in this matter, and am authorized to make this Declaration on its behalf.

2.      Chian Spirit Maritime Enterprises Inc. is the vessel manager of the M/V NICOLAS M, and I acted as Operations Manager of the vessel in connection with the charter party, dated October 10, 2007, between Sixteen Thirteen Marine S.A. ("Owners") and Congentra A.G. ("Charterers") and the fixture, dated December 20, 2007 between Sixteen Thirteen Maritime S.A. and Britannia Bulkers A/S.

2

3.    I submit this Declaration on behalf of Owners in opposition to Charterers' Motion to Vacate the Attachment. In particular, this Declaration will serve to correct the record and point out the many misrepresentations in Charterers' motion which should be denied in all respects.

4.    Insofar as the contents of this Declaration are within my own knowledge, they are true. Insofar as the contents of this Declaration are not within my own direct knowledge, they are true to the best of my information and belief based upon my review of relevant documents and discussions with persons having direct knowledge of the facts.

5.    I have assisted in the preparation of Owners' Claim Submission in the London arbitration (a copy of which is attach as Exhibit A to the Declaration of Mr. John Krzywkowski) and confirm that the facts set forth therein are true and correct.

6.    Supplementing the facts as detailed in the Claim Submission, set forth herein are additional facts and circumstances which I submit to correct particular misrepresentations alleged by Charterers in their motion papers.

7.    Charterers' request for ultrasonic testing of the hatch covers above the cargo holds at St. Petersburg was first made in the early afternoon of 28th December 2007, a matter of hours before the cargo discharge operations were completed. Notwithstanding Charterers' insistence, Owners had received analyses the extrapolation of which was

3

that the cargo wetting in two holds found on outturn at the port of St. Petersburg, Russia, was not caused by seawater ingress but rather was due to a pre-shipment condition and so the testing was inappropriate. In addition, under the terms of the charter party Charterers were not entitled to conduct ultrasonic testing at the discharge port of St. Petersburg. Ultrasonic testing was at Charterers' option only permitted to be conducted at the loading port of San Lorenzo, Argentina. Charterers and their associated companies decided not to exercise their option to perform such testing at that time. Their surveyors, and those of the shippers and receivers, were satisfied with the condition of the hatchcovers.

8.    On 28th December 2007 I received a phone call from Mr. Pavel Priymak of Congentra in connection with Charterers' requests for ultrasonic testing on my mobile phone at approximately 1600 hours (Greek time) whilst I was on a short Christmas holiday away from the office with family. The call consisted roughly of the following interchange:

> Caller: Mr. Pavel Priymak
>
> PP:    I am Pavel Priymak of Congentra.
>
> CB:    What can I do for you?
>
> PP:    I have learned that you are the decision maker for NICHOLAS M.
>
> CB:    Your information is incorrect.    I am the operations manager.  I am away from the office on holiday.
>
> PP:    I want to carry out ultrasonic tests in all the holds [*later just for Nos. 2 and 4*].

4

CB:   I understand that P & I, lawyers and local reps
      are dealing with this. Since no seawater ingress,
      I cannot assist you.

PP:   [*Very hostile and menacing*] Listen to me, I have
      the ship in my port. I control it. If you do not
      agree to testing of No. 2 and No. 4 hatches, I
      will f\*\*k you, your ship and your company.
      Understand me, your ship is in St. Petersburg –
      my home – I can f\*\*k you. [*PP continued in the
      same threatening vein for a while longer before I
      decided to terminate the call.*]

CB:   You are not a serious person. I do not want to
      speak to you anymore.

I then called Mr. Nicholas Madias of Chian Spirit Maritime to report the threats.


9.    It is clear to me, as an experienced ship operator, that the range of unusual matters
      that adversely affected the vessel only after I refused to react positively to
      Charterers'/Mr. Priymak's demands/threats were instigated by Charterers in concert
      with others to injure Owners for non-compliance.


10.   Unsurprisingly, Charterers' insistence for ultrasonic testing of the holds did not
      subside, even upon their repudiation of the charter party resulting from their failure to
      pay hire as required. In fact, Charterers continued to demand the testing after all
      contractual relations between the parties had been terminated on 2nd January 2008, but
      while the vessel remained at port under detention by Russian Port State Control—
      taking full advantage of the difficult situation which Charterers' and their associated
      companies had created for the vessel by causing (a) the BV Class Surveyor unusually
      to take personal custody of two of the class certificates and later insist on certified
      welders repairing a very straightforward steelwork support and (b) on the pretext of
      "missing" Class certificates and the lack of a Second Officer (which Anteks failed to

5

timely deliver to the ship after his arrival at the airport earlier that day), for the Port State Control officers in question to board the vessel on an "urgent" basis so as to cause its detention in most unusual circumstances. (Charterers' demands are attached as Exhibit A at pp. 75-78 to the Declaration of Mr. John Krzywkowski).

