LENNON, MURPHY & LENNON, LLC
Attorneys for Defendant
CONGENTRA A.G.
The GrayBar Building
420 Lexington Avenue, Suite 300
New York, New York 10170
Telephone:    (212) 490-6050
Facsimile:    (212) 490-6070
Kevin J. Lennon

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
SIXTEEN THIRTEEN MARINE S.A.,                :          08 CV 1318 (HB)
                                                                        :
                            Plaintiff,                         :          ECF CASE
                                                                        :
            - against -                                          :
                                                                        :
CONGENTRA A.G.,                                         :
                                                                        :
                            Defendant.                      :
-----------------------------------------------------------X

## SECOND DECLARATION OF KEVIN J. LENNON IN SUPPORT OF MOTION TO VACATE MARITIME ATTACHMENT

State of Connecticut   )
                                      )        ss: SOUTHPORT
County of Fairfield      )

            Kevin J. Lennon, being duly sworn, deposes and says:

            1.        I am a member of the Bar of this Court and represent the Defendant, Congentra

A.G. ("Congentra" or "Defendant") herein.  I am familiar with the facts of this case and make

this Declaration in support of Congentra's motion to vacate Plaintiff, Sixteen Thirteen Marine

S.A.'s ("STM" or "Plaintiff") maritime attachment.

            2.        Annexed hereto as Exhibit 1 is a true and accurate copy of U.S. v. Lee, 2000 U.S.

Dist. LEXIS 6982 (S.D.N.Y. 2000).

–1–

3.    Annexed hereto as Exhibit 2 is a true and accurate copy of Commodity Futures

Trading Commission v. Commodity Investment Group, 2006 U.S. Dist. LEXIS 5772 (S.D.N.Y.

2006).

4.    Annexed hereto as Exhibit 3 is a true and accurate copy of the Memorandum of

Plea Agreement in *U.S.A v. Chian Spirit Maritime Enterprises and Ventico Marine S/A*, Case

No. 1:06-cr-00076 (D. Del.).

5.    Annexed hereto as Exhibit 4 is a true and accurate copy of Nathan v. Cooper,

2007 U.S. Dist. LEXIS 90880 (S.D.N.Y 2006).

6.    Annexed hereto as Exhibit 5 is a true and accurate copy of the Joint Statement of

Facts in *U.S.A. v. CSME.*

7.    Annexed hereto as Exhibit 6 is a true and accurate copy of the Judgment in *U.S.A.*

*v. CSME.*

8.    Annexed hereto as Exhibit 7 is a true and accurate copy of the Deposition of Mr.

Robert Damasing[1], a member of the crew of the M/V Irene, taken in *U.S.A. v. CSME.*

9.    Annexed hereto as Exhibit 8 is a true and accurate copy of the Deposition of Mr.

Bryan Espina[2], a member of the crew of the M/V Irene, taken in *U.S.A. v. CSME.*

10.    Annexed hereto as Exhibit 9 is a true and accurate copy of the Deposition of Mr.

Edgar Villano[3], a member of the crew of the M/V Irene, taken in *U.S.A. v. CSME.*

---

[1] The Court's attention is directed to the testimony at p. 8, lines 6-11; p. 9, lines 21-24; p 13, lines 6-22; p. 29, lines 2-15; p. 94; p. 100; and pp. 109-110.
[2] The Court's attention is directed to the testimony at pp. 13, 17, and 23-24.
[3] The Court's attention is directed to the testimony at pp. 11-12, 14- 15, 26-27, 84 and 86.

11.    Annexed hereto as Exhibit 10 is a true and accurate copy of the Deposition of Mr. Paul Tudor[4], a member of the crew of the M/V Irene, taken in *U.S.A. v. CSME.*

12.    Annexed hereto as Exhibit 11 is a true and accurate copy of the Deposition of Mr. Pascual Conge, a member of the crew of the M/V Irene, taken in *U.S.A. v. CSME.*

13.    Annexed hereto as Exhibit 12 is a true and accurate copy of the Deposition of Mr. Mario Manzanilla a member of the crew of the M/V Irene, taken in *U.S.A. v. CSME.*

14.    Annexed hereto as Exhibit 13 is a true and accurate copy of the Decision dated September 7, 2007 in Centauri Shipping Ltd. v. Western Bulk Carriers KS, (07 Civ. 4761)(RJS)(S.D.N.Y. Sept. 7, 2007).

15.    Annexed hereto as Exhibit 14 is a true and accurate copy of Great White Fleet Ltd. v. M/V Bosse, 2007 U.S. Dist. LEXIS 75726 (S.D.N.Y. 2007).

Dated: March 26, 2008
       Southport, CT

Kevin J. Lennon

Sworn to and subscribed to before me
this 26th day of March, 2008.

NOTARY PUBLIC//
Commissioner of Superior Court

---

[4] The Court's attention is directed to the testimony at p. 14, 25-26 and 31-32.

# EXHIBIT 1

LexisNexis™ Total Research System
Switch Client | Preferences | Sign Off | ⊞ Help

My Lexis™ | Search | Research Tasks | Get a Document | Shepard's® | Alerts | Total Litigator | Transactional Advisor | Counsel Selector | Dossier | History | 🌐

Source: Legal > Cases - U.S. > District & State Courts - By State > NY Federal District & State Courts, Combined �above

Terms: consent / 20 "recorded conversation" (Edit Search | Suggest Terms for My Search)

✦Select for FOCUS™ or Delivery
☐

2000 U.S. Dist. LEXIS 6982, *

UNITED STATES OF AMERICA - v - LEE, KWOK HING, et al., Defendants.

97 Cr. 1053 (LMM)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

2000 U.S. Dist. LEXIS 6982

May 22, 2000, Decided
May 23, 2000, Filed

**DISPOSITION: [\*1]** Defendant Juan Javier Rodriguez motions for orders denied.

**CASE SUMMARY**

**PROCEDURAL POSTURE:** Defendant moved for orders suppressing post-arrest statements as taken in violation of defendant's Miranda rights and **recorded conversations** between himself and another man on the ground that the other man's **consent** to record the conversations was coerced.

**OVERVIEW:** Defendant moved to suppress evidence of post-arrest statements he made to police and recordings of conversations he had with another man. Both motions were denied. Defendant was given Miranda warnings prior to his giving any statement sought to be suppressed. Although he refused to sign a form waiving his Miranda rights, he did not ask for an attorney during questioning. He knowingly and voluntarily waived his right to remain silent. On the second motion, the evidence established that the other participant's recording of the conversations was voluntary. He proceeded with the conversations knowing that they were being recorded and he signed a form permitting the recording of the conversations.

**OUTCOME:** Motions denied. Defendant knowingly and voluntarily waived his right to remain silent. Participant in conversations agreed to have those conversations recorded.

**CORE TERMS:** conversation, cooperation, warning, evidence presented, remain silent, arresting officers, waiver form, voluntariness, recording, recorded, coerced

**LEXISNEXIS® HEADNOTES**                                                          ☰ **Hide**

Criminal Law & Procedure > Interrogation > Miranda Rights > Voluntary Waiver 🔖
Criminal Law & Procedure > Interrogation > Voluntariness 🔖
*HN1*⚓A defendant's refusal to sign a waiver form is not dispositive on the issue of the voluntariness of his Miranda waiver. More Like This Headnote

**COUNSEL:** For LEE, KWOK HING, defendant: John Jacobs, Larry Krantz, New York, NY.

For LEE, KWOK HING, defendant: Dan Gutlip, Gutlip and Jaffe, New York, NY.

For WONG, CHI KONG, defendant: Lawrence D. Gerzog, New York, NY USA.

For JOHN Y. LIM, defendant: Gerald Labush, Goldman & Goldman, New York, NY.

For JOHN Y. LIM, defendant: Gerald M. Labush, New York, NY.

For JOHN Y. LIM, defendant: Bennett M. Epstein, New York, NY.

For LAM, CHEONG HON, defendant: Norman L. Reiner, Gould Reiner & Gottfried, New York, NY.

For LAM, CHEONG HON, defendant: David Gordon, Gordon & Horwitz, New York, NY USA.

For LAM, CHEONG HON, defendant: Norman L. Reimer, Gould Reimer & Gottfried, New York, NY USA.

For CHIU, WAI CHU, defendant: Stanley N. Silverman, Law Offices of Silverman & Kost, P.C., Montclair, NJ.

For TONG, LI, defendant: Martin Jay Siegel.

For TONG, LI, defendant: Joseph Tacopina, Altchiler & Tacopina, NY, NY.

For BANH, CHUNG DAI, defendant: Cheryl Grace Bader, Cheryl Bader.

For QUACH, TUAN THACH, defendant: Ronald J. Margolis, New York, NY.

For QUACH, TUAN THACH, defendant: Thomas F.X. Dunn, New York, NY.

For JOSEPH WONG, defendant: Jeremy Schneider, Rothman, Schneider, Soloway, & Stern, New York, NY.

For JOSEPH WONG, defendant: Roy Kulcsar, Roy R. Kulcsar, Esq., New York, NY.

For CHAU, TIEP CUONG, defendant: Gail E. Laser, NY, NY.

For CHAU, TIEP CUONG, defendant: Megda M. Jimenez, Law Off. of Gail E. Laser, NY, NY.

For DAVID FONG, defendant: Martin R. Stolar, Martin Stolar, New York, NY.

For ALEXANDER CHAN, defendant: Don D. Buchwald, Buchwald & Kaufman, New York, NY.

For ALEXANDER CHAN, defendant: Jacob R. Euseroff, Bklyn., NY.

For JUAN JAVIER RODRIGUEZ, defendant: Robert M. Baum, The Legal Aid Society, New York, NY USA.

For CHI KIN YUEN, defendant: Susan C. Wolfe, Hoffman & Pollok, New York, NY.

For CHEN, QUI MING, defendant: Joel M Cohen, Mass & Rudin, New York, NY.

**JUDGES:** Lawrence M. McKenna, U.S.D.J.

**OPINION BY:** Lawrence M. McKenna

**OPINION**

*MEMORANDUM AND ORDER*

McKENNA, D.J.

Defendant Juan Javier Rodriguez moves for orders suppressing (1) post-arrest statements as taken in violation of *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966), and its progeny, and (2) **recorded conversations** between himself and Chi Kim Yuen ("Yuen") on the ground that Yuen's **consent** to record the conversations was coerced. Both motions are denied.

The evidence presented at the hearing establishes that Rodriguez was given Miranda warnings prior to his giving any statement sought to be suppressed, and that he knowingly and voluntarily waived his right to remain silent.

Rodriguez was given Miranda warnings very shortly after his arrest. The benefits of cooperation were discussed with him.

> An indication by the arresting officers to the defendant that his cooperation will help him is only one factor to consider in determining whether the defendant's waiver was given voluntarily. There is no inconsistency between the required warning that the defendant's statement [*2] may be used against him and a further statement that cooperation can help him. Both are true.

*United States v. Jaswal*, 47 F.3d 539, 542 (2d Cir. 1995). The voluntariness of Rodriguez' waiver of the right to remain silent "was not vitiated by any assurance that cooperation would help defendant." *Id.* [FN1] Rodriguez' refusal to sign a waiver form is not dispositive on the issue of the voluntariness of his waiver, *United States v. Spencer*, 955 F.2d 814, 819 (2d Cir. 1992), and, in the totality of the circumstances (including the refusal to sign the waiver form), the Court finds that the waiver was voluntary. Rodriguez did not indicate to the arresting officer that he wanted a lawyer.

At the FBI office, Rodriguez was again given Miranda warnings by another agent, and cooperation was again discussed. When, after some conversation, Rodriguez said, in effect, that "perhaps" he should talk to a lawyer, questioning ceased.

The evidence presented at the hearing also shows the Yuen's recording of conversations was voluntary, rather than coerced. Yuen proceeded with the conversations knowing that they were being recorded, and that is all that the government [*3] need show. *United States v. Fuentes*, 563 F.2d 527, 533 (2d Cir. 1977)(following *United States v. Bonanno*, 487 F.2d 654, 658-59 (2d Cir. 1973)). In fact, Yuen signed a form permitting the recording of conversations between himself and David Fong and others. (Gov't Ex. 21.)

SO ORDERED.

Dated: May 22, 2000

Lawrence M. McKenna

U.S.D.J.

Source: Legal > Cases - U.S. > District & State Courts - By State > NY Federal District & State Courts, Combined [i]
Terms: consent / 20 "recorded conversation" (Edit Search) | Suggest Terms for My Search)

https://www.lexis.com/research/retrieve?_m=811947b7bb64c795aac44b9694c6a000&doc... 3/24/2008

View: Full
Date/Time: Monday, March 24, 2008 - 4:41 PM EDT

* Signal Legend:
🟡 - Warning: Negative treatment is indicated
🔲 - Questioned: Validity questioned by citing refs
△ - Caution: Possible negative treatment
◆ - Positive treatment is indicated
🔵 - Citing Refs. With Analysis Available
🔵 - Citation information available

* Click on any *Shepard's* signal to *Shepardize®* that case.

**LexisNexis®**   About LexisNexis | Terms & Conditions | Contact Us
Copyright © 2008 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

# EXHIBIT 2

LexisNexis™ *Total Research System*

Switch Client | Preferences | Sign Off | ⁇ Help

*My Lexis™* ⟨Search⟩ Research Tasks ⟨Get a Document⟩ ⟨Shepard's®⟩ ⟨Alerts⟩ ⟨Total Litigator⟩ ⟨Transactional Advisor⟩ ⟨Counsel Selector⟩ Dossier | History | 🗎

Source:  Legal > Cases - U.S. > District & State Courts - By State > NY Federal District & State Courts, Combined 🖽
Terms:  "recorded conversation" and Baer (Edit Search | Suggest Terms for My Search)

✦Select for FOCUS™ or Delivery
⁝⁝

*2006 U.S. Dist. LEXIS 5772,* ✳

✣ View Available Briefs and Other Documents Related to this Case

Commodity Futures Trading Commission, Plaintiff, -against- Commodity Investment Group, Inc., et al., Defendants.

05 Civ. 5741 (HB)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

2006 U.S. Dist. LEXIS 5772

February 16, 2006, Decided

**PRIOR HISTORY:** CFTC v. Commodity Inv. Group, Inc., 2005 U.S. Dist. LEXIS 27454 (S.D.N.Y., Nov. 10, 2005)

**CORE TERMS:** customer, commodity, freeze, preliminary injunction, indirectly, trading, tape, misrepresentation, violating, enjoined, injunction prohibiting, enforcement action, disgorgement, preserving, misleading, restrained, notice, presented testimony, declarations, accounting, broker, scripts, entity, risk of loss, prima facie, reasonable likelihood, tape recordings, personal service, misrepresenting, disclosure

�End**Available Briefs and Other Documents Related to this Case:**

U.S. District Court Motion(s)
·U.S. District Court Pleading(s)

**COUNSEL: [*1]** For Commodity Futures Trading Commission, Plaintiff: Manal Sultan, U.S. Commodity Futures Trading Commission (NYC), New York, NY; W. Derek Shakabpa, Stephen Jay Obie, Commodity Futures Trading Commission (NYC), New York, NY.

For Commodity Investment Group, Inc., Linda Kuhney, also known as Linda Reinman Enzinna, Michael Kuhney also known as Michael Kirkney, National Commodities Corporation, Inc., International Commodity Clearing, LLC, Defendants: Erik Bradley Weinick, Homerbonner, Miami, FL

**JUDGES:** Hon. Harold **Baer**, Jr., U.S.D.J.

**OPINION BY:** Harold **Baer**, Jr.

**OPINION**

**OPINION & ORDER**

**Hon. Harold Baer, Jr., District Judge:**

Plaintiff Commodity Futures Trading Commission ("CFTC") has moved for a preliminary injunction prohibiting defendants Commodity Investment Group, Inc. ("CIG"), Linda Kuhney a/k/a/ Linda Reinman Enzinna ("Linda Kuhney"), and Michael Kuhney a/k/a Michael Kirkney ("Michael Kuhney") [1] (collectively "defendants") from violating section 4c(b) of the Commodity Exchange Act (the "Act"), $7$ U.S.C. $\S$ 6c(b), and CFTC Regulations 33.10(a) and (c), 17 C.F.R. $\S$ 33.10(a) and (c). In addition, CFTC seeks an order: 1) preserving **[*2]** all records relevant to this action and permitting CFTC to inspect such records; and 2) freezing CIG's assets as well as the assets of Linda and Michael Kuhney pending the outcome of this litigation.

**FOOTNOTES**

1 Plaintiff asserts that Linda and Michael Kuhney were controlling persons of CIG within the definition of $7$ U.S.C. $\S$ 13c(b).

**BACKGROUND**

Plaintiff alleges that the defendants violated the Act by systematically misrepresenting the likelihood of profit and risk of loss in connection with their sale of commodity options. On January 17, 2006, a hearing was held before me on CFTC's motion at which both parties presented testimony. During the hearing, defendants' stated that, while they did not concede that the CFTC was entitled to any injunctive relief, defendants were willing to consent to an injunction prohibiting them from violating the Act and preserving all relevant records. (Tr. 69). [2] Defendants further stated that they would be willing to consent to a freeze of CIG's corporate **[*3]** assets. (Id.) At the conclusion of the hearing, I directed the parties to attempt to agree on the terms of an injunction prohibiting defendants from violating the Act, as well as on the terms of an order preserving relevant documents. By letters dated January 27, 2006, the parties indicated that they had been unable to agree on either point.

**FOOTNOTES**

2 Citations to "Tr." refer to the transcript of the hearing held on January 17, 2006.

---

**DISCUSSION**

The CFTC is entitled to a preliminary injunction upon a *prima facie* showing that defendants have violated the Act and "that there is a reasonable likelihood that the wrong will be repeated." CFTC v. British Am. Commodity Options Corp., 560 F.2d 135, 141 (2d Cir. 1977). Plaintiff need not show irreparable harm or the inadequacy of alternative remedies. Id. To establish liability for fraud in connection with the sale of commodity options, CFTC must establish "(1) the making of a misrepresentation, misleading statement, or a deceptive omission; [*4] (2) scienter; and (3) materiality. CFTC v. R.J. Fitzgerald & Co., Inc., 310 F.3d 1321, 1328 (11th Cir. 2002). Solicitations that advise prospective customers of the potential for large profits without also disclosing that the majority of customers lose money trading commodity options may constitute fraudulent misrepresentations. Id. at 1332-1333. "Whether a misrepresentation has been made depends on the overall message and the common understanding of the information conveyed." Id. at 1328 (internal quotation omitted). A "boilerplate" risk disclosure statement will not necessarily preclude liability where the overall message is objectively misleading. Id. at 1330.

At the hearing, plaintiff presented testimony from a former employee of CIG, James Connellan. Connellan testified that he and other CIG brokers were given scripts to use during sales calls, and that those scripts touted profit ratios of between 30% and 80%. (Tr. 9-10, 18-19). Connellan testified that the scripts were provided by Linda and Michael Kuhney, and that the Kuhneys trained him and the other brokers on their sales pitches. (Tr. 8-12). The CFTC also [*5] provided 15 declarations from CIG customers who attested to misleading sales pitches by CIG employees. (See, e.g., Declaration of Norman Fisher, dated March 5, 2005, PP3, 6 (stating that both Linda Kuhney and a CIG broker told him to expect 50% profits on his investment and that Linda Kuhney advised him to sell stocks in a retirement fund and to use the money to trade options with CIG)). In addition, CFTC investigator Eliud Ramirez testified that approximately 94% of CFTC customers lost money between 2001 and 2004. (Tr. 51).

In response, defendants presented the testimony of two CIG customers, Robert Johnson and Dale Danner, who testified that they were satisfied with their experience trading with CIG and that CIG had fully disclosed the risks involved with their investments. (Tr. 115-119, 127-132). Linda Kuhney testified that CIG had received very few customer complaints, (Tr. 73), and she disputed the assertions made in several of the customer declarations. (Tr. 84-87). Defendants also presented the testimony of Janell Breig-Wright, CIG's president and compliance director. Breig-Wright testified that the account opening documents regularly provided to CIG customers contained [*6] detailed risk disclosures, and that new customers underwent a tape-recorded telephone compliance interview during which the risks of investing were explained. (Tr. 143). Defendants played the tapes of two compliance calls with customers who were ultimately rejected by CIG as unsuitable to trade options. (Tr. 175-76, 182-83). 3

**FOOTNOTES**

3 CFTC objects to the admission of these two tape **recorded conversations**, as well as to 11 other tapes of compliance calls involving plaintiff's declarants that defendants submitted (without transcripts) after the hearing. CFTC objects on the basis that the tape recordings appear to be incomplete, and purport only to represent compliance calls as opposed to sales calls or other communications between defendants and these particular customers. However, "the ordinary rules of evidence do not apply to preliminary injunction hearings, the procedures of the hearing are less formal and the burdens of proof required are not as high." Sunham Home Fashions, L.L.C. v. Pem-America, Inc., 2002 U.S. Dist. LEXIS 24185, No. 02cv6284, 2002 WL 31834477, *9 (S.D.N.Y. Dec. 17, 2002). While I have not considered the additional 11 tapes that defendants submitted after the hearing, I find it appropriate to consider the tapes that were played during the hearing.

---

[*7] I find that the testimony and other evidence produced at the hearing, while far from overwhelming, meets the minimal requirements for a *prima facie* showing of material misrepresentations to customers in violation of section 4c(b) of the Act and that there is a "reasonable likelihood" that these violations would be repeated. See British Am., 560 F.2d at 141. Therefore, CFTC is entitled to a preliminary injunction with respect to a prohibition on further violations of the Act and the preservation of records relevant to this proceeding.

The next item to be considered, and indeed the only matter truly in dispute, is the CFTC's request for an asset freeze. The CFTC is entitled to an asset freeze pending the resolution of an enforcement action when "necessary to ensure that the assets will be available to compensate public customers" or "to preserve the status quo while an investigation is conducted to clarify the sources of various funds." CFTC v. Morgan, Harris & Scott Ltd., 484 F. Supp. 669, 678 (S.D.N.Y. 1979). See also Securities and Exchange Comm'n v. Unifund S.A.L., 910 F.2d 1028, 1041 (2d Cir. 1990) (affirming temporary freeze [*8] order prior to resolution of SEC enforcement action); CFTC v. Muller, 570 F.2d 1296, 1300 (5th Cir. 1978) (affirming asset freeze in connection with preliminary injunction).

Here, the CFTC seeks to preserve funds because the ultimate relief it seeks includes disgorgement. See CFTC v. American Metals Exchange Corp., 991 F.2d 71, 76 n.9 (3rd Cir. 1993) (noting that disgorgement is available as a remedy in enforcement actions brought by the CFTC). However, the CFTC has not provided any specific information regarding the amount of funds possessed by either CIG or the Kuhneys that may be subject to disgorgement. 4 Furthermore, the CFTC waited three months after filing the complaint in this action to seek a preliminary injunction. Thus, there is a significant possibility that any "dissipation" of funds has already occurred. Put another way, it is likely that by now the genie is out of the bottle. Nonetheless, defendants have indicated that they are willing to consent to a freeze of CIG's assets. (See Tr. 69). Therefore, I will order an asset freeze with respect to CIG, but decline to do so with respect to Linda or Michael Kuhney's personal assets. [*9]

**FOOTNOTES**

4 Instead, the CFTC presented testimony regarding the total amount CIG received in commissions between 2001 and 2004 and the amount that Linda and Michael Kuhney received in wages and disbursements during that period.

---

**CONCLUSION**

For the reasons set forth above, plaintiff's motion for a preliminary injunction is GRANTED. It is further ORDERED that:

For purposes of this Order, the following definitions apply:

1. The term "document" is synonymous in meaning and equal in scope to the usage of the term in Federal Rule of Civil Procedure 34 (a), and includes, but is not limited to, writings, drawings, graphs, charts, photographs, audio and video recordings, computer records, and other data compilations from which information can be obtained and translated, if necessary, through detection devices into reasonable usable form. A draft or non-identical copy is a separate document within the meaning of the term.

2. The term "Parties" means the CFTC, CIG, Linda Kuhney **[*10]** and Michael Kuhney.

## RELIEF GRANTED

### I. *Preliminary Injunction*

**IT IS HEREBY ORDERED** that the defendants along with any of their agents, servants, employees or assigns and persons acting in concert or participation with any of them who receive actual notice of this Order by personal service or otherwise, are restrained and enjoined from violating, directly or indirectly, Section 4c(b) of the Act, 7 U.S.C. § 6c(b), and Regulation 33.10(a) and (c), 17 C.F.R. § 33.10(a) and (c), by cheating or defrauding or attempting to cheat or defraud any person in connection with commodity option transactions, or deceiving or attempting to deceive any other person by any means whatsoever in connection with commodity option transactions. Moreover, the defendants are preliminarily enjoined, directly or indirectly, from: (1) misrepresenting the likelihood of profits in commodity options trading; or (2) minimizing the risk of loss in commodity options trading.

### II. *Accounting of Assets and Asset Freeze*

**IT IS HEREBY FURTHER ORDERED** that within ten (10) business days following the service of this Order, the defendants shall **[*11]** provide the CFTC with a full accounting of all funds, documents, and assets both within and outside the United States which are (1) titled in the name individually or jointly of CIG; or (2) held by any person or entity, for the benefit of CIG; or (3) under CIG's direct or indirect control. It is further Ordered that the defendants are restrained and enjoined from, directly or indirectly:

A. Transferring, selling, alienating, liquidating, encumbering, pledging, leasing, loaning, assigning, concealing, dissipating, converting, withdrawing, or otherwise disposing of any of CIG's assets, wherever located, including assets held within or outside the United States, except as provided elsewhere in this Order, or as otherwise ordered by the Court.

This provision is subject to application by the defendants, through their attorneys, to release funds for reasonable business expenses and attorneys' fees.

### III. *Maintenance and Access to Books and Records*

**IT IS HEREBY FURTHER ORDERED** that the defendants, and all persons or entities who receive notice of this Order by personal service or otherwise, are restrained and enjoined from directly or indirectly destroying, mutilating, **[*12]** erasing, altering, concealing or disposing of, in any manner, directly or indirectly, any documents that relate to the business practices or business finances of the defendants.

### IV. *Commission's Access and Inspection of Books and Records*

**IT IS HEREBY FURTHER ORDERED** that, upon the prior provision of reasonable notice, representatives of the CFTC be allowed to inspect the books, records, and other documents of CIG and its agents, including, but not limited to, paper documents, electronically stored data, tape recordings, and computer discs, wherever they may be situated and whether they are in the possession of any of the defendants, and to copy said documents, data and records, either on or off the premises where they may be situated. Upon request by the CFTC, the defendants are ordered to deliver to the CFTC any relevant documents of defendants, including but not limited to, all books and records of accounts, all financial and accounting records, balance sheets, income statements, bank records (including monthly statements, cancelled checks, records of wire transfers, and check registers), lists of all commodity options customers, title documents, or other papers.

### [*13] SERVICE OF ORDER

**IT IS HEREBY FURTHER ORDERED** that copies of this Order may be served by any means, including facsimile transmission, upon any entity or person that may have possession, custody, or control of any documents of the defendants or that may be subject to any provision of this Order, and, additionally, that representatives of the CFTC are specially appointed by the Court to effect service.

### FORCE AND EFFECT

**IT IS HERE BY FURTHER ORDERED** that this Order shall remain in full force and effect until further order of this Court, and that this Court shall retain jurisdiction of this matter for all purposes.

**SO ORDERED.**

**February 16, 2006**

**New York, New York**

**Harold Baer**

**U.S.D.J.**

Source: Legal > Cases - U.S. > District & State Courts - By State > NY Federal District & State Courts, Combined 🔢
Terms: "recorded conversation" and Baer (Edit Search | Suggest Terms for My Search)
View: Full
Date/Time: Monday, March 24, 2008 - 4:43 PM EDT

* Signal Legend:
⊗ -  Warning: Negative treatment is indicated
🔲 -  Questioned: Validity questioned by citing refs
△ -  Caution: Possible negative treatment
◆ -  Positive treatment is indicated
🔵 -  Citing Refs. With Analysis Available
❶ -  Citation information available
* Click on any Shepard's signal to Shepardize® that case.

My Lexis™ | Search | Research Tasks | Get a Document | Shepard's® | Alerts | Total Litigator | Transactional Advisor | Counsel Selector
History | Delivery Manager | Dossier | Switch Client | Preferences | Sign Off | Help

LexisNexis®   About LexisNexis | Terms & Conditions | Contact Us
Copyright © 2008 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

# EXHIBIT 3

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) No. 1:06-cr-00076 |
| | ) |
| CHIAN SPIRIT MARITIME | ) |
| ENTERPRISES, INC.; and VENETICO | ) |
| MARINE S/A, | ) |
| | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OF PLEA AGREEMENT

Pursuant to discussions between the United States of America, by and through its

attorneys, representing and binding only the Environmental Crimes Section of the United States

Department of Justice and the Office of the United States Attorney for the District of Delaware,

and the Defendants, Chian Spirit Maritime Enterprises, Inc., (hereinafter "Chian Spirit"), and

Venetico Marine S/A, (hereinafter "Venetico"), operator and owner, respectively, of the vessel

*M/V Irene E.M.* (hereinafter "*Irene*") by and through their attorney, the following agreement is

hereby entered into by the respective parties and submitted to the Court pursuant to Federal Rule

of Criminal Procedure 11(c)(1)(C):

### Charges of Indictment

1.    The Defendants agree to enter pleas of guilty to Count 2 in the current Indictment,

charging them, in pertinent part, with the following:

### COUNT 2

On or about December 5, 2005, while in the  District of Delaware, Defendants

Chian Spirit Maritime Enterprises, Inc., and Venetico Marine S/A, did knowingly

1

fail to maintain an Oil Record Book for the _Irene_ in which all unprocessed

overboard discharges of oily sludge and bilge wastes from the _Irene_ were required

to be fully recorded. All in violation of Title 33, United State Code, Section

1908(a), Title 18, United States Code, Section 2, and Title 33, Code of Federal

Regulations, Section 151.25.

2.      Upon acceptance of this Plea Agreement and sentencing by the Court, the United

States shall move to dismiss all remaining charges in the current Indictment against the

Defendants, Chian Spirit and Venotico.

<div align="center">Potential Penalties, Assessments, and Restitution</div>

3.      The Defendants understand and agree that the statutory penalties applicable to a

corporate defendant for the felony count of the offense to which they are entering a plea of guilty

is a maximum fine of either Five Hundred Thousand Dollars ($500,000.00), or twice the gross

gain or loss resulting from the unlawful conduct, pursuant to 18 U.S.C. § 3571 (c) and (d), a term

of probation of five (5) years, pursuant to 18 U.S.C. § 3561(c)(1), and a special assessment of

Four Hundred Dollars ($400.00), pursuant to 18 U.S.C. § 3013(a)(2)(B).

4.      The Defendants understand that the Court shall order restitution to any

identifiable victims unless, pursuant to Title 18, United States Code, §§ 3663 and 3663A, the

Court determines that restitution would be inappropriate in this case.

5.      Unless otherwise ordered, should the Court order a fine of more than $2,500 as

part of the sentence, interest will be charged on the unpaid balance of a fine amount not paid

within fifteen (15) days after the judgment date, pursuant to Title 18, United States Code,

Section 3612(f). Other penalties and fines may be assessed on the unpaid balance of a fine

pursuant to Title 18, United States Code, §§ 3572(h), (i),3612(g).

<div align="center">2</div>

### Waiver of Constitutional and Statutory Rights

6.    The Defendants represent to the Court that they are satisfied that their attorney has rendered effective assistance. The Defendants understand that by pleading guilty in this case, they agree to waive certain rights afforded by the Constitution of the United States, by statute or both, including but not limited to: the right to plead not guilty; and the right to a jury trial. At a jury trial, the Defendants would have the right to be represented by counsel, to confront and cross-examine witnesses against it, to compel witnesses to appear and testify, to present other evidence in his behalf and to decide whether to testify. The Defendants would further have the right to have the jury instructed that they are presumed innocent until proven guilty, and that the burden will be on the United States to prove the Defendant's guilt beyond a reasonable doubt. If the Defendants were found guilty after a trial, they would have the right to appeal the conviction.

### Waiver of Appeal

7.    The Defendants, through their authorized representative, are aware that 18 U.S.C. § 3742 gives the right to appeal the sentence to be imposed, and that other federal statutes give a Defendant the right to appeal other aspects of the conviction. In consideration of the Agreement with the United States as set forth herein, the Defendants knowingly and voluntarily agree to waive the following rights: (a) the right, conferred by 18 U.S.C. § 3742, to appeal any sentence imposed by the Court for the conviction of these offenses, including restitution and community service; (b) the right to appeal any aspect of Defendant's conviction, including any pre-charge or pre-trial dispositions of motions or other issues; and (c) the right to bring any collateral attack against Defendant's conviction or sentence, except as it may relate to the effectiveness of legal representation.

3

## Voluntariness of the Plea

8.    The Defendants, through their authorized representative, acknowledges
that they have entered into this Plea Agreement freely and voluntarily and that they have been
fully advised by counsel, and that no threats or promises were made to induce them to enter the
guilty pleas called for by this Plea Agreement.

## Corporate Authorization

9.    The Defendants represent that both are authorized to enter into this Plea
Agreement and to bind themselves to the terms of the Environmental Compliance Plan (ECP).
At the time of signing this agreement, the Defendants shall provide to the United States a written
statement in the form of notarized legal documents certifying that the Defendants are authorized
to enter into and comply with all of the provisions of this Plea Agreement. The resolutions
further shall certify that Defendants' Boards of Directors have authorized these actions, and that
all corporate formalities for such authorizations have been observed.

## Applicability of the Sentencing Guidelines and Recommended Sentence

10.    The Parties fully and completely understand that this Plea Agreement is
submitted to the Court pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C). The Parties
agree that Chapter 8 of the United States Sentencing Guidelines Manual governs this case with
regard to any payment of restitution, community service, and probation. Regarding
determinations of an appropriate fine, however, pursuant to the Commentary to U.S.S.G.
§ 8C2.1, the provisions of § 8C2.2 and § 8C2.9 do not apply to counts for which the applicable
guideline offense level is determined under Chapter Two, Part Q (Offenses Involving the
Environment). For such cases, § 8C2.10 (Determining the Fine for Other Counts) is applicable.

4

U.S.S.G. § 8C2.10, in turn, directs the Court to apply the provisions of Title 18, United States Code, §§ 3553, 3572 to determine the appropriate fine.

### Withdrawal of Plea Agreement

11.    Should the Defendant's guilty pleas not be accepted by the Court for any reason, this agreement shall be null and void. In such an event, the Defendants hereby waive any defense to any charges in these Charging Instruments which might otherwise have been available under any statute of limitations, the Speedy Trial Act, or any common law, equitable, or Constitutional claim involving pre-indictment delay.

### Criminal Fine

12.    The Defendants shall each pay a fine in the amount of Five Hundred Thousand U.S. Dollars ($500,000.00), for a total aggregate criminal fine in the amount of One Million U.S. Dollars ($1,000,000.00.)

13.    The Parties agree that $1,000,000.00 is an appropriate aggregate fine.

14.    The Defendants shall each pay, on the day of sentencing, a special assessment of $400.00, according to 18 U.S.C. § 3013(a)(2)(B).

15.    The Defendants shall make organizational community service payments in the total amount of Two Hundred and Fifty Thousand U.S. Dollars ($250,000.00), pursuant to 18 U.S.C. § 3553(a), payable at sentencing. The Parties agree that $250,000.00 is an appropriate community service project amount and that the Court will order that the Defendants fund the project pursuant to the terms of this Agreement. This joint recommendation is made pursuant to the Organizational Community Service Provisions which appear at the Sentencing Guidelines' Community Service provisions at § 5B1.3 and § 8B1.3.

16.    The Parties agree and recommend that the Court order a community service project in the amount of $250,000 payable to the National Fish and Wildlife Foundation, Special Funds Program Management and Fiduciary Services for Settlement Accounts (hereinafter the "Foundation"). The Foundation is a charitable and nonprofit corporation established pursuant to 16 U.S.C. §§ 3701-3709. Its purposes include the acceptance and administration of "private gifts of property for the benefit of, or in connection with, the activities and services of the United States Fish and Wildlife Service," and the performance of "such other activities as will further the conservation and management of the fish, wildlife, and plant resources of the United States, and its territories and possessions for present and future generations of Americans." Id. § 3701(b)(1),(2). The Foundation is empowered to "do any and all acts necessary and proper to carry out" these purposes, including, specifically, solicitation, acceptance, and administration of "any gift, devise or bequest . . . of real or personal property." Id. § 3703(c)(1),(7). The Foundation will be responsible for all administrative, communications and fiduciary services required to implement a targeted ecological improvement grant investment program. The Foundation will coordinate with public and private marine and aquatic conservation initiatives in the District of Delaware to fund projects that may include creating coastal wetlands and upland buffers, enhancing rivers and riparian corridors that support the Delaware Bay's endangered and threatened species habitats and improving coastal national wildlife refuges. The receipt, management and expenditure of these funds shall be accounted for to Congress in annual reports required by 16 U.S.C. § 3706(b).

17.    The Defendants will be placed on a term of probation of three (3) years in accordance with Title 18, United States Code, Sections 3553(a), 3561, and 3562. The Defendants agree that three (3) years is an appropriate term of probation. The period of

6

probation shall include as a condition of probation the implementation of an Environmental Compliance Plan (hereinafter "ECP") as described in Attachment A. The Defendants may, after thirty (30) months, move for early termination of probation at the Court's discretion and consistent with 18 U.S.C. § 3564. The Government reserves the right to respond to any such motion based upon the nature of the Defendant's compliance with the terms of probation, including the provisions of the ECP. The Government's consent to any such motion will not be unreasonably withheld.

18.    As part of this plea agreement, the Defendants understand and admit to the relevant conduct described in the Joint Statement of Facts attached to this plea agreement. The Parties agree that said facts, as set forth in the Joint Statement of Facts, are accurate and provide an adequate factual basis to support the Defendants' pleas of guilty to Count 2 of the Indictment.

## Scope of Agreement

19.    Other than the offense to which the Defendants agree to plead guilty pursuant to this agreement, the Environmental Crimes Section and District of Delaware agree not to charge the Defendants with any other criminal offenses committed before execution of this agreement within the District of Delaware relating to the criminal investigation and subject matter of the Indictment in this case and about which the Government has knowledge. The Defendants understand that this plea agreement affects only criminal charges and shall not be construed, in whole or in any part, as a waiver, settlement, or compromise of any remedies available to the United States, or any other civil or administrative remedies, including suspension and debarment, available to the United States by law. In the event that any other local, state or federal enforcement agency investigates conduct related to this plea agreement, the Environmental Crimes Section agrees to advise said agency of the terms of this agreement and the nature and extent of the Defendants' cooperation under this agreement.

7

<u>Reservation of Allocution</u>

20.     The Parties reserve their full rights of allocution for purposes of sentencing in this matter, subject to the terms of this plea agreement. The Parties reserve the right to describe fully, both orally and in writing, to the sentencing judge the nature and seriousness of the Defendant's misconduct, including misconduct not described in the charge to which the Defendants are pleading guilty. The Parties also reserve their rights to inform the presentence report writer and the Court of any relevant facts, to dispute any factual inaccuracies in the presentence report, and to contest any matters not provided for in this plea agreement.

<u>Application of the Agreement</u>

21.     This Agreement shall bind the Defendants, all successors-in-interest, if applicable, and all successors and assigns. This Agreement shall apply to all vessels which the Defendants, own, operate, man, and all vessels owned, manned or operated by the Defendants during the period of probation. The Defendants shall provide to the Environmental Crimes Section with immediate notice of the following: any corporate name changes; any purchase or sale of vessels; any purchase, sale or reorganization of the ship management companies, or any other change impacting upon or affecting this Agreement and the Environmental Compliance Plan (ECP). No change in name, corporate or individual control, business reorganization, change in ownership, merger, change in legal status, sale or purchase of assets, or similar action shall alter the Defendants responsibilities under this Plea Agreement. The Defendants understand and agree that they shall not engage in any action to seek to avoid the obligations and conditions set forth in this Plea Agreement.

8

#### Cooperation

22.     As part of this Plea Agreement, the Defendants shall, during the period of probation, and at all reasonable times, with prior notice by the government as practicable, provide full access to vessels technically managed, manned, or owned by the Defendants or their subsidiaries while in U.S. ports or waters, as well as all maintenance and operation records related to the vessel. Such access shall include access to, and production of authenticated records, access to the engine room for inspection and photographs of all equipment, and access to ship-board and shore-side computers.

#### Breach of Agreement

23.     The Defendants understand and agree that upon a finding by the U.S. District Court that they have failed to perform or to fulfill each and every one of their obligations under this plea agreement, or have committed any further crimes during the period of probation, they will have breached this plea agreement. In the event of such a breach, (a) the United States will be free from its obligations under the agreement; (b) the Defendants will not have the right to withdraw the guilty plea; (c) the Defendants shall be subject fully to criminal prosecution for any other crimes which it has committed or might commit, if any, including perjury and obstruction of justice; and (d) the United States will be free to use against the Defendants, directly and indirectly, in any criminal or civil proceeding all statements made regarding the subject matter of this Indictment by employees of either Defendant while subject to cross examination by counsel for the Defendants and any documents provided by employees of either Defendant during discussion with the government, including the Defendants' statements made during proceedings before the Court pursuant to Federal Rule of Criminal Procedure 11.

24.     Any prosecutions of the Defendants not time-barred by the applicable statute of

limitations on the date of the signing of this plea agreement may be commenced against the Defendants in accordance with this paragraph, notwithstanding the running of the statute of limitations before the commencement of such prosecutions. The Defendants knowingly and voluntarily agree to waive any and all defenses based on the statute of limitations for any prosecutions commenced pursuant to the provisions of this paragraph. The Defendants understand and agree that the United States shall only be required to prove a breach of this plea agreement by a preponderance of the evidence. The Defendants further understand and agree that the United States need only prove a violation of federal, state, or local criminal law by a preponderance of the evidence probable cause in order to establish a breach of this plea agreement.

## Prosecution by Other Agencies/Jurisdictions

25.    This agreement only binds the Environmental Crimes Section of the United States Department of Justice and the District of Delaware. It does not bind any other office or agency of the United States government, including, but not limited to, the Tax Division of the United States Department of Justice, the Internal Revenue Service of the United States Department of the Treasury; the Environmental Protection Agency; or any state or local prosecutor. These individuals and agencies remain free to prosecute the Defendants for any offense(s) committed within their respective jurisdictions.

## Completeness of Agreement

26.    This Agreement is the complete and only agreement between the Parties. No promises, agreements or conditions have been entered into other than those set forth in this Agreement. This Agreement supersedes prior understandings, whether written or oral. This Agreement cannot be modified other than in a written memorandum signed by the parties or on the record in court.

10

SUE ELLEN WOOLDRIDGE
Assistant Attorney General

George M. Chalos, Esq., of Chalos, O'Connor & Duffy, LLP
As Authorized Representative of Chian
Spirit Maritime Enterprises, Inc.

George M. Chalos, Esq., of Chalos, O'Connor & Duffy, LLP
As Authorized Representative of
Venetico Marine, S/A

George M. Chalos, Esq. of Chalos, O'Connor & Duffy, LLP
Attorney for the Defendants

By: _____
Jeffrey L. Phillips
Trial Attorney
Environmental Crimes Section

By: _____
Gregory F. Linsin
Special Litigation Counsel
Environmental Crimes Section

COLM F. CONNOLLY
United States Attorney

1-18-07    By: _____
Edmond Falgowski
Assistant United States Attorney
District of Delaware

Dated:

AND NOW, this 29th day of January, 2007, the foregoing Memorandum of Plea Agreement
is hereby (accepted) (rejected) by this Court.

_____
The Honorable Gregory M. Sleet
United States District Judge

11

# EXHIBIT 4

LexisNexis® *Total Research System*

Switch Client | Preferences | Sign Off | ⊠ Help

My Lexis™ | Search | Research Tasks | Get a Document | Shepard's® | Alerts | Total Litigator | Transactional Advisor | Counsel Selector | Dossier | History |

Source: Legal > Cases - U.S. > District & State Courts - By State > NY Federal District & State Courts, Combined ⓘ
Terms: credibility / 28 "felony conviction" (Edit Search | Suggest Terms for My Search)

✓Select for FOCUS™ or Delivery

*2007 U.S. Dist. LEXIS 90880, \**

DENNIS NATHAN and NAAMAN S. NATHAN, Plaintiffs, -against- MARK A. COOPER and JEMA G. COOPER, Defendants.

06 Civ. 5973 (HB)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

2007 U.S. Dist. LEXIS 90880

December 12, 2007, Decided
December 12, 2007, Filed

**CORE TERMS:** attorneys' fees, deposit, matter of law, felony conviction, new trial, post-judgment, indemnification, indemnity, felony, purchase contract, unmistakably clear, dishonesty, default, notice, amend, bad faith, misrepresentation, verify, false statement, essential facts', credibility, indemnify, excerpts, real estate, security deposit, apartment, entitling, brokerage commissions, opportunity to defend, miscarriage of justice

**COUNSEL:** **[\*1]** For HAROLD DONALD GALEY, MARGARET M GALEY, Plaintiffs - Appellees: Preston Davis Rideout, Jr.♦, Albert Lee Abraham, Jr.♦, Abraham & Rideout, Greenwood, MS.

For WORLD MARKETING ALLIANCE, WORLD MARKETING ALLIANCE SECURITIES, Defendants - Appellants: Robert Engelbrecht Hauberg, Jr.♦, Clarence Lee Lott, III.♦, Bradley S Clanton.♦, Baker Donelson Bearman Caldwell & Berkowitz, Jackson, MS.

**JUDGES:** Hon. HAROLD BAER, JR.♦, U.S. District Judge.

**OPINION BY:** HAROLD BAER, JR.♦

**OPINION**

**OPINION & ORDER**

**Hon. HAROLD BAER, JR.♦, District Judge:**

I. BACKGROUND

On May 8, 2006, Dennis and Namaan Nathan ("Plaintiffs") entered into a real estate contract with Mark and Jema Cooper ("Defendants"), whereby Plaintiffs agreed to purchase Defendants' cooperative apartment located in New York City for $ 1.9 million. Compl. P 5-7. Plaintiffs paid Defendants a ten-percent, or $ 190,000, deposit. Id. P 8. Pursuant to paragraph 6.1 of the purchase contract, the sale of the apartment was conditioned upon the unanimous approval of Plaintiff's application by the building's Co-op Board ("Board"); if there was no such approval, Paragraph 6.3 of the contract provided that the security deposit would be refunded. Id. P 9-10. The apartment was for his mother who was moving **[\*2]** to the City from New Jersey.

As part of the Plaintiffs' application package, he was required to verify his financial assets to the Board. Plaintiffs represented assets totaling $ 89 million dollars, which included $ 1.8 million in cash, $ 17.5 million in real estate, and $ 19 million in securities. In addition, Plaintiff Dennis Nathan listed his interest in his company, Communication Components, Inc. at an estimated value of $ 50 million.

While reviewing Plaintiff's purchase application, the Board became aware of Plaintiff Dennis Nathan's previous felony conviction, and requested more information. On June 28, 2006, Plaintiff's attorney, Bradley Shaw, provided the Board with a letter of explanation. Attached to the letter were copies of both the Criminal Judgment which included Nathan as a Defendant and excerpts from the Third Circuit opinion.

Subsequently, on July 13, 2006, the Board rejected Plaintiffs' application; on July 17, 2006, Plaintiffs demanded return of the $ 190,000 deposit. Compl. P 12-13. Defendants refused, claiming that they were entitled to keep the deposit. Id. P 15. On August 4, 2006, Plaintiffs filed a complaint seeking damages in the amount of the deposit, plus interest **[\*3]** as well as attorneys' fees and court costs. Defendants responded on October 9, 2006, denying wrongdoing and counterclaiming that Plaintiffs, in bad faith, submitted an incomplete application package as required by the purchase contract and that therefore Defendants were entitled to retain the deposit.

A jury trial was held from July 9, 2007 to July 12, 2007. The jury found in favor of Plaintiffs, and judgment was entered in the amount of $ 190,000 on July 13, 2007. Subsequently, the parties both submitted post-judgment motions. Plaintiffs filed a motion to amend the judgment to include pre-and post-judgment interest as well as attorneys fees. Defendants filed a renewed motion for judgment as a matter of law or, in the alternative, a new trial.

## II. DISCUSSION

### Defendant's Motions

A. Motion for Judgment as a Matter of Law

Pursuant to Fed. R. Civ. P. 5D, Defendants move for judgment as a matter of law. A Rule 50 motion for judgment as a matter of law should only be granted where "there is no legally sufficient evidentiary basis for a reasonable jury to find for [a] party on that issue." Merrill Lynch Interfunding, Inc. v. Argenti, 155 F.3d 113, 120 (2d Cir. 1998).

Defendants predicate their [*4] motion on the argument that Plaintiff's failure to verify their total assets in the application submitted to the Board constitutes bad faith, default, and/or misrepresentation entitling Defendants to retain the $ 190,000 security deposit. [1] On their Board application, Plaintiffs listed assets totaling nearly $ 90 million. Def. Mot. for Judgment as a Matter of Law 1. These assets included approximately $ 39 million in cash, real estate and various securities--all of which were verified in the application. See Pl. Memo. in Opp. to Mot. for Judgment as a Matter of Law Ex. 1. On the other hand, Defendants argue that Plaintiff Dennis Nathan failed to verify the $ 50 million valuation of his company, and that this omission constitutes a misrepresentation or bad faith entitling them to retain the deposit pursuant to P 13.1 of the contract. [2] Def. Reply Mem. 1.

**FOOTNOTES**

[1] In making a Rule 50 motion at the close of Plaintiff's case, Defendants also argued that Plaintiff's "fraudulent concealment and nondisclosure of his felony conviction induced Defendants to enter into the Contract of Sale and that [Plaintiff] also initially concealed his conviction from the Coop Board." However, there is no evidence [*5] that Defendants agreed to sell to Plaintiff based on any assertion by Plaintiff that he had no prior felony convictions; further, the Board upon request received a letter explaining Plaintiff's felony, along with an attached copy of the Criminal Judgment as well as excerpts from the Third Circuit opinion, thus this argument is unavailing.

[2] P 13.1 of the contract provides "In the event of a default or misrepresentation by Purchaser, Seller's sole and exclusive remedies shall be to cancel this Contract, retain the Contract deposit as liquidated damages and, if applicable, Seller may enforce the indemnity in P 13.3 as to brokerage commissions or sue under P 13.4." Itkowitz Decl. Ex. 1.

Defendants' argument in support of their motion is unavailing. If the Board had lingering questions about Plaintiffs assets, the application review process provided ample time and opportunity for them to request additional information before deciding on Plaintiff's application. [3] However, evidence produced at trial indicated that Plaintiffs' "financials were acceptable" to the Board. Def. Ex. E. Moreover, as shown at trial the Board application contained Plaintiff Dennis Nathan's income tax return listing an [*6] annual adjusted gross income of over $ 10 million, including income derived from his company. Pl. Ex. 11. Finally, Plaintiff Dennis Nathan testified at trial concerning how he had valued his stake in the company using customary valuation techniques. Tr. at 120-122.

**FOOTNOTES**

[3] Indeed, the whole point of the review process is to provide the Board with the opportunity to look over the application and, if it is found to be insufficient in some respect, to request that the applicant provide additional information. For example, when the Board, during its review of Plaintiff's application, became aware of and inquired about Plaintiff's felony, Plaintiff was more than forthcoming: Plaintiff's transactional attorney sent a copy of the Criminal Judgment as well as portions of the Third Circuit opinion from the criminal case under cover of a letter explaining the circumstances surrounding Plaintiff's felony. Similarly, the Board could have--but did not--request additional information regarding Plaintiffs assets.

Therefore, based on the above evidence, it is reasonable that the jury concluded Plaintiffs failure to verify their total assets did not constitute bad faith or a misrepresentation entitling Defendants [*7] to keep the security deposit. Defendants' Motion for Judgment as a Matter of Law is denied.

### B. Motion for a New Trial

In the alternative to their Rule 5D motion, Defendants move for a new trial pursuant to Fed. R. Civ. P. 59. A District Court "should grant a new trial if it 'is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice.'" United States v. Landau, 155 F.3d 93, 104 (2d Cir. 1998) (quoting Smith v. Lightning Bolt Products, Inc., 861 F.2d 363, 370 (2d Cir. 1988)). The core of this motion is that the Court improperly limited the use of evidence of Plaintiff's felony conviction for impeachment purposes, thereby prejudicing their case.

Fed. R. of Evid. 609(a)(2) provides:

> For the purpose of attacking the character for truthfulness of a witness...evidence that any witness has been convicted of a crime shall be admitted regardless of the punishment, if it readily can be determined that establishing the elements of the crime required proof or admission of an act of dishonesty or false statement by the witness.

When, as here, a witness has been convicted of a crime of dishonesty or false statement, the Court is required to allow [*8] such evidence. [4] As construed by the Second Circuit, "the presumption under Rule 609(a)(2)...is that the 'essential facts' of a witness' convictions, including the statutory name of each offense, the date of conviction, and the sentence imposed are included within the 'evidence to be admitted for impeachment purposes.'" United States v. Estrada, 430 F.3d 606, 615 (2d Cir. 2005).

**FOOTNOTES**

[4] In contrast, when considering whether to allow evidence of crimes not involving dishonesty or false statement, Fed. R. of Evid. 609(a)(1) provides that a Court may disallow such evidence if, pursuant to Fed. R. of Evid. 403 the Court determines that the probative value of such evidence will be substantially outweighed by the risk of prejudice, confusion, or waste of time. See

Estrada, 430 F.3d at 615-16 ("The only difference between [Rule 609(a)(1) and (a)(2)] is that evidence of convictions for crimes involving 'dishonesty or false statement,' whether felonies or misdemeanors, *must* be admitted under Rule 609(a)(2) as being *per se* probative of **credibility**, while district courts, under Rule 609(a)(1), *may* admit evidence of a witness's **felony convictions** that do not constitute *crimen falsi*, subject to balancing [**\*9**] pursuant to Rule 403.") (emphasis in original).

As noted above, these "essential facts"--and more--were fully set forth for the jury at trial. A copy of Shaw's letter, including the Criminal Judgment and excerpts from the Third Circuit opinion from Plaintiff Dennis Nathan's felony trial, was introduced. Pl. Ex. 10. Defense counsel was permitted to read directly from the Criminal Judgment during his cross-examination of Plaintiff Dennis Nathan, and during his summation defense counsel was permitted to publish a portion of the letter to the jury as well as to argue the **credibility** issue. Tr. at 500-505. The jury was then charged that they could consider the **felony conviction** in evaluating Plaintiffs' **credibility**, and the letter and attached judgment and Third Circuit opinion were sent to the jury for its deliberations.

The evidence concerning Plaintiff's felony conviction was both readily available to the jury and the jury was well aware of it when left to deliberate. Moreover, such evidence was more detailed than the "essential facts" required by Estrada. Therefore, I find no miscarriage of justice or seriously erroneous result on the part of the jury. Defendants' Motion for a New Trial [**\*10**] is denied.

### Plaintiffs' Motion for Amended Judgment

A. Pre-and Post-Judgment Interest

Pursuant to Fed. R. Civ. P. 59, Plaintiffs have requested that the Court amend the judgment to include an award of pre-judgment interest. See, e.g., Paddington Partners v. Bouchard, 34 F.3d 1132 (2d Cir. 1994) (award of pre-judgment interest is properly sought by way of a motion to alter or amend the Court's judgment under Fed. R. Civ. P. 59(e)). "[U]nder New York law, 'prejudgment interest is normally recoverable as a matter of right in an action at law for breach of contract.'" Graham v. James, 144 F.3d 229, 239 (2d Cir. 1998) (quoting Adams v. Lindblad Travel, Inc., 730 F.2d 89, 93 (2d Cir. 1984)). See NY CPLR § 5001. Interest accrues from the earliest date the cause of action arose. See NY CPLR § 5001(b).

Here, the Board rejection took place on July 13, 2006, and Defendants were obligated to return Plaintiffs' deposit within 7 business days thereafter—i.e. by July 24, 2006. [5] Judgment was entered 355 days later, on July 13, 2007. The interest accrues at 9% per annum, see NY CPLR § 5004, and therefore amounts to $ 16,631.75. Furthermore, Plaintiffs are entitled to post-judgment interest calculated [**\*11**] at 9% per annum from the date the judgment was entered, July 13, 2007. NY CPLR §§ 5002, 5003, 5004. Plaintiffs motion to amend the judgment as to pre-and post-judgment interest is granted.

#### FOOTNOTES

5 See Itkowitz Decl. Ex. 1

### B. Attorneys Fees

A "fundamental aspect of the United States judicial system is the requirement that parties provide for their own costs associated with litigation. Indeed, under the 'American Rule,' 'absent statute or enforceable contract, litigants pay their own attorneys' fees.'" Doe v. Karadzic, 2001 U.S. Dist. LEXIS 12928 at \*5 (S.D.N.Y. Aug. 27, 2001); see Alyeska Pipeline Serv. Co. v. The Wilderness Soc'y, 421 U.S. 240, 247, 95 S. Ct. 1612, 44 L. Ed. 2d 141 (1975). Thus, the key inquiry here is whether the purchase contract between Plaintiffs and Defendants provides for payment of attorneys fees in a dispute between the parties.

Plaintiffs' claim for attorneys fees is based on the indemnification provision contained in P 13.3 of the contract of sale, which provides in pertinent part:

> Subject to the provisions of P 4.3, each party indemnifies and holds harmless the other against and from any claim... resulting from the Indemnitor's breach of any of its representations or covenants stated to survive Closing, [**\*12**] cancellation or termination of this Contract. Purchaser indemnifies and holds harmless Seller against and from any claim...resulting from the Lease obligations accruing from and after the closing. Each indemnity includes, without limitation, reasonable attorneys' fees and disbursements, court costs and litigation expenses arising from the defense of any claim and enforcement or collection of a judgment under this indemnity, provided the Indemnitee is given Notice and opportunity to defend the claim.

Plaintiffs argue that this language clearly and unequivocally contemplates that they may recover attorneys fees from Defendants in this breach of contract action. I disagree.

The New York Court of Appeals articulated the governing law [6] on this issue in Hooper Associates, Ltd. v. AGS Computers, Inc., 74 N.Y.2d 487, 548 N.E.2d 903, 549 N.Y.S.2d 365 (1989); see also Oscar Gruss & Son, Inc. v. Hollander, 337 F.3d 186, 199 (2d Cir. 2003) (stating that courts "should not infer a party's intention to provide counsel fees as damages for a breach of contract 'unless the intention to do so is unmistakably clear' from the language of the contract") (quoting Hooper) There, the court rejected a claim for attorneys' fees [**\*13**] based on an indemnification provision, reasoning that "when a party is under no legal duty to indemnify, a contract assuming that obligation must be strictly construed to avoid reading into it a duty which the parties did not intend to be assumed....The promise should not be found unless it can be clearly implied from the language." Id. at 491. In Hooper, the court noted that the indemnification clause included language concerning notice and the assumption of defenses, finding that such language "unmistakably relate[s] to third party claims"; in addition, the court further noted that the indemnification provision referred to claims typically made by third parties. Id. at 491-493. See also Bridgestone/Firestone, Inc. v. Recovery Credit Services, Inc., 98 F.3d 13, 20-21 (2d Cir. 1996) (applying New York law and holding that the language of an indemnity clause was clearly read as applying to third-party claims and was therefore not applicable to disputes between the parties to the contract); Canpartners Investments IV, LLC v. Alliance Gaming Corp., 981 F. Supp. 820 (S.D.N.Y. 1997) (following Hooper rationale to reject claim for attorneys' fees because language was not "unmistakably clear"). [**\*14**] [7]

#### FOOTNOTES

6 New York substantive law governs Plaintiffs' claim to attorneys fees under the contract. Banker v. Nationwide Mut. Fire Ins. Co., 977 F.2d 47, 53 (2d Cir. 1994) (stating that in a diversity action, "[s]tate law creates the substantive right to attorneys' fees").

7 For an example of contractual language that was "unmistakably clear" in providing for recovery of attorneys' fees in a dispute between the parties, see Bristol Inv. Fund, Inc. v. Carnegie Intern. Corp., 302 F. Supp. 2d 177 (S.D.N.Y. 2003). There, the court awarded attorneys' fees, noting the contracts broad language: "Paragraph 8(a) of the Securities Purchase Agreement and paragraph 11(d) of the Registration Rights Agreement both state: 'The party which does not prevail in any dispute arising under this agreement shall be responsible for all fees and expenses, including attorneys' fees, incurred by the prevailing party in connection with such dispute.'" Id. at 178. Additionally, the court noted that other provisions of the contract expressly provided for attorneys fees to be paid in disputes between the parties: "Paragraph 4.5 of the Debenture states: 'If default is made in the payment of this Debenture, the Borrower shall **[*15]** pay the Holder hereof cost of collection, including reasonable attorneys' fees.'" Id.

Similarly, P 13.3 contains language providing that the indemnitee must be given "Notice and an opportunity to defend the claim." 8 Furthermore, looking beyond P 13.3 to other provisions contained in the contract, there is further evidence that the indemnifications provision applies to third-party claims and not disputes between the parties themselves. Most significant in this regard is P 13.1, which provides that "Seller may enforce the indemnity in P 13.3 as to brokerage commissions." In other words, as in Hooper, the language at issue here is not so "unmistakably clear" as to evidence an intent that it apply to disputes between the parties; rather, it is clear that P 13.3 applies to third-party disputes, perhaps the most easily-imagined of which is when a broker seeks to recover a lost commision when one of the parties defaults on a purchase contract. Plaintiffs' motion for an award of attorneys' fees is denied.

**FOOTNOTES**

8 As the court observed in Hooper: "the requirement of notice and assumption of the defense has no logical application to a suit between the parties." 74 N.Y.2d at 493.

**III. CONCLUSION**

For the **[*16]** foregoing reasons, Defendants' motion for judgment as a matter of law or, in the alternative, for a new trial is DENIED. Plaintiffs' motion for pre- and post-judgment interest is GRANTED. Plaintiffs' motion for attorneys' fees is DENIED.

The Clerk is instructed to close this motion and remove it from the docket.

**IT IS SO ORDERED.**

**New York, New York**

**December 12, 2007**

s/ Harold Baer, Jr.

**U.S.D.J.**

Source: Legal > Cases - U.S. > District & State Courts - By State > NY Federal District & State Courts, Combined
Terms: credibility /20 "felony conviction" (Edit Search | Suggest Terms for My Search)
View: Full
Date/Time: Monday, March 24, 2008 - 4:25 PM EDT

My Lexis™ | Search | Research Tasks | Get a Document | Shepard's® | Alerts | Total Litigator | Transactional Advisor | Counsel Selector
History | Delivery Manager | Dossier | Switch Client | Preferences | Sign Off | Help

LexisNexis® About LexisNexis | Terms & Conditions | Contact Us
Copyright © 2008 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

# EXHIBIT 5

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

UNITED STATES OF AMERICA,        )
                                 )
                Plaintiff,       )
        v.                       )        No. 1:06-cr-00076
                                 )
CHIAN SPIRIT MARITIME            )
ENTERPRISES, INC., and VENETICO  )
MARINE S/A,                      )
                                 )
                                 )
                Defendants.      )

## JOINT STATEMENT OF FACTS

The United States of America, by and through the Environmental Crimes Section of the United States Department of Justice, the Office of the United States Attorney for the District of Delaware, and the Defendants, CHIAN SPIRIT MARITIME ENTERPRISES, INC., (hereinafter "CHIAN SPIRIT") and VENETICO MARINE, S/A, (hereinafter "VENETICO") agree and stipulate that this Joint Factual Statement is a true and accurate statement of the Defendants' criminal conduct and that it provides a sufficient basis for the Defendants' pleas of guilty to Count Two of the pending Indictment in this case. At all times relevant to the Indictment:

1. The *M/V Irene E.M.* (hereinafter "*Irene*"), a 23,947 gross ton vessel, registered under the flag administration of St. Vincent and the Grenadines, was operated by CHIAN SPIRIT and was owned by VENETICO. The *Irene* was engaged in international commercial maritime operations and transported bulk products from and to various ports in the United States of America and elsewhere.

2. CHIAN SPIRIT was a private limited company incorporated under the laws of the Republic of Liberia; the company was engaged in the business of technical and commercial management of bulk carrier vessels, including the *Irene*, which were engaged in international commerce; the operating address of the company was 10 Ambaticlou Ant. Street, 18536, Piraeus, Greece. VENETICO was a private limited company incorporated under the laws of the Republic of Liberia; the operating address of the company was 10 Ambaticlou Ant. Street, 18536, Piraeus, Greece.

3. Defendants, CHIAN SPIRIT and VENETICO, by and through their employees and agents, including the senior engineers and other crew members on board the *Irene*, acting on behalf of and for the benefit of the Defendants, were responsible for the operation and supervision of the Engine Department on board the *Irene*, including the management, treatment, storage and disposal of oil residue, oily mixtures and machinery space bilge water.

4. The Chief Engineer on board the *Irene*, with the assistance of other crew members, was also responsible for the maintenance, operation, and documentation of the vessel's pollution prevention equipment, including the vessel's Oily Water Separator (hereinafter "OWS").

5. The Chief Engineer on board the *Irene* was also responsible for recording the movement, discharge, and disposal of oil residue, oily mixtures and machinery space bilge water, including any non-accidental overboard discharges of oily waste in the vessel's machinery space Oil Record Book (hereinafter "ORB").

6. CHIAN SPIRIT was responsible for the implementation and certification of the International Safety Management Code within the company's shore-side management

2

operations and on board the vessels it operated to ensure that company policies and procedures were designed to ensure compliance with international safety and environmental requirements.

7.    The United States is party to an international treaty, the International Convention for the Prevention of Pollution from Ships (hereinafter "MARPOL"). MARPOL was implemented in the United States by the Act to Prevent Pollution from Ships (APPS), 33 U.S.C. §§ 1901 et seq. APPS regulations require that each vessel of more than 400 gross tons, such as the *Irene*, maintain an ORB. The ORB must fully reflect transfers of oil, the disposal of sludge and waste oil, discharges of water from slop tanks, and overboard discharges of bilge water that have accumulated in machinery spaces, and thus are contaminated with oil. MARPOL, Annex I Regulation 20 and 33 CFR § 151.25(h). The United States Coast Guard routinely inspects ORBs on board vessels to determine whether the vessel has been discharging any oil or oily mixtures in violation of MARPOL and APPS. 33 C.F.R. § 151.23. The ORB must be maintained on board the vessel for three (3) years and be readily available for inspection at all reasonable times. MARPOL, Annex I, Regulation 20.

8.    From at least June through November 2005, the Chief Engineer on board the *Irene* knew that the Oil Content Monitor (hereinafter "OCM") associated with the vessel's OWS did not function properly. During this time period, engineering officers on board the *Irene* directed other crew members to pump oily waste overboard and into the ocean. This was accomplished with the use of a by-pass pipe that was fabricated and installed at the direction of the senior engineers on board the *Irene*. On multiple occasions, at the direction of senior engineers on board the *Irene*, crew members

3

discharged oil residue, sludge, oily wastes, and machinery space bilge water directly into the ocean, using the by-pass pipe.

9.   From at least June through November 2005, the Chief Engineer on board the *Irene* knowingly failed to make several required entries in the vessel's ORB, including: the fact that the vessel's OCM was not functioning properly; and the fact that oil residue, sludge, oily wastes, and machinery space bilge water were, on multiple occasions, discharged through the by-pass pipe directly into the ocean, circumventing the pollution prevention equipment required by MARPOL. During this time period, the Chief Engineer knowingly also made false entries in the vessel's ORB, representing that discharges were made from the vessel through the OCM.

10.  On or about December 5, 2005, the United States Coast Guard conducted a Port State Control boarding and inspection of the *Irene* while the vessel was at anchor within the Big Stone Anchorage located in the Delaware Bay within the waters of the State of Delaware and within the District of Delaware.

11.  On or about December 5, 2005, during the course of the Port State Control boarding, the Chief Engineer on board the *Irene* knowingly caused the vessel's inaccurate ORB to be presented to representatives of the United States Coast Guard.

4

SUE ELLEN WOOLDRIDGE
Assistant Attorney General

George M. Chalos, *Esq. of Chalos, O'Connor, Duffy, LLP*
As Authorized Corporate Representative for
Chian Spirit Maritime Enterprises, Inc.

George M. Chalos, Esq. of Chalos, O'Connor, Duffy, LLP
As Corporate Representative for
Venetico Marine, S.A.

George M. Chalos, Esq. of Chalos, O'Connor, Duffy, LLP
Attorney for the Defendants

By: Jeffrey C. Phillips
Trial Attorney
Environmental Crimes Section
U.S. Department of Justice

By: Gregory F. Linsin
Special Litigation Counsel
Environmental Crimes Section
U.S. Department of Justice

COLM F. CONNOLLY
United States Attorney
District of Delaware

1-18-07

By: Edmond Falgowski
Assistant United States Attorney
District of Delaware

Dated:

5

# EXHIBIT 6

AO 245E    (Rev. 12/03) Judgment in a Criminal Case for Organizational Defendants
Sheet 1

# UNITED STATES DISTRICT COURT
## District of Delaware

UNITED STATES OF AMERICA
V.

CHIAN SPIRIT MARITIME ENTERPRISES, INC.

JUDGMENT IN A CRIMINAL CASE
(For Organizational Defendants)

CASE NUMBER: 06-CR-76-01 GMS

George Chalos, Esq.
Defendant Organization's Attorney

## THE DEFENDANT ORGANIZATION:

☒ pleaded guilty to count(s)  II of the Indictment

☐ pleaded nolo contendere to count(s) _____
which was accepted by the court.

☐ was found guilty on count(s) _____
after a plea of not guilty.

The organizational defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 33 USC Sec 1908(a), 18 USC Sec 2, and 33 C.F.R. Sec 151.25 | Failure to Maintain an Oil Record Book | 7/13/2006 | II |
| | | | |
| | | | |

The defendant organization is sentenced as provided in pages 2 through __5__ of this judgment.

☐ The defendant organization has been found not guilty on count(s) _____

☐ Count(s) _____ ☐ is ☐ are dismissed on the motion of the United States.

It is ordered that the defendant organization must notify the United States attorney for this district within 30 days of any change of name, principal business address, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant organization must notify the court and United States attorney of material changes in economic circumstances.

Defendant Organization's
Federal Employer I.D. No.:  none

Defendant Organization's Principal Business Address:

N/A
_____
_____
_____
_____
_____

Defendant Organization's Mailing Address:

N/A
_____
_____
_____
_____

1/29/2007
Date of Imposition of Judgment

Signature of Judge

Gregory M. Sleet, United States District Judge
Name and Title of Judge

2/9/2007
Date

FILED

FEB  9 2007

U.S. DISTRICT COURT
DISTRICT OF DELAWARE

AO 245E    (Rev. 12/03) Judgment in a Criminal Case for Organizational Defendants
            Sheet 2 Probation

Judgment Page  2  of  5

**DEFENDANT ORGANIZATION:** CHUAN SPIRIT MARITIME ENTERPRISES, INC.
**CASE NUMBER:** 06-CR-76-01 GMS

## PROBATION

The defendant organization is hereby sentenced to probation for a term of :
3 YEARS

The defendant organization shall not commit another federal, state or local crime.

While on probation, the defendant shall not commit another Federal, State, or local crime, shall comply with the standard conditions that have been adopted by the court, and shall comply with the additional condition listed on page 3 of this Judgment Order.

If this judgment imposes a fine or a restitution obligation, it is a condition of probation that the defendant organization pay in accordance with the Schedule of Payments sheet of this judgment.

The defendant organization must comply with the standard conditions that have been adopted by this court as well as with any additional conditions on the attached page (if indicated below).

## STANDARD CONDITIONS OF SUPERVISION

1) within thirty days from the date of this judgment, the defendant organization shall designate an official of the organization to act as the organization's representative and to be the primary contact with the probation officer;

2) the defendant organization shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

3) the defendant organization shall notify the probation officer ten days prior to any change in principal business or mailing address;

4) the defendant organization shall permit a probation officer to visit the organization at any of its operating business sites;

5) the defendant organization shall notify the probation officer within seventy-two hours of any criminal prosecution, major civil litigation, or administrative proceeding against the organization;

6) the defendant organization shall not dissolve, change its name, or change the name under which it does business unless this judgment and all criminal monetary penalties imposed by this court are either fully satisfied or are equally enforceable against the defendant's successors or assignees; and

7) the defendant organization shall not waste, nor without permission of the probation officer, sell, assign, or transfer its assets.

AO 245E    (Rev. 12/03) Judgment in a Criminal Case for Organizational Defendants
Sheet 2C Probation

DEFENDANT ORGANIZATION: CHIAN SPIRIT MARITIME ENTERPRISES, INC.
CASE NUMBER: 06-CR-76-01 GMS

Judgment Page 3 of 5

## ADDITIONAL STANDARD CONDITIONS OF SUPERVISION

1. The defendant shall implement an Environmental Compliance Plan ("ECP"), as described in Attachment A to the Plea Agreement. The defendant may, after 30 months, move for early termination of probation at the court's discretion and consistent with 18 U.S.C. Sec 3564.

It is further ordered that:

The defendant shall also complete a community service project in the amount of $250,000, outlined in the plea agreement and payable to the National Fish and Wildlife Foundation, Special Funds Program Management and Fiduciary Services for Settlement Accounts.

AO 245E    (Rev. 12/03) Judgment in a Criminal Case for Organizational Defendants
Sheet 3 Criminal Monetary Penalties

Judgment Page  4    of  5

DEFENDANT ORGANIZATION: CHIAN SPIRIT MARITIME ENTERPRISES, INC.
CASE NUMBER: 06-CR-76-01 GMS

## CRIMINAL MONETARY PENALTIES

The defendant organization must pay the following total criminal monetary penalties under the schedule of payments on Sheet 4.

|  | Assessment | Fine | Restitution |
|---|---|---|---|
| TOTALS | $ 400.00 | $ 500,000.00 | $ N/A |

☐ The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case* (AO 245C) will be entered after such determination.

☐ The defendant organization shall make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant organization makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss* | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| | | | |

| TOTALS | $ 400.00 | $ 500,000.00 | |

☐ Restitution amount ordered pursuant to plea agreement $ N/A

☒ The defendant organization shall pay interest on restitution or a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 4 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant organization does not have the ability to pay interest, and it is ordered that:

☐ the interest requirement is waived for    ☐ fine   ☐ restitution.

☐ the interest requirement for the   ☐ fine   ☐ restitution is modified as follows:

* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245E    (Rev. 12/03) Judgment in a Criminal Case for Organizational Defendants
Sheet 4 Schedule of Payments

Judgment Page  5  of  5

DEFENDANT ORGANIZATION: CHHAN SPIRIT MARITIME ENTERPRISES, INC.
CASE NUMBER: 06-CR-76-01 GMS

## SCHEDULE OF PAYMENTS

Having assessed the organization's ability to pay, payment of the total criminal monetary penalties are due as follows:

A   ☒  Lump sum payment of $ 400.00 _____ due immediately, balance due

     ☐  not later than _____ , or
     ☒  in accordance with  ☐ C or  ☒ D below; or

B   ☐  Payment to begin immediately (may be combined with  ☐ C or  ☐ D below); or

C   ☐  Payment in _____ (e.g., equal, weekly, monthly, quarterly) installments of $_____ over a period of
     _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

D   ☒  Special instructions regarding the payment of criminal monetary penalties:

THE DEFENDANT SHALL ALSO COMPLETE A COMMUNITY SERVICE PROJECT IN THE AMOUNT OF $250,000
(WITH VENETICO MARINE, CASE NO. 06-76-02) OUTLINED IN THE PLEA AGREEMENT AND PAYABLE TO THE
NATIONAL FISH AND WILDLIFE FOUNDATION, SPECIAL FUNDS PROGRAM MANAGEMENT AND FIDUCIARY
SERVICES FOR SETTLEMENT ACCOUNTS.

All criminal monetary penalties are made to the clerk of the court.

The defendant organization shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐   Joint and Several

Defendant and Co-Defendant Names and Case Numbers (including defendant number), Total Amount, Joint and Several Amount,
and corresponding payee, if appropriate.

☐   The defendant organization shall pay the cost of prosecution.

☐   The defendant organization shall pay the following court cost(s):

☐   The defendant organization shall forfeit the defendant organization's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal,
(5) fine interest, (6) community restitution, (7) penalties, and (8) costs, including cost of prosecution and court costs.

# EXHIBIT 7

Robert Damasing

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

— — —

UNITED STATE OF AMERICA,                :
                                        : No.
        Plaintiff,                      : 1:06-CR-00076-GMS-2
                                        :
            vs.                         :
                                        :
CHIAN SPIRIT MARITIME                   :
ENTERPRISES, INC., VENETICO             :
MARINE S.A., IRENE E/M,                 :
EVANGELOS MADIAS, CHRISTOS              :
PAGONES, ADRIEN DRAGOMIR,               :
                                        :
        Defendants.                     :

— — —

        Videotaped deposition of ROBERTO
DAMASING, Volume I, taken pursuant to notice before
Gail Inghram Verbano, CSR, RMR, in the offices of
United States Department of Justice, 700 Nemours
Building, 1007 Orange Street, Wilmington, Delaware,
on Monday, July 17, 2006, beginning at approximately
5:10 p.m.

— — —

CORBETT & WILCOX
Registered Professional Reporters
1400 French Street      Wilmington, DE 19801
(302) 571-0510
www.corbettreporting.com

Robert Damasing

2 (Pages 2 to 5)

Page 2

1   APPEARANCES:
2       MARK W. KOTILA, ESQ.
        JEFFREY L. PHILLIPS, ESQ.
3       United States Department of Justice
        Environmental Crimes Section
4       P.O. Box 23985 - L'Enfant Plaza
        Washington, DC 20026-3985.
5       Attorneys for Plaintiff
6       GEORGE M. CHALOS, ESQ.
        FOWLER, RODRIGUEZ & CHALOS
7       366 Main Street
        Port Washington, NY 11050
8       Attorney for Defendants Chian Spirit
        and Venetico Marine
9
        CARL R. WOODWARD, III, ESQ.
10      CARELLA, BYRNE, BAIN, GILFILLAN,
        CECCHI, STEWART & OLSTEIN
11      5 Becker Farm Road
        Roseland, NJ 07068-1739
12      Attorney for Defendant Dragomir
13
     ALSO PRESENT:
14
        Chris Weiss, Videographer
15      Chris Masaoay, Tagalog Interpreter
16      Adrien Dragomir
        Liviu-Lon Roth
17      Brent McKnight
        Jason F. Burgess
18
19        - - -
20
21
22
23
24

Page 3

1         THE VIDEOGRAPHER: This is Chris
2   Weiss, the videographer, and the court reporter today
3   is Gail Verbano. We are both here from the firm of
4   Corbett & Wilcox located at 230 North Market Street,
5   Wilmington, Delaware.
6         The time is 5:10 p.m. on Monday,
7   July 17, 2006. We are documenting the videotaped
8   deposition of Roberto Damasing for the plaintiff in
9   the matter of United States of America versus Chian
10  Spirit Maritime Enterprises, Inc., Venetico Marine,
11  Irene E.M., Evangelos Macias, Christos Pagones,
12  Adrien Dragomir in the United States District Court,
13  District of Delaware.
14        We are at the location of the
15  United States Attorney's office, Nemours Building,
16  1007 North Orange Street, Suite 700, Wilmington,
17  Delaware.
18        Will the attorneys please state
19  their appearance for the record.
20        MR. PHILLIPS: Jeff Phillips,
21  United States District of Delaware, Environmental
22  Crimes Section.
23        MR. KOTILA: Mark Kotila,
24  Department of Justice.

Page 4

1         MR. CHALOS: George Chalos on
2   behalf of Venetico and Chian Spirit.
3         MR. WOODWARD: Carl Woodward on
4   behalf of the defendant, Adrien Dragomir.
5         MR. TWERSKY: Michael Twersky on
6   behalf of the witness.
7         THE VIDEOGRAPHER: Will the court
8   reporter please administer the oath.
9         THE WITNESS: Yes.
10        (CHRIS MASAOAY was previously sworn
11  in as Tagalog-English interpreter.)
12
13        ROBERTO DAMASING, having first been
14  duly sworn through the interpreter according to law,
15  was examined and testified as follows:
16  BY MR. PHILLIPS:
17    Q   Mr. Damasing, good afternoon. I'm
18  Jeffrey Phillips. We've met before, have we not?
19    A   Yes, sir.
20    Q   And you've also testified before about
21  this matter, correct?
22    A   Yes, sir.
23    Q   Mr. Damasing, where are you from
24  originally?

Page 5

1     A   From the Philippines.
2     Q   Can you give the court your home address?
3     A   442 Santos Street, Santa Mesa, Manila.
4     Q   And how old are you?
5     A   I'm becoming 33.
6     Q   And what is your occupation?
7     A   Oiler/seaman.
8     Q   And for whom do you work now?
9     A   I work in a ship.
10    Q   What's the name of the ship?
11    A   Irene E.M.
12    Q   How long have you worked on that ship?
13    A   19 months.
14    Q   How long — how many of those 19 months
15  were at sea?
16    A   12 months.
17    Q   Where was the Irene when you first
18  boarded?
19    A   In China.
20    Q   How many prior ships have you worked on
21  before the Irene?
22    A   Five ships.
23    Q   And on the Irene, what was your duty?
24    A   As an oiler.

Robert Damasing

3 (Pages 6 to 9)

Page 6

1    Q    What does an oiler do?
2    A    We put the oil in the — oil sometime.
3    We also put the water in the water tanks. And we
4    also do a watch in the engine room.
5    Q    Do you work with any other pieces of
6    machinery?
7    A    Yes.
8    Q    On the Irene, what other machinery did
9    you work on?
10    A    The main engine, generator engine,
11    auxiliary machineries.
12    Q    Did you ever have an opportunity to
13    observe or work with oily waste on the Irene?
14    A    Yes.
15    Q    Could you describe what you did.
16    A    Before we arrived here in the United
17    States -- sorry — we did a cleaning of the oily
18    water separator.
19    Q    Can you describe that?
20    A    We opened the oil separator itself. We
21    cleaned the inside, the oil that was inside.
22    Q    During the 12 months that you were at sea
23    on the Irene, did the oily water separator work?
24    MR. CHALOS: Objection.

Page 7

1    THE WITNESS: No.
2    BY MR. PHILLIPS:
3    Q    Can you describe the oily waste that you
4    observed on the Irene. What did it look like?
5    A    It's black in color and it's very thick.
6    Q    Were you on board the Irene when — can
7    you describe where the Irene went after China.
8    A    To Thailand.
9    Q    And then where?
10    A    In Africa.
11    Q    And then where?
12    A    Argentina.
13    Q    Did the Irene ever go to Poland?
14    A    After Argentina, to Poland.
15    Q    And did you observe oily waste being
16    handled in Poland?
17    A    Yes.
18    Q    What did you observe?
19    A    We transferred into the port facilities.
20    Q    What did you transfer into the port
21    facilities?
22    A    The first thing that we were ordered to
23    do, the oil sludge.
24    Q    Did you ever discharge oily sludge into a

Page 8

1    port facility after Poland?
2    A    No more.
3    Q    Do you remember about what month and what
4    year that was in Poland?
5    A    In the month of May in 2005.
6    Q    After that, how was oily waste handled on
7    the Irene?
8    MR. CHALOS: Objection.
9    BY MR. PHILLIPS:
10    Q    You can answer.
11    A    Directly overboard.
12    Q    And did you have an opportunity to
13    observe this?
14    A    Yes.
15    Q    Describe it.
16    A    First —
17    MR. WOODWARD: Objection as to
18    time.
19    THE WITNESS: — we would attach —
20    BY MR. PHILLIPS:
21    Q    Go ahead.
22    A    — we would attach the magic pipe that we
23    had made. And then we would run the pumps, which
24    does the suction, either the bilge oil tank or the

Page 9

1    bilge water tank.
2    Q    When you did this, who ordered you to do
3    it, if anybody?
4    A    Normally the person that is on duty, the
5    particular officer that is on duty during our shift.
6    Q    Do you remember the name of the officers
7    that would order it?
8    A    On my particular duty, it's the second
9    engineer, Edgar Villano.
10    Q    And after Poland, could you describe the
11    journeys of the Irene. Which ports did it go to?
12    A    I don't remember anymore.
13    Q    Do you remember when you arrived at
14    the — to the United States, here?
15    A    It was on November 4th.
16    Q    To the United States?
17    A    Yes.
18    Q    Do you remember where you were before the
19    United States?
20    A    Brazil.
21    Q    Did you observe overboard discharges
22    between Brazil and the United States?
23    A    Yes.
24    Q    How many?

Robert Damasing

4 (Pages 10 to 13)

Page 10

1    A    I don't remember anymore.
2    Q    Was it more than one?
3    A    Yes.
4    Q    Was it more than five?
5    A    I'm not sure.
6    Q    How did the overboard discharges take
7  place from Brazil to the United States?
8    A    Direct overboard using the magic pipe.
9    Q    Who ordered the overboard discharges?
10         MR. CHALOS: Objection. Objection.
11  You're asking him --
12         MR. PHILLIPS: I'll rephrase the
13  question.
14  BY MR. PHILLIPS:
15    Q    Did you observe anybody ordering
16  overboard discharges?
17    A    From my side, it's the second officer.
18    Q    And who tells you?
19    A    The second engineer.
20         MR. CHALOS: Hold on a second,
21  Jeff. I can leave it for cross, but he said "second
22  officer." You want to qualify as second engineer
23  or --
24  BY MR. PHILLIPS:

Page 11

1    Q    When you say "second officer," do you
2  mean second officer for second engineer?
3    A    Yes, second engineer, Edgar Villano.
4    Q    Do you remember whether or not you talked
5  to any other engineers?
6    A    No more.
7    Q    Do you remember, or you did not talk to
8  other engineers?
9    A    I don't remember.
10    Q    Do you remember talking to me up in
11  Philadelphia?
12    A    Where in Philadelphia?
13    Q    At Mr. Twersky's office.
14    A    Yes.
15         MR. PHILLIPS: I'd like the
16  interpreter to read this first bullet to you.
17         THE INTERPRETER: The highlighted
18  one?
19         MR. WOODWARD: I'm going to object.
20         MR. PHILLIPS: The first bullet.
21         MR. WOODWARD: Could we see what
22  the document is?
23         MR. PHILLIPS: The first and second
24  bullet down.

Page 12

1         MR. CHALOS: Wait a minute.
2         MR. WOODWARD: Wait, wait. Just so
3  we understand what the procedure is.
4         MR. PHILLIPS: He said he did not
5  remember whether he talked to other engineers.
6         MR. WOODWARD: Yeah, but showing
7  him a document that you wrote, apparently, is not the
8  way to refresh his recollection. It's totally
9  improper.
10         MR. CHALOS: I join in that
11  objection.
12  BY MR. PHILLIPS:
13    Q    Mr. Damasing, do you remember talking to
14  me -- do you recall talking to me in Philadelphia,
15  Mr. Twersky's office?
16    A    Yes, sir.
17    Q    Do you remember me asking you about your
18  trip from Brazil to the United States?
19    A    Okay.
20    Q    And do you remember me asking you about
21  the chief engineer?
22    A    Yes.
23    Q    Does that help refresh your recollection
24  about who you talked to on the trip from Brazil to

Page 13

1  the United States?
2         MR. CHALOS: Objection; leading.
3         MR. WOODWARD: Objection; leading.
4         THE WITNESS: Okay.
5  BY MR. PHILLIPS:
6    Q    Now, I'll ask you again: Did you talk to
7  any other engineers besides the second engineer about
8  overboard discharges?
9    A    Yes.
10         MR. CHALOS: Objection; leading.
11  BY MR. PHILLIPS:
12    Q    Who?
13    A    Chief engineer.
14    Q    And what did he say?
15    A    It just so happened that we met each
16  other in the stairway by the engine room, and he told
17  me to pump out bilge water overboard.
18    Q    When the overboard discharges took place,
19  what time did they take place?
20    A    Normally it's during the time that it's
21  dark.
22    Q    Why?
23         MR. CHALOS: Objection.
24  BY MR. PHILLIPS:

Robert Damasing

5 (Pages 14 to 15)

Page 14

1    Q   Why when it was only dark?
2           MR. CHALOS: Objection.
3           THE WITNESS: So that the other
4    ships or the airplanes that are passing by could not
5    see it.
6           MR. PHILLIPS: All right
7    Mr. Damasing, we're going to stop today, and we'll
8    start again tomorrow.
9           THE WITNESS: Okay. Yes.
10          MR. PHILLIPS: Is everybody okay
11   with that?
12          MR. CHALOS: That's fine.
13          MR. PHILLIPS: Off the record.
14          THE VIDEOGRAPHER: Off the record
15   5:27.
16          (Signature having been waived, the
17          deposition of ROBERTO DAMASING was
18          adjourned at 5:27 p.m.)
19
20
21
22
23
24

Page 15

1    CERTIFICATE OF SHORTHAND REPORTER
2
3           I, Gail Inghram Verbano, CSR, RMR,
4    the officer before whom the foregoing proceedings
5    were taken, do hereby certify that the foregoing
6    transcript is a true and correct record of the
7    proceedings; that said proceedings were taken by me
8    stenographically and thereafter reduced to
9    typewriting under my supervision; and that I am
10   neither counsel for, related to, nor employed by any
11   of the parties to this case and have no interest,
12   financial or otherwise, in its outcome.
13
14
15
16
     _____
     Gail Inghram Verbano, CSR, RMR
17   CSR No. 8635
     Certification No.: 220
18   (Expires 1-31-2008)
19
20
21
22
23
24

Corbett & Wilcox

Roberto Damasing

Page 16

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

UNITED STATE OF AMERICA,          :
                                  : No.
          Plaintiff,              : 1:06-CR-00076-GMS-2
                                  :
          vs.                     :
                                  :
CHIAN SPIRIT MARITIME             :
ENTERPRISES, INC., VENETICO       :
MARINE S.A., IRENE E/M,           :
EVANGELOS MADIAS, CHRISTOS        :
PAGONES, ADRIEN DRAGOMIR,         :
                                  :
          Defendants.             :

                    Videotaped deposition of ROBERT
DAMASING, VOLUME 2, taken pursuant to notice before
Gail Inghram Verbano, CSR, RMR, in the offices of
United States Department of Justice, 700 Nemours
Building, 1007 Orange Street, Wilmington, Delaware,
on Tuesday, July 18, 2006, beginning at approximately
10:03 a.m.

                    CORBETT & WILCOX
              Registered Professional Reporters
        1400 French Street      Wilmington, DE 19801
                    (302) 571-0510
                  www.corbettreporting.com

Roberto Damasing

2  (Pages 17 to 20)

Page 17

APPEARANCES:
    MARK W. KOTILA, ESQ.
    JEFFREY L. PHILLIPS, ESQ.
    United States Department of Justice
    Environmental Crimes Section
    P.O. Box 23985 - L'Enfant Plaza
    Washington, DC 20026-3985
    Attorneys for Plaintiff
    GEORGE M. CHALOS, ESQ.
    FOWLER, RODRIGUEZ & CHALOS
    366 Main Street
    Port Washington, NY 11050
    Attorney for Defendants Chian Spirit
    and Venetico Marine

    CARL R. WOODWARD, III, ESQ.
    CARELLA, BYRNE, BAIN, GILFILLAN,
    CECCHI, STEWART & OLSTEIN
    5 Becker Farm Road
    Roseland, NJ 07068-1739
    Attorney for Defendant Dragomir
ALSO PRESENT:
    Chris Weiss, Videographer
    Chris Masonay, Tagalog Interpreter

    Adrien Dragomir
    Livia-Lee Roth
    Brent McKnight
    Jason F. Burgess

Page 18

1    THE VIDEOGRAPHER: This is Chris
2  Weiss, the videographer. The court reporter today is
3  Gail Verbano. We are here both from the firm of
4  Corbett & Associates, located at 230 North Market
5  Street, Wilmington, Delaware.
6        The time is 10:03 a.m. on Tuesday,
7  July 18th, 2006. We are documenting the videotaped
8  deposition of Robert Damasing for the plaintiff in
9  the matter of United States of America versus Chian
10  Spirit, Maritime Enterprises, Inc., Venetico Marine,
11  Irene E.M., Evangelos Madias, Christos Pagones,
12  Adrien Dragomir, in the United States District Court,
13  District of Delaware.
14        We are at the location of the
15  United States Attorney's office, Nemours Building,
16  1007 North Orange Street, Suite 700, Wilmington,
17  Delaware.
18        Will the attorneys please state
19  their appearance for the record.
20        MR. PHILLIPS: Jeffrey Phillips for
21  the United States.
22        MR. CHALOS: George Chalos for
23  Venetico Marine and Chian Spirit.
24        MR. WOODWARD: Carl Woodward for

Page 19

1  Adrien Dragomir.
2        MR. TWERSKY: Michael Twersky for
3  the witness.
4        THE VIDEOGRAPHER: And it's all
5  yours.
6        REDIRECT-EXAMINATION (Continued)
7  BY MR. PHILLIPS:
8    Q  Okay. Roberto, good morning.
9    A  Good morning, sir.
10    Q  We're going to continue the conversation
11  we were having yesterday.
12        Do you recall yesterday when we
13  were talking about conversations you had with
14  engineers. What were the names of the engineers on
15  the Irene with whom you worked?
16        MR. CHALOS: Objection. At what
17  point in time?
18        THE WITNESS: Second engineer Edgar
19  Villano; third engineer Pascual Conge; and fourth
20  engineer Bryan Espina; and chief engineer Adrien
21  Dragomir.
22  BY MR. PHILLIPS:
23    Q  And to be clear for the record, yesterday
24  when I asked you about conversations you had with the

Page 20

1  engineers, did you assume I was asking about the
2  other engineers that you worked with, to include the
3  chief engineer or only the lower-level engineers?
4        MR. CHALOS: Objection.
5        MR. WOODWARD: Objection; leading.
6        THE WITNESS: Just the lower ones.
7  BY MR. PHILLIPS:
8    Q  Okay, thank you.
9        Now, going back to your
10  conversations with the chief engineer --
11    A  Yes, sir.
12        MR. WOODWARD: Objection. I'm
13  going to object, and let me put my objection on the
14  record. This man was on the ship, we know, for 13
15  months. And unless we are specific as to which chief
16  engineer you're referring to, I'm going to object.
17  BY MR. PHILLIPS:
18    Q  Who was the chief engineer with whom you
19  worked on your trip from Brazil to the United States?
20    A  Chief Engineer Dragomir, sir.
21        MR. TWERSKY: Can we go off the
22  record? Sorry.
23        MR. PHILLIPS: Sure.
24        THE VIDEOGRAPHER: Off the record

Roberto Damasing

3 (Pages 21 to 24)

**Page 21**

1  at 10:06.
2      (Discussion off the record.)
3          THE VIDEOGRAPHER: We are on the
4  record at 10:07.
5  BY MR. PHILLIPS:
6      Q   Roberto, do you see Chief Engineer
7  Dragomir in the room today?
8      A   Yes, sir.
9      Q   Could you point to him?
10     A   (Indicating.)
11         MR. PHILLIPS: For the record, he
12  pointed to Adrien Dragomir.
13  BY MR. PHILLIPS:
14     Q   Now, Roberto, I'll call your attention
15  over to that plastic bag, what has been previously
16  marked as Government Exhibit 2.
17         Do you recognize that?
18     A   Yes.
19     Q   What is it?
20     A   It's a plastic pipe.
21     Q   How do you — what is it, besides a
22  plastic pipe?
23         MR. CHALOS: Objection.
24         THE WITNESS: This is what we had

**Page 22**

1  used to pump out.
2  BY MR. PHILLIPS:
3      Q   And I'll also call your attention to that
4  plastic bag —
5          And Jason, if you could open that
6  plastic bag so he can actually see what's inside of
7  it.
8          — and what has been previously
9  marked as Government Exhibit 3.
10         Just show him what's inside of it.
11         Do you recognize Government
12  Exhibit 3?
13     A   Yes. Yes.
14     Q   What is it?
15     A   Fabricated flange.
16     Q   And how do you know what they are?
17     A   That's what we use.
18     Q   Used for what?
19     A   To pump out.
20     Q   Now, when is the last time you saw these
21  two things, the pipe and the metal flanges?
22     A   Our last voyage. Coming from Brazil,
23  going into the United States.
24     Q   Do you remember approximately what month

**Page 23**

1  of the year that was?
2      A   In November.
3      Q   Of what year?
4      A   In 2005.
5      Q   And can you describe what happened the
6  last time you saw those two things.
7          MR. CHALOS: Objection; no
8  foundation; leading.
9          THE WITNESS: It was attached to
10  the bilge pump and then overboard.
11  BY MR. PHILLIPS:
12     Q   What was overboard?
13     A   Excuse me?
14     Q   When you said "overboard" — explain what
15  you mean by "overboard."
16     A   Overboard means that there's another
17  valve; and so this is attached to it.
18     Q   And where does overboard go?
19     A   To the sea.
20     Q   Now, did you ever operate the equipment
21  attached to that?
22     A   Yes, I have.
23     Q   How many times?
24     A   Many times. Many times.

**Page 24**

1      Q   From Brazil to the United States, how
2  many times?
3      A   I don't remember anymore, but I had
4  started it.
5      Q   Describe how. First —
6          MR. WOODWARD: Objection. What's
7  "start" mean?
8          MR. PHILLIPS: That's what I'm
9  going to ask.
10  BY MR. PHILLIPS:
11     Q   When you say "start," describe how you
12  start it.
13         MR. CHALOS: Objection.
14         THE WITNESS: It's a normal
15  procedure. You open up the valves —
16  BY MR. PHILLIPS:
17     Q   Just one moment.
18         Do you — who decides to start it?
19         MR. CHALOS: Objection? How is he
20  going to know. The question has got to be whether he
21  decides or not.
22  BY MR. PHILLIPS:
23     Q   Do you decide to start it?
24     A   No.

Roberto Damasing

4 (Pages 25 to 28)

Page 25

1  Q  Who does?
2      MR. WOODWARD: Calls for
3  speculation.
4      THE WITNESS: The engineer that
5  works with me.
6  BY MR. PHILLIPS:
7  Q  How do you know?
8  A  He tells me.
9  Q  What's the name of the chief engineer
10 that told you?
11     MR. CHALOS: Objection.
12     MR. WOODWARD: No time.
13     MR. CHALOS: He didn't say "chief,"
14 he said "the engineer" I work with.
15     THE WITNESS: Adrien Dragomir.
16 BY MR. PHILLIPS:
17 Q  And when did he tell you to start the
18 pump?
19     MR. CHALOS: Objection; leading.
20     MR. WOODWARD: Same objection.
21     THE WITNESS: I don't remember the
22 time.
23 BY MR. PHILLIPS:
24 Q  Which voyage?

Page 26

1      MR. CHALOS: Objection.
2      THE WITNESS: Going towards here to
3  this United States.
4  BY MR. PHILLIPS:
5  Q  And what did Chief Engineer Dragomir say?
6  A  That we should pump out the bilge water.
7  Q  And so what did you do?
8  A  I didn't do anything. Because then I
9  waited -- I waited for the second engineer to give me
10 the instructions.
11 Q  And did he?
12 A  Yes.
13 Q  And then what did you do?
14 A  I attached the hose.
15 Q  What next?
16 A  That's it. Because then the next thing
17 that will happen is the next duty person, they would
18 be the one to pump out.
19     MR. CHALOS: Objection.
20 BY MR. PHILLIPS:
21 Q  Did you see this?
22 A  No.
23 Q  Going back to the last time you saw the
24 pipe and the flanges, when was that? Which voyage?

Page 27

1  A  Brazil to America.
2  Q  And where in that voyage? How long in
3  the voyage?
4  A  The last time that I saw it was about
5  four to three days before we arrived.
6  Q  And what happened?
7      MR. CHALOS: Objection.
8      THE WITNESS: It was still there
9  attached.
10 BY MR. PHILLIPS:
11 Q  Did you talk to the chief engineer about
12 it again?
13     MR. CHALOS: Objection.
14     MR. WOODWARD: Leading.
15     THE WITNESS: No.
16 BY MR. PHILLIPS:
17 Q  Did -- when you were coming to the United
18 States, the last time that you saw the pipe and the
19 flanges, did you do anything with them?
20 A  No.
21 Q  Roberto, do you remember testifying --
22     MR. CHALOS: Objection. He didn't
23 say he didn't remember.
24     MR. WOODWARD: He said no.

Page 28

1      MR. CHALOS: The answer was clear.
2  He doesn't need his recollection refreshed.
3  BY MR. PHILLIPS:
4  Q  Do you remember testifying in another
5  proceeding?
6      MR. CHALOS: Objection.
7      THE WITNESS: "Proceeding"?
8  BY MR. PHILLIPS:
9  Q  Do you remember talking to other
10 attorneys, including myself --
11 A  Yes.
12 Q  -- about what happened to those pipes and
13 those flanges when you approached the United States?
14     MR. CHALOS: Objection. This is
15 totally improper.
16     THE WITNESS: All right.
17 BY MR. PHILLIPS:
18 Q  Now, I'll ask you again: What was the
19 last thing you did with those pipes and flanges?
20     MR. CHALOS: Objection.
21     MR. WOODWARD: Asked and answered.
22     THE WITNESS: We took it off from
23 where it was attached. And then we were asked -- I
24 was asked to hide away the flange and the hose.

Roberto Damasing

5 (Pages 29 to 32)

Page 29

BY MR. PHILLIPS:

1  Q   Is that the last time you saw the pipes
2  and the hose?
3
4  A   Yes.
5  Q   Who asked you to hide away the flange and
6  the hose?.
7  A   There were three of us that particular
8  day: The second -- the second engineer, Edgar
9  Villano; Chief Engineer Dragomir; and myself.
10        The chief engineer was talking to
11 the second engineer and telling me that I should hide
12 away the flange outside the engine room, because he
13 had had an experience at a previous time that
14 somebody had gotten caught with a flange and so there
15 was a big problem.
16  Q   And so what did you do?
17  A   I hid it in the laundry room.
18      MR. WOODWARD:  Hid what?
19      THE WITNESS:  The flange.
20 BY MR. PHILLIPS:
21  Q   What about the pipes?
22  A   It was just hidden in the engine room.
23  Q   Where did you take them from?
24  A   From the engine room.

Page 30

1  Q   Did you ever talk to the chief engineer
2  again about the pipe and the flange?
3  A   No longer.
4  Q   And did you eventually arrive to the
5  United States?
6  A   Yes.
7  Q   Do you remember when?
8  A   I really didn't understand the question.
9  Could you repeat.
10  Q   The date, the month that you arrived to
11 the United States.
12  A   November 4.
13  Q   What year?
14  A   2005.
15  Q   And what happened when you arrived to the
16 United States?
17  A   When the Coast Guard boarded, it also so
18 happened that there was oil in the sea.
19      The A.B. who was on guard gave us
20 an alarm that there was oil in the sea. Somebody
21 came down into the engine room and told me that
22 there's an oil spill.
23      MR. CHALOS: I object to this,
24 because this has nothing to do with the charges that

Page 31

1  are before the Court. It is not responsive to the
2  question that's been posed. And anything that
3  Mr. Damasing is talking about now is wholly
4  irrelevant to the proceedings.
5      MR. PHILLIPS: Continue.
6      MR. WOODWARD: Join in the
7  objection.
8  BY MR. PHILLIPS:
9  Q   Just continue for me.
10  A   So the person that came down, from what I
11 can remember, Engineer -- I believe it was the second
12 engineer told me to open the overboard from the bilge
13 pump, that perhaps there were still some oil there
14 that were left over.
15      So what I did, I opened it so I let
16 the water go through it into the engine room so that
17 the inside could be cleaned. And then I returned it
18 back to where it was, yes. And then that's it.
19  Q   Which engineer came to speak to you?
20  A   The second engineer, Villano.
21  Q   Okay.  Did the Coast Guard eventually
22 come on board?
23  A   Yes.
24  Q   Then what happened?

Page 32

1  A   They looked at the source of where the
2  oil was from, and then we discovered that it was
3  coming from the lube oil cooler of the generator.
4  Q   Did you say anything else to the Coast
5  Guard?
6  A   At that time, no.
7  Q   Did you later?
8  A   Not yet.
9  Q   Did you ever write a statement?
10  A   Yes, we were asked to.
11  Q   And describe how you did that.
12  A   From what I can remember, I wrote down
13 that the oily water separator was not working.
14 That's it.
15  Q   And did anybody else come on board?
16  A   Yes.
17  Q   Who else came on board?
18  A   The superintendent.
19  Q   What was his name?
20  A   From what I can remember, it's Christos.
21  Q   And when you say "superintendent," do you
22 know where he was from?  Did he tell you?
23  A   He's a superintendent of the ship coming
24 from Greece.

Corbett & Wilcox

Roberto Damasing

6 (Pages 33 to 36)

Page 33

1  Q  Did anybody else come on board, that you
2  know of?
3         MR. CHALOS: Objection.
4         THE WITNESS: The owner.
5  BY MR. PHILLIPS:
6  Q  Do you know his name?
7  A  Madias and Irene.
8  Q  Did you talk to any of those individuals?
9  A  No, we just met.
10  Q  But after you met, did you talk to any of
11  them? Did you talk to Christos?
12  A  We were called by Christos.
13  Q  Where?
14  A  First in the mess hall. We were there
15  together with the other Filipinos, the second
16  engineer Edgar Villano, the third engineer Pascual;
17  Edgardo Paje. That's all I can remember.
18  Q  And what did Christos say?
19  A  He told us that we should change our
20  testimony because otherwise we would go to jail.
21  Q  And did you ever talk to Christos alone?
22         MR. CHALOS: Objection.
23         THE WITNESS: Yes, on the second
24  time that he called to me by the Coast Guard.

Page 34

1  BY MR. PHILLIPS:
2  Q  And when was that?
3  A  It was already in nighttime. I was
4  called by the Coast Guard in the mess hall. And in
5  that mess hall, Christos was there at the officers'
6  mess. He told me that I need to change my testimony.
7  Q  Did he say to what?
8  A  That I should say that I don't remember
9  that at that time that the oily water separator was
10  not working?
11  Q  Was not working or was working?
12         MR. CHALOS: Objection. The answer
13  is what he answered.
14         MR. PHILLIPS: I'm making sure
15  through the interpreter.
16         THE WITNESS: That I should change
17  my testimony to say that it was working.
18  BY MR. PHILLIPS:
19  Q  Now, Roberto, where was the ship located
20  when you talked to Christos that time?
21  A  I'm not exactly sure what part that was,
22  but it was already after the Coast Guard had caught
23  us.
24  Q  Okay. Going back to the pump-outs, how

Page 35

1  much bilge -- oily bilge was pumped out?
2         MR. WOODWARD: Objection to the
3  form of the question.
4         THE WITNESS: I don't know.
5  BY MR. PHILLIPS:
6  Q  Do you -- when you operated -- when did
7  you -- when did you operate the pump and the flanges
8  the pump that was connected to those flanges?
9  A  I don't remember anymore.
10  Q  Do you remember how long you operated
11  them?
12         MR. WOODWARD: Objection to the
13  form of the question.
14         THE WITNESS: The previous times,
15  more than four hours, five hours.
16         MR. WOODWARD: Continued objection
17  to the question and the answer.
18  BY MR. PHILLIPS:
19  Q  And where would you pump from?
20         MR. WOODWARD: Objection;
21  speculative.
22         MR. CHALOS: Objection.
23         THE WITNESS: Coming from the bilge
24  tank.

Page 36

1  BY MR. PHILLIPS:
2  Q  Do you know how big the bilge tank was?
3  A  I don't know what the capacity is, but I
4  know that it's a large one.
5  Q  Would you stop the pump?
6         MR. CHALOS: Objection.
7         MR. WOODWARD: Objection; same:
8  Form. Totally lacking temporal context.
9         THE WITNESS: I don't understand
10  that question.
11  BY MR. PHILLIPS:
12  Q  Would you -- you recall testifying about
13  pumping from the bilge tank?
14         MR. CHALOS: Objection.
15  BY MR. PHILLIPS:
16  Q  Who would start the pump?
17         MR. CHALOS: Objection.
18         THE WITNESS: Normally it would
19  have to be the oiler that would start, because
20  they're the ones that are being asked to do it.
21  BY MR. PHILLIPS:
22  Q  And who would stop the pump?
23         MR. WOODWARD: Same objection.
24         MR. CHALOS: Objection. Hold on a

Roberto Damasing

7 (Pages 37 to 40)

Page 37

1  second, one second.
2        For the record, you're asking this
3  guy to speculate. Why don't you ask him specific
4  incidents. Because I don't think he can identify a
5  specific incident; he's just guessing.
6  BY MR. PHILLIPS:
7     Q  How long were you on board the Irene?
8     A  Starting China, upon arrival here in the
9  United States, 11 months. More than 11 months.
10    Q  How many times did you see overboard
11 pumping? How many times per week?
12       MR. CHALOS: Objection.
13       MR. WOODWARD: Objection. Ask the
14 first question.
15       MR. CHALOS: He didn't say ever.
16       MR. PHILLIPS: He might say zero.
17       MR. WOODWARD: Well, you have two
18 questions pending, so there's an objection.
19 BY MR. PHILLIPS:
20    Q  How many times did you pump — see
21 pumping?
22       MR. CHALOS: Objection.
23 BY MR. PHILLIPS:
24    Q  — during your time on the Irene?

Page 38

1        MR. CHALOS: Is the question how
2  many times did he pump or how many times --
3  BY MR. PHILLIPS:
4     Q  How many times did he see pumping on the
5  Irene during those months?
6     A  Many times.
7     Q  How many times?
8     A  All I can tell you is that when we leave
9  port, we start pumping out.
10    Q  And when would you stop?
11    A  It all depends. If the tank is empty for
12 that one particular time, for that one particular
13 duty, then we would stop it.
14    Q  Okay. Was that the way -- was that
15 regular practice?
16       MR. WOODWARD: Objection to
17 leading.
18       MR. CHALOS: Objection.
19 BY MR. PHILLIPS:
20    Q  — to pump until empty?
21       MR. CHALOS: Objection.
22       MR. WOODWARD: Same objection.
23       THE WITNESS: Yes.
24 BY MR. PHILLIPS:

Page 39

1     Q  Do you remember the trip from Brazil to
2  the United States?
3     A  Yes.
4     Q  Do you remember how many times you
5  observed overboard pumping?
6        MR. CHALOS: Objection.
7        THE WITNESS: I can't exactly tell
8  you, because I didn't see it.
9  BY MR. PHILLIPS:
10    Q  That's okay.
11       You've -- when you were coming from
12 the -- to the United States from Brazil, how many
13 times did you see overboard pumping?
14       MR. CHALOS: Objection; asked and
15 answered.
16       MR. WOODWARD: Objection; it's been
17 asked and answered. He said he didn't see it.
18       MR. CHALOS: Objection.
19       THE WITNESS: I couldn't tell you.
20 BY MR. PHILLIPS:
21    Q  You couldn't tell me because you don't
22 know or you don't remember?
23       MR. CHALOS: Objection --
24       MR. WOODWARD: Objection.

Page 40

1        MR. CHALOS: -- objection.
2  Objection.
3        THE WITNESS: I didn't see it.
4  BY MR. PHILLIPS:
5     Q  Roberto, do you remember testifying in a
6  Grand Jury?
7        MR. CHALOS: Objection. This is
8  improper questioning of the witness. This is
9  intimidating and harassing, and if you're going to
10 continue, we'll have to call the judge.
11 BY MR. PHILLIPS:
12    Q  Do you?
13    A  Yes.
14       MR. PHILLIPS: I'm looking at
15 Page 13 of his Grand Jury proceedings.
16       MR. WOODWARD: What's the date?
17       MR. PHILLIPS: January 13th, 2006.
18       MR. WOODWARD: Let us find the
19 page.
20       MR. PHILLIPS: Have him read
21 Page 13.
22       MR. CHALOS: Objection. That's
23 improper. The guy testified clearly. This is
24 improper line of questioning. This is just --

Corbett & Wilcox

Roberto Damasing

8 (Pages 41 to 44)

Page 41

1    MR. WOODWARD: You can't use it to
2 refresh his recollection.
3    MR. CHALOS: -- solely meant to
4 intimidate the witness. He's already scared being
5 here.
6    MR. PHILLIPS: Objections,
7 objections, objections. Get them on the record.
8    MR. WOODWARD: What line?
9    MR. PHILLIPS: It's Page 13, all of
10 it.
11    (Whereupon the requested portions of
12    transcript were read by the
13    interpreter in Tagalog to the
14    witness.)
15    MR. PHILLIPS: Thank you. Thanks.
16 Good.
17    MR. CHALOS: For the record, I'd
18 like to make the objection that the witness on that
19 page was never asked if he saw it. And in fact,
20 that's the basis of this whole -- my objection to
21 this whole line of questioning, because all the
22 questions suppose a predicate that was never
23 established.
24    The guy never saw it. He has no

Page 42

1 firsthand knowledge. His testimony has been nothing
2 but hearsay, inadmissible hearsay, and we continue
3 our objection to this line of question.
4 BY MR. PHILLIPS:
5    Q    Roberto, did you see overboard discharges
6 between Brazil and the United States?
7    A    No.
8    Q    Did you ever operate the magic pipe and
9 the flanges and the pump?
10    MR. WOODWARD: Objection to the
11 form of the question.
12 BY MR. PHILLIPS:
13    Q    From Brazil to the United States?
14    A    What I did was to attach it.
15    Q    And how long did you see it attached?
16    A    I'm not sure. But I know that a few days
17 after we had left Brazil, I was asked to attach it.
18 That's it.
19    Q    Did you ever see anybody using it?
20    MR. CHALOS: Objection.
21    THE WITNESS: No more, because, you
22 know, I had finished my duty.
23 BY MR. PHILLIPS:
24    Q    You never had duty again from Brazil to

Page 43

1 the United States?
2    MR. CHALOS: Objection. That's not
3 what he said.
4    THE WITNESS: Yes, there was. But
5 at that time it was very early. There's still bright
6 sun outside.
7 BY MR. PHILLIPS:
8    Q    What does that mean?
9    MR. CHALOS: Objection; move to
10 strike.
11    THE WITNESS: From 1600 hours to --
12    MR. CHALOS: Hold on, Chris. Hold
13 on, Chris. I have an objection.
14    I move to strike the portion of the
15 answer that's nonresponsive to the question.
16    MR. WOODWARD: Join in the
17 objection.
18 BY MR. PHILLIPS:
19    Q    What time were your duty hours?
20    A    Coming from Brazil going into the United
21 States, I was changed, from 400 hours to 800 hours,
22 to 1600 hours to 2000 hours.
23    Q    So it was never dark outside during your
24 duty?

Page 44

1    MR. CHALOS: Objection.
2    THE WITNESS: Sometimes in the
3 morning, yes. But in the afternoon, it's not.
4 BY MR. PHILLIPS:
5    Q    And what is important about the fact that
6 it was light outside during your duty?
7    MR. CHALOS: Objection.
8    Hold on one second. Objection.
9 He's never said anything about light being important
10 or irrelevant.
11    MR. PHILLIPS: He has. He's
12 testified about it before on other trips.
13    MR. CHALOS: The guy works in the
14 engine. There's no windows in the engine room.
15 What's light have to do with it?
16    MR. PHILLIPS: He testified earlier
17 about trips that were taken during his tenure on this
18 ship and about regular practice of things that
19 happened at night. I'm establishing that this
20 happened and was also important on the trip from
21 Brazil to the United States.
22    MR. CHALOS: Only I object to the
23 form of the question to ask him what's important or
24 significant about day or night, because he's never

Corbett & Wilcox

Roberto Damasing

Page 45

1   testified that there's any significance to it.
2           MR. PHILLIPS: Okay.
3           MR. CHALOS: So my objection is
4   lack of foundation, form and leading.
5           MR. WOODWARD: Join in the
6   objection.
7   BY MR. PHILLIPS:
8       Q   What is important about the fact that
9   your duty was only during the daytime —
10          MR. CHALOS: Objection.
11  BY MR. PHILLIPS:
12      Q   — as it relates to the magic pipe and
13  pumping?
14          MR. CHALOS: Objection.
15          THE WITNESS: Because they don't
16  want anybody to see, especially the airplanes and the
17  other ships, if there is oil that's coming out of
18  there.
19          MR. PHILLIPS: Okay. One second
20  Roberto.
21          Okay I have no further questions
22  right now.
23          CROSS-EXAMINATION
24

Page 46

1   BY MR. CHALOS:
2       Q   Roberto, let's get something straight.
3   You worked two four-hour shifts a day; right?
4       A   Yes.
5       Q   4:00 in the afternoon to 4:00 at night;
6   right? Sorry, let me say that again.
7           You worked from 4:00 in the
8   afternoon to 8 o'clock at night; right?
9       A   Yes.
10      Q   And when you worked -- and you also
11  worked 4 o'clock in the morning to 8 o'clock in the
12  morning; right?
13      A   Yes.
14      Q   Okay. Now, when you're on board the
15  ship, there's plenty of times that it's dark out that
16  you're working before 8:00 p.m. at night; right?
17      A   Yes.
18      Q   Okay. And when you go to work at
19  4 o'clock in the morning, it's also dark out?
20      A   Yes.
21      Q   Okay. So there's times that, during both
22  shifts in a day, it's dark out when you're working;
23  right?
24      A   Yes.

Page 47

1       Q   Okay. And the truth of the matter is you
2   never saw any overboard discharges between Brazil and
3   the United States?
4       A   Yes.
5       Q   Okay. Now, let's talk about your
6   position on board the ship.
7           You're an oiler; right?
8       A   Yes.
9       Q   And when you work as an oiler, you work
10  with a duty engineer; right?
11      A   Yes.
12      Q   And the duty engineer that you worked
13  with between Brazil and the United States was the
14  second engineer, Edgar Villano; right?
15      A   Yes, sir.
16      Q   And Mr. Villano was your boss; right?
17      A   Yes.
18      Q   And you talked to Mr. Villano yesterday,
19  lunchtime; right?
20      A   Yes, sir.
21      Q   And you talked to him again last night;
22  right?
23      A   Yes, this morning.
24      Q   And you talked to him again this morning?

Page 48

1       A   Yes.
2       Q   And you know that Mr. Villano is going
3   home to the Philippines tonight; right?
4       A   Awhile ago, I didn't. Just now.
5       Q   Okay. So as you sit here now, you know
6   that Mr. Villano is going home to the Philippines
7   tonight?
8       A   Yes.
9       Q   And you know that Mr. Villano had a deal
10  with the Government --
11          MR. PHILLIPS: Objection;
12  irrelevant.
13  BY MR. CHALOS:
14      Q   -- that if he came here and cooperated
15  with the Government, they would let him go home.
16          MR. PHILLIPS: Objection;
17  speculation.
18          THE WITNESS: No, that is not the
19  conversation that we had.
20  BY MR. CHALOS:
21      Q   Okay. But you a deal with the
22  Government; right?
23      A   No.
24      Q   You don't have a deal with the

Roberto Damasing

10 (Pages 49 to 52)

Page 49

1  Government?
2      A  No.
3      Q  You don't have an agreement with the
4  Government that if they -- if you come here and
5  cooperate, that they wouldn't prosecute you for
6  anything you did wrong?
7      A  What do you mean by that?
8      Q  The Government told you, did they not,
9  that if you cooperate with them, they won't punish
10  you?
11      A  The jury, they told him that.
12      Q  Okay. But that's -- that's the
13  understanding you had as well; right?
14      A  Yes.
15      Q  Okay. So in order for you not to be
16  punished, it's fair to say that you know you need to
17  cooperate with the Government?
18      A  No, as long as I tell the truth.
19      Q  Okay. You, as an oiler, Mr. Damasing,
20  don't have an engineer license, do you?
21      A  Yes, I do.
22      Q  You have an engineer license?
23      A  Just a new one, yes.
24      Q  To be an oiler, you don't need an

Page 50

1  engineer license, do you?
2      A  Yes.
3      Q  Okay. So the record is clear, in order
4  to work as an oiler, no special license is required?
5      A  Yes.
6      Q  But you have a fourth engineer's license;
7  right?
8      A  Yes.
9      Q  Okay. But on this ship, you were hired
10  as an oiler; right?
11      A  Yes.
12      Q  Okay. And had the company hired you as a
13  fourth engineer, you would have made a lot more money
14  than you make now as an oiler; right?
15      A  Oh, yes.
16      Q  Okay. Now let's talk about -- well,
17  before I move on.
18          The company didn't hire you as an
19  oiler, did they -- as an fourth engineer, did they --
20  strike that. Let me rephrase the question.
21          But the company didn't hire you as
22  a fourth engineer; they only hired you as an oiler;
23  right?
24      A  Yes. That's what I applied for.

Page 51

1          MR. CHALOS: Okay. Can we take two
2  minutes so we can pull out the rest of my stuff and
3  we can premark some exhibits.
4          MR. PHILLIPS: Uh-huh.
5          MR. CHALOS: Thank you.
6          THE VIDEOGRAPHER: Off the record
7  at 10:49.
8          (Brief recess.)
9          (Documents marked CSMR Exhibits 23
10  through 27 for identification.)
11          THE VIDEOGRAPHER: We're on the
12  record at 11:06.
13  BY MR. CHALOS:
14      Q  Okay. Mr. Damasing, let's talk about how
15  you went about getting employed to work on board this
16  vessel.
17          Okay. You went to a crewing agent
18  in the Philippines, did you not?
19      A  Yes.
20      Q  And when you went to the crewing agent,
21  you had to prepare some papers in order to look for a
22  job; right?
23      A  Yes.
24      Q  And you did that?

Page 52

1      A  Yes.
2      Q  And then what happens is the crewing
3  agent proposes jobs to you; right?
4      A  Yes.
5      Q  And then you either accept the job or
6  not; right?
7      A  Yes.
8      Q  And at the time that the crewing agent
9  proposed the job as oiler on the Irene E.M., you had
10  been going to sea for eight years already; right?
11      A  Yes.
12      Q  And during that eight years, you
13  received various training?
14      A  Yes.
15      Q  And some of that training related to what
16  we call MARPOL; right?
17      A  Yes.
18      Q  And MARPOL is the international pollution
19  prevention treaty?
20      A  Yes.
21      Q  And you knew at the time that you were
22  applying for this job, that it was illegal to
23  discharge any oily wastes into the sea; right?
24      A  Yes.

Corbett & Wilcox

Roberto Damasing

Page 53

1    Q   Okay. Now, take a look at what we've
2 marked as CSME Deposition Exhibit No. 23. For the
3 record, I'll represent that it's four pages.
4    A   This is my contract.
5    Q   Okay. Thank you, Mr. Damasing, but just
6 wait for my questions. Okay?
7         That document is the paperwork that
8 you prepared when you signed your contract; right?
9 To work on board the Irene E.M.?
10    A   Yes.
11    Q   And that first page has your signature on
12 the bottom?
13    A   Yes.
14    Q   Okay. Now, part of the deal when you
15 were applying for the job on board the Irene E.M. was
16 that you had to go to some training at the manning
17 agent's office; right?
18    A   Yes, there was.
19    Q   Okay. And part of that training included
20 training on the ship's safety management system and
21 environmental protection policies; right?
22    A   Yes.
23    Q   Okay. Now, take a look at the second
24 page of that exhibit, Exhibit 23. That's your

Page 54

1 signature on the bottom?
2    A   Yes.
3    Q   And part of that training was that if you
4 were found to violate the company's environmental
5 protection policy, you would be fired; right?
6    A   Yes.
7    Q   And the company was very serious about
8 their environmental protection, were they not?
9    A   Yes.
10    Q   Okay. Take a look at what we've marked
11 as CSME Defendants' Exhibit No. 24. For the record
12 I'll represent it's a four-page exhibit, and I'll
13 take back the last one.
14         That's a copy of your seaman's book
15 and your passport; right?
16    A   Yes.
17    Q   Okay. I'll take that back. Thanks.
18         For the record, I'd like to move
19 into evidence what's previously been marked as
20 Exhibit No. 23.
21         MR. PHILLIPS: No objection.
22         MR. CHALOS: And Exhibit No. 24.
23         MR. PHILLIPS: No Objection.
24         MR. CHALOS: Thank you.

Page 55

1         (Documents marked CSMR Exhibits 23
2         and 24 moved into evidence.)
3 BY MR. CHALOS:
4    Q   Now, I'm going to show you what's
5 previously been marked and I believe moved into
6 evidence as Defendants' Exhibit No. 7, and ask you to
7 take a look at that, Mr. Damasing.
8         That's the company's environmental
9 policy; right?
10    A   Yes.
11    Q   And this is the policy that you received
12 training about before you were allowed to go on board
13 the ship; right?
14    A   I don't remember this particular one.
15    Q   Okay. Well, that particular document was
16 posted and in plain view for the crew on board the
17 ship, was it not?
18    A   There is a logbook where all the policies
19 are written. Sometimes it's in the mess hall, in the
20 bridge, in the engine room. That's it.
21    Q   Okay. Now, take a look, though,
22 Mr. Damasing. That particular section of the policy
23 was posted — it was hanging in the mess hall, was it
24 not?

Page 56

1    A   There's just a book there.
2    Q   Okay. Well, that policy was also hanging
3 in the hallway, was it not? Think.
4    A   I don't remember. There's just a manual
5 that I can remember.
6    Q   That policy was also hanging on the
7 plywood bulletin board in the engine room, was it
8 not?
9    A   What I can remember is that — that we
10 don't have any control rooms, so everything was put
11 on a table.
12    Q   Okay. But just so I'm clear,
13 Mr. Damasing, you knew at the time you got on board
14 the ship that it was wrong to put any oil or oily
15 wastes into the sea; right?
16    A   Yes.
17    Q   And you knew if the company found out you
18 were doing it, they would fire you; right?
19    A   Yes.
20    Q   Okay. Now, you told us earlier today
21 when Mr. Phillips was asking some questions that
22 there were some discharges while you were on board
23 the ship; right?
24    A   Yes.

Corbett & Wilcox

Roberto Damasing

12 (Pages 57 to 60)

Page 57

1    Q   Now, you never reported that to the
2  company that owns the ship, did you?
3    A   I could not report that, because, you
4  know, I'm just asked to do this.
5    Q   My question to you, yes or no. You
6  personally never made a report to the company that
7  owns the ship, did you?
8    A   Yes.
9    Q   "Yes" meaning you agree, you never made
10 that report, did you?
11   A   Yes.
12   Q   And you never made a report to the
13 company that operates or manages the ship, did you?
14   A   Yes.
15   Q   "Yes" meaning you never made that—
16   A   No, I did not. Yes.
17   Q   Okay. And you never -- strike that.
18       You would agree with me that it's a
19 fact that you never even told the captain that you
20 saw discharges overboard?
21   A   Yes.
22   Q   Now, you knew, though, based on your
23 training, that if you saw any discharges, you were
24 supposed to report it to the captain; right?

Page 58

1    A   How could I do that? When it's coming
2  from the officers, the orders.
3    Q   Mr. Damasing, listen to my question: You
4  knew that if you saw a discharge overboard or any
5  MARPOL violation, you were supposed to tell the
6  captain; right?
7    A   All the people that make the reports are
8  officers themselves.
9    Q   I'm just going to show you what we've
10 marked as Exhibit 25, CSME Defendants' Exhibit 25.
11 Just for the record, Mr. Damasing, those are some of-
12 the certificates for some of the training you had
13 before being hired on board the ship.
14       And those were requirements in
15 order to work on the ship; right?
16   A   Yes.
17       MR. CHALOS: Okay. I'd like to
18 move that into evidence.
19       MR. PHILLIPS: No objection.
20       (Document marked CSMR Exhibit 25
21       moved into evidence.)
22 BY MR. CHALOS:
23   Q   Now, Mr. Damasing, in addition to the
24 environmental protection policy the company had, the

Page 59

1  company was also serious about having crew that was
2  physically and mentally able to do the job for which
3  they're hired; right?
4    A   Yes.
5    Q   And in fact, another requirement was for
6  you to go and have a series of tests done; right?
7    A   Yes, medicals.
8    Q   And I'm going to show you what we've
9  marked as Exhibit 26, CSME Defendants' Exhibit 26.
10 And those are the medical tests and the results that
11 you had before you were able to go on board the Irene
12 E.M.; right?
13       MR. PHILLIPS: Objection. This is
14 beyond the scope of direct --
15       THE WITNESS: Yes.
16       MR. PHILLIPS: — and irrelevant.
17       MR. CHALOS: Move it into evidence.
18 You object to it?
19       MR. PHILLIPS: Object to that.
20       MR. CHALOS: Okay.
21       (Document marked Exhibit CSMR 26
22       moved into evidence.)
23 BY MR. CHALOS:
24   Q   Now, as an oiler, Mr. Damasing, you've

Page 60

1  already told us that you're not a licensed engineer;
2  right?
3    A   I have a license.
4    Q   I understand you do. But on board the
5  Irene E.M., the job that you were functioning in does
6  not require a license?
7    A   Yes.
8    Q   And in fact, as an oiler, you have no
9  authority to decide what equipment to use in the
10 engine room; right?
11   A   Yes.
12   Q   Okay. And as an oiler, you don't decide
13 whether or not you're going to use the oily water
14 separator, do you?
15   A   Yes.
16   Q   And in fact, you have no responsibility
17 to operate the oily water separator on board the
18 Irene E.M., do you?
19   A   Yes.
20   Q   And you don't have any responsibility for
21 maintaining the oily water separator on the Irene
22 E.M., do you?
23   A   Yes.
24   Q   And you have no responsibility to repair

Roberto Damasing

13 (Pages 61 to 64)

Page 61

1  the oily water separator on the Irene E.M.?
2      A   Yes.
3      Q   So when Mr. Phillips was asking you
4  questions about the oily water separator, we can
5  agree that your answers were all about a piece of
6  equipment that you never used on the Irene E.M.?
7      A   Yes.
8      Q   Now, there was a practice on board the
9  Irene E.M. to transfer some of the materials from the
10 bilge wells to the bilge holding tank; right?
11     A   Yes.
12     Q   And in order to do that, no oily waste
13 would go into the sea, would it?
14     A   Yes.
15     Q   And the bilge holding tank was gigantic;
16 right?
17     A   Yes.
18     Q   More than 106 cubic meters; right?
19     A   I'm not sure about that.
20     Q   But it was the biggest bilge holding tank
21 you've ever seen on any ship you've ever been on?
22         MR. PHILLIPS:  Objection.  He's
23 never testified to that.
24         THE WITNESS:  No, only in the

Page 62

1  Irene.
2  BY MR. CHALOS:
3      Q   This was the biggest bilge holding tank
4  you've ever seen?
5      A   Only in the Irene.
6      Q   Okay.  Now, the captain never told you to
7  lie to the Coast Guard, did he?
8      A   Yes.
9      Q   So it's a fair -- you agree with me that
10 the captain never told you to lie; correct?
11     A   Yes.
12     Q   And you agree with me that Mr. Madias
13 never told you to lie to the Coast Guard?
14     A   Yes.
15     Q   And you agree with me that you personally
16 didn't have any communications with either the Chian
17 Spirit or Venetico Marine?
18     A   Yes.
19     Q   So neither one of those companies told
20 you to lie?
21     A   Yes.
22     Q   Okay.  Now, the captain never gave you an
23 order to pump anything overboard, did he?
24     A   Yes.

Page 63

1      Q   So you agree with me that he never gave
2  you that order?
3      A   Yes.
4      Q   And you also agree with me that the Chian
5  Spirit never ordered you to pump anything overboard?
6      A   Yes.
7      Q   And you would also agree with me that
8  Venetico Marine never told you to pump anything
9  overboard?
10     A   Yes.
11     Q   One second.
12         Mr. Damasing --
13     A   Yes.
14     Q   -- you told us before about a discussion
15 that you had with a gentleman named Christos;
16 correct?
17     A   Yes.
18     Q   Okay.  Now, you told Mr. Phillips that
19 Mr. Christos told you to change a statement that you
20 had made.
21     A   Yes, sir.
22     Q   What language did that conversation take
23 place in?
24     A   English.

Page 64

1      Q   Okay.  Now, let me see if I understand
2  this right:  Your first language is called Cebuano;
3  right?
4      A   Yes.
5         MR. CHALOS:  And for the record,
6  that's C-E-B-U-A-N-O.
7  BY MR. CHALOS:
8      Q   Now, besides Cebuano, you also speak the
9  Philippine language Tagalog; right?
10     A   Yes.
11     Q   And that's the language which Mr. Masacay
12 is speaking with you today; right?
13     A   Yes.
14     Q   So at a minimum, English is your third
15 language; right?
16     A   Yes.
17     Q   And in fact, the reason why Mr. Masacay
18 is here as our interpreter is because you're more
19 comfortable speaking in your native language at a
20 formal meeting like this; right?
21     A   Yes.
22     Q   Now, Mr. Christos, you told us, was a
23 Greek guy; is that right?
24     A   Yes.

Roberto Damasing

14  (Pages 65 to 68)

Page 65

1     Q   And English wasn't his first language,
2   was it?
3     A   Yes.
4     Q   So we can agree that there was some
5   language barrier to your communications with
6   Christos; right?
7     A   That I don't know.
8     Q   You don't know.
9         Okay. Now, you did tell us,
10  though, it was your understanding that Mr. Christos
11  wanted you to change a statement you had made to the
12  Coast Guard; right?
13    A   Yes.
14    Q   But the truth of the matter is, you told
15  Mr. Christos that you were not going to change your
16  statement; right?
17    A   What I told him was that I was just
18  telling the truth.
19    Q   Okay. And in fact, you've never changed
20  your statement, have you?
21    A   Yes.
22    Q   You agree with me that you never changed
23  your statement?
24    A   Yes.

Page 66

1     Q   Okay. One second.
2         okay. Now, Mr. Damasing, you've
3   been here in the United States for almost eight
4   months; right?
5     A   Yes.
6     Q   And you're here because the Government
7   has detained you here; right?
8         MR. PHILLIPS: Objection.
9         THE WITNESS: Yes.
10  BY MR. CHALOS:
11    Q   You don't have your passport, do you?
12    A   Yes.
13    Q   The Government has your passport?
14    A   Yes.
15    Q   And you can't go home if you wanted to,
16  can you?
17    A   Yes.
18    Q   And you told the Government you wanted to
19  go home?
20    A   Yes.
21    Q   Okay. And in fact, you -- in fact you
22  and Mr. Twersky, your lawyer, have recently filed a
23  petition with the Court for you to go home; right?
24    A   Yes, sir.

Page 67

1     Q   And you prepared a declaration in support
2   of that petition; correct?
3         MR. PHILLIPS: Objection. This is
4   irrelevant, and it's also beyond the scope of direct.
5         THE WITNESS: Yes.
6   BY MR. CHALOS:
7     Q   I'm going to show you what we've marked
8   as CSME Deposition Exhibit No. 27. For the record,
9   it's three pages. First page has a heading
10  "Declaration of Roberto Damasing."
11        Mr. Damasing, take a look at the
12  third page of that exhibit. Is that your signature?
13    A   Yes.
14    Q   Is that a statement that you've made
15  since you've been here in the United States?
16    A   No. This is already made and I signed.
17    Q   And you read it before you signed it?
18    A   Yes.
19    Q   And you agreed with its contents?
20    A   Yes. There is nothing that's bad about
21  this.
22        MR. CHALOS: Okay. I'd like to
23  move into evidence Defendants' CSME Exhibit No. 27.
24        MR. PHILLIPS: Objection to

Page 68

1   relevance.
2         (Document marked CSMR Exhibit 27
3         moved into evidence.)
4   BY MR. CHALOS:
5     Q   One second.
6         Mr. Damasing, earlier today
7   Mr. Phillips asked you about Government Exhibit 2 and
8   Government Exhibit 3. Take a look at Exhibit No. 2.
9   That's the big plastic bag with the hoses.
10        Now, can you really see what's in
11  that bag from where you're sitting?
12    A   Yes, sir.
13    Q   Now, you didn't bring those here from the
14  ship, did you?
15    A   Yes.
16    Q   You carried them to this building?
17    A   No.
18    Q   So you didn't bring them here to this
19  building?
20    A   Yes.
21    Q   And you don't know how those materials
22  came to this building, do you?
23    A   Yes.
24    Q   And you would agree with me that you

Roberto Damasing

15 (Pages 69 to 72)

Page 69

1 don't know if this exact hose came from the Irene?
2    A    These things came from the Irene.
3    Q    But you don't know that for a fact, do
4 you?
5    A    I'm sure.
6    Q    And how are you sure?
7    A    Can I go near it?
8    Q    Sure.
9    A    This was tied with a piece of rubber.
10 That means that there is a hole here.
11    Q    Okay. And you're saying it was tied with
12 rubber when it was on board the ship?
13    A    Yes.
14    Q    And it's not tied with rubber now, was
15 it?
16    A    There is still.
17    Q    Okay. Now, about the flanges, you didn't
18 bring them to the office, did you?
19    A    Yes.
20    Q    "Yes" meaning you agree you didn't bring
21 them?
22    A    No.
23    Q    Okay. Now, just so the record is clear,
24 there's lots of hoses on board the ships that you've

Page 70

1 worked on, are there not?
2    A    Yes.
3    Q    And there's also lots of flanges on board
4 the ship?
5    A    Yes.
6    Q    And there's lots of uses for hoses and
7 flanges that are legal; correct?
8    A    Yes.
9    Q    And you could use them for lube oils;
10 right?
11    A    Yes.
12    Q    And for fuel oils?
13    A    Yes.
14    Q    And for use with the generators?
15    A    Yes.
16    Q    And the boilers? Or boiler blow-downs?
17    A    I don't understand.
18    Q    Okay. Just a few final questions,
19 Mr. Damasing.
20        When you told us before about when
21 the A.B. on watch sounded the alarm for oil being in
22 the water, that oil wasn't because of an illegal
23 discharge, was it?
24    A    Yes.

Page 71

1    Q    You agree with me that it was not an
2 illegal discharge?
3        MR. PHILLIPS: Objection. No basis
4 for him to state what's illegal and not illegal.
5        THE WITNESS: Yes.
6 BY MR. CHALOS:
7    Q    In fact, the Coast Guard was on board
8 when it happened; right?
9    A    Yes.
10    Q    Okay. And that was because of a leak?
11    A    Yes.
12    Q    And then it was the Coast Guard —
13 withdraw.
14        Nothing further. I'm ready to pass
15 the witness.
16        MR. WOODWARD: Just off the record,
17 please.
18        THE VIDEOGRAPHER: Off the record,
19 11:36.
20        (Brief recess.)
21        THE VIDEOGRAPHER: On the record a
22 11:42.
23        CROSS-EXAMINATION
24

Page 72

1 BY MR. WOODWARD:
2    Q    Mr. Damasing, my name is Carl Woodward
3 and I represent the chief engineer, Adrien Dragomir
4        How are you today?
5    A    I'm fine, sir.
6    Q    Good, good.
7        Now, as I understand it, you've
8 been on this ship, the Irene, for 11 months; correct?
9    A    Yes, sir.
10    Q    And in fact, of the present crew, you
11 served the longest of anyone; isn't that right?
12    A    Yes.
13    Q    Was the captain on longer than you?
14    A    We were there at the same time.
15    Q    You came at the same time?
16    A    I don't exactly remember.
17    Q    All right. The prior chief engineer was
18 Mr. Tomandong; right?
19    A    Yes.
20    Q    And he was on the ship when you joined
21 it; correct?
22    A    Yes.
23    Q    When you joined the ship, the ship was in
24 dry dock in China?

Page 73

A Yes.
Q What was being done to the ship at that time?
A When I arrived there, there was only a little bit of things that they needed to do. Mostly, it's outside of the ship.
Q Okay. When you joined the ship in China, do you know whether the oily water separator was working?
MR. CHALOS: Objection.
THE WITNESS: No, it wasn't.
BY MR. WOODWARD:
Q Do you know whether the company sent money to have it repaired?
A I don't know.
Q Do you know whether money was sent to Mr. Tomondong or Mr. Tanasi, who was the superintendent, to repair the oily water separator?
A That I don't know.
Q Now, when you were on the ship after China and before it got to Africa in October, October 2005, Mr. Tomondong was the chief engineer; right?
A Yes.

Page 74

Q And it was while he was the chief engineer that you had received orders to pump overboard; correct?
A There were times.
Q And you knew that Mr. Tomondong allowed that?
A Yes.
Q Now, Mr. Dragomir came on the ship in October; correct?
A That I don't remember.
Q Okay. But do you remember that you were in Africa when he came on the ship?
A Perhaps.
Q Do you remember when he came on the ship?
A I don't exactly remember where he boarded, but I remember when he boarded.
Q All right, fine.
And he replaced Mr. Tomondong; correct?
A Yes.
Q Now, you knew that what Mr. Tomondong had allowed, which was pumping overboard, was against the law; right?
A Yes.

Page 75

Q You knew it was wrong?
A Yes.
Q When Mr. Dragomir joined the ship, did you tell Mr. Dragomir that that was illegal conduct going on?
A I have no right to tell him that.
Q You don't have any right to send him a note or talk to him and say, "I know there's an illegal practice on this ship"?
A I don't think that that is part of my job anymore.
Q Well, didn't you sign some document from the company that indicated that you would tell the company or its representatives that if there was illegal conduct in violation of MARPOL, that you would inform those authorities?
A I am a lower-ranking person that knows that these things are being done are illegal. How about them higher officials? Don't they know what's going on?
Q Well, the question is, did you tell Mr. Dragomir that what had gone on before he came on the ship was illegal?
A No, we did not have a conversation.

Page 76

Q So you never told him that, did you?
A Yes.
Q You agree with me that you never told him that?
A Yes.
Q Now, when you said the oily water separator wasn't working, do you know what it was that was not working on the oily water separator?
A Everything was not working.
Q The whole thing didn't work?
A It was running, but it didn't run in the proper procedure.
Q And what was it that wasn't proper?
A First of all, the suction from the oil sludge tank is not attached to the suction pipe, but it was attached to the inlet. And then the sensors on the ppm reading, it did not read correctly.
Q Did you ever operate the oily water separator?
A No.
Q So that information that you just stated didn't come from your direct observation; correct?
A I can see it.
Q When Mr. Dragomir came on the ship, did

Roberto Damasing

Page 77

1 you tell him that the oily water separator didn't
2 work?
3    A   It was turned over to him by the other
4 engineers.
5    Q   I understand that. That wasn't my
6 question.
7         Did you tell him that it was
8 broken?
9    A   No, I did not.
10    Q   Now, I'm going to direct your attention
11 to a question that was asked to you about the
12 Government Exhibit 2, the magic hose. And I think
13 you told Mr. Phillips that you were present when the
14 chief engineer, Mr. Dragomir, was talking to the
15 second engineer. Do you recall that?
16    A   Yes.
17    Q   Okay. And I think you indicated that you
18 received -- or that you overheard instruction about
19 dismantling the magic hose. Do you recall that?
20    A   Yeah.
21    Q   And in fact, Mr. Dragomir told the second
22 engineer to disassemble the magic hose and the
23 flanges; correct?
24    A   Right.

Page 78

1    Q   He also told you -- or he also told the
2 second engineer that he wanted the magic hose and the
3 flanges taken away from the engine room; correct?
4    A   Yes.
5    Q   He also told the second engineer that he
6 wanted the magic hose destroyed so that it could not
7 be used in the future; didn't he say that?
8    A   Could you repeat that question.
9         MR. WOODWARD: Sure. In fact,
10 could you read it back, please.
11         (Record read.)
12         THE WITNESS: I didn't hear that.
13 BY MR. WOODWARD:
14    Q   Did you hear him tell the second engineer
15 that he did not want the magic hose used again?
16    A   That I didn't hear.
17    Q   Okay. Now, he also did not tell him to
18 hide it; isn't that correct?
19    A   He told the second engineer to hide it.
20    Q   No, he told him to take it out of the
21 engine room; didn't he?
22    A   Yes.
23    Q   But he didn't tell him to hide it; he
24 told him to take it away; isn't that correct?

Page 79

1    A   To hide it outside of the engine room.
2    Q   Now, the chief engineer never told you to
3 lie to any Coast Guard or Government authorities, did
4 he?
5    A   Yes. And in fact, we were called by the
6 second engineer that we should tell everything that
7 is of the truth, that the separator was not working.
8    Q   That's correct.
9    A   Yes.
10    Q   But the chief engineer -- you never
11 talked to the chief engineer about that, did you?
12    A   Yes.
13    Q   You agree?
14    A   Yes.
15    Q   Did you ever take soundings on the Irene?
16    A   In the bilge tank and in the sludge tank.
17    Q   And do you record those anywhere, those
18 soundings?
19    A   In a piece of paper, and I hand it over
20 to the chief engineer or to the engineer.
21    Q   Is there a blackboard in the engine room?
22    A   Yes, there is, but nothing is written on
23 it.
24    Q   You never write on it?

Page 80

1    A   No.
2    Q   At least you don't write on it.
3    A   Yes.
4         MR. WOODWARD: Okay. I have no
5 further questions.
6         THE VIDEOGRAPHER: Off the record
7 at 11:58.
8         (Discussion held off the record.)
9         THE VIDEOGRAPHER: We're on the
10 record at 12:01. This is Tape 2 of Roberto
11 Damasing's deposition.
12         MR. WOODWARD: I think, for the
13 record, we should have this document marked for
14 identification.
15         (Document marked CSMR Exhibit 28 for
16 identification.)
17 BY MR. WOODWARD:
18    Q   Mr. Damasing, do you recall when the
19 Coast Guard came on board the ship?
20    A   Yes.
21    Q   And that was in December of 2005?
22    A   Yes.
23    Q   Do you recall being asked by the Coast
24 Guard -- in fact, Mr. McKnight -- to write a

Roberto Damasing

18 (Pages 81 to 84)

Page 81

1 statement?
2     A   Yes.
3     Q   And do you recall that Mr. McKnight
4 wanted you to be as truthful as possible about what
5 happened --
6     A   Yes.
7     Q   -- on the ship?
8         And this statement contained
9 everything you knew; correct?
10    A   Yes.
11    Q   And your memory of what happened was
12 fresher then, in December 2005, than it is now;
13 right?
14    A   I'm not really sure.
15    Q   Okay. Well, it was certainly closer in
16 time to the events in November of 2005 than it is
17 today; correct?
18    A   I don't know.
19    Q   You don't know. You don't know whether
20 December is closer in time to November off 2005 than
21 today is?
22    A   All right, sir.
23    Q   You agree with me that it is?
24    A   Yes.

Page 82

1     Q   Okay. I'm not trying to be hard with
2 you. I just want you to, you know, agree what's
3 pretty obvious. There's no trick here. All right?
4         Now, I want you to take a look at
5 this statement. Just read it to yourself.
6     A   All right, sir.
7     Q   There's nothing in this statement, is
8 there, about hiding -- an order to hide the magic
9 pipe, is there?
10    A   Yes.
11    Q   You agree with me that there is not such
12 a statement?
13    A   Yes.
14        MR. WOODWARD: Thank you. No
15 further questions.
16        MR. PHILLIPS: The Government is
17 going to -- was that moved into evidence?
18        MR. WOODWARD: No.
19        MR. PHILLIPS: The Government is
20 going to ask that that last defense exhibit be moved
21 into evidence to complete the record, since it was
22 referred to.
23        MR. WOODWARD: It doesn't mean that
24 there's a foundation for it. You can do what you

Page 83

1 want. We object.
2         MR. PHILLIPS: I'm going to take
3 what was marked as Defense Exhibit CSME 28.
4 BY MR. PHILLIPS:
5     Q   Mr. Damasing, is that your signature on
6 that?
7     A   Yes, sir.
8     Q   Do you recall writing that document?
9     A   Yes, sir, in the ship, in the bridge.
10    Q   Is that a true and accurate reflection of
11 what you wrote on that date?
12    A   Yes.
13    Q   Has it been modified in any way?
14    A   No.
15        MR. PHILLIPS: And the Government
16 is going to move that this exhibit, CSME 28, be moved
17 into evidence as -- I guess it would be Government
18 Exhibit -- it was marked as a CSME exhibit for
19 identification. The Government is going to move that
20 it be placed into evidence as a Government Exhibit,
21 whatever the next number is.
22        MR. CHALOS: I think it's
23 Government 4.
24        (Document marked CSMR Exhibit 28

Page 84

1 moved into evidence.)
2         MR. PHILLIPS: Thank you.
3         MR. WOODWARD: Objection.
4         MR. CHALOS: I object as well.
5         RE-DIRECT EXAMINATION
6 BY MR. PHILLIPS:
7     Q   And Mr. Damasing, you were asked by both
8 Mr. Woodward and also Mr. Chalos about Second
9 Engineer Villano.
10        Do you remember speaking to Villano
11 on the trip from Brazil to the United States?
12        MR. CHALOS: Objection; leading.
13        THE WITNESS: No longer.
14 BY MR. PHILLIPS:
15    Q   You don't remember?
16    A   Whatever it was that we were talking
17 about. I can't remember.
18    Q   Do you remember testifying before a Grand
19 Jury in January of 2006?
20        MR. CHALOS: I object for -- hold
21 on one second.
22        I object, because I don't think
23 there's any record that cross-examination ever
24 explored discussions between this witness and Second

Corbett & Wilcox

Roberto Damasing

19 (Pages 85 to 88)

Page 85

1 Engineer Villano.
2          MR. WOODWARD: It goes beyond the
3 scope of cross-examination. Go ahead.
4 BY MR. PHILLIPS:
5     Q   Do you recall testifying before the Grand
6 Jury?
7     A   Yes.
8     Q   And we are on January 12th, Page 14 into
9 15. I'm going to ask that the interpreter read to
10 you.
11          MR. WOODWARD: What lines do you
12 went read?
13          MR. PHILLIPS: I've marked them.
14 And, Mr. Interpreter, can I —
15          MR. WOODWARD: Can I ask what they
16 are?
17          MR. PHILLIPS: — can I see it so I
18 can see exactly which line it is; and then you'll
19 know, Mr. Interpreter.
20          It's on Page 14, starting at
21 Line 8; and then through to Page 15, ending on
22 Line 10.
23          MR. TWERSKY: I'd ask that the
24 interpreter read beginning on Page 13, Line 3, to

Page 86

1 give context to the gentleman, who doesn't speak the
2 language. And the Grand Jury testimony was in
3 January. So that's what I'd ask.
4          MR. PHILLIPS: That's fine.
5          THE INTERPRETER: 13, Line 3?
6          MR. TWERSKY: Yeah, begin there,
7 please.
8          MR. WOODWARD: I'm going to — just
9 a minute. I'm going to object. This is again beyond
10 the scope of cross-examination. Furthermore, it's
11 not clear what this is being done for. Why is the
12 witness being asked to re-read his Grand Jury
13 testimony?
14          MR. PHILLIPS: Because he said he
15 didn't remember speaking with Villano.
16          But go ahead; the objection is on
17 the record.
18          (Whereupon the requested portions of
19          transcript were read by the interpreter
20          in Tagalog to the witness.)
21          MR. PHILLIPS: Thank you.
22 BY MR. PHILLIPS:
23     Q   Mr. Villano, does that help you remember?
24     A   Yes.

Page 87

1          MR. PHILLIPS: And for the record,
2 this also goes to the questions from Mr. Chalos about
3 how Mr. Damasing received orders to pump overboard.
4          MR. CHALOS: Objection. I never
5 asked any questions about that.
6 BY MR. PHILLIPS:
7     Q   Mr. — I'm sorry. Mr. Damasing, this
8 Grand Jury testimony was closer in time to the
9 conversation you had with Second Engineer Villano
10 than today; correct?
11          MR. CHALOS: Objection — one
12 second. Objection.
13          I mean, this is an improper attempt
14 to put into evidence Grand Jury testimony which, in
15 and of itself, is inadmissible based on the form of
16 questions that were posed there. My objection is the
17 question is also improper as to form, leading, and —
18          MR. WOODWARD: Same objections.
19          MR. CHALOS: — I can't think of
20 any more.
21 BY MR. PHILLIPS:
22     Q   Now, Mr. Damasing, what did Second
23 Engineer Villano say to you on that trip from —
24          MR. WOODWARD: Objection; hearsay.

Page 88

1          MR. PHILLIPS: Let me rephrase.
2 BY MR. PHILLIPS:
3     Q   When you spoke to Villano, what was the
4 conversation about?
5          MR. WOODWARD: Objection; hearsay.
6          MR. CHALOS: Hearsay.
7          THE WITNESS: I don't exactly
8 remember what was said, but that we should pump out
9 BY MR. PHILLIPS:
10    Q   What did you do as the result of talking
11 with Mr. Villano?
12          MR. CHALOS: Objection; leading.
13          THE WITNESS: When he told me, he
14 told me —
15          MR. WOODWARD: Objection; hearsay.
16 Go ahead.
17 BY MR. PHILLIPS:
18    Q   And — I'll stop you.
19          What did you do after talking to
20 Mr. Villano?
21          MR. CHALOS: Objection; hear —
22 leading.
23 BY MR. PHILLIPS:
24    Q   What did you do?

Roberto Damasing

20 (Pages 89 to 92)

Page 89

1    MR. CHALOS: And it's "if
2  anything"; right?
3          MR. PHILLIPS: If anything.
4          THE WITNESS: I think he asked me
5  to attach the --
6          MR. WOODWARD: Objection; hearsay.
7          THE WITNESS: -- the magic hose.
8  BY MR. PHILLIPS:
9    Q   Pay attention to my question if you can.
10         After you talked to the second
11  engineer, what did you do, if anything? Not what he
12  asked you: What did you do?
13   A   I don't remember.
14   Q   We just talked -- you have just said that
15  this helped you remember --
16         MR. CHALOS: Objection. He says --
17  one second.
18         You showed it to him because he
19  said he didn't recall the substance of the
20  discussion.
21         MR. PHILLIPS: That's right.
22         MR. CHALOS: Nothing about what he
23  did. He hasn't even testified he did anything. In
24  fact, he told you he didn't do anything.

Page 90

1  BY MR. PHILLIPS:
2    Q   Mr. Damasing, on the trip from Brazil to
3  the United States, do you remember speaking with the
4  chief engineer?
5    A   No. We just met each other.
6          MR. WOODWARD: Objection; asked and
7  answered.
8  BY MR. PHILLIPS:
9    Q   What did he say?
10   A   That we could go ahead and pump out.
11   Q   And did you?
12   A   No.
13   Q   Mr. Damasing, I'm going to read from what
14  you just read --
15         MR. CHALOS: Objection. It's
16  improper use of prior testimony. He didn't testify
17  that he doesn't remember.
18         MR. PHILLIPS: This is what he read
19  to improve his recollection.
20         MR. WOODWARD: I'm going to object
21  to reading into the record his Grand Jury testimony.
22         MR. PHILLIPS: Object; and I'm
23  going to read it.
24  BY MR. PHILLIPS:

Page 91

1    Q   "Did Dragomir ever personally order you
2  to discharge overboard?
3          "Answer: Yes, sir.
4          "Question: When did he do that?
5          "Answer: It was three days after we
6  left Brazil, sir.
7          "And what did he say to you?
8          "Answer: That I must have to pump out
9  bilges overboard.
10         "Question: And when you pumped out
11  the bilges, was the bilge tank -- was it
12  more or less than half full?
13         "Answer: Full, sir."
14         And the question to you back then
15  was, "And how far did you pump it down?"
16         Your answer was "Empty, sir."
17         Is that what you recall testifying
18  to?
19         MR. CHALOS: Objection.
20         THE WITNESS: I'm just confused
21  when you ask me that question, because there were
22  also other engineers that I had worked with on
23  previous occasion that had asked me a similar.
24  BY MR. PHILLIPS:

Page 92

1    Q   Did you pump the bilges out?
2          MR. CHALOS: Objection; asked and
3  answered; beyond the scope of cross.
4          THE WITNESS: Yes.
5  BY MR. PHILLIPS:
6    Q   And how much did you pump out?
7          MR. WOODWARD: Asked and answered.
8          THE WITNESS: Whatever the contents
9  of the tank is.
10  BY MR. PHILLIPS:
11   Q   Thank you.
12         Okay. Now, going back to a
13  question -- I know this can be confusing.
14         Going back to a question that
15  Mr. Chalos asked about the company's environmental
16  protection policies, he asked, "The company was
17  serious about environmental protection?"
18         And you answered, "Yes."
19   A   Yes.
20   Q   Did the company have a working oily water
21  separator on the Irene?
22         MR. CHALOS: Objection; no
23  foundation.
24         THE WITNESS: They have an oily

Roberto Damasing

21  (Pages 93 to 96)

Page 93

1  water separator. It was working, but it's not
2  functioning properly.
3  BY MR. PHILLIPS:
4     Q   So did they have a properly functioning
5  oily water separator?
6           MR. CHALOS:  Objection; leading.
7           MR. WOODWARD:  Also, no --
8           THE WITNESS:  Yes.
9  BY MR. PHILLIPS:
10    Q   Which is it?  Did they have a working
11  oily water separator?
12           MR. CHALOS:  Objection; asked and
13  answered.
14           MR. PHILLIPS:  He's answered two
15  things.
16           THE WITNESS:  No.
17  BY MR. PHILLIPS:
18    Q   Now, how did the company handle garbage
19  on the Irene?
20           MR. CHALOS:  Objection; beyond --
21           MR. WOODWARD:  Beyond the scope of
22  direct.
23           MR. PHILLIPS:  This goes to
24  environmental protection practices.

Page 94

1           MR. CHALOS:  Well, objection; lack
2  of foundation.  He has no responsibility for garbage.
3           MR. PHILLIPS:  How do we know?
4  BY MR. PHILLIPS:
5     Q   Did you observe garbage on the Irene?
6           MR. CHALOS:  Objection.
7           THE WITNESS:  We would collect it,
8  and then we throw it out to sea.
9  BY MR. PHILLIPS:
10    Q   Why didn't you burn it in the
11  incinerator?
12           MR. CHALOS:  Objection.
13           MR. WOODWARD:  Objection.
14           MR. CHALOS:  Come on.
15           MR. WOODWARD:  No foundation.
16           THE WITNESS:  We don't have an
17  incinerator.
18  BY MR. PHILLIPS:
19    Q   So the company didn't have an
20  incinerator?
21           MR. CHALOS:  Objection.
22           THE WITNESS:  Yes.
23           MR. CHALOS:  It's like chasing
24  rabbits a hole, man.

Page 95

1  BY MR. PHILLIPS:
2     Q   Based on that testimony, I'll repeat the
3  question:  Was the company serious about
4  environmental protection?
5     A   I don't know.
6     Q   Okay.  You were asked about language by
7  Mr. Chalos.
8           How many other ships have you been
9  on before the Irene?
10    A   A lot.
11    Q   Were the crew always Filipino?
12    A   Not always.  It's mixed.
13    Q   Were the engineers always Filipino?
14    A   No, it's mixed.
15    Q   And how did you communicate?
16    A   On a simple English.
17    Q   Now, when you were asked whether or not
18  you were detained by the Government, did you stay in
19  a jail?
20           MR. CHALOS:  Objection.
21           THE WITNESS:  No.
22  BY MR. PHILLIPS:
23    Q   Where did you stay?
24    A   In a hotel.

Page 96

1     Q   Did you have to stay inside the hotel?
2     A   No.
3     Q   Were you getting paid by the company?
4     A   Yes.
5     Q   And Mr. Woodward asked you about illegal
6  practices that started with Mr. Tomondong.  And you
7  said when Chief Engineer Dragomir came on board, you
8  didn't tell him about the illegal practices.
9     A   Yes.
10    Q   Why?
11    A   We don't have this conversation like
12  that.  Because I'm just a low and an average worker.
13  Usually it should be the engineers that are having a
14  conversation with him.
15    Q   Okay.  That's fair.
16           And finally, Mr. Woodward asked you
17  about soundings.
18           Did you ever do a sounding on the
19  bilge tank during the voyage from Brazil to the
20  United States?
21    A   Yes.
22    Q   And how many times?
23    A   Almost every time that I'm on duty.
24    Q   And who did you tell about the soundings?

Roberto Damasing

22 (Pages 97 to 100)

Page 97

1    A  To the duty engineer that I'm with.
2    Q  Why did you do that?
3    A  That's what we do. That's what we
4 normally do. We check on the reading of the tank so
5 that we know if there's any water that may have
6 entered; or hopefully there's not any water.
7    Q  Okay. Do you remember how much the
8 soundings read, how much was in the tanks?
9    A  I don't really exactly remember what the
10 contents were, but then I can tell you that they were
11 full.
12    Q  Always full?
13       MR. CHALOS: Objection.
14       THE WITNESS: I don't really
15 remember.
16 BY MR. PHILLIPS:
17    Q  Do you recall if they were ever empty --
18 if the bilge tank was ever empty?
19    A  Yes.
20    Q  When?
21    A  After we pump out.
22       MR. PHILLIPS: Okay. Thank you.
23 No further questions.
24       RE-CROSS EXAMINATION

Page 98

1 BY MR. CHALOS:
2    Q  Mr. Damasing, let's get a couple things
3 cleared up here, if we can.
4       You never reported to Venetico
5 Marine the practices you told Mr. Phillips that
6 Mr. Tomondong was employing with respect to disposal
7 of oily waste, did you?
8    A  No, I did not tell him.
9    Q  And you didn't tell Chian Spirit about
10 Tomondong's practices, did you?
11    A  No, I did not.
12    Q  And you didn't tell the captain of the
13 ship about that either, did you?
14    A  Yes.
15    Q  Okay. Now, let's go back to the oily
16 water separator.
17       At the time you were on board the
18 Irene E.M., you were not authorized to operate the
19 oily water separator; right?
20       THE INTERPRETER: I'm sorry. What
21 was that?
22 BY MR. CHALOS:
23    Q  You were not authorized to operate it.
24    A  That's right.

Page 99

1    Q  And you were not authorized to make any
2 repairs to it.
3    A  Yes.
4    Q  And you were not authorized to maintain
5 it.
6    A  Yes.
7    Q  And you were not authorized to either
8 turn it on or turn it off.
9    A  Yes.
10    Q  And you made no decisions about whether
11 or not it should be used.
12    A  Yes.
13    Q  And you made no decisions about whether
14 or not it was capable of being used.
15    A  Yes.
16    Q  So the answers that you gave Mr. Phillips
17 about the oily water separator are based solely on
18 things that either you're guessing about or someone
19 else told you; right?
20    A  No, I know that it's not functioning.
21    Q  Okay. And you know that because someone
22 told you; right?
23    A  No, I see it.
24    Q  Now, you said that you were disposing

Page 100

1 some garbages into the sea; right?
2    A  Yes.
3    Q  Now, the garbage that went into the sea,
4 from your experience, is legal; right?
5    A  Illegal.
6    Q  Illegal. The garbage was separated on
7 board the ship, was it not?
8    A  Based on the law, that's what it should
9 be done.
10    Q  And plastics are retain on board; right?
11    A  Yes.
12    Q  And oil is supposed to be retained on
13 board?
14    A  Yes.
15    Q  But biodegradable materials can go into
16 the sea?
17    A  Yes.
18    Q  Now, you said that you communicated with
19 other crew members that were not Filipino in simple
20 English; right?
21    A  Yes.
22    Q  But you communicated with the Filipino
23 crew members in Tagalog?
24    A  Oh, yes.

Corbett & Wilcox

Roberto Damasing

23 (Pages 101 to 104)

Page 101

1    Q   And so after the ship was detained in the
2  United States, there was a meeting held by the second
3  engineer with all the Filipinos; right?
4    A   No, there wasn't.
5    Q   You just told Mr. Phillips that the
6  second engineer called everybody together. Remember
7  that? Yes?
8    A   I said, but it was – but we were still
9  in the ship at that time.
10   Q   That's my – okay. Let me make sure I
11 understand.
12       After the ship was in the United
13 States and after the Coast Guard came on board,
14 Second Engineer Villano called the meeting for all
15 the Filipino crew members; right?
16   A   Yes.
17   Q   And at that meeting he told you various
18 things; correct?
19   A   Yes. What he told us was that we should
20 tell the Coast Guard that the oily water separator
21 was really not working.
22   Q   So if I understand you correctly, you're
23 telling us now that the second engineer told you what
24 to tell the Coast Guard; right?

Page 102

1    A   No.
2    Q   Well, the second engineer is the guy that
3  told you that the separator wasn't working; right?
4  You just told us that.
5        MR. PHILLIPS: Objection; hearsay.
6        THE WITNESS: What he told us was
7  that it was not functioning. That's coming from the
8  chief engineer.
9  BY MR. CHALOS:
10   Q   Okay. But you learned that the oily
11 water separator wasn't functioning from the second
12 engineer at this meeting; right? Second engineer
13 told you?
14       MR. PHILLIPS: Again, objection;
15 hearsay.
16       THE WITNESS: Since the beginning,
17 when I boarded the ship, it was not functioning.
18       MR. CHALOS: I move to strike the
19 answer, because –
20 BY MR. CHALOS:
21   Q   Listen to my question. You had this
22 meeting on board the ship; right?
23   A   Yes.
24   Q   And at the meeting, the second engineer

Page 103

1  told you what to tell the Coast Guard about the oily
2  water separator; right?
3    A   Yes.
4    Q   What he told you was to tell the
5  Government that it wasn't working; right?
6    A   Yes.
7    Q   Okay. Now, you told us – and that
8  meeting was held only with the Filipinos there;
9  right?
10   A   Yes.
11   Q   And that meeting was in your native
12 language; right?
13   A   Yes.
14   Q   Okay. Now, the chief engineer wasn't
15 there, was he?
16   A   Yes.
17   Q   Now, he's the boss of all the engineers;
18 right?
19   A   Yes.
20   Q   And the captain wasn't there; right?
21   A   Yes.
22   Q   And he's the boss of the ship; right?
23   A   Yes.
24   Q   And no one from the manager, Chian

Page 104

1  Spirit, was present, for that meeting; right?
2    A   Yes.
3    Q   And that's the manager of the ship;
4  right?
5    A   Yes.
6    Q   And no one from Venetico Marine was
7  present; right?
8    A   Yes.
9    Q   And that's the owner of the ship?
10   A   Yes.
11   Q   Now, Mr. Phillips asked you whether or
12 not you stayed in jail; right?
13       THE INTERPRETER: I'm sorry?
14 BY MR. CHALOS:
15   Q   Mr. Phillips asked you whether or not you
16 were staying in jail.
17   A   Yes.
18   Q   Now, there were no bars on your hotel;
19 right?
20   A   Yes.
21   Q   But could you come and go from the United
22 States as you would like?
23   A   Yes.
24   Q   You could leave the United States?

Roberto Damasing

24  (Pages 105 to 108)

Page 105

1    A  No.
2    Q  Why not?
3    A  Because we were detained.
4    Q  By whom?
5    A  By the U.S. Coast Guard.
6    Q  Okay. Now, for eight months that you
7  were here, you weren't able to see your family, were
8  you?
9    A  Yes, through the telephones only.
10    Q  My question was, you weren't able to go
11  visit your family.
12    A  Yes.
13    Q  You weren't able to go see your friends
14  back home, were you?
15    A  Yes.
16    Q  You weren't able to go get a job, were
17  you?
18    A  Yes.
19    Q  When you say "yes," you agree with me?
20    A  Yes. Yes.
21    Q  And you weren't able to work while you
22  were here?
23    A  Yes.
24    Q  You weren't able to see your friends?

Page 106

1    A  Yes, we can see our friends.
2    Q  And that's the other crew members, you
3  mean?
4    A  Yeah.
5    Q  And you weren't able to see your family?
6    A  I don't have any family here.
7    Q  So then the answer is, you weren't able
8  to see your family in the last eight months?
9    A  Yes.
10    Q  Now, if -- during the time you were here,
11  the company paid for your hotel; right?
12    A  Yes.
13    Q  And they paid for your meals; right?
14    A  Yes.
15    Q  And they paid your salary; right?
16    A  Yes.
17    Q  And if they didn't do that, you would
18  have had nowhere to stay; right?
19    A  Yes.
20    Q  You would have had nothing to eat?
21    A  Yes.
22    Q  And you would have had no money?
23    A  Yes.
24    Q  And no ability to make money, because you

Page 107

1  couldn't work.
2    A  Yes.
3        MR. CHALOS: Nothing further.
4        RE-CROSS EXAMINATION
5  BY MR. WOODWARD:
6    Q  Mr. Damasing, when you did the soundings
7  the bilge holding tank was very large, wasn't it?
8        MR. PHILLIPS: Objection; asked and
9  answered.
10        THE WITNESS: Yes.
11  BY MR. WOODWARD:
12    Q  And it was always full when you sounded
13  it?
14    A  No.
15    Q  In fact, most of the time it was less
16  than half full, wasn't it?
17    A  Perhaps.
18    Q  Okay. And the sludge tank was very
19  difficult to get an accurate reading, wasn't it?
20    A  Yes.
21    Q  And the reason was?
22        MR. PHILLIPS: Objection; no
23  foundation for him saying that he sounded the sludge
24  tank.

Page 108

1        MR. WOODWARD: Let the record
2  reflect whatever it reflects, but I believe he was
3  already asked about that.
4  BY MR. WOODWARD:
5    Q  But with respect to the sludge tank, the
6  reason that it was difficult to get an accurate
7  reading was why?
8    A  Because there is something that's in the
9  bottom of it.
10    Q  You mean the thick -- the sludge is
11  thick?
12    A  Yes.
13    Q  It's too thick?
14    A  It's not really that thick, but it is
15  thick.
16    Q  Okay. But what was it that prevented you
17  from taking an accurate reading of the sludge tank?
18    A  Sometimes it hits the metal portion and
19  it wouldn't go down straight.
20    Q  Okay. Now, when you appeared in front of
21  the Grand Jury, there was an interpreter there;
22  right?
23    A  Yes.
24    Q  But you answered all the questions

Roberto Damasing

25 (Pages 109 to 112)

Page 109

1  yourself, isn't that right?
2  A  Yes.
3  Q  The interpreter did not translate for
4  you; isn't that correct?
5  A  There were some portions that he
6  translated for me.
7  Q  But you did the best you could without
8  the translator?
9  A  Yes.
10         MR. WOODWARD: No further
11  questions.
12         FURTHER RE-DIRECT EXAMINATION
13  BY MR. PHILLIPS:
14  Q  Mr. Damasing, were you trained on how to
15  handle garbage on a ship?
16         MR. CHALOS: Objection.
17         THE WITNESS: Yes.
18  BY MR. PHILLIPS:
19  Q  Was the garbage on the Irene handled
20  properly?
21         MR. CHALOS: Objection.
22         THE WITNESS: No.
23  BY MR. PHILLIPS:
24  Q  Explain.

Page 110

1         MR. WOODWARD: Objection.
2         THE WITNESS: All the garbage is
3  collected. It's not separated. That's all.
4  BY MR. PHILLIPS:
5  Q  What's done with it after that?
6         MR. CHALOS: Objection.
7         THE WITNESS: It's thrown out to
8  the sea.
9  BY MR. PHILLIPS:
10  Q  Now, you testified that you were getting
11  paid by the company while you were here.
12  A  Yes.
13  Q  That's why you stayed in the United
14  States; correct?
15         MR. CHALOS: Objection.
16         THE WITNESS: Could you repeat
17  that.
18  BY MR. PHILLIPS:
19  Q  Would you get paid if you left the United
20  States?
21         MR. CHALOS: Objection.
22         MR. WOODWARD: Speculative.
23         THE WITNESS: I'm not really sure.
24  BY MR. PHILLIPS:

Page 111

1  Q  You were here because the company told
2  you this was your place to be; correct?
3         MR. CHALOS: Objection.
4         THE WITNESS: That I don't know.
5  BY MR. PHILLIPS:
6  Q  You were here under an agreement between
7  your company and the Coast Guard; correct?
8         MR. CHALOS: Objection.
9         THE WITNESS: Yes.
10  BY MR. PHILLIPS:
11  Q  Okay. Now, when you are out to sea, do
12  you visit your family?
13  A  No.
14  Q  How long are your contracts usually for?
15  A  Ten months plus three, both party
16  consents.
17  Q  And during that contract time, how much
18  is spent at sea?
19  A  In this particular ship -- in one voyage,
20  you're asking me?
21  Q  No, during the contract.
22  A  On the full contract.
23         MR. PHILLIPS: Okay. No further
24  questions. Thank you.

Page 112

1         MR. CHALOS: Mr. Damasing, we're
2  going to have another --
3         MR. TWERSKY: Can we go off the
4  record for a second?
5         MR. CHALOS: Can we finish? If
6  we're going to have --
7         MR. PHILLIPS: Redirect is usually
8  the end; right?
9         MR. KOTILA: No, you can keep
10  going. You got questions, ask him.
11         MR. CHALOS: We had a direct; a
12  cross; we had a redirect; we had a recross; then we
13  re-redirect.
14         MR. KOTILA: No objection. Ask
15  your questions.
16         MR. PHILLIPS: Go ahead.
17         FURTHER RECROSS-EXAMINATION
18  BY MR. CHALOS:
19  Q  Mr. Damasing, garbage was -- on board the
20  Irene E.M., you didn't have any responsibility for
21  the handling of the garbage, did you?
22  A  Yes.
23  Q  Okay. And so then you know that garbage
24  was disposed of every time the ship came into port;

Roberto Damasing

26 (Pages 113 to 116)

**Page 113**

1  right?
2      A   Yes.
3      Q   And the company paid for the disposal to
4  the shore facilities; right?
5      A   Yes.
6      Q   Now, Mr. Phillips asked you about an
7  agreement between the company and the Coast Guard;
8  right? You weren't a party to that agreement?
9      A   I was not there.
10     Q   And the company has no right to bargain
11 away your rights; right?
12     A   Yes.
13     Q   The Coast Guard wants you here.
14     A   Yes.
15     Q   And that's why you're here?
16         MR. PHILLIPS:  Objection; asked and
17 answered.
18         THE WITNESS:  Yes.
19 BY MR. CHALOS:
20     Q   Okay. Let's talk about the time that you
21 go to sea; all right? Mr. Phillips asked if you see
22 your family when you're at sea, and you said no;
23 right?
24     A   No. No.

**Page 114**

1      Q   But when your ship came here to Delaware,
2  you had already been gone from home for how long?
3      A   Eleven months.
4      Q   And then you've been here for another
5  eight months?
6      A   Yes.
7      Q   So it's been at least 19 months since
8  you've seen your family?
9      A   Yes.
10     Q   And you want to go home; right?
11     A   Yes.
12         MR. CHALOS:  Okay. Nothing
13 further. Thank you.
14         MR. PHILLIPS:  Nothing further.
15         MR. WOODWARD:  Nothing further.
16         THE VIDEOGRAPHER:  Off the record
17 at 12:44.
18         (Signature having been waived, the
19         deposition of ROBERT DAMASING,
20         Volume 2 was concluded at 12:44
21         p.m.)
22
23
24

**Page 115**

INDEX

| WITNESS: | | PAGE |
|---|---|---|
| ROBERT DAMASING, VOLUME 2 | | |
| Mr. Phillips | | 19 |
| Mr. Chalos | | 46 |
| Mr. Woodward | | 71 |
| Mr. Phillips | | 84 |
| Mr. Chalos | | 97 |
| Mr. Woodward | | 107 |
| Mr. Phillips | | 109 |
| Mr. Chalos | | 112 |

EXHIBITS

| CSMR | DESCRIPTION | PAGE |
|---|---|---|
| 23 | Documents relating to employment of Mr. Damasing | 51 |
| 24 | Photocopy of seaman's book and passport of Mr. Damasing | 51 |
| 25 | Certificates relating to Mr. Damasing's training | 51 |
| 26 | Physical and mental test results for Mr. Damasing | 51 |
| 27 | Declaration of Mr. Damasing | 51 |
| 28 | Handwritten statement of Mr. Damasing (also marked as Government Exhibit No. 4) | 80 |

**Page 116**

EXHIBITS MOVED INTO EVIDENCE

| CSMR Exhibit No. | PAGE |
|---|---|
| 23 | 54 |
| 24 | 54 |
| 25 | 58 |
| 26 | 59 |
| 27 | 67 |

| Government Exhibit No. | PAGE |
|---|---|
| 4 | 83 |

Roberto Damasing

Page 117

1    CERTIFICATE OF SHORTHAND REPORTER
2
3         I, Gail Inghram Verbano, CSR, RMR,
4    the officer before whom the foregoing proceedings
5    were taken, do hereby certify that the foregoing
6    transcript is a true and correct record of the
7    proceedings; that said proceedings were taken by me
8    stenographically and thereafter reduced to
9    typewriting under my supervision; and that I am
10   neither counsel for, related to, nor employed by any
11   of the parties to this case and have no interest,
12   financial or otherwise, in its outcome.
13
14
15
16   _____
     Gail Inghram Verbano, CSR, RMR
17   CSR No. 8635
     Certification No. 220
18   (Expires 1-31-2008)
19
20
21
22
23
24

# EXHIBIT B

DEC 08 2005

I, ROBERTO O DAMASING   MARRIED  FILIPINO
JOINED ONBOARD LAST DEC. 22 2004 CLAIM
THAT I AM AWARE OF PUMPING OUT OF
BILGE WATER TANK AS WELL AS SLUDGE TANK
USING A BILGE PUMP THROUGH A PLASTIC HOSE
THAT WILL HOKE EVERY TIME WE DEPART THE
PORT TO PUMP OUT BILGE WATER TANK AND
SLUDGE TANK.

THIS IS DONE WITH THE CHIEF ENGINEERS ORDER
TO 2ND ENGINEER THAT HE IS ALSO TELL TO AS
OILER. TO PUMP OUT.
SOME TIMES CHIEF ENGR TELL ME PERSONALLY
TO PUMP OUT BILGE.

IM ELEVEN MONTHS ONBOARD BUT THIS
BILGE OIL SEPARATOR WAS NOT USE DURING
PUMPING OUT. THIS USE ONLY FOR THE
PORT AUTHORITY IF THEY LIKE TO SEE
IF IT WAS WORKING AND TO HEAR THE
ALARM OF THE PPM.

ROBERTO O DAMASING
OILER

Gov't
EXHIBIT NO. 4
7-17-06

EXHIBIT NO. 28
CSME
7-17-06

# EXHIBIT 8

Bryan Espina

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

UNITED STATE OF AMERICA,            :
                                    : No.
        Plaintiff,                  : 1:06-CR-00076-GMS-2
                                    :
            vs.                     :
                                    :
                                    :
CHIAN SPIRIT MARITIME               :
ENTERPRISES, INC., VENETICO         :
MARINE S.A., IRENE E/M,             :
EVANGELOS MADIAS, CHRISTOS          :
PAGONES, ADRIEN DRAGOMIR,           :
                                    :
        Defendants.                 :


                    Videotaped deposition of BRYAN
ESPINA, taken pursuant to notice before Gail Inghram
Verbano, CSR, RMR, in the offices of United States
Department of Justice, 700 Nemours Building, 1007
Orange Street, Wilmington, Delaware, on Tuesday,
July 18, 2006, beginning at approximately 4:43 p.m.


                    CORBETT & WILCOX
            Registered Professional Reporters
        1400 French Street     Wilmington, DE 19801
                    (302) 571-0510
                www.corbettreporting.com

Bryan Espina

2 (Pages 2 to 5)

Page 2

```
1  APPEARANCES:
2      MARK W. KOTILA, ESQ.
       JEFFREY L. PHILLIPS, ESQ.
3      United States Department of Justice
       Environmental Crimes Section
4      P.O. Box 23985 - L'Enfant Plaza
       Washington, DC 20026-3985
5      Attorneys for Plaintiff
6      GEORGE M. CHALOS, ESQ.
       FOWLER, RODRIGUEZ & CHALOS
7      366 Main Street
       Port Washington, NY 11050
8      Attorney for Defendants Chian Spirit
       and Venetico Marine
9
       CARL R. WOODWARD, III, ESQ.
10     CARELLA, BYRNE, BAIN, GILFILLAN,
       CECCHI, STEWART & OLSTEIN
11     5 Becker Farm Road
       Roseland, NJ 07068-1739
12     Attorney for Defendant Dragonir
13
14  ALSO PRESENT:
15     Chris Weiss, Videographer
16     Chris Masaoay, Tagalog Interpreter
       Adrien Dragonir
17     Livio-Lee Roth
       Brent McKnight
18     Jason F. Burgess
19
20
21
22
23
24
```

Page 3

```
1       THE VIDEOGRAPHER: This is Chris
2   Weiss, the videographer, and the court reporter today
3   is Gail Verbano. We are both here from the firm of
4   Corbett & Wilcox, located at 230 North Market Street
5   Wilmington, Delaware.
6       The time is 4:43 p.m. on Tuesday,
7   July 18th, 2006. We are documenting the videotaped
8   deposition of Bryan Espina for the plaintiff in the
9   matter of United States of America versus Chian
10  Spirit Maritime Enterprises, Inc., Venetico Marine,
11  Irene E.M., Evangelos Madias, Christos Pagones,
12  Adrien Dragonir, in the United States District Court,
13  District of Delaware.
14      We are at the location of the
15  United States Attorney's office, Nemours Building,
16  1007 North Orange Street, Suite 700, Wilmington,
17  Delaware.
18      Will the attorneys please state
19  their appearance for the record.
20      MR. KOTILA: Mark Kotila on behalf
21  of the United States.
22      MR. PHILLIPS: Jeff Phillips on
23  behalf of the Government.
24      MR. CHALOS: George Chalos on
```

Page 4

```
1   behalf of the defendants, Venetico Marine and Chian
2   Spirit Maritime Enterprises.
3       MR. WOODWARD: And Carl Woodward on
4   behalf of Adrien Dragonir.
5       MR. TWERSKY: Michael Twersky on
6   behalf of the witness.
7       THE VIDEOGRAPHER: Will the court
8   reporter please administer the oath.
9       (CHRIS MASAOAY was previously sworn
10  in as Tagalog-English interpreter.)
11      - - -
12      BRYAN ESPINA, having first been
13  duly sworn through the interpreter according to law,
14  was examined and testified further as follows:
15      - - -
16      DIRECT EXAMINATION
17  BY MR. KOTILA:
18      Q   Good afternoon, Mr. Espina.
19      A   Good afternoon, sir.
20      Q   My name is Mark Kotila, and I'm here on
21  behalf of the United States. And we have spoken
22  before on several occasions; correct?
23      A   Yes.
24      Q   I want to just revisit your prior
```

Page 5

```
1   testimony information that you gave to us one last
2   time today.
3       A   Yes. Yes.
4       Q   How long have you been in this country?
5       A
6           THE WITNESS: (In English) For
7   about seven months.
8       A   For about seven months.
9       Q   And where have you stayed while you've
10  been here in the United States?
11          THE WITNESS: (In English) In the
12  hotel.
13      A   In the hotel.
14      Q   Where? Philadelphia?
15          THE WITNESS: (In English) In
16  Philadelphia.
17      A   In Philadelphia.
18      Q   And your hotel bill was paid by the
19  company?
20          THE WITNESS: (In English) Yes.
21      A   Yes.
22      Q   How about your salary?
23          THE WITNESS: (In English) Not all.
24      A   Not all.
```

Bryan Espina

3 (Pages 6 to 9)

Page 6

```
1       Q    How about your food money?
2            THE WITNESS: (In English) $40 a
3  day.
4       A    $40 a day.
5       Q    Have you been free to leave your hotel
6  and leave Philadelphia?
7            THE WITNESS: (In English) Yes.
8       A    Yes.
9       Q    But you don't have your passport?
10           THE WITNESS: (In English) I don't
11 have it.
12      A    I don't have it.
13      Q    Where do you — where are you from?
14           THE WITNESS: (In English) Philip-
15 pines.
16      A    In the Philippines.
17      Q    And could you tell us, what is your
18 address in the Philippines?
19           THE WITNESS: (In English) 241
20 Cabalan Street, Poblacion, Talisay City, Cebu,
21 Philippines.
22      A    241 Cabalan Street, Poblacion, Talisay
23 City, Cebu, Philippines.
24      Q    How long had you lived there?
```

Page 7

```
1            THE WITNESS: (In English) Since
2  when I was born.
3       A    Since when I was born.
4       Q    How old are you today?
5            THE WITNESS: (In English) 30.
6       A    30.
7       Q    Tell us, what is your occupation?
8            THE WITNESS: (In English) I'm a
9  sailor.
10      A    I'm a sailor.
11      Q    And what do you do aboard vessels?
12           THE WITNESS: (In English) I was on
13 board as a fourth marine engineer.
14      A    I was on board as a fourth marine
15 engineer.
16      Q    On board what?
17           THE WITNESS: (In English) M.V.
18 Irene.
19      A    M.V. Irene.
20      Q    Was this the first vessel you ever worked
21 on?
22           THE WITNESS: (In English) No.
23      A    No.
24      Q    How about — just roughly, how many
```

Page 8

```
1  vessels have you worked on in the past?
2            THE WITNESS: (In English) I was on
3  board overseas since 1999.
4       A    I was on board overseas since 1999.
5       Q    So about six years you've been —
6            THE WITNESS: (In English) Yes.
7       A    Yes.
8       Q    — working on the seas?
9       A    Yes.
10      Q    You said you were a fourth engineer
11 aboard the Irene?
12           THE WITNESS: (In English) Yes.
13      A    Yes.
14      Q    How did you rise to the rank of a fourth
15 engineer?
16           THE WITNESS: (In English) I took
17 the exam.
18      A    I took the exam.
19      Q    What exam?
20      A
21           THE WITNESS: (In English) Exam
22 which is given by our Government to qualify —
23      A    Exam which is given by our Government to
24 qualify —
```

Page 9

```
1            THE WITNESS: (In English) — if
2  you're qualified for that position.
3       A    — if you're qualified for that position.
4       Q    Well, how much formal schooling have you
5  had?
6            THE WITNESS: (In English) Just get
7  the average.
8       A    Just get the average. What do you mean
9  by that?
10      Q    Well, I mean — I don't know how it is in
11 the Philippines. But how many years of school?
12           THE WITNESS: (In English) Since
13 seven years old, from the elementary grade, six
14 years.
15           THE WITNESS: From seven years old,
16 the elementary grade, for six years. The high school
17 days is four years.
18      Q    Any college?
19           THE WITNESS: (In English) And
20 college is, three years plus one year apprenticeship.
21      A    And college is, three years plus one year
22 apprenticeship.
23      Q    Do you have a degree?
24      A    Yes.
```

Corbett & Wilcox

Bryan Espina

4 (Pages 10 to 13)

Page 10

1        THE WITNESS: (In English) Yes.
2     Q   In what?
3        THE WITNESS: (In English) Bachelor
4  of science in marine engineer.
5     A   Bachelor of science in marine engineer.
6        (Interruption by the court
7     reporter.)
8        MR. KOTILA: Off the record.
9        THE VIDEOGRAPHER: We are on the
10 record at 4:49.
11       (Discussion held off the record.)
12 BY MR. KOTILA:
13    Q   Okay. Mr. Espina, could you just tell
14 us, what kind of training have you had in order to
15 take the exam to be a fourth engineer?
16    A   There's a lot — there's a lot of them.
17 So because there's a lot, I could not remember
18 everything. Just some of it I can remember.
19    Q   Any training or courses regarding MARPOL?
20    A   Yes.
21    Q   And tell us, basically, what did you
22 learn there?
23    A   It is said that it's against to dump oil
24 in the sea or anywhere else, because it will destroy

Page 11

1  the environment.
2     Q   In your training, did you also learn
3  about pollution control equipment aboard vessels such
4  as oily water separators?
5        MR. CHALOS: Objection.
6        THE WITNESS: Yes, they also talk
7  about that and they teach about that.
8  BY MR. KOTILA:
9     Q   So you learned about oily water
10 separators?
11    A   Yes.
12    Q   How did you get the job aboard the Irene?
13    A   I went to apply — I went to apply in a
14 manning agency in the Philippines, the Bright
15 Maritime. And they were the ones that sent me
16 wherever that ship may have been.
17    Q   Do you recall where you boarded the
18 vessel?
19    A   In Fortaleza, Brazil.
20    Q   Do you recall what date that was?
21    A   November 18th.
22    Q   Of 2005?
23    A   2005.
24    Q   And when you boarded the boat in Brazil,

Page 12

1  had you any idea where you were heading from Brazil?
2     A   When I boarded, they told me that we
3  would be carrying some salt, and then we would go to
4  the United States.
5     Q   When you boarded the vessel, who did you
6  know would be your supervisor?
7     A   The higher officials.
8     Q   Who would be your immediate supervisory
9  official?
10    A   The chief engineer.
11    Q   What was his name?
12    A   Adrien Dragomir.
13    Q   Do you see him in the room here today?
14    A   Yes.
15    Q   Could you point him out, tell us what he
16 looks like.
17    A   He's over there. He has a beard.
18    Q   And glasses?
19    A   Yes, he has glasses.
20    Q   And a jeans vest?
21    A   And some hair that's a little bit white,
22 yeah. Yes. Yes, a vest.
23        MR. KOTILA: Let the record reflect
24 that the witness, Mr. Espina, has identified the

Page 13

1  defendant, Adrien Dragomir.
2  BY MR. KOTILA:
3     Q   All right. You got on the boat
4  November 18th. What were your duties?
5     A   My work consists of, as a fourth
6  engineer, to do the maintenance work and also to
7  follow the orders of the ones that are above me.
8     Q   And who would give you orders?
9     A   The second engineer.
10    Q   And what was his name?
11    A   Edgar.
12    Q   Villano?
13    A   Villano.
14    Q   Let me ask you about the oily water
15 separator aboard the Irene.
16        Did you take a look at it?
17    A   Yes.
18    Q   And tell us about the oily water
19 separator on the Irene.
20    A   It was old. It wasn't working.
21    Q   Why was it not working?
22    A   I don't know why. But when I boarded, it
23 was no longer working.
24    Q   Was it working at any time between Brazil

Bryan Espina

Page 14

1  and the United States?
2      A   No, it wasn't.
3      Q   Did you have any work in the oily bilge
4  waste?
5      A   Yes.
6      Q   What did you have to do with getting rid
7  of that waste?
8      A   We pumped it out.
9      Q   Why did you do that?
10     A   We were asked.
11     Q   By whom?
12     A   The second engineer, Edgar.
13     Q   Did he write it to you or did he tell it
14 to you?
15     A   He told me verbally. Here's the way he
16 said it to me: "Fourth, you pump out our bilges.
17 This is an instruction from the chief engineer."
18     Q   Did you see any written instructions from
19 the chief engineer?
20         MR. CHALOS: Objection.
21         THE WITNESS: Yes.
22 BY MR. KOTILA:
23     Q   Where?
24     A   In the logbook.

Page 15

1      Q   What kind of logbook? Describe it for
2  us.
3      A   The official logbook.
4      Q   Let me show you this logbook. Was it
5  this book, Government's Exhibit —
6      A   No.
7      Q   2? 1? It's not this book?
8      A   No.
9      Q   Describe this other logbook you're
10 talking about.
11     A   It's a larger book. It's a larger book.
12     Q   Did it have a name --
13     A   It's large.
14     Q   Did it have a name on it?
15     A   It has the name of the ship.
16     Q   And what else?
17     A   It's a large book and it doesn't really
18 have any cover. It doesn't have a plastic cover.
19 That's all that I could remember.
20     Q   Where was it located on the ship?
21     A   In the engine room.
22     Q   Describe the engine room, please.
23     A   The engine room, of course, contains some
24 machineries. There's a generator, there's a

Page 16

1  propulsion, there's a compressor. All the things
2  that have to do -- all the kind of machinery that
3  makes the ship move.
4      Q   And where would this book be in that
5  room?
6      A   I can't remember where it was.
7      Q   How did you know the chief engineer's
8  handwriting was in there?
9      A   It has his signature.
10     Q   You recognize his signature?
11     A   I don't remember it at this time.
12     Q   But you recall seeing it?
13     A   Yes.
14     Q   Take a look at Government's Exhibit 1.
15 Do you recognize the signature after the entries in
16 that book?
17         MR. WOODWARD: Objection; lack of
18 foundation.
19         THE WITNESS: I can't remember
20 anymore. I don't remember the signatures anymore.
21 BY MR. KOTILA:
22     Q   Do you know what this book is?
23     A   Yes. Oil Record Book.
24     Q   Okay. Do you recognize -- I'm referring

Page 17

1  to pages on the Oil Record Book dated 10/10/05
2  through January -- December 1st, '05, a series of
3  signatures and entries.
4          Do you recognize the signature?
5          MR. WOODWARD: Objection.
6          MR. CHALOS: Objection.
7          MR. WOODWARD: Lack of foundation.
8          THE WITNESS: I don't remember
9  quite clearly, because you see, I don't look at this
10 every day.
11 BY MR. KOTILA:
12     Q   I understand that. I'm just asking you
13 if you recognize the signature of the chief engineer.
14     A   I don't remember.
15     Q   Okay. All right. Now, you told us that,
16 based on the instruction in the engine book and what
17 you were told by Villano, you pumped out the bilge.
18     A   I did it.
19     Q   You did it personally?
20     A   Yes.
21     Q   How many times from Brazil to the United
22 States?
23     A   On my duty, two times.
24     Q   Day or nighttime?

Corbett & Wilcox

Bryan Espina

6 (Pages 18 to 21)

Page 18

1    A    At night.
2    Q    Why at nighttime?
3    A    So that no one would see it.
4    Q    Did you just pump the bilge tank or any
5  other tanks?
6    A    The bilge tank.
7    Q    How did you do it? Walk us through it
8  how you did it.
9    A    I opened the valves going out -- in and
10  out; and then I looked at the lines as well.
11    Q    What lines?
12    A    The lines that you put in there, the
13  thing that you call magic pipe.
14    Q    The thing that we call magic pipe or the
15  thing that you call magic pipe?
16    A    The thing that is called magic pipe.
17    Q    You knew it to be called a magic pipe?
18    A    Yes.
19    Q    Where have -- where, if you know, did
20  that name come from?
21    A    The previous ones, that's what they call
22  it.
23    Q    Take a look to your right there. Do you
24  recognize what's under that plastic?

Page 19

1    A    Yes.
2    Q    And what do you recognize that to be?
3    A    These are tubes.
4    Q    Do you want to take a look at them?
5    A    It's all right.
6    Q    Do you know what they are?
7    A    These are the pipes.
8    Q    Those are the magic pipes you used on the
9  Irene?
10         MR. WOODWARD: Objection; leading.
11         THE WITNESS: I don't remember
12  anymore, because, you know, they were hidden
13  underneath.
14  BY MR. KOTILA:
15    Q    Hidden by whom?
16    A    The -- the connections were underneath.
17    Q    Well, take a look in this basket here.
18  What do you see those things?
19    A    Flange.
20    Q    Do you know what those were used for?
21         MR. CHALOS: Objection; leading.
22         THE WITNESS: That's what's used --
23  that's what you use to attach them to the other end.
24  BY MR. KOTILA:

Page 20

1    Q    Do those look like the actual items to
2  you?
3         MR. CHALOS: Objection.
4         THE WITNESS: Yes.
5  BY MR. KOTILA:
6    Q    How do you know?
7         MR. CHALOS: Objection.
8         THE WITNESS: I looked at it before
9  I ran the pumps.
10  BY MR. KOTILA:
11    Q    When was the last time you saw them,
12  though?
13    A    When it was still attached.
14    Q    How do you know those are the actual
15  items, though?
16         MR. CHALOS: Objection. He didn't
17  say they were.
18         MR. KOTILA: Yes, he did.
19         THE WITNESS: Just from the size of
20  it.
21  BY MR. KOTILA:
22    Q    I'm going to approach the witness. Let's
23  take a look at them.
24         Okay. Have you ever touched these

Page 21

1  before on the vessel?
2    A    No.
3    Q    No? How do you know?
4    A    Because I was not the one that
5  attached -- or took it off.
6    Q    But what do you recognize it to be then?
7    A    Because I see it when I checked the
8  valves out before I pump out.
9    Q    Were these the valves that were used to
10  pump out on the vessel?
11         MR. CHALOS: Objection; asked and
12  answered.
13         THE WITNESS: These flanges are.
14  BY MR. KOTILA:
15    Q    They are then? Okay.
16         MR. WOODWARD: Objection.
17  BY MR. KOTILA:
18    Q    And what's the difference between these
19  two hoses; do you know?
20    A    I really couldn't tell you what the
21  difference is.
22    Q    But what were they used for?
23    A    To transfer different kinds of liquids.
24    Q    Okay. Were they used by you to pump out

Corbett & Wilcox

Bryan Espina

7 (Pages 22 to 25)

Page 22

1  bilges overboard? Take a look at them.
2      A    Yes, that's it.
3      Q    All right. Now, at the time you pumped
4  those bilges overboard -- two times?
5      A    Two times.
6      Q    -- how full were they? Full? Half full?
7  What?
8      A    I could not tell you if it was half or
9  it's full. All I know, it was more than one meter.
10     Q    Each time?
11     A    Yes.
12     Q    And what exactly did you do? You turned
13 on the pumps?
14     A    I ran the pumps.
15     Q    And you turned them off too?
16     A    On the second one, I was the one that
17 turned -- turned on and turned it off.
18     Q    Did you ever tell the chief engineer that
19 you were pumping?
20     A    No.
21     Q    Did you tell the captain?
22     A    No.
23     Q    Did you know what you were doing was
24 against the law?

Page 23

1      A    I know.
2      Q    Why did you do it?
3      A    That was an instruction from a higher
4  person.
5      Q    When you got to the United States in
6  early December and the Coast Guard boarded the
7  vessel, you made a statement, a four-page statement?
8      A    Yes.
9      Q    All right. So you signed a four-page
10 statement?
11     A    Yes.
12     Q    All right. I'm not going to go through
13 the details of this thing. But that's your
14 statement; correct?
15     A    Yes, it is.
16     Q    And you read that statement before you
17 signed it on the last page?
18     A    Yes.
19     Q    Was that given to a Mr. Christos?
20     A    It was given, yes.
21     Q    All right. After that, did Mr. Christos
22 have a conversation with you and other engineers?
23     A    Yes.
24     Q    What did he tell you?

Page 24

1      A    That we should not tell the truth.
2      Q    Tell us exactly, the best you remember,
3  what did he say?
4      A    That you should that -- we should not
5  tell the truth because -- "because you
6  contributed" --
7      Q    How did he say that?
8      A    -- and so that you would go to jail.
9          "You, you have 10 percent of the
10 blame; you, you have 10 percent of the blame," and so
11 on and so forth.
12     Q    How many times did he tell you this?
13     A    One time.
14     Q    Where did this take place?
15     A    Officers mess hall.
16     Q    Who was there?
17     A    The second engineer, the third engineer.
18     Q    Did you respond to Christos when he told
19 you that?
20     A    I did not say anything.
21     Q    Did anybody say anything?
22     A    The second engineer did.
23     Q    Okay. When you left the ship to stay in
24 the United States, did Christos speak to you again?

Page 25

1      A    He spoke to me before he went home.
2      Q    Oh, what did he tell you?
3      A    That, "Go ahead, you can tell the truth."
4      Q    Why?
5          MR. CHALOS: Objection. How does
6  he know why?
7  BY MR. KOTILA:
8      Q    Well, did he say why -- what else did he
9  say?
10     A    Because he said that, "You go ahead and
11 tell them the truth, because there is -- there is
12 nothing that we can hide. You go ahead and tell the
13 truth so that they would give you a lower sentence."
14 That's it.
15     Q    Give you a lower sentence?
16     Oh, that you understood?
17     A    But I didn't do anything wrong.
18     Q    But you had already given that statement,
19 though; right?
20     A    Yes.
21         MR. KOTILA: Thank you. I have no
22 further questions.
23         MR. CHALOS: Can we take just a
24 minute, so I can get my notes?

Corbett & Wilcox

Bryan Espina

8 (Pages 26 to 29)

Page 26

1  THE VIDEOGRAPHER: Off the record
2  at 5:11 -- no.
3  MR. CHALOS: No, we don't have to
4  go off the record.
5  MR. WOODWARD: Let's go off the
6  record.
7  MR. CHALOS: Take a minute.
8  All right.
9  THE VIDEOGRAPHER: Off the record
10  at 5:11.
11  (Brief recess.)
12  (Documents marked CSME Exhibits 33
13  through 38 for identification.)
14  THE VIDEOGRAPHER: On the record at
15  5:16.
16  RECROSS-EXAMINATION
17  BY MR. CHALOS:
18  Q  Good afternoon, Mr. Espina.
19  A  Good afternoon as well.
20  Q  My name is George Chalos, and I represent
21  Venetico Marine, the company that owns this vessel;
22  and Chian Spirit Maritime Enterprises, the company
23  that manages or operates the vessel.
24  Now, let's talk a little bit about

Page 27

1  how you came to work on board the Irene E.M.
2  You went looking for a job at a
3  manning agent in the Philippines; right?
4  A  Yes.
5  Q  Okay. And you had to prepare some
6  paperwork to make an application in order to be
7  considered to join a ship as a fourth engineer;
8  right?
9  A  Yes.
10  Q  And in fact, what happens after you do
11  that is the manning agent tells you what jobs are
12  available; right?
13  A  Yes.
14  Q  And then it's your decision which
15  contract you want to take; right?
16  A  Yes.
17  Q  Okay. And in fact, you chose to enter
18  into a contract with your manning agent to go to work
19  on board the Irene E.M.; right?
20  A  Yes.
21  Q  I'm going to show you what we've marked
22  as CSME Defendants' Exhibit No. 33 and ask you to
23  take a look at this four-page exhibit.
24  My question to you, Mr. Espina,

Page 28

1  that's your employment contract; right?
2  A  Yes.
3  Q  And that's the documents that you signed
4  in connection with your employment on board the Irene
5  E.M.; right?
6  A  Yes.
7  Q  And you had to review those documents
8  before going on board; right?
9  A  Yes.
10  Q  Take a look at the second page. That's
11  your signature on the bottom left-hand side; right?
12  A  Yes.
13  Q  So it's fair to say that you signed this
14  declaration?
15  A  Yes.
16  Q  And you were provided with a copy of the
17  company's safety management system and environmental
18  protection policy; right?
19  A  Yes, there is.
20  Q  Okay. And before you went on board the
21  ship, you knew that if you were found violating the
22  policy, you could be fired?
23  A  Yes, I know that.
24  Q  Okay. Now, you also know from your

Page 29

1  training about MARPOL; right?
2  A  Yes.
3  Q  Okay. And you learned that both in
4  school -- right?
5  A  Yes.
6  Q  -- and then at some training classes you
7  took?
8  A  Yes.
9  Q  And in fact, you had to go for a special
10  seminar or a training course before you were
11  permitted to join the Irene E.M. in Brazil?
12  A  Yes.
13  Q  And one of the topics that you had to
14  study was the Chian Spirit environmental protection
15  policy; right?
16  A  Yes.
17  Q  Okay. So you knew before you got on
18  board the ship that the company, if they knew, would
19  not tolerate anybody pumping oil or oily wastes into
20  the sea?
21  A  Yes.
22  Q  Okay. And in fact, you know that there
23  was someone from the company who came on board the
24  ship in Brazil; right?

Page 30

1    A   Yes.
2    Q   And he came on board to make sure the
3   crew was following company policy; right?
4    A   Yes.
5    Q   Now, you told --
6        MR. CHALOS:  Okay.  I'll take that
7   back.  If I could move this into evidence, CSME
8   Defendants' Exhibit 33.
9        MR. KOTILA:  No objection.
10       (Document marked CSME Exhibit 33
11       moved into evidence.)
12  BY MR. CHALOS:
13   Q   Now, Mr. Espina, you told us about the
14  company's environmental protection policy; right?
15   A   Yes.
16   Q   I'm going to show you what's been
17  previously marked as CSME Defendants' Exhibit 7.
18  Now, that's the environmental
19  protection policy that you reviewed before joining
20  the ship; right?
21   A   Yes.
22   Q   And that was available on board the ship
23  for all the crew to see; right?
24   A   Yes, it's there in the ship.

Page 31

1    Q   That was in the engine room on the
2   bulletin board; right?
3    A   I just don't remember.
4    Q   Okay.  Well, think about this:  it was in
5   the mess room right, hung up?
6    A   Yes, in the mess hall.
7    Q   And it was also hung on the wall in the
8   hallway?
9    A   That I don't know.  I didn't notice it.
10   Q   Okay.  It was in the ship's office;
11  right?
12   A   That I didn't notice as well.
13   Q   Okay.  It was on the bridge?
14   A   That, I don't go over there.
15   Q   And what about in the engine room, on
16  the -- there was a plywood bulletin board; right?
17   A   I did not notice it there.
18   Q   Okay.  But you've seen that before?
19   A   Yes.
20   Q   And you understood that to be the
21  company's environmental protection policy; right?
22   A   Yes.
23       MR. CHALOS:  If it has not already
24  been introduced into evidence with any other

Page 32

1   witnesses, we move it into evidence now.
2        MR. KOTILA:  No objection.
3        MR. WOODWARD:  Exhibit 7?
4        MR. CHALOS:  CSME 7.
5        (Document marked CSME Exhibit 7
6        moved into evidence.)
7   BY MR. CHALOS:
8    Q   Okay.  Mr. Espina I'm going to show you
9   what we've marked for identification as CSME
10  Defendants' Exhibit No. 34.  And for the record, I'll
11  make a representation it's a four-page document.
12   A   Yes.
13   Q   Now, Mr. Espina, can we agree that those
14  are photocopies of your passport and your seaman's
15  book?
16   A   Yes.
17       MR. CHALOS:  Okay.  I'd like to
18  move that into evidence.
19       MR. KOTILA:  No objection.
20       (Document marked CSME Exhibit 34
21       moved into evidence.)
22  BY MR. CHALOS:
23   Q   Also, Mr. Espina, I want to show you what
24  we've marked as CSME Defendants' Exhibit No. 35.  For

Page 33

1   the record, I'll make a representation it's a
2   five-page exhibit.
3        Mr. Espina, will you agree with me
4   that that exhibit is a photocopy of your license that
5   was issued by the Philippines government?
6    A   This is it.
7    Q   And it also includes an endorsement from
8   a flag state administration for the vessel; right?
9    A   This is the first time that I am seeing
10  this flag.
11   Q   Well, first I'd like to move this
12  document into evidence.
13       MR. KOTILA:  Which one?
14       MR. CHALOS:  This is the license
15  documents.
16       MR. KOTILA:  And he never saw this
17  before?  What did he say?
18       MR. CHALOS:  He said he didn't see
19  the endorsement.  But I can clarify that.
20       MR. KOTILA:  Which is the
21  endorsement?
22       MR. CHALOS:  He didn't have
23  knowledge of the endorsement.
24       MR. KOTILA:  Well, why don't you

Bryan Espina

10 (Pages 34 to 37)

Page 34

1 separate them. Move that into evidence. He's not
2 familiar with this. I object to it.
3     MR. WOODWARD: Why don't you just
4 lay foundation.
5 BY MR. CHALOS:
6     Q    Okay. Before I move into this evidence,
7 Mr. Espina, you would agree with me that part of the
8 requirements for you going to work on the Irene E.M.
9 as the fourth engineer was that you needed to have
10 your license issued by the Philippine government
11 endorsed by the flag state administration for the
12 vessel; right?
13     A    I don't know.
14     Q    And an application was made to do that;
15 right?
16     A    Yes.
17     MR. CHALOS: Okay. Then I'd like
18 to move this into evidence.
19     MR. KOTILA: I'm just going to
20 object, because he doesn't recognize what it is.
21 BY MR. CHALOS:
22     Q    Well, take a look at the document – the
23 Exhibit 35 again. Mr. Espina, do you recognize that
24 first page?

Page 35

1     A    Yes.
2     Q    What is it?
3     A    This is the --
4     Q    It's a copy of your license, right, which
5 has been issued by the Philippine government?
6     A    Yes, it is.
7     Q    Okay. And the next page, do you
8 recognize that document?
9     A    Yes.
10     Q    And that's also part of your license;
11 right?
12     A    Yes.
13     Q    And the next page, do you recognize that
14 document?
15     A    Yes.
16     Q    And that's the endorsement application
17 for your license?
18     A    Yes.
19     Q    And the next page is the same; right? An
20 endorsement of your seaman's book?
21     A    When this was made, I was already on my
22 way to depart. They're the ones that processed this,
23 the manning agent.
24     Q    And that's something that was a

Page 36

1 requirement for you to work on board the ship; right?
2     A    Of course.
3     MR. CHALOS: Okay. Then I can move
4 that document into evidence, or that exhibit into
5 evidence.
6     MR. KOTILA: I'm just going to
7 object to it because it was not attached to the first
8 three sheets when he was on board and -- and its
9 relevance.
10     MR. CHALOS: Okay. Well, then I
11 object to -- I mean, then I move to -- then I'd like
12 to move -- if the document in its entirety is not
13 accepted into evidence, I'd like to move the pages
14 individually that were identified as being documents
15 Mr. Espina had known.
16     (Document marked CSME Exhibit 35
17     moved into evidence.)
18 BY MR. CHALOS:
19     Q    Now, Mr. Espina, let's talk about some of
20 that training you told us about.
21     Part of the requirements for you to
22 join the Irene E.M. as fourth engineer was to undergo
23 training courses; right?
24     A    Yes.

Page 37

1     Q    And you already told us that you had to
2 go for an exam given by the Philippine government to
3 be a fourth engineer?
4     A    Yes.
5     Q    And you have a bachelor's degree from a
6 maritime academy in the Philippines; right?
7     THE INTERPRETER: I'm sorry?
8     MR. CHALOS: From a maritime
9 academy in the Philippines.
10     THE WITNESS: Yes.
11 BY MR. CHALOS:
12     Q    Okay. And then you also took special
13 places in MARPOL and pollution prevention; right?
14     A    Yes.
15     Q    And you also took special training for
16 the company's pollution prevention procedures; right?
17     A    Yes.
18     Q    And then you were permitted to go on
19 board the ship; right?
20     A    Yes.
21     Q    Okay. I'd like to show you what's been
22 previously marked as CSME Defendants' Exhibit No. 36.
23 And, for the record, it's a several-page document.
24     Mr. Espina, that's photocopies of

Bryan Espina

11 (Pages 38 to 41)

Page 38

1 the certificates that you earned at various training
2 courses you attended; right?
3    A   Yes.
4       MR. CHALOS:  I'd like to move that
5 document into evidence.
6       MR. KOTILA:  No objection.
7       (Document marked CSME Exhibit 36
8    moved into evidence.)
9 BY MR. CHALOS:
10    Q   That first page, Mr. Espina, is a
11 certificate for one of the MARPOL classes you took?
12    A   Yes.
13    Q   And the second page is a certificate of
14 attendance for the specific training you took for the
15 Chian Spirit safety management system and
16 environmental protection policy; right?
17    A   Yes.
18    Q   And that class that you took was a
19 two-day course from November 3rd to November 4th of
20 2005; right?
21    A   Yes.
22    Q   And that was just before you left the
23 Philippines to go get on board the ship in Brazil;
24 right?

Page 39

1    A   Yes.
2    Q   Okay.  Thank you, Mr. Espina.
3       Now, the company also required that
4 before you go on board the ship, that you had to get
5 checked out to make sure that you were both
6 physically and mentally fit to do the job of a fourth
7 engineer; right?
8    A   Yes.
9    Q   Okay.  And, in fact, they sent you -- or
10 required you to go to various medical clinics; right?
11    A   Yes.
12    Q   And you went?
13    A   Yes.
14    Q   And I'd like to show you what we've
15 marked as CSME Defendants' Exhibit No. 37, and just
16 ask you to take a look at those documents.
17       Mr. Espina, those are the reports
18 that were issued after those examinations; right?
19    A   Yes, this is it.
20       MR. CHALOS:  I'd like to move those
21 into evidence.
22       MR. KOTILA:  No objection.
23       (Document marked CSME Exhibit 37
24    moved into evidence.)

Page 40

1 BY MR. CHALOS:
2    Q   Now, Mr. Espina, let me see if I got this
3 right.  Before you were approved to join the ship and
4 go to work on the Irene E.M. as the fourth engineer,
5 the owning company and the management company
6 required a couple things; right?  They required you
7 to have a valid license?
8    A   Yes.
9    Q   And they required you to have some
10 continuing education and training courses?
11    A   Yes.
12    Q   They required you to go to their own
13 special training on their pollution prevention
14 policies; right?
15    A   Yes.
16    Q   And their environmental protection
17 policies?
18    A   Yes.
19    Q   And their safety management system?
20    A   Yes.
21    Q   For two days in the Philippines; right?
22    A   Yes.
23    Q   They required you to go to the doctor to
24 get checked out?

Page 41

1    A   Yes.
2    Q   And they wanted to make sure that you
3 were fit for the duty; right?
4    A   Yes.
5    Q   And they wanted to make sure that you
6 knew that dumping something overboard was not
7 acceptable by the company?
8    A   Yes.
9    Q   And illegal?
10    A   Yes.
11    Q   And if you did it, you're subject to
12 getting fired --
13    A   Yes.
14    Q   -- and whatever punishment that may come
15 from the authorities; right?
16    A   Yes.
17    Q   Okay.  Then you got on board the ship;
18 right?
19    A   Yes.
20    Q   Now, you told Mr. Kotila that you got on
21 board the ship in Fortaleza, Brazil; right?
22    A   Yes.
23    Q   And when was that?
24    A   November 18th.

Corbett & Wilcox

Bryan Espina

12 (Pages 42 to 45)

Page 42

1   Q   Okay. So you get on board the ship in
2   Fortaleza, Brazil and when you got on board the ship
3   was discharging its cargo; right?
4   A   When I boarded, there was no board.
5   Q   Okay. Because the ship left Fortaleza
6   and went to another port in Brazil to load the salt;
7   right?
8   A   Yes.
9   Q   In fact, it went to two ports in Brazil
10  to load cargo; right?
11  A   I don't remember anymore. All I can only
12  remember one.
13  Q   Okay. Now, as the engineer, you don't
14  have any responsibility to navigate the ship?
15  Meaning --
16  A   No.
17  Q   -- you don't receive orders where to take
18  the ship, do you, as the fourth engineer?
19  A   They just tell us that this is where
20  we're going.
21  Q   But the company doesn't tell you that,
22  does it?
23  A   No.
24  Q   So the only way you know where the ship

Page 43

1   is going is from somebody telling you that; right?
2   A   Yes.
3   Q   And to you, as the engineer, it really
4   doesn't make a difference where the ship is going,
5   does it?
6   A   No.
7   Q   In fact, your job is just to make the
8   engines run; right?
9   A   Yes.
10  Q   And where the ship goes is for someone
11  else, not you?
12  A   No.
13  Q   Okay. Now, let's talk about the oily
14  water separator.
15          As fourth engineer on the Irene
16  E.M., you have no responsibility to operate the oily
17  water separator, do you?
18          THE INTERPRETER: I'm sorry?
19  BY MR. CHALOS:
20  Q   You have no responsibility to operate the
21  oily water separator?
22  A   Sometimes when I am asked to do it.
23  Q   Okay. Well, listen to my question. On
24  the Irene E.M., you were never asked to operate the

Page 44

1   oily water separator, were you?
2          MR. KOTILA: Objection. He
3   answered that he could.
4   BY MR. CHALOS:
5   Q   Do you understand my question?
6   A   Repeat it again.
7   Q   After you got on board the Irene E.M.,
8   were you ever asked to operate the oily water
9   separator?
10  A   No.
11  Q   Okay. So it's fair to say that since the
12  time you got on board the Irene E.M., you had no
13  responsibility for the operation of the oily water
14  separator?
15  A   None.
16  Q   Okay. You don't have any responsibility
17  to maintain the oily water separator, do you?
18  A   If I am asked to do it.
19  Q   But you weren't asked?
20  A   The second engineer just asked me to
21  familiarize myself because I was new.
22  Q   Okay. But the second engineer never
23  asked you to actually operate it, did he?
24  A   No.

Page 45

1   Q   Okay. And you don't have -- you weren't
2   asked to make any repairs to the oily water
3   separator, were you?
4   A   They asked me to clean it.
5   Q   Okay. The only thing they did was ask
6   you to clean it, right?
7   A   Yes.
8   Q   They didn't ask you to test it?
9   A   No.
10  Q   So when you told Mr. Kotila that the oily
11  water separator didn't work, the only way you know
12  that is because someone else told you that; right?
13          MR. KOTILA: Objection. Not his
14  testimony.
15          THE WITNESS: I know that it wasn't
16  working. I saw the second engineer trying to work on
17  it.
18  BY MR. CHALOS:
19  Q   Okay. But you yourself didn't try to
20  work on it?
21  A   I just cleaned it.
22  Q   So the answer is no, you didn't work on
23  it?
24  A   No.

---

Done below.

Bryan Espina

13 (Pages 46 to 49)

**Page 46**

1  Q  Okay. Now, Mr. Kotila showed you a book
2  before -- for the record, I'll identify it as
3  Government's Exhibit No. 1 -- and you said you
4  recognize this as an Oil Record Book; right?
5  A  Yes.
6  Q  On board the Irene E.M., you didn't
7  maintain the Oil Record Book, did you?
8  A  No.
9  Q  In fact, you never wrote in it, ever?
10  A  No, nothing.
11  Q  So none of the handwriting in there is
12  yours?
13  A  None.
14  Q  And, in fact, you have no responsibility
15  to write in that book at all?
16  A  Nothing.
17  Q  Before the Government showed it to you,
18  Mr. Espina, you never saw the contents of that book,
19  did you?
20  A  I didn't see it.
21  Q  So the first time you saw it was when the
22  Government showed it to you; right?
23  A  Yes, at this time.
24  Q  Because the Oil Record Book is not part

**Page 47**

1  of the fourth engineer's job; right?
2  A  You're correct.
3  Q  Okay. Now, there was a practice on board
4  the ship whereby the bilge wells would be pumped into
5  the bilge holding tank; right?
6  A  Yes, it is pumped.
7  Q  Now, you were only on board the ship for
8  a short time, but even you know that it was pumped
9  from time to time from the bilge wells to the bilge
10  holding tank; right?
11  A  Yes.
12  Q  Okay. Now, in order to pump from the
13  bilge wells to the bilge holding tank, no oily wastes
14  go into the sea; right?
15  A  They just transfer it, because there's a
16  lot of it.
17  Q  Right. And in fact, the bilge holding
18  tank was gigantic; right?
19  A  That I don't know. I have not gone
20  inside it.
21  Q  Okay. Well, you do know, though, that
22  the bilge holding tank had more than 106 cubic meters
23  of capacity, do you not?
24  A  I didn't know that.

**Page 48**

1  Q  Okay. Now, you told Mr. Kotila before
2  that you personally discharged oily wastes overboard
3  two times between Brazil and the U.S.; right?
4  A  Yes.
5  Q  Now, at the time you did that, are you
6  telling me that you didn't know what the capacity of
7  the bilge holding tank was?
8  MR. KOTILA: Objection; asked and
9  answered.
10  THE WITNESS: I didn't know.
11  BY MR. CHALOS:
12  Q  Okay. So it's fair to say that there
13  could have been plenty of space in the bilge holding
14  tank?
15  MR. KOTILA: Objection. He
16  wouldn't know the answer. He doesn't know the
17  capacity.
18  BY MR. CHALOS:
19  Q  Fair enough. But you can answer.
20  A  I don't know the capacity.
21  Q  And you didn't know the quantity of the
22  contents in the bilge holding tank at the time you
23  discharged overboard; right?
24  A  I didn't know.

**Page 49**

1  Q  Okay. Mr. Espina, when you made those
2  two discharges overboard, did you ever report what
3  you did to the captain?
4  A  No.
5  Q  Did you ever report what you did to Chian
6  Spirit Maritime Enterprises, the manager of the ship?
7  A  No.
8  Q  And you never reported what you did to
9  Venetico Marine, the owner of the ship, did you?
10  A  No.
11  Q  And in fact, Mr. Espina, you never even
12  reported it to Chief Engineer Dragomir?
13  A  No.
14  Q  Okay. Now, the order you got came from
15  the second engineer, Edgar Villano; right?
16  A  Yes.
17  Q  And you told us before, his instruction
18  was, "Fourth, pump out the bilge wells; chief
19  engineer wants you to do it"?
20  A  Yes.
21  Q  And now, you never double-checked the
22  order with the chief engineer, did you?
23  A  No, I didn't anymore.
24  Q  You believed that the second engineer was

Bryan Espina

14 (Pages 50 to 53)

Page 50

1  telling you the truth; right?
2    A   Yes.
3    Q   But you don't know what the discussions
4  were between the chief engineer and the second
5  engineer, do you?
6    A   I don't know.
7    Q   Okay. And you don't know if the chief
8  engineer -- strike that. Let me change my question.
9        You don't know if the second
10 engineer misunderstood the order of the chief
11 engineer; right?
12       MR. KOTILA: Objection as to what
13 he would think the second engineer understood.
14       THE WITNESS: That was the
15 instruction to me.
16 BY MR. CHALOS:
17   Q   Okay. Now --
18       I'm looking at the notes for the
19 wrong guy. Okay. I got the right page now.
20       Okay. Now, Mr. Kotila asked you
21 some questions about these hoses and these flanges.
22 Do you remember that?
23   A   Yes. Yes.
24   Q   Okay. Now, you didn't bring those here

Page 51

1  from the ship, did you?
2    A   No.
3    Q   You never hooked up the hose to the
4  flanges when you were on board the ship, did you?
5    A   No.
6    Q   You never hooked up the flanges to any of
7  the valves, did you?
8    A   No.
9    Q   You never disconnected any of the valves
10 and flanges; right?
11   A   Certainly not.
12   Q   You never disconnected the hoses; right?
13   A   No.
14   Q   So you really don't know whether these
15 flanges and these hoses come from the Irene E.M., do
16 you?
17       MR. KOTILA: Objection; he answered
18 that he did know.
19       THE WITNESS: I saw it there when I
20 opened the valves.
21 BY MR. CHALOS:
22   Q   Okay. But you don't know if these are
23 the hoses you saw, do you?
24       MR. KOTILA: Objection; asked and

Page 52

1  answered.
2        THE WITNESS: Now -- I remember it
3  now. These are the hoses.
4  BY MR. CHALOS:
5    Q   Okay. Now, the two times that you opened
6  the valves to do these -- or started the pumps to
7  make these discharges --
8    A   Yes.
9    Q   -- you had never discussed what you were
10 doing with the chief engineer?
11       MR. KOTILA: Objection; asked and
12 answered.
13       THE WITNESS: No.
14 BY MR. CHALOS:
15   Q   Now, you told us -- hold on one second.
16 Let's talk a little bit more about the magic pipe.
17 Okay?
18       Just so I'm clear, you never hooked
19 it up; right?
20   A   No.
21   Q   You never disconnected it; right?
22   A   No.
23   Q   The chief engineer never told you to hook
24 it up?

Page 53

1    A   No.
2    Q   He never told you, "Disconnect it"?
3    A   No.
4    Q   He never told you, "Hide it"?
5    A   No.
6    Q   Okay. The captain, he never told you to
7  hook up the magic pipe, did he?
8    A   No.
9    Q   The captain never told you to disconnect
10 the magic pipe, did he?
11   A   No.
12   Q   The captain never told you to hide the
13 magic pipe, did he?
14   A   No.
15   Q   Okay. The manager of the ship, Chian
16 Spirit, they never told you to hook up the pipe;
17 right?
18       MR. KOTILA: Objection as to who
19 Chian would be aboard the vessel.
20       THE WITNESS: No.
21 BY MR. CHALOS:
22   Q   The Chian Spirit never ordered you to
23 disconnect the magic pipe, did they?
24   A   No.

Bryan Espina

15 (Pages 54 to 57)

Page 54

1    Q   Okay.  Chian Spirit didn't tell you to
2  hide the magic pipe, did they?
3    A   No.
4    Q   The company, Venetico Marine -- that's
5  the company that owns the ship -- did I understand
6  you before, you never communicated with that company?
7    A   No.
8    Q   So it's fair to say that you never
9  received any orders from that company to either hook
10  up, disconnect or hide the magic pipe?
11   A   None.
12   Q   Okay.  Let's talk about Christos.
13       The Coast Guard came on board the
14  ship when the ship arrived here; right?
15   A   Yes.
16   Q   Okay.  Now, Christos wasn't on board when
17  the Coast Guard came on board, was he?
18   A   I don't remember.
19   Q   Okay.  The Coast Guard interviewed some
20  of the crew members.  Do you remember that?
21   A   Yes.
22   Q   But they didn't interview you?
23   A   No.
24   Q   All right.  Then at some point, Christos

Page 55

1  came on board the ship; right?
2    A   Yes, he boarded.
3    Q   Okay.  And he asked some of the crew to
4  prepare a statement.  Do you remember that?
5    A   Yes.
6    Q   And what he asked was for the crew to
7  write a statement about what they told the Coast
8  Guard so he can give it to the company's lawyers;
9  right?
10   A   Yes.
11   Q   Okay.  And after Christos asked that, the
12  second engineer, Mr. Villano, called the meeting of
13  all the Filipinos; right?
14   A   Yes.
15   Q   Okay.  Now, he didn't include Mr. Tudor,
16  the electrician, right?
17   A   He wasn't there.
18   Q   He's a Romanian guy; right?
19   A   Yes.
20   Q   And he didn't include the chief engineer;
21  right?
22   A   No.
23   Q   He's another Romanian guy?
24   A   Yes.

Page 56

1    Q   But both Mr. Tudor and Chief Engineer
2  Dragomir had been interviewed by the Coast Guard;
3  right?
4    A   I don't remember if they were interviewed
5  or not.
6    Q   But they surely weren't at that meeting
7  that Second Engineer Villano organized?
8    A   They weren't there.
9    Q   Okay.  So the statement that was prepared
10  that Mr. Kotila showed you before was something that
11  was prepared by Mr. Villano; right?
12   A   Yes.
13   Q   Okay.  And in fact, he had a draft of the
14  statement, but he asked you to re-write it because
15  you had better handwriting; right?
16   A   Yes.
17   Q   So not just the fourth engineer, but you
18  were the second engineer's secretary?
19   A   That's one of his order.
20   Q   Okay.  And that's what you do:  You
21  generally just follow orders; right?
22   A   Yes.
23   Q   Okay.  Now, after you gave that to
24  Mr. Christos, that's when he told the crew that they

Page 57

1  should retract their statement; right?
2    A   Yes.
3    Q   Okay.  But you had no statement to change
4  or retract, because you had never spoken to the Coast
5  Guard; right?
6    A   No.
7    Q   Okay.  And in fact, every time you spoke
8  to the Coast Guard, you've always told the truth;
9  right?
10   A   Yes.
11   Q   Okay.  And today you've told us the
12  truth?
13   A   Just the truth.
14   Q   Okay.  Just so I'm clear, Venetico
15  Marine, the company that owns the ship, never ordered
16  you to lie to anybody, did they?
17   A   I did not receive anything from the
18  owners.
19   Q   Okay.  And you didn't receive any orders
20  from the managers to lie either, did you?
21   A   Just from Christos.
22   Q   Okay.  But nothing from the company?
23   A   Nothing.
24   Q   Okay.  And the captain never ordered you

Corbett & Wilcox

Bryan Espina

16 (Pages 58 to 61)

Page 58

1  to lie, did he?
2      A   We don't speak.
3      Q   Okay. So it's fair to say that he never
4  told you to lie?
5      A   Yes.
6      Q   And Chief Engineer Dragomir never told
7  you to lie; right?
8      A   No.
9      Q   Okay. There was a gentleman on board
10 named Mr. Madias. Did you see him?
11     A   I saw him.
12     Q   Okay. And did you greet him and did he
13 greet you?
14     A   Just say "hi."
15     Q   Okay. Now, he never told you to lie, did
16 he?
17     A   No.
18     Q   He never told you to hide anything from
19 the Government or the Coast Guard?
20     A   No.
21     Q   Okay. One second. One second.
22         Now, Mr. Espina --
23     A   Yes.
24     Q   -- recently you, with the assistance of

Page 59

1  your attorney, made an application to the Court to
2  let you go home; right?
3      A   Yes.
4      Q   And part of that application included a
5  declaration that you made in support of that
6  application; right?
7      A   Yes.
8      Q   I'd like to show you what we've marked as
9  CSME Defendants' Exhibit No. 38. For the record,
10 it's a three-page document.
11         Now, Mr. Espina, take a look at the
12 third page. Is that your signature?
13     A   This is it.
14     Q   And before you signed it, you reviewed
15 that document? Meaning you read it?
16     A   I read it fully.
17     Q   Okay. And you agree with all the
18 contents?
19     A   Yes, of course. I signed it.
20     Q   Okay. Now, you're not here voluntarily,
21 are you?
22     A   I was asked to come here.
23     Q   Okay. Who asked you to come here? The
24 Coast Guard; right?

Page 60

1      A   Yes.
2      Q   Okay. Now, Mr. Kotila asked you about
3  where you're staying. You're staying at a motel up
4  in Philadelphia; right?
5      A   Previously. At another time.
6          MR. CHALOS: Okay. Wait one
7  second. I'd like to move into evidence CSME
8  Defendants' Exhibit No. 38.
9          MR. KOTILA: Object to this
10 document. This document is irrelevant to the case.
11 It appears -- the indictment goes through, I believe,
12 December of '05. This is dated June 26th, 2006,
13 solely prepared for this purpose. It's not even in
14 the native language; it's in English.
15         Totally object to this document,
16 and a continuing objection to that one and every one
17 in this matter.
18         MR. CHALOS: Objection.
19         (Document marked Exhibit CSME 38
20 moved into evidence.)
21 BY MR. CHALOS:
22     Q   Okay. Mr. Espina, when you first came
23 off the ship, you were staying in a motel in
24 Philadelphia; right?

Page 61

1      A   Yes.
2      Q   Okay. And then just recently you've been
3  moved to a hotel here in Delaware; right?
4      A   Yes.
5      Q   Are you free to leave the United States?
6      A   No.
7      Q   Are you free to go visit with your
8  friends and family at home?
9      A   I'm free.
10     Q   You can leave to go visit them?
11     A   With the permission of my lawyer.
12         MR. CHALOS: Okay. So you'll have
13 to talk to Mr. Twersky about that.
14         Okay. Mr. Espina, thank you very
15 much. Nothing further.
16         RECROSS-EXAMINATION
17 BY MR. WOODWARD:
18     Q   Mr. Espina, my name is Carl Woodward, and
19 I represent Adrien Dragomir, the chief engineer. I
20 just want to ask you a couple of questions.
21         I think you were showed a statement
22 by Mr. Kotila, and you were also questioned by
23 Mr. Chalos about it. It's a four-page statement.
24         Just so I'm clear, this was

Page 62

1  originally drafted by the second engineer, correct?
2      A    Yes.
3      Q    All right. And then he wrote part of it
4  in final form and you wrote the rest.
5      A    Yes.
6      Q    That is, you copied what he had written.
7      A    Yes.
8      Q    All right. Now, there's some things in
9  here -- first of all, you signed it, right, on the
10 last page?
11     A    Yes.
12     Q    But in fact, you didn't know whether all
13 of the information in this statement was true, did
14 you? For example, any conversations between the
15 chief engineer and the second engineer, you weren't
16 present at them, were you?
17     A    I was not there.
18     Q    So therefore, you don't know whether
19 what's contained in this statement of conversations
20 between the chief engineer and the second engineer
21 are true or accurate?
22     A    I trust the second engineer.
23     Q    You trust the second engineer, but you
24 don't know whether what he said is correct in this

Page 63

1  statement, do you? Because you were not present.
2      A    Yes.
3      Q    Also, any conversations between the
4  second engineer and the electrician, you weren't
5  present for any of those conversations, were you?
6      A    I was not there.
7      Q    So therefore, the only way you know what
8  those conversations is by what the second engineer
9  wrote; correct?
10     A    Whatever it is that he said.
11     Q    All right. But you don't know whether
12 it's accurate, do you?
13     A    That I don't know.
14          MR. WOODWARD: I have no further
15 questions. Thank you very much.
16          REDIRECT EXAMINATION
17 BY MR. KOTILA:
18     Q    Quickly, Mr. Espina, Mr. Chalos here
19 asked you -- you said you never were asked to operate
20 the oily separator; correct?
21     A    Yes.
22     Q    And that's because the oily water
23 separator didn't work; correct?
24          MR. CHALOS: Objection.

Page 64

1          THE WITNESS: Yes.
2  BY MR. KOTILA:
3      Q    This practice of pumping the bilges into
4  the holding tank, did you ever do that?
5      A    Yes.
6      Q    How many times?
7      A    I don't remember anymore.
8      Q    When -- explain to me, when would bilges
9  be pumped overboard, when would they go into this
10 tank? Who would make the decision?
11     A    The bilge wells, when they get full, it's
12 transferred into the bilge tank. The bilge tank,
13 that's what we pump out.
14     Q    Okay. Now, what's the bilge holding
15 tank? What's the difference?
16     A    The bilge well will tank were located in
17 the front, two of them, starboard side and port side
18 and in the aft. And the bilge tank, it's only one
19 tank. It's larger than the bilge wells. That's it.
20     Q    Which tank was pumped overboard again?
21     A    The bilge tank.
22     Q    All right. Mr. Chalos also said to you,
23 you never reported dumping or never were told to li[ ]
24 by Venetico or Chian Spirit; right?

Page 65

1      A    Yes.
2      Q    Those are companies.
3      A    Yes.
4      Q    Companies are made of individuals;
5  correct?
6          MR. CHALOS: Objection.
7          MR. WOODWARD: Calls for a legal
8  conclusion.
9          THE WITNESS: Yes.
10 BY MR. KOTILA:
11     Q    Now, were there any individuals from
12 Venetico or Chian on board during your voyage?
13     A    None.
14     Q    So who was the highest ranking member of
15 that ship?
16     A    The captain.
17     Q    Who was next?
18     A    In the deck department, you have the
19 captain, the chief officer, second officer.
20     Q    How about in the engine room?
21     A    The chief engineer.
22     Q    Who gave you the order to dump?
23     A    The second engineer.
24     Q    Who wrote the order to dump?

Bryan Espina

18 (Pages 66 to 69)

---

Page 66

1       MR. CHALOS: Objection.
2       THE WITNESS: The chief engineer.
3  BY MR. KOTILA:
4       Q   All right. This meeting, this meeting
5  that -- with Mr. Villano, Mr. Tudor was not invited;
6  correct?
7       A   He was not there.
8       Q   And he was the electrician?
9       A   Yes.
10      Q   And he was not an engine room employee,
11 was he?
12          MR. CHALOS: Objection.
13          THE WITNESS: How do you mean?
14 BY MR. KOTILA:
15      Q   He's not an engineer in the engine room.
16      A   He's not an engineer in the engine room,
17 but he's under the engine department.
18      Q   Okay. Now, Mr. Dragomir was not part of
19 that group either; correct?
20      A   In that particular meeting, he wasn't
21 there.
22      Q   Why not?
23      A   I don't know.
24          MR. WOODWARD: Objection; calls for

---

Page 68

1              INDEX
2  WITNESS:                         PAGE
3  BRYAN ESPINA
4    Mr. Kotila                      4
5    Mr. Chalos                     26
6    Mr. Woodword                       61
7    Mr. Kotila                     63
8    Mr. Woodward                       67
9

---

Page 67

1  speculation.
2  BY MR. KOTILA:
3      Q   If you know.
4          MR. WOODWARD: He answered he
5  doesn't know.
6          MR. KOTILA: All right. I have no
7  questions. Thanks.
8          MR. CHALOS: No questions for me.
9  Thank you
10         RECROSS-EXAMINATION
11 BY MR. WOODWARD:
12     Q   Yeah, I have a question.
13         Mr. Kotila asked you about a
14 written order to dump. Or did he mean -- did you
15 understand that to mean a written order in the engine
16 log? Do you recall what it said? The exact words.
17     A   "Out all engine room bilges."
18         MR. WOODWARD: Thank you. No
19 further questions.
20         THE VIDEOGRAPHER: Off the record
21 at 6:07.
22     (Signature having been waived, the
23 deposition of BRYAN ESPINA was
24 concluded at 6:07 a.m.)

---

69

1             EXHIBITS
2    EXHIBITS MARKED FOR IDENTIFICATION
3  CSME       DESCRIPTION          PAGE
4  33    Documents relating to employment    26
          of Mr. Espina
5
6  34    Photocopy of seaman's book and    25
          passport of Mr. Espina
7  35    Licensing documents for       26
          Mr. Espina
8
9  36    Certificates relating to      26
          Mr. Espina's training
10 37    Physical and mental test results   26
          for Mr. Espina
11
12 38    Declaration of Mr. Espina      26
13
14
15          EXHIBITS MOVED INTO EVIDENCE
16 CSMR Exhibit No.        PAGE
17    7                  32
18    33                 30
19    34                 32
20    35                 36
21    36                 38
22    37                 39
23    38                 60
24

70

19          70

```
 1        CERTIFICATE OF SHORTHAND REPORTER
 2
 3            I, Gail Inghram Verbano, CSR, RMR,
 4   the officer before whom the foregoing proceedings
 5   were taken, do hereby certify that the foregoing
 6   transcript is a true and correct record of the
 7   proceedings; that said proceedings were taken by me
 8   stenographically and thereafter reduced to
 9   typewriting under my supervision; and that I am
10   neither counsel for, related to, nor employed by any
11   of the parties to this case and have no interest,
12   financial or otherwise, in its outcome.
13
14
15
16
              _____
                Gail Inghram Verbano, CSR, RMR
17              CSR No. 8635
                Certification No.: 220
18              (Expires 1-31-2008)
19
20
21
22
23
24
```

# EXHIBIT 9

Edgar Villano

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

UNITED STATE OF AMERICA,              :
                                      : No.
          Plaintiff,                  : 1:06-CR-00076-GMS-2
                                      :
              vs.                     :
                                      :
CHIAN SPIRIT MARITIME                 :
ENTERPRISES, INC., VENETICO           :
MARINE S.A., IRENE E/M,               :
EVANGELOS MADIAS, CHRISTOS            :
PAGONES, ADRIEN DRAGOMIR,             :
                                      :
          Defendants.                 :


              Videotaped deposition of EDGAR
VILLANO, taken pursuant to notice before Gail Inghram
Verbano, CSR, RMR, in the offices of United States
Department of Justice, 700 Nemours Building, 1007
Orange Street, Wilmington, Delaware, on Monday,
July 17, 2006, beginning at approximately 12:06 p.m.


              CORBETT & WILCOX
         Registered Professional Reporters
1400 French Street      Wilmington, DE 19801
              (302) 571-0510
         www.corbettreporting.com

Edgar Villano

2 (Pages 2 to 5)

Page 2

```
 1  APPEARANCES:
 2      MARK W. KOTILA, ESQ.
        JEFFREY L. PHILLIPS, ESQ.
 3      United States Department of Justice
        Environmental Crimes Section
 4      P.O. Box 23985 - L'Enfant Plaza
        Washington, DC 20026-3985
 5      Attorneys for Plaintiff
 6      GEORGE M. CHALOS, ESQ.
        FOWLER, RODRIGUEZ & CHALOS
 7      356 Main Street
        Port Washington, NY 11050
 8      Attorney for Defendants Chian Spirit
        and Venetico Marine
 9
        CARL R. WOODWARD, III, ESQ.
10      CARELLA, BYRNE, BAIN, GILFILLAN,
        CECCHI, STEWART & OLSTEIN
11      5 Becker Farm Road
        Roseland, NJ 07068-1739
12      Attorney for Defendant Dragomir
13  ALSO PRESENT:
14      Chris Weiss, Videographer
        Chris Masaoay, Tagalog Interpreter
15
        Adrien Dragomir
16      Liviu-Lee Roth
        Brent McKnight
17      Jason F. Burgess
18
19
20
21
22
23
24
```

Page 3

```
 1          THE VIDEOGRAPHER: This is Chris
 2  Weiss, the videographer, and the court reporter today
 3  is Gail Verbano. We are both here from the firm of
 4  Corbett & Wilcox, located at 230 North Market Street,
 5  Wilmington, Delaware.
 6          The time is 2:06 on Monday
 7  July 17th, 2006. We are documenting the videotaped
 8  deposition of Edgar Villano for the plaintiff in the
 9  matter of United States of America versus Chian
10  Spirit Maritime Enterprises, Inc., Venetico Marine,
11  Irene E.M., Evangelos Madias, Christos Pagones,
12  Adrien Dragomir, in the United States District Court,
13  District of Delaware.
14          We are at the location of the
15  United States Attorney's office, Nemours Building,
16  1007 North Orange Street, Suite 700, Wilmington,
17  Delaware.
18          Will the attorneys please state
19  their appearance for the record.
20          MR. KOTILA: Good afternoon. My
21  name is a Mark Kotila on behalf of the United States.
22  I should correct, it's actually 12:06.
23          MR. CHALOS: George Chalos on
24  behalf of Venetico Marine and Chian Spirit Maritime
```

Page 4

```
 1  Enterprises.
 2          MR. WOODWARD: And Carl Woodward on
 3  behalf of Adrien Dragomir.
 4          MR. TWERSKY: Michael Twersky on
 5  behalf of the witness.
 6          THE VIDEOGRAPHER: Will the court
 7  reporter please administer the oath.
 8              - - -
 9          (CHRIS MASAOAY was previously sworn
10  in as Tagalog-English interpreter.)
11              - - -
12          EDGAR VILLANO, having first been
13  duly sworn through the interpreter according to law,
14  was examined and testified as follows:
15              - - -
16          DIRECT EXAMINATION
17  BY MR. KOTILA:
18      Q   Good afternoon, Mr. Villano. How are
19  you?
20      A   I'm okay, sir.
21      Q   My name is Mark Kotila, and I'm here on
22  behalf of the United States.
23      A   Yes.
24      Q   And we have spoken in the past; correct?
```

Page 5

```
 1      A   Yes, sir.
 2      Q   You testified previously in this matter?
 3      A   Yes, sir.
 4      Q   And we spoke -- I'm not sure exact times,
 5  maybe once or twice -- in the United States
 6  Attorney's office?
 7      A   Yes, sir.
 8      Q   And then, correct, last week we spoke in
 9  your attorney's office, Mr. Twersky's office,
10  briefly?
11      A   Yes, sir.
12      Q   All right. Where do you currently
13  reside?
14      A   At the Doubletree Hotel.
15      Q   Where are you from? What country?
16      A   Philippines.
17      Q   And what is your address there?
18      A   4649 Pinagbuklod Street, Santa Mesa,
19  Manila.
20      Q   Thank you.
21          Could you tell us, what is your
22  occupation?
23      A   Second engineer.
24      Q   Now, how do you become a second engineer?
```

Edgar Villano

3 (Pages 6 to 9)

1   A  You need to take a board exam from the
2 PLC, Philippine Regulation Commission.
3   Q  How much basic schooling do you have?
4   A  Two years.
5   Q  Any college?
6   A  College.
7   Q  Degree?
8   A  Yes.
9   Q  Four-year degree?
10   A  Two-year degree. Two years apprentice,
11 and then you can take as a fourth engineer.
12   Q  And this is all in the shipping industry?
13   A  Yes, sir.
14   Q  What kind of training have you had in
15 addition to school?
16   A  There is a lot. I cannot tell you, sir.
17   Q  Give us a little summary, some of your
18 courses you've taken.
19   A  MARPOL 1 and 2.
20   Q  What did you learn in MARPOL 1 and
21 MARPOL 2?
22   A  That it's illegal to dispose overboard
23 any oil.
24   Q  Do you learn in MARPOL 1 and MARPOL 2 how

1 to handle bilge waste and oil sludge and things like
2 that?
3   A  They did not teach us how to operate it.
4   Q  Okay. You just know whether it's right
5 or wrong?
6   A  Yes, sir.
7   Q  When were you hired to work aboard the
8 M.V. Irene ?
9   A  Boarded, sir?
10   Q  When were you hired to work on that
11 vessel?
12   A  In Manila.
13   Q  Okay. Tell us how the job comes to you.
14   A  I went to apply.
15   Q  With whom?
16   A  At the crewing agency.
17   Q  In the Philippines?
18   A  Yes, sir.
19   Q  And how did you get out to the vessel?
20   A  Through the airplane.
21   Q  Okay. Where did you meet up with the
22 vessel, the Irene? What country?
23   A  In Brazil.
24   Q  Do you recall the date?

1   A  Yes, sir.
2   Q  Describe the Irene for us -- hold on
3 before you do. Let me withdraw that.
4     What was the date that you got on
5 board the vessel?
6   A  November 17, 2005.
7   Q  Could you just describe briefly the
8 vessel. What was it towing or pulling or carrying,
9 what kind of cargo, that kind of thing.
10   A  It's a bulk general cargo ship, sir.
11   Q  How many people would be under your
12 supervision?
13   A  Seven, sir.
14   Q  Who would they be, what titles?
15   A  The third engineer, the electrician, the
16 fourth engineer, and the three oiler and a wiper --
17 eight, sir. Eight.
18   Q  When you're hired aboard a vessel, you're
19 hired under a contract; correct?
20   A  Yes, sir.
21   Q  Who was the contract with?
22     MR. WOODWARD: Objection.
23 BY MR. KOTILA:
24   Q  Who was the contract with? You can

1 answer the question.
2   A  With a crewing agency.
3   Q  Okay. Aboard a vessel, who do you take
4 your orders from?
5   A  The chief engineer.
6   Q  Do you see the chief engineer in this
7 room today?
8   A  Yes, sir.
9   Q  And point him out for us and tell us what
10 his name is.
11   A  There he is.
12   Q  The gentleman wearing the jeans vest?
13   A  Yes, sir.
14   Q  Do you know his name? Go ahead.
15   A  Adrien, sir.
16   Q  Do you know his last name?
17   A  Dragomir.
18     MR. KOTILA: Well, for the record,
19 the witness has identified the defendant, Adrien
20 Dragomir.
21 BY MR. KOTILA:
22   Q  When you got on board the vessel
23 November 17th, 2005, in Brazil, tell us what you did
24 once you got on board.

Edgar Villano

4 (Pages 10 to 13)

Page 10

1    A  Of course I reported to the chief
2 engineer.
3    Q  Tell us what some of your duties were.
4 What were the actions you took when you got on board?
5    A  I'm the one that collects the job order
6 from him every day in the engine room.
7    Q  Now, you speak Filipino?
8    A  Yes, sir.
9    Q  As a first language?
10   A  Yes, sir.
11   Q  And -- but do you speak English?
12   A  Yes, sir.
13   Q  Did you ever take any training or
14 education in English?
15   A  Yes, sir.
16   Q  So you took courses of the language --
17 English language?
18   A  Since the elementary school until
19 college.
20   Q  So you speak English pretty well?
21   A  Yes, sir.
22   Q  What language did you communicate with
23 the chief engineer?
24   A  In English.

Page 11

1    Q  Okay.  Tell us about the oily water
2 separator aboard the Irene.
3         MR. CHALOS:  Objection.
4         THE WITNESS:  When I first boarded,
5 I asked the chief engineer if the oily water
6 separator was working.
7 BY MR. KOTILA:
8    Q  What did he say?
9    A  He said yes.
10   Q  What did you do next?
11   A  I asked him.
12   Q  Go ahead.
13   A  I said to him, "Did you try it?"
14   Q  And what did he say?
15   A  He said yes.
16   Q  And what happened after that?
17   A  In my particular duty, in my duty at
18 nighttime, I tried to make it run.
19   Q  Tell us what you did to try to make it
20 run.
21   A  I looked for the power source, and I
22 looked at the valves together with the manual.  But I
23 was not able to make it work that evening.
24   Q  Did it ever work when you were on board?

Page 12

1    A  The next day.
2    Q  Uh-huh.  What's the purpose of the oily
3 water separator?
4    A  To separate the oil and the water.
5    Q  Does anything go overboard?
6    A  Through the separator, sir?
7    Q  Yes.
8    A  Are we talking about a testing process?
9    Q  Yes, when you test it.  How is it
10 supposed to work?
11   A  We did not open the overboard, only the
12 testing line.
13   Q  Tell us how you tested it.
14   A  When I tested it, I was with the
15 electrician.  We tried to run it.  And so he showed
16 me where the power sources were, and so we made it
17 run.  It was running, but it did not stop on the
18 proper reading, ppm.
19   Q  What is the proper ppm?
20   A  15 ppm automatic stop.
21   Q  When did it stop, though?
22   A  After 15 ppm.
23   Q  About how much after, do you remember?
24   A  About 38, going up.  More than 40.

Page 13

1    Q  Did any part of the oily water separator
2 work?
3         MR. CHALOS:  Objection; asked and
4 answered.
5 BY MR. KOTILA:
6    Q  Did the alarm work on it?
7    A  Yes, sir.
8    Q  And why is that?
9    A  When it stops, it makes an alarm.
10   Q  Did you see the electrician do anything
11 with the alarm?
12   A  I didn't see anything.
13   Q  Okay.  Did the alarm have to be fixed; do
14 you know?
15   A  Perhaps not.  It was running, the alarm.
16   Q  It was sounding, you mean?
17   A  Yes, sir.
18   Q  Is there an overboard discharge connected
19 to the oily water separator?
20   A  Yes, there is.
21   Q  Is there a lock on it?  Can it be locked?
22   A  Yes, sir.
23   Q  And when you were testing it, was it
24 locked?

Edgar Villano

5 (Pages 14 to 17)

Page 14

1    A   Yes, sir.
2    Q   Was it ever unlocked during the time you
3  were on the ship?
4    A   Sometimes.
5    Q   Was the oily water separator ever used to
6  discharge any water into the ocean?
7    A   No, sir.
8    Q   Never while you were on board?
9         MR. WOODWARD: Objection; leading.
10        THE WITNESS: No, sir.
11  BY MR. KOTILA:
12    Q   On your trip from Brazil to the United
13  States, what if anything was discharged overboard?
14        MR. CHALOS: Objection.
15        MR. WOODWARD: Objection.
16  BY MR. KOTILA:
17    Q   Answer the question.
18    A   The bilges and the sludges.
19    Q   How were these items discharged
20  overboard?
21    A   Going through a magic pipe.
22    Q   Did you do this?
23    A   We were the ones that attached it.
24    Q   Who is "we"?

Page 15

1    A   Me and Robert were the ones that attached
2  it.
3    Q   Robert Damasing?
4    A   Yes, sir.
5    Q   Why did you do this?
6    A   We were asked by the chief engineer.
7    Q   Mr. Dragomir?
8    A   Yes, sir.
9    Q   What did he ask you to do?
10   A   That when the bilges are high and the
11  sludge are high, that we should just go ahead and
12  pump it overboard through the magic pipe.
13   Q   Do you recall when is the first time that
14  the chief engineer told you to do this?
15   A   I don't remember exactly what day that
16  was.
17   Q   You got on board November 17th.
18   A   Yes, sir.
19   Q   Were you told that by the chief engineer
20  a few days later?
21        MR. WOODWARD: Objection; leading.
22        THE WITNESS: Yes, sir.
23  BY MR. KOTILA:
24    Q   How were you told?

Page 16

1    A   He told me verbally, direct.
2    Q   In what language?
3    A   In English.
4    Q   How else were you told, if at all?
5         MR. WOODWARD: Objection.
6         THE WITNESS: He also wrote it in a
7  logbook with a red ball pen.
8  BY MR. KOTILA:
9    Q   What did he write in the book?
10   A   "Out all engine room bilges."
11   Q   In red ink?
12   A   Yes, sir.
13   Q   And what did you take that to mean?
14   A   Before I read it, he told me in person.
15  So I know what it meant.
16   Q   What did he say in person? Exact words,
17  if you can recall.
18   A   All he told me was "Use the magic pipe
19  when the levels of the bilges are high. We should g
20  ahead and dispose of it before we arrive in the
21  United States."
22   Q   You knew you were coming to the United
23  States as soon as you got on board?
24    A   When I arrived there, I knew that it was.

Page 17

1    Q   Arrived where? In Brazil?
2    A   Yes, sir.
3    Q   How many times was it written in the
4  logbook to discharge?
5    A   Only one time, sir.
6    Q   Was this a standing order?
7         MR. CHALOS: Objection.
8         MR. WOODWARD: Leading.
9         THE WITNESS: After that he no
10  longer wrote it down. But then he would also talk to
11  me.
12  BY MR. KOTILA:
13   Q   And say what? What did he say?
14   A   He would tell me that we should go ahead
15  and pump it out.
16   Q   How many times in the voyage, from
17  November 17th through the time you arrived in the
18  U.S. in December -- if you recall, how many times di
19  he tell you to pump overboard?
20   A   I don't remember exactly, sir.
21   Q   More than one?
22   A   Yes, sir.
23   Q   More than five times?
24    A   I don't know, sir.

Edgar Villano

6 (Pages 18 to 21)

Page 18

1    Q   But multiple times?
2        MR. CHALOS: Objection.
3        THE WITNESS: Yes, sir.
4   BY MR. KOTILA:
5    Q   How did you know what to do?
6    A   For example, what?
7    Q   Well, did he tell you to use the magic
8   pipe?
9    A   Yes, sir.
10   Q   He used those words, "magic pipe?"
11   A   Yes, sir.
12   Q   Take a look to your right. That's
13  Government's Exhibit No. 2, I believe.
14       MR. PHILLIPS: It is.
15  BY MR. KOTILA:
16   Q   Mr. Villano, do you recognize that?
17   A   Yes, sir.
18   Q   What do you recognize that piping to be?
19   A   That's what we would use.
20   Q   How do you know those -- are they the
21  exact items, if you know? You can get up and take a
22  look at them, if you want.
23   A   Yes.
24   Q   Those are the items, the exact two pipes?

Page 19

1    A   Yes, sir.
2    Q   How can you tell?
3    A   Because I were the one that put it
4   together.
5    Q   One -- how many times did you put it
6   together?
7    A   Only once.
8    Q   Did the pipes stay connected to the
9   overboard from the tanks the entire time you were
10  there, from November to December?
11   A   Yes. It was taken out before we arrived.
12   Q   Who took it out?
13   A   I don't remember who took it out.
14   Q   Do you know why it was taken out?
15   A   Yes, sir.
16   Q   Why?
17   A   It's against the law.
18   Q   And you knew that from taking the MARPOL
19  courses; right?
20   A   Yes, sir.
21   Q   Now, you say you connected the pipe?
22   A   There were two of us, with Robert.
23   Q   Walk us through it. What did you
24  connect, what to what? What tank to what?

Page 20

1    A   When we attached this, there was already
2   a flange --
3        MR. KOTILA: Hold on a second.
4        MR. PHILLIPS: Government 3.
5   BY MR. KOTILA:
6    Q   Let's take a look at Government 3. Do
7   you see it down there?
8    A   Yes, sir.
9    Q   Do you recognize that item?
10   A   Yes, sir.
11   Q   What do you recognize it to be?
12   A   That's what we connect to the line from
13  the bilge pump going to overboard.
14   Q   And how did the material go from the --
15  from the bilge well or bilge tank?
16   A   We attached it. A flange was attached,
17  and then attached to the bilge pump -- after the
18  bilge pump.
19   Q   How did the material, the oily waste, go
20  from the tanks out oversea? How did it get pumped?
21   A   There's a suction from the bilge pump.
22   Q   Okay. When did you pump, day or night?
23       MR. CHALOS: Objection. He never
24  said he pumped.

Page 21

1        THE WITNESS: At nighttime.
2   BY MR. KOTILA:
3    Q   Did you do the pumping or did you order
4   it to be pumped?
5    A   I make the order.
6    Q   Order to whom?
7    A   The fourth engineer, the third engineer.
8    Q   When did you order to be pumped, day or
9   night?
10       MR. CHALOS: Objection.
11  BY MR. KOTILA:
12   Q   You can answer.
13   A   Two days after we left Brazil.
14   Q   But at nighttime you ordered the pump?
15       MR. CHALOS: Objection.
16       THE WITNESS: Yes, sir.
17  BY MR. KOTILA:
18   Q   Why at night?
19   A   Because in the daytime they would see it.
20   Q   Who would see it?
21   A   The authorities.
22   Q   Now, you arrived in the United States
23  around December 4th; do you recall?
24   A   Yes, sir.

Edgar Villano

Page 22

1    Q   And the Coast Guard got on board the
2  vessel?
3    A   Yes, sir.
4    Q   And did you overhear the chief engineer
5  speaking with the Coast Guard —
6    A   Yes, sir.
7    Q   — about the oily water separator?
8    A   Yes.
9    Q   What did you hear him tell the Coast
10 Guard?
11   A   On the first day, he said that it was
12 working.
13   Q   Was that true?
14   A   No, sir.
15   Q   When you were discharging or your crew
16 members were discharging overboard, did you ever go
17 back to the chief engineer and tell him this was
18 wrong to do?
19   A   No, sir.
20   Q   Do you remember whether you spoke to him
21 about that or not?
22       MR. CHALOS:  Objection.
23       MR. WOODWARD:  Objection; leading.
24 It's asked and answered.

Page 23

1        THE WITNESS:  About what?
2  BY MR. KOTILA:
3    Q   About whether it was right or wrong to
4  discharge overboard.
5    A   All he told me was, "Pump out.  Go ahead
6  and pump out."  He didn't say any other thing.
7    Q   Okay.  Well, let me remind you, you
8  testified back on January 12th in a prior proceeding
9  in this matter —
10       MR. WOODWARD:  Objection.  You
11 can't rehab your own witness.
12 BY MR. KOTILA:
13   Q   — and you told the chief engineer
14 this —
15       MR. CHALOS:  Objection.
16       MR. WOODWARD:  Can't impeach with
17 prior inconsistent statements.
18 BY MR. KOTILA:
19   Q   You told the chief engineer it was wrong
20 to discharge bilge overboard.
21       "Answer:  Yes."
22       Do you recall that?
23   A   Now I remember.
24   Q   Okay.  Now you remember.  Tell us your

Page 24

1  conversation with the chief engineer.
2        MR. CHALOS:  Objection.
3        THE WITNESS:  I told him that —
4  that it's not correct to be pumping out.
5  BY MR. KOTILA:
6    Q   What did he say to you?
7    A   There was nothing I could do.
8    Q   The chief said that?
9    A   Yes.
10   Q   Now let's talk about once you reached the
11 United States; you were here.  And you're on board
12 December '05; correct?
13       Did you meet with a company
14 representative named Christos?
15   A   Yes, sir.
16   Q   And who was he?
17   A   They said that he was the superintendent.
18   Q   For the company?
19   A   Yes, sir.
20   Q   How did he come on board the vessel; do
21 you know?
22   A   I don't know, because when he arrived, he
23 just called me.
24   Q   He called you personally?

Page 25

1    A   Somebody called me and asked me to go
2  over there, the captain's office.
3    Q   And did you have a conversation with this
4  Mr. Christos?
5    A   Yes, sir.
6    Q   What did he say to you?
7    A   He asked me — he asked me if I would
8  tell him — tell him what happened between Brazil and
9  the United States.
10   Q   And did you do that?
11   A   Yes, sir.
12   Q   And what did he say to you?
13   A   That we need to take a statement as to
14 what had happened, starting Brazil, going to the
15 United States, and that we would hand it over to the
16 attorneys.
17   Q   Did you make that statement?
18   A   Yes, sir.
19   Q   I'll show you Defense Exhibit 14,
20 four-page statement.
21   A   Yes, sir.
22   Q   Do you recognize that statement?
23   A   Yes, sir.
24   Q   And you signed it on the back on the last

Edgar Villano

8 (Pages 26 to 29)

Page 26

1 page?
2    A    Yes, sir.
3    Q    Did you write that statement?
4    A    Yes, I was the one that made it.
5    Q    All four pages?
6    A    The last page was made by the fourth
7 engineer.
8    Q    What's the fourth engineer's name?
9    A    Bryan Espina.
10    Q    Okay. And you read it, of course?
11    A    Yes, sir, because I was the one that made
12 the rough draft.
13    Q    Now, you made this statement. And did
14 you have -- did you give it to Christos?
15    A    Yes, sir.
16    Q    Now, did Christos talk to you further
17 about the incident aboard the boat afterwards?
18    A    He spoke to me many times.
19    Q    What did he say afterwards?
20    A    That we should change the statement.
21    Q    When was the first time he told you that?
22        MR. WOODWARD: Objection.
23        THE WITNESS: I don't remember any
24 more, sir.

Page 27

1 BY MR. KOTILA:
2    Q    Well, tell us what he told you then.
3    A    He told me that I should change the
4 statement -- we should change the statement, because
5 if we don't, we would go to jail.
6    Q    Christos said this?
7    A    Yes, sir.
8    Q    Did he say how you should change the
9 statement?
10    A    Yes, sir.
11    Q    Tell us.
12    A    He told us that we just made a mistake or
13 we are just afraid.
14    Q    To say that you were just afraid?
15    A    Yes, sir.
16    Q    Now, on around December 5th, you're here
17 in the U.S. still. Did there come a time that you
18 were called to the captain's office? Do you recall
19 that?
20        MR. CHALOS: Objection.
21        THE WITNESS: December 5.
22 BY MR. KOTILA:
23    Q    What happened that day? Tell us.
24        MR. CHALOS: Objection.

Page 28

1 BY MR. KOTILA:
2    Q    That you recall.
3    A    I'm asking you, who called me?
4    Q    Were you called by an oiler --
5        MR. WOODWARD: Objection; leading.
6 BY MR. KOTILA:
7    Q    -- to go up to the captain's office?
8        MR. CHALOS: Objection.
9        THE WITNESS: We were already in
10 Camden at that time.
11 BY MR. KOTILA:
12    Q    Okay. Were you called to a meeting with
13 the owner?
14    A    Yes, sir.
15    Q    Tell us about that.
16    A    That day -- that first day that they
17 arrived.
18    Q    Okay.
19    A    He said to me we could not change the
20 statement. But then on the next day, he said that we
21 need to change the statement, because if not, you
22 would go to jail.
23    Q    The first day he said, You can't do
24 anything today? Is that what he said?

Page 29

1    A    Yes, sir.
2    Q    What did that mean; do you know?
3        MR. CHALOS: Objection.
4        THE WITNESS: He said, "Whatever it
5 is that you have there, just leave it."
6 BY MR. KOTILA:
7    Q    And that's all they said that day?
8    A    Because they were having a meeting. And
9 that's what they told me.
10    Q    What was the owner's name?
11    A    Madias.
12    Q    Madias?
13    A    Yes.
14    Q    Now, you say the next day he spoke to you
15 again?
16    A    Yes, sir.
17    Q    What did he tell you the next day?
18    A    That he said that, Tell your other
19 coworkers that we need to change the statement,
20 because if not, all of you will go to jail.
21    Q    What did you say when he told you that?
22    A    I told him that, "Sir, what you're asking
23 us is complicated."
24    Q    And what did he say?

Edgar Villano

9 (Pages 30 to 33)

**Page 30**

1  A  He just said that that -- that's the help
2  that you can provide. That's the help that I could
3  provide.
4  Q  Did the owner say anything further, like
5  how to change your statement?
6  MR. CHALOS: Objection.
7  THE WITNESS: "Just tell them that
8  you made a mistake. Just change it, change the
9  statement." There was nothing else.
10  BY MR. KOTILA:
11  Q  Did he say to tell the Coast Guard that
12  you felt pressured by the Coast Guard?
13  MR. CHALOS: Objection; leading.
14  THE WITNESS: Christos was the one
15  that said something like that.
16  BY MR. KOTILA:
17  Q  All right. Are you sure it's not Madias?
18  MR. WOODWARD: Objection; leading.
19  MR. CHALOS: Objection.
20  THE WITNESS: Yes, sir.
21  BY MR. KOTILA:
22  Q  Well, do you remember, or you're not
23  sure?
24  A  I'm not sure. I don't remember.

**Page 31**

1  Q  Let me see if I can refresh your
2  recollection.
3  MR. CHALOS: You can't rehabilitate
4  your own witness.
5  MR. KOTILA: Sure you can. Refresh
6  his recollection.
7  MR. CHALOS: Well, he says he
8  doesn't remember.
9  MR. KOTILA: That's why I can
10  refresh his recollection.
11  MR. CHALOS: But he didn't say
12  that. He said it was Christos.
13  BY MR. KOTILA:
14  Q  Do you recall also testifying in a prior
15  proceeding in this matter on February 2nd, 2006 --
16  correct?
17  A  Yes.
18  Q  Do you recall the question --
19  MR. WOODWARD: Could we have a
20  page, please.
21  BY MR. KOTILA:
22  Q  Page 15, on February 6th. All right.
23  Let's -- I'm going to start at the top.
24  "Question: Did the captain ever ask

**Page 32**

1  you to change your story?"
2  "Answer: No, sir."
3  "Question: Just the owner?"
4  MR. WOODWARD: Hold it, hold it,
5  hold it.
6  MR. KOTILA: You on page 15?
7  MR. TWERSKY: It's the second day,
8  Carl.
9  MR. KOTILA: There were two. You
10  know, let me make this easy, if we could. I have --
11  let me give it to him, because he can read; right?
12  With the help of the interpreter
13  just read this page quickly. 15 to the top of 16.
14  THE INTERPRETER: "You want him to
15  go to the next page?
16  BY MR. KOTILA:
17  Q  Just the top of Page 16, please.
18  A  Yes. Yes.
19  Q  Okay. Mr. Villano, do you recall giving
20  that testimony?
21  A  Yes.
22  Q  So what did the owner tell you to say?
23  MR. CHALOS: Objection.
24  THE WITNESS: Just like what he

**Page 33**

1  said: To change the statement, because you were just
2  pressured and afraid of the Coast Guard, and you're
3  afraid.
4  BY MR. KOTILA:
5  Q  Did --
6  MR. WOODWARD: Objection. Go
7  ahead.
8  BY MR. KOTILA:
9  Q  Did Mr. Madias -- when you were leaving
10  the boat to stay in the United States, did
11  Mr. Christos say to tell the truth?
12  A  Yes, sir.
13  Q  Did Mr. Madias say that too?
14  A  No, sir.
15  Q  He never did?
16  A  No, sir.
17  Q  The engine logbook you described
18  earlier --
19  MR. WOODWARD: Objection; no
20  foundation.
21  MR. CHALOS: He never described the
22  book. Wrong guy.
23  MR. KOTILA: Huh?
24  MR. CHALOS: Wrong guy. He never

Corbett & Wilcox

Edgar Villano

10 (Pages 34 to 37)

Page 34

1  described the book.
2  BY MR. KOTILA:
3      Q  When you received orders from the chief
4  engineer to pump the bilges, did you receive that
5  order in writing too?
6          MR. CHALOS: Objection.
7          MR. KOTILA: Sure he did.
8          THE WITNESS: Sometimes not.
9  BY MR. KOTILA:
10     Q  But you did receive that one time?
11     A  Yes, sir.
12         MR. CHALOS: Objection.
13 BY MR. KOTILA:
14     Q  And what kind of -- how in writing? What
15 kind of book?
16     A  Engine logbook.
17     Q  All right. When was the last time you
18 saw that engine logbook?
19     A  Before we got off the ship, I saw it.
20     Q  Where did you see it?
21     A  Close to the door of the chief engineer.
22     Q  Mr. Dragomir?
23     A  Yes.
24     Q  Now, that engine logbook, that's not the

Page 35

1  same as this particular book?
2      A  No.
3      Q  Are you familiar with what is
4  Government's Exhibit No. 1?
5      A  Oil Record Book, sir.
6      Q  How are you familiar with this book?
7      A  I've seen it in other ships as well.
8      Q  Have you seen it on this ship?
9      A  No, I didn't see it.
10     Q  Okay. So you did see this book.
11         (Discussion held off the
12         stenographic record.)
13 BY MR. KOTILA:
14     Q  Let me ask you a question: Before you
15 got to the United States, did you receive an order
16 from the chief engineer to backfill the wells to
17 bring them up to a certain level? Do you recall?
18     A  Could you repeat that.
19     Q  Did you put water, saltwater or
20 freshwater, in wells? In tanks or wells?
21     A  Yes, sir.
22     Q  Tell us about that.
23     A  We needed to put some water -- seawater
24 and fresh for the bilge tank, freshwater for the

Page 36

1  sludge tank -- so that we could reach -- so that we
2  could reach the declared level.
3      Q  Declared where?
4      A  On the Oil Record Book of his.
5      Q  This record book?
6      A  I don't know.
7      Q  Who ordered you to do that?
8      A  The chief engineer.
9      Q  Is that a proper practice, pursuant to
10 your training and education in MARPOL?
11         MR. CHALOS: Objection.
12         THE WITNESS: No, sir.
13 BY MR. KOTILA:
14     Q  Why not?
15     A  That's against the law.
16     Q  I have no further questions -- hold on.
17 When did you do this? When did you
18 give the order to fill those tanks?
19         MR. CHALOS: Objection; no
20 foundation. He never gave the order. That was
21 never --
22         MR. PHILLIPS: He testified that
23 the chief engineer --
24 BY MR. KOTILA:

Page 37

1      Q  What's your answer? Did you give the
2  order to fill the tanks or did you fill the tanks?
3          MR. CHALOS: Objection; leading.
4          THE WITNESS: We were asked to do
5  that, and then we did it.
6  BY MR. KOTILA:
7      Q  You physically did it?
8      A  Yes, sir.
9      Q  How did you do it?
10     A  In the bilge tank, we used a bilge pump.
11 In the sludge tank, we used the freshwater hydrofoil
12 tank -- hydrophoric tank.
13     Q  So the bilge -- the suction tank pumped
14 from the bilge tank came from the ocean? That's the
15 saltwater?
16     A  Yes, sir.
17     Q  When did you do this? When on the
18 vessel?. Before you got to the United States or in
19 the United States?
20     A  Before we arrived.
21     Q  How far before you arrived?
22     A  I don't remember exactly what the
23 distance was.
24     Q  A day before you got to the United

Edgar Villano

11 (Pages 38 to 41)

Page 38

1    States? Two days?
2        A    I believe it was a day.
3        Q    A day before you reached Delaware?
4        A    Yes, sir.
5        MR. KOTILA:  Thank you.
6        (Discussion held off the record.)
7        CROSS-EXAMINATION
8    BY MR. CHALOS:
9        Q    Mr. Villano, you told us about some
10   discussions you had with two different men, one man
11   named Madias and one man named Christos; right?
12       A    Yes, sir.
13       Q    And then you told Mr. Kotila that you
14   thought Mr. Madias was the owner of the ship; right?
15       A    Yes, sir.
16       Q    Now, look me in the eyes.  You don't know
17   that, do you?
18       A    That's what they said.
19       Q    So my question to you is, you don't know
20   what Mr. Madias' role was with the ships, do you?
21       A    He told me that he was the owner.
22       Q    He told you that?
23       A    Yes, sir.
24       Q    And when he told you that, who was

Page 39

1    present?
2        A    He himself and the wife.
3        Q    So nobody else was present?
4        A    We were at the table.
5        Q    My question is nobody else from the crew
6    was present?
7        A    The chief engineer was there.
8        Q    Mr. Dragomir was there?
9        A    Yes, sir.
10       Q    Now, Mr. Christos, you don't know who
11   Mr. Christos was, do you?
12       A    They told me that he was the
13   superintendent.
14       Q    Okay.  Well, wait a minute.  When you say
15   "they told me," who is that?
16       A    He himself told me.
17       Q    Okay.  Now, before, when Mr. Kotila asked
18   you about who Madias was, your answer was "they told
19   me he was the owner."
20       A    That's what he said.
21       Q    Wait a minute.
22       A    And he himself said that.
23       Q    Well, that's not your answer to
24   Mr. Kotila, was it?

Page 40

1        A    But the question was not phrased that
2    way, you know.
3        Q    Well, I do know; that's why I'm trying to
4    find out.
5            The question of Mr. Kotila was how
6    did you know he was the owner?  And your answer to
7    him was, "They told me."
8        A    He told me.
9        Q    You didn't tell Mr. Kotila "he" told you.
10   You told Mr. Kotila, "they told me."
11           Who was "they"?
12       A    The whole engine room said that.
13       Q    So the whole engine room said that?
14       A    The group from the engine room.
15       Q    Okay.  Now, you also told me just a
16   second ago that when you met with Mr. Madias, that
17   the chief engineer was present.
18       A    Yes, sir.
19       Q    Okay.  Now, that's not what you told the
20   Grand Jury; right?
21       A    The first day that I said, I said that he
22   was there.  The next day he wasn't there.  That's
23   what I said.
24       Q    Let's talk about your Grand Jury.  Okay?

Page 41

1            Before you went to the Grand Jury,
2    the Government made a promise to you; right?  That is
3    you'd cooperate with their investigation that you
4    wouldn't get in trouble for anything that you did
5    that was wrong.
6        A    From what I know and the way I understood
7    it, nothing will happen to us if we do not tell a
8    lie.
9        Q    Okay.  But you knew that at the time the
10   Government made that promise to you you had done
11   something wrong.
12       A    All I'm telling you here is the truth.
13       Q    Okay.  Listen to my question, please.
14           At the time you made that agreement
15   with the Government that you would cooperate in their
16   investigation, their promise to you was that you
17   would not get into trouble for anything that you did
18   wrong so long as you agreed to cooperate with them;
19   right?
20       A    Yes.
21       Q    And then you went and you testified
22   before the Grand Jury on January the 12th; right?
23       A    Yes, sir.
24       Q    And then at the end of the day, after the

Edgar Villano

12 (Pages 42 to 45)

Page 42

1  Grand Jury, after the Government was finished asking
2  you questions, you took it upon yourself to go find
3  the prosecutors; right?
4       A  Yes, sir.
5       Q  And you went running to the prosecutors
6  because you wanted to tell them something else that
7  you thought would be helpful for their case; right?
8       A  Yes, sir.
9       Q  And when you went running to the
10  prosecutors, the information that you told them about
11  was what we're talking about now, your discussions
12  with Mr. Madias; right?
13      A  Yes, sir.
14      Q  And now, they asked you about if anyone
15  asked you to lie during your Grand Jury testimony;
16  right?
17      A  Yes, sir.
18      Q  And you never said anything in the first
19  session about Mr. Madias?
20      A  That was not asked as a question.
21      Q  It wasn't asked?  Well, let's take a
22  look.
23          Do you remember, there was a series
24  of questions about whether anyone told you what to

Page 43

1  tell the Coast Guard; right?
2       A  Could you repeat that.
3       Q  Yeah.  There was a series of questions
4  about whether anybody ever asked you or told you what
5  to say to the Coast Guard.
6       A  And who asked me that question?
7       Q  The prosecutors.  Do you remember that?
8       A  I don't remember that anymore.
9       Q  Okay.  So as you sit here today, you
10  don't remember what you told the Grand Jury on
11  January 12th, 2006?
12      A  Some of it I don't.
13      Q  Okay.  Now, after you finished your
14  testimony before the Grand Jury on January 12th and
15  you went to find Mr. Falgowski, you told him about
16  discussions you had with Captain Madias; right?
17      A  Yes, sir.
18      Q  And he asked you, Mr. Falgowski asked
19  you --
20          MR. KOTILA:  Objection; calls for
21  speculation.
22          MR. CHALOS:  Party statement.
23  BY MR. CHALOS:
24      Q  Mr. Falgowski asked you to tell him

Page 44

1  everything you know about all your conversations with
2  the owner -- who you thought was the owner; right?
3       A  Yes, sir.
4       Q  And you did that; right?
5       A  Yes, sir.
6       Q  And then Mr. Falgowski asked you to come
7  to the Grand Jury for a second time; right?
8       A  Yes, sir.
9       Q  And at that second session, Mr. Falgowski
10  asked you again about your discussions with
11  Mr. Madias; right?
12      A  Yes, sir.
13      Q  Okay.  And take a look now -- and I'll
14  make a representation this is a transcript of your
15  February 2nd Grand Jury appearance, and I'm asking
16  you to show me where you told Mr. Falgowski or the
17  Grand Jury that the chief engineer was present during
18  these discussions.
19      A  It was asked to me that question the
20  second day, the second time, not the first day.
21      Q  That's the second day.  That's a
22  transcript of the second day.
23      A  What I meant was that time when the chief
24  engineer -- the first day when the owner arrived, but

Page 45

1  the next day, the chief engineer was not there
2  anymore.  And so I have not told it in this
3  particular situation.
4       Q  So let me see if I got this right.
5          The only time the chief engineer
6  was present was the first day, when Mr. Madias told
7  you there's nothing you can do about your statement;
8  right?
9       A  Yes.
10      Q  So it's fair to say that all this
11  testimony that you've given us about Mr. Madias
12  telling you to change your statement occurred when
13  nobody else was present?
14      A  Yes.  Yes, sir.
15      Q  So it was just you and him?
16      A  Yes, sir.
17      Q  So there's nobody else that can confirm
18  what you're saying as being true, is there?
19      A  Only the two of us.
20          MR. CHALOS:  Okay.  Let's take a
21  break.  It's a good time for lunch.
22          THE VIDEOGRAPHER:  Off the record
23  at 1:02.
24          (Luncheon recess from 1:02 p.m. to

Edgar Villano

13 (Pages 46 to 49)

Page 46

1       2:14 p.m.)
2       (Documents marked CSME Exhibits 17
3   through 22 for identification.)
4           THE VIDEOGRAPHER: We are on the
5   record at 2:14.
6   BY MR. CHALOS:
7       Q   Good afternoon, Mr. Villano.
8       A   Good afternoon, sir.
9       Q   Did you have an opportunity to have
10  lunch?
11      A   Yes, sir.
12      Q   During lunch, did you speak with anybody
13  about your testimony here today?
14      A   No, sir.
15      Q   Did you speak with Roberto Damasing
16  during the break?
17      A   Yes, sir.
18      Q   And Mr. Damasing is going to be the next
19  witness to testify; right?
20      A   Yes, sir.
21      Q   Let's talk a little bit about you and
22  your background and history before you were hired to
23  join the Irene E.M.
24          I'm going to show you what we've

Page 47

1   previously marked as CSME Defendants' Deposition
2   Exhibit No. 17. For the record, I'll make a
3   representation that the exhibit is five pages.
4           Now, Mr. Villano, earlier today
5   Mr. Kotila asked you some questions about the
6   employment contract you signed. Do you remember
7   that?
8       A   Yes, sir.
9       Q   And is Exhibit 17 a copy of the
10  employment contract and its attachments?
11      A   Could you repeat that.
12      Q   That's the papers that you signed before
13  you joined the ship; right?
14      A   Yes, sir.
15      Q   Okay. Now, when you signed the contract
16  in the Philippines on or about November the 11th of
17  2005 -- right?
18      A   Yes, sir.
19      Q   And the deal was you were going to work
20  on board the Irene E.M. for nine months --
21      A   Yes, sir.
22      Q   -- plus a possible additional three
23  months, upon mutual consent of you and your crewing
24  agent; right?

Page 48

1       A   Yes, sir.
2       Q   Okay. Now, take a look at the second
3   page.
4           Now, that document bears your
5   signature on the bottom left-hand side; right?
6       A   Yes, sir.
7       Q   Okay. And this document, you made a
8   declaration that you received and you reviewed the
9   environmental protection policy of the principal of
10  the Irene E.M. vessel; right?
11      A   Yes, sir.
12      Q   Now, before you signed this document and
13  made that declaration, you reviewed that
14  environmental protection policy, did you not?
15      A   Yes, sir.
16      Q   Okay. And you made a declaration that
17  during your time on board the ship, that you would
18  follow that policy and uphold the laws, did you not?
19      A   Yes, sir.
20      Q   And that's what you told the owner of the
21  ship and the managers of the ship you were going to
22  do if they hired you as second engineer; right?
23      A   They didn't say anything of that sort.
24  This is just from the crewing company.

Page 49

1       Q   Okay. But the crewing company gave you
2   the principles of the environmental protection
3   policy, did they not?
4       A   Yes, sir.
5       Q   Okay. So the deal was that if you were
6   going to be hired to work on board this ship, you
7   knew that you were expected to follow the company's
8   environmental protection policy and to uphold the
9   laws; right?
10      A   Yes, sir.
11          MR. CHALOS: I'll take that back.
12  Thank you, Mr. Villano.
13          THE WITNESS: Yes, sir.
14          MR. CHALOS: If I haven't done it
15  already, I'd like to move Defendants' Exhibit No. 17
16  into evidence.
17          MR. KOTILA: No objection.
18          (Document marked CSME Exhibit 17
19          moved into evidence.)
20  BY MR. CHALOS:
21      Q   Mr. Villano, I'm going to show you what
22  we've premarked as Defense's CSME -- Defendant CSME
23  Exhibit No. 18. And for the record, I'll make a
24  representation it's a three-page document.

Edgar Villano

14 (Pages 50 to 53)

Page 50

1    Now, Mr. Villano, that exhibit I
2    just showed you is what?
3    A   Seaman's book, sir.
4    Q   It's a photocopy of your seaman's book;
5    right?
6    A   Yes, sir.
7    Q   And also it's a photocopy of your
8    passport; right?
9    A   Yes, sir.
10   Q   Okay. And you are a Philippine national,
11   correct?
12   A   Yes, sir.
13       MR. CHALOS:  Can I move into
14   evidence Defendants' Exhibit 18.
15       MR. KOTILA:  No objection.
16       (Document marked CSME Exhibit 18
17   moved into evidence.)
18   BY MR. CHALOS:
19   Q   Now, today when Mr. Kotila was asking you
20   some questions, as you're doing while I'm asking you
21   questions, you're using the assistance of our
22   interpreter.
23   A   Yes, sir.
24   Q   And the reason why you're doing that is

Page 51

1    because English is your second language; right?
2    A   Yes, sir.
3    Q   Your first language is a language called
4    Ilongo, I-L-O-N-G-O?
5    A   Yes, sir.
6    Q   And then you also speak a second language
7    called Tagalog; right?
8    A   Yes, sir.
9    Q   And you're very fortunate, you're
10   multilingual and can also speak some English;
11   correct?
12   A   Yes, sir.
13   Q   But you don't feel comfortable conducting
14   an official meeting like this solely in English, do
15   you?
16   A   I'm comfortable enough.
17   Q   Okay. I'd like you to do that then.
18   A   Okay. I'll try it.
19       MR. TWERSKY:  On advice of his
20   counsel, I'm going to advise him not to do that,
21   because I'm not comfortable with him in English.
22       MR. CHALOS:  I think we're going to
23   have to call the judge on this. Because we have an
24   issue here where he was interviewed several times by

Page 52

1    the Government, on board the vessel and subsequently,
2    sometimes with and sometimes without the assistance
3    of an interpreter. And I think it's going to be
4    important for the jury to see exactly how good or how
5    bad his command of the English language is.
6        MR. TWERSKY:  Let's go off the
7    record.
8        THE VIDEOGRAPHER:  Off the record
9    at 2:23.
10       (Brief recess.)
11       THE VIDEOGRAPHER:  We are on the
12   record at 2:33.
13   BY MR. CHALOS:
14   Q   Okay. Mr. Villano, I'm going to show you
15   what we've previously marked as CSME Defendants'
16   Exhibit No. 19. For the record, I'll make a
17   representation it's a three-page document, and I'll
18   ask you to take a look at those.
19       And my first question to you,
20   Mr. Villano, is, the first page of Exhibit 19 is a
21   copy of your license; correct?
22   A   Yes, sir, is.
23   Q   And that's your license to be a second
24   engineer; right?

Page 53

1    A   Yes, sir.
2    Q   Who is that issued by?
3    A   PRC.
4    Q   What is the PRC?
5    A   Philippine Commission.
6    Q   That's the Philippine Regulatory
7    Commission; correct?
8    A   Yes.
9    Q   And the next two pages are endorsements
10   to your Philippine license from the ship's flag
11   state; right?
12   A   Yes, sir.
13   Q   So at the time that you boarded the Irene
14   E.M. in Brazil, you held a license from the
15   Government of the Philippines and an endorsed second
16   engineer's license from the flag state administration
17   for the vessel; right?
18   A   Yes, sir.
19       MR. CHALOS:  I'd like to move that
20   into evidence.
21       MR. KOTILA:  Objection.
22       (Document marked CSME Exhibit 19
23   admitted into evidence.)
24   BY MR. CHALOS:

Corbett & Wilcox

Edgar Villano

Page 54

1    Q  Now, I'd like to show you what we've
2  marked as Exhibit 20. It's an exhibit of several
3  pages. Just take a look.
4           Now, Mr. Villano, my first question
5  to you is, do all the pages in that exhibit — strike
6  that.
7           Are all the pages copies of
8  certificates you've received for various training
9  you've gone to over the years?
10    A  Yes, sir.
11    Q  And you've been sailing since 1991?
12    A  Yes, sir.
13    Q  And you've been on board at least 10
14  other ships besides the Irene E.M.?
15    A  Yes, sir.
16    Q  Okay. Now, Mr. Villano, before we took a
17  break, I asked you if you would be comfortable in
18  proceeding today in English. And you've had an
19  opportunity to meet with your lawyer to discuss his
20  objection; right?
21    A  Object?
22    Q  Well, you've had an opportunity to
23  discuss my request with your lawyer; right?
24    A  Yeah. We talked about it, but it's not

Page 55

1  because he objected --
2           MR. TWERSKY: I'm going to advise
3  my client not to disclose anything that we discussed.
4  That's privileged and confidential between us.
5           You can answer "yes" or "no" to
6  whether we had a conversation. But I'm going to
7  advise you not to disclose the contents of our
8  conversation, because then they'll no longer be
9  confidential.
10           THE WITNESS: Yes, sir.
11  BY MR. CHALOS:
12    Q  Okay. Now, do you have a preference to
13  continue either in English or with the assistance of
14  the interpreter?
15    A  With an interpreter.
16    Q  Okay. Now, you also had official
17  meetings on board the vessel where the Coast Guard
18  called you and the rest of the crew into the mess
19  room; right?
20    A  Yes, sir.
21    Q  And did the Coast Guard have an
22  interpreter present with them?
23    A  No, sir.
24    Q  Did the Coast Guard make an interpreter

Page 56

1  available to you?
2    A  No, sir.
3    Q  Were you advised that you had the right
4  to have an attorney present during that meeting?
5    A  No, sir.
6    Q  Okay. Would you have preferred if an
7  interpreter was present for that meeting?
8    A  Yes, sir.
9    Q  Okay. Take a look again at what we just
10  marked as Exhibit 20, Mr. Villano, in front of you,
11  and --
12           Well, before we get into the
13  substance, I'd like to move Exhibit 20 into evidence
14  as a copy of training certificates.
15           MR. KOTILA: No objection.
16           (Document marked CSME Exhibit 20
17           moved into evidence.)
18  BY MR. CHALOS:
19    Q  Okay. Now take a look, Mr. Villano, at
20  the first page now. It talks about a MARPOL training
21  course from November 24th and November 25th of 1999
22  in Manila, the Philippines.
23    A  1999?
24    Q  I don't think so, Mr. Villano. Are we

Page 57

1  looking at the same page?
2           This number here. Maybe you need
3  your glasses.
4    A  Oh, yeah. Yes, sir.
5    Q  1997; right?
6    A  Yes, sir.
7    Q  And you attended that training?
8    A  Yes.
9    Q  And did you attend another training in
10  1999?
11    A  I don't remember anymore.
12    Q  Okay. Turn to the next page,
13  Mr. Villano. And there's another certificate from
14  the Philippines Seafarer's Training Center --
15  Seafarer's Training Center, correct -- and it says
16  Certificate of Completion for another MARPOL class,
17  three-day class, April 26th, 27th and 28th, 2004.
18           And my question to you is, you did
19  attend that seminar, did you not?
20    A  Yes, sir.
21    Q  And in fact, this Certificate of
22  Completion has your photograph in the bottom?
23    A  Yes, sir.
24    Q  Okay. Now, turn to the next page, if you

Edgar Villano

16 (Pages 58 to 61)

Page 58

1    will. And this is a Certificate of Completion
2    from – it looks like the Excellence and Competency
3    Training Center in Sampaloc, Manila. And this
4    relates to a training course in maritime law for
5    ships officers that was conducted from September 19th
6    through September 24th, 2005.
7        A    Maritime law, sir?
8        Q    Yeah, the next page.
9            And you attended a week-long
10   five-day seminar on maritime law for ships officers;
11   right?
12       A    Yes.
13       Q    And that Certificate of Completion also
14   has your picture on the bottom; right?
15       A    Yes, sir.
16       Q    Now, take a look at the next page. This
17   is a Certificate of Attendance for in house training
18   issued by Bright Maritime Corporation. Do you see
19   that?
20           Let me see, Mr. Villano. Let me
21   see if I can help you – correct, that's the one.
22           And it says that you received a
23   certificate for having attended a seminar on the ISM
24   code and having been briefed on the policies and

Page 59

1    safety management system of Chian Spirit Maritime
2    Enterprises, Inc. from November 14th through
3    November 15th at Pasig City in the Philippines.
4        A    Yes, sir.
5        Q    And you attended a two-day seminar in the
6    Philippines from November 14th and 15th, 2005, at
7    your crewing agent; correct?
8        A    Yes, sir.
9        Q    And you discussed Chian Spirit Maritime
10   Enterprises safety management system; right?
11       A    Yes, sir.
12       Q    And Chian Spirit was the manager or the
13   operator of the Irene E.M.; correct?
14       A    Yes, sir.
15       Q    So you went to special training to learn
16   the company's policies before you got on board their
17   ship; right?
18       A    Yes, sir.
19       Q    And in fact, you were given a copy of the
20   Chian Spirit safety management system, and
21   specifically the environmental protection policy;
22   right?
23       A    Yes, sir.
24       Q    I'm going to show you what we previously

Page 60

1    marked as Exhibit 7. And I'll take Exhibit 20 from
2    you.
3            And Mr. Villano, Exhibit 7 is a
4    copy of the Chian Spirit environmental protection
5    policy that you studied before going on board the
6    Irene E.M., is it not?
7        A    Yes, sir.
8        Q    A copy of that, Mr. Villano, was readily
9    available and displayed on board the ship, was it
10   not?
11       A    Yes, sir.
12       Q    There was a copy of the company's
13   environmental protection policy posted in the ship's
14   office, was there not?
15       A    I didn't notice it.
16       Q    Okay. There was a copy that you did
17   notice in the mess room?
18       A    Yes, sir.
19       Q    And there was another copy in the
20   hallway?
21       A    That I don't remember.
22       Q    And you know that there was one in the
23   engine room on the plywood bulletin board; right?
24       A    That I could not remember.

Page 61

1        Q    It's not that you don't know; it's just
2    that you can't remember as you sit here today; right?
3        A    I don't remember.
4        Q    Okay. Is there anything that would
5    refresh your recollection, Mr. Villano, about what
6    was on that bulletin board in the engine room?
7        A    I don't remember of anything.
8        Q    Now, Mr. Villano, when you got on board
9    the ship -- or let me rephrase my question.
10           Before you got on board the ship,
11   you knew that the owner of the ship and the manager
12   of the ship were serious about environmental
13   protection.
14       A    I'm not really sure, sir.
15       Q    Well, you know that they were serious
16   enough to make sure that you went for training on
17   their policies and procedures?
18       A    That's a requirement, sir.
19       Q    And it was a requirement that you had to
20   complete; otherwise, you couldn't work on board the
21   ship, is it not?
22       A    Yes, sir.
23       Q    And the company was also serious about
24   its crew, and they wanted to make sure that you were

Edgar Villano

17 (Pages 62 to 65)

Page 62

1  fit for the service before you got on board your
2  ship, did they not?
3      A   Yes.
4      Q   And they asked you to go and undergo
5  various tests to make sure you were physically and
6  mentally capable of doing the job, did they not?
7      A   Yes, sir.
8      Q   And I'm going to show you what we've
9  marked as CSME Defendants' Exhibit No. 21. And those
10  were the records relating to those examinations and
11  tests you underwent before getting on board the ship?
12      A   Yes, sir.
13          MR. CHALOS:  I'd like to move
14  Defendants' Exhibit 21 into evidence.
15          MR. KOTILA:  No objection.
16          (Document marked CSME Exhibit 21
17          admitted into evidence.)
18  BY MR. CHALOS:
19      Q   Now, when you came on board the ship,
20  Mr. Villano, you checked in with the chief engineer,
21  did you not?
22      A   Yes, sir.
23      Q   And the chief engineer told you that you
24  had a certain shift or a certain watch that would be

Page 63

1  your working hours on board the Irene E.M., did you
2  not?
3      A   Yes, sir.
4      Q   And the watch that you stood or the hours
5  that you worked were 4:00 to 8:00, both during the
6  day and at night?
7      A   Yes, sir.
8      Q   So in military time, you would work from
9  0400 to 0800; and then again from 1600 hours to 2000
10  hours; right?
11      A   Yes, sir.
12      Q   And when you were working those hours,
13  you were the duty engineer, were you not?
14      A   Yes, sir.
15      Q   And not only were you the duty engineer,
16  but you had one individual that reported directly to
17  you?
18      A   Yes, sir.
19      Q   And that was an oiler named Roberto
20  Damasing?
21      A   Yes, sir.
22      Q   And during the night shift, he was the
23  only other guy in the engine room with you mostly?
24      A   Yes, sir.

Page 64

1      Q   And he's the guy you spoke to during the
2  lunch break today; right?
3      A   Yes, sir.
4      Q   You joined the ship in Brazil; correct?
5      A   Yes, sir.
6      Q   Earlier today you told Mr. Kotila it was
7  about November 17th that you joined the ship?
8      A   Yes, sir.  Yes, sir.
9      Q   And that was in a place called Fortaleza,
10  Brazil; correct?
11      A   Yes, sir.
12      Q   And after you joined the vessel in
13  Fortaleza, did the vessel make any other stops in
14  Brazil?
15      A   Yes, sir.
16      Q   Where did it go?
17      A   I don't remember exactly what port that
18  was. It was a loading port.
19      Q   How long was the vessel at the loading
20  port?
21      A   I don't exactly remember how many days
22  was.
23      Q   More than one day?
24      A   Yes, sir.

Page 65

1      Q   More than two days?
2      A   All I remember was we left on the 21st.
3      Q   Mr. Villano, the ship actually made two
4  stops in Brazil after you got on board, did it not?
5      A   I arrived in Fortaleza and then we
6  loaded, and I don't remember what that port was.
7      Q   Recife?
8      A   I don't remember. I have no memory of
9  that.
10      Q   Well, Mr. Villano, that really leads me
11  to my next point.
12          As the third engineer, you don't
13  have any responsibility for --
14          MR. KOTILA:  Objection. He's the
15  second engineer.
16          MR. CHALOS:  Okay. Let me withdraw
17  my thing. I got distracted for a second. Withdraw
18  my question and start again.
19  BY MR. CHALOS:
20      Q   As the second engineer, Mr. Villano, you
21  don't have any responsibility for the navigation of
22  the vessel, do you?
23      A   Yes, sir.
24      Q   Meaning -- "yes, sir" meaning you don't

Edgar Villano

18 (Pages 66 to 69)

Page 66

1  have any responsibility for the navigation?
2      A   In navigation?
3      Q   Navigation is my question.
4      A   The bridge system, no.
5      Q   And you worked in the engine room?
6      A   Yes, sir.
7      Q   So you don't really know where the ship
8  is when you're doing things in the engine room, do
9  you?
10     A   Sometimes they would call us — call it
11 out to us where the location is.
12     Q   Okay. But if they don't call out the
13 location to you from the bridge, you wouldn't be able
14 to identify your latitude and longitude, would you?
15     A   Yes, sir.
16     Q   "Yes, sir" meaning you don't know your
17 latitude and longitude?
18     A   Yes, sir.
19     Q   Okay. Mr. Villano, what do you mean by
20 "yes, sir"? You don't know, do you?
21     A   I don't know.
22     Q   Okay. That's what I was trying to
23 clarify.
24         We just looked at your certificates

Page 67

1  Mr. Villano. And from what I've seen so far, there
2  was at least two training classes that you took on
3  MARPOL; correct?
4      A   Yes, sir.
5      Q   And during the MARPOL training, you
6  learned that it was wrong to discharge oil or oily
7  wastes into the ocean, did you not?
8      A   Yes, sir.
9      Q   And you knew that if you did that, you
10 could get into trouble for it, did you not?
11     A   Yes, sir.
12     Q   And you also knew that if you did that,
13 the company who owns the ship and the company who
14 manages or operates the ship could also get into big
15 trouble for those actions?
16     A   Yes, sir.
17     Q   And you also knew that the chief engineer
18 could get in trouble for it?
19     A   Yes, but he's the one that ordered it.
20     Q   Okay. And you also knew that the captain
21 could get in trouble for it, did you not?
22     A   Yes, sir.
23     Q   And part of that training, Mr. Villano,
24 taught you that if you observed a MARPOL violation,

Page 68

1  that you were supposed to report it to the captain;
2  right?
3      A   Yes, sir.
4      Q   Now, in this situation, you never told
5  the captain what you were doing in the engine room,
6  did you?
7      A   Yes, sir.
8      Q   When you say "yes, sir," meaning no, you
9  never told the captain what you were doing, did you?
10     A   Yes, sir.
11     Q   Okay. Mr. Villano, when you say "yes,
12 sir," are you agreeing with me that you never told
13 the captain what you were doing in the engine room?
14     A   Could you repeat that.
15     Q   When you say "yes, sir," are you agreeing
16 with me that you never told the captain what you were
17 doing in the engine room?
18     A   What do you mean, what we were doing?
19     Q   Okay. Mr. Villano, we're talking about
20 when you gave the orders to pump oil over the side.
21 Do you remember that?
22     A   Yes, sir.
23     Q   And you knew it was wrong?
24     A   Yes, sir.

Page 69

1      Q   And you knew that you and the captain and
2  the company could get in trouble; right?
3      A   Yes, sir.
4      Q   And you knew that if you saw a MARPOL
5  violation or someone asked you to break the law, you
6  were supposed to report that to the captain; right?
7      A   It should have been, yes.
8      Q   And you never reported to the captain --
9      A   Yes, sir.
10     Q   -- you never reported to the captain what
11 you were doing in the engine room?
12     A   Yes, sir.
13     Q   You agree with me that you never made
14 that report to the captain?
15     A   Yes, sir.
16     Q   And you never made any notifications to
17 Chian Spirit about the overboard discharge orders you
18 were giving to your junior engineers, did you?
19     A   Yes, sir.
20     Q   When you say "yes, sir," meaning no, you
21 never gave any notification, did you?
22     A   Yes, sir.
23     Q   Mr. Villano, I think we're saying the
24 same thing, but I'm not sure it's clear.

Edgar Villano

19 (Pages 70 to 73)

Page 70

1        When you say "yes, sir," are you
2    agreeing with my statement?
3        A   Yes, sir.
4        Q   Now, you never reported to Venedico, the
5    company that owns the ship, that you were giving
6    orders to the junior engineers to discharge
7    overboard; did you?
8        A   Yes, sir.
9            MR. KOTILA:  Stop, George.  I'm
10   sorry.
11           THE VIDEOGRAPHER:  Off the record
12   at 2:59.
13           (Brief recess.)
14           THE VIDEOGRAPHER:  We are on the
15   record at 3:14.  This is tape 4 of Edgar Villano's
16   deposition.
17   BY MR. CHALOS:
18       Q   Okay.  Mr. Villano, let me go back and
19   revisit some areas that you told us about earlier
20   today when Mr. Kotila was asking you some questions.
21           You were the guy who gave the order
22   to the third engineer to pump the bilges overboard;
23   right?
24       A   Yes, sir.

Page 71

1        Q   And you also gave that order to the
2    fourth engineer as well; right?
3        A   Yes, sir.
4        Q   Now, did you personally tell both the
5    fourth engineer and the third engineer, or did you
6    just tell the fourth engineer?
7        A   I told the fourth engineer.
8        Q   Okay.  So if I understand you correctly,
9    you never personally told the third engineer to
10   discharge anything overboard, did you?
11       A   Yes, sir.
12       Q   Yes, sir, you told him; or yes, sir, you
13   didn't tell him?
14       A   I did not tell the third engineer
15   directly.
16       Q   The only person that you ordered to
17   discharge anything overboard was the fourth engineer,
18   correct?
19       A   Yes, sir.
20       Q   And you believed that that's what the
21   chief engineer wanted; correct?
22       A   From what I understood, that I should
23   tell the fourth engineer, and the fourth engineer
24   will then in turn tell the third engineer.

Page 72

1        Q   Well, Mr. Villano, you yourself never
2    discharged anything overboard, did you?
3        A   Yes, sir.
4        Q   When you say "yes, sir," you're agreeing
5    with me?
6        A   Yes, sir.
7        Q   So it's a true statement that you, Edgar
8    Villano, second engineer on board the Irene E.M.,
9    never operated the pumps to discharge any oily waste
10   overboard?
11       A   Yes.
12       Q   And it's also a true statement that the
13   captain never instructed you to either personally
14   discharge or order anyone to discharge anything
15   overboard?
16       A   Yes, sir.
17       Q   It's also a true statement, is it not,
18   Mr. Villano, that no one from Chian Spirit ever
19   instructed you to discharge anything overboard?
20       A   Yes, sir.
21       Q   In fact, it was completely contrary to
22   the interests of Chian Spirit for you or anyone else
23   to do that on board the Irene E.M.?  That's correct?
24   That's a correct statement, Mr. Villano, is it not?

Page 73

1            MR. KOTILA:  Objection; calls for
2    speculation on behalf of what Chian's interests are.
3    BY MR. CHALOS:
4        Q   Okay.  You can answer it.
5        A   Yes, sir.
6        Q   So the record is clear, Chian Spirit
7    never directed you to discharge anything overboard?
8        A   Yes, sir.
9        Q   In fact, it was their direct instructions
10   not to discharge anything overboard?
11       A   They didn't tell me anything of that
12   sort.
13       Q   Well, you knew what their policies were;
14   right?
15       A   Yes.
16       Q   And you went to their training class, did
17   you not?
18       A   Yes, sir.
19       Q   So you knew it was the Chian Spirit
20   policy to protect the environment?
21       A   Yes, sir.
22       Q   Okay.  And same questions for Venedico,
23   the company that owns the ship:  No one from
24   Venedico -- strike that.  Let me rephrase my

Edgar Villano

20  (Pages 74 to 77)

Page 74

1    question.
2          It is a correct statement, is it
3    not, that no one from Venetico ordered you to dump
4    anything over the side into the ocean?
5        A   Yes, sir.
6        Q   And it's also a correct statement that
7    that was against the principal's policies for you or
8    anyone else to do that on board the ship?
9        A   Yes, sir.
10       Q   Let's talk a little bit more about the
11   order.
12             You said the chief engineer gave
13   you a verbal order to discharge the bilges overboard?
14       A   Yes, sir.
15       Q   When you say "bilges," what are you
16   talking about?
17       A   The water coming from -- from the bilge
18   pump.
19       Q   So it was your understanding that the
20   chief engineer, when he gave you an order to pump the
21   bilge wells -- let me strike and rephrase my
22   question. I stumbled on my words.
23             It was your understanding, when you
24   spoke to the chief engineer, he ordered you to do

Page 75

1    something with the liquid that was in the bilge
2    wells; right?
3        A   It was verbally told to me. Not only the
4    bilges, but the sludge as well.
5        Q   All right. Now, it's a fact, is it not,
6    that on board the vessel, it was the usual practice
7    to transfer materials from the bilge wells to the
8    bilge holding tank?
9        A   Yes, sir.
10       Q   And the bilge holding tank was gigantic?
11       A   Yes, sir.
12       Q   106 cubic meters at least; correct?
13       A   That I could not tell you.
14       Q   Well, bigger than you've ever seen on any
15   of the other 10 ships you were on; right?
16       A   Yes, sir.
17       Q   Okay. Now, you don't know what the level
18   of the material in that bilge holding tank was at the
19   time the chief engineer gave you that verbal order,
20   do you?
21       A   I know.
22       Q   Okay. What was it?
23       A   It was a collection of bilges from the
24   bilge well.

Page 76

1        Q   My question was, you don't know what the
2    quantity was, meaning how many tons or how many cubic
3    meters, do you?
4        A   Yes, sir.
5        Q   "Yes, sir" meaning you agree? You don't
6    know, do you?
7        A   I don't know exactly what the total
8    contents were.
9        Q   But you do know that it was the chief
10   engineer's practice to make internal transfers from
11   the bilge wells to the bilge holding tank, do you
12   not?
13             THE INTERPRETER: I'm sorry. I
14   lost that.
15   BY MR. CHALOS:
16       Q   You do know it was the chief engineer's
17   practice to make internal transfers from the bilge
18   wells to the bilge holding tank?
19       A   That's the normal procedure, sir.
20       Q   When -- and if you had done that, there
21   would be nothing that went over the side into the
22   ocean; correct?
23       A   Yes, sir.
24       Q   And that would have been a proper, legal

Page 77

1    way to maintain the oily wastes on board the vessel?
2        A   Yes, sir.
3        Q   Okay. Now, you also told us that the
4    chief engineer wrote in a logbook his order?
5        A   Yes, sir.
6        Q   And what exactly was the words he used
7    when he wrote that order?
8        A   "Out of engine room bilges."
9        Q   Okay. And that's exactly what you were
10   doing when you were making these internal transfers,
11   was it not? You were emptying out the engine room
12   bilge wells?
13       A   But it's not being done overboard.
14       Q   Well, he never wrote in the order "Pump
15   out overboard," did he?
16       A   He indicated in there "out overboard."
17   And then he even spoke to me directly.
18       Q   Wait a minute, Mr. Villano. You just
19   told us that the written order said "out engine room
20   bilges"; right?
21       A   Yes, sir.
22       Q   Now, he never wrote "pump out overboard,"
23   did he?
24       A   It's not written as "overboard," but the

Corbett & Wilcox

Edgar Villano

21 (Pages 78 to 81)

Page 78

1  word "out" is written.
2     Q   The words that were written were "out
3  engine room bilges"?
4     A   Yes, sir.
5     Q   And again, that's consistent with what
6  was going on board the vessel before you joined the
7  ship, is it not?
8     A   Could you repeat that.
9     Q   I'll withdraw the question.
10        Mr. Villano, when you got on board
11  the ship, one of the duties that you're supposed to
12  have as second engineer is to operate the oily water
13  separator, is it not?
14     A   Yes, sir.
15     Q   And that's what you do on all the other
16  ships that you served as second engineer?
17     A   Depending on the chief engineer.
18     Q   All right. Well, on this ship, when you
19  got on board, you found out that the ship was pretty
20  old; right?
21     A   Yes, sir.
22     Q   And you found out that the equipment --
23  specifically the oily water separator -- was a model
24  that you were unfamiliar with?

Page 79

1     A   Yes, sir.
2     Q   And in fact what you -- you went down to
3  try and check it out, but you couldn't even turn the
4  thing on?
5     A   Yes, sir.
6     Q   You didn't even know how to turn it on?
7     A   Yes, sir.
8     Q   You had to call the electrician to show
9  you where the switch was?
10     A   Yes, sir.
11     Q   Okay. So now you're telling us today,
12  earlier today when Mr. Kotila was asking you
13  questions, that you're qualified to comment on how or
14  if this equipment could work?
15     A   Yes, sir.
16     Q   But the truth is, you didn't know how to
17  operate it, is it not?
18     A   I know how to operate it. But the power,
19  I don't know where the power was coming from.
20     Q   Okay. So you tried to familiarize
21  yourself by reading the manual; right?
22     A   Yes, sir.
23     Q   And then when you were doing some
24  testing, you found out that the sensor was having

Page 80

1  some problems; right?
2     A   Yes, sir.
3     Q   The calibration was off; right?
4     A   Yes, sir.
5     Q   And it was only off a little bit?
6     A   That, I don't know what the difference
7  is.
8     Q   Okay. Well, I mean, you know what 15
9  ppms is; right?
10     A   Yes, sir.
11     Q   And you know what -- what did you say, 37
12  or 40 ppms was when the automatic shutoff would go
13  off?
14     A   Yes, sir.
15     Q   So ppm stands for what?
16     A   Parts per million, sir.
17     Q   So at 15 ppms, that means if you had a
18  sample of oil and water, 15 ppm would mean for every
19  one million parts of water, there would only be 15
20  parts of oil; right?
21     A   Yes, sir.
22     Q   Okay. And 37 ppm would mean for every
23  one million parts of water in a sample, there would
24  only be 37 parts of oil?

Page 81

1     A   Yes, sir.
2     Q   And that's a very small difference, is it
3  not?
4     A   Yes, sir.
5     Q   Okay. Now, the chief engineer never told
6  you to use the oily water separator, did he?
7        THE INTERPRETER: Excuse me. I'm
8  missing you.
9     BY MR. CHALOS:
10     Q   The chief engineer never told you to use
11  the oily water separator, did he?
12     A   He told me to study how to use it.
13     Q   Well, what he told you was to make sure
14  you knew how to use it in case you were asked if you
15  knew how to operate it; right?
16     A   Yes, sir.
17     Q   And that's because you didn't know what
18  you were doing? You're unfamiliar with the
19  equipment?
20     A   I studied it and I knew how to do it.
21     Q   Okay. But before you studied it, you
22  were unfamiliar with the equipment?
23     A   Yes. Yes.
24     Q   Okay. Now, let's talk about why the

Edgar Villano

22  (Pages 82 to 85)

Page 82

1   chief engineer never ordered you to use the OWS.
2          The reason why the chief engineer
3   never used the OWS and the reason why he never
4   ordered you to use the OWS was because he told you
5   that he wasn't comfortable with the accuracy of the
6   sensor? Meaning he didn't want to make pollution in
7   the ocean.
8          MR. KOTILA: Objection; calls for
9   speculation on his behalf.
10         THE WITNESS: Is what you mean is
11  that's the reason why he didn't want the separator to
12  be used? That that's the reason why he wanted to use
13  the magic pipe?
14  BY MR. CHALOS:
15      Q   Mr. Villano, he never told you to use the
16  oily water separator, did he?
17      A   What I told you, I told him -- he told me
18  that I should study how to use it.
19      Q   Okay. But besides telling you to study
20  how to use it, he never told you to use it, did he?
21      A   Yes, sir.
22      Q   Now, earlier today you told Mr. Kotila
23  about several times giving orders to discharge
24  overboard. Do you remember that?

Page 83

1       A   Yes, sir.
2       Q   How many times did you actually give an
3   order to discharge overboard?
4       A   I don't remember anymore.
5       Q   You don't remember any more?
6       A   Yes, sir.
7       Q   So it's fair to say, as you sit here
8   today, your memory of how many times you give
9   somebody an order to discharge overboard is not
10  clear?
11      A   I just don't remember. That's it.
12      Q   Was your memory better in January, when
13  you went to the Grand Jury the first time?
14      A   Yes, sir.
15      Q   Was your memory better in February, when
16  you went the second time to the Grand Jury?
17      A   Yes, sir.
18      Q   Okay. That was in January and February
19  of 2006; right?
20      A   Yes, sir.
21      Q   Was your memory even better back in early
22  December, when the Coast Guard came on board the
23  ship?
24      A   Yes, sir.

Page 84

1       Q   And actually when the Coast Guard came on
2   board the ship, they asked you to write down what
3   happened, did they not?
4       A   Yes, sir.
5       Q   And you did that?
6       A   Yes.
7       Q   And it was Mr. McKnight, this gentleman
8   over here, that asked you to do that?
9       A   Yes, sir.
10      Q   Take a look at what we've marked
11  Defendants' CSME 22, a one-page document, which
12  appears to have the date December 9th, 2005 written
13  on the top.
14          Mr. Villano, that's the statement
15  that you wrote at the request of the Coast Guard on
16  December 9th?
17      A   Yes, sir.
18      Q   And when you wrote that, your memory was
19  a lot fresher about how many times you gave the order
20  to discharge overboard, was it not?
21      A   Yes, sir.
22      Q   And you wrote here, "I was requested by
23  the chief engineer to pump out bilges through magic
24  pipe. He ordered me directly and wrote down in

Page 85

1   engine room logbook. We pump out one time since I
2   come on board."
3          You wrote that; right?
4       A   Yes, sir.
5       Q   Now, does that refresh your recollection
6   about --
7       A   Yes, sir.
8       Q   And it's a fact that since the time
9   you've been on board the ship between Brazil and the
10  United States, there was only one discharge
11  overboard?
12      A   I was afraid at that time, sir.
13      Q   You afraid at that time. What were you
14  afraid of?
15      A   Of course, they were telling me that I
16  was going to go to jail.
17      Q   Who was telling you that?
18      A   Madias and Christos.
19      Q   Wait a minute. By December 9th,
20  Mr. Villano, Christos or Mr. Madias hadn't even come
21  on board the ship.
22      A   Yes, sir, you're right. I remember.
23      Q   Okay. So you were afraid because the
24  Coast Guard was pressuring you; right?

Edgar Villano

23 (Pages 86 to 89)

## Page 86

1    A   It's not pressure really. It's just that
2    we were scared.
3    Q   What were you scared of?
4    A   Because we know that what we had done was
5    illegal.
6    Q   When you say "we," this is your
7    statement?
8    A   All of us.
9    Q   Wait a minute, Mr. Villano. Let's take a
10   look at this page.
11            That's your signature on the
12   bottom; right? And that's your statement?
13   A   Yes, sir.
14   Q   And that's the statement that you
15   prepared at the request of the Coast Guard?
16   A   Yes, sir.
17   Q   And you wrote that you -- that you
18   discharged one time since Brazil, right?
19   A   Yes, sir.
20   Q   Are you telling us now that what you
21   wrote was a lie?
22   A   No, sir.
23   Q   So that's the truth, that it was one
24   discharge overboard?

## Page 87

1    A   I only wrote the one, but I was scared at
2    that time. But it was more than once.
3    Q   Okay. So Mr. Villano, if you're scared
4    today, will you say whatever the Government wants you
5    to say so you can go home?
6            MR. KOTILA: Objection.
7            THE WITNESS: Can you repeat that.
8    BY MR. CHALOS:
9    Q   Yeah. If you're scared here today, would
10   you say whatever you think the Government wants to
11   hear?
12   A   Like what?
13   Q   Mr. Villano, you came on board
14   November 17th; right?
15   A   Yes.
16   Q   And you told us it was just a couple days
17   later that the chief engineer gave you this order;
18   right?
19   A   Yes, sir.
20   Q   You could have gotten off the ship at one
21   of the two loading ports?
22   A   I can only remember one port.
23   Q   Mr. Villano, your memory is not very
24   good, is it?

## Page 88

1    A   I'm not sure of things, so --
2    Q   So you're not sure exactly how many times
3    there were discharges overboard, are you?
4    A   I don't know of how many, but I know that
5    it's a lot.
6    Q   Well, when you say "it's a lot,"
7    Mr. Villano, you never turned the pump on, did you?
8    A   Yes, sir.
9    Q   When you say "yes, sir," meaning no, you
10   agree with me, you never turned the pump on?
11   A   Yes, sir.
12   Q   And you also agree with me that you never
13   personally turned the pump off?
14   A   Yes, sir.
15   Q   And in fact, you never even saw the pump
16   operating?
17   A   Yes, sir.
18   Q   You just simply gave the order?
19   A   Yes, sir.
20   Q   And on December 9th, you wrote that you
21   gave the order one time; right?
22   A   Yes, sir.
23   Q   And that's why, Mr. Villano, that you
24   went to the U.S. attorney after your first Grand Jury

## Page 89

1    session and started talking about the so-called
2    discussions you had with Mr. Madias, because you were
3    scared that you would get in trouble?
4    A   Yes, sir.
5    Q   And you thought it would help your
6    position if you went and shared that information with
7    the Government?
8    A   Yes, sir.
9    Q   Now, take a look at what we looked at
10   earlier today, Government Exhibit 2. And for the
11   record, I'll make a representation that earlier today
12   you identified those hoses as magic pipe; right?
13   A   Yes, sir.
14   Q   And just so we're clear, there's lots of
15   flexible hoses like this on board the ships that
16   you've served on, is there not?
17   A   Yes, sir.
18   Q   This isn't unusual equipment to be on
19   board a ship, is it?
20   A   Yes, sir.
21   Q   And they're used fairly frequently for
22   lots of different functions in the engine room, are
23   they not?
24   A   Yes, sir.

Edgar Villano

24 (Pages 90 to 93)

Page 90

1    Q    You use them with fuel oil sometimes?
2    A    Yes, sir.
3    Q    And you can use it with diesel oil;
4    right?
5    A    Yes, sir.
6    Q    And you can use it with the generators?
7    A    Yes, sir.
8    Q    And you can use it with lube oils?
9    A    Yes, sir.
10   Q    You can use it with the boilers?
11   A    That I have not used for a boiler.
12   Q    But the point is there's lots of uses for
13   these flexible hoses; right?
14   A    Yes, sir.
15   Q    Okay. Now, take a look at what we've
16   looked at earlier today, the items that were
17   described as Government Exhibit 3, the flanges.
18   A    Okay.
19   Q    Now, there's lots of flanges on board the
20   ships that you served on, is there not?
21   A    Yes, sir.
22   Q    And there's lots of flanges on board the
23   Irene E.M.?
24   A    Yes, sir.

Page 91

1    Q    And there's lots of proper purposes for
2    the flanges?
3    A    Yes, sir.
4    Q    Okay. Now, Mr. Villano, you didn't bring
5    those flanges here to this office, did you?
6    A    Yes, sir.
7    Q    Wait a minute. You agree with me you
8    didn't bring them here?
9    A    Yes, sir.
10   Q    And you agree with me that you didn't
11   bring the hoses here?
12   A    Yes, sir.
13   Q    And can you agree with me that you don't
14   know how the hoses or the flanges got to this office?
15   A    Yes, sir.
16   Q    And you don't know who took them off the
17   ship, do you?
18   A    Yes, sir.
19   Q    You don't even know if these actually
20   came from the ship?
21   A    I know.
22        MR. CHALOS: Take five minutes.
23        THE VIDEOGRAPHER: Off the record
24   at 3:45.

Page 92

1        (Brief recess.)
2        THE VIDEOGRAPHER: We are on the
3    record at 3:59.
4    BY MR. CHALOS:
5    Q    Mr. Villano, if I understand what you
6    told me correctly, earlier today, when Mr. Kotila was
7    asking you questions about the overboard discharge,
8    you told him that there was a lot of discharges;
9    right?
10   A    Yes, sir.
11   Q    And earlier when I asked you the same
12   questions, you suggested that there was a lot of
13   discharges; right?
14   A    Yes, sir.
15   Q    But when the Coast Guard asked you on
16   December 9th, you told them that there was only one
17   discharge; right?
18   A    Yes, sir.
19   Q    And in fact, you wrote that down in a
20   statement that you signed and gave to the U.S.
21   authorities; right?
22        MR. KOTILA: Objection. This is
23   asked and answered, that whole area.
24   BY MR. CHALOS:

Page 93

1    Q    You can answer.
2    A    Yes, sir.
3    Q    Now, you also talked about the
4    superintendent, and that was Mr. Christos?
5    A    Yes, sir. Yes, sir.
6    Q    And you told Mr. Kotila that he asked you
7    to change your story; right?
8    A    Yes, sir.
9    Q    Okay. Well, what actually happened was
10   he asked you to prepare a written statement of what
11   happened on board to give to the company's lawyers;
12   right?
13   A    He also told me that.
14   Q    Okay. And then what you did was you
15   called all the Filipino crew together and held a
16   meeting; right?
17   A    Yes, sir.
18   Q    And were you the highest ranking engine
19   room officer in that meeting?
20   A    Yes, sir.
21   Q    And you didn't invite the chief engineer
22   to that meeting?
23   A    No, sir.
24   Q    Just Filipinos; right?

- Edgar Villano

Page 94

1    A    Yes, sir.
2    Q    You didn't invite Paul Tudor, the
3    electrician, to that meeting?
4    A    No, sir.
5    Q    And he was a Romanian, the electrician?
6    A    Yes, sir.
7    Q    Okay. And then you prepared a four-page
8    statement for Mr. Christos to give to the lawyers;
9    right?
10    A    Yes, sir.
11    Q    And in fact, what you prepared was a
12    draft of that letter; right?
13    A    Yes, sir.
14    Q    As has the Government ever shown you a
15    copy of that draft?
16    A    Just the end part of it, sir.
17    Q    Okay. Did you ever give the draft to the
18    Government?
19    A    No, sir.
20    Q    And you didn't give the draft to
21    Mr. Christos either, did you?
22    A    The draft, no.
23    Q    So it's fair to say that the draft of
24    that statement no longer exists?

Page 96

1    saw it in the logbook.
2    Q    So are you telling us here today that
3    when you saw the order in the logbook, you knew
4    exactly what it meant?
5    A    Yes, sir.
6    Q    Okay. Then why did you write on
7    December 9th, "When I read the instruction in the
8    logbook, I don't know"?
9        The truth of the matter is,
10    Mr. Villano, that you didn't understand what the
11    chief told you verbally and you didn't understand
12    what he wrote, and you just made a mistake by
13    ordering the fourth engineer to discharge overboard;
14    right?
15    A    No, sir.
16    Q    So then why did you write, on
17    December 9th, you didn't know what the written order
18    meant?
19    A    Could you repeat that. What do you mean?
20    Q    So then why did you write, on
21    December 9th, 2005, when the Coast Guard asked you to
22    write down a truthful summary of what happened on
23    board, you wrote, "When I read the instruction, I
24    don't know."

Page 95

1    A    Only the rough draft was not given, but
2    the actual draft was given to Christos.
3    Q    Okay. What did you do with the rough
4    draft? You threw it out; right?
5    A    Yes, sir.
6    Q    And when you wrote that rough draft, you
7    didn't keep a copy for yourself?
8    A    Yes, sir.
9    Q    When you got on board the ship, it was
10    only a matter of days until when the chief engineer
11    spoke to you about pumping out the engine room bilge
12    wells; right?
13    A    Yes, sir.
14    Q    And what he told you to do was to pump
15    out the engine room bilges; correct?
16    A    Yes, sir.
17    Q    Now, he never used the word "overboard?"
18    A    Verbally he told me that.
19    Q    Okay. Now, if I'm asking this for the
20    second time please, forgive me. What happened first;
21    he wrote the order or he told you the order?
22    A    He first told me verbally.
23    Q    First told you verbally?
24    A    Yes, because then when he came down, I

Page 97

1    A    Perhaps I was just not able to fully
2    explain it in that note.
3    Q    Well, are you guessing?
4    A    No.
5    Q    Mr. Villano, take a look at your
6    statement. It's right in front of you.
7        You wrote, "When I read the
8    instruction in logbook, I don't know."
9        Do you see that, towards the bottom
10    of the page?
11    A    What I meant by that was —
12    Q    Well, Mr. Villano, I'm not asking you
13    what you meant. That's not what you wrote. What you
14    wrote was you didn't know.
15    A    And that's why I'm telling you that I was
16    not able to make a detailed explanation here.
17    Q    Why not?
18    A    Because at that time, I was trying to do
19    a shortcut, and that's all I could think of. I was
20    afraid of what was happening.
21    Q    So when the Coast Guard interviewed you
22    and asked you to write a statement of a truthful and
23    accurate summary of the events that took place on
24    board, you were taking a shortcut?

Edgar Villano

26 (Pages 98 to 101)

Page 98

1    A    That's not the way it is, not really.
2    Q    So this statement is inaccurate; right?
3    A    That is what is the truth.
4    Q    So the truth is, you ordered an overboard
5    discharge one time; and that was after you read an
6    order that you didn't understand and you went and
7    talked to Roberto, the oiler, same guy you talked to
8    at lunch today?
9    A    I really don't understand what you're
10   telling me.
11   Q    Mr. Villano, you told me you speak
12   English. My question is in basic English, you have
13   the assistance of an interpreter, and you don't
14   understand?
15   A    You're getting me confused with all your
16   questions.
17   Q    Were you confused earlier today when
18   Mr. Kotila was asking you questions?
19   A    No.
20   Q    Of course not. Because you have a deal
21   with the Government; right?
22   A    No.
23   Q    You don't have a deal with the
24   Government?

Page 99

1    A    No.
2    Q    Take a look at what we marked as
3    Exhibit 5 prior to today.
4         That summarizes the deal you had
5    with the Government; right?
6    A    All I can tell you is I am here to tell
7    the truth; that's it.
8    Q    And that's what you were doing when you
9    wrote your December 9th statement. That's all you
10   were supposed to do; right?
11   A    Yes, sir.
12   Q    You didn't do that December 9th, if we're
13   supposed to believe your testimony today; right?
14   A    I am the one that made this, sir.
15   Q    Mr. Villano, you made that as a result of
16   the Coast Guard asking you to write a truthful and
17   accurate statement of what happened; right?
18   A    Yes. And that's why I was telling you,
19   sir, that when I made this, I was a little bit
20   scared.
21   Q    So if I understand you correctly, when
22   you're scared, you don't have to tell the truth, in
23   your mind?
24   A    I don't mean that, sir.

Page 100

1    Q    Okay. So if what you wrote there is
2    inconsistent with what you said here today, what's
3    the jury supposed to believe?
4         MR. KOTILA: Objection. Objection;
5    calls for speculation.
6    BY MR. CHALOS:
7    Q    We can agree in December your
8    recollection was a lot fresher than it is today;
9    right?
10   A    Yes, sir.
11   Q    Mr. Villano, you know that some of your
12   crew mates made an application to the Court and
13   signed declarations; right?
14   A    Yes, sir.
15   Q    And you didn't do that?
16   A    Declaration of what?
17   Q    Meaning you didn't participate in a
18   petition to go home.
19   A    Yes, sir.
20   Q    Yes, sir, you agree, you didn't
21   participate?
22   A    Yes, sir.
23   Q    And the reason why you didn't participate
24   was because you're scared of what the Government

Page 101

1    could do to you?
2         MR. KOTILA: Objection. I'm going
3    to object. This is beyond the scope of my direct
4    examination. It's totally irrelevant.
5    BY MR. CHALOS:
6    Q    That's the truth, though, Mr. Villano,
7    isn't it?
8    A    No, it's not.
9    Q    It's not the truth. Okay.
10        Then why didn't you join in that
11   application to the Court?
12        MR. KOTILA: Continued objection.
13        THE WITNESS: I just wanted to wait
14   until it formally ends.
15   BY MR. CHALOS:
16   Q    Okay. Mr. Villano, in all the training
17   you had before you got on board the Irene E.M. about
18   MARPOL and the protection of the environment, you
19   also learned, sometime before you got on board the
20   ship, that if you make a report to the U.S.
21   authorities about a MARPOL violation, that sometimes
22   the Government gives reward money; right?
23   A    That I don't know about. I haven't heard
24   about that.

Edgar Villano

27 (Pages 102 to 105)

| Page 102 | Page 104 |
|---|---|

**Page 102**

1  Q  Mr. Villano, we met in your lawyer's
2  office last week.
3  A  Yes, sir.
4  Q  And you remember we talked about that?
5  A  Yes, sir.
6  Q  And you told me that you had learned
7  about it.
8  A  I just heard about that, I said to you.
9  Q  So then the fact is, as you sit here
10  today, you know about the fact, in certain
11  circumstances, the Government gives reward money if
12  you report a MARPOL violation?
13  A  Yes, sir.
14  Q  Thank you.
15     Now, you said that the chief
16  engineer told you to use a magic pipe; right?
17  A  Yes, sir.
18  Q  Now, you knew about a magic pipe long
19  before you even got on board this ship.
20  A  I just saw it.
21  Q  Okay. So you've seen a magic pipe on
22  other ships you worked on; right?
23  A  Yes, sir.
24  Q  And you've seen an oiler on another ship

**Page 103**

1  use a magic pipe; right?
2  A  Yes, sir.
3  Q  Now, on that ship that you saw this, that
4  was a different ship than the Irene; it was a
5  completely different ship that you talked about.
6  A  Yes, sir.
7  Q  That was owned by a different owning
8  company?
9  A  Yes, sir.
10  Q  Managed by a different manager?
11  A  Yes, sir.
12  Q  With a different captain?
13  A  Yes, sir.
14  Q  And a different chief engineer?
15  A  Yes, sir.
16  Q  And in fact, Mr. Villano, that was your
17  practice before coming on board the Irene; to use
18  magic pipes; right?
19     MR. TWERSKY: I want to instruct
20  the witness not to answer the question. I'm going to
21  instruct him to assert his Fifth Amendment privilege
22  against self-incrimination as to that question.
23  BY MR. CHALOS:
24  Q  Mr. Villano, are you going to invoke your

**Page 104**

1  Fifth Amendment privilege?
2     MR. TWERSKY: He's asking if you're
3  going to follow the advice of your lawyer and not
4  answer that question.
5     THE WITNESS: Yes, sir.
6  BY MR. CHALOS:
7  Q  Okay. Now, just a few more questions,
8  Mr. Villano.
9     You never did change your story,
10  did you? Meaning that after Christos asked you to
11  change your story and before he told you to tell the
12  truth, you never changed your story, did you?
13  A  Yes, sir.
14  Q  Okay. And when you actually spoke to
15  Mr. Christos for the last time, what he told you to
16  do was tell the truth; right?
17  A  Yes, sir.
18  Q  And that was the very same thing that
19  this gentleman named Mr. Madias told you the first
20  time you met with him?
21  A  Yes, sir.
22     MR. CHALOS: Okay. I'll look
23  through my notes, and in the interest of time, I'll
24  pass the witness to Mr. Woodward.

**Page 105**

1     MR. WOODWARD: Go off the record a
2  minute.
3     THE VIDEOGRAPHER: Off the record
4  at 4:18.
5     (Brief recess.)
6     THE VIDEOGRAPHER: We are on the
7  record at 4:24.
8  BY MR. CHALOS:
9  Q  Mr. Villano, I just have one or two final
10  questions.
11     Earlier today Mr. Kotila asked you
12  about taking some saltwater on to put in the bilge
13  tank and some freshwater for the sludge tank. Do you
14  remember that?
15  A  Yes.
16  Q  You can't tell us, can you, the latitude
17  and longitude the ship was at when you did it, can
18  you?
19  A  Yes, sir.
20  Q  When you say "yes, sir," you agree that
21  it's a correct statement that you don't know where
22  the ship was?
23  A  Yes, sir.
24     MR. CHALOS: Thank you. Nothing

Edgar Villano

28. (Pages 106 to 109)

Page 106

1  further.
2          CROSS-EXAMINATION
3  BY MR. WOODWARD:
4      Q  Mr. Villano, my name is Carl Woodward,
5  and I represent Chief Engineer Adrien Dragomir.
6          I've never seen you before and
7  you've never seen me; isn't that correct?  Before
8  today.
9      A  From what I recollect, you were one of
10 the persons that boarded the ship.
11     Q  I boarded the ship?  All right.  What day
12 did I board the ship?
13     A  I believe that we were in Camden.
14     Q  In Camden.  And you think I came on board
15 the ship in Camden?
16     A  I'm not sure, but --
17     Q  Did I give you my card?
18     A  No, sir.
19     Q  Who did I represent?
20     A  Chief engineer.
21     Q  And you think I was on the ship in
22 Camden?
23     A  I just think you may have been.
24     Q  But you're not sure, are you?

Page 107

1      A  Yes, sir.
2      Q  You agree with me that you're not sure?
3      A  Yes, sir.
4      Q  All right.  Now, I'm going to direct your
5  attention to the logbook which had the writing from
6  the chief engineer in it.  Do you have that?  Do you
7  understand that?
8      A  Yes, sir.
9      Q  All right.  And if I'm not mistaken, you
10 had previously testified that the exact words that
11 were written were, quote, out engine room bilges,
12 close quote?
13     A  Yes, sir.
14     Q  That is correct?
15     A  Yes, sir.
16     Q  Now, did you see that writing before or
17 after you spoke with the chief engineer about pumping
18 out engine room bilges?
19     A  After I had spoken to him.
20     Q  All right.  When you spoke with the chief
21 engineer, the conversation -- where did the
22 conversation take place?
23     A  From what I remember, it was at the mess
24 hall, sir.

Page 108

1      Q  You're sure it wasn't in the forward part
2  of the main engine?
3      A  I'm not sure, sir.
4      Q  What time of day was the conversation?
5      A  I don't remember any more, sir.
6      Q  And the conversation was just between you
7  and it was -- and Mr. Dragomir; right?
8      A  Yes, sir.
9      Q  And at that time, isn't it a fact that
10 Mr. Dragomir told you to pump out the bilges?
11     A  Yes, sir.
12     Q  And isn't it a fact that you asked him
13 how to do it?
14     A  Yes, sir.
15     Q  And he told you to go talk to Roberto;
16 isn't that correct?
17     A  Yes, sir.
18     Q  Now, the next day, did you have a
19 conversation with the chief engineer about pumping
20 overboard?
21     A  I don't remember anymore.
22     Q  Didn't you go to the chief engineer and
23 tell him that you'd pumped overboard?
24     A  From what I can remember, he was the one

Page 109

1  that was asking me.
2      Q  Isn't it a fact that you told him that
3  you pumped overboard?
4      A  Yes, I told him that.
5      Q  And didn't he ask you, "Why didn't you
6  pump into the bilge tank?"
7      A  No.
8      Q  You sure about that?
9      A  I'm sure.
10     Q  Didn't he say to you, "Why didn't you use
11 the separator," or something like that?
12     A  No.
13     Q  Didn't he order you to dismantle
14 everything at that time so it couldn't be used again,
15 including the magic hose?
16     A  No.
17     Q  Do you know that the oily water separator
18 could be used manually?
19     A  Yes, sir.
20     Q  Did you ever try to use it manually?
21     A  Yes, sir.
22     Q  Did you suggest to the chief engineer
23 that you should use it manually?
24     A  No.

Edgar Villano

29 (Pages 110 to 113)

Page 110

1   Q   So you never suggested that to him?
2   A   Yes, sir.
3   Q   You never told him that the crew pumped
4   out the second time; isn't that right?
5   A   I told him.
6   Q   Or any other time?
7   A   I told him.
8   Q   Every single time?
9   A   Not all of it.
10  Q   How many times?
11  A   I don't remember, sir.
12  Q   Every day? Every watch?
13  A   I could not remember.
14  Q   Every watch?
15  A   I don't remember.
16  Q   Who did the pump-outs?
17  A   The fourth engineer.
18  Q   Always the fourth engineer?
19  A   Yes.
20  Q   Only the fourth engineer?
21  A   The third after him.
22  Q   Oh, so the fourth engineer and the third
23  engineer?
24  A   Yes, sir.

Page 111

1   Q   The logbook, when was the last time you
2   saw it?
3   A   I don't remember anymore.
4   Q   I want to go back to a conversation that
5   you had with the chief the first time you say you
6   pumped overboard and you told him that you had done
7   so.
8       Where did that conversation take
9   place? Strike that.
10      Yeah, where did that conversation
11  take place?
12  A   As I told you, from what I remember, it
13  was at the mess hall.
14  Q   It was in the workshop, wasn't it?
15  A   That I don't remember.
16  Q   And you and he were the only two who were
17  present; isn't that right?
18  A   Yes, sir.
19  Q   If you misunderstood his order and pumped
20  out illegally, it could go bad for you, couldn't it?
21  A   What do you mean?
22  Q   What do I mean? Well, if he did not tell
23  you to pump out overboard and you misunderstood his
24  order, you could lose your license; right?

Page 112

1   A   From what I know, sir.
2   Q   That's true; right?
3   A   I really don't know, sir.
4   Q   Well, you could be punished; right?
5   A   That's possible, sir.
6   Q   So it's important that somebody else be
7   responsible for what happened here; isn't that right?
8   A   Yes, sir.
9   Q   In the engine room, is there a blackboard
10  or a whiteboard that crew members can write on?
11  A   There is a blackboard, sir.
12  Q   All right. And oilers would take
13  soundings and periodically write the soundings on
14  those blackboards; right?
15  A   I didn't notice.
16  Q   Did you ever see anything written on the
17  blackboard?
18  A   Yes, sir.
19  Q   What did you see written?
20  A   Sometimes it's a job order, sir.
21  Q   Okay. And sometimes they're soundings;
22  right?
23  A   I don't remember if there were any.
24  Q   Now, you said that you helped Roberto

Page 113

1   hook up the magic hose. Do you recall that
2   testimony?
3   A   Yes, sir.
4   Q   So you were, what, three days out from
5   Brazil?
6   A   Two to three days, about that time.
7   Q   Two to three days out from Brazil?
8   A   Yes.
9   Q   Okay. So there was nothing hooked up at
10  that point, was there?
11  A   No, sir.
12  Q   The chief engineer didn't speak very good
13  English, did he?
14  A   That, I couldn't tell you.
15  Q   Well, you had conversations with him,
16  didn't you?
17  A   Yes, sir.
18  Q   His English wasn't very good, was it?
19  A   From what I know, I understood him.
20  Q   You thought you understood him; right?
21  A   Yes, sir.
22  Q   Do you have any relatives in the United
23  States?
24  A   Yes, sir.

Edgar Villano

30 (Pages 114 to 117)

Page 114

1   Q  Where are they located?
2   A  From what I know, they're in Seattle.
3   Q  Do you have any friends here in the
4 United States?
5   A  Not really, no.
6   Q  You'd like to stay in the United States,
7 wouldn't you?
8   A  That I don't desire.
9         MR. WOODWARD:  Off the record for a
10 minute.
11         THE VIDEOGRAPHER:  Off the record
12 at 4:39.
13       (Discussion off the record.)
14         THE VIDEOGRAPHER:  We are on the
15 record at 4:41.
16 BY MR. WOODWARD:
17   Q  The chief engineer never asked you to
18 change your story or lie in this matter, did he?
19   A  Yes, sir.
20   Q  Now, in this statement that you wrote,
21 the four-page statement that you said you drafted,
22 was any of it written by somebody else?
23   A  Yes, sir.
24   Q  Who wrote it?

Page 115

1   A  Fourth engineer, sir.
2   Q  And why did he write part of it?
3   A  Because I saw that his penmanship was
4 better than mine.
5   Q  Okay.  But with respect to the statement,
6 the part that you wrote that was in your own
7 handwriting, at least part of it recounts your
8 conversation with the chief engineer; correct?
9   A  Yes, sir.
10   Q  But those things that involved the second
11 engineer — excuse me — that involved the third or
12 the fourth engineer you didn't know about, did you?
13   A  Yes, sir.
14   Q  Meaning you agree with me; correct?
15   A  Yes, sir.
16   Q  So this statement does not reflect --
17 strike that.
18        You can't say that everything in
19 this statement is true?
20   A  I let them read that, sir, before they
21 signed it.
22   Q  That's not what I said — that's not what
23 I asked you.
24        Other than the things that you know

Page 116

1 about directly, anything in here about the other crew
2 where you were not present, you don't know whether
3 those are true or not, do you?
4   A  Like, for example, what?
5   Q  Did you know Port State Control asked
6 Roberto — or asked about the flanges and Roberto
7 replied about the flanges.  You weren't present for
8 that, were you?
9   A  Yes, sir.
10   Q  You were not present?
11   A  Yes, sir.
12   Q  You agree with me that you were not
13 present?
14   A  Yes, sir.
15   Q  That's an example of what you can't say
16 is true or not; isn't that right?
17   A  Not all of it, sir.
18   Q  And in fact, the conversations that you
19 wrote down between yourself and the chief engineer
20 and the electrician were not known by anybody else
21 who signed this statement; isn't that true?
22   A  All I can tell you is they read it before
23 they signed it.
24   Q  But that didn't mean that they knew

Page 117

1 whether or not the statements were true, because they
2 weren't present?
3   A  All I can tell you, sir, is I did not
4 force them to sign this.  They read it and they
5 signed it.
6   Q  That's not what I'm asking.  I'm asking
7 whether they were present when you had conversations
8 with the chief engineer.
9   A  No, they're not.
10   Q  They were not; right?
11   A  Yes.
12   Q  So they wouldn't know whether the
13 conversation that you had written down between
14 yourself and the chief engineer was true or not,
15 would they?
16   A  Yes, sir.
17        MR. WOODWARD:  Okay.  No further
18 questions.
19        REDIRECT EXAMINATION
20 BY MR. KOTILA:
21   Q  Mr. Villano, I just have a couple of
22 follow-up.
23        One of the last few things you told
24 Mr. Chalos was, I believe the last time before you

Corbett & Wilcox

Edgar Villano

31 (Pages 118 to 121)

Page 118

1 got off the ship you spoke with Christos, and
2 Christos told you to tell the truth.
3     A  Yes, sir.
4     Q  But you also agreed when Mr. Chalos said
5 Madias said to tell the truth the first time you met
6 him.
7     A  Yes, sir.
8     Q  So the first time you met Madias, he told
9 you that?
10    A  Yes, sir.
11    Q  And when did he start telling you to
12 change your story?
13    A  The next day, sir.
14    Q  And how many times after that?
15    A  I don't remember exactly anymore, sir.
16    Q  But there were other times?
17       MR. CHALOS: Objection.
18       THE WITNESS: Yes, sir.
19 BY MR. KOTILA:
20    Q  Now, you also told Mr. Chalos you had a
21 usual practice to transfer bilge wells to the bilge
22 holding tank.
23       What happened to the oily waste in
24 the bilge holding tank?

Page 119

1     A  It's there sitting.
2     Q  Okay. Well, tell me, when would
3 materials go in the bilge holding tank and when would
4 materials go overboard?
5     A  When the bilge well readings is high,
6 when we had not arrived on shore, then we let it
7 overboard.
8     Q  Now, Mr. Chalos keeps referring to a deal
9 with the Government; correct?
10    A  Yes, sir.
11    Q  You're here to tell the truth; correct?
12       MR. CHALOS: Objection.
13       THE WITNESS: Yes, sir.
14 BY MR. KOTILA:
15    Q  Just like it says in the document
16 Mr. Chalos put before you, the honest truth?
17       MR. CHALOS: Objection.
18       THE WITNESS: Yes, sir.
19       MR. KOTILA: I have no further
20 questions.
21       RECROSS-EXAMINATION
22 BY MR. CHALOS:
23    Q  Mr. Villano, that's what the Coast Guard
24 told you on December 9th; right? They asked you to

Page 120

1 tell the truth?
2     A  Yes, sir.
3     Q  And you told them that you would do that;
4 right?
5     A  Yes, sir.
6     Q  Yet the items that appear in that
7 December 9th statement are inconsistent with what you
8 said today.
9     A  Because I was afraid. That's it.
10    Q  You were also afraid, Mr. Villano, when
11 you went to the Grand Jury on January 12th, weren't
12 you?
13    A  That's a normal occurrence, sir.
14    Q  So the answer to my question is yes, you
15 were afraid?
16    A  Not totally, sir.
17    Q  But a little bit?
18    A  Yes, sir.
19    Q  And they asked you, on the 12th of
20 January, "After you arrived in the United States and
21 the Coast Guard gets on the ship, did anyone tell you
22 to lie to the Coast Guard?"
23       Your answer was, "When we arrived
24 here?"

Page 121

1       The question was, "Yes." And then
2 you go through and you tell -- give him an answer
3       And you never said anything about
4 this guy Madias telling you to lie; right?
5     A  Yes, sir.
6     Q  Okay. And then in February, you tell a
7 different story to the Grand Jury; right?
8     A  Yes, sir.
9     Q  And yet today you tell yet a third story,
10 or a fourth story, if you look at the December 9th
11 one-page letter you wrote; right?
12    A  Yes, sir.
13    Q  And a fifth story, if you look at your
14 December 11th statement you prepared for
15 Mr. Christos.
16    A  Yes, sir.
17    Q  So there's five different stories of what
18 happened; right?
19    A  That's not all different, sir.
20    Q  Okay. Well, you told Mr. Kotila earlier
21 today something about something that you thought the chief
22 engineer told you to do with filling the tanks. Do
23 you remember that?
24       MR. KOTILA: Objection. This is

Edgar Villano

32 (Pages 122 to 125)

Page 122

1  beyond the scope of my redirect.
2          MR. CHALOS: Well, it goes to your
3  question about the veracity and accuracy of his
4  testimony.
5          MR. KOTILA: Beyond the scope of my
6  redirection. Objection.
7  BY MR. CHALOS:
8      Q   Well, Mr. Villano, you told Mr. Kotila
9  earlier that you filled the bilge tank with seawater?
10         MR. KOTILA: Again, objection.
11  Beyond the scope of the redirect. Plus, this is
12  asked and answered.
13  BY MR. CHALOS:
14     Q   And the sludge tank with freshwater;
15  right?
16     A   Yes, sir.
17     Q   That's not what you wrote on
18  December 11th, 2005, is it?
19     A   What I wrote then is correct.
20     Q   Okay. What you wrote then was, "Early
21  morning at second engineer watch, they filled bilge
22  tank and sludge tank with seawater."
23         That's different than what you told
24  Mr. Kotila today; right?

Page 123

1      A   That is the truth, what I said.
2      Q   So the truth is what? The sludge tank
3  was filled with --
4      A   Seawater in the bilge tank, freshwater in
5  the sludge tank.
6      Q   But that's not what you wrote on
7  December 11th, 2005; right? Do you agree with me?
8      A   From what I remember, what I told you is
9  correct.
10     Q   Okay. Now, about this deal you had with
11  the Government, when you went in front of the Grand
12  Jury the first time, there was another prosecutor
13  there named Mr. Falgowski; right?
14     A   Yes, sir.
15         MR. KOTILA: Objection; again,
16  asked and answered, this whole area.
17  BY MR. CHALOS:
18     Q   And Mr. Falgowski told you and all the
19  other people in the room what the deal was; right?
20  Do you remember that?
21     A   No.
22     Q   Okay. I'll refresh your recollection. On
23  January 12th, 2006 --
24         THE INTERPRETER: I'm sorry. What

Page 124

1  was the date?
2  BY MR. CHALOS:
3      Q   January 12th, 2006, Mr. Falgowski said to
4  you in front of the Grand Jury, "But you also
5  understand and it's fair to say that I told you
6  you're not a subject and you're not a target of this
7  investigation?"
8          Your answer: "Yeah."
9          The question: "All right. That
10  the Coast Guard has no intentions of prosecuting you.
11  Do you understand that?"
12         Your answer: "Yeah, I understand."
13  "Question: But in return, what you
14  have to do is you have to give us your
15  cooperation; correct?
16  "Answer: Yes."
17         That was the deal you had with the
18  Government; right?
19     A   Yes, sir.
20         MR. CHALOS: Nothing further.
21         RECROSS-EXAMINATION
22  BY MR. WOODWARD:
23     Q   Mr. Villano, are you scared today?
24     A   No, sir.

Page 125

1      Q   So you were scared on the 9th of
2  December, and so you lied on the 9th of December; is
3  that right?
4      A   Yes, sir.
5      Q   And so it's okay to lie if you're scared?
6      A   That I could not assure you, sir.
7      Q   Well, let me ask you this, sir.
8          On the 9th of December, you said
9  there was only one pump-out. Today you said there
10  were more.
11         Were you lying then or are you
12  lying now?
13     A   At this time, I'm not.
14         MR. WOODWARD: No further
15  questions.
16         FURTHER REDIRECT EXAMINATION
17  BY MR. KOTILA:
18     Q   Let me just finish up.
19         When you were in the Grand Jury on
20  January 12th, where Mr. Chalos left off, he read the
21  question "But in return" -- this is Page 4 -- "But in
22  return, what you have to do is to give us your
23  cooperation; correct?"
24     A   Yes.

Corbett & Wilcox

Edgar Villano

33 (Pages 126 to 129)

Page 126

1    Q   And your answer was: "Yes."
2         But the next question: "And your
3    cooperation has to be total and you have to tell us
4    the truth."
5         And you answered: "Yeah."
6         Next question: "You have to be
7    honest with us."
8         "Answer: I know."
9         You gave those answers to those
10   questions; correct?
11   A   Yes.
12        MR. KOTILA: All right. No further
13   questions.
14        FURTHER RECROSS-EXAMINATION
15   BY MR. CHALOS:
16   Q   Now, Mr. Villano last question.
17        When you made that deal with
18   Mr. Falgowski and he asked for you to tell the truth,
19   that wasn't a different truth than the truth that
20   Mr. McKnight asked you to tell, is it?
21   A   It's the same.
22   Q   So if you told the truth when
23   Mr. McKnight asked you, the story should be the same
24   when Mr. Kotila asked you; right?

Page 127

1    A   Yes, sir.
2         MR. CHALOS: Okay. Thank you.
3    Nothing further.
4         MR. KOTILA: Thank you.
5         THE VIDEOGRAPHER: We are off the
6    record at 5 o'clock.
7         (Signature having been waived, the
8         deposition of EDGAR VILLANO was
9         concluded at 5:00 p.m.)
10
11             INDEX
12   WITNESS:                    PAGE
13   EDGAR VILLANO
14   Mr. Kotila              4
15   Mr. Chalos            38
16   Mr. Woodward         106
17   Mr. Kotila           117
18   Mr. Chalos           119
19   Mr. Woodward         124
20   Mr. Kotila           125
21   Mr. Chalos           126
22
23
24

Page 128

1         EXHIBITS MARKED FOR IDENTIFICATION
2    CSME       DESCRIPTION            PAGE
3    17    Employment documents of        46
          Mr. Villano
4
5    18    Photocopy of Mr. Villano's      46
          seaman's book and passport
6    19    Licenses and acknowledgements of   46
          Mr. Villano
7
8    20    Certificates of completion of    46
          training courses
9    21    Physical and mental testing      46
          results of Mr. Villano
10
11   22    Handwritten document of          46
          Mr. Villano dated 12-9-05
12
13
14
15        EXHIBITS MOVED INTO EVIDENCE
16   CSMR Exhibit No.              PAGE
17        17               49
18        18               50
19        19               53
20        20               56
21        21               62
22
23
24

Page 129

1         CERTIFICATE OF SHORTHAND REPORTER
2
3         I, Gail Inghram Verbano, CSR, RMR,
4    the officer before whom the foregoing proceedings
5    were taken, do hereby certify that the foregoing
6    transcript is a true and correct record of the
7    proceedings; that said proceedings were taken by me
8    stenographically and thereafter reduced to
9    typewriting under my supervision; and that I am
10   neither counsel for, related to, nor employed by any
11   of the parties to this case and have no interest,
12   financial or otherwise, in its outcome.
13
14
15
16
17        _____
          Gail Inghram Verbano, CSR, RMR
          CSR No. 8635.
          Certification No.: 220
18        (Expires 1-31-2008)
19
20
21
22
23
24

Corbett & Wilcox

# EXHIBIT 10

Paul Tudor

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

UNITED STATES OF AMERICA,          :

            Plaintiff,   :

       vs.          :No. 1:06-CR-00076-GMS-2

CHIAN SPIRIT MARITIME          :
ENTERPRISES, INC., VENETICO
MARINE S.A. IRENE E/M,          :
EVANGELOS MADIAS, CHRISTOS
PAGONES, ADRIEN DRAGOMIR,          :

         Defendants. :

- - -

Deposition of PAUL TUDOR, taken

pursuant to notice in the offices of the United States

Department of Justice, 700 Nemours Building, 1007

North Orange Street, Wilmington, Delaware, on Friday,

July 14, 2006, at 10:36 a.m., before Lorraine B.

Marino, Registered Diplomate Reporter and Notary

Public.

- - -

CORBETT & WILCOX

230 North Market Street

Wilmington, Delaware 19901

(302) 571-0510

Corbett & Wilcox

Paul Tudor

2 (Pages 2 to 5)

Page 2

```
 1  APPEARANCES:
 2      MARK W. KOTILA, ESQ.
        JEFFREY L. PHILLIPS, ESQ.
 3      United States Department of Justice
        Environmental Crimes Section
 4      P.O. Box 23985 - L'Enfant Plaza
        Washington, DC 20026-3985
 5      for Plaintiff
 6      GEORGE M. CHALOS, ESQ.
        Fowler Rodriguez & Chalos
 7      366 Main Street
        Port Washington, NY 11050
 8      for Defendants Chian Spirit and
        Venetico Marine
 9
        CARL R. WOODWARD, III, ESQ.
10      Carella, Byrne, Bain, Gilfillan,
        Cecchi, Stewart & Olstein
11      5 Becker Farm Road
        Roseland, NJ 07068-1739
12      for Defendant Dragonair
13      MICHAEL K. TWERSKY, ESQ.
        Montgomery, McCracken, Walker &
14      Rhoads LLP
        123 South Broad Street
15      Philadelphia, PA 19109
        for the Witness
16
17  ALSO PRESENT:

18      ADRIEN DRAGOMIR
        LIVIU LEE ROTH
19      TRACY I. KATZ
        JASON F BURGESS
20      BRENT J. McKNIGHT
        MICHELLE N. HERREM
21      CARA GOELLER
        PRESTON SATCHELL
22      ---
23
24
```

Page 3

```
 1          NADIA SHARON, having been first duly
 2  sworn as the interpreter, translated as follows:
 3          PAUL TUDOR, having been first duly
 4  sworn, was examined and testified at times through the
 5  interpreter as follows:
 6          DIRECT EXAMINATION
 7  BY MR. KOTILA:
 8      Q.   Good morning, Mr. Tudor.
 9      A.   Good morning.
10      Q.   My name is Mark Kotila, and I am with
11  the United States Department of Justice. And we have
12  met several times in the past; correct?
13      A.   (without interpreter) Yes.
14      Q.   We have interviewed you. You
15  testified at a prior proceeding; correct?
16      A.   (without interpreter) Yes.
17      Q.   Could you tell us where -- how long
18  have you been in the United States now?
19          (Discussion between witness and
20  interpreter.)
21          MR. CHALOS:  One second. I would like
22  to make an objection. Mr. Tudor, Mr. Tudor, one
23  second.
24          To madam interpreter, your
```

Page 4

```
 1  responsibility today is to just interpret what he
 2  says, not to discuss the questions, not to discuss
 3  what you think or interpret the questions to be. It
 4  is just whatever he says, you tell us, and whatever
 5  the questioner said, you tell him.
 6          THE INTERPRETER:  My question is if
 7  you calculate the time from January 5 till -- from
 8  December 5 until January 3.
 9          THE WITNESS:  (without interpreter) If
10  I count -- sorry. I count the period which I been
11  with the ship --
12          MR. KOTILA:  Hold on. You probably
13  have to speak through the interpreter so we are
14  consistent.
15          THE WITNESS:  Do I have to count the
16  period that I was in anchor, from December 5 through
17  January?
18  BY MR. KOTILA:
19      Q.   Correct. I am just saying from
20  December 5 to now you have been in the United States;
21  correct?
22      A.   (without interpreter) Yes.
23      Q.   Now, where are you from?
24      A.   (without interpreter) I am from
```

Page 5

```
 1  Romania.
 2      Q.   And how old are you?
 3      A.   (without interpreter) Forty-six.
 4      Q.   Could you tell us where you live in
 5  Romania?
 6      A.   Medgidia, M-E-G-I-D-E-A.
 7      Q.   Do you have an address there?
 8      A.   Yes.
 9      Q.   What is it?
10      A.   Podgorilor -- P-O-D-G-O-R-I-L-O-R --
11  Street. The number of the street is 30. 30
12  Podgorilor.
13      Q.   Could you tell us what is your
14  occupation?
15      A.   I am an electrician.
16      Q.   How long have you been an electrician?
17      A.   (without interpreter) More than 27.
18      Q.   Twenty-seven years?
19      A.   Yes.
20      Q.   How much education have you had?
21      A.   Altogether, because I have other
22  studies, I have other things studied.
23      Q.   But how many years in school?
24      A.   Over 18 years.
```

Paul Tudor

Page 6

1    Q.    How did you learn to be an
2  electrician?
3    A.    I learned in school.
4    Q.    How long did you go to school?
5    A.    Four years.
6    Q.    Four years.  Now, as an electrician,
7  what kind of businesses have you worked in?
8    A.    Only on the sea.
9    Q.    Only on vessels?
10    A.    Yes.  A period of time also in the
11  army, but also in the same domain.
12    Q.    Which army?
13    A.    (without interpreter) Navy.
14    Q.    Romanian Navy?
15    A.    (without interpreter) Yes.
16    Q.    What kind of work have you done in
17  vessels generally?
18    A.    Maintenance and repairs.
19    Q.    All electrical maintenance and
20  repairs?
21    A.    Yes.
22    Q.    And have you worked with oily water
23  separators?
24    A.    I didn't function.  I didn't work

Page 7

1  effectively with it.
2    Q.    What does that mean?
3    A.    I wasn't the person to function the
4  separator.
5    Q.    So you are not skilled with the
6  separator?
7    A.    I have experience, but I didn't
8  operate this.
9    Q.    All right.  You did not operate them?
10    A.    Yes.
11    Q.    But you know how they work?
12    A.    Yes.
13    Q.    What do oily water separators do?
14    MR. CHALOS:  Objection.  There is no
15  foundation.  The guy said he doesn't work with it.  I
16  am not going to give you speaking objections, but
17  noted for the record.
18  BY MR. KOTILA:
19    Q.    You are familiar with oily water
20  separators?
21    A.    Yes.
22    Q.    You have not operated them; correct?
23    A.    Correct.
24    Q.    But you have worked on them?

Page 8

1    MR. CHALOS:  Objection.
2    THE WITNESS:  Yes.
3  BY MR. KOTILA:
4    Q.    Have you ever made repairs to oily
5  water separators?
6    A.    I am not able to do it.
7    Q.    So what, if any, work did you do on
8  oily water separators?
9    MR. CHALOS:  Objection; asked and
10  answered.
11    MR. KOTILA:  You can answer.
12    THE WITNESS:  I secure the part that
13  function in the electrical domain.  There I repair and
14  maintain.  But there is an electronic part of it that
15  I don't have the permission to go to.
16  BY MR. KOTILA:
17    Q.    Okay.  So there is an electrical part
18  of an oily water separator and an electronics part?
19    A.    Yes, sir.  Yes.
20    Q.    Now, what is the part affiliated with
21  the electrical part?  Tell us what you are talking
22  about.
23    A.    They are pumps.  They are the electric
24  panel, that they have a contact with them, relays, all

Page 9

1  the buttons, all the interruptors, all the commuters,
2  all kinds of electric bobbins.  They are
3  electromagnetic valves.
4    Q.    So those kind of times you did —
5    A.    (without interpreter) Solenoid valves.
6    Q.    How do you spell that?
7    A.    Solenoid valves.
8    THE INTERPRETER:  Solenoid.
9    MR. WOODWARD:  S-O-L-E-N-O-I-D,
10  solenoid.
11  BY MR. KOTILA:
12    Q.    Okay.  That part of the oily water
13  separator you were able to work with?
14    A.    Yes.
15    Q.    Repairs made?
16    A.    Yes.
17    Q.    Many times?
18    A.    Whenever was the necessity.
19    Q.    What --
20    A.    In other vessels, yes.
21    Q.    Now, what are you referring to as the
22  electronics part of an oily water separator?
23    A.    The analyzer.
24    Q.    Is this also known as the sensor?

Paul Tudor

4 (Pages 10 to 13)

Page 10

1    A.    Yes. It is the same thing.
2    Q.    Now, that part of the separator you
3 did not ever work on, on any sensor?
4    A.    No, because it is not possible to be
5 repaired.
6    Q.    Okay. If it is broke?
7    A.    It has to be replaced.
8    Q.    Okay.
9    A.    It is unrepairable.
10    Q.    Okay. When did you board the vessel
11 the Irene?
12    A.    24 May.
13    Q.    May 24?
14    A.    2005.
15    Q.    How is it that you got that job?
16    A.    I took it from the former electrician,
17 but the period was a short period, around four to five
18 hours. And I took over only the important parts that
19 were important for the vessel.
20    Q.    Okay. Well, let's back up. Where
21 were you living in May of 2005?
22    A.    I don't understand the question.
23    Q.    You boarded the Irene in May 2005.
24    A.    Yes.

Page 11

1    Q.    Where were you prior to boarding the
2 Irene?
3    A.    In my town, Medgidia.
4    Q.    How were you contacted to get the job?
5         MR. CHALOS: Objection. No foundation
6 he was ever contacted.
7 BY MR. KOTILA:
8    Q.    Well, how is it that you get on board
9 the vessel?
10    A.    Through my agent, the firm of the
11 crewing agency.
12    Q.    They contacted you in Romania?
13    A.    Yes.
14         MR. CHALOS: Objection.
15 BY MR. KOTILA:
16    Q.    Okay. Where did you meet with the
17 boat in May of '05, the boat being Irene?
18    A.    I met with them at the agency.
19    Q.    Where was the Irene at the time?
20    A.    In Poland.
21    Q.    So you boarded the vessel in Poland?
22    A.    Yes.
23    Q.    Who did you meet with once you got on
24 board the Irene? Who?

Page 12

1    A.    The first person was guardian.
2    Q.    Who?
3    A.    (without interpreter) No. Watchman.
4         THE INTERPRETER: The watchman.
5         THE WITNESS: (without interpreter)
6 The gangway watchman.
7 BY MR. KOTILA:
8    Q.    Who was to be your supervisor on board
9 the Irene?
10    A.    The second mechanic, which was the
11 chief mechanic.
12    Q.    Is that also the same as the chief
13 engineer?
14    A.    Yes. Second engineer and chief
15 engineer are my supervisors on board.
16    Q.    Immediate supervisors?
17    A.    Yes.
18    Q.    So the chief engineer and the second
19 engineer give you your jobs —
20    A.    Yes.
21    Q.    — and you do them?
22         What was the name of the chief
23 engineer when you boarded the vessel?
24    A.    Tomondong Bautista Gene.

Page 13

1    Q.    Okay. Did you take a look at the oily
2 water separator when you boarded the vessel in May of
3 '05?
4    A.    Yes. I looked at the separator along
5 with the electrician that I took the job from.
6    Q.    What was the name of that electrician?
7    A.    Aurelian, A-U-R-E-L-I-A-N. I am not
8 sure of the second name.
9         (without interpreter) Family name, I
10 am not remember.
11         (through interpreter) It might be
12 Hotoran, H-O-T-O-R-A-N. I am not sure.
13    Q.    All right. You are not sure. You
14 don't remember.
15         What was the condition of the oily
16 water separator?
17         MR. CHALOS: Objection.
18 BY MR. KOTILA:
19    Q.    You looked at the oily water
20 separator?
21    A.    Yes.
22    Q.    What parts did you look at?
23    A.    (without interpreter) Everything
24 function. I start all in function.

Corbett & Wilcox

Paul Tudor

5 (Pages 14 to 17)

| Page 14 | Page 16 |
|---|---|

Page 14

1   (through interpreter) I looked at all
2   parts.
3       Q.    All parts. What was the condition of
4   the oily water separator?
5       A.    I was told that it is not functioning
6   a long time.
7       Q.    By who?
8       A.    The former electrician that I took
9   over the job.
10      Q.    Now, you looked at the parts or did
11  you do any testing at that time?
12      A.    Yes.
13      Q.    What did you do?
14      A.    I put it in function. I regulated
15  to -- (witout interpreter) Adjusted.
16      (through interpreter) I adjusted to
17  the zero number.
18      Q.    Okay. What happened?
19      A.    It gave a false alarm in the sense
20  that the indicator of ppm didn't hold at the same
21  value with the clean water. I cannot say the value
22  that was there, the number that was there.
23      Q.    Do you mean the ppm?
24      A.    The ppm, yes.

Page 16

1   tanks with zero ppm and 15 ppm to compare, for
2   comparison.
3       Q.    Ppm stands for what?
4       A.    Pp, particular. Million -- I am a
5   little emotional so I cannot remember, but --
6       Q.    Mr. Tudor, just relax. Take it easy.
7       A.    It is the value of water of the
8   particular of a million to explain.
9       Q.    Okay. You were saying how would you
10  test it again?
11      A.    I adjust it to zero.
12      Q.    Adjust what? Adjust what?
13      A.    The analyzer, the sensor.
14      Q.    Okay.
15      A.    I put water to zero and have to give
16  me the zero result. Empty it, place water to 15. It
17  has to give me the 15 ppm. This happened at other
18  vessels.
19      Q.    And that's how you is the word
20  "calibrate" the oily water separator?
21      A.    Yes.
22           MR. CHALOS: Objection.
23  BY MR. KOTILA:
24      Q.    Did you do this test on the Irene?

Page 15

1       Q.    So you are putting plain water in?
2       A.    Yes. About three times I did put in
3   water.
4       Q.    And if the oily water separator is
5   working properly, what should happen?
6           MR. CHALOS: Objection.
7           MR. WOODWARD: No foundation.
8           MR. CHALOS: No foundation.
9   BY MR. KOTILA:
10      Q.    You have tested oily water separators
11  before?
12           MR. CHALOS: Objection.
13  BY MR. KOTILA:
14      Q.    Did you? I believe you already
15  testified that you are familiar with oily water
16  separators.
17      A.    Yes.
18      Q.    How do you test them?
19           MR. CHALOS: Objection. Are you
20  asking him for a hypothetical?
21           MR. KOTILA: No.
22  BY MR. KOTILA:
23      Q.    How have you tested them in the past?
24      A.    In the past on other vessels I had

Page 17

1       A.    No, no, because I didn't have the
2   water containers.
3       Q.    I might be wrong, but I thought you
4   said --
5       A.    I didn't.
6       Q.    -- you tested three times with water.
7       A.    Oh, with the mineral water from a
8   bottle.
9       Q.    All right. So you did test it?
10      A.    Yes.
11      Q.    And this is back in May of '05?
12      A.    Yes, together with the previous
13  electrician.
14      Q.    And tell us what were the results
15  again.
16      A.    False, false results mean that they
17  were never the same results.
18      Q.    What does that mean?
19      A.    The analyzer didn't work. It was an
20  electronic problem that I don't recognize it. I don't
21  know.
22      Q.    The electronic part that you are not
23  familiar with?
24      A.    Yes.

Paul Tudor

6 (Pages 18 to 21)

Page 18

1    Q.    It was not working?
2    A.    Yes.
3    Q.    When you discovered the oily water
4    separator was not working, who did you tell?
5          MR. CHALOS: Objection. He never
6    testified the oily water separator wasn't working. He
7    said the sensor wasn't working.
8          MR. KOTILA: Let me correct the
9    question.
10   BY MR. KOTILA:
11   Q.    When you discovered the oily water
12   sensor was not working, who did you tell, if anybody?
13         MR. WOODWARD: Objection.
14         THE WITNESS: I did tell to the chief
15   mechanic.
16   BY MR. KOTILA:
17   Q.    Tomondong?
18   A.    Yes.
19   Q.    Tomondong?
20   A.    Yes.
21   Q.    Let's go now to about October of '05.
22   Did a new chief engineer come on board?
23   A.    Yes.
24   Q.    Who?

Page 19

1    A.    Adrien Dragomir.
2    Q.    Do you see him in this room today?
3    A.    Yes.
4    Q.    And could you point him out?
5    A.    Yes, third man from here.
6    Q.    In the jean vest, gray hair?
7    A.    Yes.
8    Q.    Beard?
9    A.    He is there (indicating).
10         MR. KOTILA: Let the record reflect
11   that the witness has identified the chief engineer,
12   Mr. Dragomir.
13   BY MR. KOTILA:
14   Q.    Did you test the oily water separator
15   again when the chief engineer was on board,
16   Mr. Dragomir?
17   A.    Not then. Later.
18   Q.    When?
19   A.    In November 25.
20   Q.    What did you do that day?
21   A.    The same thing that I did previous
22   three times.
23   Q.    Tell us again, what did you do in
24   November of '05?

Page 20

1    A.    I repeat the same test that I did two
2    times before.
3    Q.    What were the results?
4    A.    Same.
5    Q.    So what did you do? Let's slow it
6    down. Did you have -- walk us through it. What did
7    you do?
8    A.    At the moment, at the moment that we
9    got the new equipment -- oh. At the moment that the
10   new crew member came on the vessel, the Filipino
11   person who came to the machine, to the engine
12   department --
13   Q.    The second engineer?
14   A.    Yes, he was the second engineer.
15   Q.    Mr. Villano?
16   A.    Yes.
17   Q.    Okay.
18   A.    He had to get familiarized with all
19   the installation in the vessels; right?
20         When the time came that he had to the
21   person to get familiarized also the separators in the
22   vessel, I was part of everything that happened there.
23   I assisted him. I participated. I explained them the
24   electrician part of the functioning of this part of

Page 21

1    the vessel.
2    Q.    What did you tell him?
3    A.    How do we start the pump, the function
4    that they have, either automatically or manually.
5    Q.    This is all on the oily water
6    separator?
7    A.    Yes. Yes, only on the separator.
8    Q.    Did you test the system again?
9    A.    Not then. This happened earlier. On
10   the 25th I received an order from the chief mechanic
11   to test it.
12   Q.    The chief mechanic, meaning
13   Mr. Dragomir?
14   A.    Yes.
15   Q.    When you say chief mechanic, that is
16   also chief engineer?
17   A.    Chief engineer.
18   Q.    Okay. He ordered you to test it?
19   A.    Yes.
20   Q.    When?
21   A.    The 24th or the 25th.
22   Q.    And you tested it with the second
23   engineer?
24   A.    Yes. What I said prior, it was that

Corbett & Wilcox

Paul Tudor

7 (Pages 22 to 25)

| Page 22 | Page 24 |
|---|---|
| 1  the second engineer get familiarized, but we didn't | 1       Q.      No. After you were done, did you tell |
| 2  test it then. | 2  the chief engineer? |
| 3       Q.      I know. But when you did test it — | 3            MR. WOODWARD: Objection; leading. |
| 4       A.      On the 25th I tested. It was there | 4  BY MR. KOTILA: |
| 5  the second mechanic participated, the fourth mechanic | 5       Q.      Who, if anyone, did you speak to after |
| 6  and two or three other motorists, oilers that I don't | 6  you tested it? |
| 7  recall their names. | 7       A.      I didn't — we didn't have to say |
| 8       Q.      What were the results of the testing? | 8  anything because everyone was there. |
| 9            MR. CHALOS: Objection. | 9       Q.      The chief engineer was there? |
| 10           THE WITNESS: Same as before. | 10      A.      Yes. Yes. I considered I didn't have |
| 11  BY MR. KOTILA: | 11  to say to no one because everyone was there. |
| 12      Q.      Which is what? | 12      Q.      Including Mr. Dragomir? |
| 13      A.      It was a defect in the sensor, in the | 13      A.      Yes. |
| 14  analyzer. | 14      Q.      Was there any point in time that you |
| 15      Q.      So it didn't work? | 15  requested parts for the oily water separator to repair |
| 16      A.      No. | 16  the electrical side? |
| 17           MR. CHALOS: Objection. | 17      A.      No. I asked for a technician. |
| 18           MR. WOODWARD: Objection; leading. | 18      Q.      You asked for a technician? |
| 19  BY MR. KOTILA: | 19      A.      Yes. |
| 20      Q.      What was the condition of the machine? | 20      Q.      To repair what? |
| 21  Was it old, new, rusty? | 21      A.      To come and repair the oil separator. |
| 22           MR. CHALOS: Objection. | 22      Q.      How many times did you request a |
| 23  BY MR. KOTILA: | 23  technician? |
| 24      Q.      What was the condition of the oily | 24      A.      I reported to my chief. It wasn't in |

| Page 23 | Page 25 |
|---|---|
| 1  water separator? | 1  my capacity, you know, to say to the company. I just |
| 2            MR. WOODWARD: Objection. He is not | 2  reported to my higher chief. |
| 3  qualified as an expert to testify as to the condition | 3       Q.      Who would that be? |
| 4  of the machine. | 4       A.      Mr. Tomondong. |
| 5  BY MR. KOTILA: | 5       Q.      Did you ever report that to |
| 6       Q.      You are looking at a machine. What | 6  Mr. Dragomir? |
| 7  does it look like? | 7       A.      When Mr. Dragomir came aboard, he |
| 8       A.      I never saw it functioning, so I | 8  received the report from his preceding chief mechanic |
| 9  cannot say. | 9  I was asked and I confirmed. |
| 10      Q.      It was never functioning? | 10      Q.      Did you ever have any further |
| 11           MR. CHALOS: Objection. | 11  discussions with this chief engineer about the oily |
| 12           MR. WOODWARD: Objection. | 12  water separator? |
| 13           THE WITNESS: I never saw it | 13      A.      Yes, when I heard that we need to come |
| 14  functioning. | 14  to America. |
| 15  BY MR. KOTILA: | 15      Q.      What did you talk about? |
| 16      Q.      What did it look like on the outside? | 16      A.      He was very scared at what may happen. |
| 17  Did it look new; what? | 17      Q.      What did he say to you? |
| 18      A.      It was rusted. | 18      A.      That the way the machine looks and it |
| 19           MR. WOODWARD: I am sorry? | 19  is — and it will be a problem. |
| 20           THE INTERPRETER: Rusted. | 20      Q.      The chief engineer says this? |
| 21  BY MR. KOTILA: | 21      A.      Yes. |
| 22      Q.      When you tested it with the second | 22      Q.      Why would there be a problem? Did he |
| 23  engineer and the others — | 23  say? |
| 24      A.      On the 25th. | 24           MR. CHALOS: Objection. |

Paul Tudor

B (Pages 26 to 29)

Page 26

1         THE WITNESS: No. No. He was scared.
2    This was the only manifestation.
3    BY MR. KOTILA:
4        Q.    What do you mean by that?
5        A.    I mean he just -- the way he showed,
6    he is scared.
7        Q.    Scared about what?
8             MR. WOODWARD: I am going to object.
9    This calls for speculation.
10   BY MR. KOTILA:
11       Q.    What I want you to do, the best you
12   can, is tell us your discussions with the chief
13   engineer, to the best of your memory, what he said
14   about being scared, if anything.
15       A.    The only discussion that we had, that
16   he said that we coming to America and we have problems
17   and he is scared that he knows that we are coming to
18   America and we have problems on the vessel. This is
19   the only discussion I had with him.
20       Q.    Did he say problems with what?
21            MR. WOODWARD: Objection; leading.
22            MR. CHALOS: Leading.
23   BY MR. KOTILA:
24       Q.    What problems, if any, did he discuss?

Page 27

1        A.    In reference to what? From my part
2    was the electrician part that I had problems.
3        Q.    With the oily water separator?
4        A.    The electrical part. Yes.
5        Q.    Was there any part of the oily water
6    separator that you repaired?
7        A.    Yes. Yes, the alarm.
8        Q.    Now, what part of the oily water
9    separator is the alarm? Is it the electrical part you
10   already discussed?
11       A.    Electrical part.
12       Q.    Why did you fix the alarm?
13       A.    Yes.
14       Q.    Did it work?
15       A.    Yes.
16       Q.    When did you fix it?
17       A.    After first -- I tested more in May.
18   July 1, this is when I detected that the alarm is
19   defective, so --
20       Q.    In July?
21       A.    In July.
22       Q.    When did you fix it?
23       A.    The second or the third day is when I
24   fixed it.

Page 28

1        Q.    Of July?
2        A.    In July.
3        Q.    Why just fix the alarm?
4        A.    Because the bell that helped serve the
5    separator served also other objects in the vessels.
6        Q.    I don't understand then.
7        A.    It was a bell that served more, many
8    other alarms in the vessel.
9        Q.    This was a bell on the oily water
10   separator?
11       A.    Yes.
12       Q.    And you repaired that?
13       A.    (without interpreter) Yes. But that
14   bell to serve also the burner boiler and expansion
15   tanks, the supply pumps from burner boiler. It was
16   many, many others which give alarm to this bell.
17       Q.    This one alarm?
18       A.    Yes.
19       Q.    It served all these functions?
20       A.    (without interpreter) Yes. Not all.
21   Parts of them.
22       Q.    But it is on the oily water separator,
23   this bell?
24       A.    (without interpreter) Yes.

Page 29

1        (through interpreter) The bell served
2    the many other alarms in the vessels.
3        Q.    Right. But also the oily water
4    separator?
5        A.    (without interpreter) Yes.
6        Q.    For the oily water separator, why only
7    fix the alarm for that?
8        A.    It was necessary because the wire was
9    not in place there, so I had to fix it.
10       Q.    When you come to ports, would anybody
11   test the oily water separator alarm --
12            MR. WOODWARD: Objection.
13            MR. KOTILA: -- in the port control?
14   Were you familiar --
15            MR. WOODWARD: Objection.
16            THE WITNESS: I didn't understand the
17   question.
18   BY MR. KOTILA:
19       Q.    When you get to a port, have you ever
20   seen --
21       A.    (without interpreter) Here in the
22   United States?
23       Q.    Here, here in the United States,
24   anybody test an oily water separator, any authorities,

Paul Tudor

9  (Pages 30 to 33)

Page 30

1  before?
2      A.    The Coast Guard.
3      Q.    What do they test?  What have you seen.
4  them test?
5          MR. CHALOS:  Objection.  When?
6          THE WITNESS:  I wasn't there.
7  BY MR. KOTILA:
8      Q.    Oh, okay.  Not in this case?
9      A.    Yes.
10     Q.    In other cases?
11         MR. KOTILA:  Give me a minute, guys.
12         THE WITNESS:  The first time the Coast
13  Guard came in, I wasn't there.  The second time I was
14  there when they came, the Coast Guard.
15  BY MR. KOTILA:
16     Q.    In the United States?
17     A.    Yes.  Check it two times, but the
18  first time I don't be there.  The second time.
19     Q.    Was it working when they tested it?
20     A.    No.
21     Q.    What was wrong with it?
22         MR. CHALOS:  Objection.
23         THE WITNESS:  The same thing.
24 .

Page 31

1  BY MR. KOTILA:
2      Q.    The same thing you tested?
3      A.    Yes.
4      Q.    I asked you about spare parts that you
5  would request to do your job; right?
6      A.    Yes.
7      Q.    Did you ever make any requests --
8      A.    Yes. .
9      Q.    -- of your company -- of who?  Who
10  would you make the request to?
11     A.    I made the list and I gave it to --
12  three times I made lists and I gave it to the chief
13  mechanic, chief engineer..
14     Q.    What kind of information was on the
15  list?  What kind of parts?
16     A.    For maintenance and repair.
17     Q.    When was this?
18     A.    I don't recall.  It was in three
19  different periods in every port and before each time
20  we get to a port.
21     Q.    Did you ever ask for any parts for the
22  oily water separator?
23     A.    No.  I ask only for a technician.
24     Q.    Even for the electrical part?

Page 32

1      A.    If the technician will came on the
2  vessel, he will came with everything.
3      Q.    Why did you request a technician?
4      A.    Because it was a problem that wasn't
5  to my capacity, capability.
6      Q.    And how often did you request a
7  technician?
8          MR. CHALOS:  Objection.
9          MR. KOTILA:  Answer the question.
10         THE WITNESS:  I asked for one time .
11  from the -- to Mr. Tomondong..
12  BY MR. KOTILA:
13     Q.    How about Mr. Dragomir?
14     A.    It wasn't necessary because another
15  person from the company part will do this.  It was
16  another person was aboard to do this.
17     Q.    Who?
18     A.    A person from the company.  I don't
19  know his name.
20     Q.    Did you ever work with the second --
21  you said you worked with the second engineer on the
22  oily water separator; correct?
23     A.    Yes.
24         MR. CHALOS:  Objection.

Page 33

1  BY MR. KOTILA:
2      Q.    Well, did you ever work with him on
3  the oily water separator?
4          MR. CHALOS:  Objection.  What does
5  "work" mean?
6          THE WITNESS:  No.
7  BY MR. KOTILA:
8      Q.    Only testing it?
9      A.    Yes.
10     Q.    And at that time did you -- and this
11  was when?  In October.  No, November.
12     A.    Yes.
13     Q.    Did you repair the hell at that time
14  on the oily water separator?
15     A.    No.  This was in July.
16     Q.    Back when you boarded the vessel back
17  in May of 2005 and you met with Tomondong; right?
18         MR. CHALOS:  Objection.
19  BY MR. KOTILA:
20     Q.    -- who else from the company was on
21  board the vessel?
22         MR. CHALOS:  Objection.
23         MR. KOTILA:  You can answer the
24  question.

Corbett & Wilcox

Page 34

1          THE WITNESS: It was the DPA.
2   BY MR. KOTILA:
3      Q.    A what?
4      A.    DPA.
5      Q.    What does DPA stand for?
6      A.    Pitaolis, Mr. Pitaolis.
7      Q.    Who is he; do you know?
8      A.    (without interpreter) Yes.  He is the
9   DPA.  The designated person ashore.
10     Q.    For the company?
11     A.    For the company.
12     Q.    Were the owners ever on board?
13     A.    Yes.
14     Q.    Were they present when you spoke about
15  the oily water separator with Tomondong?
16     A.    No.  This was in Poland.  I never
17  spoke — then I didn't spoke with no one about the
18  separator.
19          (Recess taken.)
20  BY MR. KOTILA:
21     Q.    Mr. Tudor, we are just about finished,
22  and I just want to ask you again what — we spoke a
23  lot about the oily water separator.  What other items
24  on the ship did you work on that needed repair or

Page 35

1   parts?
2          MR. CHALOS:  Objection; foundation.
3          THE WITNESS:  I had a problem that we
4   came to the United States and they didn't resolve it
5   until we came to The States.  It was the outlet, the
6   outlets on the deck.
7   BY MR. KOTILA:
8      Q.    And what was the problem with the
9   outlets on the deck?
10     A.    They were either burned or rusted,
11  rusty.  They didn't have covers.
12     Q.    Had you ever requested parts for
13  various pieces of machinery or equipment?
14          MR. CHALOS:  Objection; relevance.
15          THE WITNESS:  For outlets I made the
16  request separate.
17  BY MR. KOTILA:
18     Q.    Did you receive any?
19     A.    No.
20          MR. CHALOS:  Objection; relevance.
21  BY MR. KOTILA:
22     Q.    Who did you make the request to?
23          MR. CHALOS:  Objection; relevance.
24          THE WITNESS:  The chief mechanic.

Page 36

1   BY MR. KOTILA:
2      Q.    And you never received a response?
3      A.    No.
4          MR. KOTILA:  Well, fellows, I think I
5   am — hold on.
6          Thank you very much.
7          THE WITNESS:  (without interpreter)
8   You are welcome.
9          (Recess taken.)
10          (CSME Deposition Exhibit Nos. 1
11  through 7 were marked for identification.)
12          CROSS-EXAMINATION
13  BY MR. CHALOS:
14     Q.    Good morning, Mr. Tudor.
15     A.    (without interpreter) Good morning.
16     Q.    My name is George Chalos, and I
17  represent the owner of the ship, Venetico Marine, and
18  the managers of the ship, Chian Spirit Maritime
19  Enterprises.  And I would like to just ask you a few
20  questions about your personal background and then get
21  into your experience on board the Irene.  Okay?
22          Now, earlier today Mr. Kotila, on
23  behalf of the government, asked you some questions
24  about what your job is.  Did I understand correctly

Page 37

1   that you are a trained electrician?
2      A.    Yes.
3      Q.    And to become an electrician, you
4   attended special training schools?
5      A.    Yes.
6      Q.    And you hold a license that allows you
7   to work as an electrician; correct?
8      A.    Yes.
9      Q.    And that's a license that you have to
10  qualify for by training and experience; correct?
11     A.    Yes.
12     Q.    Now, you are not a marine engineer by
13  training, are you?
14     A.    No.
15     Q.    Okay.  Just so the record is clear,
16  you are not a marine engineer by training, are you?
17     A.    No, as an engineer, no.
18     Q.    And you don't have any experience
19  sailing on board ships as an engineer, do you?
20     A.    Of course not.
21     Q.    Okay.  So it is fair to say that you
22  as an electrician on board a ship would have a
23  completely different job than that of an engineer;
24  correct?

Paul Tudor

Page 38

1    A.    Of course. Of course.
2    Q.    I am sorry. Can you say your answer
3 again?
4    A.    Yes.
5    Q.    Okay. Thank you. Now, tell me, you
6 can speak basic English; correct?
7    A.    Yes.
8    Q.    But English is not your first
9 language?
10    A.    Yes.
11    Q.    Yes, meaning it is not?
12        THE INTERPRETER: Meaning it is not.
13        THE WITNESS: It is not.
14 BY MR. CHALOS:
15    Q.    Now, how did you learn English?
16    A.    By myself.
17    Q.    Okay. So you self-taught yourself
18 some basic English; is that right?
19    A.    Yes.
20    Q.    Okay. And what is your first language
21 or your natural language?
22    A.    (without interpreter) Romanian.
23    Q.    And on board the ship were any of the
24 engineers Romanian?

Page 39

1        MR. KOTILA: Objection. Can you
2 clarify? What ship?
3 BY MR. CHALOS:
4    Q.    Okay. Let me be more specific. You
5 were on board the Irene since October of 2005; right?
6    A.    From May.
7    Q.    Oh, right. Sorry. May. You joined
8 the ship in Poland; correct?
9    A.    Yes.
10    Q.    Now, at the time that you got on board
11 the ship in May of 2005, were any of the engineers
12 Romanians?
13    A.    No.
14    Q.    We heard some discussion earlier today
15 about a guy name Tomondong. Was he a Romanian?
16    A.    No.
17    Q.    Did he speak Romanian?
18    A.    No.
19    Q.    And English wasn't his first language
20 either, was it?
21    A.    No, it wasn't his first language.
22    Q.    Okay. Then at some point in time -- I
23 will withdraw that question and move on.
24        Now, apart from Mr. Dragomir, who sits

Page 40

1 in the room today, it is fair to say that all the
2 other engineers the whole time you were on board the
3 ship were Filipinos? Right?
4    A.    Yes.
5    Q.    And you don't speak Filipino, do you?
6    A.    No.
7    Q.    Nor do you speak any dialect that the
8 Filipinos may speak?
9    A.    No.
10    Q.    And none of the Filipinos spoke
11 Romanian?
12    A.    No.
13    Q.    Now, is it fair to say that there was
14 some language barrier between the Romanians and the
15 Filipinos on board?
16    A.    Possibility. I don't know, because we
17 understood each other. I understood them. Not
18 everyone I understood.
19    Q.    So you didn't understand everybody?
20        MR. KOTILA: Objection. That is not
21 his answer.
22        THE INTERPRETER: No. This wasn't.
23 He said, "I was the one that I understood them. I
24 don't know about others."

Page 41

1        THE WITNESS: (through interpreter) On
2 board was too many other people that they didn't
3 understand them, the Philippine.
4 BY MR. CHALOS:
5    Q.    Okay. Now, as an electrician you
6 would work certain hours each day on board the Irene;
7 correct?
8    A.    Yes.
9    Q.    Oh, by the way, before I forget, when
10 you said that you would understand the Filipinos, what
11 language did you communicate with?
12    A.    English.
13    Q.    Okay. Now, let's go back to your duty
14 on board as the electrician. You would work when?
15    A.    From 7:00 a.m. till 6:00 p.m. daily.
16    Q.    Okay. So you worked during the day?
17    A.    Yes.
18    Q.    All right. Now, let's talk about what
19 you did to prepare to come here today. Now, you met
20 with the government; correct?
21    A.    Yes.
22    Q.    And you met with Mr. Kotila?
23    A.    Yes.
24    Q.    And Mr. Phillips?

Corbett & Wilcox

12 (Pages 42 to 45)

Page 42

1    A.   Yes.
2    Q.   How many times did you meet with each
3    of them?
4    A.   I may be correct as I calculate it or
5    count it today would be the fifth time.
6    Q.   Today would be the fifth time?
7    A.   Yes.
8    Q.   And you met with the Coast Guard
9    representatives as well?
10   A.   Yes, on the boat.
11   Q.   Okay. And when you met with the
12   government lawyers, Mr. Kotila and Mr. Phillips, did
13   you review any documents with them?
14   A.   What do you refer to?
15   Q.   Well, my question is: Did they show
16   you any papers and ask you to review them?
17   A.   No.
18   Q.   Okay. Never?
19   A.   No. I saw a picture only once. At
20   one time I saw a picture.
21   Q.   What was the picture of?
22   A.   Of a hose, but I didn't know to give
23   the answer to it. They showed me a picture of a hose,
24   but I didn't know to give the answer to it.

Page 43

1    Q.   Okay. It was just one picture of one
2    hose?
3    A.   Yes.
4    Q.   And you didn't take the picture?
5    A.   No.
6    Q.   And you don't know who took the
7    picture?
8    A.   No.
9    Q.   You don't know where it was taken?
10   A.   No.
11   Q.   Okay. Thank you. Okay, Mr. Kotila
12   also asked you some questions about how you became
13   employed on the Irene. Do you recall that?
14   A.   Yes.
15   Q.   Okay. Now, let's go over this a
16   little bit. You went to a crewing agent in Romania
17   looking for work; right?
18   A.   Yes.
19   Q.   The owner of the ship, Venetico,
20   didn't look for you; right?
21   A.   Yes.
22   Q.   Nor did the manager, Chian Spirit;
23   correct? They didn't come looking for you?
24   A.   No.

Page 44

1    Q.   You went to the crewing agent looking
2    for a ship to join to work?
3    A.   Of course.
4    Q.   And the name of your crewing agent is
5    Bright Balkan Shipping Services in Romania; right?
6    A.   Yes.
7    Q.   Okay. Now, when you go to this
8    crewing agent, you can go to a lot of different
9    crewing agents?
10   A.   Yes.
11   Q.   And how many years have you been going
12   to sea?
13   A.   Twenty-seven.
14   Q.   Twenty-seven years. And during the 27
15   years that you have been going to sea, this was the
16   very first time that you worked with Bright Balkan
17   Shipping -- I will say that again. I keep stumbling.
18   Bright Balkan Shipping Services as your crewing agent;
19   right?
20   A.   Yes.
21   Q.   Now, in fact, what you do is you send
22   your paperwork to a bunch of agencies and then you
23   take the best job offer that is available; right?
24   A.   Yes.

Page 45

1    Q.   And the job that you took was a decent
2    job, but the pay, you have made more on other ships?
3    A.   Yes.
4    Q.   But you took the job anyways?
5    A.   Yes.
6    Q.   And the reason why you took the job is
7    because you wanted to go to work?
8    A.   Yes. This was the principal motive of
9    it. I wanted to work.
10   Q.   Like all of us, you have bills to pay,
11   so you have to make money; correct?
12   A.   Yes.
13   Q.   So in addition to holding an
14   electrician's license, you also received a license
15   from the ship's flag state; right?
16   A.   Yes. I got this license from another
17   company, not from this company.
18   Q.   Okay. So let me see if I understand
19   you correctly. Then at the time that you were hired
20   to work on the Irene E.M., you were not only a
21   licensed electrician but you also held a license from
22   the flag state of the vessel. That's the
23   St. Vincent's and Grenadines --
24   A.   Yes.

Paul Tudor

13 (Pages 46 to 49)

Page 46

1    Q.    — flag state administration?
2    A.    Yes.
3    Q.    So you held two licenses?
4    A.    Yes.
5    Q.    And you had 27 years of experience?
6    A.    Yes. More.
7    Q.    More. Okay. Now, after you received
8    the offer and you accepted it, you went to the office
9    of Bright Belkan Shipping Services; right?
10   A.    Yes.
11   Q.    And you had some training?
12   A.    Yes.
13   Q.    And part of the training was the
14   procedures of the company before you joined their
15   ship; right?
16   A.    Yes.
17   Q.    Okay. Now, I am going to show you
18   what we have marked as CSME Defendant 1 Exhibit. For
19   the record, I will note it is a six-page document.
20   Have you seen it? Do you have a copy?
21          MR. KOTILA: Let me see what you have.
22          MR. CHALOS: It should be the first
23   six pages of what I passed to you.
24

Page 47

1    BY MR. CHALOS:
2    Q.    Now, Mr. Tudor, I am passing to you
3    what we have marked as Deposition Exhibit No. 1 and
4    ask you to take a look at the first page. And once
5    you have had an opportunity to review it — and you
6    can certainly use the assistance of our interpreter —
7    look up so I will know you are ready for the next
8    question.
9    A.    I don't have my glasses, but I will
10   try to —
11          THE INTERPRETER: I mean, that's what
12   he said, but I will try to help. I have my glasses.
13   BY MR. CHALOS:
14   Q.    Okay. Now, you want to just take a
15   minute to look it over together. Let me ask you this,
16   Mr. Tudor.
17   A.    (without interpreter) Just a second.
18   I can borrow one glass?
19          THE INTERPRETER: They have the same
20   size, I guess.
21   BY MR. CHALOS:
22   Q.    Okay. Mr. Tudor, is that your
23   signature that appears at the bottom?
24   A.    Yes.

Page 48

1    Q.    Okay. Now, and this is the terms of
2    your contract; correct?
3    A.    Yes.
4    Q.    Turn to — let me turn to look at that
5    with you — the third page of that exhibit.
6    A.    Yes.
7    Q.    And is it fair to say that that is a
8    declaration that you signed prior to joining the
9    vessel?
10   A.    Yes.
11   Q.    And that document bears your signature
12   on the bottom; correct?
13   A.    Yes.
14   Q.    And it says to the master —
15          MR. KOTILA: Objection. First of all,
16   we don't have a document that has been placed in
17   evidence to quote off or read from.
18          MR. CHALOS: He said he signed it. It
19   is a declaration he prepared.
20          MR. KOTILA: It is not in evidence at
21   this point.
22          MR. CHALOS: Well, we would like to
23   move it into evidence, although we don't have a judge
24   to move it in.

Page 49

1    BY MR. CHALOS:
2    Q.    Okay. Let me just do it the way I
3    think it ought to happen in court and leave it for the
4    record for later determination.
5          Mr. Tudor, is this a document that you
6    reviewed and signed?
7    A.    Yes.
8    Q.    And when you signed it, did you adopt
9    the terms and conditions and the contents of it?
10   A.    Yes.
11          MR. CHALOS: Okay. At this point I
12   would like to move what we previously have marked as
13   CSME Exhibit 1 into evidence in its entirety.
14          MR. KOTILA: Well, I am going to
15   object to the document moved into evidence because it
16   is not relevant, and also object because it is beyond
17   the scope of my direct examination.
18   BY MR. CHALOS:
19   Q.    Okay. Now, Mr. Tudor, it says 2, "The
20   master and owners of the M.V. Irene E.M." —
21          THE INTERPRETER: Page 3? Page?
22          MR. TWERSKY: Yes.
23
24

Paul Tudor

14  (Pages 50 to 53)

Page 50

BY MR. CHALOS:
1
2   Q.   Okay. And it says —
3   A.   (without interpreter)  Page 3.
4   Q.   I have it right here. "I, Tudor Paul,
5   holder of Seaman's Book No. 9630, have read and
6   understood the following company's policies." And
7   then if you read —
8   A.   Yes.
9   Q.   — further down, it says, "The health,
10  safety and environmental policy of the company";
11  right?
12  A.   Yes.
13  Q.   Now, I would like to show you what we
14  have marked as CSME Defendants' Deposition Exhibit
15  No. 7 and ask you to take a look at that. And my
16  question to you is: Do you recognize this as —
17  A.   Yes.
18  Q.   — the Chian Spirit safety management
19  system and environmental policy?
20  A.   Yes.
21       MR. CHALOS: Okay. Now, Mr. Tudor,
22  that document — we marked that as Defendants' Exhibit
23  7. First we would like to move it into evidence.
24       MR. KOTILA: Once again, I am going to

Page 51

1   object. It is beyond the scope of my direct
2   examination. It is not relevant. Mr. Tudor's
3   signature is not on this document nor is his name
4   placed anywhere on this document. Objection to its
5   admission.
6   BY MR. CHALOS:
7   Q.   Now, Mr. Tudor, this document was
8   posted in several places on the ship, was it not?
9   A.   Yes.
10  Q.   So let me see if I got this right.
11  You are presented a copy of this before you joined the
12  vessel by your crewing agent; right?
13  A.   Yes.
14  Q.   Then when you got on board, this
15  document was posted in several places; right?
16  A.   Yes.
17  Q.   It was in the ship's office?
18  A.   Yes.
19  Q.   It was on the bridge?
20  A.   Yes.
21  Q.   It was in the hallway?
22  A.   Yes.
23  Q.   It was in the mess hall?
24  A.   Yes.

Page 52

1   Q.   And in the engine room there was a
2   board, a plywood board where it was also posted;
3   right?
4   A.   Yes.
5   Q.   Okay. So is it fair to say that at
6   the time that you boarded the vessel, you knew that it
7   was the company's policy —
8   A.   Yes.
9   Q.   — to protect the environment?
10  A.   Yes.
11  Q.   And they were not — the company, both
12  the management and the owning company, were not going
13  to accept any crew members violating that policy?
14  A.   Yes.
15  Q.   And, in fact, if a crew member would
16  violate the policy, they would be fired and put
17  ashore; right?
18  A.   Yes.
19  Q.   And on their own to get back home,
20  wherever they live?
21  A.   Yes.
22  Q.   Now, in fact, Mr. Tudor, part of your
23  training was that if you personally had observed any
24  sort of pollution or MARPOL violation, you were

Page 53

1   supposed to report that to the captain immediately;
2   right?
3   A.   (without interpreter) Yes.  Not to the
4   captain. To the watch officer which was on duty.
5   Q.   Okay. But the point is, if you had
6   seen such a violation, it was your obligation to
7   report it?
8   A.   (without interpreter) Yes, of course.
9   Q.   Now, I would like to show you what we
10  have marked as Deposition Exhibit 2. And it is a
11  six-page document that I ask you just to look through
12  it and identify each page. And I will make a
13  representation for the record that it appears to be
14  your passport and seaman's book, but I will ask you to
15  just to look through it and identify it.
16  A.   Yes.
17  Q.   What is the first page, Mr. Tudor?
18  A.   (without interpreter) It is my
19  passport.
20  Q.   And who issued that passport?
21  A.   The place —
22       MR. KOTILA: I am going to object
23  because you didn't move it into evidence yet or
24  attempt to.

Corbett & Wilcox

Paul Tudor

15 (Pages 54 to 57)

| Page 54 | Page 56 |
|---|---|

**Page 54**

1    MR. CHALOS: Okay. I just --
2    THE WITNESS: Romania, the place of
3 Constanta.
4 BY MR. CHALOS:
5    Q.    So you are a Romanian?
6    A.    Yes.
7    Q.    A citizen of Romania?
8    A.    Yes.
9    Q.    Okay. What is the second page of that
10 exhibit?
11    A.    My copy of my seaman book.
12    Q.    And that is a copy of your seaman's
13 book; is that right?
14    A.    (without interpreter) Yes. It is the
15 first page.
16    Q.    Okay. A copy of the first page of
17 your seaman's book?
18    A.    Yes.
19    Q.    The third page of that exhibit,
20 Mr. Tudor?
21    A.    Yes. It is my copy of the -- my
22 certificate, my license.
23    Q.    Okay. And the next page of that?
24    A.    It is my extension date of seaman's

**Page 55**

1 book.
2    Q.    Okay. And the next page, Mr. Tudor?
3    A.    It is first page of my license.
4    Q.    Okay. Now, Mr. Tudor, the next page?
5    A.    Is the flag license.
6    Q.    And that is the second license that
7 you held to be the electrician?
8    A.    Yes.
9    Q.    Okay. Now, all those documents which
10 are part of CSME Defendants' Exhibit No. 2 are all
11 documents that relate to your professional ability to
12 serve on board the M.V. Irene E.M.; correct?
13    A.    Yes.
14    MR. CHALOS: Okay. We would like to
15 move them into evidence.
16    MR. KOTILA: No objection.
17    MR. CHALOS: Thank you.
18 BY MR. CHALOS:
19    Q.    Okay. Now, Mr. Tudor, I am going to
20 show you what we have marked as CSME Deposition
21 Exhibit No. 3, which is a document that bears four
22 pages. Now, Mr. Tudor, my question to you is, take a
23 look at these four pages. Are these all certificates
24 that you received?

**Page 56**

1    A.    Yes.
2    Q.    Now, and these are training courses --
3    A.    IMO.
4    Q.    -- and seminars that you have taken in
5 connection with the International Marine
6 Organization's standard training for seafarers; right?
7    A.    Yes.
8    Q.    And this -- you have attended other
9 classes as well?
10    A.    Yes.
11    Q.    And this is also certificates that
12 relate to your capacity and ability and prior training
13 before serving on board the --
14    A.    Yes.
15    Q.    -- Irene?
16    A.    Now, you also went to the Romanian
17 Maritime Training Center, did you not, and sat for a
18 prevention of pollution of marine environment class --
19    A.    (without interpreter) MARPOL?
20    Q.    MARPOL.
21    A.    Yes.
22    Q.    And you received a certificate for
23 that as well; correct?
24    A.    Yes.

**Page 57**

1    Q.    Just give me one second. And, in
2 fact, Mr. Tudor, that is the first page of that
3 exhibit?
4    A.    Yes.
5    Q.    Now, let's talk for a minute about
6 when you first came on board the ship. You told
7 Mr. Kotila that you came on board the ship in Poland;
8 is that right?
9    A.    Yes.
10    Q.    Okay. And when you got on board the
11 ship, you did a handover with the prior electrician;
12 right?
13    A.    Yes.
14    Q.    And during that handover you went over
15 the machinery or the electronic parts?
16    A.    (without interpreter) Electrical
17 parts, yes.
18    Q.    Electrical parts?
19    A.    Yes, electrical parts.
20    Q.    Now, you didn't go over any of the
21 engine room machinery, did you? Specifically, you
22 didn't go over the main engines?
23    A.    (without interpreter) No.
24    Q.    You didn't go over the turbochargers?

Paul Tudor

16 (Pages 58 to 61)

Page 58

1    A.    (without interpreter) No.
2    Q.    You didn't go over the shaft
3    generator?
4    A.    (without interpreter) No.
5    Q.    You didn't go over the function of the
6    oily water separator?
7    A.    (without interpreter) No.
8    Q.    None of those fall within your job, do
9    they?
10    A.    Can you repeat the question?
11    Q.    Yes. Working on those types of --
12    that type of machinery and equipment is jobs for the
13    engineers; right?
14    A.    Yes.
15    Q.    Okay. And, in fact, you don't hold
16    any marine engineering license?
17    A.    No.
18    Q.    Okay. And you don't have any
19    authority to operate any of the engine room equipment,
20    do you?
21    A.    No.
22    Q.    Okay. Now, you talked a little bit
23    about an exchange that you had with the prior chief
24    engineer. That was Tomondong; right?

Page 59

1    A.    Yes.
2    Q.    And when you spoke to him, you spoke
3    to him in English; right?
4    A.    Yes.
5    Q.    And over the course of a few months,
6    you prepared three different lists for repairs --
7    A.    Yes.
8    Q.    -- and maintenance of equipment;
9    right?
10    A.    Yes.
11    Q.    And you submitted it to him hopefully
12    for requisitioning the parts; right?
13    A.    Yes.
14    Q.    Now, you don't know as you sit here
15    today whether he ever sent that requisition to the
16    company; right?
17    A.    No, no.
18    Q.    You don't know if it was ever received
19    by the company?
20    A.    No.
21    Q.    All you know is what you talked to
22    Mr. Tomondong about; right?
23    A.    Yes.
24    Q.    And in all three of those lists,

Page 60

1    neither in the first list nor the second list nor the
2    third list, did you ever ask for any equipment for the
3    oily water separator; right?
4    A.    Yes.
5    Q.    Yes, meaning that you didn't ask?
6    A.    No. Never asked.
7    Q.    And that is because the oily water
8    separator is not your job?
9    A.    Yes.
10    Q.    Okay. Now, there came a time that
11    there was a problem with the alarm in the engine room;
12    right?
13    A.    Yes.
14    Q.    And what you did was, you went and
15    fixed the electrical power to the alarm; right?
16    A.    Yes.
17    Q.    It had nothing to do with the oily
18    water separator operation, whether the engineers were
19    using it or not?
20    A.    I repair only the alarm.
21    Q.    Okay. Thank you. Now, and after you
22    made the repair, you were satisfied that the
23    equipment, the alarm was working properly; right?
24    A.    (without interpreter) Yes.

Page 61

1    Q.    Now, after Mr. Tomondong left the
2    ship, Mr. Dragomir came on board, and he became the
3    chief engineer; right?
4    A.    (without interpreter) Yes.
5    Q.    And Mr. Dragomir is also a Romanian?
6    A.    (without interpreter) Yes.
7    Q.    And when you speak to Mr. Dragomir,
8    you speak with him in Romanian; right?
9    A.    (without interpreter) Yes, right.
10    Q.    And there is no language barrier
11    between you guys?
12    A.    (without interpreter) Right.
13    Q.    And when you speak to Mr. Dragomir,
14    you understand his orders?
15    A.    (without interpreter) Yes.
16    Q.    And he, to your knowledge, understands
17    your responses?
18    A.    (without interpreter) Yes.
19    Q.    You were on board the ship during its
20    voyage from West Africa to Brazil; correct?
21    A.    (without interpreter) Yes, correct.
22    Q.    Now, during that voyage you didn't
23    have any idea where the ship was going to go after
24    Brazil, did you?

Paul Tudor

Page 62

1    A.    I knew it from when we were in Africa.
2    Q.    Okay. Let me be more specific. When
3  you left Africa, you knew the ship was going to go to
4  Brazil; right?
5    A.    Yes.
6    Q.    And then once you got to Brazil,
7  that's when you learned the ship was going to go to
8  the United States; right?
9    A.    No. When we left Africa, I knew that
10  we will arrive to the United States after Brazil.
11    Q.    How did you know that?
12    A.    It was announced, the voyage.
13    Q.    Okay. And who announced it?
14    A.    The officers.
15        (without interpreter) The mate.
16        (through interpreter) Somebody from
17  deck. One mate.
18    Q.    And how do you know that this was in
19  Africa when you learned this?
20    A.    Because I learned after one or two
21  days, three days anyhow between Brazil.
22    Q.    Okay. Because the ship wasn't ordered
23  to go to The States --
24        MR. KOTILA: Objection.

Page 63

1        MR. CHALOS: Okay. Let me rephrase
2  it.
3  BY MR. CHALOS:
4    Q.    When the ship arrived in Brazil, it
5  made three stops in Brazil; right?
6    A.    Yes.
7    Q.    And it wasn't till after the first
8  stop in Brazil that it was known the ship was going to
9  go to the United States; is that right?
10        MR. KOTILA: Objection. That counted
11  as what he already testified to, he already knew.
12        MR. CHALOS: Well, I am refreshing his
13  recollection.
14        MR. KOTILA: Objection again. He
15  didn't say he had a problem with his recollection.
16  BY MR. CHALOS:
17    Q.    Mr. Tudor, do you remember the exact
18  place and time that you learned the ship was – where
19  you were?
20    A.    (without interpreter) Anyhow between
21  Africa and Brazil, before to arrive in Brazil.
22    Q.    Okay. So if I understand you
23  correctly, sometime before arriving in Brazil was when
24  you first learned that the ship was going to go to the

Page 64

1  United States?
2        MR. KOTILA: Objection. We are asked
3  and answered now.
4        MR. CHALOS: You can answer.
5        THE WITNESS: Between Africa and
6  Brazil there were five days that we were in the sea.
7  In this period the announcement was made.
8  BY MR. CHALOS:
9    Q.    Okay. After the vessel made its three
10  stops in Brazil, where was she headed?
11    A.    We had only two stops in Brazil with
12  this trip.
13    Q.    Okay. That's your recollection of
14  Brazil, two stops?
15    A.    (without interpreter) We had three
16  stops in Brazil, but previous, the first one was in
17  another trip.
18    Q.    Okay. So I understand, between Africa
19  but before arriving in Brazil it is your recollection
20  that you were told the ship was going to go to the
21  United States; right?
22    A.    Yes.
23        MR. KOTILA: Objection; asked and
24  answered again.

Page 65

1  BY MR. CHALOS:
2    Q.    Now, did you know where in the United
3  States the ship was going to go?
4    A.    (without interpreter) The first
5  time –
6        (through interpreter) The first time
7  it was talk that we are supposed to go to Baltimore.
8    Q.    Okay. But the ship never went to
9  Baltimore; right?
10    A.    No.
11    Q.    Okay. So let's go back and let's talk
12  about your communications with Mr. Dragomir.
13    A.    Yes.
14    Q.    There came a time after the ship left
15  Brazil that you discussed with Mr. Dragomir that the
16  ship was going to be going to the United States;
17  right?
18    A.    Yes.
19    Q.    And Mr. Dragomir told you that he had
20  received a message from the office asking for a report
21  on the condition of some equipment; right?
22        MR. KOTILA: Objection; no foundation.
23        MR. CHALOS: This is cross.
24

Paul Tudor

18 (Pages 66 to 69)

Page 66

BY MR. CHALOS:

1
2   Q.   Right?
3   A.   Sorry?
4   Q.   Mr. Dragomir told you that he had
5   received information and a request from the manager of
6   the ship asking for a report on the condition of some
7   of the vessel's equipment; right?
8   A.   Yes.
9   Q.   And, in fact, what he did was he asked
10  you to go and check some equipment?
11  A.   Yes.
12  Q.   And the reason why you did that —
13  strike that.
14       And you reported to Mr. Dragomir;
15  right?
16  A.   Yes.
17  Q.   And you don't know what Mr. Dragomir
18  reported to the company?
19  A.   No.
20  Q.   And just to be clear, you are not
21  authorized to make any repairs to the oily water
22  separator; right?
23  A.   Of course.
24       MR. KOTILA: Objection. Objection,

Page 67

1   because I believe he said he is on part on his direct
2   examination.
3   BY MR. CHALOS:
4   Q.   Okay. Now, you told Mr. Kotila before
5   about some repairs that needed to be made to the oily
6   water separator; right?
7   A.   Yes.
8   Q.   And it was your testimony, was it not,
9   that an authorized technician needed to be called?
10  Right?
11  A.   Yes.
12  Q.   And you don't have the authority or
13  the training —
14  A.   Yes.
15  Q.   — or the capability to make any
16  repairs?
17  A.   Of course.
18  Q.   Okay. Now, in fact, once Mr. Dragomir
19  came on board the ship — I will withdraw that.
20       You told us before that you had done
21  some tests and you found that the solenoid sensor
22  would give inconsistent results; right?
23  A.   Yes.
24  Q.   And at some point in time you told

Page 68

1   Mr. Dragomir that; right?
2   A.   Yes.
3   Q.   And, in fact, Mr. Dragomir never used
4   the oily water separator because he knew there was a
5   problem with it; right?
6   A.   Yes.
7   Q.   Now, did Mr. Dragomir tell you that he
8   was maintaining all his sludge and oily wastes on
9   board the ship?
10  A.   Sorry?
11  Q.   Did Mr. Dragomir tell you that he was
12  storing all the sludge and oily wastes —
13  A.   (without interpreter) Yes.
14  Q.   — on board in a special tank?
15  A.   No. I never discussed it with him.
16  Q.   Okay. Because you are not an
17  engineer; right?
18  A.   Yes.
19  Q.   And that is not something that you
20  would discuss with the chief engineer?
21  A.   Yes.
22  Q.   But you never saw any oil ever being
23  discharged overboard?
24  A.   Never.

Page 69

1   Q.   Mr. Tudor —
2   A.   Just a moment. Just a moment.
3   Because here it is one point I report. I report one
4   time, but it was one accident. After dropped anchor
5   in the 5th of December.
6   Q.   Okay. Now, I was going to refine my
7   question to get to that. There was one time that
8   there was a stern tube leak; right?
9   A.   Yes.
10  Q.   And that was something that you saw —
11  A.   Yes.
12  Q.   — and you reported?
13  A.   Yes.
14  Q.   And, in fact, that fact that there was
15  a stern tube leak was reported to the U.S. Coast
16  Guard?
17  A.   Yes.
18  Q.   And they were on board?
19  A.   Yes.
20  Q.   And the Coast Guard representatives if
21  they wanted to could have seen it with their own eyes?
22       MR. KOTILA: Objection. Objection for
23  the relevance of this whole line of testimony.
24  Objection what the Coast Guard could have seen. How

Paul Tudor

19 (Pages 70 to 73)

## Page 70

1  could he tell what a Coast Guard agent could have
2  seen?
3  BY MR. CHALOS:
4      Q.    Okay. But you can answer. You could
5  see it with your eyes; right?
6      A.    Yes.
7      Q.    Okay. So now, going back to my first
8  question, you never saw any oil intentionally being
9  discharged into the sea, did you?
10     A.    Never.
11     Q.    Never?
12     A.    Never.
13     Q.    Now, Mr. Kotila in preparation for
14  today showed you a picture of a hose; right?
15     A.    I understood today. When; today?
16     Q.    Well, at some point when you met with
17  the government, they showed you a picture of a hose.
18     A.    Yes. Another time, not today, yes.
19  One picture.
20     Q.    And you had never seen that hose;
21  right?
22     A.    I saw this model of the hose but I
23  don't know this hose, what it is. I saw a model of
24  this hose, but I never saw this hose, and I don't know

## Page 71

1  what this hose is.
2      Q.    Now, just to be clear, the captain of
3  the ship, Mr. Manolache, he never ordered you to
4  discharge overboard; right?
5      A.    Yes.
6      Q.    Yes, he never ordered you or yes, he
7  did order you?
8      A.    No, never.
9      Q.    Okay. So the record is clear, Captain
10  Manolache never ordered you to discharge anything
11  overboard?
12     A.    Never.
13     Q.    Okay. Chief Engineer Dragomir never
14  ordered you to discharge anything overboard?
15     A.    Never.
16     Q.    Chief Engineer Tomondong never ordered
17  you to discharge anything overboard?
18     A.    Never.
19     Q.    Okay. None of the engineers ever
20  ordered you to discharge anything overboard?
21     A.    Never.
22     Q.    Okay. Now, we talked before about
23  being on board the ship in Poland.
24          MR. CHALOS: Is this a good time? She

## Page 72

1  needs to change a tape.
2          (Recess taken.)
3  BY MR. CHALOS:
4      Q.    Okay, Mr. Tudor, you told Mr. Kotila
5  earlier today that when you joined the ship on board
6  in Poland, at some point in time you saw the owner of
7  the ship; right?
8      A.    Yes.
9      Q.    Okay. Now, when you saw the owner on
10  board the ship --
11     A.    Yes.
12     Q.    Okay. When you saw the owner on board
13  the ship, he never asked you to lie to any
14  authorities, did he?
15          MR. KOTILA: Objection. Objection;
16  hearsay.
17  BY MR. CHALOS:
18     Q.    Okay. Now, in your discussions with
19  the owner, he never asked you to lie; right?
20     A.    Yes. Correct.
21     Q.    Correct, meaning he never asked you?
22     A.    Yes.
23     Q.    Okay. Now, you also saw the owner on
24  board the ship in Delaware; right?

## Page 73

1      A.    Yes. Yes.
2      Q.    Now, when you spoke to the owner on
3  board in Delaware, he never asked you to lie to the
4  U.S. Government, did he?
5      A.    Correct. Never.
6          MR. CHALOS: Your answer was?
7          (The court reporter read back as
8  requested.)
9  BY MR. CHALOS:
10     Q.    Okay. Thank you, Mr. Tudor. Okay.
11  Now, you also saw a guy on board named Christos
12  right?
13     A.    Correct.
14     Q.    Now, Christos never asked you to lie
15  to anybody, did he?
16     A.    Correct. Never.
17     Q.    Correct, never. Okay. And you saw
18  Christos and spoke to Christos almost every day --
19     A.    Yes.
20     Q.    -- when the ship was here in the
21  United States; right?
22     A.    Yes.
23     Q.    And he never asked you to lie?
24     A.    Never.

Paul Tudor

20 (Pages 74 to 77)

Page 74

1    Q.    Okay. Now, the captain never asked
2  you to lie; right?
3    A.    Correct.
4    Q.    Never?
5    A.    Never.
6    Q.    And Chief Engineer Dragomir never
7  asked you to lie; right?
8    A.    Correct.
9    Q.    Correct; never?
10    A.    Never.
11    Q.    He never asked you to lie?
12    A.    No.
13    Q.    Now, Mr. Tudor, I am going to show you
14  what we have marked as CSME Deposition Exhibit No. 4,
15  I just ask you to take a look at those.
16    A.    Yes.
17    Q.    Now, before I ask you about the
18  document, let me ask you some foundation questions.
19  Now, before getting on board the ship, the company
20  paid for you to go to a medical exam; right?
21    A.    No. I paid.
22    Q.    Okay. But the company asked you to
23  confirm that you were in good health before joining
24  the ship; right?

Page 75

1    A.    Right. Right.
2    Q.    And was it your understanding that the
3  company was concerned about your health and safety?
4    A.    Correct.
5    Q.    Correct. Right?
6    A.    Correct.
7    Q.    Now, remember on board once the ship
8  arrived in Delaware, the Coast Guard came on?
9    A.    Yes.
10    Q.    And they came on for several days in a
11  row; right?
12    A.    Correct.
13    Q.    And they spoke to you twice?
14    A.    Correct.
15    Q.    Now, the first time they spoke to you
16  they asked you some questions, and that question-and-
17  answer session lasted less than five minutes; right?
18    A.    Around five minutes.
19    Q.    Okay. Five minutes. Then the second
20  time they spoke to you, they asked you to help, and
21  they asked you to translate for one of the other crew
22  members named Nikolai; right?
23    A.    Yes. I translated for both of them.
24    Q.    And that was the extent of your

Page 76

1  discussions with the Coast Guard; right?
2    A.    I spoke with them about the separator,
3  and the second time I spoke in behalf of that person,
4  Nikolai, and also on behalf of me.
5    Q.    Okay. So if I understand you
6  correctly, the questions that were posed directly to
7  you that you answered, that question-and-answer
8  session was about five minutes?
9    A.    First time, yes.
10    Q.    And that question-and-answer session
11  focused on a piece of equipment in the engine room
12  that you don't operate?
13    A.    Yes.
14    Q.    That's correct?
15    A.    Yes. Correct.
16    Q.    And as a result the government has
17  detained you here for eight months after a five-minute
18  conversation about a piece of equipment you don't
19  operate; right?
20         MR. KOTILA: Objection. Objection to
21  the phrase "detained." He is here based on an
22  agreement, a surety agreement with the company.
23  BY MR. CHALOS:
24    Q.    Mr. Tudor, are you here voluntarily?

Page 77

1  I will withdraw my last question and ask you --
2    A.    No. I don't understand the question.
3         (At this point Mr. Roth spoke in
4  Romanian.)
5         THE WITNESS: No.
6  BY MR. CHALOS:
7    Q.    You are here because the government
8  asked you to be here; right?
9    A.    Yes.
10    Q.    Now, in fact, you prepared papers that
11  were filed in court asking for the government to let
12  you go home; right?
13    A.    Yes.
14    Q.    And that was the basis for us having
15  this session today; right?
16         MR. KOTILA: Objection. Objection to
17  information for the record.
18         THE WITNESS: I don't know. I am not
19  sure.
20  BY MR. CHALOS:
21    Q.    Now, Mr. Tudor, the first time you met
22  with the government, they asked you to come to
23  Delaware; right?
24    A.    Yes.

Paul Tudor

Page 78

1     Q.    And you drove more than an hour to
2  come to the meeting, right?
3     A.    No. I don't drive. I came with the
4  agency car.
5     Q.    Okay. You were in a car for more than
6  an hour to come to the meeting?
7     A.    Yes.
8     Q.    Closer to two hours?
9     A.    Yes, back and forth, yes.
10     Q.    And the day that you had that meeting,
11  nobody talked to you. You sat there all day; right?
12          MR. KOTILA: I am going to object to
13  this line --
14          THE WITNESS: No.
15          MR. KOTILA: -- of questioning as not
16  relevant and again beyond the scope of the direct
17  examination.
18  BY MR. CHALOS:
19     Q.    Now, since you have been -- now,
20  Mr. Tudor, I am going to show you what we have marked
21  for the record as CSME Defendants' Deposition Exhibit
22  No. 5. And for the record, I will make a
23  representation it is a letter on the Department of
24  Justice letterhead dated January 11, 2006, to

Page 79

1  Mr. Twersky, Esquire. Now, before you look at that,
2  Mr. Tudor, Mr. Twersky is your lawyer; correct?
3     A.    Yes.
4     Q.    Have you seen that document before
5  today?
6     A.    Yes.
7     Q.    Now, is it your understanding that
8  your lawyer on your behalf has made an agreement with
9  the government that they won't prosecute you in return
10  for your cooperation in their investigation?
11     A.    Yes.
12     Q.    Okay. And you agreed to cooperate
13  with the government; right?
14     A.    I have nothing to hide.
15          MR. CHALOS: And, in fact, I would
16  like to move into evidence what we previously marked
17  as CSME Defendants' Exhibit No. 5.
18          MR. KOTILA: I am going to object to
19  that as irrelevant to the case. I also object it is a
20  hearsay document.
21          MR. CHALOS: Well, it is a statement
22  of a party, isn't it?
23          MR. KOTILA: Falgowski?
24          MR. CHALOS: Yes. He is government.

Page 80

1  BY MR. CHALOS:
2     Q.    Okay. I am going to show you what we
3  have marked for the record as CSME Deposition Exhibit
4  No. 6, a three-page document entitled "Declaration of
5  Paul Tudor." Mr. Tudor, have you seen that document
6  before?
7          Let me withdraw that question and ask
8  you this. Does that document bear your signature on
9  the third page?
10     A.    Yes.
11     Q.    Okay. Now, take a look, Mr. Tudor, at
12  paragraph 18. And specifically, I want to point you
13  to the first sentence. You write, "I have done
14  nothing" --
15          MR. KOTILA: Objection. This document
16  is not in evidence.
17          MR. CHALOS: Okay. Then I would like
18  to move --
19          MR. WOODWARD: It doesn't have to be
20  in evidence.
21          MR. CHALOS: It is part of the court
22  record, but I would like to move the document into
23  evidence.
24          MR. WOODWARD: Off the record.

Page 81

1          (Discussion off the record.)
2  BY MR. CHALOS:
3     Q.    Okay. Mr. Tudor, is that a
4  declaration that you made and signed on or about
5  June 26, 2006?
6     A.    Yes. Yes.
7          MR. CHALOS: Okay. I would like to
8  move this into evidence.
9          MR. KOTILA: I am going to object for,
10  one, its relevancy. It is beyond the scope of my
11  direct examination. I also object because I
12  understand it is in English. His first language is
13  Romanian. I object because what it is is nothing but
14  a bolstering. He is here to testify.
15  BY MR. CHALOS:
16     Q.    Mr. Tudor, at the time that you signed
17  this, did you understand the contents of the
18  declaration?
19     A.    Yes.
20     Q.    And when you wrote, "I have done
21  nothing wrong," that's the truth; right?
22     A.    Yes.
23     Q.    Now, since the time that you have been
24  asked to come off your ship and stay in the United

Paul Tudor

22 (Pages 82 to 85)

Page 82

1  States, you have been staying in a hotel; right?
2      A.    Yes.
3      Q.    And that hotel bill is being paid by
4  the company; right?
5      A.    Yes.
6          MR. KOTILA: Objection to the
7  relevance of this line of inquiry.
8  BY MR. CHALOS:
9      Q.    The company is also paying for your
10 meals as well; right?
11     A.    Yes. Correct.
12     Q.    And the company has also agreed to pay
13 your salary as if you were on board the ship; right?
14     A.    Correct.
15     Q.    And they have done all that?
16     A.    Correct.
17     Q.    And to be clear, everything the
18 company said they were going to do they have done;
19 right?
20     A.    Yes.
21         MR. KOTILA: Objection; vague.
22 BY MR. CHALOS:
23     Q.    Just one last question, I think.
24 There were some questions earlier by Mr. Kotila about

Page 83

1  the oily water separator having some rusted parts. Do
2  you remember that?
3      A.    Yes.
4      Q.    Now, you can't tell by looking at
5  whether it is rusty or not whether or not the
6  machinery works, can you?
7          MR. ROTH: The question is: (Mr. Roth
8  spoke in Romanian.)
9          THE WITNESS: Correct.
10         MR. ROTH: Yes, correct. You can't
11 tell.
12         MR. CHALOS: You cannot tell; right?
13         MR. ROTH: You cannot tell.
14 BY MR. CHALOS:
15     Q.    Now, in fact, Mr. Tudor, in your
16 experience almost 30 years on board ships, the
17 equipment is exposed to the sea air; right?
18     A.    Yes, correct.
19     Q.    And sometimes pieces and parts do
20 rust; right?
21     A.    Of course.
22     Q.    But they still operate?
23     A.    Yes, of course.
24         MR. CHALOS: Okay. I will pass the

Page 84

1  witness. I will take a look at my notes, but I will
2  pass. Thank you, Mr. Tudor.
3          THE WITNESS: (without interpreter)
4  You are welcome.
5          MR. WOODWARD: One moment.
6          MR. KOTILA: Can we go off the record
7  for a second?
8          (Luncheon recess taken at 1:00 p.m.)
9          AFTERNOON SESSION
10         (Reconvened at 2:10 p.m.)
11 BY MR. WOODWARD:
12     Q.    Mr. Tudor, my name is Carl Woodward,
13 and I represent Adrien Dragomir, the chief engineer
14 and defendant in this case. I think you know
15 Mr. Dragomir; correct?
16     A.    Yes. Correct.
17     Q.    I am just going to ask you a few
18 questions. One, I want to go back to the first time
19 or the times that you were interviewed by the United
20 States Coast Guard back in December of 2005. Okay?
21     A.    Yes.
22     Q.    I think you said you were interviewed
23 for a very short period of time.
24     A.    The first time I was interviewed for

Page 85

1  about five minutes, and the next time was a longer
2  period, maybe --
3      Q.    How much longer?
4      A.    Approximately up to half an hour, but
5  don't quote me on this. I cannot recall it. And I
6  was together with Nikolai.
7      Q.    All right. So that interview involved
8  not only you, Mr. Tudor, but also Nikolai; correct?
9      A.    Correct.
10     Q.    Both those interviews that were
11 conducted by the Coast Guard with you and with
12 Nikolai, they were conducted in English; correct?
13     A.    Correct.
14     Q.    Was an interpreter provided?
15     A.    No.
16     Q.    Were you offered the opportunity to
17 have an interpreter?
18     A.    No. I wasn't offered.
19     Q.    Were you advised that you could have a
20 lawyer present, too?
21     A.    I don't recall.
22     Q.    Now, I want to direct your attention
23 back to sometime in the summer of 2005. And
24 specifically, did there come a point in time when

Corbett & Wilcox

Paul Tudor

23 (Pages 86 to 89)

Page 86

1  Chief Engineer Tomondong asked you to assist him in
2  preparing a nonconformity report?
3     A.    Yes.
4     Q.    And did you give him advice
5  regarding — give him technical advice regarding the
6  operation of the oily water separator?
7     A.    Yes.
8     Q.    That is, the electronics on the --
9     A.    Yes.
10    Q.    -- on the electrical part of the oily
11  water separator?
12    A.    Yes.
13    Q.    And did he prepare a report from that?
14    A.    I don't know.
15    Q.    Do you know what Mr. Tomondong did
16  with any of that information?
17    A.    I don't know. No, I don't know.
18        MR. WOODWARD: No further questions.
19        REDIRECT EXAMINATION
20  BY MR. KOTILA:
21    Q.    Just a couple questions, Mr. Tudor. I
22  just got a couple of questions for you. Again, for
23  the record, Mark Kotila. Again, I am from the
24  Department of Justice.

Page 87

1        Mr. Tudor, you took a MARPOL course.
2     A.    Yes.
3     Q.    How long was that course?
4     A.    The course was a half a day.
5     Q.    Half a day. What, if anything, do you
6  recall in that course — when did you take the course?
7     A.    Before I signed the contract.
8     Q.    In this Irene, for the Irene matter?
9     A.    What course do you refer to?
10    Q.    The MARPOL course. I believe you have
11  a certificate in there, defendants' exhibit. Pull it
12  out.
13    A.    (without interpreter) This one.
14    Q.    The top one is craft and rescue boats,
15  safety training, familiarization safety training for
16  ratings, Maritime English. You took that course.
17    A.    Yes.
18    Q.    How long was that course?
19    A.    One week.
20    Q.    One week?
21    A.    Yes.
22    Q.    And you learned English?
23    A.    No, no, no. That was only training
24  for the technical words.

Page 88

1     Q.    In English?
2     A.    Yes.
3     Q.    Okay. One of the documents placed in
4  evidence by Mr. Chalos, back in the year 2002 you took
5  the course regarding to MARPOL 7378?
6     A.    Yes.
7     Q.    Do you recall what you learned in that
8  course?
9     A.    Yes.
10    Q.    Do you recall if a ship can operate
11  with an inoperable oily water separator while at sea?
12    A.    Yes.
13    Q.    Can it operate with an inoperable —
14    A.    No.
15    Q.    It cannot?
16    A.    No, it cannot operate.
17    Q.    This document, if I may — I am not
18  going to refer to the document. You have been here in
19  the United States since December?
20    A.    Yes.
21    Q.    And you have been in a Philadelphia
22  hotel?
23    A.    Yes.
24    Q.    And you received your salary from the

Page 89

1  company?
2     A.    Yes.
3     Q.    And you are free to move about the
4  United States at will --
5     A.    Yes.
6     Q.    -- correct?
7        And your hotel is paid?
8     A.    Yes.
9        MR. KOTILA: All right. I have no
10  further questions.
11        MR. CHALOS: Just a little recross.
12        RECROSS-EXAMINATION
13  BY MR. CHALOS:
14    Q.    Now, Mr. Tudor, just a few questions
15  about the OWS. It is not part of your job to know
16  when to use the OWS, is it?
17        MR. KOTILA: Objection. That is
18  beyond the scope of my redirect.
19        MR. CHALOS: You just asked him about
20  operating it.
21        MR. KOTILA: I asked him about MARPOL.
22  Go ahead. Ask your question, but I object because
23  that is beyond the scope of what I asked him.
24

Paul Tudor

24 (Pages 90 to 93)

Page 90

1  BY MR. CHALOS:
2      Q.    Okay. Well, let me just be clear.
3  You don't really know, do you, Mr. Tudor, whether or
4  not a ship can sail between two ports if the OWS isn't
5  being used, do you?
6              MR. KOTILA: Objection; asked and
7  answered.
8              MR. CHALOS: Okay. You can answer,
9  though.
10             THE WITNESS: No. Whatever I said was
11  referred to MARPOL.
12  BY MR. CHALOS:
13     Q.    Let me see if I understand. Have you
14  ever read the MARPOL treaty?
15     A.    Yes, through the course.
16     Q.    And apart from reading it in the
17  courses, have you ever received any legal training?
18     A.    What do you refer to?
19     Q.    Well, you are not a lawyer, are you?
20  No?
21     A.    No.
22     Q.    And you are not a judge?
23     A.    Of course.
24     Q.    And it is not part of your job to.

Page 91

1  interpret laws or international treaties, is it?
2      A.    Correct.
3      Q.    Correct. It is not part of your job?
4      A.    Yes.
5      Q.    So to say whether or not the MARPOL
6  treaty speaks about the operation of an oily water
7  separator, would you agree that that is best decided
8  by the lawyers and the judge?
9              MR. KOTILA: Objection; calls for
10  speculation.
11             THE WITNESS: I don't have an idea.
12             MR. KOTILA: You don't have any idea.
13             THE WITNESS: No.
14             MR. CHALOS: Okay. Nothing further.
15             MR. WOODWARD: No further questions.
16             MR. KOTILA: Thank you, Mr. Tudor.
17             MR. TWERSKY: Reserve reading and
18  signing.
19             - - -
20             (Deposition concluded at 2:20 p.m.)
21             - - -
22
23
24

Page 92

1  I HAVE READ THE FOREGOING DEPOSITION, AND IT IS TRUE
2  AND CORRECT TO THE BEST OF MY KNOWLEDGE.
3
4
5
               PAUL TUDOR
6
7              - - -
8              INDEX
9  PLAINTIFF'S WITNESS   Direct  Cross  Redr.  Recr.
10  Paul Tudor          3    36    86    89
11  CSXE DEFENDANT'S EXHIBITS              Marked
12   1  Employment contract dated 5/23/05, between
        Chian Spirit and Mr. Tudor——————— 36
13
     2  Copy of Mr. Tudor's passport and seaman's
14     book——————————————————————— 36
15   3  Mr. Tudor's certificates for attendance at
        various courses——————————————— 36
16
     4  Mr. Tudor's medical exam report dated
17     5/12/05————————————————————— 36
18   5  Letter dated 1/11/06, from Mr. Connolly to
        Mr. Twersky————————————————— 56
19
     6  Declaration of Paul Tudor, dated 6/26/06— 56
20
     7  Chian Spirit's safety and environmental
21     protection policy——————————————— 36
22             - - -
23  (Exhibits attached to original transcript and copies.)
24

Page 93

1              CERTIFICATE
2              I, LORRAINE B. MARINO, Registered
3  Diplomate Reporter and Notary Public, do hereby
4  certify that the witness, PAUL TUDOR, after being duly
5  sworn by me, was examined by counsel for the
6  respective parties and the questions of said witness
7  and her answers were taken down by me in stenotype
8  notes and thereafter transcribed into typewriting at
9  my direction.
10             I certify that the foregoing is a true
11  and correct transcript of the testimony given at said
12  examination of said witness.
13             I further certify that the deposition
14  was made available to the witness for reading and
15  signing.
16             I further certify that I am not
17  counsel, attorney, or relative of either party, or
18  otherwise interested in the event of this suit.
19
20
21
              Registered Diplomate Reporter and Notary Public
22            Certificate No. 181PS/Exp.: Permanent
23
     Date: 7/24/06
24

# EXHIBIT 11

Pascual Conge

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

UNITED STATES OF AMERICA,          :

                    Plaintiff,     :

          vs:                      :No. 1:06-CR-00076-GMS-2

CHIAN SPIRIT MARITIME              :
ENTERPRISES, INC., VENETICO
MARINE S.A. IRENE E/M,             :
EVANGELOS MADIAS, CHRISTOS
PAGONES, ADRIEN DRAGOMIR,          :

                    Defendants. :
                    _  _  _

               Deposition of PASCUAL CONGE, taken

pursuant to notice in the offices of the United States

Department of Justice, 700 Nemours Building, 1007

North Orange Street, Wilmington, Delaware, on Friday,

July 14, 2006, at 2:33 p.m., before Lorraine B.

Marino, Registered Diplomate Reporter and Notary

Public.

               _  _  _

               CORBETT & WILCOX

               230 North Market Street

               Wilmington, Delaware 19601

               (302) 571-0510

Pascual Conge

2 (Pages 2 to 5)

## Page 2

APPEARANCES:
2   MARK W. KOTILA, ESQ.
    JEFFREY L. PHILLIPS, ESQ.
3   United States Department of Justice
    Environmental Crimes Section
4   P.O. Box 23985 - L'Enfant Plaza
    Washington, DC 20026-3985
5   for Plaintiff
6   GEORGE M. CHALOS, ESQ.
    Fowler Rodriguez & Chalos
7   366 Main Street
    Port Washington, NY 11050
8   for Defendants Chian Spirit and
    Venetico Marine
9
    CARL R. WOODWARD, III, ESQ.
10  Carella, Byrne, Bain, Gilfillan,
    Cecchi, Stewart & Olstein
11  5 Becker Farm Road
    Roseland, NJ 07068-1739
12  for Defendant Dragomir
13  MICHAEL K. TWERSKY, ESQ.
    Montgomery, McCracken, Walker &
14  Rhoads LLP
    123 South Broad Street
15  Philadelphia, PA 19109
    for the Witness
16
ALSO PRESENT:
17
    ADRIEN DRAGOMIR
18  LEVRI-LEE ROTH
    TRACY L KATZ
19  JASON F BURGESS
    BRENT S. McKNIGHT
20  MICHELLE N. FERRERI
    CARA GOELLER
21  PRESTON SATCHELL
22
23
24

## Page 3

1       CHRIS MASAOAY, having been first duly
2   sworn as the interpreter, translated as follows:
3       PASCUAL CONGE, having been first duly
4   sworn, was examined and testified through the
5   interpreter as follows:
6       DIRECT EXAMINATION
7   BY MR. PHILLIPS:
8   Q.   Mr. Conge, how are you?
9   A.   I am fine.
10  Q.   I am Jeff Phillips, with the United
11  States Department of Justice. And I will be asking
12  you some questions. And, Mr. Conge, we have met
13  before; correct?
14  A.   Yes.
15  Q.   And have you talked before about this
16  case with me?
17  A.   Yes.
18  Q.   Mr. Conge, could you tell us where
19  your home country is?
20  A.   We are coming from Brazil.
21  Q.   No. Your home country. Where are you
22  from?
23  A.   Mondragon, Northern Samar.
24  Q.   Is that in the Philippines?

## Page 4

1   A.   Philippines.
2   Q.   Could you give us your home address?
3       THE INTERPRETER: I am going to ask
4   him to start over.
5       THE WITNESS: Face 4, Block 30, Lot
6   No. 7, Mabuhay 2000, Paliparan No. 2, Dasmarinas
7   Cavite, in the Philippines.
8   BY MR. PHILLIPS:
9   Q.   Thank you. Mr. Conge, how old are
10  you?
11  A.   I am 39.
12  Q.   And what is your occupation?
13  A.   Third engineer.
14  Q.   And we will talk about your training
15  in a moment, but when were you first employed by Chian
16  Spirit?
17      MR. CHALOS: Objection.
18      THE WITNESS: This is the first time.
19  BY MR. PHILLIPS:
20  Q.   And I will back up. Do you recall
21  when you -- first off, who do you currently work for?
22  A.   Chian Spirit.
23  Q.   And when were you first hired by that
24  company?

## Page 5

1   A.   October 28, 2005.
2   Q.   And when you were hired by that
3   company, where did you report for work?
4   A.   You are asking me about the ship that
5   I reported to?
6   Q.   Is that where you reported to work?
7   A.   I first went to the agency.
8   Q.   And after the agency?
9   A.   Then they give us a principal.
10  Q.   And then what?
11  A.   If we qualify with all the
12  requirements, then we are sent somewhere, to the ship
13  somewhere.
14  Q.   Were you eventually sent to a ship?
15  A.   Yes.
16  Q.   What was the name of the ship?
17  A.   M.V. Irene E.M.
18  Q.   And where did you report to that ship?
19  A.   Tema, Ghana, Africa.
20  Q.   And when you reported to that ship,
21  did you report as a third engineer?
22  A.   Yes.
23  Q.   And is that your current position
24  still?

Corbett & Wilcox

Pascual Conge

3 (Pages 6 to 9)

Page 6

1      MR. CHALOS: Objection.
2      THE WITNESS: Yes.
3 BY MR. PHILLIPS:
4      Q.    And to become a third engineer, what
5 kind of education do you take?
6      A.    I finished my mechanical engineering.
7      Q.    How many years?
8      A.    Five years.
9      MR. WOODWARD: Could we go off the
10 record for a minute.
11      (Recess taken.)
12 BY MR. PHILLIPS:
13      Q.    Mr. Conge, in addition to the five
14 years of education for engineering, did you take any
15 other training?
16      A.    Yes.
17      Q.    What kind?
18      A.    The MARPOL 1, the MARPOL 2.
19      Q.    And how long were those training
20 sessions?
21      A.    One week each.
22      Q.    Prior to joining the Irene, how many
23 assignments had you had on ocean-going vessels, if
24 any?

Page 7

1      A.    Seven to eight ships.
2      Q.    Back to your MARPOL training, what did
3 you learn in MARPOL 1?
4      A.    Preventive measures such as not
5 throwing trash, issues with things such as oil
6 dumping. That is against the law.
7      Q.    And what about MARPOL 2 training?
8      A.    It is just about the same. It is just
9 a revision of the first.
10      Q.    And in those you said seven or eight
11 prior vessel assignments, what was your title on those
12 ships?
13      A.    You are asking me what my positions
14 are.
15      Q.    Yes.
16      A.    As a fourth engineer.
17      Q.    And did you work your way up to?
18      A.    Yes. I was promoted as a third
19 engineer.
20      Q.    When were you promoted?
21      A.    I don't remember.
22      Q.    You said you boarded the Irene in
23 Africa.
24      A.    Yes.

Page 8

1      Q.    Do you remember the voyages that you
2 took from Africa, if any?
3      A.    I don't remember, sir.
4      Q.    Do you recall; did the boat — did the
5 ship leave Africa?
6      A.    What is necessarily your question?
7      Q.    Before you got here to the United
8 States, where you are now, and after you boarded the
9 ship in Africa, in between where did it go?
10      MR. CHALOS: Objection.
11      THE WITNESS: Coming from Africa,
12 going to Brazil.
13 BY MR. PHILLIPS:
14      Q.    And do you remember when you left
15 Africa?
16      A.    You are leaving from where again?
17      Q.    Africa.
18      A.    I don't remember.
19      Q.    How long were you on board the Irene?
20      A.    When this thing has happened?
21      Q.    Total.
22      A.    Almost eight months.
23      Q.    From Brazil where did the Irene
24 travel?

Page 9

1      A.    Could you repeat that?
2      Q.    From Brazil where did Irene go to
3 next?
4      A.    To the United States coming from
5 Fortaleza.
6      Q.    Do you remember when you arrived in
7 the United States?
8      A.    I don't remember, sir.
9      Q.    Do you remember when you left Brazil?
10      A.    November 21.
11      Q.    So on November 21 you left Brazil.
12 When year was that?
13      A.    2005.
14      Q.    And approximately how many days was
15 the voyage from Brazil to the United States?
16      A.    I don't remember, sir.
17      Q.    Mr. Conge, do you remember testifying
18 earlier?
19      A.    And you are asking me?
20      Q.    Yes.
21      A.    This is my first time here.
22      Q.    Do you remember when you left Brazil
23 traveling to the United States, did it take more than
24 a month?

Pascual Conge

4 (Pages 10 to 13)

## Page 10

1    A.    No, it didn't.
2    Q.    Less than a month?
3    A.    Yes.
4    Q.    And you left on the 21st of November?
5    A.    Yes.
6    Q.    I am going to move to something else
7    now. Did you observe oil waste collection on board
8    the Irene?
9         MR. CHALOS: Objection.
10        THE WITNESS: I don't remember, sir.
11   BY MR. PHILLIPS:
12   Q.    As part of your duties were you
13   required to handle oily waste?
14   A.    No.
15   Q.    Were you required to handle bilge
16   water?
17   A.    No.
18   Q.    Do you recall testifying in front of
19   other people earlier this year?
20   A.    Yes.
21        MR. PHILLIPS: For the record, I am
22   going to put in front of Mr. Conge —
23        MR. WOODWARD: Objection.
24        MR. CHALOS: Objection.

## Page 11

1    BY MR. PHILLIPS:
2    Q.    Do you remember during that time
3    talking about your duties?
4    A.    Yes.
5    Q.    Do you remember talking about handling
6    a pump?
7         MR. WOODWARD: Objection; leading.
8         MR. CHALOS: Objection.
9         THE WITNESS: No.
10   BY MR. PHILLIPS:
11   Q.    Did you as part of your duties ever
12   have to start or stop a pump?
13        MR. WOODWARD: Objection; leading.
14        THE WITNESS: Could you repeat that
15   question?
16        MR. PHILLIPS: Sure.
17   BY MR. PHILLIPS:
18   Q.    As an engineer what are your duties on
19   the Irene?
20   A.    To maintain the generator and the
21   boiler.
22   Q.    What else?
23   A.    Emergency fire pump.
24        MR. CHALOS: Can I have that read

## Page 12

1    back, please?
2         (The court reporter read back as
3    follows:
4         "Question: As an engineer what are
5    your duties on the Irene?
6         "Answer: To maintain the generator
7    and the boiler.
8         "Question: What else?
9         "Answer: Emergency fire pump.")
10   BY MR. PHILLIPS:
11   Q.    Do you remember what you did on
12   November 23?
13   A.    Yes.
14   Q.    Did you receive — what did you do on
15   that day?
16   A.    May I ask you, could you repeat that?
17   Q.    What do you remember about
18   November 23?
19   A.    We did the pump on November 23.
20   Q.    Can you describe —
21   A.    A pump-out. Pump out the bilge.
22   Q.    Can you describe what that means?
23   A.    On November 23, when I went down to
24   the engine room, the fourth engineer turned over to me

## Page 13

1    the pumps. It was running at that time. It was
2    suctioning of the bilge tank going overboard, from the
3    bilge tank going outside.
4    Q.    What is in the bilge tank?
5    A.    It is a mixture of oil, water.
6    Q.    You said the fourth engineer was
7    operating the pump?
8         MR. CHALOS: Objection.
9         MR. PHILLIPS: I will rephrase that.
10        THE WITNESS: When I came down, he was
11   the one who was running it.
12   BY MR. PHILLIPS:
13   Q.    Who was running it?
14   A.    The fourth engineer.
15   Q.    What is his name?
16   A.    Bryan.
17   Q.    Do you remember his last name?
18   A.    Espina.
19   Q.    So if you are the third engineer and
20   Bryan is the fourth engineer, are there other
21   engineers?
22   A.    Yes, a second engineer, a chief
23   engineer.
24   Q.    Who is the chief engineer?

## Page 14

1   A.   Adrien Dragomir.
2   Q.   Would you recognize him if you saw him
3   today?
4   A.   Yes.
5   Q.   Do you see him today?
6   A.   (no interpreter) I salute you, Chief
7   (indicating).
8        MR. PHILLIPS: For the record, the
9   witness has identified Adrien Dragomir.
10  BY MR. PHILLIPS:
11  Q.   Does the fourth engineer give you
12  orders?
13  A.   No.
14  Q.   How are orders given?
15  A.   Coming from the second.
16  Q.   Does the second get orders from
17  anybody?
18       MR. WOODWARD: Objection.
19       MR. CHALOS: Objection.
20       MR. WOODWARD: No foundation.
21       THE WITNESS: From the chief engineer.
22  BY MR. PHILLIPS:
23  Q.   Where does the order start?
24       MR. WOODWARD: Objection.

## Page 15

1        MR. CHALOS: Objection.
2        MR. WOODWARD: Same.
3        THE WITNESS: Could you please repeat?
4   BY MR. PHILLIPS:
5   Q.   When an order is given, how is it
6   given?
7        MR. CHALOS: Objection.
8        THE WITNESS: Sometimes the chief
9   engineer would write it down on the logbook, or
10  sometimes it would be verbal.
11  BY MR. PHILLIPS:
12  Q.   Do you remember on the 23rd of
13  November how the order was given --
14       MR. CHALOS: Objection.
15  BY MR. PHILLIPS:
16  Q.   -- to do the pumping?
17       MR. WOODWARD: Objection.
18       MR. CHALOS: Objection.
19       MR. WOODWARD: No foundation.
20       THE WITNESS: Out all engine room
21  bilges.
22  BY MR. PHILLIPS:
23  Q.   Can you describe, what is that term?
24       MR. CHALOS: Objection.

## Page 16

1        THE WITNESS: That means that to pump
2   out the bilge tank, the bilge well.
3   BY MR. PHILLIPS:
4   Q.   When you approached Bryan and the pump
5   was going, what did you do?
6   A.   He turned it over to me. He told
7   me --
8        MR. WOODWARD: Objection; hearsay.
9        THE WITNESS: -- "Third, the pump is
10  working. It is suctioning from the bilge tank going
11  to the overboard."
12  BY MR. PHILLIPS:
13  Q.   When you spoke of the order out bilge
14  tank, where did you -- how did you know about that
15  order?
16       MR. CHALOS: Objection.
17       MR. WOODWARD: Objection.
18       THE WITNESS: The fourth engineer told
19  me that he was ordered by the second engineer. And
20  the second engineer --
21       MR. WOODWARD: Objection.
22       THE WITNESS: -- of course, was
23  asked --
24       MR. WOODWARD: Hearsay.

## Page 17

1        THE WITNESS: -- by the chief
2   engineer.
3        MR. CHALOS: I move to strike the
4   answer to the question; based solely on hearsay.
5   BY MR. PHILLIPS:
6   Q.   When you talked about how orders are
7   given, are they given by word or written?
8        MR. WOODWARD: Asked and answered.
9        THE WITNESS: Sometimes it is
10  verbally. I don't remember the other.
11  BY MR. PHILLIPS:
12  Q.   Do you ever see orders written?
13  A.   Yes.
14  Q.   Did you ever see an order from the
15  chief engineer written?
16  A.   Yes.
17  Q.   Where is it written?
18  A.   In the logbook.
19  Q.   Can you describe the logbook? Where
20  is it?
21       MR. CHALOS: Objection. It is two
22  questions.
23  BY MR. PHILLIPS:
24  Q.   First describe it.

Pascual Conge

6 (Pages 18 to 21)

Page 18

1    A.    It is an engine logbook like this
2    (indicating).
3    Q.    And where is it kept?
4    A.    In the engine room there is a table
5    close to the engine.  The table is close to the engine
6    because this particular ship, it does not have a
7    control room.  The logbook is just on top of the table
8    and so we can see it easily.
9    Q.    On the 23rd of November did you see an
10   order from the chief engineer in that book?
11   A.    Yes.
12   Q.    And what did it say?
13   MR. WOODWARD:  Objection.
14   MR. CHALOS:  Objection.
15   MR. WOODWARD:  Hold it.  Hold it.
16   Hold it.  Objection; best evidence rule.  Objection;
17   hearsay.
18   BY MR. PHILLIPS:
19   Q.    And what did it say?
20   A.    About the pumping.
21   Q.    And what did it say about the pumping?
22   A.    Out all engine room bilges.
23   Q.    And what did you think that meant?
24   A.    That we would pump out overboard the

Page 19

1    oil from the bilge tank.
2    Q.    Pump out the oil to where?
3    A.    Outside.
4    Q.    Are you sure?
5    MR. CHALOS:  Objection.
6    THE WITNESS:  Yes.
7    MR. PHILLIPS:  For the record,
8    actually, should you mark that as a government
9    exhibit?
10   MR. CHALOS:  We object.  There is no
11   foundation if that is the oil record book.
12   MR. PHILLIPS:  I am going to make a
13   foundation, but I want to have it marked first.
14   MR. WOODWARD:  Just mark it first.
15   (Government Deposition Exhibit No. 1
16   was marked for identification.)
17   MR. CHALOS:  Before we go to the next
18   set of questions, for the record, I note that we have
19   not seen this engine logbook --
20   MR. PHILLIPS:  Neither have we.
21   MR. CHALOS:  -- that Mr. Conge has
22   spoken about.  So if that is something that is within
23   the government's possession, we ask that it be turned
24   over forthwith.

Page 20

1    MR. PHILLIPS:  And the government
2    that if it is in the defense's possession, that it be
3    turned over forthwith.  Back on the record.
4    MR. WOODWARD:  Well, I can tell you
5    right now that speaking on behalf of Mr. Dragonit, we
6    don't have it.
7    MR. PHILLIPS:  Okay.
8    MR. WOODWARD:  And you also know from
9    our prior conversation, when he last saw it, it was in
10   the possession of the United States.
11   MR. PHILLIPS:  So he says.  Are we
12   back on the record?
13   BY MR. PHILLIPS:
14   Q.    Mr. Conge, back to the order and what
15   you saw on the 23rd of November, how do you know that
16   the oil was being pumped outside?
17   MR. CHALOS:  Objection.
18   THE WITNESS:  The pump has a pressure
19   gauge.  It has a suction and delivery.
20   BY MR. PHILLIPS:
21   Q.    How do you know, if you know, that it
22   went outside the ship?
23   MR. CHALOS:  Objection.
24   THE WITNESS:  You would know that

Page 21

1    because the pressure would be moving.
2    BY MR. PHILLIPS:
3    Q.    Now, in describing the pipe, what --
4    can you describe what the pipe looked like?
5    MR. CHALOS:  Objection.  What pipe?
6    THE WITNESS:  Should I draw it?  Can I
7    draw it?
8    BY MR. PHILLIPS:
9    Q.    No.  You can describe the way it
10   looked.
11   A.    It is a plastic hose, about four
12   meters.  There is a flange on both ends.
13   Q.    And going from where to where?
14   A.    It is connected to the end of the
15   bilge pump.  Going towards outside there is another
16   flange on the end.  This would be the wailing of the
17   ship going towards overboard.  There is another flange
18   there.
19   Q.    And that is what you saw operating on
20   the 23rd of November?
21   A.    Yes.
22   Q.    Did that pipe go through the oily
23   water separator?
24   MR. CHALOS:  Objection.

Corbett & Wilcox

Pascual Conge

Page 22

1    THE WITNESS: No.
2  BY MR. PHILLIPS:
3    Q.    Are you familiar with the oily water
4  separator? Do you know what it looks like?
5    A.    Yes.
6    MR. PHILLIPS: For the record, I would
7  like Mr. Conge to look to his right at the plastic
8  bag. Actually, we need to mark that as an exhibit.
9  This will be marked as Government Exhibit No. 2.
10 BY MR. PHILLIPS:
11    Q.    Mr. Conge, do you recognize what is in
12 that plastic bag?
13    MR. CHALOS: Objection.
14    THE WITNESS: Yes,
15 BY MR. PHILLIPS:
16    Q.    What is it?
17    A.    This is what is being used as a magic
18 pipe.
19    MR. PHILLIPS: Chris, I am going to
20 have to move around. How should I do that?
21    (Recess taken.)
22    (Government Deposition Exhibit No. 2
23 was marked for identification.)
24

Page 23

1  BY MR. PHILLIPS:
2    Q.    Mr. Conge, do you recognize this?
3    A.    Yes.
4    Q.    What is it?
5    A.    Magic pipe plastic hose.
6    Q.    Is there only one hose there?
7    A.    I cannot clearly see it because it is
8  inside, but —
9    Q.    Feel free to look at it.
10    A.    Two hoses.
11    Q.    Do you recognize each hose?
12    A.    I don't remember.
13    Q.    Do you know what this is? For the
14 record, I am pointing at a rag wrapped around the hose
15 closest to the window.
16    A.    This is the plastic hose magic pipe.
17    Q.    Okay. You can sit down, Mr. Conge.
18 Why do you call it a magic hose or
19 magic pipe?
20    A.    Because that is what you would use
21 coming from the bilge pump going into the overboard.
22    Q.    The overboard, describe what you mean
23 by the overboard?
24    A.    It is connected outside in the walling

Page 24

1  of the ship. That's where it is connected.
2    Q.    And where does it come out?
3    A.    Going outside.
4    Q.    Outside above or below the water?
5    A.    I don't remember.
6    Q.    How often did you see the magic pipe?
7    MR. CHALOS: Objection.
8    THE WITNESS: Since we left Brazil and
9  as we were going here to the United States.
10 BY MR. PHILLIPS:
11    Q.    How many times?
12    A.    I don't remember.
13    Q.    Was it more than once?
14    A.    Two times I saw it.
15    Q.    Two times. And who, if anybody, did
16 you see operating?
17    MR. CHALOS: Objection.
18    THE WITNESS: I don't remember.
19 BY MR. PHILLIPS:
20    Q.    Did you ever operate the magic pipe?
21    A.    No, because normally it is the oiler
22 that does it, but I just don't remember.
23    Q.    Did you ever turn on or off the pump
24 that you spoke of?

Page 25

1    A.    Yes.
2    Q.    Describe that.
3    A.    Five days before the arrival here in
4  the United States the second ordered the fourth
5  engineer that the bilge tank, we needed to empty it
6  out.
7    MR. WOODWARD: Objection; hearsay.
8  Objection; hearsay.
9    THE WITNESS: That we needed to lessen
10 the contents of the bilge tank.
11 BY MR. PHILLIPS:
12    Q.    When you observed the magic pipe being
13 used, how long was the pumping?
14    MR. CHALOS: Objection.
15    THE WITNESS: I don't remember.
16 BY MR. PHILLIPS:
17    Q.    Was it one hour?
18    MR. WOODWARD: Objection; leading.
19    THE WITNESS: On the second time that
20 I pumped, I am the one that started it. I am the one
21 that stopped it. It was for one hour that I pumped.
22 BY MR. PHILLIPS:
23    Q.    Did you ever know how much liquid you
24 pumped?

Corbett & Wilcox

Pascual Conge

8  (Pages 26 to 29)

Page 26

1    A.    I don't remember, sir.
2    Q.    Did you ever do soundings?
3    A.    No, sir.
4    Q.    Did anyone ever do soundings?
5    A.    The oiler, sometimes the chief
6  engineer.
7    Q.    And how would you use the soundings,
8  if at all?
9          MR. CHALOS: Objection.
10         MR. WOODWARD: Object; speculation.
11         THE WITNESS: The tank has a tube that
12  goes down that leads to the tank. So then you have a
13  measuring tape. You would put it there so you would
14  know what the contents are.
15  BY MR. PHILLIPS:
16    Q.    When you saw the magic pipe, where was
17  it in the engine room?
18         MR. CHALOS: Objection.
19         THE WITNESS: I don't remember, sir.
20  BY MR. PHILLIPS:
21    Q.    Were there other people going in and
22  out of the engine room?
23    A.    Yes.
24    Q.    Who would go in and out of the engine

Page 27

1  room?
2    A.    Sometimes people from the deck. They
3  would borrow the tools.
4    Q.    Who from the deck?
5    A.    I don't remember.
6    Q.    Did the engineers go into the engine
7  room?
8          MR. CHALOS: Objection.
9          THE WITNESS: Yes.
10  BY MR. PHILLIPS:
11    Q.    Did you ever see the chief engineer in
12  the engine room?
13    A.    Yes, every day.
14    Q.    Going back to the oily water
15  separator, did you ever see anyone use it?
16    A.    No.
17    Q.    Do you know if it worked?
18         MR. CHALOS: Objection.
19         THE WITNESS: It's not working.
20  BY MR. PHILLIPS:
21    Q.    In the 13 months that you were on the
22  ship -- I am sorry. In the months -- in the month
23  that you were on the ship --
24         MR. WOODWARD: Objection.

Page 28

1          MR. CHALOS: Objection.
2  BY MR. PHILLIPS:
3    Q.    -- did you ever see the oily water
4  separator work?
5          MR. WOODWARD: Objection; leading.
6          THE WITNESS: No.
7  BY MR. PHILLIPS:
8    Q.    Did you ever see anyone working on the
9  oily water separator?
10    A.    Yes.
11    Q.    Who?
12    A.    They were testing it.
13    Q.    Who tested it?
14    A.    The chief engineer, the second
15  engineer, the electrician.
16         MR. PHILLIPS: For the record, the
17  government would like to move into evidence what has
18  been previously marked as Government Exhibit No. 2 for
19  identification.
20         MR. CHALOS: Objection.
21         MR. WOODWARD: Objection. There are
22  two hoses. Only one has been identified.
23  BY MR. PHILLIPS:
24    Q.    The pumping on the 23rd, was that done

Page 29

1  in the day or the night?
2    A.    It was nighttime.
3    Q.    The second time was it day or night?
4    A.    I don't remember.
5    Q.    Did you ever pump out near shore?
6          MR. CHALOS: Objection.
7          MR. WOODWARD: Leading.
8          THE WITNESS: No.
9          MR. PHILLIPS: Another sticker,
10  please.
11         (Government Deposition Exhibit No. 3
12  was marked for identification.)
13         (Recess taken.)
14         (CSME Defendants' Deposition Exhibit
15  Nos. 8 through 16 were marked for identification.)
16  BY MR. PHILLIPS:
17    Q.    Mr. Conge, back to what has been
18  marked as Government Exhibit 2, for the record, I am
19  pointing to the plastic pipe that is closest to the
20  window. Mr. Conge, do you see what I am pointing at
21  here?
22    A.    Yes.
23    Q.    Can you tell me what it is I am
24  pointing at?

Corbett & Wilcox

Pascual Conge

Page 30

1   A.    Rags, rags.
2   Q.    Okay. Do you see anything on the
3   other pipe to indicate something similar or not?
4   A.    No.
5   Q.    The pipe that you spoke of, the magic
6   pipe, of these two, which one was the magic pipe?
7         MR. WOODWARD: Objection.
8         MR. CHALOS: Objection.
9         THE WITNESS: This (indicating).
10        MR. PHILLIPS: Let the record reflect
11  that Mr. Conge is pointing to the one on the right
12  without the rag.
13  BY MR. PHILLIPS:
14   Q.    How do you know that this is the one
15  that you saw? And again, I am pointing to the one on
16  the right without the rag.
17   A.    Because this is the piece that we
18  attached to that piece over there (indicating), and
19  the other piece over there is attached to the end of
20  this.
21   Q.    Okay. Now, Mr. Conge, the government
22  is showing you what has been marked previously as
23  Government Exhibit 3. Do you recognize this?
24   A.    Yes.

Page 31

1         MR. PHILLIPS: And do you have that,
2   Chris? And you can sit it down, Jason.
3   BY MR. PHILLIPS:
4    Q.    Mr. Conge, what are those?
5    A.    Flange.
6    Q.    And how do you -- what -- you said
7   flanges?
8    A.    Yes.
9    Q.    And how do you recognize them?
10   A.    Because those, these are the things
11  that are attached and you would put the clip, clip
12  right here (indicating).
13   Q.    And what would the flanges be
14  connected to?
15        MR. WOODWARD: Objection.
16        THE WITNESS: Delivery from the bilge
17  pump to the ocean.
18  BY MR. PHILLIPS:
19   Q.    So would these flanges be connected to
20  something?
21   A.    No.
22   Q.    These flanges would not be connected
23  to anything?
24   A.    On the corner of the delivery from the

Page 32

1   bilge pump, the other corners is attached, and the
2   other one, it goes to the ocean, outside.
3    Q.    It goes to the ocean outside?
4    A.    Yes.
5    Q.    Now, what is in between?
6    A.    (without interpreter) I don't remember
7   the --
8    Q.    The distance?
9    A.    (without interpreter) The clearance,
10  the distance.
11        (through interpreter) I don't remember
12  the clearance, the distance.
13   Q.    Mr. Conge, going back to the written
14  orders that you described, and you described seeing an
15  order from Chief Engineer Dragomir, how did you know
16  that that was his order?
17   A.    I know his penmanship and I know his
18  signature.
19   Q.    What color was the penmanship made in
20  the engine room logbook?
21        MR. WOODWARD: Objection.
22        THE WITNESS: Red.
23  BY MR. PHILLIPS:
24   Q.    Now, the government is going to show

Page 33

1   you what has been previously marked as Government
2   Exhibit No. 1 for you to look at. And I will show it
3   first to defense counsel.
4         MR. CHALOS: We have seen it before.
5   We object to the introduction of it.
6         MR. PHILLIPS: I am not introducing it
7   for --
8         MR. WOODWARD: I would like to look at
9   it.
10        MR. PHILLIPS: Are we okay there,
11  Chris?
12        Let the record reflect that I am
13  putting down what has been previously marked as
14  Government Exhibit 1 for identification in front of
15  Mr. Conge.
16  BY MR. PHILLIPS:
17   Q.    And, Mr. Conge, can you tell me what
18  are the dates on this page?
19        MR. WOODWARD: Objection.
20        MR. CHALOS: Objection.
21        MR. WOODWARD: You haven't identified
22  that he knows the book.
23  BY MR. PHILLIPS:
24   Q.    Can you tell me what -- if you

Corbett & Wilcox

Pascual Conge

10 (Pages 34 to 37)

Page 34

1  recognize what this is?
2       MR. WOODWARD: Again, I object.
3       MR. CHALOS: One second. For the
4  record, I would like to make an objection --
5       THE WITNESS: I don't recognize --
6       MR. KOTILA: Hold on. Hold on. They
7  are making an objection. Let that go on the record;
8  then continue.
9       MR. CHALOS: Do you have his answer?
10      THE COURT REPORTER: I have everything
11  that was said.
12      MR. PHILLIPS: Let the record reflect
13  that I am pointing to the upper left-hand corner.
14  And, Mr. Conge, can you read what this says?
15      MR. CHALOS: Objection.
16      MR. WOODWARD: I am going to object.
17  In fact, I think he already testified he doesn't know
18  what it is.
19      MR. PHILLIPS: He just testified that
20  he did.
21      MR. WOODWARD: I am sorry. Could we
22  have the last couple questions read back, please.
23      (The court reporter read back as
24  follows:

Page 35

1       "Mr. Phillips: Let the record reflect
2  that I am putting down what has been previously marked
3  as Government Exhibit 1 for identification in front of
4  Mr. Conge.
5       "Question: And, Mr. Conge, can you
6  tell me what are the dates on this page?
7       "Mr. Woodward: Objection.
8       "Mr. Chalos: Objection.
9       "Mr. Woodward: You haven't identified
10  that he knows the book.
11      "By Mr. Phillips:
12      "Question: Can you tell me what -- if
13  you recognize what this is?
14      "Mr. Woodward: Again, I object.
15      "Mr. Chalos: One second. For the
16  record, I would like to make an objection --
17      "The Witness: I don't recognize --
18      "Mr. Kotila: Hold on. Hold on. They
19  are making an objection. Let that go on the record;
20  then continue.
21      "Mr. Chalos: Do you have his answer?
22      "The Court Reporter: I have
23  everything that was said.
24      "Mr. Phillips: Let the record reflect

Page 36

1  that I am pointing to the upper left-hand corner.
2  And, Mr. Conge, can you read what this says?
3       "Mr. Chalos: Objection.
4       "Mr. Woodward: I am going to object.
5  In fact, I think he already testified he doesn't know
6  what it is.
7       "Mr. Phillips: He just testified that
8  he did.
9       "Mr. Woodward: I am sorry. Could we
10  have the last couple questions read back, please.")
11      MR. WOODWARD: Okay. I'd just say
12  that I think at least half of his answer said he
13  doesn't recognize, but in any event, continue. But I
14  don't think you have laid any kind of an adequate
15  foundation for questioning the witness from this
16  document.
17      MR. PHILLIPS: We are not looking at
18  this document. We are looking at a page. And I have
19  asked -- again, for the record, I have pointed to the
20  top left-hand corner of this box.
21  BY MR. PHILLIPS:
22      Q.   And, Mr. Conge, can you read what that
23  says?
24      A.   Date.

Page 37

1       Q.   And as you follow the column down, can
2  you read what the first written entry says?
3       MR. CHALOS: Objection.
4       MR. WOODWARD: Objection.
5       MR. CHALOS: Object to this whole line
6  of questioning of this document of this witness.
7       MR. WOODWARD: It is totally improper.
8       THE WITNESS: You are asking me what
9  question again?
10  BY MR. PHILLIPS:
11      Q.   Following the column "date" down, what
12  is the first entry?
13      MR. CHALOS: Wait. Objection.
14      THE WITNESS: '05. November 6, 2005.
15  BY MR. PHILLIPS:
16      Q.   Then going down --
17      MR. PHILLIPS: I know. You are going
18  to have an objection. Go ahead.
19      MR. WOODWARD: We have a continuing
20  objection to this whole questioning.
21  BY MR. PHILLIPS:
22      Q.   Going down to the end of this column,
23  what is the final entry in the date column?
24      A.   December 1, 2005.

Corbett & Wilcox

Pascual Conge

11 (Pages 38 to 41)

Page 38

1    Q.    Now, on this page that we have
2 identified, do you see any signatures that you
3 recognize?
4        MR. CHALOS: Objection. This man is
5 not a handwriting expert.
6        THE WITNESS: Yes.
7        MR. PHILLIPS: Is the objection
8 finished being heard?
9 BY MR. PHILLIPS:
10    Q.    And what signature do you recognize?
11    A.    The signature of the captain.
12    Q.    Are there any other signatures that
13 you recognize on this page, on this page?
14    A.    Chief engineer.
15    Q.    Do you recognize that signature?
16        MR. CHALOS: Objection.
17        THE WITNESS: Yes.
18 BY MR. PHILLIPS:
19    Q.    Thank you. Now, I am going to ask
20 you, do you recognize that?
21        MR. CHALOS: Objection.
22        MR. PHILLIPS: For the record, it is
23 Government Exhibit 1 for identification.
24        THE WITNESS: Yes.

Page 39

1 BY MR. PHILLIPS:
2    Q.    What is it?
3    A.    Oil record book.
4    Q.    How do you know that's what it is?
5    A.    Because all of the oil records are
6 written here by the chief engineer.
7        MR. WOODWARD: Objection. Objection.
8 That's not responsive. Ask that the answer be
9 stricken.
10        MR. PHILLIPS: Is there any other
11 signature there that you recognize?
12        MR. WOODWARD: Do you know what page
13 is being looked at?
14        MR. PHILLIPS: For the record, it is
15 the page that was identified before by dates, those
16 dates being November 6, 2005 through December 1, 2005.
17        THE WITNESS: It is from the bilge,
18 the bilge.
19        MR. WOODWARD: Objection. Again, this
20 witness has not made -- you haven't laid any
21 foundation for him to testify from this, and it is
22 just like reading a piece of evidence into the record.
23 It is totally improper.
24

Page 40

1 BY MR. PHILLIPS:
2    Q.    Is there -- when you said you
3 recognized this book --
4    A.    Yes.
5    Q.    -- have you ever seen this book or a
6 book like it on other ships?
7    A.    Yes.
8    Q.    Now, do you know; is there anything
9 from looking at this document that tells you where
10 this book belongs?
11        MR. CHALOS: Objection; leading.
12        MR. WOODWARD: Objection.
13 BY MR. PHILLIPS:
14    Q.    Which ship does this book belong to?
15        MR. WOODWARD: Objection. Once again
16 no foundation.
17        THE WITNESS: Irene E.M.
18 BY MR. PHILLIPS:
19    Q.    How do you know?
20    A.    Name of ship, Irene E.M.
21    Q.    Is there anything else that you
22 recognize on that document?
23        MR. WOODWARD: Objection.
24        MR. CHALOS: Objection.

Page 41

1        MR. WOODWARD: It doesn't say that he
2 recognizes anything. There is no foundation.
3        MR. PHILLIPS: He did. He already
4 said that he recognized it. Would you like it read
5 back?
6        MR. WOODWARD: Continue.
7        MR. PHILLIPS: Okay.
8        THE WITNESS: The date.
9 BY MR. PHILLIPS:
10    Q.    And what are the dates?
11    A.    February 6, '04.
12    Q.    Does it say anything else about the
13 dates?
14        MR. CHALOS: Objection.
15        MR. WOODWARD: Objection. You are
16 asking the witness to read the document.
17        MR. CHALOS: The document speaks for
18 itself.
19        MR. WOODWARD: It is not in evidence.
20 It hasn't been offered in evidence. No foundation.
21 BY MR. PHILLIPS:
22    Q.    The date that you just -- what does
23 the date that you just read refer to?
24        MR. WOODWARD: Objection.

Pascual Conge

12 (Pages 42 to 45)

Page 42

BY MR. PHILLIPS:
2    Q.    Do you know what it refers to?
3    A.    It is the beginning date, but it does
4 not have the ending date.
5    Q.    And what is the beginning date?
6    MR. CHALOS: Objection.
7    THE WITNESS: January 6, 2004.
8 BY MR. PHILLIPS:
9    Q.    And what is the ending date?
10    A.    There is nothing written.
11    Q.    And when were you on the ship?
12    A.    October 28, 2005.
13    Q.    Is this or is this not the oil record
14 book from when you were on the ship —
15    MR. CHALOS: Objection.
16    MR. WOODWARD: Objection; no
17 foundation.
18 BY MR. PHILLIPS:
19    Q.    — based on those dates?
20    A.    No.
21    Q.    Based on those? Again, let me repeat
22 the question. Is that the record book while you were
23 on the ship based on those dates?
24    MR. WOODWARD: Objection.

Page 43

1    MR. CHALOS: Objection.
2    MR. WOODWARD: No foundation.
3    MR. CHALOS: And leading.
4    THE WITNESS: Yes.
5    MR. PHILLIPS: Thank you. And the
6 government is going to move to have this what has been
7 previously marked as Government Exhibit 1 for
8 identification into evidence as Government Exhibit 1.
9    MR. CHALOS: Objection.
10    MR. WOODWARD: Well, totally —
11 objection; totally lacking of any foundation.
12 BY MR. PHILLIPS:
13    Q.    Now, moving back to November 23, when
14 you were told to pump the bilges out, do you see that
15 date written in the oil record book?
16    MR. CHALOS: Objection.
17    MR. WOODWARD: Objection.
18    THE WITNESS: It's not written.
19    MR. WOODWARD: Objection, by the way,
20 to that answer.
21 BY MR. PHILLIPS:
22    Q.    When you saw the magic pipe connected
23 on the voyage from Brazil to the United States, did
24 the magic pipe — was the magic pipe still connected

Page 44

1 when you got to the United States?
2    MR. CHALOS: Objection.
3    MR. WOODWARD: Objection; leading.
4 BY MR. PHILLIPS:
5    Q.    Yes or no?
6    MR. CHALOS: Objection.
7    THE WITNESS: No.
8 BY MR. PHILLIPS:
9    Q.    Do you know when the magic pipe was
10 removed on the trip from Brazil to the United States?
11    A.    Three days before we arrived at
12 America.
13    Q.    How do you know?
14    A.    Robert took it out together with the
15 second.
16    Q.    Once you were in the United States, do
17 you remember what happened after you got to the United
18 States?
19    A.    Yes.
20    Q.    What happened?
21    A.    When we arrived in anchorage, the
22 Coast Guard, U.S. Coast Guard boarded. Everything in
23 the ship, they wanted to check it. We were gathered
24 in the officers' mess room, all of us. And one by one

Page 45

1 they asked us to sit in the chairs. We could not step
2 out or go outside. If we needed to use the bathroom,
3 there was a security.
4    Q.    Do you remember when that was, the
5 date?
6    A.    I don't remember the date.
7    Q.    Do you remember the month?
8    A.    December.
9    Q.    Of what year?
10    A.    2005.
11    Q.    Do you remember where the ship was
12 when the Coast Guard came on board?
13    A.    Would you repeat that?
14    Q.    Do you remember where the ship was
15 located when the Coast Guard came on board?
16    A.    Anchorage in Delaware.
17    Q.    Do you recall if anybody else was on
18 board when the Coast Guard was on board?
19    MR. CHALOS: Objection; leading.
20    THE WITNESS: Yes.
21 BY MR. PHILLIPS:
22    Q.    There was other people on board?
23    A.    The owner of the ship, Christos,
24 superintendent.

Pascual Conge

13 (Pages 46 to 49)

Page 46

1    Q.    Let's go back to the owner first. Do
2    you remember the owner's name?
3    A.    Yes.
4    Q.    What was it?
5    A.    Madias.
6    Q.    And the second name that you said,
7    what was the second name?
8    A.    Christos, superintendent.
9    Q.    And did either of those gentlemen talk
10    to you?
11    A.    Yes.
12    Q.    Who?
13    A.    Superintendent Christos.
14    Q.    And what did he say to you?
15    A.    When he boarded, he asked the second
16    engineer and the fourth engineer to make a statement.
17    The second and the fourth engineer prepared the
18    statement, and they made us read it, all of us, and
19    then we signed. Each of us signed. And after we have
20    signed, the second gave it to Mr. Christos.
21        After the Superintendent Christos had
22    read it, we were eating in the mess hall. The second
23    engineer was there, myself, the fourth engineer, Paje,
24    Mario, Damasing. He said that impossible; could we

Page 47

1    change the statements. And then we said we could not
2    change it because we are just telling the truth.
3    Q.    Did he — go ahead.
4    A.    And then he said that if we don't
5    change it, then we would go to jail.
6    Q.    And what did you say?
7    A.    I said we are just telling the truth.
8    We cannot change it.
9    Q.    Did he tell you how he wanted to
10    change the statement?
11        MR. CHALOS: Objection.
12        THE WITNESS: They want that we change
13    the statement.
14    BY MR. PHILLIPS:
15    Q.    Did he tell you what words to use?
16    A.    I don't remember.
17        MR. PHILLIPS: Before we finish up, I
18    want to talk to my counsel.
19        That is done for me for right now.
20        MR. CHALOS: Okay. Passing him?
21        MR. PHILLIPS: Passing him.
22        MR. CHALOS: One second. I have got
23    to move back up to my spot.
24        MR. PHILLIPS: Thank you.

Page 48

1        THE WITNESS: Thank you.
2        CROSS-EXAMINATION
3    BY MR. CHALOS:
4    Q.    Ready? Mr. Conge, good afternoon. My
5    name is George Chalos, and I represent the company
6    which owns the Irene E.M. and the company which
7    manages the Irene E.M. And I would like to just
8    clarify a couple things before we go too much further.
9        You were the third engineer on board
10    the ship, right?
11    A.    Yes.
12    Q.    And as the third engineer, your duties
13    relate to maintaining the generators; right?
14    A.    Yes.
15    Q.    You don't have any — your job doesn't
16    have any responsibility for the oily water separator,
17    does it?
18    A.    No.
19    Q.    You don't maintain the oily water
20    separator, right?
21    A.    No, I don't.
22    Q.    You don't fix the oily water
23    separator, do you?
24    A.    No.

Page 49

1    Q.    You don't operate the oily water
2    separator?
3    A.    In Irene E.M. I don't — I never run
4    those things since I boarded the ship.
5    Q.    Okay. So you don't turn — you don't
6    make the decisions when to use the oily water
7    separator?
8    A.    No.
9    Q.    Okay. Now, as third engineer, you
10    don't keep any logbooks, do you?
11    A.    No, nothing.
12    Q.    Okay. So you don't write in the
13    engine log, do you?
14    A.    No.
15    Q.    You don't maintain the oil record
16    book, do you?
17    A.    In the generator logbook.
18    Q.    Okay. So apart from the generator
19    logbook, you don't have any other responsibility for
20    any other records?
21    A.    The spares for the generators.
22    Q.    Okay. So let's go back to my
23    question. You don't write in the oil record book, do
24    you?

Pascual Conge

14 (Pages 50 to 53)

Page 50

1    A.    No.
2    Q.    You don't keep the oil record book in
3 your cabin?
4    A.    No.
5    Q.    Okay. You don't have any
6 responsibility to make entries in the oil record book,
7 do you?
8    A.    No.
9    Q.    Okay. So all the questions that
10 Mr. Phillips asked you about the oil record book were
11 questions about a record you have nothing to do with?
12    A.    No.
13    Q.    No, you have nothing to do with it;
14 right?
15    A.    No.
16    Q.    Okay. Now, in fact, had you ever seen
17 the contents of this before the government showed it
18 to you?
19    A.    I don't remember.
20    Q.    Okay. Thank you. So let's go back
21 and talk a little bit more about you. English is not
22 your first language; right?
23    A.    No.
24    Q.    Okay. Now, did you study a little

Page 51

1 English?
2    A.    Yes.
3    Q.    Okay. And where did you study it?
4    A.    University of the Philippines,
5 Catarman, Northern Samar.
6    Q.    Okay. Do you feel comfortable enough
7 to speak in English in an official meeting like this?
8    A.    Yes.
9    Q.    Okay. And do you believe that you
10 will be able to answer my questions accurately?
11    A.    I need an interpreter.
12    Q.    Oh, okay. So let's go back. To
13 participate in an official meeting like this, you need
14 the assistance of an interpreter; right?
15    A.    Yes.
16    Q.    Okay. Now, when the Coast Guard came
17 on board, they talked to you; right?
18    A.    Yes.
19    Q.    They called all the crew for an
20 official meeting in the mess room; right?
21    A.    Yes.
22    Q.    Did the Coast Guard offer an
23 interpreter for you?
24    A.    No, they didn't.

Page 52

1    Q.    Was an interpreter available for your
2 use and assistance?
3    A.    None.
4    Q.    Okay. Were you advised that you had
5 the right to have an attorney present to represent
6 your interests?
7    A.    Nothing.
8    Q.    Okay. Let's talk about your
9 employment with -- your employment contract with this
10 vessel. I am going to show you what we have marked as
11 CSME Defendants' Deposition No. 8. And for the
12 record, I will make a representation it is a four-page
13 document.
14          And my first question to you,
15 Mr. Conge, is this your employment contract that you
16 signed before joining the Irene E.M.?
17    A.    Yes.
18    Q.    Okay. Now, at the time -- strike
19 that.
20          Let's just go back and talk about you
21 a little bit more. You have been a sailor since when?
22    A.    1991, 1992.
23    Q.    Okay. So by the time that you got on
24 board the Irene E.M., you had been at sea almost 15

Page 53

1 years?
2    A.    Almost 13 to 14 years.
3    Q.    Okay. And did I understand you to
4 tell Mr. Phillips before that you had been on seven or
5 eight prior ships?
6    A.    Yes.
7    Q.    Okay. Now, when you work, you stand a
8 watch in the engine room; right?
9    A.    Yes.
10    Q.    And what hours is that watch?
11    A.    12:00 to 4:00.
12    Q.    Okay. When you say you work 12:00 to
13 4:00, what that really means is you work 12:00 to 4:00
14 in the afternoon and 12:00 to 4:00 at night?
15    A.    Yes.
16    Q.    Okay. Now, you were the third
17 engineer?
18    A.    Yes.
19    Q.    Okay. Now, take a look at your
20 contract. Now, tell us how you went about getting
21 this job. What you did was, you went to a crewing
22 agent in the Philippines; right?
23    A.    Yes.
24    Q.    And you went to the crewing agent

Corbett & Wilcox

Page 54

1  looking for a ship to join?
2      A.    Yes.
3      Q.    And the reason why you wanted to join
4  a ship was because you wanted to go back to work?
5      A.    Yes.
6      Q.    Okay. And that's how you make a
7  living, by going to sea?
8      A.    Yes.
9      Q.    Okay. Now, you signed this contract
10  when?
11      A.    I don't remember, sir.
12      Q.    Take a look at the document. And it
13  says at the bottom, "In witness whereof the parties
14  have" --
15          MR. PHILLIPS: Objection. I don't
16  even know what you are referring to right now.
17          MR. CHALOS: The contract of
18  employment.
19          MR. WOODWARD: CSME 8.
20          MR. PHILLIPS: Is it in evidence? Is
21  there an exhibit on it?
22          MR. CHALOS: We have it.
23          MR. WOODWARD: There is an exhibit.
24          MR. CHALOS: It is an exhibit.

Page 55

1          MR. WOODWARD: It has been marked.
2          MR. PHILLIPS: It has not been marked,
3  and I don't have a copy of it.
4          MR. CHALOS: Let's take care of the
5  formalities.
6  BY MR. CHALOS:
7      Q.    You have already testified, Mr. Conge,
8  that this is your employment contract, right?
9      A.    Yes.
10          MR. CHALOS: Okay. Now, we move into
11  evidence CSME Defendants' Exhibit 8, Mr. Conge's
12  employment contract.
13          MR. PHILLIPS: We need a copy of it.
14          MR. CHALOS: You need a copy. Okay.
15  One second.
16          MR. WOODWARD: Why don't you just show
17  it to him right now so he can see it.
18          MR. CHALOS: I have another one.
19          MR. WOODWARD: That is marked?
20          MR. CHALOS: No.
21  BY MR. CHALOS:
22      Q.    Okay, Mr. Conge, where did you join
23  the vessel, meaning when did you go to work?
24      A.    What do you mean by that?

Page 56

1      Q.    Okay. Well, where did you get on the
2  ship?
3      A.    Tema, Ghana, Africa.
4      Q.    Okay. So before you got on board the
5  ship, you had to go to the crewing agent's office to
6  sign the contract; right?
7      A.    Yes.
8      Q.    Okay. And when you went, you were
9  given some training; right?
10      A.    Yes.
11      Q.    And some of that training was related
12  to the company's SMS, safety management system?
13      A.    Yes.
14      Q.    And part of that training included the
15  company's environmental protection policy; right?
16      A.    Yes.
17      Q.    Okay. So before you got on board the
18  ship, you had to learn about the company's policies
19  with respect to protecting the environment; right?
20      A.    Yes.
21      Q.    Okay. Now, take a look, Mr. Conge, at
22  the second page of that exhibit. Now, this is a
23  declaration that you signed?
24      A.    Yes, yes.

Page 57

1      Q.    Okay. And I will focus your attention
2  to the bottom. That's your signature?
3      A.    Yes.
4      Q.    Okay. Now, and it says in sum and
5  substance — well, I will withdraw that and we will
6  just move on.
7          MR. CHALOS: Now, I would like to mark
8  this as the next exhibit. I am sorry to ask.
9  Actually, you know what? I can --
10          (Discussion off the record.)
11  BY MR. CHALOS:
12      Q.    I am going to show you what was marked
13  previously as CSME Deposition, Defendants' Deposition
14  Exhibit No. 7. Okay. Now, earlier today Mr. Tudor
15  identified that as the Chian Spirit environmental
16  protection policy. Is he right?
17      A.    Yes.
18      Q.    Now, a copy of that policy was
19  provided to you during your training; right, before
20  getting on board the ship?
21      A.    Yes, yes.
22      Q.    Okay. And copies of that were also
23  available on board the vessel; right?
24      A.    Yes.

Pascual Conge

16 (Pages 58 to 61)

Page 58

1    Q.    Okay. There was a copy of that in the
2  ship's office?
3    A.    Yes.
4    Q.    And a copy in the hallway?
5    A.    Yes.
6    Q.    And a copy in the mess room?
7    A.    Yes.
8    Q.    There was a copy on the bridge?
9    A.    Yes.
10    Q.    And there was a copy in the engine
11  room on the plywood bulletin board; right?
12    A.    Yes.
13    Q.    Okay. Now, I will take that back.
14  Thank you very much. I will take back number —
15  now — okay, Mr. Conge, I am going to show you what we
16  have marked as CSME Defendants' Deposition Exhibit
17  No. 9. I will ask you to just take a look at that.
18  And can you identify for the record what each page of
19  that exhibit is?
20    A.    This is the seaman book.
21    Q.    Wait a minute. Just so I am clear,
22  that is a photocopy of the first page of your seaman's
23  book?
24    A.    Page 1, yes.

Page 59

1    Q.    Okay. And what is the next page?
2    A.    This is seaman book.
3    Q.    Okay. And the next page. No, the
4  next page.
5    A.    Passport. Seaman book.
6    Q.    Okay. All right. Let's go back. The
7  first page you are correcting. That is a copy of your
8  passport?
9    A.    Passport, yes.
10    Q.    Okay. The second page of the exhibit
11  is a copy of your seaman book?
12    A.    Seaman book.
13    Q.    Okay. And the next page of the
14  exhibit. Next page?
15    A.    Seaman book.
16    Q.    Okay. So the third page is a copy of
17  your seaman book?
18    A.    Yes.
19    Q.    Okay. And the next page?
20    A.    Seaman book.
21    Q.    Okay. So is it fair to say that all
22  four pages are copies of documents that you needed in
23  order to go to work as the third engineer on the Irene
24  E.M.?

Page 60

1    A.    Yes.
2        MR. CHALOS:  Okay. I would like to
3  move CSME Defendants' Exhibit No. 9 into evidence.
4        MR. PHILLIPS:  No objection.
5        MR. CHALOS:  Okay.
6        (Recess taken.)
7  BY MR. CHALOS:
8    Q.    Mr. Conge, I am going to show you what
9  we have previously marked as CSME Deposition
10  Defendants' Deposition Exhibit No. 10. I ask you to
11  take a look at those documents. (Pause)
12        Mr. Conge, are those all certificates
13  for various training sessions you attended before you
14  boarded the Irene E.M.?
15    A.    Yes.
16    Q.    Okay. And take a look at the first
17  page of that exhibit. It says, "Bright Maritime
18  certificate of attendance in-house training program."
19  Do you see that?
20    A.    Yes.
21    Q.    It says, "For having attended a
22  seminar on the International Safety Management Code
23  and have been briefed on the policies and safety
24  management system of Chian Spirit from October 17

Page 61

1  through October 18, 2005." Now, did you attend that
2  training program?
3    A.    Yes.
4        MR. CHALOS:  And I would like to move
5  into evidence what we previously marked as CSME
6  Deposition Exhibit 11.
7        MR. PHILLIPS:  No objection.
8  BY MR. CHALOS:
9    Q.    Okay. Now, also, Mr. Conge, I would
10  like to show you what we have marked as CSME
11  Deposition Exhibit 11. And for the record, I will
12  identify it as a series of five documents —
13        MR. WOODWARD:  Excuse me. What you
14  just moved in was 10?
15        MR. CHALOS:  Yes.
16        MR. WOODWARD:  I think he said 11.
17        MR. CHALOS:  If I misspoke, so the
18  record is clear, what we have just moved in is CSME
19  Defendants' Deposition Exhibit No. 10 without
20  objection from the government.
21        MR. PHILLIPS:  No objection.
22  BY MR. CHALOS:
23    Q.    Mr. Conge, looking at Defendants' CSME
24  Exhibit 11, is that a copy of your license and

Corbett & Wilcox

Pascual Conge

Page 52

1  endorsements by the flag state for the Irene E.M.?
2      A.    Yes.
3      Q.    Okay. So let me just be clear. The
4  first page is a copy of your third engineer's license?
5      A.    Yes.
6      Q.    And behind that are the certificates
7  which the flag state administration for the Irene E.M.
8  vessel issued as endorsements to your license?
9      A.    Yes.
10     Q.    Okay. Now, before you were able to go
11 on board the ship, did you have to obtain a second
12 license or another third engineer's license from the
13 flag state for the vessel?
14     A.    No.
15     Q.    Okay. Fine. The flag state just
16 endorsed your prior license?
17     A.    Third engineer.
18     Q.    Okay. Did you have to get a third
19 engineer's license from the flag state?
20     A.    Yes, because this is my license, third
21 engineer.
22     Q.    Okay. So I am clear, by the time you
23 got on board the Irene E.M., you had a third
24 engineer's license issued in the Philippines?

Page 63

1      A.    Yes.
2      Q.    And then you had another third
3  engineer's license from the flag state administration?
4      A.    Yes.
5      MR. CHALOS: Okay. Now, also, the
6  last question before we take a break for today,
7  Mr. Conge -- for the record, I would like to move into
8  evidence what has previously been marked as CSME
9  Defendants' Deposition Exhibit No. 11.
10     MR. PHILLIPS: I think that's --
11     MR. CHALOS: The engineer license.
12     MR. PHILLIPS: Yes. No objection.
13 BY MR. CHALOS:
14     Q.    Okay. Now, Mr. Conge, before you went
15 on board -- before you were permitted to go on board
16 the vessel to go to work, did you have to go to a
17 doctor for a physical examination?
18     A.    Yes.
19     Q.    And the company required that you be
20 checked and make sure you are fit for service; right?
21     A.    Yes.
22     Q.    Okay. And that is because they don't
23 want anything to happen to you on board?
24     A.    Yes.

Page 64

1      Q.    They want to make sure you are in good
2  health?
3      A.    Yes.
4      Q.    Okay. Now, I am going to show you
5  what has been previously marked as CSME Defendants'
6  Deposition Exhibit No. 12 and ask if you can identify
7  that -- I ask you if you can confirm that those are
8  records of your medical examinations prior to joining
9  the Irene E.M.
10     A.    Yes.
11     MR. CHALOS: Okay. Thank you very
12 much. This is probably a very good time to take a
13 break.
14     MR. PHILLIPS: Are you going to put
15 that into evidence?
16     MR. CHALOS: Oh. Yes, just before we
17 break, I would like to move CSME Defendants'
18 Deposition Exhibit No. 12 into evidence.
19     MR. PHILLIPS: No objection.
20         - - -
21     (Deposition adjourned at 5:22 p.m.)
22         - - -
23
24

Page 65

1  I HAVE READ THE FOREGOING DEPOSITION, AND IT IS TRUE
2  AND CORRECT TO THE BEST OF MY KNOWLEDGE.
3
4
5
6              PASCUAL CONGE
7
8              INDEX
9  PLAINTIFFS' WITNESSES  Direct  Cross  Redir.  Recr.
10 Pascual Conge          3      48     --     --
11 GOVERNMENT'S EXHIBITS                    Marked
12 1 Irene E.M. oil record book———————— 19
13 2 Two plastic pipes————————————— 22
14 3 Flanges————————————————————— 29
15 CSME DEFENDANTS' EXHIBITS
16 8 Employment contract dated 9/15/05, between
17   Chian Spirit and Mr. Conge——————— 30
18 9 Copy of Mr. Conge's passport and seaman's
19   book—————————————————————— 30
20 10 Mr. Conge's Bright Maritime certificate
21   of attendance for ISM seminar 10/17-18/05-- 30
22 11 Mr. Conge's Philippine and flag state
23   third engineer's licenses—————————— 30
24 12 Mr. Conge's medical exam report dated 9/9/05  30
   13 Mr. Conge's handwritten statement dated
   12/9/05.————————————————————— 30

Corbett & Wilcox

Pascual Conge

18 (Pages 66 to 67)

Page 66

1  CSME DEFENDANTS' EXHIBITS, Cont'd.          Marked
2  14 Four-page handwritten statement signed
   by Mr. Conge and others——————— 30
3
   15 Letter dated 1/11/06, from Mr. Connolly to
4   Mr. Twersky——————————— 30
5  16 Declaration of Pascual Conge, dated 6/26/06  30
6                      - - -
7  (Government's Exhibit Nos. 1 through 5 retained
   by Mr. Phillips.  CSME Exhibit Nos. 8 through 16
8  attached to original transcript and copies.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 67

1           CERTIFICATE
2           I, LORRAINE B. MARINO, Registered
3  Diplomate Reporter and Notary Public, do hereby
4  certify that the witness, PASCUAL CONGE, after being
5  duly sworn by me, was examined by counsel for the
6  respective parties and the questions of said witness
7  and his answers were taken down by me in stenotype
8  notes and thereafter transcribed into typewriting at
9  my direction.
10          I certify that the foregoing is a true
11 and correct transcript of the testimony given at said
12 examination of said witness.
13          I further certify that the deposition
14 was made available to the witness for reading and
15 signing.
16          I further certify that I am not
17 counsel, attorney, or relative of either party, or
18 otherwise interested in the event of this suit.
19
20
21
           Registered Diplomate Reporter and Notary Public
22         Certificate No. 181PS/Exp.: Permanent
23
   Date: 7/24/06
24

Corbett & Wilcox

Pascuale Conge

Page 68

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

UNITED STATE OF AMERICA,

     Plaintiff,

          vs.

CHIAN SPIRIT MARITIME
ENTERPRISES, INC., VENETICO
MARINE S.A., IRENE E/M,
EVANGELOS MADIAS, CHRISTOS
PAGONES, ADRIEN DRAGOMIR,

     Defendants.

: No.
: 1:06-CR-00076-GMS-2
:
:
:
:

:

              Videotaped deposition of PASCUALE
CONGE, Volume II, taken pursuant to notice before
Gail Inghram Verbano, CSR, RMR, in the offices of
United States Department of Justice, 700 Nemours
Building, 1007 Orange Street, Wilmington, Delaware,
on Monday, July 17, 2006, beginning at approximately
10:50 a.m..

CORBETT & WILCOX
Registered Professional Reporters
1400 French Street    Wilmington, DE 19801
(302) 571-0510
www.corbettreporting.com

Pascuale Conge

2 (Pages 69 to 72)

Page 69

1   APPEARANCES:
2       MARK W. KOTILA, ESQ.
        JEFFREY L. PHILLIPS, ESQ.
3       United States Department of Justice
        Environmental Crimes Section
4       P.O. Box 23985 - L'Enfant Plaza
        Washington, DC 20026-3585
5       Attorneys for Plaintiff
6       GEORGE M. CHALOS, ESQ.
        FOWLER, RODRIGUEZ & CHALOS
7       366 Main Street
        Port Washington, NY 11050
8       Attorney for Defendants Chian Spirit
        and Venetico Marine
9
        CARL R. WOODWARD, III, ESQ.
10      CARELLA, BYRNE, BAIN, GILFILLAN,
        CECCHI, STEWART & OLSTEIN
11      5 Becker Farm Road
        Roseland, NJ 07068-1739
12      Attorney for Defendant Dragomir
13  ALSO PRESENT:
14      Chris Weiss, Videographer
        Chris Masaoay, Tagalog Interpreter
15
        Adrien Dragomir
16      Liviu-Lee Roth
        Brent McKnight
17      Jason F. Burgess
18
19
20
21
22
23
24

Page 70

1       THE VIDEOGRAPHER: This is Chris
2   Weiss, the videographer, and the court reporter today
3   is Gail Verbano. We are both here from the firm of
4   Corbett & Wilcox, located at 230 North Market Street
5   Wilmington, Delaware.
6       The time is 10:50 a.m., on Monday,
7   July 17th, 2006. We are documenting the videotaped
8   deposition of Pascuale Conge for the Plaintiff in the
9   matter of the United States of America versus Chian
10  Spirit Maritime Enterprises, Inc., Venetico Marine,
11  Irene E.M., Evangelos Madias, Christos Pagones,
12  Adrien Dragomir, in the United States District Court,
13  District of Delaware.
14      We are at the location of the
15  United States Attorney's Office, Nemours Building,
16  1007 North Orange Street, Suite 700, Wilmington,
17  Delaware.
18      Will the attorneys please state
19  their appearance for the record.
20      MR. KOTILA: Mark Kotila on behalf
21  of the United States.
22      MR. PHILLIPS: Jeffrey Phillips,
23  United States.
24      MR. CHALOS: George Chalos for

Page 71

1   Venetico and Chian Spirit.
2       MR. WOODWARD: Carl Woodward on
3   behalf of Adrien Dragomir.
4       MR. TWERSKY: Mike Twersky on
5   behalf of the witness.
6       MR. CHALOS: Just before we begin,
7   on Friday when we left off, we left the exhibits with
8   the court reporter. Do we have them available?
9       MR. PHILLIPS: She says that you
10  have the last three that you tried to put in.
11      MR. CHALOS: I have the last three
12  we marked but we didn't offer yet, but I don't have
13  the first 12.
14      Great. Thank you.
15      (CHRIS MASAOAY was previously sworn
16  in as Tagalog-English interpreter.)
17  - - -
18      PASCUALE CONGE, having first been
19  previously duly sworn through the interpreter
20  according to law, was examined and testified further
21  as follows:
22  - - -
23          CROSS-EXAMINATION
24  BY MR. CHALOS:

Page 72

1   Q   Good morning, Mr. Conge.
2   A   Good morning as well.
3   Q   Mr. Conge, do you understand that this is
4   a continuation of your Federal Rule of Criminal
5   Procedure Rule 15 deposition?
6   A   Yes.
7   Q   And do you understand that you're still
8   under oath?
9   A   Yes.
10  Q   Okay. Now, Mr. Conge, what did you do
11  over the weekend?
12  A   I just stayed in the hotel.
13  Q   Did you discuss your testimony with
14  anybody?
15  A   No, I did not.
16  Q   Did you meet with anyone from the
17  Government?
18  A   No, I didn't.
19  Q   Did you meet with anybody from the Coast
20  Guard?
21  A   When we came to pick us up in the hotel.
22  Q   Okay. And when was that?
23  A   Sunday.
24  Q   When the Coast Guard picked you up from

Pascuale Conge

Page 73

1 the hotel, where did they take you?
2     A    Here in the hotel.
3     Q    So did you —
4     A    The Doubletree Hotel.
5     Q    So on Sunday is it fair to say that you
6 changed hotels?
7     A    Yes, sir.
8     Q    And the Coast Guard assisted you with
9 that move?
10    A    Yes.
11    Q    Now, during the time that you were with
12 the Coast Guard, did you discuss this proceeding?
13    A    No, we did not.
14    Q    All right. Let's go back to where we
15 left off.
16         You were the third engineer on
17 board the Irene R.M.; correct?
18    A    Yes.
19    Q    And there came a time that you were asked
20 to get off the ship; right?
21    A    Yes.
22    Q    When was that?
23    A    I don't remember.
24    Q    Was it before Christmas, after Christmas

Page 74

1 or something else?
2     A    January 3.
3     Q    So the record is clear that you recall
4 being asked to come off the ship on or about
5 January 3, 2005? 2006. I misspoke, I'm sorry.
6     A    Yes.
7     Q    And who asked you to come off the ship?
8     A    The Coast Guard.
9     Q    Did the Coast Guard tell you why they
10 wanted you to come off the ship?
11    A    I really don't know. I don't remember.
12    Q    But is it fair to say that you came off
13 the ship and remained in the United States since
14 January 3rd?
15    A    Yes.
16    Q    Because the Coast Guard asked you to?
17    A    They didn't ask me to do anything. They
18 just asked us to get off the ship.
19    Q    And they also asked you to stay in the
20 United States; right?
21    A    Yes.
22    Q    Now, you weren't here voluntarily, were
23 you?
24    A    No.

Page 75

1     Q    It was because the Coast Guard made you
2 stay; right?
3     A    We are here because we are a witness to
4 this case.
5     Q    And a witness for the Government; right?
6     A    Yes, sir.
7     Q    You told us the other day that you work
8 12:00 to 4:00 in the afternoon and 12:00 to 4:00 at
9 night in the engine room; correct?
10    A    Yes, sir.
11    Q    And when you work, you're the duty
12 engineer during those times; correct?
13    A    Yes.
14    Q    And during those times that you're the
15 duty engineer, you have someone that works for you
16 an oiler; correct?
17    A    Yes, sir.
18    Q    And your oiler was a gentleman named
19 Felix Bersamino?
20    A    Yes, sir.
21    Q    Felix Bersamino was also asked to come
22 off the ship and stay in the United States on or
23 about January 3rd, 2006; right?
24    A    Yes, sir.

Page 76

1     Q    And he stayed in the same hotel where you
2 were?
3     A    Yes, sir.
4     Q    And when you were in the engine room, he
5 was working in the engine room; right?
6     A    Yes, sir.
7     Q    And he would have seen what you would
8 have seen during your ship?
9         MR. PHILLIPS: Objection;
10 speculation.
11         THE WITNESS: Sometimes I don't
12 know what he's doing sometimes. Sometimes he would
13 make his rounds, and I also do my rounds.
14 BY MR. CHALOS:
15    Q    Okay. But whatever Mr. Bersamino would
16 do, he would do following your instructions; correct?
17    A    Yes.
18    Q    And so you were Mr. Bersamino's boss?
19    A    Yes, sir.
20    Q    Now, Mr. Bersamino is not here anymore,
21 is he?
22    A    No, sir. He's already in the
23 Philippines.
24    Q    When did he go back to the Philippines?

Corbett & Wilcox

Pascuale Conge

4 (Pages 77 to 80)

Page 77

1    MR. PHILLIPS: Objection;
2  speculation.
3         THE WITNESS: I don't remember the
4  date.
5  BY MR. CHALOS:
6    Q  A long time ago?
7    A  I don't remember the date, sir.
8    Q  Well, was it in January?
9    A  March or April.
10   Q  Okay. And did Mr. Bersamino tell you why
11 he was allowed to go and you weren't?
12   A  I don't know.
13   Q  Do you have any idea why he was allowed
14 to go and you weren't?
15   A  No, I don't, sir.
16   Q  Now, before you joined the Irene E.M.,
17 you had been at sea as a sailor for 13 or 14 years;
18 is that right?
19   A  Yes, sir.
20   Q  And before you got on board the Irene
21 E.M., you had gone for various training and seminars
22 in the Philippines?
23   A  Yes, sir. Yes, sir.
24   Q  And also you went for an in-house

Page 78

1  training at the crewing agent?
2    A  Yes.
3    Q  And at that training session, you learned
4  Chian Spirit's environmental protection policy;
5  correct?
6    A  Yes, sir.
7    Q  And before you got on board the ship, you
8  had learned that it was wrong to dump oil or oily
9  wastes into the sea; correct?
10   A  Yes, sir.
11   Q  And you were also trained that if you had
12 observed anyone doing that, you were supposed to
13 report that to the chief engineer, the captain or the
14 company; right?
15   A  Yes, sir.
16   Q  And you also knew if someone on board the
17 ship was dumping oil or oily waste into the sea, that
18 the company could get into trouble?
19   A  Yes, sir.
20   Q  And I think we talked about this the last
21 time, but just so the record is clear, the Chian
22 Spirit environmental policy, the environmental
23 protection policy was posted on the ship in several
24 places?

Page 79

1    A  Yes, sir.
2    Q  And just so the record is clear -- I
3  think we covered this -- that was available and
4  easily in view for the crew in the engine room?
5    A  Yes.
6    Q  And the hallways?
7    A  Yes.
8    Q  And the mess room?
9    A  Yes.
10   Q  And the ship's office?
11   A  Yes.
12   Q  And on the bridge?
13   A  Yes, sir.
14   Q  You boarded the ship in Africa at the end
15 of October 2005?
16   A  Yes, sir. Yes, sir.
17   Q  And then after Africa, the ship went to
18 Brazil; right?
19   A  Yes, sir.
20   Q  And at what point in time did you learn
21 that the ship was going to come to the United States?
22        MR. PHILLIPS: This is asked and
23 answered. Objection.
24        THE WITNESS: I don't remember

Page 80

1  that.
2  BY MR. CHALOS:
3    Q  Okay. You told Mr. Phillips the other
4  day that there was an incident where some oil wastes
5  were discharged overboard on or about November 23rd,
6  2005. Do you recall that testimony?
7    A  Yes, sir.
8    Q  Okay. Now, at the time that that
9  happened, you didn't know the ship was coming to the
10 United States, did you?
11        MR. PHILLIPS: Objection. That's
12 asked and answered.
13        THE WITNESS: No, I did not.
14 BY MR. CHALOS:
15   Q  And you also told Mr. Phillips about a
16 second time where there might have been some oily
17 waste dumped overboard about six days before arrival
18 in the United States?
19   A  Six days before we arrived at the United
20 States, that was the second time that we had pumped
21 out. This was turned over to me by the fourth
22 engineer that the bilge tank should have -- should be
23 emptied. He made a sounding to pump out the bilge
24 tank. And so I started the pump, and I was the one

Pascuale Conge

Page 81

1   that stopped it as well. It was turned over to me by
2   the fourth engineer.
3       Q   Okay. So the record is clear and so I
4   understand what you're saying, are you telling us
5   that the second time that you're aware that oil was
6   pumped over the side, the pumps were started by
7   someone else, meaning the fourth engineer?
8       A   Yeah. Yeah.
9       Q   So if you told us on Friday that you
10  turned the pumps on yourself – if I understood,
11  that's what you said last Friday – that would be
12  wrong?
13      A   Yes. I was the one that started it.
14      Q   Okay. So let me see if I understand it.
15          The second time, about six days
16  before arrival in the United States, you started the
17  pump?
18      A   Yes, sir.
19      Q   And at the time you started the pump, you
20  intended to discharge oily wastes into the sea;
21  right?
22      A   Yes, sir.
23      Q   Now, did you personally tell the chief
24  engineer that you were doing this?

Page 82

1       A   Because it was turned over to me by the
2   fourth engineer.
3       Q   Okay. Just listen to my question. Yes
4   or no, did you tell the chief engineer that you were
5   turning on the pumps or you had turned on the pumps
6   to discharge oily wastes into the sea?
7       A   No, because that was a turned over to me
8   by the fourth engineer.
9       Q   My question is yes or no. And the answer
10  to my question is no, right, you didn't tell the
11  chief?
12      A   No, no. Yes –
13      Q   So the record is clear, no, you never
14  told the chief engineer what you did?
15      A   No, I did not. It was a turnover to me
16  by the fourth engineer.
17      Q   Okay. Now, did you ever tell the captain
18  what you did?
19      A   No, I did not.
20      Q   Did you ever tell anybody from the
21  company before arrival what you did?
22      A   No, I did not, because they don't really
23  talk to me. It's only the second engineer that they
24  speak to. The second engineer is the highest-ranking

Page 83

1   MOS. He is the one that directs the work flow as to
2   what we need to do.
3       Q   All right. Let me just go over this one
4   more time.
5           Mr. Conge, you never told either
6   the owner -- strike that.
7           You never told the owner what you
8   were doing on board the ship before arrival in the
9   United States; right?
10      A   No, I did not.
11      Q   And you never told the manager before
12  arrival what you were doing on board the ship?
13      A   No, I did not.
14      Q   You never told the captain what you were
15  doing on board the ship before arrival in the U.S.?
16      A   No, I did not, sir.
17      Q   And you never told Chief Engineer
18  Dragomir what you were doing before arrival in the
19  U.S.?
20      A   No, I did not. Because they and the
21  second engineer, they're the two that are always
22  talking with each other.
23      Q   Okay. So let me see if I got this right.
24          At the time that you turned the

Page 84

1   pump on, you knew that it was wrong; right?
2       A   I know that, sir.
3       Q   And you knew it was illegal?
4       A   Yes, sir.
5       Q   And you knew that you could get in
6   trouble for it?
7       A   Yes, I know that, sir. That was an order
8   that was made to me. If I don't -- if I don't follow
9   the orders, then they would send us home and I would
10  lose my job.
11          MR. CHALOS: Okay. Well, wait a
12  minute. I move to strike the portion nonresponsive
13  from the record.
14  BY MR. CHALOS:
15      Q   At the time that you turned the pumps on,
16  Mr. Conge, you knew that the operator of the ship and
17  the owner of the ship could also get in trouble;
18  right?
19      A   Yes, sir.
20      Q   So you didn't think that your actions
21  were for the benefit of the company at all, did you?
22      A   No, sir. That was just an order that was
23  given to me.
24      Q   But now, even though you know what you

Pascuale Conge

6 (Pages 85 to 88)

Page 85

1 did was wrong, the Government has made a promise to
2 you in this case; right?
3    A   No, they didn't tell us anything.
4    Q   Well, didn't the Government promise you
5 that if you came here and told us about the
6 discharging overboard, that you wouldn't get in
7 trouble?
8    A   Yes, I know that. I know that I could be
9 in trouble.
10   Q   But the Government promised you that if
11 you came here and testified about —
12        MR. PHILLIPS:  Objection.  That's
13 not what he testified to.
14        MR. CHALOS:  Okay.  Fine.  Let me
15 rephrase my question.
16 BY MR. CHALOS:
17   Q   You're aware, are you not, that the
18 Government made a promise to you that if you came and
19 cooperated with the Government and testified about
20 what happened on board the ship, you wouldn't get in
21 trouble?
22   A   No, they didn't tell us that.
23   Q   Okay.  Well, let's take a look at your
24 Grand Jury testimony.

Page 86

1        Do you remember, Mr. Conge,
2 testifying before the Grand Jury?
3    A   Yes, sir.
4    Q   Do you remember Mr. Faigowski, the local
5 U.S. Attorney, asked you some questions?
6    A   Yes, sir.
7    Q   And do you remember Mr. Falgowski saying
8 to you, "However" -- this is on Page 4, beginning at
9 Line 4.
10        Do you remember on or about
11 February 2nd, 2006, coming here to Delaware?
12   A   Yes, sir.
13   Q   And do you remember Mr. Falgowski saying
14 to you "However, the agreement that we've reached is
15 that if you tell the truth, we won't prosecute you,
16 even if you did commit a crime.  Is that your
17 understanding?"
18        Your answer "Yes."
19        "And so you just have to tell us
20 the truth."
21        And your answer:  "Yeah, yeah."
22        And then a little further down
23 beginning on Line 14, Mr. Falgowski said, "And also,
24 is it fair to say that you've been advised that you

Page 87

1 are not a subject and you're not a target of this
2 investigation?"
3        And your answer was, "I
4 understand."
5        Do you remember that?
6    A   Yes, I do.  Yes.
7    Q   So it's fair to say that the Government
8 made a promise to you that if you cooperate with the
9 Government, that you wouldn't get in trouble for
10 doing something that you knew was wrong?
11   A   No, sir.
12   Q   Let's take this again slowly.
13        You knew starting the pumps was
14 illegal; right?
15   A   Yes, I know, sir.
16   Q   And you knew you could get in trouble for
17 it?
18   A   Yes, sir.
19   Q   And you know that the Government told you
20 that they won't take any action against you if you
21 cooperate in their prosecution; right?
22   A   Yes, sir.
23   Q   And that's the basis why you're here
24 today?

Page 88

1    A   Yes, sir.  Yes, sir.
2    Q   And you expect that once you finish with
3 this, you'd be free to return to your home?
4    A   Yes, sir.
5    Q   And I'm just going to show you what we've
6 marked previously as CSME Defendants' Exhibit
7 Exhibit 15.  It's a little out of order.  There's a
8 couple other exhibits we haven't looked at yet.
9        (Discussion held off the record.)
10 BY MR. CHALOS:
11   Q   Mr. Conge, I'm going to show you what
12 we've marked as Defendants' Exhibit 15 for the
13 record.  I'll make a representation, it's the same as
14 Defendants' Deposition Exhibit No. 5.  It's just a
15 scrivener's error in re-marking.
16        And I'll move its admission, which
17 I believe has already addressed previously.
18        (Document marked CSMR Exhibit 15
19 moved into evidence.)
20 BY MR. CHALOS:
21   Q   Now, Mr. Conge, have you seen that
22 document before today?
23   A   Just now, sir.
24   Q   Okay.  Let's go back and talk about the

Corbett & Wilcox

Pascuale Conge

7 (Pages 89 to 92)

Page 89

1  first time -- the first of the two times that you
2  believe you saw a magic pipe being used to discharge
3  overboard.
4           Okay. You said that the first time
5  you saw it being used was on or about November 23rd,
6  2005?
7     A   Yes, sir.
8     Q   And you told Mr. Phillips that; right?
9     A   Yes, sir.
10    Q   How do you know it was November 23rd?
11    A   I know that, sir, because in our engine
12  room there is a table, a small table. That logbook,
13  it's there on top of the table. And so I had read
14  that order by the chief engineer. It was written
15  with a red ink ball pen.
16    Q   Well, Mr. Conge, have you ever seen this
17  logbook since you've gotten off the ship?
18    A   That book, I had not seen it since we
19  arrived here in the States.
20    Q   So is it fair to say that since you got
21  off the ship, you've never seen this logbook with
22  that entry?
23    A   No, I have not seen it, because it was
24  collected by the chief engineer and put in his cabin.

Page 90

1     Q   Did the Coast Guard take it?
2         MR. PHILLIPS: Objection;
3  speculation.
4         THE WITNESS: No.
5  BY MR. CHALOS:
6     Q   Okay. Well, has either Mr. Phillips or
7  Mr. Kotila ever showed this to you since you've been
8  here?
9     A   No, because that logbook, it's a large
10 book. It's an engine logbook. That's where the
11 chief engineer had written down the order "Out of
12 engine room bilge," and the ball pen that was used
13 was red.
14        That was an order made by the chief
15 engineer. If the chief engineer did not order us to
16 do that, then we wouldn't have done the pump-out.
17        The chief engineer is the highest
18 officer among us. We just follow the orders, the
19 orders that he makes. If we don't follow his orders,
20 then we would be sent home. We would lose our jobs.
21    Q   Mr. Conge, let me just ask my question
22 again. My question to you was, has the Government
23 ever shown you this logbook, since you've been here?
24    A   I don't remember.

Page 91

1     Q   You don't remember — you've met with the
2  Government several times; right?
3     A   Yeah, yeah.
4     Q   And you met with them before your Grand
5  Jury testimony; right?
6     A   Yeah.
7     Q   You met with them the day of your Grand
8  Jury testimony?
9     A   Yes, yeah.
10    Q   You met with them preparing for Friday?
11    A   Yeah.
12    Q   And you're here again today?
13    A   Yeah.
14    Q   And you met with the Coast Guard guys a
15 couple times?
16    A   Yeah.
17    Q   And in all those meetings, you don't
18 remember if you ever saw this logbook?
19        MR. PHILLIPS: Objection; asked and
20 answered. He said he hasn't seen it since he got to
21 the United States.
22        THE WITNESS: That logbook, it's a
23 large book.
24 BY MR. CHALOS:

Page 92

1     Q   Well, Mr. Conge, listen to my question.
2  It's very simple: You don't remember if anyone from
3  the Government or the Coast Guard has showed you this
4  logbook since you got off the ship, do you?
5         MR. PHILLIPS: Objection; asked and
6  answered.
7         THE WITNESS: I don't remember
8  that.
9         MR. CHALOS: Okay. We've got to
10 take a break, I guess.
11        THE VIDEOGRAPHER: Off the record
12 at 10:34.
13        (Discussion held off the record.)
14        THE VIDEOGRAPHER: On the record at
15 10:34.
16 BY MR. CHALOS:
17    Q   Now, Mr. Conge, you just told us before,
18 and you told Mr. Phillips on Friday, that you believe
19 that you need to follow the chief engineer's orders
20 or else you might lose your job; right?
21    A   Yes, sir.
22    Q   Did Chief Engineer Dragomir, the
23 gentleman sitting here —
24    A   Yes, sir. Yes, sir.

Corbett & Wilcox

Pascuale Conge

8 (Pages 93 to 96)

Page 93

1    Q    He's the chief engineer; right?
2    A    Yes, sir.
3    Q    He never said to you personally, "Pump
4    out overboard or else you're going to lose your job,"
5    he did?
6    A    No, he didn't, sir.
7    Q    Okay. Now, in fact, Mr. Dragomir never
8    told you personally to discharge anything overboard;
9    right?
10    A    Yes, sir.
11    Q    "Yes, sir" meaning he never told you;
12    right?
13    A    He did not order me personally; he
14    ordered the second. It's written in the logbook.
15    When I went down for my duty, it
16    was turned over to me by the fourth engineer. And so
17    I read what was written by the chief engineer that
18    pump was already working.
19    Q    So let me see if I understand this right.
20    It's fair to say that Chief
21    Engineer Dragomir never personally spoke to you and
22    ordered you to discharge overboard?
23    A    No, he did not, sir.
24    Q    Okay. Now, there came a time, right, on

Page 94

1    board the ship shortly after arrival in the United
2    States that the Coast Guard gathered all the crew in
3    the mess room. Do you remember that?
4    A    Yeah.
5    Q    And Mr. McKnight, the gentleman over
6    here, was there?
7    A    Yeah.
8    Q    And Mr. McKnight asked you to write down
9    what happened on board the ship; right?
10    A    Yes, sir.
11    Q    Now, I want to show you what we've
12    premarked as CSME Defendants' Deposition Exhibit
13    13 — show it to the Government and I'll show it to
14    you.
15    Mr. Conge, I'm going to show you
16    what we marked as Defendants' Exhibit No. 13.
17    Now, Mr. Conge, is that your
18    signature on top of the diagonal line?
19    A    Yeah, yeah.
20    Q    And this is a document that you prepared
21    on or about December 9th, 2005, in your own
22    handwriting; correct?
23    A    Yes, sir.
24    Q    And we can agree, Mr. Conge, that

Page 95

1    December 9th, 2005, is a lot closer to November 23rd,
2    2005, than today?
3    A    Could you repeat your question.
4    Q    Yeah. Well, December 9th is about 15,
5    16, 17 days after November 23rd; right?
6    A    Yes, sir.
7    Q    Okay. Well, you remember the months of
8    the year; right?
9    A    Yeah.
10    Q    And you know how to count to 30 or 31
11    right?
12    A    Yeah.
13    Q    So December 9th was a lot closer to
14    November 23rd than today?
15    A    Yes.
16    Q    And your memory of the events of
17    November 23rd would have been a lot fresher than they
18    are today; right?
19    A    Yes, sir.
20    Q    Do you write anywhere in your statement
21    on December 9th that you pumped out on the 23rd of
22    November?
23    A    It is put in that general statement that
24    was made by the second engineer. This one, this is

Page 96

1    no good, because we had put everything in that other
2    document, written by the second engineer.
3    Q    Mr. Conge, I understand that you have a
4    story to tell, but I'd like you to just answer my
5    questions.
6    When you wrote the statement at the
7    request of Mr. McKnight from the Coast Guard, you
8    didn't write anything about discharging on
9    November 23rd, did you?
10    A    No, sir, because this was about the oily
11    water separator.
12    Q    So the answer to my question is, no, you
13    didn't write anything about discharging overboard on
14    November 23rd when you wrote this on December 9th,
15    2005?
16    A    No, sir, I did not.
17    Q    Okay. Now, and you also didn't write
18    about discharging overboard twice, did you?
19    A    No, sir.
20    Q    Okay. Now — and then you turned this
21    over to the Coast Guard at their request; right?
22    A    Yes, sir.
23    MR. CHALOS: Thank you. I'd like
24    to move into evidence Defendants' Exhibit 13.

Help

Pascuale Conge

10 (Pages 101 to 104)

Page 101

1    Q    Now, it's a fact, is it not, that the
2    engine bilge wells were, from time to time, pumped
3    and pumped into a bilge storage tank; right?
4    A    Yes.
5    Q    And, in fact, when that pumping took
6    place, nothing went into the sea; right?
7    A    Sir, in the bilge well, it is put in the
8    bilge tank.
9    Q    And when you put materials from the bilge
10   well to the bilge tank, nothing goes into the sea;
11   right?
12   A    Yes, sir. But when the reading in the
13   bilge tank is up, the second engineer instructs us to
14   empty it out going overboard. The one that does that
15   work is the oiler.
16   Q    Okay. Now, Mr. Bersamino never did that
17   work, did he?
18   MR. PHILLIPS:  Objection;
19   speculation.
20   THE WITNESS:  Bersamino is my
21   oiler. Sometimes he's the one that pumps outside to
22   the bilge well. That is his job.
23   BY MR. CHALOS:
24   Q    Okay. And when Bersamino pumps from the

Page 102

1    bilge well, you pump it to the bilge tank; right?
2    A    Sometimes they don't let it pass through
3    the bilge tank. They directly do it overboard.
4    Q    And how many times did you see that with
5    your own eyes?
6    A    I don't remember, sir, because Bersamino
7    is the one who do this job for the bilge well.
8    Q    So you don't know if Mr. Bersamino did
9    that?
10   A    I don't remember, sir.
11   Q    You don't really know if he did that,
12   because you didn't do it?
13   A    Yes, sir.
14   Q    Okay. Now, you personally never
15   connected what you told us the other day was called
16   the magic hose; right?
17   A    No, I did not connect it.
18   Q    And you personally never disconnected a
19   magic hose?
20   A    No, sir.
21   Q    In fact, when you saw the chief
22   engineer's order in the logbook, you weren't sure
23   what it meant and you had to talk to the fourth
24   engineer; right?

Page 103

1    A    Yes, because he's the one that I follow.
2    Q    Okay. So really you didn't follow the
3    written order; you followed what the fourth engineer
4    told you; right?
5    A    No, sir. The order in the logbook, I
6    read it, and then it was turned over to me by the
7    fourth engineer. They were the ones that started it
8    first, doing the pumping.
9    Q    Now, when you read the order in the
10   engine logbook, you didn't expect that order to mean
11   to dump into the sea, did you?
12   A    When it's written "Out of engine room
13   engine," that means out at sea, overboard.
14   Q    Well, is that because you've done this
15   before on other ships?
16   MR. TWERSKY:  I'm going to object
17   and I'm going to instruct the witness not answer that
18   question on the basis of the Fifth Amendment.
19   Explain to him not to answer the
20   question.
21   THE WITNESS:  Yes.
22   MR. CHALOS:  Well, he's been given
23   immunity this deal. I don't know why he would invoke
24   the Fifth Amendment.

Page 104

1    MR. TWERSKY:  As I read the
2    immunity, it's limited to this case. If the
3    Government wants to expand it, that's another story.
4    BY MR. CHALOS:
5    Q    Mr. Conge, were you surprised when you
6    read the order?
7    A    Yes, I was surprised. Because, you know,
8    sir, when you write in the logbook, you cannot write
9    your order on the logbook saying that you need to
10   pump out overboard. That's against the law.
11   Q    Now, when you saw this order, you never
12   went up to the chief engineer to talk to him about
13   it, did you? Yes or no.
14   A    No, I did not.
15   Q    And when you saw the order, you never
16   went and talked to the captain about it, did you?
17   A    No, I did not.
18   Q    And you never called anybody. You have a
19   cell phone; right?
20   A    No, I did not. No one.
21   Q    Okay. So you just followed what you
22   thought was the chief's order?
23   MR. PHILLIPS:  Objection. This
24   whole line is asked and answered.

Pascuale Conge

11 (Pages 105 to 108)

Page 105

```
1              THE WITNESS: Yes, sir.
2   BY MR. CHALOS:
3       Q   Without checking with the chief engineer?
4              MR. PHILLIPS: Objection; asked and
5   answered twice.
6              THE WITNESS: No, I did not,
7   because the pump was already working when I got down
8   there. I was not the one that started it.
9   BY MR. CHALOS:
10      Q   Okay. And you don't know what, if
11  anything, the chief engineer said to the fourth
12  engineer? You weren't there; right?
13      A   No, I did not.
14      Q   Okay. Now, let's talk about the magic
15  hose.
16             MR. CHALOS: If I unhook this -- if
17  unhook this, will you still be able to pick me up?
18             Okay. Okay. Let me see?
19  BY MR. CHALOS:
20      Q   Mr. Conge, I'd like to --
21             MR. PHILLIPS: Jason, go and help
22  him.
23             MR. CHALOS: Can we go off the
24  record for a second.
```

Page 106

```
1              THE VIDEOGRAPHER: Off the record
2   at 10:54.
3              (Brief recess.)
4              THE VIDEOGRAPHER: We are on the
5   record at 11:01.
6   BY MR. CHALOS:
7       Q   Okay. Mr. Conge, remember the other day
8   in response to some questions by Mr. Phillips, you
9   identified what's been previously marked as, I
10  believe, Government Exhibit 1.
11             MR. PHILLIPS: No, it's not 1. I
12  think it's 2.
13             MR. WOODWARD: It's Government
14  Exhibit.
15  BY MR. CHALOS:
16      Q   2. These two hoses; right?
17             Just so the record is clear,
18  Mr. Conge, most ships that you've served on, if not
19  all of them, have flexible hoses on board; right?
20      A   Yes, there is.
21      Q   In fact, flexible hoses are standard
22  equipment on board ocean-going ships; right?
23      A   Yes.
24      Q   And there's many, many legitimate uses
```

Page 107

```
1   for flexible hoses on board; right?
2       A   Yes.
3       Q   And oftentimes they're even used for
4   internal transfers of oil and oily wastes; right?
5       A   Yes.
6       Q   Sometimes with fuel oils?
7       A   Yes.
8       Q   Sometimes with lube oils?
9       A   Yes.
10      Q   And sometimes with the generators?
11      A   Yes, sir.
12      Q   And sometimes with the boilers?
13      A   Yes.
14      Q   Okay. So just because there is flexible
15  hoses on board the Irene E.M., that doesn't mean that
16  there was something illegal going on, does it?
17      A   Yes.
18      Q   "Opo" is yes or no?
19      A   Yes, with respect.
20      Q   So, and you told us before that you never
21  connected the magic hose; right?
22      A   Yes.
23      Q   You've never done it?
24      A   Yes, sir.
```

Page 108

```
1       Q   And you've never disconnected it; right?
2       A   No, sir.
3       Q   And you don't know where it's stored on
4   board the ship; right?
5       A   No, I don't know, sir.
6       Q   So it's fair to say that you've never
7   handled the magic pipe or what you've identified as
8   magic pipe on board the ship?
9       A   I just saw it.
10      Q   Okay. My question was, you've never
11  handled it; right?
12      A   No, I did not.
13      Q   So you really don't know if this is the
14  magic pipe you saw, do you?
15             MR. PHILLIPS: Objection; asked and
16  answered.
17             THE WITNESS: I know that it is,
18  because on my duty it's always there. I see it.
19  It's attached to the delivery from the bilge pump
20  going out to sea. On my duty, on my specific duty, I
21  see it.
22  BY MR. CHALOS:
23      Q   What you're really saying is --
24             MR. PHILLIPS: Objection.
```

Pascuale Conge

12 (Pages 109 to 112)

Page 109

BY MR. CHALOS:
1
2  Q  -- you know that there's a hose, but you
3  don't know that this is the hose.
4       MR. PHILLIPS: Objection. He
5  can't --
6       THE WITNESS: I know that this is
7  it, because I see it on my duty. It's fixed -- it's
8  fixed in the bilge delivery going outside.
9       MR. PHILLIPS: Objection;
10  characterizing the testimony of the witness.
11       MR. WOODWARD: Cross-examination.
12  BY MR. CHALOS:
13  Q  Okay. Now, Mr. Conge, I'm going to show
14  you what was previously marked as Government
15  Exhibit --
16       MR. PHILLIPS: 3.
17       MR. CHALOS: 3?
18       MR. PHILLIPS: Yeah.
19  BY MR. CHALOS:
20  Q  And those are two metal pieces I think
21  you've identified as flanges; right?
22  A  Yes, sir.
23  Q  Now, on board the Irene E.M., there were
24  lots of flanges in the engine room; right?

Page 110

1  A  Yes, there is.
2  Q  Okay. And you never connected this hose
3  to these flanges personally, did you?
4  A  No, I did not.
5  Q  And you never disconnected these flanges
6  from these hoses?
7  A  No, I did not.
8  Q  Okay. And you can't tell for sure
9  whether or not these two particular flanges were ever
10  attached to these hoses, can you?
11  A  Sir, I know that it is, because on my
12  duty, my fingers almost got cut out because the pump
13  was running.
14       I see this, if it has suction or no
15  suction. When they are pumping out, I see that.
16  Q  Okay. Were there any markings that you
17  can show us today that you saw?
18  A  Sir, this is attached over here on the
19  end of this.
20       This has a clip, right here, and
21  it's attached here. And this piece is on the end of
22  this piece. It's attached here, and there's also a
23  clip.
24  Q  Now, did you ever tell the chief engineer

Page 111

1  that you saw these flanges attached to this hose?
2       Listen to my question. Did you
3  ever personally speak to Chief Engineer and tell him
4  that this was connected?
5  A  The chief engineer knows about it because
6  he's the one that ordered that.
7  Q  Listen to my question. Okay?
8       Did you ever speak to the chief
9  engineer personally and tell him that these flanges
10  were connected to this hose?
11  A  No, I did not have a conversation with
12  the chief.
13  Q  Did you ever speak to the captain of the
14  ship and tell him that there were flanges connected
15  to a hose in the engine room?
16  A  No.
17  Q  Did you ever tell the captain of the ship
18  that there was a magic pipe on board the ship?
19  A  No.
20  Q  Did you ever tell anybody from the
21  company, before the ship arrived in the United
22  States, that there was a magic pipe on board?
23  A  No.
24  Q  Now, Mr. Conge, did you bring these hoses

Page 112

1  from the ship here?
2  A  No, I did not.
3  Q  So you don't know how these hoses got
4  here, did you?
5  A  No, I don't know, sir.
6  Q  And did you bring these flanges from the
7  ship here?
8  A  No, I did not.
9  Q  So you don't know how the flanges got
10  here?
11  A  No, I don't.
12  Q  In fact, sir, if you look at either of
13  two hoses or the flanges, there's no markings that
14  show that these came from the Irene E.M., is there?
15  And take a good look at them. Take a look.
16  A  Yes.
17  Q  So you don't know if these actually came
18  from the Irene E.M.?
19  A  There are rags attached to it.
20  Q  So the answer to my question is you don't
21  really know, do? It looks like what you saw, but you
22  don't know.
23  A  I'm not sure, because when they brought
24  it here, I didn't see it.

Pascuale Conge

13 (Pages 113 to 116)

Page 113

1    Q   Okay. Now, I think we're done with those
2  exhibits, I'll move back to my spot.
3         Now, Mr. Conge, I'd like to go over
4  just a few more points with you, and I think we'll be
5  finished.
6         Now, the chief engineer never asked
7  you to lie to anyone, did he?
8    A   No, he did not.
9    Q   Mr. Conge, the captain of the ship never
10 asked you to lie to anyone, did he?
11   A   No, he did not.
12   Q   Okay. And when you were on board the
13 ship, you saw a man named Mr. Madias; right?
14   A   Yes, sir. Yes, sir.
15   Q   Now, Mr. Madias never asked you to lie to
16 anyone, did he?
17   A   No, he did not, sir.
18   Q   Now, you told Mr. Phillips the other day
19 that a guy named Mr. Christos asked the crew if they
20 could retract their statement; right?
21   A   Yes, sir.
22   Q   Now, he didn't ask the crew to lie; he
23 asked them to retract their statements; right?
24   A   He told us that we should change the

Page 114

1  statement.
2    Q   Okay. And you never did change your
3  statement, did you?
4    A   No, we did not.
5    Q   And in fact, Mr. Christos, before he left
6  the ship, told you to tell the truth; right?
7    A   Yes, sir.
8    Q   And that's what you've done so far?
9    A   Yes, sir.
10   Q   Okay. Let's take a look at what's been
11 marked as CSME Defendants' Deposition Exhibit No. 16.
12 For the record, it's a three-page document with a
13 heading, "Declaration of Pascuale Conge."
14       And before we look at that,
15 Mr. Conge, even after Mr. Christos asked you to
16 change your statement, the captain never asked you to
17 change your statement, did he?
18   A   No, he did not.
19   Q   And the chief engineer never asked you to
20 change your statement?
21   A   No, he did not.
22   Q   And Mr. Madias never asked you to change
23 your statement?
24   A   No, he did not.

Page 115

1    Q   And in fact, Mr. Christos changed his
2  instruction and told you to tell the truth; right?
3    A   I don't remember that, sir.
4    Q   But you never lied to anybody?
5    A   Yes, sir.
6    Q   Okay. Take a look at what we've marked
7  as CSME Defendants' Deposition Exhibit No. 16, and
8  just ask you to take a look at Page No. 3.
9         And on Page No. 3, that's your
10 signature?
11   A   Yes, sir.
12   Q   And when you signed it, the contents of
13 that document were accurate and truthful to the best
14 of your knowledge; right?
15   A   Yet.
16       MR. CHALOS: I move into evidence
17 defendants Exhibit 16.
18       MR. PHILLIPS: Objection;
19 bolstering.
20       MR. CHALOS: Is there an objection
21 for bolstering in the federal rules?
22       MR. KOTILA: Probably.
23       (Document marked Exhibit CSMR 16
24 moved into evidence.)

Page 116

1        MR. CHALOS: Okay. Now --
2        MR. WOODWARD: Can I see.
3        MR. CHALOS: Sure.
4  BY MR. CHALOS:
5    Q   Mr. Conge, you don't know what the level
6  of the bilge tanks were -- or the bilge wells were on
7  November 23rd at the start of the day, did you? As
8  you sit here today,
9    A   No, I did not.
10   Q   And you don't know what they were at the
11 end of the day, at the end of your shift, do you?
12   A   No. There is a sounding that the chief
13 engineer is supposed to follow.
14   Q   My question was you: You don't know?
15   A   No, I don't know.
16   Q   And you don't know what the sounding
17 results were on the 24th of November, as you sit here
18 today, do you?
19   A   No, I don't know, sir.
20       MR. CHALOS: Okay. I'm just going
21 to take a break for one second, look at my notes, and
22 I think I may pass the witness.
23       MR. PHILLIPS: Okay.
24       MR. TWERSKY: I'm going to get --

Corbett & Wilcox

Pascuale Conge

Page 117

1        THE VIDEOGRAPHER: Off the record,
2  11:15.
3        (Brief recess.)
4        THE VIDEOGRAPHER: On the record at
5  11:17.
6  BY MR. CHALOS:
7     Q   Mr. Conge, just a few final questions
8  before I finish.
9        When you told us about Mr. Christos
10 asking the crew to change statements -- do you
11 remember that testimony?
12    A   Yes, sir.
13    Q   Now, the truth is, Mr. Christos wasn't
14 speaking directly to you, was he?
15    A   Just at the mess hall, sir.
16    Q   And in the mess hall, Mr. Christos was
17 talking to the second engineer, meaning he addressed
18 his comments to the second engineer, which you
19 overheard?
20    A   He was addressing all of us that was in
21 the mess hall.
22    Q   Okay. And did you respond to him
23 personally?
24    A   Yes, sir.

Page 118

1        MR. CHALOS: Okay. Nothing
2  further.
3        RECROSS-EXAMINATION
4  BY MR. WOODWARD:
5     Q   Mr. Conge, my name is Carl Woodward. I
6  represent the chief engineer, Mr. Dragomir. I want
7  to ask you a few questions about your testimony and
8  what you did on the ship.
9        Now, Mr. Phillips asked you about
10 Government Exhibit 1. It's labeled Oil Record Book.
11 Do you remember that?
12    A   Yes, sir.
13        (Discussion held off the record with
14        the videographer.)
15        MR. WOODWARD: Let's go off the
16 record for a minute.
17        THE VIDEOGRAPHER: Off the record,
18 11:19.
19        (Discussion held off the record.)
20        THE VIDEOGRAPHER: We are on the
21 record at 11:21.
22 BY MR. WOODWARD:
23    Q   Now, Mr. Conge, I'm showing you again
24 Government Exhibit 1. Okay?

Page 119

1     A   Yes, sir.
2     Q   And that is labeled "Oil Record Book."
3        Just so I'm clear, on this ship,
4  the Irene, you never made any entries in the Oil
5  Record Book; correct?
6     A   Yes.
7     Q   You didn't keep the Oil Record Book;
8  correct?
9     A   No, I did not.
10    Q   The Oil Record Book was not kept in the
11 engine room, was it?
12    A   No, sir.
13    Q   It was kept by the chief engineer;
14 correct?
15    A   Yes, sir.
16    Q   And you've never actually seen that Oil
17 Record Book before, have you?
18    A   No, because it's in the cabin. I know
19 his signature. That's it.
20    Q   Yeah. But you've actually never seen
21 that book before last Friday; isn't that correct?
22    A   No, sir.
23    Q   That is, you have not seen it; correct?
24    A   Yes, sir.

Page 120

1     Q   All right, fine. Thank you.
2        Now, you were asked by Mr. Phillips
3  about a statement that you made with the other crew.
4  Do you recall that testimony?
5     A   Yes, sir.
6     Q   And do you recall saying that the
7  statement was not prepared by you?
8     A   The one that is multiple pages?
9     Q   Yes.
10    A   No, I did not make that. The second and
11 the fourth did.
12    Q   That's correct. And in fact, you didn't
13 know -- excuse me.
14        Did you read the statement ever
15 before you signed it?
16    A   Yes, sir.
17    Q   But in fact, you didn't know whether all
18 the information was true?
19    A   I read it, everything.
20    Q   Yes. But any conversations that took
21 place between the chief engineer and the second
22 engineer you didn't know about, did you?
23    A   No, I did not.
24    Q   And any conversations that took place

Pascuale Conge

15 (Pages 121 to 124)

Page 121

1  between the second engineer and the fourth engineer
2  you didn't know about either, did you?
3      A   No, I did not.
4      Q   And any conversation that took place
5  between the second engineer and the oiler, Roberto
6  Damasing, you didn't know about that either, did you?
7      A   No, I don't.
8      Q   So much of the information in the
9  statement that you signed you had no knowledge of; is
10 that correct?
11     A   I know something about it.
12     Q   But you don't know what the second
13 engineer and the chief engineer spoke about, do you?
14     A   No, I don't.
15     Q   You don't know whether anything that's
16 recounted in this statement between the chief
17 engineer and the second engineer is true?
18     A   No, because this is a statement that was
19 asked to be made by Mr. Christos.
20     Q   I understand that. But you signed this
21 statement, didn't you?
22     A   Yes, sir. Yes, sir.
23     Q   Did you mean that all of the information
24 in there was true?

Page 122

1      A   Yes, sir.
2      Q   But you couldn't say whether all the
3  information was true; isn't that correct?
4      A   What was written there is the truth.
5      Q   You don't know that, do you?
6      A   No, because I read it.
7      Q   Well, just because you read it doesn't
8  make it true; isn't that correct?
9      A   So what is your question?
10     Q   My question is that you can't say whether
11 everything in this statement is true, can you,
12 because you weren't present for many of the
13 conversations.
14     A   When this was made, we were asked to read
15 it, each of us. And so I know.
16     Q   But that's the only way you know anything
17 in this statement, is by reading it, correct?
18     A   Yes, sir.
19     Q   You don't know of your own knowledge what
20 the chief engineer and the second engineer said to
21 each other, do you?
22     A   No, I don't.
23     Q   So you don't know whether that's true;
24 isn't that correct?

Page 123

1      A   Yeah, because that's the statement made
2  by the second engineer. We were asked to read it.
3      Q   But you don't know if the second engineer
4  is telling the truth, do you?
5      A   That I don't know.
6      Q   And you don't know if the fourth engineer
7  is telling the truth, do you?
8      A   That I don't know.
9      Q   Now, when you testified that you were
10 asked by Mr. Phillips and by Mr. Chalos about pumping
11 overboard, what shift did that occur on? The first
12 time.
13     A   May I ask you, you're talking about the
14 pump-out?
15     Q   Yes. You said, I think, that you – that
16 the pump-out occurred on November 23rd.
17     A   Yes, sir.
18     Q   Do you recall that?
19     A   Yes, sir.
20     Q   Okay. So when did that – what time?
21 Did that take place while you were on duty?
22     A   It was in the evening of the 23rd.
23     Q   The evening? What is –
24     A   Yes.

Page 124

1      Q   What is your duty?
2      A   12:00 to 4:00, sir.
3      Q   So zero hundred hours to 0400 hours?
4      A   Yes.
5      Q   On the 23rd?
6      A   Yes, sir.
7      Q   Or on the 24th?
8      A   Yes, between 23 and 24 of that date.
9      Q   All right. Let me just try to understand
10 this.
11         On the 23rd, did you – did this
12 occur between 000 and 0400 on the 23rd?
13     A   Yes.
14     Q   So it occurred very early on the 23rd?
15     A   On the 23rd, 10:00 to 12:00, I went down.
16 That is on November 23rd.
17         On the 12:00 to 4:00, that is
18 coming into November 24th.
19     Q   Okay. So when you were working, you were
20 working on the 24th, not the 23rd; isn't that
21 correct?
22     A   Yes, sir. But I came down 10 minutes
23 before it's midnight on November 23rd.
24     Q   But when you shut off the pump, it was on

Pascuale Conge

16 (Pages 125 to 128)

Page 125

1  November 24th; right?
2      A  Yes, sir.
3      Q  Now, the logbook, I think you described
4  it as being in the engine room on a table?
5      A  Yes, sir.
6      Q  And in the course of a day, someone would
7  take that logbook up to the chief's cabin; correct?
8      A  Yes, sir.
9      Q  And then it would come back to the engine
10 room; correct?
11     A  Yes, sir.
12     Q  What was the name of this logbook?
13     A  "Main engine logbook."
14     Q  Did it have a name called "dirty log"?
15     A  No, sir.
16     Q  Do you know what — do you know whether
17 information that was in that logbook was transferred
18 into another logbook?
19     A  Yes, sir. The final one is transferred
20 by the chief engineer. He transfers it.
21     Q  Right. And that was the main formal
22 logbook; correct?
23     A  Yes, sir. Yes, sir.
24     Q  So the logbook that was in the engine

Page 126

1  room was a dirty log or a rough log?
2      A  Yes, sir.
3      Q  Okay. When was the last time that you
4  saw that logbook?
5      A  Before we arrived in the Americas. It
6  was brought by the chief engineer to his cabin.
7      Q  Did the chief engineer take it or did
8  someone else take it to the chief engineer's cabin?
9      A  There was an oiler that was asked by the
10 chief engineer to bring it up to him.
11     Q  And that was done every day, wasn't it?
12     A  Yes, sir.
13     Q  Now, that was the last time you saw the
14 logbook; right?
15     A  Yes, sir.
16     Q  Do you know if the Coast Guard took the
17 logbook?
18     A  I have no idea, sir.
19     Q  Now, I think you testified about what was
20 written in the logbook. And I think what you said
21 was — and I quote, exact words were "Out all engine
22 room bilges."
23     A  Yes, sir.
24     Q  Is that correct?

Page 127

1      A  Yes, sir.
2      Q  Was the word "pump" used in that phrase?
3      A  What that means, "out" —
4      Q  No, I'm not asking what you mean. I want
5  to know what the exact words were. And the word
6  "pump"" was not included, was it?
7      A  Yeah.
8      Q  And then it says, "all engine room
9  bilges"; right? Correct?
10     A  Yes.
11     Q  It didn't say "bilge tank," did it? Yes
12 or no.
13     A  No, sir.
14     Q  Didn't say "sludge tank," did it?
15     A  No, sir.
16     Q  That's all it said?
17     A  Yes, sir.
18     Q  By the way, had you ever worked on this
19 ship before?
20     A  Yes.
21     Q  When?
22     A  I don't remember.
23     Q  More than a year before this last trip?
24     A  No, sir.

Page 128

1      Q  Let me just go back.
2         Have you ever worked on this ship
3  before this voyage?
4      A  No, sir.
5      Q  So this was your first time on this ship?
6      A  Yes, sir.
7      Q  And had you ever worked with Mr. Dragomir
8  before?
9      A  No, sir.
10     Q  Had you ever worked with the second
11 engineer before?
12     A  No, sir.
13     Q  Or the fourth engineer?
14     A  No, sir.
15     Q  Or any of the oilers?
16     A  No, sir.
17     Q  Or any of the wipers?
18     A  No, sir.
19     Q  Or the electrician, Paul Tudor?
20     A  No, sir.
21     Q  Now, the chief engineer is Romanian;
22 correct?
23     A  Yes, sir.
24     Q  Were there any other Romanians on the

Pascuale Conge

17 (Pages 129 to 132)

Page 129

1    ship?
2        A    Yes, sir.
3        Q    Captain?
4        A    Yet.
5        Q    The electrician?
6        A    Yes, sir.
7        Q    And a fitter?
8        A    Fitter, sir.
9        Q    That's it, right? Just four?
10       A    Yes.
11       Q    All the other crew were Filipino;
12   correct?
13       A    Yes, sir.
14       Q    When you were on the ship between the
15   time you got on the ship in the end of October until
16   you got off the ship in December or January, how many
17   conversations did you have with the chief engineer?
18       A    I don't remember, sir.
19       Q    Did you have any conversations with him
20   in which he gave you orders?
21       A    No.
22       Q    But orders — the written order in this
23   book, the logbook, "out all engine room bilges," that
24   was written in English; correct?

Page 130

1        A    Yes, sir.
2        Q    Now, did you ever have any conversations
3    at all of any kind between the chief engineer between
4    the time you got on the ship and the time you got off
5    of it?
6        A    No, sir.
7        Q    You never spoke with him about anything?
8        A    Sometimes he would ask me to do things.
9        Q    Like what?
10       A    For example, my generator.
11       Q    Correct. He would give you an order
12   about the generator?
13       A    Yeah.
14       Q    And he would speak with you in English?
15       A    Yes, sir.
16       Q    He didn't speak with you in Romanian, did
17   he?
18       A    No.
19       Q    You don't understand Romanian, do you?
20       A    No, sir.
21       Q    And he didn't speak to you in Tagelog or
22   any other language of the Philippines, did he?
23       A    No, sir.
24       Q    Okay. And English is not his native

Page 131

1    language, is it?
2        A    Yes.
3        Q    It is not his native language, is it?
4        A    No, it's not.
5        Q    And it's not your native language either,
6    is it?
7        A    No, sir.
8             MR. WOODWARD: Let's go off the
9    record for a minute.
10            THE VIDEOGRAPHER: Off the record
11   at 11:39.
12            (Discussion held off the record.)
13            THE VIDEOGRAPHER: We're on the
14   record at 11:41.
15   BY MR. WOODWARD:
16       Q    Mr. Conge, the first time you saw the
17   magic hose was on November 23rd?
18       A    Yes, sir.
19       Q    You didn't see it before then?
20       A    No, I did not.
21            MR. WOODWARD: No further
22   questions.
23            REDIRECT EXAMINATION
24

Page 132

1    BY MR. PHILLIPS:
2        Q    This is Jeff Phillips again for the
3    Government.
4             Mr. Conge, can you hand me this.
5             Just for the record, is this or is
6    this not the engine room logbook that you spoke of?
7    Referring to what is marked as Government Exhibit ?
8        A    No, it's not. It's the larger one, sir.
9        Q    Now, speaking about Mr. Chalos' question
10   to you about the company's environmental and safety
11   policies that were posted on the ship, how did the
12   company put into practice those policies?
13       A    They just put — they just display it.
14       Q    What about the safety policy? How did
15   the company — what did they provide you to practice
16   those policies?
17            MR. CHALOS: Objection.
18            THE WITNESS: Sometimes they gave
19   us a drill. But sometimes they just make us sign the
20   papers.
21   BY MR. PHILLIPS:
22       Q    Did they make you sign the papers?
23            MR. WOODWARD: Objection.
24   BY MR. PHILLIPS:

Page 133

1      Q   What do you mean?
2          MR. WOODWARD: It's irrelevant.
3    BY MR. PHILLIPS:
4      Q   What do you mean, sometimes they just
5    made you sign the papers?
6          MR. CHALOS: Objection.
7          THE WITNESS: This is regarding the
8    drill.
9    BY MR. PHILLIPS:
10     Q   Explain.
11     A   Sometimes there is no drill, but they
12   make us sign the papers -- the papers.
13     Q   What were the papers?
14     A   I don't remember the -- the papers, sir.
15     Q   Okay. Now, Mr. Conge, why would you pump
16   oily waste overboard into the ocean if you know it's
17   wrong?
18     A   Sir, because there is no other place to
19   put it.
20     Q   And why would you pump oily waste
21   overboard into the ocean if you knew that it was
22   against company policy?
23     A   Because, you see sir, we are just
24   following the orders.

Page 134

1      Q   Okay. Now, going back to Mr. Christos
2    and Mr. Chalos' question about Mr. Christos telling
3    you to just tell the truth, when did Christos say
4    that? Was it before or after you said you would only
5    tell the truth?
6          MR. WOODWARD: Objection; leading.
7          THE WITNESS: I don't remember,
8    sir.
9    BY MR. PHILLIPS:
10     Q   Okay. Now, you have met with the
11   Government. How many times have you met with the
12   defense before today?
13     A   Two times, sir.
14         MR. PHILLIPS: Okay. I think
15   that's all the Government has.
16      FURTHER RECROSS-EXAMINATION
17   BY MR. CHALOS:
18     Q   Mr. Conge, you just told Mr. Phillips
19   that you met with the defense two times. Do you know
20   what he meant when he said "defense"?
21     A   Are you referring to my defense? What
22   are you --
23     Q   Well, what did you understand
24   Mr. Phillips mean when he said "the defense"?

Page 135

1      A   The defense for the case.
2      Q   When you said you met two times, was that
3    two times with Mr. Twersky?
4      A   A lot of times with Mr. Twersky. More
5    than that.
6      Q   And Mr. Twersky is your lawyer; right?
7      A   Yes, sir.
8      Q   Now, how many times have you met with me?
9      A   Three times, sir.
10     Q   Three times? That's not true, is it?
11   We've met one time.
12     A   First at the office -- at the office of
13   Michael Twersky, here last Friday, and, of course,
14   this time. Three times.
15     Q   Okay. So is it fair to say that before
16   we came here on Friday, we've only met one time;
17   right?
18     A   Could you repeat that.
19     Q   Yeah. Before we started here last
20   Friday, we only got together one time; right?
21     A   Oh, yes, sir.
22     Q   And that was at Mr. Twersky's office?
23     A   Yes.
24     Q   And that was a short meeting; right?

Page 136

1      A   Yes, sir.
2      Q   How long?
3      A   Almost two hours, sir.
4      Q   Almost two hours. Okay.
5          Now, let's talk about the company's
6    environmental protection policy.
7          Mr. Phillips just asked you about
8    what the company did to implement its policy. Do you
9    remember that?
10     A   Yes, sir.
11     Q   Now, they did a lot; right?
12     A   Yes, there are things they did.
13     Q   They gave you training?
14     A   Yes, sir.
15     Q   They required you to have specific
16   training before even considering you for a job;
17   right?
18     A   Yes, sir.
19     Q   And they made sure that you had training
20   about MARPOL and the protection of the environment?
21     A   Yes, sir. Yes, sir.
22     Q   And they gave you specific training about
23   its own policies; right?
24     A   Yes, sir.

Page 137

1    Q   And that was a two-day class before
2   joining the vessel that you had to go to in Manila?
3    A   Yes.
4    Q   And from time to time, the company would
5   send auditors on board to make sure that its policies
6   were being implemented; right?
7    A   Yes, sir.
8    Q   And if the auditor found a problem, you
9   would correct it; right?
10    A   Yes, sir.
11         MR. CHALOS:  Okay.  Nothing
12   further.  Thank you.
13         FURTHER RECROSS-EXAMINATION
14   BY MR. WOODWARD:
15    Q   Now, you were asked by Mr. Phillips why
16   you pumped it overboard, and you said there was no
17   place to put it.
18    A   Yes, sir.
19    Q   No place to put the bilge; right?
20    A   Yes.
21    Q   But on November 23rd, you didn't know how
22   full the tank was, did you?
23    A   No, I did not.
24    Q   So therefore, you don't know whether the

Page 138

1   bilges could have been pumped into the bilge tank, do
2   you?
3    A   That I don't know, sir.
4         MR. WOODWARD:  No further
5   questions.
6         THE VIDEOGRAPHER:  Off the record
7   at 11:50.
8         (Signature having been waived, the
9         deposition of PASCUALE CONGE was
10         concluded at 11:50 a.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 139

1              INDEX
2   WITNESS:                        PAGE
3   PASCUALE CONGE
4    Mr. Chalos                     71
5    Mr. Woodward                   118
6    Mr. Phillips                   132
7    Mr. Chalos                     134
8    Mr. Woodward                   137
9
10
11         EXHIBITS MOVED INTO EVIDENCE
12   CSMR Exhibit No.                PAGE
13     13                  97
14     14                  99
15     15                  88
16     16                 115
17
18
19
20
21
22
23
24

Page 140

1         CERTIFICATE OF SHORTHAND REPORTER
2
3         I, Gail Inghram Verbano, CSR, RMR,
4   the officer before whom the foregoing proceedings
5   were taken, do hereby certify that the foregoing
6   transcript is a true and correct record of the
7   proceedings; that said proceedings were taken by me
8   stenographically and thereafter reduced to
9   typewriting under my supervision; and that I am
10   neither counsel for, related to, nor employed by any
11   of the parties to this case and have no interest,
12   financial or otherwise, in its outcome.
13
14
15
16
                  _____
17                Gail Inghram Verbano, CSR, RMR
                  CSR No. 8635
                  Certification No.: 220
18                (Expires 1-31-2008)
19
20
21
22
23
24

Corbett & Wilcox

# EXHIBIT B

DEC 9, 2005

I 3/E PASCUAL CONGE JR. ; I ON BOARD THIS VESSEL
M/V IRENE E.M. FROM OCT. 26, 2005 C/E ORDERED IN
THE LOG BOOK TO PUMP-OUT BILGES. I FOLLOW ONLY
THE ORDER BECAUSE THEY ARE HIGHER OFFICER IN
ENGINE DEPARTMENT. THE BILGES WATER PUMP-OUT
OVER BOARD. THE OIL WATER SEPARATOR DID NOT WORK.

PASCUAL E CONGE JR.

3/E ROD M/V E.M.

C.C.M.R.
DEPOSITION
EXHIBIT

# EXHIBIT 12

Mario Manzanilla

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

- - -

| | |
|---|---|
| UNITED STATE OF AMERICA, | : |
| | : No. |
| Plaintiff, | : 1:06-CR-00076-GMS-2 |
| | : |
| vs. | : |
| | : |
| CHIAN SPIRIT MARITIME | : |
| ENTERPRISES, INC., VENETICO | : |
| MARINE S.A., IRENE E/M, | : |
| EVANGELOS MADIAS, CHRISTOS | : |
| PAGONES, ADRIEN DRAGOMIR, | : |
| | : |
| Defendants. | : |

- - -

Videotaped deposition of MARIO
MANZANILLA, taken pursuant to notice before Gail
Inghram Verbano, CSR, RMR, in the offices of United
States Department of Justice, 700 Nemours Building,
1007 Orange Street, Wilmington, Delaware, on Tuesday,
July 18, 2006, beginning at approximately 3:24 p.m.

- - -

CORBETT & WILCOX
Registered Professional Reporters
1400 French Street    Wilmington, DE 19801
(302) 571-0510
www.corbettreporting.com

Mario Manzanilla

2 (Pages 2 to 5)

Page 2

```
1  APPEARANCES:
2      MARK W. KOTILA, ESQ.
       JEFFREY L. PHILLIPS, ESQ.
3      United States Department of Justice
       Environmental Crimes Section
4      P.O. Box 23985 - L'Enfant Plaza
       Washington, DC 20026-3985
5      Attorneys for Plaintiff
6      GEORGE M. CHALOS, ESQ.
       FOWLER, RODRIGUEZ & CHALOS
7      366 Main Street
       Port Washington, NY 11050
8      Attorney for Defendants Chian Spirit
       and Venetico Marine
9
       CARL R. WOODWARD, III, ESQ.
10     CARELLA, BYRNE, BAIN, GILFILLAN,
       CECCHI, STEWART & OLSTEIN
11     5 Becker Farm Road
       Roseland, NJ 07068-1739
12     Attorney for Defendant Dragomir
13  ALSO PRESENT:
14     Chris Weiss, Videographer
       Chris Masaoay, Tagalog Interpreter
15
       Adrien Dragomir
16     Livia-Lee Roth
       Brent McKnight
17     Jason F. Burgess
18         - - -
19
20
21
22
23
24
```

Page 3

```
1          THE VIDEOGRAPHER: This is Chris
2   Weiss, the videographer, and the court reporter today
3   is Gail Verbano. We are both here from the firm of
4   Corbett & Wilcox, located at 230 North Market Street,
5   Wilmington, Delaware.
6          The time is 3:24 p.m. on Tuesday,
7   July 18th, 2006. We are documenting the videotaped
8   deposition of Mario Manzanilla for the plaintiff in
9   the matter of United States of America versus Chian
10  Spirit Maritime Enterprises, Inc., Venetico Marine,
11  Irene E.M., Evangelos Mafias, Christos Pagones,
12  Adrien Dragomir in the United States District Court,
13  District of Delaware.
14         We are at the location of the
15  United States Attorney's office, Nemours Building,
16  1007 North Orange Street, Suite 700, Wilmington,
17  Delaware.
18         Will the attorneys please state
19  their appearance for the record.
20         MR. PHILLIPS: Jeff Phillips, U.S.
21  Government.
22         MR. KOTILA: United States
23  Government — I mean Mark Kotila, United States
24  Government.
```

Page 4

```
1          MR. CHALOS: George Chalos,
2   Venetico Marine and Chian Spirit Maritime
3   Enterprises.
4          MR. WOODWARD: Carl Woodward on
5   behalf of Adrien Dragomir.
6          MR. TWERSKY: Michael Twersky on
7   behalf of the witness.
8          Will the court reporter please
9   administer the oaths.
10         (CHRIS MASAOAY was previously sworn
11  in as Tagalog-English interpreter.)
12             - - -
13         MARIO MANZANILLA, having first been
14  duly sworn through the interpreter according to law,
15  was examined and testified further as follows:
16             - - -
17         DIRECT EXAMINATION
18  BY MR. PHILLIPS:
19  Q    Mr. Manzanilla, thank you for being here
20  today.
21         Could you tell the court, where are
22  you from, your hometown?
23  A    Bacolod City, Negros, Occidental.
24  Q    And how old are you?
```

Page 5

```
1   A    35.
2   Q    And what is your occupation?
3   A    Seaman.
4   Q    And where do you normally work?
5   A    In the engine.
6   Q    As a seaman, I assume you work on ships?
7   A    Yes, sir.
8   Q    How many ships have you worked on?
9   A    Eight, sir.
10  Q    Including the last one?
11  A    Yes, sir.
12  Q    And what kind of work do you do in the
13  engine?
14  A    Cleaning the main engine, throwing
15  garbage, assisting for the oilers and the officers.
16  Q    And assisting the oilers and officers, do
17  you ever work on an oily water separator?
18  A    No, sir.
19  Q    Do you know what an oily water separator
20  is?
21  A    Yes, sir.
22  Q    Okay. How do you know what an oily water
23  separator is?
24  A    The previous ships that I have boarded
```

Corbett & Wilcox

Mario Manzanilla

3 (Pages 6 to 9)

Page 6

1  in, I saw them operating it.
2  Q   Okay.  And when you say you saw them,
3  describe what you saw.
4        MR. CHALOS:  Objection.
5        THE WITNESS:  Sir, there is a pump,
6  a suction coming from the bilge tank, and the bilge
7  tank going into the overboard.
8  BY MR. PHILLIPS:
9  Q   Okay.  And going from the bilge tank
10  overboard, but you didn't say where the oily water
11  separator was.
12  A   It was in the main engine after Pick.
13  Q   Okay.  Now, when were you hired -- or
14  were you ever hired to work on the Irene?
15  A   Yes, sir.
16  Q   Do you remember when?
17  A   November 2004.
18  Q   And where did you board the Irene?
19  A   China, at the port of Lian Yun Gang.
20  Q   And when you boarded the Irene, did you
21  observe if the Irene had an oily water separator?
22  A   Yes, there is.  I saw one.
23  Q   Did you observe if it worked?
24  A   When I boarded the ship, the separator

Page 7

1  was not working, the bilge pump was not in order, and
2  the ship was in critical condition.
3  Q   Where did it go from the port you boarded
4  it?  What was the next port?
5  A   Guangzhou port for dry dock.
6  Q   Did you stay with the ship while it was
7  in dry dock?
8  A   Yes.  For two months, I was working
9  there.
10  Q   Did you observe the oil/water separator
11  while it was at dry dock?
12        MR. CHALOS:  Objection.
13        THE WITNESS:  The separator was not
14  working, and so we had to use an invincible pump to
15  pump overboard.
16  BY MR. PHILLIPS:
17  Q   And then what happened after the dry
18  dock?
19  A   We left.  We went to Hong Kong.  But we
20  were not using that separator at that time.  It was
21  not working.
22        MR. CHALOS:  Objection; move to
23  strike.
24        THE WITNESS:  And then --

Page 8

1  BY MR. PHILLIPS:
2  Q   Go ahead.
3  A   -- the bilge pump -- that's the only one
4  that they had fixed.  And then we had a collision in
5  Hong Kong, because we didn't have a radar.
6        MR. CHALOS:  Objection; move to
7  strike the portion of the answer nonresponsive to the
8  question.
9  BY MR. PHILLIPS:
10  Q   Did you eventually come to port in
11  Africa?
12  A   What do you mean by that?
13  Q   After China, did the Irene go back on the
14  sea?
15  A   We went back again for a dry dock,
16  because there was a hold.
17  Q   And then what?
18  A   So when it went to the dry dock, it got
19  fixed.  And then we went into another travel going to
20  Thailand.
21  Q   Did you eventually get to Africa?
22  A   After Thailand, we went to Africa for
23  discharging.
24  Q   What do you mean?

Page 9

1  A   We went to get some loading in Thailand,
2  and so then we went to Africa to discharge.
3  Q   To discharge what you -- what the ship
4  carried?
5  A   Yes.  It was rice.
6  Q   Rice.  Okay.
7        And when you were in Africa, do you
8  remember what time that was?  Month? year?
9  A   Africa, I don't remember that mouth.
10  Q   Do you remember the year?
11  A   2005.  2005.
12  Q   Do you remember where you went from
13  Africa?  From Africa, the next port?
14  A   Brazil.
15  Q   Do you remember which month you arrived
16  in Brazil?
17  A   I don't remember.  I think January -- no,
18  no, wait.
19        We came in November -- I think
20  October, like this.  October.
21  Q   Okay.  On board -- when you were in
22  Africa, who was your chief engineer; do you know?
23  A   Tomondong, the chief engineer before.
24  Q   Before what?

Page 10

1    A   Before the Chief Engineer Dragomir.
2    Q   And did you ever talk to Chief Engineer
3 Tomondong?
4    A   Yes. We worked together for quite some
5 time.
6    Q   Did he ever give you orders?
7    A   Yes. Yes, sir.
8    Q   Do you recall any orders he gave you?
9    A   Yes, sir.
10   Q   Tell us.
11   A   He ordered me to pick out the hard pipe,
12 the original pipes of the bilge pump overboard, the
13 line for overboard; to take out and change the magic
14 pipe.
15   Q   What is the magic pipe?
16   A   Here, sir.
17       MR. PHILLIPS:  For the record, the
18 witness pointed out Government Exhibit 2.
19       THE WITNESS:  The flange.
20       MR. PHILLIPS:  And also the flange,
21 as Government Exhibit 3.
22       THE WITNESS:  (In English) The
23 second engineer who fixed this one --
24   A   The second engineer who fixed this one --

Page 11

1        THE WITNESS:  (In English) And
2 this, also.
3        THE WITNESS:  And this also, this
4 one.
5        MR. PHILLIPS:  And we'll get to
6 that.
7        MR. TWERSKY:  I just want to advise
8 the witness to speak through the interpreter.
9        THE WITNESS:  (In English) Sorry,
10 sorry, sorry.
11 BY MR. PHILLIPS:
12   Q   And so what did you do?
13   A   He asked me to get the original piece of
14 pipe.  He asked me to hide it.  And then together
15 with the fourth engineer, the previous one and the
16 oiler, that we should take it out and then change it
17 to this.
18   Q   Why do you call it a magic pipe?
19   A   Because -- because quickly, you can put
20 it out and quickly you can hide it away.
21   Q   When -- did you ever hide it away?
22   A   This particular one, no.  But the
23 original one, yes.  I was the one that hid it.  I was
24 also the one that gave to the Coast Guard the

Page 12

1 location of where it was hidden.
2    Q   Okay.  Who asked you to hide it?
3        MR. CHALOS:  Objection.
4 BY MR. PHILLIPS:
5    Q   Did anyone ask you to hide it?
6    A   The previous chief engineer, Tomondong.
7    Q   He asked you to hide which pipe?
8    A   The original, the hard pipe.
9    Q   Okay.  Now, you eventually came to the
10 United States?
11   A   Yes.
12   Q   When did you knew -- did you know you
13 were coming to the United States before you arrived?
14   A   Yes, sir, in Africa.
15   Q   How did you find out?
16   A   Because that was the news from the
17 Superintendent Tanasi and the captain.
18   Q   Superintendent Tomasi?
19   A   Tanasi.
20   Q   Tanasi.
21       On the trip from Africa to Brazil,
22 after you hooked on the magic pipe, did you -- did
23 you observe the magic pipe during the voyage?
24       MR. WOODWARD:  Sorry.  Context?

Page 13

1        THE WITNESS:  Yes, it was fixed.
2        MR. WOODWARD:  Where -- which
3 voyage?
4        MR. PHILLIPS:  This is from Africa
5 to Brazil.
6        MR. CHALOS:  Yeah, but when was it?
7 There was two of those.
8        MR. PHILLIPS:  Two voyages from
9 Africa to Brazil?  He didn't say that.
10       MR. CHALOS:  I know, but you're
11 presupposing a predicate.
12 BY MR. PHILLIPS:
13   Q   Did you ever see the magic pipe being
14 used during the voyage from Africa to Brazil?
15   A   No, sir.
16   Q   You never saw it being used?
17   A   No, sir.
18   Q   Did you ever see the pump working?
19   A   What kind of pump?
20   Q   From Africa to Brazil --
21   A   What kind of, separator or bilge pump?
22   Q   The bilge pump.
23   A   Yes, I saw it.
24   Q   What did you see?

Mario Manzanilla

## Page 14

1     A  It was working. It was working.

2     Q  What was the bilge pump connected to?

3     A  It's connected to the bilge tank, the

4  bilge pump -- the bilge well and sludge tank.

5     Q  And where would the pumping -- where

6  would the liquid go?

7         MR. CHALOS: Objection.

8         THE WITNESS: Outside.

9  BY MR. PHILLIPS:

10     Q  How would it get outside?

11     A  Because of the use of this magic pipe --

12         MR. CHALOS: Objection.

13         THE WITNESS: -- going overboard.

14  BY MR. PHILLIPS:

15     Q  How many times would you see that?

16         MR. WOODWARD: Objection; context

17  Time?

18         MR. KOTILA: When?

19         THE WITNESS: About three times I

20  saw it.

21  BY MR. PHILLIPS:

22     Q  Three times from the trip -- from Africa

23  to Brazil?

24         MR. WOODWARD: Wait a minute.

## Page 15

1  There's been no foundation for that.

2         MR. CHALOS: Objection. Objection.

3         MR. PHILLIPS: That was the

4  original foundation.

5         MR. CHALOS: The guy said --

6         MR. WOODWARD: You're going far

7  beyond that.

8         THE WITNESS: From Africa, yes.

9         MR. CHALOS: Wait a minute. Hold

10  on a second.

11         When he testified, you asked if he

12  saw a pump between Africa and Brazil; and then he

13  said that it was working. Then you asked him where

14  it was connected, and then you asked him --

15         MR. PHILLIPS: No. Then he asked

16  if it was a oil/water separator or if it was a bilge

17  pump.

18         MR. CHALOS: No, that's not what

19  the testimony has been.

20         MR. PHILLIPS: That was the

21  testimony.

22         MR. CHALOS: You led this guy right

23  down the path and based on testimony that we've never

24  had from this witness.

## Page 16

1         MR. PHILLIPS: Okay.

2         MR. CHALOS: Can we have that read

3  back. Starting with you saw the bilge pump --

4         (Discussion off the stenograph

5         record with the court reporter)

6         MR. CHALOS: The question and

7  answer said -- you asked him --

8         MR. PHILLIPS: The question is did

9  he talk about a bilge pump before that question?

10         MR. CHALOS: You asked him if he

11  saw -- if you saw a magic pipe between Africa and

12  Brazil; and he said no. Then you asked -- him the

13  next question was whether he ever saw the pumps being

14  used.

15         MR. PHILLIPS: He obviously didn't

16  get the question --

17         MR. CHALOS: Well, then --

18         MR. PHILLIPS: -- because then he

19  said he saw it.

20         MR. CHALOS: Okay. Well, if he

21  didn't get the question, that doesn't mean you can

22  just assume that he made a mistake.

23         MR. PHILLIPS: Well, he brought it

24  out when his gave his full explanation.

## Page 17

1         MR. CHALOS: I don't think so.

2         MR. PHILLIPS: So where are we?

3         If you could show me the last thing

4  we worked on.

5         (Discussion off the stenograph

6         record with the court reporter.)

7  BY MR. PHILLIPS:

8     Q  Do you remember arriving to the United

9  States?

10     A  Yes, sir.

11     Q  And can you describe what happened when

12  you got to the United States.

13     A  The Coast Guard boarded the vessel.

14     Q  And then what happened?

15     A  And then they checked the engine room.

16  The second engineer, myself and the chief engineer

17  we checked the pumps and tanks, and that's it.

18     Q  Did you ever talk to the Coast Guard?

19     A  No, no.

20     Q  Did you ever write a statement?

21     A  Yes, sir.

22     Q  And did anybody else come on board?

23     A  The superintendent.

24     Q  Do you remember his name?

Mario Manzanilla

6 (Pages 18 to 21)

---

Page 18

1    A    Yes, Christos.
2    Q    And did you ever talk to him?
3    A    Yes, sir.
4    Q    And what did he say?
5    A    He told us that we should retract our
6    statement, because if not, we would go to jail.
7    Q    Who is "us"?
8    A    The engineers that are with me working:
9    The second engineer, the third engineer, the fourth
10   engineer, and the oiler, Robert.
11   Q    And what did you say, if anything?
12   A    We told them -- we told him that we could
13   not change it, because we had already done it, and
14   what is contained there is the truth and so we cannot
15   change it anymore; it's already there.
16   Q    And did you talk to him again?
17   A    When he talked to me again, before New
18   Year's in the mess hall, when we were going down
19   there, he said to us if we tell the truth, that's
20   what we should do so that we don't go to jail.
21   Q    Now, how many months total were you on
22   the Irene?
23   A    From what I remember, about 14 months.
24   Q    During that time, did the oil/water

---

Page 19

1    separator ever work?
2         MR. CHALOS: Objection.
3         MR. WOODWARD: Leading.
4         THE WITNESS: No. You never use it
5    since the very first time.
6    BY MR. PHILLIPS:
7    Q    So how was oily waste handled on the
8    Irene?
9         MR. CHALOS: Objection; no
10   foundation.
11        MR. PHILLIPS: He's already said
12   he's worked in the engine room.
13        MR. CHALOS: Yeah. What so?
14        THE WITNESS: They used the bilge
15   pump to pump overboard.
16        MR. CHALOS: One second. I'm
17   working in the U.S. Attorney's office, but I'm not a
18   government guy. Does that make him qualified?
19        MR. PHILLIPS: No, but you know
20   what attorneys do.
21        MR. CHALOS: All right.
22   BY MR. PHILLIPS:
23   Q    Okay. How often did you observe oil
24   waste being discharged from the Irene?

---

Page 20

1         MR. WOODWARD: During what period
2    of time?
3         MR. PHILLIPS: During his time on
4    the ship.
5         MR. WOODWARD: All 14 months?
6         MR. PHILLIPS: That's right.
7         MR. WOODWARD: How many times over
8    14 months?
9         MR. PHILLIPS: This is the
10   question. I'm asking the question. If you're
11   objecting, you can object.
12        MR. WOODWARD: I'm objecting to the
13   form of the question. I'm just trying to help you
14   out.
15        MR. PHILLIPS: No, you're not
16   helping anybody out.
17        THE INTERPRETER: There was a
18   response there.
19        MR. WOODWARD: Look, you don't want
20   to put in the time, that's fine.
21        MR. PHILLIPS: I'm asking about his
22   entire time on the ship.
23        MR. WOODWARD: Now you did, after
24   you --

---

Page 21

1         MR. PHILLIPS: I already have.
2         THE WITNESS: From what I remember,
3    many times.
4    BY MR. PHILLIPS:
5    Q    Let's start again, just so the record is
6    clear.
7         How many months were you on the
8    ship?
9    A    About 14 months, sir.
10   Q    During that time, how often did you see
11   overboard discharges?
12   A    Since the very beginning, I saw many
13   times. I saw it, they would pump it out since even
14   when Tomondong was there. He was the chief engineer.
15   Q    What about after Tomondong?
16   A    After Tomondong left, I don't exactly
17   remember how many times they did the pump-out.
18   Q    So you don't remember how many times?
19   A    I don't remember exactly, but I believe
20   maybe about three times.
21   Q    Three times in how long?
22   A    That I saw. Since coming from Brazil --
23   coming from Brazil to America.
24        MR. PHILLIPS: All right. The

---

Mario Manzanilla

7 (Pages 22 to 25)

Page 22

1 defense will have some questions for you.
2          CROSS-EXAMINATION
3 BY MR. CHALOS:
4    Q   Hi, Mr. Manzanilla. My name is George
5 Chalos. And I represent Chian Spirit Maritime
6 Enterprises and Venetico Marine in this proceeding.
7          Now, you know that Venetico Marine
8 is the company that owns the ship; right?
9    A   That I don't know. I only remember Chian
10 Spirit.
11   Q   Okay. So you know that Chian Spirit is
12 the operator or manager of the ship; right?
13   A   Yes, sir.
14   Q   Okay. Let's talk about how you got this
15 job.
16          You went to a crewing agent in the
17 Philippines; right?
18   A   Yes, sir.
19   Q   And you submitted some paperwork looking
20 for a job; right?
21   A   Yes, sir.
22   Q   And then the crewing agent offered you a
23 job that you could either pick or not pick; right?
24   A   Yes, sir.

Page 23

1    Q   And you picked to go to work on the
2 Irene; right?
3    A   Yes, sir.
4    Q   And when you picked to go on board the
5 Irene, you had to execute an employment contract;
6 right?
7    A   Yes, sir.
8    Q   And when you did that, the job that you
9 were signing up for was to be a wiper; right?
10   A   Yes, sir.
11          MR. CHALOS: Could we mark a couple
12 documents. Take a break and — take three minutes to
13 mark some documents.
14          THE VIDEOGRAPHER: Off the record
15 at 3:52.
16          (Brief recess.)
17          (Documents marked CSME Exhibits 29
18 through 32 for identification.)
19          THE VIDEOGRAPHER: On the record at
20 3:57.
21 BY MR. CHALOS:
22   Q   Mr. Manzanilla, I'm going to show you
23 what we've marked as CSME Defendants' Exhibit No. 29.
24 For the record, I'll make a representation that it's

Page 24

1 a five-page document. Take a look at that document
2 would you please, sir.
3          My first question to you,
4 Mr. Manzanilla, is that the first page and the
5 employment contract you signed to go to work on the
6 Irene E.M.; correct?
7    A   Yes, sir.
8    Q   And then the rest of the documents are
9 also documents that you signed in connection with
10 your application to work on the Irene E.M.; right?
11   A   Yes, sir.
12   Q   And take a look at the second page of
13 that document, if you will. Now, that's a
14 declaration that you signed before you joined the
15 Irene E.M.; correct?
16   A   Yes, sir.
17   Q   And that is your signature on the bottom
18 left-hand side; right?
19   A   Yes, sir.
20   Q   And in fact, before you were allowed to
21 go to work on this ship, you had to go for some
22 training; right?
23   A   Yes, sir.
24   Q   And in fact, you had to go to the office

Page 25

1 of your manning agent to learn about the company's
2 policies; right?
3    A   Yes, sir.
4    Q   And some of that training involved
5 learning about the company's safety management
6 system; right?
7    A   Yes, sir.
8    Q   And the company's environmental
9 protection policy; right?
10   A   Yes, sir.
11   Q   And you also learned that if you were in
12 violation of the company's policies, you could be
13 fired; right?
14   A   Yes, sir.
15          MR. CHALOS: Okay. I'd like to
16 move into evidence Defendants' Exhibit 29, which has
17 been identified by the witness.
18          MR. PHILLIPS: No objection.
19          (Document marked Exhibit CSME 29
20 moved into evidence.)
21 BY MR. CHALOS:
22   Q   I want to show you what we've previously
23 marked and I believe moved into evidence as
24 Exhibit 7, Mr. Manzanilla. And take a look at that

Mario Manzanilla

8 (Pages 26 to 29)

Page 26

1  document.
2         That is, in fact, a copy of the
3  company's environmental protection policy; correct?
4  A  Yes, sir.
5  Q  Okay.  Now, Mr. Manzanilla, that was
6  available and posted in several places on board the
7  ship, was it not?
8  A  Yes, sir.
9  Q  That was on the bulletin board in the
10  engine room; right?  Right?
11  A  Yes, sir.  And in the mess hall.
12  Q  And also in the mess hall; right?
13  A  Yes, sir.
14  Q  And in the hallways; right?
15  A  Yes.  Yes, sir.  Yes, sir.
16  Q  All right.  Now, you also –
17         MR. CHALOS:  Okay.  If that's not
18  moved into evidence, I'd like to move that into
19  evidence with this witness.
20         MR. WOODWARD:  That's CSME 30?
21         MR. CHALOS:  CSME 7.  We'll come
22  back to this in a second.
23  BY MR. CHALOS:
24  Q  I'd like to show you what was marked as

Page 27

1  Defendants'– CSME Defendants' Deposition Exhibit 30.
2  For the record, I'll make a representation that it's
3  a two-page document.
4         Mr. Manzanilla, that document
5  contains a photocopy of the first page of your
6  passport; right?
7  A  Yes.
8  Q  And also the first page of your seaman's
9  book; right?
10  A  Yeah.
11  Q  And that's you on there?
12  A  Yeah.
13  Q  And that is your photograph?
14  A  Yes, sir.
15  Q  With a different hair style?
16  A  Yes, sir.  Long hair.
17         MR. CHALOS:  Okay.  Now, I'd like
18  to move that into evidence.
19         MR. PHILLIPS:  No objection.
20         (Document marked CSME Exhibit 30
21         moved into evidence.)
22  BY MR. CHALOS:
23  Q  Mr. Manzanilla, I'd like to ask you to
24  take a look at what we've marked CSME Defendants'

Page 28

1  Exhibit No. 31.  It's an exhibit bearing several
2  pages.
3         And I just ask you, Mr. Manzanilla,
4  are these photocopies of some of the certificates you
5  received for the training courses you had attended
6  before joining the Irene E.M.?
7  A  Yes, sir.
8  Q  Okay.  Now, you also attended classes
9  about MARPOL before you got on board the ship; right?
10  A  Yes, sir.
11  Q  And you knew that it's illegal to
12  discharge oil or oily wastes overboard before you got
13  hired by the company to work on the Irene; right?
14  A  Yes, sir.
15  Q  And you also learned that at the training
16  seminar you went to for the company in the
17  Philippines; right?
18  A  Yes, sir.
19         MR. CHALOS:  Okay.  I'd like to
20  move into evidence Exhibit No. 31.
21         MR. PHILLIPS:  No objection.
22         (Document marked CSME Exhibit 31
23         moved into evidence.)
24  BY MR. CHALOS:

Page 29

1  Q  Okay.  Now, Mr. Manzanilla, you've been
2  going to sea for how many years?
3  A  Eight years.
4  Q  And how many ships had you worked on?
5  A  About eight, sir.
6  Q  Okay.  So based on your experience, you
7  would agree with me that the company who owned and
8  the company that managed the Irene E.M. were serious
9  companies; right?
10         MR. PHILLIPS:  Objection; vague.
11         THE WITNESS:  Yes, sir.
12  BY MR. CHALOS:
13  Q  And in fact, before you were even
14  permitted to go on board to start work, the company
15  required you to go for some examinations to make sure
16  that you were both physically and mentally fit to do
17  the job; right?
18  A  Yes, sir.
19  Q  And I'm going to show you what we've
20  premarked as CSME Defendants' Exhibit No. 32, and ask
21  you to take a look at that.
22  A  Yes, sir, these are medicals.
23         Yes, sir, these are medicals, sir.
24  Q  Okay.  So Mr. Manzanilla, these are some

Corbett & Wilcox

Mario Manzanilla

9 (Pages 30 to 33)

**Page 30**

1   of the test results and the reports following your
2   prejoining examinations?
3       A   Yes, sir.
4           MR. CHALOS: Okay. I'd like to
5   move that into evidence.
6           MR. PHILLIPS: No objection.
7           MR. CHALOS: And also ask for our
8   court reporter to fix the exhibit.
9           (Document marked CSME Exhibit 32
10  moved into evidence.)
11  BY MR. CHALOS:
12      Q   Now, I'd like to talk a little bit about
13  what you do on board the ship, Mr. Manzanilla.
14          You're not a licensed engineer,
15  right?
16      A   No, sir.
17      Q   You don't hold a license as an engineer?
18      A   No, sir. I'm just an oiler and a wiper.
19      Q   Okay. And on board the Irene E.M., you
20  weren't working as an oiler; right?
21      A   No, I'm a wiper.
22      Q   Okay. So when you were on the Irene
23  E.M., you were hired to work as a wiper; right?
24      A   Yes, sir.

**Page 31**

1       Q   And is it fair to say that a wiper is the
2   lowest-ranking member of the engine room team?
3       A   Yes, sir.
4       Q   Now, let's talk about the oily water
5   separator.
6           The oily water separator is
7   operated by the engineers; right?
8       A   Yes, sir.
9       Q   You don't operate the oily water
10  separator?
11      A   No, sir. I'm only an oiler. Only the
12  oiler uses it.
13      Q   Okay. So that the answer is clear, you
14  would agree with me that you don't operate the oily
15  water separator?
16      A   No, sir.
17      Q   And you don't have any responsibility to
18  maintain the oily water separator, do you?
19      A   No, sir. Just the main engine is what
20  I'm entail.
21      Q   Mr. Manzanilla, yes or no: You don't
22  have any --
23      A   No, sir. No, sir.
24      Q   Okay. Let me finish my question.

**Page 32**

1           Mr. Manzanilla, you would agree
2   with me that you don't have any responsibility to
3   maintain the oily water separator?
4       A   No, sir.
5       Q   So that means you agree with me, yes?
6       A   Yes, sir.
7       Q   It's also a correct statement that you
8   don't have any responsibility to repair the oily
9   water separator?
10      A   Yes, sir.
11      Q   You don't make the decision to use the
12  oily water separator if it's being used, do you?
13      A   No, sir.
14      Q   And you don't make the decision not to
15  use it if the chief engineer decides not to use it;
16  correct?
17      A   Yes, sir.
18      Q   So all questions Mr. Phillips asked you
19  about the oily water separator, you would agree, were
20  questions about a piece of equipment that you don't
21  have any reason to operate, no reason to maintain, no
22  reason to repair, and no reason to ever use; right?
23      A   Yes, sir.
24      Q   So everything you know about the oily

**Page 33**

1   water separator is based on something someone else
2   told you; right?
3       A   Yes, sir.
4       Q   Okay. Now, you also said something about
5   radar.
6           Now, you don't work on the bridge
7   of the ship; right?
8       A   Yes, sir.
9       Q   "Yes, sir," meaning you agree with me,
10  you don't work on the bridge?
11      A   Yes, sir.
12      Q   Yes, sir, you agree with me; or yes, sir,
13  you work on the bridge? I'm not sure I understand.
14      A   I'm not working on the bridge.
15      Q   Okay, Mr. Manzanilla. There's no radars
16  in the engine room, are there?
17      A   No, sir.
18      Q   So anything that you know about the radar
19  or anything you told us about the radar is based on
20  something that someone else told you; right?
21      A   Yes, sir.
22      Q   Okay. Let's talk about Chief Engineer
23  Tomondong.
24      A   Yes, sir.

Mario Manzanilla

10 (Pages 34 to 37)

Page 34

1    Q    Now, you would agree with me that Chief
2 Engineer Tomondong never ordered you to discharge
3 anything overboard?
4    A    No, sir.
5    Q    So when you say "no, sir," you agree that
6 Chief Engineer Tomondong never -- strike that. Let
7 me rephrase my question. I stumbled on my words.
8        You would agree with me, right,
9 that Chief Engineer Tomondong never ordered you to
10 discharge anything overboard?
11   A    No, sir.
12   Q    When you say "no, sir," are you agreeing
13 with me?
14   A    Yes, sir.
15   Q    Okay. By the way, in addition to the
16 training that you took at the crewing agent and the
17 other training classes that you had, you also went to
18 a maritime school in the Philippines; right?
19   A    Yes, sir.
20   Q    And at that maritime school, you also
21 learned about pollution prevention?
22   A    Yes, sir.
23   Q    All right. Now, you also learned, did
24 you not, that it was illegal to discharge oil or oily

Page 35

1 wastes overboard; right?
2    A    Yes, sir.
3    Q    And you also learned that if you observed
4 any oil or oily wastes being discharged overboard,
5 that you were supposed to report that to the captain
6 or to the owner of the ship; right?
7    A    Yes, sir.
8    Q    All right. Now, all the stuff you told
9 us about chief -- that happened when Chief Engineer
10 Tomondong was on board, you never reported that to
11 the captain of the ship, did you?
12   A    No, sir. He himself, he didn't report
13 it. He knows that it's wrong.
14   Q    Mr. Manzanilla, I'm asking you what you
15 did. We'll talk to the other guys at another time.
16        Okay. You personally never
17 reported it to Chien Spirit; right?
18   A    No, sir. I don't know what to do, sir.
19   Q    And just so I'm clear, you also never
20 made a report to Vemetico Marine, the owner of the
21 ship, did you?
22   A    No, sir. And I don't know who they are.
23   Q    Okay. Now, let me see if I understand a
24 couple of the things right.

Page 36

1        You told us before that in the
2 engine room, if you start on the bottom, there's the
3 wipers; right?
4    A    Yes, sir.
5    Q    And then the next promotion would be to
6 oiler?
7    A    Yes, sir.
8    Q    And then the next promotion would be to
9 engineer?
10   A    Yes, sir.
11   Q    And then the boss of the engine room is
12 the chief engineer; right?
13   A    Yes, sir.
14   Q    And the boss of the ship is the captain;
15 right?
16   A    Yes, sir.
17   Q    All right. Now, in all the time that you
18 were on board the ship, you never reported any MARPOL
19 violations to the captain; right?
20   A    No, sir.
21   Q    And now you never reported any MARPOL
22 violations to the chief engineer?
23   A    No, sir.
24   Q    And you never reported any MARPOL

Page 37

1 violations to either the management company or the
2 company that owns the ship; right?
3    A    No, sir.
4    Q    And now you yourself, in all the time
5 that you were on board the ship, never turned on the
6 pumps to pump anything overboard; right?
7    A    No, sir.
8    Q    Okay. Now, you yourself never turned off
9 the pumps?
10   A    No, sir.
11   Q    Now, the whole time you were on board the
12 ship, the captain never asked you to set up a magic
13 pipe; right?
14   A    No, sir.
15   Q    And the companies, meaning the management
16 company and the owning company, never asked you to
17 set up a magic pipe?
18   A    No, sir.
19   Q    Okay. And Chief Engineer Dragomir never
20 asked you to set up a magic pipe; right?
21   A    No, sir.
22   Q    And Second Engineer Villano, you know
23 him; right?
24   A    Yes, sir.

Corbett & Wilcox

Mario Manzanilla

11 (Pages 38 to 41)

Page 38

1    Q    Okay.  He never asked you to set up a
2  magic pipe?
3    A    No, sir.
4    Q    In fact, no one asked you to set up the
5  magic pipe between Brazil and the United States.
6    A    No, sir.
7    Q    And in fact, the truth is, between Brazil
8  and the United States, you never saw anybody
9  discharging anything overboard, did you?
10    A    Yes, sir.
11    Q    So let me see if I'm clear.
12        Between Brazil and the United
13  States, you never saw anything with your own eyes
14  being discharged overboard.
15    A    That's what I remember, that I didn't see
16  anything.
17    Q    Okay.  Now, in fact, Mr. Manzanilla, just
18  so we're clear, no one has ever asked you to hide
19  anything from the Government or the Coast Guard;
20  right?
21    A    No, sir.  No, sir.
22    Q    Not the chief engineer, Mr. Dragomir?
23    A    No, sir.
24    Q    Not the captain of the ship?

Page 39

1    A    No, sir.
2    Q    Not the company?
3    A    The superintendent only.
4    Q    Okay.  Now, the superintendent, he didn't
5  ask you to hide anything, did he?  What he asked was
6  if you could retract the statement you made; right?
7    A    Yes, that's right, sir.
8    Q    So he didn't ask you to hide anything?
9    A    No, sir.
10    Q    Okay.  Now, you also saw a man on board
11  named Mr. Madias; right?
12    A    Yes, sir.
13    Q    Now, Mr. Madias never asked you to hide
14  anything; right?
15    A    No, sir.
16    Q    And he never asked you to lie?
17    A    No, sir.
18    Q    And in fact, the captain never asked you
19  to lie either?
20    A    No, sir.
21    Q    Okay.  And Chief Engineer Dragomir never
22  asked you to lie.
23    A    No, sir.
24    Q    And you told us earlier today the

Page 40

1  companies didn't tell you to lie either; right?
2        MR. PHILLIPS:  Objection; asked and
3  answered.
4        THE WITNESS:  No, sir.
5  BY MR. CHALOS:
6    Q    Okay.  Now, even though you didn't talk
7  to the Coast Guard when they came on board, they
8  asked you to write a statement; right?
9    A    Yes, sir.
10    Q    And you did that?
11    A    Yes, sir.
12    Q    And when you wrote it, it was the truth;
13  right?
14    A    Yes, sir.
15    Q    Okay.  And at the time wrote it, this guy
16  Christos wasn't even on board the ship yet; right?
17    A    No, sir, not yet.
18    Q    Okay.  Is it fair to say that when the
19  Coast Guard asked you to write a statement, that no
20  one had told you to lie to them?
21    A    No, sir.
22    Q    So you agree with me?
23    A    Yes, sir.
24    Q    Okay.  So just so I'm clear about when

Page 41

1  this discussion took place in the mess room, you had
2  already given your statement to the Coast Guard;
3  right?
4    A    Let me try to remember that.
5        I believe I had already given it.
6    Q    Okay.  And then Mr. Christos asked if you
7  could retract the statement; right?
8    A    Yes.
9    Q    And you said that you couldn't, because
10  you had already told him the truth and given him your
11  statement; right?
12    A    Yes, sir.
13    Q    Okay.  And you never lied to the Coast
14  Guard?
15    A    No, sir.
16        MR. CHALOS:  Okay.  One second,
17  Mr. Manzanilla.
18        Okay.  Nothing further.
19        MR. WOODWARD:  I have no questions.
20        REDIRECT EXAMINATION
21  BY MR. PHILLIPS:
22    Q    Mr. Manzanilla, when you were -- when I
23  was asking you questions, and you said that you had
24  saw three overboard discharges from Brazil to the

Mario Manzanilla

12 (Pages 42 to 45)

Page 42

1　United States, is that still your testimony?
2　　A　That's what I remember, sir.
3　　Q　Okay. Now, going back to your employment
4　contract, how much money does a wiper earn on the
5　Irene?
6　　A　230 only, sir.
7　　Q　Per year? Per month?
8　　A　A month.
9　　Q　Now, you testified, in response to
10　Mr. Chalos' questions that this was a serious
11　company. But specifically, were they serious about
12　preventing pollution?
13　　　　MR. WOODWARD: Objection —
14　　　　MR. CHALOS: Objection.
15　　　　MR. WOODWARD: — speculation.
16　　　　THE WITNESS: I don't know, sir.
17　BY MR. PHILLIPS:
18　　Q　You testified that the Irene never had an
19　oily water separator that worked?
20　　　　MR. CHALOS: Objection.
21　　　　THE WITNESS: Yes, sir.
22　BY MR. PHILLIPS:
23　　Q　Now, you also testified that you were
24　trained on pollution prevention and how to observe

Page 43

1　oily waste going overboard.
2　　　　MR. CHALOS: Objection. That
3　wasn't his testimony.
4　　　　MR. PHILLIPS: That was his
5　testimony — that was your question.
6　BY MR. PHILLIPS:
7　　Q　Now —
8　　　　THE COURT REPORTER: What was the
9　answer?
10　　　　THE INTERPRETER: He hasn't
11　answered.
12　　　　"Yes, sir." Yes, sir, is the
13　answer.
14　BY MR. PHILLIPS:
15　　Q　Now, can you tell when an oily water
16　separator is working?
17　　　　MR. CHALOS: Objection.
18　　　　MR. WOODWARD: No foundation.
19　　　　THE WITNESS: It was not working.
20　Since I boarded the ship, it had not been working.
21　They just use it as an exhibit.
22　BY MR. PHILLIPS:
23　　Q　Now, when Chief Dragomir came on board,
24　did he change the way oily waste was handled?

Page 44

1　　　　MR. WOODWARD: Objection; goes
2　beyond the scope of direct.
3　　　　MR. CHALOS: And cross.
4　　　　MR. WOODWARD: Introducing an
5　entirely new line of questioning.
6　BY MR. PHILLIPS:
7　　Q　Go ahead and answer.
8　　A　I don't remember, sir.
9　　Q　So you don't remember if he changed the
10　way —
11　　A　That I don't remember, sir.
12　　Q　Did they still use the magic pipe when
13　Chief Dragomir was on board?
14　　　　MR. WOODWARD: Objection, goes
15　beyond direct and cross.
16　　　　MR. CHALOS: And he testified he
17　doesn't even work there.
18　　　　THE WITNESS: They were still using
19　it.
20　　　　MR. PHILLIPS: Okay.
21　　　　MR. CHALOS: That doesn't come in.
22　　　　MR. PHILLIPS: For the record,
23　Mr. Chalos asked several questions about all the
24　engineers, the chief engineers, and whether they made

Page 45

1　orders for overboard discharges. That's what this
2　question relates to.
3　　　　MR. CHALOS: Anything else?
4　　　　MR. PHILLIPS: No further from me.
5　Thank you.
6　　　　RECROSS-EXAMINATION
7　BY MR. CHALOS:
8　　Q　Mr. Manzanilla, you told me that you
9　yourself never saw any overboard discharges, and
10　that's the truth; right?
11　　A　Yes, sir.
12　　Q　So when Mr. Phillips force-feeds you —
13　　　　MR. PHILLIPS: Objection. This
14　is —
15　　　　MR. CHALOS: Okay. I'll rephrase.
16　　　　THE WITNESS: The only thing that I
17　remember is that this equipment was attached.
18　BY MR. CHALOS:
19　　Q　Okay. So really the answer is that you
20　never saw any overboard discharges between Brazil and
21　the United States with your own eyes?
22　　A　I don't really remember exactly, because,
23　you know, this has happened a lot, coming from Africa
24　going to the United States. It was many times.

Corbett & Wilcox

Mario Manzanilla

13 (Pages 46 to 49)

Page 46

1   Q   Okay. Now, you're not authorized or
2   qualified to report on the condition of the oily
3   water separator to the company, are you?
4   A   No, sir. Yes, sir. No, sir.
5   Q   Okay. So the answer to that would be no,
6   you're not authorized or qualified; right?
7   A   Yes, sir.
8   Q   You agree with me?
9   A   Yes, sir.
10  Q   Okay. Now, and Mr. Phillips asked you
11  about if you knew how oily wastes were handled on
12  board. Do you remember that?
13  A   Yes, sir.
14  Q   You do know that there were internal
15  transfers from the bilge wells to the bilge holding
16  tank; right?
17  A   Yes, sir.
18  Q   And you also know that the bilge holding
19  tank was really big?
20  A   Yes, sir.
21  Q   In fact, the biggest one you've ever seen
22  on any of the ships you've ever sailed on?
23  A   Yes, sir.
24  Q   More than 106 cubic meters, right, were

Page 47

1   the capacity?
2   A   Yes, sir.
3   Q   And that tank never filled up while you
4   were on board, did it?
5   A   We were there in Poland, and — what kind
6   of tanks are we talking about now?
7   Q   You remember in Poland that oily wastes
8   were discharged to a shore facility; right?
9   A   Because there's a lot of tanks, you know.
10  There's a bilge tank, a sludge tank, a bilge well.
11  Q   So my question is, you remember that oily
12  wastes were put ashore to a shore-side facility in
13  Poland; right?
14  A   In Poland, the sludge tank, yes. But
15  they put it on shore in Poland through a suction.
16  Q   Okay. And that was -- that discharge
17  went from the ship to a shore facility; right?
18  A   Yes, sir.
19  Q   And it didn't go to the sea?
20  A   No, sir.
21      MR. CHALOS: Okay. Nothing
22  further. Thank you.
23      RECROSS-EXAMINATION
24

Page 48

1   BY MR. WOODWARD:
2   Q   Between Africa and Brazil, when you were
3   asked the question by Mr. Phillips about magic pipe
4   you said, quote, "they" used it.
5   A   Yes, sir.
6   Q   You don't know who that was, do you?
7   A   The former crew. They've already gone
8   home.
9   Q   Mr. Dragomir never used it, did he?
10  A   In Africa he was just new, so he hadn't
11  made his orders, yet.
12      MR. WOODWARD: Thank you. No
13  further questions.
14      FURTHER REDIRECT EXAMINATION
15  BY MR. PHILLIPS:
16  Q   Mr. Manzanilla, how many times did the
17  Irene discharge oily waste to port?
18  A   Only one time in Poland.
19  Q   That's during your entire time on the
20  ship?
21  A   Yes, only once.
22  Q   Okay.
23  A   Because we were there for a long time.
24  We were there for one month, and then after that, the

Page 49

1   sludge tank got filled.
2   Q   Okay. Were Chief Engineer Dragomir and
3   Chief Tomondong on the ship at the same time?
4   A   No, because he joined us in Africa. Our
5   chief engineer in Poland was Tomondong.
6   Q   Who was giving orders from Africa to
7   Brazil?
8       MR. WOODWARD: I'm going to object
9   to the form of the question.
10      THE WITNESS:  I remember that in
11  Africa it was still Tomondong.
12  BY MR. CHALOS:
13  Q   In Africa. What about in the ocean from
14  Africa to Brazil?
15  A   I believe it was the second engineer that
16  was making orders then; or maybe it's coming from the
17  chief engineer.
18  Q   Do you know?
19  A   I believe that it was done that way. I'm
20  just not sure.
21      MR. PHILLIPS: Okay. No further
22  questions.
23      MR. CHALOS: Nothing further.
24      MR. WOODWARD: Nothing further.

Mario Manzanilla

14 (Pages 50 to 52)

Page 50

1        THE VIDEOGRAPHER: Off the record
2    at 4:30.
3        (Signature having been waived, the
4        deposition of MARIO MANZANILLA was
5        concluded at 4:30 p.m.)
6
7
8
9            INDEX
10   WITNESS:                    PAGE
11   MARIO MANZANILLA
12   Mr. Phillips            4
13   Mr. Chalos             22
14   Mr. Phillips           41
15   Mr. Manzanilla         45
16   Mr. Woodward           48
17   Mr. Phillips           48
18
19
20
21
22
23
24

Page 51

1        EXHIBITS
2
3    EXHIBITS MARKED FOR IDENTIFICATION
4  CSME     DESCRIPTION        PAGE
5   29   Documents relating to employment   23
         of Mr. Manzanilla
6
    30   Photocopy of seaman's book and     23
7        passport of Mr. Manzanilla
8   31   Certificates related to            23
         Mr. Manzanilla's training
9
    32   Physical and mental test results   23
10       for Mr. Manzanilla
11
12
13       EXHIBITS MOVED INTO EVIDENCE
14   CSMR Exhibit No.          PAGE
15   29               25
16   30               27
17   31               28
18   32               30
19
20
21
22
23
24

Page 52

1        CERTIFICATE OF SHORTHAND REPORTER
2
3        I, Gail Inghram Verbano, CSR, RMR,
4    the officer before whom the foregoing proceedings
5    were taken, do hereby certify that the foregoing
6    transcript is a true and correct record of the
7    proceedings; that said proceedings were taken by me
8    stenographically and thereafter reduced to
9    typewriting under my supervision; and that I am
10   neither counsel for, related to, nor employed by any
11   of the parties to this case and have no interest,
12   financial or otherwise, in its outcome.
13
14
15
16
                    _____
17                  Gail Inghram Verbano, CSR, RMR
                    CSR No. 8635
18                  Certification No.: 220
19                  (Expires 1-31-2008)
20
21
22
23
24

Corbett & Wilcox

# EXHIBIT 13

```
                        7979CEND.txt
                                                          1
       7979CEND              Decision
  1    UNITED STATES DISTRICT COURT
  1    SOUTHERN DISTRICT OF NEW YORK
  2    --------------------------------x
  2
  3    CENTAURI SHIPPING LTD.;
  3
  4              Plaintiff,
  4
  5         v.                          07 CV 4761 (RJS)
  5
  6    WESTERN BULK CARRIERS KS, ET
  6    AL.,
  7
  7              Defendants.
  8
  8    --------------------------------x
  9                                     New York, N.Y.
  9                                     September 7, 2007
 10                                     9:30 a.m.
 10
 11    Before:
 11
 12              HON. RICHARD J. SULLIVAN,
 12
 13.                                        District Judge
 13
 14                        APPEARANCES
 14
 15    LYONS & FLOOD, L.L.P.
 15         Attorneys for Plaintiff
 16    BY:  KIRK M.H. LYONS
 16         JON WERNER
 17
 17    LENNON, MURPHY & LENNON, LLC
 18         Attorney for Defendants
 18    BY:  PATRICK F. LENNON
 19
 19
 20
 21
 22
 23
 24
 25
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
U                                                          2
       7979CEND              Decision
  1              (Case called)
  2              THE DEPUTY CLERK:  If the parties could stated their
  3    appearances for the record, please.
  4              MR. LYONS:  Kirk Lyons and John Werner from Lyons &
  5    Flood for plaintiff.
  6              THE COURT:  Good morning.  I'm sorry.  I didn't --
  7              MR. LYONS:  Jon Werner.
  8              THE COURT:  Mr. Werner.
  9              Good morning.
 10              MR. WERNER:  Good morning.
 11              MR. LENNON:  Good morning.  Patrick Lennon from
 12    Lennon, Murphy & Lennon for the defendant, Western Bulk
 13    Carriers KS.
                            Page 1
```

7979CEND.txt

14    THE COURT:  Good morning, Mr. Lennon.
15    Thank you both for coming in.
16    We last met on Wednesday.  We had pretty extensive
17    argument, and I had asked basically for a couple days to
18    consider the arguments, review the cases, review the facts, and
19    to try to come up with where I came out on this thing.
20    I'm prepared to do that unless there is anything you
21    want to handle preliminarily.
22    MR. LYONS:  None from plaintiff's side, your Honor.
23    MR. LENNON:  None for defendant, your Honor.
24    THE COURT:  I had contemplated issuing a written
25    opinion but I think in the interest of speed decided to just do
                  SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                              3

7979CEND                    Decision
1    it from the bench.  I will read portions of it.  I hope it's
2    all right.
3          I'll ready slowly.  Cites and things I can give you
4    copies of those as we go or afterwards.
5          This case is before the court on the defendants'
6    motion to vacate an order of maritime attachment that was
7    entered by Judge Karas on June 5 of 2007.  The case was
8    subsequently reassigned to me, and a hearing was conducted
9    pursuant to Supplemental Admiralty Rule E(4)(f) on September 5,
10   2007.  After considering the arguments presented at the hearing
11   as well as those set forth in the parties' extensive papers and
12   submissions, I hereby grant the defendants' motion and vacate
13   the June 5 attachment order.
14         By way of background, under Rule B of the Supplemental
15   Rules of Certain Admiralty and Maritime Claims, a plaintiff may
16   obtain an ex parte order authorizing attachment of defendants'
17   property upon the filing of a verified complaint praying for an
18   attachment and affidavit stating that to the best of
19   plaintiff's knowledge the defendant cannot be found within the
20   judicial district.  On June 5, plaintiff presented such a
21   verified complaint and affidavit to Judge Karas, who, accepting
22   the representations contained therein, issued the attachment
23   order at issue in this case.
24         Once its property had been restrained, the defendant
25   has the right under Rule E(4)(f) to appear before the district
                  SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                              4

7979CEND                    Decision
1    court to contest that attachment; whereupon the plaintiff must
2    show why the arrest or attachment should not be vacated or
3    other relief granted.  Under the Second Circuit's ruling in
4    Aqua Stoli Shipping Limited v. Gardner Smith, the plaintiff at
5    such a hearing bears the burden of demonstrating that:  One, it
6    has a valid prima facie admiralty claim against the defendant;
7    two, defendant cannot be found within the district; three, the
8    defendants' property may be found within the district; and
9    four, there is no statutory or maritime law bar to the
10   attachment.
11         In the instant action, the defendant challenges the
12   June 5 attachment order on three grounds.  First, defendant
13   asserts that the plaintiff's verified complaint failed to state
14   a valid prima facie admiralty claim and that the action, styled
15   as a motion to enforce a money judgment entered by the Angolan
16   Supreme Court, was unripe.  Specifically, defendant argues that
17   no such judgment had been issued by the Angolan Court and that,
18   in fact, plaintiff had failed to even commence an action that
                          Page 2

7979CEND.txt
19    might result in such judgment at the time of the attachment.
20        Second, defendant asserts that plaintiff failed to
21    demonstrate the second prong of the Aqua Stoli test, namely,
22    that the defendant could not be found within the Southern
23    District of New York.
24        Finally, defendant asserts that the attachment order
25    should be vacated as a result of the court's equitable

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

5

7979CEND              Decision
1    discretion to vacate maritime attachments that otherwise comply
2    with Rule B. And I'm quoting from Aqua Stoli at 444.
3        Because I find that the defendant was, in fact, found
4    within the district at the time that the attachment order was
5    issued, I grant the defendants' motion to vacate the June 5
6    order without necessarily reaching the other two bases. The
7    reasons for my finding are as follows.
8        Although the supplemental rules do not precisely
9    define what it means to be found within the district, the
10   Second Circuit has articulated a two-prong test designed to
11   facilitate the determination of whether defendant is, in fact,
12   found within the district for purposes of Rule B. This test,
13   first enunciated in Seawind Compania, SA v. Crescent Line,
14   Inc., provides that the defendant is found within the district
15   if: One, he's found within the district for purposes of
16   jurisdiction; and two, he's found within the district for
17   purposes of the service of process. In essence, the Seawind
18   test requires that the defendant be both amenable to suit in
19   the district and readily susceptible to process in the
20   district.
21        Addressing the second prong first, there appears to be
22   no dispute that at the time the attachment was sought, the
23   defendant had a valid registered agent for service of process
24   in the Southern District of New York. Accordingly, the parties
25   appear to concede that the defendant was readily susceptible to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

6

7979CEND              Decision
1    process in the district, thereby satisfying the process prong
2    of Seawind. I cited to plaintiff's memorandum of law at 7 and
3    8 and Mr. Lyons' affidavit in support thereof at paragraph 10.
4        However, the parties dispute whether the defendant was
5    present jurisdictionally under the first prong of the Seawind
6    test. Although plaintiff concedes that at the time of the
7    attachment it was, in fact, aware that WBC was registered to do
8    business in the State of New York, and had a registered agent
9    for the service of process -- and that's Mr. Lyons' affidavit,
10   10 -- plaintiff nevertheless insists that a defendant may only
11   be found within the jurisdiction -- found within the district
12   for jurisdictional purposes if it engages in substantial
13   commercial activity within the district. Relying principally
14   on Magistrate Judge Gorenstein's opinion in Erne Shipping v.
15   HBC Hamburg Bulk Carriers, plaintiff asserts that general
16   jurisdiction under New York law may be found only where a
17   defendant corporation's contacts with the district are
18   continuous and systematic, requiring inquiry into "whether the
19   company has an office in the state, whether it has any bank
20   accounts or other property in the state, whether it has a phone
21   listing in the state, whether it does public relations work
22   there, and whether it has individuals permanently located in
23   the state to promote its interests." That's plaintiff's

Page 3

7979CEND.txt
24    memorandum at 9.  Applying these factors to the defendant,
25    plaintiff contends that WBC's contacts "taken as a whole are
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                    7

7979CEND                    Decision
1     insufficient to establish a jurisdictional presence in New
2     York" thereby defeating WBC's motion to vacate the attachment
3     on the basis that WBC is not present in New York in the
4     jurisdictional sense.  That's also plaintiff's memorandum at 10
5     and 11 and 13.
6          I reject this argument as inconsistent with the Second
7     Circuit's opinion in Seawind.  Like Judge Lynch in Express Sea
8     Transport Corp, v. Novel Commodities SA, 06 CV 2404, cited in
9     the defendants' brief, I reiterate that the key inquiry
10    relating to the jurisdictional prong of the Seawind test is
11    whether the defendant is amenable to suit within the district.
12    Although such amenability may at times be demonstrated tacitly
13    through the existence of continuous and systematic contacts
14    such as those described by plaintiff, such contacts are by no
15    means the only method of demonstrating a defendant's
16    jurisdictional presence in the district.  In fact, the language
17    and context of Seawind suggests that inquiry into the
18    intra-district activities of the defendant is most relevant
19    perhaps as a default in the absence of more explicit
20    manifestations of jurisdictional acquiescence.  Here, there is
21    no dispute that the defendant is and was at all times relevant
22    to the attachment a registered foreign corporation within the
23    State of New York.  As such, defendant, under New York law, has
24    consented to jurisdiction in the courts of this state.  And I
25    cite New York Business Corporations Law 1304 through 1314.  The
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                    8

7979CEND                    Decision
1     defendant, by the way, explicitly consented or rather conceded
2     as much at oral argument on Wednesday.
3          The suggestion that Rule B and the jurisdictional
4     prong of Seawind somehow require more than this so that they
5     would require the court to ignore defendants' explicit consent
6     to jurisdiction in this district in favor of a more cumbersome
7     and unwieldy balancing test of intra-district commercial
8     activity I believe flies in the face of common sense and is not
9     required by Seawind.
10         Having determined that defendant was both amenable to
11    suit in the district and readily available to accept service of
12    process in the district, I conclude the defendant meets both
13    prongs of the Seawind test.  Accordingly, I find the defendant
14    was, in fact, found in the district under Rule B and that the
15    June 5 attachment order must be vacated.  As a necessary
16    corollary, I also vacate Judge Karas' June 15 order in which he
17    approved the parties' stipulation to substitute a bond for the
18    attached funds.
19         Although defendants' motion also requested the
20    dismissal of the complaint in this matter, I believe that the
21    parties agreed at oral argument that there may be at least
22    potentially a basis for this action to continue even though the
23    attachment order has been vacated.  I leave that for the
24    plaintiff and plaintiff's counsel to consider, and I will grant
25    plaintiffs ten days in which to amend the complaint if they so
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                    9

7979CEND.txt
7979CEND                        Decision
1  choose, ten days from today.
2        Now, as was brought out during the September 5 hearing
3  and in the written submissions made in connection with this
4  motion, the verified complaints and the supporting affirmation
5  of this case contained what I consider to be serious
6  misstatements of fact that to my mind require further comment
7  and action by the court, which brings me to the second portion
8  of my ruling, and I think requires a further discussion of the
9  facts leading up to the issuance of the June 5, 2007
10 attachment.
11        On June 5, 2007, plaintiff, proceeding ex parte,
12 presented to U.S. District Judge Kenneth M. Karas, a writ of
13 maritime attachment and garnishment and verified complaint.
14        They sought to attach more than fifteen million
15 dollars of the defendants' funds. Accompanying the attachment
16 was an affirmation by counsel, Mr. Lyons. And in the second
17 paragraph of that affirmation, which was signed by Mr. Lyons
18 under the penalty of perjury, the affirmation read as follows:
19 "Your affiant has attempted to locate the defendants, western
20 Bulk Carriers KS, western Bulk AS, and western Bulk Carriers AS
21 within the district. As part of the investigation, my office
22 has contacted the Division of Corporations of the New York
23 Department of State and found no records indicating that
24 defendants were either incorporated or licensed to do business
25 in the State of New York." That's at paragraph 2 of the
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                              10
7979CEND                        Decision
1  affirmation.
2        Pursuant to Supplemental Admiralty Rule B(1) of the
3  Federal Rules of Civil Procedure, Judge Karas signed
4  plaintiff's attachment. Plaintiffs thereupon proceeded to
5  attach the defendants' funds and on June 15, 2007 the parties
6  entered into a stipulation to substitute a bond for the
7  attached funds.
8        In August, 2007, defendants requested a
9  post-deprivation hearing pursuant to Rule of Civil Procedure --
10 well, Supplemental Admiralty Rule E(4)(f). The parties briefed
11 their positions. And on September 5 of 2007 I held a hearing
12 on the defendants' application to vacate the attachment. Among
13 other things, the defendants argued, as I noted before, that
14 the attachment should be vacated because the defendants could
15 be found in the district within the meaning of Supplemental
16 Rule B(1)(a). Specifically, defendants argue that contrary to
17 the assertions set forth in Mr. Lyons' June 5 affirmation, they
18 had, in fact, been registered with the New York State
19 Department of Corporations to conduct business in New York as a
20 foreign limited partnership since June 22, 2005.
21        I'm citing the memorandum of law in support of the
22 defendants' motion to vacate the maritime attachment, 3, 4, and
23 page 10 through 15.
24        Defendants also noted that they had retained a
25 registered agent in New York to accept service of legal
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                              11
7979CEND                        Decision
1  process.
2        In response to defendants' claims that they could be
3  found in the district, plaintiff offered a mea culpa -- that's
4  plaintiff's term, not mine -- acknowledging that it had made a
                            Page 5

7979CEND.txt

5    misstatement to the court in that it failed to disclose that
6    defendant was, in fact, registered to do business in the State
7    of New York and had a registered agent for the service of legal
8    process within the district.
9         And I'm quoting the memorandum of law in opposition to
10   the motion to vacate, that's plaintiff's memorandum of law at
11   6.
12        Insisting that the misstatement was at most a harmless
13   error, plaintiff attributed the misstatement in Mr. Lyons' ex
14   parte affirmation to a "clerical error" occasioned by
15   plaintiff's use of "a pro forma Rule B(1) affirmation in
16   support of the application for an attachment order" that
17   plaintiffs failed to "revise to properly reflect the results of
18   our investigation." That's Mr. Lyons' affirmation in support
19   of the opposition motion at paragraph 10.
20        I find that the facts surrounding plaintiff's
21   misstatements suggest otherwise and are highly troubling. In
22   the first place, it should be noted that it was not until
23   August 16 of 2007, more than two months after the issuance of
24   an ex parte attachment order that totaled more than fifteen
25   million dollars, that plaintiff first notified the court that
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                                    12

7979CEND                    Decision
1    its affirmation in support of the attachment was inaccurate.
2         Second, counsel's euphemistic characterization of the
3    misstatement as a clerical error seems wholly inconsistent with
4    the record developed before and during the September 5 oral
5    argument in this matter. For example, in Mr. Lyons'
6    affirmation in opposition to defendants' motion to vacate the
7    attachment, he acknowledged that at the time the initial
8    affirmation was submitted to Judge Karas, "Plaintiff was, in
9    fact, aware that WBC was registered to do business in the State
10   of New York and had a registered agent for the service of
11   process." That's paragraph 10 of the affirmation of Mr. Lyons.
12        At oral argument Mr. Lyons reaffirmed this fact,
13   conceding that at the time he signed the affirmation presented
14   to Judge Karas, he was, in fact, aware that the defendants were
15   registered in New York and had an agent to accept legal process
16   in New York.
17        Indeed, Mr. Lyons went even further, stating that he
18   and his cocounsel had actually researched whether registration
19   to do business in New York and having an agent to accept
20   process was sufficient to be found within the district. And he
21   did this research before he signed the affirmation accompanying
22   the attachment. Counsel stated that it was their conclusion
23   that it was not sufficient to be found in the district.
24        In light of the knowledge and forethought apparently
25   expanded on this issue prior to plaintiff's submission of the
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                                    13

7979CEND                    Decision
1    affirmation in this matter, I find it all but inconceivable
2    that counsel could have signed an affirmation under penalty of
3    perjury asserting, as I noted before, that the affiant had
4    attempted to locate the defendants in the district and that as
5    part of the investigation counsel's office had contacted the
6    Division of Corporations of the New York Department of State
7    and found no records indicating that defendants were either
8    incorporated or licensed to do business in the State of New
9    York.

                              Page 6

7979CEND.txt

```
10            Indeed, the only two possible explanations that come
11   to mind for me are these:  Either counsel signed a crucial ex
12   parte affirmation without reading it in even the most cursory
13   fashion; or worse, counsel deliberately submitted an affidavit
14   which he knew to be false and materially misleading to the
15   court.  Although the latter conclusion is far more serious,
16   each is gravely troubling, particularly in the context of an ex
17   parte proceeding involving significant sums of money and
18   implicating important and fundamental due process rights.  In
19   any event, under no circumstances to my mind could the
20   misstatement at issue here be blindly dismissed as a clerical
21   error.
22            Equally disturbing to me is the fact that
23   notwithstanding plaintiff's mea culpa, plaintiff nevertheless
24   insists that the misstatement contained in the affirmation was
25   a harmless error and that the June 5 attachment would have
```
                   SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                    14
7979CEND                    Decision
```
 1   appropriately issued even if plaintiff had not misstated the
 2   facts about defendants' presence in the district.  Obviously,
 3   that is not a determination that plaintiff's counsel is
 4   entitled to make.  Moreover, plaintiff conceded at oral
 5   argument that the information omitted by plaintiff's counsel in
 6   the affirmation could have been determinative of whether a
 7   judge of this court would have signed the attachment.  In light
 8   of that concession, not to mention this court's prior ruling
 9   today, in which it, in fact, vacated the June 5 attachment
10   order on precisely those grounds, it seems safe to say that
11   counsel's confidence in the harmlessness of the misstatements
12   at issue was highly misplaced.  I would also suggest that the
13   facts presented here would arguably justify vacatur of the June
14   5 order as an exercise of the Court's equitable discretion
15   generally recognized by the Second Circuit in Aqua Stoli and
16   other maritime cases, though, as I mentioned before, it was not
17   necessary to reach that finding for purposes of the motion to
18   vacate.
19            Finally, I would note that if fifteen million dollar
20   ex parte maritime attachments have now become so routine, so
21   automatic, and so perfunctory as to render the supporting
22   affirmations mere pro forma documents not worthy of being read
23   before they are signed, or that misstatements of the sort at
24   issue here can be brushed aside as mere clerical errors that
25   are simply harmless in nature, then I must consider this entire
```
                   SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                    15
7979CEND                    Decision
```
 1   area of law may have gotten off the rails, to the detriment of
 2   the defendants and the court.
 3            Rule B is a powerful and in some ways unprecedented
 4   tool available to plaintiffs in maritime actions.  There are
 5   good reasons for it.  But, it is premised on the assurance that
 6   plaintiffs and their counsel will act with care and candor in
 7   ex parte proceedings with the court.  That clearly did not
 8   happen here.
 9            Be that as it may, I believe that the conduct of
10   counsel in this case requires further action by the court.
11   Regardless of whether plaintiff's counsel was careless or
12   deliberately misled the court, the result was the same.  The
13   court issued an ex parte order attaching more than fifteen
14   million dollars of defendants' assets based on the affirmation
```
                              Page 7

7979CEND.txt

15  which plaintiff's counsel now admits was false, at least in
16  part.
17          In light of these facts, plaintiff is hereby ordered
18  to show cause why the court should not impose sanctions,
19  payable to the court, on plaintiff's counsel under Federal Rule
20  of Civil Procedure 11(b) for submitting an affirmation to the
21  court, Judge Karas in this case, that plaintiff's counsel knew
22  or should have known was materially false, at least in part.
23  And I would cite the Federal Rule of Civil Procedure
24  11(c)(1)(B) and also the Second Circuit's ruling in Baffa v.
25  Donaldson, Lufkin & Jenrette Securities Corp., at 222 F.3d 52,
                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                              16

7979CEND              Decision
 1  at 57, Second Circuit, 2000.
 2          Plaintiff's memorandum of law is due no later than
 3  September 28, 2007.  That's two weeks from today.
 4          Defendants' counsel, Mr. Lennon, is invited, but not
 5  required, to submit its own memorandum on or before that date.
 6          As a concluding comment, let me just say, I derive no
 7  satisfaction in issuing an order to show cause in this case,
 8  and I don't do it lightly.
 9          Mr. Lyons, I don't know you.  I met you on Wednesday
10  for the first time.  You struck me as a decent man and a very
11  capable lawyer.  I was impressed by the quality of the papers
12  you submitted.  I was impressed by the quality and
13  sophistication of the legal arguments that you made at the
14  hearing.  I want to assure you, I have not made up my mind with
15  regard to the Rule 11 sanctions issue.  I'm keeping an open
16  mind and I intend to read your submissions very carefully and
17  with great attention.  I have to admit, however, that I find
18  that the affirmation that was submitted in support of the
19  June 5 attachment order to have been, at best, so careless and
20  so negligent as to border on an abdication of your duties as an
21  officer of the court.
22          As I just mentioned, that is arguably the best gloss
23  one can put on it.  But under these circumstances, I feel I
24  have no choice but to issue this order to show cause and
25  consider the Rule 11 sanctions.
                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                              17

7979CEND              Decision
 1          Again, I intend to keep an open mind.  I really do
 2  hope you'll persuade me that they are not warranted here, but I
 3  think on these facts and on this record I have no choice.
 4          That's all I have to say.  Unless there are other
 5  matters we need to cover, we are adjourned.
 6          MR. LENNON:  Your Honor, I'd just like to add a couple
 7  of comments about the second portion of your decision on the
 8  order to show cause.  And I can only say, based on my
 9  relationship with Mr. Lyons over many, many years, that this is
10  completely an out-of-character incident for him.  We've had
11  countless, countless cases together.  And when it came to light
12  that this affidavit was incorrect, which only came to my
13  attention on the 10th of August, which is the first date that
14  we actually attempted to file the motion, I was surprised.  And
15  I can tell from you speaking with Mr. Lyons that he, at that
16  time when he first realized the mistake himself.
17          I'm not offering that as an excuse.  I take fully and
18  seriously the comments you made about the impact of that
19  affidavit in terms of a lawyer's obligations.
                            Page 8

7979CEND.txt
```
 25    then there's an opportunity, and we probably will file a motion
                SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300
```

20

```
       7979CEND            Decision
  1    to stay the -- your decision pending appeal.
  2            So, I would ask that we not have to return the bond
  3    until after at least the ten-day automatic stay.
  4            THE COURT:  I don't think we've discussed really this,
  5    but Mr. Lennon you want to respond to that?
  6            MR. LENNON:  I have no problem with that position.
  7    I've taken that same position myself.
  8            THE COURT:  Understood.  All right.
  9            And that should be reflected in the order of the
 10    court.
 11            Anything else we need to cover today gentlemen?
 12            MR. LENNON:  No.  Thank you, your Honor.
 13            MR. LYONS:  No.  Thanks, your Honor.
 14            THE COURT:  Thank you all very much.
 15            You know, I'm talking to Mr. Hernandez, and he
 16    suggests maybe I should invite the parties or Mr. Lennon to
 17    submit a proposed order for the return of the bond that I can
 18    then execute.
 19            MR. LENNON:  I will do that, your Honor.  Is it okay
 20    if I submit that by fax?
 21            THE COURT:  That's fine.  Yes.
 22            MR. LENNON:  I'll get the fax number at the end of the
 23    hearing.
 24            (Adjourned)
 25
```

```
                SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300
```

7979CEND.txt

20      But I do want to add those comments to the court in
21   terms of your consideration of the order to show cause because
22   this is not, to my knowledge and my experience with Mr. Lyons,
23   in keeping with his character and reputation as a lawyer in
24   this bar.
25           THE COURT:   I appreciate that, and I certainly credit
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                              18
7979CEND                    Decision
1    it.  And as I said, I haven't made up my mind on this.  And
2    this is, obviously, not personal because my own observations of
3    Mr. Lyons were very positive.  But I'm troubled at a state of
4    affairs where an affidavit like that gets presented to a judge
5    on what is not a small matter.  This is not a certificate of
6    service demonstrating that a brief was served on an opposing
7    party or that somebody received an innocuous document.  This is
8    a fifteen million dollar attachment that in effect was in place
9    for three months, in an ex parte proceeding where the judge is
10   relying on the statement of counsel in the affirmation in
11   making a determination of an attachment.  It is a serious,
12   serious matter.  And so, I just think I have an obligation to
13   follow up along the lines I've suggested.
14           MR. LENNON:   I'm not disagreeing with your Honor.  In
15   fact, some of those comments are arguments that we made in our
16   papers as well.  So I appreciate that.
17           I just wanted to share my thoughts about the situation
18   before the order to show cause comes on for decision.
19           THE COURT:   Thank you, Mr. Lennon.  I appreciate that.
20           Mr. Lyons, you'll have an opportunity to think about
21   this and submit something in writing.  But, I do want to hear
22   from you if you want to be heard.
23           MR. LYONS:   No.  I have no comments at this time, your
24   Honor.  I'll save that for the order to show cause.
25           THE COURT:   Thank you.  Anything else we need to cover
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                              19
7979CEND                    Decision
1    today, gentlemen?
2            MR. LENNON:   Your Honor, I think the only point of
3    clarification I would request with respect to the first part of
4    the court's decision is with regard to return of the bond.
5            One of the things we did request as part of the motion
6    to vacate is that if the court did grant the motion, that the
7    bond be ordered to be returned, which I think is a necessary
8    part of the process.
9            THE COURT:   Yes.  I think that's right.  And I think I
10   alluded to that in suggesting that as a corollary to the
11   vacatur of the attachment order, I would also be vacating the
12   June 15 order of Judge Karas.  But I think I should be more
13   explicit.  So I thank you for that.
14           Yes.  I would order that the bond be returned -- or
15   how do you style it?
16           MR. LENNON:   Just the return of the bond.
17           THE COURT:   Okay.  Mr. Lyons, do you object to that?
18           MR. LYONS:   The only requirement, your Honor, there's
19   a ten-day automatic stay in respect of your decision and
20   vacation of the attachment.  That gives us an opportunity to
21   decide whether we want to appeal.  We have the right to appeal
22   your decision.
23           THE COURT:   Understood.
24           MR. LYONS:   So there's an automatic ten-day stay.  And
                        Page 9

# EXHIBIT 14

LexisNexis® *Total Research System*

Search Client | Preferences | Sign Off | [?] Help

~My Lexis™ ~Search ~Research Tasks ~Get a Document ~Shepard's® ~Alerts ~Total Litigator ~Transactional Advisor ~Counsel Selector~    Dossier | History |

Service: Get by LEXSEE®
Citation: 2007 U.S. Dist. LEXIS 75726

*518 F. Supp. 2d 589, \*; 2007 U.S. Dist. LEXIS 75726, \*\*;*
*2007 AMC 2489*

CHIQUITA INTERNATIONAL LIMITED and GREAT WHITE FLEET LIMITED, Plaintiffs, - against - MV BOSSE her engines, boilers, tackle, furniture, apparel, etc., in rem; BOSSE SHIPPING LIMITED, and HOLY HOUSE SHIPPING AB in personam, Defendants. BOSSE SHIPPING LIMITED, Plaintiff, - against - GREAT WHITE FLEET LIMITED, Defendant.

07 Civ. 6786 (PKL), 07 Civ. 7221 (PKL)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

518 F. Supp. 2d 589; 2007 U.S. Dist. LEXIS 75726; 2007 AMC 2489

October 11, 2007, Decided
October 11, 2007, Filed

**CASE SUMMARY**

**PROCEDURAL POSTURE:** Defendants, a vessel, its owner, and a manager, filed a motion pursuant to Supp. R. Certain Adm. & Mar. Cl. E(4)(f) for vacatur of the process of maritime attachment and garnishment levied in favor of plaintiffs, a banana company and a shipper. In a related case, the shipper filed a Supp. R. Certain Adm. & Mar. Cl. E(4)(f) motion for an order vacating the process of maritime attachment and garnishment levied in favor of the vessel owner.

**OVERVIEW:** The shipper chartered the vessel from the vessel owner to carry bananas. The vessel was arrested for a week as a result of a customs fine that did not relate to the parties' charter. The owner paid the fine. In the first action, the banana company sought reimbursement for losses caused by the one-week delay. In the second action, the owner sought to recover from the shipper reimbursement for the fine, an amount the shipper withheld for fuel used during the arrest, and indemnity for any damages the owner might owe to the banana company. The court held that funds that were directed to or from the manager's bank accounts were properly restrained because the banana company and the shipper had a valid prima facie claim, the manager had an interest in the funds sufficient to uphold the attachment, and the manger's intended use of funds in its accounts was irrelevant. The court held that vacatur of the attachment levied in favor of the owner was appropriate because the owner abused the attachment process by obtaining ex parte security despite the owner's knowledge that an earlier case arising out of the same events, between the same parties, and before the same court was still pending.

**OUTCOME:** The court denied the motion to vacate that was filed by the vessel, the vessel owner, and the vessel manger. The court granted the shipper's motion to vacate the ex parte order of attachment that was levied in favor of the vessel owner.

**CORE TERMS:** attachment, ex parte order, vacate, restrained, shipping, notice, fine, maritime, vacatur, vessel, e-mail, indemnity, prima facie, notification, vacating, prompt notice, garnishment, arbitration, admiralty, ownership, shipowners, levied, arrest, clerk's, charter party, customs, Federal Rules, Admiralty Rules, moves to vacate

**LEXISNEXIS® HEADNOTES**                                                                                    ⌐Hide

Admiralty Law > Practice & Procedure > Attachment & Garnishment > In Rem Actions Generally

*HN1* ± When a defendant moves to vacate an attachment pursuant to Supp. R. Certain Adm. & Mar. Cl. E, the plaintiff bears the burden of showing that the filing and service requirements of Supp. R. Certain Adm. & Mar. Cl. B and E were met and that (1) it has a valid prima facie admiralty claim against the defendant; (2) the defendant cannot be found within the district; (3) the defendant's property may be found within the district; and (4) there is no statutory or maritime law bar to the attachment. If the plaintiff fails to demonstrate that it has met the requirements, the court must vacate the attachment. The plaintiff, however, is not required to prove its case. Rather, the plaintiff must meet a prima facie standard. More Like This Headnote | Shepardize: Restrict By Headnote

Admiralty Law > Practice & Procedure > Attachment & Garnishment > In Rem Actions: Generally

*HN2* ± Once a defendant's property has been restrained by a maritime attachment order, Supp. R. Certain Adm. & Mar. Cl. E(4)(f) provides the defendant an opportunity to appear before the court to contest the attachment. At a Rule E(4)(f) hearing, the defendant can attack the complaint, the arrest, the security demanded, or any other alleged deficiency in the proceedings. If the plaintiff carries its burden to show that an attachment satisfies the requirements, the district court still may vacate the attachment if (1) the defendant is present in a convenient adjacent jurisdiction; (2) the defendant is present in the district where the plaintiff is located; or (3) the plaintiff has already obtained sufficient security for a judgment. More Like This Headnote

Admiralty Law > Practice & Procedure > Attachment & Garnishment > General Overview
Banking Law > Bank Activities > Electronic Banking > Fund Transfers

*HN3* ± Electronic fund transfers to or from a party are attachable by a court as they pass through banks located in that court's jurisdiction. More Like This Headnote

Admiralty Law > Practice & Procedure > Attachment & Garnishment > General Overview

*HN4* ☆ Supp. R. Certain Adm. & Mar. Cl. B only permits attachment of a named defendant's assets. More Like This Headnote

Admiralty Law > Practice & Procedure > Attachment & Garnishment > General Overview 🔍
*HN5* ☆ Property should be construed broadly. Under Supp. R. Certain Adm. & Mar. Cl. B, it is possible for more than one party to have an interest in the same property. More Like This Headnote

Admiralty Law > Practice & Procedure > Attachment & Garnishment > General Overview 🔍
*HN6* ☆ S.D.N.Y. Adm. R. B.2 states that in an action where any property of a defendant is attached, the plaintiff shall give prompt notice to the defendant of the attachment. Such notice shall be in writing, and may be given by telex, telegram, cable, fax, or other verifiable electronic means. More Like This Headnote

Admiralty Law > Practice & Procedure > Attachment & Garnishment > General Overview 🔍
*HN7* ☆ S.D.N.Y. Adm. R. B.2 clearly provides for notification via electronic means, which includes electronic mail notification. More Like This Headnote

Admiralty Law > Practice & Procedure > Attachment & Garnishment > In Rem Actions Generally 🔍
Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Motions to Dismiss 🔍
*HN8* ☆ Supp. R. Certain Adm. & Mar. Cl. E(4)(f) allows a motion for vacatur of attachment, but does not provide for dismissal. Fed. R. Civ. P. 12 is the proper vehicle by which a party moves to dismiss. More Like This Headnote

International Law > Dispute Resolution > Arbitration & Mediation > General Overview 🔍
*HN9* ☆ Courts should be particularly reluctant to prejudge the merits of claims when the merits will be decided by a foreign arbitration panel. More Like This Headnote

Admiralty Law > Practice & Procedure > Attachment & Garnishment > General Overview 🔍
*HN10* ☆ In order to survive a motion to vacate, a plaintiff must make a prima facie showing and demonstrate that all technical requirements for effective attachment have been met. The two purposes of maritime attachments are to obtain jurisdiction of a respondent in personam through his property and to assure satisfaction of any decree in a libelant's favor. Courts also have an inherent authority to vacate an attachment upon a showing of any improper practice or a manifest want of equity on the part of a plaintiff. More Like This Headnote

Admiralty Law > Practice & Procedure > Attachment & Garnishment > In Rem Actions Generally 🔍
*HN11* ☆ Supp. R. Certain Adm. & Mar. Cl. E(7) allows defendants to seek counter-security when a counterclaim arises from the same transaction or occurrence that is the subject of the original action. More Like This Headnote

Admiralty Law > Practice & Procedure > Attachment & Garnishment > General Overview 🔍
*HN12* ☆ The purpose of a maritime attachment is to secure jurisdiction over an absent party and to get security for a potential judgment where the absent party's assets are transitory. More Like This Headnote

**COUNSEL:** [**1] CASEY & BARNETT, LLC, New York, New York, Gregory George Barnett, Esq., ✦, Attorneys for Chiquita International Limited and Great White Fleet Limited.

FREEHILL HOGAN & MAHAR, LLP, New York, New York, Michael E. Unger, Esq., ✦, Lawrence Jay Kahn, Esq., ✦, Attorneys for MV Bosse, Bosse Shipping Limited, and Holy House Shipping AB.

**JUDGES:** Peter K. Leisure ✦, U.S.D.J.

**OPINION BY:** Peter K. Leisure ✦

**OPINION**

**[*591] OPINION AND ORDER**

**LEISURE ✦, District Judge:**

Defendants MV Bosse, Bosse Shipping Ltd. ("Bosse"), and Holy House Shipping AB ("Holy House") move this Court pursuant to Rule E (4)(f) of the Supplemental Admiralty Rules of the Federal Rules of Civil Procedure for an order vacating the process of maritime attachment and garnishment levied in favor of plaintiffs Chiquita International Limited ("Chiquita") and Great White Fleet Limited ("GWF") (collectively "Chiquita/GWF") pursuant to this Court's ex parte order dated July 30, 2007. In a related case, defendants GWF move this Court pursuant to Supplemental Admiralty Rule E(4)(f) for an order vacating the process of maritime attachment and garnishment levied in favor of plaintiff Bosse pursuant to an ex parte order issued by Chief Judge Kimba M. Wood in the Southern District of New York dated [**2] August 14, 2007. Alternatively, GWF seeks to have the amount of Bosse's security reduced pursuant to Supplemental Admiralty Rule E(6). For the following reasons, MV Bosse, Bosse, and Holy House's motion is denied and GWF's motion is granted.

**BACKGROUND**

I. Factual History

The underlying dispute in both of these admiralty actions arises out of the shipping of Chiquita bananas in April and May of 2005 on the vessel MV Bosse. (Chiquita Compl. P 2.) MV Bosse is owned by Bosse and managed by Holy House. (Chiquita Compl. PP 5, 7.) GWF, the transportation arm of Chiquita, chartered the vessel from Bosse to carry Chiquita bananas from Costa Rica to European ports. (Chiquita Compl. PP 8, 10.) GWF was to make payments for the charter to Holy House. (Chiquita Compl. P 8.)

The vessel was arrested when it arrived in Tartous, Syria on May 2, 2005, as a result of a customs fine from 2001 when the vessel was under a different name and different ownership. (Chiquita Compl. P 12; Bosse Compl. P 6.) Bosse paid the $ 420,000 fine on May 4, 2005, and the vessel was released by Syrian authorities on May 9, 2005. (Bosse Compl. PP 6, 8.) As a result of this one-week delay, Chiquita asserts that the bananas [**3] were damaged and could not be brought to the next port for sale. (Chiquita Compl. PP 12-14.) Chiquita sold the cargo in Tartous at a reduced price. (Chiquita Compl. P 14.) Thus, Chiquita seeks reimbursement for the resulting losses.

Bosse claims that GWF agreed to indemnify Bosse in the charter party, but that GWF failed to provide a letter of indemnity and failed to pay the 2001 fine. (Bosse Compl. P 7.) The vessel's previous owner paid Bosse $ 300,000 in settlement of an indemnity claim in connection with the 2001 fine. (Bosse Compl. P 9.) Bosse seeks from GWF the remaining balance of the fine, plus interest, totaling $ 153,600. (Bosse Compl. P 10.) Bosse also seeks $ 94,709.27 from GWF, which is the amount that GWF withheld from Bosse for fuel used during the delay in Tartous. (Bosse Compl. P 11.) Additionally, Bosse brings a claim against GWF for indemnification for any damages that Bosse might owe to Chiquita. (Bosse Compl. PP 12-15.)

[*592]  II. Procedural History

On July 27, 2007, plaintiffs Chiquita and GWF filed suit (the "Chiquita action") against defendants MV Bosse, Bosse, and Holy House. Plaintiffs sought an ex parte order directing the clerk to issue process of maritime [**4] attachment and garnishment against defendants pursuant to Supplemental Admiralty Rule B of the Federal Rules in Civil Procedure in an amount up to $ 800,610.03. On July 30, 2007, the Court issued such an order. On September 5, 2007, defendants moved for an order pursuant to Supplemental Admiralty Rule E(4)(f), vacating the process of attachment levied pursuant to the July 30, 2007 order. Plaintiffs oppose this motion.

On August 14, 2007, Bosse, one of the defendants in the Chiquita action, demanded arbitration in London from GWF, one of the plaintiffs in the Chiquita action, and filed an action in the Southern District of New York seeking security (the "Bosse action"). The Bosse action arises out of the same events as the Chiquita action. Chief Judge Kimba M. Wood signed an order on August 14, 2007 directing the clerk to issue process of maritime attachment and garnishment against GWF pursuant to Supplemental Admiralty Rule B in an amount up to $ 1,485,934.85. In a letter dated August 27, 2007, the parties requested that the Court consolidate the actions and set forth a consolidated motion schedule. [1] This Court granted the order on August 27, 2007. In accordance with the Court's [**5] schedule, on September 5, 2007, GWF moved for an order pursuant to Supplemental Admiralty Rule E(4)(f) vacating the process of attachment levied pursuant to Chief Judge Wood's August 14, 2007 order, as well as to dismiss the complaint filed by Bosse. Bosse opposes this motion.

FOOTNOTES

1 Initially, this case was assigned to Judge Sullivan. Chief Judge Wood granted the ex parte order while sitting as the Part I judge. The Bosse action was formally transferred to this Court on September 13, 2007.

The parties submitted memoranda of law and affidavits, and appeared before the Court on September 25, 2007 for a hearing pursuant to Supplemental Admiralty Rule E(4)(f) of the Federal Rules of Civil Procedure (the "September 25 hearing"). [2] At the September 25 hearing, in response to Holy House's request, the Court granted Holy House one week to submit additional information, such as Holy House's management contracts, in support of its motion in the Chiquita action. (9/25 Tr. at 19:15-20:24.) Plaintiffs were given one week to respond to Holy House's submission. (9/25 Tr. at 29:4-15.) Holy House failed to submit any additional information to the Court.

FOOTNOTES

2 Citations to the transcript from this hearing are [**6] designated by "(9/25 Tr.)"

DISCUSSION

HN1 When a defendant moves to vacate an attachment pursuant to Supplemental Admiralty Rule E, the plaintiff bears the burden of showing that the filing and service requirements of Supplemental Admiralty Rules B and E were met and that "1) it has a valid prima facie admiralty claim against the defendant; 2) the defendant cannot be found within the district; 3) the defendant's property may be found within the district; and 4) there is no statutory or maritime law bar to the attachment." Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd., 460 F.3d 434, 445 (2d Cir. 2006) (footnote omitted). If plaintiff fails to demonstrate that it has met the requirements, the Court must vacate the attachment. Plaintiff, however, is not required to prove its case. Rather, plaintiff must meet a prima facie standard. See [*593]  Ronda Ship Mgmt. v. Doha Asian Games Organising, Comm., No. 07 Civ. 94, 511 F. Supp. 2d 399, 2007 U.S. Dist. LEXIS 72694, 2007 WL 2812897, at *3 (S.D.N.Y. Sep. 20, 2007)("The majority of courts in this district have understood Aqua Stoli to require the application of the prima facie standard when considering the adequacy of a claim in a maritime vacatur motion.")

HN2 Once defendant's property has been restrained [**7] by a maritime attachment order, Rule E(4)(f) provides defendant an opportunity to appear before the Court to contest the attachment. See Fed. R. Civ. P. Supp. R. E(4)(f). At a Rule E(4)(f) hearing, defendant "can attack the complaint, the arrest, the security demanded, or any other alleged deficiency in the proceedings." Fed. R. Civ. P. Supp. R. E(4) advisory committee's note.

If plaintiff carries its burden to show that an attachment satisfies the requirements, the district court still may vacate the attachment if "1) the defendant is present in a convenient adjacent jurisdiction; 2) the defendant is present in the district where the plaintiff is located; or 3) the plaintiff has already obtained sufficient security for a judgment." Aqua Stoli Shipping Ltd., 460 F.3d at 436.

I. The Chiquita Action

Defendants MV Bosse, Bosse, and Holy House move to vacate the attachment of funds that were restrained by an ex parte order issued by the Court on July 30, 2007. Defendants do not challenge whether plaintiffs have a valid prima facie claim. Rather, defendants make two arguments in support of their motion to vacate. First, they argue that the majority of the restrained funds do

not belong to [**8] Bosse or Holy House and therefore must be released. (Bosse Mot. at 4-7.) Second, they argue that the attachments of funds on August 7 and 17, 2007 should be vacated for failure to provide prompt notice. (Bosse Mot. at 7-11.)

## A. Ownership of the Restrained Assets

"Under the law of this circuit, [HN5] EFTs to or from a party are attachable by a court as they pass through banks located in that court's jurisdiction." Aqua Stoli, 460 F.3d at 436 (citing Winter Storm Shipping Ltd. v. TPI, 310 F.3d 263 (2d Cir. 2002)). [HN6] Rule B only permits attachment of a named defendant's assets. See T&O Shipping, Ltd. v. Source Link Co., No. 06 Civ. 7724, 2006 U.S. Dist. LEXIS 88153, 2006 WL 3513638, at *4 (S.D.N.Y. Dec. 5, 2006); see also DS Bulk Pte. Ltd. v. Calder Seacarrier Corp., No. 05 Civ. 10146, 2006 U.S. Dist. LEXIS 39242, 2006 WL 1643110, at *2 (S.D.N.Y. June 13, 2006).

Defendants MV Bosse, Bosse, and Holy House assert that most of the restrained funds (all but $ 4,348) belong to other shipowners whose vessels are managed by Holy House and describes Holy House's role as an agent without "any personal interest in the transaction[s]." (Bosse Mot. at 6.) Holy House further states that it has been expressly authorized to make the application for vacatur on [**9] behalf of the shipowners whose property it asserts has been improperly restrained. (Bosse Mot. at 4-5.) Holy House submitted two declarations by Mr. Einar Blidberg, the Financial Controller of Holy House, which state that Holy House acts as manager and agent for its vessel-owning clients. (Blidberg Decl. P 19; Blidberg Reply Decl. PP 3-5.) Additionally, Holy House notes that its company website describes the ownership of each of the ships whose funds it contends are being restrained. (Bosse Reply at 6 n.l.) Further, Holy House submitted to the Court a table of the restrained funds, describing the intended business purpose for the transfer of funds in each instance. (Bosse Reply at 4-5.) [*594] Holy House argues that Chiquita/GWF have not met their burden to show why the funds should be restrained.

Chiquita/GWF assert that because the funds were directed to or from a Holy House bank account, they are attachable. (Chiquita Opp. at 3-6.) Further, Chiquita/GWF contend that Holy House has not provided sufficient supporting documentation to prove the nature of the relationships between Holy House and the other shipowners. (Chiquita Opp. at 4-5.) At the September 25 hearing, counsel for Chiquita/GWF [**10] reiterated that Chiquita/GWF are willing to take other forms of security. (9/25 Tr. at 18:19-22.) Counsel for Chiquita/GWF further argued that if the Court validates the rationale put forth by Holy House, the Court inevitably will become bogged down with repeated requests to vacate attachments based upon the elusive concept of the intended purpose of the funds at issue. (9/25 Tr. at 18:14-17.) Such action would severely impede plaintiffs' right to security for their claims, and would be contrary to Second Circuit precedent. (9/25 Tr. at 18:18-19:9.)

In support of their motion, Holy House relies, in part, on T&O Shipping Ltd. and DS Bulk Pte. Ltd., in which the courts held that plaintiffs may attach a defendant's property, but not an unnamed party's property. See T&O Shipping Ltd., 2006 U.S. Dist. LEXIS 88153, 2006 WL 3513638, at *4; DS Bulk Pte. Ltd., 2006 U.S. Dist. LEXIS 39242, 2006 WL 1643110, at *2. Notably, both T&O Shipping Ltd. and DS Bulk Pte. Ltd. involved the restraint of funds held in the name of a company that was not named in the underlying complaint. In this case, however, the funds are in the name of defendant Holy House. In addition, the Second Circuit has held that [HN7] "property" should be construed broadly. See Essar Int'l, Ltd. v. Martrade Gulf Logistics, No. 07 Civ. 3439, 2007 U.S. Dist. LEXIS 61713, 2007 WL 2456629, at *2 (S.D.N.Y. Aug. 23, 2007)(citing [**11] Winter Storm Shipping, Ltd., 310 F.3d at 275). Further, "[u]nder Rule B, it is also possible for more than one party to have an interest in the same property." Id.

The Court finds that Chiquita/GWF have met their burden under the Supplemental Admiralty Rules and Second Circuit case law of proving a valid prima facie claim. Further, Chiquita/GWF have demonstrated that Holy House has an interest in the property sufficient to uphold the attachment and that the funds were properly restrained. Holy House's assertions regarding agency and ownership of the attached funds are unpersuasive. Regardless of Holy House's management role with respect to the other non-party shipowners with whom it does business, it is undisputed that the funds were directed to or from defendant Holy House's bank accounts. (Blidberg Decl. PP 11-16; Blidberg Reply Decl. PP 3-5.) Holy House's intended use of the funds that were in its account is irrelevant here. Therefore, the restraint of funds was proper under Second Circuit precedent. See Aqua Stoli, 460 F.3d at 436; see also Ronda Ship Mgmt. Inc., 2007 U.S. Dist. LEXIS 72694, 2007 WL 2812897, at *3.

## B. Notice of Restraints

Defendants MV Bosse, Bosse, and Holy House further claim that plaintiffs [**12] Chiquita/GWF are unable to show that they have met all technical requirements. (Bosse Mot. at 7-11.) Specifically, defendants assert that plaintiffs did not give proper notice under Local Admiralty Rule B.2 of restraint of defendants' property. See [HN8] S.D.N.Y. Local Admiralty Rule B.2 (stating that "[i]n an action where any property of a defendant is attached, the plaintiff shall give prompt notice to the defendant of the attachment. Such notice shall be in writing, and may be given by telex, telegram, cable, fax, or other verifiable electronic means").

[*595] First, defendants claim that plaintiffs did not give notice of restraints of the first two wire transfers, which occurred on August 7 and 17. Second, defendants claim that to the extent plaintiffs attempted to give notice, such notice was not "prompt" and did not provide sufficient information. The prompt notice rule does not provide for a specific penalty, however, defendants assert that under former Local Admiralty Rule 12, on which Local Admiralty Rule B.2 is based, vacatur of the attachment may be appropriate, see Rolls Royce Indus. Power (India) v. M.V. Fratzis M., No. 95 Civ. 2630, 1995 U.S. Dist. LEXIS 22219, 1995 WL 846690, at *2 (S.D.N.Y. July 24, 1995)(quoting [**13] former Local Admiralty Rules 10 and 12 regarding the procedure for a Rule E(4)(f) hearing), and that therefore, vacatur would be appropriate here.

In response, Chiquita/GWF assert that prompt notice was provided to defendants in the form of an e-mail, which was sent to defendant Holy House following the first restraint and to defense counsel following the second restraint, one day after receiving written confirmation from the banks. (Chiquita Opp. at 6-7.) Specifically, Chiquita/GWF claim that e-mails were sent on August 9 and August 23, (Chiquita Opp. at 6-7), and included copies of these e-mails in their submission to the Court. (Barnett Chiquita Decl. at Exhs. 1-2.) At the September 25 hearing, plaintiffs' counsel stated that he received no e-mail delivery failure notification and confirmed that he had a proper e-mail address. (9/25 Tr. at 14:3-11.)

Defendants, citing the Blidberg Declaration, state that defendant Holy House never received the August 9 e-mail and that notice was not sent by "verifiable" means, as required under the Local Rule. (Bosse Reply at 8-9.; Blidberg Reply Decl. P 7.) At the September 25 hearing, defense counsel reiterated that other verifiable means of communication [**14] were readily available to Chiquita/GWF, including a facsimile number and mailing address posted on the Holy House website. (9/25 Tr. at 12:24-13:24.)

The current Local Rule does not provide any specific penalty for failure to provide prompt notice. In Rolls Royce Industrial Power

(India) v. M/V Fratzis M, which defendants cite in support of their argument regarding Chiquita/GWF's failure to provide notice, Judge Haight asked, "[i]n obtaining the attachment at issue, have the plaintiffs engaged in improper practices to such a degree, or do circumstances reveal a want of equity so manifest as to require that the attachment be vacated in its entirety?" Rolls Royce Indus. Power (India) v. M.V. Fratzis M., No. 95 Civ. 2630, 1995 U.S. Dist. LEXIS 22219, 1995 WL 846690, at *3. In the instant case, the Court finds that such severe action is not warranted. Chiquita/GWF provided more than just mere "conclusory statements," that notice was given. C3 Media & Mktg. Group, LLC v. Firsgate Internet, Inc., 419 F. Supp. 2d 419, 427 (S.D.N.Y. 2005). Specifically, Chiquita/GWF submitted to the Court a copy of each of the e-mails that were sent to Holy House and defense counsel. (Barnett Chiquita Decl. at Exhs. 1-2.) [HN7]The rule clearly provides for notification via [**15] electronic means, see S.D.N.Y. Local Admiralty Rule E.2, which the Court reads to include electronic mail notification. See, e.g., T&O Shipping Ltd., 2006 U.S. Dist. LEXIS 88153, 2006 WL 3513638, at *1 (discussing notification of attachment via e-mail). Further, Chiquita/GWF explained steps that were taken to verify receipt of the e-mail. Additionally, Chiquita/GWF's notification was "prompt" because notification was provided just one day after Chiquita/GWF received confirmation from the banks that attached the funds.

[*596] Plaintiffs Chiquita/GWF have met their required burden and therefore, defendants' motion to vacate is denied.

II. The Bosse Action

GWF moves to vacate the ex parte order of attachment issued by Chief Judge Wood on August 14, 2007. GWF asserts that Bosse's complaint was made for the improper purpose of retaliation against Chiquita/GWF for filing suit against Bosse.

**A. Motion to Dismiss**

In its submission to the Court, GWF moves to dismiss Bosse's complaint pursuant to Supplemental Admiralty Rule E(4)(f). Bosse correctly noted in its submission to the Court that [HN8]Rule E(4)(f) allows a motion for vacatur of attachment, but does not provide for dismissal. (Bosse Opp. at 11-12.) Rule 12 of the Federal Rules of Civil Procedure [**16] is the proper vehicle by which a party moves to dismiss. See Fed. R. Civ. P. 12. GWF, however, made no mention of Rule 12 in its submission to the Court. Courts "will not consider such an argument lest Rule 12(b)(6) be completely subsumed by Supplemental Rule E(4)(f)." Maersk, Inc. v. Neewra, Inc., 443 F. Supp. 2d 519, 531 (S.D.N.Y. 2006). At the September 25 hearing, the Court notified GWF's counsel of the deficiency and offered GWF the opportunity to submit a motion and supporting papers under Rule 12. (9/25 Tr. at 38:23-39:16.) GWF informed the Court that it did not wish to pursue the motion to dismiss. (9/25 Tr. at 40:12-13.) Thus, the Court views GWF's procedurally deficient motion to dismiss as withdrawn and need not address it further here.

**B. Motion to Vacate**

In its submissions to the Court and at the September 25 hearing, GWF addressed each of Bosse's claims in the Complaint. Both GWF and Bosse submitted opinions from English Solicitors in support of their positions. GWF submitted two affidavits from Mr. Adrian Charles Hardingham and Bosse submitted one declaration from Mr. Michael John Smith. While GWF argues for vacatur, Bosse responds that the attachment must be maintained [**17] and the claims should be decided before a London arbitral tribunal. (Bosse Opp. at 6.)

First, GWF addresses the deductions from the hire that were taken by GWF for alleged off-hire and bunkers (fuel) used when the vessel was delayed by the arrest. (GWF Not. at 11.) In its complaint, Bosse claims that GWF improperly took these deductions. (Bosse Compl. P 11.) In its motion, GWF asserts that Clause 41 of the charter party specifically grants GWF the right to take the vessel off- hire during an arrest. (GWF Not. at 11.) Thus, GWF argues, Bosse's claim for the deducted funds is unfounded.

Second, GWF argues that it is not responsible for payment of the 2001 customs fine that led to the arrest of the vessel. (GWF Not. at 11-12.) Bosse relies on Clause 77 of the charter party for its claim that GWF is obligated to pay the 2001 customs fine. (Bosse Compl. P 7.) GWF asserts, however, that because Clause 77 speaks only "in respect of present or future Customs fines in respect of this charter," it is not liable. (GWF Mot. at 10; GWF Reply at 5.) GWF, citing the Hardingham Affidavits, argues that it is not obligated to pay for a past fine or for a fine that does not relate to this charter, such [**18] as the 2001 fine. (Hardingham Aff. PP 7-8; Second Hardingham Aff. PP 7-15.) Bosse, citing the Smith Declaration, disputes GWF's interpretation of "present and future," and claims that "'present' means 'at the time when the charter party contract was agreed' and that 'future' [*597] means thereafter occurring." (Bosse Opp. at 5; Smith Decl. PP 5-6.)

Third, GWF argues that it is not liable in indemnity. Bosse claims that GWF must indemnify Bosse for any liability to Chiquita in the Chiquita action. (Bosse Compl. P 14.) GWF asserts, however, that the indemnity claim is without merit and is not ripe. (GWF Mot. at 12-13.) GWF also states that if GWF is held liable in indemnity, Chiquita would be willing to waive any claim against Bosse. (GWF Reply at 7.) Bosse responds that under English law, the claim is ripe. (Bosse Opp. at 7-11.) Further, at the September 25 hearing, counsel for Bosse stated that for Chiquita's purported waiver offer to have "teeth" to it, the Chiquita action should be stayed pending arbitration of Bosse's claims. (9/25 Tr. at 30:22-31:10.)

GWF moves, in the alternative, pursuant to Supplemental Admiralty Rule E(6), for a reduction of the security currently under attachment, [**19] asserting that Bosse's claims "are either non-existent or grossly exaggerated." (GWF Mot. at 14.) In part, GWF asserts that the interest calculated by Bosse should be reduced. Additionally, GWF states that the attachment should be reduced by the amount of the Chiquita claim because Chiquita has agreed to waive their claim against Bosse if GWF is found liable in indemnity. (GWF Reply at 7.) Bosse responds that GWF has failed to make a good faith showing that a reduction is warranted, Bosse has demonstrated that its claims are not frivolous, and the Smith Declaration supports its estimated interest and costs. (Bosse Opp. at 13-14; Smith Decl. PP 24-26.)

GWF also requests permission to amend its Chiquita complaint to include an adequate amount of security for fees, costs and interest, as Bosse did in its complaint, if the attachment is upheld. (9/25 Tr. at 26:23-27:7.) Bosse responds that GWF improperly included a motion to amend the Chiquita complaint in its submissions to the Court in the Bosse action. Further, Bosse asserts that attorneys' fees are not recoverable as to Chiquita because its action was brought under American law and should be denied to GWF because GWF has not commenced [**20] arbitration of its own. (Bosse Opp. at 15-16.)

In their papers and at the September 25 hearing, the parties debated the merits of the Bosse action in detail. A detailed discussion of the merits, however, has little bearing on the motion to vacate, which is decided based on whether a prima facie claim is shown and technical requirements for attachment have been met. See Aqua Stoli Shipping Ltd., 460 F.3d at 445. The Court need not, and should not, reach the merits of the Bosse action as that is properly left to the London arbitrators to decide. See Finecom Shipping Ltd. v.

Multi Trade Enters. AG, No. 05 Civ. 6695, 2005 U.S. Dist. LEXIS 25761, 2005 WL 2838611, at *1-2 (S.D.N.Y. Oct. 24, 2005) (stating that [HN9] courts should be particularly reluctant to prejudge the merits of claims when the merits will be decided by a foreign arbitration panel).

As noted above, [HN10] in order to survive a motion to vacate, the plaintiff must make a prima facie showing and demonstrate that all technical requirements for effective attachment have been met. See Aqua Stoli Shipping Ltd., 460 F.3d at 445. Additionally, the Second Circuit has held that the two purposes of maritime attachments are "to obtain jurisdiction of the respondent in [**21] personam through his property [and] to assure satisfaction of any decree in libelant's favor." Seawind Compania, S.A. v. Crescent Line, Inc., 320 F.2d 580, 581-82 (2d Cir. 1963). Courts also have an "inherent authority to vacate an attachment upon a showing of any improper practice or a manifest want of equity on the part of plaintiff." Maersk, Inc., [*598] 443 F. Supp. 2d at 528 (internal quotations omitted); Sea Transport Contractors, Ltd. v. Industries Chemiques du Senegal, 411 F. Supp. 2d 386, 391 (S.D.N.Y. 2006); see also Greenwich Marine, Inc. v. S.S. Alexandra, 339 F.2d 901, 905 (2d Cir. 1965)("The inherent power to adapt an admiralty rule to the equities of a particular situation is entrusted to the sound discretion of the district judge.").

Bosse makes three arguments in support of its ex parte order. First, at the September 25 hearing, Bosse's counsel stated that the court clerk directed him to file the Bosse action as a separate and unrelated action, and that Bosse therefore believed that it was entitled to an ex parte order. (9/25 Tr. at 3:20-23.) Because Bosse was aware that GWF was a party to the Chiquita action, which arose out of the same facts and between the same parties, [**22] the clerk's advice is irrelevant to the Court's consideration of the instant motion to vacate. Second, Bosse's counsel stated that Bosse believed GWF was not a proper party to the Chiquita action. (9/25 Tr. at 37:16-38:6.) This contention, however, also is irrelevant to the instant motion. Regardless of whether Bosse agreed with GWF's inclusion as a party in Chiquita, Bosse still was fully aware that GWF was a party before the Southern District of New York in the related action. Third, at the September 25 hearing, Bosse's counsel asserted that an ex parte order was appropriate because if it pursued the alternative and sought counter-security in the Chiquita action, Bosse likely would have received a dollar-for-dollar equivalent order of attachment to place it on equal footing with Chiquita/GWF in the Chiquita action. (9/25 Tr. at 37:11-15.) Bosse's argument is unpersuasive. If Bosse had provided GWF with notice of its action, Bosse would have had the opportunity to seek adequate security. See [HN11] Fed. R. Civ. P. Supp. R. E(7)(allowing defendants to seek counter-security when the "counterclaim arises from the same transaction or occurrence that is the subject of the original action.").

In [**23] Aqua Stoli Shipping Ltd., "[a]lthough the precise boundaries of a district court's vacatur power" were not before the court, the Second Circuit described circumstances that would justify vacatur of an attachment. Aqua Stoli Shipping Ltd., 460 F.3d at 444. The Second Circuit stated that vacatur would be appropriate if "1) the defendant is subject to suit in a convenient adjacent jurisdiction; 2) the plaintiff could obtain in personam jurisdiction over the defendant in the district where the plaintiff is located; or 3) the plaintiff has already obtained sufficient security for the potential judgment, by attachment or otherwise." Id. at 445. Although the instant case does not fall squarely within the Second Circuit's guidelines, vacating the attachment in this case, given the unique posture, is a logical -- and limited -- extension of those guidelines.

The first two guidelines set forth in Aqua Stoli Shipping Ltd. suggest that vacatur is appropriate in this case. First, defendant GWF is subject to suit in this jurisdiction in the Chiquita action. The Southern District of New York clearly is convenient to plaintiff because plaintiff initiated the Bosse action here. Second, plaintiff Bosse [**24] could obtain personal jurisdiction over defendant GWF in the Southern District of New York in the Chiquita action. In this case, Bosse did not go to another district to attach defendant's assets; however, Bosse did institute a separate action, which it failed to mark as related, to attach GWF's assets. The Court finds that such circumstances fall within the Second Circuit's "narrowly circumscribed" "concept of convenience." Id. at 444.

[*599] In Rapture Shipping Ltd. v. Allround Fuel Trading B.V. Chemoil, Judge Keenan stated that it was improper for the plaintiff to obtain ex parte security when an earlier case arising out of the same event, between the same parties, and before the same court, was still pending, and jurisdiction over the defendant in the prior action was not an issue because the defendant had submitted to the jurisdiction of the Court. [3] See Rapture Shipping Ltd. v. Allround Fuel Trading B.V. Chemoil, No. 06 Civ. 5296, 2006 U.S. Dist. LEXIS 60771, 2006 WL 2474869, at *2 (S.D.N.Y. Aug. 28, 2006)(Keenan, J.)(dismissing complaint and vacating attachment because action was wholly duplicative of prior pending action). Judge Keenan noted that "this is not the purpose of Rule B." Id. The instant case differs [**25] procedurally from Rapture Shipping Ltd. because the Chiquita and Bosse actions are not "wholly duplicative," [4] and Bosse is the defendant in the prior action, not the plaintiff. Nonetheless, Bosse obtained ex parte security that is inconsistent with the purposes of Rule B. As did the plaintiff in Rapture Shipping Ltd., Bosse obtained ex parte security even though an earlier case arising out of the same events, between the same parties, and before the same court, is still pending. [5] In addition, Bosse would have no jurisdictional issues because GWF had already submitted to the jurisdiction of the Court by filing the Chiquita action.

## FOOTNOTES

3 Judge Keenan declined to rule on whether the defendant's consent to jurisdiction in the prior action was sufficient to satisfy Rule B's "presence" requirement in the second action. Rapture Shipping Ltd., 2006 U.S. Dist. LEXIS 60771, 2006 WL 2474869; see also Winter Storm Shipping, Ltd., 310 F.3d at 268 ("A Rule B attachment is available only if the defendant is not found within the district.")(internal quotations omitted). Similarly, in the instant case, this Court need not determine whether GWF bringing suit in the Chiquita action satisfies the "presence" test in the Bosse action. [**26]

4 In an opinion denying plaintiff's motion for reconsideration, Judge Keenan stated that "the Court took no position on what requirements a plaintiff must satisfy in non-duplicative actions where the defendant has consented to jurisdiction, in order to defeat a motion to vacate an order of attachment under Rule B." Rapture Shipping Ltd. v. Allround Fuel Trading B.V. Chemoil, No. 06 Civ. 5296, 2006 U.S. Dist. LEXIS 72704, 2006 WL 2850206, at *2 (S.D.N.Y. Oct. 4, 2006)(Keenan, J.). However, the Court also stated that "an attachment cannot be obtained 'except as an adjunct to obtaining jurisdiction.'" Id. Although Judge Keenan declined to address whether the holding would apply to non-duplicative actions, the Court finds that extension of the Rapture Shipping Ltd. holding in the instant case is appropriate. Although the Chiquita and Bosse actions are not "wholly duplicative," they do arise out of the same facts, between the same parties, before the same court.

5 In fact, one of Bosse's own claims arises directly from the Chiquita action, seeking indemnity from GWF for any liability in the Chiquita action. (Bosse Compl. P 13-16.)

Essentially, Bosse abused the attachment process and took advantage of the ex parte nature [**27] of a Rule B order, despite Bosse's knowledge that GWF already was before the Southern District of New York in the related Chiquita action arising out of the

same facts and between the same parties. *HN12*The purpose of a maritime attachment is to "secure jurisdiction over an absent party and to get security for a potential judgment where the absent party's assets are transitory." Aqua Stoli Shipping Ltd., 460 F.3d at 435. GWF, however, was not an "absent party," and securing jurisdiction was unnecessary considering the pending Chiquita action. Given Bosse's knowledge of the pending Chiquita action, seeking an ex parte order of attachment in the Bosse action was an improper practice and showed a want of equity on the part of Bosse. See Maersk, Inc., 443 F. Supp. 2d at 528. Ultimately, Bosse's actions are not in accordance with **[*600]** the purposes of maritime attachments. Therefore, GWF's motion to vacate is granted.

## CONCLUSION

For the reasons set forth above, defendants MV Bosse, Bosse, and Holy House's motion to vacate in the Chiquita action is hereby DENIED, and defendant GWF's motion to vacate in the Bosse action is hereby GRANTED. The Court hereby orders that the ex parte order of attachment **[**28]** issued by Chief Judge Wood on August 14, 2007 be vacated and directs the garnishees to release all restrained funds. The parties are ordered to appear before the Court for a pre-trial status conference on December 13, 2007 at 10:00 a.m.

## SO ORDERED.

### New York, New York

October 11, 2007

Peter K. Leisure

U.S.D.J.

Service: Get by LEXSEE®
Citation: 2007 U.S. Dist. LEXIS 75726
View: Full
Date/Time: Wednesday, March 26, 2008 - 1:53 AM EDT

* Signal Legend:
🛑 - Warning: Negative treatment is indicated
🔶 - Questioned: Validity questioned by citing refs
⚠ - Caution: Possible negative treatment
◆ - Positive treatment is indicated
✪ - Citing Refs. With Analysis Available
🟡 - Citation information available
* Click on any Shepard's signal to Shepardize® that case.



LexisNexis® About LexisNexis  : Terms & Conditions  : Contact Us
Copyright © 2008 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.