UNITED STATES DISTRICT COURT`
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x
SIXTEEN THIRTEEN MARINE S.A.,         :     08 CV 1318 (HB)
                                          :
                      Plaintiffs,      :     ECF CASE
    -against-                     :
                                            :
CONGENTRA AG,                     :
                                          :
                      Defendant.     :
-----------------------------------------------------------------------x

## DECLARATION OF THE HON. SIR ANTHONY COLMAN

1.    I am foreign counsel for the Defendant herein, Congentra AG ("Defendant").

2.    I submit this Declaration in support of Defendant's Motion to Vacate or in the alternative to Reduce the Amended Ex-Parte Order of Maritime Attachment issued on behalf of Plaintiff, Sixteen Thirteen Marine S.A. ("Plaintiff") based on facts and information known to me personally, as well as documents and information available to me, all of which I believe to be true and accurate

3.    Since preparing my Expert Report dated February 26, 2008, I have had the opportunity to read the following documents:

        (a) Declaration of Captain Konstantinos Bourdis;

        (b) Plaintiff's Memorandum of Law in Opposition to the Motion to Vacate;

        (c) Declaration of John Krzywkowski.

4.    I do not comment further on the various individual issues referred to by Mr. Krzywkowski in the Memorandum of Law in the context of a motion to vacate in attachment proceedings in the United States District Court. The evaluation of the relative strength/weakness of evidence adduced by the Plaintiff for the purpose of deciding whether the plaintiff has established a case of sufficient substantiality is peculiarly a matter for the District Court.  This is particularly so in a case involving serious allegations against the Defendant rather than major issues of English law.

5.    Further, although the application of the equitable jurisdiction to vacate is necessarily a matter to be determined in accordance with law of the State of New York as distinct from English law, I believe that it may be of assistance to the Court if I were now to draw attention to the principles of English law which apply in all cases where it is alleged that an order has been made by the court in response to an application without notice to the opposite party and that the plaintiff has either made a misrepresentation to the court or has failed to disclose a fact material to the court's decision.

6.    My reason for believing that these principles may be of interest to the United States Court seised of the present motion is the evidence adduced by the Plaintiff in opposition to the motion to vacate and in particular that of Captain Konstantinos Bourdis with regard to a telephone conversation said to have taken place on the 28th of January, 2007 between him and Mr. Pavel Priymak of the Defendants.  Capt. Bourdis states at paragraph 8 of his Declaration what were "roughly" the contents of the call.   The words said to have been spoken by Mr. Priymak suggest an aggressive attitude towards the Plaintiffs which is relied on as evidence of intent to damage the Plaintiff – a key allegation for the purposes of making a good prima facie case of conspiracy.   That is the only telephone conversation with Mr. Priymak of which Capt. Bourdis gives evidence.

7.    My attention has been drawn to the transcript of a telephone conversation said to have taken place between the same two persons on the same day, but at a later hour – 21:00 Russsian time.  I am advised that this is an accurate transcript of a tape recording of that conversation in the possession of the Defendant.  What Mr. Priymak is recorded as saying bears no resemblance to the account given by Capt. Bourdis.  The sole threat made by Mr. Priymak is that if the owners of the vessel will not allow an inspection of the holds, the charterers will put the vessel off hire and will not order her to go to the pilot station to be re-delivered under the charterparty.  This is clearly a threat of a very different kind to that spoken to by Capt. Bourdis.   Above all, it is simply evidence of an intention to deploy the contractual machinery of the charter party for commercial reasons and does not connote an intrinsic propensity to injure the Plaintiff or to use unlawful means.

8.    The evidence provided by the tape would likely be regarded by an English court to be so strong as to suggest that Capt. Bourdis' evidence had been fabricated in order to retain the attachment by defeating the Motion to Vacate.   If it took that view, it is very probable that it would order that there should be a cross-examination of at least Capt. Bourdis in order to ascertain whether the evidence had been fabricated.   If it concluded that such was the case, the court would automatically discharge the order for attachment on the grounds that the plaintiff had attempted to retain it by knowingly misrepresenting the evidence, regardless of whether the plaintiff has an arguable case on the merits.

9.    Although most of the cases which develop this principle are concerned with obtaining orders on a without notice application, I have no doubt that the principle extends to attempts to perpetuate an order previously made.  The principle is a long-standing one, most frequently applicable in the field of applications for interim injunctions, such as freezing injunctions.  See a general statement of principles in the decision of the Court of Appeal in Brink's Mat Ltd. v. Elcombe, [1988] 1 WLR 1350, annexed hereto as Exhibit "1."  See also Memory Corporation v. Sidhu, [2000] 1 WLR 1443, annexed hereto as Exhibit "2."  For a case in which the evidence was fabricated, see Bir v. Sharma, the Times Newspaper, 7 December 1988, cited in Practice and Procedure of the Commercial Court, 5th Ed., p. 147.  Whereas, it is open to the court as a matter of discretion to decline to discharge the order in spite of non-disclosure or misrepresentation, this is practically never done where the non-disclosure or misrepresentation is made knowingly.

2

10.    I am satisfied the court would adopt a similar approach to misrepresentations made for the purpose of continuing an order previously made without notice upon an application by the other party to discharge it.  Although it be the case that the misrepresentation could not then be made on a without notice hearing, the fact that the plaintiff sought to sustain a previously made order by fabricated evidence would entitle the court to deprive it of the order, particularly if in the form of an equitable remedy.


I declare under penalty of perjury and the laws of the United States of America that the foregoing is true and correct.

**Executed this 26 of March 2008, London, England.**

Signed:    ...................................

# EXHIBIT 1

Status: [C] Judicial Consideration or Case History Available

## *1350 Brink's Mat Ltd. v Elcombe and Others

1986 B. No. 7698

Court of Appeal

12 June 1987

### [1988] 1 W.L.R. 1350

Slade, Balcombe and Ralph Gibson L.JJ.

1987 May 5, 6, 7, 8; June 12

Injunction—Mareva injunction—Non-disclosure—Ex parte application—Breach of duty to disclose all relevant matters—Whether discretion to continue injunction—Whether order to be set aside

The plaintiffs, who had been robbed of gold bullion worth £25m., commenced an action against a number of defendants claiming, inter alia, damages for wrongful interference with stolen gold, damages for conspiracy to inJure the plaintiffs and declarations that certain assets were the proceeds of sale, or profits made from the use of, stolen gold and were held on trust for the plaintiffs. Before issuing the writ they had obtained, on an ex parte application, an interlocutory injunction from Roch J. restraining nine of the defendants from disposing of specified assets. The ninth and tenth defendants applied unsuccessfully to Judge White, sitting as a High Court judge, to discharge the injunction. But, on a further application, Alliott J. discharged the injunction as against the ninth and tenth defendants on the ground that there had been innocent but material non-disclosure of facts in the information the plaintiffs had put before Roch J. and that new material had falsified the basis on which the plaintiffs had sought to show a ground of claim against the ninth and tenth defendants.

*1351

On appeal by the plaintiffs and cross-appeal by the ninth and tenth defendants from the decision of Judge White:—

*Held,* allowing the appeal and dismissing the cross-appeal, that, on any ex parte application it was imperative that the applicant should make full and frank disclosure of all facts known to him or which should have been known to him had he made all such inquiries as were reasonable and proper in the circumstances; but that, notwithstanding proof of material non- disclosure which justified or required the immediate discharge of an ex parte order, the court had a discretion to continue the order or to make a new order; that, although the plaintiffs had failed to disclose material facts to Roch J., on the evidence before Judge White, it would have been right for him to continue the injunction; that the additional information before Alliott J. did not establish any further material non-disclosure; and that, as a matter of discretion, it was a proper case for maintaining the injunction (post, pp. 1356F–H, 1357E, G–H, 1358B–C, D–E, G–H, 1359E–F).

Dicta of Lord Denning M.R. in Bank Mellat v. Nikpour [1985] F.S.R. 87, 90, C.A. and Glidewell L.J. in Lloyds Bowmaker Ltd. v. Britannia Arrow Holdings Plc., C.A., ante, p. 1337, applied.

*Per* Slade L.J. Particularly in heavy commercial cases the borderline between material and non-material facts may be a somewhat uncertain one. While in no way discounting the heavy duty of candour and care which falls on persons making ex parte applications, the application of the principle should not be carried to extreme lengths (post, p. 1359C).

Decision of Judge White, sitting as a judge of the Queen's Bench Division, affirmed.

Decision of Alliott J. reversed.

### The following cases are referred to in the judgments:

- Bank Mellat v. Nikpour [1985] F.S.R. 87, C.A.

- Columbia Picture Industries Inc. v. Robinson [1987] Ch. 38; [1986] 3 W.L.R. 542; [1986] 3 All

E.R. 338

* Dalglish v. Jarvie (1850) 2 Mac. & G. 231

* Lloyds Bowmaker Ltd. v. Britannia Arrow Holdings Plc. [1988] 1 W.L.R. 1337, C.A.

* Practice Direction (Judge in Chambers: Procedure) [1983] 1 W.L.R. 433; [1983] 1 All E.R. 1119

* Reg. v. Inland Revenue Commissioners, Ex parte Rossminster Ltd. [1980] A.C. 952; [1980] 2 W.L.R. 1; [1980] 1 All E.R. 80, H.L.(E.)

* Rex v. Kensington Income Tax Commissioners, Ex parte Princess Edmond de Polignac [1917] 1 K.B. 486, C.A.

* Thermax Ltd. v. Schott Industrial Glass Ltd. [1981] F.S.R. 289

* WEA Records Ltd. v. Visions Channel 4 Ltd. [1983] 1 W.L.R. 721; [1983] 2 All E.R. 589, C.A.

No additional cases were cited in argument.

INTERLOCUTORY APPEALS fron Judge White, sitting as a judge of the Queen's Bench Division, and Alliott J.

On 9 December 1986 the plaintiffs, Brink's Mat Ltd., on an ex parte application to Roch J., obtained an injunction restraining, inter alios, the ninth and tenth defendants, Boinco Corporation and Stephen Kay, until trial or further order from disposing of assets listed against their names in a schedule to the order. The plaintiffs gave an undertaking to abide by such order as to damages as the court might make in relation to any damage suffered by the defendants by reason of the order and *1352 further undertook forthwith to issue a writ and to swear and file an affidavit by Mr. McCunn, their solicitor, setting out the substance of what counsel had informed the court.

On 10 December 1986 the plaintiffs issued a writ against 11 defendants claiming, against the first to ninth defendants, (1) damages for wrongful interference with gold, to which the plaintiffs were entitled to possession and/or were the owners, stolen from the plaintiffs' warehouse on 26 November 1983; (2) damages for conspiracy to inJure the plaintiffs and/or procuring the breach by Anthony Black of his contract of employment and/or fiduciary duty; and, against all defendants, (3) an order requiring the defendants to disclose to the plaintiffs all information and documents in their possession or power which might assist in showing who had received the gold and/or the proceeds of sale thereof; (4) a declaration that, inter alia, proceeds of sale of Cyclops Wharf under an agreement dated 29 July 1986 were proceeds of the sale of and/or profits made from the use of the gold and were held on trust for the plaintiffs; (5) an account; and (6) an injunction in the terms of that already granted by Roch J.

On 30 December 1986 Judge White, sitting as a judge of the Queen's Bench Division, dismissed an application by the ninth and tenth defendants to discharge the injunction made against them by Roch J. On 15 April 1987, on a further application by the ninth and tenth defendants to discharge Roch J.'s order, Alliott J. made an order by which, on certain undertakings being given by the ninth and tenth defendants, the order of Roch J. was discharged as against them.

By notice of appeal dated 24 April 1987 the plaintiffs appealed on the grounds, inter alia, that (1) the judge was wrong to find that the inference drawn by Judge White, as to the source of the deposit for Cyclops Wharf, had been falsified and that Roch J. would not have granted the injunction had there been full disclosure; (2) the judge erred in finding that on the material before him the arguable case which he did find the plaintiffs had was not sufficiently good or that there might be a good arguable defence; and (3) in deciding not to grant a new injunction the judge wrongly failed to consider the balance of convenience.

By respondents' notice and notice of cross-appeal dated 29 April 1987 the defendants contended that the decision of Alliott J. should be affirmed on additional or alternative grounds and sought leave to appeal from the order of Judge White on the ground that he erred in holding that the non-disclosures he found were not material non-disclosures justifying the discharge of Roch J.'s order.

The facts are stated in the judgment of Ralph Gibson L.J.

**Representation**

- Michael Tugendhat Q.C. and David Parsons for the plaintiffs.
- Peter Leaver Q.C. and Jeffrey Onions for the ninth and tenth defendants.

*Cur. adv. vult.*

RALPH GIBSON L.J.

