UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
                                                               :

**SIXTEEN THIRTEEN MARINE S.A.,**          :

                                    **Plaintiff,**     :

                                                                :      **08 Civ. 1318 (HB)**

           **- against -**                                :

                                                                :      <u>**OPINION & ORDER**</u>

**CONGENTRA A.G.,**                                         :

                                              **Defendant.**   :

-------------------------------------------------------------------x

**Hon. HAROLD BAER, JR., District Judge:**

        Defendant Congentra A.G. ("Congentra") moves to vacate this Court's February 20, 2008 Amended Ex Parte Order for Process of Maritime Attachment ("Ex Parte Attachment Order") or, alternatively, to reduce the amount of the attachment. For the reasons given below, the Court denies Congentra's motion to vacate the Ex Parte Attachment Order and reduces the attachment as set forth herein.

## I. BACKGROUND

        On February 19, 2008, Plaintiff Sixteen Thirteen Marine ("STM") submitted an Amended Verified Complaint ("Amended Complaint")[1] against Congentra, seeking an amended *ex parte* order for process of maritime attachment and garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims ("Supplemental Rules") of the Federal Rules of Civil Procedure.

        STM claims that Congentra breached their charter party and tortiously interfered with STM's business relations; the merits of these claims will be decided in a London arbitration applying English law.[2] Generally, STM contends that Congentra unduly delayed the movement of a ship owned by STM while tied up in St. Petersburg, Russia, thereby preventing STM from performing its obligations under a later contract and causing STM to lose the money it would

---

[1] The Amended Verified Complaint was filed on February 21, 2008.

[2] As of March 28, 2008, STM had submitted its point of claim in the London arbitration, and Congentra expected to submit an opposition in early April 2008. Transcript of Oral Argument (Mar. 28, 2008) ("Tr.") 5:23-25; *see* Declaration of John Krzywkowski (Mar. 20, 2008) ("Krzywkowski Decl.") Ex. A (STM's Claim Submission). Congentra suggests a possibility that the arbitrators will apply Russian law, instead of English law, to STM's claims. Def.'s Reply at 8 n. 3.

1

have made on that contract and possibly an even later one.

**A.     Allegations in STM's Amended Complaint**

According to the Amended Complaint, on October 10, 2007, STM, as vessel owner, and Congentra, as charterer, entered into a charter party for the charter of the M/V NICHOLAS M (the "Vessel") for a charter trip to carry soybean meal from Argentina to St. Petersburg, Russia. Am. Compl. ¶ 4.  The Vessel loaded the soybean meal in Argentina, set sail, reached St. Petersburg on or before December 2, 2007, and, according to the Amended Complaint, by that date had begun unloading and discharging the cargo.  *Id.* ¶ 5.  While the cargo was being discharged, STM scheduled the Vessel for her next employment, with non-party Britannia Bulkers.  *Id.* ¶ 16.  The agreement between STM and Britannia Bulkers required STM to deliver the Vessel to Britannia Bulkers by December 31, 2008, or else Britannia Bulkers would have the right to cancel the agreement.  *Id.* ¶ 13.

   *1.     Alleged Delay of the Vessel Caused by Congentra*

On December 2, 2007, the Russian inspectors found a small quantity (150.12 metric tons) of damaged or wetted cargo in the Vessel's cargo hold number 4, and on December 15, 2007, they found a smaller quantity (64.12 metric tons) of damaged or wetted cargo in cargo hold number 2.  *Id.* ¶¶ 5-6.  STM alleges that after this discovery, Congentra, in concert with the cargo receivers and their agents, which are not parties to this action, demanded security from STM in the amount of $2,790,000 and threatened to arrest the vessel.  *Id.* ¶ 7.  On December 24, 2007, the Vessel's insurance company posted security in the amount of $322,271, plus interest and costs.  *Id.* ¶ 8.  STM asserts that tests performed on the cargo determined that none of the damage was caused by seawater, meaning that the damage was all due to pre-shipment conditions for which STM was neither liable nor responsible.  *Id.* ¶ 9.  STM claims that, nevertheless, Congentra, in concert with the cargo receivers and their agents, refused in bad faith to discharge the cargo and to separate the undamaged from the damaged cargo on shore, and so "extensively" delayed the Vessel from completing her discharge.  *Id.* ¶ 10.