11.    In my experience, the role of port authority inspectors is to detain a vessel where they may view a lack of maintenance by noting unattended non-conformities. However, the port authority officers who boarded the vessel on 29th December 2007 listed as deficiencies requiring detention or otherwise four matters which were the subject of on-going maintenance: (i) the damage to the steelwork support for the starboard hinge for No.6 aft hatchcovers [which repair had already been the subject of detailed discussion with the BV surveyor]; (ii) the hole in the exhaust pipe in the engine room and the missing fire extinguisher nozzle [not detainable items – nevertheless, listed as deficiencies in circumstances where staging had been erected to repair the hole and the extinguisher nozzle was in use on standby for such repairs]; (iii) the small hole in the bulkhead of the stevedores' toilet [where it was manifestly clear that crew maintenance was on-going and chipping had uncovered the small hole – which had not been attempted to be covered up with paint – but was openly awaiting hotwork repair by the fitters within the crew] and (iv) the leak in the bilge water tank [which was already the subject of investigation by the engineers on board and which the port authority officers would have had no other means of knowing existed].

12.    Despite Charterers' persistence to conduct the ultrasonic testing, at no point did Charterers or their affiliated companies challenge with supporting damaged cargo analyses Owners' position that the cargo damage was due to a pre-shipment condition

6

for which Owners are not responsible. They threatened to apply to the High Court in London for various orders but Owners were never served with any orders or application papers.

13. I would also like to comment on the allegation by Mr. Konykhov of Anteks in paragraph 9 of his Declaration (for the sake of brevity, although I do not refer to other parts of his Declaration, it should not be taken that I agree with those other parts). He suggests that vessel remained within the port of St. Petersburg on 28th December 2007 because the Master refused to sail from the port that evening on condition that the pilot be dropped off at Big Kronstadt Roads rather than at the Pilot Station. I have three comments. The first is that Anteks' message of 2011hrs on 28th December 2007 (attached as Exhibit A at p. 74 to the Declaration of Mr. John Krzywkowski) does not mention this at all – which is most surprising if what Mr Konykhov declares is the truth. The second comment is derived from a telephone call with the Master of the vessel – who denies all of what Mr Konykhov declares. The Master insists that no such condition was mentioned. He was simply informed by Anteks that proceeding to the anchorage was prohibited because of bad weather. The third comment is that dropping the pilot at Big Kronstadt Roads rather than out at the Pilot Station is neither an onerous condition nor is it an unusual occurrence at St. Petersburg. Big Kronstadt Roads is at the immediate mouth of the river leading from the sea into the port of St. Petersburg. The Pilot Station is perhaps 1-2 nautical miles further out to sea, navigable through a well-lit buoyed channel. It would not occur to the Master to miss the chance to go to the anchorage because of such an inconsequential condition – as alleged. In reality, the pilots at St. Petersburg often ask a favour of a vessel emerging

7

from the river; to drop them earlier at Big Kronstadt Roads - especially if there is no ship to pilot back into the port.

14.    We have endeavoured to obtain information from St. Petersburg as to whether the weather conditions actually prevented vessels from navigating up or down the river during the evening of 28th December 2007 because of a suspension of pilotage services - as stated by Anteks in their above-mentioned message of 28th December 2007. We have so far failed to receive any confirmatory evidence that the port authorities had effectively "closed" the port in this way.

15.    On the phone, I have asked the Master to clarify the comment which he wished to note on the St. Petersburg statement of facts (denied by Charterers) that the damaged cargo found in holds No.2 and 4 did not slow down discharge. He has explained that his intention was solely to record that, due to the number of stevedore gangs employed by the Charterers at St. Petersburg, no time had been lost due to any deficiency of the vessel for which Charterers could claim entitlement to deduct hire for an off-hire allegation.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Dated: Piraeus, Greece

March 20, 2008

_____
Captain Konstantinos Bourdis

NYDOCS1/301034.1