12 June 1987. The following judgments were handed down.

This is an appeal by the plaintiffs, Brink's Mat Ltd., from the order of Alliott J. of 15 April 1987 whereby an interlocutory injunction made by Roch J. on 9 December 1986 was **\*1353** discharged as against the ninth defendant, Boinco Corporation, and the tenth defendant, Mr. Stephen Philip Kay. Roch J. had on 9 December 1986 on an ex parte application by the plaintiffs ordered that nine out of the eleven defendants in the action be restrained until trial or further order from disposing of the assets listed against their names in a schedule to the order. So far as concerns Boinco and Mr. Kay the assets so listed are described as the proceeds of sale of Cyclops Wharf, a dockland property in West Ferry Road, London E.14. The order was made, of course, on the usual undertakings, including undertakings as to damages, given by the plaintiffs. The plaintiffs seek an order continuing the injunction until trial.

The action in which this interlocutory appeal is brought is but one of a number of separate actions in which the plaintiffs claim various forms of relief against a number of men and women and corporations. All robbery at Heathrow Airport in November 1983 when valuables, including gold bullion worth then some £25m., were stolen. The main grounds of claim made against the first nine defendants in this case are three: first, damages for wrongful interference with the stolen gold; secondly, damages for conspiracy to injure the plaintiffs and for procuring the breach of duty of a servant of the plaintiffs who was involved in the robbery; and, thirdly, for declarations that certain assets are the proceeds of sale of, or profits made from the use of, the stolen gold and are held on trust for the plaintiffs. The parties to this appeal are Boinco and Mr. Kay. The plaintiffs' claim against Boinco is advanced on all three grounds but as against Mr. Kay it is made only on the third ground of constructive trust. Mr. Kay appears to have been caught up in this litigation because he is and has long been the close personal friend of Mr. Relton, a solicitor. Mr. Relton acted for Mr. Parry, the seventh defendant, who on the evidence before the court got hold of some £2.7m. in cash in sterling and paid it into an account, code-named "Burton," in a bank in Zurich. That fund was the source of finance for a large number of property deals in this country, and for one in Spain, by which large profits were made by companies formed, or acquired, and operated, for Mr. Parry by Mr. Relton. Mr. Relton has admitted that the money in the Burton account was the proceeds of the stolen gold and that he knew that fact from about December 1985.

In January 1986 the eighth defendant, Selective Estates Ltd. ( "Selective"), a Jersey company, owned and controlled by Mr. Parry, or by Mr. Parry and Mr. Relton, contracted to buy Cyclops Wharf from Durable Warehousing Co. Ltd. for £2.7m. Only £135,000 was paid as deposit by Selective. The rest of the purchase price was payable as to £135,000 on 31 July 1986 and the balance on 1 May 1987. On 29 July 1986 Selective contracted to sell Cyclops Wharf to Chrysalis Plc. for £4.25m., to be paid by instalments with completion on 1 May 1987 and to yield a gross profit of £1.55m. Thus Selective did not have to find any further funds from its own resources. Under the resale contract to Chrysalis, Selective received £600,000 on 29 July 1986; £400,000 was to be paid on 15 December 1986; £300,000 on 2 March 1987; and the balance of £2.95m. on completion on 1 May 1987.

As against Selective the claim of the plaintiffs to be entitled in equity to the proceeds of sale of Cyclops Wharf appears on the stated facts to be good. According to Mr. Kay and Mr. Relton, however, Selective is no longer entitled to the proceeds of sale of Cyclops Wharf. It is said **\*1354** that by an oral agreement in March 1986 Mr. Kay became entitled to one half of the Cyclops Wharf transaction and therefore to one half of the profit. On or before 4 September 1986 Mr. Relton became joint owner with Mr. Kay of Boinco, a Panamanian corporation, previously wholly owned by Mr. Kay, and on 17 September 1986 it is said that Selective by a written agreement validly passed and assigned the burden and benefits of the purchase and resale contracts for Cyclops Wharf to Boinco. Further, it is said that, while some companies owned and

operated by Mr. Parry and Mr. Relton did carry out many property transactions with money derived from the stolen gold, the Cyclops Wharf transaction was different in that no tainted money was used to acquire the property and therefore the plaintiffs have no equitable claim against the proceeds of sale. If they have such a claim it is contended nevertheless that Mr. Kay and Boinco are bona fide purchasers of the rights under the contracts without notice of the equitable rights of the plaintiffs.

The assignment contract of 17 September 1986, if that is what it was, is an important matter in this case. According to the copy provided to the plaintiffs' loss adjusters, Selective by that contract assigned to Boinco all the interest of Selective in the purchase contract for Cyclops Wharf and in the resale contract, together with the right to receive from Chrysalis the outstanding stage payments. The receipt by Selective of £600,000 from Chrysalis, being the first payment under the resale contract, was recited. The consideration for the assignment to Boinco was said to be £800,000 paid by Boinco to Selective and, by the terms of the contract, Selective acknowledged receipt of that sum. In fact, as has become apparent in the course of the proceedings, nothing was paid by Boinco to Selective. The evidence as to the circumstances in which the assignment contract was made and such explanation as there is for the difference between the form of the contract and the facts as they are alleged to have been will be described later in this judgment.

Alliott J. on 15 April 1987 ordered that the injunction be discharged as against Boinco and Mr. Kay and refused in his discretion to make any new order. He directed, however, that the injunction continue pending the hearing of this appeal. The grounds on which Alliott J. so proceeded were in substance that there had been innocent but material non-disclosure of facts in the information put by the plaintiffs before Roch J., and that new material put before Alliott J. had falsified the basis on which the plaintiffs had sought to show a ground of claim against Boinco and Mr. Kay. He declined in his discretion to make any new order on the ground that on the evidence the plaintiffs had not made out a sufficiently strong case.

There had been an earlier application by Boinco and Mr. Kay to set aside the order of Roch J. That application was heard by Judge White, sitting as a High Court judge, and on 30 December 1986 was dismissed by him. During the hearing in this court Mr. Leaver applied on behalf of Boinco and Mr. Kay for leave to appeal against that decision of Judge White out of time on the ground that on the evidence before him he was wrong not to set aside the order of Roch J. by reason of material non-disclosure by the plaintiffs. This court gave leave to appeal. [His Lordship referred to the robbery, and stated that the ex parte application on 9 December 1986 was made by Mr. Tugendhat on behalf of the plaintiffs before the issue of the writ and unsupported by affidavit; that Roch J. made the order on the plaintiffs' undertaking that their solicitor, *1355 Mr. McCunn, would swear and file an affidavit setting out the substance of what counsel had told the court; and that the affidavit accurately described the information given to the court with the important exception that it did not refer to the fact that Mr. Tugendhat had informed the court that the basis of the information put before the court was information made available by the police and that there was more information not known to Mr. Tugendhat. His Lordship referred to the defects in the affidavit, considered the first application by Boinco and Mr. Kay to Judge White to discharge the injunction made and continued:] Finally, Judge White said that, if he were wrong in his assessments of the various matters of non-disclosure, he would hold that this was a case in which the plaintiffs should have a locus poenitentiae, that is to say the injunction should not be set aside because none of the matters was so centrally material as to require the court to penalise the plaintiffs by revoking the injunctions.

Before examinination of Mr. Leaver's submissions in support of the defendants' appeal against Judge White's order I will explain the relationship between that appeal and the plaintiffs' appeal against Alliott J.'s order and, also, the reasons for giving leave to the defendants to appeal out of time. There was before Alliott J. a great deal more material than there had been before Judge White. Alliott J. was dealing with a renewed application to discharge the injunction made on the ex parte application and not with an appeal from Judge White. Alliott J. directed himself that it was only where additional evidence was before him that he would be in a position to look anew at any matter. He said that it would be wrong for him to hold as material non-disclosure the several matters rehearsed by Judge White and held by him not to be material non-disclosure; and that he would concern himself only with fresh material disclosed since the hearing before Judge White. He added that, if he were wrong in that approach, he reached the same conclusion as Judge White for the reasons he gave.

By their respondents' notice to the plaintiffs' appeal the defendants contend that Alliott J. was wrong in refusing to have any regard to the items of non-disclosure which Judge White found to have been established on the evidence but which Judge White held did not justify revocation of the order. In determining the cumulative effect of the non-disclosures by the plaintiffs, i.e. those established on the evidence before Judge White and those established on the evidence before Alliott J., it is said that regard should be had to all. By the cross-appeal the defendants contend that the non-disclosure found by Judge White to have occurred should have been held by him to be both material and such as to justify discharge of the ex parte order.

The defendants had made a decision not to appeal and had allowed the time for appealing to expire. That occurred in this case after express notice given by the defendants to the plaintiffs that the defendants challenged the correctness of the decision and were only not appealing so as to get on as fast as possible with the action and with a view to a further application to discharge the ex parte order after pleadings and discovery. On that further application the defendants succeeded and the plaintiffs have now appealed in order to reinstate the ex parte order. The plaintiffs have not changed their position in any way as a result of the failure by the defendants to appeal in time, and the proceedings as a whole would not be delayed by the grant of leave. If leave were granted it would be open to this court to consider the validity of the defendants' *1356 contentions at both stages of these proceedings and, if the question of continuing the order of Roch J. in the exercise of the discretion of this court, or of making a new order, should arise, that could proceed on the basis of this court's view of the merits of the defendants' contentions on all the issues of non-disclosure. That appeared to be the better course in justice to both sides and accordingly leave was given.

For my part, I consider that Alliott J. was wrong in saying that he would concern himself only with the fresh material on the issue of non-disclosure. I agree that it was not open to Alliott J. to review Judge White's conclusions on the evidence before Judge White as to what the plaintiffs had or had not failed to disclose, or as to whether anything not disclosed was material; but, in so far as Judge White found that in regard to some fact there had been a material non-disclosure but that it did not justify discharging the order, Alliott J. was, in my judgment, bound to take that undisclosed material fact into consideration in deciding whether, cumulatively with any undisclosed material facts found by him, those facts justified discharging the order. In the event that point was not decisive before Alliott J., who discharged the order on the new ground which he found, and it is not, in my view, decisive in this court for reasons which will be clear.

The answer to the question whether the defendants have made out any effective ground of appeal against the decision of Judge White only affects the continuation of the injunction until trial if the plaintiffs' appeal against the order of Alliott J. would otherwise be allowed but the defendants' appeal must be considered in any event because it raises issues with reference to the costs of the hearing before Judge White. I will deal first with the defendants' appeal and before referring to the additional evidence which was before Alliott J.

In my judgment, the conclusion of Judge White, namely, that the ex parte injunction against Boinco and Mr. Kay should not be discharged, was right but I would reach that conclusion by a different route. His findings that the plaintiffs had demonstrated a good cause of action and a good arguable case on the evidence are not attacked on this appeal and, in my respectful opinion, were clearly right.

In considering whether there has been relevant non-disclosure and what consequence the court should attach to any failure to comply with the duty to make full and frank disclosure, the principles relevant to the issues in these appeals appear to me to include the following. (1) The duty of the applicant is to make "a full and fair disclosure of all the material facts:" see Rex v. Kensington Income Tax Commissioners, Ex parte Princess Edmond de Polignac [1917] 1 K.B. 486, 514, per Scrutton L.J.

- (2) The material facts are those which it is material for the judge to know in dealing with the application as made: materiality is to be decided by the court and not by the assessment of the applicant or his legal advisers: see Rex v. Kensington Income Tax Commissioners, per Lord Cozens-Hardy M.R., at p. 504, citing Dalglish v. Jarvie (1850) 2 Mac. & G. 231, 238, and Browne-Wilkinson J. in Thermax Ltd. v. Schott Industrial Glass Ltd. [1981] F.S.R. 289, 295.

- (3) The applicant must make proper inquiries before making the application: see Bank

Mellat v. Nikpour [1985] F.S.R. 87. The duty of disclosure therefore applies not only to material facts known to the applicant but also to any additional facts which he would have known if he had made such inquiries. *1357

- (4) The extent of the inquiries which will be held to be proper, and therefore necessary, must depend on all the circumstances of the case including (a) the nature of the case which the applicant is making when he makes the application; and (b) the order for which application is made and the probable effect of the order on the defendant: see, for example, the examination by Scott J. of the possible effect of an Anton Piller order in Columbia Picture Industries Inc. v. Robinson [1987] Ch 38; and (c) the degree of legitimate urgency and the time available for the making of inquiries: see *per* Slade L.J. in Bank Mellat v. Nikpour [1985] F.S.R. 87, 92–93.

- (5) If material non-disclosure is established the court will be "astute to ensure that a plaintiff who obtains [an ex parte injunction] without full disclosure ... is deprived of any advantage he may have derived by that breach of duty:" see *per* Donaldson L.J. in Bank Mellat v. Nikpour, at p. 91, citing Warrington L.J. in the Kensington Income Tax Commissioners': case [1917] 1 K.B. 486, 509.