On December 29, 2007, STM claims that Congentra, along with the non-party cargo receivers and their agents, tried to further delay the Vessel by demanding ultrasound tests inside the cargo holds.  *Id.* ¶ 11.  STM contends that Congentra had a contractual right pursuant to the charter party to have ultrasound tests performed at the "loadport," *i.e.*, where the cargo was loaded into the ship in Argentina, it opted not to do so there, and so was not entitled to do so at St. Petersburg.  *Id.*  When STM refused to permit Congentra to perform ultrasound tests, STM

2

alleges that Congentra threatened to obtain an order of the English High Court; no order, however, was ever presented to the Vessel. *Id.*

STM alleges in its Amended Complaint that Bureau Veritas, a non-governmental organization that surveys vessels to ensure that safety and technical requirements are met, temporarily withdrew the Vessel's "certificate of class," pending repairs to a hydraulic lifting mechanism for the hatch covers of cargo hold number 6. *Id.* However, in its opposition to Congentra's motion and during oral argument, STM asserted that it had been mistaken: Bureau Veritas, in fact, never withdrew the Vessel's certificate of class, and although the society did physically remove the certificate from the Vessel on December 28, 2008, the Vessel was never "out of class." Pl.'s Br. at 16; Tr. 39: 11-14. STM's Amended Complaint alleges that the hydraulic mechanism for cargo hold number 6 was repaired prior to December 31, 2007. Am. Compl. ¶ 15. However, Congentra argues that the repairs were not made until January 8, 2008. Tr. 10: 14-16.

On December 29, 2007, STM alleges that Congentra "persuaded" the Russian Port State Control officials to go on board and detain the Vessel until about January 2, 2008, causing STM to miss its December 31 deadline to notify Britannia Bulkers that the Vessel was ready to set sail. Am. Compl. ¶ 12. STM pleads that "[t]he Russian Port State Control eventually released the vessel without any serious deficiencies having been found that would warrant detention. No explanation has been provided as to why Defendant [Congentra] waited over three weeks after the first discovery of damaged cargo on board to involve the Russian Port State Control." *Id.* STM claims that, but for the Vessel's delay and detention at port in St. Petersburg, it would have been able to fulfill its obligations to Britannia Bulkers, which canceled its contract with STM because STM missed the December 31 deadline for delivery of the Vessel. *Id.* ¶ 13.

### 2.   *Alleged Damages*

STM's contract with Britannia Bulkers was for a time charter trip to South America, for approximately forty-five days with payment set at $40,000 per day. *Id.* ¶ 16. STM alleges that if the Vessel had performed the Britannia Bulkers charter, she would have earned $1,800,000 for STM (45 days multiplied by $40,000 per day). *Id.* ¶ 17. STM further asserts that it had expected, once it completed the Britannia Bulkers charter to South America, to secure a contract to take cargo from South America to the Far East so as to be in the Far East for the Vessel's scheduled dry-docking and "Class survey" in April 2008. *Id.* ¶ 16. STM asserts that if it had obtained such a subsequent contract to the Far East, the Vessel would have earned an estimated

3

$2,205,000 (52.5 days multiplied by $42,000 per day).[3]  *Id.* ¶ 18.