- (6) Whether the fact not disclosed is of sufficient materiality to justify or require immediate discharge of the order without examination of the merits depends on the importance of the fact to the issues which were to be decided by the judge on the application. The answer to the question whether the non-disclosure was innocent, in the sense that the fact was not known to the applicant or that its relevance was not perceived, is an important consideration but not decisive by reason of the duty on the applicant to make all proper inquiries and to give careful consideration to the case being presented.

- (7) Finally, it "is not for every omission that the injunction will be automatically discharged. A locus poenitentiae may sometimes be afforded:" *per* Lord Denning M.R. in Bank Mellat v. Nikpour [1985] F.S.R. 87, 90. The court has a discretion, notwithstanding proof of material non-disclosure which justifies or requires the immediate discharge of the ex parte order, nevertheless to continue the order, or to make a new order on terms.

    "when the whole of the facts, including that of the original non-disclosure, are before [the court, it] may well grant ... a second injunction if the original non-disclosure was innocent and if an injunction could properly be granted even had the facts been disclosed:" *per* Glidewell L.J. in Lloyds Bowmaker Ltd. v. Britannia Arrow Holdings Plc., ante, pp. 1343H–1344A.

[His Lordship reviewed the case before Judge White and concluded:] For my part, therefore, on the evidence before Judge White I would have held that the defendants had demonstrated material non-disclosure so that the plaintiffs were, within the principles to which I have referred, in mercy before the court, that is to say liable to have the order set aside on that ground. Nevertheless, I have no doubt whatever that on the facts of this case, if the additional information had been before Roch J., the order would still have been made by him at once and on the same terms. [His Lordship referred to counsel's submissions and explained why, having regard to all the evidence before Alliott J., the injunction granted by Roch J. should be continued notwithstanding the non-disclosure before Roch J., and concluded:] For these reasons, therefore, I would allow the plaintiffs' appeal against the order of Alliott J., and I would dismiss the defendants' appeal against the order of Judge White.

*1358

BALCOMBE L.J.

I have had the advantage of reading the draft judgment of Ralph Gibson L.J. I agree with him, and for the reasons which he gives, that the plaintiffs' appeal against the order of Alliott J. should be allowed and that the defendants' appeal against the order of Judge White should be dismissed. However, as we are differing from the conclusions of Alliott J., I propose to add a few words of my own.

The courts today are frequently asked to grant ex parte injunctions, either because the matter is too urgent to await a hearing on notice, or because the very fact of giving notice may precipitate the action which the application is designed to prevent. On any ex parte application, the fact that

the court is asked to grant relief without the person against whom the relief is sought having the opportunity to be heard makes it imperative that the applicant should make full and frank disclosure of all facts known to him or which should have been known to him had he made all such inquiries as were reasonable and proper in the circumstances.

The rule that an ex parte injunction will be discharged if it was obtained without full disclosure has a two-fold purpose. It will deprive the wrongdoer of an advantage improperly obtained: see <u>Rex v. Kensington Income Tax Commissioners, Ex parte Princess Edmond de Polignac [1917] 1 K.B. 486</u>, 509. But it also serves as a deterrent to ensure that persons who make ex parte applications realise that they have this duty of disclosure and of the consequences (which may include a liability in costs) if they fail in that duty. Nevertheless, this judge-made rule cannot be allowed itself to become an instrument of injustice. It is for this reason that there must be a discretion in the court to continue the injunction, or to grant a fresh injunction in its place, notwithstanding that there may have been non-disclosure when the original ex parte injunction was obtained: see in general <u>Bank Mellat v. Nikpour [1985] F.S.R. 87</u>, 90 and <u>Lloyds Bowmaker Ltd. v. Britannia Arrow Holdings Plc.</u>, ante, p. 1337, a recent decision of this court in which the authorities are fully reviewed. I make two comments on the exercise of this discretion. (1) Whilst, having regard to the purpose of the rule, the discretion is one to be exercised sparingly, I would not wish to define or limit the circumstances in which it may be exercised. (2) I agree with the views of Dillon L.J. in the <u>Lloyds Bowmaker</u> case, at p. 1349C--D, that, if there is jurisdiction to grant a fresh injunction, then there must also be a discretion to refuse, in an appropriate case, to discharge the original injunction. Those being the principles involved, it remains only to apply them to the facts of the present case. [His Lordship considered the facts and concluded that (1) Judge White should have found that, though the plaintiffs did not intentionally withhold information they thought to be material, there was on their part material non-disclosure when they made the ex parte application; (2) the additional information before Alliott J. did not establish any further non-disclosure; and (3):] The arguments in favour of maintaining the injunction are all one way, save only for "punishing" the plaintiffs for their original innocent and, as it now transpires, immaterial, non-disclosure. On the application of the discretion to which I have already referred, I am satisfied that this is a proper case for maintaining the injunction.

SLADE L.J.

These appeals raise a number of different questions arising out of the application of what is sometimes known as the *1359 principle of <u>Rex v. Kensington Income Tax Commissioners, Ex parte Princess Edmond de Polignac [1917] 1 K.B. 486</u>. I have had the advantage of reading in draft the judgments of Ralph Gibson and Balcombe L.JJ. I respectfully agree with them, both in their analyses of the principle and in its application to the facts of the present case. The principle is, I think, a thoroughly healthy one. It serves the important purposes of encouraging persons who are making ex parte applications to the court diligently to observe their duty to make full disclosure of all material facts and to deter them from any failure to observe this duty, whether through deliberate lack of candour or innocent lack of due care.

Nevertheless, the nature of the principle, as I see it, is essentially penal and in its application the practical realities of any case before the court cannot be overlooked. By their very nature, ex parte applications usually necessitate the giving and taking of instructions and the preparation of the requisite drafts in some haste. Particularly, in heavy commercial cases, the borderline between material facts and non-material facts may be a somewhat uncertain one. While in no way discounting the heavy duty of candour and care which falls on persons making ex parte applications, I do not think the application of the principle should be carried to extreme lengths. In one or two other recent cases coming before this court, I have suspected signs of a growing tendency on the part of some litigants against whom ex parte injunctions have been granted, or of their legal advisers, to rush to the <u>Rex v. Kensington Income Tax Commissioners [1917] 1 K.B. 486</u> principle as a tabula in naufragio, alleging material non-disclosure on sometimes rather slender grounds, as representing substantially the only hope of obtaining the discharge of injunctions in cases where there is little hope of doing so on the substantial merits of the case or on the balance of convenience.

Though in the present case I agree that there was some material, albeit innocent, non-disclosure on the application to Roch J., I am quite satisfied that the punishment would be out of all proportion to the offence, and indeed would cause a serious potential injustice if this court were, on account of such non-disclosure, to refuse to continue the injunction granted by Roch J. on 9 December 1986.

As Ralph Gibson L.J. has explained in his judgment, the three principle issues on the two appeals now before the court have, in effect, been (A) whether the plaintiffs failed in their obligation to make full and frank disclosure to Roch J. in such a manner as to require revocation of the order made by him ex parte on 9 December 1986; (B) whether the plaintiffs have shown a good arguable claim to be beneficially entitled to the proceeds of the sale of Cyclops Wharf; and (C) if the plaintiffs fail on (A) but succeed on (B), whether the court can and should in its discretion continue Roch J.'s injunction or grant a new injunction. It has, I think, been common ground, and is to my mind clear that, if the plaintiffs have shown a good arguable case as in (B), the balance of convenience would support the grant or continuation of an interlocutory injunction. [His Lordship reviewed the evidence and concluded, as to issue (B):] I agree that the plaintiffs have established a good arguable case both to be beneficially entitled to the proceeds of sale of Cyclops Wharf and to have a title to such proceeds superior to any which may be possessed by Boinco and Mr. Kay; and, indeed, that they have done so at all stages of these interlocutory proceedings.

*1360

As to issues (A) and (C), for the reasons given in the judgment of Ralph Gibson L.J. and the further reasons given by Balcombe L.J. so far as they too relate to these points, I too have reached the following conclusions.

- (1) On the information put before him orally by counsel, Roch J. was right to make the order which he made ex parte on 9 December 1986.

- (2) Quite apart from any other questions of material non-disclosure (as to which see (7) below) the affidavit subsequently sworn by Mr. McCunn on 10 December 1986 pursuant to the undertaking given to Roch J. was formally defective because (i) it should have included an account of what counsel had said to the judge about the information available to the plaintiffs; (ii) it did not sufficiently state the sources of the deponent's information or of his belief that payments from the proceeds of the robbery were probably the source of the funds used by Selective to make the initial deposit of £135,000 which enabled it to buy Cyclops Wharf; (iii) it did not comply with <u>Practice Direction (Judge in Chambers: Procedure) [1983] 1 W.L.R. 433</u> with reference to stating the facts relied on as justifying the application being made ex parte; and (iv) the course followed by the plaintiffs in relation to the evidence could not be justified by reference to public interest immunity.

- (3) Judge White, on the evidence before him, was right to hold that the plaintiffs had established a good cause of action and a good arguable case against Boinco and Mr. Kay.

- (4) On such evidence, Judge White was also right to hold that the ex parte injunction against Boinco and Mr. Kay should not be discharged, but for the reasons summarised in (9) below, rather than the reasons given by him.

- (5) In so far as Judge White found that in regard to some facts there had been a material non-disclosure but that it did not justify discharging the order, Alliott J. (contrary to his own view) was bound to take those undisclosed material facts into consideration in deciding whether, in conjunction with any undisclosed material facts found by him, those facts justified the discharge of the order.

- (6) The defendants' appeal against Judge White's decision would only affect the continuation of the injunction until trial, if the plaintiffs' appeal against Alliott J.'s order would otherwise be allowed. However, it has to be considered in any event, because it could be relevant in relation to the costs of the hearing before Judge White.

- (7) The plaintiffs, in their evidence in support of the ex parte application, should have informed the court of the various instances of frankness which Mr. Kay had apparently shown in his contacts with loss adjusters about his relationship with Mr. Relton, because this information was material to the question whether Mr. Kay's conduct was consistent with his not having been aware of the alleged tainted nature of the funds used by Selective to acquire its rights to Cyclops Wharf, and, further, was a relevant consideration for the court in deciding whether or not this was an appropriate case in which to grant ex parte relief.

- (8) The failure to disclose these matters, though innocent in the sense that the plaintiffs did not intentionally omit information which they thought to be material, amounted to material non-disclosure within the principles of <u>Rex v. Kensington Income Tax Commissioners, Ex</u>

parte Princess Edmond de Polignac [1917] 1 K.B. 486 and Judge White should have so held. *1361

- (9) Nevertheless, even if this additional information had been put before him, it would not (and should not) have caused Roch J. to decline to grant ex parte relief, in the terms in which he granted it, at once.

- (10) In all the circumstances of this case, notwithstanding this non-disclosure and notwithstanding the defects in the presentation of the information placed before Roch J. and recorded in Mr. McCunn's first affidavit, it would have been right for Judge White, on the evidence before him, in the exercise of his discretion to continue the injunction granted by Roch J.

- (11) As to the new evidence before Alliott J., the plaintiffs are not yet shown to have had knowledge of the contents of the police witness statements at the time when they made their ex parte application to Roch J. Nor are they to be treated as having constructive knowledge of those contents. The additional information placed before Alliott J. thus did not establish any further material non-disclosure.

- (12) Even if the relevant statements had been before Roch J., they would not have presented any obstacle to the finding that there was a good arguable case that the initial deposit paid by Selective represented proceeds of the stolen gold, but would have provided support for that inference, because Mr. Relton was reporting that Selective had obtained the money by borrowing and said nothing to contradict the inference that the borrowing by Selective was based on the assets of Selective which represented the proceeds of the stolen gold or assets derived from deals financed by those proceeds.

- (13) Alliott J. was wrong to accept the submission that the only evidence before him was that the first £135,000 of the deposit was not tainted money.

- (14) Alliott J. erred in holding that the basis on which Judge White had declined to discharge the injunctions had been falsified by the new evidence and in allowing the defendants' application to discharge them on the new grounds of non-disclosure relating to the contents of the police statements.

- (15) Having regard to all the evidence which was before Alliott J., the injunction granted by Roch J. on 9 December 1986 against Boinco and Mr. Kay should continue until judgment in the action or further order in the meantime.

- (16) The plaintiffs' appeal against the order of Alliott J. should be allowed. The defendants' appeal against the order of Judge White should be dismissed.

## Representation

- Solicitors: Shaw & Croft; Roscoe-Phillips.

Plaintiffs' appeal allowed with costs. Defendants' appeal dismissed. No order as to costs.

(c) Incorporated Council of Law Reporting for England & Wales

© 2008 Sweet & Maxwell Ltd



EXHIBIT 2

Status: 🅲 Judicial Consideration or Case History Available

## *1443 Memory Corporation Plc. and Another v Sidhu and Another (No. 2)

Court of Appeal

21 January 2000

### [2000] 1 W.L.R. 1443

Mummery and Robert Walker L.JJ. and Alliott J.