Once the Britannia Bulkers contract was lost, STM's Vessel stayed in St. Petersburg waters seeking alternative employment but was eventually forced out into the Gulf of Finland. *Id.* ¶ 20.  STM asserts that applicable legal regulations[4] disallowed the Vessel from entering another port in the area to take cargo, and as a result STM was forced to direct the Vessel to depart the Gulf of Finland with no employment.  *Id.* ¶¶ 21-22.  To mitigate its damages, STM fixed the Vessel on a substitute charter for approximately thirty-five days at a hire rate of $35,703 per day, totaling $1,074,605.  *Id.* ¶ 23.  Therefore, STM claims, as a result of Congentra's alleged breach of charter and alleged tortious interference in STM's business relations, and the alleged conspiracy between Congentra and the non-party cargo receivers and their agents, STM suffered total damages of $3,430,395, which is the sum of the amount it would have received under the Britannia Bulkers contract, plus the estimated amount of the anticipated subsequent contract to the Far East, less the amount of the substitute charter that STM obtained to mitigate its damages.  *Id.* ¶ 24.

STM further estimates that the legal expenses and costs of prosecuting its claims in the London arbitration will be $200,000 and anticipates interest in the amount of $510,723.32 (calculated at the rate of 7% per annum compounded quarterly for a period of two years, the estimated time for completion of the proceedings in London).  *Id.* ¶ 31.  The total amount of damages stated in the Amended Complaint, therefore, is $4,141,118.32.  *Id.* ¶ 32.

Finally, the Amended Complaint alleges that Congentra cannot be found within this district within the meaning of Supplemental Rule B but has assets within the district.  *Id.* ¶ 33.

**B.    Procedural History**

On February 20, 2008, based on the Amended Complaint and the affidavit of STM's counsel, Michael Unger, Judge Lawrence M. McKenna, sitting in Part I, issued the amended Ex Parte Attachment Order against Congentra, for the amount of damages stated in the Amended Complaint, *i.e.*, $4,141,118.32.[5]  By March 5, 2008, pursuant to the Ex Parte Attachment Order, Congentra's funds in the amount of approximately $212,170 had been attached via service of

---

[3] STM alleges that it would also have earned a "ballast" bonus of $550,000. Am. Compl. ¶ 18.

[4] The Baltic Ice Campaign Regulations.

[5] STM submitted the Affidavit of Michael Unger ("Unger Affidavit") to me on February 8, 2008 in support of its original Verified Complaint, which was filed on that date. However, the Unger Affidavit was not filed with the Court until February 14, 2008. I issued the original Ex Parte Order for Process of Maritime Attachment on February 11, 2008.

process of maritime attachment and garnishment at various garnishee banks in this district. *See* Def.'s Br. (Mar. 5, 2008) at 1.  As of March 25, 2008, STM had not attached any additional funds pursuant to the Ex Parte Attachment Order.  *See* Def.'s Counterclaim (Mar. 25, 2008) ("Counterclaim") ¶ 8.

On March 5, 2008, Congentra moved to vacate the Ex Parte Attachment Order pursuant to Rule E(4)(f) of Supplemental Rule B or, alternatively, to reduce the amount of the attachment pursuant to Rule E(6) of Supplemental Rule B.  This Court heard oral argument on Congentra's motion on March 28, 2008.

## II.  DISCUSSION

**A.     Congentra's Motion to Vacate the Attachment**

Congentra argues that this Court should vacate the Ex Parte Attachment Order because "the potential for STM to recover against Congentra, under controlling English law, predicated on STM's alleged facts, for its articulated claim, is, to cite Sir Anthony Colman, inherently improbable."  Def.'s Reply at 10.  Congentra calls on this Court to examine the evidence submitted by the parties—more than 800 pages of exhibits and more than sixty pages of declarations, in addition to the legal briefs—and argues that once it has done so this Court will see that "STM's claims are, at best, flagrant distortions of fact and, in any event, constitute claims for which it cannot recover under English law."  Def.'s Br. at 7.  In this respect, Congentra appears to ask the Court to usurp the role of the London arbitrators whose job it is to decide these issues.  I decline the invitation.