1999 Dec. 15, 16; 2000 Jan. 21

Injunction—Mareva injunction—Non-disclosure—Counsel misrepresenting that freezing order applied for in standard form—Failure to inform court of possibility that evidence in support of application obtained illegally—Whether order to be discharged

The plaintiffs intended to take action against the first defendant, the second plaintiff's acting managing director, who was suspected of abusing his position to benefit the second defendant and another company in both of which he had a secret interest. Before issuing a writ the plaintiffs applied without notice for orders freezing the assets of both defendants and for a search order in respect of premises belonging to the second defendant. The application was made by counsel at 5.15 p.m. on 26 January 1999 without either a skeleton argument or a draft order and the judge was not given advance sight of the affidavit on which the application was based. At the continuation of the hearing at 9 a.m. the following morning the judge was shown draft orders provided by the plaintiff's solicitors. Counsel assured the judge that each of the two draft orders was in standard form. In fact the freezing order was in terms which the Court of Appeal, in a previous reported case, had disapproved on the basis that a provision requiring the defendant to hand allegedly self-incriminating material to a supervising solicitor did not provide effective protection for the defendant. The plaintiffs also placed evidence of bank accounts before the judge without disclosing that the evidence had probably been obtained illegally. It emerged subsequently that five of those bank accounts belonged to the first defendant's brothe On 1 February 1999 another judge continued the freezing order against both defendants in a modified and more conventional form, removing what he described as unusual and oppressive provisions in the original order as to disclosure and delivery of documents. On 21 May 1999 the original judge refused an application by the first defendant to discharge the freezing order, having found that the acts and omissions of the plaintiff's counsel in the without notice application were not deliberate.

On appeal by the first defendant: -

*Held,* dismissing the appeal, (1) that where the advocate's individual duty to the court on a without notice application overlapped with the collective duty to the court of the applicant and his lawyers, the court need not insist on one categorisation of duty applying to the exclusion of another; that in deciding on the consequences of any breach of either duty the court should consider all relevant circumstances, including the gravity and remediability of the breach, any excuse or explanation offered by the applicant or his lawyers and any prejudice to the respondent, bearing in mind the overriding objective and the need for proportionality; that the judge-made rule that a without notice order would be discharged if it was obtained without full disclosure could not be permitted to become an instrument of injustice; and that the relative culpability of the applicant and of his lawyers, though relevant, would seldom if ever be determinative of the consequences of any breach (post, pp. 1455E–G, 1459B).

(2) That evidence obtained by questionable means could be admitted without condoning illegality, although the court would *1444 have to decide how much weight to give such evidence; that on the evidence the judge had been entitled to conclude that the plaintiffs and their lawyers were not aware that the information about the first defendant's bank accounts was incorrect and were not put on inquiry as to how the information was obtained, so that they did not act in breach of their duty of full disclosure in relation to that matter; that, moreover, although the judge erred in approaching counsel's failure to disclose that parts of the freezing order were in non-standard form on the basis that the court had no discretion to apply the sanction of depriving the plaintiffs of the freezing order, his exercise of discretion was not significantly flawed since on the evidence

he would still have concluded that such a sanction was inappropriate; and that in the circumstances, since counsel's error was not deliberate, only affected the form of the order rather than the decision to grant relief and was rectified within three working days, since counsel had tried his best to explain the error and apologised for it, and since to discharge the freezing order might unduly prejudice the plaintiffs in making serious allegations of fraud, there were ample grounds for affirming the judge's conclusion (post, pp. 1458C–1459B).

<u>Kuruma v. The Queen [1955] A.C. 197, P.C.</u> and <u>Den Norske Bank A.S.A. v. Antonatos [1999] Q.B. 271, C.A. considered.</u>

*Per curiam.* It is always prudent where an advocate's conduct of a case is subject to, or likely to be subject to, controversy for the advocate to make a full written account of his recollection as close in time to the events in question as possible. This is particularly desirable where the impugned conduct occurred at a hearing at which the other side were not present and no transcript is available. Within the limits of legal professional privilege the advocate's statement should be made available to the other side (post, pp. 1449H, 1459B).

*Per* Mummery L.J. It is unsatisfactory for an advocate to hand to the court for the first time during the course of an urgent hearing a long and complex draft order which requires close reading and careful scrutiny by the court. If the advocate is unable to produce a draft order for the judge to read before the oral hearing starts then the application should not be made, save in the most exceptional circumstances, until the order has been drafted and lodged (post, p. 1460B–C).

Decision of Hart J. affirmed.

## The following cases are referred to in the judgment of Robert Walker L.J.:

- Bank Mellat v. Nikpour [1985] F.S. 87, C.A.

- Behbehani v. Salem (Note) [1989] 1 W.L. 723; [1989] 2 All E. 143, C.A.

- Brink's Mat Ltd. v. Elcombe [1988] 1 W.L. 1350; [1988] 3 All E. 188, C.A.

- Castelli v. Cook (1849) 7 Hare 89

- <u>Den Norske Bank A.S.A. v. Antonatos [1999] Q.B. 271; [1998] 3 W.L. 711; [1998] 3 All E. 74, C.A.</u>

- Dering v. Earl of Winchelsea (1787) 1 Cox Eq. 318

- Dubai Aluminium Co. Ltd. v. Al Alawi [1999] 1 W.L. 1964; [1999] 1 All E. 703

- Hytec Information Systems Ltd. v. Coventry City Council [1997] 1 W.L. 1666, C.A.

- <u>Kuruma v. The Queen [1955] A.C. 197; [1955] 2 W.L. 223; [1955] 1 All E. 236, P.C.</u>

- Lloyds Bowmaker Ltd. v. Britannia Arrow Holdings Plc. [1988] 1 W.L. 1337; [1988] 3 All E. 178, C.A.

- <u>Marc Rich & Co. Holding v. Krasner (unreported), 18 December 1998, Carnwath J.; (unreported), 15 January 1999; Court of Appeal (Civil Division) Transcript No. 84 of 1999, C.A. *1445</u>

- Practice Direction (Mareva Injunctions and Anton Piller Orders [1994] 1 W.L. 1233; [1994] 4 All E. 52

- Practice Direction (Mareva Injunctions and Anton Piller Orders: Forms [1996] 1 W.L. 1552 [1997] 1 All E. 288

- <u>Rex v. Kensington Income Tax Commissioners, Ex parte de Polignac (Princess) [1917] 1 K.B. 486, C.A.</u>

- Siporex Trade S.A. v. Comdel Commodities Ltd. [1986] 2 Lloyd's Rep. 428

- <u>Tate Access Floors Inc. v. Boswell [1991] Ch. 512; [1991] 2 W.L. 304; [1990] 3 All E. 303</u>

- <u>Tinsley v. Milligan [1994] 1 A.C. 340; [1993] 3 W.L. 126; [1993] 3 All E. 65, H.L.(E.)</u>

**The following additional cases were cited in argument:**

- <u>Sal Oppenheim v. Rotherwood (U.K.) Ltd. (unreported), 19 April 1996; Court of Appeal (Civil Division) Transcript No. 386 of 1996</u>, C.A.

- Worldwide Corporation Ltd. v. Marconi Communications Ltd., The Times, 7 July 1999; Court of Appeal (Civil Division) Transcript No. 1073 of 1999, C.A.

Appeal from Hart J.

On 27 January 1999 Hart J. granted an application made without notice by the plaintiffs, Memory Corporation Plc. and Datrontech Hong Kong Ltd., on 26 January 1999 for *Mareva* (freezing) and *Anton Piller* (search) orders against the first defendant, Sukhbir Singh Siddhu. Both orders were continued, in modified form, by Jacob J. on 1 February 1999. The first defendant's application by notice of motion dated 15 March 1999 seeking, inter alia, the discharge of both orders, was dismissed by Hart J. on 21 May 1999. By notice of appeal dated 18 June 1999 the first defendant appealed with permission of the judge against that decision on the grounds, inter alia, that the judge had erred in holding that a misrepresentation made by counsel for the plaintiffs was not a breach of the duty of full and frank disclosure; alternatively, that if the misrepresentation was a breach of the advocate's duty only, the judge was in error in holding that a breach of that duty in the context of a without notice application should have any lesser consequence than a breach of the duty of full and frank disclosure; further or alternatively, that the judge erred in making a positive finding that the breach of duty was inadvertent, since he had no material from which he could have drawn any such conclusion; and that the judge also erred in concluding that the plaintiffs were not in breach of the duty of disclosure in having not informed the court that evidence of bank accounts which was before the court might have been obtained illegally.

The facts are stated in the judgment of Robert Walker L.J.

## Representation

- Robert Howe for the first defendant.

- Timothy Higginson for the plaintiffs.

- The second defendant did not appear and was not represented.

*Cur. adv. vult.*

Robert Walker L.J.

21 January 2000. The following judgments were handed down.

This is an appeal with the permission of the judge from part of an order of Hart J. made in the Chancery Division on 21 May 1999. The relevant part of the order dismissed an application by the first defendant, M Sukhbir Singh Sidhu, for the immediate discharge, on the ground of material non-disclosure, of a freezing order and a search order made by Hart J. on 27 January 1999, on an application made without notice, and continued, in a modified form, by Jacob J. on 1 February.

The first plaintiff, Memory Corporation Plc. ("Memory"), is a Scottish company and is the holding company of a group engaged in the design, manufacture and sale of computer hardware and software. The second plaintiff, Datrontech Hong Kong Ltd. ("D.H.K."), is a Hong Kong company which has since mid-1998 been a wholly-owned subsidiary of a joint-venture company called Dtech Memory Corporation (Holdings) Ltd., a Scottish company owned as to 51 per cent. by Memory and as to 49 per cent. by Datrontech Plc. D.H.K. is engaged in sourcing, assembling and distributing high-volume semi-conductors for use in personal computers.

M Sidhu was employed by D.H.K. in June 1998 as its acting managing director to run its office in Hong Kong. The office is in Kowloon and has a staff of about eleven. M Sidhu had a written contract requiring him to devote the whole of his time to his duties and not, without the consent of D.H.K.'s board of directors, to have any outside business interests in which he had more than a 10 per cent. holding. The other members of the board are M Mark Doughty, who lives in Scotland and is finance director of Memory, and M David Savage and M William Hipp, who are also directors of Memory, M Savage being the chief executive. The plaintiff's complaints against M

Sidhu are summarized at the beginning of an affidavit sworn by M Doughty on 26 January 1999 in support of the application, without notice, to Hart J.:

> "Without the prior knowledge or consent of the other directors of D.H.K. or Memory, M Sidhu has substantial interests in at least two other businesses, including the intended second defendant, Sunsar Ltd. ('sunsar'), a company registered in England and Wales and carrying on business here. He is also a director and shareholder in a company called Microsimm India P.V.T. Ltd. ('Microsimm India'). Those two companies have been doing substantial business with D.H.K. M Sidhu has been using his position as managing director of D.H.K. with a view to benefiting those two companies unlawfully, thereby causing substantial loss to Memory and D.H.K."

M Sidhu accepts that the affidavit of M Doughty establishes that D.H.K., but not Memory, has a good arguable case for relief.

The plaintiff's application was made on 26 January 1999, before any writ had been issued. The plaintiffs were represented by experienced junior counsel, M Timothy Higginson, instructed by Mishcon de Reya (the same counsel and solicitors as represent Memory and D.H.K. on this appeal). The hearing began at about 5.15 p.m. on 26 January. It was adjourned at about 6 p.m. and continued on the next day at 9 a.m. The evidence before the judge was M Doughty's affidavit (extending to 30 pages with over 200 pages in an exhibit). At the end of the hearing, at about 10 a.m., the judge made two separate orders: a freezing order against each defendant in respect of world-wide assets up to the value of U.S.$1m., and a search order against the defendants in respect of Sunsar's premises at 61A, High Street, Witney, Oxfordshire. In view of the criticisms made of the form of one of these orders, as well as the circumstances in which they were obtained, it is necessary to describe the freezing order in some detail.

**\*1447**

The freezing order is most easily described by reference to its similarities to, and differences from, the standard form set out in *The Supreme Court Practice 1999*, vol. 2, p. 274, paras. 2C–68 and following. The introductory parts and paragraphs 1 and 2 (restriction on disposal of assets by the first and second defendants respectively) were in standard form for a worldwide order, setting a limit of U.S.$1m. in respect of each defendant and listing a number of specific assets of each defendant (including five separate bank accounts at the Maidenhead branch of National Westminster Bank to which it will be necessary to return on a separate issue in this appeal).

Paragraph 3 (disclosure of information, corresponding to paragraph 2 of the standard form) followed the precedent but in a rather expanded form and with the addition at the end (after the reference to possible self-incrimination) of this sentence:

> "In the event that the defendants claim to be entitled to the benefit of such a privilege, they must provide such allegedly privileged information to the supervising solicitor who will hold such information to the order of the court."