### *1.     Legal Standard*

With respect to *in personam* actions based on an admiralty claim, Supplemental Rule B provides, in relevant part:

> If a defendant is not found within the district . . ., a verified complaint may contain a prayer for process to attach the defendant's tangible or intangible personal property—up to the amount sued for—in the hands of garnishees named in the process.  The plaintiff or the plaintiff's attorney must sign and file with the complaint an affidavit stating that, to the affiant's knowledge, or on information and belief, the defendant cannot be found within the district.  The court must review the complaint and affidavit and, if the conditions of this Rule B appear to exist, enter an order so stating and authorizing process of attachment and garnishment.  The clerk may issue supplemental process enforcing the court's order upon application without further order.

Fed. R. Civ. P. Supp. Rule B(1)(a)-(b).

As recently summarized by the Court of Appeals for the Second Circuit:

5

> [T]o begin this process, a plaintiff must file a verified complaint praying for an attachment and an affidavit stating that, to the best of the plaintiff's knowledge, the defendant cannot be found within the judicial district. If the plaintiff's filings comply with these conditions, the court must enter an order authorizing the attachment, which the plaintiff may then serve on any persons in possession of the defendant's property located within the district.

*Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.*, 460 F.3d 434, 438 (2d Cir. 2006) (citing Fed. R. Civ. P. Supp. Rules B(1), B(2), E(3)). The Court of Appeals further explained that "[t]he power to grant attachments in admiralty is an inherent component of the admiralty jurisdiction given to the federal courts under Article III of the Constitution," and its "historical purpose has been two-fold: first, to gain jurisdiction over an absent defendant; and second, to assure satisfaction of a judgment." *Id.* at 437-38.

Once its property has been restrained, the defendant may appear before the district court to contest the attachment pursuant to Supplemental Rule E(4)(f), which provides in relevant part:

> Whenever property is arrested or attached, any person claiming an interest in it shall be entitled to a prompt hearing at which the plaintiff shall be required to show why the arrest or attachment should not be vacated or other relief granted consistent with these rules.

Fed. R. Civ. P. Supp. Rule E(4)(f). At the Rule E(4)(f) hearing, the plaintiff bears the burden to show that an attachment was properly ordered and complied with the requirements of Rules B and E. *Aqua Stoli*, 460 F.3d at 445 n. 5.

Because Rule E(4)(f) itself does not explain under what circumstances the district court should vacate the attachment, the *Aqua Stoli* Court considered "to what extent the district court may require a showing by the plaintiff beyond the simple fact that the textual requirements of Rule B have been met." *Id.* at 438. The Circuit held that

> in addition to having to meet the filing and service requirements of [Supplemental] Rules B and E, an attachment should issue if the plaintiff shows that 1) it has a valid *prima facie* admiralty claim against the defendant; 2) the defendant cannot be found within the district; 3) the defendant's property may be found within the district; and 4) there is no statutory or maritime law bar to the attachment. Conversely, a district court must vacate an attachment if the plaintiff fails to sustain his burden of showing that he has satisfied the requirements of Rules B and E.

*Id.* at 444-45. If a party satisfies that burden and meets the filing and service requirements of Supplemental Rules B and E, the attachment must be upheld, except in limited circumstances not

relevant here.[6] *See id.* at 445.

Of the vacatur grounds set forth in *Aqua Stoli*, Congentra argues only that STM has failed to demonstrate a valid *prima facie* admiralty claim against Congentra. As described above, STM alleges that Congentra breached their charter party and tortiously interfered with STM's business relations by delaying, in bad faith, the departure of the Vessel from the port at St. Petersburg. It is common ground that a charter party is a maritime contract, so STM is asserting an "admiralty claim" against Congentra. *See Norfolk S. Ry. v. James N. Kirby, Pty., Ltd.*, 543 U.S. 14, 25 (2004) (contract is maritime where its "principle objective" is "maritime commerce"); *Folksamerica Reinsurance Co. v. Clean Water of New York, Inc.*, 413 F.3d 307, 312 (2d Cir. 2005) (holding that, in a contract action, courts "should look to the contract's nature and character to see whether it has reference to maritime service or maritime transactions"); *Sonito Shipping Co., Ltd. v. Sun United Maritime Ltd.*, 478 F. Supp. 2d 532, 536 (S.D.N.Y. 2007). However, as Judge Haight queried in *Sonito Shipping*, "but is it a *valid* 'prima facie admiralty claim,' as Rule B requires?" 478 F. Supp. 2d at 536 (emphasis in original).