The order did (unusually for a freezing order, as opposed to a search order) appoint a supervising solicitor.

Paragraphs 4, 5, 6 and 7 of the order were not in standard form. Paragraph 4 required the defendants to inform the plaintiff's solicitors, and to confirm by affidavit within seven days, (i) what documents they had (anywhere in the world) in their possession, power or control "which relate to or evidence the existence, location or value" of any assets referred to in paragraphs 1 and 2, or disclosed under paragraph 3, and (ii) the location of all such documents. Paragraph 5 imposed on the defendants obligations, expressed in wide terms, for the preservation and delivery, or for giving instructions for delivery, to the plaintiff's solicitors of all those documents. Paragraph 6 ordered M Sidhu to hand over to the plaintiff's solicitors every passport which he held, and not to leave England and Wales until 48 hours after he had properly complied with his obligations under paragraphs 3 and 4, or for nine days after service of the order, if soone Paragraph 7 imposed restrictions on the defendants as regards informing third parties of the order before the return date.

The exceptions to the order were in standard form, M Sidhu being allowed £750 a week for living expenses and each defendant £10,000 for legal advice and representation. The return date was fixed for Monday 1 February 1999 (instead of 3 February as proposed in the draft; this is one of

several time limits which the judge required to be altered).

The remaining notes and the schedule of undertakings given to the court by the plaintiffs (schedule 2) were in conventional form, although not exactly in the published standard form. There were two further schedules of undertakings (schedules 3 and 4, given by the plaintiff's solicitors and the supervising solicitor respectively) which were not in standard form, since they relate to non-standard provisions in the body of the order, but to which no particular objection has been taken.

The plaintiffs issued their writ and effected service in accordance with their undertakings. The search provided for by the search order was carried out at Sunsar's premises at Witney on 27 and 28 January 1999. M Sidhu instructed solicitors and counsel (Morgan Cole of Reading and M Robert Howe) and was represented by them on the return date, when the matter came before Jacob J. On that occasion M Sidhu through his *1448 counsel reserved his position as to whether both orders ought to be completely discharged for material non-disclosure, but argued that in any event certain parts of the freezing order ought not to be continued as being unusual, disproportionate and oppressive. It is understandable that M Sidhu wished to reserve his position on the wider issues since his lawyers had been unable, at that stage, to obtain any attendance note, still less any verbatim transcript, of what had been said to Hart J. on 26 and 27 January. Since then a verbatim transcript of the hearing on 27 January, but not of the hearing on the previous evening, has become available.

On 1 February Jacob J. continued the freezing order against both defendants, but in a modified and more conventional form. Paragraph 1 of his order reproduced the combined effect of paragraphs 1 and 2 of the original order but with an overall limit of U.S.$1m. (rather than two separate limits). Paragraph 2 reproduced paragraph 3 of the original order (disclosure of assets) except for the last sentence, as to delivery of incriminating material to the supervising solicito That last sentence, and the whole of paragraphs 4 and 5 of the original freezing order, were discharged by paragraph 3 of the order of Jacob J. Paragraph 4 directed the plaintiff's solicitors to return M Sidhu's passport within 48 hours after service of an affidavit confirming his assets. There was one simple schedule of undertakings to the court given by the plaintiffs.

Before making his order Jacob J. gave a short judgment explaining his reasons for modifying the freezing orde In connection with the provision about incriminating material he referred to the decision of this court in <u>Den Norske Bank A.S.A. v. Antonatos [1998] 3 W.L. 711; [1998] 3 All E. 74</u>, since reported in the Law Reports <u>[1999] Q.B. 271</u>. It will be necessary to come back to that case in some detail. At this stage it is sufficient to note that Jacob J. said:

"In the end counsel for the plaintiffs felt unable to maintain that sentence in view of that authority which was not shown to Hart J. He himself was not aware of that authority. I think it is unfortunate that his solicitors may have been (they were also solicitors in the <u>Norske Bank</u> case) but that is not a matter for me to deal with today"

He also regarded the provisions of paragraphs 4 and 5, as to disclosure and delivery of documents, as unusual and oppressive:

"It seems to me that here we have an example of an order which, although there may be cases in which parts or even all of it are justified, is not an order which ought normally to be made where a Mareva order is granted. Its extremely oppressive nature is not justified on the material before me. All I have on the material before me is evidence suggesting that this defendant dishonestly operated a company, of which he was managing director, for the plaintiffs by doing transactions with companies in which he had an interest when he should not have done. Necessarily, there is always evidence of dishonesty where there is a successful application for a Mareva order, and if the plaintiffs were right in this case then the additions to the standard they have obtained here would be made in all cases. The additions themselves would become the new standard. I think an extension from the standard form of order of this great extent requires special justification. I am told that Sir Richard Scott V.-C. made such an order in the <u>Norske Bank</u> case, but I do not know the details of what happened before the Vice-Chancello It is also the *1449 case that the order itself was, to some extent, challenged in the Court of Appeal and this aspect of it was not challenged. Whether the order would have been found to be oppressive or not I do not know"

M Sidhu did therefore succeed before Jacob J. in knocking out most of the unusual provisions in the original freezing orde He and his brother M Sohan Sidhu also established, without the need for a court order, that parts of paragraph 1 of the original order were misconceived since the five accounts at the Maidenhead branch of National Westminster Bank listed in paragraph 1(b)(i) to (v) belonged to M Sohan Sidhu, who is a solicitor and has the same initials as the first defendant. Morgan Cole contacted the bank about that on 28 January and M Sohan Sidhu wrote a letter of protest to Mischon de Reya on 1 February. These five accounts were again referred to in the order of Jacob J. but it is common ground that they should have been excluded. The incident is significant for present purposes only as evidence of one of M Sidhu's outstanding complaints, that is the probability that details of the bank accounts were obtained illegally, and that Hart J. was not told of that at the original hearing.

After obtaining more information about the original hearing, and taking further advice, M Sidhu made an application to discharge the two original orders in their entirety on the ground of material non-disclosure. The application also sought other relief, including the striking out of Memory's claim against M Sidhu and security both to fortify the plaintiff's cross-undertakings in damages and to provide for M Sidhu's litigation costs. The application came before Hart J. (by what the judge referred to as an accident of listing). He granted the other relief sought by the application but refused to discharge the original orders.

In his affidavit evidence in support of the application to discharge the orders M Sidhu relied on a variety of grounds. Some of these, which might be called allegations of material non-disclosure of a conventional character, were abandoned before Hart J. or were rejected by him and are not pursued on appeal. In this court M Howe, for M Sidhu, has relied on two matters. The first is that M Higginson misled the judge by telling him that paragraphs 3, 4 and 5 of the draft freezing order were in the form prescribed by the practice direction as to the forms of order in force at the time: see Practice Direction (Mareva Injunctions and Anton Piller Orders: Forms) [1996] 1 W.L. 1552. Those forms were to be used "save to the extent that the judge hearing a particular application considers there is good reason for adopting a different form:" see Practice Direction (Mareva Injunctions and Anton Piller Orders) [1994] 1 W.L. 1233, which was not wholly superseded. The second matter is that the judge was not told of the probability that bank account details had been obtained illegally.

Before any detailed consideration of the authorities, of the judgment of Hart J., and of counsel's submissions on this appeal, it is necessary to set out some more matters of fact. These are derived partly from the affidavit evidence before the judge and partly from what M Higginson has told this court from his own recollection of the matte M Higginson had not prepared any written witness statement recording what happened immediately before and during the without notice hearings on 26 and 27 January 1999. In a matter as contentious as this, it would be better if he had done so. On this point I respectfully agree with the observations of Mummery L.J., whose judgment I have read in draft.

*1450*

It appears from the affidavit of M Doughty that suspicion first fell on M Sidhu in October 1998, when company searches disclosed that M Sidhu was a director and shareholder in Sunsar, which was a customer of, and had substantial liabilities to, D.H.K. In November D.H.K.'s board of directors tried to obtain further evidence by placing an investigator called Johnnie Lew in the Kowloon office, ostensibly to work on the information technology systems and other projects but in fact to obtain information. However, this proved unsuccessful. Early in January 1999 M Savage visited Hong Kong and obtained some relevant documents. But a complete search of the Hong Kong office was possible only when the board of D.H.K. called M Sidhu to a meeting in London on 27 January, and instructed a security firm, Network Security Management Ltd., trading as Network International ("Network"), to search the office in his absence. M Sidhu left Hong Kong on 23 January and the search took place after his departure. The final version of M Doughty's affidavit could not be prepared until after Network had carried out its search and reported to D.H.K.'s solicitors in London.

M Higginson explained that, in those circumstances, he was instructed only at a late stage, the timing of the without notice application was of critical importance, and the plaintiff's advisers were under great pressure. None of those features is uncommon on an application of this sort. That was the extent of the explanation offered (either orally by M Higginson, or in an affidavit sworn by M Anthony Morton-Hooper, a partner in Mishcon de Reya) for the failure of the plaintiff's legal representatives to produce, at the first hearing on the early evening of 26 January 1999, either a

written skeleton argument or drafts of the orders which the judge was being asked to make. The earlier practice direction [1994] 1 W.L. 1233, which was not superseded by the later practice direction [1996] 1 W.L. 1552 except as regards the standard forms, required that the papers to be used on the application should, where practicable, be lodged with the judge at least two hours before the hearing. The requisite papers are not specified, but the need for an affidavit and a draft order are obvious.

In this case the judge was shown the affidavit of M Doughty only when he sat, and he had no skeleton argument and no draft orde The absence of a skeleton argument can probably be overlooked, especially since M Doughty's affidavit is both clear and comprehensive. But the absence of a draft order is astonishing, especially as the plaintiffs were seeking a freezing order in unusual terms and hoped to obtain both orders that day, before M Sidhu met the board of D.H.K. the next morning. If the delay in producing draft orders was caused by last-minute investigations into M Sidhu's bank accounts and other assets (a possibility which was not clearly addressed either in the affidavit evidence or in counsel's account of the matter) it should still have been possible to put the basic form of the proposed order before the judge, with some gaps in the enumeration of particular assets. As it was, the judge had not even a rough draft order to consider overnight, before he sat again at 9 a.m. the next morning.

When the judge sat again he was shown a form of order which was not, as counsel told us, drafted by him. M Morton-Hooper stated in his affidavit that he had adopted the wording of the freezing order made by Sir Richard Scott V.-C. in <u>Den Norske Bank v. Antonatos [1999] Q.B. 271</u> (a case in which M Morton-Hooper's firm had acted for the plaintiffs, although M Morton-Hooper had not been personally involved). He was *1451 not aware that the form of order had been disapproved by the Court of Appeal, apart from what he called a faint recollection, derived from an All England Law Report published in June 1998 (see <u>[1998] 3 All E. 74</u>) of a limitation on cross-examination of a deponent who was subject to freezing and search orders.

M Antonatos was the manager of a Norwegian bank's Greek shipping finance business. There was powerful evidence that he had, through a Liberian company, received at least 10 bribes totalling over $700,000 from four different customers of the bank, causing it losses of over $24m. in bad debts. He was also alleged to have made an unauthorised and illegal profit of over $1m. On 18 February 1998 Sir Richard Scott V.-C. made freezing and search orders against him. The full terms of the freezing order are not set out in the law reports of the subsequent proceedings on appeal but copies produced to this court show that it contained a provision requiring allegedly self-incriminating material to be handed to the supervising solicitor, and (in paragraphs 4, 5 and 6) very wide orders as to disclosure and delivery of documents, and surrender of passports, almost identical to the same numbered paragraphs in this case. The order also contained (and this is a feature not replicated in this case) a paragraph referring to receipts from certain identified customers of the bank, this part of the order being based on a restitutionary claim of a proprietary character.

After service of the orders M Antonatos made an affidavit stating that he had disclosed some material to the supervising solicitor on the ground that he claimed privilege against self-incrimination. He refused to provide any information as to gifts or bribes from customers. A senior officer of the bank made a further affidavit describing further investigations suggesting M Antonatos's dishonest involvement with three other companies in different parts of the world. M Antonatos made a further affidavit stating that he was not using the privilege against self-incrimination in order to keep secret any assets frozen by the injunction.