The Second Circuit has not opined on what a plaintiff must show to make out a *valid prima facie* admiralty claim. *See Transportes Navieros y Terrestes, S.A. de D.V. v. Fairmount Heavy Transp. N.V.*, No. 07 Civ. 3076, 2007 WL 1989309, at *3 (S.D.N.Y. July 6, 2007); *SPL Shipping Ltd. v. Gujarat Cheminex Ltd.*, No. 06 Civ. 15375, 2007 WL 831810, at *3 (S.D.N.Y. Mar. 15, 2007).

However, in *Tide Line, Inc. v. Eastrade Commodities, Inc.*, No. 06 Civ. 1979, 2006 U.S. Dist. Lexis 95870 (S.D.N.Y. Aug. 15, 2006), Chief Judge Wood found that the holding and rationale in *Aqua Stoli* "strongly undermine the standard, stated in a number of cases, that the hearing pursuant to Supplemental Rule E(4)(f) is intended to 'make a preliminary determination whether there were reasonable grounds for issuing the [attachment].'" *Id.* at *14 (citing and quoting *Ullises Shipping Corp. v. FAL Shipping Co.*, 415 F. Supp. 2d 318, 322-23 & n. 37 (S.D.N.Y. 2006) (internal quotation omitted)). Judge Wood thus interpreted "valid prima facie

---

[6] The Second Circuit enumerated those "other limited circumstances" in which vacatur is appropriate:

> We believe that a district court may vacate the attachment if the defendant shows at the Rule E hearing that 1) the defendant is subject to suit in a convenient adjacent jurisdiction; 2) the plaintiff could obtain *in personam jurisdiction* over the defendant in the district where the plaintiff is located; or 3) the plaintiff has already obtained sufficient security for the potential judgment, by attachment or otherwise.

*Aqua Stoli*, 460 F.3d at 445.

admiralty claim" to mean no more than a proper Verified Complaint and concluded that

> to show that it has a *prima facie* claim, a plaintiff seeking a maritime attachment need not provide any supporting evidence; its complaint should suffice. Furthermore *Aqua Stoli* implies that a plaintiff is likewise not required to provide evidence showing that it has a claim against defendant, to carry its burden under Supplemental Rule E(4)(f).

2006 U.S. Dist. LEXIS 95870, at *15-16 (internal footnote omitted).

*See also SPL Shipping*, 2007 WL 831810, at *3 (on vacatur motion, to determine whether plaintiff had made a valid *prima facie* admiralty claim, courts look "only to Plaintiff's pleadings, and not to any evidence submitted by the Parties, to determine whether Plaintiff has made a legally sufficient claim"); *OGI Oceangate Transp. Co. Ltd. v. RP Logistics Pvt. Ltd.*, No. 06 Civ. 9441, 2007 U.S. Dist. LEXIS 46841 (S.D.N.Y. June 26, 2007) (noting that "of the courts in this district to have considered the issue, the majority have interpreted *Aqua Stoli* to require the application of the *prima facie* standard when considering the adequacy of the claim asserted in the context of a maritime attachment"); *Dolco Invs., Ltd. v. Moonriver Dev. Ltd.*, No. 06 Civ. 12876, 2007 WL 1237997, at *4 (S.D.N.Y. Apr. 26, 2007) (same); *Transportes Navieros*, 2007 WL 1989309, at *3 (holding, based on a survey of cases in this district, that "maritime plaintiffs are not required to prove their cases at this stage of a Rule E(4) hearing" and that the plaintiff had shown a valid *prima facie* admiralty claim based on the complaint alone); *Wilhelmsen Premier Marine Fuels AS v. UBS Provedores Pty Ltd.*, 519 F. Supp. 2d 399, 408 (S.D.N.Y. 2007) (to survive a vacatur motion, the complaint need not evidence a "fair probability" that the claim is valid; in applying the *prima facie* standard, which is a pleading requirement and not an evidentiary standard, the court need look only to the complaint to determine whether the plaintiff has alleged a valid admiralty claim).