In those circumstances the bank sought permission to cross-examine M Antonatos on his first affidavit. On 10 March 1998 Steel J. ordered cross-examination and the course which it took has been described in the judgment of Waller L.J. in this court: see <u>[1999] Q.B. 271</u>, 280–282. The appeal was against Steel J.'s initial decision to order cross-examination, and against some rulings which she made in the course of the cross-examination hearing on 12 and 13 March 1998. It was concerned with the scope of the privilege against self-incrimination and with associated procedural issues. It was not directly concerned with the orders originally made by Sir Richard Scott V.-C. But Waller L.J., with whom Millett and Chadwick L.JJ. agreed, expressed the view, at pp. 285 and 295, that the provision for the supervising solicitor to take allegedly incriminating material did not provide effective protection to the defendant. M Higginson has submitted that this view was not necessary to the decision. M Morton-Hooper has in his affidavit questioned the proper interpretation of what he calls "the dicta of the Court of Appeal." The fact remains, however, that what Waller L.J. said, with the concurrence of the other members of the


court, was a considered view which followed from the principle of the decision. It was something which any lawyer seeking a freezing order should not consciously disregard. It is regrettable that the plaintiff's counsel and solicitors have shown themselves disposed to question the relevance of the decision rather than to apologise for having overlooked its significance.

*1452

On 27 January M Higginson returned to court accompanied only by a trainee and a clerk from Mishcon de Reya. M Morton-Hooper and his assistant solicitor did not come to court but were deployed elsewhere for service and execution of the orders which they hoped to obtain. The draft order was, it seems, provided by Mishcon de Reya and it may be that M Higginson did not have long to study it before the judge sat at 9 a.m. The transcript of the proceedings that morning shows that the judge was handed two draft orders either when he sat, or just before, and that after some preliminary matters most of that morning's hearing was taken up with consideration of the draft orders (the judge having by then already considered the evidence and said that he was disposed to grant relief). The search order was considered first. It referred to various classes of documents and the judge seems to have noted an overlap with the freezing order "so far as the wide casting of the net is concerned." Then counsel's submissions moved on to the freezing orde He is reported as having said that this was in the form prescribed by the practice direction. A little later he is reported as having said: "Paragraphs 3 and 4 are again in the form prescribed by the practice direction, and 5." (The transcript actually reads 'proscribed' in each place, but it is agreed that that is an obvious erro) There was some discussion to the effect that the appointment of a supervising solicitor was not a normal part of a freezing order, but that M Gould, the supervising solicitor for the search order, had recommended it.

M Higginson has emphasised to this court that the hearing on 27 January took nearly an hour, and that the greater part of the time was occupied by the judge reading and considering the two draft orders (a fact borne out, counsel said, by the relative brevity of the transcript of an hour's hearing). Nevertheless judges at all levels have to rely on the assistance of the advocates who appear before them, especially in considering relatively long and complex documents put before them at short notice. In this case Hart J. acknowledged that, for the reasons given by Jacob J., he (Hart J.) had been mistaken in including many of the non-standard provisions of the freezing orde He cannot have been overstating the position when he said that M Higginson's representation that the provisions were standard "should be viewed as having contributed to that mistake"

It is appropriate to set out in his own words the judge's perception of the mistake (which he had already described as serious):

> "I should at this point record my firm conclusion, formed as a result of the way in which he conducted himself both on the original application and on the present discharge application, that there was nothing deliberate in M Higginson's acts and omissions. M Howe, on behalf of the first defendant, made much of the fact that I had been left without a full explanation as to how the misrepresentation came to be made to me. The fact was that M Higginson was at a loss to explain how he had come to say the fateful words. I think the explanation probably was that the draft was based on the form of the order recently obtained by his solicitors from the Vice-Chancellor in the <u>Norske Bank</u> litigation, and which was being used as a precedent within the firm. The basic format of that order was in accordance with the standard form, but the exceptional nature of paragraphs 4 and 5 had not been noted, and was regrettably missed by M Higginson when he presented it to the court"

*1453

The compelling duty on a litigant to make full and frank disclosure on a without notice application (and especially on a without notice application for relief which freezes the defendant's assets, invades his privacy and threatens his reputation) is not in dispute. The principle goes back to Castelli v. Cook (1849) 7 Hare 89, 94 and to the well known case of <u>Rex v. Kensington Income Tax Commissioners, Ex parte de Polignac (Princess) [1917] 1 K.B. 486</u>, 509, in which Warrington L.J. said:

> "It is perfectly well settled that a person who makes an ex parte application to the court—that is to say, in the absence of the person who will be affected by that which the court is asked to do—is under an obligation to the court to make the fullest possible

disclosure of all material facts within his knowledge, and if he does not make that fullest possible disclosure, then he cannot obtain any advantage from the proceedings, and he will be deprived of any advantage he may have already obtained by means of the order which has thus wrongly been obtained by him. That is perfectly plain and requires no authority to justify it."

This court has also been referred to a number of more recent cases directly concerned with freezing orders and search orders.

Most of these recent authorities were cited to Hart J. on the application to discharge the injunctions. However the judge accepted the submission that there was a significant distinction between the duty of full and frank disclosure which applies on without notice applications, and what the judge called "the separate duty owed to the court by counsel in relation to matters of law and practice." The judge saw the former duty as a duty in relation to disclosure of material *facts*; as owed by the plaintiff himself (although the plaintiff's lawyers could be expected to play a critical role in its performance); and as arising only because the application was made in the absence of the defendant. The judge saw the relevant duty owed to the court by an advocate as different in all three respects. The judge continued:

"Of course, in the context of an application without notice the existence of both duties provides an important safeguard to the defendant, and a breach of either duty in that context requires to be treated very seriously. It does not, however, follow that, because both duties in that context share the same aim, the same consequences should flow from a breach of eithe The sanction underpinning the duty of disclosure is the threat that if it is not complied with the party who, or whose lawyers, are in breach will be deprived of the fruits of the process… The effective policing of the advocate's duty does not, however, in the same way require (although it may in a particular case justify) the imposition of that particular sanction."

He then recorded (in a passage set out earlier in this judgment) that he was satisfied that M Higginson had not deliberately misled him; and he concluded that the error was not such as to warrant the drastic sanction of the freezing order being discharged and the plaintiffs denied relief.

M Howe, for M Sidhu, has criticised the judge's approach on four grounds. He has submitted that the misrepresentation about the form of the order was not only a breach of the advocate's duty to the court, but was also a failure to disclose material facts; that the judge's distinction (in terms of responsibility and consequences) between the litigant and his lawyers was contrary to authority and to the general policy of the court; *1454 that the breach of an advocate's duty should not have less serious consequences than a breach of the duty of disclosure; and that the judge should not have excused the misrepresentation in the absence of a proper explanation (that is, a fuller explanation than the plaintiff's counsel and solicitors had given) of how it came to be made. In those circumstances there was, M Howe submitted, no basis for the court to exercise its exceptional discretion to continue the freezing orde In describing the discretion as exceptional he relied on various authorities, including what was said by Balcombe L.J. in Brink's Mat Ltd. v. Elcombe [1988] 1 W.L. 1350, 1358 ("the discretion is one to be exercised sparingly") and by Dillon L.J. in Lloyds Bowmaker Ltd. v. Britannia Arrow Holdings Plc. [1988] 1 W.L. 1337, 1347 ("an element of discretion which, despite non-disclosure, might allow an injunction to stand in an exceptional case.")

I see some force in some of these criticisms, if and so far as the judge intended to draw any fundamental distinction between the litigant's duty of full disclosure of material facts, and the advocate's duty to assist the court by reference to (or correct summary of) relevant authorities, statutory provisions and practice directions. In the context of what should be disclosed to the court on a without notice application, the distinction between fact and law is not clear-cut. Many of the authorities already cited refer almost interchangeably to non-disclosure of "material facts" or "relevant matters." Little weight can be attached to these slight variations in language. But some statements of the principle of full disclosure extend to what the court is told about matters of law.

In Bank Mellat v. Nikpour [1985] F.S. 87, 92 Slade L.J. said:

"the applicant should recognise his responsibility to present his case fully and fairly to

the court and that he should support it by evidence showing the principal material facts upon which he relies."

In Siporex Trade S.A. v. Comdel Commodities Ltd. [1986] 2 Lloyd's Rep. 428, 437, Bingham J. said that the plaintiff

"must show the utmost good faith and disclose his case fully and fairly... He must identify the crucial points for and against the application, and not rely on general statements and the mere exhibiting of numerous documents. He must investigate the nature of the cause of action asserted and the facts relied on before applying and identify any likely defences."

In Tate Access Floors Inc. v. Boswell [1991] Ch. 512, 534–535 (a decision of Sir Nicolas Browne-Wilkinson V.-C. not cited to this court, but referred to in some of the cases that were cited) the two matters considered by the Vice-Chancellor as possible breaches of the duty of full disclosure (although not accepted by him) were not as to past facts, but as to the likely future course of litigation overseas, and as to the legal implications in terms of self-incrimination of a search orde In Marc Rich & Co. Holding v. Krasner (unreported), 18 December 1998, Carnwath J. cited the Tate Access case and said:

"Full disclosure must be linked with fair presentation. The judge must be able to have complete confidence in the thoroughness and objectivity of those presenting the case for the applicant. Once that confidence is undermined he is lost."

For these reasons I cannot fully accept the judge's restriction of the duty of full disclosure to matters of fact. Nor can I fully accept his *1455 corresponding distinction between non-disclosure of facts for which the client must bear responsibility (even if the non-disclosure was based on legal advice, as in Behbehani v. Salem (Note) [1989] 1 W.L. 723) and breaches of an advocate's duty which are exclusively or primarily a matter of professional discipline. The well known decision of this court in Hytec Information Systems Ltd. v. Coventry City Council [1997] 1 W.L. 1666 illustrates that an advocate's professional failure may lead to his client suffering the severe sanction of having his defence struck out. It also, in the judgment of Ward L.J., contains a clear statement of the principle which applies, at p. 1675:

"Ordinarily this court should not distinguish between the litigant himself and his advisers. There are good reasons why the court should not: first, if anyone is to suffer for the failure of the solicitor it is better that it be the client than another party to the litigation; secondly, the disgruntled client may in appropriate cases have his remedies in damages or in respect of the wasted costs; thirdly, it seems to me that it would become a charter for the incompetent (as M MacGregor eloquently put it) were this court to allow almost impossible investigations in apportioning blame between solicitor and counsel on the one hand, or between themselves and their client on the othe The basis of the rule is that orders of the court must be observed and the court is entitled to expect that its officers and counsel who appear before it are more observant of that duty even than the litigant himself."

That was said in the context of an unless order but the same principle applies to without notice applications.

The correct view, it seems to me, is that the advocate's individual duty to the court, and the collective duty to the court, on a without notice application, of the plaintiff and his team of legal advisers are duties which often overlap. Where they do overlap it will usually be unnecessary, and unprofitable, to insist on one categorisation to the exclusion of the othe It will however always be necessary for the court, in deciding what should be the consequences of any breach of duty, to take account of all the relevant circumstances, including the gravity of the breach, the excuse or explanation offered, and the severity and duration of the prejudice occasioned to the defendant (which will include the question whether the consequences of the breach are remediable and have been remedied). Above all the court must bear in mind the overriding objective and the need for proportionality. As Balcombe L.J. said in Brink's Mat Ltd. v. Elcombe [1988] 1 W.L. 1350, 1358, this judge-made rule cannot itself be allowed to become an instrument of injustice. The relative degrees of culpability of the client and of his lawyers are not irrelevant

but will seldom if ever be determinative.

The above remarks cover the first three of M Howe's four criticisms of the judge. I see no force in the fourth criticism, that the judge erred in making a positive finding that the breach of duty on counsel's part was not deliberate. As the judge who had heard the original without notice applications as well as the application to discharge the orders, Hart J. was in an uniquely good position to make a finding on that point. As I have already mentioned, I think that M Higginson would have been well advised, as soon as the events of 26 and 27 January 1999 became controversial, to have made a written statement of his recollections and furnished it to M Sidhu's advisers and to the court. But his omission to do so does not mean that he did not offer any explanation. He offered an oral explanation (so far as he could) and an apology both to Hart J. and *1456 to this court. Hart J. decided, in the exercise of his discretion, not to apply the severe sanction of completely discharging the orders. Whether he erred in the exercise of his discretion can best be considered after addressing the other outstanding matter of complaint, which relates to the (incorrect) information about M Sidhu's bank accounts placed before the court, and the means by which that information was obtained.

When the original applications were made to Hart J. he was told nothing about how information as to M Sidhu's bank accounts had been obtained, and the judge did not raise the issue himself. On the later application to discharge the orders there was some evidence about how the information was obtained, but it was extremely tenuous. M Morton-Hooper said in his affidavit that the information had been obtained through Network, the investigators instructed by the plaintiffs, and that he (the deponent) believed, having been so informed by M David Burger, Network's managing director, that no unlawful act was committed in obtaining details of the bank accounts. The most likely form of any illegality would be an offence under section 5 of the Data Protection Act 1984, which had not at the time been wholly replaced by the Data Protection Act 1998.

M Burger made an affidavit stating that the information had been obtained by a subcontractor whom the deponent did not identify. He stated that Network was a highly ethical company and aimed to ensure that its subcontractors knew of its ethics and complied with the law. He deposed (in what may be carefully chosen words):

"I am not aware of the method that was used to obtain the information because it is considered to be a business secret. However, based on the above criteria, I do not believe that there has been a breach of the Data Protection Act 1984."