In *Rice Co. v. Express Sea Transport Corp.*, No. 07 Civ. 7077, 2007 WL 4142774, (S.D.N.Y. Nov. 15, 2007), the defendant moved to vacate a writ of attachment on the basis that the plaintiff had violated the laws of the United States by conducting business with Iran and thus had "unclean hands." *Id.* at *1. The district court held that it could not consider the plaintiff's unclean hands without probing the merits of the underlying claim, which it could not do without undermining the standard that "a proper Verified Complaint is all that is required." *Id.* at *2 (quoting *Transportes Navieros*, 2007 WL 1989309, at *4). Therefore, the court upheld the attachment even though it "enforces a contract that may be illegal," because the court read *Aqua*

*Stoli* to require such a result.[7]  *Id.*

This Court adheres to the *Tide Line* line of cases, which constitute the weight of authority in this district, and thus declines to engage in a "reasonable grounds," or "probable cause," inquiry that would impose on STM "the burden of presenting some evidence showing reasonable grounds for the attachment."  *See Tide Line,* 2006 U.S. Dist. LEXIS 95870, at *17.

### 2. *STM Has Made a Valid Prima Facie Maritime Claim*

Supplemental Rule E, which extends to a maritime attachment, requires that the complaint "shall state the circumstances from which the claim arises with such particularity that the defendant or claimant will be able, without moving for a more definite statement, to commence an investigation of the facts and to frame a responsive pleading."  Fed. R. Civ. P. Supp. Rule E(2)(a).  STM's Amended Complaint does just this, and indeed Congentra has demonstrated its ability to investigate the facts and construct a response by submitting extensive materials and legal arguments in connection with this motion.

Further, "Rule B specifies the sum total of what must be shown for a valid maritime attachment" and held that a "fact-intensive inquiry" was "improper."  *See* 460 F.3d at 447.  Similarly, it appears to this Court that a "fact-intensive inquiry" into the substance of STM's claim would be improper here, in part, too, because this Court ought not to encroach upon the province of the arbitrators in London who will ultimately decide the merits.[8]  *See T & O Shipping, Ltd. v. Lydia Mar Shipping Co.*, 415 F. Supp. 2d 310, 316 (S.D.N.Y. 2006) (declining to interpret the charter party contract because it was a "substantive legal question which will be decided under English law in the arbitration and is not a question that this Court should or will resolve").  This Court need only be satisfied that STM's claims "are not frivolous."  *Sanko*

---

[7] Although it did not vacate the maritime attachment, the court forwarded its opinion to the United States Attorney for the Southern District of New York for such action as he deemed appropriate.  *Id.* at *3.

[8] For the same reason, this Court declines to evaluate Congentra's allegation that Captain Konstantinos Bourdis, Operations Manager for Chian Spirit Maritime Enterprises, the Vessel's manager at the relevant times, lied in his declaration about his conversation on December 28, 2007 with Pavel Priymak, who was responsible for chartering vessels for Congentra.  *See* Def.'s Reply at 2; Tr. 20:12.  Captain Bourdis reported in his declaration that Mr. Priymak threatened him when STM refused to have ultrasound tests performed on the Vessel.  Declaration of Konstantinos Bourdis (Mar. 20, 2008) ¶¶ 8-9.  During the oral argument on Congentra's motion, Priymak testified before this Court that Captain Bourdis lied, and Congentra's counsel played a recording of the telephone conversation.  Tr. 20-26.  Captain Bourdis then testified that the recording was incomplete and ended before Mr. Priymak's threats.  Tr. 58: 9-17.  It is not this Court's role to determine the credibility of these two witnesses, particularly since STM's attorney suggested that telephone records, once obtained, might indicate whether the telephone conversation continued beyond the recording.  This question is for the London arbitrators.