"The above criteria" appears to refer to what the deponent had said about ethics and compliance.

The judge summarised the evidence on this point and noted that the gathering of evidence by illegal means has not in general led to its exclusion under the English law of evidence. He referred to Kuruma v. The Queen [1955] A.C. 197 (it is not here necessary to note more recent statutory developments in the field of criminal evidence). He said that the plaintiffs were not put on inquiry, since the information might have been obtained without fraud or criminal conduct.

The judge then reached a conclusion on this point as follows:

"It is the fact that the information turned out to be inaccurate which points much more forcibly to the probability that in obtaining it the sub-contractor employed means which constituted an offence under the Data Protection Act 1984. But the applicants were obviously unaware of the inaccuracy of the information. While the consequence may be (I do not decide the point) that documents obtained or produced in the course of the investigation will not enjoy the privilege from discovery which otherwise they might (see Dubai Aluminium Co. Ltd. v. Al Alawi [1999] 1 W.L. 1964), I am not persuaded that the applicant was in breach of its duty of disclosure in not airing with the court the possibility that the information had been illegally obtained. I should add that, in arriving at this conclusion, I am very far from accepting M Burger's evidence that, in the circumstances which now obtain, there is any relevant confidentiality in the name of the sub-contractor or in the method actually used by the sub-contractor to obtain the information in *1457 question. I would also add that it seems to me desirable that the court should in the future be more astute than perhaps it has been in the past to be satisfied that information of this nature, placed before it on a without notice application, is both accurate and lawfully obtained"

It is not entirely clear from this part of his judgment whether the judge regarded the procurement of evidence by illegal means (that is, by conduct amounting to a criminal offence or fraud) to have been established as a probability, or merely a possibility. His use of both words suggests that he may not have seen it as essential for him to make a finding on the point. M Howe's complaint to him (as to this court) was at one remove, that is, of M Higginson's omission to draw the matter, either as a probability or as a possibility, to the attention of the court on the without notice application for a freezing orde M Howe submits that that was a material non-disclosure because the circumstances in which the evidence was obtained were relevant, first, because of the "clean hands" maxim (which is relevant on any application for an equitable remedy) and, secondly, as having some bearing on the reliability of the evidence.

M Howe has criticised the judge's reasoning and conclusions on this part of the case under four heads: (i) that the judge was not entitled to find (as he did, at least implicitly) that the plaintiffs and their legal advisers had no knowledge of the use of illegal methods; (ii) that the judge was wrong to ask himself whether the plaintiffs and their legal advisers were on enquiry as to illegality; (iii) that if that was the right question, the judge answered it wrongly; and (iv) that his overall approach was too lenient.

Before addressing these particular criticisms I would note that the "clean hands" doctrine must not be pressed too fa It requires "an immediate and necessary relation to the equity sued for:" Dering v. Earl of Winchelsea (1787) 1 Cox Eq. 318, 319. Moreover its present status seems a little unclear since Tinsley v. Milligan [1994] 1 A.C. 340: see Lord Goff's observations at pp. 357 and 362, but compare the observations of Lord Browne-Wilkinson, who was in the majority, at p. 375, as to the fusion of law and equity. It should also be noted that, although any doubts as to the quality of the evidence laid before the court on a without notice application ought to be explained to the court, in this case the location and numbers of M Sidhu's bank accounts was a matter of very little concern to the judge, once he had decided to grant a freezing orde It would no doubt have been different if the judge had been told that M Sidhu had enormous sums standing to his credit in the accounts. The identification of the accounts was largely a matter of convenience for the plaintiffs (or would have been, if the information had been correct) in communicating with the various banks in order to carry out the order.

M Howe relied on the decision of Rix J. in Dubai Aluminium Co. Ltd. v. Al Alawi [1999] 1 W.L. 1964 (which was, as Hart J. noted, a case on discovery and the limits of legal professional privilege). In his judgment in the Dubai Aluminium case Rix J. referred to an interim statement by the Bar Council on the Data Protection Act 1984 which is reproduced in Gee on Mareva Injunctions and Anton Piller Relief, 4th ed. (1998), p. 121 (but has not, it seems, been followed by a fuller statement). Rix J. continued, at p. 1969:

> "It seems to me that if investigative agents employed by solicitors for the purpose of litigation were permitted to breach the provisions of such statutes or to indulge in fraud or impersonation without any consequence at all for the conduct of litigation, then the courts would *1458 be going far to sanction such conduct. Of course, there is always the sanction of prosecutions or civil suits, and those must always remain the primary sanction for any breach of the criminal or civil law. But it seems to me that criminal or fraudulent conduct for the purposes of acquiring evidence in or for litigation cannot properly escape the consequence that any documents generated by or reporting on such conduct, and which are relevant to the issues in the case are discoverable and fall outside the legitimate area of legal professional privilege"

That was a case where evidence of breaches of English and Swiss law as to banking confidentiality had not been challenged at all. Rix J. was careful to limit his remarks to legal professional privilege and it is far from obvious that these concerns should be added to the heavy responsibilities already undertaken by lawyers who are making a without notice application, except perhaps in circumstances where the evidence in question is of central importance to the application. Even when the evidence is of central importance (for example, evidence as to the sale of contraband goods in a case of piracy of intellectual property rights) "trap orders" and other conduct involving impersonation or deception have been commonplace in the Chancery Division for a century or more, and do not seem to have attracted censure.

This is not an area in which it would be appropriate to attempt to lay down any general rule. Certainly the court should not condone any illegal conduct. But the court's general attitude to

evidence obtained by questionable means (as shown by Kuruma v. The Queen [1955] A.C. 197) indicates that the court may admit such evidence without condoning illegality, although the court always has to decide what weight to give it.

In this case the judge was on any view entitled to conclude, on all the material before him, that the plaintiffs and their lawyers were not aware that the information about the bank accounts was incorrect and were not therefore put on enquiry as to how it had been obtained. The judge was entitled to conclude that the plaintiffs and their lawyers, by omitting to raise this point on the without notice application, were not in breach of their duty of full disclosure. In those circumstances the question of the judge being over-lenient does not arise on this part of the case.

I must now return to the serious breach of duty which the judge did find established, that is, counsel's incorrect representation that some non-standard parts of the freezing order were in standard form (or to put it negatively—there is no difference in substance—his failure to disclose that parts of the order were non-standard). For the reasons which I have already given, I consider that the judge approached the exercise of his discretion on this point in an unduly restricted way, and did not recognise that even where the breach could be described as a professional failure, it might still be appropriate to apply the sanction of depriving the client of the benefit of the freezing orde

This court will not interfere with the judge's exercise of his discretion, especially on a matter on which the judge was in an uniquely good position to assess its seriousness, unless satisfied that the judge erred in principle. Having studied the judgment I have the strong impression that the judge would have reached the same conclusion even if he had not seen his discretion as being restricted in the manner which I have mentioned. I am doubtful whether his exercise of discretion was significantly flawed. But if it was, I would exercise this court's discretion in just the same way. I would do so principally for the following reasons: (i) the error was not deliberate; (ii) the error affected the form of the order, not the judge's decision whether to grant relief at all; (iii) the error was rectified within three working days; *1459 (iv) counsel explained the error as best he could (even though it is still not fully explained) and he apologised for it; and (v) (though this is probably the point of least significance) the discharge of the freezing order because of a professional error on the part of counsel might unduly prejudice his clients in an important case in which the plaintiffs make serious allegations of fraud.

For those reasons I would dismiss this appeal.

Alliott J.

I have had the opportunity of reading in draft the judgments of Mummery and Robert Walker L.JJ. and I agree with both.

Mummery L.J.

I agree. I have short comments on two points.

## Evidence of counsel

The ground of material non-disclosure relied on to discharge the freezing order is based on serious criticisms of counsel's conduct on a without notice application. It is regrettable that counsel has not at any stage even attempted to supply the other party's advisers or the court with a written statement of his recollection of the hearings that took place before Hart J. late in the afternoon of 26 January and early in the morning of 27 January 1999. In particular he has not supplied a written explanation of how, as is evident from the transcript, he came to misinform the court on 27 January (albeit not deliberately) that certain paragraphs in the draft freezing order were in the standard form, when in fact those paragraphs were clearly not in the standard form and the judge was not given any good reason in argument or in the evidence for departing from the standard form.

In my judgment it is always prudent in cases where an advocate's conduct of a case is subject to, or is likely to be subject to, controversy for the advocate to make a full written account of his recollection as close in time to the events in question as possible. This is particularly desirable where the impugned conduct occurred at a hearing at which the other side were not present and no transcript is available, as was the case with the hearing late in the afternoon of 26 January.

Within the limits allowed by legal professional privilege, if it is not waived by the client, the advocate's statement should be made available to the other side and to the court.

It is unsatisfactory for the advocate to do what counsel has seen fit to do in this case, namely to give oral evidence to Hart J. and to this court many months after the relevant events and as an integral part of his overall submissions in the course of seeking to retain for his client the benefit of the order obtained in the disputed circumstances.

It was only when this court asked to see the papers in the Norske Bank litigation used by Memory's solicitors in connection with the application for the freezing order in this case that they were provided to the court. It was only when Alliott J. indicated in the course of the hearing of this appeal that an apology in this court might be appropriate that counsel offered an apology. I cannot help thinking that if counsel had at an early stage written down his recollection of what had happened in connection with the January 1999 hearings he might have formed a keener appreciation of the seriousness of the criticisms of his conduct and of the appropriate response to those criticisms.

## Duties to the court

It cannot be emphasised too strongly that at an urgent without notice hearing for a freezing order, as well as for a search order or any other *1460 form of interim injunction, there is a high duty to make full, fair and accurate disclosure of material information to the court and to draw the court's attention to significant factual, legal and procedural aspects of the case. It is the particular duty of the advocate to see that the correct legal procedures and forms are used; that a written skeleton argument and a properly drafted order are prepared by him personally and lodged with the court before the oral hearing; and that at the hearing the court's attention is drawn by him to unusual features of the evidence adduced, to the applicable law and to the formalities and procedure to be observed.

There was a lapse of duty in the failure to provide Hart J. with a skeleton argument and a draft order before the oral hearing on 26 January 1999 started. It is unsatisfactory for an advocate to hand to the court for the first time during the course of an urgent hearing a long and complex draft order which requires close reading and careful scrutiny by the court. If the advocate is unable to produce a draft order for the judge to read before the oral hearing starts then the application should not be made, save in the most exceptional circumstances, until the order has been drafted and lodged.

I emphasise the special responsibility of the advocate for the preparation of draft orders for the use of the court. There may be a convenient precedent to hand on the word processor of the instructing solicitors or in their files or in counsel's chambers, but it is the duty of the advocate actually presenting the case on the oral hearing of the application to settle the draft order personally so as to ensure that he is thoroughly familiar with the detail of it and is in the best possible position to respond to the court's concerns and to assist the court on the final form of the order.

Applications of this kind should never be treated by the advocate and those instructing him as involving routine pieces of paper work containing common form orders to be printed out from a computer and rubber stamped by the court. The urgency of the application and the absence of the other side necessarily mean that the court is even more reliant than it normally is on the scrupulous and meticulous assistance of the advocate in deciding whether or not to make extreme orders of this kind in the circumstances of the particular case.

In this case I am sorry to say that Hart J. did not receive from counsel as much careful assistance as he was entitled to expect on the detailed form of the freezing orde That lack of assistance contributed to the judge making an order in a form which I am confident he would not have made if counsel had performed his functions to the high standard required of the profession of an advocate.

## Representation

* Solicitors: Morgan Cole, Reading; Mishcon de Reya.

Appeal dismissed with costs.

(c) Incorporated Council of Law Reporting for England & Wales

© 2008 Sweet & Maxwell Ltd



# EXHIBIT 3



# THE PRACTICE
# AND PROCEDURE
# OF THE
# COMMERCIAL COURT

## FIFTH EDITION

THE HON. MR ANTHONY COLMAN
VICTOR LYON
PHILIPPA HOPKINS

LLP

~~ No. O1/CC94
16 January 2001

Shipping Library

LLP Professional Publishing
(a trading division of Informa Publishing Group)
69–77 Paul Street
London EC2A 4LQ
Great Britain

SOUTH EAST ASIA
LLP Asia Limited
Room 1101, Hollywood Centre
233 Hollywood Road
Hong Kong

© Anthony D. Colman
1983, 1986, 1990, 1995, 2000

First Edition, 1983
Second Edition, 1986
Third Edition, 1990
Fourth Edition, 1995
Fifth Edition, 2000

*British Library Cataloguing in Publication Data*
A catalogue record for this book
is available from the
British Library

ISBN 1–85978–300–7

All rights reserved. No part of this publication may be reproduced, stored in a
retrieval system, or transmitted, in any form or by any means, electronic,
mechanical, photocopying, recording or otherwise, without the prior
written permission of LLP Professional Publishing Ltd.