*Steamship Co., Ltd. v. China Nat. Chartering Corp.*, 536 F. Supp. 2d 362, 368 (S.D.N.Y. 2008).

Congentra argues that the attachment should be vacated because STM's claims are "frivolous, and/or manifestly inequitable."[9] Def.'s Br. at 8. Congentra contends that the allegations in the Amended Complaint are lies and asks the Court to evaluate hundreds of pages of exhibits to find that STM has misrepresented the facts. *See, e.g.*, Def.'s Br. at 4. For example, Congentra submits an email dated January 7, 2008 from the Vessel's Master to the Vessel's commercial managers, which states that the Vessel's class certificate was received back on the Vessel on January 6, 2008, as well as emails from the Vessel's Master that indicate that the rectification of a small number of "deficiencies" was still in progress during the first week of January 2008. Declaration of Kevin J. Lennon (Mar. 5, 2008) Ex. 6. Congentra also asks the Court to consider declarations by Edward Eurof Lloyd Lewis, Congentra's English counsel, and by the Honorable Sir Anthony Colman, a former English judge, which seek to persuade this Court into believing that STM will lose at the London arbitration under English law—despite Congentra's suggestion in its reply brief that Russian law might apply instead. *See* Def.'s Reply at 8 n. 3.

While these and other pieces of evidence may support Congentra's defense in the London arbitration, they will not be considered on this motion. I sit in admiralty to test for plausibility, not veracity. It is possible, for instance, that, based on their own evaluation of all of the evidence, the arbitrators will agree with STM that Congentra conspired with the regulators to delay the Vessel's readiness to depart. It is not for the district court to make that determination, nor will it. This Court is not arbitrating the dispute.

STM, in turn, submits a declaration of its own English counsel, John Krzywkowski, who argues that STM will prevail at the London arbitration, and evidence in support of its factual allegations. *See* Krzywkowski Decl. Ex. A (STM's Claim Submission and related exhibits submitted to London arbitrator). For example, STM claims that the "Class Maintained Certificate" issued by the Vessel's classification society shows that the Vessel remained in good

---

[9] Congentra urges this Court to apply the three-part test used by a district court more than ten years before *Aqua Stoli*, in *Rolls Royce Industrial Power v. M.V. FRATZIS M.*, No. 95 Civ. 2630, 1995 WL 846690 (S.D.N.Y. July 24, 1995). In that case, Judge Haight examined, first, whether the plaintiff's claim was so lacking in merit as to be characterized as frivolous; second, whether the plaintiff engaged in improper practices to such a degree, or the circumstances revealed a want of equity so manifest, as to require that the attachment be vacated; and third, whether the amount attached was excessive or reasonably necessary to secure the plaintiff's claims. *Id.* at *3. After examining evidence presented during the hearing, Judge Haight concluded that the claim was not frivolous and there was no manifest inequity, and he kept the attachment in place. *Id.* at *3-5.

standing and "in Class" for the entire time that it was at port in St. Petersburg, that the Vessel could have been validly delivered to Britannia Bulkers at any time, and that Congentra conspired with the classification society to remove the certificates from the Vessel and then used this pretext to encourage the ship's detention.  STM argues that the deficiencies noted by the Russian Port State Control as reasons for the Vessel's detention "were entirely contrived" by Congentra and its affiliated companies.  *See* Krzywkowski Decl. ¶¶ 13-14.  It is noteworthy that, because of some concern as to the correct definition of "frivolous," which appears to be at least elusive, and in an abundance of caution, I held a brief hearing, but the argument only reinforced my conclusions.  In short, these troubling factual allegations, among others, must be adjudged by the arbitrators in London.  There is enough to convince me that STM's claims are not frivolous and that the minimal protections have been afforded the Defendant.  STM has made out a *prima facie* case.