Whilst every effort has been made to ensure that the information contained
in this book is correct, neither the editors and contributors nor LLP Limited
can accept any responsibility for any errors or omissions or
for any consequences resulting therefrom.

Text set in 10/12pt Times by
Interactive Sciences Ltd, Gloucester
Printed in Great Britain by
MPG Books
Bodmin, Cornwall

PR

The first five year
of the entirely new
has involved wide
old Rules of the S
to the Commercia
number of previou
Court have now b
treated as a comp
mercial Court wh
Court. Although t
many respects in

The fifth edition
solicitor, and to a
detailed account
Commercial Cou
interlock. We have
procedure readily

The Commerci
in commercial lit
working out to wh
Commercial Jud
introducing featu
procedure, which
typical commercia
Court. This has n

It is, however, I
the Commercial C
court. The structu
List, statements o
the entire pre-tria
a trial date, shoul
opportunities for
however, that th
conduct of the ca
loading of costs,
judgment the tota
may have bee

been non-disclosure when the

towards reliance on non-
injunctions on the basis of

1aterial facts and non-material
the heavy duty of candour and
1t think the application of the

vhich completion under the
: late afternoon by payment
1n of a letter releasing to the
:nt of the deposit, wished to
he sale contract for bottom
on the same afternoon, the
ig the sellers from removing
: jurisdiction. Just prior to
: the deposit was on joint
hen proceeded to complete,
he sellers that an injunction
1n the sellers' application on
r plan for obtaining security
e might never have granted
In *Z Ltd.* v. *A–Z*[201] this type
*eva* jurisdiction.
has been illegally obtained,
ing the application.[202]

### Fabricated evidence on *ex parte* application

If the plaintiff has obtained a freezing injunction on the basis of fabricated evidence addressed at the initial application the court will discharge the injunction and direct that the plaintiff should pay all the defendant's costs on an indemnity basis. This would be the appropriate order even if the plaintiff established that he was personally entirely innocent and unaware of the fabrication.[203]

### Wasted costs orders against solicitors

Where a solicitor has knowledge of a material fact but negligently or unreasonably believes it not to be material or where a solicitor negligently fails to make enquiries which would have revealed material facts, a wasted costs order may be made.[204]

### Freezing injunctions to secure claims in arbitration

It was held by Brandon, J., in *The "Rena K"*[205] that the court had power under section 12(6)(*f*) and (*h*) of the Arbitration Act 1950 to grant a *Mareva* injunction for the purpose of protecting a claim arising under an arbitration and to do so in the case of an arbitration not yet commenced, subject to a term providing for the arbitration to be commenced within a specified time, together with other terms as it thought fit. In *Third Chandris Corporation* v. *Unimarine S.A.*,[206] in which the applicants were claimants in arbitrations, this decision was not challenged and the Court of Appeal did not suggest that it was wrong. The power to grant freezing injunctions in respect of pending arbitrations is now contained in section 44(2) of the Arbitration Act 1996. A form of order appropriate in relation to an arbitration is identified at page 167 below.

### Claimant's duty to prosecute substantive proceedings without delay

Once the claimant has been granted a freezing injunction he has a duty to prosecute the substantive claim with all reasonable despatch. If he fails to do so the court may order the injunction to be discharged or not renewed if it has been discharged on other grounds[207]; but the course to be adopted in each case of delay is a matter of discretion.[208] In deciding whether a claimant has failed to prosecute the proceedings with reasonable despatch the court should take into account such explanation for delay as is placed before it. In many cases it might be relevant to take into account whether the delay was still continuing at the date of issue of the summons or whether it was merely historic delay which having already taken place at some earlier stage in the proceedings was no longer continuing. On the

r Glidewell L.J. at pp. 1343–1344,
0 per Balcombe L.J. at p. 1358. In
nd serious non-disclosure the court
:ction not to dispose of his assets.
  The effect would be to enable the
  that application the original *non-*
:ance" (per Woolf L.J., at p. 736).
l Lloyd's Rep. 331.
hould grant a *Mareva* injunction at
: before delivery of the vessel in it
  it is submitted that normally not
s a completed cause of action for
nduct is such that at the time when
vitable and possibly that there is a
ets from the jurisdiction in order to
*lschaft m.b.H. und Co. K.G.* [1983]
e absence of a completed cause of
urther application on the following

J.

203. *Bir* v. *Sharma*, The Times, 7 December 1988.
204. *Lowline PSV Ltd.* v. *Direct Aviation Ltd.* (unrep.) 8 March 1999, Rix, J.
205. [1979] Q.B. 377.
206. [1979] Q.B. 645.
207. *Lloyds Bowmaker Ltd* v. *Britannia Arrow Holdings plc* [1988] 1 W.L.R. 1337. *Town and Country Building Society* v. *Daisystar Ltd.*, The Times, 16 October 1989.
208. *Francesca Black* v. *Mohammad al Merikhi* (unrep.) 20 October 1989 (Mr A.D. Colman Q.C.). See also *A/S D/S Svendborg* v. *Awada* [1999] 2 Lloyd's Rep. 244.

# EXHIBIT 4

# Photographer not guilty of contempt

DEC 1988

**Regina v Runting**

Before Lord Lane, Lord Chief Justice, Mr Justice McCowan and Mr Justice Steyn.

[Judgment December 6]

A freelance Press photographer succeeded in an appeal against conviction at Southwark Crown Court (before Judge Paiba) of contempt of court arising out of his conduct in attempting to take photographs of a defendant who had left court.

Simon Runting, of Market Place, Abridge, Essex, who had been fined £500 and ordered to pay £500 costs, was awarded his costs out of central funds for the hearing on appeal and at the crown court.

Mr Gareth Williams, QC and Mr Edward Southwell for the appellant; Mr Neill Stewart as *amicus curiae*.

The LORD CHIEF JUSTICE, giving the judgment of the court, said that, for reasons which their Lordships did not know, *The Sun* newspaper and other newspapers were interested in taking photographs of Mr Charles Springall and Mr Anthony Bowles who were charged with living on immoral earnings in a trial taking some days.

On March 28 they left court and came down the steps in order to make their ways home. The appellant took some close up photographs of Mr Bowles but Mr Springall put a folded *Guardian* newspaper over his head and face and, with his surety as guide, made his way quickly up Morgans Lane and Tooley Street towards London Bridge station.

The appellant ran after and caught up with the two men. It was not disputed that for the next 90 seconds to two minutes he persistently tried to photograph Mr Springall in spite of his making it clear that he did not wish his photograph to be taken.

A solicitor's clerk joined them. The appellant dodged about, around and between the group and walked backwards holding his camera low in order to penetrate the protection of the newspapers.

The incident ended when Mr Springall, unable to see where he was going, bumped into some scaffolding and, possibly also, a lamp post. He then made a run for it, managing to escape from the appellant who followed for a short distance.

So far as concerned the facts, their Lordships could only say, "Yea" or "Nay" to the success of the appeal on reading the judge's findings of fact.

The law insisted that the defendant, the witnesses and others with duties to perform in any case, civil or criminal, were entitled to go to and from the court, whether on foot or otherwise without being molested or assaulted or threatened with violence.

The reason for that was, first, that there must be nothing to create fear in the minds of such persons so as to make them less likely to come to court to perform their functions.

The second reason was more difficult to put into words. It was that the authority and dignity of the court required that those attending it to take part in a trial should be allowed to do so without let or hindrance and without fear of molestation.

The principle derived from a judgment of Lord Justice Bowen in *In re Johnson* ((1888) 20 QBD 68, 74).

As in all criminal cases, there were two aspects to be considered: the act, and the intent with which it was performed.

So far as the act was concerned there was a dividing line between trivial acts which no one could say were acts amounting to the necessary interference and serious acts which might amount to it. The dividing line was not easy to draw.

Had the judge found that the appellant had snatched the paper away, or that he had struck the "victim" in the groin with the camera, or that he had been physically jostled, or that he had been pushed into a lamp post or scaffolding poll, or was threatened: that he would be followed: day after day all the way home, then quite clearly the necessary foundation for finding both the act and the intent were present.

But those matters, as the judge held, were not found to be proved.

What was conceded was that, given summary proceedings, they were carried out with great propriety. All necessary evidence was called, all necessary representation was present and the matters were properly argued at length.

Consequently, one was left with behaviour which was offensive, rude, uncivilized and wholly reprehensible but which fell short of acts which, on an objective view, were not capable of amounting to interference sufficient to constitute the necessary acts.

Their Lordships did not, in those circumstances, have to deal with the further interesting submissions of Mr Gareth Williams so far as intent was concerned. The judge did not direct his attention to the question of intent.

Where there was conduct which did physically impede or alarm, it might not be difficult to draw the inference of intent.

The appeal was to be allowed on the ground that there was insufficient by way of proof of the necessary acts set out in the judgment, to create a proper foundation for the contempt order which he made.

Solicitors: Daniel B. Taylor, Wapping; Crown Prosecution Service.

# Costs of injunction granted on false evidence

7 DEC 1988

**Bir v Sharma**

Before Mr Justice Vinelott.

[Judgment October 6]

Where a *Mareva* injunction to prevent the dissipation of assets was obtained on the basis of fabricated evidence the costs of the application for the injunction and the subsequent application for its discharge should be paid by the plaintiff forthwith on an indemnity basis even where it could not as yet be established whether or not the plaintiff was personally implicated in the plot to fabricate the evidence.

Mr Justice Vinelott so held in the Chancery Division on an application by Mr Om Parkesh Sharma to discharge the *Mareva* injunction obtained by Mr Dharam Bir on May 5, 1988.

Mr Stephen Rubin for Mr Sharma; Mr Anthony Clover for Mr Bir.

MR JUSTICE VINELOTT said that Mr Bir and Mr Sharma had formerly been partners and the dispute was as to the ownership of partnership assets.

It was now established that the *Mareva* injunction had been granted on the basis of forged evidence, a letter from a Mr Raj Kumar Sharma, the branch manager of the State Bank of India's branch at Delhi airport. That letter indicated that Mr Om Parkesh Sharma, the defendant, intended to "open an account with the purpose of transferring substantial funds from England ..."

It transpired that the defendant had no intention of opening such an account: he was, as claimed, in India at the relevant time and that the signature on the account mandate form opening the account was a forgery.

The defendant had incurred considerable costs in going to India with his legal adviser to find out what had happened

That was the conduct of an innocent man caught up in deception.

The plaintiff argued that Mr Raj Kumar Sharma acted without his knowledge and consent and as he was not personally implicated in the scheme to fabricate evidence he should not be ordered to pay the defendant's costs but that the question of the costs of the *Mareva* injunction should be left until trial.

His Lordship held that the court was in fact misled by fabricated evidence into granting a *Mareva* injunction which, apart from that evidence, would not have been granted. The evidence was clearly fabricated in order to assist the plaintiff in obtaining an injunction to which he was not entitled.

The result was that the defendant had not only suffered the disruption to his business affairs which was the inevitable consequence of the granting of a *Mareva* injunction, but had been put to considerable expense in order to uncover the deception and establish the true facts.

A *Mareva* injunction was an exceptional remedy and if the court was misled into granting an injunction by fabricated evidence, the party who obtained the injunction on reliance on that evidence had to accept responsibility for the costs and damage that ensued, even if he was able ultimately to show that he was not a party to or even aware of the deception which was practised for motives of friendship by someone who wished to help him.

Therefore the only course his Lordship could take in the circumstances was to direct that the plaintiff pay the defendant's costs of the application for the *Mareva* injunction, and the application to discharge it, on an indemnity basis, to be taxed and paid forthwith.

Solicitors: Kenneth Shaw & Co, Mauric; Putsman & Co, Birmingham.

7 DEC 1988

# Applicant to answer new ground

**Regina v Secretary of State for the Home Department, Ex parte Gaima**

Where an affidavit, sworn on behalf of the secretary of state in proceedings for judicial review of his decision to reject an application for political asylum, suggested for the first time that a further basis on which that decision was justified was that her delay in applying for asylum cast doubt on her credibility, and the applicant had had no opportunity of dealing with that suggestion before the decision had been made, the decision should be quashed and the applicant should be afforded such an opportunity before a final decision was made.

The Court of Appeal (Lord Justice May, Lord Justice Croom-Johnson and Lord Justice Gildewell) so held on December 6, allowing an appeal by Marion Gaima from Mr Justice Macpherson who on July 22 had dismissed her application for judicial review of decisions by the Secretary of State for the Home Department, refusing to rescind a deportation order made against her in 1984.

LORD JUSTICE MAY said that in refugee and asylum cases the court should subject administrative decisions to rigorous examination. It was not for the courts to say which factors had weighed most heavily with the decision taker, and the suggestion in the affidavit could not be passed over as being akin to an "obiter dictum".