Moreover, if this Court vacated the attachment, but it is finally determined by the London proceedings that STM's claims had merit, "then the attachment should not have been vacated, and in the interim the defendant may have dissipated or hidden its assets, thereby unfairly depriving plaintiff of the security Rule B is intended to confer."  *See Sonito Shipping*, 478 F. Supp. 2d at 542.  Therefore, this Court will not vacate the Ex Parte Attachment Order.

**B.      Congentra's Alternative Motion to Reduce the Amount of the Attachment**

Congentra argues in the alternative that the amount of the attachment should be reduced because STM's damages are either non-existent or grossly exaggerated.  Congentra asks that the security be reduced from $4,141,118.32 "to a nominal amount," or "to an amount commensurate with the Plaintiff's provable damages, if any."  Def.'s Br. at 19-20.

   *1.     Legal Standard*

Supplemental Rule E(6) provides that "[w]henever security is taken the court may, on motion and hearing, for good cause shown, reduce the amount of security given; and if the surety shall be or become insufficient, new or additional sureties may be required on motion and hearing."  Fed. R. Civ. P. Supp. Rule E(6).  In *Donbgu Express Co. Ltd. v. Navios Corp.*, 944 F. Supp. 235, 237 (S.D.N.Y. 1996), the vessel charterer obtained a maritime attachment against the vessel owner in this district as well as in South Korea; the underlying dispute was subject to arbitration in London.  944 F. Supp. at 237.  On the vessel owner's motion for a partial release of the funds attached in New York, Judge Scheindlin found that the vessel charterer was oversecured because a portion of the New York attachment was duplicative of the Korean

11

attachment and thus ordered a partial release pursuant to Supplemental Rule E(6). *Id.*

Similarly, in *Daeshin Shipping Co. Ltd. v. Meridian Bulk Carriers, Ltd.*, No. 05 Civ. 7173, 2005 WL 2446236, at *2 (S.D.N.Y. Oct. 3, 2005), Judge Buchwald reduced the plaintiff's attachment pursuant to Supplemental Rule E(6) where the plaintiff failed to produce evidence to justify the total amount of the attachment. Judge Buchwald ordered the release of the amount that was in excess of the funds for which there was sufficient evidence to justify attachment. 2005 WL 2446236, at *2. *See also Sea Transp. Contractors Ltd. v. Industries Chemiques du Senegal*, 411 F. Supp. 2d 386, 396 (S.D.N.Y. 2006) (finding "good cause" pursuant to Rule E(6) to reduce the amount of a maritime attachment where the complaint did not accurately allege the amount of damages as evidenced by the parties' underlying contract).

### 2. *The Attachment Is Reduced*

Here, the portion of STM's claimed damages that depends on its anticipation of obtaining a charter party from South America to the Far East, once it completed its charter for Britannia Bulkers, is little more than wishful thinking. STM has not, at least on this record, alleged any facts that show that it had or would have secured such a contract, or that the Vessel would have earned an estimated $2,205,000, plus a "ballast" bonus of $550,000, for a total of $2,755,000. As in *Daeshin Shipping*, these bare assertions are not enough. Therefore, STM's attachment must be reduced by $2,755,000 and by the interest associated with this portion of the attachment.

### III. CONCLUSION

For the foregoing reasons, Defendant Congentra's motion to vacate is denied. Congentra's motion to reduce the attachment is granted in part and the attachment is reduced as set forth above, with the parties to submit a second amended Ex Parte Attachment Order that reflects this reduction within ten days from the date hereof.

On March 25, 2008, Congentra filed a Counterclaim alleging that STM breached the charter party and requesting that STM post countersecurity in the amount of $426,208.15, pursuant to Rule E(7)(a) of Supplemental Rule B. STM is hereby ordered to respond to Congentra's motion for countersecurity within fourteen days of the date hereof, and Congentra is ordered to submit a reply brief within ten days thereafter.

**IT IS SO ORDERED.**
**New York, New York**
**July 25, 2008**

_____
U.S.D.J.